EXHIBIT
B

# Case: Tina Moore, et al. v. Brian Kaminski, et al.

4:14-CV1443 SNLJ

# Transcript of: Brian Kaminski

**Date:** September 22, 2015

This transcript is printed on 100% recycled paper



515 Olive Street, Suite 300
St. Louis, MO  63101
(314) 241-6750
1-800-878-6750
Fax: (314) 241-5070
Email: schedule@goreperry.com
Internet: <<<www.goreperry.com>>>

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 1

TINA MOORE, Individually and as Personal

Representative of the ESTATE OF JASON MOORE, DELORES

MOORE, and RENEE RODGERS, as Next Friend for A.D.R.,

a Minor,


PLAINTIFFS,


VS.


BRIAN KAMINSKI, et al.,


DEFENDANTS.


DEPOSITION OF

BRIAN KAMINSKI


SEPTEMBER 22, 2015

Tina Moore, et al. v. Brian Kaminski, et al.
Brian Kaminski                                    September 22, 2015

```
                                                    Page 2
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF MISSOURI

 3                      EASTERN DIVISION

 4

 5   TINA MOORE, Individually and as Personal

 6   Representative of the ESTATE OF JASON MOORE, DELORES

 7   MOORE, and RENEE RODGERS, as Next Friend for A.D.R.,

 8   a Minor,

 9

10              Plaintiffs,

11

12   vs.                         No. 4:14-CV1443 SNLJ

13                               No. 4:14-CV1447 SNLJ

14   BRIAN KAMINSKI, et al.,

15

16              DEFENDANTS.

17

18      Videotaped Deposition of BRIAN KAMINSKI, taken

19   on behalf of the Plaintiffs, at Pitzer Snodgrass,

20   100 South Fourth Street, 4th Floor, St. Louis,

21   Missouri, 63102, on the 22nd day of September, 2015,

22   between the hours of 9:31 a.m. and 1:56 p.m., before

23   Tracey Aurelio, RDR, CRR, MO-CCR #973, IL CSR

24   #084.003465.

25
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

```
                                                        Page 3
  1   APPEARANCES OF COUNSEL:

  2    FOR THE PLAINTIFFS TINA MOORE, INDIVIDUALLY AND AS
      PERSONAL REPRESENTATIVE OF THE ESTATE OF JASON
  3   MOORE:
           Mr. Mark L. Floyd
  4        The Floyd Law Firm, P.C.
           8151 Clayton Road, Suite 202
  5        St. Louis, MO  63117
           (314) 863-4114
  6        mark@thefloydlawfirm.com

  7    FOR THE PLAINTIFFS TINA MOORE, INDIVIDUALLY AND AS
      PERSONAL REPRESENTATIVE OF THE ESTATE OF JASON
  8   MOORE:
           Mr. William T. Dowd
  9        Dowd & Dowd, P.C.
           211 North Broadway, Suite 4050
 10        St. Louis, MO  63102
           (314) 621-2500
 11        bill@dowdlaw.net

 12    FOR THE PLAINTIFFS DELORES MOORE AND RENEE RODGERS,
      AS NEXT FRIEND OF A.D.R., A MINOR:
 13        Mr. Todd M. Johnson
           Baty, Holm-KC
 14        4600 Madison Avenue, Suite 210
           Kansas City, MO  64112-3012
 15        (816) 531-7200
           tjohnson@batyholm.com
 16
       FOR THE DEFENDANTS:
 17        Mr. Robert T. Plunkert
           Ms. Ida S. Shafaie
 18        Pitzer Snodgrass, P.C.
           100 South Fourth Street, Suite 400
 19        St. Louis, MO  63102
           (314) 421-5545
 20        Plunkert@pspclaw.com
           shafaie@pspclaw.com
 21
       THE VIDEOGRAPHER:
 22        Mr. Tim Perry, CLVS
           GorePerry Reporting & Video
 23        515 Olive Street, Suite 300
           St. Louis, MO  63101
 24        (314) 241-6750

 25
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 4

1                    INDEX OF EXAMINATION

2    QUESTIONS BY MR. FLOYD ...................6

3    QUESTIONS BY MR. JOHNSON ...............144

4    QUESTIONS BY MR. FLOYD .................192

5    QUESTIONS BY MR. PLUNKERT ..............195

6    QUESTIONS BY MR. FLOYD .................196

7

8                     INDEX OF EXHIBITS

9    Exhibit 12, .............................31

10   Exhibit 13, .............................66

11   Exhibit 14, .............................93

12   Exhibit 15, .............................93

13   Exhibit 16, .............................93

14   Exhibit 17, .............................98

15   Exhibit 18, ............................134

16   Exhibit 19, ............................139

17   Exhibit 20, ............................143

18   Exhibit 21, ............................141

19   Exhibit 22, ............................180

20

21           (Exhibits were retained by Mr. Dowd.)

22

23

24

25

**Gore Perry Reporting and Video**

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 5

 1          THE VIDEOGRAPHER:  We're on the record at

 2   9:31.  Today is September 22, 2015, and we are at

 3   the law offices of Pitzer Snodgrass at 100 South

 4   Fourth Street in St. Louis, Missouri.

 5               This is the deposition of Brian

 6   Kaminski being taken in the cause of Tina Moore,

 7   et al., versus Brian Kaminski, et al., pending in

 8   the United States District Court, for the Eastern

 9   District of Missouri, Eastern Division.

10               My name is Tim Perry, certified legal

11   video specialist, here with Tracey Aurelio our

12   certified court reporter.  We're with Gore Perry

13   Reporting and Video at 515 Olive Street in

14   St. Louis, Missouri.

15               And, Counsel, I would ask you now to

16   please identify yourselves for the record.

17          MR. FLOYD:  Mark Floyd representing the

18   Plaintiff, Tina Moore.

19          MR. JOHNSON:  Todd Johnson representing the

20   Plaintiff, Delores Moore, and Renee Rodgers.

21          MR. PLUNKERT:  Bob Plunkert representing the

22   defendants.

23          MS. SHAFAIE:  Ida Shafaie representing the

24   defendants.

25          THE VIDEOGRAPHER:  Thank you, all.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                      September 22, 2015

```
 1              Tracey, please swear in the witness.
 2                   (Witness sworn.)
 3         MR. PLUNKERT:  I just now remembered this.
 4   So before we start, the officer has been out on call
 5   all night.  He's been on duty.  So he's coming off
 6   of working on the night.  And whenever we want to
 7   readdress it, if he gets tired I just kind of want
 8   to raise that now.  It may become an issue.  It may
 9   not be, but it's something that I want to express on
10   your behalf.
11         THE WITNESS:  I appreciate it.
12                   BRIAN KAMINSKI,
13   of lawful age, having been first duly sworn to
14   testify the truth, the whole truth, and
15   nothing but the truth in the case aforesaid,
16   deposes and says in reply to oral
17   interrogatories, propounded as follows, to-wit:
18                   [EXAMINATION]
19   QUESTIONS BY MR. FLOYD:
20     Q   Good morning, Officer.
21     A   Good morning.
22     Q   My name is Mark Floyd.  I'm representing
23   Jason Moore's widow, Tina.  And we've asked you here
24   today to take your deposition to ask you some
25   questions regarding the events that took place on
```

Case: 4:14-cv-01443-SNLJ  Doc. #: 64-1  Filed: 04/29/16  Page: 8 of 234 PageID #: 601

Page 7

1    September 17, 2011.

2              Before we get started, I wanted to

3    cover a couple of preliminary issues.  Have you

4    given a deposition before?

5        **A**   No, I have not.

6        **Q**   You understand that you're under oath today?

7        **A**   Yes, sir.

8        **Q**   And if you have any questions or if you

9    don't understand any of my questions, will you let

10   me know so that I can rephrase them in such a way

11   that you do understand them?

12       **A**   Yes, sir.

13       **Q**   And if you answer my questions, I'll assume

14   you understood them.  Fair enough?  And while we're

15   going through the deposition, if you can answer my

16   questions verbally.  I know that we have a video

17   here today, but just so there's no question about

18   whether it was an "huh-uh" or an "uh-huh" or a

19   gesture, we try to get everybody to answer the

20   questions verbally so that the answers are clear on

21   the record.

22       **A**   Okay.

23       **Q**   Can you do that?

24       **A**   Yes, sir.

25       **Q**   If you need to take a break at any time, you

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                September 22, 2015

Page 8

 1   can do that as well.  Okay?

 2       **A**   Okay.

 3       **Q**   Can you state -- can you state your name for

 4   the record.

 5       **A**   Brian Kaminski.

 6       **Q**   And how old of a gentleman are you?

 7       **A**   I'll be 37 next month.

 8       **Q**   And can you tell me a little bit about your

 9   education starting with high school?

10       **A**   Graduated Hazelwood Central with a diploma.

11   After that I went to the police academy at the

12   Eastern Missouri Police Academy.

13       **Q**   Is that in St. Charles?

14       **A**   Yes, sir.

15       **Q**   What year did you graduate from the police

16   academy?

17       **A**   I graduated the police academy in 2003.

18       **Q**   In addition to the police academy training,

19   have you completed any other training, whether it be

20   something that you do within the police force or

21   continuing education that you do from -- through

22   third parties?

23       **A**   We do continuing education, 48 hours minimum

24   every three years.  I am usually in the 48 to 60

25   hours for the three years.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 9

1      **Q**   Has any of that continued training been on
2   the subject matter of crisis intervention?
3      **A**   Yes, sir.
4      **Q**   Can you tell me what you understand crisis
5   intervention training to be?
6      **A**   It's to be able to identify mentally ill or
7   subjects that have some kind of learning disability.
8      **Q**   Is it to prepare and educate a police
9   officer in handling and dealing with situations
10   involving people with mental illness?
11      **A**   Sounds like a good quote, yes.
12      **Q**   Does it also train and educate police
13   officers on how to deal with people that are in
14   emotional distress?
15      **A**   Yes, sir.
16      **Q**   Have you had any of that training?
17      **A**   Yes, sir.
18      **Q**   Looking through some of the documents, I saw
19   that at one point you had taken a course that was 44
20   hours of crisis intervention training.  Do you
21   remember that?
22      **A**   Yes, sir.
23      **Q**   Have you had additional crisis
24   interventional training in addition to the 44-hour
25   course?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 10

```
 1      A    No, sir.  I was scheduled to go last year.
 2  And I was injured on the job, and I had to cancel
 3  that education.
 4      Q    Prior to September 17, 2011, had you had any
 5  crisis intervention training?
 6      A    No, sir.
 7      Q    When you were with the police academy, did
 8  you have any crisis intervention training?
 9      A    No.  There was no training at that time.
10      Q    Did you have any training through any of
11  your employers on the job in dealing with
12  emotionally disturbed or mentally ill subjects?
13      A    Not until I took a class with Ferguson in
14  late 2011.
15      Q    When did you take the course with Ferguson
16  in 2011?
17      A    I can't remember the exact dates.
18      Q    It was after the incident with Mr. Moore?
19      A    Correct.
20      Q    How many years had you been a police officer
21  before you had crisis intervention training?
22      A    Nine.
23      Q    Had you had -- have you had any training
24  regarding the use of a Taser weapon?
25      A    Yes, sir.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 11

```
 1    Q    When was the first year in your career as a
 2   police officer that you were equipped with a Taser
 3   weapon?
 4    A    2004.
 5    Q    Before being equipped with a Taser weapon,
 6   were you trained to properly use the Taser weapon?
 7    A    Can you repeat that?
 8    Q    Did you have any training with the Taser
 9   weapon before you were equipped with it?
10    A    We were trained through Cool Valley before
11   we were able to carry it.
12    Q    Tell me about that training with Cool
13   Valley.
14    A    Detective Chris Cassiday went to the
15   instructor certification class to become an
16   instructor for Taser.  Once he completed his class,
17   he trained the whole department.
18    Q    What was the -- what were the circumstances
19   of the training?  Was it in a classroom setting or
20   was it --
21    A    It was at the police station.
22    Q    How long was the training?
23    A    Eight hours.
24    Q    Was he a certified Taser instructor?
25    A    Yes, sir.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                September 22, 2015

Page 12

1     **Q**   And you had that training with Cool Valley?

2     **A**   Yes, sir.

3     **Q**   Was that before or in 2004?

4     **A**   It was in 2004.

5     **Q**    In addition to the training at Cool Valley

6     in 2004 on the use of Taser weapons, have you had

7     any additional training?

8      **A**   You have to be recertified once a year.  So

9     from 2004 up until 2010, I had the one-year

10    evaluation -- or recertification class.

11     **Q**   So you would have had, between 2004 and

12    2011, you would have had six to seven additional --

13    **A**   Correct.

14    **Q**   -- Taser classes?

15    **A**   Correct.

16    **Q**   From year to year, is it essentially the

17    same information that's -- that you're taught?

18    **A**   Most of the time, yes, it is.

19    **Q**   From let's say, for example, from the 2010

20    training to the 2011 training, did you learn

21    anything new?

22    **A**   Well, at 2010 I was given the chance to take

23    the course of being a certified instructor myself.

24    So there was a lot more training in that aspect than

25    the training just to be a user.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

```
                                                   Page 13
 1      Q    So in 2010, you took sufficient Taser
 2  training to become a certified Taser instructor?
 3      A    Correct.
 4      Q    And did you complete that course?
 5      A    Yes, sir.
 6      Q    And then when you took another certification
 7  course in 2011, did you learn anything new in the
 8  2011 course, or had you already learned it all in
 9  the 2010 course?
10      A    The 2011 course they put in a couple other
11  things on where to try and use the probes, you know,
12  in the front lower mass, keep it away from the
13  chest.  They -- that was always in the course, but
14  they were recommending more towards not hitting in
15  the upper chest area.
16      Q    But you already knew that before 2011?
17      A    Correct.
18      Q    Do you know what agitated delirium is?
19      A    I've been trying to read up a little bit
20  more about it, yes.
21      Q    Do you know what excited delirium is?
22      A    I'm again trying to learn more about it.
23      Q    Have you ever heard the terms "compressing
24  time and space"?
25      A    No, sir.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                      September 22, 2015

Page 14

```
 1      Q   While you were with Cool Valley or while you
 2   were with Ferguson Police Department, has there ever
 3   been a protocol where EMS is called to the scene of
 4   an incident or dispatched at the same time or
 5   shortly after police officers are dispatched?
 6      A   Yes.
 7      Q   What kind of circumstances call for that?
 8          MR. PLUNKERT:  Calls for speculation.  You
 9   may answer.
10      A   Any time that we have any kind of injury, be
11   it police officer, be it the person we are subduing
12   or anything like that.
13      Q   (By Mr. Floyd) Do you ever have EMS called
14   to the scene if you have a serious medical condition
15   of a mentally ill or disturbed person?
16      A   Yes, sir.
17      Q   Have you ever seen EMS administer sedation
18   to any of the subjects?
19      A   I have personally not, no.
20      Q   Have you heard of that happening?
21      A   I have heard of that happening, yes.
22      Q   You understand that in many cases it's
23   appropriate protocol to administer sedation to an
24   emotionally or mentally ill person that's agitated?
25          MR. PLUNKERT:  Object to foundation.  You
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                              Page 15
 1    may answer.
 2       A    That's not my call.  I don't know with EMS
 3    what their policies are.
 4       Q    (By Mr. Floyd) When you took your Taser
 5    training -- looking through the materials, I did see
 6    some indication there of discussing the use of
 7    Tasers with emotionally distressed individuals.  Do
 8    you remember that portion of the training?
 9       A    Not right off the top of my head, I do not.
10       Q    Would you agree that Tasers are a great tool
11    for a police officer?
12       A    I do agree with it, yes.
13       Q    Would you also agree that if a police
14    officer doesn't understand all the risks and dangers
15    associated with the use of a Taser that it can be a
16    dangerous tool?
17       A    It could be a --
18            MR. PLUNKERT:  Calls for speculation.  I'm
19    sorry.  Go ahead.
20       A    It could be a dangerous tool, yes.
21       Q    (By Mr. Floyd) And that Tasers aren't
22    appropriate in every situation with every subject,
23    are they?
24       A    It's all, you know, depending on the
25    situation, but, yeah, I would agree with that.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

```
                                                   Page 16
   1      Q    Would you agree that Tasers can be lethal?
   2           MR. PLUNKERT:  I object.  Lack of
   3      foundation.  You can answer.
   4      A    I agree that they could be lethal, yes.
   5      Q    (By Mr. Floyd) That's what your training
   6      teaches you, correct?
   7      A    Uh-huh.
   8      Q    Is that a yes?
   9      A    Yes, sir.  Sorry.
  10      Q    I want to go back to your employment a
  11      little bit.  After you graduated from the academy
  12      in, was it 2003 or 2004?
  13      A    2003.
  14      Q    Where did you first obtain employment in the
  15      field as a police officer?
  16      A    The City of Cool Valley.
  17      Q    When did you obtain that employment?
  18      A    I became a reserve officer with them in June
  19      of 2003.
  20      Q    How long did you work with them?
  21      A    I left Cool Valley in 2010.
  22      Q    Did your position with Cool Valley change
  23      from 2003 to 2010?
  24      A    Yes, sir.
  25      Q    Can you explain to me how it changed?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                      September 22, 2015

Page 17

1       **A**   I was originally a reserve officer, which is
2   just a secondary officer that goes in on his own
3   time to learn the field.
4                   About six to eight months after that,
5   I became a part-time officer with the city.  Then I
6   became a full-time officer about six months after
7   that.
8       **Q**   Would it have been around 2004 or '05 that
9   you were a full-time officer then?
10      **A**   Late 2004, yeah.
11      **Q**   Did you have any promotions or change in
12  rank from 2004 to 2010?
13      **A**   No, sir.
14      **Q**   What were your job duties with Cool Valley?
15      **A**   Job duties were patrolling the city, traffic
16  enforcement, report writing, booking officer, court
17  bailiff.
18      **Q**   Was there any type of an oath or creed that
19  you subscribed to after you graduated from the
20  academy or when you took employment with Cool Valley
21  as far as your responsibilities as a police officer
22  to the community?
23      **A**   I don't understand.
24      **Q**   Was there any type of an oath or a creed or,
25  you know, someone might call it in a business like a

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 18

 1    mission statement, you know, to serve the people, to

 2    protect?

 3        **A**    To serve and protect.

 4        **Q**    During your years with Cool Valley, were you

 5    called out to circumstances where there were

 6    domestic disputes?

 7        **A**    Yes, sir.

 8        **Q**    How often did you deal with domestic

 9    disputes?

10        **A**    Probably three, five times a week.

11        **Q**    And in some of these situations, did you

12    deal with people who were under the influence or who

13    were intoxicated in some form?

14        **A**    Yes, sir.

15        **Q**    Did you deal with people who were

16    experiencing delirium or a mental illness?

17        **A**    Yes, sir.

18        **Q**    That was something that you encountered on a

19    fairly frequent basis?

20        **A**    I would say with the mental or -- I would

21    say probably once a week.

22        **Q**    So you had some experience in dealing with

23    emotionally disturbed or mentally ill people through

24    on-the-job experience with Cool Valley?

25        **A**    Correct.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                            September 22, 2015

```
                                                    Page 19

  1        Q    Were there other officers at Cool Valley who
  2   had crisis intervention training that you worked
  3   with?
  4        A    Not while I was employed there, no.
  5        Q    Did you ever use your Taser on a subject
  6   while you were employed with Cool Valley?
  7        A    Yes, sir.
  8        Q    Do you know approximately how many times?
  9        A    Twice.
 10        Q    What were the situations in which you used
 11   the Taser in Cool Valley?
 12        A    The first time was a vehicle pursuit where
 13   the subject wrecked his vehicle and started running
 14   on foot.  I was in close proximity when I noticed he
 15   was trying to pull something out of his waistband,
 16   and I deployed the Taser at that point.
 17        Q    Did the subject have a weapon on him?
 18        A    Yes, sir.
 19        Q    What weapon did he have?
 20        A    It was a sawed-off .22 shotgun.
 21        Q    Was there any other instances where you used
 22   a Taser?
 23        A    Again, it was a vehicle pursuit where the
 24   subject wrecked his vehicle to the point where he
 25   was having problems getting out of the vehicle.  We
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                      September 22, 2015

```
                                                Page 20
 1   assisted getting him out of the vehicle.  And as
 2   soon as he was out of the vehicle, he started to
 3   kick and swing punches at us.  And I used a Taser to
 4   subdue him also.
 5       Q    Do you know how many loads you discharged on
 6   the first subject?
 7       A    One.
 8       Q    On the second subject?
 9       A    One.
10       Q    Have you ever responded to a call where the
11   subject was naked when you arrived at the scene?
12       A    Not until this, this incident.
13       Q    Have you ever heard of a fellow officer
14   responding to the scene where a subject was naked?
15       A    Yes, sir.
16       Q    While you were with Cool Valley?
17       A    Yes, sir.
18       Q    And subsequent to Cool Valley, did you ever
19   hear of it happening while you were with Ferguson?
20       A    No.
21       Q    But it did happen at Cool Valley?
22       A    Yes, sir.
23       Q    And how long were you with Ferguson before
24   the Moore incident occurred?
25       A    Approximately a year and a half.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                               Page  21

  1      Q    As an officer with Cool Valley, did you

  2   carry pepper mace or some type of mace or spray?

  3      A    I do not.  I have a severe reaction to it.

  4      Q    Is your reaction to it worse than an average

  5   person's?

  6      A    Yes, sir.

  7           MR. PLUNKERT:  Objection to lack of

  8   foundation.  Go ahead.

  9      A    Yes, sir.

 10      Q    (By Mr. Floyd) At any time as an officer

 11   have you ever carried any mace?

 12      A    I carried it my first six to eight months.

 13      Q    When did you -- what is the information

 14   about your reaction to it that you were explaining

 15   to me?  When did you discover that?

 16      A    We were in a large fight at one of the bars

 17   in the City of Cool Valley.  One of the other

 18   officers deployed mace during that.  And without

 19   even being a direct shot to me, my eyes swelled up

 20   to the point where I could not see.

 21      Q    Is that what the purpose of mace is, to

 22   swell someone's eyes up and to swell up their mucous

 23   membranes?

 24           MR. PLUNKERT:  Object.  Calls for

 25   speculation.  You can answer.
```

Page  22

1      **A**    I'm not exactly sure what the actual cause

2    to have mace is.  I know it burns and it does cause

3    a lot of mucous problems, but I've never really seen

4    anybody swell up the way I do.

5      **Q**    (By Mr. Floyd) Were you -- were you given

6    the option to carry pepper mace with the City of

7    Ferguson?

8      **A**    Yes, sir.

9      **Q**    And you decided not to carry it?

10     **A**    I do not carry it.

11     **Q**    Have you been examined by a doctor to

12   determine whether you're at any health risk if you

13   would have secondary exposure to pepper mace?

14          MR. PLUNKERT:  Objection.  This invades his

15   privacy.  This isn't an issue in the case, and

16   there's been no waiver.

17          MR. FLOYD:  Are you instructing him not to

18   answer the question?

19          MR. PLUNKERT:  Well, I mean, are you asking

20   about his medical history?

21          MR. FLOYD:  I'm asking about exploring the

22   basis why he doesn't carry pepper mace.

23          MR. PLUNKERT:  When we've been objecting on

24   to producing materials, it's been on the basis of

25   privacy.  So when it comes to medical records, the

Brian Kaminski                                    September 22, 2015

 1   agreement that we had on the previous discovery has

 2   been we're not --

 3         MR. FLOYD:  I haven't asked for medical

 4   records.  I'm still asking him questions about what

 5   he knows and what he's done.

 6         MR. PLUNKERT:  The physician-patient

 7   conversation, that's --

 8         MR. DOWD:  A physician can't disclose it,

 9   but he can disclose it.  And he's made it relevant

10   by saying why he doesn't carry mace.  That's

11   changed.

12         MR. PLUNKERT:  Not the conversation that

13   he's had with the physician.  I mean, I would

14   encourage you to work around this so that we don't

15   have an issue.

16               It's going into his health history.

17   And the gentleman's health history is not at issue

18   in this case as a defendant.  He's not a plaintiff;

19   so it's the right to privacy that's being infringed

20   upon in these questions.  And again, based on the

21   course of conduct of the parties going through

22   discovery and what we've agreed not to produce, it's

23   been the medical records that have contained the

24   personnel files.

25         MR. FLOYD:  I disagree with you on your

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

                                                              Page 24

 1    objection.  I believe that these questions are

 2    relevant.  If we were seeking medical records or

 3    seeking an authorization to obtain a medical file, I

 4    think your argument might have more merit.  But

 5    we're in a discovery deposition more or less, and

 6    he's indicated basis for some not carrying pepper

 7    mace, and I should be able to explore those bases.

 8    If he says there is a medical condition, I should be

 9    able to ask him about it.

10         MR. PLUNKERT:  Let's go off the record.

11         THE VIDEOGRAPHER:  Off the record at 9:52.

12              (Recess taken.)

13         THE VIDEOGRAPHER:  Back on the record at

14    10:04.

15         MR. PLUNKERT:  This is Bob Plunkert.  And

16    we've had the chance to have a break and meet and

17    confer over a dispute that's arisen.  And we've come

18    to an agreement.  The witness is going to be

19    permitted to testify regarding any conversations he

20    may have had with any doctor regarding this issue as

21    to spray.

22              And in exchange, there will be deemed

23    no waiver of any right to privacy or privilege

24    otherwise.  Do I have that summarized fairly?

25         MR. FLOYD:  Yes.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 25

1        MR. DOWD:  Yes.  There won't be a waiver due
2    to his testimony here today.
3        MR. PLUNKERT:  Okay.  Great.  I was worried
4    about the partial waiver thing.  And we've all
5    agreed on that won't be argued.  So subject to that,
6    he is free to answer the next sets of questions that
7    Mark has about seeing a doctor and spray.
8        Q    (By Mr. Floyd) Getting back to the subject
9    matter of pepper mace, you indicated that you had
10   received some secondary spray in the face while the
11   pepper mace was deployed?
12       A    Correct.
13       Q    This was with Cool Valley?
14       A    Yes, sir.
15       Q    Do you know if it was -- there's two types.
16   There's mace and then there's pepper spray.
17       A    This was pepper spray in the fog form.
18       Q    Okay.  And it caused your eyes to swell?
19       A    Yes, sir.
20       Q    And have you had any restrictions from a
21   physician telling you that it's not safe for you to
22   be anywhere near pepper mace?
23       A    No, sir.
24       Q    The decision not to carry mace or pepper
25   mace was your own personal decision?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 26

 1      **A**    Yes, sir.

 2      **Q**    And you haven't looked into any medical

 3  evaluation to determine whether or not you're at any

 4  heightened risk to be exposed to pepper mace or

 5  spray as opposed to the general population; is that

 6  fair?

 7      **A**    That is fair.

 8      **Q**    And you understood that when you made the

 9  decision not to carry mace or pepper mace, that you

10  essentially eliminated one of your options for

11  controlling or taking into custody any variety of

12  subjects?

13      **A**    Correct.

14      **Q**    Have you ever dealt with a hostile subject

15  while you were employed with Cool Valley?

16      **A**    Yes, sir.

17      **Q**    Have you ever taken a hostile subject into

18  custody?

19      **A**    Yes, sir.

20      **Q**    Has that occurred often?

21      **A**    I wouldn't say often, no.

22      **Q**    How many times have you had to deal with a

23  combative or hostile subject?

24      **A**    Throughout my whole career?

25      **Q**    Yes.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

---

                                                        Page  27

    1        **A**    10, 12 times.

    2        **Q**    Have you had specific training on dealing

    3    with hostile subjects?

    4        **A**    As in what kind of aspect of training?

    5        **Q**    Taking them into custody, physical

    6    confrontation?

    7        **A**    I've been trained for closed combat, you

    8    know, resisting arrest, PPCT type training, you

    9    know, if you are trying to gain compliance of them,

   10    yes.

   11        **Q**    And where did you get that training?

   12        **A**    That training was through the police

   13    academy.

   14        **Q**    And what was the training again?

   15        **A**    PPCT.

   16        **Q**    What's that stand for?

   17        **A**    Pressure point control tactics.

   18        **Q**    Have you found that to be an effective,

   19    helpful training tool?

   20        **A**    On some people, yes.  It doesn't always work

   21    on everyone.

   22        **Q**    Have you ever used it when it hasn't worked?

   23        **A**    Yes.

   24        **Q**    What were the circumstances when you used it

   25    and it didn't work?

---

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 28

1    **A**    Down at the local bar in Cool Valley, big

2    fight.  I was the only one working.  I tried to

3    control a guy with the -- I don't remember exactly

4    what it's called, but the pressure point right

5    behind your jaw, and no bearing whatsoever to him.

6    **Q**    Was he a large, medium or small subject?

7    **A**    I would say probably close to my size.

8    **Q**    And while we're on that subject matter, what

9    is your height and weight?

10   **A**    Right now I'm six foot, about 230 pounds.

11   **Q**    How about back in September of 2011, do you

12   recollect what your weight was then?

13   **A**    I was probably six foot, 190 pounds.

14   **Q**    While you were employed with Cool Valley,

15   throughout your period of employment were there any

16   complaints made against you?

17   **A**    Not that I'm aware of.

18   **Q**    Let's talk about Ferguson Police Department.

19   You indicated you were hired in 2010?

20   **A**    Correct.

21   **Q**    Do you remember the month you were hired?

22   **A**    February.

23   **Q**    Was there any type of a mission statement or

24   creed that you were expected to follow as a police

25   officer with Ferguson?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

Page 29

1      **A**    Protect and serve the community.

2      **Q**    And how would you describe your purpose of a

3   police officer?  I mean, in your words what do

4   you -- what do you -- what do you consider your job?

5      **A**    I believe it's going out, trying to make

6   contact with the citizens of the city, traffic

7   enforcement.

8      **Q**    Would you agree that being a police officer

9   isn't just to catch the bad guys?

10     **A**    Correct.

11     **Q**    It's oftentimes to help people that are in

12  need?

13     **A**    I agree.

14     **Q**    And I want to talk about some of the

15  training that you've had with Ferguson.  We talked

16  about some of the training before Ferguson.  And we

17  mentioned it a little bit, but you have had crisis

18  intervention training now with Ferguson?

19     **A**    Yes, sir.

20     **Q**    And you had that after the September 17,

21  2011, incident with Moore?

22     **A**    Yes, sir.

23     **Q**    And how soon after that incident did you

24  have the crisis intervention training?

25     **A**    I'm not really sure on how -- I don't

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                                  Page  30
 1    remember exactly what time I had the CIT training.
 2        Q    But it was in 2011?
 3        A    I'm pretty sure it was.
 4        Q    And you've had additional Taser training
 5    while you've been with Ferguson, correct?
 6        A    Yes, sir.
 7        Q    You have that every year?
 8        A    Every year.
 9        Q    Have you had any training with mace or
10    pepper spray?
11        A    No, sir.
12        Q    Have you had any training with a baton?
13        A    Yes, sir.
14        Q    During your period with Ferguson as a police
15    officer leading up to September 17, 2011, did you
16    ever feel unequipped or inadequate from a training
17    perspective on how to deal with mentally disturbed
18    or emotionally disturbed subjects?
19        A    No, sir.
20        Q    You felt like you knew enough to do your job
21    adequately?
22        A    Yes, sir.
23        Q    And not to bring any of the subjects into
24    unnecessary harm?
25        A    Correct.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 31

1      **Q**   If you did feel like you had inadequate

2    knowledge or training, would you have asked Ferguson

3    for additional training?

4      **A**   Yes, sir.

5          MR. PLUNKERT:  Calls for speculation.  Go

6    ahead.

7      **A**   Yes, sir.

8      **Q**   (By Mr. Floyd) I want to talk to you about

9    the report of the incident in question.  I'll hand

10   you a copy of it.

11         MR. FLOYD:  You can mark this.  And what

12   number were we up to?

13         MR. JOHNSON:  Twelve.  This will be 12.

14         MR. FLOYD:  This will be 12.

15                   (Exhibit 12 was marked for

16                   identification by the court

17                   reporter.)

18         MR. FLOYD:  Let me let your attorney take a

19   look.

20         MR. PLUNKERT:  Thank you.  Sure.  It's Bates

21   stamped 0001 through 19.

22     **Q**   (By Mr. Floyd) Prior to giving our

23   deposition today, did you review any documents in

24   preparation for the deposition?

25     **A**   I've gone over the report, yes.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                         September 22, 2015

Page 32

1     **Q**    Did you speak to anybody other than your
2   attorney in preparation for the deposition?
3     **A**    No, sir.
4     **Q**    Did you review any documents other than the
5   police report?
6     **A**    I did look through my Taser training manual,
7   yes.
8     **Q**    Okay.  Any other documents?
9     **A**    No, sir.
10    **Q**    Just two documents, Taser training manual
11  and the police report?
12    **A**    Yes, sir.
13    **Q**    That's it?
14    **A**    Yeah.
15    **Q**    Talking about this report which is marked as
16  Exhibit 12, what was the date this report was
17  completed?
18    **A**    I had my portion of the report completed on
19  the day of the incident.  Other than that, it
20  appears that the final approval was done on the
21  30th.
22    **Q**    And final approval -- I want to talk about
23  the report process.  When you complete a report like
24  this, do you rely on any field notes?
25    **A**    Yes.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 33

1      Q    And did you have any field notes that you

2    utilized in preparing this report?

3      A    I do not recall.

4      Q    And when you prepared your initial draft of

5    the report, did you submit it to someone, one of

6    your superiors for approval?

7      A    Yes, sir.

8      Q    And who did you submit that to?

9      A    I would most likely have submitted it to

10   Lieutenant Ballard.  I don't remember right offhand.

11     Q    And did Lieutenant Ballard have you make any

12   changes or additions to the report?

13          MR. PLUNKERT:  Lack of foundation.  You can

14   answer.

15     A    A couple spelling grammars -- spelling and

16   grammar.

17     Q    (By Mr. Floyd) Did you speak to any of the

18   other officers in between the time of the incident

19   with Moore and the time that you submitted your

20   report?

21     A    No, sir.

22     Q    You didn't communicate with Officer White or

23   Officer Ballard or Officer Bebe during the period

24   that you were preparing this report?

25     A    No, sir.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                      September 22, 2015

---

Page  34

1      **Q**   Is there a date on the report which would
2   indicate the time that it was completed?
3      **A**   I'm not sure.  I know I was -- I completed
4   the report on that day.  I don't remember what time
5   it was.  I was sent home after my portion of the
6   report was completed.
7      **Q**   And you're still with the City of Ferguson
8   Police Department?
9      **A**   Correct.
10      **Q**   And are you still an officer?
11      **A**   Yes, sir.
12      **Q**   Can you explain to me how this report is
13   broken down?  What is on page 1?  What does that
14   contain?
15      **A**   A face sheet of the incident, where it
16   occurred at and everybody that was involved.
17      **Q**   Does it have the time?
18      **A**   Yes, sir.
19      **Q**   Time received and time/date received,
20   time/date dispatched.  What's the difference between
21   received and dispatched?
22      **A**   The time received is when the call came in
23   over 911.  And the time dispatched is when I was
24   actually called from dispatch to the area where it
25   happened.

---

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 35

 1      **Q**   And does it show what time you arrived at
 2  the scene?
 3      **A**   Yes, sir.  Directly across from dispatch
 4  time.
 5      **Q**   6:49?
 6      **A**   6:49.
 7      **Q**   Does it indicate what time Officer White was
 8  dispatched, or would it have been the same time you
 9  were dispatched?
10      **A**   It was the same time I was dispatched.
11      **Q**   What were you doing that day with regard to
12  your shift?  Had you just arrived?  Had you been
13  there all night?  What were the circumstances?
14      **A**   I just arrived.  We arrive at 6:30 in the
15  morning.  We do our roll call.  I was out in the
16  parking lot getting all my equipment from my
17  personal vehicle to put into the police vehicle.
18      **Q**   Was there a new crew coming in at 6:00 a.m.?
19      **A**   That was my crew coming in.
20      **Q**   How many officers would have been involved
21  in that?
22      **A**   Back then --
23          MR. PLUNKERT:  Object to foundation.  You
24  can answer.
25      **A**   Back then six maybe.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                            Page 36
 1      Q   (By Mr. Floyd) What are the rules or
 2   protocol for dispatching?  Is there only a certain
 3   number of officers that get dispatched to the scene,
 4   or do all of them get dispatched that are on duty?
 5      A   It's all by the scenario of what's going on.
 6      Q   How many officers ultimately arrived at that
 7   scene?
 8      A   I believe it was myself and three others.
 9      Q   That would have been Officer Michael White,
10   Lieutenant William Ballard, Officer Matthew Bebe.
11   Am I saying his name right?
12      A   Bebe.
13      Q   Bebe.  And what about -- oh, Harry Dilworth,
14   did he approve the report?
15      A   Correct.  He was -- he's a sergeant that was
16   the final approval.
17      Q   Is there anywhere on this report where it
18   indicates the time that Officer White arrived at the
19   scene?
20      A   I don't believe this report would have that,
21   no.
22      Q   Officer White did prepare a portion of this
23   report?
24      A   I believe so, yes, sir.
25      Q   Are you familiar with how your dispatch
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

```
                                                 Page  37
 1   works?  Do you have the understanding of, you know,
 2   if it's a local Ferguson dispatch?
 3       A    It is.
 4       Q    St. Louis County?  It's a local Ferguson
 5   dispatch?
 6       A    Yes.  Yes, sir.
 7       Q    And you're dispatched through a radio?
 8       A    Yes, sir.
 9       Q    And what are the protocols or what were the
10   protocols on September 17, 2011, with regard to
11   dispatch?  And I want to go through this a little
12   bit.  When officers get dispatched to a scene, do
13   officers respond who will be going to the scene?
14       A    The way our department works is each officer
15   is assigned to a sector.  The city is broke down
16   into four sectors.  So there's an officer per
17   sector, then usually one or two cover cars which
18   roam the city and are used for backups for other
19   officers in the sectors.
20       Q    Does the dispatch have any type of GPS
21   system that shows where the officers are?
22       A    No, sir.
23       Q    Okay.  And so it's based upon zones or
24   sectors?
25       A    Correct.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                     September 22, 2015

                                                        Page 38

1      **Q**    And how many officers would have been in a

2    zone or a sector where this call indicated you

3    needed to be?

4      **A**    There would have been one assigned to that

5    sector.

6      **Q**    And who was that?

7      **A**    I don't recall on that day.

8      **Q**    Okay.  So I noticed on page 1 it says the

9    date and time arrival, 9/17/11.  You arrived at

10   6:49 a.m; is that correct?

11     **A**    That appears to be, yes.

12     **Q**    And how did you determine that time?

13     **A**    That is what is stamped in our CAD system,

14   the computer assisted dispatch system.

15     **Q**    And it shows that Officer White arrived at

16   6:50 a.m; is that correct?  That's on page 5 of the

17   report.

18          MR. DOWD:  Do you see that, Officer?

19          THE WITNESS:  I see it.  I'm just --

20     **Q**    (By Mr. Floyd) Take a look at it.  And then

21   once you've had an opportunity to look at it, let me

22   know what your answer is.

23     **A**    If I'm reading the report, it does appear

24   that, yes.

25     **Q**    You appeared at 6:15?  And that information,

Case: 4:14-cv-01443-SNLJ   Doc. #:  64-1   Filed: 04/29/16   Page: 40 of 234 PageID #: 633

Page  39

 1    is that something that is provided to -- or that's

 2    information that he could have obtained from the

 3    CAD?

 4           MR. PLUNKERT:  Object.  Foundation.  You can

 5    answer.

 6       **A**   Yes.

 7       **Q**   (By Mr. Floyd) Is that -- how did you get

 8    your time?  How did you -- when you documented the

 9    time that you arrived, where did you get that

10    information?

11       **A**   Through dispatch.  When we get either very

12    close to the area we're in, like in this for

13    instance, we weren't exactly sure where Mr. Moore

14    was.  So when I got to the area, I called out on the

15    radio to dispatch saying I'm in the area.

16       **Q**   When you arrived -- and that's what I want

17    to go through, the protocol.  And that's what I want

18    to understand.

19              Okay.  So you get dispatched.  I

20    understand that, that it goes out on the radio and

21    that officers respond to that.  And when they arrive

22    at the scene, do they then indicate back to the

23    dispatch that I'm here at the scene?

24       **A**   Correct.

25       **Q**   And is there a certain verbiage, terminology

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                              September 22, 2015

```
                                                          Page  40
 1    that Ferguson used at the time?
 2        A    When we're -- if we're going to a specific
 3    address, we say we are 1023 to the address.  1023 is
 4    our way or ten code of saying we're on scene.  When
 5    there's not a specific address, we say we're 1023 to
 6    the area, which could be a block, a half a block.
 7        Q    When you're looking for a particular
 8    subject, do you make that -- when you're -- that
 9    indication when you actually see the subject and you
10    are out of your vehicle?
11        A    No.
12        Q    Do you make any communication with dispatch
13    once you exit your vehicle?
14        A    Yes.
15        Q    And what's the communication to the dispatch
16    when you exit your vehicle?
17        A    I just tell them that I'm out of the vehicle
18    on foot.
19        Q    So when you arrived at 6:49, would that have
20    been when your vehicle arrived on the scene?
21        A    When I arrived to the area, yes.
22        Q    Would the CAD indicate when you exited your
23    vehicle?
24        A    Most of the time, probably not.
25        Q    But you would have indicated back to
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 41

 1    dispatch I've exited my vehicle?

 2        **A**    Correct.

 3        **Q**    That would have been protocol?

 4        **A**    That would be protocol, yes.

 5        **Q**    Officer White would be subject to the same

 6    protocol?

 7        **A**    Yes.

 8        **Q**    When he arrives at the scene, he would

 9    report back to dispatch, arrived at the scene?

10        **A**    Uh-huh.

11        **Q**    That's a yes?

12        **A**    Yes.  Sorry.

13        **Q**    And then when he exits his vehicle, he would

14    indicate, exited my vehicle or what's the

15    terminology?

16        **A**    At that time --

17            MR. PLUNKERT:  Let me object on the

18    foundation at that stage.  You may answer.

19        **A**    At that time with me already being out of

20    the vehicle, he would probably most likely not

21    called out that he was exiting his vehicle.

22        **Q**    (By Mr. Floyd) Okay.  And then it looks

23    like -- just take a look here.  With regard to

24    Officer Bebe, does it indicate when he arrived at

25    the scene?  Does that indicate 6:50?

Page 42

1          MR. PLUNKERT:  What page is that, Mark?

2          MR. FLOYD:  That would be page 8.

3     **A**   That does indicate 6:50, yes.

4     **Q**   (By Mr. Floyd) And how about on page 10?

5     Stephanie Wilson?

6          MR. PLUNKERT:  Object to form.

7     **Q**   (By Mr. Floyd) Do you see page 10?

8     **A**   Yes, sir.

9     **Q**   Whose -- what's this page telling us?  Which

10    Ferguson officer or employee is it referencing?

11    **A**   That's Detective Wilson.  I do not remember

12    her being on scene.

13    **Q**   According to this report, does it indicate

14    that Officer Stephanie Wilson arrived at the scene

15    at 6:50?

16         MR. PLUNKERT:  Object to foundation.  You

17    may answer.

18    **A**   The report states that, yes.

19    **Q**   (By Mr. Floyd) Okay.  Look at the top, the

20    top of that page.  Is that on a different date?  Is

21    that the next day or?

22    **A**   It appears to be, yes.

23    **Q**   I'm a little confused, though, because --

24    I'm trying to understand this page.  Indicates call

25    received radio, reporting officer 538 Wilson.  Do

Case: 4:14-cv-01443-SNLJ   Doc. #: 64-1   Filed: 04/29/16   Page: 44 of 234 PageID #: 637

 1    you see that?

 2        A    I see that, yes.

 3        Q    And then down further under occurrence

 4    details, it indicates 9/17, 6:50 a.m, correct?

 5        A    Correct.

 6        Q    Okay.  And looking at -- further on this

 7    report, looking to Mr. Moore, does it give the

 8    details of Mr. Moore's age and statistical

 9    information?  What page would that be?  That would

10    be page 2?

11        A    Yes.

12        Q    And the report, does it indicate that

13    Mr. Moore was five feet seven?

14        A    Yes, sir.

15        Q    Does that seem accurate to you?  Is that

16    consistent with what you saw?

17        A    As far as I can remember, yes.

18        Q    Slight build?  He weighed 145 pounds

19    according to this report?

20        A    That's what the report says, yes.

21        Q    Where would the weight have been obtained?

22    Would that have been obtained from license

23    information or department of vehicles?

24        A    Yes, sir.

25        Q    So tell me -- kind of go through the report.

Case: 4:14-cv-01443-SNLJ  Doc. #: 64-1  Filed: 04/29/16  Page: 45 of 234 PageID #: 638

Page 44

1    Tell me what happened.  We'll use the report to do

2    this, but you get the call at 6:46 a.m., correct?

3         **A**    Correct.

4         **Q**    And you arrive at the scene at 6:50,

5    correct?

6         **A**    Correct.

7         **Q**    Tell me what the call was.  What information

8    was given to you from the dispatch before you even

9    got to the scene?

10        **A**    We received a call for a black male running

11   in and out of traffic, beating on cars.  And at the

12   time that he was doing that, he was completely

13   naked.

14        **Q**    No indication that he had a weapon?

15        **A**    No indication he had a weapon.

16        **Q**    No indication that he had hit anyone?

17        **A**    Correct.  It was -- as of right then, it was

18   hitting on the vehicles.

19        **Q**    And then you appeared at the scene?

20        **A**    Yes, sir.

21        **Q**    And you announced that you were at the

22   scene, correct?

23        **A**    Correct.

24        **Q**    And then what happened next?

25        **A**    As I was driving, canvassing the area

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 45

1    looking for him, what I did was I called out that I

2    was in the area when I hit the spot where he was

3    last seen.  Then approximately about two blocks

4    away, I located Mr. Moore standing at the curb of

5    Airport Road at Henquin.

6        Q    Airport Road and what?

7        A    Henquin.

8        Q    Henquin?

9        A    Yeah.

10       Q    And how soon did you spot him after you had

11   made the announcement to dispatch that you arrived?

12       A    I would say within probably a minute, minute

13   and a half.

14       Q    Within how long?

15       A    Approximately a minute to a minute and a

16   half.

17       Q    And this is your recollection some four

18   years later?

19       A    Correct.

20       Q    Is there anything about your protocol and

21   the way that you report information to dispatch that

22   would allow us to pinpoint the time that you spotted

23   Mr. Moore, with more accuracy?

24            MR. PLUNKERT:  Object to form and

25   foundation.  You can answer.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 46

```
 1      A   It's a good possibility.  We have changed
 2  dispatch systems since then.  I am not sure if
 3  they're able to obtain the information or not.
 4      Q   (By Mr. Floyd) Would all of your
 5  communications with dispatch have been recorded on
 6  the CAD?
 7      A   Yes, sir.
 8      Q   Can you tell me what a CAD is?
 9      A   It's a computer assisted dispatch.
10  Basically, the way it works is we are assigned DSN,
11  department serial numbers.  When they log us onto
12  the shift, they use our DSN and what sector we are
13  working.  So any time they -- I call out on the
14  radio, they type 586.  And whatever I'm doing, they
15  time stamp it.
16      Q   And when you communicate back with dispatch,
17  does the dispatcher type that information into the
18  CAD?
19      A   That is protocol, yes.
20      Q   So as you understand the protocol, would all
21  of your communications with dispatch have been
22  entered into the CAD by the dispatch?
23      A   By policy, yeah, it should be, yes.
24      Q   Okay.  All right.  Continue on through the
25  report.  You indicated that you saw Mr. Moore
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                             Page 47
 1   standing at Airport and Henquin?  Am I saying that
 2   right?
 3       A   Henquin, yes.
 4       Q   Henquin.
 5       A   Yeah.  He came from behind the building and
 6   stood at the curb.
 7       Q   Where did he stand?
 8       A   At the curb from -- he walked from a
 9   building.  There's a building with a parking lot.
10   He walked from the building and stood at the curb of
11   the parking lot at Airport Road.
12       Q   Who was the closest person to him?
13       A   As in officers?
14       Q   Anyone.
15       A   Anyone?  As far as I can remember, it was
16   me.
17       Q   Okay.
18       A   There were vehicles driving down the street.
19       Q   What street were they driving down?
20       A   Airport Road.
21       Q   Is that mostly a residential area there?
22       A   There are a few businesses, but mostly
23   residential, yes.
24       Q   Are any of the businesses open, as far as
25   you know, at 6:50 in the morning?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 48

1      **A**   I don't believe so.

2      **Q**   What was the lighting like?  Was it light?

3  Was it dark?

4      **A**   It was just becoming daylight.

5      **Q**   Was the traffic still light at that time?

6      **A**   No.  The traffic was getting heavy.

7      **Q**   How far from Mr. Moore were you when you

8  first saw him?

9      **A**   Kind of hard to predict, you know.

10         MR. PLUNKERT:  It calls for speculation.

11     **A**   I can't really tell you the distance.

12     **Q**   (By Mr. Floyd) We'll get back to that later.

13  So and then at some point you have contact with

14  Mr. Moore.  Can you tell me what happens from that

15  point when you saw him?

16     **A**   Yeah.  I pulled into the parking lot of

17  where I saw him come out of, kept my vehicle a

18  distance away from Mr. Moore, exited my vehicle,

19  advised him to come towards me with his hands in the

20  air.

21             When he noticed my presence, that's

22  when he turned around.  And at first he started

23  walking towards me.  As he got closer, he started

24  swinging his fists in a pinwheel motion and started

25  walking more in an aggressive manner towards me.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

Page 49

1      **Q**   And then what happened?

2      **A**   After that, I pulled my department Taser,
3  pointed it at him and advised him to stop, which he
4  did not.

5            Second warning I told him -- I
6  advised him to stop or you're going to be Tased.

7      **Q**   How far were you from your vehicle when all
8  of this was occurring?

9      **A**   I was approximately probably --

10           MR. PLUNKERT:  Calls for speculation.  You
11  may answer.

12     **A**   Probably 10 feet.

13     **Q**   (By Mr. Floyd) Okay.  You can continue.
14  What happened next?

15     **A**   Gave him --

16     **Q**   Go ahead.

17     **A**   Gave him the second command to -- well, the
18  first command was to come towards me with his hands
19  up.

20           The second command after he started
21  walking towards me aggressively with his fists
22  swinging was to stop and to get on the ground, which
23  he refused.

24           Third verbal command, I told him to
25  stop or he was going to be Tased.  He refused.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

Page 50

 1   That's when I deployed the Taser.

 2       **Q**    Is this information documented in the

 3   report?

 4       **A**    I believe so.

 5       **Q**    Can you direct me to the area where that

 6   exchange is documented in the report?  I'm looking

 7   at page 3 and 4.

 8       **A**    Uh-huh.

 9       **Q**    I see on page 3 -- and is this your

10   narrative on page 3?

11       **A**    Yes, sir.

12       **Q**    Where it indicates -- starting at the last

13   paragraph.

14       **A**    Uh-huh.

15       **Q**    "Jason Moore walked from behind the building

16   and stood at the curb of Airport Road.  I exited my

17   patrol vehicle and advised Jason to put his hands in

18   the air and to walk my way.  At that time Jason

19   began to yell and began to walk my way

20   aggressively."  And then, you know, we're into

21   page 4 then.

22       **A**    Uh-huh.  And then I advised Jason to stop

23   and get on the ground, which he refused to comply

24   with the commands and started running towards me in

25   the aggressive manner.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                September 22, 2015

```
                                                    Page 51
  1      Q    Do you document three verbal warnings in
  2  your report before the first Tase?
  3      A    That appears to be, yes.
  4      Q    Is that a yes?
  5      A    Yes.
  6      Q    Indicates that you, "Began to walk backwards
  7  advising Jason to stop and get on the ground.  He
  8  refused to comply with the commands and starting
  9  running towards me in an aggressive manner while
 10  swinging his fists in a pinwheel motion towards me.
 11  I again stepped back commanding Jason to get on the
 12  ground.  He refused to comply.  Unholstered my
 13  department-issued X26 Taser and advised Jason to
 14  stop.  He continued to charge.  At that point I
 15  deployed one, five-second burst with the Taser."  Is
 16  that correct?
 17      A    Correct.
 18      Q    And what happened after that?
 19      A    After the Taser was deployed and had
 20  contact, the probes had contact with the right side
 21  of his body and he locked up and fell to the ground.
 22      Q    How close was he to you when you Tased him?
 23      A    Again, it's kind of hard to --
 24           MR. PLUNKERT:  Calls for speculation.  You
 25  may answer.
```

Case: 4:14-cv-01443-SNLJ   Doc. #: 64-1   Filed: 04/29/16   Page: 53 of 234 PageID #: 646

Page 52

1      **A**   I would say between probably 8 to 10 feet.

2      **Q**   (By Mr. Floyd) Did -- did you know that you

3    had made contact -- the darts had made contact with

4    his body?

5      **A**   Yes, sir.

6      **Q**   Did you -- does your laser have a -- does

7    your Taser have a laser on it?

8      **A**   It does.

9      **Q**   Where was the laser pointing when you pulled

10   the trigger?

11     **A**   When I first pointed -- when I first pulled

12   the trigger, the laser was pointed on the right side

13   probably about mid hip.

14     **Q**   And where did the Tasers enter, the darts

15   enter?

16         MR. PLUNKERT:  Did the camera get what he

17   was -- okay.

18         THE VIDEOGRAPHER:  Yes.

19         MR. PLUNKERT:  Sorry.

20     **Q**   (By Mr. Floyd) Where did the darts enter his

21   body?

22     **A**   With looking at the Taser report, one

23   went -- the bottom one went into the pelvic area.

24   And the other one went probably about mid chest.

25     **Q**   And you're 8 feet away from him at this

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 53

1    point?

2        **A**    Roughly.

3             MR. PLUNKERT:  Calls for speculation.

4        **Q**    (By Mr. Floyd) Is that what your testimony

5    was?

6        **A**    Roughly.

7             MR. PLUNKERT:  Same.

8        **Q**    (By Mr. Floyd) I'm sorry?

9        **A**    It was roughly.

10       **Q**    So you saw the darts had entered his body?

11       **A**    I did not see the darts enter his body, no.

12       **Q**    But you knew the darts were in his body?

13       **A**    I can tell by the sound of the Taser, yes.

14       **Q**    And is it your testimony -- well, did you

15   know that one dart was in his chest?

16       **A**    I did not know one was in his chest, no.

17       **Q**    Eight feet away and you can't tell that one

18   dart's in his chest?

19            MR. PLUNKERT:  Object to form.

20            MR. FLOYD:  I'm just asking a question.

21            MR. PLUNKERT:  Foundation.

22       **Q**    (By Mr. Floyd) From 8 feet away, can you not

23   tell that the dart is in his chest?

24            MR. PLUNKERT:  Same objections.

25            MR. FLOYD:  What's the basis of the

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                     September 22, 2015

Page 54

 1   objection?

 2        MR. PLUNKERT:  The form is argumentative.

 3   And on foundation it calls for speculation, which

 4   I'm objecting on you haven't established that he has

 5   knowledge of how far away he was.  He said it was

 6   difficult to say, so.

 7   **Q**   (By Mr. Floyd) Your best estimate, did you

 8   tell me your best estimate was that you were 8 to

 9   10 feet away from him when you discharged the Taser?

10        MR. PLUNKERT:  Same.  It's calling for

11   speculation.  You may answer.

12   **A**   Roughly.

13        MR. FLOYD:  It's not speculation.

14        MR. DOWD:  That's an improper objection.

15   **Q**   (By Mr. Floyd) That's okay.  You can go

16   ahead.  You're answering the question though, right?

17             Okay.  Now, and from that distance

18   you gave me from 8 to 10 feet away, are you

19   testifying that you couldn't see that the dart was

20   in his chest?

21   **A**   As soon as the darts hit him, I could tell

22   by the sound of the Taser it made good contact, and

23   he fell.

24   **Q**   Do you -- what's your vision?

25   **A**   Back then I was corrective pretty close --

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 55

1   pretty close to 20/20.

2       Q    And you were wearing contacts or glasses?

3       A    I had glasses on that day.

4       Q    So with your glasses you were 20/20 vision

5   back then?

6       A    Uh-huh.

7       Q    Is that a yes?

8       A    Yes, sir.

9            MR. PLUNKERT:  Foundation.

10      Q    (By Mr. Floyd) Okay.  After the darts had

11  entered his body, did you discharge the Taser?  I

12  mean, did you -- you held, kept the trigger down?

13      A    No.

14      Q    Okay.  Tell me how that Taser works.  I

15  understand that it can be programmed different ways;

16  is that correct?

17      A    When it comes to the programming part, I

18  don't know.

19      Q    Did this Taser operate where you pulled the

20  trigger once and then it shoots the darts and

21  discharges the five-second load?

22      A    Correct.

23      Q    If you hold the trigger down, will it

24  discharge another load or do you have to release?

25      A    It would continue.  If you hold the trigger

Brian Kaminski                                        September 22, 2015

1    down, it will continuously shock.

2        Q    Okay.  And if you let your finger off the

3    trigger right away, will it just deliver a

4    five-second load?

5        A    Correct, within the first five seconds.

6        Q    And what did you do in the situation?  How

7    did you handle the trigger?

8        A    I released the trigger.

9        Q    Immediately after pulling it; is that

10   correct?

11       A    Yes, sir.

12       Q    And what did Mr. Moore do?

13       A    Mr. Moore fell to the ground.  If I remember

14   right, he fell towards his chest or fell face --

15   face down.

16       Q    Did he land on sidewalk, street, grass?

17       A    Parking lot.

18       Q    So he landed on asphalt?

19       A    Asphalt.

20       Q    And then what happened?

21       A    After the five seconds was up, he started to

22   try and pull himself up off the ground, which I

23   requested him to stay down a few times, and he

24   refused.  And once he got up to his knees, I

25   administered the second.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                            September 22, 2015

Page 57

 1     **Q**   And what's a few times?  Is that three
 2   times?
 3     **A**   Two to three times.
 4     **Q**   So two to three times once he's -- this is
 5   after of the load had discharged, correct?
 6     **A**   Correct.
 7     **Q**   So after the five-second load two to three
 8   times, he -- let me go through the sequence.  After
 9   the five-second load, he tried to get up, correct?
10     **A**   Correct.
11     **Q**   And then you gave two to three commands to
12   stay down?
13     **A**   It started while the Taser is still in
14   effect.  We're trying to -- while the Taser is still
15   cycling, you would start giving him verbal commands.
16     **Q**   Okay.  And when did -- tell me about the
17   commands you gave after the Taser quit cycling.
18     **A**   I was telling him to stay down, stay down on
19   the ground.
20     **Q**   Did you give two warnings after the Taser
21   quit cycling to stay down?
22     **A**   If I can remember right, yes.
23     **Q**   Do you remember what your words were, what
24   you said to him?
25     **A**   Stay down on the ground.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                           September 22, 2015

                                                              Page 58

1      **Q**   Is that documented in your report?

2      **A**   It's in there, "I clearly shouted get on the

3    ground."

4      **Q**   In the report you indicate that, "Once I

5    noticed Jason was attempting to get back up," and

6    that would have been after the Taser discharged, I

7    mean after the load had been delivered?

8      **A**   After the five seconds had --

9      **Q**   And if I understand the report, unless I'm

10   reading it wrong, it says, "After the five-second

11   burst, Jason attempted to get back onto his feet.

12   Once I noticed Jason attempt to get back on his

13   feet, I clearly shouted get back on the ground."  So

14   would that have been when the warnings were issued

15   after the load had discharged?

16     **A**   That one, yes.

17     **Q**   Okay.

18     **A**   We give verbal commands while the Taser is

19   in effect.

20     **Q**   It's your position, though, you gave him two

21   verbal commands?

22         MR. PLUNKERT:  Object to foundation.  You

23   may answer.

24     **Q**   (By Mr. Floyd) Would you have given him a

25   verbal command to stay on the ground if he was

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                                    Page 59
 1   already on the ground?
 2          MR. PLUNKERT:  Calls for speculation.  You
 3   may answer.
 4       A   Yes.
 5       Q   (By Mr. Floyd) What happened after that,
 6   after he started to get back up and you gave him the
 7   two commands and he -- what happened after that?
 8          MR. PLUNKERT:  Object to the form.
 9       A   He was -- he was up almost on his knees
10   trying to get up with -- and not doing the verbal
11   commands.  I then administered a second burst of the
12   Taser.
13       Q   (By Mr. Floyd) How long did it take him to
14   get from the position on his stomach to where he's
15   almost up on his knees?
16       A   Within seconds.
17          MR. PLUNKERT:  Foundation.  I'm sorry.
18   Foundation.
19          THE WITNESS:  I'm sorry.
20          MR. PLUNKERT:  Go ahead and answer.
21       A   Within seconds.
22       Q   (By Mr. Floyd) Seconds?  Within two or three
23   seconds?
24          MR. PLUNKERT:  Same objection.
25       A   I would say probably one to two seconds,
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                                     Page 60
 1   yes.

 2        Q    (By Mr. Floyd) And then what did do you?

 3        A    That's when I administered the second burst.

 4        Q    As he was starting to stand up onto his

 5   knees, were you able to now notice the dart in his

 6   chest?

 7        A    No.  Because he was kind of doggy on his --

 8   dog style on his knees and hands.

 9        Q    Okay.  And so then what'd you do?  You

10   administered another charge?

11        A    Yes.  That's the second charge.

12        Q    And how long was that charge?

13        A    Five seconds.

14        Q    What happened during that charge?  What did

15   his body do?

16        A    His body straightened out, you know, the

17   muscle mass.  The Taser makes your body tighten up.

18        Q    Okay.  And then -- and I'm going to -- I

19   just want to kind of get some of the general details

20   at this point, but then what happened after that?

21   Did he -- did he comply?

22        A    No.

23        Q    What did you do then?

24        A    After the five-second, the second

25   five-second burst still giving him the commands to
```

Tina Moore, et al. v. Brian Kaminski, et al.
Brian Kaminski                                    September 22, 2015

                                                        Page 61
 1    stay on the ground, he was still attempting to get
 2    up; so I administered the third.
 3        Q    And when did you -- did you give him a
 4    warning to stay down?
 5        A    Yeah.
 6        Q    How many warnings did you give him?
 7        A    Between the second and third time?  I mean,
 8    throughout the whole course, he was getting commands
 9    to stay on the ground throughout the whole time.
10        Q    Okay.
11        A    While he was being Tased and while it wasn't
12    in effect.
13        Q    And so in between the first and second Tase,
14    you gave him a couple of warnings.  And then in
15    between the second and third Tase, how many warnings
16    did you give him?
17        A    Approximately probably the same.  Two.
18        Q    And then you gave him the third Tase?
19        A    Correct.
20        Q    Where's Officer White at this point?
21        A    Officer White was coming across Airport Road
22    at this point, coming to where I was.
23        Q    On foot?
24        A    No.  In his vehicle.
25        Q    And what happened after the third Tase?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 62

 1      **A**   After the third Tase, Officer White was able

 2   to come over to me and was able to handcuff

 3   Mr. Moore while the Tasing or while the third burst

 4   was being administered.

 5      **Q**   And what happened then?  Did he cuff him?

 6      **A**   Yes.

 7      **Q**   And then what did he do?

 8      **A**   What did Jason do or what did Officer White

 9   do?

10      **Q**   What did you and Officer White do?

11      **A**   Officer White cuffed him.  Officer White and

12   I had, you know, a couple words asking if I was okay

13   and stuff like that.  Then we checked --

14      **Q**   Go ahead.

15      **A**   We checked -- Officer White checked Jason

16   and, you know, moved his arm saying, hey, you okay?

17   You okay?  That's when we --

18      **Q**   Is there any --

19         MR. DOWD:  Let him finish.

20      **Q**   (By Mr. Floyd) Go ahead.  Yeah, go ahead.

21      **A**   That's when we realized that he was not

22   breathing.

23      **Q**   Is there any portion in the report that

24   indicates when you noticed that he wasn't breathing

25   in relation to when he was last Tased and cuffed?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                              Page 63

  1      A   I don't think it gives any kind of, like,

  2   time period.

  3      Q   Okay.  We'll go through it here a minute.  I

  4   think there might be.

  5      A   Possibly in Officer White's supplement.

  6      Q   Let's go to Officer White's.  Have you

  7   located it?  I'll find it if not.

  8      A   Page 6.

  9      Q   Okay.

 10      A   Officer White wrote that approximately one

 11   minute after being handcuffed.

 12      Q   Okay.  And during the period that he was

 13   handcuffed, was he laying on his stomach?

 14      A   Yes.

 15      Q   Okay.  And then after approximately one

 16   minute after being handcuffed, noticed that he

 17   wasn't breathing, and then there was some medical

 18   attention delivered?

 19      A   Correct.

 20      Q   All right.  I want to go back to some of the

 21   Taser training.  It looked like you had -- you've

 22   indicated that you had some Taser training while you

 23   were with Cool Valley.  And then it looks like you

 24   had Taser training with Ferguson; is that correct?

 25      A   Uh-huh.  Yes, sir.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 64

1      **Q**   And Taser training with the Taser training
2   academy, correct?
3      **A**   Yes, sir.
4      **Q**   And every year you had Taser training,
5   correct?
6      **A**   Correct.
7      **Q**   Okay.  And have you ever seen that video of
8   a Longhorn bull being Tased by a Taser?
9      **A**   Yes, sir.
10      **Q**   And it's a -- when did you see that video?
11      **A**   I saw that originally back in 2004.
12      **Q**   And how big do you think that bull was?
13      **A**   It was 1,200 pounds.
14      **Q**   And it's hit with a Taser.  Does it knock
15   the bull off its feet?
16      **A**   It puts it on its side, yes.
17      **Q**   I mean, it just basically paralyzes it there
18   while it's being Tased, correct?
19      **A**   Correct.
20      **Q**   And that's one of those Texas Longhorn
21   bulls, right?
22      **A**   Correct.
23      **Q**   An angry bull at that, was it not?
24      **A**   That I don't remember.
25      **Q**   It charged the fence.  Do you remember that?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                September 22, 2015

Page 65

1        **A**    I don't remember that, no.

2        **Q**    Okay.  How many volts go through the Taser

3   X26?

4        **A**    50,000.

5        **Q**    Is there different settings it has on it?

6        **A**    No, sir, not for volt wise or anything like

7   that, no.

8        **Q**    Is there a stun setting?

9        **A**    There is a dry stun.  The dry stun is used

10  when you take the cartridges, the Taser cartridge

11  off and you just apply the actual gun to skin.

12       **Q**    And you rely on your Taser training when

13  you're using a Taser, correct?

14       **A**    Correct.

15       **Q**    And you did back in 2011; is that correct?

16       **A**    Correct.

17       **Q**    50,000 volts, is that what you said?

18       **A**    Yeah.

19       **Q**    And do you have an understanding of how the

20  Taser actually works?  And I don't mean how it

21  generates the electricity, but what is it about the

22  Taser that it does to the human body that causes the

23  person not to resist and to comply and to

24  incapacitate them?

25            MR. PLUNKERT:  Objection.  Foundation.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

Page 66

1     **Q**    (By Mr. Floyd) If you know.

2          MR. PLUNKERT:  Subject to that, you can

3     answer.

4     **A**    What I remember from the training is it's

5     muscle memory.  The Taser puts the electricity

6     through the barbs, and it shuts down the central

7     nervous system.

8     **Q**    (By Mr. Floyd) Does it cause -- when the

9     electricity goes through the body, does it cause the

10    muscles to contract?

11    **A**    Yes.

12    **Q**    I was looking through your Taser training

13    materials, and I saw some things in there I wanted

14    to ask you about.  In your -- do you remember in

15    your Taser training materials where it indicates

16    that Tasers can cause soft tissue, muscle, tendon

17    and ligament tears to point a Taser on someone?  Did

18    you know that?

19    **A**    I don't recall that, no.

20    **Q**    It's in your Taser training material.  Let

21    me hand that to you.

22          MR. FLOYD:  Mark this as 13.  Put 13 on

23    here.

24                        (Exhibit 13 was marked for

25                         identification by the court

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                            September 22, 2015

Page 67

 1                              reporter.)

 2          MR. FLOYD:  I think that's Bates stamped

 3   Ferguson 00073.

 4          MR. PLUNKERT:  Okay.  Exhibit 13?

 5          MR. FLOYD:  Yeah.

 6      **Q**   (By Mr. Floyd) Take a look at that.  This is

 7   the information that your attorneys provided us that

 8   came from a Taser training class you took?

 9      **A**   Correct.

10      **Q**   Do you see in there this is the "Instructor

11   and User:  Warnings, Risks, Releases &

12   Indemnification Agreement" at the top?  Do you see

13   that?

14      **A**   Yes, sir.

15      **Q**   And if you look down the page where I start

16   the highlight, it says "Safety Information:  CEW

17   Risks, Avoidance."  Do you see that below that

18   warning?

19      **A**   Yes, sir.

20      **Q**   Do you see where it indicates that "Muscle

21   contraction or strain-related injury:  CEWs in

22   probe-deployment mode can cause muscle contractions

23   that may result in injury including bone fractures"?

24   Do you see that?

25      **A**   I do see that.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 68

1    **Q**   Does it go on to say that it can cause tears

2    of other soft tissue, organ, muscle, tendon,

3    ligament, cartilage, disc, nerve and bone?  Do you

4    see that?

5    **A**   I do see that.

6    **Q**   It can cause fractures to the bone,

7    including compression fractures to vertebrae?

8         MR. PLUNKERT:  Object to the form and

9    foundation.

10   **Q**   (By Mr. Floyd) Do you see that in there, in

11   the report?

12   **A**   I do see that.

13   **Q**   Okay.  And then did you know that some

14   individuals are at heightened risk of injury from a

15   Taser?

16   **A**   There are some, yes.

17   **Q**   Would you agree that some of those people

18   that are at heightened risk could be elderly people?

19        MR. PLUNKERT:  Objection to foundation.

20   **A**   Yes, sir.

21   **Q**   (By Mr. Floyd) And would you agree that some

22   of the people at heightened risk of injury from a

23   Taser could be an individual with a heart condition?

24        MR. PLUNKERT:  Objection to foundation.

25   **A**   Yes, sir.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 69

1      **Q**   (By Mr. Floyd) And that a person that is

2   emotionally distressed?

3            MR. PLUNKERT:   Same.

4      **A**   Yes, sir.

5      **Q**   (By Mr. Floyd) In fact, on the document that

6   you have before you, which is part of your Taser

7   training, does it indicate that, "Emotional stress

8   and physical exertion, both likely in incidents

9   involving CEW and other uses of force, are reported

10  as seizure-precipitating factors"?   That's down --

11  it's below the second warning.

12     **A**   Yes.

13     **Q**   And then down on the third warning, down at

14  that bottom of that page in the left column, does it

15  state, "Cumulative Effects:   CEW exposure causes

16  certain effects, including psychological and

17  metabolic changes, stress, and pain"?  Do you see

18  that?

19     **A**   Yes, sir.

20     **Q**   "In some individuals, the risk of death or

21  serious injury may increase with cumulative CEW

22  exposure."  Did you see that?

23     **A**   Yes, sir.

24     **Q**   And that, "Repeated, prolonged, or

25  continuous CEW applications may cause or contribute

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                              Page 70
 1    to cumulative exhaustion, stress, cardiac,
 2    physiological, metabolic, respiratory, and
 3    associated medical risks which could increase the
 4    risk of death or serious injury."  Do you see that?
 5        A   Yes, sir.
 6        Q   And, "Minimize repeated, continuous, or
 7    simultaneous exposures."  Do you see that?
 8        A   Yes, sir.
 9        Q   And that, "Physiologic and metabolic
10    effects:  CEW use causes physiologic and/or
11    metabolic effects that may increase the risk of
12    death or serious injury."  Did you see that?
13        A   Yes, sir.
14        Q   And then right in the last sentence of that
15    page, it says, "These effects include changes in
16    blood chemistry, blood pressure, respiration, heart
17    rate and rhythm."  Do you see that?
18        A   Yes.
19        Q   And then moving on to the column two on that
20    same page, it's about six lines down.  Does it state
21    that, "Some individuals may be particularly
22    susceptible to the effects of CEW use"?
23        A   Yes, sir.
24        Q   And it says, "These susceptible individuals
25    include the elderly, those with heart conditions,
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

                                                        Page  71

 1    asthma, or other pulmonary conditions."  Do you see

 2    that?

 3        **A**    I do.

 4        **Q**    And then it states, "And people suffering

 5    from excited delirium, profound agitation."  Do you

 6    see that?

 7        **A**    I do.

 8        **Q**    And it goes on to state that, "In a

 9    physiologically or metabolically compromised person,

10    any physiologic or metabolic change may cause or

11    contribute to sudden death."  Do you see that?

12        **A**    I do.

13        **Q**    And do you see down about five lines below

14    that where it starts, "Minimize the number and

15    duration"?  Do you see that?

16        **A**    I do.

17        **Q**    It says, "Minimize the number and duration

18    of CEW exposures:  Most human CEW lab testing has

19    not exceeded 15 seconds."  Have you seen that?

20        **A**    I do see it.

21        **Q**    And then below that about another six lines,

22    it says, "Avoid simultaneous CEW exposures."  Do you

23    see that?

24        **A**    I do.

25        **Q**    And then about five lines below that, it

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 72

1    says, "Control and restrain immediately.  Begin to

2    control and" -- "begin control and restraint

3    procedures, including during CEW exposure," and then

4    in parentheses it says, "cuffing under power."  Do

5    you see that?

6        **A**   I do.

7        **Q**   Is that telling you that you shouldn't be

8    exposing people to multiple loads; you should cuff

9    them while they're under load?

10        MR. PLUNKERT:  Object to form and

11   foundation.

12        **Q**   (By Mr. Floyd) Is that what it's saying in

13   that?  Is that what you understand that to be

14   saying?

15        MR. PLUNKERT:  Same objections.  You may

16   answer.

17        **A**   It does say that, but also in training it

18   tells you that the person that is using the Taser is

19   not the one that cuffs the subject.

20        **Q**   (By Mr. Floyd) I got it.  But going below

21   that, there's some more under "Warning."  It's about

22   halfway down the second column.  "Cardiac capture,"

23   do you know what that is?

24        **A**   I do not.

25        **Q**   With all the training that you've had

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                   September 22, 2015

Page 73

1   through Taser, did they cover cardiac capture?

2       **A**   No, they did not.

3       **Q**   I found it here in this training material

4   that you had.  Did you not see it?

5       **A**   I did not.

6           MR. PLUNKERT:  Object to the form.

7       **Q**   (By Mr. Floyd) Okay.  "Cardiac Capture.  CEW

8   exposure in the chest area near the heart has a low

9   probability of including extra heart beats (cardiac

10  capture).  In rare circumstances, cardiac capture

11  could lead to cardiac arrest.  When possible, avoid

12  targeting the frontal chest area near the heart to

13  reduce the risk of potential serious injury or

14  death."  Do you see that?

15      **A**   I do.

16      **Q**   And it goes on to state that, "Cardiac

17  capture may be more likely in children and in thin

18  adults."  Do you see that?

19      **A**   I do see that.

20      **Q**   Was Mr. Moore a thin adult?

21      **A**   He was pretty muscular.  I mean, he was thin

22  but he was -- he was tone.

23      **Q**   If the coroner's report had his weight at

24  about 132 pounds, would you dispute that?

25      **A**   No.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 74

1      **Q**    You've been exposed to the training that was

2   contained in Exhibit Number 13 that I provided you,

3   correct?

4      **A**    Correct.

5      **Q**    I mean, in fact, you had had training for

6   some six to seven years before this incident with

7   Mr. Moore took place, correct?

8      **A**    Correct.

9      **Q**    And you were a certified Taser instructor at

10  the time that this incident took place with

11  Mr. Moore, correct?

12     **A**    Correct.

13     **Q**    Do you agree that police officers should

14  minimize the number of Tases and limit the duration

15  of Tases?

16        MR. PLUNKERT:   Object to form and

17  foundation.   You may answer.

18     **A**    I believe that the officers should use what

19  is necessary.

20     **Q**    (By Mr. Floyd) Do you agree that officers

21  should use the minimum number of Taser loads to

22  accomplish the lawful objectives?

23        MR. PLUNKERT:   Same objections.   You may

24  answer.

25     **A**    I believe each circumstances has a

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 75

1    different --

2        Q    (By Mr. Floyd) But do you agree with that?

3    That regardless of what the circumstances are, that

4    officers should use the minimum number of loads to

5    accomplish the lawful objectives; no more?

6        A    Yeah.

7        Q    Do you agree with that?

8        A    I agree with that.

9        Q    And that in between each Tase that's

10   delivered, each load that's delivered to a subject,

11   that the officer should reassess the subject's

12   behavior, reaction and resistance before initiating

13   continued exposure.  Would you agree with that?

14       A    I agree with that.

15       Q    In fact, during your Taser training, were

16   you not asked those questions on some of the testing

17   and materials that you covered?

18       A    I believe we were, yes.

19       Q    And that you answered in the affirmative on

20   those questions that I just asked you.  Would you

21   agree?

22            MR. PLUNKERT:  Object to foundation.  You

23   may answer.

24       A    I misunderstood what you said.

25       Q    (By Mr. Floyd) Well, for instance, in

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                                   Page 76
 1   deploying a CEW, the officer should, and did you

 2   answer, "Use the least number of CEW discharges to

 3   accomplish lawful objectives"?

 4        MR. PLUNKERT:  Object to foundation.  You

 5   may answer.

 6        A    If that's what I answered on the page, yes.

 7   I don't --

 8        Q    (By Mr. Floyd) You agree with that though,

 9   right?

10        A    Yes.

11        MR. PLUNKERT:  Same objections.

12        Q    (By Mr. Floyd) I mean, you've known that

13   since you started using a Taser, didn't you?

14        A    Any use of force, yes.

15        Q    Okay.  And when deploying or using a CEW,

16   sensitive CEW target areas of the body to be avoided

17   when practical or possible include the head, throat,

18   the chest, the breast, the chest area near the

19   heart, the genitals.  You answer "all the above."

20   You agree with that?

21        A    I agree with that.

22        MR. PLUNKERT:  Objection to the form and

23   foundation.

24        Q    (By Mr. Floyd) And you've known that for a

25   long time, correct?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 77

 1      **A**   Correct.

 2      **Q**   And since you've been using them, correct?

 3      **A**   Uh-huh.

 4      **Q**   Is that yes?

 5      **A**   Yes, sir.

 6      **Q**   And that the preferred target areas for a

 7   CEW deployment are the lower center mass, back

 8   shots, correct?

 9      **A**   Correct.

10      **Q**   And you knew that since you started using a

11   Taser, correct?

12      **A**   Correct.

13      **Q**   And that as with any use of force, the

14   longer the CEW exposure, the greater the potential

15   cumulative, physiological or metabolic effects on

16   the subject.  You know that, right?

17      **A**   Correct.

18      **Q**   And you've known that since you started the

19   Taser, correct?

20      **A**   Correct.

21      **Q**   Going all the way back to 2004, correct?

22      **A**   Yes, sir.

23      **Q**   And that officers should attempt to minimize

24   the total or cumulative CEW exposure durations by

25   cuffing under power, correct?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 78

1       **A**    Correct.

2       **Q**    And observing the person during breaks in
3    the CEW exposure, correct?

4       **A**    Correct.

5       **Q**    And using a window of opportunity, correct?

6       **A**    Correct.

7       **Q**    I want to cover just some general rules with
8    you as a police officer.  I want your opinions on
9    these so that we can establish some basic
10   understandings of what's appropriate and what's not.
11                Do you agree that a police officer
12   should never use more force than necessary to
13   accomplish lawful objectives?

14       MR. PLUNKERT:  Object to form and
15   foundation.  You may answer.

16       **A**    I agree.

17       **Q**    (By Mr. Floyd) And that using more force
18   than necessary creates an unnecessary risk of injury
19   or death.  Do you agree with that?

20       MR. PLUNKERT:  Form and foundation.  You can
21   answer.

22       **A**    I agree.

23       **Q**    (By Mr. Floyd) It's never appropriate to
24   expose citizens to unnecessary risk of injury or
25   death.  Do you agree?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                September 22, 2015

Page 79

1      **A**   I agree.

2      **Q**   Citizens in an agitated state, such as

3    excited delirium or emotional distress are at

4    increased risk of injury or death when Tased.  Do

5    you agree with that?

6          MR. PLUNKERT:  Object to form and

7    foundation.  You may answer.

8      **A**   I do not agree with that.

9      **Q**   (By Mr. Floyd) Do you agree that the Taser

10   training materials indicate that the answer to that

11   question is the affirmative based upon what we --

12   what you -- the course that you took?

13         MR. PLUNKERT:  Form and foundation.

14     **A**   I believe in Version 19, which is the new

15   Taser training version.  Yes, it's still a risk,

16   that it is a serious risk, but they are now saying

17   that during excited delirium, it is preferred to use

18   a Taser to try and control the subject as quickly as

19   possible.

20     **Q**   (By Mr. Floyd) But you do agree with the

21   statement that citizens in the agitated state,

22   emotionally distressed or excited delirium are at an

23   increased risk of injury or death when Tased as

24   compared to an otherwise healthy, normal, calm

25   person?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

```
                                              Page 80

 1          MR. PLUNKERT:  Object to form and

 2   foundation.

 3      Q    (By Mr. Floyd) Do you agree with that?

 4      A    That I do agree with.

 5      Q    Based upon your Taser training and the years

 6   that you've been using a Taser?

 7          MR. PLUNKERT:  Same objections.

 8      A    Correct.

 9      Q    (By Mr. Floyd) And you've known that for

10   years, correct?

11          MR. PLUNKERT:  Same objections.

12      Q    (By Mr. Floyd) Is that yes?

13      A    Yes, sir.

14      Q    Since 2004, correct?

15          MR. PLUNKERT:  Same objections.

16      A    Yes, sir.

17      Q    (By Mr. Floyd) Okay.  And you agree that

18   citizens Tased in the chest area are at an increased

19   risk of injury or death compared to citizens Tased

20   in the back or lower body?  Do you see with that?

21          MR. PLUNKERT:  Same objections.

22      A    I agree.

23      Q    (By Mr. Floyd) And you've known that since

24   you started using a Taser, correct?

25          MR. PLUNKERT:  Same objections.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                               Page 81
  1        A    Yes, sir.

  2        Q    (By Mr. Floyd) Citizens that are Tased

  3   repeatedly are at increased risk of injury or death

  4   compared to citizens Tasered one time.  Do agree

  5   with that?

  6             MR. PLUNKERT:  Same objections.

  7        A    Through the manual, yes.

  8        Q    (By Mr. Floyd) And you've known that since

  9   you started using a Taser, correct?

 10             MR. PLUNKERT:  Same objections.

 11        A    Yes.

 12        Q    (By Mr. Floyd) The greater number -- and you

 13   agree that the greater number of times a person is

 14   Tasered, the greater the risk of injury or death.

 15   Do you agree with that?

 16             MR. PLUNKERT:  Same objections.

 17        A    Yes.

 18        Q    (By Mr. Floyd) And you've known that since

 19   you started using a Taser in 2004, correct?

 20             MR. PLUNKERT:  Same objections.

 21        A    Yes.

 22        Q    (By Mr. Floyd) And do you agree that

 23   tasering an emotionally disturbed citizen until they

 24   die is not an acceptable outcome?

 25             MR. PLUNKERT:  Object to the form.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 82

1      **Q**    (By Mr. Floyd) Do you agree with that?

2      **A**    On a situation based, yes.

3      **Q**    Do you agree that tasering an unarmed

4    emotionally disturbed citizen until they die is not

5    an acceptable outcome?

6      **A**    On --

7            MR. PLUNKERT:  Object to form.

8      **A**    Based --

9            MR. PLUNKERT:  And foundation.  Go ahead.

10     **A**    Based by a situation, I mean, if it --

11   unfortunately, sometimes it does happen, but on

12   situations --

13     **Q**    (By Mr. Floyd) Is that an acceptable outcome

14   to you?

15           MR. PLUNKERT:  Object.  Same objections.

16     **A**    I would say no.

17     **Q**    (By Mr. Floyd) Do you agree that an unarmed

18   citizen should never be Tased unless they pose a

19   serious threat of injury or death to themselves or

20   another person?

21           MR. PLUNKERT:  Same objections.

22     **A**    Can you read that one again?

23     **Q**    (By Mr. Floyd) An unarmed citizen should

24   never be Tased unless they pose a serious threat of

25   injury or death to themselves or another person?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                      September 22, 2015

1             MR. PLUNKERT:   Same objections.

2        **A**   I agree.

3        **Q**   (By Mr. Floyd) Do you know what submission

4    recognition is?

5        **A**   No, sir.

6        **Q**   Do you understand the process by which

7    someone is being Tased and you have to recognize or

8    assess whether they have submitted?

9        **A**   Yes, sir.

10       **Q**   Okay.  So when I say submission recognition,

11   what terminology would you use?  Would you use

12   different terminology?

13       **A**   Complying.

14       **Q**   Okay.  Would there be some type of

15   assessment, compliance assessment, or how would you

16   term it?

17       **A**   Yes.

18       **Q**   So compliance assessment or we'll say

19   submission recognition, that's when the officer has

20   to recognize when the subject has submitted,

21   correct?

22       **A**   Correct.

23       **Q**   When they've complied, correct?  You would

24   agree that submission recognition, the officer is

25   required to observe, communicate and evaluate a

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 84

 1  person before he discharges additional loads?  Do

 2  agree with that?

 3          MR. PLUNKERT:  Object to foundation.  You

 4  may answer.

 5      **A**   I agree.

 6      **Q**   (By Mr. Floyd) And you agree that cuffing

 7  under power should be done when possible to avoid

 8  cumulative Taser loads?

 9          MR. PLUNKERT:  Object to form and

10  foundation.

11      **A**   I agree.

12      **Q**   (By Mr. Floyd) Do you agree that multiple

13  CEWs on a citizen cannot be justified solely on the

14  grounds that a person fails to comply?

15          MR. PLUNKERT:  Same objections.

16      **A**   Can you read that one one more time?

17      **Q**   (By Mr. Floyd) Multiple CEWs loads, Taser

18  loads on a citizen cannot be justified solely on the

19  grounds that a person fails to comply?

20          MR. PLUNKERT:  Same objections.

21      **A**   That one's tripping me up.

22      **Q**   (By Mr. Floyd) You don't agree with that?

23      **A**   Well --

24          MR. PLUNKERT:  Same objections.

25      **A**   I'm trying to get the wording.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 85

```
 1      Q    (By Mr. Floyd) I'll read it one more time.
 2   Say it a little differently.  Do you agree that
 3   Tasing an individual multiple times solely just
 4   because the only reason is because they won't comply
 5   is not justifiable?
 6           MR. PLUNKERT:   Same objections.
 7      A    I do not agree with that.
 8      Q    (By Mr. Floyd) Okay.  Would you be surprised
 9   if I told you that the Taser International Training
10   Academy states that multiple CEWs on a citizen
11   cannot be justified solely on the grounds if a
12   person fails to comply?
13           MR. PLUNKERT:   Object to the form.  You may
14   answer.
15      A    I would be surprised, yes.
16      Q    (By Mr. Floyd) Do you agree that an officer
17   must conduct a risk assessment to justify each Tase?
18      A    I would agree with that, yes.
19      Q    I want to go back to the incident again and
20   revisit a couple of things.  When you received the
21   dispatch, were you informed that there was a naked
22   man at the scene running around --
23      A    Yes.
24      Q    -- the neighborhood?
25      A    Yes.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 86

1    **Q**   You understood that from your training and
2    experience that he was likely emotionally disturbed?
3          MR. PLUNKERT:  Objection.  Foundation.
4    Calls for speculation.  You may answer.
5    **A**   One of two, either emotionally disturbed or
6    on some kind of narcotic.
7    **Q**   (By Mr. Floyd) And you knew that -- you
8    understood the information was that he did not have
9    a weapon; is that correct?
10   **A**   Correct.
11   **Q**   Did you know Jason Moore before this
12   incident?
13   **A**   No, sir.
14   **Q**   When you arrived at the scene and you saw
15   Jason, did he exhibit signs of emotional distress?
16   **A**   He showed sign of aggression.
17   **Q**   Did you see him speaking?
18   **A**   He was mumbling something, but I could not
19   understand what he was either mumbling or attempting
20   to say.
21   **Q**   Does a normal person in a normal emotional
22   state in your opinion take their clothes off in
23   public?
24         MR. PLUNKERT:  Objection.  Foundation.
25   **A**   No.

Brian Kaminski                                          September 22, 2015

1      **Q**    (By Mr. Floyd) Does a rational person do

2    that?

3           MR. PLUNKERT:  Same objection.

4      **A**   No.

5      **Q**    (By Mr. Floyd) Do they pace back and forth

6    in their yard and talk to Jesus while they're naked

7    if they're in a normal, rational emotional state in

8    your opinion?

9           MR. PLUNKERT:  Same objection.

10     **A**   In my opinion no, but I have also seen that

11   with subjects that are on narcotics.

12     **Q**    (By Mr. Floyd) Did you happen to get the

13   information about the tox report on Jason after this

14   incident?

15     **A**   I've never received it, no.

16     **Q**    Would you be surprised to know that he was

17   not under the influence of any narcotics or drugs?

18          MR. PLUNKERT:  Objection to the form.  You

19   may answer.

20     **A**   I would say no.

21     **Q**    (By Mr. Floyd) And that some people can be

22   standing naked in their yard talking to Jesus and

23   pacing back and forth if they're experiencing a

24   mental illness or emotional distress.  You agree

25   with that?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                               Page 88
 1            MR. PLUNKERT:  Calls for speculation.
 2      A   I agree.
 3      Q   (By Mr. Floyd) Did you perceive Jason as a
 4   criminal suspect or an emotionally disturbed person
 5   with a serious medical emergency?
 6            MR. PLUNKERT:  Objection to the form.  You
 7   may answer.
 8      A   I didn't perceive him as anything until he
 9   came aggressively at me.
10      Q   (By Mr. Floyd) Knowing that you have an
11   individual at 6:46 in the morning naked in his front
12   yard pacing back and forth, did you consider the
13   possibility that there may be a crisis situation and
14   that he was a person with a medical emergency?
15      A   At that time, no.
16      Q   Did you have adequate training as a police
17   officer at that time to recognize that a person
18   exhibiting the behavior that Mr. Moore was
19   exhibiting on September 17, 2011, might be
20   indicative of mental illness or emotional distress?
21            MR. PLUNKERT:  Object to foundation.  You
22   may answer.
23      A   I did not have a good amount of training on
24   that, no.
25      Q   (By Mr. Floyd) Since that time after this
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 89

 1    incident you've had crisis intervention training?

 2        **A**    Correct.

 3        **Q**    And the crisis intervention training that

 4    you've had now would lead you to a different

 5    conclusion, would it not?

 6        **A**    It's all on --

 7             MR. PLUNKERT:  Calls for speculation.  You

 8    can answer.

 9        **A**    It's all on different situations.  Every

10    situation is different.  I would not know what I

11    would --

12        **Q**    (By Mr. Floyd) The crisis intervention

13    training that you've completed educates you that

14    there are individuals that suffer from agitated

15    delirium, excited delirium, chaotic events; is that

16    correct?

17             MR. PLUNKERT:  Same.

18        **A**    Correct.

19        **Q**    (By Mr. Floyd) And emotional distress,

20    correct?

21             MR. PLUNKERT:  Same.

22        **Q**    (By Mr. Floyd) Is that yes?

23        **A**    Yes, sir.

24        **Q**    And that in some of these cases with excited

25    delirium, the individuals will oftentimes be naked.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

```
                                                   Page 90
 1   You understand that, correct?

 2       A    Yes, sir.

 3       Q    And that was part of the crisis intervention

 4   training, correct?

 5       A    Correct.

 6       Q    It's a very easy symptom to detect with

 7   excited delirium, is it not?

 8            MR. PLUNKERT:  Object to form.

 9       A    Yes, sir.

10       Q    (By Mr. Floyd) Someone naked in the front

11   yard talking nonsense; do you agree?

12            MR. PLUNKERT:  Same.

13       A    I agree.  It's also a very good symptom of

14   showing of somebody being on PCP or

15   methamphetamines.

16       Q    (By Mr. Floyd) Whatever -- and I won't

17   discuss, you know, we won't have you give a medical

18   diagnosis, but assuming that someone can become in a

19   state of excited delirium or agitated delirium for

20   many, many different reasons, one of them being drug

21   withdrawal, drug overdose, schizophrenia, withdrawal

22   from psychiatric medication, a variety of other

23   things.  Regardless of why they get in the state of

24   excited delirium, you understand I'm not asking

25   about those.  Okay?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                                  Page 91
   1        A    Okay.
   2        Q    Did you talk about any of those in your
   3    training?
   4        A    Of?
   5        Q    The various ways that the brain can get to
   6    excited delirium?  The dopamine, those types of
   7    things, did you discuss that?
   8        A    Very briefly, yes.
   9        Q    And that the brain will have an overload of
  10    dopamine and it will cause the person to go into
  11    excited delirium?  You understood that?
  12        A    Chemical imbalance, yes.
  13        Q    And that there's many different things that
  14    can cause that chemical imbalance, correct?
  15        A    Correct.
  16        Q    It's not your job to know that, though, is
  17    it?
  18        A    No, sir.
  19        Q    It's just your job after the training to
  20    recognize when someone is in a state of excited
  21    delirium, whether they got there because of their
  22    own wrongdoing or because of something out of their
  23    control, correct?
  24        A    Correct.
  25        Q    And you don't know whether they got in that
```

Page 92

1    state because they did something to cause it or

2    whether it just happened to their body, correct?

3        **A**    Correct.

4        **Q**    And you understand that now that someone

5    that's in a state of excited delirium, they could be

6    suffering from a serious medical condition, correct?

7        **A**    Correct.

8        **Q**    And that that person needs help, correct?

9        **A**    Correct.

10       **Q**    And if they are naked and they're not

11   carrying a weapon, you know they can't shoot you,

12   correct?

13       **A**    That is true.

14            MR. PLUNKERT:  Object to the form and

15   foundation.

16       **Q**    (By Mr. Floyd) And at the time on

17   September 17, 2011, you didn't have that crisis

18   intervention training, did you?

19       **A**    No, sir.

20       **Q**    Did you know that other officers were

21   dispatched to the scene on September 17, 2011,

22   besides yourself?

23       **A**    I know the call came out and there were a

24   few officers that responded.

25       **Q**    Did you know how close those other officers

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 93

 1  were to the scene when you arrived?

 2      A   No, sir.

 3      Q   Did you consider waiting for backup before

 4  approaching Mr. Moore?

 5      A   No, sir.

 6      Q   Why not?

 7      A   Because he was close to the road, a highly

 8  trafficked flowing area.  It was rush hour.  It was

 9  rush hour on a Saturday morning, but it was still --

10  it's still a highly traveled road.

11      Q   Why don't you look through these and tell me

12  if there's one -- we'll start by just letting you

13  look at this map.  And take your time.  There's a

14  couple different views.  And see if you can find one

15  that will help us visualize.

16          MR. FLOYD:  Have we already used 13?

17          THE WITNESS:  Thirteen has been used, yes.

18                       (Exhibits 14, 15 and 16 were

19                       marked for identification by the

20                       court reporter.)

21      Q   (By Mr. Floyd) Take a look at 14, 15 and 16,

22  and take your time and try to find one of those that

23  will help you describe where the scene unfolded.

24      A   The closest one would probably be Number 14.

25      Q   Fourteen.  Can I see that again?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

```
                                                    Page 94
  1                  You have an extra pen?  Well, you've
  2    got a pen.  I'm sorry.
  3        A    Yeah.  I have a pen.
  4        Q    Okay.  So looking at Exhibit 14 then, can
  5    you tell me identifying the roads there where -- is
  6    it -- is it Henquin?  How do you say that?
  7        A    Henquin.
  8        Q    Henquin.  Is that Henquin going right down
  9    the middle of the exhibit?
 10        A    Correct.
 11        Q    And is that -- where is Airport Road?
 12        A    Airport Road is the four-lane road at the
 13    bend.
 14             MR. PLUNKERT:  Do you mind if we take a
 15    quick break?
 16             MR. FLOYD:  Sure.  We can do that.
 17             THE VIDEOGRAPHER:  Off the record at 11:23.
 18                    (Recess taken.)
 19             THE VIDEOGRAPHER:  Back on the record at
 20    11:37.
 21        Q    (By Mr. Floyd) Okay.  We're back on the
 22    record.  And when we took the break, we were
 23    discussing Exhibit 14 which is a Google map of the
 24    area that I believe involved the incident.
 25                  Can you take a look at Exhibit 14 and
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                      September 22, 2015

                                                        Page 95

 1    tell me is that a good Google map of the area where

 2    the incident took place?

 3        A    Yes, sir, it is.

 4        Q    And which road did you approach Henquin

 5    from?  And can you spell Henquin for the record?

 6        A    It is H-E-Q-U-I-N [sic].

 7        Q    Okay.  And which way did you -- in which

 8    direction -- and if you don't know, that's okay.

 9    Which direction does Henquin run?  Is it north,

10    south, east, west?

11        A    Henquin runs north and south.

12        Q    Okay.  And looking at Exhibit 14, would the

13    north side be closer to Airport Road, or would the

14    north side be at the top of the page?

15        A    North side would be at the top of the page.

16        Q    Okay.  That's the way I have it drawn.

17    Okay.  And so which way did you enter, if you

18    recall, which way did you enter the area?  Did you

19    first stop on Airport Road?  Henquin?  Where did you

20    stop your vehicle?

21        A    I came -- I was traveling westbound on

22    Airport Road, saw Mr. Moore coming out of the back

23    of the building right there with the white vehicle

24    in front of it.

25        Q    (By Mr. Floyd) Okay.

Case: 4:14-cv-01443-SNLJ   Doc. #:  64-1   Filed: 04/29/16   Page: 97 of 234 PageID #: 690

Page 96

```
 1          MR. PLUNKERT:  Do you want -- the record is
 2   not going to reflect where.  Do you want to hold it
 3   up for the video?
 4      A    Okay.  Mr. Moore was coming from the rear of
 5   this building right here, which is --
 6      Q    (By Mr. Floyd) Was he -- okay.  And so the
 7   rear of the building, is that a -- was that
 8   previously like a dry cleaners or something?
 9      A    It was a washing machine repair shop.
10      Q    Okay.  Washing machine repair shop.  And
11   which side of the building, with relation to that
12   white truck that's on exhibit, was it the side of
13   the building where the white truck is or the back of
14   it?
15      A    It was the back of it.  It was the west side
16   of the building.
17      Q    Okay.  The west side of it.  And so where
18   did you pull your vehicle?
19      A    I pulled my vehicle basically where the
20   white van was parked at.  A little bit closer to the
21   west side of the building than where the white van.
22   I would say probably in the -- and right in front of
23   the third parking spot.
24      Q    What day of the week was this?
25      A    On a Saturday.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 97

1    **Q**    So it's Saturday morning?

2    **A**    Correct.

3    **Q**    And this is predominantly a residential

4    neighborhood?

5    **A**    Correct.

6    **Q**    And you indicated that when you arrived on

7    the scene, you're in the parking lot.  You were the

8    closest person to Moore; is that correct?

9    **A**    Correct.

10   **Q**    Did you see any other people in the parking

11   lot?

12   **A**    No, sir.

13   **Q**    Did you see any other people near him?

14   **A**    No, sir.  It was just all vehicles.

15   **Q**    Okay.  And were there any other vehicles in

16   the parking lot?

17   **A**    I don't recall.

18   **Q**    And when you first saw him, your testimony

19   was you didn't consider him to be a person with a --

20   I asked you someone with a serious medical emergency

21   or criminal suspect, and you said an aggressive

22   person.  Was that your answer?

23   **A**    Yes, sir.

24   **Q**    Now, you park your vehicle.  Is it on the

25   south side of the building?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 98

```
 1      A    Yes, sir.

 2      Q    Just west of where the white truck is?

 3      A    Correct.

 4      Q    Can you mark on that, if your pen will on

 5    that exhibit, where you parked your vehicle?  Can

 6    you hold that up for the videographer?  He may or

 7    may not be able to zoom in.  I'm not sure.

 8           MR. PLUNKERT:  You marked with an X.

 9      A    Marked with an X right there.

10           THE VIDEOGRAPHER:  Thank you.

11                      (Exhibit 17 was marked for

12                       identification by the court

13                       reporter.)

14      Q    (By Mr. Floyd) Let's do this.  Let's go to

15    Exhibit 17.  It's the same picture except it's

16    zoomed, so it might be easier to work with.  Do you

17    agree with me on that?

18      A    Yes, sir.

19      Q    So let's just pick back up where we were,

20    and let's go to 17 because it's the same picture.

21    It's just zoomed.  Can you mark on that photograph

22    with an X where your vehicle parked in the parking

23    lot?

24      A    Parked right there.

25      Q    Okay.  And point with your pen where
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 99

1   Mr. Moore was when you saw him.

2       A    Approximately right here.

3       Q    Okay.  And you would agree that the traffic

4   on a Saturday morning at 6:45 in the morning, 6:46

5   in the morning is light?

6       A    It was not light that morning, no.  Normally

7   it's light, but that Saturday morning it was not

8   light.

9       Q    So you're saying that on this particular day

10  there was an anomaly as far as the traffic is

11  concerned and there was heavier traffic than usual?

12      A    Correct.

13      Q    And what do you base that information on?

14  Is that -- and I'm asking you.  Well, let me ask it

15  this way.  And are you making that conclusion based

16  upon your observations?

17      A    Yes, sir.

18      Q    Anything else you base it on?

19      A    Just being in the area on Saturday mornings,

20  and it was heavier traffic than normal.

21      Q    Okay.  And was Mr. Moore clothed when you

22  saw him?

23      A    No, sir.

24      Q    Did he have any weapons on his person that

25  you could see?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

```
                                                    Page 100
    1      A   No, sir.

    2      Q   Were you able to see his hands?

    3      A   Yes, sir.

    4      Q   Did you shine any lights on him?

    5      A   No, sir.

    6      Q   When you observed Jason, did you hear him

    7   saying anything?

    8      A   Not right away, no.  He was -- once I

    9   started commanding him to come towards me, he

   10   started yelling, mumbling.  I was unable to tell

   11   what he was saying.

   12      Q   How much time elapsed from the time that you

   13   pulled up in your vehicle until you said something

   14   to him?

   15      A   I'd say approximately 30, 45 seconds.

   16      Q   What did you do during that 30 or 45 seconds

   17   before you said something to him?

   18      A   I exited my vehicle and started walking

   19   towards him.

   20      Q   Did you radio dispatch?

   21      A   When I exited my vehicle, yes.

   22      Q   What did you tell them?

   23      A   That I have located the subject at the

   24   intersection of Airport and Henquin.

   25      Q   Did you do a threat assessment?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 101

1      **A**   Yeah.  In my head.

2      **Q**   Well, tell me about that.  What was your

3   threat?  What was your precontact, well, precontact

4   threat assessment?  Let's make sure we're on the

5   same terms here.  Do you know what a precontact

6   threat assessment is?

7      **A**   Yeah.  Before I made any kind of contact

8   with him.

9      **Q**   Is that something you're required to do?

10     **A**   Yes.

11     **Q**   And what would have been the things that you

12   went through on your precontact threat assessment?

13     **A**   Weapons.

14     **Q**   He had none?

15     **A**   He had none.  Stature to where, you know,

16   body language, and verbal language.

17     **Q**   And you knew that other officers had been

18   dispatched, correct?

19     **A**   Correct.

20     **Q**   And he was standing stationary when you

21   arrived, correct?

22     **A**   Correct.

23     **Q**   He wasn't running around, was he?

24     **A**   Not at this time, no.

25     **Q**   He didn't start to move around until you

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

```
                                              Page 102
  1   spoke to him, correct?

  2        A    Correct.

  3        Q    And the information that you had at that

  4   time was there was a naked man in the yards in the

  5   neighborhood walking around, correct?

  6        A    We received a call for him being in the

  7   middle of Airport Road hitting cars as they drove,

  8   as they passed by.

  9        Q    And that he was naked was part of it?

 10        A    And that he was naked, yeah.

 11        Q    And you made the decision to approach him by

 12   yourself without backup, correct?

 13        A    Correct.

 14        Q    You're not carrying any mace at that time,

 15   correct?

 16        A    Correct.

 17        Q    And that was a personal decision that you

 18   made not to carry it, correct?

 19        A    Correct.

 20        Q    And the weapons available to you at that

 21   time would have been what?

 22        A    My baton, my Taser and my firearm.

 23        Q    What's the most lethal of those weapons?

 24        A    Firearm.

 25        Q    What's the next lethal?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 103

 1      **A**    I would say baton.

 2             MR. PLUNKERT:  Foundation.

 3      **Q**    (By Mr. Floyd) It's your position that a

 4    baton is more lethal than a Taser?

 5      **A**    Yes, sir.

 6      **Q**    What's your basis for that?

 7             MR. PLUNKERT:  Same.  Go ahead.

 8      **A**    Stories I've read with police getting to

 9    assaults using their batons, accidently striking

10    them in the head, accidently striking them in the

11    back of the neck.

12      **Q**    (By Mr. Floyd) You control where you hit

13    them with the baton, correct?

14      **A**    No.

15      **Q**    You don't control where you hit them with

16    the baton?

17      **A**    During the situation, this is no control of

18    where that baton is being swung, because you swing

19    it at center of mass.  If he ducks, it's going

20    straight to his head.

21      **Q**    It'd have to be a pretty big duck if you

22    swung at a center mass to get all the way down to

23    his head; would you agree?

24             MR. PLUNKERT:  Objection to the form and

25    foundation.  You may answer.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

Page 104

```
 1        Q    (By Mr. Floyd) Do you agree?

 2        A    I agree.

 3        Q    Okay.  What are the -- what's your protocol

 4   for approaching a subject?  Is there a protocol?

 5   Let's start with this.  Is there a protocol for you

 6   approaching a subject under the circumstances that

 7   we have, a naked person standing in the street?  Is

 8   there a series of, you know, force continuum

 9   contact?  What does your training tell you to do at

10   that time?

11        A    My training tells me to remove him away from

12   any kind of harm to himself.

13        Q    Okay.  When you first saw him, you indicated

14   that you saw him as an aggressor.  Have you now

15   changed your evaluation of harm to himself, because

16   I'm trying to make sure I understand that you didn't

17   consider him somebody with a serious medical

18   condition or mental illness?

19             MR. PLUNKERT:  Object to the form.

20        Q    (By Mr. Floyd) Is that correct?

21             MR. PLUNKERT:  You may answer.

22        A    That is correct.

23        Q    (By Mr. Floyd) Okay.  So at what point did

24   you change your assessment and say I'm worried about

25   him harming himself?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

```
                                                       Page 105
 1      A    When he walked from the back of the building
 2   to the curb.
 3      Q    That was the first time that you came to
 4   that conclusion?
 5      A    Yes.
 6      Q    And did you say anything to calm him down
 7   like I'm here to help you; I'm not going to hurt
 8   you; everything is going to be okay?  Anything like
 9   that?
10      A    No.  I stated, come over here away from the
11   curb.
12      Q    You told him to come towards you?
13      A    Yes.
14      Q    And you were walking towards him?
15      A    Correct.
16      Q    So while you're walking towards him, you're
17   telling him to come towards you, correct?
18      A    Correct.
19      Q    Would you agree that crisis intervention
20   training that you've subsequently had would suggest
21   that you try to calm someone in his situation and
22   say -- and say something to the tune of I'm not
23   going to hurt you; I'm here to help you; I'm going
24   to keep my distance?  Would you agree with that?
25           MR. PLUNKERT:  Form and foundation.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                September 22, 2015

Page 106

1    **A**   With the training I've had prior to that,
2    yes.
3    **Q**   (By Mr. Floyd) Yes.  But that you didn't
4    have the training at that time, correct?
5    **A**   Correct.
6    **Q**   And you didn't do those things, correct?
7    **A**   Correct.
8    **Q**   Instead you walked towards him while he was
9    standing stationary at the time, and you told him to
10   come towards you, correct?
11   **A**   Correct.
12   **Q**   And at some point did you raise your voice
13   at him?
14   **A**   I don't recall if I did or not.
15   **Q**   Were you yelling at him?
16   **A**   At first, no.
17   **Q**   When did you start yelling?
18   **A**   When he started coming at me in an
19   aggressive manner.
20   **Q**   How far was he from you when you got out of
21   your vehicle?
22        MR. PLUNKERT:  Calls for speculation.
23   **Q**   (By Mr. Floyd) What was the distance between
24   you, in your best estimate, between your vehicle and
25   Mr. Moore when you first saw him?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

                                              Page 107

 1          MR. PLUNKERT:  Calls for speculation.  You

 2    can answer.

 3       A    25, 30 feet.

 4       Q    (By Mr. Floyd) And so based upon your

 5    Exhibit 17, can you make an X where, if you haven't

 6    done it, make an X where Mr. Moore was standing?

 7    And then hold that up for the videographer, please.

 8       A    Right there.

 9          THE VIDEOGRAPHER:  One second.  Thank you.

10          MR. PLUNKERT:  Do you want to use different

11    colors so that you can tell it apart from where he

12    parked?

13          MR. FLOYD:  No.  That's okay.

14          MR. PLUNKERT:  Okay.

15       Q    (By Mr. Floyd) And so now the -- was there

16    an option for you to go back into your vehicle when

17    he came towards you?

18       A    Yeah.  Yes.

19       Q    Was there an option for you to go back in

20    your vehicle and wait for backup?

21       A    Yes.

22       Q    And at any point did you believe he had a

23    weapon?

24       A    No.

25       Q    He wasn't a threat to any other individuals

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                              Page 108
 1   there, was he?

 2            MR. PLUNKERT:  Object.  Calls for

 3   speculation.  You may answer.

 4       Q   (By Mr. Floyd) From your perception?

 5            MR. PLUNKERT:  The same.

 6       A   No individuals were out, no.  It was just

 7   vehicles.

 8       Q   (By Mr. Floyd) The only -- were there any

 9   threats that you perceived?

10       A   Towards me?

11       Q   Yes.

12       A   Yes.  When he came towards me.

13       Q   Before.  Before you approached him?

14       A   No.  Just to himself.  I was afraid he was

15   going to step off the curb in the traffic again.

16                As you can see on that picture,

17   Airport Road has a bend in it.  And there is also a

18   hill right there.  So when you come over the hill

19   into the bend, it's kind of hard to see that corner

20   of the area.

21       Q   When you saw him standing -- well, strike

22   that.

23                Where did you see Moore first in the

24   parking lot?  Was he standing in the very spot that

25   you saw him when you pulled into the parking lot?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                              Page 109
 1   Because I think you indicated he didn't move.

 2       A    He was -- he walked from the back of the

 3   building.  As he was walking, that's when I was

 4   pulling into the parking lot.

 5       Q    How much time elapsed from the time that you

 6   arrived at the scene until Officer White showed up?

 7       A    That one --

 8            MR. PLUNKERT:  Calls for speculation.  You

 9   may answer.

10       A    I am not quite sure.

11       Q    (By Mr. Floyd) The report shows him to be

12   there within a minute of you.  Did you realize that?

13            MR. PLUNKERT:  Objection.  Same objection.

14       A    It's probably not to the area, that report

15   within the minute.  It was probably he called out

16   that he was in the area from the time -- because

17   like I said, when we're searching for somebody, we

18   put ourselves in the area.  We don't put it exactly

19   at that address.

20       Q    (By Mr. Floyd) If the dispatch records

21   establish that Officer White was on the scene within

22   a minute of you being on the scene or a minute and a

23   half, would you dispute that?

24       A    I would probably dispute that, yes.

25       Q    And what would be your basis for disputing
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

Page 110

1    that?

2        **A**    The time lapse between me showing up and

3    Officer White getting there.

4        **Q**    Do you agree that Officer White was present

5    on the scene before the third Tase was administered?

6            MR. PLUNKERT:  Objection.  Calls for

7    speculation.  You may answer.

8        **A**    If I'm recalling it, he either showed up

9    during the third Tase or right after the third Tase.

10       **Q**    (By Mr. Floyd) Okay.  What do you mean by

11   showed up?  Where did he enter?  From this

12   Exhibit 17, where did Officer White enter the scene?

13       **A**    Henquin is a road that snakes across from

14   Airport Road.  As you can see, there's a parking lot

15   right here.  On this side of the parking lot right

16   here, Henquin also is on that side of Airport Road.

17       **Q**    Uh-huh.

18       **A**    He came from that side of Henquin and came

19   over when I called out that I had him at that

20   location.  So he was -- back here is another

21   subdivision that he was checking.

22       **Q**    Did he pull up in his vehicle?

23       **A**    He did pull up in his vehicle.

24       **Q**    And where did he park?  And he came from

25   northbound on Henquin?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 111

1      **A**    Yes.

2      **Q**    And did he pull up on Airport Road?

3      **A**    He pulled up into the parking lot also,

4   probably right about almost in front of the van.

5      **Q**    Okay.  So he parked just east of -- was he

6   just south of the van, the white van that's on

7   the --

8      **A**    Yeah.  Yeah.

9      **Q**    And when did you become aware of his

10  presence?

11     **A**    When I saw his vehicle pull into the parking

12  lot.

13     **Q**    Okay.  And at that time had you already

14  had -- deployed your Taser into Mr. Moore?

15     **A**    Yes.

16     **Q**    And where was -- where was -- where did the

17  Tasing take place?

18     **A**    The first one took place about midway into

19  the parking lot between where I originally saw

20  Mr. Moore and my vehicle.

21     **Q**    Can you -- I've got a blue pen.  Maybe you

22  can just put a circle --

23     **A**    Okay.

24     **Q**    -- a big circle where Mr. Moore was

25  positioned when he was Tased.

Case: 4:14-cv-01443-SNLJ   Doc. #:  64-1   Filed: 04/29/16   Page: 113 of 234 PageID #:
706

```
                                                  Page 112

  1       A    The first time he was approximately in

  2   between where he was and where I parked my vehicle.

  3       Q    Did that position change at any time

  4   during --

  5       A    Yes.

  6       Q    It changed?

  7       A    Because when he fell.  And when he fell, he

  8   fell a little bit closer to my vehicle.

  9       Q    Okay.

 10       A    When he got back up on his knees and I Tased

 11   him for a second time, he lunged again and was right

 12   about my tire of my patrol vehicle.

 13       Q    Okay.

 14       A    Then the third time, he ended up about

 15   midway in the doors of my vehicle.

 16       Q    Okay.  And is any of this documented in your

 17   report that he's -- his position moved from Tase to

 18   Tase?

 19       A    That I don't recall.  Let me take a look.

 20   No.  It does not recall.  It does not say.

 21       Q    I mean, the report doesn't indicate that he

 22   ever got back up on his feet, does it?

 23       A    He never got back to his feet.  He was onto

 24   his knees both times when I administered the other

 25   bursts.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

```
                                                Page 113
 1       Q    Is there anywhere in your report that
 2   indicates that he was on his knees?
 3       A    No.  It just states that he attempted to get
 4   back up onto his feet.
 5       Q    Okay.  But you would agree at the end of the
 6   Tasing process, he was closer to the building than
 7   he was Airport Road?  Fair statement?  Closer to the
 8   building in the parking lot that's identified on
 9   Exhibit 17 than he was Airport Road?
10       A    I agree with that, yes.
11       Q    And did Officer White cuff Mr. Moore while
12   Mr. Moore was under load, or was it after the load
13   was administered?
14       A    I believe he started cuffing him while the
15   burst was going.  It was right at the end of the
16   burst though.
17       Q    And for the record, you didn't make any
18   attempt to calm Mr. Moore before Tasing him or
19   approaching him; is that a fair statement?
20       A    Yes.
21       Q    Did you make any attempt to delay contact
22   with Mr. Moore until backup arrived?
23       A    No.
24       Q    Would you agree if backup had been on the
25   scene with you, that it would have been possible to
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

                                                  Page 114

 1   perform a cuffing under load on the first Tase?

 2        MR. PLUNKERT:  Calls for speculation.  You

 3   may answer.

 4      **A**   If an officer was there with me quicker,

 5   yes.

 6      **Q**   (By Mr. Floyd) Have you been trained to cuff

 7   under load?

 8      **A**   Yes.

 9      **Q**   Has Officer White been trained to cuff under

10   load?

11        MR. PLUNKERT:  Object to foundation.  You

12   may answer.

13      **A**   He should have been, yes.

14      **Q**   (By Mr. Floyd) As far as you know, are all

15   Ferguson officers trained to cuff under load?

16      **A**   Yes.

17        MR. PLUNKERT:  Object to foundation.

18      **Q**   (By Mr. Floyd) Is that a yes?

19      **A**   Yes.

20      **Q**   Would you agree that you didn't utilize any

21   of the crisis intervention skills that you learned

22   in the crisis intervention training that you had

23   subsequent to this?  I mean, I'm saying -- I'm not

24   saying -- I'm saying you didn't know those skills.

25   So after -- let me state it like this so it's not

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 115

1    confusing.  Subsequent to this event you took a

2    crisis intervening course, correct?

3        **A**    Correct.

4        **Q**    And you learned skills and protocols and

5    techniques for dealing with emotionally disturbed,

6    excited delirium and mentally ill people, correct?

7        **A**    Correct.

8        **Q**    And the skills that -- had you had this

9    training course before this incident, there would

10   have been some things you could have done

11   differently, correct?

12           MR. PLUNKERT:  That calls for speculation.

13   Lack of foundation.  You may answer.

14       **A**    Every situation is different.  I don't know.

15       **Q**    (By Mr. Floyd) You could have at least tried

16   some of the things that you learned in crisis

17   intervention training, correct?

18           MR. PLUNKERT:  Same objections.

19       **A**    It's possible, yes.

20       **Q**    (By Mr. Floyd) What happened to Moore when

21   the darts entered his body and the load entered his

22   body?

23           MR. PLUNKERT:  Object to form.  Go ahead.

24       **A**    He fell down.

25       **Q**    (By Mr. Floyd) Did he fall, drop hard?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 116

1      **A**   He fell, yes, face -- or face down, yes.

2      **Q**   He went face first.  Not meaning his head

3    hit first, but he just collapsed?  Did he collapse

4    forward?

5      **A**   Yes.

6      **Q**   And hit the asphalt?

7      **A**   Correct.

8      **Q**   And you indicated that during this period,

9    that you gave commands to Mr. Moore, correct?

10     **A**   Correct.

11     **Q**   You gave him commands while he was under

12   load?

13     **A**   Correct.

14     **Q**   And you gave him commands when the load was

15   finished?

16     **A**   Correct.

17     **Q**   And you previously indicated that you gave

18   him a couple of commands after the load was

19   finished, correct?

20     **A**   I would say probably two, yes.

21     **Q**   Okay.  And then he started to get back up,

22   correct?

23     **A**   Correct.

24     **Q**   And although it doesn't state it in the

25   report, you indicated that he got up to the level of

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                September 22, 2015

Page 117

1   his knees, correct?

2        **A**    Correct.

3        **Q**    And then you Tased him again?

4        **A**    Yes, sir.

5        **Q**    Is that correct?

6        **A**    Yes, sir.

7        **Q**    And what was Jason's body position after the

8   second Tase?  During the second Tase what happened

9   to him?  Did he fall back down?

10       **A**    Yes.  His body tightened up, and he went

11  from the kneeling position to laying back on his

12  belly.

13       **Q**    Okay.  And --

14            MR. PLUNKERT:  Did you say belly or belt?

15            THE WITNESS:  Belly.

16            MR. PLUNKERT:  Okay.

17       **Q**    (By Mr. Floyd) I think I had asked you this

18  before.  I will ask it again.  Did you notice the

19  probe in his chest when Jason was up on his knees?

20       **A**    I did not.

21       **Q**    Where did you -- on the Taser there are

22  lasers, correct?

23       **A**    Correct.

24       **Q**    How many lasers?

25       **A**    One.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                      September 22, 2015

Page 118

1     **Q**   And is that for the main dart?  There's one

2   that's got --

3     **A**   The top dart goes at an upper angle.  One

4   I'd say is 8 degrees.  The bottom dart goes down at

5   a 3-degree angle.

6     **Q**   Do you know which dart has -- which one's

7   the ground and which one's the charge?

8     **A**   That I do not know.

9     **Q**   What were your exact words to Moore, if you

10  can recall the commands that you gave him during

11  right after the first load, after the first Taser

12  load?  Do you remember?

13    **A**   I honestly do not remember what the exact

14  words were.

15    **Q**   Okay.  And do you understand that a person

16  under load often cannot hear commands while they're

17  under load?

18    **A**   Correct.

19        MR. PLUNKERT:  Lack of foundation.  You may

20  answer.

21    **Q**   (By Mr. Floyd) I'm asking him if he knows

22  that.  Do you know that?

23    **A**   I do not.

24        MR. PLUNKERT:  That calls for speculation.

25  You may answer.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 119

1      **Q**   (By Mr. Floyd) Are you guessing about that

2   or have you been trained on that?

3      **A**   That they sometimes do not respond?

4      **Q**   Yes.

5      **A**   Yes, I've been trained on that.

6      **Q**   And does the training also suggest that

7   commands under load aren't reliable in making a

8   submission recognition assessment?

9      **A**   Yes.

10      **Q**   So what I mean by that is if you give a

11   command while someone is under load and they don't

12   comply, it may very well be because they didn't

13   comprehend the command because they were under load

14   and couldn't comprehend it.  Do you understand that?

15         MR. PLUNKERT:  Lack of foundation.  Calls

16   for speculation.  You may answer.

17      **A**   Yes, sir.

18      **Q**   (By Mr. Floyd) You do understand that.  And

19   what I'm stating is what you understand the training

20   to dictate, correct?

21      **A**   Correct.

22         MR. PLUNKERT:  Same objections.

23      **Q**   (By Mr. Floyd) Did they tell you, did any of

24   the training instructors or anyone tell you why a

25   command while someone is under load isn't effective

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                   September 22, 2015

Page 120

1    or might not be comprehended?

2        **A**   Because a lot of times they cannot

3    physically do the commands that you're stating.

4        **Q**   Do they sometimes have trouble since it

5    affects their sensory function and their nervous

6    system that the subject sometimes can't hear what's

7    being said while he is being Tased?

8            MR. PLUNKERT:  Object to foundation.  You

9    may answer.

10       **A**   I believe so, yes.

11       **Q**   (By Mr. Floyd) And you would agree that in

12   order to conduct a proper submission recognition

13   assessment, that you would have to give a command to

14   a subject after the load had been deployed, correct?

15       **A**   Right.

16       **Q**   Correct?

17       **A**   Correct.

18       **Q**   And did you do that in this situation?

19       **A**   Yes, sir.

20       **Q**   And did you say you gave him two --

21       **A**   Yes, sir.

22       **Q**   -- verbal commands after load was deployed?

23       **A**   Yes, sir.

24       **Q**   And that was after the first load, correct?

25       **A**   Correct.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 121

1     **Q**   Okay.  Then with the second load -- and
2   again after the first load if you had had pepper
3   spray, you would have had adequate time during the
4   first load and after the first load to spray
5   Mr. Moore with the pepper spray had you had it on
6   your person, correct?

7     **A**   Negative.

8         MR. PLUNKERT:  Objection.  Lack of
9   foundation.  Calls for speculation.  You may answer.

10    **A**   Once a Taser is deployed, you do not mix
11  Taser and OC spray together.

12    **Q**   (By Mr. Floyd) Why?

13    **A**   Because it can ignite the pepper spray with
14  the electric current.

15    **Q**   You didn't use a baton?

16    **A**   No, sir.

17    **Q**   You wouldn't have had -- there wouldn't have
18  been much risk of where he was going to be hit with
19  the baton while he's on the ground, correct?

20        MR. PLUNKERT:  Objection.  Lacks of
21  foundation.  Calls for speculation.  You may answer.

22    **A**   Correct.

23    **Q**   (By Mr. Floyd) Not much risk that he's going
24  to accidently get hit in the head if you're aiming
25  for his lower body or extremities, correct?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                             Page 122
 1            MR. PLUNKERT:   Same objections.
 2      A    Correct.
 3      Q    (By Mr. Floyd) Before issuing the second
 4   load to Mr. Moore, did you consider using any other
 5   type of less harmful tool to restrain him?
 6      A    No.
 7      Q    Any did you consider any less lethal forms
 8   of restraint other than the Taser after the first
 9   load?
10      A    No, sir.
11      Q    At this time, Jason's only threat to you
12   would have been his body, correct?
13      A    Correct.
14      Q    As he was laying on the ground with the
15   Taser prongs in his body, did you consider him to be
16   a threat to you?
17      A    Yes.
18      Q    What did you do when -- what did Jason do
19   when you delivered the second load?
20      A    He was on his knees.  When I delivered the
21   second load, he straighted out, was muscular, you
22   know.
23      Q    Muscular contractions?
24      A    Yeah.  The contractions straightened him out
25   and he fell forward again.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

```
                                                  Page 123

  1      Q    And these were five-second loads?

  2      A    Yes, sir.

  3      Q    50,000 volts?

  4      A    Yes, sir.

  5      Q    And you gave commands for him to comply?

  6      A    Correct.

  7      Q    And did you give those commands under load?

  8      A    Both.  Under load and without being on it.

  9      Q    And we're talking during the second load you

 10  gave him commands under load?

 11      A    Yes, sir.

 12      Q    Which we, based upon our conversations, we

 13  understand that those really aren't reliable,

 14  correct?

 15           MR. PLUNKERT:  Objection.  Object to the

 16  form.

 17      Q    (By Mr. Floyd) Would you agree?

 18      A    Every person is different.

 19      Q    But if somebody doesn't respond to a command

 20  while they're under load, you have to recognize that

 21  they may not have even heard or received the load or

 22  the command from their perspective because they were

 23  under load.  Do you agree with that?

 24      A    I agree with that.

 25           MR. PLUNKERT:  Object.  Foundation.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                              Page 124
 1              MR. FLOYD:  Could we just agree that you're
 2    going to object to foundation on all my questions
 3    because --
 4              MR. PLUNKERT:  No.
 5              MR. FLOYD:  -- it's kind of interrupting the
 6    answer and question, because now I've got to ask,
 7    because even if this gets editing, you're objecting
 8    in the middle of people talking?
 9              MR. PLUNKERT:  If you would like for a
10    foundation objection to be preserved for the record
11    and stipulate to that, pursuant to the federal rules
12    I'm willing to entertain that.
13              MR. FLOYD:  Okay.  Why don't we do that.
14              MR. PLUNKERT:  Okay.  So form and foundation
15    or all objections?
16              MR. DOWD:  Just form and foundation.
17              MR. FLOYD:  Form and foundation.
18              MR. PLUNKERT:  Okay.  So those are going to
19    be preserved for this deposition or for all
20    depositions?
21              MR. FLOYD:  For this deposition.
22              MR. PLUNKERT:  Okay.  Do we have an
23    agreement from all counsel here that that's going to
24    be the case?
25              MR. DOWD:  Agreed.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                           September 22, 2015

Page 125

1            MR. PLUNKERT:  And specifically in order to
2    preserve any problem I have with any of the
3    questions on this witness, I don't have to state
4    anything on the record, and I can raise that at any
5    point hereafter?  Is that agreed?
6            MR. DOWD:  As to form and foundation only.
7            MR. PLUNKERT:  Yeah.  I mean, I guess I'll
8    object to privileged, but that's about it.  Okay.
9       Q    (By Mr. Floyd) So getting back to the second
10   load, you gave a command to comply during the second
11   load, correct?
12      A    During and after.
13      Q    After.  What commands did you issue to
14   Mr. Moore during the load?
15           MR. PLUNKERT:  Is that -- by the way, Mark,
16   is that okay?
17           MR. FLOYD:  Yes.
18           MR. PLUNKERT:  And Todd and Bill, that's
19   okay?
20           MR. DOWD:  Yes.  Form and foundation.
21           MR. JOHNSON:  Agreed.
22           MR. PLUNKERT:  Okay.
23      A    I can't recall exactly what I said.  It was
24   most likely to stay on the ground.
25      Q    (By Mr. Floyd) And you gave him two commands

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                          Page 126
 1   verbal after the load?
 2       A    Uh-huh.
 3       Q    Is that yes?
 4       A    Yes.
 5       Q    And then he started to get back up?
 6       A    Correct.
 7       Q    And so give me an example of what you would
 8   say to him while he's -- after the load's
 9   administered?
10       A    Stay on the ground.  Put your hands behind
11   your back.
12       Q    Stay on the ground.  Put your hands behind
13   your back.  Stay on the ground.  Put your hands
14   behind your back.  Okay.  Would that be one command
15   and you would say that twice?
16       A    No.  That would be two commands.
17       Q    Okay.  Stay on the ground.  Put your hands
18   behind your back.  Do you say them so that they're
19   clear to him?
20       A    I believe so, yes.
21       Q    Okay.  And then he starts -- and then after
22   you give that command, how long do you wait before
23   you pull the trigger?  Do you give him a chance to
24   respond to it, like whoa, he just told me to stay on
25   the ground and put my hands behind my back?  Do you
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                           September 22, 2015

Page 127

1    give him any time to respond to that?  Does he get

2    like a second of leeway in order for him --

3        **A**    I would say a second.

4        **Q**    Okay.

5        **A**    Other than trying to get back up.

6        **Q**    So it might be a couple seconds to deliver

7    the warning and then a second to see if he's going

8    to respond to it?

9        **A**    I would say two seconds or so total, yeah.

10       **Q**    No less than two seconds though to deliver

11   all that, to deliver those warnings and then make

12   sure to determine whether he's going to follow them?

13       **A**    I would say probably.

14       **Q**    And then you -- where was Mr. Moore's body

15   position when you delivered the third load?

16       **A**    He was on his left side.

17       **Q**    And how would he have -- when you say left

18   side, was any part of his stomach touching the

19   ground or both hips or just his left hip, left

20   shoulder?

21       **A**    I would say -- I'm trying to remember.  Left

22   shoulder kind of leaning onto his stomach.

23       **Q**    And when you Tased him, was his body again

24   contracting and vibrating, shaking?

25       **A**    Correct.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 128

 1      **Q**   And during that five-second load, is that
 2   when, around that time is that when Officer White
 3   came up?
 4      **A**   Correct.  Around that time.
 5      **Q**   And cuffed him?
 6      **A**   Correct.
 7      **Q**   And then according to Officer White, it was
 8   approximately a minute, I thought it may have even
 9   been in excess of a minute after he was cuffed
10   before there was some recognition that Mr. Moore was
11   suffering from some breathing distress?
12      **A**   Correct.
13      **Q**   Now, what does your training tell you to do
14   after you have cuffed an individual?  Are they -- I
15   think the report shows that he was laying on his
16   stomach; is that correct?
17      **A**   Correct.
18      **Q**   Face down?
19      **A**   Correct.
20      **Q**   And you were there and Officer White was
21   there, correct?
22      **A**   Correct.
23      **Q**   Was there any other officers there?
24      **A**   At that time I don't believe so.
25      **Q**   Mr. Moore certainly was alive after the

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 129

1    first Tase, correct?

2        **A**    Correct.

3        **Q**    And he was alive after the second Tase,

4    correct?

5        **A**    Correct.

6        **Q**    And then from what you could see, he was

7    alive immediately after the third Tase, correct?

8        **A**    Correct.

9        **Q**    And it wasn't until approximately a minute

10   or so after the third Tase, the final Tase, that he

11   started to have breathing distress, correct?

12       **A**    Correct.

13       **Q**    And at no time was there any request for EMS

14   to come to the scene up until the point that he had

15   breathing distress, correct?

16       **A**    No.  As soon as the Tasers are deployed, EMS

17   is called to respond.

18       **Q**    Okay.  And was there ever any attempt to

19   place Mr. Moore in a seated position after he was

20   cuffed?

21       **A**    No.

22       **Q**    Was there any effort to place Mr. Moore in a

23   side position after he was cuffed?

24       **A**    When Officer -- after Officer White cuffed

25   him, we checked to make sure we were both okay, we

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                                   Page 130
 1   rolled him over onto his side to try and get some
 2   information out of him.  That's when we know or
 3   notice that he wasn't breathing.
 4       Q    That would have been the one minute or more
 5   after he was cuffed, correct?
 6       A    Correct.
 7       Q    So, and the reason that he would have been
 8   rolled over to his side would have been for you guys
 9   to elicit some information from him, correct?
10       A    Correct.
11       Q    So that I'm clear, is that after he was
12   cuffed he wasn't immediately placed in a seated or
13   side position, was he?
14       A    No, he was not.
15       Q    And he wasn't checked to ensure that he
16   wasn't suffering from any breathing distress,
17   correct?
18       A    Not right away, no.
19       Q    What does your -- does your -- well, strike
20   that.
21            Does your police training tell you
22   that you are supposed to place a subject that's in
23   custody that's been cuffed into a seated position or
24   side position to avoid breathing distress?
25       A    I've never been trained that, no.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 131

1      **Q**   So again, this would have been -- this
2   would -- the failure for you to do that you're
3   telling me is because you weren't trained to do that
4   by the City of Ferguson?
5      **A**   I have not been trained by any department or
6   police academy.
7      **Q**   You understood based upon your Taser
8   training that with each load that you deliver to
9   Jason, his risk of injury -- each Taser load that
10  you delivered to Jason, that his risk of injury or
11  death increased?
12     **A**   Correct.
13     **Q**   You also understood that he was at or maybe
14  that he was at -- or did you understand he was at a
15  heightened risk of injury due to his agitated state?
16     **A**   Correct.  Like, I couldn't -- I didn't know
17  if he was in an agitated state.  I didn't know if he
18  was in a drug-induced state.
19     **Q**   You understand that a thin build places an
20  individual at a heightened risk of injury or death
21  from a Taser, correct?
22     **A**   Correct.
23     **Q**   And you could see he had a thin build,
24  correct?
25     **A**   He was thin, yes, but he also had a lot of

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 132

1   muscle to him.

2       **Q**   And so you understood that you're delivering

3   50,000 volts of current through an individual, and

4   you've done that by your testimony three times,

5   correct?

6       **A**   Correct.

7       **Q**   Did you discharge a fourth load into Jason?

8       **A**   I have been told that the Taser --

9           MR. PLUNKERT:  Let me object at this point.

10          THE WITNESS:  Okay.

11          MR. PLUNKERT:  To the extent that don't

12  testify regarding what you -- your conversations

13  with attorneys.  If you consulted a document or

14  learned from someone other than your attorneys,

15  that's okay.  But to the extent that the question

16  asks for any communications between attorney-client,

17  I would instruct you not to answer.  Subject to that

18  you're free to answer otherwise.

19      **Q**   (By Mr. Floyd) So you told me that before in

20  preparation for this deposition that you consulted

21  two documents, your Taser training and the police

22  report?

23      **A**   Uh-huh.

24      **Q**   Taser training document didn't tell you how

25  many Tasers, how many loads you issued to Mr. Moore,

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                                 Page 133
 1   did it?

 2        A    No.

 3        Q    And the police report did tell you though,

 4   didn't it?

 5        A    It states three, yes.

 6        Q    Three times.  And when you filled out that

 7   Taser -- or when you filled out that police report,

 8   you are required to fill that report out honestly,

 9   correct?

10        A    Correct.

11        Q    And you filled that out within 24 hours of

12   the event, correct?

13        A    Correct.

14        Q    And in your report you indicated that there

15   were three loads, correct?

16        A    Correct.

17        Q    Have you seen any documents today that

18   change your position on that?

19        A    I have not seen them, no.

20        Q    What did you base the three -- what did you

21   base the total of three Tases in your report, how

22   did you -- what did you base that information on?

23   How did you justify that information that there was

24   three Tases?  Not two, not four, not five; three?

25        A    That's what I remember, pulling the trigger
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

```
                                                    Page 134
 1    three times.
 2       Q    Okay.  I'm going to hand you another
 3    exhibit.  What are we up to?  18?  18?
 4                    (Exhibit 18 was marked for
 5                     identification by the court
 6                     reporter.)
 7       Q    (By Mr. Floyd) This is the Bates stamp
 8    00091.  Have you ever seen one of these types of
 9    documents before?
10       A    I have not.
11       Q    I'm representing that Exhibit Number 18 is
12    the printout of the Taser download which documents
13    the charges that were run through the Taser, as well
14    as the time that those charges were run through the
15    Taser.
16                    So if you could look at this exhibit
17    and you go down to 947, which is the one, two,
18    three, four, fifth number in the left column from
19    the bottom, that shows that there was an event on
20    9/17 that was one second in duration.  And I suspect
21    that that would be when you spark your Taser?
22       A    Yes.  Spark test.
23       Q    And tell me about the spark test.
24       A    We hold the Taser up, turn it on, pull the
25    trigger and make sure you've got a good spark as --
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                          Page 135
 1   without the cartridge on it just so you know that it
 2   is functioning correctly.
 3       Q   When would you do a spark test?
 4       A   The beginning of your shifts.
 5       Q   Okay.  And then move down to 948, which is
 6   the one below it.  And on 9/17/11, 6:53 and 17
 7   seconds there is a charge, correct?
 8       A   Correct.
 9       Q   What's the duration?
10       A   It says six seconds.
11       Q   And then there's a 949 directly below that
12   on 9/17/11 at 6 minutes, 53 seconds -- 6 hours, 53
13   minutes and 22 seconds there is another charge.  And
14   if you do the math from the 6:53:17 to 6:53:22,
15   that's 18, 19, 20, 21, 22.  There's five seconds.
16            So this is documenting, as I
17   understand it, the time that each discharge was made
18   with the Taser, each load was given.  And based upon
19   this document here, it would appear that there was
20   no gap in between the last three discharges; that
21   they were continuous; and that there was no three
22   seconds or two seconds in between discharges; and
23   that at best there was a one-second gap between the
24   first one.  Do you see that?
25       A   Yes.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 136

1     **Q**   If that is in fact true, would you agree

2   that that is wholly and completely inconsistent with

3   the testimony that you gave about the lapse of time

4   in between the loads where you Tased Mr. Moore and

5   the period that you testified that you were giving

6   him commands to comply and waited to assess whether

7   he was going to comply before you would discharge

8   him again?  Would you agree that this document is

9   inconsistent with that testimony you gave?

10    **A**   I agree that my testimony states that I was

11  giving him commands.

12    **Q**   And if this document is --

13        MR. PLUNKERT:  Hang on.  I don't know if he

14  is done answering the question.

15    **A**   And I can't -- I can't go about how long I

16  thought it was.  I mean, apparently this is showing

17  that it was a second in between them, but there was

18  three different bursts that I did.

19    **Q**   (By Mr. Floyd) You would -- if I'm

20  interpreting this document correctly, which believe

21  I am.

22    **A**   Right.

23    **Q**   It would show that there were four bursts?

24    **A**   This -- correct.  Apparently.  I remember

25  three.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

Page 137

1      **Q**   Okay.  So there were four bursts.  And there

2   was no time in between the last three according to

3   this document.  Do you see that?

4      **A**   I do see that.  And I can't tell you why

5   because I know there was time in between them.

6      **Q**   So you're acknowledging that if this

7   document reads the way that I believe it reads, that

8   the evidence contained on the download from the

9   Taser weapon is inconsistent with the testimony that

10  you've given in this deposition?

11     **A**   I agree with that, yeah.

12     **Q**   And if in fact the evidence that's contained

13  on this document, Exhibit 18, which is the Taser

14  download information, it would suggest that there

15  was no gap between the last three Taser bursts and

16  loads, of five-second loads into Mr. Moore?  Would

17  you agree?

18     **A**   I agree that's what it says, yes.

19     **Q**   And you would agree from our testimony

20  earlier that in order for a compliance command to be

21  considered appropriate and proper, that you can't

22  give those compliance commands while a subject is

23  under load, correct?

24     **A**   On some subjects, correct.

25     **Q**   So this document, Exhibit Number 18, would

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

```
                                                    Page 138
 1    suggest that Mr. Moore was Tased four times,
 2    five-second bursts of 50,000 volts and that there's
 3    only a one-second gap between the first Tase.  And
 4    the last three Tases came consecutively without any
 5    time for you to do a submission recognition
 6    assessment.  Would you agree?
 7         A   I agree that's what it shows, yes.
 8         Q   Do you agree that issuing
 9    back-to-back-to-back Taser loads on a subject
10    without performing an appropriate submission
11    recognition assessment is inappropriate?
12         A   I would agree, yeah.
13         Q   Do you agree that Jason Moore's safety was
14    not protected by the failure to place him in a side
15    or seated position immediately after he was cuffed?
16         A   I do not agree with that, no.
17             MR. FLOYD:  I'm going to pass the questions
18    to one of these gentlemen unless you want to take a
19    break.  Take a break.
20             MR. PLUNKERT:  Okay.
21             THE VIDEOGRAPHER:  Off the record at 12:27.
22                   (Recess taken.)
23             THE VIDEOGRAPHER:  Back on the record at
24    12:39.
25         Q   (By Mr. Floyd) Sir, I have just a couple of
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

```
                                                      Page 139
 1   questions.  With regard to the CAD, did you ever see
 2   the transcript from the CAD related to this
 3   9/17/11 event?
 4      A    No, sir.
 5      Q    With regard to -- is it Lieutenant Ballard?
 6      A    Yes, sir.
 7      Q    I think I asked you this, but I wasn't sure
 8   what your answer was.  Do you have a recollection as
 9   to when Officer or Lieutenant Ballard arrived in
10   relation to when Moore was cuffed?
11      A    I do not.  I'm not quite sure when he
12   arrived on scene.
13      Q    And with regard to your Taser training, your
14   certification as a Taser instructor, I would assume
15   that you have Taser documents secondary to that
16   training?
17      A    I believe I do, yes.
18      Q    And do you keep those at home on your
19   computer or in a file, or how do you keep those?
20      A    I keep them in the file at home.  I recently
21   moved not too long ago and not quite sure where
22   they're at.
23      Q    And I want to hand you a couple of exhibits.
24                        (Exhibit 19 was marked for
25                         identification by the court
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                              Page 140
 1                         reporter.)

 2      Q    (By Mr. Floyd) The first one is marked

 3  Plaintiff's Exhibit 19.

 4          MR. PLUNKERT:   Thanks.

 5      Q    (By Mr. Floyd) Go ahead and take a look at

 6  that.   I'm going to represent to you that this is

 7  information of warnings produced by Taser.   And this

 8  would be information that is distributed to you

 9  personally from Taser.

10      A    Uh-huh.

11      Q    And you've seen this document before?

12      A    Yes, sir.

13      Q    And look down at the bottom.   That date is

14  May 1, 2010, correct, on the bottom left-hand

15  corner?

16      A    Correct.

17      Q    And you would have read through this

18  document?

19      A    Correct.

20      Q    We don't need to go through it now if you've

21  read through it, but you did receive this document

22  and you're aware of these warnings with Taser,

23  correct?

24      A    Yes, sir.

25      Q    Okay.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                      September 22, 2015

```
                                             Page 141
 1                       (Exhibit 21 was marked for
 2                       identification by the court
 3                       reporter.)
 4    Q    (By Mr. Floyd) All right.  And then I want
 5   to hand you what's marked Exhibit 21.
 6        MR. FLOYD:  That's the only one we've got?
 7        MR. DOWD:  Yes.
 8    Q    (By Mr. Floyd) Okay.  So I'm going to just
 9   hand this to your counsel first.  It's Ferguson --
10   it's Bates number Ferguson 1418.  And these are
11   instructor certification lesson plan for Taser dated
12   May 2010.  And I'm going to hand this entire
13   document to your counsel.  And then if you could
14   pass it to the witness.
15        MR. PLUNKERT:  Is there an Exhibit 20?
16        MR. FLOYD:  Sorry.  I'm going out of order.
17   My fault.
18        MR. DOWD:  He is going out of chronological
19   order.
20    A    I have this one in my car.
21    Q    (By Mr. Floyd) So that document there, you
22   can thumb through it.  Those would be the -- and
23   tell me what that is.
24    A    It's a lesson plan to teach the users on how
25   to use the Taser.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                            September 22, 2015

Page 142

 1      **Q**    And you're familiar with those documents and

 2    the information contained in those documents?

 3      **A**    Correct.  I have not seen them since 2010.

 4      **Q**    What's the title of that document on the

 5    cover?

 6      **A**    "Taser Training Academy, Instructor

 7    Certification Lesson Plan."

 8      **Q**    And what's the date on it?

 9      **A**    May 2010.

10      **Q**    Okay.  And then I've got -- and we can hand

11    that back and we'll keep them for the court

12    reporter.  We'll just leave them in the middle of

13    the table here.

14              One thing I wanted to ask you on

15    here, too.  Right where this paper clip is marked,

16    this page in particular, it's Version 17.  It says

17    Ferguson 1483.  And this page is paper clipped.  It

18    says.  "Cardiac.  We have issued new Taser target

19    guide."  And this is dated May of 2010?

20      **A**    Correct.

21      **Q**    I want to reference this page for you.  If

22    you can identify the top of that page.  You can take

23    the exhibit.

24      **A**    Yeah.  I know the page.

25      **Q**    Okay.  And for the videographer.  You're

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                September 22, 2015

```
                                              Page 143
 1   familiar with the contents on this page?
 2       A   Yes, sir.
 3       Q   And you were familiar with the contents on
 4   this page before September 11 -- September 17, 2011?
 5       A   Yes, sir.
 6                       (Exhibit 20 was marked for
 7                       identification by the court
 8                       reporter.)
 9       Q   (By Mr. Floyd) And then finally I want to
10   hand you what's marked Plaintiff's Exhibit 20.  Can
11   you identify that document for me?
12                   I represent that that would be more
13   information and warnings released by Taser as of May
14   of 2011.
15       A   Yes, sir.
16       Q   You're familiar with this document?
17       A   Yes.  This is the new -- this was the new
18   version, I would guess.
19       Q   As of May of 2011?
20       A   Correct.
21       Q   And you received -- you received this
22   information either in your -- and/or both the
23   July 2011 training from Taser International, and you
24   also receive emails from Taser?
25       A   I used to, yes.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 144

1      **Q**    Back then you did?

2      **A**    Back then I did, yes.

3      **Q**    And you would have received this email?

4      **A**    Correct.

5      **Q**    You have seen this document?

6      **A**    Yes, sir.

7      **Q**    And you would have seen it before

8   December 17, 2011?

9      **A**    Yes, sir.

10     **Q**    And you would have read it and been familiar

11  with it, correct?

12     **A**    Correct.

13        MR. FLOYD:  Those are all the questions I

14  have.  Thank you.

15        THE WITNESS:  You're welcome.

16                 [EXAMINATION]

17  QUESTIONS BY MR. JOHNSON:

18     **Q**    Officer Kaminski, my name is Todd Johnson.

19  I represent other family members of Mr. Moore that

20  are involved in this case.  My questions hopefully

21  will bounce around a little bit and try and not be

22  too duplicative of Mr. Floyd's questions.

23             I want to start with the date in

24  question that we're here for today.  Who dispatched

25  you to the scene?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

                                                      Page 145

 1      **A**    Whoever was working dispatch that morning.
 2  I don't recall which dispatcher it was.
 3      **Q**    The dispatcher, is that a Ferguson Police
 4  Department employee?
 5      **A**    Yes.
 6      **Q**    And was that the arrangement in September of
 7  2011?
 8      **A**    Correct.
 9      **Q**    The Ferguson communication police department
10  employees dispatch Ferguson Police Department
11  officers to scenes, correct?
12      **A**    Yes, sir.
13      **Q**    Do you remember if it was a male or a
14  female?
15      **A**    I do not remember.
16      **Q**    The information that you were provided that
17  dispatched you to Henquin and Airport, is all of the
18  information that you recall receiving from dispatch
19  about this occurrence listed in your reports?
20      **A**    I believe so.  I'll take a look at it again.
21      **Q**    Feel free to do so.
22      **A**    I believe it is, yes.
23      **Q**    Those are all the words you recall hearing?
24      **A**    Yes.
25      **Q**    Do you recall the tone of the dispatcher's

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 146

1    voice when they dispatched you to this particular

2    scene?

3         **A**    No, sir.

4         **Q**    Do you have a memory today that the

5    dispatcher was frightened about this man?

6         **A**    No, sir.

7         **Q**    When you arrived to the scene and you

8    encountered the lady that you set forth in your

9    report who gave you another description of what had

10   happened -- and feel free to look at that as well,

11   sir.

12        **A**    Let me take a look at that.

13        **Q**    I think it's by Abson Road.  Abston.  I'm

14   sorry.

15        **A**    Yeah.  The lady in the white Pontiac, yes.

16        **Q**    The lady in the white Pontiac, the words

17   that she gave you about this occurrence, are those

18   all the words that you remember this lady telling

19   you about the occurrences that are set forth in your

20   report?

21        **A**    Yeah.  Pretty much.

22        **Q**    Do you recall this lady's demeanor when she

23   was providing you that information?

24        **A**    She was excited.

25        **Q**    Was she frightened?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                            Page 147

 1      A   I wouldn't say frightened, no.

 2      Q   Did she -- was this -- was Mr. Moore ever

 3   described to you by dispatch or witnesses as violent

 4   before you arrived to the scene?

 5      A   I had got the call for him beating on

 6   vehicles.  So I would take that as being in a

 7   violent manner, yes.

 8      Q   That's the conduct that you use synonymous

 9   with what you consider to be violent?

10      A   Correct.

11      Q   Violent towards property?

12      A   Beating on cars I believe is just a violent

13   manner.

14      Q   Was he beating on it in a violent manner?

15   Was it described to you like that?

16      A   Beating on a vehicle or vehicles passing by.

17      Q   No information that was described that he

18   was striking people?

19      A   Correct.

20      Q   He never struck any people, including

21   yourself that day, did he?

22      A   He attempted to.

23      Q   Did he strike you?

24      A   He did not strike me, no.

25      Q   Did he strike anybody else that day?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                    September 22, 2015

Page 148

1      **A**    No.

2      **Q**    Did he break anything in your presence?

3      **A**    Not in my presence, no.

4      **Q**    Did you receive information that he had

5   broken any property?

6      **A**    I did not receive any information about any

7   property damage at that time, no.

8      **Q**    How many vehicles went in either direction

9   on Airport Road between the time you first arrived

10   to the scene and when you first used your Taser?

11      **A**    I could not recall on how many there were.

12      **Q**    How many vehicles went in either direction

13   on Airport Road between any time you arrived to the

14   scene and when you observed Mr. Moore not to be

15   breathing or having difficulty breathing?

16      **A**    When he was having difficulty breathing or

17   not breathing, I wasn't paying attention on how many

18   vehicles were in the road.

19      **Q**    Can you give me in any number, the number of

20   vehicles that travel on Airport Road in either

21   direction between the time you first encountered the

22   scene at Henquin and Airport and the time you first

23   observed Mr. Moore have difficulty breathing?

24      **A**    I couldn't give you a number, no.

25      **Q**    Is the only vehicle that you know was in

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 149

1    your presence after you arrived to Henquin and

2    Airport Officer White's cruiser?

3         **A**    No.  He was not there before I got there.

4         **Q**    I'm asking for the time between when you

5    first arrived to the scene and when you recalled

6    Mr. Moore have difficulty breathing.  So that gap in

7    time, okay?

8         **A**    Okay.

9         **Q**    In that gap in time is the only vehicle that

10   you know you have a memory of being present other

11   than your own cruiser Officer White's cruiser?

12        **A**    Physically, yes.  That is the only vehicle

13   that I realized that was there.  I heard traffic in

14   the background.

15        **Q**    Who called for the ambulance?

16        **A**    I did.

17        **Q**    What information did you give them?

18        **A**    I believe I told them -- I told dispatch,

19   because what we do is we radio our dispatch.  Our

20   dispatch contacts the EMS.  I advised that a Taser

21   was deployed; we need EMS.

22        **Q**    And is the reason that you summoned EMS

23   because you deployed the Taser?

24        **A**    Yes, sir.

25        **Q**    Did you summon EMS because of Mr. Moore's

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

```
                                                    Page 150
  1   labored breathing?

  2       A    No.  I summoned EMS before we had the

  3   breathing problem.  Once we noticed he was not

  4   breathing, we called and advised them to have EMS

  5   expedite because of the breathing issue.

  6       Q    Who radioed for EMS the second time?

  7       A    Officer White did.

  8       Q    And what information, if you know, did he

  9   give EMS?

 10       A    He just, as far as I can remember, he

 11   advised that he was not breathing, to have them

 12   expedited.

 13       Q    What was the gap in time between you

 14   summoning EMS and Officer White summoning EMS?

 15       A    I could not tell you.

 16       Q    So did you summon to EMS before you observed

 17   Mr. Moore have difficulty breathing?

 18       A    Yes.

 19       Q    Did you summon for EMS before he was rolled

 20   to his side?

 21       A    Yes.

 22       Q    How long before?

 23       A    Not long before.  It was during one of the

 24   five-second bursts.  We had a department policy that

 25   anytime somebody is Tased, you summons EMS.  So I
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                                   Page 151
 1   Tased him.  I automatically got on the radio and

 2   summonsed EMS.

 3       Q   Can you demonstrate for the jury this

 4   pinwheel motion that Mr. Moore's fists were engaged

 5   in prior to your deployment of the Taser?

 6       A   I could do it with one arm due to a shoulder

 7   injury I have right now.

 8       Q   Sorry to hear that.

 9       A   But he --

10           MR. PLUNKERT:  Watch your microphone.

11       A   He was running towards me going like this.

12       Q   (By Mr. Johnson) Were these fists clenched?

13       A   Yes.

14       Q   Both of them?

15       A   Yes.

16       Q   Did you have the shoulder injury on

17   September 17, 2011?

18       A   No, sir.

19       Q   After you deployed the Taser for the first

20   time, I think you testified in earlier questioning

21   the sights were pointed to what side of his body?

22       A   It was midsection on the right side.

23       Q   Do you use the terms upper and lower probe

24   in the Taser?  We know there's two probes, right?

25       A   Right.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

                                                   Page 152

 1      **Q**   Do you use, as a certified user and
 2   instructor of a Taser X26, do you use the terms
 3   upper and lower probe?
 4      **A**   On the Taser form, yes.
 5      **Q**   And is the Taser form set forth as part of
 6   the report materials in this case?
 7      **A**   Correct.  Any time a Taser is deployed or
 8   shown in person, that Taser form is --
 9      **Q**   Could you refer to your report and provide
10   me the exhibit number we're on?
11          MR. PLUNKERT:  I think he may have also been
12   in the middle of the answer, and then we had a
13   little bit of an interruption.  So as long as he's
14   allowed to give the answer to that question earlier,
15   then, yeah, find whatever you need to.
16          MR. JOHNSON:  Yeah.  I have no problem.  I
17   just want to know what exhibit this is.
18      **Q**   (By Mr. Johnson) What exhibit is this, sir?
19      **A**   12.
20      **Q**   Okay.  Looking at Exhibit 12, are there any
21   other parts of Exhibit 12 that you yourself
22   completed as part of this body of report other than
23   your own report that was part of the offense report,
24   sir?
25      **A**   No.  Just my portion of the offense report.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                              Page 153
  1    Everything is done by a supervisor.

  2        Q    And what part of Exhibit 12 did you prepare?

  3        A    Page 1 through 4.

  4        Q    Okay.  And in this case there are

  5    supplements to your offense report, correct?

  6        A    Correct.

  7        Q    And obviously those are submitted by

  8    different officers of the department, correct?

  9        A    Correct.

 10        Q    When we're looking at the Ferguson Police

 11    Department Taser International use report that is on

 12    pages 12 and 13, did you provide any information for

 13    the creation of that portion of Exhibit 12?

 14        A    I provided the Taser serial number.  I

 15    provided Mr. Moore's information for the supervisor

 16    that completed this.  And I -- excuse me -- provided

 17    where the darts, the probes were located.

 18        Q    You didn't actually fill out pages 12 and 13

 19    of Exhibit 12, did you, sir?

 20        A    No.

 21        Q    Did Lieutenant Ballard do that to your

 22    knowledge?

 23        A    Yes.

 24        Q    Do you recognize that as his handwriting?

 25        A    Correct.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 154

1      **Q**    Do you know what information Lieutenant

2    Ballard relied on for purposes of his creation of

3    pages 12 and 13 of Exhibit 12?

4      **A**    As far as to my knowledge is what I told him

5    on scene and what he observed.

6      **Q**    So the, as far as you know, the sources of

7    information for pages 12 and 13 of Exhibit 12 would

8    be you verbally giving Lieutenant Ballard

9    information at the scene, correct?

10     **A**    Correct.

11     **Q**    And then his own observations at the scene?

12     **A**    Correct.

13     **Q**    The portions of pages 12 and 13 of

14   Exhibit 12 that discuss the type of incident, are

15   you the person that gave Lieutenant Ballard that

16   type of incident which permitted him to circle the

17   type of incident that it was?

18     **A**    Yes.

19     **Q**    Did you review Lieutenant Ballard's Taser

20   use report after he created it back in 2011?

21     **A**    No, sir.

22     **Q**    Is the first time that you reviewed this use

23   report, was it in preparation for today's

24   deposition?

25     **A**    Yes, sir.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 155

1      **Q**   Are there any parts of pages 12 and 13 of
2    Exhibit 12 that you believe to be Lieutenant
3    Ballard's observations as opposed to your own?
4      **A**   Let me look at it.
5      **Q**   Absolutely.
6      **A**   I don't see anything, no.
7      **Q**   And we'll have a chance to ask Lieutenant
8    Ballard about this, but from your own observation
9    today, you believe you're the primary source of
10   information that enabled him to complete the report?
11     **A**   Correct.
12     **Q**   Obviously Lieutenant Ballard, was he present
13   when you discharged the Taser at all in this case?
14     **A**   I do not believe so.  I believe he was
15   called for after the incident was over.
16     **Q**   Who called for Lieutenant Ballard?
17     **A**   I believe it was either Officer White or
18   Officer Bebe.
19     **Q**   And for what reason, to your knowledge, was
20   he summoned to the scene?
21     **A**   Any time we have a major incident, a
22   supervisor is to respond.
23     **Q**   Major incident meaning somebody was
24   seriously injured or died?
25     **A**   Correct.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

                                                        Page 156

 1        **Q**    Going back further to pages 14 through --
 2   just 14 for now, the use of force report, do you
 3   know who created that, sir?
 4        **A**    Lieutenant Ballard.
 5        **Q**    Did you provide Lieutenant Ballard any
 6   information that enabled him to fill out this use of
 7   force report that is part of Exhibit 12?
 8        **A**    Yeah.  I gave him the information.
 9        **Q**    Is there any information on the use of force
10   report component of Exhibit 12 that you believe to
11   be from Lieutenant Ballard's observations as opposed
12   to your own?
13        **A**    I don't believe so.
14        **Q**    Did Chief Jackson ever review this use of
15   force report with you at any point?
16        **A**    No.
17        **Q**    Was there any department review of your use
18   of force in this case?
19        **A**    That I do not know.  Not with me.
20        **Q**    Yeah.  I'm asking if anybody sat you down --
21        **A**    No, not with me.
22        **Q**    -- and walked you through your use of force?
23        **A**    Not with me.
24        **Q**    Was there a protocol or general order in
25   your department for any type of review of use of

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

```
                                              Page 157
 1   force with the Ferguson Police Department?

 2       A   Not to my knowledge.

 3       Q   Have you ever, to your knowledge, ever sat

 4   down with any superior within the Ferguson Police

 5   Department to review your use of force?

 6       A   I have, yes.

 7       Q   How many times?

 8       A   Once.

 9       Q   Before or after this incident?

10       A   After.

11       Q   And what were the facts and circumstances,

12   sir?

13       A   It was a dry stun with the Taser.  We sat

14   down and went over the report together.

15       Q   And what were the facts and circumstances

16   that caused you to have to use the dry stun mode of

17   the Taser device?

18       A   Resisting arrest on a -- kind of a home

19   invasion.

20       Q   Okay.

21       A   It was a child's father and child's mother

22   getting into it.  He tried to break into the house.

23   And when we got there, he physically fought us.  And

24   I -- one of the officers had him down trying to get

25   his arms around him.  And I gave him a dry stun
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

```
                                                   Page 158
 1   right on the buttocks.  And just one dry stun, and
 2   he complied.
 3       Q    And if you know, why were you summoned to go
 4   through that particular use of force?
 5       A    Why?
 6       Q    Why did you sit down with the department and
 7   go through that use of force?
 8       A    I just went and explained, you know,
 9   going -- my lieutenant and I sat together and did
10   the use of force report together.
11       Q    Okay.  So when we see page 14 of Exhibit 12,
12   you're saying in that case you just sat down with
13   the lieutenant and jointly created the use of force
14   report?
15       A    I gave him information when he did -- when
16   he was filling out the use of force report, I was
17   gone for the day.  They sent me home after I had my
18   report finished.
19       Q    Have you ever known Colonel Jackson to have
20   reviewed any use of force reports of Ferguson?
21       A    I do not know at all.
22       Q    Have you ever known any Ferguson Police
23   Department officer to have been disciplined with use
24   of force as the reason for discipline?
25       A    I do not know.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                      September 22, 2015

Page 159

1      **Q**   And I'm asking for before or after September
2   of 2011.
3      **A**   Right.  I -- it's pretty quiet around the
4   station when it comes to that stuff.
5      **Q**   Have -- what do you mean by quiet?
6      **A**   It's not --
7      **Q**   People don't talk about it?
8      **A**   People don't talk about it.
9      **Q**   Okay.  Any citizen complaints registered
10  against you as a Ferguson Police Department officer,
11  to your knowledge?
12     **A**   Not that I'm aware of.
13     **Q**   Any officer versus officer complaints
14  registered towards you and your conduct as a
15  Ferguson Police Department officer, sir?
16     **A**   None that I'm aware of.
17     **Q**   And when I ask about these complaints, is it
18  your testimony that you're aware of no such
19  complaints either before or after September of 2011?
20     **A**   Correct.
21     **Q**   Do you get information about any type of
22  major incident at roll call?
23     **A**   Yes.
24     **Q**   Is that how you would receive if there's
25  some type of incident in the field that some

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 160

1    superior or commander needed to make you aware of as

2    a patrol officer?

3         **A**   Yes, sir.

4         **Q**   And has that always been the case where that

5    information would be transmitted during roll call?

6         **A**   Yes, sir.

7         **Q**   At any particular roll call session, did

8    anybody ever make you aware that there had been a

9    complaint against an officer related to the use of

10   force?

11        **A**   No.

12        **Q**   Or the use of a Taser?

13        **A**   No.

14        **Q**   At any roll call, was there any type of

15   incident involving force addressed with the

16   department?

17        **A**   No.

18        **Q**   At any roll call, was there any type of

19   criticism or evaluation about some use of force

20   incident?

21        **A**   No.

22        **Q**   Any type of taser-related incident ever

23   addressed at roll call?

24        **A**   Other than my sergeant shooting the ceiling,

25   no.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                September 22, 2015

Page 161

1      **Q**   What happened there?

2      **A**   Desk pop, that's what we call it.  He didn't

3   realize the cartridge was on it, and he did his

4   spark test and shot the ceiling.

5      **Q**   Causing some property damage, I guess?

6      **A**   It just stuck in the drop ceiling tiles.

7      **Q**   I forgot to ask you a question earlier about

8   the probes because you were looking at the report

9   and I was talking too much.  The probes, are they

10  upper and lower probes?  Do you have any type of

11  definition like that?

12     **A**   We call them upper and lower.  The upper

13  one -- the top dart has a different angle than the

14  bottom dart does.

15     **Q**   When you use your sight -- and there's one

16  laser, correct?

17     **A**   Correct.

18     **Q**   One laser sight on the device involving

19  Mr. Moore, correct?

20     **A**   Correct.

21     **Q**   Do you still use the same X26 today that you

22  did in September of 2011?

23     **A**   No.  That one has been put in evidence.

24     **Q**   What do you mean put in evidence?

25     **A**   The day of the incident, they wrapped it up,

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 162

1    put it in evidence, and it's been there since.

2         Q    At the department?

3         A    I drop it into evidence.  And I have no idea

4    where it goes from there.

5         Q    Who asked you to put it in evidence?

6         A    Lieutenant Ballard.

7         Q    Do you have any information about how this

8    device was downloaded to obtain the data that

9    Mr. Floyd showed you earlier?

10        A    I do not know how that worked.

11        Q    As a certified user and instructor on the

12   use of the Taser, do you have an understanding how

13   this data is downloaded off the device?

14        A    I do not, no.

15        Q    When you used your laser sight on

16   September 17, 2011, which probe followed that laser

17   sight?

18        A    They go at an angle.  I mean, the laser

19   sight is in the middle, and they go at an angle.

20        Q    And your testimony earlier was you focused

21   your sight on his pelvic area?

22        A    Yes, sir.

23        Q    And at a distance of 8 to 10 feet I think,

24   if I recall your earlier testimony correctly?

25        A    Approximately that feet, yes.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 163

1    **Q**   After you deployed the Taser for the first

2    time -- first of all, Mr. Moore was facing you when

3    you deployed the Taser, correct?

4    **A**   Correct.

5    **Q**   And after you deployed the Taser, I think

6    you testified he fell forward?

7    **A**   Correct.

8    **Q**   In your report when you testified earlier

9    that he attempted to rise, were you facing him when

10   he attempted to rise?

11   **A**   Yes.

12   **Q**   And did he attempt to rise in a fashion

13   where his body or torso was facing you?

14   **A**   It was facing the ground.

15   **Q**   So when he got to his knees, his torso was

16   still facing the pavement?

17   **A**   Correct.

18   **Q**   At any point -- strike that.

19            What distance was his torso from the

20   ground when he was attempting to rise before you

21   deployed the Taser a second time?

22   **A**   Probably six inches or so.

23   **Q**   And when he attempted to rise a third time

24   causing you to use the Taser a third time possibly,

25   at what distance was his torso from the ground?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                               Page 164
   1      A    I'd say about the same.

   2      Q    Did he ever rise completely to his knees

   3  where his torso was facing you in any fashion?

   4      A    No.

   5      Q    Is the only resistance that you observed

   6  between the time you first deployed the Taser and

   7  the time you realized that he was having difficulty

   8  breathing, this attempting to rise to the ground in

   9  a fashion that you just told me about?

  10      A    Correct.

  11      Q    He never lunged at you?

  12      A    No.

  13      Q    And at what distance from you was he when he

  14  attempted to rise the first time?

  15      A    3 feet maybe.

  16      Q    At what distance was he from you when he

  17  attempted to rise the second time?

  18      A    Approximately the same.

  19      Q    When he was attempting to rise the first

  20  time, could you see his hands?

  21      A    His hands were on the pavement.

  22      Q    So they weren't clenched?

  23      A    No.

  24      Q    When he attempted to rise the second time,

  25  could you see his hands?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 165

1      **A**    I could see one of them.

2      **Q**    And where was the other one when you

3   couldn't see that first one?

4      **A**    It was kind of on his side to where the

5   angle I couldn't see it.

6      **Q**    So the second time he tries to rise, his

7   hands were clenched?

8      **A**    Not at that time, no.

9      **Q**    In the times that he attempted to rise, was

10  he swinging his hands at you?

11     **A**    No.

12     **Q**    Did you ever have the subjective belief,

13  sir, that he was attempting to flee after you used

14  the Taser?

15     **A**    After using the Taser and somebody gets up,

16  they are usually trying to flee, correct.

17     **Q**    He never got that far though?

18     **A**    No.

19     **Q**    Did he ever utter to you that he was trying

20  to flee?

21     **A**    No.

22     **Q**    The only physical conduct that you saw of

23  Mr. Moore was him putting his hands onto the

24  pavement and pushing himself up to where he couldn't

25  even get on his knees yet, correct?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 166

 1     **A**   He was on his knees the second time, yes.

 2     **Q**   But not in an aspect on his knees where he

 3  was facing you in any sense?

 4     **A**   No.

 5     **Q**   Or all the way up where his torso was up

 6  which would enable him, obviously, to get to his

 7  feet?

 8     **A**   Correct.

 9     **Q**   Did Mr. Moore make any verbal threats

10  towards you at any point after you Tased him?

11     **A**   No.

12     **Q**   Did he make any verbal threats to other

13  persons in your presence after you Tased him?

14     **A**   No.

15     **Q**   Did he ever pound on your car?

16     **A**   When I'm doing body work, yes.

17     **Q**   No.  Did he?  Did Mr. Moore?

18     **A**   No.  No, he did not.

19     **Q**   Did he ever pound on Mr. White's car?

20     **A**   No.

21     **Q**   Did he pound on any cars in this business,

22  this washer business that you were at that day?

23     **A**   No.  There were no vehicles in the parking

24  lot that day.

25     **Q**   We see a vehicle in the picture, but you're

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                              Page 167
 1   saying that day --

 2        A    There was --

 3        Q    -- the vehicles were the cruisers?

 4        A    Cruisers, correct.

 5        Q    Patrol cars.  Did you ever utter the phrase

 6   "Taser, Taser, Taser" at any point that day?

 7        A    Yes, before the first Tasing.

 8        Q    It's not in your report though, correct?

 9        A    I don't know if it's in there or not.  It's

10   not in my report, so I -- it's in memory that any

11   time you pull the trigger, you say it.

12        Q    Mr. Floyd asked you about writing reports.

13   And you agree with me that you want factually

14   accurate and truthful reports in your business,

15   correct?

16        A    Correct.

17        Q    Did you at any point after September 17,

18   2011, go back and attempt to revise your report in

19   any way?

20        A    No.

21        Q    Did you provide information or request to

22   any peers in your department that you would like to

23   add or change anything in your portion of the

24   report?

25        A    No, sir.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                           September 22, 2015

Page 168

 1      **Q**   Did you make any requests to Lieutenant
 2   Ballard that you would like for him to add or change
 3   anything in the portions of Exhibit 12 where you
 4   provided him information?
 5      **A**   Other than him requesting my spelling and
 6   grammar, no.
 7      **Q**   Were you disciplined at all relating to this
 8   incident?
 9      **A**   I was sent home for the day as department
10   policy on any kind of incident, occurrence.  Then I
11   was advised to stay home the following day also.
12      **Q**   By who?
13      **A**   By Lieutenant Ballard.
14      **Q**   Would he be your direct report in your chain
15   of command on September 17, 2011?
16      **A**   Yes, sir.
17      **Q**   I understand that this was a weekend?
18      **A**   Correct.
19      **Q**   Was he the acting chief that weekend as far
20   as staffing goes?
21      **A**   He was the acting commander, correct.
22      **Q**   Because we talked to Mr. Jackson, the
23   former-Colonel Jackson, last Friday.  And he said he
24   might have been out of the area on vacation.  Do you
25   recall anything of that nature, sir?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 169

1       **A**    I do not recall that, no.

2       **Q**    Okay.  To your knowledge, was Lieutenant

3    Ballard the highest ranking officer within the

4    Ferguson Police Department the weekend of

5    September 17 and 18, 2011?

6       **A**    Yes.

7       **Q**    Did you receive what you considered to be

8    any type of retraining after this incident?

9       **A**    We get the recertification on the Tasers

10   every year.  I did not recertify as an instructor.

11   They decided to let another officer have that.  Up

12   until this last year, I have been receiving my

13   recertification classes, yes.

14      **Q**    Tell me about the facts and circumstances of

15   why you no longer were going to be a Taser

16   instructor as opposed to just a certificate holder.

17      **A**    I'm not sure why.  I requested to put in --

18   I put in, requested to take the recertification for

19   the instructor class.  And they went with another

20   officer.

21      **Q**    Who informed you of that decision?

22      **A**    Officer Brannan.

23      **Q**    Would you consider Officer Brannan kind of

24   the head of the Taser use and certification aspect

25   of the Ferguson Police Department?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                               Page 170
  1      A    He was, yes.

  2      Q    We heard from Mr. Jackson that he was

  3   intimately involved in procuring Taser devices.  Is

  4   that your belief?

  5      A    Correct.

  6      Q    Did you have any involvement personally in

  7   procuring the Taser devices?

  8      A    I -- they asked my opinion on them because I

  9   had them prior in Cool Valley.  And I just advised

 10   them they were a very effective tool.

 11      Q    And who got the instructor position over you

 12   after this incident?

 13      A    His name is Eric Davis.

 14      Q    And is he an officer with the department?

 15      A    Yes.

 16      Q    Had you signed up for the CIT training as of

 17   September 17, 2011?

 18      A    I don't remember the exact dates when I was

 19   signed up.  Every officer through our department has

 20   gone through the training.  So they were sending two

 21   of us a week.

 22      Q    You began in 2010 with the department,

 23   correct?

 24      A    Correct.

 25      Q    Tell me about your memory of officers being
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                           September 22, 2015

Page 171

1    sent by the Ferguson Police Department for CIT

2    training between when you started in February of

3    2010 and this incident in September of 2011.

4         **A**    I don't recall.

5         **Q**    Were they all sent at once?

6         **A**    No.

7         **Q**    Were they sent on any periodic basis?

8         **A**    The academy has a certain amount of classes

9    a year.  I'm not exactly sure how many they are a

10   year, the 40, 48-hour class, between 40 and 48

11   hours.  So the department was sending two people to

12   each class.  And I don't remember how many went to

13   the class before me or after me.  I can't recall

14   that.

15        **Q**    Is there a training coordinator that you

16   conferred with to enroll in this case?

17        **A**    Officer Greg McDaniel, he was the

18   coordinator when they got the spots through the

19   academy for us.

20        **Q**    How were you notified, sir, that you were

21   going to take the CIT training?

22        **A**    Email and by paper.

23        **Q**    And who sent you the email?

24        **A**    Officer McDaniel.

25        **Q**    And did anybody attend that training with

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 172

1    you from your department?

2        **A**    There was.  Give me a minute.  It's going to

3    take me a minute to remember that.

4                    I honestly can't remember who was

5    with me there.

6        **Q**    Would you still have that email which

7    alerted you that you were to take the training?

8        **A**    No.  No.  We -- they got a new server and

9    everything at work when we switched to a different

10   report writing system.

11       **Q**    When was that, sir?

12       **A**    August 2012.

13       **Q**    Did you ever place Mr. Moore under arrest?

14       **A**    No.

15       **Q**    Was he cited with any offense?

16       **A**    No.  He went from the scene in the ambulance

17   to the hospital.  So I mean, he was never placed

18   under arrest and never cited, no.

19       **Q**    When were you alerted he had passed?

20       **A**    They sent Officer Bebe to the hospital from

21   the scene, and probably about a half an hour after

22   that.

23       **Q**    And what did Mr. Bebe tell you?

24       **A**    He advised that he passed at the hospital

25   and they were notifying the family.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                            Page 173
  1      Q    Anything else, sir?

  2      A    No.

  3      Q    Is Mr. Bebe the only person you communicated

  4  with about the facts and circumstances of

  5  Mr. Moore's passing?

  6      A    At that time, yes.

  7      Q    Did you subsequently speak with other

  8  officers within the department about the facts and

  9  circumstances of his death?

 10      A    Officer White and Lieutenant Ballard.

 11      Q    And tell me about that conversation.

 12      A    I just basically advised them that I was

 13  told that he passed at the hospital.  Lieutenant

 14  Ballard already knew because Officer Bebe advised

 15  him before he advised me.

 16      Q    Did you check for any warrants on this

 17  individual before you arrived on the scene?

 18      A    No.

 19      Q    What is -- you gave us your dimensions.

 20  What about Mr. White's dimensions, height and

 21  weight?

 22      A    Officer White?

 23      Q    Yes, sir.

 24      A    Back then he's six-five, probably about 210.

 25      Q    Did you understand that Officer White was on
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                September 22, 2015

```
                                                      Page 174
 1   his way to the scene before you first encountered

 2   Mr. Moore?

 3       A    I knew there were officers heading my way.

 4   I did not know where they were coming from, and I

 5   did not know how close they were.

 6       Q    Which officers do you believe were headed

 7   your way?  Can you tell me by name?

 8       A    I knew Officer White was.  And as far as

 9   that, that's all I knew.

10       Q    There were other officers obviously staffed

11   that morning, correct?

12       A    Correct.

13       Q    How many officers, patrol officers were

14   staffed that morning?

15       A    I don't know exactly.  I know there was at

16   least five.

17       Q    And is there a zone or beat that you cover?

18       A    We rotate.  We got four sectors.  We rotate

19   sectors a day.

20       Q    What sector was this?

21       A    That was in sector five.

22       Q    And how many officers were staffed to sector

23   five September 17, 2011?

24       A    One.  There is one per sector.

25       Q    Okay.  Over your radio, did you hear
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                               September 22, 2015

```
                                              Page 175
 1   geographically where the other officers were before

 2   you arrived to the scene?

 3       A    No.

 4       Q    Did you hear geographically where the other

 5   officers were before you exited your vehicle and

 6   encountered Mr. Moore?

 7       A    No.

 8       Q    Did you have an understanding whether any of

 9   the officers assigned to your patrol on

10   September 17, 2011, had CIT training?

11       A    Not to my knowledge.  I don't know.

12       Q    Do you know of anybody in the communications

13   division that had CIT training as of September 17,

14   2011?

15       A    Communication as in dispatch?

16       Q    Yes, sir.

17       A    I don't believe anyone did.

18       Q    Do you know if anybody ever in dispatch has

19   received CIT training in Ferguson?

20       A    Every one of them have now.

21       Q    In communications?

22       A    Yes.

23       Q    Did you speak with anybody from Mr. Moore's

24   family about this incident?

25       A    When he was being transported in the
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 176

1    ambulance, a family member -- I'm not sure who it

2    was -- did come to the scene.  And we advised him

3    what hospital they were going to.

4        **Q**   And the family member you encountered male

5    or female?

6        **A**   Female.

7        **Q**   Elderly or not elderly?

8        **A**   I would say middle age.

9        **Q**   Okay.  Do you recall any words or statements

10   this family member made at the scene?

11       **A**   No, I do not.

12       **Q**   Do you recall anybody -- strike that.

13               Do you know anybody who saw the

14   interaction between you and Jason Moore that day?

15       **A**   The lady in the white Pontiac I saw in the

16   area still.  Other than that, I don't know.  I don't

17   even know if she saw anything.

18       **Q**   Nobody has come to you and said they saw

19   this encounter, have they?

20       **A**   Correct.

21       **Q**   Obviously, that's part of your

22   investigation.  You want to know if anybody present

23   saw the facts and circumstances, correct?

24       **A**   Correct.

25       **Q**   Can you tell me by name any persons in the

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                            Page 177
 1   community who appeared at the incident scene after
 2   this incident occurred?
 3       A   No, I cannot.
 4       Q   Did you speak with any people that you
 5   associate to be with Mr. Moore's family after the
 6   scene of the occurrence on September 17, 2011?
 7       A   No, I have not.
 8       Q   Do you know what agonal breathing is?
 9       A   I am not aware, no.
10       Q   Well, I'll use your verbiage.  Let's go with
11   difficulty breathing.  Okay?
12       A   Okay.
13       Q   And that's how you described Mr. Moore's
14   condition after this occurrence, correct?
15       A   Correct.
16       Q   Did he use any words that you heard when he
17   was on the ground?
18       A   No.
19       Q   Did he use any words that you could make out
20   while he was having trouble breathing?
21       A   No.
22       Q   Did he appear conscious to you when he was
23   having trouble breathing?
24       A   Yes.
25       Q   And the trouble breathing, is this labored
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 178

1    breathing like if you were to run a long ways and
2    you were having a hard time catching your breath, or
3    is this something different?
4        **A**    It was something different.  It was -- it
5    was shallow breathing.
6        **Q**    Like he was having a hard time catching his
7    breath?  Shallow breathing?
8        **A**    Correct.
9        **Q**    Any groans or moans or murmurs?
10       **A**    I did not hear anything, no.
11       **Q**    Did you observe any other part of his body
12   to have any type of difficulty?  And what I'm
13   talking about is sometimes in the case of a trauma,
14   we know that, you know, ears and eyes and things
15   like that can have difficulty as well.  Anything
16   like that, sir, or was it just the breathing that
17   you observed?
18       **A**    Just the breathing.
19       **Q**    Did you observe any type of marks on
20   Mr. Moore's body that you attributed to the use of
21   the Taser?
22       **A**    There's a couple abrasions on his knees, I
23   believe, from falling onto the concrete.
24       **Q**    Any other abrasions that you noted on his
25   body?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

                                                          Page 179

 1      **A**   Not that I did, no.

 2      **Q**   Who secured Mr. Moore to handcuff him?

 3      **A**   Officer White.

 4      **Q**   And how did he do that?

 5      **A**   I had the Taser.  Officer White came in,

 6   pulled his arms behind him and put the restraints

 7   on.

 8      **Q**   Did he use his feet or legs or knees in any

 9   fashion to secure Mr. Moore?

10      **A**   No.  I don't recall.

11      **Q**   Any scrapes to Mr. Moore's face that you

12   observed?

13      **A**   I did not observe any, no.

14      **Q**   Any types of contusions or bruises that you

15   observed to Mr. Moore that you attributed to this

16   encounter?

17      **A**   Not that I saw.

18      **Q**   Did he have any types of scrapes,

19   lacerations or bruises before you used the Taser

20   that day?

21      **A**   Not that I can remember.

22      **Q**   You didn't know him, correct?

23      **A**   I did not know him.

24      **Q**   Did you know him professionally as somebody

25   you had had a law enforcement encounter with before

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                     September 22, 2015

Page 180

1    that day?

2        **A**    No.

3        **Q**    Did Officers White or Ballard or Bebe tell

4    you that they had encountered this individual

5    before?

6        **A**    They have not told me, no.

7        **Q**    Mr. Moore does have siblings, brothers and

8    sisters.  When I say family members, I'm including

9    the word siblings as far as brothers and sisters.

10   Any law enforcement encounters you've had with

11   Mr. Moore's brothers and sisters that you can tell

12   us about today?

13       **A**    Not to my recollection, no.

14       **Q**    Any communication with any of those siblings

15   about this encounter that we've talked about,

16   September 17, 2011?

17       **A**    In August when they were doing the protests,

18   I heard somebody from the crowd scream Jason Moore's

19   name, but other than that that's all I can think of.

20   I couldn't even tell who it was.

21                         (Exhibit 22 was marked for

22                         identification by the court

23                         reporter.)

24       **Q**    (By Mr. Johnson) We're going to give you

25   Exhibit 22 which is another photograph of the area

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 181

1    of this encounter, sir.  And you've been kind enough

2    to tell us the different areas of this parking lot

3    that you recall the different parts of this incident

4    occurring.  And I want to make sure that we have a

5    different vantage point --

6        **A**   Uh-huh.

7        **Q**   -- where we can map out the different things

8    that happened that day.  I want to start on

9    Exhibit 22 with -- and I'm going to ask you to mark

10   with the Number 1 --

11       **A**   Okay.

12       **Q**   -- the location where you first observed --

13   well, the location where you first observed

14   Mr. Moore, is it contained on Exhibit 22?

15       **A**   No, it's not.  It's not there.

16       **Q**   Let's start then with the location where you

17   saw Mr. Moore and you notified in your report that

18   he was standing near the curb of Airport Road.  Can

19   you mark with a Number 1 on Exhibit 22 that?  Can

20   you hold that up for the camera so they can get it?

21       **A**   It's going to be kind of hard to see.  Right

22   there.

23       **Q**   You make it as -- make it as thorough as you

24   want, sir.

25            MR. PLUNKERT:  Put an X for the pointing.

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

                                                    Page 182

1      **Q**   (By Mr. Johnson) On Exhibit 22, does it
2  contain an area where you parked your patrol vehicle
3  that day?
4      **A**   I don't believe so.
5      **Q**   Would it be located, as you are looking at
6  Exhibit 22, to the right of that photograph?
7      **A**   Correct.
8      **Q**   Does Exhibit 22 contain a part of the
9  premises where you were standing when you discharged
10 your Taser?
11     **A**   Yeah.
12     **Q**   Can you mark with the Number 2 where you
13 were standing when you first discharged the Taser on
14 Mr. Moore?  Can you hold it up so the camera catches
15 that as well and gesture to it?
16     **A**   Right there.
17     **Q**   Does Exhibit 22 contain the area where
18 Mr. Moore was standing when you discharged the Taser
19 on him the first time?
20     **A**   Yes.
21     **Q**   Can you mark with a Number 3 on that exhibit
22 where he was standing when you discharged the Taser
23 the first time?
24     **A**   Right there.
25     **Q**   Thank you.  And then I think you testified

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                   September 22, 2015

Page 183

1   earlier that Mr. Moore's body position did change

2   after he was Tased the first time, correct?

3       **A**   Correct.

4       **Q**   Did it change in terms of the location of

5   the premises after the first Taser all the way to

6   when you realized he was having trouble breathing?

7       **A**   Yes.

8       **Q**   Okay.  Can you mark in a sequence starting

9   with the Number 4 through whatever number you need

10  where his body positions changed?  And then we'll go

11  through each of them.

12      **A**   That's the first deploy.  He fell.

13      **Q**   So is Number 4 where he fell too, sir?

14      **A**   Yeah.  Approximately that area.

15      **Q**   Okay.

16      **A**   Then he got up on his hands and knees, and I

17  deployed the second -- or the third one.  Or yeah,

18  the first, second -- second one, and he lunged

19  forward again from his knees to this point.

20      **Q**   Where Number 5 is?

21      **A**   Where Number 5 is.  Then the same thing as

22  he was trying to get up again and lunged to where

23  Number 6 is.

24      **Q**   Is Number 6 where he was positioned when you

25  first observed him having trouble breathing?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 184

 1    **A**   Correct.  It might have been a little bit

 2  closer to the building.  It's kind of hard to tell

 3  with the building not being there.

 4    **Q**   Absolutely.  Thank you for that.

 5            Did you have your lights and sirens

 6  on when you went to the scene?

 7    **A**   I believe I had my lights on.

 8    **Q**   When did you turn them off?

 9    **A**   I believe they were on the whole time.

10    **Q**   Were these emergency lights?

11    **A**   Yes.  Red and blues.  No siren at that time.

12    **Q**   Did you ever activate your siren?

13    **A**   I don't believe so.

14    **Q**   Other than the mumbling that you told us

15  about, were there any words or sounds that you

16  recall Mr. Moore making at any point at the scene?

17    **A**   Just the yelling right at the beginning.  It

18  was just a (witness demonstrating sound) type of

19  yell.

20    **Q**   When he first went to the ground after the

21  use of the Taser, did he have his hands up to

22  protect himself?

23    **A**   No.

24    **Q**   What part of his body struck the ground

25  first?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 185

1      **A**    I'm wanting to say his -- like right here on

2   his shoulder.  He went down kind of at like an

3   angle.

4      **Q**    Did his head strike the ground to your

5   knowledge?

6      **A**    I don't believe so.

7      **Q**    How are the general orders at the Ferguson

8   Police Department disseminated to you as a patrol

9   officer?

10     **A**    Through our computer system.  Our report

11  writing system has a spot for general orders.

12     **Q**    And were these general orders disseminated

13  to you in the same fashion between February of 2010

14  and September of 2011?

15     **A**    Yes.  Just in a different computer system.

16     **Q**    And the Taser warnings and bulletins, and I

17  know you have been asked about some versions of

18  these in earlier questioning, but in what way are

19  the Taser warnings and bulletins disseminated to you

20  as a certified Taser operator?

21     **A**    You get the -- when you start the class, you

22  get the first five pages of the manual that has all

23  the warnings on it.  You sign off on that.  That

24  gets mailed back to Taser.  And it's just the

25  original course that you get them until another

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 186

1    version comes out.  Then you get them again with the
2    new version.
3        **Q**    So do you get the entirety of the versions
4    that are released by Taser as a certified operator?
5        **A**    You do not get the whole thing, no.  You get
6    instructed by the instructor.  And the instructor is
7    the one that keeps all the material.
8        **Q**    And if there are bulletins that are separate
9    and apart from the versions, how are the bulletins
10   disseminated to you as a Taser certified operator?
11       **A**    You usually you get them in your mailbox.
12   And they normally post one on the bulletin board.
13       **Q**    So you have a personal mailbox at the
14   department?
15       **A**    Correct.
16       **Q**    And then the bulletin board, where is that
17   situated?
18       **A**    In our squad room.
19       **Q**    And was Mr. Brannan the trainer at Ferguson
20   on the Taser between your start date and September
21   of 2011?
22       **A**    Yes.
23       **Q**    And did Mr. Brannan disseminate
24   taser-related materials to you separate and apart
25   from the ways that you just told us about?  When it

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                September 22, 2015

                                                              Page 187

 1   came to a new version or a bulletin, did he also

 2   attempt to make you aware of that?

 3       **A**   Yes.

 4       **Q**   And how did he do that?

 5       **A**   Just by making me a copy of the DVD that he

 6   retrieves.  With me being an instructor also, we all

 7   received a copy of the DVD and the Taser manual.

 8            MR. JOHNSON:  I don't think I have any

 9   further questions.  Thank you for your time, sir.

10            THE WITNESS:  Thank you.

11            MR. FLOYD:  I just had a couple redirect

12   questions.  This is really going to be less than a

13   minute.

14            MR. PLUNKERT:  I was going to say, is now an

15   okay time for him to answer that question that I

16   wanted him to have the chance to fully answer?

17            MR. JOHNSON:  About what?  One of my

18   questions?

19            MR. PLUNKERT:  It was when you were talking

20   about Exhibit 12.  I was hoping we would come back

21   to it, but I didn't want to interrupt your

22   questioning.

23            MR. JOHNSON:  No.  That's fine.  We can make

24   sure that's clear.

25            MR. PLUNKERT:  I mean, you can question more

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

---

Page 188

1    on it as much as you want.  I just want to give the

2    witness an opportunity.

3                    We can go off the record or do this

4    however you want, but it was -- it was in response.

5    I think a good search term would be Exhibit 12, and

6    then when I chime in.  And I can try and help you

7    find it.

8            THE VIDEOGRAPHER:  Off the video record at

9    1:37.

10                   (Recess taken.)

11           THE VIDEOGRAPHER:  Back on the record at

12   1:45.

13           MR. PLUNKERT:  Could we read back the

14   questions during the break that we discussed and

15   just ensure that the witness had an ample

16   opportunity to answer that?

17           THE COURT REPORTER:  "QUESTION:  Do you use,

18   as a certified user and instructor of a Taser X26,

19   do you use the terms upper and lower probe?

20                   "ANSWER:  On the Taser form, yes.

21                   "QUESTION:  And is the Taser form set

22   forth as part of the report materials in this case?

23                   "ANSWER:  Correct.  Any time a Taser

24   is deployed or shown in person, that Taser form

25   is --

---

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 189

```
 1               "QUESTION:  Could you refer to your
 2   report and provide me the exhibit number we're on?"
 3               MR. PLUNKERT:  And my question, I suppose,
 4   is there anything that you had further that you were
 5   to answer about the Taser form in this case as the
 6   question was posed by --
 7               THE WITNESS:  I don't think so.
 8               MR. PLUNKERT:  Okay.
 9               MR. JOHNSON:  Now I have more questions.
10               THE WITNESS:  Okay.
11               MR. JOHNSON:  Of course.
12      Q   (By Mr. Johnson) On this report, the Taser
13   use report that you were just asked about, I know
14   that there's -- you said there's a reference to the
15   probes?
16      A   Correct.
17      Q   Correct?  Which probe of this device struck
18   which part of Mr. Moore's body?
19      A   The upper probe struck, I'm wanting to say
20   it was mid chest.  Mid chest.  The lower probe
21   struck right at the pelvis area.  So I don't know
22   if -- when I pulled the trigger if I flinched.  A
23   lot of times when you're shooting a firearm, you
24   flinch.  I don't know if I flinched and it went up.
25   I don't know what kind of circumstances it was.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                              Page 190
 1      Q    Were there any other circumstances or
 2  variables such as the wind or the weather that you
 3  believe affected your aim or the discharge of this
 4  device?
 5      A    Other than him moving around, I don't
 6  believe so.
 7      Q    I'm asking about atmospheric variables.
 8      A    I can't -- I can't think of anything, no.
 9      Q    And the sight, you had good sight distance?
10      A    Yes.
11      Q    You could see him?
12      A    Yeah.
13      Q    He wasn't obscured by anything?
14      A    No.
15      Q    Did you ever communicate your aversion to
16  pepper mace or pepper spray to anybody with the
17  Ferguson Police Department?
18      A    I have not.  We have -- we had the
19  capability of carrying or not carrying it.
20      Q    Is this -- and I don't know the operations
21  that well, but is this a situation where you have
22  the ability to select different force options and
23  you just consciously chose not to select mace
24  because you have an aversion to it?
25      A    Correct.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                      September 22, 2015

Page 191

1    **Q**   And so when you go out on patrol, is the

2    different weaponry there for you, the firearm, the

3    baton, the Taser, and then you pick them up?

4    **A**   The Taser is kept at the station, but I have

5    my firearm, I have my baton on my duty belt at all

6    times.

7    **Q**   And so you've never communicated to your

8    superiors or commanders or anybody within the

9    department this aversion to mace?

10   **A**   I've told my lieutenant that it affects me

11   horribly.

12   **Q**   Who did you tell?

13   **A**   It was probably Lieutenant Ballard.

14   **Q**   When?

15   **A**   Back when I first started.

16   **Q**   Was there any alternatives explored?

17   Instead of using mace, you could use some other

18   alternative use of force?

19   **A**   No.  It's --

20   **Q**   I know and I appreciate that you worked

21   overnight.  With that in mind, were you still able

22   to listen to the questions that Mr. Floyd and I have

23   asked you today?

24   **A**   Yes, sir.

25   **Q**   Were you still able to give what you

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 192

1    consider to be intelligent responses and responses

2    based on your knowledge, background, training and

3    experience?

4        **A**   I believe so.

5        **Q**   And any type of -- and I know this is a

6    little spur of the moment here, but any type of

7    changes or amendments that you'd like to make right

8    now that, you know, given further time to reflect or

9    given the fact you were on a break you'd like to

10   change some answer, sir?

11       **A**   I don't believe so.

12           MR. JOHNSON:  Okay.  I appreciate your time,

13   and I don't have any further questions.  Mr. Floyd

14   might have a little follow-up.

15           MR. FLOYD:  Not much.

16                  [EXAMINATION]

17   QUESTIONS BY MR. FLOYD:

18       **Q**   Just going back to Exhibit Number 21, which

19   was this Taser Training Academy.  I'll try to flip

20   through the pages to make it easy.  There was

21   something on Ferguson Bates stamp 1464.  Do you see

22   that handwriting there on the page talking about

23   the --

24       **A**   I can see it.  I just can't read it.

25       **Q**   Is that your handwriting?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

                                                          Page 193

 1      **A**   It kind of looks like it, yes.

 2      **Q**   Okay.  Do you know of anybody else that

 3  would have put those notes on there?  Do you want to

 4  look at it closer and tell me if it's your

 5  handwriting?

 6          MR. PLUNKERT:  We can go off the record I

 7  think to clarify, unless you would like the witness

 8  to answer.

 9      **A**   I don't think that's my handwriting.

10          MR. DOWD:  There's a couple of pages that

11  are --

12          MS. SHAFAIE:  I can just clarify.  It wasn't

13  his handwriting.

14          MR. PLUNKERT:  If you would like for us to.

15          MR. FLOYD:  Yeah.  Go ahead.  Whose

16  handwriting is it?

17          MS. SHAFAIE:  It's Detective -- Detective

18  Ballard.

19      **A**   Detective Ballard.

20      **Q**   (By Mr. Floyd) Okay.

21      **A**   It don't -- I was going to say it don't look

22  like mine.  It's close but it's not.

23      **Q**   One more though.  Flip through there.  I

24  think it's one that has the big clip on the top.

25  One more.  Yeah.  I think that's the one.  I think

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 194

 1    that's okay.  Now, these are -- the bottom of that

 2    page it talks about the needle sizes.  And as I

 3    understand them, the three types, there was a

 4    quarter inch needle that was a training needle?

 5        A    Correct.

 6        Q    And then one that's four-tenths of an inch,

 7    just short of a half inch, and one that's .55 inches

 8    on the needle.  Can you tell me which type needle

 9    was used on the X26 that was used on Mr. Moore?

10        A    I'm trying to remember what color of doors

11    go with the size needle.  I'm wanting to say it was

12    the .4, the .40.

13        Q    Is there any way that we can determine which

14    one, if that gun is still in evidence?

15        A    If that gun is still in evidence and it has

16    the blast doors with it, I'd be able to tell you,

17    yes.

18        Q    At a minimum it would be .4-inch which is

19    just under a half inch.  And then at a maximum it

20    would be .55 inches?

21        A    Correct.

22             MR. JOHNSON:  She has the Taser in her

23    office.  Can we go off the record while you grab

24    that and we can look at the Taser door?

25             MR. FLOYD:  Go off the record.

Tina Moore, et al. v. Brian Kaminski, et al.
Brian Kaminski                                           September 22, 2015

                                                        Page 195
 1              THE VIDEOGRAPHER:  Off the record at 1:52.
 2                   (Recess taken.)
 3              THE VIDEOGRAPHER:  Back on the record at
 4      1:53.
 5                   [EXAMINATION]
 6      QUESTIONS BY MR. PLUNKERT:
 7         Q    Officer, do you remember in response to
 8      Todd's questions earlier regarding whether you had
 9      been disciplined regarding this incident?  Was that
10      a yes?  Do you remember that testimony?
11         A    Yes, I remember that testimony.
12         Q    And to your knowledge have you?
13         A    I don't believe I was disciplined.
14         Q    You mentioned you had time off after this
15      incident, right?
16         A    Correct.
17         Q    Do you attribute that to discipline?
18         A    No.  I contribute that to department
19      policies.
20         Q    Okay.  And lastly on clarification, you've
21      spoken about the aversion that you have to spray,
22      right?
23         A    Correct.
24         Q    Can you describe the aversion and how long
25      that aversion lasts?

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

```
                                                Page 196
    1        A    My eyes swell to where they're completely
    2    swollen shut.  It normally takes 12 to 13 hours for
    3    them to go down.
    4            MR. PLUNKERT:  Those are the clarification
    5    questions that we have.
    6            MR. DOWD:  Let's go off the record.
    7            THE VIDEOGRAPHER:  Off the record at 1:54.
    8                  (Recess taken.)
    9            THE VIDEOGRAPHER:  Back on the record at
   10    1:55.
   11                  [EXAMINATION]
   12    QUESTIONS BY MR. FLOYD:
   13        Q    Just so that we're clear to answer the
   14    question as to the needle length on the Taser that
   15    was in question in this case, you were actually able
   16    to look at the Taser and verify that it was the
   17    .4-inch needle; is that correct?
   18        A    Correct.
   19        Q    And you were also asked a question about
   20    your dislike of pepper spray.  There was some
   21    indication that you had 12 or 13 hours' worth of
   22    symptoms to dissipate; is that correct?
   23        A    Correct.
   24        Q    I just want to make sure that I'm clear on
   25    something though.  That as I understand it, and
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                      September 22, 2015

Page 197

1    correct me if I'm wrong, pepper spray or mace is

2    intended to cause a rapid inflammatory process in

3    the mucous membranes, the eyes, even the breathing

4    so as to incapacitate someone who is hostile or

5    being dangerous, correct?

6         **A**    Correct.

7         **Q**    And did you happen to time this or is this

8    just an estimate that you had these symptoms for 12

9    hours?

10        **A**    It was approximately, an estimate.

11        **Q**    And this was how many years ago?

12        **A**    Back in probably 2005.

13        **Q**    Okay.  So about ten years ago.  And you were

14   sprayed with the pepper spray one time, correct?

15        **A**    It was the fog, yes.

16             MR. FLOYD:  Okay.  All right.  I think those

17   are all the questions I have.  Thank you.

18             MR. PLUNKERT:  We can -- we'll read.

19                  I'll send you the testimony.  You can

20   check it over, ensure that it's been accurately

21   transcribed, and we can return it.  Okay?

22             THE WITNESS:  Okay.

23             THE VIDEOGRAPHER:  We're off the record at

24   1:56.

25

Tina Moore, et al. v. Brian Kaminski, et al.

Page 198

1   State of Missouri

2                          SS.

3   County of St. Louis

4        I, Tracey Aurelio, duly commissioned, qualified

5   and authorized to administer oaths and to certify to

6   depositions, do hereby certify that pursuant to

7   Notice in the civil cause now pending and

8   undetermined in the United States District Court,

9   Eastern District of Missouri, Eastern Division, to

10  be used in the trial of said cause in said court, I

11  was attended at the offices of Pitzer Snodgrass,

12  100 South Fourth Street, 4th Floor, St. Louis,

13  Missouri, 63102, by the aforesaid attorneys; on the

14  22nd day of September, 2015.

15       The said witness, being of sound mind and being

16  by me first carefully examined and duly cautioned

17  and sworn to testify the truth, the whole truth, and

18  nothing but the truth in the case aforesaid,

19  thereupon testified as is shown in the foregoing

20  transcript, said testimony being by me reported in

21  shorthand and caused to be transcribed into

22  typewriting, and that the foregoing pages correctly

23  set forth the testimony of the aforementioned

24  witness, together with the questions propounded by

25  counsel and remarks and objections of counsel

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                              September 22, 2015

Page 199

1    thereto, and is in all respects a full, true,

2    correct and complete transcript of the questions

3    propounded to and the answers given by said witness;

4    that signature of the deponent was not waived by

5    agreement of counsel.

6         I further certify that I am not of counsel or

7    attorney for either of the parties to said suit, not

8    related to nor interested in any of the parties or

9    their attorneys.

10

11   Dated this 22nd of September, 2015.

12

13

14   _____

15        Tracey Aurelio, CCR, CSR, RDR, C

16

17

18

19

20

21

22

23

24

25

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                              September 22, 2015

```
                                                        Page 200

  1   GorePerry Reporting & Video

  2   Tuesday, September 29, 2015

  3
      Mr. Robert T. Plunkert, Esq.
  4   Pitzer Snodgrass
      100 South Fourth Street Suite 400
  5   St. Louis, MO, 63102

  6   Re: Deposition of Brian Kaminski
      Date:Tuesday, September 22, 2015
  7   Case:Tina Moore, et al. vs.
      Brian Kaminski, et al.

  8

  9   Mr. Robert T. Plunkert, Esq.

 10   Your witness did not waive the right to read and sign
      his/her deposition in the above referenced matter.
 11   Enclosed is the copy of the deposition you ordered,
      together with errata sheets and additional signature
 12   page.  Please instruct your witness to read the
      transcript, list any corrections (including page and
 13   line number) on the errata sheets, sign and date the
      errata sheets and signature page.

 14
      Within 30 days, please return the errata sheets and
 15   signature page to our office for further processing.

 16   Your prompt cooperation will be appreciated.

 17

 18

 19

 20

 21   Sincerely,

 22

 23   Production Department
      GorePerry Reporting & Video
 24   515 Olive Street
      St. Louis, MO  63101
 25   (314) 241-6750
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

                                                        Page 201

     1   Page Line Should Read:

     2   Reason for change:

     3

     4   Page Line Should Read:

     5   Reason for change:

     6

     7   Page Line Should Read:

     8   Reason for change:

     9

    10   Page Line Should Read:

    11   Reason for change:

    12

    13   Page Line Should Read:

    14   Reason for change:

    15

    16   Page Line Should Read:

    17   Reason for change:

    18

    19   Page Line Should Read:

    20   Reason for change:

    21

    22   Page Line Should Read:

    23   Reason for change:

    24

    25

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                           September 22, 2015

```
                                                     Page  202

  1   Page Line Should Read:

  2   Reason for change:

  3

  4   Page Line Should Read:

  5   Reason for change:

  6

  7   Page Line Should Read:

  8   Reason for change:

  9

 10   Page Line Should Read:

 11   Reason for change:

 12

 13   Page Line Should Read:

 14   Reason for change:

 15

 16   Page Line Should Read:

 17   Reason for change:

 18

 19   Page Line Should Read:

 20   Reason for change:

 21

 22   Page Line Should Read:

 23   Reason for change:

 24

 25
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

                                                        Page 203

 1   Comes now the witness, Brian Kaminski,

 2   and having read the foregoing transcript

 3   of the deposition taken on 9/22/2015,

 4   acknowledges by signature hereto that it is a

 5   true and accurate transcript of the testimony given

 6   on the date hereinabove mentioned.

 7

 8

 9   _____

10   Brian Kaminski

11

12   Subscribed and sworn to me before this

13   _____ day of _____,20_____.

14   My Commission expires

15

16

17   _____

18   Notary Public

19

20

21

22

23

24

25

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

```
                                                    Page 204

  1   COURT MEMO

  2

  3

  4

  5   Tina Moore, et al. vs. Brian Kaminski, et al.

  6

  7

  8   CERTIFICATE OF OFFICER AND

  9   STATEMENT OF DEPOSITION CHARGES

 10

 11   DEPOSITION OF Brian Kaminski

 12

 13   9/22/2015

 14   Name and address of person or firm having custody of

 15   the original transcript:

 16

 17   Dowd & Dowd

 18   211 North Broadway, Suite 4050

 19   St. Louis, MO 63101

 20

 21

 22

 23

 24

 25
```

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 205

1   ORIGINAL TRANSCRIPT TAXED IN FAVOR OF:

2

3   Dowd & Dowd

4   211 North Broadway, Suite 4050

5   St. Louis, MO 63101

6   Total:

7   1 ONE COPY - TAXED IN FAVOR OF:

8

9   Pitzer Snodgrass

10   100 South Fourth Street Suite 400

11   St. Louis, MO 63102

12   Total:

13   1 ONE COPY - TAXED IN FAVOR OF:

14

15   Baty, Holm & Numrich, PC.

16   4600 Madison Avenue, Suite 210

17   Kansas City , MO 64112

18   Total:

19

20

21

22

23

24

25

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                    September 22, 2015

                                                                      Page 206

1   Upon delivery of transcripts, the above

2   charges had not been paid.  It is anticipated

3   that all charges will be paid in the normal course

4   of business.

5   GORE PERRY GATEWAY & LIPA REPORTING COMPANY

6   515 Olive Street, Suite 700

7   St. Louis, Missouri 63101

8   IN WITNESS WHEREOF, I have hereunto set

9   STATEMENT OF DEPOSITION CHARGES

10  my hand and seal on this _____ day of _____

11  Commission expires

12  _____

13  Notary Public

14

15

16

17

18

19

20

21

22

23

24

25

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                    September 22, 2015

Page 207

**A**

**A.D.R** 1:3 2:7 3:12
**a.m** 2:22 35:18 38:10,16 43:4 44:2
**ability** 190:22
**able** 9:6 11:11 24:7 24:9 46:3 60:5 62:1,2 98:7 100:2 191:21,25 194:16 196:15
**abrasions** 178:22 178:24
**Absolutely** 155:5 184:4
**Abson** 146:13
**Abston** 146:13
**academy** 8:11,12 8:16,17,18 10:7 16:11 17:20 27:13 64:2 85:10 131:6 142:6 171:8,19 192:19
**acceptable** 81:24 82:5,13
**accidently** 103:9,10 121:24
**accomplish** 74:22 75:5 76:3 78:13
**accuracy** 45:23
**accurate** 43:15 167:14 203:5
**accurately** 197:20
**acknowledges** 203:4
**acknowledging** 137:6
**acting** 168:19,21
**activate** 184:12
**actual** 22:1 65:11
**add** 167:23 168:2
**addition** 8:18 9:24 12:5
**additional** 9:23

12:7,12 30:4 31:3 84:1 200:11
**additions** 33:12
**address** 40:3,3,5 109:19 204:14
**addressed** 160:15 160:23
**adequate** 88:16 121:3
**adequately** 30:21
**administer** 14:17 14:23 198:5
**administered** 56:25 59:11 60:3,10 61:2 62:4 110:5 112:24 113:13 126:9
**adult** 73:20
**adults** 73:18
**advised** 48:19 49:3 49:6 50:17,22 51:13 149:20 150:4,11 168:11 170:9 172:24 173:12,14,15 176:2
**advising** 51:7
**affirmative** 75:19 79:11
**aforementioned** 198:23
**aforesaid** 6:15 198:13,18
**afraid** 108:14
**age** 6:13 43:8 176:8
**aggression** 86:16
**aggressive** 48:25 50:25 51:9 97:21 106:19
**aggressively** 49:21 50:20 88:9
**aggressor** 104:14
**agitated** 13:18 14:24 79:2,21

89:14 90:19 131:15,17
**agitation** 71:5
**ago** 139:21 197:11 197:13
**agonal** 177:8
**agree** 15:10,12,13 15:25 16:1,4 29:8 29:13 68:17,21 74:13,20 75:2,7,8 75:13,14,21 76:8 76:20,21 78:11,16 78:19,22,25 79:1 79:5,8,9,20 80:3,4 80:17,22 81:4,13 81:15,22 82:1,3 82:17 83:2,24 84:2,5,6,11,12,22 85:2,7,16,18 87:24 88:2 90:11 90:13 98:17 99:3 103:23 104:1,2 105:19,24 110:4 113:5,10,24 114:20 120:11 123:17,23,24 124:1 136:1,8,10 137:11,17,18,19 138:6,7,8,12,13 138:16 167:13
**agreed** 23:22 25:5 124:25 125:5,21
**agreement** 23:1 24:18 67:12 124:23 199:5
**ahead** 15:19 21:8 31:6 49:16 54:16 59:20 62:14,20,20 82:9 103:7 115:23 140:5 193:15
**aim** 190:3
**aiming** 121:24
**air** 48:20 50:18
**Airport** 45:5,6 47:1

47:11,20 50:16 61:21 94:11,12 95:13,19,22 100:24 102:7 108:17 110:14,16 111:2 113:7,9 145:17 148:9,13 148:20,22 149:2 181:18
**al** 1:12 2:14 5:7,7 200:7,7 204:5,5
**alerted** 172:7,19
**alive** 128:25 129:3 129:7
**allow** 45:22
**allowed** 152:14
**alternative** 191:18
**alternatives** 191:16
**ambulance** 149:15 172:16 176:1
**amendments** 192:7
**amount** 88:23 171:8
**ample** 188:15
**and/or** 70:10 143:22
**angle** 118:3,5 161:13 162:18,19 165:5 185:3
**angry** 64:23
**announced** 44:21
**announcement** 45:11
**anomaly** 99:10
**answer** 7:13,15,19 14:9 15:1 16:3 21:25 22:18 25:6 33:14 35:24 38:22 39:5 41:18 42:17 45:25 49:11 51:25 54:11 58:23 59:3 59:20 66:3 72:16 74:17,24 75:23 76:2,5,19 78:15

78:21 79:7,10 84:4 85:14 86:4 87:19 88:7,22 89:8 97:22 103:25 104:21 107:2 108:3 109:9 110:7 114:3,12 115:13 118:20,25 119:16 120:9 121:9,21 124:6 132:17,18 139:8 152:12,14 187:15,16 188:16 188:20,23 189:5 192:10 193:8 196:13
**answered** 75:19 76:6
**answering** 54:16 136:14
**answers** 7:20 199:3
**anticipated** 206:2
**anybody** 22:4 32:1 147:25 156:20 160:8 171:25 175:12,18,23 176:12,13,22 190:16 191:8 193:2
**anytime** 150:25
**apart** 107:11 186:9 186:24
**apparently** 136:16 136:24
**appear** 38:23 135:19 177:22
**APPEARANCES** 3:1
**appeared** 38:25 44:19 177:1
**appears** 32:20 38:11 42:22 51:3
**applications** 69:25
**apply** 65:11
**appreciate** 6:11

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                    September 22, 2015

Page 208

191:20 192:12
**appreciated** 200:16
**approach** 95:4
  102:11
**approached** 108:13
**approaching** 93:4
  104:4,6 113:19
**appropriate** 14:23
  15:22 78:10,23
  137:21 138:10
**approval** 32:20,22
  33:6 36:16
**approve** 36:14
**approximately** 19:8
  20:25 45:3,15
  49:9 61:17 63:10
  63:15 99:2 100:15
  112:1 128:8 129:9
  162:25 164:18
  183:14 197:10
**area** 13:15 34:24
  39:12,14,15 40:6
  40:21 44:25 45:2
  47:21 50:5 52:23
  73:8,12 76:18
  80:18 93:8 94:24
  95:1,18 99:19
  108:20 109:14,16
  109:18 162:21
  168:24 176:16
  180:25 182:2,17
  183:14 189:21
**areas** 76:16 77:6
  181:2
**argued** 25:5
**argument** 24:4
**argumentative**
  54:2
**arisen** 24:17
**arm** 62:16 151:6
**arms** 157:25 179:6
**arrangement** 145:6
**arrest** 27:8 73:11
  157:18 172:13,18

**arrival** 38:9
**arrive** 35:14 39:21
  44:4
**arrived** 20:11 35:1
  35:12,14 36:6,18
  38:9,15 39:9,16
  40:19,20,21 41:9
  41:24 42:14 45:11
  86:14 93:1 97:6
  101:21 109:6
  113:22 139:9,12
  146:7 147:4 148:9
  148:13 149:1,5
  173:17 175:2
**arrives** 41:8
**asked** 6:23 23:3
  31:2 75:16,20
  97:20 117:17
  139:7 162:5
  167:12 170:8
  185:17 189:13
  191:23 196:19
**asking** 22:19,21
  23:4 53:20 62:12
  90:24 99:14
  118:21 149:4
  156:20 159:1
  190:7
**asks** 132:16
**aspect** 12:24 27:4
  166:2 169:24
**asphalt** 56:18,19
  116:6
**assaults** 103:9
**assess** 83:8 136:6
**assessment** 83:15
  83:15,18 85:17
  100:25 101:4,6,12
  104:24 119:8
  120:13 138:6,11
**assigned** 37:15 38:4
  46:10 175:9
**assisted** 20:1 38:14
  46:9

**associate** 177:5
**associated** 15:15
  70:3
**assume** 7:13 139:14
**assuming** 90:18
**asthma** 71:1
**atmospheric** 190:7
**attempt** 58:12
  77:23 113:18,21
  129:18 163:12
  167:18 187:2
**attempted** 58:11
  113:3 147:22
  163:9,10,23
  164:14,17,24
  165:9
**attempting** 58:5
  61:1 86:19 163:20
  164:8,19 165:13
**attend** 171:25
**attended** 198:11
**attention** 63:18
  148:17
**attorney** 31:18 32:2
  199:7
**attorney-client**
  132:16
**attorneys** 67:7
  132:13,14 198:13
  199:9
**attribute** 195:17
**attributed** 178:20
  179:15
**August** 172:12
  180:17
**Aurelio** 2:23 5:11
  198:4 199:14
**authorization** 24:3
**authorized** 198:5
**automatically**
  151:1
**available** 102:20
**Avenue** 3:14
  205:16

**average** 21:4
**aversion** 190:15,24
  191:9 195:21,24
  195:25
**avoid** 71:22 73:11
  84:7 130:24
**Avoidance** 67:17
**avoided** 76:16
**aware** 28:17 111:9
  140:22 159:12,16
  159:18 160:1,8
  177:9 187:2

**B**

**back** 16:10 24:13
  25:8 28:11 35:22
  35:25 39:22 40:25
  41:9 46:16 48:12
  51:11 54:25 55:5
  58:5,11,12,13
  59:6 63:20 64:11
  65:15 77:7,21
  80:20 85:19 87:5
  87:23 88:12 94:19
  94:21 95:22 96:13
  96:15 98:19
  103:11 105:1
  107:16,19 109:2
  110:20 112:10,22
  112:23 113:4
  116:21 117:9,11
  125:9 126:5,11,13
  126:14,18,25
  127:5 138:23
  142:11 144:1,2
  154:20 156:1
  167:18 173:24
  185:24 187:20
  188:11,13 191:15
  192:18 195:3
  196:9 197:12
**back-to-back-to-...**
  138:9
**background** 149:14

192:2
**backup** 93:3
  102:12 107:20
  113:22,24
**backups** 37:18
**backwards** 51:6
**bad** 29:9
**bailiff** 17:17
**Ballard** 33:10,11
  33:23 36:10 139:5
  139:9 153:21
  154:2,8,15 155:8
  155:12,16 156:4,5
  162:6 168:2,13
  169:3 173:10,14
  180:3 191:13
  193:18,19
**Ballard's** 154:19
  155:3 156:11
**bar** 28:1
**barbs** 66:6
**bars** 21:16
**base** 99:13,18
  133:20,21,22
**based** 23:20 37:23
  79:11 80:5 82:2,8
  82:10 99:15 107:4
  123:12 131:7
  135:18 192:2
**bases** 24:7
**basic** 78:9
**basically** 46:10
  64:17 96:19
  173:12
**basis** 18:19 22:22
  22:24 24:6 53:25
  103:6 109:25
  171:7
**Bates** 31:20 67:2
  134:7 141:10
  192:21
**baton** 30:12 102:22
  103:1,4,13,16,18
  121:15,19 191:3,5

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                        September 22, 2015

Page 209

**batons** 103:9
**Baty** 3:13 205:15
**bearing** 28:5
**beat** 174:17
**beating** 44:11
  147:5,12,14,16
**beats** 73:9
**Bebe** 33:23 36:10
  36:12,13 41:24
  155:18 172:20,23
  173:3,14 180:3
**becoming** 48:4
**began** 50:19,19
  51:6 170:22
**beginning** 135:4
  184:17
**behalf** 2:19 6:10
**behavior** 75:12
  88:18
**belief** 165:12 170:4
**believe** 24:1 29:5
  36:8,20,24 48:1
  50:4 74:18,25
  75:18 79:14 94:24
  107:22 113:14
  120:10 126:20
  128:24 136:20
  137:7 139:17
  145:20,22 147:12
  149:18 155:2,9,14
  155:14,17 156:10
  156:13 174:6
  175:17 178:23
  182:4 184:7,9,13
  185:6 190:3,6
  192:4,11 195:13
**belly** 117:12,14,15
**belt** 117:14 191:5
**bend** 94:13 108:17
  108:19
**best** 54:7,8 106:24
  135:23
**big** 28:1 64:12
  103:21 111:24

193:24
**Bill** 125:18
**bill@dowdlaw.net**
  3:11
**bit** 8:8 13:19 16:11
  29:17 37:12 96:20
  112:8 144:21
  152:13 184:1
**black** 44:10
**blast** 194:16
**block** 40:6,6
**blocks** 45:3
**blood** 70:16,16
**blue** 111:21
**blues** 184:11
**board** 186:12,16
**Bob** 5:21 24:15
**body** 51:21 52:4,21
  53:10,11,12 55:11
  60:15,16,17 65:22
  66:9 76:16 80:20
  92:2 101:16
  115:21,22 117:7
  117:10 121:25
  122:12,15 127:14
  127:23 151:21
  152:22 163:13
  166:16 178:11,20
  178:25 183:1,10
  184:24 189:18
**bone** 67:23 68:3,6
**booking** 17:16
**bottom** 52:23 69:14
  118:4 134:19
  140:13,14 161:14
  194:1
**bounce** 144:21
**brain** 91:5,9
**Brannan** 169:22,23
  186:19,23
**break** 7:25 24:16
  94:15,22 138:19
  138:19 148:2
  157:22 188:14

192:9
**breaks** 78:2
**breast** 76:18
**breath** 178:2,7
**breathing** 62:22,24
  63:17 128:11
  129:11,15 130:3
  130:16,24 148:15
  148:15,16,17,23
  149:6 150:1,3,4,5
  150:11,17 164:8
  177:8,11,20,23,25
  178:1,5,7,16,18
  183:6,25 197:3
**Brian** 1:12,18 2:14
  2:18 5:5,7 6:12
  8:5 200:6,7 203:1
  203:10 204:5,11
**briefly** 91:8
**bring** 30:23
**Broadway** 3:9
  204:18 205:4
**broke** 37:15
**broken** 34:13 148:5
**brothers** 180:7,9,11
**bruises** 179:14,19
**build** 43:18 131:19
  131:23
**building** 47:5,9,9
  47:10 50:15 95:23
  96:5,7,11,13,16
  96:21 97:25 105:1
  109:3 113:6,8
  184:2,3
**bull** 64:8,12,15,23
**bulletin** 186:12,16
  187:1
**bulletins** 185:16,19
  186:8,9
**bulls** 64:21
**burns** 22:2
**burst** 51:15 58:11
  59:11 60:3,25
  62:3 113:15,16

**bursts** 112:25
  136:18,23 137:1
  137:15 138:2
  150:24
**business** 17:25
  166:21,22 167:14
  206:4
**businesses** 47:22,24
**buttocks** 158:1

## C

**CAD** 38:13 39:3
  40:22 46:6,8,18
  46:22 139:1,2
**call** 6:4 14:7 15:2
  17:25 20:10 34:22
  35:15 38:2 42:24
  44:2,7,10 46:13
  92:23 102:6 147:5
  159:22 160:5,7,14
  160:18,23 161:2
  161:12
**called** 14:3,13 18:5
  28:4 34:24 39:14
  41:21 45:1 109:15
  110:19 129:17
  149:15 150:4
  155:15,16
**calling** 54:10
**calls** 14:8 15:18
  21:24 31:5 48:10
  49:10 51:24 53:3
  54:3 59:2 86:4
  88:1 89:7 106:22
  107:1 108:2 109:8
  110:6 114:2
  115:12 118:24
  119:15 121:9,21
**calm** 79:24 105:6
  105:21 113:18
**camera** 52:16
  181:20 182:14
**cancel** 10:2
**canvassing** 44:25

**capability** 190:19
**capture** 72:22 73:1
  73:7,10,10,17
**car** 141:20 166:15
  166:19
**cardiac** 70:1 72:22
  73:1,7,9,10,11,16
  142:18
**career** 11:1 26:24
**carefully** 198:16
**carried** 21:11,12
**carry** 11:11 21:2
  22:6,9,10,22
  23:10 25:24 26:9
  102:18
**carrying** 24:6 92:11
  102:14 190:19,19
**cars** 37:17 44:11
  102:7 147:12
**cartilage** 68:3
**cartridge** 65:10
  135:1 161:3
**cartridges** 65:10
**case** 6:15 22:15
  23:18 124:24
  144:20 152:6
  153:4 155:13
  156:18 158:12
  160:4 171:16
  178:13 188:22
  189:5 196:15
  198:18
**Case:Tina** 200:7
**cases** 14:22 89:24
**Cassiday** 11:14
**catch** 29:9
**catches** 182:14
**catching** 178:2,6
**cause** 5:6 22:1,2
  66:8,9,16 67:22
  68:1,6 69:25
  71:10 91:10,14
  92:1 197:2 198:7

Tina Moore, et al. v. Brian Kaminski, et al.
Brian Kaminski                                                September 22, 2015

Page 210

198:10
**caused** 25:18
157:16 198:21
**causes** 65:22 69:15
70:10
**causing** 161:5
163:24
**cautioned** 198:16
**CCR** 199:14
**ceiling** 160:24
161:4,6
**center** 77:7 103:19
103:22
**central** 8:10 66:6
**certain** 36:2 39:25
69:16 171:8
**certainly** 128:25
**certificate** 169:16
204:8
**certification** 11:15
13:6 139:14
141:11 142:7
169:24
**certified** 5:10,12
11:24 12:23 13:2
74:9 152:1 162:11
185:20 186:4,10
188:18
**certify** 198:5,6
199:6
**CEW** 67:16 69:9
69:15,21,25 70:10
70:22 71:18,18,22
72:3 73:7 76:1,2
76:15,16 77:7,14
77:24 78:3
**CEWs** 67:21 84:13
84:17 85:10
**chain** 168:14
**chance** 12:22 24:16
126:23 155:7
187:16
**change** 16:22 17:11
71:10 104:24

112:3 133:18
167:23 168:2
183:1,4 192:10
201:2,5,8,11,14
201:17,20,23
202:2,5,8,11,14
202:17,20,23
**changed** 16:25
23:11 46:1 104:15
112:6 183:10
**changes** 33:12
69:17 70:15 192:7
**chaotic** 89:15
**charge** 51:14 60:10
60:11,12,14 118:7
135:7,13
**charged** 64:25
**charges** 134:13,14
204:9 206:2,3,9
**Charles** 8:13
**check** 173:16
197:20
**checked** 62:13,15
62:15 129:25
130:15
**checking** 110:21
**chemical** 91:12,14
**chemistry** 70:16
**chest** 13:13,15
52:24 53:15,16,18
53:23 54:20 56:14
60:6 73:8,12
76:18,18 80:18
117:19 189:20,20
**chief** 156:14 168:19
**child's** 157:21,21
**children** 73:17
**chime** 188:6
**chose** 190:23
**Chris** 11:14
**chronological**
141:18
**circle** 111:22,24
154:16

**circumstances**
11:18 14:7 18:5
27:24 35:13 73:10
74:25 75:3 104:6
157:11,15 169:14
173:4,9 176:23
189:25 190:1
**CIT** 30:1 170:16
171:1,21 175:10
175:13,19
**cited** 172:15,18
**citizen** 81:23 82:4
82:18,23 84:13,18
85:10 159:9
**citizens** 29:6 78:24
79:2,21 80:18,19
81:2,4
**city** 3:14 16:16 17:5
17:15 21:17 22:6
29:6 34:7 37:15
37:18 131:4
205:17
**civil** 198:7
**clarification** 195:20
196:4
**clarify** 193:7,12
**class** 10:13 11:15
11:16 12:10 67:8
169:19 171:10,12
171:13 185:21
**classes** 12:14
169:13 171:8
**classroom** 11:19
**Clayton** 3:4
**cleaners** 96:8
**clear** 7:20 126:19
130:11 187:24
196:13,24
**clearly** 58:2,13
**clenched** 151:12
164:22 165:7
**clip** 142:15 193:24
**clipped** 142:17
**close** 19:14 28:7

39:12 51:22 54:25
55:1 92:25 93:7
174:5 193:22
**closed** 27:7
**closer** 48:23 95:13
96:20 112:8 113:6
113:7 184:2 193:4
**closest** 47:12 93:24
97:8
**clothed** 99:21
**clothes** 86:22
**CLVS** 3:22
**code** 40:4
**collapse** 116:3
**collapsed** 116:3
**Colonel** 158:19
**color** 194:10
**colors** 107:11
**column** 69:14
70:19 72:22
134:18
**combat** 27:7
**combative** 26:23
**come** 24:17 48:17
48:19 49:18 62:2
100:9 105:10,12
105:17 106:10
108:18 129:14
176:2,18 187:20
**comes** 22:25 55:17
159:4 186:1 203:1
**coming** 6:5 35:18
35:19 61:21,22
95:22 96:4 106:18
174:4
**command** 49:17,18
49:20,24 58:25
119:11,13,25
120:13 123:19,22
125:10 126:14,22
137:20 168:15
**commander** 160:1
168:21
**commanders** 191:8

**commanding** 51:11
100:9
**commands** 50:24
51:8 57:11,15,17
58:18,21 59:7,11
60:25 61:8 116:9
116:11,14,18
118:10,16 119:7
120:3,22 123:5,7
123:10 125:13,25
126:16 136:6,11
137:22
**Commission**
203:14 206:11
**commissioned**
198:4
**communicate**
33:22 46:16 83:25
190:15
**communicated**
173:3 191:7
**communication**
40:12,15 145:9
175:15 180:14
**communications**
46:5,21 132:16
175:12,21
**community** 17:22
29:1 177:1
**COMPANY** 206:5
**compared** 79:24
80:19 81:4
**complaint** 160:9
**complaints** 28:16
159:9,13,17,19
**complete** 13:4
32:23 155:10
199:2
**completed** 8:19
11:16 32:17,18
34:2,3,6 89:13
152:22 153:16
**completely** 44:12
136:2 164:2 196:1

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                September 22, 2015

Page 211

**compliance** 27:9
   83:15,18 137:20
   137:22
**complied** 83:23
   158:2
**comply** 50:23 51:8
   51:12 60:21 65:23
   84:14,19 85:4,12
   119:12 123:5
   125:10 136:6,7
**Complying** 83:13
**component** 156:10
**comprehend**
   119:13,14
**comprehended**
   120:1
**compressing** 13:23
**compression** 68:7
**compromised** 71:9
**computer** 38:14
   46:9 139:19
   185:10,15
**concerned** 99:11
**conclusion** 89:5
   99:15 105:4
**concrete** 178:23
**condition** 14:14
   24:8 68:23 92:6
   104:18 177:14
**conditions** 70:25
   71:1
**conduct** 23:21
   85:17 120:12
   147:8 159:14
   165:22
**confer** 24:17
**conferred** 171:16
**confrontation** 27:6
**confused** 42:23
**confusing** 115:1
**conscious** 177:22
**consciously** 190:23
**consecutively** 138:4
**consider** 29:4 88:12

93:3 97:19 104:17
   122:4,7,15 147:9
   169:23 192:1
**considered** 137:21
   169:7
**consistent** 43:16
**consulted** 132:13
   132:20
**contact** 29:6 48:13
   51:20,20 52:3,3
   54:22 101:7 104:9
   113:21
**contacts** 55:2
   149:20
**contain** 34:14
   182:2,8,17
**contained** 23:23
   74:2 137:8,12
   142:2 181:14
**contents** 143:1,3
**continue** 46:24
   49:13 55:25
**continued** 9:1
   51:14 75:13
**continuing** 8:21,23
**continuous** 69:25
   70:6 135:21
**continuously** 56:1
**continuum** 104:8
**contract** 66:10
**contracting** 127:24
**contraction** 67:21
**contractions** 67:22
   122:23,24
**contribute** 69:25
   71:11 195:18
**control** 27:17 28:3
   72:1,2,2 79:18
   91:23 103:12,15
   103:17
**controlling** 26:11
**contusions** 179:14
**conversation** 23:7
   23:12 173:11

**conversations**
   24:19 123:12
   132:12
**Cool** 11:10,12 12:1
   12:5 14:1 16:16
   16:21,22 17:14,20
   18:4,24 19:1,6,11
   20:16,18,21 21:1
   21:17 25:13 26:15
   28:1,14 63:23
   170:9
**cooperation** 200:16
**coordinator** 171:15
   171:18
**copy** 31:10 187:5,7
   200:11 205:7,13
**corner** 108:19
   140:15
**coroner's** 73:23
**correct** 10:19 12:13
   12:15 13:3,17
   16:6 18:25 25:12
   26:13 28:20 29:10
   30:5,25 34:9
   36:15 37:25 38:10
   38:16 39:24 41:2
   43:4,5 44:2,3,5,6
   44:17,22,23 45:19
   51:16,17 55:16,22
   56:5,10 57:5,6,9
   57:10 61:19 63:19
   63:24 64:2,5,6,18
   64:19,22 65:13,14
   65:15,16 67:9
   74:3,4,7,8,11,12
   76:25 77:1,2,8,9
   77:11,12,17,19,20
   77:21,25 78:1,3,4
   78:5,6 80:8,10,14
   80:24 81:9,19
   83:21,22,23 86:9
   86:10 89:2,16,18
   89:20 90:1,4,5
   91:14,15,23,24

92:2,3,6,7,8,9,12
   94:10 97:2,5,8,9
   98:3 99:12 101:18
   101:19,21,22
   102:1,2,5,12,13
   102:15,16,18,19
   103:13 104:20,22
   105:15,17,18
   106:4,5,6,7,10,11
   115:2,3,6,7,11,17
   116:7,9,10,13,16
   116:19,22,23
   117:1,2,5,22,23
   118:18 119:20,21
   120:14,16,17,24
   120:25 121:6,19
   121:22,25 122:2
   122:12,13 123:6
   123:14 125:11
   126:6 127:25
   128:4,6,12,16,17
   128:19,21,22
   129:1,2,4,5,7,8,11
   129:12,15 130:5,6
   130:9,10,17
   131:12,16,21,22
   131:24 132:5,6
   133:9,10,12,13,15
   133:16 135:7,8
   136:24 137:23,24
   140:14,16,19,23
   142:3,20 143:20
   144:4,11,12 145:8
   145:11 147:10,19
   152:7 153:5,6,8,9
   153:25 154:9,10
   154:12 155:11,25
   159:20 161:16,17
   161:19,20 163:3,4
   163:7,17 164:10
   165:16,25 166:8
   167:4,8,15,16
   168:18,21 170:5
   170:23,24 174:11

174:12 176:20,23
   176:24 177:14,15
   178:8 179:22
   182:7 183:2,3
   184:1 186:15
   188:23 189:16,17
   190:25 194:5,21
   195:16,23 196:17
   196:18,22,23
   197:1,5,6,14
   199:2
**corrections** 200:12
**corrective** 54:25
**correctly** 135:2
   136:20 162:24
   198:22
**counsel** 3:1 5:15
   124:23 141:9,13
   198:25,25 199:5,6
**County** 37:4 198:3
**couple** 7:3 13:10
   33:15 61:14 62:12
   85:20 93:14
   116:18 127:6
   138:25 139:23
   178:22 187:11
   193:10
**course** 9:19,25
   10:15 12:23 13:4
   13:7,8,9,10,13
   23:21 61:8 79:12
   115:2,9 185:25
   189:11 206:3
**court** 2:1 5:8,12
   17:16 31:16 66:25
   93:20 98:12 134:5
   139:25 141:2
   142:11 143:7
   180:22 188:17
   198:8,10 204:1
**cover** 7:3 37:17
   73:1 78:7 142:5
   174:17
**covered** 75:17

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                            September 22, 2015

Page 212

**created** 154:20
  156:3 158:13
**creates** 78:18
**creation** 153:13
  154:2
**creed** 17:18,24
  28:24
**crew** 35:18,19
**criminal** 88:4 97:21
**crisis** 9:2,4,20,23
  10:5,8,21 19:2
  29:17,24 88:13
  89:1,3,12 90:3
  92:17 105:19
  114:21,22 115:2
  115:16
**criticism** 160:19
**crowd** 180:18
**CRR** 2:23 199:14
**cruiser** 149:2,11,11
**cruisers** 167:3,4
**CSR** 2:23 199:14
**cuff** 62:5 72:8
  113:11 114:6,9,15
**cuffed** 62:11,25
  128:5,9,14 129:20
  129:23,24 130:5
  130:12,23 138:15
  139:10
**cuffing** 72:4 77:25
  84:6 113:14 114:1
**cuffs** 72:19
**cumulative** 69:15
  69:21 70:1 77:15
  77:24 84:8
**curb** 45:4 47:6,8,10
  50:16 105:2,11
  108:15 181:18
**current** 121:14
  132:3
**custody** 26:11,18
  27:5 130:23
  204:14
**cycling** 57:15,17,21

**D**

**damage** 148:7
  161:5
**dangerous** 15:16
  15:20 197:5
**dangers** 15:14
**dark** 48:3
**dart** 53:15,23 54:19
  60:5 118:1,3,4,6
  161:13,14
**dart's** 53:18
**darts** 52:3,14,20
  53:10,11,12 54:21
  55:10,20 115:21
  153:17
**data** 162:8,13
**date** 32:16 34:1
  38:9 42:20 140:13
  142:8 144:23
  186:20 200:13
  203:6
**Date:Tuesday**
  200:6
**dated** 141:11
  142:19 199:11
**dates** 10:17 170:18
**Davis** 170:13
**day** 2:21 32:19 34:4
  35:11 38:7 42:21
  55:3 96:24 99:9
  147:21,25 158:17
  161:25 166:22,24
  167:1,6 168:9,11
  174:19 176:14
  179:20 180:1
  181:8 182:3
  198:14 203:13
  206:10
**daylight** 48:4
**days** 200:14
**deal** 9:13 18:8,12
  18:15 26:22 30:17
**dealing** 9:9 10:11
  18:22 27:2 115:5

**dealt** 26:14
**death** 69:20 70:4
  70:12 71:11 73:14
  78:19,25 79:4,23
  80:19 81:3,14
  82:19,25 131:11
  131:20 173:9
**December** 144:8
**decided** 22:9
  169:11
**decision** 25:24,25
  26:9 102:11,17
  169:21
**deemed** 24:22
**defendant** 23:18
**defendants** 1:15
  2:16 3:16 5:22,24
**definition** 161:11
**degrees** 118:4
**delay** 113:21
**delirium** 13:18,21
  18:16 71:5 79:3
  79:17,22 89:15,15
  89:25 90:7,19,19
  90:24 91:6,11,21
  92:5 115:6
**deliver** 56:3 127:6
  127:10,11 131:8
**delivered** 58:7
  63:18 75:10,10
  122:19,20 127:15
  131:10
**delivering** 132:2
**delivery** 206:1
**Delores** 1:2 2:6
  3:12 5:20
**demeanor** 146:22
**demonstrate** 151:3
**demonstrating**
  184:18
**department** 11:17
  14:2 28:18 34:8
  37:14 43:23 46:11
  49:2 131:5 145:4

  145:9,10 150:24
  153:8,11 156:17
  156:25 157:1,5
  158:6,23 159:10
  159:15 160:16
  162:2 167:22
  168:9 169:4,25
  170:14,19,22
  171:1,11 172:1
  173:8 185:8
  186:14 190:17
  191:9 195:18
  200:23
**department-issued**
  51:13
**depending** 15:24
**deploy** 183:12
**deployed** 19:16
  21:18 25:11 50:1
  51:15,19 111:14
  120:14,22 121:10
  129:16 149:21,23
  151:19 152:7
  163:1,3,5,21
  164:6 183:17
  188:24
**deploying** 76:1,15
**deployment** 77:7
  151:5
**deponent** 199:4
**deposes** 6:16
**deposition** 1:17
  2:18 5:5 6:24 7:4
  7:15 24:5 31:23
  31:24 32:2 124:19
  124:21 132:20
  137:10 154:24
  200:6,10,11 203:3
  204:9,11 206:9
**depositions** 124:20
  198:6
**describe** 29:2 93:23
  195:24
**described** 147:3,15

  147:17 177:13
**description** 146:9
**Desk** 161:2
**details** 43:4,8 60:19
**detect** 90:6
**Detective** 11:14
  42:11 193:17,17
  193:19
**determine** 22:12
  26:3 38:12 127:12
  194:13
**device** 157:17
  161:18 162:8,13
  189:17 190:4
**devices** 170:3,7
**diagnosis** 90:18
**dictate** 119:20
**die** 81:24 82:4
**died** 155:24
**difference** 34:20
**different** 42:20
  55:15 65:5 75:1
  83:12 89:4,9,10
  90:20 91:13 93:14
  107:10 115:14
  123:18 136:18
  153:8 161:13
  172:9 178:3,4
  181:2,3,5,7
  185:15 190:22
  191:2
**differently** 85:2
  115:11
**difficult** 54:6
**difficulty** 148:15,16
  148:23 149:6
  150:17 164:7
  177:11 178:12,15
**Dilworth** 36:13
**dimensions** 173:19
  173:20
**diploma** 8:10
**direct** 21:19 50:5
  168:14

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                     September 22, 2015

Page 213

**direction** 95:8,9
148:8,12,21
**directly** 35:3
135:11
**disability** 9:7
**disagree** 23:25
**disc** 68:3
**discharge** 55:11,24
132:7 135:17
136:7 190:3
**discharged** 20:5
54:9 57:5 58:6,15
155:13 182:9,13
182:18,22
**discharges** 55:21
76:2 84:1 135:20
135:22
**discipline** 158:24
195:17
**disciplined** 158:23
168:7 195:9,13
**disclose** 23:8,9
**discover** 21:15
**discovery** 23:1,22
24:5
**discuss** 90:17 91:7
154:14
**discussed** 188:14
**discussing** 15:6
94:23
**dislike** 196:20
**dispatch** 34:24 35:3
36:25 37:2,5,11
37:20 38:14 39:11
39:15,23 40:12,15
41:1,9 44:8 45:11
45:21 46:2,5,9,16
46:21,22 85:21
100:20 109:20
145:1,10,18 147:3
149:18,19,20
175:15,18
**dispatched** 14:4,5
34:20,21,23 35:8

35:9,10 36:3,4
37:7,12 39:19
92:21 101:18
144:24 145:17
146:1
**dispatcher** 46:17
145:2,3 146:5
**dispatcher's** 145:25
**dispatching** 36:2
**dispute** 24:17 73:24
109:23,24
**disputes** 18:6,9
**disputing** 109:25
**disseminate** 186:23
**disseminated** 185:8
185:12,19 186:10
**dissipate** 196:22
**distance** 48:11,18
54:17 105:24
106:23 162:23
163:19,25 164:13
164:16 190:9
**distress** 9:14 79:3
86:15 87:24 88:20
89:19 128:11
129:11,15 130:16
130:24
**distressed** 15:7
69:2 79:22
**distributed** 140:8
**District** 2:1,2 5:8,9
198:8,9
**disturbed** 10:12
14:15 18:23 30:17
30:18 81:23 82:4
86:2,5 88:4 115:5
**division** 2:3 5:9
175:13 198:9
**doctor** 22:11 24:20
25:7
**document** 51:1
69:5 132:13,24
135:19 136:8,12
136:20 137:3,7,13

137:25 140:11,18
140:21 141:13,21
142:4 143:11,16
144:5
**documented** 39:8
50:2,6 58:1
112:16
**documenting**
135:16
**documents** 9:18
31:23 32:4,8,10
132:21 133:17
134:9,12 139:15
142:1,2
**dog** 60:8
**doggy** 60:7
**doing** 35:11 44:12
46:14 59:10
166:16 180:17
**domestic** 18:6,8
**door** 194:24
**doors** 112:15
194:10,16
**dopamine** 91:6,10
**Dowd** 3:8,9,9 4:21
23:8 25:1 38:18
54:14 62:19
124:16,25 125:6
125:20 141:7,18
193:10 196:6
204:17,17 205:3,3
**download** 134:12
137:8,14
**downloaded** 162:8
162:13
**draft** 33:4
**drawn** 95:16
**driving** 44:25 47:18
47:19
**drop** 115:25 161:6
162:3
**drove** 102:7
**drug** 90:20,21
**drug-induced**

131:18
**drugs** 87:17
**dry** 65:9,9 96:8
157:13,16,25
158:1
**DSN** 46:10,12
**duck** 103:21
**ducks** 103:19
**due** 25:1 131:15
151:6
**duly** 6:13 198:4,16
**duplicative** 144:22
**duration** 71:15,17
74:14 134:20
135:9
**durations** 77:24
**duties** 17:14,15
**duty** 6:5 36:4 191:5
**DVD** 187:5,7

--------

**E**

**earlier** 137:20
151:20 152:14
161:7 162:9,20,24
163:8 183:1
185:18 195:8
**ears** 178:14
**easier** 98:16
**east** 95:10 111:5
**Eastern** 2:2,3 5:8,9
8:12 198:9,9
**easy** 90:6 192:20
**editing** 124:7
**educate** 9:8,12
**educates** 89:13
**education** 8:9,21
8:23 10:3
**effect** 57:14 58:19
61:12
**effective** 27:18
119:25 170:10
**effects** 69:15,16
70:10,11,15,22
77:15

**effort** 129:22
**eight** 11:23 17:4
21:12 53:17
**either** 39:11 86:5
86:19 110:8
143:22 148:8,12
148:20 155:17
159:19 199:7
**elapsed** 100:12
109:5
**elderly** 68:18 70:25
176:7,7
**electric** 121:14
**electricity** 65:21
66:5,9
**elicit** 130:9
**eliminated** 26:10
**email** 144:3 171:22
171:23 172:6
**emails** 143:24
**emergency** 88:5,14
97:20 184:10
**emotional** 9:14
69:7 79:3 86:15
86:21 87:7,24
88:20 89:19
**emotionally** 10:12
14:24 15:7 18:23
30:18 69:2 79:22
81:23 82:4 86:2,5
88:4 115:5
**employed** 19:4,6
26:15 28:14
**employee** 42:10
145:4
**employees** 145:10
**employers** 10:11
**employment** 16:10
16:14,17 17:20
28:15
**EMS** 14:3,13,17
15:2 129:13,16
149:20,21,22,25
150:2,4,6,9,14,14

Tina Moore, et al. v. Brian Kaminski, et al.
Brian Kaminski                                              September 22, 2015

Page 214

150:16,19,25
151:2
**enable** 166:6
**enabled** 155:10
  156:6
**Enclosed** 200:11
**encounter** 176:19
  179:16,25 180:15
  181:1
**encountered** 18:18
  146:8 148:21
  174:1 175:6 176:4
  180:4
**encounters** 180:10
**encourage** 23:14
**ended** 112:14
**enforcement** 17:16
  29:7 179:25
  180:10
**engaged** 151:4
**enroll** 171:16
**ensure** 130:15
  188:15 197:20
**enter** 52:14,15,20
  53:11 95:17,18
  110:11,12
**entered** 46:22
  53:10 55:11
  115:21,21
**entertain** 124:12
**entire** 141:12
**entirety** 186:3
**equipment** 35:16
**equipped** 11:2,5,9
**Eric** 170:13
**errata** 200:11,13,13
  200:14
**Esq** 200:3,9
**essentially** 12:16
  26:10
**establish** 78:9
  109:21
**established** 54:4
**ESTATE** 1:2 2:6

3:2,7
**estimate** 54:7,8
  106:24 197:8,10
**et** 1:12 2:14 5:7,7
  200:7,7 204:5,5
**evaluate** 83:25
**evaluation** 12:10
  26:3 104:15
  160:19
**event** 115:1 133:12
  134:19 139:3
**events** 6:25 89:15
**everybody** 7:19
  34:16
**evidence** 137:8,12
  161:23,24 162:1,3
  162:5 194:14,15
**exact** 10:17 118:9
  118:13 170:18
**exactly** 22:1 28:3
  30:1 39:13 109:18
  125:23 171:9
  174:15
**EXAMINATION**
  4:1 6:18 144:16
  192:16 195:5
  196:11
**examined** 22:11
  198:16
**example** 12:19
  126:7
**exceeded** 71:19
**excess** 128:9
**exchange** 24:22
  50:6
**excited** 13:21 71:5
  79:3,17,22 89:15
  89:24 90:7,19,24
  91:6,11,20 92:5
  115:6 146:24
**excuse** 153:16
**exertion** 69:8
**exhaustion** 70:1
**exhibit** 4:9,10,11

4:12,13,14,15,16
  4:17,18,19 31:15
  32:16 66:24 67:4
  74:2 86:15 94:4,9
  94:23,25 95:12
  96:12 98:5,11,15
  107:5 110:12
  113:9 134:3,4,11
  134:16 137:13,25
  139:24 140:3
  141:1,5,15 142:23
  143:6,10 152:10
  152:17,18,20,21
  153:2,13,19 154:3
  154:7,14 155:2
  156:7,10 158:11
  168:3 180:21,25
  181:9,14,19 182:1
  182:6,8,17,21
  187:20 188:5
  189:2 192:18
**exhibiting** 88:18,19
**exhibits** 4:8,21
  93:18 139:23
**exit** 40:13,16
**exited** 40:22 41:1
  41:14 48:18 50:16
  100:18,21 175:5
**exiting** 41:21
**exits** 41:13
**expected** 28:24
**expedite** 150:5
**expedited** 150:12
**experience** 18:22
  18:24 86:2 192:3
**experiencing** 18:16
  87:23
**expires** 203:14
  206:11
**explain** 16:25 34:12
**explained** 158:8
**explaining** 21:14
**explore** 24:7
**explored** 191:16

**exploring** 22:21
**expose** 78:24
**exposed** 26:4 74:1
**exposing** 72:8
**exposure** 22:13
  69:15,22 72:3
  73:8 75:13 77:14
  77:24 78:3
**exposures** 70:7
  71:18,22
**express** 6:9
**extent** 132:11,15
**extra** 73:9 94:1
**extremities** 121:25
**eyes** 21:19,22 25:18
  178:14 196:1
  197:3

---

**F**

**face** 25:10 34:15
  56:14,15 116:1,1
  116:2 128:18
  179:11
**facing** 163:2,9,13
  163:14,16 164:3
  166:3
**fact** 69:5 74:5
  75:15 136:1
  137:12 192:9
**factors** 69:10
**facts** 157:11,15
  169:14 173:4,8
  176:23
**factually** 167:13
**fails** 84:14,19 85:12
**failure** 131:2
  138:14
**fair** 7:14 26:6,7
  113:7,19
**fairly** 18:19 24:24
**fall** 115:25 117:9
**falling** 178:23
**familiar** 36:25
  142:1 143:1,3,16

144:10
**family** 144:19
  172:25 175:24
  176:1,4,10 177:5
  180:8
**far** 17:21 43:17
  47:15,24 48:7
  49:7 54:5 99:10
  106:20 114:14
  150:10 154:4,6
  165:17 168:19
  174:8 180:9
**fashion** 163:12
  164:3,9 179:9
  185:13
**father** 157:21
**fault** 141:17
**FAVOR** 205:1,7,13
**February** 28:22
  171:2 185:13
**federal** 124:11
**feel** 30:16 31:1
  145:21 146:10
**feet** 43:13 49:12
  52:1,25 53:17,22
  54:9,18 58:11,13
  64:15 107:3
  112:22,23 113:4
  162:23,25 164:15
  166:7 179:8
**fell** 51:21 54:23
  56:13,14,14 112:7
  112:7,8 115:24
  116:1 122:25
  163:6 183:12,13
**fellow** 20:13
**felt** 30:20
**female** 145:14
  176:5,6
**fence** 64:25
**Ferguson** 10:13,15
  14:2 20:19,23
  22:7 28:18,25
  29:15,16,18 30:5

Tina Moore, et al. v. Brian Kaminski, et al.
Brian Kaminski                                    September 22, 2015

Page 215

```
30:14 31:2 34:7          118:11,11 120:24       48:12 49:13 52:2      Floyd's 144:22         122:25 163:6
37:2,4 40:1 42:10        121:2,4,4 122:8         52:20 53:4,8,20       focused 162:20         183:19
63:24 67:3 114:15        129:1 135:24            53:22,25 54:7,13      fog 25:17 197:15       fought 157:23
131:4 141:9,10           138:3 140:2 141:9       54:15 55:10 58:24     follow 28:24 127:12    found 27:18 73:3
142:17 145:3,9,10        148:9,10,21,22          59:5,13,22 60:2       follow-up 192:14       foundation 14:25
153:10 157:1,4           149:5 151:19            62:20 66:1,8,22       followed 162:16          16:3 21:8 33:13
158:20,22 159:10         154:22 163:1,2          67:2,5,6 68:10,21     following 168:11         35:23 39:4 41:18
159:15 169:4,25          164:6,14,19 165:3       69:1,5 72:12,20       follows 6:17             42:16 45:25 53:21
171:1 175:19             167:7 174:1             73:7 74:20 75:2       foot 19:14 28:10,13      54:3 55:9 58:22
185:7 186:19             181:12,13 182:13        75:25 76:8,12,24        40:18 61:23            59:17,18 65:25
190:17 192:21            182:19,23 183:2,5       78:17,23 79:9,20      force 8:20 69:9          68:9,19,24 72:11
field 16:15 17:3         183:12,18,25            80:3,9,12,17,23        76:14 77:13 78:12       74:17 75:22 76:4
  32:24 33:1 159:25      184:20,25 185:22        81:2,8,12,18,22        78:17 104:8 156:2       76:23 78:15,20
fifth 134:18             191:15 198:16           82:1,13,17,23          156:7,9,15,18,22        79:7,13 80:2 82:9
fight 21:16 28:2         fists 48:24 49:21       83:3 84:6,12,17        157:1,5 158:4,7         84:3,10 86:3,24
file 24:3 139:19,20      51:10 151:4,12          84:22 85:1,8,16        158:10,13,16,20         88:21 92:15 103:2
files 23:24              five 18:10 43:13        86:7 87:1,5,12,21      158:24 160:10,15        103:25 105:25
fill 133:8 153:18          56:5,21 58:8          88:3,10,25 89:12       160:19 190:22           114:11,17 115:13
  156:6                    60:13 71:13,25        89:19,22 90:10,16      191:18                  118:19 119:15
filled 133:6,7,11        133:24 135:15           92:16 93:16,21        foregoing 198:19         120:8 121:9,21
filling 158:16           174:16,21,23           94:16,21 95:25        198:22 203:2            123:25 124:2,10
final 32:20,22           185:22                  96:6 98:14 103:3      forgot 161:7            124:14,16,17
  36:16 129:10           five-second 51:15       103:12 104:1,20      form 18:13 25:17         125:6,20
finally 143:9            55:21 56:4 57:7,9       104:23 106:3,23        42:6 45:24 53:19      four 37:16 45:17
find 63:7 93:14,22       58:10 60:24,25          107:4,13,15 108:4      54:2 59:8 68:8          133:24 134:18
  152:15 188:7           123:1 128:1             108:8 109:11,20        72:10 73:6 74:16        136:23 137:1
fine 187:23              137:16 138:2            110:10 114:6,14        76:22 78:14,20          138:1 174:18
finger 56:2              150:24                  114:18 115:15,20       79:6,13 80:1          four-lane 94:12
finish 62:19             flee 165:13,16,20       115:25 117:17         81:25 82:7 84:9        four-tenths 194:6
finished 116:15,19       flinch 189:24           118:21 119:1,18       85:13 87:18 88:6       Fourteen 93:25
  158:18                 flinched 189:22,24      119:23 120:11         90:8 92:14 103:24      fourth 2:20 3:18
firearm 102:22,24        flip 192:19 193:23      121:12,23 122:3       104:19 105:25            5:4 132:7 198:12
  189:23 191:2,5         Floor 2:20 198:12       123:17 124:1,5,13     115:23 123:16            200:4 205:10
firm 3:4 204:14          flowing 93:8            124:17,21 125:9       124:14,16,17          fractures 67:23
first 6:13 11:1          Floyd 3:3,4 4:2,4,6     125:17,25 132:19      125:6,20 152:4,5         68:6,7
  16:14 19:12 20:6       5:17,17 6:19,22         134:7 136:19          152:8 188:20,21       free 25:6 132:18
  21:12 48:8,22          14:13 15:4,21           138:17,25 140:2,5     188:24 189:5             145:21 146:10
  49:18 51:2 52:11       16:5 21:10 22:5         141:4,6,8,16,21      former-Colonel         frequent 18:19
  52:11 56:5 61:13       22:17,21 23:3,25        143:9 144:13          168:23                 Friday 168:23
  95:19 97:18            24:25 25:8 31:8         162:9 167:12         forms 122:7             Friend 1:3 2:7 3:12
  104:13 105:3           31:11,14,18,22          187:11 191:22        forth 87:5,23 88:12     frightened 146:5
  106:16,25 108:23       33:17 36:1 38:20        192:13,15,17          146:8,19 152:5          146:25 147:1
  111:18 112:1           39:7 41:22 42:2,4       193:15,20 194:25     188:22 198:23          front 13:12 88:11
  114:1 116:2,3          42:7,19 46:4            196:12 197:16        forward 116:4            90:10 95:24 96:22
```

Gore Perry Reporting and Video
FAX 314-241-6750          314-241-6750          www.goreperry.com

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 216

111:4
**frontal** 73:12
**full** 199:1
**full-time** 17:6,9
**fully** 187:16
**function** 120:5
**functioning** 135:2
**further** 43:3,6
  156:1 187:9 189:4
  192:8,13 199:6
  200:15

**G**

**gain** 27:9
**gap** 135:20,23
  137:15 138:3
  149:6,9 150:13
**GATEWAY** 206:5
**general** 26:5 60:19
  78:7 156:24 185:7
  185:11,12
**generates** 65:21
**genitals** 76:19
**gentleman** 8:6
**gentleman's** 23:17
**gentlemen** 138:18
**geographically**
  175:1,4
**gesture** 7:19 182:15
**getting** 19:25 20:1
  25:8 35:16 48:6
  61:8 103:8 110:3
  125:9 157:22
**give** 43:7 57:20
  58:18 61:3,6,16
  90:17 119:10
  120:13 123:7
  126:7,22,23 127:1
  137:22 148:19,24
  149:17 150:9
  152:14 172:2
  180:24 188:1
  191:25
**given** 7:4 12:22

22:5 44:8 58:24
135:18 137:10
192:8,9 199:3
203:5
**gives** 63:1
**giving** 31:22 57:15
  60:25 136:5,11
  154:8
**glasses** 55:2,3,4
**go** 10:1 15:19 16:10
  21:8 24:10 31:5
  37:11 39:17 43:25
  49:16 54:15 57:8
  59:20 62:14,20,20
  63:3,6,20 65:2
  68:1 82:9 85:19
  91:10 98:14,20
  103:7 107:16,19
  115:23 134:17
  136:15 140:5,20
  158:3,7 162:18,19
  167:18 177:10
  183:10 188:3
  191:1 193:6,15
  194:11,23,25
  196:3,6
**goes** 17:2 39:20
  66:9 71:8 73:16
  118:3,4 162:4
  168:20
**going** 7:15 23:16,21
  24:18 29:5 36:5
  37:13 40:2 49:6
  49:25 60:18 72:20
  77:21 94:8 96:2
  103:19 105:7,8,23
  105:23 108:15
  113:15 121:18,23
  124:2,18,23 127:7
  127:12 134:2
  136:7 138:17
  140:6 141:8,12,16
  141:18 151:11
  156:1 158:9

169:15 171:21
172:2 176:3
180:24 181:9,21
187:12,14 192:18
193:21
**good** 6:20,21 9:11
  46:1 54:22 88:23
  90:13 95:1 134:25
  188:5 190:9
**Google** 94:23 95:1
**Gore** 5:12 206:5
**GorePerry** 3:22
  200:1,23
**GPS** 37:20
**grab** 194:23
**graduate** 8:15
**graduated** 8:10,17
  16:11 17:19
**grammar** 33:16
  168:6
**grammars** 33:15
**grass** 56:16
**great** 15:10 25:3
**greater** 77:14 81:12
  81:13,14
**Greg** 171:17
**groans** 178:9
**ground** 49:22 50:23
  51:7,12,21 56:13
  56:22 57:19,25
  58:3,13,25 59:1
  61:1,9 118:7
  121:19 122:14
  125:24 126:10,12
  126:13,17,25
  127:19 163:14,20
  163:25 164:8
  177:17 184:20,24
  185:4
**grounds** 84:14,19
  85:11
**guess** 125:7 143:18
  161:5
**guessing** 119:1

**guide** 142:19
**gun** 65:11 194:14
  194:15
**guy** 28:3
**guys** 29:9 130:8

**H**

**H-E-Q-U-I-N** 95:6
**half** 20:25 40:6
  45:13,16 109:23
  172:21 194:7,19
**halfway** 72:22
**hand** 31:9 66:21
  134:2 139:23
  141:5,9,12 142:10
  143:10 206:10
**handcuff** 62:2
  179:2
**handcuffed** 63:11
  63:13,16
**handle** 56:7
**handling** 9:9
**hands** 48:19 49:18
  50:17 60:8 100:2
  126:10,12,13,17
  126:25 164:20,21
  164:25 165:7,10
  165:23 183:16
  184:21
**handwriting**
  153:24 192:22,25
  193:5,9,13,16
**Hang** 136:13
**happen** 20:21
  82:11 87:12 197:7
**happened** 34:25
  44:1,24 49:1,14
  51:18 56:20 59:5
  59:7 60:14,20
  61:25 62:5 92:2
  115:20 117:8
  146:10 161:1
  181:8
**happening** 14:20

14:21 20:19
**happens** 48:14
**hard** 48:9 51:23
  108:19 115:25
  178:2,6 181:21
  184:2
**harm** 30:24 104:12
  104:15
**harmful** 122:5
**harming** 104:25
**Harry** 36:13
**Hazelwood** 8:10
**head** 15:9 76:17
  101:1 103:10,20
  103:23 116:2
  121:24 169:24
  185:4
**headed** 174:6
**heading** 174:3
**health** 22:12 23:16
  23:17
**healthy** 79:24
**hear** 20:19 100:6
  118:16 120:6
  151:8 174:25
  175:4 178:10
**heard** 13:23 14:20
  14:21 20:13
  123:21 149:13
  170:2 177:16
  180:18
**hearing** 145:23
**heart** 68:23 70:16
  70:25 73:8,9,12
  76:19
**heavier** 99:11,20
**heavy** 48:6
**height** 28:9 173:20
**heightened** 26:4
  68:14,18,22
  131:15,20
**held** 55:12
**help** 29:11 92:8
  93:15,23 105:7,23

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                    September 22, 2015

Page 217

188:6
**helpful** 27:19
**Henquin** 45:5,7,8
  47:1,3,4 94:6,7,8
  94:8 95:4,5,9,11
  95:19 100:24
  110:13,16,18,25
  145:17 148:22
  149:1
**hereinabove** 203:6
**hereto** 203:4
**hereunto** 206:8
**hey** 62:16
**high** 8:9
**highest** 169:3
**highlight** 67:16
**highly** 93:7,10
**hill** 108:18,18
**hip** 52:13 127:19
**hips** 127:19
**hired** 28:19,21
**his/her** 200:10
**history** 22:20 23:16
  23:17
**hit** 44:16 45:2
  54:21 64:14
  103:12,15 116:3,6
  121:18,24
**hitting** 13:14 44:18
  102:7
**hold** 55:23,25 96:2
  98:6 107:7 134:24
  181:20 182:14
**holder** 169:16
**Holm** 205:15
**Holm-KC** 3:13
**home** 34:5 139:18
  139:20 157:18
  158:17 168:9,11
**honestly** 118:13
  133:8 172:4
**hopefully** 144:20
**hoping** 187:20
**horribly** 191:11

**hospital** 172:17,20
  172:24 173:13
  176:3
**hostile** 26:14,17,23
  27:3 197:4
**hour** 93:8,9 172:21
**hours** 2:22 8:23,25
  9:20 11:23 133:11
  135:12 171:11
  196:2 197:9
**hours'** 196:21
**house** 157:22
**huh-uh** 7:18
**human** 65:22 71:18
**hurt** 105:7,23

_____

**I**

**Ida** 3:17 5:23
**idea** 162:3
**identification**
  31:16 66:25 93:19
  98:12 134:5
  139:25 141:2
  143:7 180:22
**identified** 113:8
**identify** 5:16 9:6
  142:22 143:11
**identifying** 94:5
**ignite** 121:13
**IL** 2:23
**ill** 9:6 10:12 14:15
  14:24 18:23 115:6
**illness** 9:10 18:16
  87:24 88:20
  104:18
**imbalance** 91:12,14
**immediately** 56:9
  72:1 129:7 130:12
  138:15
**improper** 54:14
**inadequate** 30:16
  31:1
**inappropriate**
  138:11

**incapacitate** 65:24
  197:4
**inch** 194:4,6,7,19
**inches** 163:22
  194:7,20
**incident** 10:18 14:4
  20:12,24 29:21,23
  31:9 32:19 33:18
  34:15 74:6,10
  85:19 86:12 87:14
  89:1 94:24 95:2
  115:9 154:14,16
  154:17 155:15,21
  155:23 157:9
  159:22,25 160:15
  160:20,22 161:25
  168:8,10 169:8
  170:12 171:3
  175:24 177:1,2
  181:3 195:9,15
**incidents** 69:8
**include** 70:15,25
  76:17
**including** 67:23
  68:7 69:16 72:3
  73:9 147:20 180:8
  200:12
**inconsistent** 136:2
  136:9 137:9
**increase** 69:21 70:3
  70:11
**increased** 79:4,23
  80:18 81:3 131:11
**Indemnification**
  67:12
**INDEX** 4:1,8
**indicate** 34:2 35:7
  39:22 40:22 41:14
  41:24,25 42:3,13
  43:12 58:4 69:7
  79:10 112:21
**indicated** 24:6 25:9
  28:19 38:2 40:25
  46:25 63:22 97:6

104:13 109:1
  116:8,17,25
  133:14
**indicates** 36:18
  42:24 43:4 50:12
  51:6 62:24 66:15
  67:20 113:2
**indication** 15:6
  40:9 44:14,15,16
  196:21
**indicative** 88:20
**individual** 68:23
  85:3 88:11 128:14
  131:20 132:3
  173:17 180:4
**Individually** 1:1
  2:5 3:2,7
**individuals** 15:7
  68:14 69:20 70:21
  70:24 89:14,25
  107:25 108:6
**inflammatory**
  197:2
**influence** 18:12
  87:17
**information** 12:17
  21:13 38:25 39:2
  39:10 43:9,23
  44:7 45:21 46:3
  46:17 50:2 67:7
  67:16 86:8 87:13
  99:13 102:3 130:2
  130:9 133:22,23
  137:14 140:7,8
  142:2 143:13,22
  145:16,18 146:23
  147:17 148:4,6
  149:17 150:8
  153:12,15 154:1,7
  154:9 155:10
  156:6,8,9 158:15
  159:21 160:5
  162:7 167:21
  168:4

**informed** 85:21
  169:21
**infringed** 23:19
**initial** 33:4
**initiating** 75:12
**injured** 10:2
  155:24
**injury** 14:10 67:21
  67:23 68:14,22
  69:21 70:4,12
  73:13 78:18,24
  79:4,23 80:19
  81:3,14 82:19,25
  131:9,10,15,20
  151:7,16
**instance** 39:13
  75:25
**instances** 19:21
**instruct** 132:17
  200:12
**instructed** 186:6
**instructing** 22:17
**instructor** 11:15,16
  11:24 12:23 13:2
  67:10 74:9 139:14
  141:11 142:6
  152:2 162:11
  169:10,16,19
  170:11 186:6,6
  187:6 188:18
**instructors** 119:24
**intelligent** 192:1
**intended** 197:2
**interaction** 176:14
**interested** 199:8
**International** 85:9
  143:23 153:11
**interpreting** 136:20
**interrogatories**
  6:17
**interrupt** 187:21
**interrupting** 124:5
**interruption**
  152:13

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                              September 22, 2015

Page 218

intersection 100:24
intervening 115:2
intervention 9:2,5
  9:20 10:5,8,21
  19:2 29:18,24
  89:1,3,12 90:3
  92:18 105:19
  114:21,22 115:17
interventional 9:24
intimately 170:3
intoxicated 18:13
invades 22:14
invasion 157:19
investigation
  176:22
involved 34:16
  35:20 94:24
  144:20 170:3
involvement 170:6
involving 9:10 69:9
  160:15 161:18
issue 6:8 22:15
  23:15,17 24:20
  125:13 150:5
issued 58:14 132:25
  142:18
issues 7:3
issuing 122:3 138:8
It'd 103:21

**J**

Jackson 156:14
  158:19 168:22,23
  170:2
Jason 1:2 2:6 3:2,7
  6:23 50:15,17,18
  50:22 51:7,11,13
  58:5,11,12 62:8
  62:15 86:11,15
  87:13 88:3 100:6
  117:19 122:18
  131:9,10 132:7
  138:13 176:14
  180:18

Jason's 117:7
  122:11
jaw 28:5
Jesus 87:6,22
job 10:2,11 17:14
  17:15 29:4 30:20
  91:16,19
Johnson 3:13 4:3
  5:19,19 31:13
  125:21 144:17,18
  151:12 152:16,18
  180:24 182:1
  187:8,17,23 189:9
  189:11,12 192:12
  194:22
jointly 158:13
July 143:23
June 16:18
jury 151:3
justifiable 85:5
justified 84:13,18
  85:11
justify 85:17
  133:23

**K**

Kaminski 1:12,18
  2:14,18 5:6,7 6:12
  8:5 144:18 200:6
  200:7 203:1,10
  204:5,11
Kansas 3:14 205:17
keep 13:12 105:24
  139:18,19,20
  142:11
keeps 186:7
kept 48:17 55:12
  191:4
kick 20:3
kind 6:7 9:7 14:7
  14:10 27:4 43:25
  48:9 51:23 60:7
  60:19 63:1 86:6
  101:7 104:12

108:19 124:5
127:22 157:18
165:4 168:10
169:23 181:1,21
184:2 185:2
189:25 193:1
kneeling 117:11
knees 56:24 59:9,15
  60:5,8 112:10,24
  113:2 117:1,19
  122:20 163:15
  164:2 165:25
  166:1,2 178:22
  179:8 183:16,19
knew 13:16 30:20
  53:12 77:10 86:7
  101:17 173:14
  174:3,8,9
knock 64:14
know 7:10,16 13:11
  13:18,21 15:2,24
  17:25 18:1 19:8
  20:5 22:2 25:15
  27:8,9 34:3 37:1
  38:22 47:25 48:9
  50:20 52:2 53:15
  53:16 55:18 60:16
  62:12,16 66:1,18
  68:13 72:23 77:16
  83:3 86:11 87:16
  89:10 90:17 91:16
  91:25 92:11,20,23
  92:25 95:8 101:5
  101:15 104:8
  114:14,24 115:14
  118:6,8,22 122:22
  130:2 131:16,17
  135:1 136:13
  137:5 142:24
  148:25 149:10
  150:8 151:24
  152:17 154:1,6
  156:3,19 158:3,8
  158:21,25 162:10

167:9 174:4,5,15
174:15 175:11,12
175:18 176:13,16
176:17,22 177:8
178:14,14 179:22
179:23,24 185:17
189:13,21,24,25
190:20 191:20
192:5,8 193:2
Knowing 88:10
knowledge 31:2
  54:5 153:22 154:4
  155:19 157:2,3
  159:11 169:2
  175:11 185:5
  192:2 195:12
known 76:12,24
  77:18 80:9,23
  81:8,18 158:19,22
knows 23:5 118:21

**L**

L 3:3
lab 71:18
labored 150:1
  177:25
lacerations 179:19
lack 16:2 21:7
  33:13 115:13
  118:19 119:15
  121:8
Lacks 121:20
lady 146:8,15,16,18
  176:15
lady's 146:22
land 56:16
landed 56:18
language 101:16,16
lapse 110:2 136:3
large 21:16 28:6
laser 52:6,7,9,12
  161:16,18 162:15
  162:16,18
lasers 117:22,24

lastly 195:20
lasts 195:25
late 10:14 17:10
law 3:4 5:3 179:25
  180:10
lawful 6:13 74:22
  75:5 76:3 78:13
laying 63:13 117:11
  122:14 128:15
lead 73:11 89:4
leading 30:15
leaning 127:22
learn 12:20 13:7,22
  17:3
learned 13:8
  114:21 115:4,16
  132:14
learning 9:7
leave 142:12
leeway 127:2
left 16:21 69:14
  127:16,17,19,19
  127:21 134:18
left-hand 140:14
legal 5:10
legs 179:8
length 196:14
lesson 141:11,24
  142:7
let's 12:19 24:10
  28:18 63:6 98:14
  98:14,19,20 101:4
  104:5 177:10
  181:16 196:6
lethal 16:1,4 102:23
  102:25 103:4
  122:7
letting 93:12
level 116:25
license 43:22
lieutenant 33:10,11
  36:10 139:5,9
  153:21 154:1,8,15
  154:19 155:2,7,12

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 219

155:16 156:4,5,11
158:9,13 162:6
168:1,13 169:2
173:10,13 191:10
191:13
**ligament** 66:17
68:3
**light** 48:2,5 99:5,6
99:7,8
**lighting** 48:2
**lights** 100:4 184:5,7
184:10
**limit** 74:14
**line** 200:13 201:1,4
201:7,10,13,16,19
201:22 202:1,4,7
202:10,13,16,19
202:22
**lines** 70:20 71:13
71:21,25
**LIPA** 206:5
**list** 200:12
**listed** 145:19
**listen** 191:22
**little** 8:8 13:19
16:11 29:17 37:11
42:23 85:2 96:20
112:8 144:21
152:13 184:1
192:6,14
**load** 55:21,24 56:4
57:5,7,9 58:7,15
72:9 75:10 113:12
113:12 114:1,7,10
114:15 115:21
116:12,14,18
118:11,12,16,17
119:7,11,13,25
120:14,22,24
121:1,2,4,4 122:4
122:9,19,21 123:7
123:8,9,10,20,21
123:23 125:10,11
125:14 126:1

127:15 128:1
131:8,9 132:7
135:18 137:23
**load's** 126:8
**loads** 20:5 72:8
74:21 75:4 84:1,8
84:17,18 123:1
132:25 133:15
136:4 137:16,16
138:9
**local** 28:1 37:2,4
**located** 45:4 63:7
100:23 153:17
182:5
**location** 110:20
181:12,13,16
183:4
**locked** 51:21
**log** 46:11
**long** 11:22 16:20
20:23 45:14 59:13
60:12 76:25
126:22 136:15
139:21 150:22,23
152:13 178:1
195:24
**longer** 77:14
169:15
**Longhorn** 64:8,20
**look** 31:19 32:6
38:20,21 41:23
42:19 67:6,15
93:11,13,21 94:25
112:19 134:16
140:5,13 145:20
146:10,12 155:4
193:4,21 194:24
196:16
**looked** 26:2 63:21
**looking** 9:18 15:5
40:7 43:6,7 45:1
50:6 52:22 66:12
94:4 95:12 152:20
153:10 161:8

182:5
**looks** 41:22 63:23
193:1
**lot** 12:24 22:3
35:16 47:9,11
48:16 56:17 97:7
97:11,16 98:23
108:24,25 109:4
110:14,15 111:3
111:12,19 113:8
120:2 131:25
166:24 181:2
189:23
**Louis** 2:20 3:5,10
3:19,23 5:4,14
37:4 198:3,12
200:5,24 204:19
205:5,11 206:7
**low** 73:8
**lower** 13:12 77:7
80:20 121:25
151:23 152:3
161:10,12 188:19
189:20
**lunged** 112:11
164:11 183:18,22

**M**

**M** 3:13
**mace** 21:2,2,11,18
21:21 22:2,6,13
22:22 23:10 24:7
25:9,11,16,22,24
25:25 26:4,9,9
30:9 102:14
190:16,23 191:9
191:17 197:1
**machine** 96:9,10
**Madison** 3:14
205:16
**mailbox** 186:11,13
**mailed** 185:24
**main** 118:1
**major** 155:21,23

159:22
**making** 99:15
119:7 184:16
187:5
**male** 44:10 145:13
176:4
**man** 85:22 102:4
146:5
**manner** 48:25
50:25 51:9 106:19
147:7,13,14
**manual** 32:6,10
81:7 185:22 187:7
**map** 93:13 94:23
95:1 181:7
**mark** 3:3 5:17 6:22
25:7 31:11 42:1
66:22 98:4,21
125:15 181:9,19
182:12,21 183:8
**mark@thefloydl...**
3:6
**marked** 31:15
32:15 66:24 93:19
98:8,9,11 134:4
139:24 140:2
141:1,5 142:15
143:6,10 180:21
**marks** 178:19
**mass** 13:12 60:17
77:7 103:19,22
**material** 66:20 73:3
186:7
**materials** 15:5
22:24 66:13,15
75:17 79:10 152:6
186:24 188:22
**math** 135:14
**matter** 9:2 25:9
28:8 200:10
**Matthew** 36:10
**maximum** 194:19
**McDaniel** 171:17
171:24

**mean** 22:19 23:13
29:3 55:12 58:7
61:7 64:17 65:20
73:21 74:5 76:12
82:10 110:10
112:21 114:23
119:10 125:7
136:16 159:5
161:24 162:18
172:17 187:25
**meaning** 116:2
155:23
**medical** 14:14
22:20,25 23:3,23
24:2,3,8 26:2
63:17 70:3 88:5
88:14 90:17 92:6
97:20 104:17
**medication** 90:22
**medium** 28:6
**meet** 24:16
**member** 176:1,4,10
180:8
**members** 144:19
**membranes** 21:23
197:3
**MEMO** 204:1
**memory** 66:5 146:4
149:10 167:10
170:25
**mental** 9:10 18:16
18:20 87:24 88:20
104:18
**mentally** 9:6 10:12
14:15,24 18:23
30:17 115:6
**mentioned** 29:17
195:14 203:6
**merit** 24:4
**metabolic** 69:17
70:2,9,11 71:10
77:15
**metabolically** 71:9
**methamphetami...**

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                    September 22, 2015

Page 220

90:15
**Michael** 36:9
**microphone** 151:10
**mid** 52:13,24
189:20,20
**middle** 94:9 102:7
124:8 142:12
152:12 162:19
176:8
**midsection** 151:22
**midway** 111:18
112:15
**mind** 94:14 191:21
198:15
**mine** 193:22
**minimize** 70:6
71:14,17 74:14
77:23
**minimum** 8:23
74:21 75:4 194:18
**Minor** 1:4 2:8 3:12
**minute** 45:12,12,15
45:15 63:3,11,16
109:12,15,22,22
128:8,9 129:9
130:4 172:2,3
187:13
**minutes** 135:12,13
**mission** 18:1 28:23
**Missouri** 2:2,21 5:4
5:9,14 8:12 198:1
198:9,13 206:7
**misunderstood**
75:24
**mix** 121:10
**MO** 3:5,10,14,19
3:23 200:5,24
204:19 205:5,11
205:17
**MO-CCR** 2:23
**moans** 178:9
**mode** 67:22 157:16
**moment** 192:6
**month** 8:7 28:21

**months** 17:4,6
21:12
**Moore** 1:1,2,3 2:5,6
2:7 3:2,3,7,8,12
5:6,18,20 10:18
20:24 29:21 33:19
39:13 43:7,13
45:4,23 46:25
48:7,14,18 50:15
56:12,13 62:3
73:20 74:7,11
86:11 88:18 93:4
95:22 96:4 97:8
99:1,21 106:25
107:6 108:23
111:14,20,24
113:11,12,18,22
115:20 116:9
118:9 121:5 122:4
125:14 128:10,25
129:19,22 132:25
136:4 137:16
138:1 139:10
144:19 147:2
148:14,23 149:6
150:17 161:19
163:2 165:23
166:9,17 172:13
174:2 175:6
176:14 179:2,9,15
180:7 181:14,17
182:14,18 184:16
194:9 200:7 204:5
**Moore's** 6:23 43:8
127:14 138:13
149:25 151:4
153:15 173:5
175:23 177:5,13
178:20 179:11
180:11,18 183:1
189:18
**morning** 6:20,21
35:15 47:25 88:11
93:9 97:1 99:4,4,5

99:6,7 145:1
174:11,14
**mornings** 99:19
**mother** 157:21
**motion** 48:24 51:10
151:4
**move** 101:25 109:1
135:5
**moved** 62:16
112:17 139:21
**moving** 70:19
190:5
**mucous** 21:22 22:3
197:3
**multiple** 72:8 84:12
84:17 85:3,10
**mumbling** 86:18,19
100:10 184:14
**murmurs** 178:9
**muscle** 60:17 66:5
66:16 67:20,22
68:2 132:1
**muscles** 66:10
**muscular** 73:21
122:21,23

**N**

**naked** 20:11,14
44:13 85:21 87:6
87:22 88:11 89:25
90:10 92:10 102:4
102:9,10 104:7
**name** 5:10 6:22 8:3
36:11 144:18
170:13 174:7
176:25 180:19
204:14
**narcotic** 86:6
**narcotics** 87:11,17
**narrative** 50:10
**nature** 168:25
**near** 25:22 73:8,12
76:18 97:13
181:18

**necessary** 74:19
78:12,18
**neck** 103:11
**need** 7:25 29:12
140:20 149:21
152:15 183:9
**needed** 38:3 160:1
**needle** 194:2,4,4,8
194:8,11 196:14
196:17
**needs** 92:8
**Negative** 121:7
**neighborhood**
85:24 97:4 102:5
**nerve** 68:3
**nervous** 66:7 120:5
**never** 22:3 78:12,23
82:18,24 87:15
112:23 130:25
147:20 164:11
165:17 172:17,18
191:7
**new** 12:21 13:7
35:18 79:14
142:18 143:17,17
172:8 186:2 187:1
**night** 6:5,6 35:13
**Nine** 10:22
**nonsense** 90:11
**normal** 79:24 86:21
86:21 87:7 99:20
206:3
**normally** 99:6
186:12 196:2
**north** 3:9 95:9,11
95:13,14,15
204:18 205:4
**northbound** 110:25
**Notary** 203:18
206:13
**noted** 178:24
**notes** 32:24 33:1
193:3
**notice** 60:5 117:18

130:3 198:7
**noticed** 19:14 38:8
48:21 58:5,12
62:24 63:16 150:3
**notified** 171:20
181:17
**notifying** 172:25
**number** 31:12 36:3
71:14,17 74:2,14
74:21 75:4 76:2
81:12,13 93:24
134:11,18 137:25
141:10 148:19,19
148:24 152:10
153:14 181:10,19
182:12,21 183:9,9
183:13,20,21,23
183:24 189:2
192:18 200:13
**numbers** 46:11
**Numrich** 205:15

**O**

**oath** 7:6 17:18,24
**oaths** 198:5
**object** 14:25 16:2
21:24 35:23 39:4
41:17 42:6,16
45:24 53:19 58:22
59:8 68:8 72:10
73:6 74:16 75:22
76:4 78:14 79:6
80:1 81:25 82:7
82:15 84:3,9
85:13 88:21 90:8
92:14 104:19
108:2 114:11,17
115:23 120:8
123:15,25 124:2
125:8 132:9
**objecting** 22:23
54:4 124:7
**objection** 21:7
22:14 24:1 54:1

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                               September 22, 2015

Page 221

54:14 59:24 65:25
68:19,24 76:22
86:3,24 87:3,9,18
88:6 103:24
109:13,13 110:6
121:8,20 123:15
124:10
**objections** 53:24
72:15 74:23 76:11
80:7,11,15,21,25
81:6,10,16,20
82:15,21 83:1
84:15,20,24 85:6
115:18 119:22
122:1 124:15
198:25
**objectives** 74:22
75:5 76:3 78:13
**obscured** 190:13
**observation** 155:8
**observations** 99:16
154:11 155:3
156:11
**observe** 83:25
178:11,19 179:13
**observed** 100:6
148:14,23 150:16
154:5 164:5
178:17 179:12,15
181:12,13 183:25
**observing** 78:2
**obtain** 16:14,17
24:3 46:3 162:8
**obtained** 39:2
43:21,22
**obviously** 153:7
155:12 166:6
174:10 176:21
**OC** 121:11
**occurred** 20:24
26:20 34:16 177:2
**occurrence** 43:3
145:19 146:17
168:10 177:6,14

**occurrences** 146:19
**occurring** 49:8
181:4
**offense** 152:23,25
153:5 172:15
**offhand** 33:10
**office** 194:23
200:15
**officer** 6:4,20 9:9
10:20 11:2 14:11
15:11,14 16:15,18
17:1,2,5,6,9,16,21
20:13 21:1,10
28:25 29:3,8
30:15 33:22,23,23
34:10 35:7 36:9
36:10,18,22 37:14
37:16 38:15,18
41:5,24 42:10,14
42:25 61:20,21
62:1,8,10,11,11
62:15 63:5,6,10
75:11 76:1 78:8
78:11 83:19,24
85:16 88:17 109:6
109:21 110:3,4,12
113:11 114:4,9
128:2,7,20 129:24
129:24 139:9
144:18 149:2,11
150:7,14 155:17
155:18 158:23
159:10,13,13,15
160:2,9 169:3,11
169:20,22,23
170:14,19 171:17
171:24 172:20
173:10,14,22,25
174:8 179:3,5
185:9 195:7 204:8
**officers** 9:13 14:5
19:1 21:18 33:18
35:20 36:3,6
37:12,13,19,21

38:1 39:21 47:13
74:13,18,20 75:4
77:23 92:20,24,25
101:17 114:15
128:23 145:11
153:8 157:24
170:25 173:8
174:3,6,10,13,13
174:22 175:1,5,9
180:3
**offices** 5:3 198:11
**oftentimes** 29:11
89:25
**oh** 36:13
**okay** 7:22 8:1,2
25:3,18 32:8
37:23 38:8 39:19
41:22 42:19 43:6
46:24 47:17 49:13
52:17 54:15,17
55:10,14 56:2
57:16 58:17 60:9
60:18 61:10 62:12
62:16,17 63:3,9
63:12,15 64:7
65:2 67:4 68:13
73:7 76:15 80:17
83:10,14 85:8
90:25 91:1 94:4
94:21 95:7,8,12
95:16,17,25 96:4
96:6,10,17 97:15
98:25 99:3,21
104:3,13,23 105:8
107:13,14 110:10
111:5,13,23 112:9
112:13,16 113:5
116:21 117:13,16
118:15 121:1
124:13,14,18,22
125:8,16,19,22
126:14,17,21
127:4 129:18,25
132:10,15 134:2

135:5 137:1
138:20 140:25
141:8 142:10,25
149:7,8 152:20
153:4 157:20
158:11 159:9
169:2 174:25
176:9 177:11,12
181:11 183:8,15
187:15 189:8,10
192:12 193:2,20
194:1 195:20
197:13,16,21,22
**old** 8:6
**Olive** 3:23 5:13
200:24 206:6
**on-the-job** 18:24
**once** 11:16 12:8
18:21 38:21 40:13
55:20 56:24 57:4
58:4,12 100:8
121:10 150:3
157:8 171:5
**one's** 84:21 118:6,7
**one-second** 135:23
138:3
**one-year** 12:9
**open** 47:24
**operate** 55:19
**operations** 190:20
**operator** 185:20
186:4,10
**opinion** 86:22 87:8
87:10 170:8
**opinions** 78:8
**opportunity** 38:21
78:5 188:2,16
**opposed** 26:5 155:3
156:11 169:16
**option** 22:6 107:16
107:19
**options** 26:10
190:22
**oral** 6:16

**order** 120:12 125:1
127:2 137:20
141:16,19 156:24
**ordered** 200:11
**orders** 185:7,11,12
**organ** 68:2
**original** 185:25
204:15 205:1
**originally** 17:1
64:11 111:19
**outcome** 81:24 82:5
82:13
**overdose** 90:21
**overload** 91:9
**overnight** 191:21

─────────────

**P**

**P.C** 3:4,9,18
**p.m** 2:22
**pace** 87:5
**pacing** 87:23 88:12
**page** 34:13 38:8,16
42:1,2,4,7,9,20,24
43:9,10 50:7,9,10
50:21 63:8 67:15
69:14 70:15,20
76:6 95:14,15
142:16,17,21,22
142:24 143:1,4
153:3 158:11
192:22 194:2
200:12,12,13,15
201:1,4,7,10,13
201:16,19,22
202:1,4,7,10,13
202:16,19,22
**pages** 153:12,18
154:3,7,13 155:1
156:1 185:22
192:20 193:10
198:22
**paid** 206:2,3
**pain** 69:17
**paper** 142:15,17

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 222

171:22
**paragraph** 50:13
**paralyzes** 64:17
**parentheses** 72:4
**park** 97:24 110:24
**parked** 96:20 98:5
  98:22,24 107:12
  111:5 112:2 182:2
**parking** 35:16 47:9
  47:11 48:16 56:17
  96:23 97:7,10,16
  98:22 108:24,25
  109:4 110:14,15
  111:3,11,19 113:8
  166:23 181:2
**part** 55:17 69:6
  90:3 102:9 127:18
  152:5,22,23 153:2
  156:7 176:21
  178:11 182:8
  184:24 188:22
  189:18
**part-time** 17:5
**partial** 25:4
**particular** 40:7
  99:9 142:16 146:1
  158:4 160:7
**particularly** 70:21
**parties** 8:22 23:21
  199:7,8
**parts** 152:21 155:1
  181:3
**pass** 138:17 141:14
**passed** 102:8
  172:19,24 173:13
**passing** 147:16
  173:5
**patrol** 50:17 112:12
  160:2 167:5
  174:13 175:9
  182:2 185:8 191:1
**patrolling** 17:15
**pavement** 163:16
  164:21 165:24

**paying** 148:17
**PC** 205:15
**PCP** 90:14
**peers** 167:22
**pelvic** 52:23 162:21
**pelvis** 189:21
**pen** 94:1,2,3 98:4
  98:25 111:21
**pending** 5:7 198:7
**people** 9:10,13 18:1
  18:12,15,23 27:20
  29:11 68:17,18,22
  71:4 72:8 87:21
  97:10,13 115:6
  124:8 147:18,20
  159:7,8 171:11
  177:4
**pepper** 21:2 22:6
  22:13,22 24:6
  25:9,11,16,17,22
  25:24 26:4,9
  30:10 121:2,5,13
  190:16,16 196:20
  197:1,14
**perceive** 88:3,8
**perceived** 108:9
**perception** 108:4
**perform** 114:1
**performing** 138:10
**period** 28:15 30:14
  33:23 63:2,12
  116:8 136:5
**periodic** 171:7
**permitted** 24:19
  154:16
**Perry** 3:22 5:10,12
  206:5
**person** 14:11,15,24
  47:12 65:23 69:1
  71:9 72:18 78:2
  79:25 81:13 82:20
  82:25 84:1,14,19
  85:12 86:21 87:1
  88:4,14,17 91:10

92:8 97:8,19,22
  99:24 104:7
  118:15 121:6
  123:18 152:8
  154:15 173:3
  188:24 204:14
**person's** 21:5
**personal** 1:1 2:5
  3:2,7 25:25 35:17
  102:17 186:13
**personally** 14:19
  140:9 170:6
**personnel** 23:24
**persons** 166:13
  176:25
**perspective** 30:17
  123:22
**photograph** 98:21
  180:25 182:6
**phrase** 167:5
**physical** 27:5 69:8
  165:22
**physically** 120:3
  149:12 157:23
**physician** 23:8,13
  25:21
**physician-patient**
  23:6
**physiologic** 70:9,10
  71:10
**physiological** 70:2
  77:15
**physiologically**
  71:9
**pick** 98:19 191:3
**picture** 98:15,20
  108:16 166:25
**pinpoint** 45:22
**pinwheel** 48:24
  51:10 151:4
**Pitzer** 2:19 3:18 5:3
  198:11 200:4
  205:9
**place** 6:25 74:7,10

95:2 111:17,18
  129:19,22 130:22
  138:14 172:13
**placed** 130:12
  172:17
**places** 131:19
**plaintiff** 5:18,20
  23:18
**Plaintiff's** 140:3
  143:10
**Plaintiffs** 1:7 2:10
  2:19 3:2,7,12
**plan** 141:11,24
  142:7
**please** 5:16 6:1
  107:7 200:12,14
**Plunkert** 3:17 4:5
  5:21,21 6:3 14:8
  14:25 15:18 16:2
  21:7,24 22:14,19
  22:23 23:6,12
  24:10,15,15 25:3
  31:5,20 33:13
  35:23 39:4 41:17
  42:1,6,16 45:24
  48:10 49:10 51:24
  52:16,19 53:3,7
  53:19,21,24 54:2
  54:10 55:9 58:22
  59:2,8,17,20,24
  65:25 66:2 67:4
  68:8,19,24 69:3
  72:10,15 73:6
  74:16,23 75:22
  76:4,11,22 78:14
  78:20 79:6,13
  80:1,7,11,15,21
  80:25 81:6,10,16
  81:20,25 82:7,9
  82:15,21 83:1
  84:3,9,15,20,24
  85:6,13 86:3,24
  87:3,9,18 88:1,6
  88:21 89:7,17,21

90:8,12 92:14
  94:14 96:1 98:8
  103:2,7,24 104:19
  104:21 105:25
  106:22 107:1,10
  107:14 108:2,5
  109:8,13 110:6
  114:2,11,17
  115:12,18,23
  117:14,16 118:19
  118:24 119:15,22
  120:8 121:8,20
  122:1 123:15,25
  124:4,9,14,18,22
  125:1,7,15,18,22
  132:9,11 136:13
  138:20 140:4
  141:15 151:10
  152:11 181:25
  187:14,19,25
  188:13 189:3,8
  193:6,14 195:6
  196:4 197:18
  200:3,9
**Plunkert@pspcl...**
  3:20
**point** 9:19 19:16,24
  21:20 27:17 28:4
  48:13,15 51:14
  53:1 60:20 61:20
  61:22 66:17 98:25
  104:23 106:12
  107:22 125:5
  129:14 132:9
  156:15 163:18
  166:10 167:6,17
  181:5 183:19
  184:16
**pointed** 49:3 52:11
  52:12 151:21
**pointing** 52:9
  181:25
**police** 8:11,12,15
  8:17,18,20 9:8,12

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 223

10:7,20 11:2,21
14:2,5,11 15:11
15:13 16:15 17:21
27:12 28:18,24
29:3,8 30:14 32:5
32:11 34:8 35:17
74:13 78:8,11
88:16 103:8
130:21 131:6
132:21 133:3,7
145:3,9,10 153:10
157:1,4 158:22
159:10,15 169:4
169:25 171:1
185:8 190:17
**policies** 15:3
195:19
**policy** 46:23 150:24
168:10
**Pontiac** 146:15,16
176:15
**pop** 161:2
**population** 26:5
**portion** 15:8 32:18
34:5 36:22 62:23
152:25 153:13
167:23
**portions** 154:13
168:3
**pose** 82:18,24
**posed** 189:6
**position** 16:22
58:20 59:14 103:3
112:3,17 117:7,11
127:15 129:19,23
130:13,23,24
133:18 138:15
170:11 183:1
**positioned** 111:25
183:24
**positions** 183:10
**possibility** 46:1
88:13
**possible** 73:11

76:17 79:19 84:7
113:25 115:19
**possibly** 63:5
163:24
**post** 186:12
**potential** 73:13
77:14
**pound** 166:15,19
166:21
**pounds** 28:10,13
43:18 64:13 73:24
**power** 72:4 77:25
84:7
**PPCT** 27:8,15
**practical** 76:17
**precontact** 101:3,3
101:5,12
**predict** 48:9
**predominantly**
97:3
**preferred** 77:6
79:17
**preliminary** 7:3
**premises** 182:9
183:5
**preparation** 31:24
32:2 132:20
154:23
**prepare** 9:8 36:22
153:2
**prepared** 33:4
**preparing** 33:2,24
**presence** 48:21
111:10 148:2,3
149:1 166:13
**present** 110:4
149:10 155:12
176:22
**preserve** 125:2
**preserved** 124:10
124:19
**pressure** 27:17 28:4
70:16
**pretty** 30:3 54:25

55:1 73:21 103:21
146:21 159:3
**previous** 23:1
**previously** 96:8
116:17
**primary** 155:9
**printout** 134:12
**prior** 10:4 31:22
106:1 151:5 170:9
**privacy** 22:15,25
23:19 24:23
**privilege** 24:23
**privileged** 125:8
**probability** 73:9
**probably** 18:10,21
28:7,13 40:24
41:20 45:12 49:9
49:12 52:1,13,24
59:25 61:17 93:24
96:22 109:14,15
109:24 111:4
116:20 127:13
163:22 172:21
173:24 191:13
197:12
**probe** 117:19
151:23 152:3
162:16 188:19
189:17,19,20
**probe-deployment**
67:22
**probes** 13:11 51:20
151:24 153:17
161:8,9,10 189:15
**problem** 125:2
150:3 152:16
**problems** 19:25
22:3
**procedures** 72:3
**process** 32:23 83:6
113:6 197:2
**processing** 200:15
**procuring** 170:3,7
**produce** 23:22

**produced** 140:7
**producing** 22:24
**Production** 200:23
**professionally**
179:24
**profound** 71:5
**programmed** 55:15
**programming**
55:17
**prolonged** 69:24
**promotions** 17:11
**prompt** 200:16
**prongs** 122:15
**proper** 120:12
137:21
**properly** 11:6
**property** 147:11
148:5,7 161:5
**propounded** 6:17
198:24 199:3
**protect** 18:2,3 29:1
184:22
**protected** 138:14
**protests** 180:17
**protocol** 14:3,23
36:2 39:17 41:3,4
41:6 45:20 46:19
46:20 104:3,4,5
156:24
**protocols** 37:9,10
115:4
**provide** 152:9
153:12 156:5
167:21 189:2
**provided** 39:1 67:7
74:2 145:16
153:14,15,16
168:4
**providing** 146:23
**proximity** 19:14
**psychiatric** 90:22
**psychological**
69:16
**public** 86:23

203:18 206:13
**pull** 19:15 56:22
96:18 110:22,23
111:2,11 126:23
134:24 167:11
**pulled** 48:16 49:2
52:9,11 55:19
96:19 100:13
108:25 111:3
179:6 189:22
**pulling** 56:9 109:4
133:25
**pulmonary** 71:1
**punches** 20:3
**purpose** 21:21 29:2
**purposes** 154:2
**pursuant** 124:11
198:6
**pursuit** 19:12,23
**pushing** 165:24
**put** 13:10 35:17
50:17 66:22
109:18,18 111:22
126:10,12,13,17
126:25 161:23,24
162:1,5 169:17,18
179:6 181:25
193:3
**puts** 64:16 66:5
**putting** 165:23

---

**Q**

**qualified** 198:4
**quarter** 194:4
**question** 7:17 22:18
31:9 53:20 54:16
79:11 124:6
132:15 136:14
144:24 152:14
161:7 187:15,25
188:17,21 189:1,3
189:6 196:14,15
196:19
**questioning** 151:20

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                    September 22, 2015

Page 224

185:18 187:22
**questions** 4:2,3,4,5
 4:6 6:19,25 7:8,9
 7:13,16,20 23:4
 23:20 24:1 25:6
 75:16,20 124:2
 125:3 138:17
 139:1 144:13,17
 144:20,22 187:9
 187:12,18 188:14
 189:9 191:22
 192:13,17 195:6,8
 196:5,12 197:17
 198:24 199:2
**quick** 94:15
**quicker** 114:4
**quickly** 79:18
**quiet** 159:3,5
**quit** 57:17,21
**quite** 109:10
 139:11,21
**quote** 9:11

————————
**R**
**radio** 37:7 39:15,20
 42:25 46:14
 100:20 149:19
 151:1 174:25
**radioed** 150:6
**raise** 6:8 106:12
 125:4
**rank** 17:12
**ranking** 169:3
**rapid** 197:2
**rare** 73:10
**rate** 70:17
**rational** 87:1,7
**RDR** 2:23 199:14
**reaction** 21:3,4,14
 75:12
**read** 13:19 82:22
 84:16 85:1 103:8
 140:17,21 144:10
 188:13 192:24

**readdress** 6:7
**reading** 38:23
 58:10
**reads** 137:7,7
**realize** 109:12
 161:3
**realized** 62:21
 149:13 164:7
 183:6
**really** 22:3 29:25
 48:11 123:13
 187:12
**rear** 96:4,7
**reason** 85:4 130:7
 149:22 155:19
 158:24 201:2,5,8
 201:11,14,17,20
 201:23 202:2,5,8
 202:11,14,17,20
 202:23
**reasons** 90:20
**reassess** 75:11
**recall** 33:3 38:7
 66:19 95:18 97:17
 106:14 112:19,20
 118:10 125:23
 145:2,18,23,25
 146:22 148:11
 162:24 168:25
 169:1 171:4,13
 176:9,12 179:10
 181:3 184:16
**recalled** 149:5
**recalling** 110:8
**receive** 140:21
 143:24 148:4,6
 159:24 169:7
**received** 25:10

34:19,19,21,22
 42:25 44:10 85:20
 87:15 102:6
 123:21 143:21,21
 144:3 175:19
 187:7
**receiving** 145:18
 169:12
**recertification**
 12:10 169:9,13,18
**recertified** 12:8
**recertify** 169:10
**Recess** 24:12 94:18
 138:22 188:10
 195:2 196:8
**recognition** 83:4,10
 83:19,24 119:8
 120:12 128:10
 138:5,11
**recognize** 83:7,20
 88:17 91:20
 123:20 153:24
**recollect** 28:12
**recollection** 45:17
 139:8 180:13
**recommending**
 13:14
**record** 5:1,16 7:21
 8:4 24:10,11,13
 94:17,19,22 95:5
 96:1 113:17
 124:10 125:4
 138:21,23 188:3,8
 188:11 193:6
 194:23,25 195:1,3
 196:6,7,9 197:23
**recorded** 46:5
**records** 22:25 23:4
 23:23 24:2 109:20
**Red** 184:11
**redirect** 187:11
**reduce** 73:13
**refer** 152:9 189:1
**reference** 142:21

189:14
**referenced** 200:10
**referencing** 42:10
**reflect** 96:2 192:8
**refused** 49:23,25
 50:23 51:8,12
 56:24
**regard** 35:11 37:10
 41:23 139:1,5,13
**regarding** 6:25
 10:24 24:19,20
 132:12 195:8,9
**regardless** 75:3
 90:23
**registered** 159:9,14
**related** 139:2 160:9
 199:8
**relating** 168:7
**relation** 62:25
 96:11 139:10
**release** 55:24
**released** 56:8
 143:13 186:4
**Releases** 67:11
**relevant** 23:9 24:2
**reliable** 119:7
 123:13
**relied** 154:2
**rely** 32:24 65:12
**remarks** 198:25
**remember** 9:21
 10:17 15:8 28:3
 28:21 30:1 33:10
 34:4 42:11 43:17
 47:15 56:13 57:22
 57:23 64:24,25
 65:1 66:4,14
 118:12,13 127:21
 133:25 136:24
 145:13,15 146:18
 150:10 170:18
 171:12 172:3,4
 179:21 194:10
 195:7,10,11

**remembered** 6:3
**remove** 104:11
**Renee** 1:3 2:7 3:12
 5:20
**repair** 96:9,10
**repeat** 11:7
**repeated** 69:24
 70:6
**repeatedly** 81:3
**rephrase** 7:10
**reply** 6:16
**report** 17:16 31:9
 31:25 32:5,11,15
 32:16,18,23,23
 33:2,5,12,20,24
 34:1,4,6,12 36:14
 36:17,20,23 38:17
 38:23 41:9 42:13
 42:18 43:7,12,19
 43:20,25 44:1
 45:21 46:25 50:3
 50:6 51:2 52:22
 58:1,4,9 62:23
 68:11 73:23 87:13
 109:11,14 112:17
 112:21 113:1
 116:25 128:15
 132:22 133:3,7,8
 133:14,21 146:9
 146:20 152:6,9,22
 152:23,23,25
 153:5,11 154:20
 154:23 155:10
 156:2,7,10,15
 157:14 158:10,14
 158:16,18 161:8
 163:8 167:8,10,18
 167:24 168:14
 172:10 181:17
 185:10 188:22
 189:2,12,13
**reported** 69:9
 198:20
**reporter** 5:12 31:17

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                                                    September 22, 2015

Page 225

67:1 93:20 98:13 134:6 140:1 141:3 142:12 143:8 180:23 188:17
**reporting** 3:22 5:13 42:25 200:1,23 206:5
**reports** 145:19 158:20 167:12,14
**represent** 140:6 143:12 144:19
**Representative** 1:2 2:6 3:2,7
**representing** 5:17 5:19,21,23 6:22 134:11
**request** 129:13 167:21
**requested** 56:23 169:17,18
**requesting** 168:5
**requests** 168:1
**required** 83:25 101:9 133:8
**reserve** 16:18 17:1
**residential** 47:21 47:23 97:3
**resist** 65:23
**resistance** 75:12 164:5
**resisting** 27:8 157:18
**respects** 199:1
**respiration** 70:16
**respiratory** 70:2
**respond** 37:13 39:21 119:3 123:19 126:24 127:1,8 129:17 155:22
**responded** 20:10 92:24
**responding** 20:14
**response** 188:4

195:7
**responses** 192:1,1
**responsibilities** 17:21
**restrain** 72:1 122:5
**restraint** 72:2 122:8
**restraints** 179:6
**restrictions** 25:20
**result** 67:23
**retained** 4:21
**retraining** 169:8
**retrieves** 187:6
**return** 197:21 200:14
**review** 31:23 32:4 154:19 156:14,17 156:25 157:5
**reviewed** 154:22 158:20
**revise** 167:18
**revisit** 85:20
**rhythm** 70:17
**right** 15:9 23:19 24:23 28:4,10 33:10 36:11 44:17 46:24 47:2 51:20 52:12 54:16 56:3 56:14 57:22 63:20 64:21 70:14 76:9 77:16 94:8 95:23 96:5,22 98:9,24 99:2 100:8 107:8 108:18 110:9,15 110:15 111:4 112:11 113:15 118:11 120:15 130:18 136:22 141:4 142:15 151:7,22,24,25 158:1 159:3 181:21 182:6,16 182:24 184:17 185:1 189:21

192:7 195:15,22 197:16 200:10
**rise** 163:9,10,12,20 163:23 164:2,8,14 164:17,19,24 165:6,9
**risk** 22:12 26:4 68:14,18,22 69:20 70:4,11 73:13 78:18,24 79:4,15 79:16,23 80:19 81:3,14 85:17 121:18,23 131:9 131:10,15,20
**risks** 15:14 67:11 67:17 70:3
**road** 3:4 45:5,6 47:11,20 50:16 61:21 93:7,10 94:11,12,12 95:4 95:13,19,22 102:7 108:17 110:13,14 110:16 111:2 113:7,9 146:13 148:9,13,18,20 181:18
**roads** 94:5
**roam** 37:18
**Robert** 3:17 200:3 200:9
**Rodgers** 1:3 2:7 3:12 5:20
**roll** 35:15 159:22 160:5,7,14,18,23
**rolled** 130:1,8 150:19
**room** 186:18
**rotate** 174:18,18
**roughly** 53:2,6,9 54:12
**rules** 36:1 78:7 124:11
**run** 95:9 134:13,14 178:1

**running** 19:13 44:10 50:24 51:9 85:22 101:23 151:11
**runs** 95:11
**rush** 93:8,9

## S

**S** 3:17
**safe** 25:21
**safety** 67:16 138:13
**sat** 156:20 157:3,13 158:9,12
**Saturday** 93:9 96:25 97:1 99:4,7 99:19
**saw** 9:18 43:16 46:25 48:8,15,17 53:10 64:11 66:13 86:14 95:22 97:18 99:1,22 104:13,14 106:25 108:21,25 111:11,19 165:22 176:13,15,17,18 176:23 179:17 181:17
**sawed-off** 19:20
**saying** 23:10 36:11 39:15 40:4 47:1 62:16 72:12,14 79:16 99:9 100:7 100:11 114:23,24 114:24 158:12 167:1
**says** 6:16 24:8 38:8 43:20 58:10 67:16 70:15,24 71:17,22 72:1,4 135:10 137:18 142:16,18
**scenario** 36:5
**scene** 14:3,14 20:11 20:14 35:2 36:3,7 36:19 37:12,13 39:22,23 40:4,20

41:8,9,25 42:12 42:14 44:4,9,19 44:22 85:22 86:14 92:21 93:1,23 97:7 109:6,21,22 110:5,12 113:25 129:14 139:12 144:25 146:2,7 147:4 148:10,14 148:22 149:5 154:5,9,11 155:20 172:16,21 173:17 174:1 175:2 176:2 176:10 177:1,6 184:6,16
**scenes** 145:11
**scheduled** 10:1
**schizophrenia** 90:21
**school** 8:9
**scrapes** 179:11,18
**scream** 180:18
**seal** 206:10
**search** 188:5
**searching** 109:17
**seated** 129:19 130:12,23 138:15
**second** 20:8 49:5 49:17,20 56:25 59:1 60:3,11,24 61:7,13,15 69:11 72:22 107:9 112:11 117:8,8 121:1 122:3,19,21 123:9 125:9,10 127:2,3,7 129:3 134:20 136:17 150:6 163:21 164:17,24 165:6 166:1 183:17,18 183:18
**secondary** 17:2 22:13 25:10 139:15

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                          September 22, 2015

Page 226

seconds 56:5,21
  58:8 59:16,21,22
  59:23,25 60:13
  71:19 100:15,16
  127:6,9,10 135:7
  135:10,12,13,15
  135:22,22
sector 37:15,17
  38:2,5 46:12
  174:20,21,22,24
sectors 37:16,19,24
  174:18,19
secure 179:9
secured 179:2
sedation 14:17,23
see 15:5 21:20
  38:18,19 40:9
  42:7 43:1,2 50:9
  53:11 54:19 64:10
  67:10,12,17,20,24
  67:25 68:4,5,10
  68:12 69:17,22
  70:4,7,12,17 71:1
  71:6,11,13,15,20
  71:23 72:5 73:4
  73:14,18,19 80:20
  86:17 93:14,25
  97:10,13 99:25
  100:2 108:16,19
  108:23 110:14
  127:7 129:6
  131:23 135:24
  137:3,4 139:1
  155:6 158:11
  164:20,25 165:1,3
  165:5 166:25
  181:21 190:11
  192:21,24
seeing 25:7
seeking 24:2,3
seen 14:17 22:3
  45:3 64:7 71:19
  87:10 133:17,19
  134:8 140:11

142:3 144:5,7
seizure-precipita...
  69:10
select 190:22,23
send 197:19
sending 170:20
  171:11
sense 166:3
sensitive 76:16
sensory 120:5
sent 34:5 158:17
  168:9 171:1,5,7
  171:23 172:20
sentence 70:14
separate 186:8,24
September 1:20
  2:21 5:2 7:1 10:4
  28:11 29:20 30:15
  37:10 88:19 92:17
  92:21 143:4,4
  145:6 151:17
  159:1,19 161:22
  162:16 167:17
  168:15 169:5
  170:17 171:3
  174:23 175:10,13
  177:6 180:16
  185:14 186:20
  198:14 199:11
  200:2,6
sequence 57:8
  183:8
sergeant 36:15
  160:24
serial 46:11 153:14
series 104:8
serious 14:14 69:21
  70:4,12 73:13
  79:16 82:19,24
  88:5 92:6 97:20
  104:17
seriously 155:24
serve 18:1,3 29:1
server 172:8

session 160:7
set 146:8,19 152:5
  188:21 198:23
  206:8
sets 25:6
setting 11:19 65:8
settings 65:5
seven 12:12 43:13
  74:6
severe 21:3
Shafaie 3:17 5:23
  5:23 193:12,17
shafaie@pspclaw...
  3:20
shaking 127:24
shallow 178:5,7
sheet 34:15
sheets 200:11,13,13
  200:14
shift 35:12 46:12
shifts 135:4
shine 100:4
shock 56:1
shoot 92:11
shooting 160:24
  189:23
shoots 55:20
shop 96:9,10
short 194:7
shorthand 198:21
shortly 14:5
shot 21:19 161:4
shotgun 19:20
shots 77:8
shoulder 127:20,22
  151:6,16 185:2
shouted 58:2,13
show 35:1 136:23
showed 86:16
  109:6 110:8,11
  162:9
showing 90:14
  110:2 136:16
shown 152:8

188:24 198:19
shows 37:21 38:15
  109:11 128:15
  134:19 138:7
shut 196:2
shuts 66:6
siblings 180:7,9,14
sic 95:6
side 51:20 52:12
  64:16 95:13,14,15
  96:11,12,15,17,21
  97:25 110:15,16
  110:18 127:16,18
  129:23 130:1,8,13
  130:24 138:14
  150:20 151:21,22
  165:4
sidewalk 56:16
sight 161:15,18
  162:15,17,19,21
  190:9,9
sights 151:21
sign 86:16 185:23
  200:10,13
signature 199:4
  200:11,13,15
  203:4
signed 170:16,19
signs 86:15
simultaneous 70:7
  71:22
Sincerely 200:21
sir 7:7,12,24 8:14
  9:3,15,17,22 10:1
  10:6,25 11:25
  12:2 13:5,25
  14:16 16:9,24
  17:13 18:7,14,17
  19:7,18 20:15,17
  20:22 21:6,9 22:8
  25:14,19,23 26:1
  26:16,19 29:19,22
  30:6,11,13,19,22
  31:4,7 32:3,9,12

33:7,21,25 34:11
  34:18 35:3 36:24
  37:6,8,22 42:8
  43:14,24 44:20
  46:7 50:11 52:5
  55:8 56:11 63:25
  64:3,9 65:6 67:14
  67:19 68:20,25
  69:4,19,23 70:5,8
  70:13,23 77:5,22
  80:13,16 81:1
  83:5,9 86:13
  89:23 90:2,9
  91:18 92:19 93:2
  93:5 95:3 97:12
  97:14,23 98:1,18
  99:17,23 100:1,3
  100:5 103:5 117:4
  117:6 119:17
  120:19,21,23
  121:16 122:10
  123:2,4,11 138:25
  139:4,6 140:12,24
  143:2,5,15 144:6
  144:9 145:12
  146:3,6,11 149:24
  151:18 152:18,24
  153:19 154:21,25
  156:3 157:12
  159:15 160:3,6
  162:22 165:13
  167:25 168:16,25
  171:20 172:11
  173:1,23 175:16
  178:16 181:1,24
  183:13 187:9
  191:24 192:10
siren 184:11,12
sirens 184:5
sisters 180:8,9,11
sit 158:6
situated 186:17
situation 15:22,25
  56:6 82:2,10

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 227

88:13 89:10
103:17 105:21
115:14 120:18
190:21
**situations** 9:9 18:11
19:10 82:12 89:9
**six** 12:12 17:4,6
21:12 28:10,13
35:25 70:20 71:21
74:6 135:10
163:22
**six-five** 173:24
**size** 28:7 194:11
**sizes** 194:2
**skills** 114:21,24
115:4,8
**skin** 65:11
**Slight** 43:18
**small** 28:6
**snakes** 110:13
**SNLJ** 2:12,13
**Snodgrass** 2:19
3:18 5:3 198:11
200:4 205:9
**soft** 66:16 68:2
**solely** 84:13,18 85:3
85:11
**somebody** 90:14
104:17 109:17
123:19 150:25
155:23 165:15
179:24 180:18
**someone's** 21:22
**soon** 20:2 29:23
45:10 54:21
129:16
**sorry** 15:19 16:9
41:12 52:19 53:8
59:17,19 94:2
141:16 146:14
151:8
**sound** 53:13 54:22
184:18 198:15
**sounds** 9:11 184:15

**source** 155:9
**sources** 154:6
**south** 2:20 3:18 5:3
95:10,11 97:25
111:6 198:12
200:4 205:10
**space** 13:24
**spark** 134:21,22,23
134:25 135:3
161:4
**speak** 32:1 33:17
173:7 175:23
177:4
**speaking** 86:17
**specialist** 5:11
**specific** 27:2 40:2,5
**specifically** 125:1
**speculation** 14:8
15:18 21:25 31:5
48:10 49:10 51:24
53:3 54:3,11,13
59:2 86:4 88:1
89:7 106:22 107:1
108:3 109:8 110:7
114:2 115:12
118:24 119:16
121:9,21
**spell** 95:5
**spelling** 33:15,15
168:5
**spoke** 102:1
**spoken** 195:21
**spot** 45:2,10 96:23
108:24 185:11
**spots** 171:18
**spotted** 45:22
**spray** 21:2 24:21
25:7,10,16,17
26:5 30:10 121:3
121:4,5,11,13
190:16 195:21
196:20 197:1,14
**sprayed** 197:14
**spur** 192:6

**squad** 186:18
**SS** 198:2
**St** 2:20 3:5,10,19
3:23 5:4,14 8:13
37:4 198:3,12
200:5,24 204:19
205:5,11 206:7
**staffed** 174:10,14
174:22
**staffing** 168:20
**stage** 41:18
**stamp** 46:15 134:7
192:21
**stamped** 31:21
38:13 67:2
**stand** 27:16 47:7
60:4
**standing** 45:4 47:1
87:22 101:20
104:7 106:9 107:6
108:21,24 181:18
182:9,13,18,22
**start** 6:4 57:15
67:15 93:12
101:25 104:5
106:17 144:23
181:8,16 185:21
186:20
**started** 7:2 19:13
20:2 48:22,23,24
49:20 50:24 56:21
57:13 59:6 76:13
77:10,18 80:24
81:9,19 100:9,10
100:18 106:18
113:14 116:21
126:5 129:11
171:2 191:15
**starting** 8:9 50:12
51:8 60:4 183:8
**starts** 71:14 126:21
**state** 8:3,3 69:15
70:20 71:8 73:16
79:2,21 86:22

87:7 90:19,23
91:20 92:1,5
114:25 116:24
125:3 131:15,17
131:18 198:1
**stated** 105:10
**statement** 18:1
28:23 79:21 113:7
113:19 204:9
206:9
**statements** 176:9
**states** 2:1 5:8 42:18
71:4 85:10 113:3
133:5 136:10
198:8
**stating** 119:19
120:3
**station** 11:21 159:4
191:4
**stationary** 101:20
106:9
**statistical** 43:8
**Stature** 101:15
**stay** 56:23 57:12,18
57:18,21,25 58:25
61:1,4,9 125:24
126:10,12,13,17
126:24 168:11
**step** 108:15
**Stephanie** 42:5,14
**stepped** 51:11
**stipulate** 124:11
**stomach** 59:14
63:13 127:18,22
128:16
**stood** 47:6,10 50:16
**stop** 49:3,6,22,25
50:22 51:7,14
95:19,20
**Stories** 103:8
**straight** 103:20
**straighted** 122:21
**straightened** 60:16
122:24

**strain-related**
67:21
**street** 2:20 3:18,23
5:4,13 47:18,19
56:16 104:7
198:12 200:4,24
205:10 206:6
**stress** 69:7,17 70:1
**strike** 108:21
130:19 147:23,24
147:25 163:18
176:12 185:4
**striking** 103:9,10
147:18
**struck** 147:20
184:24 189:17,19
189:21
**stuck** 161:6
**stuff** 62:13 159:4
**stun** 65:8,9,9
157:13,16,25
158:1
**style** 60:8
**subdivision** 110:21
**subdue** 20:4
**subduing** 14:11
**subject** 9:2 15:22
19:5,13,17,24
20:6,8,11,14 25:5
25:8 26:14,17,23
28:6,8 40:8,9 41:5
66:2 72:19 75:10
77:16 79:18 83:20
100:23 104:4,6
120:6,14 130:22
132:17 137:22
138:9
**subject's** 75:11
**subjective** 165:12
**subjects** 9:7 10:12
14:18 26:12 27:3
30:18,23 87:11
137:24
**submission** 83:3,10

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                September 22, 2015

Page 228

| | | | |
|---|---|---|---|
| 83:19,24 119:8 | 30:3 31:20 34:3 | 38:20 41:23 59:13 | 183:2 |
| 120:12 138:5,10 | 39:13 46:2 94:16 | 65:10 67:6 86:22 | **Taser** 10:24 11:2,5 |
| **submit** 33:5,8 | 98:7 101:4 104:16 | 93:13,21,22 94:14 | 11:6,8,16,24 12:6 |
| **submitted** 33:9,19 | 109:10 127:12 | 94:25 111:17 | 12:14 13:1,2 15:4 |
| 83:8,20 153:7 | 129:25 134:25 | 112:19 138:18,19 | 15:15 19:5,11,16 |
| **subscribed** 17:19 | 139:7,11,21 | 140:5 142:22 | 19:22 20:3 30:4 |
| 203:12 | 169:17 171:9 | 145:20 146:12 | 32:6,10 49:2 50:1 |
| **subsequent** 20:18 | 176:1 181:4 | 147:6 169:18 | 51:13,15,19 52:7 |
| 114:23 115:1 | 187:24 196:24 | 171:21 172:3,7 | 52:22 53:13 54:9 |
| **subsequently** | **surprised** 85:8,15 | **taken** 2:18 5:6 9:19 | 54:22 55:11,14,19 |
| 105:20 173:7 | 87:16 | 24:12 26:17 94:18 | 57:13,14,17,20 |
| **sudden** 71:11 | **susceptible** 70:22 | 138:22 188:10 | 58:6,18 59:12 |
| **suffer** 89:14 | 70:24 | 195:2 196:8 203:3 | 60:17 63:21,22,24 |
| **suffering** 71:4 92:6 | **suspect** 88:4 97:21 | **takes** 196:2 | 64:1,1,4,8,14 65:2 |
| 128:11 130:16 | 134:20 | **talk** 28:18 29:14 | 65:10,12,13,20,22 |
| **sufficient** 13:1 | **swear** 6:1 | 31:8 32:22 87:6 | 66:5,12,15,17,20 |
| **suggest** 105:20 | **swell** 21:22,22 22:4 | 91:2 159:7,8 | 67:8 68:15,23 |
| 119:6 137:14 | 25:18 196:1 | **talked** 29:15 | 69:6 72:18 73:1 |
| 138:1 | **swelled** 21:19 | 168:22 180:15 | 74:9,21 75:15 |
| **suit** 199:7 | **swing** 20:3 103:18 | **talking** 32:15 87:22 | 76:13 77:11,19 |
| **Suite** 3:4,9,14,18 | **swinging** 48:24 | 90:11 123:9 124:8 | 79:9,15,18 80:5,6 |
| 3:23 200:4 204:18 | 49:22 51:10 | 161:9 178:13 | 80:24 81:9,19 |
| 205:4,10,16 206:6 | 165:10 | 187:19 192:22 | 84:8,17 85:9 |
| **summarized** 24:24 | **switched** 172:9 | **talks** 194:2 | 102:22 103:4 |
| **summon** 149:25 | **swollen** 196:2 | **target** 76:16 77:6 | 111:14 117:21 |
| 150:16,19 | **sworn** 6:2,13 | 142:18 | 118:11 121:10,11 |
| **summoned** 149:22 | 198:17 203:12 | **targeting** 73:12 | 122:8,15 131:7,9 |
| 150:2 155:20 | **swung** 103:18,22 | **Tase** 51:2 61:13,15 | 131:21 132:8,21 |
| 158:3 | **symptom** 90:6,13 | 61:18,25 62:1 | 132:24 133:7 |
| **summoning** 150:14 | **symptoms** 196:22 | 75:9 85:17 110:5 | 134:12,13,15,21 |
| 150:14 | 197:8 | 110:9,9 112:17,18 | 134:24 135:18 |
| **summons** 150:25 | **synonymous** 147:8 | 114:1 117:8,8 | 137:9,13,15 138:9 |
| **summonsed** 151:2 | **system** 37:21 38:13 | 129:1,3,7,10,10 | 139:13,14,15 |
| **superior** 157:4 | 38:14 66:7 120:6 | 138:3 | 140:7,9,22 141:11 |
| 160:1 | 172:10 185:10,11 | **Tased** 49:6,25 | 141:25 142:6,18 |
| **superiors** 33:6 | 185:15 | 51:22 61:11 62:25 | 143:13,23,24 |
| 191:8 | **systems** 46:2 | 64:8,18 79:4,23 | 148:10 149:20,23 |
| **supervisor** 153:1 | | 80:18,19 81:2 | 151:5,19,24 152:2 |
| 153:15 155:22 | **T** | 82:18,24 83:7 | 152:4,5,7,8 |
| **supplement** 63:5 | **T** 3:8,17 200:3,9 | 111:25 112:10 | 153:11,14 154:19 |
| **supplements** 153:5 | **table** 142:13 | 117:3 120:7 | 155:13 157:13,17 |
| **suppose** 189:3 | **tactics** 27:17 | 127:23 136:4 | 160:12 162:12 |
| **supposed** 130:22 | **take** 6:24 7:25 | 138:1 150:25 | 163:1,3,5,21,24 |
| **sure** 22:1 29:25 | 10:15 12:22 31:18 | 151:1 166:10,13 | 164:6 165:14,15 |

| |
|---|
| 167:6,6,6 169:15 |
| 169:24 170:3,7 |
| 178:21 179:5,19 |
| 182:10,13,18,22 |
| 183:5 184:21 |
| 185:16,19,20,24 |
| 186:4,10,20 187:7 |
| 188:18,20,21,23 |
| 188:24 189:5,12 |
| 191:3,4 192:19 |
| 194:22,24 196:14 |
| 196:16 |
| **taser-related** |
| 160:22 186:24 |
| **Tasered** 81:4,14 |
| **tasering** 82:3 82:3 |
| **Tasers** 15:7,10,21 |
| 16:1 52:14 66:16 |
| 129:16 132:25 |
| 169:9 |
| **Tases** 74:14,15 |
| 133:21,24 138:4 |
| **Tasing** 62:3 85:3 |
| 111:17 113:6,18 |
| 167:7 |
| **taught** 12:17 |
| **TAXED** 205:1,7,13 |
| **teach** 141:24 |
| **teaches** 16:6 |
| **tears** 66:17 68:1 |
| **techniques** 115:5 |
| **tell** 8:8 9:4 11:12 |
| 40:17 43:25 44:1 |
| 44:7 46:8 48:11 |
| 48:14 53:13,17,23 |
| 54:8,21 55:14 |
| 57:16 93:11 94:5 |
| 95:1 100:10,22 |
| 101:2 104:9 |
| 107:11 119:23,24 |
| 128:13 130:21 |
| 132:24 133:3 |
| 134:23 137:4 |
| 141:23 150:15 |

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                    September 22, 2015

Page 229

169:14 170:25 172:23 173:11 174:7 176:25 180:3,11,20 181:2 184:2 191:12 193:4 194:8,16
**telling** 25:21 42:9 57:18 72:7 105:17 131:3 146:18
**tells** 72:18 104:11
**ten** 40:4 197:13
**tendon** 66:16 68:2
**term** 83:16 188:5
**terminology** 39:25 41:15 83:11,12
**terms** 13:23 101:5 151:23 152:2 183:4 188:19
**test** 134:22,23 135:3 161:4
**testified** 136:5 151:20 163:6,8 182:25 198:19
**testify** 6:14 24:19 132:12 198:17
**testifying** 54:19
**testimony** 25:2 53:4,14 97:18 132:4 136:3,9,10 137:9,19 159:18 162:20,24 195:10 195:11 197:19 198:20,23 203:5
**testing** 71:18 75:16
**Texas** 64:20
**Thank** 5:25 31:20 98:10 107:9 144:14 182:25 184:4 187:9,10 197:17
**Thanks** 140:4
**thereto** 199:1
**thin** 73:17,20,21 131:19,23,25

**thing** 25:4 142:14 183:21 186:5
**things** 13:11 66:13 85:20 90:23 91:7 91:13 101:11 106:6 115:10,16 178:14 181:7
**think** 24:4 63:1,4 64:12 67:2 109:1 117:17 128:15 139:7 146:13 151:20 152:11 162:23 163:5 180:19 182:25 187:8 188:5 189:7 190:8 193:7,9,24 193:25,25 197:16
**third** 8:22 49:24 61:2,7,15,18,25 62:1,3 69:13 96:23 110:5,9,9 112:14 127:15 129:7,10 163:23 163:24 183:17
**Thirteen** 93:17
**thorough** 181:23
**thought** 128:8 136:16
**threat** 82:19,24 100:25 101:3,4,6 101:12 107:25 122:11,16
**threats** 108:9 166:9 166:12
**three** 8:24,25 18:10 36:8 51:1 57:1,3,4 57:7,11 59:22 132:4 133:5,6,15 133:20,21,24,24 134:1,18 135:20 135:21 136:18,25 137:2,15 138:4 194:3
**throat** 76:17

**thumb** 141:22
**tighten** 60:17
**tightened** 117:10
**tiles** 161:6
**Tim** 3:22 5:10
**time** 7:25 10:9 12:18 13:24 14:4 14:10 17:3 19:12 21:10 30:1 33:18 33:19 34:2,4,17 34:19,22,23 35:1 35:4,7,8,10 36:18 38:9,12 39:8,9 40:1,24 41:16,19 44:12 45:22 46:13 46:15 48:5 50:18 61:7,9 63:2 74:10 76:25 81:4 84:16 85:1 88:15,17,25 92:16 93:13,22 100:12,12 101:24 102:4,14,21 104:10 105:3 106:4,9 109:5,5 109:16 110:2 111:13 112:1,3,11 112:14 121:3 122:11 127:1 128:2,4,24 129:13 134:14 135:17 136:3 137:2,5 138:5 148:7,9,13 148:21,22 149:4,7 149:9 150:6,13 151:20 152:7 154:22 155:21 163:2,21,23,24 164:6,7,14,17,20 164:24 165:6,8 166:1 167:11 173:6 178:2,6 182:19,23 183:2 184:9,11 187:9,15 188:23 192:8,12

195:14 197:7,14
**time/date** 34:19,20
**times** 18:10 19:8 26:22 27:1 56:23 57:1,2,3,4,8 81:13 85:3 112:24 120:2 132:4 133:6 134:1 138:1 157:7 165:9 189:23 191:6
**Tina** 1:1 2:5 3:2,7 5:6,18 6:23 204:5
**tire** 112:12
**tired** 6:7
**tissue** 66:16 68:2
**title** 142:4
**tjohnson@batyh...** 3:15
**to-wit** 6:17
**today** 5:2 6:24 7:6 7:17 25:2 31:23 133:17 144:24 146:4 155:9 161:21 180:12 191:23
**today's** 154:23
**Todd** 3:13 5:19 125:18 144:18
**Todd's** 195:8
**told** 49:5,24 85:9 105:12 106:9 126:24 132:8,19 149:18,18 154:4 164:9 173:13 180:6 184:14 186:25 191:10
**tone** 73:22 145:25
**tool** 15:10,16,20 27:19 122:5 170:10
**top** 15:9 42:19,20 67:12 95:14,15 118:3 142:22 161:13 193:24
**torso** 163:13,15,19

163:25 164:3 166:5
**total** 77:24 127:9 133:21 205:6,12 205:18
**touching** 127:18
**tox** 87:13
**Tracey** 2:23 5:11 6:1 198:4 199:14
**traffic** 17:15 29:6 44:11 48:5,6 99:3 99:10,11,20 108:15 149:13
**trafficked** 93:8
**train** 9:12
**trained** 11:6,10,17 27:7 114:6,9,15 119:2,5 130:25 131:3,5
**trainer** 186:19
**training** 8:18,19 9:1,5,16,20,24 10:5,8,9,10,21,23 11:8,12,19,22 12:1,5,7,20,20,24 12:25 13:2 15:5,8 16:5 19:2 27:2,4,8 27:11,12,14,19 29:15,16,18,24 30:1,4,9,12,16 31:2,3 32:6,10 63:21,22,24 64:1 64:1,4 65:12 66:4 66:12,15,20 67:8 69:7 72:17,25 73:3 74:1,5 75:15 79:10,15 80:5 85:9 86:1 88:16 88:23 89:1,3,13 90:4 91:3,19 92:18 104:9,11 105:20 106:1,4 114:22 115:9,17 119:6,19,24

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski

September 22, 2015

Page 230

128:13 130:21 131:8 132:21,24 139:13,16 142:6 143:23 170:16,20 171:2,15,21,25 172:7 175:10,13 175:19 192:2,19 194:4

**transcribed** 197:21 198:21

**transcript** 139:2 198:20 199:2 200:12 203:2,5 204:15 205:1

**transcripts** 206:1

**transmitted** 160:5

**transported** 175:25

**trauma** 178:13

**travel** 148:20

**traveled** 93:10

**traveling** 95:21

**trial** 198:10

**tried** 28:2 57:9 115:15 157:22

**tries** 165:6

**trigger** 52:10,12 55:12,20,23,25 56:3,7,8 126:23 133:25 134:25 167:11 189:22

**tripping** 84:21

**trouble** 120:4 177:20,23,25 183:6,25

**truck** 96:12,13 98:2

**true** 92:13 136:1 199:1 203:5

**truth** 6:14,14,15 198:17,17,18

**truthful** 167:14

**try** 7:19 13:11 56:22 79:18 93:22 105:21 130:1 144:21 188:6

192:19

**trying** 13:19,22 19:15 27:9 29:5 42:24 57:14 59:10 84:25 104:16 127:5,21 157:24 165:16,19 183:22 194:10

**Tuesday** 200:2

**tune** 105:22

**turn** 134:24 184:8

**turned** 48:22

**Twelve** 31:13

**twice** 19:9 126:15

**two** 25:15 32:10 37:17 45:3 57:3,4 57:7,11,20 58:20 59:7,22,25 61:17 70:19 86:5 116:20 120:20 125:25 126:16 127:9,10 132:21 133:24 134:17 135:22 151:24 170:20 171:11

**type** 17:18,24 21:2 27:8 28:23 37:20 46:14,17 83:14 122:5 154:14,16 154:17 156:25 159:21,25 160:14 160:18,22 161:10 169:8 178:12,19 184:18 192:5,6 194:8

**types** 25:15 91:6 134:8 179:14,18 194:3

**typewriting** 198:22

**U**

**uh-huh** 7:18 16:7 41:10 50:8,14,22 55:6 63:25 77:3

110:17 126:2 132:23 140:10 181:6

**ultimately** 36:6

**unable** 100:10

**unarmed** 82:3,17 82:23

**understand** 7:6,9 7:11 9:4 14:22 15:14 17:23 39:18 39:20 42:24 46:20 55:15 58:9 72:13 83:6 86:19 90:1 90:24 92:4 104:16 118:15 119:14,18 119:19 123:13 131:14,19 135:17 168:17 173:25 194:3 196:25

**understanding** 37:1 65:19 162:12 175:8

**understandings** 78:10

**understood** 7:14 26:8 86:1,8 91:11 131:7,13 132:2

**undetermined** 198:8

**unequipped** 30:16

**unfolded** 93:23

**unfortunately** 82:11

**Unholstered** 51:12

**United** 2:1 5:8 198:8

**unnecessary** 30:24 78:18,24

**upper** 13:15 118:3 151:23 152:3 161:10,12,12 188:19 189:19

**use** 10:24 11:6 12:6 13:11 15:6,15

19:5 44:1 46:12 70:10,22 74:18,21 75:4 76:2,14 77:13 78:12 79:17 83:11,11 107:10 121:15 141:25 147:8 151:23 152:1,2 153:11 154:20,22 156:2,6 156:9,14,17,22,25 157:5,16 158:4,7 158:10,13,16,20 158:23 160:9,12 160:19 161:15,21 162:12 163:24 169:24 177:10,16 177:19 178:20 179:8 184:21 188:17,19 189:13 191:17,18

**user** 12:25 67:11 152:1 162:11 188:18

**users** 141:24

**uses** 69:9

**usual** 99:11

**usually** 8:24 37:17 165:16 186:11

**utilize** 114:20

**utilized** 33:2

**utter** 165:19 167:5

**V**

**vacation** 168:24

**Valley** 11:10,13 12:1,5 14:1 16:16 16:21,22 17:14,20 18:4,24 19:1,6,11 20:16,18,21 21:1 21:17 25:13 26:15 28:1,14 63:23 170:9

**van** 96:20,21 111:4 111:6,6

**vantage** 181:5

**variables** 190:2,7

**variety** 26:11 90:22

**various** 91:5

**vehicle** 19:12,13,23 19:24,25 20:1,2 35:17,17 40:10,13 40:16,17,20,23 41:1,13,14,20,21 48:17,18 49:7 50:17 61:24 95:20 95:23 96:18,19 97:24 98:5,22 100:13,18,21 106:21,24 107:16 107:20 110:22,23 111:11,20 112:2,8 112:12,15 147:16 148:25 149:9,12 166:25 175:5 182:2

**vehicles** 43:23 44:18 47:18 97:14 97:15 108:7 147:6 147:16 148:8,12 148:18,20 166:23 167:3

**verbal** 49:24 51:1 57:15 58:18,21,25 59:10 101:16 120:22 126:1 166:9,12

**verbally** 7:16,20 154:8

**verbiage** 39:25 177:10

**verify** 196:16

**version** 79:14,15 142:16 143:18 186:1,2 187:1

**versions** 185:17 186:3,9

**versus** 5:7 159:13

**vertebrae** 68:7

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                      September 22, 2015

Page 231

vibrating 127:24
video 3:22 5:11,13
  7:16 64:7,10 96:3
  188:8 200:1,23
videographer 3:21
  5:1,25 24:11,13
  52:18 94:17,19
  98:6,10 107:7,9
  138:21,23 142:25
  188:8,11 195:1,3
  196:7,9 197:23
Videotaped 2:18
views 93:14
violent 147:3,7,9,11
  147:12,14
vision 54:24 55:4
visualize 93:15
voice 106:12 146:1
volt 65:6
volts 65:2,17 123:3
  132:3 138:2
vs 1:10 2:12 200:7
  204:5

              W
waistband 19:15
wait 107:20 126:22
waited 136:6
waiting 93:3
waive 200:10
waived 199:4
waiver 22:16 24:23
  25:1,4
walk 50:18,19 51:6
walked 47:8,10
  50:15 105:1 106:8
  109:2 156:22
walking 48:23,25
  49:21 100:18
  102:5 105:14,16
  109:3
want 6:6,7,9 16:10
  29:14 31:8 32:22
  37:11 39:16,17

60:19 63:20 78:7
  78:8 85:19 96:1,2
  107:10 138:18
  139:23 141:4
  142:21 143:9
  144:23 152:17
  167:13 176:22
  181:4,8,24 187:21
  188:1,1,4 193:3
  196:24
wanted 7:2 66:13
  142:14 187:16
wanting 185:1
  189:19 194:11
warning 49:5 61:4
  67:18 69:11,13
  72:21 127:7
warnings 51:1
  57:20 58:14 61:6
  61:14,15 67:11
  127:11 140:7,22
  143:13 185:16,19
  185:23
warrants 173:16
washer 166:22
washing 96:9,10
wasn't 61:11 62:24
  63:17 101:23
  107:25 129:9
  130:3,12,15,16
  139:7 148:17
  190:13 193:12
Watch 151:10
way 7:10 22:4
  37:14 40:4 45:21
  46:10 50:18,19
  77:21 95:7,16,17
  95:18 99:15
  103:22 125:15
  137:7 166:5
  167:19 174:1,3,7
  183:5 185:18
  194:13
ways 55:15 91:5

178:1 186:25
we'll 44:1 48:12
  63:3 83:18 93:12
  142:11,12 155:7
  183:10 197:18
we're 5:1,12 7:14
  23:2 24:5 28:8
  39:12 40:2,2,4,5
  50:20 57:14 94:21
  101:4 109:17
  123:9 144:24
  152:10 153:10
  180:24 189:2
  196:13 197:23
we've 6:23 22:23
  23:22 24:16,17
  25:4 141:6 180:15
weapon 10:24 11:3
  11:5,6,9 19:17,19
  44:14,15 86:9
  92:11 107:23
  137:9
weaponry 191:2
weapons 12:6
  99:24 101:13
  102:20,23
wearing 55:2
weather 190:2
week 18:10,21
  96:24 170:21
weekend 168:17,19
  169:4
weighed 43:18
weight 28:9,12
  43:21 73:23
  173:21
welcome 144:15
went 8:11 11:14
  52:23,23,24
  101:12 116:2
  117:10 148:8,12
  157:14 158:8
  169:19 171:12
  172:16 184:6,20

185:2 189:24
weren't 39:13
  131:3 164:22
west 95:10 96:15
  96:17,21 98:2
westbound 95:21
what'd 60:9
whatsoever 28:5
WHEREOF 206:8
white 33:22 35:7
  36:9,18,22 38:15
  41:5 61:20,21
  62:1,8,10,11,11
  62:15 63:10 95:23
  96:12,13,20,21
  98:2 109:6,21
  110:3,4,12 111:6
  113:11 114:9
  128:2,7,20 129:24
  146:15,16 150:7
  150:14 155:17
  173:10,22,25
  174:8 176:15
  179:3,5 180:3
White's 63:5,6
  149:2,11 166:19
  173:20
whoa 126:24
wholly 136:2
widow 6:23
William 3:8 36:10
willing 124:12
Wilson 42:5,11,14
  42:25
wind 190:2
window 78:5
wise 65:6
withdrawal 90:21
  90:21
witness 6:1,2,11
  24:18 38:19 59:19
  93:17 117:15
  125:3 132:10
  141:14 144:15

184:18 187:10
  188:2,15 189:7,10
  193:7 197:22
  198:15,24 199:3
  200:10,12 203:1
  206:8
witnesses 147:3
word 180:9
wording 84:25
words 29:3 57:23
  62:12 118:9,14
  145:23 146:16,18
  176:9 177:16,19
  184:15
work 16:20 23:14
  27:20,25 98:16
  166:16 172:9
worked 19:2 27:22
  162:10 191:20
working 6:6 28:2
  46:13 145:1
works 37:1,14
  46:10 55:14 65:20
worried 25:3
  104:24
worse 21:4
worth 196:21
wouldn't 26:21
  121:17,17 147:1
wrapped 161:25
wrecked 19:13,24
writing 17:16
  167:12 172:10
  185:11
wrong 58:10 197:1
wrongdoing 91:22
wrote 63:10

              X
X 98:8,9,22 107:5,6
  181:25
X26 51:13 65:3
  152:2 161:21
  188:18 194:9

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                    September 22, 2015

Page 232

| Y | | | | |
|---|---|---|---|---|
| **yard** 87:6,22 88:12 90:11 | **1** 34:13 38:8 140:14 153:3 181:10,19 205:7,13 | **141** 4:18 | 17:8,10,12 64:11 77:21 80:14 81:19 | **24** 133:11 |
| **yards** 102:4 | **1,200** 64:13 | **1418** 141:10 | **2005** 197:12 | **241-6750** 3:24 200:25 |
| **yeah** 15:25 17:10 32:14 45:9 46:23 47:5 48:16 61:5 62:20 65:18 67:5 75:6 94:3 101:1,7 102:10 107:18 111:8,8 122:24 125:7 127:9 137:11 138:12 142:24 146:15,21 152:15,16 156:8 156:20 182:11 183:14,17 190:12 193:15,25 | **1:37** 188:9 | **143** 4:17 | **2010** 12:9,19,22 13:1,9 16:21,23 17:12 28:19 140:14 141:12 142:3,9,19 170:22 171:3 185:13 | **25** 107:3 |
| | **1:45** 188:12 | **144** 4:3 | | **29** 200:2 |
| | **1:52** 195:1 | **145** 43:18 | | |
| | **1:53** 195:4 | **1464** 192:21 | | **3** |
| | **1:54** 196:7 | **1483** 142:17 | | **3** 50:7,9,10 164:15 182:21 |
| | **1:55** 196:10 | **15** 4:12 71:19 93:18 93:21 | | **3-degree** 118:5 |
| | **1:56** 2:22 197:24 | **16** 4:13 93:18,21 | | **30** 100:15,16 107:3 200:14 |
| | **10** 27:1 42:4,7 49:12 52:1 54:9 54:18 162:23 | **17** 4:14 7:1 10:4 29:20 30:15 37:10 88:19 92:17,21 98:11,15,20 107:5 110:12 113:9 135:6 142:16 143:4 144:8 151:17 162:16 167:17 168:15 169:5 170:17 174:23 175:10,13 177:6 180:16 | **2011** 7:1 10:4,14,16 12:12,20 13:7,8 13:10,16 28:11 29:21 30:2,15 37:10 65:15 88:19 92:17,21 143:4,14 143:19,23 144:8 145:7 151:17 154:20 159:2,19 161:22 162:16 167:18 168:15 169:5 170:17 171:3 174:23 175:10,14 177:6 180:16 185:14 186:21 | **300** 3:23 |
| **year** 8:15 10:1 11:1 12:8,16,16 20:25 30:7,8 64:4 169:10,12 171:9 171:10 | **10:04** 24:14 | | | **30th** 32:21 |
| | **100** 2:20 3:18 5:3 198:12 200:4 205:10 | | | **31** 4:9 |
| | **1023** 40:3,3,5 | | | **314** 3:5,10,19,24 200:25 |
| | **11** 143:4 | | | **37** 8:7 |
| | **11:23** 94:17 | | | |
| | **11:37** 94:20 | | | **4** |
| **years** 8:24,25 10:20 18:4 45:18 74:6 80:5,10 197:11,13 | **12** 4:9 27:1 31:13 31:14,15 32:16 152:19,20,21 153:2,12,13,18,19 154:3,3,7,7,13,14 155:1,2 156:7,10 158:11 168:3 187:20 188:5 196:2,21 197:8 | **18** 4:15 134:3,3,4 134:11 135:15 137:13,25 169:5 | **2012** 172:12 | **4** 50:7,21 153:3 183:9,13 194:12 |
| | | **180** 4:19 | **2015** 1:20 2:21 5:2 198:14 199:11 200:2,6 | **4-inch** 194:18 196:17 |
| **yell** 50:19 184:19 | | **19** 4:16 31:21 79:14 135:15 139:24 140:3 | **202** 3:4 | **4:14-CV1443** 2:12 |
| **yelling** 100:10 106:15,17 184:17 | | **190** 28:13 | **21** 4:18 135:15 141:1,5 192:18 | **4:14-CV1447** 2:13 |
| | **12:27** 138:21 | **192** 4:4 | **210** 3:14 173:24 205:16 | **40** 171:10,10 194:12 |
| | **12:39** 138:24 | **195** 4:5 | | **400** 3:18 200:4 205:10 |
| **Z** | **13** 4:10 66:22,22,24 67:4 74:2 93:16 153:12,18 154:3,7 154:13 155:1 196:2,21 | **196** 4:6 | **211** 3:9 204:18 205:4 | **4050** 3:9 204:18 205:4 |
| **zone** 38:2 174:17 | | | **22** 1:20 4:19 5:2 19:20 135:13,15 180:21,25 181:9 181:14,19 182:1,6 182:8,17 200:6 | **421-5545** 3:19 |
| **zones** 37:23 | | **2** | | **44** 9:19 |
| **zoom** 98:7 | | **2** 43:10 182:12 | | **44-hour** 9:24 |
| **zoomed** 98:16,21 | | **20** 4:17 135:15 141:15 143:6,10 203:13 | | **45** 100:15,16 |
| | **132** 73:24 | **20/20** 55:1,4 | | **4600** 3:14 205:16 |
| **0** | **134** 4:15 | **2003** 8:17 16:12,13 16:19,23 | **22nd** 2:21 198:14 199:11 | **48** 8:23,24 171:10 |
| **0001** 31:21 | **139** 4:16 | **2004** 11:4 12:3,4,6 12:9,11 16:12 | **230** 28:10 | **48-hour** 171:10 |
| **00073** 67:3 | **14** 4:11 93:18,21,24 94:4,23,25 95:12 156:1,2 158:11 | | | **4th** 2:20 198:12 |
| **00091** 134:8 | | | | |
| **05** 17:8 | | | | **5** |
| **084.003465** 2:24 | | | | **5** 38:16 183:20,21 |
| | | | | **50,000** 65:4,17 123:3 132:3 138:2 |
| **1** | | | | |

Tina Moore, et al. v. Brian Kaminski, et al.

Brian Kaminski                                                    September 22, 2015

Page 233

| | | | | |
|---|---|---|---|---|
| **515** 3:23 5:13<br>   200:24 206:6<br>**53** 135:12,12<br>**531-7200** 3:15<br>**538** 42:25<br>**55** 194:7,20<br>**586** 46:14<br><br>**6**<br>**6** 4:2 63:8 135:12<br>   135:12 183:23,24<br>**6:00** 35:18<br>**6:15** 38:25<br>**6:30** 35:14<br>**6:45** 99:4<br>**6:46** 44:2 88:11<br>   99:4<br>**6:49** 35:5,6 38:10<br>   40:19<br>**6:50** 38:16 41:25<br>   42:3,15 43:4 44:4<br>   47:25<br>**6:53** 135:6<br>**6:53:17** 135:14<br>**6:53:22** 135:14<br>**60** 8:24<br>**621-2500** 3:10<br>**63101** 3:23 200:24<br>   204:19 205:5<br>   206:7<br>**63102** 2:21 3:10,19<br>   198:13 200:5<br>   205:11<br>**63117** 3:5<br>**64112** 205:17<br>**64112-3012** 3:14<br>**66** 4:10<br><br>**7**<br>**700** 206:6<br><br>**8**<br>**8** 42:2 52:1,25<br>   53:22 54:8,18<br>   118:4 162:23 | **8151** 3:4<br>**816** 3:15<br>**863-4114** 3:5<br><br>**9**<br>**9/17** 43:4 134:20<br>**9/17/11** 38:9 135:6<br>   135:12 139:3<br>**9/22/2015** 203:3<br>   204:13<br>**9:31** 2:22 5:2<br>**9:52** 24:11<br>**911** 34:23<br>**93** 4:11,12,13<br>**947** 134:17<br>**948** 135:5<br>**949** 135:11<br>**973** 2:23<br>**98** 4:14 | | | |