<div style="border:1px solid">EXHIBIT<br>**F**</div>

# Case: Tina Moore, et al. v. Brian Kaminski, et al.

4:14-CV1443 SNLJ

# Transcript of: William Ballard

**Date:** September 25, 2015

This transcript is printed on 100% recycled paper



515 Olive Street, Suite 300
St. Louis, MO  63101
(314) 241-6750
1-800-878-6750
Fax: (314) 241-5070
Email: schedule@goreperry.com
Internet: <<<www.goreperry.com>>>

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 1

TINA MOORE, Individually and

as Personal Representative of

the ESTATE OF JASON MOORE, DELORES

MOORE, and RENEE RODGERS, as Next

Friend for A.D.R., a Minor,


Plaintiffs,


VS.                    Cause Nos.  4:14-CV1443 SNLJ

                                   4:14-CV1447 SNLJ


BRIAN KAMINSKI, et al.,


Defendants.



VIDEOTAPED DEPOSITION OF WILLIAM BALLARD


September 25, 2015

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                                    Page 2

  1              IN THE UNITED STATES DISTRICT COURT

  2             FOR THE EASTERN DISTRICT OF MISSOURI

  3                     EASTERN DIVISION

  4

  5   TINA MOORE, Individually and

  6   as Personal Representative of

  7   the ESTATE OF JASON MOORE,

  8   DELORES MOORE, and RENEE RODGERS,

  9   as Next Friend for A.D.R., a Minor,

 10              Plaintiffs,

 11

 12   vs.                        Nos. 4:14-CV1443 SNLJ

 13                                    4:14-CV1447 SNLJ

 14

 15   BRIAN KAMINSKI, et al.,

 16              Defendants.

 17

 18

 19

 20      Videotaped Deposition of WILLIAM BALLARD, taken

 21   on behalf of the Plaintiffs, at the offices of

 22   Pitzer Snodgrass, PC, 100 South Fourth Street, Suite

 23   400, in the City of St. Louis, State of Missouri, on

 24   the 25th day of September, 2015, before Julie A.

 25   Bulard, CCR MO #835.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                                September 25, 2015

```
                                                        Page 3

 1   APPEARANCES OF COUNSEL:

 2

 3     FOR THE PLAINTIFFS:

 4        Mr. William T. Dowd

 5        Dowd & Dowd

 6        211 North Broadway, Suite 4050

 7        St. Louis, MO  63102

 8        (314) 621-2500

 9        bill@dowdlaw.net

10

11     FOR THE PLAINTIFFS:

12        Ms. Molly Westering

13        Baty, Holm & Numrich & Otto, PC

14        4600 Madison Ave., Suite 210

15        Kansas City, MO  64112-3012

16        (816) 531-7200

17        tjohnson@batyholm.com

18

19     FOR THE DEFENDANTS:

20        Ms. Ida Shafaie

21        Pitzer Snodgrass, P.C.

22        100 S. 4th Street, Suite 400

23        St. Louis, MO  63102

24        (314) 421-5545

25        shafaie@pspclaw.com
```

Case: 4:14-cv-01443-SNLJ   Doc. #:  64-5   Filed: 04/29/16   Page: 5 of 220 PageID #: 951

```
                                                        Page 4
  1    THE VIDEOGRAPHER:

  2       Mr. Timothy Perry

  3       Gore Perry Reporting & Video

  4       515 Olive Street, Suite 300

  5       St. Louis, MO  63101

  6       (314) 241-6750

  7

  8

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                              Page 5

  1                        INDEX

  2                                          PAGE

  3                     EXAMINATION

  4   QUESTIONS BY MR. DOWD                    7

  5   QUESTIONS BY MS. SHAFAIE               164

  6   QUESTIONS BY MR. DOWD                  173

  7                      EXHIBITS

  8   Plaintiff's Deposition Exhibit 12       42

  9   Plaintiff's Deposition Exhibit 19       62

 10   Plaintiff's Deposition Exhibit 20       62

 11   Plaintiff's Deposition Exhibit 22A      50

 12   Plaintiff's Deposition Exhibit 23      139

 13   Plaintiff's Deposition Exhibit 24      142

 14   Plaintiff's Deposition Exhibit 25      145

 15   Plaintiff's Deposition Exhibit 26      146

 16   Plaintiff's Deposition Exhibit 27      147

 17   Plaintiff's Deposition Exhibit 28      148

 18   Plaintiff's Deposition Exhibit 29      153

 19   Plaintiff's Deposition Exhibit 30      154

 20   Plaintiff's Deposition Exhibit 31      156

 21                     (Plaintiff's Exhibits 1-31 were

 22                      retained by the court reporter

 23                      and attached to transcript,

 24                      except for Exhibit 23 which was

 25                      retained by Mr. Dowd.)
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

```
                                                   Page 6
 1              VIDEOGRAPHER:  And we're on the record at
 2     9:30.  Today is September 25th, 2015.  We are at the
 3     Pitzer Snodgrass Law Firm at 100 South Fourth Street
 4     in St.~Louis, Missouri.  This is the deposition of
 5     Lieutenant William Ballard being taken in the cause
 6     of Tina Moore, et al., versus Brian Kaminski, et al.
 7     pending in the United States District Court for the
 8     Eastern District of Missouri, Eastern Division.
 9              My name is Tim Perry, Certified Legal
10     Video Specialist, here today with Julie Bulard, our
11     Certified Court Reporter.  We're with Gore Perry
12     Reporting & Video at 515 Olive Street in St.~Louis,
13     Missouri.  Counsel, would you identify yourselves
14     for the record, please?
15              MR. DOWD:  My name is Bill Dowd.  I'm here
16     for Tina Moore.
17              MS. WESTERING:  Molly Westering for
18     Delores Moore and Renee Rodgers.
19              MS. SHAFAIE:  Ida Shafaie for Defendants.
20              VIDEOGRAPHER:  Thank you all.  Julie,
21     please swear in the witness.
22                   WILLIAM BALLARD,
23     of lawful age, having been first duly sworn to
24     testify the truth, the whole truth, and nothing but
25     the truth in the case aforesaid, deposes and says in
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 7

1   reply to oral interrogatories propounded as follows,
2   to-wit:
3                      EXAMINATION
4   QUESTIONS BY MR. DOWD:
5      **Q**   Good morning, Lieutenant.  My name is Bill
6   Dowd.  We just met this morning.  And as you know, I
7   represent Tina Moore, the widow of Jason Moore.  I'm
8   going to be asking you some questions today about
9   the incident and your knowledge of the incident and
10  your involvement.  Do you understand that's why
11  you're here?
12     **A**   Yes, sir.
13     **Q**   Would you go ahead and tell the jury your
14  name, please?
15     **A**   William Ballard.
16     **Q**   And how old a man are you?
17     **A**   I am 61 years old.
18     **Q**   Okay.  Can you tell us a bit about your
19  educational background?
20     **A**   I have a high school education.  I spent
21  14 years in the marines, various military schools.
22  I was a drill instructor at Parris Island for three
23  years.  I've been to the St. Charles County Police
24  Academy, and then I've had various continuing
25  education related to the police work.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 8

1        **Q**    Okay.  When is the first time you were

2    sworn in as a peace officer?

3        **A**    February or March of 1989.

4        **Q**    Have you been deposed before in your

5    official capacity as a police --

6        **A**    Yes, I have.

7        **Q**    Okay.  About how many times, sir?

8        **A**    Once that I can recall.

9        **Q**    Okay.  And was that while you were working

10   for the City of Ferguson?

11       **A**    Yes.

12       **Q**    Do you remember what that case was about?

13       **A**    It was a case involving a prisoner in the

14   jail.

15       **Q**    Was that the case against Officer White?

16   Was he a -- was he a defendant in that case?

17       **A**    Yes.

18       **Q**    Okay.  That case is still pending to your

19   knowledge?

20       **A**    I don't know.

21       **Q**    Okay.  You were deposed in that case?

22       **A**    Yes, sir, I was.

23       **Q**    Okay.  About how long ago was that?

24       **A**    Maybe a year or so.  I'm not sure.

25       **Q**    The same attorneys were present on your

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                                September 25, 2015

Page 9

 1    behalf at that deposition?  I mean, attorneys from
 2    this firm, I mean?
 3        **A**    Correct.
 4        **Q**    So you may know what I'm about to tell
 5    you, but I just want to make it clear for the
 6    record.  I'm going to ask you a series of questions.
 7    Obviously we have a videographer and a court
 8    reporter here.  It's very important that we get your
 9    answers down clearly and correctly.  The best way to
10    do that is for you to answer out loud, yes or no, if
11    appropriate.  As we go along, we may understand, you
12    and I, what we're saying and we may say uh-huh and
13    uh-uh, about obviously we don't want the court
14    reporter to have to translate that or have a judge
15    or a juror to have to translate that later.  You
16    understand that?
17        **A**    I do understand.
18        **Q**    Okay.  Further, if there's any time that
19    my questions are unclear, I'm obviously not a member
20    of your profession or have the experience you do, I
21    may use some of your terms of art inaccurately.  So
22    if sometime you don't understand my question, I want
23    you to tell me so and I'll try to rephrase it and
24    make it more clear.  Do you understand that?
25        **A**    Yes, sir.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 10

```
 1        Q     Okay.  And if we -- if you answer my
 2    questions, we're going to understand and agree for
 3    the record that you did understand it as asked.  Is
 4    that fair enough?
 5        A     Yes, sir.
 6        Q     Okay.  Can you tell us what you've
 7    reviewed prior to your deposition today regarding
 8    the Moore incident?
 9        A     I have reviewed the police report, the use
10    of force report, the taser report, and I reviewed
11    the use of force policy and the taser policy.
12        Q     Anything else?
13        A     No.
14        Q     Other than your attorneys, who have you
15    spoken to about your deposition today?
16        A     Just to let the department know that I
17    would be here and not at Ferguson.
18        Q     Okay.  No substantive discussions with
19    Officer White or Kaminski or any of the -- either
20    the former Chief Jackson or Officer Bebe, anybody
21    like that?
22        A     No.
23        Q     Now, through your career, you've had
24    firearm training, I assume?
25        A     Yes, sir, I have.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 11

```
 1        Q     And firearm training is designed to make
 2   you proficient if you had to use your weapon to be
 3   accurate, correct?
 4        A     Yes, sir.
 5        Q     And it's -- you go through annual training
 6   for that, I understand, is that correct, all
 7   officers at the Ferguson Police Department?
 8        A     Yes, sir, a minimum of annually.
 9        Q     Okay.  And what is the purpose of having
10   annual training for firearms?
11        A     Just to keep your skills up to speed where
12   you need to be.
13        Q     Okay.
14        A     We try at Ferguson to do it a minimum of
15   twice a year.  And depending on the budget and the
16   ammunition, sometimes as much as three and four
17   times a year.
18        Q     Okay.  And the skills include techniques
19   and the decision-making process?
20              MS. SHAFAIE:  Object to form.  You may
21   answer.  You may answer.
22        Q     (By Mr. Dowd) Do you understand the
23   question?
24        A     Yes.  I'm not really sure if -- about the
25   decision-making.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

                                                              Page 12

1        **Q**    Okay.

2        **A**    But it's more proficiency.

3        **Q**    Okay.  So one of the things I understand

4    is that general firearms training includes that if

5    you're going to pull your weapon, don't pull it

6    unless you're going to use it, correct?

7        **A**    Yes, sir.  If you're going to pull a

8    weapon then there's a reason for you to pull that

9    weapon.

10       **Q**    Right.  And in general, if you're going to

11   fire your weapon at an aggressive or armed suspect

12   you're going to aim for center body mass?

13       **A**    That is correct.

14       **Q**    All right.  And center body mass would

15   include slightly below your microphone today?

16       **A**    Yes, sir.

17       **Q**    Okay.  And the reason that the training on

18   that proficiency is done is so that the officers

19   have muscle memory as to -- in the pressure of the

20   situation to react and aim at center body mass,

21   correct?

22       **A**    That is correct.

23       **Q**    Do the officers at Ferguson when they go

24   through the POST training, do they have deescalation

25   training?

Case: 4:14-cv-01443-SNLJ   Doc. #:  64-5   Filed: 04/29/16   Page: 14 of 220 PageID #: 960

1      **A**     We have just started doing that within the
2   last six months or so.

3      **Q**     When you went through the academy in St.
4   Charles, did you have deescalation training there?

5      **A**     No, sir.

6      **Q**     Could you tell the jury what your
7   understanding of deescalation training is?

8      **A**     Different techniques of how to approach a
9   situation and possibly peacefully resolve it, I
10  suppose, without the use of force.  You know, the
11  way you present yourself, the way you speak with
12  people.

13     **Q**     Okay.  Can you give us some examples with
14  regard to -- one of the force continuums is
15  obviously just officer presence, right?

16     **A**     That's correct.

17     **Q**     And what is officer presence designed to
18  do in a disruptive situation?

19     **A**     Just to show that a person of authority is
20  now on scene and going to take charge of the
21  situation.

22     **Q**     Okay, all right.  And are deescalation
23  techniques to be used as sort of the next use of
24  force tool if the circumstances allow?

25     **A**     Yes, sir.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 14

1     **Q**    Okay.  Can you give us some examples where
2  deescalation training is to be used most commonly?
3     **A**    Most commonly it would probably be used in
4  a disturbance type situation or, say, approaching a
5  pedestrian on the street, you know, a call for a
6  suspicious person or whatever.  Instead of looking
7  so abrupt and, you know, everything else, you want
8  to approach that person in more I guess of a
9  friendlier subdued manner.  You don't want to come
10 off as being too hard-nosed about it.
11    **Q**    Okay.  So more of a calming effect?
12    **A**    Correct.
13    **Q**    Can you tell us about your taser training,
14 if any?
15    **A**    Right after we first got the tasers -- and
16 please forgive me, I don't remember when that was.
17    **Q**    Sometimes in 2010, middle of 2010.
18    **A**    Okay.  Each officer was required if you
19 were going to carry the taser to have the initial
20 taser training, and then after that, a minimum of
21 annual training to recertify with your taser.
22    **Q**    How about you personally, sir?
23    **A**    Yes, sir, I took the initial training.
24 And I believe it was in January or February, again,
25 forgive me, I recertified again.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

Page 15

1       **Q**     Okay.  January of this year you

2    recertified?

3       **A**     I believe it was.

4       **Q**     Okay.  What about what's referred to as

5    CIT training, or crisis intervention team training?

6       **A**     We have officers who are CIT trained.  And

7    we're -- our goal is to have everyone in the

8    department CIT trained.  However, the problem lies

9    in the fact that the only place to get that training

10   is the St. Louis County Police Academy.  And they

11   usually run, I would say, semiannual classes.  And

12   again, the problem with that is that we have, you

13   know, in excess of 50 officers in our department.

14   You also have 92 municipalities.  If I'm off one or

15   two, I'm sorry.

16      **Q**     Yeah.

17      **A**     They may only have 50 seats for that CIT

18   class.

19      **Q**     Understood.

20      **A**     So we send whoever we can if a seat's

21   available.

22      **Q**     How long have you been with the Ferguson

23   department again, please?

24      **A**     26 years.

25      **Q**     Okay.  And when did the department begin

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 16

1    sending people to the academy for CIT training?

2         **A**    It was soon after the program was

3    instituted, maybe within two years after they first

4    started teaching CIT.

5         **Q**    Okay.  And approximately when was that?

6         **A**    I couldn't begin to guess.  Maybe --

7         **Q**    I don't want you to guess either, but

8    would it -- is it something as far back as 2000 or

9    2010 or, you know, can you give us just a range,

10   please?

11        **A**    I would have to say prior to 2010.  Maybe

12   2008.  But again, I'm not really sure.

13        **Q**    No, that's fine.

14        **A**    I'd just be speculating.

15        **Q**    I appreciate that.  Do you know if Officer

16   White or Officer Kaminski had CIT training in

17   September of 2011?

18        **A**    No, sir, I don't.

19        **Q**    What is the purpose, to your

20   understanding -- excuse me.  Have you had CIT

21   training yourself?

22        **A**    No, sir, I haven't.

23        **Q**    As -- are you one of the command officers

24   who's trying to get these field officers to get

25   their CIT training as soon as possible?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                September 25, 2015

1      **A**    Yes, sir.  We try and -- well, I'm part of
2   the process.  I don't have the ultimate say in who
3   goes, but I do submit names.  You know, I go with my
4   sergeants and say who's up next, and we send --
5      **Q**    Why is it important, in your opinion to
6   get the field officers trained in CIT training,
7   crisis intervention training?
8      **A**    Probably because most of the contacts that
9   we have have some sort of mental issue going on with
10  them.  It's -- again, we're back to the deescalation
11  also.  People are upset either through circumstances
12  or possibly some sort of, you know, mental defect at
13  the time or a disease.  The CIT training, as I
14  understand it, helps these officers recognize that
15  and gives them different tools to help that person
16  or, you know, not to escalate the problem if you can
17  help from doing that.
18     **Q**    Understood.  With regard to -- tell me
19  your involvement -- let's say since 2005, you were a
20  lieutenant at that time in Ferguson?
21     **A**    2005 --
22     **Q**    Why don't I withdraw the question.  We can
23  do it this way.  It might be easier for you and --
24     **A**    I was a sergeant, I believe, in 2005.
25     **Q**    Okay.  Would you just tell us -- I think

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

Page 18

```
 1   you said you have been in Ferguson 26 years?

 2       A    Yes, sir.

 3       Q    Can you tell us -- you started as a field

 4   officer, patrolman?

 5       A    Yes, sir.

 6       Q    And tell us when you were promoted to

 7   sergeant, if that was your next rank.

 8       A    I would have been promoted somewhere

 9   around 2000 maybe.

10       Q    Okay.

11       A    Something like that.  I'm not exactly

12   sure.

13       Q    That's okay.  Just -- close is good enough

14   for these dates.  And then how long were you a

15   sergeant before you were promoted to lieutenant?

16       A    I was promoted in 2008 or 2009.

17       Q    Okay.  So what is your involvement as a

18   lieutenant since you were promoted to that position

19   in 2008 or 2009 approximately with regard to

20   supervising the force in general as far as complying

21   with policies of the police department?

22       A    As a lieutenant?

23       Q    Yes, sir.

24       A    As a lieutenant, I'm watch commander or

25   platoon commander and I am in charge of --
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 19

1    ultimately in charge of two squads of eight men and

2    two sergeants.  And I do payroll, approve reports,

3    and answer calls on the street and fill in for the

4    sergeants on their days off or vacations, that sort

5    of thing.

6        Q    Are there any regular meetings with the

7    other commanders with regard to how the force is

8    doing with regard to complying with your policies,

9    the Ferguson policies and procedures?  I think they

10   are called general orders.

11       A    We have a weekly or -- we try to have it

12   weekly, staff meeting.  Sometimes, though, depending

13   on, you know, what happens, we may only have one

14   staff meeting a month.

15       Q    Okay.  And who's present at the staff

16   meetings?

17       A    Oh, that would be usually the chief of

18   police, the three captains -- well, at that time

19   there would have been three.  There's only two

20   captains now.  The sergeants and the lieutenants.

21       Q    How many sergeants are there

22   approximately?

23       A    I believe there are five.

24       Q    And that would have been about the same in

25   September of 2011?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 20

1       **A**     Yes.

2       **Q**     And who did you say besides sergeants that
3    would be there?  So I've got --

4       **A**     Oh, no, there would only have been four in
5    2011, I'm sorry.

6       **Q**     Okay, thank you.  So chief, two to three
7    captains, and then -- in 2011 it would have been
8    four sergeants.  Anyone else that would be at those
9    staff meetings?

10      **A**     In 2011, the sergeants and the lieutenants
11   very rarely went to the staff meetings.

12      **Q**     Okay.

13      **A**     It was mostly the captains and the chief.

14      **Q**     And about when did that change?

15      **A**     I would say within the last two years.
16   They now have it to where the lieutenants and the
17   sergeants are invited to the meetings.

18      **Q**     Excuse me.  Why was that change made?

19      **A**     The -- I guess ultimately the chief and
20   whomever decided that they needed to have
21   lieutenants and the sergeants there.  Because I know
22   myself and Lieutenant Rettke, we had always asked if
23   we could -- you know, can we come to the staff
24   meetings, but we would never get the invite or
25   whatever.

Gore Perry Reporting and Video
FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 21

1      **Q**    Yeah.

2      **A**    They told us, well, you guys are working

3    midnights and we don't want to bother you and that

4    sort of thing.

5      **Q**    So what -- do you know what was discussed

6    in those meetings prior to the lieutenants and

7    sergeants joining the staff meetings?

8           MS. SHAFAIE:  Object to foundation.  You

9    may answer.

10     **A**    No, I have no idea.

11     **Q**    (By Mr. Dowd) Okay.  Just in general

12   terms.  I'm not going to ask you any specific

13   reviews or anything.  But what was the -- if you

14   know what the agenda was by most general terms.

15     **A**    I have no idea what the agenda would have

16   been unless it directly related to patrol such as

17   scheduling for a 4th of July event, some sort of

18   thing like that.  Other than that, no, I have no

19   idea what they talked about.

20     **Q**    Okay.  So I think you said in the last

21   two -- approximately last two years you have been

22   attending the staff meetings?

23     **A**    Yes.

24     **Q**    And tell us what are discussed generally

25   at those meetings.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                      September 25, 2015

Page  22

 1      **A**     Community problem solving.  We're in the
 2  process of revamping or looking at all of the
 3  general orders.  There's over a hundred of them.
 4  We're looking at those to see what needed to be
 5  changed or that sort of thing.  Personnel transfers
 6  to cover shortages.
 7      **Q**     Anything else?
 8      **A**     Additional training, any training classes
 9  that may be available, or the chief will ask us to
10  see if we can find training for something.
11      **Q**     Okay.  Is there -- is there -- I know
12  there's a phrase in-house training that we've heard
13  in these depositions.  Is there a room at the police
14  department and are there classes given --
15      **A**     Our -- yes, our in-house training would
16  have been conducted in the roll call or muster room,
17  except for firearms which is conducted on the range.
18      **Q**     And what kind of training occurs in the
19  muster room?
20      **A**     Well, all sorts of things.  Just recently
21  we've had training in deescalation.  We've had
22  training in community policing models, different
23  types of them.  We'll have training on
24  investigations.
25      **Q**     Like investigation techniques and the

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 23

1    proper way to do it?

2        **A**    Correct.

3        **Q**    Okay.  Anything else you can recall?

4        **A**    Evidence procedures.  Nothing else comes

5    to mind or doesn't jump out at me.

6        **Q**    Okay.  Can you tell us what -- you

7    mentioned deescalation being something that's come

8    about recently or relatively recently.  Do you

9    recall in 2011 the kinds of things that were

10   discussed, or I should say covered in the training

11   sessions at the department?  For example, were

12   community policing models and evidence procedures

13   things that were covered in those trainings back

14   then?

15       **A**    Just the best practices for the evidence

16   and, you know, any supreme court updates, rulings,

17   pertaining to that.  Deescalation, I don't believe

18   we had any type of deescalation at that time.

19       **Q**    Where are the documents kept of the

20   training currently, and if you know, back to 2011,

21   2010 timeframe.

22       **A**    I have no idea.

23       **Q**    Okay.

24       **A**    I just -- we send them upstairs.  And

25   where they go from there, we -- I have no clue.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                          Page 24
  1       Q    Okay.  When you say upstairs, is there
  2    somebody generally --
  3       A    My office is down in the basement.
  4       Q    Understood.  After all these years?  So if
  5    you had to pick up a phone now and say I want to get
  6    those materials, who would be the first call you'd
  7    make?
  8       A    Right now it would be Detective Rick Fenn.
  9    He and Sergeant Allen are the two, I believe, that
 10    are doing that.
 11       Q    Okay.  And what kind of documents would
 12    you expect them to have?  Written materials covering
 13    these subjects would be one?
 14       A    No.  I think mostly what they have -- what
 15    we turn in to them is just our certificates of
 16    completion.
 17       Q    Okay.
 18       A    If we go to St. Louis County they always
 19    give out a -- you know, because we have to have our
 20    continuing education units to stay certified as
 21    police officers.  So we keep those on file for three
 22    years during the reporting period because we have to
 23    have a minimum of 48 hours.
 24       Q    Okay.  And what about the materials that
 25    may have been used at the training session?
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 25

1      **A**    I have no idea where those would be.

2      **Q**    Okay.  Were there -- to your recollection,

3  were there materials at the training sessions,

4  handouts, things like that?

5      **A**    There were some handouts, especially

6  pertaining to constitutional laws, search and

7  seizure, that sort of thing.  Evidence was

8  usually -- they would just -- you know, each person

9  would have the evidence log, a blank one, and then

10  we'd just go through and they'd talk about how to do

11  it and the chain of custody, that sort of thing.

12      **Q**    Okay.  What about any testing on the

13  training in-house in the muster room?  After -- you

14  know, was there any regular testing where the things

15  that are covered -- did you say you -- they did that

16  how many times a month?

17      **A**    On the training?

18      **Q**    Or year?  Yes, sir.  I forgot.

19      **A**    It just depended.  It was -- it was

20  nothing that was set in stone that, you know, today

21  is training day or anything.

22      **Q**    Okay.  Do you have an estimate of --

23  every -- some officers are going to be on the street

24  so you can't -- you've got to have it multiple times

25  to get everybody the constitutional or evidence

Case: 4:14-cv-01443-SNLJ   Doc. #:  64-5   Filed: 04/29/16   Page: 27 of 220 PageID #: 973

Page 26

1    training?

2          **A**     Correct.

3          **Q**     Yeah.  So can you give us a general idea

4    about how much -- how often you would have expected

5    each officer to have received the in-service

6    training per year?

7          **A**     I couldn't guess on that.

8          **Q**     Okay.  Who would -- who would know best

9    about that, you think, at the department?

10         **A**     That would probably be Sergeant Allen or

11   possibly Lieutenant Nabdzyk.  Would you like me to

12   spell that for you?

13         **Q**     Yes, please.  For her too.

14         **A**     N-a-b-d-z-y-k.

15         **Q**     So are there just two lieutenants at the

16   Ferguson Police Department right now?

17         **A**     Currently there are three, Lieutenant

18   Nabdzyk, Lieutenant Rettke and myself.

19         **Q**     Do you want to spell Rettke for her?  I

20   think I've seen it, but --

21         **A**     That would be R-e-t-t-k-e.

22         **Q**     So to your knowledge, as you sit here

23   today, you're not aware of any testing on the

24   in-house training at the physical location of the

25   Ferguson Police Department?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 27

1        **A**     In regards to any training?

2        **Q**     Any of these issues we've been talking

3    about, yes.

4        **A**     Anything that we've been certified on

5    there's always a written test.  The taser, firearms

6    when we had our transitional training on -- from

7    Glock to the Sig Sauer pistol.  There were written

8    tests on all of that.

9        **Q**     Okay.  And that's -- I understand most of

10   that was done outside the Ferguson Police

11   Department, the physical facilities, right?  You

12   would -- off-site, so to speak?

13       **A**     For --

14       **Q**     For the weapons training and the taser

15   training.

16       **A**     No.  We have a range at Ferguson Police

17   Department.

18       **Q**     Okay.  You just don't do it in the muster

19   room is what you were saying earlier?

20       **A**     Correct.

21       **Q**     Understood.  Where are the results of

22   those tests kept?

23       **A**     I would have to defer to one of those --

24       **Q**     Sergeant Allen or --

25       **A**     -- individuals.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                             Page  28

 1      Q    Okay.  On the in-house training.  I just

 2   want to make sure I understand this.  On the

 3   in-house training on community policy modules or

 4   evidence procedures or the supreme court rulings on

 5   constitutional rights and use of force, etcetera,

 6   are you aware that those officers at the end of that

 7   training or on some kind of regular basis would be

 8   given a test?

 9      A    No.  They usually weren't.

10      Q    And why was that, if you know?

11      A    I don't know.

12      Q    Okay.

13      A    Now, if you go to St. Louis County Police

14   Department --

15      Q    Uh-huh.

16      A    -- to their training courses, they -- on

17   some of their courses they will have a test.  But as

18   far as the constitutional -- you know, there's

19   nothing on every training course that you have

20   that's a written test.

21      Q    And St. Louis County Academy and the St.

22   Louis County Police Department, they don't train

23   your officers on the Ferguson general orders, do

24   they?

25      A    No, not on Ferguson general orders.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                        Page 29

 1       **Q**     That's the responsibility of the Ferguson

 2   Police Department?

 3       **A**     The Ferguson Police Department.

 4       **Q**     Okay.  And what kind of monthly or annual

 5   training do the officers have on the policies, the

 6   general orders of the department?

 7       **A**     Once an order is issued, it goes into the

 8   computer system which each officer has access to.

 9   When they read that policy, they electronically sign

10   that they acknowledge they've read and understand

11   the policy.  Any additions to that are also done the

12   same way.

13       **Q**     Okay.

14       **A**     Myself and Lieutenant Rettke and our

15   sergeants will bring up short subjects at roll call.

16   And, you know, it could be something as simple as,

17   you know, don't -- you know, this is what you have

18   to do to package DNA.  Don't forget to sign this

19   sheet, you know, that sort of thing.

20       **Q**     Reminders?

21       **A**     Right.

22       **Q**     Okay.

23       **A**     So it's an ongoing process.  But formally,

24   there's nothing that --

25       **Q**     Okay.  So there's no formal requirements

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 30

1    that they review them on a regular basis and there's

2    no testing on them.  Is that -- do I understand that

3    correctly?

4        **A**    Yes.

5        **Q**    Okay.  You said that they -- when a new

6    order is issued or a previous order is modified,

7    they have to go on and read it and acknowledge on

8    the computer, correct?

9        **A**    Correct.

10        **Q**    When is the next time that they are

11    required to do that per policies and procedures and

12    general orders of the Ferguson Police Department?

13        **A**    It should be immediately.  When they log

14    on to their computer, they're required by policy to

15    check what's called Deskbook.  It's just a -- I

16    don't know, a folder or whatever inside the computer

17    program that tells you any neighborhood problems,

18    etcetera, etcetera.  And it's done on a daily basis.

19        **Q**    Okay.

20        **A**    Any new policies or procedures or anything

21    like that goes into Deskbook.  So the officer, as

22    soon as he signs in, if he checks Deskbook, knows to

23    go in and check that policy.

24        **Q**    Is there someone who checks to make sure

25    the officers regularly check their Deskbook before

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                          Page 31
 1   their --

 2      A    Captain Henke used to do that, but he's

 3   retired.  I don't know if anyone's doing it now or

 4   not.

 5      Q    You think he was the one likely doing it

 6   in the 2011 time frame?

 7      A    Probably so because he was in charge --

 8   again, I can't speak for the entire department.

 9      Q    Yeah.

10      A    Just the patrol division.  But he was the

11   patrol division commander.  And I know that he would

12   send, you know, the list down, these officers need

13   to get on here and, you know, acknowledge or read

14   the policies.

15      Q    All right.  So I understand from your

16   prior testimony that there may be as many as a

17   hundred general orders, policies?

18      A    There's at least a hundred.

19      Q    Okay.  And it's further my understanding

20   that the only time the officers acknowledge having

21   reviewed a policy is when it's new or modified,

22   correct, as far as acknowledging it on their

23   computer on their Deskbook?

24      A    Correct.  They are not required to go back

25   through once it's signed off on.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                         September 25, 2015

```
                                                    Page  32
   1        Q     Do you know what types of statistics, if
   2   any, the department uses to analyze the
   3   effectiveness of their policies and procedures and
   4   the training on those?
   5        A     No, sir, I don't.
   6        Q     Are you aware of any kind of analysis that
   7   the department was going through in 2010 or 2011 to
   8   determine if the officers were complying with the
   9   policies and procedures and general orders of the
  10   Ferguson Police Department?
  11        A     No, sir, I don't.
  12        Q     How does the department measure its
  13   success as far as communicating the policies and
  14   procedures and the training on an ongoing basis?
  15              MS. SHAFAIE:  Object to foundation.  You
  16   may answer.
  17        A    I don't know because I'm not involved in
  18   any of that portion.  I'm involved in the day-to-day
  19   patrol operations.
  20        Q    (By Mr. Dowd) Who --
  21        A    That's --
  22        Q    Sorry to cut you off.
  23        A    No, that's quite all right.
  24        Q    Who in 2011 would have been involved in
  25   that?
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

                                                                Page 33

 1        **A**     That would probably -- and I'm guessing

 2    again because --

 3        **Q**     Your best --

 4        **A**     My best guess would be Captain Henke or

 5    possibly Lieutenant Nabdzyk.

 6        **Q**     You were on duty on September 17th, 2011,

 7    I understand?

 8        **A**     Yes, sir.

 9        **Q**     And you were a lieutenant at that time to

10    your belief?

11        **A**     I believe so.

12        **Q**     Okay.  And if you were there on a Saturday

13    morning, would that -- safe to say you were covering

14    for a sergeant on that shift?

15        **A**     Well, my days rotate.  So even if a

16    sergeant is working, I may be working any day.

17        **Q**     Okay.

18        **A**     But that day, I believe the sergeant was

19    off because there was no sergeant working.  I don't

20    know if he was off or if I was -- if they had -- I

21    don't -- I don't remember the circumstances.  I just

22    know I was the only supervisor on.

23        **Q**     That was going to be my next question.  So

24    can you tell us when that shift would have started

25    for -- I assume your shift is the same as the patrol

Case: 4:14-cv-01443-SNLJ   Doc. #:  64-5   Filed: 04/29/16   Page: 35 of 220 PageID #: 981

Page 34

1   officers, Bebe and the rest?

2        **A**    Yes.

3        **Q**    And approximately what time would that

4   shift have started?

5        **A**    That would have started at 6:30 a.m.

6        **Q**    Okay.  So at the very beginning of that

7   Saturday morning shift?

8        **A**    Correct.

9        **Q**    And can you tell us anything that had

10  happened prior to this incident, this call that you

11  recall that day?

12       **A**    No.  We were in roll call and received the

13  call.

14       **Q**    Okay.  While you were still in the

15  station, the muster room?

16       **A**    Correct.

17       **Q**    Okay.  And what was the first thing you

18  heard about the call?

19       **A**    A naked man running out into traffic on

20  Airport Road.

21       **Q**    Okay.  And were you in the muster room

22  with Officer Kaminski, White and Bebe?

23       **A**    Yes.

24       **Q**    Okay.  And did the meeting break up upon

25  that call?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                     September 25, 2015

Page 35

1        **A**     Yes.

2        **Q**     Okay.  And everyone went to their

3    respective patrol cars?

4        **A**     Correct, everyone went and loaded their

5    patrol call and --

6        **Q**     Okay.  And tell us what you mean by

7    loaded.

8        **A**     They put in their work bags, their

9    paperwork.  You know, you make sure your lights and

10   siren work and just make sure you have all your

11   equipment that you're going to need for the day.

12   That's what we call loading the car.

13       **Q**     Okay.  Is the car previously looked over

14   by somebody from the functional stability of the

15   automobile, make sure it's got gas and all that

16   stuff in it?  When you start a shift, is the car

17   ready to go?

18       **A**     Yes.  The officer who used the vehicle

19   prior to you should have taken it to gas it or

20   whatever, that may not happen because he could be

21   delayed for whatever reason or he just could, you

22   know, not do it.

23       **Q**     Okay.  Anything else that you would have

24   done or the patrol officers would have done at the

25   station prior to leaving to go look for Jason Moore?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                                    Page 36
  1        A     Not to my knowledge.

  2        Q     Can you tell us approximately how much

  3   time passed from the time you got that call when you

  4   were present with the other officers in the muster

  5   room until you arrived at the scene?

  6        A     I'm -- again, I -- without looking, I'd

  7   have to say 15 minutes.

  8        Q     Okay.  Can you tell us approximately how

  9   much time passed from the time you heard the call in

 10   the muster room until you heard over your radio, if

 11   you did, that Officer Kaminski was on the scene?

 12        A     I don't recall exactly how much time that

 13   would have been.

 14        Q     Okay.  Do you have a sense of how long he

 15   was on the scene prior to your arrival?

 16        A     Probably -- again, I'm going to guess,

 17   maybe three, four minutes.

 18        Q     And what else, if anything, did you learn

 19   about the gentleman you learned later was Jason

 20   Moore between the time you heard the call when you

 21   were with the other officers at the station and you

 22   arrived at the scene?

 23        A     What did I hear --

 24        Q     Yes.

 25        A     -- about him?
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 37

```
 1       Q     Yes.

 2       A     That he had been seen at several

 3  locations.  Originally I believe it was in front of

 4  Poyeye's Chicken or something on Airport Road.  Then

 5  I went through there.  There was no one there.  Then

 6  I hear on the radio that he had been seen up, you

 7  know, another two or three blocks up.  I go there.

 8  There's nobody there.  So myself and the other

 9  officers start fanning out in circles trying to find

10  Mr. Moore.

11       Q     Okay.

12       A     Then on the radio I heard that Officer

13  Kaminski had found him and --

14       Q     Had the radio dispatch reports that you

15  were hearing about his moving location, were those

16  simultaneously likely heard by Officers Kaminski and

17  White?

18       A     Possibly.  It came across the radio.

19       Q     The dispatch?

20       A     To the best of my recollection it came

21  through dispatch, yes.

22       Q     So it's going to everybody that's active

23  in the field?

24       A     Correct.

25       Q     Was there any mention he was running?
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                              Page 38

 1        A    Yes.

 2        Q    Okay.  And so that was known prior to?

 3        A    Yes.

 4        Q    -- officer Kaminski --

 5        A    He was running naked through traffic

 6   and --

 7        Q    So what was the first thing you saw when

 8   you arrived at the scene of Airport and -- is it

 9   Henquin?  Is that how you all pronounce it?

10        A    Yes, Henquin.  As I pulled up onto the

11   scene, Officer Kaminski was there, Officer White was

12   there.  Mr. Moore was in custody.  You'll have to

13   forgive me.  I don't remember if Officer Bebe was

14   there at that time or not.  And as I approached,

15   asked what happened, Officer Kaminski started

16   telling me, and then it was determined that

17   Mr. Moore had stopped breathing.

18        Q    What position was Mr. Moore in when you

19   say he was in custody as you approached the scene

20   and got out of your car?

21        A    Again, to the best of my recollection, I

22   would say he was probably handcuffed and laying on

23   the street prone, facedown.

24        Q    Okay.  On his stomach?

25        A    On his stomach.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                   September 25, 2015

```
                                              Page  39

  1        Q     And chest?  Do you recall if you could see

  2    his face?  Was his face turned towards you or away

  3    from you?

  4        A     His face was turned towards me and he was

  5    sort of growling and --

  6        Q     Groaning?

  7        A     No.  It was more of a -- like a growling.

  8    It's kind of hard to explain.

  9        Q     Like a guttural breathing?

 10        A     I suppose you could say that.  But to me,

 11    it sounded more like a growl like, you know, he

 12    was -- and Officer White and Officer Kaminski were

 13    standing there.  Officer White -- to me, it looked

 14    like Mr. Moore was going to try and get up again

 15    because I think, if I recall correctly, Officer

 16    White said something like, just stay there, don't --

 17    it's over, don't get up, something like that.

 18        Q     So you think it was shortly after he had

 19    been handcuffed?

 20        A     I don't know how long he had been

 21    handcuffed.

 22        Q     Okay.  Did you -- when you were

 23    approaching the scene, were Mr. Moore's eyes open?

 24        A     Yes.

 25        Q     Did you notice any bruising or scrapes on
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                              Page  40
 1   his face?

 2       A    Yes.  It looked like he had probably

 3   scraped his face on the pavement because he kept

 4   raising his face up and down off -- you know, and

 5   turning his head side-to-side.

 6       Q    Okay.  And you don't know how much time

 7   had passed from the cessation of the tasing until

 8   you got there.  Is that correct?

 9       A    That's correct.

10       Q    Did -- have you -- you were Officer

11   Kaminski's supervisor that day, correct?

12       A    Yes, sir.

13       Q    And who was his sergeant at that time, if

14   there was a particular sergeant?

15       A    I don't know, to be honest with you.  I

16   don't remember who the sergeant would have been.

17       Q    To your knowledge, in 2011, did Officer

18   Kaminski have any kind of abnormal allergic reaction

19   to pepper spray?

20       A    Yes.  Officer Kaminski does not tolerate

21   OC spray.  He let me know about it after an incident

22   where we had taken old OC canisters and we were

23   getting rid of them in the dump -- spraying them in

24   the dumpster to, you know, dispose of it.  And he --

25   he does not tolerate OC spray.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 41

```
 1      Q     I mean, nobody tolerates it well, but
 2   you're saying --
 3      A     No, but he's exceptionally -- you know,
 4   his eyes swell up and -- you know, so he made sure
 5   he told pretty much everybody that worked with him,
 6   you know, don't spray that stuff because I can't --
 7      Q     So approximately when did that occur, the
 8   dumpster cleaning of the OC sprays?
 9      A     Oh, that was probably months prior.  I
10   don't know exactly.
11      Q     Months prior to September --
12      A     The incident that you're --
13      Q     Okay.
14      A     -- speaking of?  I thought we were still
15   talking about that day.
16      Q     I just wanted to make sure for the record,
17   yeah.  So you knew at that time that one of his use
18   of force tools was not an option for him.  He was
19   down to baton, taser, hands on, arm locks, wrist
20   locks?
21      A     Correct.
22      Q     Command presence, command voice and his
23   firearm?
24      A     That's correct.
25      Q     Any other officers out there unable to
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 42

1    tolerate mace?

2        **A**    Not to my knowledge that work for me.

3    Usually if they are they'll come and tell a

4    supervisor or at least the other officers.  But to

5    my knowledge, they -- none like it, you know.

6        **Q**    Sure.

7        **A**    But I -- none have come to me and said,

8    look, I just can't do this and I'm --

9        **Q**    Okay.  So based on your understanding, if

10   Officer Kaminski was in a scene where one of the

11   officers or an officer from another department used

12   their mace he could have an allergic reaction

13   leaving him unable to perform his duties?

14       **A**    Yes, sir.

15       **Q**    I'm going to give you what's been marked

16   Exhibit 12, which is what we've been referring to as

17   the police report in this matter.  I understand it

18   has your use of force report and the taser report as

19   well.  Would you look through that, sir, and see if

20   it looks familiar to you?

21       **A**    Yes, sir, with the exception of the

22   property receipt.  I've never --

23       **Q**    Okay.

24       **A**    I haven't seen a copy of that.

25       **Q**    Understood.  So if you would look back --

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

Page 43

1    I think it's a few pages back there is your use of

2    force report slash pursuit report.

3         **A**    Yes, sir.

4         **Q**    Okay.  On the second page of that is

5    the -- your narrative, right?

6         **A**    Yes, sir.

7         **Q**    And that's -- so this is -- you authored

8    this narrative here?

9         **A**    Yes.

10        **Q**    Okay.  And it's dated 09/17/11.  Is that

11   when you completed this report?

12        **A**    That is correct.

13        **Q**    Have you ever seen the CAD transcripts

14   from this event?

15        **A**    No, sir, I have not.

16        **Q**    All right.  Have you ever listened to the

17   dispatch tapes?

18        **A**    No, sir.

19        **Q**    Do you know when the dispatch tapes would

20   have been destroyed or discarded?

21        **A**    No, sir, I have no idea what they do in

22   dispatch.

23        **Q**    Okay.  Would the CAD transcript show when

24   you arrived at the scene?  Would you have let the

25   dispatcher know you were there and it would have

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

```
                                                     Page 44
  1    been recorded automatically?

  2         A     Normally I do.  But there have been times

  3    when I just jump out of the car and don't tell them

  4    I'm on scene.

  5         Q     But normally you would say on scene --

  6         A     Normally I do.

  7         Q     -- as you're parking your car?

  8         A     Correct.

  9         Q     So I want to run through this with you.

 10    Hopefully -- there's just a few things in here I

 11    want to ask you about.  The first paragraph -- the

 12    first sentence of the first paragraph, this is the

 13    information you mentioned earlier that you had

 14    received while you were in the -- what's the other

 15    word you used besides the muster room?

 16         A     Roll call room.

 17         Q     Roll call room.  While you were in that

 18    room, you all heard that over the dispatch?  There's

 19    a speaker in the room and you all heard that?

 20         A     We have our walkie-talkies.

 21         Q     So you're hearing it from the --

 22         A     I believe so.

 23         Q     Okay.  Do you all have attachments on

 24    your -- on your collar, on your epaulet, whatever

 25    this is called?
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                                   Page 45

    1        A     Some officers do.

    2        Q     Okay.  And do you recall that day whether

    3   Officer Kaminski had one up there, his microphone up

    4   there?

    5        A     No, sir, I don't.

    6        Q     You don't recall either way?

    7        A     I don't recall.

    8        Q     Okay.  So that's the -- that's the report

    9   you heard while you were in the room, right?

   10        A     Yes, sir.

   11        Q     Okay.  And does that indicate to you that

   12   that's a person who's in personal crisis --

   13              MS. SHAFAIE:  Object to --

   14        Q     (By Mr. Dowd) -- having some kind of --

   15   excuse me.

   16              MS. SHAFAIE:  You can finish.

   17              MR. DOWD:  I'll rephrase it, yeah.

   18        Q     (By Mr. Dowd) Does that indicate to you

   19   that you've got somebody who's either in personal

   20   crisis or having some kind of mental problems?

   21        A     Yes, sir.

   22        Q     Did anyone notify an ambulance or call for

   23   an ambulance at that time?

   24        A     Not at that time, to my knowledge.  We

   25   didn't -- I didn't call.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
 1      Q    Wasn't department policy to call an
 2 ambulance when there was somebody in personal crisis
 3 or --
 4      A    Not until we locate that person.
 5      Q    Okay.
 6      A    If not, you tie up an ambulance that's
 7 just driving around or sitting some place waiting
 8 for you -- you know, if you don't locate a person.
 9      Q    And so it's still not department policy
10 today, correct?
11      A    No, sir.
12      Q    And then the next sentence regarding
13 Officer Kaminski locating the subject at Airport and
14 Henquin at Tim Allen's Cleaning Service, correct?
15      A    Yes, sir.
16      Q    And have you ever spoken to Mr. Allen?
17      A    No, I haven't.
18      Q    Do you know if any of the officers have
19 ever spoken to Mr. Allen?
20      A    No, sir, I don't.
21      Q    Have you heard of him?
22      A    I haven't met the man, but -- so I'd have
23 to say no.
24      Q    Have you heard anything about him from
25 other members of the department?
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                                    Page 47
    1       A    No, sir.

    2       Q    Okay.  So the next paragraph, the first

    3   sentence states, quote, The subject later identified

    4   as Moore, comma, Jason, B/M 03-04-080 was completely

    5   naked staring out at Airport Road.

    6            Did I read that correctly?

    7       A    Yes, sir.

    8       Q    Is that information you would have

    9   received from Officer Kaminski?

   10       A    That's correct.

   11       Q    So that sentence, if I can leave out the

   12   abbreviations states, quote, The subject later

   13   iden -- let me just start over.  The subject was

   14   completely naked staring out at Airport Road,

   15   correct?

   16       A    Yes, sir.

   17       Q    As part of deescalation training, is that

   18   something that if he's static at that point the

   19   deescalation training would say let him be until

   20   backup arrives?

   21            MS. SHAFAIE:  Object to form and

   22   foundation.

   23       Q    (By Mr. Dowd) Generally speaking?

   24            MS. SHAFAIE:  You may answer.

   25       A    Generally speaking, yes.  But in this
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                          September 25, 2015

Page 48

1    situation where he had been running out into the
2    street and it was exceptionally heavy traffic, I --
3    I don't know that that would have been a good idea
4    because you're not going to know exactly what his
5    frame of mind is and whether or not he's going to
6    run out into the roadway.
7        **Q**    (By Mr. Dowd) Okay.  You used the phrase
8    exceptionally heavy traffic.
9        **A**    Yes.
10       **Q**    What did you mean by that?
11       **A**    It was almost -- odd as it may seem, it
12   was almost a rush hour traffic for whatever reason
13   that morning.
14       **Q**    Okay.
15       **A**    There was a lot of traffic on Airport
16   Road.
17       **Q**    And you're familiar with that in your 26
18   years of being a Ferguson Police Department,
19   correct?
20       **A**    Correct.
21       **Q**    Police officer and sergeant and
22   lieutenant.  During that time at Airport near
23   Henquin, you're saying that the traffic on that
24   Saturday morning was comparable to what you might
25   see at 5:00 on a Thursday or Friday?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 49

1        **A**    Yes.  There was a lot of traffic.

2        **Q**    Okay.  And most Saturdays, how would you

3    describe the traffic on most Saturdays?

4        **A**    Early in the morning like that on a

5    Saturday, once Boeing lets out, there's usually not

6    the amount of traffic that there -- you know, it

7    picks up as the day goes on.  But once Boeing

8    Corporation lets out their employees, I guess at

9    whatever time they make shift change, it usually

10    starts dying down a little bit and then picks up

11    some more.

12        **Q**    So is the Boeing plant west of Henquin on

13    Airport Road or east?

14        **A**    It is west.

15        **Q**    Okay.  So the traffic from Boeing would be

16    on the north -- excuse me, the south side of the

17    street traveling east, correct?

18        **A**    Correct.

19        **Q**    And Mr. Moore was on the north side where

20    the westbound traffic would be, correct?

21        **A**    Correct.  But the traffic was both

22    directions.

23        **Q**    That morning it was both directions?

24        **A**    Yes.  It was like rush hour.

25        **Q**    Do you have an explanation as to why the

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                                  September 25, 2015

                                                                    Page 50

1    westbound traffic was heavy that morning as opposed

2    to all the other mornings in 2011 on Saturday

3    morning?

4         **A**    No, sir.

5         **Q**    Was the traffic heavy when you arrived?

6         **A**    Yes.  We were actually directing traffic

7    around us.

8         **Q**    Okay.  Where was Mr. Moore located at the

9    time that you arrived on the scene?

10        **A**    He was in the -- right at the edge of the

11   roadway in the westbound lane closer to the curb.

12   Not in the middle of the roadway, but closer to the

13   curb.

14        **Q**    I'm going to hand you what's been marked

15   Exhibit 22A and ask you if you would put the number

16   1 where you just described Mr. Jason Moore being

17   when you arrived at the scene.  If you'd put a 1 and

18   circle it.

19        **A**    (Witness complied.)

20        **Q**    And maybe you would put your initials out

21   to the right of that, please.

22             MS. SHAFAIE:  And I'm sorry, did you say

23   when he arrived where Mr. --

24        **Q**    (By Mr. Dowd) When Mr. -- when

25   Lieutenant -- when the lieutenant arrived, he just

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                      September 25, 2015

```
                                                    Page 51
  1     testified he saw him on the ground.  And I'm -- he's
  2     put a number 1 where you saw him on the ground,
  3     correct?
  4          A    Yes.
  5          Q    And which way was his head pointing
  6     towards?  Was his head closer to the street or his
  7     feet closer to the street?
  8          A    He was at an angle.  I would have to say
  9     his feet were closer to the street.  But I can't be
 10     one hundred percent positive.
 11          Q    Okay.  That's the best of your
 12     recollection today?
 13          A    Correct.
 14          Q    Can you indicate with a number 2 where
 15     Officer Kaminski was standing in relation to
 16     Mr. Moore?
 17          A    (Witness complied.)
 18          Q    And then with a number 3 Officer White,
 19     please.
 20          A    (Witness complied.)
 21          Q    And what position was Officer White in at
 22     that time when you first observed him?
 23          A    Officer White was turned towards the
 24     traffic lanes facing -- as was Officer Kaminski.
 25     They were both standing, looking -- I guess that
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                              Page 52
 1   would be the south -- looking south --

 2        Q     Okay.

 3        A     -- on the westbound lanes.

 4        Q     Okay.  Was Officer White standing straight

 5   up by the time you arrived or was he still finishing

 6   his handcuffing to the best of your recollection?

 7        A     I believe he was just starting to stand

 8   up.  He was -- he was not in the middle of

 9   handcuffing.

10        Q     Okay.  Maybe just finishing and standing

11   up?

12        A     Just finishing up possibly.

13        Q     And Officer Bebe has previously testified

14   in this case that he was on the scene.  But you've

15   testified you weren't sure either way.  So can you

16   tell us where he was?  I mean, that's maybe the

17   worst question I've ever asked in a deposition,

18   but -- because you just said you don't know.  Is it

19   safe to say you can't tell us where Officer Bebe was

20   standing when you arrived at the scene?

21        A     No, I can't tell you where he was

22   standing.

23        Q     If you would --

24        A     Did you want initials by the 3 and the 2?

25   I'm sorry.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 53

1       **Q**    No, we're just going to use this for you.
2   But I just wanted your initials on there somewhere.
3   Thank you, though.  If you would, if you could put a
4   line, if it's visible on the exhibit, where the
5   front of Officer Kaminski's patrol car was.
6       **A**    I am not sure.
7       **Q**    Okay.  Is it -- do you think it would have
8   been in this picture or --
9       **A**    To the best of my recollection, there was
10  a police vehicle parked over here, but I'm not
11  exactly sure whose police vehicle that would have
12  been --
13      **Q**    Okay.  Let's do it this way --
14      **A**    -- in the parking lot.
15      **Q**    Yeah.  If you would put a line and a
16  number 4 where you thought the front grill -- and if
17  you would draw the line in the angle that the front
18  grill would have been in, and we'll understand you
19  don't know which officer's vehicle it was.
20      **A**    (Witness complied.)  And a number 4, you
21  said?
22      **Q**    Yes.  Maybe -- yeah, go ahead.  If you
23  could make that line a little longer so maybe it's
24  closer to proportionate with the front of his
25  vehicle to the other things in the scene.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                          Page 54

1        **A**     Well --

2        **Q**     And I'm not going to hold you to the

3     proportional part.  But it's more visible if it's

4     longer, please.

5        **A**     (Witness complied.)

6        **Q**     Thank you.  So the back of his car would

7     have been closer to the building that's on that

8     corner?

9             MS. SHAFAIE:  I'm just going to make sure

10    that when you're saying his car, again, he --

11            MR. DOWD:  I'll rephrase.

12       **Q**     (By Mr. Dowd) The patrol car that you've

13    indicated there as number 4 on Exhibit 22A --

14       **A**     Correct.

15       **Q**     -- is the front.  So the car would be

16    facing towards Henquin?

17       **A**     The building.

18       **Q**     It was facing towards the building?

19       **A**     Correct.

20       **Q**     Okay.  So the rear of the car would be

21    facing either towards Henquin or Airport?

22       **A**     Sort of at an angle, I believe, if I

23    remember correctly.

24       **Q**     Towards the corner?

25       **A**     Yes.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                September 25, 2015

```
                                            Page 55
 1       Q    Okay.  If we could go back to Exhibit 12
 2   and your use of force report at Ferguson 0015, the
 3   next sentence states, quote, Officer Kaminski told
 4   Moore to place his hands over his head and walk
 5   towards him, period, closed quotes.
 6            Did I read that correctly?
 7       A    Yes.
 8       Q    That's information you would have received
 9   from Officer Kaminski?
10       A    That is correct.
11       Q    Do you know why he told him to put his
12   hands over his head?
13       A    I don't have any idea.
14       Q    At this point in time, you had not -- you
15   were trying to get to the scene.  You're looking for
16   Mr. Moore and you've heard a dispatch by this time
17   that he's on -- Kaminski is on scene, right?
18       A    Correct.
19       Q    At this point in time, you have not heard
20   any report of any persons being injured, correct?
21       A    Correct.
22       Q    No reports of a -- no reports of a weapon,
23   correct?
24       A    Correct.
25       Q    No reports that he's threatened his wife
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                           Page 56

 1   or any family members or neighbors, correct?

 2       **A**    Other than coming out into traffic and

 3   beating on the cars, no.

 4       **Q**    Okay.  But do you know if any of those

 5   cars were driven by his neighbors or his family?

 6       **A**    No, sir, I don't.

 7       **Q**    My question was, you did not have any

 8   reports of any domestic violence with regard to his

 9   family or neighbors, correct?

10       **A**    Not to my recollection.

11       **Q**    And if the man is naked and he's not

12   reported to have a gun or any weapon at the time

13   Officer Kaminski arrives at the scene per this

14   report staring out at Airport Road, correct?

15       **A**    Correct.

16       **Q**    So he's not running at that time, correct,

17   per the report?

18       **A**    Per the report.

19       **Q**    Okay.  Is it your opinion that it's

20   consistent with deescalation training to immediately

21   shout orders to a person who's having a personal

22   crisis or mental health issues?

23           MS. SHAFAIE:  Object to form and

24   foundation.  You may answer.

25       **A**    Well, having had deescalation training

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 57

1   now, that would probably not be the first thing that
2   you would want to do.  At that time, though, we had
3   no deescalation training.
4        **Q**     (By Mr. Dowd) So the next sentence states,
5   Moore began to yell and move towards Officer
6   Kaminski.
7             That information came from Officer
8   Kaminski, correct?
9        **A**     That is correct.
10       **Q**     Do you have any idea what Mr. Moore may
11  have yelled from any source?
12       **A**     Except for what was told to me for the
13  report.  Other than that, I have no idea.
14       **Q**     All right.  The next sentence reads,
15  quote, Officer Kaminski told Moore to stop and get
16  on the ground but Moore continued to advance,
17  period, closed quotes.
18            I read that correctly, sir?
19       **A**     That is correct.
20       **Q**     And that is information you received from
21  Officer Kaminski?
22       **A**     Correct.
23       **Q**     The next sentence reads, quote, Officer
24  Kaminski backed away, comma, ordering Moore to stop,
25  comma, however Moore only began to run at Officer

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                        Page 58

 1    Kaminski, comma, screaming and swinging his fists,

 2    period, closed quotes.

 3              Did I read that correctly?

 4    **A**    Yes, sir, you did.

 5    **Q**    And is that information that you would

 6    have learned only from Officer Kaminski?

 7    **A**    Yes.

 8    **Q**    The next sentence is, quote, Officer

 9    Kaminski then deployed his department-issued taser,

10    comma, striking Moore with a probe into his chest

11    and a probe into his right upper thigh area, period,

12    closed quotes.

13              I read that correctly?

14    **A**    That is correct.

15    **Q**    And Officer Kaminski provided that

16    information?

17    **A**    Yes.

18    **Q**    He's the sole provider of that

19    information?

20    **A**    Yes.

21    **Q**    It would be abusive department policy and

22    excessive force to tase a man in the chest who was

23    complying with his orders and standing perfectly

24    still?

25              MS. SHAFAIE:  Object to form and

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                      September 25, 2015

Page 59

 1   foundation.  You may answer.

 2       **A**   I'm sorry, could you ask --

 3            MR. DOWD:  Would you read that back,

 4   please?

 5            (The requested portion of the

 6            record read by the reporter.)

 7            MS. SHAFAIE:  Objection.

 8       **A**   Yes, that would be abusive.

 9       **Q**   (By Mr. Dowd) And if Officer Kaminski

10   struck Mr. Moore in the chest, that would be center

11   body mass and be consistent with his firearms

12   training?

13            MS. SHAFAIE:  Object to form.  You may

14   answer.

15       **A**   Yes.

16       **Q**   (By Mr. Dowd) So it wouldn't have been a

17   bad shot necessarily if he's been practicing for

18   years, at least on an annual basis, to have his

19   muscle memory available to him in a reactive and

20   high pressured situation to draw his weapon, a taser

21   in this case, and aim and fire and hit center body

22   mass, correct?

23            MS. SHAFAIE:  Object to form and

24   foundation.  You may answer.

25       **A**   Yes, you shoot for the largest part of the

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                                    Page 60
 1   body.  And that's what Taser also teaches.

 2        Q    (By Mr. Dowd) Okay.  Is that what they

 3   were teaching in 2011?  Taser, I mean.

 4             MS. SHAFAIE:  Object to foundation.  You

 5   may answer.

 6        Q    (By Mr. Dowd) If you know.

 7        A    Yes, when we went to the Taser class, they

 8   told us to shoot for the largest part of the body.

 9        Q    Okay.

10        A    Preferably -- you know, you don't want to

11   shoot for genitalia, breasts, or anything like that.

12        Q    Female breasts?

13        A    Correct.  But shoot for the biggest part

14   of the body because of the way the darts spread.

15        Q    And what training -- you said you first

16   went to training.  Which training would that have

17   been, what year or month?

18        A    It would have been shortly after we were

19   issued the tasers and -- or, you know, after the

20   department received the tasers.  Once we had all

21   those tasers, then each officer was certified in

22   them.  Officer Kaminski was a taser instructor.

23        Q    Okay.  So he would have had even more

24   training than a certified user?

25        A    Correct.  He was certified by Taser
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                        Page 61

 1    International to teach the officers.

 2         **Q**    Besides the training that you got on a

 3    taser, were there also bulletins or warnings that

 4    were given out?

 5         **A**    Not to my recollection.

 6         **Q**    Okay.  So you're not familiar at the

 7    Ferguson Police Department how taser warnings or

 8    taser bulletins are distributed and communicated to

 9    the officers that are certified as users or as

10    instructors?

11         **A**    No, sir, I'm not.

12         **Q**    Have you ever received an email from Taser

13    International with any training or bulletins?

14         **A**    No, sir, I have not.

15         **Q**    Have you received a handout from Officer

16    Brannan -- is he officer or sergeant?  Officer

17    Brannan -- you know who Officer Brannan is, right?

18         **A**    Correct.

19         **Q**    And he was the lead taser -- head of sort

20    of the taser implementation and training?

21              MS. SHAFAIE:  Object to foundation.  You

22    may answer.

23              MR. DOWD:  I'll withdraw it.

24         **Q**    (By Mr. Dowd) Tell us your understanding

25    of what Officer Brannan's role was with tasers at

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                      September 25, 2015

Page 62

1    Ferguson Police Department.

2        **A**    That he was one of the taser instructors

3    who were certified by Taser International.  That's

4    all that I know.

5        **Q**    And you don't receive -- you ever recall

6    receiving an email or a handout in your mailbox at

7    the department from Officer Brannon or anyone at the

8    Ferguson Police Department with bulletins or

9    warnings?

10       **A**    Not to my recollection.

11       **Q**    (By Mr. Dowd) I'm going to give you

12   Exhibits 19 and 20.  I'm just asking you -- you can

13   page through them if you like.  I'm just asking in

14   general if you've ever seen those documents before.

15       **A**    I may have when I was first certified with

16   the taser, but I can't recall.

17       **Q**    And when was that again, please?

18       **A**    It would have been shortly after the

19   tasers were acquired by the department.

20       **Q**    So if that was in June of 2010, it would

21   have been within a couple of months of that?

22       **A**    Yes, sir.

23       **Q**    Okay.  So the second exhibit you're now

24   looking at, which I think -- is that Exhibit 20,

25   sir?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                          September 25, 2015

Page 63

1          **A**      Yes, sir.

2          **Q**      What is the date on the lower left-hand

3    corner of that?

4          **A**      That would be May 31st, 2011.

5          **Q**      Okay.  So that's approximately three and a

6    half months, three months prior to the incident

7    where Mr. Moore died?

8          **A**      Yes, sir, I believe so.

9          **Q**      And the Exhibit 19, the date on the lower

10   left corner is -- I think that's 2010?

11         **A**      Correct, sir, May 1st, 2010.

12         **Q**      So that's a year and a couple months prior

13   to this incident, correct?

14         **A**      Correct.

15         **Q**      And it's my understanding of your

16   testimony that you don't recall ever receiving

17   either of those two documents in the ordinary course

18   of your job duties at Ferguson Police Department.

19         **A**      Unless this was part of the original

20   training, I have never had this in my mailbox to my

21   recollection.

22         **Q**      Okay.  I'll take those back.  So if we

23   could go back to Exhibit 12, your use of force

24   report.

25         **A**      Yes, sir.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 64

1      **Q**     On page 2, the next sentence is, quote,

2   Moore, comma, after initially falling to the ground,

3   comma, attempted to regain his feet and Officer

4   Kaminski ordered him to stay down, comma, and was

5   met with noncompliance, period, closed quotes.

6              That's what Officer Kaminski told you,

7   correct?

8      **A**     That is correct, sir.

9      **Q**     Did he -- the next question is -- or

10  statement, I should say, quote, Officer Kaminski

11  administered a second, comma, five-second burst

12  which placed Moore back on the ground, period,

13  closed quotes.

14             That was information supplied solely by

15  Officer Kaminski, correct?

16     **A**     Yes, sir.

17     **Q**     Did he tell you at any time how much time

18  lapsed between the first taser application and his

19  attempts to gain compliance and the second

20  application of the taser?

21     **A**     I don't recall.  I don't believe so.

22     **Q**     Okay.  Did anyone at the department ever

23  indicate to you that -- how long he waited?

24     **A**     No, sir.

25     **Q**     Officers Kaminski's report that we just

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 65

1    read into the record indicates that Mr. Moore was

2    put back on the ground, correct?

3        **A**    Yes.

4        **Q**    Would you agree that after the first taser

5    deployment that Mr. Moore was extremely unlikely to

6    be able to get back into -- to get to the street as

7    you indicated Officer Kaminski may have been in fear

8    of?

9            MS. SHAFAIE:  Object to form and

10   foundation.  You may answer.

11       **Q**    (By Mr. Dowd) Do you understand the

12   question?

13       **A**    As if the taser didn't work?  Is that what

14   you --

15       **Q**    No, let me rephrase the question.  You've

16   been in law enforcement, between the military and

17   law enforcement, since you were out of high school,

18   right?

19       **A**    Correct.

20       **Q**    Okay.  Including many of those years is

21   use of force, when to use it, how to use it and the

22   effect of it, correct?

23       **A**    Correct.

24       **Q**    Would you agree that the situation from

25   the time Mr. Moore was standing by the curb where

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 66

1    you've indicated he on Exhibit 22A to the time after

2    Officer Kaminski tased him the first time that that

3    situation had drastically changed?

4            MS. SHAFAIE:  Object to form and

5    foundation.  You may answer.

6        **A**    I'd have to speculate because I wasn't

7    there.

8        **Q**    (By Mr. Dowd) Well, he's no longer

9    standing on the curb facing Airport Road, correct?

10       **A**    Correct.

11       **Q**    He's now on the ground, correct?

12       **A**    Correct.

13       **Q**    He's now further away from Airport Road

14   than he previously had been, correct?

15           MS. SHAFAIE:  Object to form.  You may

16   answer.

17       **A**    Yes.

18       **Q**    (By Mr. Dowd) Based on your indication --

19       **A**    Right.

20       **Q**    -- on Exhibit 22 --

21       **A**    That's correct.

22       **Q**    -- he's further away from the road.  Okay.

23   He's on the ground?

24       **A**    Correct.

25       **Q**    You agree that Mr. Moore was a slightly

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                                    September 25, 2015

                                                                   Page 67

 1   built man?

 2       **A**     Yes.

 3       **Q**     Okay.  So the threat to himself going into

 4   traffic has been extremely reduced, correct?

 5             MS. SHAFAIE:  Object to form.

 6       **Q**     (By Mr. Dowd) You'd agree with that?

 7             MS. SHAFAIE:  Object to form.  You may

 8   answer.

 9       **A**     Again, not having -- having not been

10   there --

11       **Q**     (By Mr. Dowd) I'm not asking you -- I'm

12   just -- assume what I'm telling --

13       **A**     Assuming that everything is --

14       **Q**     That I'm saying is accurate.

15             MS. SHAFAIE:  Same objection.

16       **Q**     (By Mr. Dowd) That he's on the ground,

17   he's unarmed, he's no longer standing facing staring

18   into Airport Road.  He's got taser probes, one in

19   his chest and one in his groin area.  It's been

20   effective.  It brought him down the first time.

21   Assume the probes are still in his chest.  Wouldn't

22   you agree that that threat assessment, the threat to

23   himself and the threat to the officer, has changed

24   and has become -- he's become less of a threat by

25   some degree?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                                    Page 68
 1              MS. SHAFAIE:  Form.  You may answer.
 2       A    At that moment --
 3       Q    (By Mr. Dowd) Go ahead, sir, you can
 4   answer.
 5       A    At that moment, yes.  But tasers don't
 6   always work.
 7       Q    I understand.  You understand it was
 8   working -- the first application brought him down,
 9   correct?
10              MS. SHAFAIE:  Object to form.  You may
11   answer.
12       A    Yes.
13       Q    (By Mr. Dowd) They are designed to
14   incapacitate the muscles and sensory system of the
15   person they're being used on, right?
16       A    That's right.
17       Q    It appears to have worked effectively?
18   Wide spread of the probes is desired, right?
19       A    Yes.
20       Q    He had the wide spread of the probes,
21   correct?
22       A    Yes.
23       Q    Probes are still in place after the first
24   tase because we know he was able to tase him again
25   and he dropped again, right?
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                   September 25, 2015

Page 69

1        **A**    Correct.

2        **Q**    So after each use of force, an officer is

3    to do an on-the-spot threat assessment, correct?

4             MS. SHAFAIE:  Object to foundation.  You

5    may answer.

6        **A**    Yes.

7        **Q**    (By Mr. Dowd) For example, if a guy throws

8    a punch at a policeman and he has to use his baton

9    on him, once the guy is down you don't get to just

10   keep hitting him because he threw a punch, right?

11       **A**    That's correct.  You don't just keep

12   beating on him, right.

13       **Q**    The guy's on the ground, he's no longer

14   swinging at me --

15       **A**    It's over.

16       **Q**    It's over, okay.  And I understand your

17   position that Mr. Moore is on the ground and

18   you're -- let me rephrase the question.  So at the

19   time that Mr. Moore is on the ground with the taser

20   probes in his chest and his groin with the wide

21   spread, it's proven to be effective on the first

22   application as he's advancing aggressively,

23   according to Officer Kaminski, to stop him and bring

24   him to the ground, correct?

25       **A**    Correct.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 70

1      **Q**    That threat assessment has to be redone by

2   the officer before using an additional type of

3   force?

4            MS. SHAFAIE:  Object to foundation.

5      **Q**    (By Mr. Dowd) Do you agree with that?

6            MS. SHAFAIE:  You may answer.

7      **A**    Yes.

8      **Q**    (By Mr. Dowd) He certainly -- Officer

9   Kaminski certainly wouldn't have been authorized to

10  use escalated force, use his side arm, correct?

11     **A**    No, he wouldn't have been authorized to

12  use his side arm.

13     **Q**    At any time that day, correct?

14           MS. SHAFAIE:  Object to form.  You may

15  answer.  You may answer.

16     **Q**    (By Mr. Dowd) Based on the facts as you

17  understand them.

18     **A**    No, he wouldn't have been -- wouldn't have

19  been authorized to use that.

20     **Q**    He would have been authorized to use an

21  alternative type of force, a wrist lock, arm lock,

22  baton maybe, or mace if he didn't have the personal

23  allergy, correct?

24     **A**    Yes.

25     **Q**    Other non-lethal use of force.  He could

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 71

 1   have applied that, correct?

 2       **A**    Correct.

 3       **Q**    Do you agree that setting aside officer

 4   Kaminski's personal reaction to mace that it would

 5   have been within Ferguson policies and procedures to

 6   have used mace or OC spray on Mr. Moore as he was

 7   advancing towards Officer Kaminski?

 8            MS. SHAFAIE:  Object to form.  You may

 9   answer.

10       **A**    Yes.

11       **Q**    (By Mr. Dowd) It would have been

12   permissible to use a baton strike?

13       **A**    Yes.

14       **Q**    It would have been permissible to use a

15   hands-on form of force, either combat maneuvers or

16   arm locks or some other hands-on use of force,

17   correct?

18       **A**    Correct.

19       **Q**    Each of those uses of force that we've

20   touched on have pros and cons, correct?

21            MS. SHAFAIE:  Object to form.  You may

22   answer.

23       **A**    Yes.

24       **Q**    (By Mr. Dowd) Okay.  For example, mace is

25   pretty much of a con for Officer Kaminski, right?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 72

 1      **A**    Yes, sir, it is.

 2      **Q**    But is there anything you can say about if

 3   he had used his baton to bring that man to the

 4   ground or some kind of a throw?  I've seen in the --

 5   I've seen in the use of force reports that some

 6   officers used other takedown procedures.  Is there

 7   any reason he couldn't have just used a takedown

 8   procedure to get him down?

 9          MS. SHAFAIE:  Object to form.  You may

10   answer.

11      **A**    Just standing back looking at it, I really

12   couldn't answer that honestly because I don't know

13   exactly what was happening at that moment.

14      **Q**    (By Mr. Dowd) Well --

15      **A**    If someone -- if someone is -- speaking

16   from my experience, when someone is advancing on me

17   fast, I am not going to wrestle around or, you know,

18   possibly allow my side arm to be taken or anything

19   else if I can help it.  If I have other tools I will

20   use those tools.

21      **Q**    Okay.  Mace, baton, taser?

22      **A**    Correct.

23      **Q**    Okay.  So based on your last answer, if

24   someone's approaching you aggressively, I understand

25   what you're saying.  Change that scenario to

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                September 25, 2015

Page 73

1    somebody who's now on the ground, has just had

2    50,000 volts of electricity put into his body to

3    contract his muscles somewhere from 16 to 22 times

4    muscle contractions per second.  And I want you to

5    assume that it was 11 seconds of taser application

6    that he underwent, okay?  That's a different

7    scenario as far as getting into a wrestling and

8    lowing your weapon, would you agree with that, than

9    somebody who is standing free, not being tasered and

10   running towards you?  That's a different scenario?

11          MS. SHAFAIE:  Object to form.  You may

12   answer.

13       **A**    Yes.

14       **Q**    (By Mr. Dowd) Is there anything preventing

15   Officer Kaminski after the 11-second initial tasing

16   application from putting an arm lock on him, putting

17   a wrist lock on him and keeping him on the ground

18   until Officer White arrives?

19          MS. SHAFAIE:  Object to form and

20   foundation.  You may answer.

21       **Q**    (By Mr. Dowd) Anything in department

22   policy that would prohibit that?

23          MS. SHAFAIE:  Same objection.

24       **A**    No, there's nothing in policy that would

25   prohibit that.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                          September 25, 2015

                                                              Page 74

1       **Q**    (By Mr. Dowd) Okay.  Is there anything in

2    your experience that you think would make that

3    unadvisable?

4       **A**    The -- if the subject is still combative

5    or resisting, then continue to use your tool.  I

6    don't want an officer to get injured.  I tell my

7    officers that, do not get hurt.  If you -- there's

8    no reason -- you know, we're not there to be hurt.

9    There's no reason not to use the tools that are

10   available to you.  So if someone continues, then no.

11   If -- but as I said before, once the resisting

12   stops, it's over, it's done, go ahead and apply the

13   handcuffs and --

14      **Q**    I understand that it's your position and

15   it's the policy of the department that taser, baton,

16   mace are all in the same class of non-lethal force,

17   correct?

18      **A**    Yes.

19      **Q**    And they're also equally available to the

20   officer based on the officer's discretion?

21      **A**    That is correct.

22      **Q**    Okay.  Within those three, do you

23   understand there to be any greater risk to the

24   person who's being the recipient of this use of

25   force as between taser, OC spray and a baton?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 75

 1              MS. SHAFAIE:  I'm going to object to form.
 2    And you can answer.
 3        **Q**    (By Mr. Dowd) Do you understand the
 4    question?
 5        **A**    Of those three, which would be the --
 6        **Q**    -- riskiest for the person who's receiving
 7    the use of force, yes.
 8              MS. SHAFAIE:  Same objection.
 9        **Q**    (By Mr. Dowd) Do you understand the
10    question though?
11        **A**    I believe so.
12        **Q**    Yes.
13        **A**    Yes, the taser would be the riskiest, I
14    would believe.
15        **Q**    And why is that?
16        **A**    Well, I'm -- I mean, I've been
17    certified -- or trained on the taser.  But
18    50,000 volts, to me, is a lot.  I've never been
19    tased.  But I've seen the videos and -- during
20    training.  It just seems like that's -- you know,
21    for it to contract your muscles like that, that's a
22    lot.
23        **Q**    It's powerful?
24        **A**    It is powerful.  That's the word I was
25    looking for.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 76

1      **Q**    And -- because it's electricity and it's
2   near the heart, are you aware that it can have
3   unintended effects on the heart rhythm?
4          MS. SHAFAIE:  Object to form and
5   foundation.  You may answer.
6      **A**    I'm not exactly sure about the taser as
7   far as the medical aspects of it go.  But any use of
8   force, there's a danger and risk.  If you use your
9   baton you could miss an arm strike and hit someone
10  in the head.  If you go to do an arm bar and take
11  someone to the ground, they could strike their head.
12  I mean, there's a risk involved with everything.
13     **Q**    (By Mr. Dowd) Understood.  But is it your
14  opinion that the use of the taser has a -- at least
15  in the order I gave them to you, the taser has
16  slightly more risk for the person it's being used on
17  but it's safer for the officer than the other uses
18  of force you just mentioned?
19         MS. SHAFAIE:  Object to form.  You may
20  answer.
21     **A**    I believe so just because it's more
22  powerful.
23     **Q**    (By Mr. Dowd) If we could go back to
24  Exhibit 12, sir, your use of force report at
25  Ferguson 15.  I believe we left off with the second

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 77

 1    taser application, so I'll read the next sentence.

 2    Quote, Moore again tried to raise up and a third

 3    five-second burst was administered, comma, again

 4    placing Moore back onto the ground, period, closed

 5    quotes.

 6              That's information you received from

 7    Officer Kaminski?

 8       A    That is correct.

 9       Q    Okay.  It indicates that the taser was

10    working properly because it put the man back on the

11    ground, correct?

12              MS. SHAFAIE:  Object to form.  You may

13    answer.

14       A    Correct.

15       Q    (By Mr. Dowd) And it was having the effect

16    that you had been trained to look for to make sure

17    it's working so you don't have to change to another

18    use of force, right?

19       A    That is correct.

20              MS. SHAFAIE:  Form.  You may answer.

21              MR. DOWD:  Can I ask what's wrong with the

22    form?

23              MS. SHAFAIE:  Argumentative.

24              MR. DOWD:  Okay.

25       Q    (By Mr. Dowd) Do you know what compliance

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 78

 1    interval is?  Sometimes I've heard it used, a phrase

 2    submission assessment.  Do you know what either of

 3    those two terms mean?

 4        **A**    No, sir.

 5        **Q**    Let me ask you based on your training and

 6    experience what an officer is to do after he applies

 7    force, for example, a taser or a baton strike before

 8    using another application of force.

 9        **A**    You assess and make sure the first

10    application worked.

11        **Q**    Okay.  And how much time do you generally

12    use per your training to assess that situation?

13            MS. SHAFAIE:  Object to form.  You may

14    answer.

15        **A**    It depends on the situation, how fluid and

16    violent it is.  But it could be instantaneous to

17    seconds.

18        **Q**    (By Mr. Dowd) Okay.  Depending on the

19    level of threat?

20        **A**    Correct.

21        **Q**    Okay.  So based, you know, on your

22    experience as a -- based on your experience as a

23    supervisor of patrolmen through their sergeants and

24    directly, in the situation that -- I'm asking you to

25    assume, and it's mostly based on what you've told me

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 79

1    and we've agreed to, but that the gentleman is on

2    the ground after a second taser application, the

3    taser appears to be working, being effective and

4    putting him on the ground.  He's no longer -- has a

5    less likely threat to run into traffic, correct?

6             MS. SHAFAIE:  Object to form.  You may

7    answer.

8        **A**    Correct.

9        **Q**    (By Mr. Dowd) How long should a person

10   who's in this situation, who's known or appears to

11   be in personal crisis, having mental issues, to be

12   given to comply before another 50,000 volts of taser

13   application would be appropriate?

14            MS. SHAFAIE:  Object to form.  You may

15   answer.

16       **A**    I wouldn't want to say how much time

17   because each person's different.  I don't know what

18   Officer Kaminski's mindset was or anything.  And I

19   would not tell one of my officers if this doesn't

20   work you wait 10 seconds, you know, to see if it's

21   going to work.  That's -- each individual officer

22   has to make that decision.

23       **Q**    (By Mr. Dowd) Okay.  Back to our scenario

24   where a guy throws a punch at an officer and he hits

25   him with a baton, the guy goes down, he's not

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 80

1    allowed to just strike him again and again and

2    again, correct?  He's supposed to strike him,

3    hesitate to see what the reaction is, right?

4        **A**    Yes.

5        **Q**    If the guy's -- if there's a gun nearby,

6    that's a different threat level than if it's just a

7    guy who's been drinking and he's laying on the

8    ground, his keys have fallen on the ground.  You

9    assess that unique threat, correct?

10       **A**    Yes.

11       **Q**    If there's a gun in the baton scenario,

12   maybe you go ahead and hit him immediately again

13   just to make sure he can't get to the gun.  If

14   there's no gun, you maybe give him a second longer,

15   correct?

16               MS. SHAFAIE:  Object to form.  You may

17   answer.

18       **A**    Yes.  You assess as you go along with it.

19       **Q**    (By Mr. Dowd) Okay.  And you reassess the

20   best you can between each use of force application?

21       **A**    Yes, you should.

22       **Q**    Okay.  And sometimes it takes time to make

23   that assessment?

24       **A**    Yes.

25       **Q**    I want you to assume that Officer Kaminski

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 81

1    is aware that Officer White is approaching the scene

2    after the second taser application, either knows

3    through his dispatch or he sees his car coming or

4    hears his car coming, that he knows Kaminski is on

5    route, okay, and that he knows prior to the

6    second -- excuse me, he knows prior to the third

7    application that Kaminski is on scene.

8              MS. SHAFAIE:  I think you mean White.

9              MR. DOWD:  Yes, let me rephrase.

10      Q    (By Mr. Dowd) I want you to further assume

11   that Officer Kaminski is aware that Officer White is

12   on scene or will be on scene within the next ten

13   seconds.  Can you assume that for me?

14      A    Yes, sir.

15      Q    This is prior to the third taser

16   application.  And again, the man is on the ground.

17   He's attempting to get up.  He's unarmed.  He's

18   naked.  Would you agree that those factors, the fact

19   that Officer White is on scene or almost immediately

20   on scene, changes the threat assessment analysis?

21              MS. SHAFAIE:  Object to form.  You may

22   answer.

23      A    Yes.

24      Q    (By Mr. Dowd) Because now you have backup,

25   right?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 82

1       **A**     Correct.

2       **Q**     Less risky to try to use a physical move,

3   arm long or something to press him down, when you've

4   got another officer present?

5       **A**     Yes.

6       **Q**     And you would agree that that would have

7   allowed Officer Kaminski more time between taser

8   applications if he in fact knew that Officer

9   Kaminski was on scene or almost immediately on

10  scene?

11          MS. SHAFAIE:  Object to form.  You may

12  answer.

13      **A**     Yes, if Officer Kaminski knew all those

14  things.

15      **Q**     (By Mr. Dowd) Okay.  And that to avoid

16  using excessive force he could have and probably

17  should have hesitated longer in his threat

18  assessment if, in fact, he knew backup was very

19  close?

20          MS. SHAFAIE:  Object to form and

21  foundation.  You may answer.

22      **Q**     (By Mr. Dowd) Do you agree with that?

23      **A**     Yes.

24      **Q**     Do you know the difference between a

25  cardiac arrest and a heart attack in general terms?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 83

     1          **A**     No, sir.

     2          **Q**     Okay.  Do you know if a taser is a risk to

     3     cause a heart attack?

     4                MS. SHAFAIE:  Object to foundation.  You

     5     may answer.

     6          **A**     I don't know for sure that it does.  I

     7     don't have that medical knowledge to --

     8          **Q**     (By Mr. Dowd) Okay.  So would your answer

     9     be the same if I asked you about a cardiac arrest

    10     being caused by a taser?

    11          **A**     Yes, my answer would be the same.

    12          **Q**     So the next sentence back on Exhibit 12 at

    13     Ferguson 15 is, quote, Officer White 560 arrived and

    14     was able to pull Moore's arms behind his back and

    15     handcuffed him, period, closed quotes.

    16                I read that correctly?

    17          **A**     Yes, sir.

    18          **Q**     And was that information you received from

    19     Officer Kaminski and Officer White, or do you

    20     remember who provided that?

    21          **A**     It could have been both or -- definitely

    22     one or the other.

    23          **Q**     Understood.  Is there any reason for you

    24     as you sit here today based on what we've discussed

    25     and the facts as you understand them that Officer

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                              Page 84
 1   White would not have been able to get Mr. Moore's
 2   hands behind his back if he had been present between
 3   the second and third taser applications?
 4           MS. SHAFAIE:  Object to form.  You may
 5   answer.
 6      A    Officer White by himself getting him --
 7      Q    (By Mr. Dowd) No, under this situation
 8   with --
 9      A    With both --
10      Q    Yes.
11      A    Both officers and having been tased?
12      Q    Twice, yes, sir.
13           MS. SHAFAIE:  Same objection.
14      Q    (By Mr. Dowd) You can answer.
15           MS. SHAFAIE:  Oh, I'm sorry, you can
16   answer.
17      A    Oh, yes, two officers should have been
18   able to get the handcuffs on Mr. Moore.
19      Q    (By Mr. Dowd) Okay.  How big a man is
20   Officer White?
21      A    Well, not knowing exactly, I would say
22   Officer White is six-foot-one, 180 pounds.
23      Q    Okay.  So he's bigger than a guy that's
24   six-foot, 135 pounds?
25      A    Yes.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 85

1       **Q**     And Officer Kaminski is approximately, to

2   your recollection, how big?

3       **A**     Five-foot-eleven, six-foot.  I don't know

4   what he would have weighed at that time.  Hundred

5   and -- I'll say 180 pounds.

6       **Q**     So if they are both 180 pounds, you have

7   approximately 360 pounds of professionally trained

8   police officers on scene, assuming he's on scene

9   either between a second and third tasing, or Officer

10  Kaminski knows he's immediately going to be on

11  scene.  Do you understand?

12          MS. SHAFAIE:  Object to form.  You may

13  answer.

14      **A**     Yes.

15      **Q**     (By Mr. Dowd) And that's part of the basis

16  of your opinion that those two guys would have been

17  able to handcuff him without another tase if they

18  were both there?

19          MS. SHAFAIE:  Form.

20      **A**     Yes.

21          MS. SHAFAIE:  You may answer.

22      **A**     Yes.  With everything being perfect, two

23  people like that should be able to get the handcuffs

24  on someone.

25      **Q**     (By Mr. Dowd) I mean, you know better than

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 86

1    me.  It's not perfect out there.

2         **A**    No.

3         **Q**    So what I'm asking is --

4         **A**    That's why I find some of the questions

5    kind of hard.

6         **Q**    I understand.  And I respect that.  And

7    I'm -- my point is that you guys got to do your job

8    in an imperfect situation, but there are training

9    and there are rules to protect the officer, rules to

10   protect the people that are being -- being either

11   tased or having force used on them by the police,

12   right?

13        **A**    Yes.

14        **Q**    So the next sentence says, quote, After

15   being handcuffed, comma, Moore tried moving his arms

16   again but stopped when Officer White told him to,

17   period, closed quotes.

18             Have I read that correctly?

19        **A**    That is correct.

20        **Q**    You believe that was told to you by

21   Officer White?

22        **A**    Yes.

23        **Q**    So it sounds like shortly after he was

24   handcuffed he stopped resisting.

25        **A**    Yes.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 87

1      **Q**    Next sentence, quote, Officer White then
2  requested an ambulance and supervisor to respond,
3  period, closed quotes.
4              That was read that correctly?
5      **A**    That is correct.
6      **Q**    And that's the first time an ambulance was
7  called to your knowledge?
8      **A**    Yes, sir.
9      **Q**    And that's per department policy?
10     **A**    Yes.
11     **Q**    And tell me about that policy.  What's
12 the -- what is the policy and what's the purpose of
13 the policy?
14     **A**    The policy is the Ferguson use of force
15 report.  It's based on -- once you have a resisting
16 that you want to have an ambulance respond to the
17 scene to check the arrested subject for any
18 injuries, that sort of thing, it's required by the
19 taser policy that an ambulance respond to the scene
20 of all tasings as well as a supervisor.
21     **Q**    And do you know why that is per the taser
22 policies?  Did they tell you why that's part of
23 their policies?
24     **A**    I would imagine, and I'm guessing here
25 because I had no part in writing the policy --

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                                   Page 88
   1        Q     Right.

   2        A     -- I'm only going to guess that because of

   3    the application of the taser with the --

   4        Q     The electricity?

   5        A     Yes, and the removal of the darts.

   6    They've always said that you can -- you know, they

   7    teach the officer to remove the probes themselves.

   8    However, they said that if you're uncomfortable with

   9    that, you can ask medical personnel to do it.

  10        Q     And that's based on your understanding

  11    from your training --

  12        A     Yes.

  13        Q     -- by Taser?  That's yes?

  14        A     Yes.

  15              MR. DOWD:  Could we take a short break?

  16              MS. SHAFAIE:  Sure.

  17              VIDEOGRAPHER:  Off the record at 11:08.

  18              (Off the record.)

  19              VIDEOGRAPHER:  Back on the record at

  20    11:15.

  21        Q     (By Mr. Dowd) Sir, if I could draw your

  22    attention back to Exhibit 12, to pages -- if I could

  23    direct your attention back to Exhibit 12 at Ferguson

  24    15, the next sentence in your report is, quote, As I

  25    approached Moore and the officers, comma, Moore let
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

---

Page 89

1    out a raspy sound and appeared to stop breathing,

2    period, closed quotes.

3              Have I read that correctly?

4        **A**    Yes, sir.

5        **Q**    Do you know what -- sensitive question,

6    but have you been present when people have died in

7    the past?

8        **A**    Numerous.

9        **Q**    Okay.  Did that raspy sound that you heard

10   from Mr. Moore, was that -- have you heard that

11   before in that situation?

12       **A**    I had not heard that type of a sound --

13       **Q**    Okay.  Have you ever --

14       **A**    -- from Mr. Moore.

15       **Q**    Okay.  Have you heard the phrase agonal

16   breathing before?

17       **A**    No, sir.

18       **Q**    I thought I read somewhere that you

19   thought that you may have heard his last breath.

20   Was that you that said that, that that raspy sound

21   was his last breath?

22       **A**    I don't believe so.

23       **Q**    Okay.  Do you think -- was -- let me just

24   ask you then.  Based on that statement that as you

25   approached the officers Moore let out a raspy sound

---

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 90

1    and appeared to stop breathing, is that the last

2    time you saw him breathe?

3        **A**    Yes.  When he made that noise, I turned

4    around and looked.  And I noticed that he wasn't

5    breathing, and that's when Officer White --

6        **Q**    Okay.  That's the first time you noticed

7    he was not breathing?

8        **A**    Yes, until then he had been --

9        **Q**    -- to your knowledge, breathing?

10       **A**    Yes.

11       **Q**    Okay.  So as you approached the officers,

12   I think you said when you got on the scene and got

13   out of your car Officer White was coming up from the

14   handcuffing and then you got up to the officers.

15   Then you heard this raspy breathing?

16       **A**    Yes.

17       **Q**    Next sentence says, quote, Officer White

18   released the handcuffs from Moore and said he's not

19   breathing.  Those are in quotes, he's not breathing,

20   period.

21              Have I read that correctly?

22       **A**    Yes, sir.

23       **Q**    You would agree with that assessment?

24       **A**    Yes.

25       **Q**    Did he -- he was still on his stomach?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                          September 25, 2015

Page 91

1    You called it a prone position?

2         **A**    Yes.

3         **Q**    So handcuffs were taken off, then he was

4    rolled over?

5         **A**    I believe they rolled him before the

6    handcuffs came off, and that's when they checked to

7    make sure that he was not breathing.

8         **Q**    Okay.  How did they check to make sure he

9    was not breathing?

10        **A**    Put their head down and -- you know, next

11   to his mouth.

12        **Q**    Okay.  And they confirmed he was not

13   breathing?

14        **A**    Correct.

15        **Q**    Removed the handcuffs, put him on his

16   back, and began chest compressions.  Is that what

17   you observed?

18        **A**    Yes, sir.

19        **Q**    Okay.  Did you notice anything about

20   Mr. Moore as far as his coloration?  He's an

21   African-American gentleman, but were his lips

22   abnormally purple or blue, anything like that that

23   you noticed?

24        **A**    No, sir.

25        **Q**    And if you could, just in case I'm not

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 92

1    asking the right question, which does happen quite

2    often, could you just tell us as you were observing

3    Mr. Moore, Jason Moore, what you observed about his

4    face?

5        **A**    He was extremely sweaty and devoid of any

6    expression on his face whatsoever.

7        **Q**    Okay.  Any bruising or marks on his face?

8        **A**    Oh, I'm sorry, yes, he had like some

9    scratches on his face, I guess, or abrasions from

10   what I would imagine, because I wasn't there, was

11   when he was tased and went to the ground.

12       **Q**    Were his eyes closed at that time when

13   they began the chest compressions, if you recall?

14       **A**    I don't recall.

15       **Q**    Okay.  And you wrote in your report, I'll

16   try to summarize you, advised EMS to sort of

17   expedite because he's not breathing, right?

18       **A**    Yes.

19       **Q**    And then White and Bebe in some order did

20   chest compressions until the EMS arrived, correct?

21       **A**    That's correct.

22       **Q**    And so when the ambulance arrived, the

23   EMTs got out and took over the situation.  Can you

24   just tell us what you observed as they got out as

25   they approached Mr. Moore, how that transition

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 93

1   occurred, what they did?

2       **A**    They exited the ambulance, they brought

3   their medical equipment with them.  As soon as they

4   came over they said we got it.  The officers backed

5   up.  I believe at that time there may have been

6   another ambulance -- or not an ambulance, another

7   paramedic that was with them on the truck.

8       **Q**    Right.

9       **A**    And they scooped up Mr. Moore and left for

10  the hospital.

11      **Q**    Okay.  Did they -- did they perform any

12  chest compressions before he got in the ambulance?

13      **A**    Yes, sir.  One was working the chest

14  compressions and the others were --

15      **Q**    Okay.  So they continued those while the

16  other two were picking up the stretcher and putting

17  it in the --

18      **A**    Yes.  There was -- there was never a break

19  in-between the officers and them.  I mean, it was

20  just a perfect switch.

21      **Q**    And except for maybe one -- excuse me, I'm

22  sorry to talk over you.  Maybe besides one brief

23  incident when they physically put him and then

24  somebody jumped in and continued the chest

25  compressions?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

Page 94

1       **A**     Even as they were putting him in the

2    ambulance, the one person walks alongside the gurney

3    still doing the chest compressions and the other

4    people lift the gurney and put it in.  Those

5    commercials never stop.

6       **Q**     Okay.  Did you observe them at any time

7    put any pads, you know, like lead wires to a

8    monitor, a heart monitor or anything while he was

9    still on the ground or --

10      **A**     No, sir, I didn't see any of that.

11      **Q**     So when that happened, it likely happened

12   in the back of the ambulance?

13      **A**     If that happened, yes.  I never saw it

14   outside.

15      **Q**     There's pictures of Mr. Moore with the

16   leads on him.  So they must have had -- well, maybe

17   strike that.  And my question is based -- again,

18   this is just on your knowledge.  We'll talk to them

19   about what they did and when they did it.

20      **A**     Correct.  No, I understand.

21      **Q**     You never observed them doing anything

22   except chest compressions and load him and get him

23   in the ambulance.  Is that a fair statement?

24      **A**     To the best of my recollection, yes.

25      **Q**     As a supervisor, what did you do next as

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 95

1    part of your job responsibilities?

2         **A**    Once the ambulance got there, I diverted

3    my attention from Mr. Moore and the ambulance to the

4    officers.  I directed them to retrieve any

5    identification dots that are with the taser.  When

6    it's deployed it sends the serial number out on

7    the --

8         **Q**    The blaster and the little paper mache

9    type things?

10        **A**    Right.  Had them do that.  Sent, I don't

11   know which officer, down to try and locate the

12   clothing that Mr. Moore had discarded and locate any

13   witnesses.

14        **Q**    Okay.  So then just tell me generally what

15   happened next as you were doing those things.  You

16   sent the officers to canvass the neighborhood,

17   right?

18        **A**    Yes.

19        **Q**    Looking for witnesses.  What did you

20   observe or hear next about this incident?

21        **A**    I don't recall off the top of my head.

22        **Q**    Okay.  What's just the next thing you

23   recall?  Did you hear --

24        **A**    I don't remember.  I believe I was on the

25   phone with Captain Henke notifying them that, you

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                            September 25, 2015

Page 96

1    know, we had had an incident.  And I really don't

2    recall.

3        **Q**     Yeah, okay.  What would be -- after an

4    incident like this where a person was engaged with

5    the police and left in an ambulance like that,

6    what's the normal procedure for --

7        **A**     Oh, I'm sorry, I sent Officer Bebe, I

8    believe, to follow the ambulance to the hospital.

9        **Q**     Okay.  Any other things that you would

10   normally do in a situation like that as part of your

11   supervisory responsibilities?

12       **A**     Not to my knowledge.

13       **Q**     Okay.  Did you talk to Officer Kaminski at

14   the scene and get the information that we've just

15   been covering in Exhibit 12 in your use of force

16   report?

17       **A**     Yes, at the scene, and I also spoke with

18   him at the station.

19       **Q**     Okay.  And did you have written notes that

20   you took while you were speaking to him or were you

21   typing this up as you went?  Or tell us how that

22   worked.

23       **A**     I don't recall.

24       **Q**     Okay.

25       **A**     I know that I spoke with him.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

Page 97

1      **Q**    Sure.

2      **A**    I don't recall if I had written notes or

3   not.

4      **Q**    Okay.  In any event, you would have

5   discard them after you finished your report?

6      **A**    Yes.  I don't keep my notes.

7      **Q**    Is there an investigative file separate

8   from the police report file when there's a death?

9      **A**    I have no knowledge of it.

10     **Q**    Okay.  Any special forms or procedures

11  when there's a death at the Ferguson Police

12  Department, automatic investigation, automatically

13  put the officer off on leave, anything like that?

14     **A**    Not to my knowledge.  We notify our

15  supervisor, who at that time would have been Captain

16  Henke, and advise him of the situation.  And then I

17  guess he notifies the chief and it goes up the

18  chain, however that works, the chain of command.

19     **Q**    Okay.  Did you have any conversation with

20  Officer White at the station, or is everything in

21  your report from your conversation in the street?

22     **A**    Everything's in the report from the

23  conversation.

24     **Q**    At the street?  I mean at Airport and

25  Henquin?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 98

1      **A**    Yes.

2      **Q**    Did you review Officer White or Officer

3    Kaminski's reports prior to authoring your own

4    report?

5      **A**    I briefly read through them.  I didn't

6    approve them though.  They weren't approved by me.

7      **Q**    Okay.  Is that -- I think Dilworth --

8      **A**    Sergeant Dilworth approved, yes.

9      **Q**    Approved at least one of them.  So was

10   Sergeant Dilworth on duty that day?

11     **A**    No, he was not.

12     **Q**    Okay.  So how would he have approved their

13   reports that are dated that day if he was not on

14   duty?

15     **A**    That was a question that I had.  And

16   Sergeant Dilworth had told me that -- he had just

17   recently been promoted.  He was a brand new

18   sergeant.

19     **Q**    Okay.

20     **A**    He said, oh, I saw the report was in there

21   and I read it and just --

22     **Q**    Signed off?

23     **A**    Signed off on it.

24     **Q**    Okay.  So you understand -- your

25   understanding from that conversation and your

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 99

 1    involvement in this scene was that Officer --

 2    Sergeant Dilworth signed off on it just after

 3    reading it?  He didn't necessarily interview

 4    Kaminski or --

 5        A    No, he didn't interview anyone.  He just

 6    signed off after reading the report and checking it

 7    for -- you know, to make sure all the --

 8        Q    Okay.  And so your use of force report is

 9    primarily based on -- and let's talk about the first

10    two paragraphs that we've already gone through.  I'm

11    not going to go through them again.  The first two

12    paragraphs at Ferguson 15 in Exhibit 12 came from

13    Officers White and Kaminski exclusively, correct?

14        A    Yes, sir.

15        Q    And those are the facts that you relied on

16    when you made your report that's in the use of force

17    report, correct?

18        A    Yes, sir, that and their written reports

19    and the police report.

20        Q    And did you make a determination as far as

21    your responsibilities as to whether the use of that

22    force was appropriate?

23        A    No, I did not.

24        Q    Was it someone's responsibility at the

25    Ferguson Police Department to review the situation

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                September 25, 2015

```
                                                   Page 100
 1    and make that assessment?

 2         A    Yes, sir.

 3         Q    Who was that?

 4         A    That's sort of complicated.

 5         Q    Okay.

 6         A    If I could explain.

 7         Q    Just tell me how it works, please.

 8         A    If it's a use of force where we -- it's

 9    basically a wrestling match scenario, I read the

10    report, I look at it, and I will check off the block

11    that says we followed policy or procedures, yes or

12    no.

13         Q    So let's go to that previous page of

14    Exhibit 12, which is Ferguson 14.  I think that's

15    what your talking about.  You'd go through --

16         A    Yes, sir.

17         Q    -- this form report first?  Okay.  And

18    this one's dated 09/17/11.  The time is 06:46.

19    That's the time of the call?

20         A    Correct.

21         Q    Okay.  So as you described it in a general

22    sense, in a wrestling match situation you'd go

23    through and check all the appropriate boxes,

24    correct?

25         A    That is correct.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                              Page 101

 1        **Q**    Okay.  And in this case, you checked the
 2  use of force incident involves -- you checked both
 3  advanced taser used and injured arrestee?
 4        **A**    That is correct.
 5        **Q**    And what does that refer to, injured
 6  arrestee?
 7        **A**    That anyone who has been arrested, whether
 8  they had visible injuries or they are just claiming
 9  injury, that's what that refers to.
10        **Q**    So everybody who resists, you check that
11  box?
12        **A**    If they say that they were --
13        **Q**    -- injured or you can observe that they
14  were injured?
15        **A**    Correct.
16        **Q**    Okay.  So for Mr. Moore, that may have
17  been simply the taser prongs?  Would that be
18  considered an injured arrestee if he had not died?
19        **A**    No.
20        **Q**    I guess the bruises on his face?
21        **A**    The bruising or the abrasions on the face
22  and the knees, and I'm not sure wherever he had
23  them.
24        **Q**    But that would have all constituted an
25  injured arrestee and you would have checked that box

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 102

1    even if he had not died, correct?

2        **A**    Yes.

3        **Q**    That's your signature at the bottom of

4    that page?

5        **A**    Yes, it is.

6        **Q**    Okay.  And you filled that report out on

7    the 17th of September, 2011?

8        **A**    Yes, I did.

9        **Q**    Is this a -- I interrupted you because I

10   remembered I wanted to cover that page with you.

11   But tell us the procedure for how it's determined

12   whether an officer's use of force was within policy

13   and procedures of the general orders of Ferguson

14   Police Department.

15       **A**    I look at the -- like I said, on the

16   smaller incidents, a wrestling match, fist fight,

17   that sort of thing, I look at whether or not the

18   officer followed the force continuum, if he used the

19   appropriate levels of force.  Basically I do the

20   investigation.  If it's something that I think may

21   have a further investigation attached to it, I let

22   that go forward.  I send the report without

23   checking --

24       **Q**    Any boxes?

25       **A**    Correct, because it still has to go up

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                      September 25, 2015

Page 103

1    through the captain and everybody.  And I'll let

2    them make that determination.

3         **Q**    Okay.  And in this case, did the -- did

4    Jason Moore's use of force report go to the captain?

5         **A**    Yes, it was sent up to his office, I

6    guess, because --

7         **Q**    And tell me which captain, please.

8         **A**    That would be Captain Henke.

9         **Q**    Okay.

10        **A**    He was in charge of the patrol division.

11        **Q**    And to your general knowledge, what would

12   have happened next?

13        **A**    To the best of my knowledge, according to

14   policy, after Captain Henke reviews it and

15   determines that it was, you know --

16        **Q**    Lawful force?

17        **A**    Right, lawful use of force, he -- or not

18   lawful, whichever it would be, he forwards that then

19   to the chief's office.

20        **Q**    Okay.

21        **A**    And what they do there, I have no idea.

22        **Q**    Are you aware of what the determination

23   was in this case?

24        **A**    No, sir, I don't.

25        **Q**    Are you aware if -- are you aware if

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                September 25, 2015

```
                                            Page 104
 1   Sergeant -- excuse me, Captain Henke interviewed
 2   yourself or Officer White or Officer Kaminski?
 3       A    Other than speaking with Captain Henke on
 4   the phone that morning about it and briefly telling
 5   him about the incident as I knew it, no, there were
 6   no other interviews.
 7       Q    Where would the paperwork or reports be on
 8   Captain Henke's determination as to the lawfulness,
 9   I'll say, of the use of force by Officer Kaminski
10   and Officer White, whatever the determination was?
11            MS. SHAFAIE:  Object to foundation.  You
12   may answer.
13       A    According to policy, it would be with the
14   chief's office.  And I have no idea what they do
15   with it once --
16       Q    (By Mr. Dowd) Okay.
17       A    Again, I'm in the basement.
18       Q    If you -- if you elevated from your
19   review -- as you say, if it's sort of an easy one
20   that you know what happened and you're confident
21   it's what happened and you're just -- it ends with
22   you, if it's something maybe more serious or
23   you're -- it's unclear as to the level of force and
24   appropriateness, you send it up without filling out
25   a use of force report to Captain Henke, correct?
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                              Page 105
 1        A     No, sir.  I send out -- I fill out a use
 2   of force on all incidents.
 3        Q     Thank you.
 4        A     I'll leave the -- there's a block that
 5   says officer's actions comply with department
 6   policy.
 7        Q     Okay.
 8        A     If it's something that, you know, is
 9   serious then I leave that to their discretion.
10        Q     Okay.  And this is one of those cases that
11   you left to their discretion?
12        A     I believe so, yes, sir.
13        Q     And you've never heard whether they found
14   it to be appropriate or inappropriate use of force
15   or conduct that was -- that the actions complied
16   with department policy?
17        A     No, sir, I never heard anything else.
18        Q     Is Captain Henke's -- would his decision
19   ever be final or would it always have to be reviewed
20   by the chief?
21        A     I'm not sure if his is the final word or
22   not.
23        Q     Okay.
24        A     I couldn't speak to that.
25        Q     If there was discipline involved, it would
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                      September 25, 2015

Page 106

1    require the chief's involvement.  Is that a fair

2    statement?

3         **A**    Yes.

4         **Q**    Okay.  After you called Captain Henke and

5    completed your reports, your report, that's sort of

6    like the next day, do you recall anything else

7    occurring to your knowledge with regard to Jason

8    Moore's death, your involvement or anything you

9    heard at the department?

10        **A**    No, sir, I don't recall.

11        **Q**    When did you learn that Mr. Moore had

12   died?

13        **A**    Probably within -- I would guess 30

14   minutes or so after he went to the hospital.

15   Officer Bebe called me and told me that Mr. Moore

16   had passed.

17        **Q**    Any procedures that required you as the

18   lieutenant to take any actions in that situation

19   once you had been notified of a death?

20        **A**    No, sir, other than notify the chain of

21   command, Captain Henke, and at that time I believe

22   he was making the determination on who -- you know,

23   each person has their own person that they are

24   supposed to notify.  So I don't know who was in his

25   chain of command at that time other than ultimately,

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                             Page 107
  1    I suppose, the chief.

  2        Q     Okay.  Have you ever spoken to Tina Moore?

  3        A     I don't recall.

  4        Q     Okay.  Have you ever spoken to Delores

  5    Moore, Jason's mother?

  6        A     I don't recall.

  7        Q     Okay.  Have you ever spoken to anyone that

  8    you believed was a member of the Moore family?

  9        A     Not to my recollection.

 10        Q     Other than what you may have heard from

 11    your attorneys, one of whom is here today, have you

 12    heard anything else at the department about

 13    Mr. Moore's -- the incident involving Mr. Moore in

 14    which he died?

 15        A     No, sir.

 16        Q     Didn't come up at a staff meeting or

 17    anything like that?

 18        A     Not that I recall.

 19        Q     It's my understanding from Officer

 20    Kaminski's testimony that he was sent home after he

 21    completed his report.

 22        A     Yes, sir.

 23        Q     Okay.  And was that you that sent him

 24    home?

 25        A     Yes, sir, I did.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                          September 25, 2015

                                                              Page 108

1        **Q**    Okay.  And that was because you had

2    learned that the man had died?

3        **A**    Yes, sir.

4        **Q**    Okay.  And that's custom and practice?

5        **A**    Yes, sir.  I send each of my officers,

6    depending on the severity of the resisting -- I

7    mean, whether a person dies or not, if it's a -- if

8    it's just a shoving match basically or a fist fight,

9    no, you don't get the day off.  If it's something

10   more serious, you're involved with gun play or some

11   critical event, then I send them home with pay

12   without -- usually without the chief's approval or

13   anything else.

14       **Q**    Understood.  Okay.  If you would go to

15   page 12 -- or Ferguson 12 on Exhibit 12, is that the

16   taser report that you referred to at the beginning

17   of the deposition that you had reviewed prior to

18   your deposition?

19       **A**    Yes, sir, that appears to be the Taser

20   International use report.

21       **Q**    Okay.  You're the on-scene supervisor

22   noted here and Officer Kaminski is the tasering --

23   taser -- tasering, is that the way you guys say,

24   tasering or tases?  Let me start the question over.

25   I'll try to move through this a little more quickly.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 109

1   So Officer Kaminski's named in this report as the

2   officer who used the taser and you're the supervisor

3   on scene, right?

4        **A**    That is correct, sir.

5        **Q**    And they have the taser serial number

6   571300, correct?

7        **A**    That is correct.

8        **Q**    And Christian Hospital is where he was

9   taken and Dr. Patel took over care there.  Is that

10  correct?

11       **A**    Oh, yes, sir.  Sorry.

12       **Q**    Thank you.  That's all right.  So it says

13  nature of the call or incident, and you've written

14  in there suspicious person, correct?

15       **A**    That is correct.

16       **Q**    And what do you mean by that?

17       **A**    That's just a term that we use.  It's sort

18  of a catch-all for -- it could -- a suspicion person

19  could be someone who's acting strangely.  They could

20  be standing at the back of a building where they've

21  never been before, just anything suspicious.

22       **Q**    Okay.

23       **A**    That's how the -- that's just part of what

24  we use.

25       **Q**    Okay.  Other options would be domestic,

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                            September 25, 2015

Page 110

1    right, a domestic situation?

2         **A**    Correct, traffic stop, domestic, that sort

3    of thing.

4         **Q**    So this is sort of a neutral,

5    non-criminal --

6         **A**    Correct, because that's the way we had

7    originally sort of received that call is a

8    suspicious person until it's classified different.

9         **Q**    Running naked and taking off his clothes

10   and -- that's suspicious behavior, right?

11        **A**    Yes, sir.

12        **Q**    Okay.  So then the charges, assault third,

13   paren, small c, closed paren, indecent exposure.

14   Did I read that handwriting correctly?

15        **A**    Yes, sir.

16        **Q**    What does the (c) after assault third

17   mean?

18        **A**    City charge.

19        **Q**    Okay.  So that would be an ordinance

20   violation?

21        **A**    Yes.

22        **Q**    Same with an indecent exposure, it's an

23   ordinance violation?

24        **A**    Correct.

25        **Q**    Was he -- he was never formally charged,

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                    Page 111

1    correct?

2         **A**    That is correct.

3         **Q**    What's that word right after it?  The

4    writing goes over it and I can't read it.

5         **A**    Booked, yes or no.

6         **Q**    And it was no.  If it was determined that

7    Mr. Moore was having mental health issues or

8    personal crisis and he had not died, is it likely he

9    wouldn't have been charged with indecent exposure?

10             MS. SHAFAIE:  Object to form and

11   foundation.  You may answer.

12        **A**    Yes, I don't believe I would have

13   charged --

14        **Q**    (By Mr. Dowd) Sought a warrant?  You

15   wouldn't have sought a warrant or anything like

16   that?

17        **A**    That's correct.

18        **Q**    What about the assault third?  If he had

19   not died from the -- assuming died from the third

20   taser application, would you have charged him with

21   assault third that city misdemeanor ordinance

22   violation?

23        **A**    Yes.

24        **Q**    Because the taser had to be used?

25        **A**    Because the taser had to be used and he

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 112

1   didn't -- he charged the officer.

2        **Q**    Okay.  Is there anything on this report

3   when you reviewed it this morning or whenever you

4   reviewed it that you thought was inaccurate or

5   wanted to change?  And I'm talking about the taser

6   use report.

7        **A**    No, sir.

8        **Q**    And where did you get the information

9   regarding his age?  Obviously you observed his sex.

10  Height, race, weight, those kind of things?

11       **A**    I believe that information would have came

12  from a computer check.

13       **Q**    Okay.  After the scene?

14       **A**    Correct.

15       **Q**    Had you ever heard of Jason Moore prior to

16  this incident?

17       **A**    No, sir.  I had never had any dealings

18  with Mr. Moore.

19       **Q**    Okay.  Do you know if the Ferguson Police

20  Department had ever had any dealings with him?

21       **A**    No, sir, I don't.

22       **Q**    So when you say your computer, is that a

23  Regis database at that time?

24       **A**    At that time I'm not sure if we were still

25  with Regis or not.  I believe we were still with

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 113

1   Regis, but I --

2       **Q**    Assuming you were still with Regis, that's

3   where you would have gotten the information?  Or do

4   you think you got it from the family?  I'm just --

5       **A**    I -- I don't recall.

6       **Q**    That's fine.  Okay.  So the next line says

7   taser, and you circled success.  What did you mean

8   by that?

9       **A**    That the taser had operated as it was

10  advertised and built to do.  The doors deployed, the

11  darts, probes deployed.  And according to Officer

12  Kaminski, it worked as advertised.

13      **Q**    Okay.  And then they ask on the form,

14  suspect wearing heavy clothes, and you indicated no

15  because he was naked.  What is your understanding as

16  to why that's relevant?

17      **A**    It was my understanding during the

18  training that the heavier the coat, clothing, you

19  know, the big poofy coats or the hoodies and the

20  more layers of clothing you have, that you'll get

21  less penetration with the probes.

22      **Q**    Okay.  And the probes come in different

23  sizes, to your understanding?  There's one that's

24  about .55 of an inch, a little over an inch --

25      **A**    I don't know anything about the sizes of

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                        Page 114

 1    them.

 2        **Q**    Did you procure the taser from the scene

 3    or do you know what happened, how that --

 4        **A**    The taser came back to the station and was

 5    logged into evidence.

 6        **Q**    Okay.  Do you know by who?

 7        **A**    I don't recall.

 8        **Q**    That's all right.  The next one indicates

 9    that there was one cartridge used, and the number of

10    cycles applied three.  Where did you get that

11    information?

12        **A**    From Officer Kaminski, who told me three.

13        **Q**    A cycle is the same as pulling the

14    trigger, correct?

15        **A**    Yes.

16        **Q**    Okay.  So he told you he pulled the

17    trigger three times?

18        **A**    Yes.  My understanding is a cycle is a

19    five-second cycle.

20        **Q**    So he told you at the time that he pulled

21    the trigger three times for five seconds each?

22        **A**    No.  It was my understanding through

23    training, maybe I just was misinformed, but it was

24    my understanding that the cycles run in five-second

25    cycles.  So when he tells me three, I'm thinking

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 115

1    that after the first cycle the taser automatically

2    shuts off, you squeeze it again, it runs for five

3    seconds, automatically shuts off.

4        **Q**    I think in the prior report we went

5    through, he told you it was five seconds, five

6    seconds.  So he believed that as well, right?

7        **A**    Yes, sir, I'm guessing so.

8        **Q**    Okay.  So then you've indicated that the

9    dart probes made contact, that there was no stun gun

10   used, correct?

11       **A**    Correct.

12       **Q**    No stun application.  And just for the

13   record, to your understanding, you know, the dart

14   probes were used in this case, one in his chest and

15   one in Mr. Moore's groin that brought him to the

16   ground.  Tell the jury what your understanding of

17   using the stun application is.

18       **A**    The stun application is nothing more than

19   a stun gun.  It doesn't -- when you use the stun

20   application, the probes or darts are not deployed.

21   And you have to be in close to use it because it's,

22   you know, used by hand.  The stun application is

23   used when either you're in a situation where

24   deploying the probes would not be -- you know, in a

25   room full of people, you don't want to just launch

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 116

1    these two probes that spread out like buckshot

2    basically as they go across the room.  So you would

3    probably go to a stun with it.  And it's used to

4    gain compliance.

5        Q    Okay.  And so the stun application, it's

6    the same gun, you just pull off the cartridge,

7    correct?

8        A    Correct.

9        Q    To your knowledge, it's feasible to pull

10   off the cartridge after you've used the darts if

11   they come out or something and then use the stun,

12   correct?

13       A    Yes, you could do that.  I've never done

14   that, but it could be done that way.

15       Q    Okay.  So to your understanding, your

16   belief, Officer Kaminski had one other use of force

17   alternative that morning, and that was after the

18   first or after the second taser he could have pulled

19   off the cartridge and used the stun to gain pain

20   compliance, correct?

21       A    Yes, I suppose so.

22       Q    Did you ever discuss with him why he did

23   not do that?

24       A    No, sir.

25       Q    And the information on the lines regarding

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 117

1    15 feet being the approximate target distance at the

2    time the darts were launched, you got that from

3    Mr. -- excuse me, Officer Kaminski?

4         **A**    That is correct.

5         **Q**    Same with the distance between the two

6    probes being 18 inches between the groin and the

7    dart in the chest?

8         **A**    Yes, and Officer Kaminski and -- you know,

9    telling me that the -- showing me, you know,

10   basically.

11        **Q**    Yeah.

12        **A**    Didn't actually measure it though.

13        **Q**    That's an approximation based on where --

14        **A**    Correct.

15        **Q**    I guess you observed the darts while you

16   were there too, right?

17        **A**    No.  They had already removed the darts.

18        **Q**    Okay.  The officers or the --

19        **A**    The officers had.

20        **Q**    Okay.  Do you know when they removed the

21   darts?

22        **A**    No, sir.  It was prior to my arrival is

23   all I know.

24        **Q**    So if my understanding is correct, when

25   you arrived he was laying on his stomach in the

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                                   Page 118
  1   prone position you described.  And when they rolled

  2   him over, you didn't see the probes in his chest?

  3        A    I didn't see the probes in the chest.

  4   They may have still been there.  I didn't see them.

  5        Q    Okay.  So again, you're just relying on

  6   what Officer Kaminski and White told you was the

  7   distance between the two probes?

  8        A    Correct.

  9        Q    Okay.  And the report indicates that the

 10   probes penetrated the skin, correct?

 11        A    That is correct.

 12        Q    And that they were removed at the scene?

 13        A    That is correct.

 14        Q    You just don't know if it was the officers

 15   or the EMT that did that?

 16        A    I don't recollect right at this second.

 17        Q    Okay.  It says, did the application cause

 18   injury?  And you circled yes.

 19        A    Yes.

 20        Q    And did we cover that before, the injury

 21   being the abrasions to the face?

 22        A    Yes.

 23        Q    Okay.  When you filled this out, did you

 24   know that Mr. Moore had died?

 25        A    When this was filled out?
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 119

1        **Q**    Yes, sir.

2        **A**    Yes, I filled this out at the station

3    afterwards.

4        **Q**    So the injury was -- included the death?

5        **A**    I did not know -- I don't have the medical

6    knowledge and the medical examiner had not done a

7    post-mortem exam.

8        **Q**    Okay.

9        **A**    So I had no reason to say one way or the

10   other what the cause of death was.

11       **Q**    Okay.  So we're clear that the -- the

12   application of taser caused injury, when you circled

13   that, you were solely referring to the fall injuries

14   to his face?

15       **A**    Correct.

16       **Q**    And then it says, if yes, was the subject

17   treated for the injury?  And you circled yes again,

18   correct?

19       **A**    Yes.

20       **Q**    Do you know what treatment he received for

21   the abrasions to his face?

22       **A**    No, I don't.  I guessed that when he went

23   to the hospital they were going to take care of it

24   there.

25       **Q**    So the second page of your taser report

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                          September 25, 2015

Page 120

1   appears to be basically the -- a more brief

2   statement of the facts that are contained in your

3   use of force report, correct?

4        **A**    Yes, sir.

5        **Q**    Let's just run through it real quick.

6   Subject ran at officer swinging arms, comma, taser

7   employed, dash, subject, parentheses, naked, closed

8   parentheses, fell to ground, period.  Attempted to

9   rise after initial cycle, period.  Second cycle,

10  paren, five seconds, closed paren, applied.  Subject

11  layed back down and tried to rise after cycle ended,

12  period.  Subject tried getting up and was given

13  third five-second cycle and complied.  Correct?

14       **A**    Yes.

15       **Q**    I read that correctly?

16       **A**    Yes, sir.

17       **Q**    Okay.  And it says the device responded

18  satisfactorily.  You circled yes?

19       **A**    That is correct.

20       **Q**    Further, you describe -- the form says,

21  describe the subject's demeanor after the device was

22  used or displayed, question mark.  And you wrote in

23  your report, compliant after third cycle, comma,

24  then unresponsive and not breathing, period.

25                I read that correctly?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                              Page 121
 1      A    Yes, sir, you did.
 2      Q    And that's based on your observations as
 3   well as Officer White and Kaminski's reports?
 4      A    Yes, sir.
 5      Q    So the authorized control hold was the
 6   handcuff behind back after the tasing.  Is that
 7   correct?
 8      A    Yes.
 9      Q    No videos on any of the cars, patrol cars
10   at the scene to your knowledge?
11      A    No, sir, we did not have any video
12   equipment, body cameras, anything of that sort at
13   that time.
14      Q    Did you speak to any of the witnesses
15   whose statements are in the report?
16      A    I believe --
17      Q    Non-police officer witnesses, I mean.
18      A    I believe I spoke with this Fatima Shum or
19   Shurn.  I can't make out the last --
20      Q    I think it's Shum, S-h-u-m, but I'm not
21   sure either.  And from my review of her report, she
22   did not actually witness the arrival of Officer
23   Kaminski and the things that followed, correct?
24      A    No, she never, according to her statement,
25   saw anything.
```

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                September 25, 2015

Page 122

1      **Q**     Okay.  And then there's a -- it looks like

2  an Alan G. Shilling statement on the next page.  Had

3  you seen this when you did your report?

4      **A**     Shilling?

5      **Q**     Yes, sir.

6      **A**     No, I don't believe I had.

7      **Q**     Had you taken Fatima Shum's or Fatima

8  Shurn's --

9      **A**     Yes.

10      **Q**     -- report prior to finishing your report?

11      **A**     Yes, I did.

12      **Q**     Did Officer White or Kaminski ever say to

13  you that they heard Mr. Moore say anything about, I

14  am Cain, or Jesus is great, or God is good, any of

15  those things during the incident?

16      **A**     I don't -- I don't recall.

17          MR. DOWD:  Okay.  Let's go off the record,

18  please.

19          VIDEOGRAPHER:  Off the record at 11:55.

20          (Off the record.)

21          VIDEOGRAPHER:  Back on the record at

22  11:57.

23      **Q**     (By Mr. Dowd) Lieutenant, as far as the

24  functioning of the dispatch system and the officers

25  and your communications system, you actually have a

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                September 25, 2015

Page 123

1    communications officer, correct?

2        **A**    You mean a supervisor over --

3        **Q**    Yes.

4        **A**    At that time, I believe we did, yes.

5        **Q**    Okay.  And do you remember who that might

6    have been?

7        **A**    Possibly -- we've had two.

8        **Q**    Okay.

9        **A**    Or three.  It possibly was one of three,

10   Sergeant Mudd, M-u-d-d, Lieutenant Rettke, who would

11   have been a sergeant at that time.

12       **Q**    Okay.

13       **A**    I'm not exactly sure where he was.  And

14   the most recent one we've had is Sergeant Wood,

15   but -- W-o-o-d, but he wasn't there during this

16   time.

17       **Q**    Okay.  When you radio -- for example, when

18   you first heard Kaminski's -- you heard through the

19   dispatcher Kaminski's on scene with subject,

20   something along those lines?

21       **A**    Yes.

22       **Q**    What would your response have been to

23   dispatch, if any?

24       **A**    I wouldn't have just -- other than we're

25   en route, I wouldn't have given any more

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                        Page 124

1    information.

2        **Q**    Okay.  Would you have said, for example,

3    your location, Marguerite and Airport, en route, or

4    close by en route, I'm there, something like that,

5    if you had been?

6        **A**    No.

7        **Q**    Okay.  Just en route?

8        **A**    Just en route.

9        **Q**    That just acknowledges you got the

10   information and you're responding to the scene?

11       **A**    And I'm on my way to the scene.

12       **Q**    How does the dispatcher then know or is

13   able to relay to the officer on scene how close

14   backup is if they don't get any more information

15   than just people are en route?

16       **A**    The -- there is no way.

17       **Q**    Unless they hear the car coming, see the

18   car coming, anything like that?

19       **A**    Correct.

20       **Q**    Do you recall when you arrived at the

21   scene whether any emergency lights were on on the

22   vehicles?

23       **A**    There were emergency lights activated here

24   on the street because, as I said, we were blocking

25   traffic.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                                  September 25, 2015

Page 125

1      **Q**    So you're pointing to Exhibit 22A?

2      **A**    That's correct.

3      **Q**    Okay.  I'm sorry, you were finished?

4      **A**    Yes, and he was blocking -- there was one

5      there.  And forgive me, I don't remember which

6      vehicle it was.

7      **Q**    Okay.

8      **A**    But there was a vehicle there, and then I

9      parked my vehicle in behind there and had my lights

10     activated.

11     **Q**    Okay.  What about headlights?  Were your

12     headlights on?  Was it that --

13     **A**    I don't recall.

14     **Q**    Okay.  Was the sun up enough that you

15     didn't need headlights?  Can you describe the

16     lighting?

17     **A**    It seems to be that they -- it was bright

18     enough that could you see.

19     **Q**    You don't have a recollection of

20     headlights on Mr. Moore as you pulled in, anything

21     like that?

22     **A**    No.

23     **Q**    Okay.  So did you just say that the two

24     squad cars, the patrol cars that were there when you

25     arrived, had their lights on?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                September 25, 2015

```
                                              Page 126
 1      A    I don't --
 2      Q    Or emergency lights, I mean?
 3      A    I don't remember if the car on the parking
 4  lot had lights or not.  I do believe there was a car
 5  parked on the street in front.
 6      Q    Okay.
 7      A    And I'm not sure whose car that was.  But
 8  it had its overheads on.
 9      Q    Okay.  Without committing to it, let's
10  assume that's the second car and it's Officer
11  White's car.  I just want to know, can you put a
12  line based on where you think the front of his car
13  is -- you're pointing to the picture on 22A,
14  Exhibit 22A.  And I think you're pointing at Airport
15  Road.  I just want to make sure you're saying it was
16  blocking Airport Road.
17      A    Yes.  He was pulled to the corner or --
18      Q    You can draw a box where you think his car
19  is, if you could, where it was.
20      A    That would make it a lot easier.
21      Q    Okay.
22      A    (Witness complied.)
23      Q    And what number --
24      A    Number 5.
25      Q    Would you put a number 5, please?  Yes,
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 127

 1    sir.  And so the front is facing the current --

 2    yeah, perfect, thank you for the arrow.  Let the

 3    record reflect -- would you mind, if you can,

 4    drawing a similar vehicle for box number -- for

 5    number 4?

 6         **A**    (Witness complied.)

 7         **Q**    So it sort of looks like they both pulled

 8    in sort of facing the same direction.

 9         **A**    Yes, sir.  They were, I believe, both were

10    facing west.

11         **Q**    Is there any policy or training on when

12    you pull up to a suspect, keep the front of your car

13    towards the suspect so you can hide behind the door?

14    Is there any training like that?

15         **A**    Yes, that's just standard officer safety

16    practice.  But in this instance, we always try --

17    and I have no idea what the officer was thinking --

18         **Q**    Understood.

19         **A**    -- when he parked there.  I parked behind

20    them.  My vehicle was behind this vehicle.  Mine was

21    solely to block off that traffic lane so that no one

22    ended up being struck by a vehicle.

23         **Q**    Okay.  So you pointed to Exhibit 22A

24    behind a vehicle with the number 5.  Would you just

25    go ahead and -- you don't have to put a box for

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                        Page 128

 1   yours.  Just put a number 6, please.

 2        **A**    (Witness complied.)

 3        **Q**    So Officer Kaminski's car, if he pulled

 4   in, he pulled with his door perpendicular to where

 5   the suspect had been if the suspect was at the curb

 6   of Airport Road?

 7             MS. SHAFAIE:  I just want to stop right

 8   there.  I think what he had said was that he didn't

 9   know whose car that was in the parking lot.

10             THE WITNESS:  I don't know --

11             MR. DOWD:  Okay, you're right.  I'm sorry

12   to assume because I think I know.

13             MS. SHAFAIE:  I just wanted to make sure

14   we're not assuming --

15             MR. DOWD:  You're right, I'm sorry.  Did

16   you get as much of it as you needed?

17             COURT REPORTER:  Got it.

18        **Q**    (By Mr. Dowd) If you would assume for me,

19   sir, that the car with number 4 on it is Officer

20   Kaminski's car.  And if you would assume that

21   without admitting it's true, his driver door would

22   have been facing the suspect if the suspect was at

23   the curb near where you've put your number 1, right?

24        **A**    Yes, sir.

25        **Q**    And it's preferred that if you can you

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

                                                        Page 129

 1   would put the front of your car there so if you have

 2   to you could get behind your door, correct?

 3       **A**    That is correct.

 4       **Q**    And even theoretically possible to even

 5   get back in your car and close the door?

 6       **A**    That's correct.  But there were other cars

 7   pulling in too.  That's why I don't know exactly

 8   whose car was where.

 9       **Q**    Fair enough.  Okay.  Would you agree that

10   an officer who's on the scene who allows a fellow

11   officer to use excessive force that that first

12   officer could have prevented is also guilty of using

13   excessive force?

14           MS. SHAFAIE:  Object to form and

15   foundation.  You may answer.

16       **A**    Yes, I would say so.

17       **Q**    (By Mr. Dowd) Okay.  And I'm going to give

18   you an example.  Maybe you have a better one.  But

19   if there's two officers that are in a room with a

20   suspect and the suspect's compliant and

21   non-threatening and someone is just beating him with

22   his baton, the other officer has a duty to tell him

23   to stop, and then stop him if he doesn't, right?

24           MS. SHAFAIE:  Object to form and

25   foundation.  You may answer.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 130

1       **A**    Yes, we have a duty to stop.

2       **Q**    (By Mr. Dowd) My understanding of Chief

3    Jackson's testimony was that he tried to have a, I

4    guess through his chain of command going down, a

5    CIT-trained officer on each shift.  Do you recall

6    that?

7       **A**    No, sir, I don't recall.

8       **Q**    Okay.  Was there ever an attempt in the

9    2010, 2011 time frame to have a CIT-trained officer

10   on each patrol?

11      **A**    Yes.  We were trying to get everyone in

12   the department moving that direction with the CIT.

13      **Q**    Okay.

14      **A**    That was a goal that we wanted, but at

15   that time I don't remember --

16      **Q**    -- one way or another whether you had

17   enough?

18      **A**    Correct.

19      **Q**    Okay.  The goal would have been to have

20   one CIT-trained officer on each patrol so -- one of

21   the purposes of that would be so that they could

22   hopefully help handle a citizen who was in crisis or

23   a person was having mental health issues, right?

24      **A**    Yes, sir.

25      **Q**    And it would be preferred to have the

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 131

1   officers trained with that tool deal with that

2   person rather than somebody who wasn't trained how

3   to deal with them, correct?

4       **A**    That's correct.

5       **Q**    I assume that in your career you've met

6   officers that come in all -- of all types, large,

7   small, heavy, fast, smart, maybe more practical or

8   less intelligent, right?

9       **A**    Yes.

10          MS. SHAFAIE:  Object to form.  You can

11   answer.

12          THE WITNESS:  Sorry.

13      **Q**    (By Mr. Dowd) I mean, it's -- that's

14   everybody.  I mean, probably in my own office that's

15   true.  So -- and they come with different levels of

16   experience as well, correct?

17      **A**    Yes.

18      **Q**    So you've got somebody who's fresh out of

19   the academy versus somebody like yourself.

20   Experience is going to give them different insights

21   and ability to handle situations, correct?

22      **A**    Yes.

23      **Q**    And because those things are true, it's

24   important to train officers as much as possible,

25   correct?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                      September 25, 2015

Page 132

 1              MS. SHAFAIE:  Object to form.  You may

 2     answer.

 3         **Q**    (By Mr. Dowd) Do you understand the

 4     question?

 5         **A**    Yes.

 6         **Q**    Because you don't want to assume everybody

 7     that comes out of the academy is the same robotic

 8     officer, right?

 9              MS. SHAFAIE:  Form.

10         **Q**    (By Mr. Dowd) One is going to be smarter

11     than the other, one's going to be bigger, you're

12     going to have lady officers, you're going to have

13     large male officers.  Each person has to be trained

14     on the policies and procedures of the department so

15     that they are trained and learn them uniformly.

16              MS. SHAFAIE:  Form.

17         **Q**    (By Mr. Dowd) Is that a fair statement?

18              MS. SHAFAIE:  Form.  You may answer.  I'm

19     sorry.

20         **A**    Yes.

21         **Q**    (By Mr. Dowd) And the importance of that

22     is amplified by the fact that you and your officers

23     are involved in fluid situations that are changing

24     and you have to make decisions quickly, correct?

25              MS. SHAFAIE:  Form.  You may answer.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 133

1        **A**    Yes, sir.

2        **Q**    (By Mr. Dowd) You don't have to -- you

3    don't have time to look at your training manual,

4    your use of force manual or the policies and

5    procedures, correct?

6             MS. SHAFAIE:  Form.  You may answer.

7        **A**    That's correct.

8             MR. DOWD:  Can I ask what's wrong with the

9    form and foundation of that question?

10            MS. SHAFAIE:  Compound, argumentative,

11   vague.

12            MR. DOWD:  He's a defendant in this

13   lawsuit.  That's not -- argumentative is not a valid

14   objection.  And I don't think it was compound, but

15   the record will speak for itself.

16       **Q**    (By Mr. Dowd) Did you understand my last

17   question, sir?

18       **A**    I just forgot what you said listening

19   to --

20       **Q**    Listening to the debate.

21            MR. DOWD:  Okay.  Would you mind reading

22   back the last question that was objected to?

23            (The requested portion of the

24            record read by the reporter.)

25            MS. SHAFAIE:  Same objection.  You can

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                     September 25, 2015

                                                              Page 134

 1   answer.

 2        **A**     Oh, correct.

 3        **Q**     (By Mr. Dowd) And that also raises the

 4   importance of repeatedly training and also testing

 5   on the training to re-enforce?  For example, we

 6   talked earlier in the deposition about the firearms

 7   training.  Obviously if an officer is in a situation

 8   where he's got to use his firearm, that's heightened

 9   everything, his reactions, his adrenaline,

10   everything.  And so the repetitive training is so

11   that he can react properly under that stressful

12   situation, correct?

13        MS. SHAFAIE:  Object to form and

14   foundation.  You may answer.

15        **A**     Yes.

16        **Q**     (By Mr. Dowd) You agree with that

17   statement?

18        **A**     I do agree with that statement.

19        **Q**     Okay.  So you can -- you can have good

20   policies, but they're not worth much in the police

21   business, in the profession of the police, unless

22   they are communicated to the officers, the officers

23   are trained on them, and then the training's

24   reinforced, correct?

25        MS. SHAFAIE:  Form and foundation.  You

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 135

 1    may answer.

 2         **A**    I believe --

 3         **Q**    (By Mr. Dowd) Do you agree with that

 4    statement?

 5         **A**    I believe that's with any profession.

 6         **Q**    And this training on the policies and

 7    procedures, whether it's firearms or use of force or

 8    helping people who have a lost child or an elderly

 9    person in distress, all of those things are for the

10    safety of either or both people who are not officers

11    and the officers?

12              MS. SHAFAIE:  Form and foundation.  You

13    may answer.

14         **A**    Yes, that's correct.

15         **Q**    (By Mr. Dowd) So these policies and

16    procedures of the department are to promote the

17    public safety and the safety of the police officers?

18         **A**    Yes.

19         **Q**    So to put it another way, when police

20    departments train the officers not to use excessive

21    force, this is for the safety of the public?

22              MS. SHAFAIE:  Form and foundation.  You

23    may answer.

24         **A**    Yes, it is.

25         **Q**    (By Mr. Dowd) And excessive force is

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                September 25, 2015

```
                                            Page 136
 1   designed to protect the public from abuse by police

 2   officers?

 3            MS. SHAFAIE:  Form and foundation.  You

 4   may answer.

 5        A    I'm sorry, could you --

 6        Q    (By Mr. Dowd) Sure.  Excessive force

 7   training or use of force training is designed, at

 8   least in part, to protect the public from abuse by

 9   police officers?

10            MS. SHAFAIE:  Same objection.  You may

11   answer.

12        A    Yes, it is.

13            MR. DOWD:  Your form and foundation

14   objections can be for the record until we take our

15   next break, okay?  You don't have to make them.

16            MS. SHAFAIE:  So we'll just stipulate --

17            MR. DOWD:  Just like --

18            MS. SHAFAIE:  -- and you agree with that

19   as well that --

20            MR. DOWD:  Until the next break, just the

21   same record that Robert made in the previous

22   deposition.  I thought it was pretty thorough.

23            MS. SHAFAIE:  Just until the next break?

24            MR. DOWD:  Exactly.

25            MS. SHAFAIE:  Okay.  That's fine.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 137

1       **Q**     (By Mr. Dowd) So -- and police departments
2    also have a duty as a lieutenant, sergeants,
3    captains, chief, to supervise the patrol officers
4    who are engaging with the public, correct?
5       **A**     That is correct.
6       **Q**     And if I understand Chief Jackson's
7    testimony, that was part of his ability to monitor
8    and review compliance with the policies and
9    procedures was the superior officers, the
10   supervisors and the fellow officers, correct?
11      **A**     That is correct.
12      **Q**     So that supervision, when a police
13   department supervises officers not to use excessive
14   force, this is also for the safety of the public?
15      **A**     Yes, sir.
16      **Q**     And excessive force supervision of the
17   department's officers is designed to protect the
18   public from abuse by police officers?
19      **A**     Yes, sir.
20      **Q**     You would agree that this training and
21   supervision is designed to protect all of us from
22   serious injury and death?
23      **A**     Yes.
24      **Q**     You agree that departments should train
25   officers how to deal with people who are having

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 138

1   personal crisis?

2       **A**    Yes, sir.

3       **Q**    You agree that departments should

4   supervise its officers on how they deal with people

5   in personal crisis?

6       **A**    Yes, sir, I do.

7       **Q**    You further agree that training and

8   supervision on how to safely deal with people in

9   personal crisis is to protect the public from

10  serious injury and death?

11      **A**    Yes.

12      **Q**    Do you believe it is particularly

13  important for police officers not to use excessive

14  force when dealing with people who are having a

15  personal crisis or mental health issues?

16      **A**    Yes, sir, I do.

17      **Q**    Okay.  Why is that?

18      **A**    That person at that moment in time has --

19  well, let me rephrase that.  They can actually be

20  knowing what they are doing, if that makes sense, or

21  they could totally have no clue of what they are

22  doing or the consequences of their actions.

23      **Q**    You say they.  You mean the members of the

24  public that might have a mental issues?

25      **A**    Correct, the people that you asked me

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                      Page 139

1    about.  So the officer needs to be trained, I feel,

2    instead of -- you know, to handle that better rather

3    than just jump out like some --

4        **Q**    Cowboy and --

5        **A**    Yeah, that's a good word, I guess.  But

6    some robot or whatever and, you know, just

7    automatically cart people off to jail or, you

8    know -- I mean, if you have to fight, you have to

9    fight.  But if you can talk a person down or talk

10   them out of it, then that's what they need to be

11   doing.

12       **Q**    That's consistent with using the least

13   amount of force necessary?

14       **A**    That is correct.

15           MR. DOWD:  Okay.  Let's go off the record.

16           VIDEOGRAPHER:  Off the record at 12:15.

17           (Back on the written record, but off the

18   video record.)

19           MS. SHAFAIE:  Before going on the record,

20   Mr. Dowd, counsel for Plaintiff, handed the witness

21   and also me Plaintiff's Exhibit 23.  I asked him if

22   he had previously produced it to us, meaning us, the

23   defendants.  He said that he thought perhaps he had

24   received it from Defendants.  I examined Exhibit 23

25   very briefly, noted that there were no Bates

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 140

1    labeling on Exhibit 23.  And had it been produced by

2    Defendants, it would have had some sort of Bates

3    labeling.

4              I then asked whether this had been

5    previously produced to Defendants by Plaintiffs.

6    Mr. Dowd responded that it had not been previously

7    produced.  He has not told me what it is, where he

8    received it, when he received it.  And so I'm going

9    to ask him now --

10             MR. DOWD:  I'll tell you, as I told you

11   off the record, that this is a document that was in

12   my file from my work product.  We have lots of

13   lawyers working on this case gathering information.

14   It was in my file.  I saw Mr. Ballard's name --

15   Lieutenant Ballard's name on it.  I didn't know what

16   it was.  So I wanted to bring it today and ask him

17   if he knew what it was and why his name is on it.

18             MS. SHAFAIE:  I just want to --

19             MR. DOWD:  I discovered it in my file last

20   night just scrolling through and clicking on things

21   that had Mr. Ballard's name on it.

22             MS. SHAFAIE:  And I just want to clarify,

23   when you say you found it --

24             MR. DOWD:  Further, I don't have to

25   disclose documents used solely for purposes of

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 141

1    cross-examination.  So for the record, I didn't have

2    to produce this, if that's what it turns out to be.

3    So do you need to make any more record before we ask

4    three questions about this?

5            MS. SHAFAIE:  The only other thing I want

6    to state into the record is that because I've never

7    seen it before and I don't know what it is and I've

8    only had five seconds to examine it, I don't know if

9    it may have been responsive to our previous

10   discovery request.  And so that is the only reason

11   why I inquire as to when you received it and what it

12   is, so that I may know whether it should have been

13   provided to us previously.

14           VIDEOGRAPHER:  Back on the video record at

15   12:20.

16       Q    (By Mr. Dowd) Lieutenant, I've given you

17   what's previously been marked Plaintiff's Exhibit

18   23.  Do you see that?

19       A    Yes, sir, I do.

20       Q    Have you had a moment to page through it?

21       A    Yes, sir, I have.

22       Q    Do you know what this document is?  It's

23   titled detailed report.

24       A    I have no idea what this is, sir.

25       Q    Is -- I'm going to ask you without reading

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                        Page 142

 1    into the record, for privacy purposes, is that email

 2    address that appears on there your personal email

 3    address?

 4        **A**    No, sir, it is not.

 5        **Q**    Is that a department email address?

 6        **A**    That's my son's email.

 7        **Q**    Okay.  Is your son a certified instructor

 8    or taser user?  He's an -- is he an officer?

 9        **A**    Yes, sir, he's a detective with the

10    Ferguson Police Department.

11        **Q**    Okay.  So that's his -- so this would be

12    relative to him?

13        **A**    Yes, sir.  552 is his badge number.

14        **Q**    You looked -- not that you're old, but you

15    looked a little old to have Billy Ballard as your

16    email address.  Okay, so you don't have any

17    knowledge about the document.  That's all the

18    questions I have.

19        **A**    No, sir, I --

20        **Q**    Thank you.

21        **A**    -- don't have any.

22        **Q**    I'd like to give you Exhibit 24 and ask

23    you to take a look at that.  I'll give one to your

24    counsel as well.  Can I give you the other one?

25    Officer, can I have that one back?  Or Lieutenant,

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 143

1   I'm sorry.  This one's got my highlights.  I'm going

2   to try to -- you can see on the one I just gave you

3   I've got two areas highlighted.  That's sort of what

4   I'm going to focus on.

5        **A**    Okay.

6        **Q**    I'll move through a couple of these so I

7   understand how these reports are made.  Does that

8   appear to be a non-lethal force report from the

9   Ferguson Police Department?

10       **A**    Yes, sir, this is the one we were using

11  when I was hired back in '89, I believe.

12       **Q**    Okay.  And the date of this incident was

13  February 25th, 2008?

14       **A**    Yes, sir.

15       **Q**    And if tasers were obtained by Ferguson in

16  July of 2010, this would have been before they had

17  tasers as a use of force tool, correct?

18       **A**    Yes, sir.

19       **Q**    If you would look on section 22, the

20  supplemental narrative, the last part of it reads, 8

21  to 12 females started fighting, period.  They were

22  told several times, parentheses, three, closed

23  parentheses, to stop fighting and disburse.  They

24  continued to fight.  I warned them I was going to

25  use OC spray.  They continued, period.  OC spray was

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 144

 1    sprayed in their direction, period.  They took off

 2    running, period.

 3            Did I read that correctly?

 4       **A**    Yes, sir.

 5       **Q**    And that's -- there's a reporting officer,

 6    it looks look Horton?

 7       **A**    That is correct, yes, sir.

 8       **Q**    Okay.  So there's no officer injury in

 9    this situation?

10       **A**    I was not there.  I don't know.

11       **Q**    Okay.  Or at least pursuant to this

12    report.  I think there's a --

13            MS. SHAFAIE:  I'm just going to object.

14       **Q**    (By Mr. Dowd) On the first page of

15    Exhibit 24, is there a box for, I notice on the

16    later forms there is, whether an officer was

17    injured?

18            MS. SHAFAIE:  Are you asking him a

19    question?

20            MR. DOWD:  I'm sorry?

21            MS. SHAFAIE:  Are you asking him a

22    question?

23            MR. DOWD:  Yes.  I'm asking him if

24    there -- if this form indicates whether there was an

25    officer injured.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                              Page 145
  1       A    I don't see any place on there for officer

  2    injury.

  3       Q    (By Mr. Dowd) Okay.  So it doesn't say

  4    either way, correct?

  5       A    Correct.

  6       Q    But there was no citizen that was injured

  7    and no taser was used.  Would you agree with that?

  8       A    According to the report, yes, sir.

  9       Q    I'll give you Exhibit 25.  Does that

 10    appear to be a non-lethal force report dated

 11    June 15th, 2009?

 12       A    Yes, sir, it does.

 13       Q    Does it indicate one way or the other

 14    whether an officer was injured?  I'll point out at

 15    section 22 it says, once -- the subject began to

 16    resist arrest.  You see that?  And then it goes down

 17    to, once in the patrol car subject became irate and

 18    began yelling, period.  He kicked my seat, comma,

 19    causing me to jerk forward and strain my neck,

 20    period.  I ordered him to stop kicking, period.  He

 21    continued to kick, comma, striking the car window

 22    and shattering it, period.  I then had to use a shot

 23    of OC spray to help him get under control.

 24            Did I read that correctly?

 25       A    Yes, sir.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                              Page 146
 1       Q    Okay.  So that officer did not have to use
 2   a taser, correct?
 3       A    No, sir.
 4       Q    And there a citizen was not seriously
 5   injured or killed?
 6       A    No, sir.
 7       Q    And the injury to the officer happened
 8   before the use of force, correct, not after?
 9       A    According to the report, that's correct.
10       Q    Let me give you Exhibit 26.  Is that a
11   non-lethal force report for Ferguson dated
12   October 30th?  And if you look on the back page,
13   it's got a complete date of 10/30/2009.  Do you see
14   that?
15       A    Yes, sir, I do.
16       Q    Okay.  And this use of force report, it
17   says that the male subject began fighting with the
18   officers to avoid being arrested, period.  One
19   subject was taken to the ground.  He continued to
20   resist, refusing to put his hands behind -- excuse
21   me, his hands behind his back.  Subject was told
22   several times to stop resisting, period.  Subject
23   was sprayed with OC and placed under arrest without
24   further incident, period.
25            Did I read that correctly?
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                      September 25, 2015

```
                                                    Page 147
   1        A    Yes, sir.

   2        Q    Okay.  So the officer was able to gain

   3    compliance without the use of a taser, correct?

   4        A    Yes, sir, it appears so.

   5        Q    Doesn't appear from this report the

   6    officer was injured?

   7        A    No.

   8        Q    And it doesn't appear a citizen was

   9    seriously injured or killed either, correct?

  10        A    That is correct.

  11        Q    Let me give you Exhibit 26.  I'm sorry,

  12    this will be Exhibit 27.  Does that appear to be a

  13    use of force report from Ferguson Police dated

  14    August 23rd, 2010?

  15        A    Yes, it does.

  16        Q    Okay.  It indicates that pepper mace was

  17    used?

  18        A    Yes, sir, it does.

  19        Q    And that was at a domestic assault third?

  20        A    Correct.

  21        Q    You signed this as the commander and

  22    supervisor?

  23        A    I did, sir.

  24        Q    If you look on the second page, it looks

  25    like the suspect was not injured and was
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 148

1   decontaminated at the station after he was maced.

2   Is that correct?

3        **A**    That's correct.

4        **Q**    Does it indicate the police officer was

5   hurt?

6        **A**    No, sir, it does not.

7        **Q**    Okay.  So no officer injury, no citizen

8   injury and no taser required, correct?

9        **A**    That's correct.

10            MS. SHAFAIE:  Can we go off the record for

11   a second?

12            MR. DOWD:  Yes, ma'am.

13            VIDEOGRAPHER:  Off the record at 12:28.

14            (Back on the written record, but off the

15   video record.)

16            MR. DOWD:  We had a discussion off the

17   record how many of these we're going to go through,

18   and I said I'm going to go through the date of the

19   incident.  And I was asking if she would stipulate

20   on behalf of her clients that these are business

21   records as recognized by the federal rules of

22   evidence so I don't have to go through the

23   foundation with each one or all of them.

24            MS. SHAFAIE:  I will stipulate to the

25   admissibility of the document itself.  Not to any of

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 149

1    its contents, if they were to be used for hearsay or

2    anything like that.

3              MR. DOWD:  Okay.  So the authentication is

4    complete --

5              MS. SHAFAIE:  Correct.

6              MR. DOWD:  -- but you reserve hearsay

7    objections.

8              MS. SHAFAIE:  Yes.

9              MR. DOWD:  Okay.

10             VIDEOGRAPHER:  Back on the record at

11   12:30.

12      Q    (By Mr. Dowd) I've given you Exhibit 28,

13   Lieutenant, which is a use of force report dated

14   August 26, 2010.

15      A    Yes, sir, you did.

16      Q    And these reports, the ones I've shown you

17   previously, are generally -- they're kept in the

18   ordinary course of the department's business,

19   correct?

20      A    That is correct.

21      Q    And they're made at or near the time of

22   the information contained in them?

23      A    Yes, sir.

24      Q    And they're used for the professional and

25   business purposes of the department?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                              Page 150
  1       A    That is correct.

  2       Q    All right.  They're not created solely for

  3   purposes of litigation, are they?

  4       A    No, sir.

  5       Q    And do you and the other officers in the

  6   command at the department rely on the information

  7   that's contained in these reports?  I mean, do you

  8   look at them and assume that they're accurate and

  9   true?

 10       A    Yes, sir.

 11       Q    And that they're made by persons with

 12   knowledge of the facts contained therein?

 13       A    That is correct.

 14       Q    So on 28, Exhibit 28, this was a physical

 15   force situation where the person was resisting

 16   arrest, correct?

 17       A    That is correct.

 18       Q    And so if you look on the additional

 19   comments, the third sentence down, it begins, he

 20   refused to give his hands to the officer and was

 21   struck with an open palm strike, parentheses, heel

 22   of the hand, closed parentheses, once in the back,

 23   between the shoulder blades, period.  The subject

 24   then complied and was handcuffed without further

 25   incident, period.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                              Page 151
 1              I read that correctly?

 2      A    That is correct.

 3      Q    And then I'd like to go down to where it

 4   begins, Officer Pillarick acted properly and within

 5   the departmental policy guidelines.  The arrestee

 6   shows no signs of injury.

 7              I read that correctly?

 8      A    Yes, sir.

 9      Q    Okay.  There were paramedics at the scene,

10   but they did not see any obvious injuries.  Do you

11   see that?

12      A    Yes.

13      Q    And would you agree that there is no

14   mention of serious injury to an officer in this

15   report?

16      A    Yes, sir.

17      Q    And there was no person, citizen, that was

18   injured or killed?

19              MS. SHAFAIE:  I'm going to object.

20              MR. DOWD:  I'll rephrase.

21              MS. SHAFAIE:  Just look -- if you look at

22   the first page, just --

23              MR. DOWD:  Okay.

24              MS. SHAFAIE:  I think it mischaracterizes.

25              MR. DOWD:  Okay.  So I'll withdraw the
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

Page 152

1   question.

2       **Q**    (By Mr. Dowd) Would you agree that this

3   report shows that the citizen, the person who was

4   taken into custody by the officer, showed no signs

5   of serious injury and was not killed?

6       **A**    Yes, sir, according to the report.

7       **Q**    There was no taser application required at

8   all?

9       **A**    No, sir.

10      **Q**    And at least in the narrative it doesn't

11  describe any serious injury to an officer, correct?

12      **A**    That is correct.

13      **Q**    Would an officer who tackles a suspect and

14  has to take him, would they be presumed to have been

15  injured?

16          MS. SHAFAIE:  Object to form.  You can

17  answer?

18      **A**    It depends on where you tackle him.

19      **Q**    (By Mr. Dowd) If you tackle him on the

20  concrete?

21      **A**    On the concrete, I would imagine that you

22  would have some sort of abrasion or injury or --

23  unless, of course, you fall on the person you're

24  tackling and they break your fall.

25      **Q**    Okay.  So the officer injured could mean

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                            Page 153
 1    something like that, that the officer scraped his

 2    elbow or his knee when he was tackling the

 3    gentleman?

 4         A    Yes.

 5         Q    I'll give you Exhibit 29.  Does that also

 6    appear to be a use of force report from the Ferguson

 7    Police Department?  And this one is dated

 8    January 15th, 2011?

 9         A    Yes, it is.

10         Q    And here it's resisting arrest and

11    physical force was used by the officer, correct?

12         A    That is correct.

13         Q    And there's no indication on the front

14    page that there was an officer injured?

15         A    No, sir.

16         Q    If you look on the second page under the

17    comments, it appears that the person appeared to be

18    intoxicated and refused to do what the officer told

19    him to do and grabbed the officer's arm and pushed

20    him, period.  Officer Mullen then took him to the

21    ground and the subject's nose started to bleed.  An

22    LSU was requested and responded, period.  The

23    subject was treated and made no further complaints

24    and then complied with the officer's request,

25    period.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                          Page 154

 1            Did I read that handwriting correctly to
 2    your belief?
 3        A    Except for the LSU should be LSV, V as in
 4    vehicle.
 5        Q    Okay.  And what is LSV, please?
 6        A    Life support vehicle.  It's an ambulance.
 7        Q    Okay.  So this report indicates that no
 8    officer was injured?
 9        A    Correct.
10        Q    That no person, namely the citizen or
11    suspect, was not seriously injured or killed and no
12    taser was used, correct?
13        A    Correct.
14        Q    I'll give you what I'm marking Exhibit 30.
15    Is that a use of force report dated September 12th,
16    2011?
17        A    Yes, sir, it is.
18        Q    And this, again, is after there were
19    tasers for use at the Ferguson Police Department?
20        A    To the best of my knowledge, yes, sir.
21        Q    And this is just a -- it's the day
22    after -- excuse me, a couple days before the
23    September 17th, 2011 Moore incident, correct?
24        A    Yes, sir.
25        Q    Okay.  And this, again, is a resisting

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                                     Page 155
 1    arrest with physical force used by the officer?

 2        A    Yes, sir, it is.

 3        Q    And if you look at the middle of the

 4    additional comments, you're welcome to read the

 5    entire comments if you'd like, but I'm going to read

 6    into the record the middle part that states, verbal

 7    commands were given to Edwards but he continued on

 8    toward Beard.  Using an arm bar technique against

 9    Edwards he was forced to the ground but resisted

10    handcuffing.  Keeping in a push-up stance to resist

11    further, Edwards was finally pushed to the ground

12    fully for handcuffing, period.

13             Did I read that portion correctly?

14        A    That is correct.

15        Q    It says during the process -- it indicates

16    Edwards received an abrasion to his forehead,

17    correct?

18        A    That is correct.

19        Q    Doesn't indicate there was an officer

20    injury in this situation?

21        A    No, sir, it does not.

22        Q    Does not indicate that the suspect

23    received a serious injury or death?

24        A    No, sir.

25        Q    And there was no need for a taser,
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                      September 25, 2015

```
                                               Page 156
 1   correct?

 2       A     That is correct, sir.

 3       Q     In all the discussions you had with White

 4   and Officer Kaminski regarding their observations of

 5   Mr. Moore on the day that Mr. Moore died, did you

 6   ever hear either of those officers use the phrase

 7   that he was in the push-up stance to resist or was

 8   in a push-up stance at all?

 9       A     It sounds familiar, sir, but I just read

10   it in the narrative there, so I don't want to -- I

11   don't recall.

12       Q     You don't have a specific recollection of

13   them using that phrase?

14       A     I don't recall.

15       Q     And you don't -- you never saw in any of

16   the reports you reviewed prior to your testimony

17   today, did you?

18       A     I don't believe so.

19       Q     Let me give you what's been marked

20   Exhibit 31 and ask you to confirm that this is a use

21   of force report dated September 21st, 2011.  It

22   indicates this was resisting arrest where physical

23   force was used by the officer including mace.  Is

24   that correct?

25       A     Yes, sir, it is.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                        Page 157

1        **Q**     This officer was trying to apprehend

2    someone who continued to walk away from the officer,

3    did not comply with the officer.  Officer -- the

4    officer used an arm bar to pin the suspect against a

5    patrol vehicle and attempted to handcuff her, but

6    the suspect continued to resist and pull away,

7    actually kicked the officer in the chest and spit on

8    the officer, kicked both doors and windows of the

9    vehicle, kicked again the officer in the chest.  The

10   officer used the OC spray, or pepper spray, to gain

11   control of the suspect.  The suspect had been warned

12   to stop being physically violent prior to the OC

13   spray.

14           Does that all appear consistent with the

15   report you have, sir?

16       **A**     Yes, sir, it is.

17       **Q**     It appears the suspect was given dry

18   towels to clean off the OC spray and did not claim

19   any injury, correct?

20       **A**     That is correct.

21       **Q**     And neither officer was injured.  It

22   states that as well?

23       **A**     Yes, sir.

24       **Q**     So no officer injury, no serious injury to

25   the citizen, and no need for a taser in that

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                September 25, 2015

```
                                           Page 158
 1   instance, correct?

 2        A    That is correct.

 3        Q    This is September 21st, 2011 when the

 4   department had tasers available, certain officers

 5   had tasers?

 6        A    Yes, sir.  Not everyone has a taser.

 7        Q    I understand.  But they were able to get

 8   the situation under control without an injury,

 9   without a taser?

10        A    Yes, sir, according to the report.

11        Q    According to the report.

12             MR. DOWD:  Okay.  Let's go off the record,

13   please.

14             VIDEOGRAPHER:  Off the record at 12:40.

15             (Off the record.)

16             VIDEOGRAPHER:  Back on the record at

17   12:44.

18        Q    (By Mr. Dowd) Lieutenant, we talked

19   earlier in the deposition about your experiences

20   with and a foreseeability of different people that

21   your officers and when you were a street officer

22   encountered members of the public who were either in

23   public crisis or having mental health issues.  I

24   just wanted to ask, you'd agree that -- I had a few

25   more specific examples and ask you if these fall
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                             Page 159

 1   into the types of people we were talking about

 2   earlier.  People with certain mental disabilities?

 3        A    Yes, sir.

 4        Q    Diabetics having diabetic shock?

 5        A    Yes.

 6        Q    Elderly people with dementia or

 7   Alzheimer's?

 8        A    That's correct.

 9        Q    People having agitated or excited

10   delirium?

11        A    Yes.

12        Q    Okay.  Do you under -- is there a

13   distinction in your mind between agitated delirium

14   and excited delirium?

15        A    No, sir.

16        Q    Okay.  What's your understanding of that

17   state of mind?

18        A    I'm not exactly sure what that is, to be

19   honest with you.

20        Q    Okay.

21        A    I've just recently heard the term over the

22   last couple years and read up on it.  But the way I

23   see it -- and whether it's agitated or -- what was

24   the other?

25        Q    Excited.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                                  Page 160
   1        A     Excited, is that this person is not in
   2   their right, you know, frame of mind.  They may be
   3   hallucinating, they may be hearing voices, and it
   4   could be for a number of different reasons, and they
   5   act on those impulses.
   6        Q     Uh-huh.
   7        A     So, you know, it elevates the activity of
   8   the person, their heart rate, their breathing, you
   9   know, whereas an officer may originally look at that
  10   person and think that they are just mad or angry or
  11   whatever.  You know, they're not going to maybe
  12   realize it's an underlying medical condition.
  13        Q     Okay.  And are those people -- because of
  14   that underlying medical condition, are they at
  15   greater risk for an in-custody death or a --
  16        A     Yes, sir, they are.
  17        Q     And why is that?
  18        A     From what I've read, it's due to the
  19   elevated heart rate, the respirations and that sort
  20   of thing.
  21        Q     Okay.  And is it your understanding that a
  22   taser application accelerates the heart rate and
  23   does -- puts more stress on a person's body?
  24              MS. SHAFAIE:  Object to foundation.
  25        Q     (By Mr. Dowd) Is that your understanding?
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                           Page 161
 1   You can answer.
 2           MS. SHAFAIE:  I'm sorry, you can answer.
 3   I'm so sorry.
 4           THE WITNESS:  I just hear objection and --
 5           MS. SHAFAIE:  You're good.
 6      A   Yes, it does elevate the heart rate as to
 7   what we were told during training.
 8      Q   (By Mr. Dowd) Was there any training by
 9   the Ferguson Police Department prior to September of
10   2011 regarding helping an officer identify people
11   that are in excited delirium?
12      A   Other than just going, sending whichever
13   officers are available to go to the CIT training,
14   no, there wasn't.
15      Q   So CIT training would be applicable use
16   of -- applicable tool to use on a person in excited
17   delirium if possible?
18      A   Having not --
19           MS. SHAFAIE:  I'll object to foundation.
20   You can answer.
21      Q   (By Mr. Dowd) You have not had CIT
22   training?
23      A   Having not been CIT certified, I don't
24   know.
25      Q   But you have a general idea of what the
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 162

1    purpose of CIT is.  You agree with that?

2         **A**    Yes, sir.

3         **Q**    Okay.  And you want your officers to get

4    trained on it, correct?

5         **A**    Yes, sir, I do.

6         **Q**    And a person in excited delirium, that

7    officer would have, if they're trained, they would

8    have that as a tool for managing that person?

9         **A**    Yes, sir, they would.

10        **Q**    The other tool they would have available

11   would be the deescalation techniques that they -- if

12   they had been trained on deescalation techniques,

13   they would have that as a tool to deal with a person

14   who's in excited or agitated delirium?

15        **A**    Yes, sir, that would be another tool.

16        **Q**    Those would be early tools in the use of

17   force continuum?

18             MS. SHAFAIE:  Object to form.

19        **Q**    (By Mr. Dowd) And obviously -- let me

20   clarify.  I'll rephrase.  Deescalation techniques

21   and CIT training techniques are early in the use of

22   force continuum?  And what I mean by that is there's

23   command presence, there's soft voice, there's hands

24   on softly, there's hands on firmly, and somewhere in

25   that early progression the CIT and deescalation

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 163

1    tools would be used in that phase of the selection

2    process?

3              MS. SHAFAIE:  Form.  You can answer.

4        **A**    Yes, you would.

5        **Q**    (By Mr. Dowd) Once you get to firm hands

6    on or body holds, arm bars, thumb locks, things like

7    that, you're past the CIT and deescalation training,

8    correct?

9        **A**    Yes, sir.  Once -- once you get into that,

10   you're no longer talking nice.

11       **Q**    And that's what I meant by in the

12   continuum.  You would use it before those?

13       **A**    Yes, you would use it before any

14   physical --

15       **Q**    And in the hopes that you wouldn't have to

16   escalate the force?

17       **A**    That's the object of it, yes, sir.

18             MR. DOWD:  Okay.  Let's go off the record.

19             VIDEOGRAPHER:  Off the record at 12:50.

20             (Off the record.)

21             VIDEOGRAPHER:  Back on the record at

22   12:51.

23             MR. DOWD:  Lieutenant, thank you for your

24   time today.  I don't have any further questions.  I

25   would reserve the right to inquire further if

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 164

1   documents that are produced that should have been

2   previously produced or are later discovered to

3   inquire further about those subjects.  But again,

4   thank you for your time.

5           THE WITNESS:  Thank you, sir.

6                    EXAMINATION

7   QUESTIONS BY MS. SHAFAIE:

8       Q    I just have a couple questions for you to

9   follow up on some of the topics that Mr. Dowd spoke

10  to you about.  One of the things that he talked to

11  you about was roll call and also staff meeting.  And

12  you said that you did not remember the topic of

13  Mr. Moore being brought up during a staff meeting.

14  Do you recall the topic of Mr. Moore ever being

15  brought up during any role call?

16      A    Other than just maybe someone saying that

17  we had had a death with a taser.  But I don't recall

18  anything else.

19      Q    Okay.  So do you know if the topic of

20  Mr. Moore would have been brought up in roll call,

21  say, the evening of Mr. Moore's death?

22      A    I don't recall that.

23      Q    Okay.  Then you talked about -- Mr. Dowd

24  asked you about whether you were aware of a desire

25  of Tom Jackson's to have a CIT-trained officer on

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

Page 165

1   every patrol shift.  Do you remember him talking to

2   you about that?

3       **A**    Yes, I do.

4       **Q**    And you said, and correct me if I'm wrong,

5   you said you didn't -- you remember that it is an

6   initiative for all officers to be CIT-trained, but

7   you didn't remember specifically that there should

8   be a CIT-trained officer on each patrol.  Do you

9   remember giving that answer?

10      **A**    Yes.

11      **Q**    Were you, as lieutenant at that time, in

12  charge of scheduling officers onto each shift?

13      **A**    Yes.

14      **Q**    Okay.  And were -- was there anyone who

15  was in charge of scheduling over you?

16      **A**    Captain Henke would have been.

17      **Q**    And what would Captain Henke's

18  responsibility have been with regard to scheduling

19  officers?

20      **A**    To work?

21      **Q**    Yes.

22      **A**    Captain Henke made the schedule for the

23  year with each officer, days off, rotations, that

24  sort of thing.  Also, he kept the running totals on,

25  you know, who was on vacation or that sort of thing.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                      September 25, 2015

```
                                              Page 166
 1       Q    Okay.  So would he have known whether
 2  there was an officer that was CIT-trained on each
 3  schedule or shift?
 4       A    I'm -- I can't answer that because we
 5  didn't specifically -- or I didn't.  I can't speak
 6  for the other supervisors.  I didn't specifically
 7  send up anything saying that, you know, so-and-so is
 8  CIT-trained or a bomb technician or anything.
 9       Q    Sure.
10       A    K-9, everybody pretty much knows.
11       Q    Then Mr. Dowd went over several exhibits
12  with you that were use of force reports that were
13  not authored by you except for maybe one.  Do you
14  remember looking at those exhibits?
15       A    Yes, I do.
16       Q    I think they were Exhibits 24 through 31,
17  for the record.  And do you remember Mr. Dowd going
18  over what uses of force were used in each one of
19  those reports?
20       A    Yes, I do.
21       Q    And specifically, Mr. Dowd talked to you
22  about certain force reports that showed that OC or
23  pepper spray or mace was used.  Do you remember
24  looking at those reports?
25       A    Yes, sir, I do.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                                  Page 167
  1       Q     And then Mr. Dowd --

  2       A     Or yes, ma'am.

  3       Q     Sure.  And then do you remember Mr. Dowd

  4   also going over some of the reports where empty hand

  5   techniques or other sort of physical force was used?

  6   Do you remember those?

  7       A     Yes.

  8       Q     Okay.  Do you know whether the officers in

  9   those situations would have had access to a taser on

 10   their shift?

 11       A     No, I would not.

 12       Q     Are all -- are -- do all officers have

 13   access to a taser when they're on their shift?

 14       A     No.

 15       Q     And why is that?

 16       A     I believe when we first got the tasers

 17   there was barely enough to outfit a shift, a squad

 18   that was working.  Then when tasers -- you know, for

 19   whatever reason they would -- you know, somebody

 20   drops it on the floor and it breaks or we don't want

 21   to use it after you drop it, to this day we still do

 22   not have a taser per officer.

 23       Q     So it's fair to say there aren't enough

 24   tasers for each officer going out on each shift to

 25   carry one with them?
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                      September 25, 2015

                                              Page 168

 1      **A**    That's correct.

 2      **Q**    Okay.  And then does each officer, as far

 3   as you know, also always carry mace with them?

 4      **A**    No.

 5      **Q**    Okay.  Why is that?

 6      **A**    It was found that -- well, as in Officer

 7   Kaminski's instance, he's deathly allergic to the

 8   stuff.  But a lot of the officers, they don't

 9   tolerate OC spray.  So they would go to the taser as

10   their alternate versus the OC.

11      **Q**    Okay.  And you brought up Officer

12   Kaminski.  And Mr. Dowd also talked to you about

13   Officer Kaminski's aversion to mace or OC spray.

14   Would you want Officer Kaminski, as his lieutenant,

15   to be carrying mace and using mace because of his

16   reaction to it?

17           MR. DOWD:  Objection, vague as to time and

18   scope.  Go ahead, sir, you can answer.

19      **A**    No, I wouldn't want him to.

20      **Q**    (By Ms. Shafaie) Why would you not want

21   Officer Kaminski to ever carry mace with him?

22           MR. DOWD:  Same objections.

23      **A**    It would be because of the way it affects

24   him.  But also, it's a safety issue.

25      **Q**    (By Ms. Shafaie) Talk to me about safety

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                        Page 169

1    issue.

2         **A**    If an officer on the scene cannot defend

3    himself or assist another officer, then he becomes a

4    liability, he or she, because now you've introduced

5    another gun onto the scene where maybe there wasn't

6    before.  So now you're dealing with whatever problem

7    you're dealing with or the subject you're dealing

8    with, and out of one side of your head you're

9    looking concerned about where your officer's at so

10   that you can, you know, take care of him if you need

11   to.  So it becomes a problem.  I would rather have

12   two officers I can depend on than one little spray

13   of pepper spray which may or may not affect

14   somebody.

15        **Q**    Okay.  Now, Mr. Dowd also asked you about

16   the use of force report that you completed regarding

17   this incident involving Mr. Moore.  Do you remember

18   talking about that use of force report?

19        **A**    Yes.

20        **Q**    And he asked you about whether it was your

21   responsibility at that time to make a determination

22   about whether Officer Kaminski's use of force was

23   in -- within the policy guidelines.  Do you remember

24   him talking to you about that?

25        **A**    Yes, I do.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 170

1      **Q**    Okay.  Even though it was not your
2   responsibility at the time you were filling out the
3   report to make that determination, did you ever form
4   an opinion about whether Officer Kaminski's use of
5   force was appropriate and in line with the policies
6   of the Ferguson Police Department?
7      **A**    Yes, I did.
8           MR. DOWD:  I'll make an objection as to
9   undisclosed expert testimony.  We asked an
10  interrogatory on it.  We do have a scheduling order
11  as to the disclosures.  Subject to that, you can
12  answer the question.
13          MS. WESTERING:  Join in the objection.
14          MS. SHAFAIE:  Let me ask him a few
15  questions --
16          MR. DOWD:  Yeah, don't worry about it.
17  Anything we say is for the record.  You don't have
18  to worry about anything until she says don't answer
19  the question.
20     **Q**    (By Ms. Shafaie) You talked to Mr. Dowd
21  about the fact that normally when you're going
22  through a use of force report you do make a
23  determination about whether the use of force was
24  appropriate.  Do you remember that?
25     **A**    Yes.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 171

1      **Q**    And you said that typically it's just part

2    of going through the report.  And then at the end,

3    you may refer to reports or you may refer to general

4    orders and then make a decision about whether you

5    think the use of force is appropriate.

6      **A**    Yes.

7      **Q**    And then do you remember that you said

8    that your determination would then get forwarded up

9    the chain of command?  Do you remember that?

10     **A**    That's correct.

11     **Q**    Okay.  And so in this situation when you

12   were doing the use of force report, was there

13   anything preventing you from making a personal

14   opinion as to whether the use of force was

15   appropriate or not?

16     **A**    No, there wasn't.

17     **Q**    And so you would agree that you make

18   determinations about whether use of force is

19   appropriate all the time?

20     **A**    Yes.

21     **Q**    And had you -- and you were at this time

22   the lieutenant of Officer Kaminski.  Is that right?

23     **A**    That's correct.

24     **Q**    Do you ever make disciplinary decisions

25   based on a use of force or other action by one of

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 172

```
 1   your officers?

 2        A    Yes, I have.

 3        Q    If you had felt Officer Kaminski did not

 4   use the appropriate amount of force, would you have

 5   disciplined him?

 6        A    Yes, I would.

 7        Q    Okay.  Did you discipline him in this

 8   case?

 9        A    No, I did not.

10        Q    Why didn't you discipline him?

11        A    From the facts that I had at the time, I

12   thought that Officer Kaminski had followed

13   departmental policy and acted within our guidelines.

14   However, I left that block open in case someone --

15   you know, like I said, I didn't have access to any

16   medical examiner or anything else, any further

17   investigations.  So I wanted to leave that open and

18   not just have a door slammed shut that said, yeah,

19   we did it the right way.

20        Q    At any point after you completed this

21   report, did you issue any discipline to Officer

22   Kaminski?

23        A    No.

24        Q    Okay.  Why not?

25             MR. DOWD:  Objection, form and foundation.
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 173

1              MS. WESTERING:  Join.

2         **A**    There was nothing that I found to be wrong

3    with the initial reports that I had.  And I never

4    heard back from anyone in a higher position telling

5    me to either investigate it or that they had

6    investigated it and found him to be at fault with

7    anything.

8              MS. SHAFAIE:  Okay.  I don't have any

9    further questions at this time.

10                           EXAMINATION

11   QUESTIONS BY MR. DOWD:

12        **Q**    Lieutenant, a couple follow-up questions.

13   When did the policy change at City of Ferguson

14   Police Department regarding requiring officers to

15   carry mace?

16             MS. SHAFAIE:  Object to foundation.

17             MR. DOWD:  Well, he testified earlier that

18   there was a time that because certain officers had

19   an aversion or allergy, whatever, that they were no

20   longer required to carry it.  I'm asking him when --

21        **Q**    (By Mr. Dowd) Is that accurate, what I

22   just said?

23             MS. SHAFAIE:  I think that misstates his

24   testimony.  You can --

25        **A**    I think what I -- I think you're pretty

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 174

1    accurate on what you just said.

2         **Q**    (By Mr. Dowd) Okay.

3         **A**    That I did say that.

4         **Q**    Okay.

5         **A**    And the policy still says that you carry

6    both.

7         **Q**    Okay.

8         **A**    However, I am not going to hold Officer

9    Kaminski to that because I've seen the effects of

10   mace on him.

11        **Q**    Understood.  So while the policy is

12   written, you're using your command decision-making

13   to make an adjustment and exception for --

14        **A**    No, I actually thought it was for officer

15   discretion.  And then when I reread the policy, I've

16   been wrong.

17        **Q**    Okay.  So the policy requires them to have

18   it, correct?

19        **A**    I believe so.

20        **Q**    But you are saying based on your

21   discretion as a commander, as a lieutenant --

22        **A**    I had -- I had --

23        **Q**    -- to require -- you could relieve him of

24   that requirement because you thought that was safer.

25   Is that a fair statement?

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 175

1        **A**     No.  I had the impression that it was

2    officer discretion between taser and OC.

3        **Q**     I see.

4        **A**     And so I let him choose the taser, knowing

5    that the OC would -- you know, affected him the way

6    that it does.

7        **Q**     What's your understanding now?  I thought

8    you were saying that was your understanding is they

9    had a choice, but then you looked at the policy

10   again.

11       **A**     Right.  I reread the policy and I don't

12   believe they have a choice.  I think it says that --

13       **Q**     And so my statement is the policy as

14   written is that they are supposed to have one of

15   each so they have both tools available, correct?

16       **A**     That's the way the policy reads.  I

17   believe so, yes, sir.

18       **Q**     And you've made a decision based on your

19   experience that you're going to relieve -- you're

20   going to allow him to, you know, quote-unquote, not

21   comply with the policy because you're aware of his

22   specific problems with OC, and you think it's safer,

23   correct?

24            MS. SHAFAIE:  Object to form.

25       **Q**     (By Mr. Dowd) So he's deviating from

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                                Page 176
 1   policy based on your allowing him to?

 2            MS. SHAFAIE:  Object to form and

 3   foundation.  You can answer.

 4       Q   (By Mr. Dowd) I'm just trying to make the

 5   record clear.

 6            MS. SHAFAIE:  Same objection.  You can

 7   answer.

 8       A   Under -- my understanding of that policy

 9   was that it was discretion, you know, officer

10   discretion.  Since Officer Kaminski was -- has such

11   a reaction to OC spray, I told him, sure, carry the

12   taser, don't carry the OC.  I mean, I'm sorry, I

13   made that mistake.

14       Q   (By Mr. Dowd) No, that's okay.

15       A   But that's what happened.  It happened.

16       Q   That's fine.  So there was some discussion

17   when your attorney was asking you questions about

18   enough tasers to go around.  Is it safe to say that

19   Officer Kaminski always has a taser because he can't

20   carry mace?

21            MS. SHAFAIE:  Object to foundation.  You

22   can answer.

23       A   When --

24       Q   (By Mr. Dowd) If you know.

25       A   Yes.  When Officer -- when we first got
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                              Page 177

 1    the tasers in, Officer Kaminski carried the taser.

 2    Since this incident, Officer Kaminski has not

 3    carried a taser.

 4         Q    Okay.  Why is that?

 5         A    I -- I don't know.

 6         Q    Was that your decision for him not to

 7    carry one?

 8         A    No, sir.

 9         Q    Do you know whose decision it was?

10         A    No, sir.  I believe it's probably Officer

11    Kaminski's.

12         Q    Okay.  So he is on the street without mace

13    or a taser?

14         A    No, sir.  He's currently working on the --

15    in the jail.

16         Q    Okay.

17         A    But we don't have the tasers, you know,

18    the amount for everybody to have a taser.  So

19    Officer Kaminski is one of those now, or since he's

20    gone back out onto the street, that doesn't.  So he

21    carries a night stick or a --

22         Q    Baton?

23         A    -- baton.

24         Q    So was -- and I think I understand, but

25    I'll just ask to avoid any objections.  Is Officer
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 178

1   Kaminski -- his active duty right now is on the

2   street?

3        **A**    Currently, he's filling in in the

4   corrections facility --

5        **Q**    Okay.

6        **A**    -- because we've had so many corrections

7   officers leave that we don't have coverage.  So he's

8   working there while he's rehabbing his arm.

9        **Q**    When did he stop using a taser, to your

10  knowledge, after September 17th, 2011?

11       **A**    I don't really know, sir, because he was

12  transferred from my platoon a few months after that,

13  I believe.

14       **Q**    And had he stopped using a taser before he

15  was transferred from your platoon?

16       **A**    I don't recall.  I don't really remember.

17       **Q**    You don't recall either way?  If I

18  understand your prior testimony correctly, and I'd

19  ask you to correct me if I'm wrong, in September of

20  2011 you did not make a formal determination of

21  Officer Kaminski or Officer White's use of force and

22  the appropriateness of that.  Is that correct?

23       **A**    That is correct, I didn't make the

24  official --

25       **Q**    Right.  You didn't go through all the

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 179

 1   steps necessary, further discussions, and document

 2   that?

 3          MS. SHAFAIE:   Object to foundation.   You

 4   can answer.

 5      **A**    I went through what was required by

 6   policy.

 7      **Q**    (By Mr. Dowd) Meaning you filled out the

 8   use of force report?

 9      **A**    Correct.

10      **Q**    But you did not indicate at that time

11   whether you -- it was your opinion one way or the

12   other whether the use of force was appropriate?

13      **A**    Correct.  The seriousness or the nature, I

14   was going to allow someone above, which is on the

15   form there, the division commander.

16      **Q**    So if the officer -- if you had determined

17   that the officer had used excessive force under the

18   circumstances in any of the taser applications, the

19   first, second or the third, would you automatically

20   have had to discipline him?

21      **A**    I would have completed the block there

22   with -- follow however that's worded, follow

23   department policy or --

24      **Q**    Right.

25      **A**    -- whatever.  I would have checked -- if

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 180

1    it was not in compliance, I would have checked no.

2    I would have immediately started my own separate

3    investigation, forwarded that along with the taser

4    and police report up the chain.

5        **Q**    And you didn't go through any part of that

6    process?

7        **A**    No, sir, I did not.

8        **Q**    Okay.  And so you didn't make a formal

9    evaluation of whether or not he had violated the

10   policies and procedures when he tased that day based

11   on the facts you knew at the time?

12       **A**    Correct.

13       **Q**    Do you understand -- or do you intend to

14   render an opinion at the trial of this matter as to

15   whether his use of force was appropriate?

16       **A**    I have no idea what I'm going to be asked

17   at the trial.

18       **Q**    Okay.  And as you sit here today, the only

19   opinions you may have are based on what you learned

20   at the time and that are contained in the reports

21   that you reviewed today?

22       **A**    Correct.

23       **Q**    Okay.  When you told -- this is a little

24   bit of proving a negative here, but I'm going to try

25   to ask you anyway.  You did not make a determination

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                        Page 181

1    whether the use of force was appropriate and you

2    also did not make a determination as to whether or

3    not any discipline was appropriate, correct?

4          MS. SHAFAIE:  Object to form and

5    foundation.  You may answer.

6      **A**    Yes.  I didn't make a determination.

7      **Q**    (By Mr. Dowd) Okay.  And any opinion that

8    you would have on that would be based on the

9    information that Officer Kaminski had tased the

10   naked man for five seconds, gave him the appropriate

11   opportunity to comply, he attempted to get up, he

12   gave him another five-second taser application, gave

13   him another opportunity to comply, a fair and

14   reasonable opportunity to comply, and then gave him

15   a third application at which time he was handcuffed,

16   following which he stopped breathing and died.

17   That's the scenario and the facts that you knew at

18   the time, correct?

19     **A**    Yes.

20         MS. SHAFAIE:  Form and foundation.  You

21   can answer.

22     **A**    Yes.

23     **Q**    (By Mr. Dowd) So I assume because you're

24   his supervising officer and we're here today and

25   your attorney is asking you these questions, you're

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 182

1    of the opinion based on those facts that the

2    appropriate use of force was used by Officer

3    Kaminski and Officer White?

4        **A**    Yes, sir.  I had no other evidence to

5    contrary.

6        **Q**    Have you ever seen a taser firing sequence

7    download report that has the actual times the taser

8    trigger was pulled and the intervals in-between

9    those?

10       **A**    No, sir.  I have no access to any of that.

11       **Q**    Okay.  That wasn't provided to you by

12   counsel today?

13           MS. SHAFAIE:  I'm going to object.

14       **A**    I --

15       **Q**    (By Mr. Dowd) You've never seen the taser

16   download report in this case?

17           MS. SHAFAIE:  If you've seen it, yeah.

18       **A**    I haven't seen it.

19       **Q**    (By Mr. Dowd) Have you ever seen a taser

20   download report?

21       **A**    I have never seen a taser download report.

22       **Q**    Would you think that under the scenario I

23   just described it's the basis of your opinion that

24   if less than one second between one of the taser

25   applications would be sufficient for the gentleman

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

                                                        Page 183

 1    to comply or for Officer Kaminski to make a

 2    submission assessment?

 3              MS. SHAFAIE:  Form and foundation.  You

 4    may answer.

 5        **A**    I don't think one second would be enough.

 6        **Q**    (By Mr. Dowd) Okay.

 7        **A**    If that was your question to me.

 8        **Q**    Yes, it was.  So same question, but less

 9    than one second would not be enough either, correct?

10              MS. SHAFAIE:  Same objection.  You may not

11    answer.

12        **A**    That's correct, less than a second

13    wouldn't be enough.

14        **Q**    (By Mr. Dowd) Okay.  And in the scenario

15    that you're familiar with in which the man is on the

16    ground and he's naked and he's attempting to get up,

17    would you agree that two seconds is probably not

18    even enough time for the subject to comply after

19    he's hit the ground, after the first taser

20    application and the officer's watching him?

21              MS. SHAFAIE:  Same objections.  You can

22    answer.

23        **A**    I don't think two seconds would be enough.

24        **Q**    (By Mr. Dowd) Enough time to make a --

25        **A**    Correct.

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                                  Page 184

  1       Q     -- submission assessment?   That's correct?

  2             MS. SHAFAIE:  Same objections.

  3       A     Correct.

  4             MR. DOWD:  Okay.  I don't have anything

  5    further of this witness at this time.

  6             MS. WESTERING:  I don't have any

  7    questions.

  8             MS. SHAFAIE:  I don't have any questions.

  9             COURT REPORTER:  Signature?

 10             MS. SHAFAIE:  We'll read.

 11             VIDEOGRAPHER:  We're off the record at

 12    1:14.

 13    SIGNATURE WAIVED, BY AGREEMENT OF COUNSEL

 14    AND WITNESS

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                              Page 185

 1   State of Missouri

 2                    SS.

 3   County of St. Charles

 4        I, Julie A. Bulard, do hereby certify that

 5   pursuant to Notice in the civil cause now pending

 6   and undetermined in the United States District

 7   Court, Eastern District of Missouri, Eastern

 8   Division, to be used in the trial of said cause in

 9   said court, I was attended at the offices of Pitzer

10   Snodgrass, PC, 100 South Fourth Street, Suite 400,

11   in the City of St. Louis, State of Missouri, by the

12   aforesaid attorneys; on the 25th day of September,

13   2015.

14        The said witness, being of sound mind and being

15   by me first carefully examined and duly cautioned

16   and sworn to testify the truth, the whole truth, and

17   nothing but the truth in the case aforesaid,

18   thereupon testified as is shown in the foregoing

19   transcript, said testimony being by me reported in

20   shorthand and caused to be transcribed into

21   typewriting, and that the foregoing pages correctly

22   set forth the testimony of the aforementioned

23   witness, together with the questions propounded by

24   counsel and remarks and objections of counsel

25   thereto, and is in all respects a full, true,
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 186

1    correct and complete transcript of the questions

2    propounded to and the answers given by said witness;

3    that signature of the deponent was not waived by

4    agreement of counsel.

5        I further certify that I am not of counsel or

6    attorney for either of the parties to said suit, not

7    related to nor interested in any of the parties or

8    their attorneys.

9        Witness my hand at St. Charles, Missouri, this

10   6th day of October, 2015.

11

12

13

14

15

16   ----------------*Julie A. Bulard*----------------

17              Julie A. Bulard

18              CCR MO #835

19

20

21

22

23

24

25

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                            Page 187

 1   GorePerry Reporting & Video

 2   Wednesday, October 07, 2015

 3
     Ms. Ida S. Shafaie
 4   Pitzer Snodgrass
     100 South Fourth Street, Suite 400
 5   St. Louis, MO, 63102

 6   Re: Deposition of William Ballard
     Date:Friday, September 25, 2015
 7   Case:Tina Moore, et al. vs. Brian
     Kaminski, et al.

 8

 9   Ms. Ida S. Shafaie

10   Your witness did not waive the right to read and sign
     his/her deposition in the above referenced matter.
11   Enclosed is the copy of the deposition you ordered,
     together with errata sheets and additional signature
12   page.  Please instruct your witness to read the
     transcript, list any corrections (including page and
13   line number) on the errata sheets, sign and date the
     errata sheets and signature page.
14
     Within 30 days, please return the errata sheets and
15   signature page to our office for further processing.

16   Your prompt cooperation will be appreciated.

17

18

19

20

21   Sincerely,

22

23   Production Department
     GorePerry Reporting & Video
24   515 Olive Street
     St. Louis, MO  63101
25   (314) 241-6750
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                           September 25, 2015

```
                                                    Page 188

  1   Page Line Should Read:

  2   Reason for change:

  3

  4   Page Line Should Read:

  5   Reason for change:

  6

  7   Page Line Should Read:

  8   Reason for change:

  9

 10   Page Line Should Read:

 11   Reason for change:

 12

 13   Page Line Should Read:

 14   Reason for change:

 15

 16   Page Line Should Read:

 17   Reason for change:

 18

 19   Page Line Should Read:

 20   Reason for change:

 21

 22   Page Line Should Read:

 23   Reason for change:

 24

 25
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

```
                                                      Page 189

  1   Page Line Should Read:

  2   Reason for change:

  3

  4   Page Line Should Read:

  5   Reason for change:

  6

  7   Page Line Should Read:

  8   Reason for change:

  9

 10   Page Line Should Read:

 11   Reason for change:

 12

 13   Page Line Should Read:

 14   Reason for change:

 15

 16   Page Line Should Read:

 17   Reason for change:

 18

 19   Page Line Should Read:

 20   Reason for change:

 21

 22   Page Line Should Read:

 23   Reason for change:

 24

 25
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

                                                        Page 190

 1   Comes now the witness, William Ballard,

 2   and having read the foregoing transcript

 3   of the deposition taken on 9/25/2015,

 4   acknowledges by signature hereto that it is a

 5   true and accurate transcript of the testimony given

 6   on the date hereinabove mentioned.

 7

 8

 9   _____

10   William Ballard

11

12   Subscribed and sworn to me before this

13   _____ day of _____,20_____.

14   My Commission expires

15

16

17   _____

18   Notary Public

19

20

21

22

23

24

25

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                                September 25, 2015

```
                                                     Page 191
 1  COURT MEMO

 2

 3

 4

 5  Tina Moore, et al. vs. Brian Kaminski, et al.

 6

 7

 8  CERTIFICATE OF OFFICER AND

 9  STATEMENT OF DEPOSITION CHARGES

10

11  DEPOSITION OF William Ballard

12

13  9/25/2015

14  Name and address of person or firm having custody of

15  the original transcript:

16

17  Dowd & Dowd

18  211 North Broadway, Suite 4050

19  St. Louis, MO 63101

20

21

22

23

24

25
```

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                          September 25, 2015

Page 192

 1   ORIGINAL TRANSCRIPT TAXED IN FAVOR OF:

 2

 3   Dowd & Dowd

 4   211 North Broadway, Suite 4050

 5   St. Louis, MO 63101

 6   Total:

 7   1 ONE COPY - TAXED IN FAVOR OF:

 8

 9   Pitzer Snodgrass

10   100 South Fourth Street, Suite 400

11   St. Louis, MO 63102

12   Total:

13   1 ONE COPY - TAXED IN FAVOR OF:

14

15   Baty, Holm & Numrich, PC.

16   4600 Madison Avenue, Suite 210

17   Kansas City , MO 64112

18   Total:

19

20

21

22

23

24

25

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                          September 25, 2015

                                                              Page 193

1   Upon delivery of transcripts, the above

2   charges had not been paid.  It is anticipated

3   that all charges will be paid in the normal course

4   of business.

5   GORE PERRY GATEWAY & LIPA REPORTING COMPANY

6   515 Olive Street, Suite 700

7   St. Louis, Missouri 63101

8   IN WITNESS WHEREOF, I have hereunto set

9   STATEMENT OF DEPOSITION CHARGES

10  my hand and seal on this _____ day of _____

11  Commission expires

12  _____

13  Notary Public

14

15

16

17

18

19

20

21

22

23

24

25

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 194

**A**

**A.D.R** 1:5 2:9
**a.m** 34:5
**abbreviations**
  47:12
**ability** 131:21
  137:7
**able** 65:6 68:24
  83:14 84:1,18
  85:17,23 124:13
  147:2 158:7
**abnormal** 40:18
**abnormally** 91:22
**abrasion** 152:22
  155:16
**abrasions** 92:9
  101:21 118:21
  119:21
**abrupt** 14:7
**abuse** 136:1,8
  137:18
**abusive** 58:21 59:8
**academy** 7:24 13:3
  15:10 16:1 28:21
  131:19 132:7
**accelerates** 160:22
**access** 29:8 167:9
  167:13 172:15
  182:10
**accurate** 11:3
  67:14 150:8
  173:21 174:1
  190:5
**acknowledge** 29:10
  30:7 31:13,20
**acknowledges**
  124:9 190:4
**acknowledging**
  31:22
**acquired** 62:19
**act** 160:5
**acted** 151:4 172:13
**acting** 109:19
**action** 171:25

**actions** 105:5,15
  106:18 138:22
**activated** 124:23
  125:10
**active** 37:22 178:1
**activity** 160:7
**actual** 182:7
**additional** 22:8
  70:2 150:18 155:4
  187:11
**additions** 29:11
**address** 142:2,3,5
  142:16 191:14
**adjustment** 174:13
**administered** 64:11
  77:3
**admissibility**
  148:25
**admitting** 128:21
**adrenaline** 134:9
**advance** 57:16
**advanced** 101:3
**advancing** 69:22
  71:7 72:16
**advertised** 113:10
  113:12
**advise** 97:16
**advised** 92:16
**affect** 169:13
**aforementioned**
  185:22
**aforesaid** 6:25
  185:12,17
**African-American**
  91:21
**age** 6:23 112:9
**agenda** 21:14,15
**aggressive** 12:11
**aggressively** 69:22
  72:24
**agitated** 159:9,13
  159:23 162:14
**ago** 8:23
**agonal** 89:15

**agree** 10:2 65:4,24
  66:25 67:6,22
  70:5 71:3 73:8
  81:18 82:6,22
  90:23 129:9
  134:16,18 135:3
  136:18 137:20,24
  138:3,7 145:7
  151:13 152:2
  158:24 162:1
  171:17 183:17
**agreed** 79:1
**agreement** 184:13
  186:4
**ahead** 7:13 53:22
  68:3 74:12 80:12
  127:25 168:18
**aim** 12:12,20 59:21
**Airport** 34:20 37:4
  38:8 46:13 47:5
  47:14 48:15,22
  49:13 54:21 56:14
  66:9,13 67:18
  97:24 124:3
  126:14,16 128:6
**al** 1:12 2:15 6:6,6
  187:7,7 191:5,5
**Alan** 122:2
**Allen** 24:9 26:10
  27:24 46:16,19
**Allen's** 46:14
**allergic** 40:18 42:12
  168:7
**allergy** 70:23
  173:19
**allow** 13:24 72:18
  175:20 179:14
**allowed** 80:1 82:7
**allowing** 176:1
**allows** 129:10
**alongside** 94:2
**alternate** 168:10
**alternative** 70:21
  116:17

**Alzheimer's** 159:7
**ambulance** 45:22
  45:23 46:2,6 87:2
  87:6,16,19 92:22
  93:2,6,6,12 94:2
  94:12,23 95:2,3
  96:5,8 154:6
**ammunition** 11:16
**amount** 49:6
  139:13 172:4
  177:18
**amplified** 132:22
**analysis** 32:6 81:20
**analyze** 32:2
**angle** 51:8 53:17
  54:22
**angry** 160:10
**annual** 11:5,10
  14:21 29:4 59:18
**annually** 11:8
**answer** 9:10 10:1
  11:21,21 19:3
  21:9 32:16 47:24
  56:24 59:1,14,24
  60:5 61:22 65:10
  66:5,16 67:8 68:1
  68:4,11 69:5 70:6
  70:15,15 71:9,22
  72:10,12,23 73:12
  73:20 75:2 76:5
  76:20 77:13,20
  78:14 79:7,15
  80:17 81:22 82:12
  82:21 83:5,8,11
  84:5,14,16 85:13
  85:21 104:12
  111:11 129:15,25
  131:11 132:2,18
  132:25 133:6
  134:1,14 135:1,13
  135:23 136:4,11
  152:17 161:1,2,20
  163:3 165:9 166:4
  168:18 170:12,18

  176:3,7,22 179:4
  181:5,21 183:4,11
  183:22
**answers** 9:9 186:2
**anticipated** 193:2
**anybody** 10:20
**anyone's** 31:3
**anyway** 180:25
**appear** 143:8
  145:10 147:5,8,12
  153:6 157:14
**APPEARANCES**
  3:1
**appeared** 89:1 90:1
  153:17
**appears** 68:17 79:3
  79:10 108:19
  120:1 142:2 147:4
  153:17 157:17
**applicable** 161:15
  161:16
**application** 64:18
  64:20 68:8 69:22
  73:5,16 77:1 78:8
  78:10 79:2,13
  80:20 81:2,7,16
  88:3 111:20
  115:12,17,18,20
  115:22 116:5
  118:17 119:12
  152:7 160:22
  181:12,15 183:20
**applications** 82:8
  84:3 179:18
  182:25
**applied** 71:1
  114:10 120:10
**applies** 78:6
**apply** 74:12
**appreciate** 16:15
**appreciated** 187:16
**apprehend** 157:1
**approach** 13:8 14:8
**approached** 38:14

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                          September 25, 2015

38:19 88:25 89:25
90:11 92:25
**approaching** 14:4
39:23 72:24 81:1
**appropriate** 9:11
79:13 99:22
100:23 102:19
105:14 170:5,24
171:5,15,19 172:4
179:12 180:15
181:1,3,10 182:2
**appropriateness**
104:24 178:22
**approval** 108:12
**approve** 19:2 98:6
**approved** 98:6,8,9
98:12
**approximate** 117:1
**approximately** 16:5
18:19 19:22 21:21
34:3 36:2,8 41:7
63:5 85:1,7
**approximation**
117:13
**area** 58:11 67:19
**areas** 143:3
**argumentative**
77:23 133:10,13
**arm** 41:19 70:10,12
70:21 71:16 72:18
73:16 76:9,10
82:3 153:19 155:8
157:4 163:6 178:8
**armed** 12:11
**arms** 83:14 86:15
120:6
**arrest** 82:25 83:9
145:16 146:23
150:16 153:10
155:1 156:22
**arrested** 87:17
101:7 146:18
**arrestee** 101:3,6,18
101:25 151:5

**arrival** 36:15
117:22 121:22
**arrived** 36:5,22
38:8 43:24 50:5,9
50:17,23,25 52:5
52:20 83:13 92:20
92:22 117:25
124:20 125:25
**arrives** 47:20 56:13
73:18
**arrow** 127:2
**art** 9:21
**aside** 71:3
**asked** 10:3 20:22
38:15 52:17 83:9
138:25 139:21
140:4 164:24
169:15,20 170:9
180:16
**asking** 7:8 62:12,13
67:11 78:24 86:3
92:1 144:18,21,23
148:19 173:20
176:17 181:25
**aspects** 76:7
**assault** 110:12,16
111:18,21 147:19
**assess** 78:9,12 80:9
80:18
**assessment** 67:22
69:3 70:1 78:2
80:23 81:20 82:18
90:23 100:1 183:2
184:1
**assist** 169:3
**assume** 10:24 33:25
67:12,21 73:5
78:25 80:25 81:10
81:13 126:10
128:12,18,20
131:5 132:6 150:8
181:23
**assuming** 67:13
85:8 111:19 113:2

128:14
**attached** 5:23
102:21
**attachments** 44:23
**attack** 82:25 83:3
**attempt** 130:8
**attempted** 64:3
120:8 157:5
181:11
**attempting** 81:17
183:16
**attempts** 64:19
**attended** 185:9
**attending** 21:22
**attention** 88:22,23
95:3
**attorney** 176:17
181:25 186:6
**attorneys** 8:25 9:1
10:14 107:11
185:12 186:8
**August** 147:14
149:14
**authentication**
149:3
**authored** 43:7
166:13
**authoring** 98:3
**authority** 13:19
**authorized** 70:9,11
70:19,20 121:5
**automatic** 97:12
**automatically** 44:1
97:12 115:1,3
139:7 179:19
**automobile** 35:15
**available** 15:21
22:9 59:19 74:10
74:19 158:4
161:13 162:10
175:15
**Ave** 3:14
**Avenue** 192:16
**aversion** 168:13

173:19
**avoid** 82:15 146:18
177:25
**aware** 26:23 28:6
32:6 76:2 81:1,11
103:22,25,25
164:24 175:21

**B**

**B/M** 47:4
**back** 16:8 17:10
23:13,20 31:24
42:25 43:1 54:6
55:1 59:3 63:22
63:23 64:12 65:2
65:6 72:11 76:23
77:4,10 79:23
83:12,14 84:2
88:19,22,23 91:16
94:12 109:20
114:4 120:11
121:6 122:21
129:5 133:22
139:17 141:14
142:25 143:11
146:12,21 148:14
149:10 150:22
158:16 163:21
173:4 177:20
**backed** 57:24 93:4
**background** 7:19
**backup** 47:20
81:24 82:18
124:14
**bad** 59:17
**badge** 142:13
**bags** 35:8
**Ballard** 1:17 2:20
6:5,22 7:15
142:15 187:6
190:1,10 191:11
**Ballard's** 140:14,15
140:21
**bar** 76:10 155:8

157:4
**barely** 167:17
**bars** 163:6
**based** 42:9 66:18
70:16 72:23 74:20
78:5,21,22,25
83:24 87:15 88:10
89:24 94:17 99:9
117:13 121:2
126:12 171:25
174:20 175:18
176:1 180:10,19
181:8 182:1
**basement** 24:3
104:17
**basically** 100:9
102:19 108:8
116:2 117:10
120:1
**basis** 28:7 30:1,18
32:14 59:18 85:15
182:23
**Bates** 139:25 140:2
**baton** 41:19 69:8
70:22 71:12 72:3
72:21 74:15,25
76:9 78:7 79:25
80:11 129:22
177:22,23
**Baty** 3:13 192:15
**Beard** 155:8
**beating** 56:3 69:12
129:21
**Bebe** 10:20 34:1,22
38:13 52:13,19
92:19 96:7 106:15
**began** 57:5,25
91:16 92:13
145:15,18 146:17
**beginning** 34:6
108:16
**begins** 150:19
151:4
**behalf** 2:21 9:1

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                           September 25, 2015

Page 196

148:20
**behavior** 110:10
**belief** 33:10 116:16
154:2
**believe** 14:24 15:3
17:24 19:23 23:17
24:9 33:11,18
37:3 44:22 52:7
54:22 63:8 64:21
75:11,14 76:21,25
86:20 89:22 91:5
93:5 95:24 96:8
105:12 106:21
111:12 112:11,25
121:16,18 122:6
123:4 126:4 127:9
135:2,5 138:12
143:11 156:18
167:16 174:19
175:12,17 177:10
178:13
**believed** 107:8
115:6
**best** 9:9 23:15 26:8
33:3,4 37:20
38:21 51:11 52:6
53:9 80:20 94:24
103:13 154:20
**better** 85:25 129:18
139:2
**big** 84:19 85:2
113:19
**bigger** 84:23
132:11
**biggest** 60:13
**Bill** 6:15 7:5
**bill@dowdlaw.net**
3:9
**Billy** 142:15
**bit** 7:18 49:10
180:24
**blades** 150:23
**blank** 25:9
**blaster** 95:8

**bleed** 153:21
**block** 100:10 105:4
127:21 172:14
179:21
**blocking** 124:24
125:4 126:16
**blocks** 37:7
**blue** 91:22
**body** 12:12,14,20
59:11,21 60:1,8
60:14 73:2 121:12
160:23 163:6
**Boeing** 49:5,7,12
49:15
**bomb** 166:8
**Booked** 111:5
**bother** 21:3
**bottom** 102:3
**box** 101:11,25
126:18 127:4,25
144:15
**boxes** 100:23
102:24
**brand** 98:17
**Brannan** 61:16,17
61:17
**Brannan's** 61:25
**Brannon** 62:7
**break** 34:24 88:15
93:18 136:15,20
136:23 152:24
**breaks** 167:20
**breasts** 60:11,12
**breath** 89:19,21
**breathe** 90:2
**breathing** 38:17
39:9 89:1,16 90:1
90:5,7,9,15,19,19
91:7,9,13 92:17
120:24 160:8
181:16
**Brian** 1:12 2:15 6:6
187:7 191:5
**brief** 93:22 120:1

**briefly** 98:5 104:4
139:25
**bright** 125:17
**bring** 29:15 69:23
72:3 140:16
**Broadway** 3:6
191:18 192:4
**brought** 67:20 68:8
93:2 115:15
164:13,15,20
168:11
**bruises** 101:20
**bruising** 39:25 92:7
101:21
**buckshot** 116:1
**budget** 11:15
**building** 54:7,17,18
109:20
**built** 67:1 113:10
**Bulard** 2:25 6:10
185:4 186:17
**bulletins** 61:3,8,13
62:8
**burst** 64:11 77:3
**business** 134:21
148:20 149:18,25
193:4

---

**C**

**c** 110:13,16
**CAD** 43:13,23
**Cain** 122:14
**call** 14:5 22:16 24:6
29:15 34:10,12,13
34:18,25 35:5,12
36:3,9,20 44:16
44:17 45:22,25
46:1 100:19
109:13 110:7
164:11,15,20
**called** 19:10 30:15
44:25 87:7 91:1
106:4,15
**calls** 19:3

**calming** 14:11
**cameras** 121:12
**canisters** 40:22
**canvass** 95:16
**capacity** 8:5
**captain** 31:2 33:4
95:25 97:15 103:1
103:4,7,8,14
104:1,3,8,25
105:18 106:4,21
165:16,17,22
**captains** 19:18,20
20:7,13 137:3
**car** 35:12,13,16
38:20 44:3,7 53:5
54:6,10,12,15,20
81:3,4 90:13
124:17,18 126:3,4
126:7,10,11,12,18
127:12 128:3,9,19
128:20 129:1,5,8
145:17,21
**cardiac** 82:25 83:9
**care** 109:9 119:23
169:10
**career** 10:23 131:5
**carefully** 185:15
**carried** 177:1,3
**carries** 177:21
**carry** 14:19 167:25
168:3,21 173:15
173:20 174:5
176:11,12,20
177:7
**carrying** 168:15
**cars** 35:3 56:3,5
121:9,9 125:24,24
129:6
**cart** 139:7
**cartridge** 114:9
116:6,10,19
**case** 6:25 8:12,13
8:15,16,18,21
52:14 59:21 91:25

101:1 103:3,23
115:14 140:13
172:8,14 182:16
185:17
**Case:Tina** 187:7
**cases** 105:10
**catch-all** 109:18
**cause** 1:9 6:5 83:3
118:17 119:10
185:5,8
**caused** 83:10
119:12 185:20
**causing** 145:19
**cautioned** 185:15
**CCR** 2:25 186:18
**center** 12:12,14,20
59:10,21
**certain** 158:4 159:2
166:22 173:18
**certainly** 70:8,9
**CERTIFICATE**
191:8
**certificates** 24:15
**certified** 6:9,11
24:20 27:4 60:21
60:24,25 61:9
62:3,15 75:17
142:7 161:23
**certify** 185:4 186:5
**cessation** 40:7
**chain** 25:11 97:18
97:18 106:20,25
130:4 171:9 180:4
**change** 20:14,18
49:9 72:25 77:17
112:5 173:13
188:2,5,8,11,14
188:17,20,23
189:2,5,8,11,14
189:17,20,23
**changed** 22:5 66:3
67:23
**changes** 81:20
**changing** 132:23

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                          September 25, 2015

Page 197

charge 13:20 18:25
    19:1 31:7 103:10
    110:18 165:12,15
charged 110:25
    111:9,13,20 112:1
charges 110:12
    191:9 193:2,3,9
Charles 7:23 13:4
    185:3 186:9
check 30:15,23,25
    87:17 91:8 100:10
    100:23 101:10
    112:12
checked 91:6 101:1
    101:2,25 179:25
    180:1
checking 99:6
    102:23
checks 30:22,24
chest 39:1 58:10,22
    59:10 67:19,21
    69:20 91:16 92:13
    92:20 93:12,13,24
    94:3,22 115:14
    117:7 118:2,3
    157:7,9
Chicken 37:4
chief 10:20 19:17
    20:6,13,19 22:9
    97:17 105:20
    107:1 130:2 137:3
    137:6
chief's 103:19
    104:14 106:1
    108:12
child 135:8
choice 175:9,12
choose 175:4
Christian 109:8
circle 50:18
circled 113:7
    118:18 119:12,17
    120:18
circles 37:9

circumstances
    13:24 17:11 33:21
    179:18
CIT 15:5,6,8,17
    16:1,4,16,20,25
    17:6,13 130:12
    161:13,15,21,23
    162:1,21,25 163:7
CIT-trained 130:5
    130:9,20 164:25
    165:6,8 166:2,8
citizen 130:22
    145:6 146:4 147:8
    148:7 151:17
    152:3 154:10
    157:25
city 2:23 3:15 8:10
    110:18 111:21
    173:13 185:11
    192:17
civil 185:5
claim 157:18
claiming 101:8
clarify 140:22
    162:20
class 15:18 60:7
    74:16
classes 15:11 22:8
    22:14
classified 110:8
clean 157:18
cleaning 41:8 46:14
clear 9:5,24 119:11
    176:5
clearly 9:9
clicking 140:20
clients 148:20
close 18:13 82:19
    115:21 124:4,13
    129:5
closed 55:5 57:17
    58:2,12 64:5,13
    77:4 83:15 86:17
    87:3 89:2 92:12

110:13 120:7,10
    143:22 150:22
closer 50:11,12
    51:6,7,9 53:24
    54:7
clothes 110:9
    113:14
clothing 95:12
    113:18,20
clue 23:25 138:21
coat 113:18
coats 113:19
collar 44:24
coloration 91:20
combat 71:15
combative 74:4
come 14:9 20:23
    23:7 42:3,7
    107:16 113:22
    116:11 131:6,15
comes 23:4 132:7
    190:1
coming 56:2 81:3,4
    90:13 124:17,18
comma 47:4 57:24
    57:25 58:1,10
    64:2,3,4,11 77:3
    86:15 88:25 120:6
    120:23 145:18,21
command 16:23
    41:22,22 97:18
    106:21,25 130:4
    150:6 162:23
    171:9 174:12
commander 18:24
    18:25 31:11
    147:21 174:21
    179:15
commanders 19:7
commands 155:7
comments 150:19
    153:17 155:4,5
commercials 94:5
Commission

190:14 193:11
committing 126:9
commonly 14:2,3
communicated
    61:8 134:22
communicating
    32:13
communications
    122:25 123:1
community 22:1,22
    23:12 28:3
COMPANY 193:5
comparable 48:24
complaints 153:23
complete 146:13
    149:4 186:1
completed 43:11
    106:5 107:21
    169:16 172:20
    179:21
completely 47:4,14
completion 24:16
compliance 64:19
    77:25 116:4,20
    137:8 147:3 180:1
compliant 120:23
    129:20
complicated 100:4
complied 50:19
    51:17,20 53:20
    54:5 105:15
    120:13 126:22
    127:6 128:2
    150:24 153:24
comply 79:12 105:5
    157:3 175:21
    181:11,13,14
    183:1,18
complying 18:20
    19:8 32:8 58:23
compound 133:10
    133:14
compressions 91:16
    92:13,20 93:12,14

93:25 94:3,22
computer 29:8 30:8
    30:14,16 31:23
    112:12,22
con 71:25
concerned 169:9
concrete 152:20,21
condition 160:12
    160:14
conduct 105:15
conducted 22:16,17
confident 104:20
confirm 156:20
confirmed 91:12
cons 71:20
consequences
    138:22
considered 101:18
consistent 56:20
    59:11 139:12
    157:14
constituted 101:24
constitutional 25:6
    25:25 28:5,18
contact 115:9
contacts 17:8
contained 120:2
    149:22 150:7,12
    180:20
contents 149:1
continue 74:5
continued 57:16
    93:15,24 143:24
    143:25 145:21
    146:19 155:7
    157:2,6
continues 74:10
continuing 7:24
    24:20
continuum 102:18
    162:17,22 163:12
continuums 13:14
contract 73:3 75:21
contractions 73:4

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

Page 198

contrary 182:5
control 121:5
    145:23 157:11
    158:8
conversation 97:19
    97:21,23 98:25
cooperation 187:16
copy 42:24 187:11
    192:7,13
corner 54:8,24 63:3
    63:10 126:17
Corporation 49:8
correct 9:3 11:3,6
    12:6,13,21,22
    13:16 14:12 23:2
    26:2 27:20 30:8,9
    31:22,24 34:8,16
    35:4 37:24 40:8,9
    40:11 41:21,24
    43:12 44:8 46:10
    46:14 47:10,15
    48:19,20 49:17,18
    49:20,21 51:3,13
    54:14,19 55:10,18
    55:20,21,23,24
    56:1,9,14,15,16
    57:8,9,19,22
    58:14 59:22 60:13
    60:25 61:18 63:11
    63:13,14 64:7,8
    64:15 65:2,19,22
    65:23 66:9,10,11
    66:12,14,21,24
    67:4 68:9,21 69:1
    69:3,11,24,25
    70:10,13,23 71:1
    71:2,17,18,20
    72:22 74:17,21
    77:8,11,14,19
    78:20 79:5,8 80:2
    80:9,15 82:1
    86:19 87:5 91:14
    92:20,21 94:20
    99:13,17 100:20
100:24,25 101:4
101:15 102:1,25
104:25 109:4,6,7
109:10,14,15
110:2,6,24 111:1
111:2,17 112:14
114:14 115:10,11
116:7,8,12,20
117:4,14,24 118:8
118:10,11,13
119:15,18 120:3
120:13,19 121:7
121:23 123:1
124:19 125:2
129:2,3,6 130:18
131:3,4,16,21,25
132:24 133:5,7
134:2,12,24
135:14 137:4,5,10
137:11 138:25
139:14 143:17
144:7 145:4,5
146:2,8,9 147:3,9
147:10,20 148:2,3
148:8,9 149:5,19
149:20 150:1,13
150:16,17 151:2
152:11,12 153:11
153:12 154:9,12
154:13,23 155:14
155:17,18 156:1,2
156:24 157:19,20
158:1,2 159:8
162:4 163:8 165:4
168:1 171:10,23
174:18 175:15,23
178:19,22,23
179:9,13 180:12
180:22 181:3,18
183:9,12,25 184:1
184:3 186:1
corrections 178:4,6
187:12
correctly 9:9 30:3
39:15 47:6 54:23
55:6 57:18 58:3
58:13 83:16 86:18
87:4 89:3 90:21
110:14 120:15,25
144:3 145:24
146:25 151:1,7
154:1 155:13
178:18 185:21
counsel 3:1 6:13
139:20 142:24
182:12 184:13
185:24,24 186:4,5
County 7:23 15:10
24:18 28:13,21,22
185:3
couple 62:21 63:12
143:6 154:22
159:22 164:8
173:12
course 28:19 63:17
149:18 152:23
193:3
courses 28:16,17
court 2:1 5:22 6:7
6:11 9:7,13 23:16
28:4 128:17 184:9
185:7,9 191:1
cover 22:6 102:10
118:20
coverage 178:7
covered 23:10,13
25:15
covering 24:12
33:13 96:15
Cowboy 139:4
created 150:2
crisis 15:5 17:7
45:12,20 46:2
56:22 79:11 111:8
130:22 138:1,5,9
138:15 158:23
critical 108:11
cross-examination
141:1
curb 50:11,13
65:25 66:9 128:5
128:23
current 127:1
currently 23:20
26:17 177:14
178:3
custody 25:11
38:12,19 152:4
191:14
custom 108:4
cut 32:22
cycle 114:13,18,19
115:1 120:9,9,11
120:13,23
cycles 114:10,24,25

**D**

daily 30:18
danger 76:8
dart 115:9,13 117:7
darts 60:14 88:5
113:11 115:20
116:10 117:2,15
117:17,21
dash 120:7
database 112:23
date 63:2,9 143:12
146:13 148:18
187:13 190:6
Date:Friday 187:6
dated 43:10 98:13
100:18 145:10
146:11 147:13
149:13 153:7
154:15 156:21
dates 18:14
day 2:24 25:21
33:16,18 34:11
35:11 40:11 41:15
45:2 49:7 70:13
98:10,13 106:6
108:9 154:21
156:5 167:21
180:10 185:12
186:10 190:13
193:10
day-to-day 32:18
days 19:4 33:15
154:22 165:23
187:14
deal 131:1,3 137:25
138:4,8 162:13
dealing 138:14
169:6,7,7
dealings 112:17,20
death 97:8,11
106:8,19 119:4,10
137:22 138:10
155:23 160:15
164:17,21
deathly 168:7
debate 133:20
decided 20:20
decision 79:22
105:18 171:4
175:18 177:6,9
decision-making
11:19,25 174:12
decisions 132:24
171:24
decontaminated
148:1
deescalation 12:24
13:4,7,22 14:2
17:10 22:21 23:7
23:17,18 47:17,19
56:20,25 57:3
162:11,12,20,25
163:7
defect 17:12
defend 169:2
defendant 8:16
defendants 1:14
2:16 3:19 6:19
139:23,24 140:2,5

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                          September 25, 2015

**defer** 27:23
**definitely** 83:21
**degree** 67:25
**delayed** 35:21
**delirium** 159:10,13
159:14 161:11,17
162:6,14
**delivery** 193:1
**Delores** 1:3 2:8
6:18 107:4
**demeanor** 120:21
**dementia** 159:6
**department** 10:16
11:7 15:8,13,23
15:25 18:21 22:14
23:11 26:9,16,25
27:11,17 28:14,22
29:2,3,6 30:12
31:8 32:2,7,10,12
42:11 46:1,9,25
48:18 58:21 60:20
61:7 62:1,7,8,19
63:18 64:22 73:21
74:15 87:9 97:12
99:25 102:14
105:5,16 106:9
107:12 112:20
130:12 132:14
135:16 137:13
142:5,10 143:9
149:25 150:6
153:7 154:19
158:4 161:9 170:6
173:14 179:23
187:23
**department's**
137:17 149:18
**department-issued**
58:9
**departmental**
151:5 172:13
**departments**
135:20 137:1,24
138:3

**depend** 169:12
**depended** 25:19
**depending** 11:15
19:12 78:18 108:6
**depends** 78:15
152:18
**deployed** 58:9 95:6
113:10,11 115:20
**deploying** 115:24
**deployment** 65:5
**deponent** 186:3
**deposed** 8:4,21
**deposes** 6:25
**deposition** 1:17
2:20 5:8,9,10,11
5:12,13,14,15,16
5:17,18,19,20 6:4
9:1 10:7,15 52:17
108:17,18 134:6
136:22 158:19
187:6,10,11 190:3
191:9,11 193:9
**depositions** 22:13
**describe** 49:3
120:20,21 125:15
152:11
**described** 50:16
100:21 118:1
182:23
**designed** 11:1
13:17 68:13 136:1
136:7 137:17,21
**desire** 164:24
**desired** 68:18
**Deskbook** 30:15,21
30:22,25 31:23
**destroyed** 43:20
**detailed** 141:23
**detective** 24:8
142:9
**determination**
99:20 103:2,22
104:8,10 106:22
169:21 170:3,23

171:8 178:20
180:25 181:2,6
**determinations**
171:18
**determine** 32:8
**determined** 38:16
102:11 111:6
179:16
**determines** 103:15
**deviating** 175:25
**device** 120:17,21
**devoid** 92:5
**diabetic** 159:4
**Diabetics** 159:4
**died** 63:7 89:6
101:18 102:1
106:12 107:14
108:2 111:8,19,19
118:24 156:5
181:16
**dies** 108:7
**difference** 82:24
**different** 13:8
17:15 22:22 73:6
73:10 79:17 80:6
110:8 113:22
131:15,20 158:20
160:4
**Dilworth** 98:7,8,10
98:16 99:2
**direct** 88:23
**directed** 95:4
**directing** 50:6
**direction** 127:8
130:12 144:1
**directions** 49:22,23
**directly** 21:16
78:24
**disabilities** 159:2
**disburse** 143:23
**discard** 97:5
**discarded** 43:20
95:12
**disciplinary** 171:24

**discipline** 105:25
172:7,10,21
179:20 181:3
**disciplined** 172:5
**disclose** 140:25
**disclosures** 170:11
**discovered** 140:19
164:2
**discovery** 141:10
**discretion** 74:20
105:9,11 174:15
174:21 175:2
176:9,10
**discuss** 116:22
**discussed** 21:5,24
23:10 83:24
**discussion** 148:16
176:16
**discussions** 10:18
156:3 179:1
**disease** 17:13
**dispatch** 37:14,19
37:21 43:17,19,22
44:18 55:16 81:3
122:24 123:23
**dispatcher** 43:25
123:19 124:12
**displayed** 120:22
**dispose** 40:24
**disruptive** 13:18
**distance** 117:1,5
118:7
**distinction** 159:13
**distress** 135:9
**distributed** 61:8
**District** 2:1,2 6:7,8
185:6,7
**disturbance** 14:4
**diverted** 95:2
**division** 2:3 6:8
31:10,11 103:10
179:15 185:8
**DNA** 29:18
**document** 140:11

141:22 142:17
148:25 179:1
**documents** 23:19
24:11 62:14 63:17
140:25 164:1
**doing** 13:1 17:17
19:8 24:10 31:3,5
94:3,21 95:15
138:20,22 139:11
171:12
**domestic** 56:8
109:25 110:1,2
147:19
**door** 127:13 128:4
128:21 129:2,5
172:18
**doors** 113:10 157:8
**dots** 95:5
**Dowd** 3:4,5,5 5:4,6
5:25 6:15,15 7:4,6
11:22 21:11 32:20
45:14,17,18 47:23
48:7 50:24 54:11
54:12 57:4 59:3,9
59:16 60:2,6
61:23,24 62:11
65:11 66:8,18
67:6,11,16 68:3
68:13 69:7 70:5,8
70:16 71:11,24
72:14 73:14,21
74:1 75:3,9 76:13
76:23 77:15,21,24
77:25 78:18 79:9
79:23 80:19 81:9
81:10,24 82:15,22
83:8 84:7,14,19
85:15,25 88:15,21
104:16 111:14
122:17,23 128:11
128:15,18 129:17
130:2 131:13
132:3,10,17,21
133:2,8,12,16,21

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                           September 25, 2015

Page 200

134:3,16 135:3,15
135:25 136:6,13
136:17,20,24
137:1 139:15,20
140:6,10,19,24
141:16 144:14,20
144:23 145:3
148:12,16 149:3,6
149:9,12 151:20
151:23,25 152:2
152:19 158:12,18
160:25 161:8,21
162:19 163:5,18
163:23 164:9,23
166:11,17,21
167:1,3 168:12,17
168:22 169:15
170:8,16,20
172:25 173:11,17
173:21 174:2
175:25 176:4,14
176:24 179:7
181:7,23 182:15
182:19 183:6,14
183:24 184:4
191:17,17 192:3,3
**download** 182:7,16
182:20,21
**Dr** 109:9
**drastically** 66:3
**draw** 53:17 59:20
88:21 126:18
**drawing** 127:4
**drill** 7:22
**drinking** 80:7
**driven** 56:5
**driver** 128:21
**driving** 46:7
**drop** 167:21
**dropped** 68:25
**drops** 167:20
**dry** 157:17
**due** 160:18
**duly** 6:23 185:15

**dump** 40:23
**dumpster** 40:24
41:8
**duties** 42:13 63:18
**duty** 33:6 98:10,14
129:22 130:1
137:2 178:1
**dying** 49:10

**E**

**earlier** 27:19 44:13
134:6 158:19
159:2 173:17
**early** 49:4 162:16
162:21,25
**easier** 17:23 126:20
**east** 49:13,17
**Eastern** 2:2,3 6:8,8
185:7,7
**easy** 104:19
**edge** 50:10
**education** 7:20,25
24:20
**educational** 7:19
**Edwards** 155:7,9
155:11,16
**effect** 14:11 65:22
77:15
**effective** 67:20
69:21 79:3
**effectively** 68:17
**effectiveness** 32:3
**effects** 76:3 174:9
**eight** 19:1
**either** 10:19 16:7
17:11 45:6,19
52:15 54:21 63:17
71:15 78:2 81:2
85:9 86:10 115:23
121:21 135:10
145:4 147:9 156:6
158:22 173:5
178:17 183:9
186:6

**elbow** 153:2
**elderly** 135:8 159:6
**electricity** 73:2
76:1 88:4
**electronically** 29:9
**elevate** 161:6
**elevated** 104:18
160:19
**elevates** 160:7
**email** 61:12 62:6
142:1,2,5,6,16
**emergency** 124:21
124:23 126:2
**employed** 120:7
**employees** 49:8
**empty** 167:4
**EMS** 92:16,20
**EMT** 118:15
**EMTs** 92:23
**en** 123:25 124:3,4,7
124:8,15
**Enclosed** 187:11
**encountered**
158:22
**ended** 120:11
127:22
**ends** 104:21
**enforcement** 65:16
65:17
**engaged** 96:4
**engaging** 137:4
**entire** 31:8 155:5
**epaulet** 44:24
**equally** 74:19
**equipment** 35:11
93:3 121:12
**errata** 187:11,13,13
187:14
**escalate** 17:16
163:16
**escalated** 70:10
**especially** 25:5
**ESTATE** 1:3 2:7
**estimate** 25:22

**et** 1:12 2:15 6:6,6
187:7,7 191:5,5
**etcetera** 28:5 30:18
30:18
**evaluation** 180:9
**evening** 164:21
**event** 21:17 43:14
97:4 108:11
**everybody** 25:25
37:22 41:5 101:10
103:1 131:14
132:6 166:10
177:18
**Everything's** 97:22
**evidence** 23:4,12
23:15 25:7,9,25
28:4 114:5 148:22
182:4
**exactly** 18:11 36:12
41:10 48:4 53:11
72:13 76:6 84:21
123:13 129:7
136:24 159:18
**exam** 119:7
**EXAMINATION**
5:3 7:3 164:6
173:10
**examine** 141:8
**examined** 139:24
185:15
**examiner** 119:6
172:16
**example** 23:11 69:7
71:24 78:7 123:17
124:2 129:18
134:5
**examples** 13:13
14:1 158:25
**exception** 42:21
174:13
**exceptionally** 41:3
48:2,8
**excess** 15:13
**excessive** 58:22

82:16 129:11,13
135:20,25 136:6
137:13,16 138:13
179:17
**excited** 159:9,14,25
160:1 161:11,16
162:6,14
**exclusively** 99:13
**excuse** 16:20 20:18
45:15 49:16 81:6
93:21 104:1 117:3
146:20 154:22
**exhibit** 5:8,9,10,11
5:12,13,14,15,16
5:17,18,19,20,24
42:16 50:15 53:4
54:13 55:1 62:23
62:24 63:9,23
66:1,20 76:24
83:12 88:22,23
96:15 99:12
100:14 108:15
125:1 126:14
127:23 139:21,24
140:1 141:17
142:22 144:15
145:9 146:10
147:11,12 149:12
150:14 153:5
154:14 156:20
**exhibits** 5:7,21
62:12 166:11,14
166:16
**exited** 93:2
**expect** 24:12
**expected** 26:4
**expedite** 92:17
**experience** 9:20
72:16 74:2 78:6
78:22,22 131:16
131:20 175:19
**experiences** 158:19
**expert** 170:9
**expires** 190:14

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                                September 25, 2015

Page 201

193:11
**explain** 39:8 100:6
**explanation** 49:25
**exposure** 110:13,22
111:9
**expression** 92:6
**extremely** 65:5
67:4 92:5
**eyes** 39:23 41:4
92:12

**F**
**face** 39:2,2,4 40:1,3
40:4 92:4,6,7,9
101:20,21 118:21
119:14,21
**facedown** 38:23
**facilities** 27:11
**facility** 178:4
**facing** 51:24 54:16
54:18,21 66:9
67:17 127:1,8,10
128:22
**fact** 15:9 81:18
82:8,18 132:22
170:21
**factors** 81:18
**facts** 70:16 83:25
99:15 120:2
150:12 172:11
180:11 181:17
182:1
**fair** 10:4 94:23
106:1 129:9
132:17 167:23
174:25 181:13
**fall** 119:13 152:23
152:24 158:25
**fallen** 80:8
**falling** 64:2
**familiar** 42:20
48:17 61:6 156:9
183:15
**family** 56:1,5,9

107:8 113:4
**fanning** 37:9
**far** 16:8 18:20
28:18 31:22 32:13
73:7 76:7 91:20
99:20 122:23
168:2
**fast** 72:17 131:7
**Fatima** 121:18
122:7,7
**fault** 173:6
**FAVOR** 192:1,7,13
**fear** 65:7
**feasible** 116:9
**February** 8:3 14:24
143:13
**federal** 148:21
**feel** 139:1
**feet** 51:7,9 64:3
117:1
**fell** 120:8
**fellow** 129:10
137:10
**felt** 172:3
**Female** 60:12
**females** 143:21
**Fenn** 24:8
**Ferguson** 8:10
10:17 11:7,14
12:23 15:22 17:20
18:1 19:9 26:16
26:25 27:10,16
28:23,25 29:1,3
30:12 32:10 48:18
55:2 61:7 62:1,8
63:18 71:5 76:25
83:13 87:14 88:23
97:11 99:12,25
100:14 102:13
108:15 112:19
142:10 143:9,15
146:11 147:13
153:6 154:19
161:9 170:6

173:13
**field** 16:24 17:6
18:3 37:23
**fight** 102:16 108:8
139:8,9 143:24
**fighting** 143:21,23
146:17
**file** 24:21 97:7,8
140:12,14,19
**fill** 19:3 105:1
**filled** 102:6 118:23
118:25 119:2
179:7
**filling** 104:24 170:2
178:3
**final** 105:19,21
**finally** 155:11
**find** 22:10 37:9
86:4
**fine** 16:13 113:6
136:25 176:16
**finish** 45:16
**finished** 97:5 125:3
**finishing** 52:5,10
52:12 122:10
**fire** 12:11 59:21
**firearm** 10:24 11:1
41:23 134:8
**firearms** 11:10 12:4
22:17 27:5 59:11
134:6 135:7
**firing** 182:6
**firm** 6:3 9:2 163:5
191:14
**firmly** 162:24
**first** 6:23 8:1 14:15
16:3 24:6 34:17
38:7 44:11,12,12
47:2 51:22 57:1
60:15 62:15 64:18
65:4 66:2 67:20
68:8,23 69:21
78:9 87:6 90:6
99:9,11 100:17

115:1 116:18
123:18 129:11
144:14 151:22
167:16 176:25
179:19 183:19
185:15
**fist** 102:16 108:8
**fists** 58:1
**five** 19:23 114:21
115:2,5,5 120:10
141:8 181:10
**Five-foot-eleven**
85:3
**five-second** 64:11
77:3 114:19,24
120:13 181:12
**floor** 167:20
**fluid** 78:15 132:23
**focus** 143:4
**folder** 30:16
**follow** 96:8 164:9
179:22,22
**follow-up** 173:12
**followed** 100:11
102:18 121:23
172:12
**following** 181:16
**follows** 7:1
**force** 10:10,11
13:10,14,24 18:20
19:7 28:5 41:18
42:18 43:2 55:2
58:22 63:23 65:21
69:2 70:3,10,21
70:25 71:15,16,19
72:5 74:16,25
75:7 76:8,18,24
77:18 78:7,8
80:20 82:16 86:11
87:14 96:15 99:8
99:16,22 100:8
101:2 102:12,18
102:19 103:4,16
103:17 104:9,23

104:25 105:2,14
116:16 120:3
129:11,13 133:4
135:7,21,25 136:6
136:7 137:14,16
138:14 139:13
143:8,17 145:10
146:8,11,16
147:13 149:13
150:15 153:6,11
154:15 155:1
156:21,23 162:17
162:22 163:16
166:12,18,22
167:5 169:16,18
169:22 170:5,22
170:23 171:5,12
171:14,18,25
172:4 178:21
179:8,12,17
180:15 181:1
182:2
**forced** 155:9
**foregoing** 185:18
185:21 190:2
**forehead** 155:16
**foreseeability**
158:20
**forget** 29:18
**forgive** 14:16,25
38:13 125:5
**forgot** 25:18 133:18
**form** 11:20 47:21
56:23 58:25 59:13
59:23 65:9 66:4
66:15 67:5,7 68:1
68:10 70:14 71:8
71:15,21 72:9
73:11,19 75:1
76:4,19 77:12,20
77:22 78:13 79:6
79:14 80:16 81:21
82:11,20 84:4
85:12,19 100:17

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

Page 202

| | | | | |
|---|---|---|---|---|
| 111:10 113:13 | **Fourth** 2:22 6:3 | 171:3 | 161:13 163:18 | **grill** 53:16,18 |
| 120:20 129:14,24 | 185:10 187:4 | **generally** 21:24 | 168:9,18 176:18 | **Groaning** 39:6 |
| 131:10 132:1,9,16 | 192:10 | 24:2 47:23,25 | 178:25 180:5 | **groin** 67:19 69:20 |
| 132:18,25 133:6,9 | **frame** 31:6 48:5 | 78:11 95:14 | **goal** 15:7 130:14,19 | 115:15 117:6 |
| 134:13,25 135:12 | 130:9 160:2 | 149:17 | **God** 122:14 | **ground** 51:1,2 |
| 135:22 136:3,13 | **free** 73:9 | **genitalia** 60:11 | **goes** 17:3 29:7 | 57:16 64:2,12 |
| 144:24 152:16 | **fresh** 131:18 | **gentleman** 36:19 | 30:21 49:7 79:25 | 65:2 66:11,23 |
| 162:18 163:3 | **Friday** 48:25 | 79:1 91:21 153:3 | 97:17 111:4 | 67:16 69:13,17,19 |
| 170:3 172:25 | **Friend** 1:5 2:9 | 182:25 | 145:16 | 69:24 72:4 73:1 |
| 175:24 176:2 | **friendlier** 14:9 | **getting** 40:23 73:7 | **going** 7:8 9:6 10:2 | 73:17 76:11 77:4 |
| 179:15 181:4,20 | **front** 37:3 53:5,16 | 84:6 120:12 | 12:5,6,7,10,12 | 77:11 79:2,4 80:8 |
| 183:3 | 53:17,24 54:15 | **give** 13:13 14:1 | 13:20 14:19 17:9 | 80:8 81:16 92:11 |
| **formal** 29:25 | 126:5,12 127:1,12 | 16:9 24:19 26:3 | 21:12 25:23 32:7 | 94:9 115:16 120:8 |
| 178:20 180:8 | 129:1 153:13 | 42:15 62:11 80:14 | 33:23 35:11 36:16 | 146:19 153:21 |
| **formally** 29:23 | **full** 115:25 185:25 | 129:17 131:20 | 37:22 39:14 42:15 | 155:9,11 183:16 |
| 110:25 | **fully** 155:12 | 142:22,23,24 | 48:4,5 50:14 53:1 | 183:19 |
| **former** 10:20 | **functional** 35:14 | 145:9 146:10 | 54:2,9 62:11 67:3 | **growl** 39:11 |
| **forms** 97:10 144:16 | **functioning** 122:24 | 147:11 150:20 | 72:17 75:1 79:21 | **growling** 39:5,7 |
| **forth** 185:22 | **further** 9:18 31:19 | 153:5 154:14 | 85:10 88:2 99:11 | **guess** 14:8 16:6,7 |
| **forward** 102:22 | 66:13,22 81:10 | 156:19 | 119:23 129:17 | 20:19 26:7 33:4 |
| 145:19 | 102:21 120:20 | **given** 22:14 28:8 | 130:4 131:20 | 36:16 49:8 51:25 |
| **forwarded** 171:8 | 138:7 140:24 | 61:4 79:12 120:12 | 132:10,11,12,12 | 88:2 92:9 97:17 |
| 180:3 | 146:24 150:24 | 123:25 141:16 | 139:19 140:8 | 101:20 103:6 |
| **forwards** 103:18 | 153:23 155:11 | 149:12 155:7 | 141:25 143:1,4,24 | 106:13 117:15 |
| **found** 37:13 105:13 | 163:24,25 164:3 | 157:17 186:2 | 144:13 148:17,18 | 130:4 139:5 |
| 140:23 168:6 | 172:16 173:9 | 190:5 | 151:19 155:5 | **guessed** 119:22 |
| 173:2,6 | 179:1 184:5 186:5 | **gives** 17:15 | 160:11 161:12 | **guessing** 33:1 87:24 |
| **foundation** 21:8 | 187:15 | **giving** 165:9 | 166:17 167:4,24 | 115:7 |
| 32:15 47:22 56:24 | | **Glock** 27:7 | 170:21 171:2 | **guidelines** 151:5 |
| 59:1,24 60:4 | **G** | **go** 7:13 9:11 11:5 | 174:8 175:19,20 | 169:23 172:13 |
| 61:21 65:10 66:5 | **G** 122:2 | 12:23 17:3 23:25 | 179:14 180:16,24 | **guilty** 129:12 |
| 69:4 70:4 73:20 | **gain** 64:19 116:4,19 | 24:18 25:10 28:13 | 182:13 | **gun** 56:12 80:5,11 |
| 76:5 82:21 83:4 | 147:2 157:10 | 30:7,23 31:24 | **good** 7:5 18:13 48:3 | 80:13,14 108:10 |
| 104:11 111:11 | **gas** 35:15,19 | 35:17,25 37:7 | 122:14 134:19 | 115:9,19 116:6 |
| 129:15,25 133:9 | **GATEWAY** 193:5 | 53:22 55:1 63:23 | 139:5 161:5 | 169:5 |
| 134:14,25 135:12 | **gathering** 140:13 | 68:3 74:12 76:7 | **Gore** 4:3 6:11 | **gurney** 94:2,4 |
| 135:22 136:3,13 | **general** 12:4,10 | 76:10,23 80:12,18 | 193:5 | **guttural** 39:9 |
| 148:23 160:24 | 18:20 19:10 21:11 | 99:11 100:13,15 | **GorePerry** 187:1 | **guy** 69:7,9 79:24,25 |
| 161:19 172:25 | 21:14 22:3 26:3 | 100:22 102:22,25 | 187:23 | 80:7 84:23 |
| 173:16 176:3,21 | 28:23,25 29:6 | 103:4 108:14 | **gotten** 113:3 | **guy's** 69:13 80:5 |
| 179:3 181:5,20 | 30:12 31:17 32:9 | 116:2,3 112:17 | **grabbed** 153:19 | **guys** 21:2 85:16 |
| 183:3 | 62:14 82:25 | 127:25 139:15 | **great** 122:14 | 86:7 108:23 |
| **four** 11:16 20:4,8 | 100:21 102:13 | 148:10,17,18,22 | **greater** 74:23 | |
| 36:17 | 103:11 161:25 | 151:3 158:12 | 160:15 | **H** |

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                          September 25, 2015

Page 203

**half** 63:6
**hallucinating** 160:3
**hand** 50:14 115:22
  150:22 167:4
  186:9 193:10
**handcuff** 85:17
  121:6 157:5
**handcuffed** 38:22
  39:19,21 83:15
  86:15,24 150:24
  181:15
**handcuffing** 52:6,9
  90:14 155:10,12
**handcuffs** 74:13
  84:18 85:23 90:18
  91:3,6,15
**handed** 139:20
**handle** 130:22
  131:21 139:2
**handout** 61:15 62:6
**handouts** 25:4,5
**hands** 41:19 55:4
  55:12 84:2 146:20
  146:21 150:20
  162:23,24 163:5
**hands-on** 71:15,16
**handwriting**
  110:14 154:1
**happen** 35:20 92:1
**happened** 34:10
  38:15 94:11,11,13
  95:15 103:12
  104:20,21 114:3
  146:7 176:15,15
**happening** 72:13
**happens** 19:13
**hard** 39:8 86:5
**hard-nosed** 14:10
**head** 40:5 51:5,6
  55:4,12 61:19
  76:10,11 91:10
  95:21 169:8
**headlights** 125:11
  125:12,15,20

**health** 56:22 111:7
  130:23 138:15
  158:23
**hear** 36:23 37:6
  95:20,23 124:17
  156:6 161:4
**heard** 22:12 34:18
  36:9,10,20 37:12
  37:16 44:18,19
  45:9 46:21,24
  55:16,19 78:1
  89:9,10,12,15,19
  90:15 105:13,17
  106:9 107:10,12
  112:15 122:13
  123:18,18 159:21
  173:4
**hearing** 37:15
  44:21 160:3
**hears** 81:4
**hearsay** 149:1,6
**heart** 76:2,3 82:25
  83:3 94:8 160:8
  160:19,22 161:6
**heavier** 113:18
**heavy** 48:2,8 50:1,5
  113:14 131:7
**heel** 150:21
**Height** 112:10
**heightened** 134:8
**help** 17:15,17 72:19
  130:22 145:23
**helping** 135:8
  161:10
**helps** 17:14
**Henke** 31:2 33:4
  95:25 97:16 103:8
  103:14 104:1,3,25
  106:4,21 165:16
  165:22
**Henke's** 104:8
  105:18 165:17
**Henquin** 38:9,10
  46:14 48:23 49:12

  54:16,21 97:25
**hereinabove** 190:6
**hereto** 190:4
**hereunto** 193:8
**hesitate** 80:3
**hesitated** 82:17
**hide** 127:13
**high** 7:20 59:20
  65:17
**higher** 173:4
**highlighted** 143:3
**highlights** 143:1
**hired** 143:11
**his/her** 187:10
**hit** 59:21 76:9
  80:12 183:19
**hits** 79:24
**hitting** 69:10
**hold** 54:2 121:5
  174:8
**holds** 163:6
**Holm** 3:13 192:15
**home** 107:20,24
  108:11
**honest** 40:15
  159:19
**honestly** 72:12
**hoodies** 113:19
**hopefully** 44:10
  130:22
**hopes** 163:15
**Horton** 144:6
**hospital** 93:10 96:8
  106:14 109:8
  119:23
**hour** 48:12 49:24
**hours** 24:23
**hundred** 22:3
  31:17,18 51:10
  85:4
**hurt** 74:7,8 148:5

---

**I**

**Ida** 3:20 6:19 187:3

  187:9
**idea** 21:10,15,19
  23:22 25:1 26:3
  43:21 48:3 55:13
  57:10,13 103:21
  104:14 127:17
  141:24 161:25
  180:16
**iden** 47:13
**identification** 95:5
**identified** 47:3
**identify** 6:13
  161:10
**imagine** 87:24
  92:10 152:21
**immediately** 30:13
  56:20 80:12 81:19
  82:9 85:10 180:2
**imperfect** 86:8
**implementation**
  61:20
**importance** 132:21
  134:4
**important** 9:8 17:5
  131:24 138:13
**impression** 175:1
**impulses** 160:5
**in-between** 93:19
  182:8
**in-custody** 160:15
**in-house** 22:12,15
  25:13 26:24 28:1
  28:3
**in-service** 26:5
**inaccurate** 112:4
**inaccurately** 9:21
**inappropriate**
  105:14
**incapacitate** 68:14
**inch** 113:24,24
**inches** 117:6
**incident** 7:9,9 10:8
  34:10 40:21 41:12
  63:6,13 93:23

  95:20 96:1,4
  101:2 104:5
  107:13 109:13
  112:16 122:15
  143:12 146:24
  148:19 150:25
  154:23 169:17
  177:2
**incidents** 102:16
  105:2
**include** 11:18 12:15
**included** 119:4
**includes** 12:4
**including** 65:20
  156:23 187:12
**indecent** 110:13,22
  111:9
**INDEX** 5:1
**indicate** 45:11,18
  51:14 64:23
  145:13 148:4
  155:19,22 179:10
**indicated** 54:13
  65:7 66:1 113:14
  115:8
**indicates** 65:1 77:9
  114:8 118:9
  144:24 147:16
  154:7 155:15
  156:22
**indication** 66:18
  153:13
**individual** 79:21
**Individually** 1:1
  2:5
**individuals** 27:25
**information** 44:13
  47:8 55:8 57:7,20
  58:5,16,19 64:14
  77:6 83:18 96:14
  112:8,11 113:3
  114:11 116:25
  124:1,10,14
  140:13 149:22

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 204

150:6 181:9
**initial** 14:19,23
  73:15 120:9 173:3
**initially** 64:2
**initials** 50:20 52:24
  53:2
**initiative** 165:6
**injured** 55:20 74:6
  101:3,5,13,14,18
  101:25 144:17,25
  145:6,14 146:5
  147:6,9,25 151:18
  152:15,25 153:14
  154:8,11 157:21
**injuries** 87:18
  101:8 119:13
  151:10
**injury** 101:9
  118:18,20 119:4
  119:12,17 137:22
  138:10 144:8
  145:2 146:7 148:7
  148:8 151:6,14
  152:5,11,22
  155:20,23 157:19
  157:24,24 158:8
**inquire** 141:11
  163:25 164:3
**inside** 30:16
**insights** 131:20
**instance** 127:16
  158:1 168:7
**instantaneous**
  78:16
**instituted** 16:3
**instruct** 187:12
**instructor** 7:22
  60:22 142:7
**instructors** 61:10
  62:2
**intelligent** 131:8
**intend** 180:13
**interested** 186:7
**International** 61:1

61:13 62:3 108:20
**interrogatories** 7:1
**interrogatory**
  170:10
**interrupted** 102:9
**interval** 78:1
**intervals** 182:8
**intervention** 15:5
  17:7
**interview** 99:3,5
**interviewed** 104:1
**interviews** 104:6
**intoxicated** 153:18
**introduced** 169:4
**investigate** 173:5
**investigated** 173:6
**investigation** 22:25
  97:12 102:20,21
  180:3
**investigations**
  22:24 172:17
**investigative** 97:7
**invite** 20:24
**invited** 20:17
**involved** 32:17,18
  32:24 76:12
  105:25 108:10
  132:23
**involvement** 7:10
  17:19 18:17 99:1
  106:1,8
**involves** 101:2
**involving** 8:13
  107:13 169:17
**irate** 145:17
**Island** 7:22
**issue** 17:9 168:24
  169:1 172:21
**issued** 29:7 30:6
  60:19
**issues** 27:2 56:22
  79:11 111:7
  130:23 138:15,24
  158:23

**J**

**Jackson** 10:20
**Jackson's** 130:3
  137:6 164:25
**jail** 8:14 139:7
  177:15
**January** 14:24 15:1
  153:8
**Jason** 1:3 2:7 7:7
  35:25 36:19 47:4
  50:16 92:3 103:4
  106:7 112:15
**Jason's** 107:5
**jerk** 145:19
**Jesus** 122:14
**job** 63:18 86:7 95:1
**Join** 170:13 173:1
**joining** 21:7
**judge** 9:14
**Julie** 2:24 6:10,20
  185:4 186:17
**July** 21:17 143:16
**jump** 23:5 44:3
  139:3
**jumped** 93:24
**June** 62:20 145:11
**juror** 9:15
**jury** 7:13 13:6
  115:16

**K**

**K-9** 166:10
**Kaminski** 1:12
  2:15 6:6 10:19
  16:16 34:22 36:11
  37:13,16 38:4,11
  38:15 39:12 40:18
  40:20 42:10 45:3
  46:13 47:9 51:15
  51:24 55:3,9,17
  56:13 57:6,8,15
  57:21,24 58:1,6,9
  58:15 59:9 60:22
  64:4,6,10,15 65:7

66:2 69:23 70:9
  71:7,25 73:15
  77:7 80:25 81:4,7
  81:11 82:7,9,13
  83:19 85:1,10
  96:13 99:4,13
  104:2,9 108:22
  113:12 114:12
  116:16 117:3,8
  118:6 121:23
  122:12 156:4
  168:12,14,21
  171:22 172:3,12
  172:22 174:9
  176:10,19 177:1,2
  177:19 178:1,21
  181:9 182:3 183:1
  187:7 191:5
**Kaminski's** 40:11
  53:5 64:25 71:4
  79:18 98:3 107:20
  109:1 121:3
  123:18,19 128:3
  128:20 168:7,13
  169:22 170:4
  177:11
**Kansas** 3:15 192:17
**keep** 11:11 24:21
  69:10,11 97:6
  127:12
**keeping** 73:17
  155:10
**kept** 23:19 27:22
  40:3 149:17
  165:24
**keys** 80:8
**kick** 145:21
**kicked** 145:18
  157:7,8,9
**kicking** 145:20
**killed** 146:5 147:9
  151:18 152:5
  154:11
**kind** 22:18 24:11

28:7 29:4 32:6
  39:8 40:18 45:14
  45:20 72:4 86:5
  112:10
**kinds** 23:9
**knee** 153:2
**knees** 101:22
**knew** 41:17 82:8,13
  82:18 104:5
  140:17 180:11
  181:17
**know** 7:6 8:20 9:4
  10:16 13:10 14:5
  14:7 15:13 16:9
  16:15 17:3,12,16
  19:13 20:21,23
  21:5,14 22:11
  23:16,20 24:19
  25:8,14,20 26:8
  28:10,11,18 29:16
  29:17,17,19 30:16
  31:3,11,12,13
  32:1,17 33:20,22
  35:9,22 37:7
  39:11,20 40:4,6
  40:15,21,24 41:3
  41:4,6,10 42:5
  43:19,25 46:8,18
  48:3,4 49:6 52:18
  53:19 55:11 56:4
  60:6,10,19 61:17
  62:4 68:24 72:12
  72:17 74:8 75:20
  77:25 78:2,21
  79:17,20 82:24
  83:2,6 85:3,25
  87:21 88:6 89:5
  91:10 94:7 95:11
  96:1,25 99:7
  103:15 104:20
  105:8 106:22,24
  112:19 113:19,25
  114:3,6 115:13,22
  115:24 117:8,9,20

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                            September 25, 2015

Page 205

117:23 118:14,24
119:5,20 124:12
126:11 128:9,10
128:12 129:7
139:2,6,8 140:15
141:7,8,12,22
144:10 160:2,7,9
160:11 161:24
164:19 165:25
166:7 167:8,18,19
168:3 169:10
172:15 175:5,20
176:9,24 177:5,9
177:17 178:11
**knowing** 84:21
138:20 175:4
**knowledge** 7:9 8:19
26:22 36:1 40:17
42:2,5 45:24 83:7
87:7 90:9 94:18
96:12 97:9,14
103:11,13 106:7
116:9 119:6
121:10 142:17
150:12 154:20
178:10
**known** 38:2 79:10
166:1
**knows** 30:22 81:2,4
81:5,6 85:10
166:10

**L**

**labeling** 140:1,3
**lady** 132:12
**lane** 50:11 127:21
**lanes** 51:24 52:3
**lapsed** 64:18
**large** 131:6 132:13
**largest** 59:25 60:8
**launch** 115:25
**launched** 117:2
**law** 6:3 65:16,17
**lawful** 6:23 103:16

103:17,18
**lawfulness** 104:8
**laws** 25:6
**lawsuit** 133:13
**lawyers** 140:13
**layed** 120:11
**layers** 113:20
**laying** 38:22 80:7
117:25
**lead** 61:19 94:7
**leads** 94:16
**learn** 36:18 106:11
132:15
**learned** 36:19 58:6
108:2 180:19
**leave** 47:11 97:13
105:4,9 172:17
178:7
**leaving** 35:25 42:13
**left** 63:10 76:25
93:9 96:5 105:11
172:14
**left-hand** 63:2
**Legal** 6:9
**let's** 17:19 53:13
99:9 100:13 120:5
122:17 126:9
139:15 158:12
163:18
**level** 78:19 80:6
104:23
**levels** 102:19
131:15
**liability** 169:4
**lies** 15:8
**lieutenant** 6:5 7:5
17:20 18:15,18,22
18:24 20:22 26:11
26:17,18 29:14
33:5,9 48:22
50:25,25 106:18
122:23 123:10
137:2 140:15
141:16 142:25

149:13 158:18
163:23 165:11
168:14 171:22
173:12 174:21
**lieutenants** 19:20
20:10,16,21 21:6
26:15
**Life** 154:6
**lift** 94:4
**lighting** 125:16
**lights** 35:9 124:21
124:23 125:9,25
126:2,4
**line** 53:4,15,17,23
113:6 126:12
170:5 187:13
188:1,4,7,10,13
188:16,19,22
189:1,4,7,10,13
189:16,19,22
**lines** 116:25 123:20
**LIPA** 193:5
**lips** 91:21
**list** 31:12 187:12
**listened** 43:16
**listening** 133:18,20
**litigation** 150:3
**little** 49:10 53:23
95:8 108:25
113:24 142:15
169:12 180:23
**load** 94:22
**loaded** 35:4,7
**loading** 35:12
**locate** 46:4,8 95:11
95:12
**located** 50:8
**locating** 46:13
**location** 26:24
37:15 124:3
**locations** 37:3
**lock** 70:21,21 73:16
73:17
**locks** 41:19,20

71:16 163:6
**log** 25:9 30:13
**logged** 114:5
**long** 8:23 15:22
18:14 36:14 39:20
64:23 79:9 82:3
**longer** 53:23 54:4
66:8 67:17 69:13
79:4 80:14 82:17
163:10 173:20
**look** 35:25 42:8,19
42:25 77:16
100:10 102:15,17
133:3 142:23
143:19 144:6
146:12 147:24
150:8,18 151:21
151:21 153:16
155:3 160:9
**looked** 35:13 39:13
40:2 90:4 142:14
142:15 175:9
**looking** 14:6 22:2,4
36:6 51:25 52:1
55:15 62:24 72:11
75:25 95:19
166:14,24 169:9
**looks** 42:20 122:1
127:7 144:6
147:24
**lost** 135:8
**lot** 48:15 49:1
53:14 75:18,22
126:4,20 128:9
168:8
**lots** 140:12
**loud** 9:10
**Louis** 2:23 3:7,23
4:5 6:4,12 15:10
24:18 28:13,21,22
185:11 187:5,24
191:19 192:5,11
193:7
**lower** 63:2,9

**lowing** 73:8
**LSU** 153:22 154:3
**LSV** 154:3,5

**M**

**M-u-d-d** 123:10
**ma'am** 148:12
167:2
**mace** 42:1,12 70:22
71:4,6,24 72:21
74:16 147:16
156:23 166:23
168:3,13,15,15,21
173:15 174:10
176:20 177:12
**maced** 148:1
**mache** 95:8
**mad** 160:10
**Madison** 3:14
192:16
**mailbox** 62:6 63:20
**making** 106:22
171:13
**male** 132:13 146:17
**man** 7:16 34:19
46:22 56:11 58:22
67:1 72:3 77:10
81:16 84:19 108:2
181:10 183:15
**managing** 162:8
**maneuvers** 71:15
**manner** 14:9
**manual** 133:3,4
**March** 8:3
**Marguerite** 124:3
**marines** 7:21
**mark** 120:22
**marked** 42:15
50:14 141:17
156:19
**marking** 154:14
**marks** 92:7
**mass** 12:12,14,20
59:11,22

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

match 100:9,22
  102:16 108:8
materials 24:6,12
  24:24 25:3
matter 42:17
  180:14 187:10
mean 9:1,2 35:6
  41:1 48:10 52:16
  60:3 75:16 76:12
  78:3 81:8 85:25
  93:19 97:24 108:7
  109:16 110:17
  113:7 121:17
  123:2 126:2
  131:13,14 138:23
  139:8 150:7
  152:25 162:22
  176:12
meaning 139:22
  179:7
meant 163:11
measure 32:12
  117:12
medical 76:7 83:7
  88:9 93:3 119:5,6
  160:12,14 172:16
meeting 19:12,14
  34:24 107:16
  164:11,13
meetings 19:6,16
  20:9,11,17,24
  21:6,7,22,25
member 9:19 107:8
members 46:25
  56:1 138:23
  158:22
MEMO 191:1
memory 12:19
  59:19
men 19:1
mental 17:9,12
  45:20 56:22 79:11
  111:7 130:23
  138:15,24 158:23

159:2
mention 37:25
  151:14
mentioned 23:7
  44:13 76:18 190:6
met 7:6 46:22 64:5
  131:5
microphone 12:15
  45:3
middle 14:17 50:12
  52:8 155:3,6
midnights 21:3
military 7:21 65:16
mind 23:5 48:5
  127:3 133:21
  159:13,17 160:2
  185:14
mindset 79:18
Mine 127:20
minimum 11:8,14
  14:20 24:23
Minor 1:5 2:9
minutes 36:7,17
  106:14
mischaracterizes
  151:24
misdemeanor
  111:21
misinformed
  114:23
Missouri 2:2,23 6:4
  6:8,13 185:1,7,11
  186:9 193:7
misstates 173:23
mistake 176:13
MO 2:25 3:7,15,23
  4:5 186:18 187:5
  187:24 191:19
  192:5,11,17
models 22:22 23:12
modified 30:6
  31:21
modules 28:3
Molly 3:12 6:17

moment 68:2,5
  72:13 138:18
  141:20
monitor 94:8,8
  137:7
month 19:14 25:16
  60:17
monthly 29:4
months 13:2 41:9
  41:11 62:21 63:6
  63:6,12 178:12
Moore 1:1,3,4 2:5,7
  2:8 6:6,16,18 7:7
  7:7 10:8 35:25
  36:20 37:10 38:12
  38:17,18 39:14
  47:4 49:19 50:8
  50:16 51:16 55:4
  55:16 57:5,10,15
  57:16,24,25 58:10
  59:10 63:7 64:2
  64:12 65:1,5,25
  66:25 69:17,19
  71:6 77:2,4 84:18
  86:15 88:25,25
  89:10,14,25 90:18
  91:20 92:3,3,25
  93:9 94:15 95:3
  95:12 101:16
  106:11,15 107:2,5
  107:8,13 111:7
  112:15,18 118:24
  122:13 125:20
  154:23 156:5,5
  164:13,14,20
  169:17 187:7
  191:5
Moore's 39:23
  83:14 84:1 103:4
  106:8 107:13
  115:15 164:21
morning 7:5,6
  33:13 34:7 48:13
  48:24 49:4,23

50:1,3 104:4
  112:3 116:17
mornings 50:2
mother 107:5
mouth 91:11
move 57:5 82:2
  108:25 143:6
moving 37:15
  86:15 130:12
Mudd 123:10
Mullen 153:20
multiple 25:24
municipalities
  15:14
muscle 12:19 59:19
  73:4
muscles 68:14 73:3
  75:21
muster 22:16,19
  25:13 27:18 34:15
  34:21 36:4,10
  44:15

——————————
        N
——————————
N-a-b-d-z-y-k
  26:14
Nabdzyk 26:11,18
  33:5
naked 34:19 38:5
  47:5,14 56:11
  81:18 110:9
  113:15 120:7
  181:10 183:16
name 6:9,15 7:5,14
  140:14,15,17,21
  191:14
named 109:1
names 17:3
narrative 43:5,8
  143:20 152:10
  156:10
nature 109:13
  179:13
near 48:22 76:2

128:23 149:21
nearby 80:5
necessarily 59:17
  99:3
necessary 139:13
  179:1
neck 145:19
need 11:12 31:12
  35:11 125:15
  139:10 141:3
  155:25 157:25
  169:10
needed 20:20 22:4
  128:16
needs 139:1
negative 180:24
neighborhood
  30:17 95:16
neighbors 56:1,5,9
neither 157:21
neutral 110:4
never 20:24 42:22
  63:20 75:18 93:18
  94:5,13,21 105:13
  105:17 109:21
  110:25 112:17
  116:13 121:24
  141:6 156:15
  173:3 182:15,21
new 30:5,20 31:21
  98:17
nice 163:10
night 140:20
  177:21
noise 90:3
non-criminal 110:5
non-lethal 70:25
  74:16 143:8
  145:10 146:11
Non-police 121:17
non-threatening
  129:21
noncompliance
  64:5

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

**normal** 96:6 193:3
**normally** 44:2,5,6
  96:10 170:21
**north** 3:6 49:16,19
  191:18 192:4
**Nos** 1:9 2:12
**nose** 153:21
**Notary** 190:18
  193:13
**noted** 108:22
  139:25
**notes** 96:19 97:2,6
**notice** 39:25 91:19
  144:15 185:5
**noticed** 90:4,6
  91:23
**notified** 106:19
**notifies** 97:17
**notify** 45:22 97:14
  106:20,24
**notifying** 95:25
**number** 50:15 51:2
  51:14,18 53:16,20
  54:13 95:6 109:5
  114:9 126:23,24
  126:25 127:4,5,24
  128:1,19,23
  142:13 160:4
  187:13
**Numerous** 89:8
**Numrich** 3:13
  192:15

———————
**O**
———————
**object** 11:20 21:8
  32:15 45:13 47:21
  56:23 58:25 59:13
  59:23 60:4 61:21
  65:9 66:4,15 67:5
  67:7 68:10 69:4
  70:4,14 71:8,21
  72:9 73:11,19
  75:1 76:4,19
  77:12 78:13 79:6

79:14 80:16 81:21
  82:11,20 83:4
  84:4 85:12 104:11
  111:10 129:14,24
  131:10 132:1
  134:13 144:13
  151:19 152:16
  160:24 161:19
  162:18 163:17
  173:16 175:24
  176:2,21 179:3
  181:4 182:13
**objected** 133:22
**objection** 59:7
  67:15 73:23 75:8
  84:13 133:14,25
  136:10 161:4
  168:17 170:8,13
  172:25 176:6
  183:10
**objections** 136:14
  149:7 168:22
  177:25 183:21
  184:2 185:24
**observations** 121:2
  156:4
**observe** 94:6 95:20
  101:13
**observed** 51:22
  91:17 92:3,24
  94:21 112:9
  117:15
**observing** 92:2
**obtained** 143:15
**obvious** 151:10
**obviously** 9:7,13,19
  13:15 112:9 134:7
  162:19
**OC** 40:21,22,25
  41:8 71:6 74:25
  143:25,25 145:23
  146:23 157:10,12
  157:18 166:22
  168:9,10,13 175:2

175:5,22 176:11
  176:12
**occur** 41:7
**occurred** 93:1
**occurring** 106:7
**occurs** 22:18
**October** 146:12
  186:10 187:2
**odd** 48:11
**off-site** 27:12
**office** 24:3 103:5,19
  104:14 131:14
  187:15
**officer** 8:2,15 10:19
  10:20 13:15,17
  14:18 16:15,16
  18:4 26:5 29:8
  30:21 34:22 35:18
  36:11 37:12 38:4
  38:11,11,13,15
  39:12,12,13,15
  40:10,17,20 42:10
  42:11 45:3 46:13
  47:9 48:21 51:15
  51:18,21,23,24
  52:4,13,19 53:5
  55:3,9 56:13 57:5
  57:7,15,21,23,25
  58:6,8,15 59:9
  60:21,22 61:15,16
  61:16,17,25 62:7
  64:3,6,10,15 65:7
  66:2 67:23 69:2
  69:23 70:2,8 71:3
  71:7,25 73:15,18
  74:6,20 76:17
  77:7 78:6 79:18
  79:21,24 80:25
  81:1,11,11,19
  82:4,7,8,13 83:13
  83:19,19,25 84:6
  84:20,22 85:1,9
  86:9,16,21 87:1
  88:7 90:5,13,17

95:11 96:7,13
  97:13,20 98:2,2
  99:1 102:18 104:2
  104:2,9,10 106:15
  107:19 108:22
  109:1,2 112:1
  113:11 114:12
  116:16 117:3,8
  118:6 120:6 121:3
  121:17,22 122:12
  123:1 124:13
  126:10 127:15,17
  128:3,19 129:10
  129:11,12,22
  130:5,9,20 132:8
  134:7 139:1 142:8
  142:25 144:5,8,16
  144:25 145:1,14
  146:1,7 147:2,6
  148:4,7 150:20
  151:4,14 152:4,11
  152:13,25 153:1
  153:11,14,18,20
  154:8 155:1,19
  156:4,23 157:1,2
  157:3,3,4,7,8,9,10
  157:21,24 158:21
  160:9 161:10
  162:7 164:25
  165:8,23 166:2
  167:22,24 168:2,6
  168:11,13,14,21
  169:2,3,22 170:4
  171:22 172:3,12
  172:21 174:8,14
  175:2 176:9,10,19
  176:25 177:1,2,10
  177:19,25 178:21
  178:21 179:16,17
  181:9,24 182:2,3
  183:1 191:8
**officer's** 53:19
  74:20 102:12
  105:5 153:19,24

169:9 183:20
**officers** 11:7 12:18
  12:23 15:6,13
  16:23,24 17:6,14
  24:21 25:23 28:6
  28:23 29:5 30:25
  31:12,20 32:8
  34:1 35:24 36:4
  36:21 37:9,16
  41:25 42:4,11
  45:1 46:18 61:1,9
  64:25 72:6 74:7
  79:19 84:11,17
  85:8 88:25 89:25
  90:11,14 93:4,19
  95:4,16 99:13
  108:5 117:18,19
  118:14 122:24
  129:19 131:1,6,24
  132:12,13,22
  134:22,22 135:10
  135:11,17,20
  136:2,9 137:3,9
  137:10,13,17,18
  137:25 138:4,13
  146:18 150:5
  156:6 158:4,21
  161:13 162:3
  165:6,12,19 167:8
  167:12 168:8
  169:12 172:1
  173:14,18 178:7
**offices** 2:21 185:9
**official** 8:5 178:24
**oh** 19:17 20:4 41:9
  84:15,17 92:8
  96:7 98:20 109:11
  134:2
**okay** 7:18 8:1,7,9
  8:18,21,23 9:18
  10:1,6,18 11:9,13
  11:18 12:1,3,17
  13:13,22 14:1,11
  14:18 15:1,4,25

Tina Moore, et al. v. Brian Kaminski, et al.
William Ballard                                           September 25, 2015

Page 208

16:5 17:25 18:10
18:13,17 19:15
20:6,12 21:11,20
22:11 23:3,6,23
24:1,11,17,24
25:2,12,22 26:8
27:9,18 28:1,12
29:4,13,22,25
30:5,19 31:19
33:12,17 34:6,14
34:17,21,24 35:2
35:6,13,23 36:8
36:14 37:11 38:2
38:24 39:22 40:6
41:13 42:9,23
43:4,10,23 44:23
45:2,8,11 46:5
47:2 48:7,14 49:2
49:15 50:8 51:11
52:2,4,10 53:7,13
54:20 55:1 56:4
56:19 60:2,9,23
61:6 62:23 63:5
63:22 64:22 65:20
66:22 67:3 69:16
71:24 72:21,23
73:6 74:1,22 77:9
77:24 78:11,18,21
79:23 80:19,22
81:5 82:15 83:2,8
84:19,23 89:9,13
89:15,23 90:6,11
91:8,12,19 92:7
92:15 93:11,15
94:6 95:14,22
96:3,9,13,19,24
97:4,10,19 98:7
98:12,19,24 99:8
100:5,17,21 101:1
101:16 102:6
103:3,9,20 104:16
105:7,10,23 106:4
107:2,4,7,23
108:1,4,14,21

109:22,25 110:12
110:19 112:2,13
112:19 113:6,13
113:22 114:6,16
115:8 116:5,15
117:18,20 118:5,9
118:17,23 119:8
119:11 120:17
122:1,17 123:5,8
123:12,17 124:2,7
125:3,7,11,14,23
126:6,9,21 127:23
128:11 129:9,17
130:8,13,19
133:21 134:19
136:15,25 138:17
139:15 142:7,11
142:16 143:5,12
144:8,11 145:3
146:1,16 147:2,16
148:7 149:3,9
151:9,23,25
152:25 154:5,7,25
158:12 159:12,16
159:20 160:13,21
162:3 163:18
164:19,23 165:14
166:1 167:8 168:2
168:5,11 169:15
170:1 171:11
172:7,24 173:8
174:2,4,7,17
176:14 177:4,12
177:16 178:5
180:8,18,23 181:7
182:11 183:6,14
184:4
**old** 7:16,17 40:22
142:14,15
**Olive** 4:4 6:12
187:24 193:6
**on-scene** 108:21
**on-the-spot** 69:3
**once** 8:8 29:7 31:25

49:5,7 60:20 69:9
74:11 87:15 95:2
104:15 106:19
145:15,17 150:22
163:5,9,9
**one's** 100:18
132:11 143:1
**ones** 149:16
**ongoing** 29:23
32:14
**open** 39:23 150:21
172:14,17
**operated** 113:9
**operations** 32:19
**opinion** 17:5 56:19
76:14 85:16 170:4
171:14 179:11
180:14 181:7
182:1,23
**opinions** 180:19
**opportunity** 181:11
181:13,14
**opposed** 50:1
**option** 41:18
**options** 109:25
**oral** 7:1
**order** 29:7 30:6,6
76:15 92:19
170:10
**ordered** 64:4
145:20 187:11
**ordering** 57:24
**orders** 19:10 22:3
28:23,25 29:6
30:12 31:17 32:9
56:21 58:23
102:13 171:4
**ordinance** 110:19
110:23 111:21
**ordinary** 63:17
149:18
**original** 63:19
191:15 192:1
**originally** 37:3

110:7 160:9
**Otto** 3:13
**outfit** 167:17
**outside** 27:10 94:14
**overheads** 126:8

─────────

**P**

**P.C** 3:21
**package** 29:18
**pads** 94:7
**page** 5:2 43:4 62:13
64:1 100:13 102:4
102:10 108:15
119:25 122:2
141:20 144:14
146:12 147:24
151:22 153:14,16
187:12,12,13,15
188:1,4,7,10,13
188:16,19,22
189:1,4,7,10,13
189:16,19,22
**pages** 43:1 88:22
185:21
**paid** 193:2,3
**pain** 116:19
**palm** 150:21
**paper** 95:8
**paperwork** 35:9
104:7
**paragraph** 44:11
44:12 47:2
**paragraphs** 99:10
99:12
**paramedic** 93:7
**paramedics** 151:9
**paren** 110:13,13
120:10,10
**parentheses** 120:7
120:8 143:22,23
150:21,22
**parked** 53:10 125:9
126:5 127:19,19
**parking** 44:7 53:14

126:3 128:9
**Parris** 7:22
**part** 17:1 47:17
54:3 59:25 60:8
60:13 63:19 85:15
87:22,25 95:1
96:10 109:23
136:8 137:7
143:20 155:6
171:1 180:5
**particular** 40:14
**particularly** 138:12
**parties** 186:6,7
**passed** 36:3,9 40:7
106:16
**Patel** 109:9
**patrol** 21:16 31:10
31:11 32:19 33:25
35:3,5,24 53:5
54:12 103:10
121:9 125:24
130:10,20 137:3
145:17 157:5
165:1,8
**patrolman** 18:4
**patrolmen** 78:23
**pavement** 40:3
**pay** 108:11
**payroll** 19:2
**PC** 2:22 3:13
185:10 192:15
**peace** 8:2
**peacefully** 13:9
**pedestrian** 14:5
**pending** 6:7 8:18
185:5
**penetrated** 118:10
**penetration** 113:21
**people** 13:12 16:1
17:11 85:23 86:10
89:6 94:4 115:25
124:15 135:8,10
137:25 138:4,8,14
138:25 139:7

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                                September 25, 2015

Page 209

158:20 159:1,2,6
159:9 160:13
161:10
**pepper** 40:19
147:16 157:10
166:23 169:13
**percent** 51:10
**perfect** 85:22 86:1
93:20 127:2
**perfectly** 58:23
**perform** 42:13
93:11
**period** 24:22 55:5
57:17 58:2,11
64:5,12 77:4
83:15 86:17 87:3
89:2 90:20 120:8
120:9,12,24
143:21,25 144:1,2
145:18,20,20,22
146:18,22,24
150:23,25 153:20
153:22,25 155:12
**permissible** 71:12
71:14
**perpendicular**
128:4
**Perry** 4:2,3 6:9,11
193:5
**person** 13:19 14:6,8
17:15 25:8 45:12
46:4,8 56:21
68:15 74:24 75:6
76:16 79:9 94:2
96:4 106:23,23
108:7 109:14,18
110:8 130:23
131:2 132:13
135:9 138:18
139:9 150:15
151:17 152:3,23
153:17 154:10
160:1,8,10 161:16
162:6,8,13 191:14

**person's** 79:17
160:23
**personal** 1:2 2:6
45:12,19 46:2
56:21 70:22 71:4
79:11 111:8 138:1
138:5,9,15 142:2
171:13
**personally** 14:22
**personnel** 22:5 88:9
**persons** 55:20
150:11
**pertaining** 23:17
25:6
**phase** 163:1
**phone** 24:5 95:25
104:4
**phrase** 22:12 48:7
78:1 89:15 156:6
156:13
**physical** 26:24
27:11 82:2 150:14
153:11 155:1
156:22 163:14
167:5
**physically** 93:23
157:12
**pick** 24:5
**picking** 93:16
**picks** 49:7,10
**picture** 53:8 126:13
**pictures** 94:15
**Pillarick** 151:4
**pin** 157:4
**pistol** 27:7
**Pitzer** 2:22 3:21 6:3
185:9 187:4 192:9
**place** 15:9 46:7
55:4 68:23 145:1
**placed** 64:12
146:23
**placing** 77:4
**Plaintiff** 139:20
**Plaintiff's** 5:8,9,10

5:11,12,13,14,15
5:16,17,18,19,20
5:21 139:21
141:17
**Plaintiffs** 1:7 2:10
2:21 3:3,11 140:5
**plant** 49:12
**platoon** 18:25
178:12,15
**play** 108:10
**please** 6:14,21 7:14
14:16 15:23 16:10
26:13 50:21 51:19
54:4 59:4 62:17
100:7 103:7
122:18 126:25
128:1 154:5
158:13 187:12,14
**point** 47:18 55:14
55:19 86:7 145:14
172:20
**pointed** 127:23
**pointing** 51:5 125:1
126:13,14
**police** 7:23,25 8:5
10:9 11:7 15:10
18:21 19:18 22:13
24:21 26:16,25
27:10,16 28:13,22
29:2,3 30:12
32:10 42:17 48:18
48:21 53:10,11
61:7 62:1,8 63:18
85:8 86:11 96:5
97:8,11 99:19,25
102:14 112:19
134:20,21 135:17
135:19 136:1,9
137:1,12,18
138:13 142:10
143:9 147:13
148:4 153:7
154:19 161:9
170:6 173:14

180:4
**policeman** 69:8
**policies** 18:21 19:8
19:9 29:5 30:11
30:20 31:14,17
32:3,9,13 71:5
87:22,23 132:14
133:4 134:20
135:6,15 137:8
170:5 180:10
**policing** 22:22
23:12
**policy** 10:11,11
28:3 29:9,11
30:14,23 31:21
46:1,9 58:21
73:22,24 74:15
87:9,11,12,13,14
87:19,25 100:11
102:12 103:14
104:13 105:6,16
127:11 151:5
169:23 172:13
173:13 174:5,11
174:15,17 175:9
175:11,13,16,21
176:1,8 179:6,23
**poofy** 113:19
**portion** 32:18 59:5
133:23 155:13
**position** 18:18
38:18 51:21 69:17
74:14 91:1 118:1
173:4
**positive** 51:10
**possible** 16:25
129:4 131:24
161:17
**possibly** 13:9 17:12
26:11 33:5 37:18
52:12 72:18 123:7
123:9
**POST** 12:24
**post-mortem** 119:7

**pounds** 84:22,24
85:5,6,7
**powerful** 75:23,24
76:22
**Poyeye's** 37:4
**practical** 131:7
**practice** 108:4
127:16
**practices** 23:15
**practicing** 59:17
**Preferably** 60:10
**preferred** 128:25
130:25
**presence** 13:15,17
41:22 162:23
**present** 8:25 13:11
19:15 36:4 82:4
84:2 89:6
**press** 82:3
**pressure** 12:19
**pressured** 59:20
**presumed** 152:14
**pretty** 41:5 71:25
136:22 166:10
173:25
**prevented** 129:12
**preventing** 73:14
171:13
**previous** 30:6
100:13 136:21
141:9
**previously** 35:13
52:13 66:14
139:22 140:5,6
141:13,17 149:17
164:2
**primarily** 99:9
**prior** 10:7 16:11
21:6 31:16 34:10
35:19,25 36:15
38:2 41:9,11 63:6
63:12 81:5,6,15
98:3 108:17
112:15 115:4

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                                September 25, 2015

Page 210

117:22 122:10
156:16 157:12
161:9 178:18
**prisoner** 8:13
**privacy** 142:1
**probably** 14:3 17:8
26:10 31:7 33:1
36:16 38:22 40:2
41:9 57:1 82:16
106:13 116:3
131:14 177:10
183:17
**probe** 58:10,11
**probes** 67:18,21
68:18,20,23 69:20
88:7 113:11,21,22
115:9,14,20,24
116:1 117:6 118:2
118:3,7,10
**problem** 15:8,12
17:16 22:1 169:6
169:11
**problems** 30:17
45:20 175:22
**procedure** 72:8
96:6 102:11
**procedures** 19:9
23:4,12 28:4
30:11,20 32:3,9
32:14 71:5 72:6
97:10 100:11
102:13 106:17
132:14 133:5
135:7,16 137:9
180:10
**process** 11:19 17:2
22:2 29:23 155:15
163:2 180:6
**processing** 187:15
**procure** 114:2
**produce** 141:2
**produced** 139:22
140:1,5,7 164:1,2
**product** 140:12

**Production** 187:23
**profession** 9:20
134:21 135:5
**professional** 149:24
**professionally** 85:7
**proficiency** 12:2,18
**proficient** 11:2
**program** 16:2
30:17
**progression** 162:25
**prohibit** 73:22,25
**promote** 135:16
**promoted** 18:6,8,15
18:16,18 98:17
**prompt** 187:16
**prone** 38:23 91:1
118:1
**prongs** 101:17
**pronounce** 38:9
**proper** 23:1
**properly** 77:10
134:11 151:4
**property** 42:22
**proportional** 54:3
**proportionate**
53:24
**propounded** 7:1
185:23 186:2
**pros** 71:20
**protect** 86:9,10
136:1,8 137:17,21
138:9
**proven** 69:21
**provided** 58:15
83:20 141:13
182:11
**provider** 58:18
**proving** 180:24
**public** 135:17,21
136:1,8 137:4,14
137:18 138:9,24
158:22,23 190:18
193:13
**pull** 12:5,5,7,8

83:14 116:6,9
127:12 157:6
**pulled** 38:10
114:16,20 116:18
125:20 126:17
127:7 128:3,4
182:8
**pulling** 114:13
129:7
**punch** 69:8,10
79:24
**purple** 91:22
**purpose** 11:9 16:19
87:12 162:1
**purposes** 130:21
140:25 142:1
149:25 150:3
**pursuant** 144:11
185:5
**pursuit** 43:2
**push-up** 155:10
156:7,8
**pushed** 153:19
155:11
**put** 35:8 50:15,17
50:20 51:2 53:3
53:15 55:11 65:2
73:2 77:10 91:10
91:15 93:23 94:4
94:7 97:13 126:11
126:25 127:25
128:1,23 129:1
135:19 146:20
**puts** 160:23
**putting** 73:16,16
79:4 93:16 94:1

---

**Q**

**question** 9:22 11:23
17:22 33:23 52:17
56:7 64:9 65:12
65:15 69:18 75:4
75:10 89:5 92:1
94:17 98:15

108:24 120:22
132:4 133:9,17,22
144:19,22 152:1
170:12,19 183:7,8
**questions** 5:4,5,6
7:4,8 9:6,19 10:2
86:4 141:4 142:18
163:24 164:7,8
170:15 173:9,11
173:12 176:17
181:25 184:7,8
185:23 186:1
**quick** 120:5
**quickly** 108:25
132:24
**quite** 32:23 92:1
**quote** 47:3,12 55:3
57:15,23 58:8
64:1,10 77:2
83:13 86:14 87:1
88:24 90:17
**quote-unquote**
175:20
**quotes** 55:5 57:17
58:2,12 64:5,13
77:5 83:15 86:17
87:3 89:2 90:19

---

**R**

**R-e-t-t-k-e** 26:21
**race** 112:10
**radio** 36:10 37:6,12
37:14,18 123:17
**raise** 77:2
**raises** 134:3
**raising** 40:4
**ran** 120:6
**range** 16:9 22:17
27:16
**rank** 18:7
**rarely** 20:11
**raspy** 89:1,9,20,25
90:15
**rate** 160:8,19,22

161:6
**re-enforce** 134:5
**react** 12:20 134:11
**reaction** 40:18
42:12 71:4 80:3
168:16 176:11
**reactions** 134:9
**reactive** 59:19
**read** 29:9,10 30:7
31:13 47:6 55:6
57:18 58:3,13
59:3,6 65:1 77:1
83:16 86:18 87:4
89:3,18 90:21
98:5,21 100:9
110:14 111:4
120:15,25 133:24
144:3 145:24
146:25 151:1,7
154:1 155:4,5,13
156:9 159:22
160:18 184:10
187:10,12 188:1,4
188:7,10,13,16,19
188:22 189:1,4,7
189:10,13,16,19
189:22 190:2
**reading** 99:3,6
133:21 141:25
**reads** 57:14,23
143:20 175:16
**ready** 35:17
**real** 120:5
**realize** 160:12
**really** 11:24 16:12
72:11 96:1 178:11
178:16
**rear** 54:20
**reason** 12:8,17
35:21 48:12 72:7
74:8,9 83:23
119:9 141:10
167:19 188:2,5,8
188:11,14,17,20

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

188:23 189:2,5,8
189:11,14,17,20
189:23
**reasonable** 181:14
**reasons** 160:4
**reassess** 80:19
**recall** 8:8 23:3,9
  34:11 36:12 39:1
  39:15 45:2,6,7
  62:5,16 63:16
  64:21 92:13,14
  95:21,23 96:2,23
  97:2 106:6,10
  107:3,6,18 113:5
  114:7 122:16
  124:20 125:13
  130:5,7 156:11,14
  164:14,17,22
  178:16,17
**receipt** 42:22
**receive** 62:5
**received** 26:5 34:12
  44:14 47:9 55:8
  57:20 60:20 61:12
  61:15 77:6 83:18
  110:7 119:20
  139:24 140:8,8
  141:11 155:16,23
**receiving** 62:6
  63:16 75:6
**recertified** 14:25
  15:2
**recertify** 14:21
**recipient** 74:24
**recognize** 17:14
**recognized** 148:21
**recollect** 118:16
**recollection** 25:2
  37:20 38:21 51:12
  52:6 53:9 56:10
  61:5 62:10 63:21
  85:2 94:24 107:9
  125:19 156:12
**record** 6:1,14 9:6

10:3 41:16 59:6
65:1 88:17,18,19
115:13 122:17,19
122:20,21 127:3
133:15,24 136:14
136:21 139:15,16
139:17,18,19
140:11 141:1,3,6
141:14 142:1
148:10,13,14,15
148:17 149:10
155:6 158:12,14
158:15,16 163:18
163:19,20,21
166:17 170:17
176:5 184:11
**recorded** 44:1
**records** 148:21
**redone** 70:1
**reduced** 67:4
**refer** 101:5 171:3,3
**referenced** 187:10
**referred** 15:4
  108:16
**referring** 42:16
  119:13
**refers** 101:9
**reflect** 127:3
**refused** 150:20
  153:18
**refusing** 146:20
**regain** 64:3
**regard** 13:14 17:18
  18:19 19:7,8 56:8
  106:7 165:18
**regarding** 10:7
  46:12 112:9
  116:25 156:4
  161:10 169:16
  173:14
**regards** 27:1
**Regis** 112:23,25
  113:1,2
**regular** 19:6 25:14

28:7 30:1
**regularly** 30:25
**rehabbing** 178:8
**reinforced** 134:24
**related** 7:25 21:16
  186:7
**relation** 51:15
**relative** 142:12
**relatively** 23:8
**relay** 124:13
**released** 90:18
**relevant** 113:16
**relied** 99:15
**relieve** 174:23
  175:19
**rely** 150:6
**relying** 118:5
**remarks** 185:24
**remember** 8:12
  14:16 33:21 38:13
  40:16 54:23 83:20
  95:24 123:5 125:5
  126:3 130:15
  164:12 165:1,5,7
  165:9 166:14,17
  166:23 167:3,6
  169:17,23 170:24
  171:7,9 178:16
**remembered**
  102:10
**Reminders** 29:20
**removal** 88:5
**remove** 88:7
**removed** 91:15
  117:17,20 118:12
**render** 180:14
**Renee** 1:4 2:8 6:18
**repeatedly** 134:4
**repetitive** 134:10
**rephrase** 9:23
  45:17 54:11 65:15
  69:18 81:9 138:19
  151:20 162:20
**reply** 7:1

**report** 10:9,10,10
42:17,18,18 43:2
43:2,11 45:8 55:2
55:20 56:14,17,18
57:13 63:24 64:25
76:24 87:15 88:24
92:15 96:16 97:5
97:8,21,22 98:4
98:20 99:6,8,16
99:17,19 100:10
100:17 102:6,22
103:4 104:25
106:5 107:21
108:16,20 109:1
112:2,6 115:4
118:9 119:25
120:3,23 121:15
121:21 122:3,10
122:10 141:23
143:8 144:12
145:8,10 146:9,11
146:16 147:5,13
149:13 151:15
152:3,6 153:6
154:7,15 156:21
157:15 158:10,11
169:16,18 170:3
170:22 171:2,12
172:21 179:8
180:4 182:7,16,20
182:21
**reported** 56:12
  185:19
**reporter** 5:22 6:11
  9:8,14 59:6
  128:17 133:24
  184:9
**reporting** 4:3 6:12
  24:22 144:5 187:1
  187:23 193:5
**reports** 19:2 37:14
  55:22,22,25 56:8
  72:5 98:3,13
  99:18 104:7 106:5

121:3 143:7
149:16 150:7
156:16 166:12,19
166:22,24 167:4
171:3 173:3
180:20
**represent** 7:7
**Representative** 1:2
  2:6
**request** 141:10
  153:24
**requested** 59:5
  87:2 133:23
  153:22
**require** 106:1
  174:23
**required** 14:18
  30:11,14 31:24
  87:18 106:17
  148:8 152:7
  173:20 179:5
**requirement**
  174:24
**requirements** 29:25
**requires** 174:17
**requiring** 173:14
**reread** 174:15
  175:11
**reserve** 149:6
  163:25
**resist** 145:16
  146:20 155:10
  156:7 157:6
**resisted** 155:9
**resisting** 74:5,11
  86:24 87:15 108:6
  146:22 150:15
  153:10 154:25
  156:22
**resists** 101:10
**resolve** 13:9
**respect** 86:6
**respective** 35:3
**respects** 185:25

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 212

**respirations** 160:19
**respond** 87:2,16,19
**responded** 120:17
　140:6 153:22
**responding** 124:10
**response** 123:22
**responsibilities**
　95:1 96:11 99:21
**responsibility** 29:1
　99:24 165:18
　169:21 170:2
**responsive** 141:9
**rest** 34:1
**results** 27:21
**retained** 5:22,25
**retired** 31:3
**retrieve** 95:4
**Rettke** 20:22 26:18
　26:19 29:14
　123:10
**return** 187:14
**revamping** 22:2
**review** 30:1 98:2
　99:25 104:19
　121:21 137:8
**reviewed** 10:7,9,10
　31:21 105:19
　108:17 112:3,4
　156:16 180:21
**reviews** 21:13
　103:14
**rhythm** 76:3
**Rick** 24:8
**rid** 40:23
**right** 12:10,14
　13:15,22 14:15
　24:8 26:16 27:11
　29:21 31:15 32:23
　43:5,16 45:9
　50:10,21 55:17
　57:14 58:11 61:17
　65:18 66:19 68:15
　68:16,18,25 69:10
　69:12 71:25 77:18

80:3 81:25 86:12
　88:1 92:1,17 93:8
　95:10,17 103:17
　109:3,12 110:1,10
　111:3 114:8 115:6
　117:16 118:16
　128:7,11,15,23
　129:23 130:23
　131:8 132:8 150:2
　160:2 163:25
　171:22 172:19
　175:11 178:1,25
　179:24 187:10
**rights** 28:5
**rise** 120:9,11
**risk** 74:23 76:8,12
　76:16 83:2 160:15
**riskiest** 75:6,13
**risky** 82:2
**road** 34:20 37:4
　47:5,14 48:16
　49:13 56:14 66:9
　66:13,22 67:18
　126:15,16 128:6
**roadway** 48:6
　50:11,12
**Robert** 136:21
**robot** 139:6
**robotic** 132:7
**Rodgers** 1:4 2:8
　6:18
**role** 61:25 164:15
**roll** 22:16 29:15
　34:12 44:16,17
　164:11,20
**rolled** 91:4,5 118:1
**room** 22:13,16,19
　25:13 27:19 34:15
　34:21 36:5,10
　44:15,16,17,18,19
　45:9 115:25 116:2
　129:19
**rotate** 33:15
**rotations** 165:23

**route** 81:5 123:25
　124:3,4,7,8,15
**rules** 86:9,9 148:21
**rulings** 23:16 28:4
**run** 15:11 44:9 48:6
　57:25 79:5 114:24
　120:5
**running** 34:19
　37:25 38:5 48:1
　56:16 73:10 110:9
　144:2 165:24
**runs** 115:2
**rush** 48:12 49:24

─────────────
**S**
**S** 3:22 187:3,9
**S-h-u-m** 121:20
**safe** 33:13 52:19
　176:18
**safely** 138:8
**safer** 76:17 174:24
　175:22
**safety** 127:15
　135:10,17,17,21
　137:14 168:24,25
**satisfactorily**
　120:18
**Saturday** 33:12
　34:7 48:24 49:5
　50:2
**Saturdays** 49:2,3
**Sauer** 27:7
**saw** 38:7 51:1,2
　90:2 94:13 98:20
　121:25 140:14
　156:15
**saying** 9:12 27:19
　41:2 48:23 54:10
　67:14 72:25
　126:15 164:16
　166:7 174:20
　175:8
**says** 6:25 86:14
　90:17 100:11

105:5 109:12
　113:6 118:17
　119:16 120:17,20
　145:15 146:17
　155:15 170:18
　174:5 175:12
**scenario** 72:25 73:7
　73:10 79:23 80:11
　100:9 181:17
　182:22 183:14
**scene** 13:20 36:5,11
　36:15,22 38:8,11
　38:19 39:23 42:10
　43:24 44:4,5 50:9
　50:17 52:14,20
　53:25 55:15,17
　56:13 81:1,7,12
　81:12,19,20 82:9
　82:10 85:8,8,11
　87:17,19 90:12
　96:14,17 99:1
　109:3 112:13
　114:2 118:12
　121:10 123:19
　124:10,11,13,21
　129:10 151:9
　169:2,5
**schedule** 165:22
　166:3
**scheduling** 21:17
　165:12,15,18
　170:10
**school** 7:20 65:17
**schools** 7:21
**scooped** 93:9
**scope** 168:18
**scraped** 40:3 153:1
**scrapes** 39:25
**scratches** 92:9
**screaming** 58:1
**scrolling** 140:20
**seal** 193:10
**search** 25:6
**seat** 145:18

**seat's** 15:20
**seats** 15:17
**second** 43:4 62:23
　64:11,19 73:4
　76:25 79:2 80:14
　81:2,6 84:3 85:9
　116:18 118:16
　119:25 120:9
　126:10 147:24
　148:11 153:16
　179:19 182:24
　183:5,9,12
**seconds** 73:5 78:17
　79:20 81:13
　114:21 115:3,5,6
　120:10 141:8
　181:10 183:17,23
**section** 143:19
　145:15
**see** 22:4,10 39:1
　42:19 48:25 79:20
　80:3 94:10 118:2
　118:3,4 124:17
　125:18 141:18
　143:2 145:1,16
　146:13 151:10,11
　159:23 175:3
**seen** 26:20 37:2,6
　42:24 43:13 62:14
　72:4,5 75:19
　122:3 141:7 174:9
　182:6,15,17,18,19
　182:21
**sees** 81:3
**seizure** 25:7
**selection** 163:1
**semiannual** 15:11
**send** 15:20 17:4
　23:24 31:12
　102:22 104:24
　105:1 108:5,11
　166:7
**sending** 16:1
　161:12

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 213

sends 95:6
sense 36:14 100:22
   138:20
sensitive 89:5
sensory 68:14
sent 95:10,16 96:7
   103:5 107:20,23
sentence 44:12
   46:12 47:3,11
   55:3 57:4,14,23
   58:8 64:1 77:1
   83:12 86:14 87:1
   88:24 90:17
   150:19
separate 97:7 180:2
September 1:19
   2:24 6:2 16:17
   19:25 33:6 41:11
   102:7 154:15,23
   156:21 158:3
   161:9 178:10,19
   185:12 187:6
sequence 182:6
sergeant 17:24 18:7
   18:15 24:9 26:10
   27:24 33:14,16,18
   33:19 40:13,14,16
   48:21 61:16 98:8
   98:10,16,18 99:2
   104:1 123:10,11
   123:14
sergeants 17:4 19:2
   19:4,20,21 20:2,8
   20:10,17,21 21:7
   29:15 78:23 137:2
serial 95:6 109:5
series 9:6
serious 104:22
   105:9 108:10
   137:22 138:10
   151:14 152:5,11
   155:23 157:24
seriously 146:4
   147:9 154:11

seriousness 179:13
Service 46:14
session 24:25
sessions 23:11 25:3
set 25:20 185:22
   193:8
setting 71:3
severity 108:6
sex 112:9
Shafaie 3:20 5:5
   6:19,19 11:20
   21:8 32:15 45:13
   45:16 47:21,24
   50:22 54:9 56:23
   58:25 59:7,13,23
   60:4 61:21 65:9
   66:4,15 67:5,7,15
   68:1,10 69:4 70:4
   70:6,14 71:8,21
   72:9 73:11,19,23
   75:1,8 76:4,19
   77:12,20,23 78:13
   79:6,14 80:16
   81:8,21 82:11,20
   83:4 84:4,13,15
   85:12,19,21 88:16
   104:11 111:10
   128:7,13 129:14
   129:24 131:10
   132:1,9,16,18,25
   133:6,10,25
   134:13,25 135:12
   135:22 136:3,10
   136:16,18,23,25
   139:19 140:18,22
   141:5 144:13,18
   144:21 148:10,24
   149:5,8 151:19,21
   151:24 152:16
   160:24 161:2,5,19
   162:18 163:3
   164:7 168:20,25
   170:14,20 173:8
   173:16,23 175:24

176:2,6,21 179:3
   181:4,20 182:13
   182:17 183:3,10
   183:21 184:2,8,10
   187:3,9
shafaie@pspclaw...
   3:25
shattering 145:22
sheet 29:19
sheets 187:11,13,13
   187:14
shift 33:14,24,25
   34:4,7 35:16 49:9
   130:5 165:1,12
   166:3 167:10,13
   167:17,24
Shilling 122:2,4
shock 159:4
shoot 59:25 60:8,11
   60:13
short 29:15 88:15
shortages 22:6
shorthand 185:20
shortly 39:18 60:18
   62:18 86:23
shot 59:17 145:22
shoulder 150:23
shout 56:21
shoving 108:8
show 13:19 43:23
showed 152:4
   166:22
showing 117:9
shown 149:16
   185:18
shows 151:6 152:3
Shum 121:18,20
Shum's 122:7
Shurn 121:19
Shurn's 122:8
shut 172:18
shuts 115:2,3
side 49:16,19 70:10
   70:12 72:18 169:8

side-to-side 40:5
Sig 27:7
sign 29:9,18 187:10
   187:13
signature 102:3
   184:9,13 186:3
   187:11,13,15
   190:4
signed 31:25 98:22
   98:23 99:2,6
   147:21
signs 30:22 151:6
   152:4
similar 127:4
simple 29:16
simply 101:17
simultaneously
   37:16
Sincerely 187:21
sir 7:12 8:7,22 9:25
   10:5,25 11:4,8
   12:7,16 13:5,25
   14:22,23 16:18,22
   17:1 18:2,5,23
   25:18 32:5,11
   33:8 40:12 42:14
   42:19,21 43:3,6
   43:15,18,21 45:5
   45:10,21 46:11,15
   46:20 47:1,7,16
   50:4 56:6 57:18
   58:4 61:11,14
   62:22,25 63:1,8
   63:11,25 64:8,16
   64:24 68:3 72:1
   76:24 78:4 81:14
   83:1,17 84:12
   87:8 88:21 89:4
   89:17 90:22 91:18
   91:24 93:13 94:10
   99:14,18 100:2,16
   103:24 105:1,12
   105:17 106:10,20
   107:15,22,25

108:3,5,19 109:4
   109:11 110:11,15
   112:7,17,21 115:7
   116:24 117:22
   119:1 120:4,16
   121:1,4,11 122:5
   127:1,9 128:19,24
   130:7,24 133:1,17
   137:15,19 138:2,6
   138:16 141:19,21
   141:24 142:4,9,13
   142:19 143:10,14
   143:18 144:4,7
   145:8,12,25 146:3
   146:6,15 147:1,4
   147:18,23 148:6
   149:15,23 150:4
   150:10 151:8,16
   152:6,9 153:15
   154:17,20,24
   155:2,21,24 156:2
   156:9,25 157:15
   157:16,23 158:6
   158:10 159:3,15
   160:16 162:2,5,9
   162:15 163:9,17
   164:5 166:25
   168:18 175:17
   177:8,10,14
   178:11 180:7
   182:4,10
siren 35:10
sit 26:22 83:24
   180:18
sitting 46:7
situation 12:20
   13:9,18,21 14:4
   48:1 59:20 65:24
   66:3 78:12,15,24
   79:10 84:7 86:8
   89:11 92:23 96:10
   97:16 99:25
   100:22 106:18
   110:1 115:23

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 214

situations 131:21 132:23 167:9
134:7,12 144:9 150:15 155:20 158:8 171:11
six 13:2
six-foot 84:24 85:3
six-foot-one 84:22
sizes 113:23,25
skills 11:11,18
skin 118:10
slammed 172:18
slash 43:2
slightly 12:15 66:25 76:16
small 110:13 131:7
smaller 102:16
smart 131:7
smarter 132:10
SNLJ 1:9,10 2:12 2:13
Snodgrass 2:22 3:21 6:3 185:10 187:4 192:9
so-and-so 166:7
soft 162:23
softly 162:24
sole 58:18
solely 64:14 119:13 127:21 140:25 150:2
solving 22:1
somebody 24:2 35:14 45:19 46:2 73:1,9 93:24 131:2,18,19 167:19 169:14
someone's 72:24 99:24
son 142:7
son's 142:6
soon 16:2,25 30:22 93:3
sorry 15:15 20:5

32:22 50:22 52:25 59:2 84:15 92:8 93:22 96:7 109:11 125:3 128:11,15 131:12 132:19 136:5 143:1 144:20 147:11 161:2,3 176:12
sort 13:23 17:9,12 19:4 21:4,17 22:5 25:7,11 29:19 39:5 54:22 61:19 87:18 92:16 100:4 102:17 104:19 106:5 109:17 110:2,4,7 121:12 127:7,8 140:2 143:3 152:22 160:19 165:24,25 167:5
sorts 22:20
sought 111:14,15
sound 89:1,9,12,20 89:25 185:14
sounded 39:11
sounds 86:23 156:9
source 57:11
south 2:22 6:3 49:16 52:1,1 185:10 187:4 192:10
speak 13:11 27:12 31:8 105:24 121:14 133:15 166:5
speaker 44:19
speaking 41:14 47:23,25 72:15 96:20 104:3
special 97:10
Specialist 6:10
specific 21:12 156:12 158:25 175:22

specifically 165:7 166:5,6,21
speculate 66:6
speculating 16:14
speed 11:11
spell 26:12,19
spent 7:20
spit 157:7
spoke 96:17,25 121:18 164:9
spoken 10:15 46:16 46:19 107:2,4,7
spray 40:19,21,25 41:6 71:6 74:25 143:25,25 145:23 157:10,10,13,18 166:23 168:9,13 169:12,13 176:11
sprayed 144:1 146:23
spraying 40:23
sprays 41:8
spread 60:14 68:18 68:20 69:21 116:1
squad 125:24 167:17
squads 19:1
squeeze 115:2
SS 185:2
St 2:23 3:7,23 4:5 6:4,12 7:23 13:3 15:10 24:18 28:13 28:21,21 185:3,11 186:9 187:5,24 191:19 192:5,11 193:7
stability 35:14
staff 19:12,14,15 20:9,11,23 21:7 21:22 107:16 164:11,13
stance 155:10 156:7,8
stand 52:7

standard 127:15
standing 39:13 51:15,25 52:4,10 52:20,22 58:23 65:25 66:9 67:17 72:11 73:9 109:20
staring 47:5,14 56:14 67:17
start 35:16 37:9 47:13 108:24
started 13:1 16:4 18:3 33:24 34:4,5 38:15 143:21 153:21 180:2
starting 52:7
starts 49:10
state 2:23 141:6 159:17 185:1,11
statement 64:10 89:24 94:23 106:2 120:2 121:24 122:2 132:17 134:17,18 135:4 174:25 175:13 191:9 193:9
statements 121:15
states 2:1 6:7 47:3 47:12 55:3 57:4 155:6 157:22 185:6
static 47:18
station 34:15 35:25 36:21 96:18 97:20 114:4 119:2 148:1
statistics 32:1
stay 24:20 39:16 64:4
steps 179:1
stick 177:21
stipulate 136:16 148:19,24
stomach 38:24,25 90:25 117:25
stone 25:20

stop 57:15,24 69:23 89:1 90:1 94:5 110:2 128:7 129:23,23 130:1 143:23 145:20 146:22 157:12 178:9
stopped 38:17 86:16,24 178:14 181:16
stops 74:12
straight 52:4
strain 145:19
strangely 109:19
street 2:22 3:22 4:4 6:3,12 14:5 19:3 25:23 38:23 48:2 49:17 51:6,7,9 65:6 97:21,24 124:24 126:5 158:21 177:12,20 178:2 185:10 187:4,24 192:10 193:6
stress 160:23
stressful 134:11
stretcher 93:16
strike 71:12 76:9 76:11 78:7 80:1,2 94:17 150:21
striking 58:10 145:21
struck 59:10 127:22 150:21
stuff 35:16 41:6 168:8
stun 115:9,12,17,18 115:19,19,22 116:3,5,11,19
subdued 14:9
subject 46:13 47:3 47:12,13 74:4 87:17 119:16 120:6,7,10,12

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                September 25, 2015

Page 215

123:19 145:15,17
146:17,19,21,22
150:23 153:23
169:7 170:11
183:18
**subject's** 120:21
153:21
**subjects** 24:13
29:15 164:3
**submission** 78:2
183:2 184:1
**submit** 17:3
**Subscribed** 190:12
**substantive** 10:18
**success** 32:13 113:7
**sufficient** 182:25
**suit** 186:6
**Suite** 2:22 3:6,14
3:22 4:4 185:10
187:4 191:18
192:4,10,16 193:6
**summarize** 92:16
**sun** 125:14
**superior** 137:9
**supervise** 137:3
138:4
**supervises** 137:13
**supervising** 18:20
181:24
**supervision** 137:12
137:16,21 138:8
**supervisor** 33:22
40:11 42:4 78:23
87:2,20 94:25
97:15 108:21
109:2 123:2
147:22
**supervisors** 137:10
166:6
**supervisory** 96:11
**supplemental**
143:20
**supplied** 64:14
**support** 154:6

**suppose** 13:10
39:10 107:1
116:21
**supposed** 80:2
106:24 175:14
**supreme** 23:16 28:4
**sure** 8:24 11:24
16:12 18:12 28:2
30:24 35:9,10,15
41:4,16 42:6
52:15 53:6,11
54:9 76:6 77:16
78:9 80:13 83:6
88:16 91:7,8 97:1
99:7 101:22
105:21 112:24
121:21 123:13
126:7,15 128:13
136:6 159:18
166:9 167:3
176:11
**suspect** 12:11
113:14 127:12,13
128:5,5,22,22
129:20 147:25
152:13 154:11
155:22 157:4,6,11
157:11,17
**suspect's** 129:20
**suspicion** 109:18
**suspicious** 14:6
109:14,21 110:8
110:10
**swear** 6:21
**sweaty** 92:5
**swell** 41:4
**swinging** 58:1
69:14 120:6
**switch** 93:20
**sworn** 6:23 8:2
185:16 190:12
**system** 29:8 68:14
122:24,25

**T**

**T** 3:4
**tackle** 152:18,19
**tackles** 152:13
**tackling** 152:24
153:2
**take** 13:20 63:22
76:10 88:15
106:18 119:23
136:14 142:23
152:14 169:10
**takedown** 72:6,7
**taken** 2:20 6:5
35:19 40:22 72:18
91:3 109:9 122:7
146:19 152:4
190:3
**takes** 80:22
**talk** 25:10 93:22
94:18 96:13 99:9
139:9,9 168:25
**talked** 21:19 134:6
158:18 164:10,23
166:21 168:12
170:20
**talking** 27:2 41:15
100:15 112:5
159:1 163:10
165:1 169:18,24
**tapes** 43:17,19
**target** 117:1
**tase** 58:22 68:24,24
85:17
**tased** 66:2 75:19
84:11 86:11 92:11
180:10 181:9
**taser** 10:10,11
14:13,19,20,21
27:5,14 41:19
42:18 58:9 59:20
60:1,3,7,22,25
61:3,7,8,12,19,20
62:2,3,16 64:18
64:20 65:4,13

67:18 69:19 72:21
73:5 74:15,25
75:13,17 76:6,14
76:15 77:1,9 78:7
79:2,3,12 81:2,15
82:7 83:2,10 84:3
87:19,21 88:3,13
95:5 101:3,17
108:16,19,23
109:2,5 111:20,24
111:25 112:5
113:7,9 114:2,4
115:1 116:18
119:12,25 120:6
142:8 145:7 146:2
147:3 148:8 152:7
154:12 155:25
157:25 158:6,9
160:22 164:17
167:9,13,22 168:9
175:2,4 176:12,19
177:1,3,13,18
178:9,14 179:18
180:3 181:12
182:6,7,15,19,21
182:24 183:19
**tasered** 73:9
**tasering** 108:22,23
108:24
**tasers** 14:15 60:19
60:20,21 61:25
62:19 68:5 143:15
143:17 154:19
158:4,5 167:16,18
167:24 176:18
177:1,17
**tases** 108:24
**tasing** 40:7 73:15
85:9 121:6
**tasings** 87:20
**TAXED** 192:1,7,13
**teach** 61:1 88:7
**teaches** 60:1
**teaching** 16:4 60:3

**team** 15:5
**technician** 166:8
**technique** 155:8
**techniques** 11:18
13:8,23 22:25
162:11,12,20,21
167:5
**tell** 7:13,18 9:4,23
10:6 13:6 14:13
17:18,25 18:3,6
21:24 23:6 33:24
34:9 35:6 36:2,8
42:3 44:3 52:16
52:19,21 61:24
64:17 74:6 79:19
87:11,22 92:2,24
95:14 96:21 100:7
102:11 103:7
115:16 129:22
140:10
**telling** 38:16 67:12
104:4 117:9 173:4
**tells** 30:17 114:25
**ten** 81:12
**term** 109:17 159:21
**terms** 9:21 21:12
21:14 78:3 82:25
**test** 27:5 28:8,17,20
**testified** 51:1 52:13
52:15 173:17
185:18
**testify** 6:24 185:16
**testimony** 31:16
63:16 107:20
130:3 137:7
156:16 170:9
173:24 178:18
185:19,22 190:5
**testing** 25:12,14
26:23 30:2 134:4
**tests** 27:8,22
**thank** 6:20 20:6
53:3 54:6 105:3
109:12 127:2

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                        September 25, 2015

Page 216

142:20 163:23
164:4,5
**theoretically** 129:4
**thereto** 185:25
**they'd** 25:10
**thigh** 58:11
**thing** 19:5 21:4,18
22:5 25:7,11
29:19 34:17 38:7
57:1 87:18 95:22
102:17 110:3
141:5 160:20
165:24,25
**things** 12:3 22:20
23:9,13 25:4,14
44:10 53:25 82:14
95:9,15 96:9
112:10 121:23
122:15 131:23
135:9 140:20
163:6 164:10
**think** 17:25 19:9
21:20 24:14 26:9
26:20 31:5 39:15
39:18 43:1 53:7
62:24 63:10 74:2
81:8 89:23 90:12
98:7 100:14
102:20 113:4
115:4 121:20
126:12,14,18
128:8,12 133:14
144:12 151:24
160:10 166:16
171:5 173:23,25
173:25 175:12,22
177:24 182:22
183:5,23
**thinking** 114:25
127:17
**third** 77:2 81:6,15
84:3 85:9 110:12
110:16 111:18,19
111:21 120:13,23

147:19 150:19
179:19 181:15
**thorough** 136:22
**thought** 41:14
53:16 89:18,19
112:4 136:22
139:23 172:12
174:14,24 175:7
**threat** 67:3,22,22
67:23,24 69:3
70:1 78:19 79:5
80:6,9 81:20
82:17
**threatened** 55:25
**three** 7:22 11:16
19:18,19 20:6
24:21 26:17 36:17
37:7 63:5,6 74:22
75:5 114:10,12,17
114:21,25 123:9,9
141:4 143:22
**threw** 69:10
**throw** 72:4
**throws** 69:7 79:24
**thumb** 163:6
**Thursday** 48:25
**tie** 46:6
**Tim** 6:9 46:14
**time** 8:1 9:18 17:13
17:20 19:18 23:18
30:10 31:6,20
33:9 34:3 36:3,3,9
36:9,12,20 38:14
40:6,13 41:17
45:23,24 48:22
49:9 50:9 51:22
52:5 55:14,16,19
56:12,16 57:2
64:17,17 65:25
66:1,2 67:20
69:19 70:13 78:11
79:16 80:22 82:7
85:4 87:6 90:2,6
92:12 93:5 94:6

97:15 100:18,19
106:21,25 112:23
112:24 114:20
117:2 121:13
123:4,11,16 130:9
130:15 133:3
138:18 149:21
163:24 164:4
165:11 168:17
169:21 170:2
171:19,21 172:11
173:9,18 179:10
180:11,20 181:15
181:18 183:18,24
184:5
**timeframe** 23:21
**times** 8:7 11:17
25:16,24 44:2
73:3 114:17,21
143:22 146:22
182:7
**Timothy** 4:2
**Tina** 1:1 2:5 6:6,16
7:7 107:2 191:5
**titled** 141:23
**tjohnson@batyh...**
3:17
**to-wit** 7:2
**today** 6:2,10 7:8
10:7,15 12:15
25:20 26:23 46:10
51:12 83:24
107:11 140:16
156:17 163:24
180:18,21 181:24
182:12
**told** 21:2 41:5 55:3
55:11 57:12,15
60:8 64:6 78:25
86:16,20 98:16
106:15 114:12,16
114:20 115:5
118:6 140:7,10
143:22 146:21

153:18 161:7
176:11 180:23
**tolerate** 40:20,25
42:1 168:9
**tolerates** 41:1
**Tom** 164:25
**tool** 13:24 74:5
131:1 143:17
161:16 162:8,10
162:13,15
**tools** 17:15 41:18
72:19,20 74:9
162:16 163:1
175:15
**top** 95:21
**topic** 164:12,14,19
**topics** 164:9
**Total** 192:6,12,18
**totally** 138:21
**totals** 165:24
**touched** 71:20
**towels** 157:18
**traffic** 34:19 38:5
48:2,8,11,15,23
49:1,3,6,15,20,21
50:1,5,6 51:24
56:2 67:4 79:5
110:2 124:25
127:21
**train** 28:22 131:24
135:20 137:24
**trained** 15:6,8 17:6
75:17 77:16 85:7
131:1,2 132:13,15
134:23 139:1
162:4,7,12
**training** 10:24 11:1
11:5,10 12:4,17
12:24,25 13:4,7
14:2,13,20,21,23
15:5,5,9 16:1,16
16:21,25 17:6,7
17:13 22:8,8,10
22:12,15,18,21,22

22:23 23:10,20
24:25 25:3,13,17
25:21 26:1,6,24
27:1,6,14,15 28:1
28:3,7,16,19 29:5
32:4,14 47:17,19
56:20,25 57:3
59:12 60:15,16,16
60:24 61:2,13,20
63:20 75:20 78:5
78:12 86:8 88:11
113:18 114:23
127:11,14 133:3
134:4,5,7,10
135:6 136:7,7
137:20 138:7
161:7,8,13,15,22
162:21 163:7
**training's** 134:23
**trainings** 23:13
**transcribed** 185:20
**transcript** 5:23
43:23 185:19
186:1 187:12
190:2,5 191:15
192:1
**transcripts** 43:13
193:1
**transferred** 178:12
178:15
**transfers** 22:5
**transition** 92:25
**transitional** 27:6
**translate** 9:14,15
**traveling** 49:17
**treated** 119:17
153:23
**treatment** 119:20
**trial** 180:14,17
185:8
**tried** 77:2 86:15
120:11,12 130:3
**trigger** 114:14,17
114:21 182:8

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                                    September 25, 2015

Page 217

truck 93:7
true 128:21 131:15
    131:23 150:9
    185:25 190:5
truth 6:24,24,25
    185:16,16,17
try 9:23 11:14 17:1
    19:11 39:14 82:2
    92:16 95:11
    108:25 127:16
    143:2 180:24
trying 16:24 37:9
    55:15 130:11
    157:1 176:4
turn 24:15
turned 39:2,4
    51:23 90:3
turning 40:5
turns 141:2
twice 16:13 84:12
two 15:15 16:3 19:1
    19:2,19 20:6,15
    21:21,21 24:9
    26:15 37:7 63:17
    78:3 84:17 85:16
    85:22 93:16 99:10
    99:11 116:1 117:5
    118:7 123:7
    125:23 129:19
    143:3 169:12
    183:17,23
type 14:4 23:18
    70:2,21 89:12
    95:9
types 22:23 32:1
    131:6 159:1
typewriting 185:21
typically 171:1
typing 96:21

U

uh-huh 9:12 28:15
    160:6
uh-uh 9:13

ultimate 17:2
ultimately 19:1
    20:19 106:25
unable 41:25 42:13
unadvisable 74:3
unarmed 67:17
    81:17
unclear 9:19
    104:23
uncomfortable
    88:8
underlying 160:12
    160:14
understand 7:10
    9:11,16,17,22,24
    10:2,3 11:6,22
    12:3 17:14 27:9
    28:2 29:10 30:2
    31:15 33:7 42:17
    53:18 65:11 68:7
    68:7 69:16 70:17
    72:24 74:14,23
    75:3,9 83:25
    85:11 86:6 94:20
    98:24 132:3
    133:16 137:6
    143:7 158:7
    177:24 178:18
    180:13
understanding
    13:7 16:20 31:19
    42:9 61:24 63:15
    88:10 98:25
    107:19 113:15,17
    113:23 114:18,22
    114:24 115:13,16
    116:15 117:24
    130:2 159:16
    160:21,25 175:7,8
    176:8
Understood 15:19
    17:18 24:4 27:21
    42:25 76:13 83:23
    108:14 127:18

174:11
underwent 73:6
undetermined
    185:6
undisclosed 170:9
uniformly 132:15
unintended 76:3
unique 80:9
United 2:1 6:7
    185:6
units 24:20
unresponsive
    120:24
updates 23:16
upper 58:11
upset 17:11
upstairs 23:24 24:1
use 9:21 10:9,11
    11:2 12:6 13:10
    13:23 28:5 41:17
    42:18 43:1 53:1
    55:2 63:23 65:21
    65:21,21 69:2,8
    70:10,10,12,19,20
    70:25 71:12,14,16
    72:5,20 74:5,9,24
    75:7 76:7,8,14,24
    77:18 78:12 80:20
    82:2 87:14 96:15
    99:8,16,21 100:8
    101:2 102:12
    103:4,17 104:9,25
    105:1,14 108:20
    109:17,24 112:6
    115:19,21 116:11
    116:16 120:3
    129:11 133:4
    134:8 135:7,20
    136:7 137:13
    138:13 143:17,25
    145:22 146:1,8,16
    147:3,13 149:13
    153:6 154:15,19
    156:6,20 161:15

161:16 162:16,21
    163:12,13 166:12
    167:21 169:16,18
    169:22 170:4,22
    170:23 171:5,12
    171:14,18,25
    172:4 178:21
    179:8,12 180:15
    181:1 182:2
user 60:24 142:8
users 61:9
uses 32:2 71:19
    76:17 166:18
usually 15:11 19:17
    25:8 28:9 42:3
    49:5,9 108:12

V

V 154:3
vacation 165:25
vacations 19:4
vague 133:11
    168:17
valid 133:13
various 7:21,24
vehicle 35:18 53:10
    53:11,19,25 125:6
    125:8,9 127:4,20
    127:20,22,24
    154:4,6 157:5,9
vehicles 124:22
verbal 155:6
versus 6:6 131:19
    168:10
video 4:3 6:10,12
    121:11 139:18
    141:14 148:15
    187:1,23
videographer 4:1
    6:1,20 9:7 88:17
    88:19 122:19,21
    139:16 141:14
    148:13 149:10
    158:14,16 163:19

163:21 184:11
videos 75:19 121:9
Videotaped 1:17
    2:20
violated 180:9
violation 110:20,23
    111:22
violence 56:8
violent 78:16
    157:12
visible 53:4 54:3
    101:8
voice 41:22 162:23
voices 160:3
volts 73:2 75:18
    79:12
vs 1:9 2:12 187:7
    191:5

W

W-o-o-d 123:15
wait 79:20
waited 64:23
waiting 46:7
waive 187:10
waived 184:13
    186:3
walk 55:4 157:2
walkie-talkies
    44:20
walks 94:2
want 9:5,13,22
    14:7,9 16:7 21:3
    24:5 26:19 28:2
    44:9,11 52:24
    57:2 60:10 73:4
    74:6 79:16 80:25
    81:10 87:16
    115:25 126:11,15
    128:7 132:6
    140:18,22 141:5
    156:10 162:3
    167:20 168:14,19
    168:20

Gore Perry Reporting and Video
FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al. v. Brian Kaminski, et al.

William Ballard                                    September 25, 2015

Page 218

**wanted** 41:16 53:2
  102:10 112:5
  128:13 130:14
  140:16 158:24
  172:17
**warned** 143:24
  157:11
**warnings** 61:3,7
  62:9
**warrant** 111:14,15
**wasn't** 46:1 66:6
  90:4 92:10 123:15
  131:2 161:14
  169:5 171:16
  182:11
**watch** 18:24
**watching** 183:20
**way** 9:9 13:11,11
  17:23 23:1 29:12
  45:6 51:5 52:15
  53:13 60:14
  108:23 110:6
  116:14 119:9
  124:11,16 130:16
  135:19 145:4,13
  159:22 168:23
  172:19 175:5,16
  178:17 179:11
**we'll** 22:23 53:18
  94:18 136:16
  184:10
**we're** 6:1,11 9:12
  10:2 15:7 17:10
  22:1,4 53:1 74:8
  119:11 123:24
  128:14 148:17
  181:24 184:11
**we've** 22:12,21,21
  27:2,4 42:16
  71:19 79:1 83:24
  96:14 99:10 123:7
  123:14 178:6
**weapon** 11:2 12:5,8
  12:9,11 55:22

  56:12 59:20 73:8
**weapons** 27:14
**wearing** 113:14
**Wednesday** 187:2
**weekly** 19:11,12
**weighed** 85:4
**weight** 112:10
**welcome** 155:4
**went** 13:3 20:11
  35:2,4 37:5 60:7
  60:16 92:11 96:21
  106:14 115:4
  119:22 166:11
  179:5
**weren't** 28:9 52:15
  98:6
**west** 49:12,14
  127:10
**westbound** 49:20
  50:1,11 52:3
**Westering** 3:12
  6:17,17 170:13
  173:1 184:6
**whatsoever** 92:6
**WHEREOF** 193:8
**whichever** 103:18
  161:12
**White** 8:15 10:19
  16:16 34:22 37:17
  38:11 39:12,13,16
  51:18,21,23 52:4
  73:18 81:1,8,11
  81:19 83:13,19
  84:1,6,20,22
  86:16,21 87:1
  90:5,13,17 92:19
  97:20 98:2 99:13
  104:2,10 118:6
  121:3 122:12
  156:3 182:3
**White's** 126:11
  178:21
**wide** 68:18,20
  69:20

**widow** 7:7
**wife** 55:25
**William** 1:17 2:20
  3:4 6:5,22 7:15
  187:6 190:1,10
  191:11
**window** 145:21
**windows** 157:8
**wires** 94:7
**withdraw** 17:22
  61:23 151:25
**witness** 6:21 50:19
  51:17,20 53:20
  54:5 121:22
  126:22 127:6
  128:2,10 131:12
  139:20 161:4
  164:5 184:5,14
  185:14,23 186:2,9
  187:10,12 190:1
  193:8
**witnesses** 95:13,19
  121:14,17
**Wood** 123:14
**word** 44:15 75:24
  105:21 111:3
  139:5
**worded** 179:22
**work** 7:25 35:8,10
  42:2 65:13 68:6
  79:20,21 140:12
  165:20
**worked** 41:5 68:17
  78:10 96:22
  113:12
**working** 8:9 21:2
  33:16,16,19 68:8
  77:10,17 79:3
  93:13 140:13
  167:18 177:14
  178:8
**works** 97:18 100:7
**worry** 170:16,18
**worst** 52:17

**worth** 134:20
**wouldn't** 59:16
  67:21 70:9,11,18
  70:18 79:16 111:9
  111:15 123:24,25
  163:15 168:19
  183:13
**wrestle** 72:17
**wrestling** 73:7
  100:9,22 102:16
**wrist** 41:19 70:21
  73:17
**writing** 87:25 111:4
**written** 24:12 27:5
  27:7 28:20 96:19
  97:2 99:18 109:13
  139:17 148:14
  174:12 175:14
**wrong** 77:21 133:8
  165:4 173:2
  174:16 178:19
**wrote** 92:15 120:22

---
**X**
---

---
**Y**
---

**yeah** 15:16 21:1
  26:3 31:9 41:17
  45:17 53:15,22
  96:3 117:11 127:2
  139:5 170:16
  172:18 182:17
**year** 8:24 11:15,17
  15:1 25:18 26:6
  60:17 63:12
  165:23
**years** 7:17,21,23
  15:24 16:3 18:1
  20:15 21:21 24:4
  24:22 48:18 59:18
  65:20 159:22
**yell** 57:5
**yelled** 57:11
**yelling** 145:18

---
**Z**
---

---
**0**
---
**0015** 55:2
**03-04-080** 47:4
**06:46** 100:18
**07** 187:2
**09/17/11** 43:10
  100:18

---
**1**
---
**1** 50:16,17 51:2
  128:23 192:7,13
**1-31** 5:21
**1:14** 184:12
**10** 79:20
**10/30/2009** 146:13
**100** 2:22 3:22 6:3
  185:10 187:4
  192:10
**11** 73:5
**11-second** 73:15
**11:08** 88:17
**11:15** 88:20
**11:55** 122:19
**11:57** 122:22
**12** 5:8 42:16 55:1
  63:23 76:24 83:12
  88:22,23 96:15
  99:12 100:14
  108:15,15,15
  143:21
**12:15** 139:16
**12:20** 141:15
**12:28** 148:13
**12:30** 149:11
**12:40** 158:14
**12:44** 158:17
**12:50** 163:19
**12:51** 163:22
**12th** 154:15
**135** 84:24
**139** 5:12
**14** 7:21 100:14

Tina Moore, et al. v. Brian Kaminski, et al.
William Ballard                                        September 25, 2015

Page 219

**142** 5:13
**145** 5:14
**146** 5:15
**147** 5:16
**148** 5:17
**15** 36:7 76:25 83:13
  88:24 99:12 117:1
**153** 5:18
**154** 5:19
**156** 5:20
**15th** 145:11 153:8
**16** 73:3
**164** 5:5
**173** 5:6
**17th** 33:6 102:7
  154:23 178:10
**18** 117:6
**180** 84:22 85:5,6
**19** 5:9 62:12 63:9
**1989** 8:3
**1st** 63:11

**2**
**2** 51:14 52:24 64:1
**20** 5:10 62:12,24
  190:13
**2000** 16:8 18:9
**2005** 17:19,21,24
**2008** 16:12 18:16
  18:19 143:13
**2009** 18:16,19
  145:11
**2010** 14:17,17 16:9
  16:11 23:21 32:7
  62:20 63:10,11
  130:9 143:16
  147:14 149:14
**2011** 16:17 19:25
  20:5,7,10 23:9,20
  31:6 32:7,24 33:6
  40:17 50:2 60:3
  63:4 102:7 130:9
  153:8 154:16,23
  156:21 158:3

**161**:10 178:10,20
**2015** 1:19 2:24 6:2
  185:13 186:10
  187:2,6
**210** 3:14 192:16
**211** 3:6 191:18
  192:4
**21st** 156:21 158:3
**22** 66:20 73:3
  143:19 145:15
**22A** 5:11 50:15
  54:13 66:1 125:1
  126:13,14 127:23
**23** 5:12,24 139:21
  139:24 140:1
  141:18
**23rd** 147:14
**24** 5:13 142:22
  144:15 166:16
**241-6750** 4:6
  187:25
**25** 1:19 5:14 145:9
  187:6
**25th** 2:24 6:2
  143:13 185:12
**26** 5:15 15:24 18:1
  48:17 146:10
  147:11 149:14
**27** 5:16 147:12
**28** 5:17 149:12
  150:14,14
**29** 5:18 153:5

**3**
**3** 51:18 52:24
**30** 5:19 106:13
  154:14 187:14
**300** 4:4
**30th** 146:12
**31** 5:20 156:20
  166:16
**314** 3:8,24 4:6
  187:25
**31st** 63:4

**360** 85:7

**4**
**4** 53:16,20 54:13
  127:5 128:19
**4:14-CV1443** 1:9
  2:12
**4:14-CV1447** 1:10
  2:13
**400** 2:23 3:22
  185:10 187:4
  192:10
**4050** 3:6 191:18
  192:4
**42** 5:8
**421-5545** 3:24
**4600** 3:14 192:16
**48** 24:23
**4th** 3:22 21:17

**5**
**5** 126:24,25 127:24
**5:00** 48:25
**50** 5:11 15:13,17
**50,000** 73:2 75:18
  79:12
**515** 4:4 6:12 187:24
  193:6
**531-7200** 3:16
**55** 113:24
**552** 142:13
**560** 83:13
**571300** 109:6

**6**
**6** 128:1
**6:30** 34:5
**61** 7:17
**62** 5:9,10
**621-2500** 3:8
**63101** 4:5 187:24
  191:19 192:5
  193:7
**63102** 3:7,23 187:5
  192:11

**64112** 192:17
**64112-3012** 3:15
**6th** 186:10

**7**
**7** 5:4
**700** 193:6

**8**
**8** 143:20
**816** 3:16
**835** 2:25 186:18
**89** 143:11

**9**
**9/25/2015** 190:3
  191:13
**9:30** 6:2
**92** 15:14