EXHIBIT
G

# Case: Tina Moore, et al. v. Brian Kaminski, et al.

4:14-CV1443 SNLJ

## Transcript of: Michael White

**Date:** October 1, 2015

This transcript is printed on 100% recycled paper



GorePerry
REPORTING & VIDEO

515 Olive Street, Suite 300
St. Louis, MO  63101
(314) 241-6750
1-800-878-6750
Fax: (314) 241-5070
Email: schedule@goreperry.com
Internet: <<<www.goreperry.com>>>

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 1

TINA MOORE, Individually and

as Personal Representative of

the ESTATE OF JASON MOORE, DELORES

MOORE, and RENEE RODGERS, as Next

Friend for A.D.R., a Minor,


Plaintiffs,


VS.                    Cause Nos.  4:14-CV1443 SNLJ

                                   4:14-CV1447 SNLJ


BRIAN KAMINSKI, et al.,


Defendants.



VIDEOTAPED DEPOSITION OF MICHAEL WHITE


October 1, 2015

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF MISSOURI

 3                       EASTERN DIVISION

 4

 5    TINA MOORE, Individually and

 6    as Personal Representative of

 7    the ESTATE OF JASON MOORE,

 8    DELORES MOORE, and RENEE RODGERS,

 9    as Next Friend for A.D.R., a Minor,

10              Plaintiffs,

11

12    vs.                           Nos. 4:14-CV1443 SNLJ

13                                       4:14-CV1447 SNLJ

14

15    BRIAN KAMINSKI, et al.,

16              Defendants.

17

18

19

20        Videotaped Deposition of MICHAEL WHITE, taken

21    on behalf of the Plaintiffs, at the offices of

22    Pitzer Snodgrass, PC, 100 South Fourth Street, Suite

23    400, in the City of St. Louis, State of Missouri, on

24    the 1st day of October, 2015, before Julie A.

25    Bulard, CCR MO #835.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

```
                                                          Page 3

 1   APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFFS:

 4       Mr. William T. Dowd

 5       Dowd & Dowd

 6       211 North Broadway, Suite 4050

 7       St. Louis, MO  63102

 8       (314) 621-2500

 9       bill@dowdlaw.net

10

11    FOR THE PLAINTIFFS:

12       Mr. Todd Johnson

13       Baty, Holm & Numrich & Otto, PC

14       4600 Madison Ave., Suite 210

15       Kansas City, MO  64112-3012

16       (816) 531-7200

17       tjohnson@batyholm.com

18

19    FOR THE DEFENDANTS:

20       Ms. Ida Shafaie

21       Pitzer Snodgrass, P.C.

22       100 S. 4th Street, Suite 400

23       St. Louis, MO  63102

24       (314) 421-5545

25       shafaie@pspclaw.com
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                      October 1, 2015

Page 4

```
 1    THE VIDEOGRAPHER:

 2        Mr. Timothy Perry

 3        Gore Perry Reporting & Video

 4        515 Olive Street, Suite 300

 5        St. Louis, MO  63101

 6        (314) 241-6750

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

```
                                                    Page 5

 1                      INDEX

 2                                              PAGE

 3                   EXAMINATION

 4    QUESTIONS BY MR. DOWD                       7

 5    QUESTIONS BY MR. JOHNSON                   160

 6

 7

 8                    EXHIBITS

 9    Plaintiff's Deposition Exhibit 16B         42

10    Plaintiff's Deposition Exhibit 17B         41

11    Plaintiff's Deposition Exhibit 35         146

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                                                        Page 6

 1             VIDEOGRAPHER:  We're on the record at

 2     9:31.  Today is October 1st, 2015.  We are at Pitzer

 3     Snodgrass Law Firm in St.~Louis, Missouri.  We're

 4     here for the deposition of Michael White, being

 5     taken in the cause of Tina Moore, et al., versus

 6     Brian Kaminski, et al., pending in the United States

 7     District Court for the Eastern District of Missouri,

 8     Eastern Division.

 9             My name is Tim Perry, Certified Legal

10     Video Specialist, here today with Julie Bulard, our

11     Certified Court Reporter.  We're with Gore Perry

12     Reporting & Video at 515 Olive Street in St.~Louis.

13             Counsel, would you please identify

14     yourselves for the record?

15             MR. DOWD:  I'm Bill Dowd here for Tina

16     Moore.

17             MR. JOHNSON:  Todd Johnson for Delores

18     Moore and Renee Rodgers.

19             MS. SHAFAIE:  Ida Shafaie for Defendants.

20             VIDEOGRAPHER:  Thank you all.  Please

21     swear in the witness.

22                     MICHAEL WHITE,

23     of lawful age, having been first duly sworn to

24     testify the truth, the whole truth, and nothing but

25     the truth in the case aforesaid, deposes and says in

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 7

 1   reply to oral interrogatories propounded as follows,

 2   to-wit:

 3                       EXAMINATION

 4   QUESTIONS BY MR. DOWD:

 5       **Q**    Good morning, sir.  Would you tell the

 6   jurors your name, please?

 7       **A**    Michael White.

 8       **Q**    And how old a man are you?

 9       **A**    31.

10       **Q**    And tell us a bit about your educational

11   background.

12       **A**    I graduated from McClure High School in

13   2003, went to Florissant Valley Community College,

14   where I got an associate's degree in criminal

15   justice, graduated from there in 2005.

16       **Q**    And what did you do after you graduated

17   from Florissant Valley?

18       **A**    I went to the Eastern Missouri Police

19   Academy for six months.

20       **Q**    Where is that located, or where was it at

21   that time?

22       **A**    St. Charles Community College.

23       **Q**    And what year did you graduate from the

24   police academy?

25       **A**    It was 2006.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 8

1      **Q**    How long were you in the police academy?
2   How long is that course, sir?
3      **A**    Six months.
4      **Q**    Can you tell the jurors and myself some of
5   the things that you studied and were trained on at
6   the academy?
7      **A**    We studied statutory law, we studied --
8   I'm sorry, the other law I'm drawing a blank on
9   right now.
10      **Q**    Constitutional law?
11      **A**    Constitutional law.  We studied everything
12   from handcuffing to self defense techniques to
13   physical fitness.
14      **Q**    All right.  And what did you do after you
15   graduated from the police academy in 2006?
16      **A**    I started as a police officer at City of
17   Ferguson.
18      **Q**    And you were a patrol officer at that
19   time?
20      **A**    Yes.
21      **Q**    And have you remained a patrol officer
22   through today?
23      **A**    Yes.
24      **Q**    Have you had any other assignments, for
25   example, in the jail or any other assignments other

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 9

1   than a street patrol officer?

2       **A**    While I was going through the police

3   academy I was a correctional officer.

4       **Q**    Okay.  And did you go somewhere to act as

5   a correctional officer, sort of an internship?

6       **A**    No.  It was just with Ferguson.

7       **Q**    And is that when you worked in the jail?

8       **A**    Yes.

9       **Q**    And how long was that?

10      **A**    Approximately a year.

11      **Q**    So you understand that rules for prisoners

12  that are already in jail are the same as the rules

13  for citizens on the street as far as use of force?

14      **A**    Yes.

15      **Q**    So the first time you were sworn in as a

16  peace officer was in 2006 with City of Ferguson?

17      **A**    Yes.

18      **Q**    Have you been deposed before?

19      **A**    Yes.

20      **Q**    Okay.  How many times?

21      **A**    Twice.

22      **Q**    And can you tell us the two cases you were

23  deposed in?

24      **A**    One was a criminal case and one was a

25  civil case.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

```
                                                    Page 10
  1        Q      And the criminal case, do you know who the
  2   attorney was that deposed you?
  3        A      I believe it was Jim Schottel, Schottel.
  4        Q      And how about in the civil case, who --
  5   who would have deposed you?
  6        A      Jim Schottel.
  7        Q      Did it arise out of the same incident?
  8        A      Yes.
  9        Q      So were you deposed twice?
 10        A      Yes.
 11        Q      No other depositions?
 12        A      No.
 13        Q      Have you ever testified in trial?
 14        A      Yes.
 15        Q      How many times?
 16        A      Criminal trials, I couldn't really give
 17   you a number.  It's been ten years.  But one civil
 18   trial.
 19        Q      And what was the civil trial related to?
 20        A      It was a claim of excessive force.
 21        Q      And were you a defendant?
 22        A      Yes.
 23        Q      And that's different than the case with
 24   Jim Schottel or the same case?
 25        A      Same case.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                      October 1, 2015

Page 11

1      **Q**    Do you know the status of that case?

2      **A**    It was appealed and it's still in process.

3      **Q**    I know you've given your deposition

4    before, but I'm going to be asking you a series of

5    questions regarding your training and regarding the

6    incident on September 17th, 2011.  If at any time my

7    questions are unclear to you, I want you to tell me

8    so that I can rephrase them.  Do you understand

9    that?

10     **A**    Yes.

11     **Q**    As we go forward, some of the questions,

12   you may be able to anticipate my answers to those

13   questions.  I'd ask you to wait to start answering

14   until I've completed the full question.  That makes

15   the court reporter's job easier.  And more

16   importantly, it makes the transcript and the record

17   clear, which everybody in this room wants the

18   transcript to be clear.  Do you understand that?

19     **A**    Yes.

20     **Q**    And if we -- if you answer a question, I'm

21   going to assume for the records, and the ladies and

22   gentlemen of the jury are going to assume, that you

23   understood the question as asked.  Do you understand

24   that?

25     **A**    Yes.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 12

```
 1        Q     Finally, you're answering out loud, and I
 2   appreciate that.  As we go on, sometimes people will
 3   nod their head or say huh-uh or uh-uh.  And again,
 4   that is really difficult for the court reporter to
 5   make a clear record of that.  We don't want her in a
 6   position to have to interpret those.  So if I say
 7   you have to answer out loud that's what I'm
 8   referring to.  You have to say yes or no if that's
 9   appropriate or a narrative answer if that's
10   appropriate.  Do you understand that?
11        A     Yes.
12        Q     Okay.  Thank you, sir.  Can you tell us
13   what you've reviewed in relation to your deposition
14   today?
15        A     I reviewed the police report.  My portion
16   of the police report, I'm sorry.
17        Q     Anything else?
18        A     No.
19        Q     You didn't read any depositions of Chief
20   Jackson or Officer Kaminski or anyone like that?
21        A     No.
22        Q     Have you spoken to anyone other than the
23   attorneys representing the City of Ferguson and the
24   defendants?
25        A     I talked to Officer Kaminski.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

```
                                            Page 13

  1        Q    Okay.  When did you talk to him?

  2        A    It's been about two weeks.

  3        Q    Okay.  Was that, to your understanding,

  4   before or after his deposition?

  5        A    I don't know when his deposition was.

  6        Q    Okay.  What did you talk about?

  7        A    A little bit about this case, not too

  8   much.

  9        Q    All right.  And what did he say to you?

 10        A    We were just talking about the fact that

 11   we had to do a deposition.

 12        Q    Okay.

 13        A    We haven't talked much about this since

 14   it -- since this has come up.

 15        Q    Okay.  Do you recall anything he said to

 16   you during that conversation approximately two weeks

 17   ago regarding the incident?  I mean, I get the

 18   general nature of it.  But do you recall anything

 19   that he said to you about the incident or about the

 20   deposition, anything like that?

 21        A    I don't recall specific statements.  I

 22   just remember talking a little bit about it.

 23        Q    Anyone else that you've spoken to recently

 24   about this matter?

 25        A    Just Ida.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 14

1      **Q**    Is the -- can you tell us since the

2   incident what your knowledge is of Officer

3   Kaminski's assignments with regard to whether -- he

4   was a street patrol officer at the time of this

5   incident, correct?

6          MS. SHAFAIE:  Object to foundation.  You

7   can answer.

8      **Q**    (By Mr. Dowd) Just basic -- all I -- all

9   the questions I'm asking you today are based on what

10  you know, either -- for these questions, it's what

11  Officer Kaminski told you or what you've been able

12  to observe with your own eyes.  Do you understand

13  that?

14     **A**    Yes.

15     **Q**    And what do you know about Officer

16  Kaminski's change in assignments, if anything, since

17  September 17th, 2011?

18     **A**    I know he's a patrolman.

19     **Q**    Okay.  And I understood from Lieutenant

20  Ballard that at one point -- that some time since

21  then he was in the jail working as a corrections

22  officer in the Ferguson jail due to manpower issues

23  and things like that.  Were you aware of that?

24     **A**    Yes.

25     **Q**    Is it your understanding that he returned

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

```
                                                        Page 15
 1    to patrol duty after September 17th, 2011?

 2         A    Yes.

 3         Q    Do you guys ride one officer to a car in

 4    Ferguson?

 5         A    Yes.

 6         Q    So you're not a -- you don't have partners

 7    and he's not your partner?

 8         A    He's not my partner.

 9         Q    But do you guys ride -- do you guys tend

10    to be on the same shifts, on the same patrol?

11         A    Do me and him?

12         Q    Yes, sir.

13         A    We were at one point, but we haven't been

14    in a couple years.

15         Q    Okay.  Do you know why that was changed?

16         A    They just do a manpower shift, rotate

17    schedules.  You know, people want to go to midnights

18    or different schedule.  They just change it up.

19         Q    Understood.  Do you know if he still

20    carries a taser?

21         A    The last time he was on the street, yes,

22    he had a taser.

23         Q    And approximately when was that?

24         A    I couldn't give you a timeframe.

25         Q    Was it six months ago or last month or --
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 16

1       **A**     I think I saw him a couple months ago on
2    the street and he had a taser.

3       **Q**     Can you -- I want to ask you a few
4    questions about your ongoing training at the
5    Ferguson Police Department and through the Ferguson
6    Police Department.  You have firearm training every
7    year.  Is that correct?

8       **A**     Yes.

9       **Q**     And tell the jurors what that entails.

10      **A**     Every six months we go up into the range
11   and we do our qualifying course.  Sometimes we do
12   some training beforehand, sometimes we do some
13   after.  But if I remember the course correctly,
14   which it's been six months, it's 36 rounds, various
15   movements.

16      **Q**     Okay.  And what are your general rules of
17   force -- if you are in a situation where you have to
18   use lethal force and you have to draw your firearm,
19   what are your general rules with regard to
20   targeting?

21      **A**     Generally aim for center mass.

22      **Q**     Center body mass?

23      **A**     Yes.

24      **Q**     And that's basically the middle of the
25   chest, just a little bit below where your microphone

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                October 1, 2015

Page 17

 1   is today?

 2       **A**    Yes.

 3       **Q**    And the 36 rounds that you often times use

 4   as far as practice, do most of those -- you're

 5   trying to aim at center body mass when you're

 6   pulling the trigger?

 7       **A**    Yes.

 8       **Q**    All right.  And have you heard the phrase

 9   memory -- muscle memory as far related to your

10   firearm training?

11       **A**    Yes.

12       **Q**    Tell the jurors what your understanding

13   is.

14       **A**    The more you train, the more you're likely

15   to do the same instance.

16       **Q**    Hit the target that you've been trained to

17   hit?

18       **A**    Yes.

19       **Q**    So if you were to fire your firearm in a

20   justifiable use of lethal force case and hit someone

21   in the chest, that wouldn't be an accident.  That

22   would be intentionally where you're aiming, correct?

23           MS. SHAFAIE:  Object to form and

24   foundation.  You can answer.

25       **Q**    (By Mr. Dowd) Is that -- do you understand

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 18

1    the question?

2        **A**    I understand the question.  Every

3    situation is different.

4        **Q**    Right.

5        **A**    You know, you can aim at the chest.  If

6    people are running around jumping, shooting at you,

7    you never know what you're going to hit.  But

8    generally to stop the threat, the easiest way is to

9    aim for center mass.

10       **Q**    And that's what you're trained to do, and

11   you intentionally aim for that if you're trying to

12   stop the threat?

13       **A**    Yes.

14       **Q**    At the academy, did you have any training

15   in deescalation techniques?

16       **A**    I don't recall.

17       **Q**    Through the City of Ferguson, have you

18   ever received any deescalation training as a peace

19   officer?

20       **A**    I would recall deescalation training as

21   kind of being incorporated in various different

22   training.  But we recently had a specific

23   deescalation class.

24       **Q**    At the Ferguson Police Department,

25   physically on the property?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                      October 1, 2015

Page 19

1      **A**    Yes.

2      **Q**    Okay.  And who taught that class?

3      **A**    It was St. Louis County tactical officers.

4      **Q**    Do you remember any of their names or --

5      **A**    I do not.

6      **Q**    Was there any written materials

7   distributed to you at the deescalation training?

8      **A**    There was.

9      **Q**    And do you still have that?

10     **A**    I do not.

11     **Q**    Do you know who does have that?

12     **A**    I do not.

13     **Q**    Was that the first formal deescalation

14   training you've had as a peace officer?

15     **A**    As far as a deescalation class, yes.

16     **Q**    Okay.  You said it may be incorporated in

17   other training that you have had along the way.  Can

18   you tell me what training that would have been and

19   which deescalation training was provided?

20     **A**    Specific classes, no.  But I mean, in law

21   enforcement you're trained through various things.

22   You always want to deescalate the situation.  That's

23   how we've always been taught whether you're dealing

24   with -- I'm trying to think of the class, but I

25   can't give you a specific class.  But the whole

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 20

1    point is to deescalate any situation.

2        **Q**    Okay.  And can you tell us what that means

3    to you in laymen terms as far as deescalate a

4    situation?

5        **A**    Yeah.  I mean, you try to talk someone

6    down, try to calm the situation down, bring it down

7    to a point where no force has to be used, nobody has

8    to be hurt, everything is okay.

9        **Q**    Is it -- can you give us some common

10   examples of when you may have to use deescalation

11   techniques, or your training as you've described on

12   your day-to-day job?

13       **A**    It's pretty much every day.  You know,

14   anyone you come in contact, disturbances, you know,

15   you get people that are angry, yelling at each

16   other.  You want to talk to them calmly, try to get

17   them to talk to you calmly, and try to understand

18   their situation so it makes everything better.

19       **Q**    Okay.  And does that include people that

20   are having domestic disputes?  Those are quite

21   emotional, aren't they?

22       **A**    Yes.

23       **Q**    And do you have occasion to use your

24   deescalation training in domestic disputes?

25       **A**    Yes.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 21

 1         **Q**    And for the same purposes you've just
 2  described?
 3         **A**    Yes.
 4         **Q**    Tell me about your taser training.  When
 5  were you first certified?
 6         **A**    I can't give you the exact date.
 7         **Q**    Just a year is fine.
 8         **A**    We got tasers, I think, in 2011, maybe
 9  2010.
10         **Q**    I believe it was 2010.
11         **A**    But we had to go through the training to
12  use it.
13         **Q**    And you went to the taser training on
14  that?
15         **A**    Yes.
16         **Q**    Did they come to the City of Ferguson to
17  give you that training or did you go somewhere else?
18         **A**    I can't recall.  I think it was at the
19  station, but I'm drawing a blank on that.
20         **Q**    Okay.  Have you been recertified since
21  2010?
22         **A**    Yes.
23         **Q**    Where did you go for that?
24         **A**    It was at the station.
25         **Q**    And approximately what year was that?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 22

 1        **A**    I believe last year, but I'm drawing a

 2   blank on the actual timeframe.

 3        **Q**    While you were an officer at the City of

 4   Ferguson, do you recall receiving any warnings or

 5   bulletins from Taser through -- through the --

 6   through the department?

 7        **A**    You kind of have to be more specific

 8   there.

 9        **Q**    Sure.

10        **A**    I mean, I don't --

11        **Q**    I understand you have mailboxes, physical

12   mailboxes out there.

13        **A**    Yes.

14        **Q**    Tell us what kind of things are put in

15   those mailboxes.

16        **A**    Well, I mean, anything from subpoenas to

17   court -- just court papers, reports, be on the

18   lookouts.

19        **Q**    Okay.  Have you ever received any

20   information about tasers in your mailbox?

21        **A**    Everything we've received about tasers was

22   through taser training.

23        **Q**    Okay.  Did they ever supplement with

24   warnings or changes in warnings or send bulletins to

25   you by email or mail?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 23

```
 1       A     Not that I can recall.

 2       Q     Do you know who Officer Brannan is?

 3       A     Yes.

 4       Q     And was he an officer or did he have a

 5   higher rank when he was -- when he left the

 6   department?

 7       A     Patrolman.

 8       Q     Patrolman.  And what was his relationship

 9   to the taser training?

10       A     He was our taser instructor.

11       Q     Did you ever have any conversations with

12   him about warnings or bulletins?

13       A     Just through the training class, nothing

14   extra.

15       Q     Okay.  Tell the jury what your

16   understanding is of CIT training.

17       A     Crisis intervention training.  I went

18   through that in about 2011.  It was a great class.

19   We got to interact with subjects who were -- could

20   possibly have a crisis moment.  For existence, we

21   got taught what bipolar is, autistic, schizophrenia.

22   We got to deal with people in those situations and

23   understand what they are going through.  So if we

24   encounter them, to try to stand back and talk to

25   them and just be able to realize what's actually
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 24

 1   happening as opposed to not knowing.

 2       **Q**    All right.  So identify people that are

 3   having mental health issues or personal crisis?

 4       **A**    Attempt to identify that, yes.

 5       **Q**    Okay.  And were there written materials

 6   given to you in the CIT training?

 7       **A**    Yes.

 8       **Q**    Was there also -- did that come to you as

 9   a physical pamphlet or papers or did you get that

10   emailed to you?

11       **A**    It was a book.

12       **Q**    Okay.  And do you still have the book?

13       **A**    I don't think I do.

14       **Q**    Do you know if there's one kept at the

15   department for reference or any other purpose?

16       **A**    I haven't seen one.

17       **Q**    Approximately when in 2011 did you receive

18   that training?

19       **A**    I couldn't remember the exact date.

20       **Q**    You don't know if it was --

21       **A**    2010, 2011.

22       **Q**    You don't remember what part of the year

23   it was, whether it was spring, summer, fall, winter?

24       **A**    I don't recall that.

25       **Q**    Has there been any follow-up training or

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                      October 1, 2015

Page 25

1    testing on the CIT diagnosis techniques and

2    responses to those since 2010 or 2011 when you had

3    that first training?

4         **A**    I have not attended any.

5         **Q**    You have not received any pamphlets or

6    handouts or emails regarding that?

7         **A**    I can't recall if I have or not.

8         **Q**    So as you sit here, you don't have any

9    specific recollection of that?

10        **A**    No.

11        **Q**    And you haven't received any further

12   training through the department in crisis

13   intervention training regarding people in personal

14   crisis since that class?

15        **A**    I have not.

16        **Q**    And no testing on that either, right?

17   They don't have quizzes pop up on your computers

18   that you have to answer every day on CIT training?

19        **A**    No.

20        **Q**    There's no regular testing on use of force

21   policies.  Is that correct?

22        **A**    No.

23        **Q**    Testing, I mean filling out a test and

24   multiple choice or essays, anything like that where

25   you're actually tested on your knowledge of the

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

---

Page 26

 1   policies and procedures of the Ferguson general

 2   orders?

 3       **A**    No.

 4       **Q**    That was true prior to September of

 5   2010 -- '11, correct?

 6       **A**    Yes.

 7       **Q**    And that's still true through today?

 8       **A**    Yes.

 9       **Q**    You said that the CIT training, crisis --

10   intervention team training is what CIT stands for,

11   right?

12       **A**    Crisis intervention training is what I

13   call it.

14       **Q**    All right.  And you said it was a great

15   class.  And tell me why, why you say that.

16       **A**    It was just nice to be able to interact

17   with subjects who deal with that and have episodes

18   when their meds don't work or something, just to

19   understand what they're going through.

20       **Q**    Okay.  Is there -- to your understanding,

21   is there any attempt by the department, by the

22   sergeants or the lieutenants, whoever's in charge of

23   the scheduling, to try to have a CIT-trained officer

24   on each patrol?

25       **A**    I don't -- I couldn't really answer that.

---

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 27

1    I'm not sure how they do that.

2        **Q**    If you would just tell me, so I can

3    understand and we all have the same understanding of

4    what a patrol means, when you get to your job in the

5    beginning of a shift, how is Ferguson broken down

6    into areas that are to be worked by the officers?

7        **A**    Ferguson has four beats, one, two, four

8    and five.  Each -- there's always an officer

9    assigned to one of the beats.  And you've got -- if

10   you have extra officers, those are just roaming cars

11   that just patrol anywhere in the city.  And you're

12   just responsible for your beat.

13       **Q**    All right.  So when you guys use the

14   phrase patrol, you know, as far as your group, that

15   doesn't encompass everybody who's out that day in

16   the City of Ferguson during that shift?

17       **A**    I'm kind of trying to understand the

18   question here.

19       **Q**    Yeah, let me rephrase it.  You said there

20   was one officer per the four -- did you call them

21   districts?

22       **A**    Beats, districts, same thing.

23       **Q**    Same thing, okay.  If you say, I'm on

24   patrol with an officer, another officer, would that

25   include somebody who is in the other adjacent beat?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 28

1      **A**    We don't normally say we're on patrol with
2    another officer.

3      **Q**    Okay.

4      **A**    We're not in cars together.  We just --
5    patrol is just driving around.

6      **Q**    Right.

7      **A**    Officer presence.

8      **Q**    Right.  And available to respond to calls?

9      **A**    Yes.

10     **Q**    Understood.  So how many officers are
11   generally on patrol during a shift?

12     **A**    It just depends.  Scheduling really
13   reflects that.  They usually try to have five plus a
14   supervisor on at all times.

15     **Q**    Okay.  So hopefully a minimum of five?

16     **A**    Yes.

17     **Q**    Okay.  So on September 17th, 2011, if
18   Officer Bebe, yourself, Officer White and Officer
19   Kaminski were three of the patrol officers, there
20   was at least another two patrol officers out that
21   morning, correct?

22     **A**    I couldn't tell you that.

23     **Q**    I mean, I'm not asking for an exact
24   number.  But that would be your expectation?

25     **A**    Expectation.  But again, that was 2011.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 29

1       **Q**    Right.  Tell me how you received your CIT

2    training.

3       **A**    I went to a week-long course at the

4    St.~Louis County Police Academy.  The first three

5    days were classroom work with an instructor and then

6    dealing with the subjects who came in to talk to us.

7    Then the fourth day we went and visited various

8    mental health facilities, got to interact and talk

9    to people that work there, give us -- try to give us

10   some advice on certain things.  And I don't remember

11   what the last day was.

12      **Q**    Was there testing, do you recall, at the

13   end of the, end of the class?

14      **A**    I don't recall.

15      **Q**    I'm going to ask you a little bit about

16   the weekly staff meetings that happen at Ferguson.

17   Is there any time -- do you attend those as an

18   officer?

19      **A**    No.

20      **Q**    That's just for the sergeants and

21   lieutenants, captain and chief?

22      **A**    Yes.

23      **Q**    And does that have to do with how they're

24   going to staff, to your understanding?

25           MS. SHAFAIE:  Object to foundation.  You

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 30

 1    may answer.

 2        **Q**    (By Mr. Dowd) I'll rephrase.  What's your

 3    understanding of what occurs in a staffing meeting

 4    with those command personnel?

 5        **A**    I've never been a command personnel, so

 6    who knows what they talk about up there.  I would

 7    assume that staffing would be part of their topic.

 8        **Q**    All right.  But tell us how -- what the

 9    word staffing means in the context of the Ferguson

10    Police Department.

11        **A**    Probably, you know, assignments or people

12    are going to get moved, do we have enough people on

13    a squad.  Just, you know, is the schedule filled.

14        **Q**    Before each shift at the City of Ferguson

15    Police Department, do you all meet in the -- in a

16    muster room?

17        **A**    Yes.

18        **Q**    What's the other name for that room?  I

19    can never remember.

20        **A**    Roll call room.

21        **Q**    Roll call room.  And how long are you

22    generally there prior to going on patrol?

23        **A**    It can vary, anywhere from five to twenty

24    minutes.

25        **Q**    Okay.  And generally what are discussed --

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 31

1    what is discussed in that meeting?

2        A    Events from the previous shift, vacation

3    checks, watch on patrols, your assignments, if

4    there's court that day, just department related.

5        Q    Okay.  There's no training, per se, during

6    that, those pre-shift meetings?

7        A    No, no training.

8        Q    Other than the recent deescalation

9    training, I guess in the 2011 time frame -- I

10   shouldn't say recent, but then the CIT training that

11   you were sent for, what other training have you

12   received while you've been an officer at the -- and

13   taser training, excuse me.  What other kind of

14   training have you received since you've been an

15   officer at the Ferguson Police Department?

16       A    There's been so much.  Trying to name them

17   all off.  I mean, I went to bicycle training, I went

18   to driver training.

19       Q    Some K-9 training, I understand?

20       A    Well, yeah, I am a K-9 officer.  A did a

21   lot of K-9 training.  Racial profiling classes that

22   we go to.  You know, I'd have to review my list.

23   There's so many of them that we do.

24       Q    Okay.  And your attorneys have provided us

25   a lot of certificates.  So I just -- is there

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 32

1    anything that -- any training that you've had since

2    you began at Ferguson in the 2006 timeframe that was

3    directed specifically at use of force training and

4    on the policies at the City of Ferguson?

5         **A**    You know, we -- we are directed to review

6    our policies through at the time was the Pass

7    system.  So you have to sign off and show that

8    you've read and reviewed it and that you understand

9    it.  And there's times where they would force those

10   back in there where you'd have to read it again,

11   sign off again saying that you do acknowledge this.

12   As far as training goes, you know, I'd have to look

13   at my list of classes again.  But, you know, each

14   class you go to you talk about use of force and

15   certain situations and what to do and what not to

16   do.  You review videos of other uses of force and,

17   you know, you talk about it and try to help you

18   better yourself in the future in what to do and what

19   not to do.

20        **Q**    My understanding of the prior testimony

21   from the other officers, including Lieutenant

22   Ballard and Chief Jackson, is that you guys when you

23   get to your -- get to the station, you bring up your

24   computer screen and look and see what's there.  Is

25   that part of what you do every day?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

                                                              Page 33

 1       **A**    We review the computers, yes.

 2       **Q**    Okay.  And I understood that if there was

 3   a new order or policy or a change to an existing

 4   policy that those were brought up to your screen.

 5   Is that what you're referring to when you say the

 6   Pass system?

 7       **A**    Yes.

 8       **Q**    Okay.

 9       **A**    Yeah, any changes, you have to review it.

10       **Q**    Okay.  So to your understanding, it's just

11   new general orders, which are policies and

12   procedures that you're to follow, right?

13       **A**    Yes.

14       **Q**    And it's also any changes in those

15   existing policies and procedures, correct?

16       **A**    Yes.

17       **Q**    But other than that, you don't see the

18   policies and procedures on a regular basis, I mean,

19   as you said, forced on you by the department?

20       **A**    Well, they are readily and available for

21   to us review, but we're not mandated to do that.

22       **Q**    Oh, I do want to talk to you now about the

23   day of September 17th, 2011 and ask you, what time

24   did you report to work that day, if you recall?

25       **A**    I'm an early bird.  I get to work about

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 34

 1   5:30.

 2        **Q**    And what time would your shift have

 3   started?

 4        **A**    6:30.

 5        **Q**    And how long did you anticipate it being?

 6   Eight-hour shifts or --

 7        **A**    I'm trying to recall if we were on

 8   eight-hour shifts in 2011.  If we were eight-hour

 9   shifts we'd be getting off at 2:30.

10        **Q**    And what do you generally do between when

11   you arrive and when you go into the muster room for

12   your pre-shift meeting?

13        **A**    Check emails, make sure I'm caught up on

14   all my reports.  I check the Pass system, make sure

15   there's no new policies or changes in there that

16   need to be read.

17        **Q**    Okay.  Then when you get to the muster

18   room, who's generally there?  Everybody who's going

19   on patrol and the sergeant?

20        **A**    It can vary.  Sometimes dispatchers, but

21   mainly officers.

22        **Q**    And what's the purpose of having the

23   dispatchers there?  When -- what would cause them to

24   be there?

25        **A**    They can better understand some of the

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 35

1    calls that happen the night before, tell us what

2    they heard.

3         **Q**    Do you know who the dispatcher was on

4    September 17th, 2011?

5         **A**    I don't recall.

6         **Q**    Was there -- how many dispatchers were

7    there at that time?

8         **A**    I don't recall.

9         **Q**    Was there male dispatchers and female

10   dispatchers?

11        **A**    Yes.

12        **Q**    Do you remember the names of any of the

13   male dispatchers?

14        **A**    Not from 2011.

15        **Q**    Okay.  Do you know what a CAD transcript

16   is?

17        **A**    CAD?

18        **Q**    Yes.

19        **A**    Yes.

20        **Q**    And tell the jury your understanding.

21        **A**    That's the call screen.  It's where a

22   dispatcher enters all the call notes for us to see

23   as time of arrival, time dispatched, who dispatched

24   it, what officers.

25        **Q**    Does it also include what officers may

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 36

1    have said, notes on that?

2         **A**    If the -- the officer will relay something

3    over the radio.  And if the dispatcher types in what

4    that officer said, then it might have that in there.

5         **Q**    Okay.  I think you said that's something

6    you can see, correct?

7         **A**    Yes.

8         **Q**    And where do you see that?

9         **A**    On our laptop computers in the car.

10        **Q**    And you had those in September of 2011?

11        **A**    Yes.

12        **Q**    Okay.  Is that something that you can go

13   back and review on your laptop the next day?

14        **A**    I can't recall if we could at that time.

15        **Q**    Can you now?

16        **A**    I don't think you can in that system.

17        **Q**    Did you get a new laptop computer since

18   September 2011?

19        **A**    Not new computers.

20        **Q**    Okay.  Did you have a laptop computer

21   assigned to you or was it assigned to the patrol

22   car?

23        **A**    The car.

24        **Q**    And do you believe that laptop computer is

25   still in existence?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                           October 1, 2015

Page 37

1      **A**    You know, they do change computers, so I

2   don't know.

3      **Q**    You just don't know either way whether

4   that one's been replaced or not?

5      **A**    Yes.

6      **Q**    Do you recall a wholesale replacement of

7   all the laptop computers at the City of Ferguson

8   since 2011?

9      **A**    No.

10      **Q**    Have you ever seen the CAD transcript in

11   this case?

12      **A**    I have not.

13      **Q**    Do you ever use the CAD transcripts to

14   fill out your reports?

15      **A**    No.

16      **Q**    Why is that?

17      **A**    Well, I should say yes, only for like time

18   of arrival and time of like cleared, if we went

19   10-8.

20      **Q**    Do you know what the phrase excessively

21   cleared means?

22      **A**    No.

23      **Q**    I saw that on our report.  I'll ask --

24   I'll point it out to you when we get to the report

25   and ask you if it makes any more sense in context.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                              October 1, 2015

```
                                                      Page 38
 1    Tell us when you first learned that morning that
 2    there was something going on that you later learned
 3    related to Mr. Moore.
 4        A    I would -- can't give the exact timeframe
 5    we were dispatched.  But it was roughly 6:30 we
 6    received the radio call.
 7        Q    Okay.  And what do you recall the radio
 8    call being?
 9        A    A naked male subject running in the middle
10    of the roadway, possibly banging on cars.
11        Q    And when you heard that, what was your
12    first thought, your reaction to what that may
13    involve?
14        A    I don't recall what my thought was at the
15    time.  I just was ready to go, ready to drive to it.
16        Q    Other than the man being naked, there was
17    no real report of a violent crime, correct?
18        A    There were several things, I believe
19    several callers.  I can't exactly recall what was
20    said.
21        Q    Okay.  What you heard in the muster room
22    was from the dispatcher, correct?
23        A    Yes.
24        Q    All right.  And do you recall the
25    dispatcher saying anything else while you were in
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

```
                                              Page 39
 1    the muster room other than what you've already told
 2    us that morning?
 3         A    I don't recall.
 4         Q    How long after you heard that report from
 5    the dispatcher did you leave the muster room?
 6         A    Immediately.
 7         Q    And what did you do?
 8         A    We had to -- well, I had to load up my
 9    police car with my paperwork.
10         Q    Okay.  Tell the jurors what you mean by
11    load up the car with paperwork.
12         A    I've got a duty bag.  It's just got
13    general forms we use throughout police work.  And we
14    load that up, traffic vest, rain gear, flashlights.
15         Q    Did you have a taser on your belt that
16    morning?
17         A    I can't recall.
18         Q    Did -- do you recall anything that was
19    said by any of the other officers or the sergeant or
20    anyone else in the muster room that you haven't told
21    us about yet?
22         A    No.
23         Q    Approximately how long would it take from
24    the time you left the muster room until you left the
25    station in your patrol car?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 40

1       **A**     Approximately -- I couldn't give you a
2    timeframe, but maybe five minutes.

3       **Q**     And did you learn anything else about the
4    situation in that five minutes?

5       **A**     I believe we were told he had taken his
6    clothes off and, again, was banging on cars.

7       **Q**     Okay.  And from the time you got in your
8    patrol car until you got to the scene, can you tell
9    us approximately how much time passed?

10      **A**     I can give you an approximate.  Not quite
11   sure of the exact time.  Two to three minutes.

12      **Q**     Okay.  From the time you left the Ferguson
13   Police Department until you got to Marguerite and
14   Henquin?

15      **A**     Yes.

16      **Q**     Two to three minutes?

17      **A**     Yes.

18      **Q**     Did you learn anything new in that two to
19   three minutes that you haven't already told us about
20   other than the man being naked and running in the
21   street, etcetera?

22      **A**     I know we were told something else on the
23   radio, but I'm not -- I'm drawing a blank on it
24   right now.

25      **Q**     Okay.  And I'm talking about what you knew

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 41

1   as you're -- before you got to the scene.

2        **A**    Yes.

3        **Q**    You understand that?

4        **A**    Yes.

5                         (Plaintiff's Deposition Exhibit

6                         17B marked for identification.)

7        **Q**    (By Mr. Dowd) I'm going to give you what's

8   been marked Exhibit 17B and ask you to look at that.

9   And does that appear to be the intersection of

10  Airport and Henquin Road, an aerial view?

11       **A**    Yes.

12       **Q**    Can you draw on that map with a --

13  approximately a one-inch line and an arrow the

14  direction that you came from when you were

15  approaching that scene?  Do you understand my

16  question?

17       **A**    Yes.

18       **Q**    Okay.  You can put it sort of --

19       **A**    What direction I was going or coming from?

20       **Q**    The direction you were coming from and the

21  direction you were going towards.  So you can do it

22  sort of -- yeah, that looks good.

23       **A**    (Witness complied.)

24       **Q**    Okay.  Can you tell us what you wrote

25  there?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                      October 1, 2015

Page 42

1       **A**    Yeah.  I drew a line with an arrow

2   pointing away from Henquin and wrote "coming from,"

3   and then a line going towards Henquin stating

4   "going."

5       **Q**    Okay.  So which arrow indicates where you

6   were -- the direction you were going when you were

7   coming to the scene?

8       **A**    The arrow closest to Henquin is the way I

9   was going.

10      **Q**    Can I see that for one second?  So going,

11  meaning going to the scene?

12      **A**    Yes.

13      **Q**    Okay.  Sometimes when you get these

14  transcripts back it's not clear.  That's why I'm

15  being so redundant.  So you're going westbound on

16  Airport Road, correct?

17      **A**    Yes.

18      **Q**    And how far back were you on Airport Road

19  before you could see Officer Kaminski's patrol car?

20      **A**    That's not easily -- easy to depict,

21  especially looking at this map.  But I would have to

22  approximate five to eight hundred feet.

23                    (Plaintiff's Deposition Exhibit

24                    16B marked for identification.)

25      **Q**    (By Mr. Dowd) Okay.  Let me give you 16B,

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                           October 1, 2015

Page 43

1   please.  Can you also indicate back on Airport Road

2   with an arrow on that exhibit which way you were

3   going, please, or which way you were going to the

4   scene?

5        **A**    (Witness complied.)

6        **Q**    Okay.  And on Exhibit 16B, can you

7   indicate with a number 1 where you believe you were

8   when you were first able to see the corner of

9   Henquin and Airport Road?

10       **A**    You know, there's a hill there, so this

11  won't be an exact location, but it will be kind of

12  close.

13       **Q**    Are you attempting to mark the top of the

14  hill?

15       **A**    Yes.

16       **Q**    So once the hill no longer obstructed your

17  view of the intersection, would you have been able

18  to see that morning Officer Kaminski's vehicle?

19       **A**    Yes.

20       **Q**    And were you able to see Mr. Moore at the

21  same time you could see Officer Kaminski's vehicle?

22       **A**    Not right away.

23       **Q**    Okay.  Approximately how far did you

24  travel before you could see Officer -- excuse me,

25  Mr. Moore?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                             October 1, 2015

Page 44

1        **A**     I would say roughly a hundred feet,

2    approximately -- approximately a hundred feet.

3        **Q**     Okay.  And did you have your emergency

4    lights on at that time?

5        **A**     Yes.

6        **Q**     Did you have your siren on?

7        **A**     I don't recall that.

8        **Q**     What are the policies regarding when you

9    are to have your emergency siren on?

10       **A**     When you have your lights on.

11       **Q**     Okay.  So it's more likely than not that

12   you had your siren on if you had your lights on?

13   That would have been compliant with policies?

14       **A**     Well, I could have.  But sometimes when

15   you get close you turn them off.

16       **Q**     Okay.  And what do you mean by close?  As

17   you came over the hill and saw him you may have

18   turned them off?

19       **A**     Yeah, if you're getting close, you're

20   going to turn it off so you can hear the radio.

21       **Q**     And is that -- do you believe that's

22   likely what happened that morning when you came over

23   the hill and you saw him and turned off your siren?

24       **A**     Yes.

25       **Q**     Did you ever at any time when you were on

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 45

1   route to the scene hear any other officers' sirens?

2      **A**    I don't recall.

3      **Q**    And do you know how long it took you from

4   the top of that hill on Airport Road to get to the

5   intersection of Henquin and Airport and park your

6   patrol car?  Was it less than 30 seconds?

7      **A**    I would give it less than 30 seconds to

8   actually -- when you look at it in person, it's much

9   closer than how it would look on that map.

10     **Q**    And approximately how fast were you

11  traveling?

12     **A**    I couldn't -- I don't recall that.

13     **Q**    Do you recall whether you were -- I'm not

14  asking for exactly, you know, 23 or 43 miles per

15  hour.  But were you in a state of I want to get

16  there in a hurry and maybe exceeded the speed limit

17  to get to backup position?

18          MS. SHAFAIE:  Object to form.  You can

19  answer.

20     **A**    I mean, again, I can't tell you my exact

21  speed.

22     **Q**    (By Mr. Dowd) Okay.

23     **A**    But, you know, you're trying to get there.

24     **Q**    Understood.  Had you heard anything on the

25  dispatch report prior to coming over the hill on

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 46

1    Airport Road going westbound that you haven't

2    already told us about with regard to what was going

3    on at the scene?

4        **A**    All I heard, remember hearing, was that --

5    whether it was Brian calling out that he was with

6    him or dispatch advising that he was there, and

7    that's why I proceeded there.

8        **Q**    Is it possible for an officer to call out

9    and be heard by other officers without going through

10   dispatch?

11       **A**    No.

12       **Q**    Okay.  So I'm not understanding what you

13   meant by you may have learned that he was on the

14   scene by him calling out.  Do you mean --

15       **A**    Calling out on his radio.

16       **Q**    Okay.  So if he calls out on his radio,

17   who hears it?

18       **A**    Officers and dispatch.

19       **Q**    And so what is the point of dispatch if

20   the officers can already hear it?

21       **A**    They're our communicator.  They're our

22   lifeline.

23       **Q**    As far as calling ambulances and things

24   like that?

25       **A**    Yeah.  You know, they relay information,

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 47

 1   especially at the time the radios -- you know, you

 2   might run into a dead spot that you can't hear that

 3   officer, but dispatch can so they relay it to you.

 4       **Q**    They have bigger antennas and better able

 5   to receive signals?  Is that why you think that's

 6   true?

 7       **A**    Well, yes.

 8       **Q**    So when you were -- I can't remember what

 9   you told me.  How far did you say you think you were

10   from Mr. Moore when you first were able to observe

11   him?

12       **A**    From Mr. Moore, anywhere from three to

13   four, maybe five hundred feet.  I mean, I'm just

14   guessing.  I don't -- I never measured that.

15       **Q**    And what position was he in when you first

16   observed him?

17       **A**    He was on the ground.

18       **Q**    Okay.  And were his feet closer to Airport

19   Road or his head?

20       **A**    His feet.

21       **Q**    And was he lying on his stomach or was he

22   lying on his side or was he lying on his back?

23       **A**    He was on his back.

24       **Q**    And can you tell the ladies and gentlemen

25   of the jury where his arms were by demonstrating?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 48

```
 1      A    When I observed him, his arms were kind
 2   of -- he was moving his arms around, kind of
 3   flailing them.
 4      Q    And do you know why he was moving his arms
 5   around like that?
 6      A    I do not exactly.
 7      Q    Have you seen people being tased?
 8      A    Yes.
 9      Q    Have you been tased?
10      A    Yes.
11      Q    Do some people flap their arms around like
12   that when they're tased?
13      A    People are different.  Some do, yes.
14      Q    How far was Officer Kaminski from
15   Mr. Moore when you first observed Mr. Moore and he
16   was shaking his arms like that?
17      A    Approximately five feet.
18      Q    And what was in his hand?
19      A    In Moore's or --
20      Q    Mr. -- you're right, Officer Kaminski's
21   hand.
22      A    His taser.
23      Q    Was there anything in Mr. Moore's hands?
24      A    Not that I saw.
25      Q    Did you ever find anything near Mr. Moore
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 49

```
 1   at the scene?

 2       A    No.

 3       Q    So as you're approaching the scene,

 4   there's not been a report of a weapon, correct?

 5       A    Correct.

 6       Q    There's not been a report of any domestic

 7   violence?

 8       A    Correct.

 9       Q    There's not been a report of any violent

10   crime against any person, correct?

11       A    Just that he was jumping and hitting on

12   cars.

13       Q    Okay.  But other than that, there's no

14   reports of violence against a person, that he had

15   injured anyone, correct?

16       A    Correct.

17       Q    Did you know who the gentleman was that

18   Officer Kaminski was tasing?

19       A    Not until after the fact.

20       Q    So he wasn't a suspected criminal at the

21   time you were approaching the scene?  What I mean by

22   that is somebody who had been coming from an armed

23   robbery or running from a burglary scene, correct?

24       A    Nothing that we were described.

25       Q    And nothing that you learned later,
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                               October 1, 2015

Page 50

1   correct?

2        **A**     Correct.

3        **Q**     So as you're approaching the scene, you

4   have a naked gentleman on the ground with Officer

5   Kaminski standing approximately five feet from him

6   with a taser in Officer Kaminski's hand and possibly

7   Mr. Moore, from your observation, being tased at

8   that time, correct?

9        **A**     Yes.

10       **Q**     Do you know how many more times Officer

11  Kaminski tased Mr. Moore from that point forward?

12       **A**     One.

13       **Q**     So as you were coming over the hill and

14  you turned off your siren and you were three to four

15  to five hundred feet from the scene, it's your

16  belief that Mr. Moore was being tased for the second

17  time?

18       **A**     Yes.

19       **Q**     And he was on his back?

20       **A**     Yes.

21       **Q**     Did you observe him change positions?

22       **A**     When I was approximately, I'd say, two

23  hundred feet from Brian getting ready to --

24       **Q**     I'm sorry, I didn't hear what you said.

25  Two feet?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 51

 1      **A**     Two hundred -- roughly a hundred to two

 2   hundred feet away from Brian.  I was slowing down

 3   getting ready to come to a stop.  I could see

 4   Mr. Moore attempting to get up off the ground.

 5      **Q**     Okay.  And if he was -- from his back he

 6   was attempting to get up?

 7      **A**     Yes.  I was trying to lean up off the

 8   ground.

 9      **Q**     Okay.  Sort of do a sit up?

10      **A**     Yes.

11      **Q**     Okay.  Did he have his hands behind his

12   back pushing himself up?

13      **A**     No.  His hands were still --

14      **Q**     Still waving?

15      **A**     Yeah.

16      **Q**     Did his -- what was his next position as

17   he was attempting to sit up?

18      **A**     He went back down to the ground.

19      **Q**     On his back?

20      **A**     Yes.

21      **Q**     And approximately how close to him were

22   you when he went back down on his back?

23      **A**     At that point, probably -- I mean, I was

24   already coming to a stop, so 20 to 50 feet.

25      **Q**     Okay.  Can you indicate on Exhibit 17B

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 52

1   where you parked your car by drawing a box where

2   your car was, please?

3        **A**    On which one?

4        **Q**    17B, please.

5        **A**    It's going to be an approximate.  I can't

6   recall exactly how I parked my car that day.  You

7   said a box, sir?  A box, sir?

8        **Q**    Yes, sir.

9        **A**    (Witness complied.)

10       **Q**    Okay.  And if you could draw an arrow

11  inside that box that would show which way your car

12  was facing when you parked it.

13       **A**    (Witness complied.)

14       **Q**    And would you mind putting your initials

15  next to that, please?

16       **A**    (Witness complied.)

17       **Q**    Were your emergency lights still on as you

18  pulled up?

19       **A**    At that point, I don't recall.

20       **Q**    Did you do anything from the time you

21  brought your patrol car to a stop until you got out?

22       **A**    No.

23       **Q**    Okay.  Did you report to the dispatcher

24  that you were on scene at any point prior to getting

25  out of your car?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                      October 1, 2015

Page 53

1      **A**    I don't recall exactly telling them I was
2   on scene.
3      **Q**    Is that something that would be in the CAD
4   transcript?
5      **A**    Yes, if they --
6      **Q**    If you reported it?
7      **A**    If I did, they should have put that in
8   there.
9      **Q**    As you're exiting your patrol car, what
10  were you able to observe about Mr. Moore?  What
11  position was he in?
12     **A**    He was attempting to get back off the
13  ground.
14     **Q**    Okay.  Did you say anything to Officer
15  Kaminski as you were exiting your vehicle?
16     **A**    I did not.  He was at that point yelling
17  at Mr. Moore to stay down.
18     **Q**    Okay.  Did you make any eye contact with
19  Officer Kaminski?
20     **A**    I don't recall eye contact.
21     **Q**    Do you recall at any time as you were
22  approaching the scene Officer Kaminski turning and
23  looking towards your patrol car?
24     **A**    I recall when I was coming over the hill
25  that he was trying to call out on his radio and I

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 54

1   thought he was looking back.  But he might have just
2   been turned.
3        **Q**    Okay.  Is there any other time from the
4   time you first saw Officer Kaminski until you got
5   out of your patrol car that you believe he would
6   have known you were there?
7        **A**    I'm assuming he knew I was there, but I
8   can't definitely tell you that.
9        **Q**    Between the sound of the siren, the
10  lights, and your sound that your patrol car makes as
11  you're coming to the scene and parking it, you
12  assume he knew you were there?
13       **A**    One would assume that, yes.
14       **Q**    Fair assumption?
15       **A**    Yes.
16       **Q**    Is -- as you're exiting your vehicle, what
17  position was Mr. Moore in at that time?
18       **A**    When I was exiting the vehicle he was
19  trying to come back off the ground.
20       **Q**    All right.  Sit up again?
21       **A**    Yes.
22       **Q**    Okay.  And were you able to observe
23  Officer Kaminski's taser?
24       **A**    I don't recall looking exactly at his
25  taser.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                               October 1, 2015

```
                                              Page 55

   1      Q    Okay.  Were you able to see the wires?

   2      A    Yes.

   3      Q    And you could see the probes as you were

   4   getting -- after you got out of your vehicle?

   5      A    You can't really see the probes right

   6   off -- I mean, that's something you see afterwards.

   7   They're kind of small.  It's hard to tell where

   8   they're at.

   9      Q    Okay.  But you could see the wires, right?

  10      A    Yes.

  11      Q    And you could see which direction the

  12   wires were going, right?

  13      A    Yes.

  14      Q    And you knew that they weren't going

  15   towards his lower leg, correct?

  16      A    Again, the taser cartridge we use -- or --

  17   I believe they're up to 25 feet.  You know, so those

  18   wires when you're that close, they're hanging.  And,

  19   you know, they could have been tangled, they could

  20   have been moved.  So I mean, when you -- when you

  21   pull up and you see the wires, you can't tell

  22   exactly where someone's being -- where the prongs

  23   are.

  24      Q    Okay.

  25      A    You can't tell that.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 56

1      **Q**    So depending on the length of the

2   particular taser wires, they may not be in a

3   straight line is what you're saying?

4      **A**    Yes.

5      **Q**    How close were you to Mr. Moore when you

6   were first able to observe the taser prongs in his

7   chest?

8      **A**    I don't recall seeing the taser prongs

9   until after he was rolled over.

10     **Q**    Okay.  So it's your testimony that the

11  first time you saw the taser prongs that morning was

12  when Mr. Moore was rolled over about the time you

13  realized he couldn't breathe?

14     **A**    Yes.

15     **Q**    You described earlier that the officers --

16  excuse me, let me start over.  You described earlier

17  that Mr. Moore's arms were shaking as he tried to

18  sit up when you first observed him, correct?

19     **A**    Yes.

20     **Q**    And then he went back down on his back.

21  Is that correct?

22     **A**    Yes.

23     **Q**    As he went back down on his back, did his

24  arms stop shaking out in front of him?

25     **A**    I don't recall at that point what the arms

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 57

1   were doing.

2       **Q**    Okay.  Are you able -- generally able from

3   your training and your experience to know when a

4   person is being effectively tased?

5       **A**    One can assume when you see it.  But

6   again, different people have different reactions to

7   it, so --

8       **Q**    What are the kind of things you base your

9   assumption on?  Is there a noise or an observation?

10      **A**    Generally when people are being tased

11  they're kind of locked out and they might be shaking

12  a little bit.  But when you pull up and you see the

13  taser wires and the officer's got the taser out, I

14  mean, you assume they're being tased, especially

15  since they're on the ground.  But was he actually

16  giving him a cycle at that point?  I don't know.

17      **Q**    Does the taser, when it's properly making

18  contact, make any kind of a sound when you pull the

19  trigger?

20      **A**    If you're close enough you can hear the --

21  kind of the tick, tick, tick, tick kind of a noise,

22  like the spark.

23      **Q**    And when's the first time, if ever, you

24  heard that from Mr. -- Officer Kaminski's taser that

25  morning?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

```
                                                        Page 58
   1        A     I don't remember hearing it at all.

   2        Q     Tell us approximately how far you were

   3   from Mr. Moore when you exited your patrol vehicle.

   4        A     Anywhere from 15 to 20 feet.

   5        Q     Okay.  Would you mind marking on

   6   Exhibit 17B where Mr. Moore was?  And if you

   7   could -- you can just do a circle.

   8        A     (Witness complied.)  I'm going to write

   9   "Moore" next to it.

  10        Q     All right.  Could you also put a -- why

  11   don't you put a 2 next to Mr. Moore's name and put a

  12   1 by your vehicle, if you would, please, since

  13   that's the order I think you entered those.

  14        A     (Witness complied.)

  15        Q     And where was Officer Kaminski when you

  16   exited your vehicle.

  17        A     (Witness indicated.)  This is just a

  18   guesstimate.  Obviously in this parking lot.  I

  19   can't tell you exact feet, but I'll write "Kaminski"

  20   underneath that one.  You want me to put a 3 next to

  21   that?

  22        Q     Yes, sir.

  23        A     (Witness complied.)

  24        Q     As you were -- you exited your vehicle,

  25   where did you go?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 59

1      **A**    I ran -- I went up immediately towards
2  Mr. Moore.
3      **Q**    Okay.  And what did you do when you got
4  there?
5      **A**    When I got out and I was going up towards
6  him, he was trying to get back up.  Brian, Officer
7  Kaminski, administered another cycle to Mr. Moore.
8  And that's when I handcuffed him.
9      **Q**    Okay.  And do you recall when you
10  handcuffed him, was he still in the -- on his back
11  when you began handcuffing him?
12      **A**    No.  I had -- I can't tell you which arm I
13  grabbed, but I grabbed an arm, rolled him over onto
14  his stomach, and brought his hands behind his back
15  and cuffed him.
16      **Q**    Okay.  And were you able to do that
17  relatively quickly?
18      **A**    Yeah, it was very quickly.
19      **Q**    Okay.  And why do you think that was?
20      **A**    I believe because he was under power from
21  the taser.
22      **Q**    So he didn't -- he wasn't resisting your
23  handcuffing at that point?
24      **A**    No.
25      **Q**    From your taser training, is it easy to

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                            October 1, 2015

Page 60

1    comply with instructions to move your body in a

2    certain way while you're under the power of the

3    taser electricity?

4          MS. SHAFAIE:  Object to form.  You can

5    answer.

6      **Q**    (By Mr. Dowd) What's your experience?

7      **A**    You know, it's -- again, it's different

8    for different people.  You know, some people it

9    doesn't even affect.  But, you know, generally your

10   muscles kind of tense up.  And at that point, that's

11   when it's easier for us, you're not resisting, to

12   try to handcuff you.

13     **Q**    Okay.  So you think it took two or three

14   seconds to handcuff him?

15     **A**    I can't give you a timeframe, but it was

16   relatively quickly.

17     **Q**    And how long do you believe Officer

18   Kaminski was tasing him while you were handcuffing

19   him?

20     **A**    I mean, I -- he was under, under it while

21   I was cuffing him.  And I'm assuming -- I'm not

22   sure.  He stopped after he was cuffed.

23     **Q**    And so Mr. Moore was on his face at the

24   end of the cuffing process?

25     **A**    He was on his stomach.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 61

 1      **Q**    On his stomach.  Which way was his face
 2   facing?  Was it facing towards Officer Kaminski or
 3   away?
 4      **A**    I couldn't tell you which way his face was
 5   facing at that point.
 6      **Q**    So you don't recall either way?
 7      **A**    I don't recall that, no.
 8      **Q**    Did Mr. Moore, to your recollection, ever
 9   move his face or head?  Did he move from one side to
10   the other so his --
11      **A**    No.
12      **Q**    -- face was looking a different direction?
13      **A**    I don't recall after handcuffing him
14   moving his head.
15      **Q**    Okay.  Do you recall him moving at all
16   after you completed the handcuffing?
17      **A**    No.
18      **Q**    What did you do -- did you have to get
19   down on one knee to finish the handcuffing?
20      **A**    I was down on one or both.  Yeah, I had to
21   go down.
22      **Q**    And how big a man are you, sir?
23      **A**    6' 5".
24      **Q**    Okay.  And how much do you weigh?
25      **A**    I am now 260.  At that time, I was 220.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 62

1     **Q**     Okay.  Approximately how much time passed

2     before you looked back down and saw that Mr. Moore

3     was not breathing?

4     **A**     It was relatively quickly.  The way I'd

5     put it is, you know, when something like that

6     happens, I cuffed him, I looked up at Brian and

7     said, hey, man, are you okay, everything all right?

8     Briefly, yeah, I'm fine.  Then I looked back down.

9     I'm like, hey man, what's your name?  And that's

10    when I realized -- when I got no response, I

11    realized something was wrong.

12    **Q**     So just a few seconds for you to check on

13    Officer Kaminski and then ask him his name?

14    **A**     You know, I say anywhere -- it could be

15    from a few seconds, it could have been approximately

16    a minute, you know, the exact timeframe.  But it was

17    just a brief conversation with me and Brian.

18    **Q**     So you think it may have been as long as a

19    minute before you checked on the suspect who was

20    handcuffed facedown?

21    **A**     It could have been.

22    **Q**     Did you ever put your knee in his back?

23    **A**     I didn't have to, no.

24    **Q**     Do you know what positional asphyxiation

25    is?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 63

 1       **A**    Yes.

 2       **Q**    Tell the jury your understanding.

 3       **A**    You know, I don't know the exact

 4    terminology of it.  But from my experience, it's

 5    been with generally larger male subjects that have

 6    trouble breathing when you handcuff them behind

 7    their back.

 8       **Q**    Did you make any call outs after the

 9    handcuffing but before noticing Mr. Moore not

10    breathing?

11            MS. SHAFAIE:  Object to form.  You can

12    answer.

13       **Q**    (By Mr. Dowd) Do you understand my

14    question?  When I say call out, I mean call the

15    dispatcher or --

16       **A**    I don't recall exactly who did, but you --

17    somebody called out that he was in custody.

18       **Q**    Okay.  And this -- at that time it would

19    have been you or Officer Kaminski, correct?

20       **A**    Yes.

21       **Q**    Okay.  How long before anyone else arrived

22    at the scene?

23       **A**    People were arriving during the

24    handcuffing.  I'm assuming a little bit of time

25    after that.  My back was kind of turned to them, so

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 64

 1    I didn't see who arrived when.

 2        **Q**    Okay.  Do you remember Chief -- excuse me,

 3    Lieutenant Ballard arriving at the scene?

 4        **A**    I remember him being there.  I don't

 5    remember him arriving.

 6        **Q**    Okay.  And you remember Officer Bebe being

 7    at the scene?

 8        **A**    Yes.

 9        **Q**    You don't know which arrived first?

10        **A**    I do not.

11        **Q**    Okay.  Do you recall what Officer Bebe

12    said when he arrived at the scene?

13        **A**    Not what was said, no.

14        **Q**    Okay.  What did he do?

15        **A**    When I remember seeing Officer Bebe is

16    when I realized Mr. Moore wasn't breathing.

17    Unhandcuffed Moore, rolled him over.  I believe it

18    was Bebe checked for a pulse and then started chest

19    compressions.

20        **Q**    Okay.  Did you make any radio dispatches

21    or radio call outs once you realized he wasn't

22    breathing?

23        **A**    We had -- or I had asked for the ambulance

24    to step it up because he wasn't breathing.

25        **Q**    Okay.  How much time do you think passed

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                        October 1, 2015

Page 65

 1  from the time, assuming that you called out when you

 2  were parking your patrol car, until the time that

 3  you would have called out to ask the EMTs to

 4  expedite?

 5      **A**    It happened so quick.  I almost want to

 6  say two minutes.  I mean, it all happened really

 7  quick.

 8      **Q**    Okay.  And the same question, as best you

 9  can -- let me ask it this way.  How much time do you

10  think passed from the first time an ambulance was

11  called until the call to expedite was made?

12      **A**    Thirty seconds to a minute.  I mean, it

13  was really fast.

14      **Q**    Okay.  So was a call made for the EMT and

15  supervisor right after the handcuffing was

16  completed?

17      **A**    Yes.

18      **Q**    And then the call to expedite occurred

19  immediately after you realized he wasn't breathing?

20      **A**    Yes.

21      **Q**    You guys work with the Christian Northeast

22  Ambulance?

23      **A**    They -- they're the ones that are

24  dispatched.

25      **Q**    And do you work with them on a regular

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                      October 1, 2015

Page 66

1   basis?

2       **A**    You see them from time to time.  I

3   wouldn't say we generally work with them, but yes --

4       **Q**    Does somebody -- does some other ambulance

5   service come if you call for an ambulance through

6   your dispatcher?

7       **A**    We have had one other come sometimes.

8       **Q**    And who is that?

9       **A**    Abbott.

10      **Q**    Is there -- to your knowledge, who was the

11  communications officer at that time?

12      **A**    I don't remember.

13      **Q**    Do you know, is there any attempt to

14  synchronize the clocks at the dispatcher for the CAD

15  transcript and the ambulance timing?

16      **A**    I don't -- I don't think they are.  I

17  don't know.

18      **Q**    Are you aware of any relationship between

19  those two?

20      **A**    No.

21      **Q**    So after you stand up from putting the

22  handcuffs on Mr. Moore -- relatively quickly you're

23  able to get the handcuffs on, right?

24      **A**    Yes.

25      **Q**    You stand up, you check on Officer

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                           October 1, 2015

                                                         Page 67

 1    Kaminski's status, one of you calls for an

 2    ambulance.  Then you noticed that Mr. Moore is not

 3    breathing when you asked him his name, correct?

 4        **A**    Correct.

 5        **Q**    And what did you do next?

 6        **A**    He was immediately unhandcuffed, rolled

 7    over onto his back, and that's when Bebe checked for

 8    a pulse and started chest suppressions.

 9        **Q**    Okay.  Any mouth-to-mouth resuscitation

10    given to the gentleman?

11        **A**    No.

12        **Q**    Were the chest compressions then given

13    continuously until the ambulance arrived?

14        **A**    We did not stop until they got there and

15    then they took over.

16        **Q**    All right.  So there was never a time he

17    wasn't receiving chest compressions to your

18    knowledge?

19        **A**    Exactly, wasn't.

20        **Q**    Approximately how long until the EMT

21    arrived and took over chest compressions?

22        **A**    The timing, I can't be exact.  Five to six

23    minutes maybe.

24        **Q**    Okay.  And what did you observe them do

25    when they arrived at the scene?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                              October 1, 2015

Page 68

1      **A**     They took over.  They had their equipment.

2   They continued with the chest compressions.  I think

3   I saw one of those airbags.

4      **Q**     Okay.  Did they attempt any defibrillation

5   at the scene to your knowledge?

6      **A**     I don't recall.

7      **Q**     You didn't see them with paddles, you

8   know, giving him a defibrillator shock?

9      **A**     I don't recall seeing that.

10      **Q**     Did you see them put any electrode type

11   pads on him at any time at the scene?

12      **A**     I don't recall that.

13      **Q**     You don't recall either way?

14      **A**     No.

15      **Q**     Approximately how long were they on the

16   scene before they got him in the back of ambulance?

17      **A**     You know, timing, a minute, two minutes.

18   I mean --

19      **Q**     Two minutes max?

20      **A**     They were there pretty quick.

21      **Q**     Did you go to the back of the ambulance

22   and observe anything they did in the back of the

23   ambulance?

24      **A**     I looked in and just saw them still doing

25   chest compressions --

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 69

```
 1         Q     Okay.

 2         A     -- and their bag.  But there's some many

 3    people in there, I couldn't see much.

 4         Q     Okay.  They're blocking your view?

 5         A     Yes.

 6               MR. DOWD:  Can we go off the record for a

 7    second?

 8               MS. SHAFAIE:  Sure.

 9               VIDEOGRAPHER:  Off the record at 10:39.

10               (Off the record.)

11               VIDEOGRAPHER:  Back on the record at

12    10:47.

13         Q     (By Mr. Dowd) When you were approaching

14    the scene in September of 2011 and based on

15    everything you had heard to that point before you

16    got out of your squad car, do you believe and did

17    you appreciate that Mr. Moore was likely a person

18    who was in a -- either an emotional crisis, personal

19    crisis, or some kind of a mental health issue?

20         A     There wasn't enough information to assume

21    that.

22         Q     Okay.  Is that based on your subsequent

23    training?

24         A     No.  I mean, it's just based on years of

25    experience that there's not enough information there
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                              October 1, 2015

Page 70

1    to assume what is going on.

2        **Q**    And we talked earlier about -- there is a

3    difference as a peace officer when dealing with

4    somebody who's a criminal suspect as opposed to a

5    person in emotional distress or personal crisis,

6    correct?

7        **A**    There is a difference, yes.

8        **Q**    And as far as Mr. Moore's crimes that you

9    were aware of at that time, it was indecent exposure

10   and possibly pushing on cars?

11       **A**    Possibly property damage, yes.

12       **Q**    But other than that, there was no report

13   of a weapon or injury or property damage, any

14   persons injured, correct?

15       **A**    Nobody injured.

16       **Q**    And the gentleman just unarmed, naked.

17   Did you assume that he was more likely a person in

18   personal crisis or emotional distress than a violent

19   criminal suspect when you were approaching the scene

20   that morning?

21       **A**    There's many assumptions that could be

22   made.  There's not enough there to determine that.

23   One could also assume that he could have been on a

24   narcotic.  But you don't make assumptions based on

25   information you don't have.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

```
                                                      Page 71
    1        Q    The information you did have is that he
    2   was unarmed, naked, running in the street, correct?
    3        A    The information we were given was that he
    4   was naked, possibly jumping and banging on cars in
    5   the street.
    6        Q    Possibly jumping.  What does that mean?
    7        A    Well, as it sounds, possibly jumping on
    8   cars.
    9        Q    Oh, jumping on cars?
   10        A    Yes.
   11        Q    Okay.  And is that -- where did you -- you
   12   heard that that morning that he was jumping on cars?
   13        A    Yeah.
   14        Q    Okay.  Is that something you put in your
   15   report?
   16        A    I didn't write the original report, but --
   17   I don't recall what I wrote.
   18        Q    That just the first time I've heard that
   19   this morning that he was jumping on cars.
   20        A    I said it earlier.
   21        Q    Okay.  And where did you learn that
   22   information?
   23        A    It was through the radio.
   24        Q    From the dispatcher?
   25        A    Yes.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 72

1       **Q**    That would be considered -- being naked

2    and jumping on cars would be considered erratic

3    behavior, wouldn't it?

4       **A**    Yes.

5       **Q**    But you would agree that both you and

6    Officer Kaminski likely knew he wasn't a serious

7    criminal suspect as you were approaching the scene?

8            MS. SHAFAIE:  Object to form.  You can

9    answer.

10      **Q**    (By Mr. Dowd) As far as yourself.  Let me

11   rephrase the question.

12      **A**    I'm not going to agree to that.  We deal

13   with people on a day-to-day basis.  You could run

14   into somebody and at that point not know what they

15   might have previously done.

16      **Q**    Understood.  But based on what you know,

17   as you previously testified, as you approached the

18   scene he did not appear to be, a fair assumption of

19   the basis of the facts, did not appear to be fleeing

20   from a serious criminal scene, correct?

21      **A**    The facts that they were --

22           MS. SHAFAIE:  Sorry, form.  You can

23   answer.

24      **A**    With the facts we were given, we were not

25   told of a serious felony crime that he was fleeing

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 73

1   from.

2       **Q**    (By Mr. Dowd) As you were approaching the

3   scene in your vehicle going westbound on Airport

4   Road, did any cars have to pull over to get out of

5   your way?

6       **A**    I don't remember a car pulling over, but I

7   did talk to one.

8       **Q**    Okay.  Who was that?

9       **A**    I wasn't able to get their identity.  They

10  left before I could find them.

11      **Q**    But as you're traveling westbound towards

12  the scene from the station, is that the direction

13  you were coming from?

14      **A**    From the station.

15      **Q**    Did you -- you had your emergency lights

16  on at some point, correct?

17      **A**    Yes.

18      **Q**    All right.  Approximately how long after

19  you left the station had you turned on your

20  emergency lights?

21      **A**    I couldn't tell you exactly.

22      **Q**    Okay.  What I'm asking is, as you were

23  approaching the scene, coming up towards the hill

24  and over had the hill, were there cars that were

25  having to pull over to get out of your way at

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                October 1, 2015

Page 74

1    6:30 a.m. on that Saturday morning?  Do you recall

2    any?

3        A    Traffic was very, very light.  I don't

4    recall what cars were there.

5        Q    Okay.  That's pretty consistent with most

6    Saturday mornings at 6:30 a.m. on Airport Road,

7    right?

8        A    Yes.

9        Q    So you don't recall as you were traveling

10   westbound cars in both lanes having to pull over to

11   get out of your way, correct?

12       A    I don't recall a lot of cars at all.

13       Q    Okay.  Same -- you're talking about both

14   directions when you say you don't recall a lot of

15   cars at all, eastbound and westbound, not many cars?

16       A    The direction that I'm going, I don't

17   recall a lot of cars.

18       Q    And do you have any recollection of the

19   eastbound?

20       A    No.

21       Q    Was that light traffic also to your

22   recollection?

23       A    I have no recollection of that.

24       Q    Okay.  In your subsequent deescalation

25   training and your CIT training, crisis intervention

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                        October 1, 2015

Page 75

1    training, if you do believe a person may be in

2    personal crisis or emotional distress, what are some

3    of the techniques you would use when you arrived at

4    a scene where the person was standing still or

5    static?

6         A    If they're standing still and static

7    and -- it's a lot of talking, trying to understand,

8    listen to them, have them tell you what's wrong,

9    have them possibly tell you their diagnosis, get

10   enough information to relay to a paramedic who's

11   going to show up so they understand as well what's

12   going on.

13        Q    All right.  Is it -- part of the force

14   continuum includes command -- excuse me, officer

15   presence on the scene, soft voice, correct?

16             MS. SHAFAIE:  Object to foundation.  You

17   can answer.

18        A    Officer presence.

19        Q    (By Mr. Dowd) All right.  Do you know what

20   soft voice means?

21        A    Well, yeah.

22        Q    Okay.  Tell the jury what that means.

23        A    Just like me and you are talking.

24        Q    Okay.

25        A    Just general conversation.  You're not

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                           October 1, 2015

Page 76

1    yelling.

2         **Q**    Right.  A calm, low voice?

3         **A**    Yes.

4         **Q**    And why do you think that's beneficial at

5    a scene with someone in personal crisis?

6         **A**    So they know you're not agitated.  They

7    can trust that you're calm.  And it will bring them

8    down knowing you're not there to yell at them.

9         **Q**    And it's also a good way to get

10   information from them?

11        **A**    Yes.  They're more willing to talk to you

12   when you're talking to them normal like this.

13        **Q**    And have you had experience in your career

14   dealing with people who are in personal crisis or

15   emotional distress?  We talked about it a little bit

16   earlier?  And have those techniques been successful?

17        **A**    Oh, yes.

18        **Q**    The department, Ferguson Police

19   Department, has a -- has policies on report writing,

20   correct?

21        **A**    Yes.

22        **Q**    And you guys are required to write reports

23   as accurately as possible?

24        **A**    Yes.

25        **Q**    And as truthfully as possible?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 77

    1        **A**    Yes.

    2        **Q**    And as complete as possible?

    3        **A**    Yes.

    4        **Q**    And is that what you did when you wrote

    5    your report in this case?

    6        **A**    Yes.

    7        **Q**    Why is it important for officers to write

    8    complete, truthful and accurate reports?

    9        **A**    You want the complete documentation of

   10    events, you know, for court, for anything.  And

   11    also, in case you have to go back and review it, you

   12    want to be able to know exactly what happened.

   13        **Q**    Okay.

   14        **A**    You want the families to know exactly what

   15    happened, the victims to know exactly what happened.

   16        **Q**    And the command, Ferguson Police command,

   17    to know exactly what happened?

   18        **A**    Yes.

   19        **Q**    I'm going to give you what's been marked

   20    Exhibit 12 in this matter.  Would you page through

   21    that?  You said you reviewed your portion of the

   22    report this morning.  Is that included in there?

   23        **A**    Yes, it's in here.

   24        **Q**    Okay.  And you see at the bottom there's a

   25    number, a Ferguson number.  What page is that in

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                              October 1, 2015

Page 78

```
 1    Exhibit 12, please?
 2         A    It's Ferguson 0006.
 3         Q    Okay.
 4         A    And 0007.
 5         Q    Did you write any other portions of
 6    Exhibit 12?
 7         A    I did not.
 8         Q    Did you review prior to your deposition
 9    today any other portions of Exhibit 12?
10         A    I did not.
11         Q    If you would look at the previous page,
12    Ferguson 0005.  Is that -- that's sort of a
13    computer-generated portion of your report?
14         A    Yes.
15         Q    Did you input any of this information --
16    what I mean by input, did you actually type into a
17    computer this information, or did this come from the
18    CAD?
19         A    No, at the time, we typed our reports into
20    like Microsoft Word and forwarded it to the clerks
21    who typed it in for us.  So this front page right
22    here would have been inputted by them.
23         Q    Okay.  And when you say the clerks, do
24    they have an officer position or are they civilians?
25         A    Civilians.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 79

1      **Q**    So at the top left of page 5 of 11 of

2  Exhibit 12, it says, current case status,

3  exceptionally cleared.  Do you know what that means?

4      **A**    Yeah.  Exceptionally cleared is something

5  we use -- like you have a suspect or you have a

6  suspect in custody, and this is just an example, and

7  say you haven't gone and got a warrant on them yet.

8  That's something like I would attribute

9  exceptionally clear to.

10     **Q**    Okay.  So it's clear, but there's an

11  exception?

12     **A**    Yes.

13     **Q**    Okay.  What was the exception in this

14  case?

15     **A**    I don't know why they classified it as

16  exceptionally clear.

17     **Q**    It shows, the next line, date and time of

18  investigation, September 16th, 2011 at 6:46, Friday.

19  Do you see that?

20     **A**    Which part are we talking about?

21     **Q**    Right under the current -- right under the

22  exceptionally cleared.

23     **A**    Okay.

24     **Q**    Is that an inaccurate date?  That

25  investigation didn't start the day before the

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

                                                        Page 80

 1    incident, did it?

 2        **A**    No.  I don't know why that's in there.

 3        **Q**    So the next is the -- next box is original

 4    offense.  Do you see that?

 5        **A**    Yes.

 6        **Q**    It says assault third slash indecent

 7    exposure?

 8        **A**    Yes.

 9        **Q**    The assault third is a mandatory charge

10    when an officer uses his taser to stop a suspect,

11    correct?

12        **A**    It's not a mandatory charge, but --

13        **Q**    You have to charge him with something

14    because you used that level of force?

15        **A**    Yes.

16        **Q**    So was the assault the beating on the cars

17    or was it charging Officer Kaminski to your

18    understanding?

19        **A**    I don't know.  To my knowledge, it was the

20    charging of Officer Kaminski.

21        **Q**    Okay.  Indecent exposure was the fact that

22    he was naked, correct?

23        **A**    Correct.

24        **Q**    And if a person was to have dementia or

25    Alzheimer's, was to come out of their house naked,

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 81

1    they wouldn't normally be charged with indecent

2    exposure, would they?

3              MS. SHAFAIE:  Objected to form.  You can

4    answer.

5       **A**    You know, every situation is different,

6    sir.  This situation, it was noted like that because

7    he was naked.  You just go by different situations

8    and what's happening.

9       **Q**    (By Mr. Dowd) And I'm not criticizing

10   that.  I'm just asking in general.  As you say,

11   every situation is different.  I'm trying to give an

12   example of another situation, and that is, that if

13   someone would call and say my 90-year-old neighbor

14   is walking down the street naked, you would go to

15   that person, assuming that's a person having mental

16   issues or personal crisis, and get them help.  And

17   you wouldn't charge them with indecent exposure,

18   would you?

19             MS. SHAFAIE:  Form.  You can answer.

20      **A**    Again, the situations are different.

21      **Q**    (By Mr. Dowd) I know.  I'm giving you --

22      **A**    Most of the time you're writing a --

23   you're writing a report just like was done here and

24   you have to classify that report as something.  So

25   yes, if a 90-year-old man is walking down the

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                        October 1, 2015

Page 82

1   street, you're going to classify it as an indecent

2   exposure and a report is going to be made,

3   documentation, just like this is here.

4        **Q**     But he's not likely to be charged formally

5   by the department or by the prosecutor with indecent

6   exposure, is he?

7            MS. SHAFAIE:  Form.  You can answer.

8        **A**     I don't have any control over that.  I

9   write my report.  They -- they do their thing.

10       **Q**     (By Mr. Dowd) I'm not asking about your

11  control.  I'm asking about your experience.  You

12  wouldn't expect that to happen, would you?

13       **A**     It's happened before.

14       **Q**     Okay.  On repeated offenders or first time

15  offenders?

16       **A**     Again, I don't know about previous

17  offenders or first time offenders.  But I've seen

18  it.  I've seen it done.

19       **Q**     All right.  So then it says the nature,

20  indecent act.  Does that just go back to the fact he

21  was naked in public?

22       **A**     Yes.

23       **Q**     Okay.  Down -- the next line below nature,

24  it says date slash time of arrival, and that's

25  blank.  Do you see that?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 83

1     **A**    Yes.

2     **Q**    Do you know why that's blank?

3     **A**    I do not.  Again, they -- they input this

4     portion of it.

5     **Q**    Okay.  Is it possible that you didn't

6     report your exact time of arrival at the scene and

7     that's why that's blank?  Is that one explanation, I

8     mean, by possible?

9     **A**    I think I recovered earlier I can't recall

10    if I called out exactly what time I arrived.

11    **Q**    Okay.  I'm really just trying to

12    understand this --

13    **A**    Yeah.

14    **Q**    -- form and the abbreviations.  I'm not --

15    so underneath it, it says COGIS, C-O-G-I-S, all

16    caps, correct?

17    **A**    Yes.

18    **Q**    1450.  Do you know what that means?

19    **A**    Yeah.  Every area is divided into that

20    COGIS.  I can't give you the exact acronym for it.

21    But that area just happened to be 145.

22    **Q**    What does that mean?  Is that one of these

23    four districts we talked about earlier?

24    **A**    No.  COGIS is -- I wish I could give you a

25    better description of it.  But like part of that

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 84

 1   area was in COGIS 145.  There could have been one or
 2   two other COGISes in that beat, but that's just what
 3   that one was.
 4        **Q**    All right.  If you go down a little
 5   further, it says -- I believe the box says response
 6   location.  Do you see that, street, and then under
 7   that it says street address?
 8        **A**    Uh-huh.
 9        **Q**    It says North Marguerite at Airport Road.
10   Do you see that?
11        **A**    Yes.
12        **Q**    What does that mean if this incident
13   happened at Airport and Henquin?
14        **A**    Response location -- this was -- the calls
15   were coming out that it was occurring at North
16   Marguerite and Airport.
17        **Q**    Initially?
18        **A**    Initially.
19        **Q**    Gotcha.
20        **A**    He wasn't located until Henquin.
21        **Q**    So if you go down two boxes, my copy is
22   hopefully -- hopefully your box is clearer.  I think
23   it says documents detail right under the word area
24   code?
25        **A**    Occurrence detail.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 85

1       **Q**     Occurrence detail, thank you.  And then it
2   says date slash time from.  Do you see that?
3       **A**     Yes.
4       **Q**     And 09/17/2011, 6:46, Saturday.  What does
5   that mean?
6       **A**     6:46 a.m.
7       **Q**     What occurred at that time?
8       **A**     That would be the time the call came in.
9   I believe that would be the time the call came in.
10      **Q**     So that would put us -- that's where you
11  would have been at the muster room approximately?
12      **A**     Or that could have been a time of arrival.
13  I don't -- I can't say for sure because I didn't put
14  that in there.
15      **Q**     Okay.  But you look at these kind of
16  reports routinely if you have to testify or have any
17  follow-up?
18      **A**     I generally review -- like if it's a
19  supplement, I review my narrative because you rely
20  on the original report to be accurate as far as the
21  time.  As an officer, when you look at it, you rely
22  on that to be accurate.
23      **Q**     So what's your best understanding as to
24  what that time means there?
25      **A**     At this point, I don't --

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

---

                                                          Page 86

 1       **Q**    Okay.

 2       **A**    I don't know what to tell you.

 3       **Q**    All right.  The next -- right up on that

 4  same line, it says date slash time to.  And it's

 5  September 17, 2011, 6:50, Saturday, correct?

 6       **A**    Yes.

 7       **Q**    And can you tell us what your

 8  understanding of what that means?

 9       **A**    Well, the date from and to would really be

10  from when it started to when the incident ended.

11  That's what it understands to me.

12       **Q**    Okay.

13       **A**    Now, the exact times here, again, were put

14  in by somebody else, not by me.

15       **Q**    The -- is that the person that entered it?

16  It says, date/time entered and entered by Kay

17  Ermerling?

18       **A**    She's the one that would have entered it,

19  yes.

20       **Q**    And under that it says final approval,

21  Harry Dilworth, 09/30/11 at 4:09 on Friday.  Do you

22  see that?

23       **A**    Yes.

24       **Q**    And do you know why it was approved 13

25  days later or so.

---

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 87

1        **A**     With the investigation was ongoing, I

2   don't know -- I can't give you a definitive answer

3   as to why he did.  But some cases, they -- with the

4   investigation ongoing, they wait until everything's

5   entered and entered correctly and then they approve

6   it.  During this reporting period, the way they did

7   it, they typed your narrative in, sent your

8   narrative back down.  You read it, reviewed it, said

9   yes, that's my narrative, and then it goes back

10  upstairs.  So it just might have been that amount of

11  timeframe for it to go back upstairs.

12       **Q**     And Harry Dilworth, what was his rank at

13  that time?

14       **A**     At the time, I believe he was a sergeant.

15       **Q**     And was he your sergeant?

16       **A**     At the time, I can't remember who was my

17  sergeant.

18       **Q**     If would you go to the next page of

19  Exhibit 12 at Ferguson 006, which is also on this

20  report page 6 of 11.  Do you see that?

21       **A**     006, yes.

22       **Q**     The narrative is all information that you

23  provided to the person who entered this report,

24  correct?

25       **A**     Yes.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 88

1     **Q**    Let's just -- I'm going to run through

2   this hopefully fairly quickly.  Your first line

3   states, In reference to the original report, comma,

4   the following is pertinent.

5          Do you see that?

6     **A**    Yes.

7     **Q**    And I'm going to ask you, if I ever read

8   any of these lines incorrectly, would you tell me?

9   Otherwise, I'm going to have to ask after each

10  question, did I read that correctly.  Can we agree

11  to that?

12    **A**    Yes.

13    **Q**    Okay.  Do you mean that those observations

14  are the important observations based on your

15  training and experience when you say pertinent?

16    **A**    Yes.

17    **Q**    Your next sentence says, I responded to

18  the area of Airport and North Marguerite for a

19  report of a male subject running naked in the middle

20  of the street.

21          I read that correctly?

22    **A**    Yes.

23    **Q**    You see that?  And when you say that's

24  from report, that came from dispatch, right?

25    **A**    Yes.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 89

1       **Q**    And your first impression of that was not

2   that this is a person with emotional or mental

3   issues or personal crisis?

4       **A**    Again, a male running naked in the middle

5   of the street, there's a lot of assumptions that

6   could be made there.

7       **Q**    So you're -- you're in -- you're in the

8   squad room or in the muster room.  Does everybody

9   say, oh, boy, here we go, great Saturday morning,

10  first call, we've got a naked guy running down the

11  street?

12           MS. SHAFAIE:  Object to form.  You can

13  answer.

14      **Q**    (By Mr. Dowd) Do you recall anything like

15  that?

16      **A**    No.  I mean, I -- I don't recall anything

17  like that.

18      **Q**    Okay.  So the next line, upon arrival, I

19  observed black clothes in the middle of the

20  intersection at Airport and Marguerite.

21           That's based on your observations,

22  correct?

23      **A**    Yes.

24      **Q**    And then you were stopped by a subject in

25  a black car that told you the naked man ran down

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

                                                    Page 90

 1   Margo, correct?

 2        **A**    Yes.

 3        **Q**    He didn't mention a weapon or any

 4   violence, correct?

 5        **A**    Correct.

 6        **Q**    Next line, While checking the area officer

 7   Kaminski 586 advised he had the subject at Airport

 8   and Henquin.

 9             Do you see that?

10        **A**    Yes.

11        **Q**    You recall him saying anything else?

12        **A**    I just recall the location.

13        **Q**    Okay.  Your next line, you state, I

14   responded to the area and observed Kaminski

15   attempting to call out on his radio with the subject

16   on the ground who had been tased, correct?

17        **A**    Correct.

18        **Q**    How did you know as you got to the scene

19   he had been tased?

20        **A**    The wires.

21        **Q**    Can you please describe how you -- what

22   you meant when you say he was attempting to call out

23   on his radio?

24        **A**    Yeah.  Like I said earlier, when he was

25   looking over his shoulder, it appeared -- you know,

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 91

1   because -- to explain it a little bit, there's a --

2   when something like that happens you've got a lot of

3   officers on the radio trying to call out that they

4   are going or where they are at.  And from what I

5   appeared to see was he was trying to call out what

6   was going on, but there was other people talking on

7   the radio.  So it didn't come over.

8        **Q**    Okay.  So you could see him as you're

9   coming westbound on Airport Road reach up on his

10  left shoulder, but you couldn't hear him coming

11  through your radio?

12       **A**    Yes.

13       **Q**    And that's -- that was the conclusion you

14  reached, that he was attempting to say something?

15       **A**    Yes.

16       **Q**    Understood.  Your next line in your report

17  is, quote, As I exited the vehicle, comma, the

18  subject, paren, Jason Moore, attempted to get up,

19  closed parentheses.

20            Do you see that?

21       **A**    Yes.

22       **Q**    Have we covered all of your observations

23  regarding his attempt to get up?

24       **A**    We covered that.

25       **Q**    Okay.  You never saw Mr. Moore lunge at

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

```
                                                      Page 92
 1    Officer Kaminski, did you?

 2         A    He was on the ground when I got there, so

 3    no.

 4         Q    Never saw him on his knees, correct?

 5         A    I don't recall.

 6         Q    And you saw him attempt to get up one time

 7    while you were able to observe Mr. Moore?

 8         A    When I was getting out of the car he was

 9    trying to get up that one time.

10         Q    Okay.  So that's the only time you saw him

11    attempt to get up?

12         A    Yeah.  It all happened very quickly.

13         Q    I'm sorry?

14         A    It all happened very quickly.

15         Q    I understand.

16         A    One time.

17         Q    Your next line is, Kaminski was yelling at

18    him very loudly to stay on the ground, correct?

19         A    Yes.

20         Q    Is that the first thing you heard Officer

21    Kaminski say once you were at the scene?

22         A    Yeah.  When I got out of the car he was

23    yelling.

24         Q    Do you recall him using any other words

25    prior to tasing him again?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 93

1       **A**    I don't recall.

2       **Q**    You don't recall any other words?

3       **A**    Not -- I don't -- I mean, it was 2011.  I

4  don't recall that right now.

5       **Q**    I understand.  In your -- tell the jury

6  based on your training what the stun application is

7  from a taser.

8       **A**    What the --

9       **Q**    Stun application.  If you use the -- you

10 can either use the darts or use it as a stun gun,

11 correct?

12      **A**    Yes.

13      **Q**    Okay.  And the only thing you have to do

14 to turn it into a stun weapon is to pull the

15 cartridge off the end and pull the trigger and push

16 it on the person's body, right?

17      **A**    You can use it two ways like that.  If the

18 cartridges are already deployed and they don't seem

19 to be taking effect and you feel like you can do it,

20 you can run up and try stunning them in another spot

21 to make the connection.  Or you can take that dart

22 off and do it that way.

23      **Q**    Okay.  And was there -- is there ever an

24 effect when a person uses it in its stun form with

25 the cartridge off to putting it on a person's leg to

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 94

```
 1   get their attention?

 2              MS. SHAFAIE:  Object to form.  You can

 3   answer.

 4       A     We don't use it to get someone's

 5   attention.

 6       Q     (By Mr. Dowd) Okay.  What do you use it

 7   for?

 8       A     You're trying to use the force to make an

 9   arrest.  You don't -- it's not to get an attention.

10       Q     To get somebody to respond to your

11   commands, when I say get their attention.  You tase

12   them and say, hey, stop resisting or I'm going to

13   tase you again.  With the stun, you can do that,

14   right?

15              MS. SHAFAIE:  Form.  You can answer.

16       A     That could be agreeable.  You're trying to

17   get them to comply to your, to your commands and

18   that.  In that form.

19       Q     (By Mr. Dowd) And sometimes referred to as

20   pain compliance?

21       A     Yes.

22       Q     Assume a person is on their stomach and

23   they've been tased and they're on the ground on

24   their stomach and they've been tased.  Would you

25   agree that a stun application without the cartridge
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 95

1    on to that person's back with the officer above the

2    person, an unarmed person, a naked person, would be

3    a safer use of force than a taser to the chest?

4            MS. SHAFAIE:  Form and foundation.  You

5    can answer.

6        **Q**    (By Mr. Dowd) Safer for the suspect, I

7    mean.

8            MS. SHAFAIE:  Same objection.

9        **A**    Every situation is different.  You know, I

10   can't really answer that based on that.  I mean,

11   it -- so many different variables come into play

12   when you're dealing with different people on a

13   different daily basis.  I just -- it's just too much

14   to say.

15       **Q**    (By Mr. Dowd) Okay.  But do you have to

16   make those decisions, correct, during -- when you're

17   trying to get somebody to comply and maybe take them

18   into custody?

19       **A**    Yeah.  When an event's happening you make

20   your decisions then and based off your training

21   and --

22       **Q**    Understood.  And what I'm saying, based on

23   your training, when you're -- you understand that

24   there is some risk of a cardiac arrest when a person

25   is tased to the chest?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                           October 1, 2015

Page 96

 1          MS. SHAFAIE:  Object to foundation.  You
 2    can answer.
 3      **Q**    (By Mr. Dowd) You've heard that in your
 4    training, haven't you?
 5          MS. SHAFAIE:  Same objection.
 6      **A**    We went through training and --
 7          MS. SHAFAIE:  You can answer.
 8      **A**    We went through the training and they had
 9    mentioned a small possibility.  And, you know, they
10    try to tell you, if you can, avoid that area.  But
11    there are different situations.  Again, you have to
12    do what you have to do.
13      **Q**    (By Mr. Dowd) All right.  And that's with
14    the prongs, that you're saying there's a small
15    possibility of a cardiac arrest.  That was your
16    training, right?
17          MS. SHAFAIE:  Foundation.  You can answer.
18      **A**    We were advised of -- there's no -- I
19    don't remember the percentage we were told.  But
20    they had mentioned something along the lines of the
21    chest area.
22      **Q**    (By Mr. Dowd) Right.  And so if a person
23    is being tased, even with the prongs in the back,
24    that's based on your taser training somewhat safer,
25    correct, for the suspect?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 97

 1          MS. SHAFAIE:  Object to foundation.  You

 2    can answer.

 3      **A**    If the opportunity is there to tase them

 4    in the back, that would be a safer place.

 5      **Q**    (By Mr. Dowd) Okay.  And do you agree that

 6    it's even less likely than -- scratch the question.

 7    In your taser training, do you recall that it's --

 8    there's not any warning or training about cardiac

 9    arrest with regard to a stun application away from

10    the heart, is there?

11          MS. SHAFAIE:  Object to foundation.  You

12    can answer.

13      **A**    I don't recall the stun application part

14    of that.

15      **Q**    (By Mr. Dowd) Okay.  But they didn't

16    associate any cardiac risk with the stunning, right?

17          MS. SHAFAIE:  Form and foundation.  You

18    can answer.

19      **A**    Again, I don't recall the stun part of

20    the -- as far as cardiac arrest.

21      **Q**    (By Mr. Dowd) Right.  Well, tell the

22    jurors what the risk is of using a stun on a person

23    who's laying facedown on their back when you're

24    trying to arrest them and they're unarmed?

25          MS. SHAFAIE:  Form and foundation.  You

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

                                                          Page 98

 1    can answer.

 2        **Q**    (By Mr. Dowd) What's the risk from the

 3    taser is what I'm asking.

 4            MS. SHAFAIE:  Same objection.  You can

 5    answer.

 6        **A**    From a stun?

 7        **Q**    (By Mr. Dowd) Yes, sir.

 8        **A**    Again, stun's pain compliance.  It's more

 9    narrow of a location.  You know, if you -- if

10    they're on their back and you stun them in the arm,

11    they're not going to feel that in their heart.  I

12    mean, it's --

13        **Q**    Okay.

14        **A**    They're still going to feel it.

15        **Q**    Right.  So a stun application can be

16    effective to apprehend suspects, correct?

17        **A**    If a situation allows it, yes.

18        **Q**    All right.  And assuming if Mr. Moore was

19    on his stomach that morning when Mr. -- Officer

20    Kaminski was tasing him and Mr. Moore was not

21    resisting during the second taser application, he

22    would have had the option to stun Mr. Moore in the

23    back and obtain pain compliance to get him

24    handcuffed, correct?

25            MS. SHAFAIE:  Form and foundation.  You

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

                                                          Page 99

 1    can answer.

 2        **Q**    (By Mr. Dowd) Was an option?

 3        **A**    Situations will depict on what happens.

 4        **Q**    That's one of his force options though,

 5    right?

 6            MS. SHAFAIE:  Same objections.  You can

 7    answer.

 8        **Q**    (By Mr. Dowd) One of his tools?

 9            MS. SHAFAIE:  Same objections.

10        **A**    A stun is one of the tools, yes.

11        **Q**    (By Mr. Dowd) Like a baton or mace?

12        **A**    Yes.

13        **Q**    Those were all options that he had after

14    the first tasing, correct?

15            MS. SHAFAIE:  Same objections.  You can

16    answer.

17        **A**    Those are options we all have.

18        **Q**    (By Mr. Dowd) Your next line in your

19    report in Exhibit 12, Ferguson 0006 is, quote, Moore

20    was yelling but his words were hard to understand,

21    period, close quotes.

22            Were his words hard to understand because

23    he was mumbling?

24        **A**    It could be considered a mumbling, a

25    yelling.  I mean, it -- I don't know -- I don't know

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                October 1, 2015

Page 100

 1    how else to describe it besides a mumbling, kind of

 2    a yelling.

 3         Q    But you couldn't make out any of the

 4    words?

 5         A    No.

 6         Q    Did you notice anything about his face as

 7    you were approaching the scene?

 8         A    No.

 9         Q    Do you know what excited delirium is?

10         A    I've heard about it.

11         Q    Okay.  And what's your understanding of

12    that?

13         A    Accelerated heart rate.

14         Q    And did you have -- have you had any taser

15    training with regard to excited delirium and

16    accelerated heart rate and a taser application to

17    the chest?

18         A    Not that I can recall.

19         Q    You have not received any warnings from

20    them about persons that are in agitated or excited

21    delirium are at higher risk?

22         A    I think that went along the lines of the

23    chest area, the avoiding.  I mean, I do recall

24    hearing some of that.  I can't recall if it was

25    during the taser training or if it was something

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

                                                         Page 101

 1    else.

 2        **Q**    What are some of the physical restraint

 3    techniques that you are trained on with regard to

 4    taking a person under control?  I've heard of

 5    phrases called thumb locks, arm locks, you know,

 6    just twisting someone's arm behind their back.  Can

 7    you tell us what your training from the academy

 8    through the present are, some of those physical

 9    restraint techniques are?

10        **A**    You've got your pressure points, arm bars,

11    you know, wrist bends.  Good old body weight on them

12    usually works trying to restrain them.

13        **Q**    What -- when are pressure points

14    considered a proper use of force?

15             MS. SHAFAIE:  Object to form.  You can

16    answer.

17        **A**    I generally use pressure points when

18    they're physically resisting.  And they can also be

19    used when they are passive resistance,

20    noncompliance, just completely ignoring you, sitting

21    still.

22        **Q**    (By Mr. Dowd) And what part of the body do

23    you generally use the pressure point on?

24        **A**    Right underneath the ear.

25        **Q**    Okay.  And that's sometimes helps you get

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

                                                    Page 102

1    compliance?

2        **A**    Oh, that one works.

3        **Q**    Is there any great risk to the person that

4    you're using that pressure point on?

5        **A**    No.

6        **Q**    How about the arm bars?  Can you

7    demonstrate sort of how that works?

8        **A**    Depending on -- grabbing a hold of

9    somebody's wrists, keeping their arm locked

10   straight, keeping them close to you.  That way if

11   they try to pull away or move you're able to take

12   them to the ground quickly.

13       **Q**    You have the person's arm straight?  Can

14   you demonstrate for us?  You're pulling on --

15       **A**    You're grabbing a wrist.  You've got their

16   arm down here.  You've got a hold of them here.

17   You're keeping their arm straight.  That way if

18   they're trying to turn, you can turn with them, kind

19   of control where they're going, take them to the

20   ground if you need to.

21       **Q**    And you use your legs to take them to the

22   ground if you need to, kick -- I think I saw in some

23   of the use of force reports some kind of a kick

24   move.

25       **A**    Sometimes if you've got to sweep their

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 103

1    legs out, yeah.

2        **Q**    How else would you bring them down if you

3    had them in an arm lock?

4        **A**    Body weight, just kind of take them to the

5    ground.

6        **Q**    Your next sentence in your report is,

7    quote, Kaminski utilized the taser again, period,

8    closed quotes.

9            Do you see that?

10       **A**    Yes.

11       **Q**    What's your best estimate as to the amount

12   time between when he stopped tasing him the first

13   time as you were arriving at the scene until he

14   tased him the next time?

15       **A**    You know, I can look back.  I didn't

16   guess.  But I can't really tell you for sure, it

17   happened so quickly.  Everything there happened so

18   quickly.

19       **Q**    When you're applying force to a person,

20   whether it's through pain compliance, using a taser

21   stun device, whether striking someone with a baton,

22   spraying them with mace or tasering them, after the

23   application of force you're required per your

24   training to assess their compliance, right?

25           MS. SHAFAIE:  Object to foundation.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                              October 1, 2015

---

Page 104

```
 1      Q    (By Mr. Dowd) To see if they're complying?

 2           MS. SHAFAIE:  Foundation.  You can answer.

 3      Q    (By Mr. Dowd) Do you understand the

 4   question?

 5      A    Yeah.  I mean, situations dictate, but

 6   yes.

 7      Q    So if you hit someone with a baton, you

 8   don't get to hit them five times in a row.  You can

 9   hit him once and see if he goes down and see if he's

10   going to resist further, right?

11           MS. SHAFAIE:  Form.  You can answer.

12      A    You're trained to use the least amount of

13   force possible to effect the arrest, and that's the

14   ultimate goal.

15      Q    (By Mr. Dowd) Right.  And one way to do

16   that is to wait to see if the person is complying,

17   right?

18      A    If the situation dictates that you can do

19   that, yes.

20      Q    All right.  And if a person is -- the

21   officer also has to go through his -- you just said,

22   what's the least amount of force, or also, do I have

23   to use greater force, right?

24      A    Yes.

25      Q    And that's basically a use of force
```

---

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                            October 1, 2015

Page 105

1    assessment that you go through on a regular basis

2    when you're at a scene, right?

3        **A**    Yes.

4        **Q**    When that officer -- after an officer uses

5    force, they have to give that suspect a reasonable

6    time to comply, right --

7            MS. SHAFAIE:  Foundation.

8        **Q**    (By Mr. Dowd) -- to make that use of force

9    assessment in their attempt to use the least amount

10   of force as necessary?  Would you agree with that?

11           MS. SHAFAIE:  Form, foundation.  You can

12   answer.

13       **A**    Every officer has to evaluate a situation

14   as it comes.  Every situation is different.  You

15   want to try to do -- to evaluate it the best that

16   you can.  Some people will comply, some people

17   don't.  But it's just a different situation to

18   everything.

19       **Q**    (By Mr. Dowd) That's why, because some

20   people will comply and some people won't, why you

21   have to give everyone a reasonable chance to comply

22   after using force on them, right?

23           MS. SHAFAIE:  Same, foundation.  You can

24   answer.

25       **A**    You're always evaluating the situation.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

---

Page 106

1    Again, it's -- to see if their use of force needs to

2    continue.

3       **Q**    (By Mr. Dowd) Right.  And that's -- the

4    reasonableness of the force is largely based on the

5    threat they pose, correct?

6       **A**    Correct.

7       **Q**    And were there any other persons around on

8    the scene with Mr. Moore that morning?  Once you

9    arrived at the scene, did you see a group of people

10   standing next to him or anything like that?

11      **A**    No.

12      **Q**    So only the closest people besides Officer

13   Kaminski were the people in their car, right, cars

14   going by?

15      **A**    Yes.

16      **Q**    So the threat as Officer Kaminski was

17   tasing Mr. Moore as you were arriving at the scene

18   is primarily from Mr. Moore himself and to Officer

19   Kaminski, correct?

20      **A**    Yes.

21      **Q**    And he's naked on the ground.  You believe

22   he's being effectively tased as you get to the

23   scene.  In your opinion, how much time would be

24   reasonable for an officer to allow to do a

25   compliance assessment and also to determine whether

---

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 107

1    additional force is necessary on this person?

2           MS. SHAFAIE:  Form and foundation.  You

3    can answer.

4       **A**    I go back to every situation is different.

5       **Q**    (By Mr. Dowd) I'm asking you about that

6    situation.

7           MS. SHAFAIE:  Same objection.  You can

8    answer.

9       **A**    And my answer is, every situation is

10   different.  I wasn't there to see what happened

11   before I got there.  You have to understand what

12   that officer's going through.  He made that

13   decision.  And I can't answer for him as to why he

14   would do that.  It didn't happen to me.  So I wasn't

15   the one tasing him so I can't answer that.  It's --

16   every situation is different.  Every officer

17   perceives it differently.

18      **Q**    (By Mr. Dowd) You said why he would do

19   that.  What do you mean by why he would do that?

20      **A**    Why he used the force.

21      **Q**    I'm just asking -- not why he used the

22   force, but how much time should he have waited in

23   your opinion based as a field officer with a lot of

24   experience to -- would be reasonable under that

25   specific threat, a naked man lying on the ground

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

```
                                                        Page 108
 1    trying to get up, how much time should be given for

 2    him to comply before using another taser

 3    application?

 4              MS. SHAFAIE:  Form and foundation.  You

 5    can answer.

 6        Q    (By Mr. Dowd) And I'm not asking you for

 7    an exact time.

 8        A    I know.

 9              MS. SHAFAIE:  Same objection.

10        A    I'm going back to he assessed the

11    situation as it came from the start up until then,

12    how every officer will do it.  I wasn't there to

13    perceive that, to see that.  So I can't give you an

14    opinion on how long that would be.  I don't know

15    what happened beforehand.  That all comes into play

16    when you're tasing somebody.

17        Q    (By Mr. Dowd) All right.  But you also

18    have to reassess the threat at the time that you're

19    going to apply the force, correct?  And I'm saying

20    this is a man who's, per your observation, naked,

21    unarmed, lying flat on his back trying to sit up

22    with his arms out in front of him shaking, no

23    citizens anywhere near around.  Should an officer

24    give a person less than one second between taser

25    applications to assess his risk threat and whether
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 109

1  he should use form again?

2         MS. SHAFAIE:  Form and foundation.  You

3  can answer.

4      **A**    And again, I'm going back to it's every

5  situation, every officer depicts things differently.

6  I'm not going to give you a definitive answer on

7  that.  I just -- it depends on what happened from

8  the beginning to the end to that.  You know, for a

9  situation, if you show up and an officer just got

10 the crap beat out of him, he's not going to give a

11 guy another chance to get back up, okay?  So that

12 goes along with every situation is different.

13     **Q**    (By Mr. Dowd) And there was no report that

14 he had actually struck Officer Kaminski at the time

15 that Officer Kaminski was tasing him when you

16 arrived, right?

17     **A**    After the fact, I found out there was --

18 no, there wasn't after the fact.

19     **Q**    All right.  And before the fact, you had

20 not heard anything over the radio that somebody --

21 that he had assaulted Officer Kaminski, right?

22     **A**    I did not hear anything over the radio.

23     **Q**    So you're -- if I understand your

24 testimony correctly, you're saying that when an

25 officer uses force it's solely that officer's

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

```
                                                Page 110
 1   discretion as to when to apply force again based on

 2   that circumstance, and there's no reasonable time

 3   between a taser application on a naked person

 4   without a weapon and no citizens around to allow

 5   that person to comply, there's no timeframe you can

 6   give, less than a second or more than one second,

 7   anything like that?

 8            MS. SHAFAIE:  Form.  You can answer.

 9      A    It's all about perceived use of force.

10   The officer has to assess the situation and what

11   goes on.  That's our job.  That's how we do it.  You

12   assess what force has to be used.

13      Q    (By Mr. Dowd) All right.  So it's your

14   testimony that it would be your opinion that the

15   force used would be appropriate if a person was

16   tased while they're charging, falls to the ground,

17   is on the ground, that they can be tased repeatedly

18   with less than one second, but not more than one

19   second, to ever comply between all of those taser

20   applications?

21            MS. SHAFAIE:  Object to form and

22   foundation.

23      A    My testimony is I wasn't there to see what

24   happened.  I show up on scene and I assist that

25   officer.  He felt that that needed to be done and
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

```
                                                     Page 111
 1   that's what he did.  That's police work.  You have
 2   to perceive a situation as it comes and handle it
 3   correctly.
 4       Q    (By Mr. Dowd) I understand.  So you're
 5   saying that the officer's assessment and discretion
 6   on the use of force is to be unquestioned by you as
 7   a fellow officer?
 8            MS. SHAFAIE:  Object to form.  You can
 9   answer.
10       A    I'm not questioning another officer's use
11   of force.  When I show up to assist him, I assist
12   him.  We have to trust each other and trust that
13   it's being done for a reason and go from there.
14       Q    (By Mr. Dowd) So no matter what the facts
15   are, you're going to trust his judgment, his
16   discretion and back him up, correct?
17            MS. SHAFAIE:  Form.  You can answer.
18       A    Yes.
19       Q    (By Mr. Dowd) The next line in your report
20   on Exhibit 12 is, quote, At that time, comma, I was
21   able to force Moore's hands behind his back and
22   handcuff him, period, closed quotes.
23            At that time, it's just you and Officer
24   Kaminski at the scene, correct?
25       A    That I can remember, yes.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 112

1      **Q**     And he's on his -- Mr. Moore is on his

2      back at the completion of the handcuffing.  Is that

3      your testimony?

4      **A**     He was on his stomach with his hands

5      behind his back.

6      **Q**     I'm sorry, you're right.  You said earlier

7      he was on his back when he was being tased.  But

8      after the handcuffing he was then on his stomach and

9      his face, and you weren't sure whether his face was

10     facing to his right or to his left, correct?

11     **A**     Correct.

12     **Q**     After the handcuffing, did you touch

13     Mr. Moore at any time prior to realizing he wasn't

14     breathing?

15     **A**     No.

16     **Q**     And the only touch you made to him was to

17     roll him over and get his handcuffs, correct?

18     **A**     To handcuff him.

19     **Q**     To -- after you realized he wasn't

20     breathing.  I'm sorry, my question wasn't clear.

21     The next time you touched Mr. Moore was to roll him

22     over and take off his handcuffs so that Officer Bebe

23     could start the chest compressions?

24     **A**     Yes.

25     **Q**     What was Officer Kaminski doing when you

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

                                                        Page 113

 1    were doing that?

 2         **A**    You know, I don't recall.

 3         **Q**    In your taser training, you described

 4    earlier some people are able to use their arms when

 5    they are being tased better than others.  There's a

 6    couple differences.  In your taser training, they

 7    use a quarter-inch barb, correct?

 8              MS. SHAFAIE:  Object to foundation.  You

 9    can answer.

10         **A**    I don't recall the exact length of it

11    or --

12         **Q**    (By Mr. Dowd) They use a training barb?

13    Have you ever heard that phrase?

14         **A**    In training, we use a training cartridge.

15         **Q**    Right.  And I'll represent to you that

16    that's a quarter-inch barb as opposed to the ones

17    that are used out in the field, okay?  So you're

18    using a smaller barb when you and your fellow

19    officers are being tased in training?

20              MS. SHAFAIE:  Foundation.  You can answer.

21         **Q**    (By Mr. Dowd) Do you understand that?

22         **A**    I don't -- I've never looked at it and saw

23    it that way, but --

24         **Q**    Yeah, I'm -- you can -- for purposes of my

25    question, you can assume that I'm telling you that,

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 114

1    that that's a quarter-inch barb, okay?

2         **A**    Okay.

3         **Q**    That barb is not going to be as painful

4    going into you as a barb that's, for example,

5    .55 inches, a little over a half an inch.  Would you

6    agree with that?

7              MS. SHAFAIE:  Foundation.  You can answer.

8         **A**    I wouldn't know.  I haven't had that one

9    come into me.

10        **Q**    (By Mr. Dowd) Okay.  Would you assume that

11   the taser people put that out there because it's

12   more effective at incapacitating subjects than the

13   quarter-inch barb?

14             MS. SHAFAIE:  Form and foundation.  You

15   can answer.

16        **A**    Again, I don't know.

17        **Q**    (By Mr. Dowd) Do you think it's likely to

18   have more effect, a half-inch barb than a

19   quarter-inch barb, based on your training?

20        **A**    I've never seen the difference between

21   both.

22        **Q**    When you said it affects people

23   differently, does it affect large, heavy people

24   less, the taser, I mean, taser prongs and the taser

25   prong application format, does that affect heavier,

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 115

 1    larger people less than it does slight, skinnier

 2    people?  Is that your training?

 3        **A**    No.  When I say differently, there's just

 4    people of small stature or big stature that for some

 5    reason it just doesn't affect them.

 6        **Q**    Based on your observations the morning of

 7    September 17th, 2011, it was affecting Mr. Moore,

 8    wasn't it?

 9        **A**    Yes.

10        **Q**    Do -- are you aware of any additional risk

11    between persons who are of slight build and persons

12    who are more heavily built with regard to cardiac

13    arrest?

14            MS. SHAFAIE:  Form and foundation.  You

15    can answer.

16        **A**    No.

17        **Q**    (By Mr. Dowd) Do you know the difference

18    between a cardiac arrest and a heart attack?

19        **A**    Yes.

20        **Q**    Tell us your understanding.

21        **A**    Cardiac arrest is when your -- I believe

22    that's when your heart is pretty much stopped.  A

23    heart attack is when you're having heart issues,

24    possible excessive heartbeat, not enough heartbeat.

25        **Q**    Okay.  And which of those two is your

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                              October 1, 2015

Page 116

 1    understanding are caused by taser applications,

 2    although as you say, a slight possibility?

 3              MS. SHAFAIE:  Form and foundation.  You

 4    can answer.

 5         A    I mean, either one could, if somebody has

 6    previous existing, probably caused either one of

 7    them.  We have no way of knowing that.

 8         Q    (By Mr. Dowd) When you arrived on the

 9    scene and saw Mr. Moore, did he appear to be

10    somebody who was slightly built?

11         A    He was -- I mean, he looked muscular.

12         Q    But thin?

13         A    But thin, yeah, I would say.

14         Q    What's your estimate of his height and

15    weight?

16         A    I mean, I've never seen him actually

17    standing up, but I would say six-foot.

18         Q    How about weight?  What's your

19    understanding of how much he weighed?

20         A    A guess?

21         Q    Your best estimate.

22         A    180, 190.

23         Q    That's when he was laying on the ground?

24         A    Again, I'm just guessing.

25         Q    Does the size of the person who you're

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

                                                              Page 117

 1    trying to gain control of, is that part of the

 2    factor in the risk assessment, a threat assessment

 3    as you said earlier, when you're trying to determine

 4    how much force to use?

 5        A     I mean, you're going to -- you're going to

 6    think about that as you're doing it.  But that's

 7    incorporated into their actions.

 8        Q     Do you believe, sir, that as you got to

 9    the scene and exited your vehicle, assuming that

10    occurred during or shortly after the second tase

11    application that morning, that you had been able to

12    safely handcuff Mr. Moore on the ground with Officer

13    Kaminski there without the use of another taser

14    application?

15            MS. SHAFAIE:  Object to form.  You can

16    answer.

17        A     That's going to go back to the factors

18    that happened before.

19        Q     (By Mr. Dowd) But I'm asking you what you

20    knew as you arrived at that scene and were able to

21    observe that slightly built man on the ground being

22    tased effectively whether or not based on your

23    experience, your training at the academy, your

24    experience in apprehending people, being 6' 5", a

25    hundred and -- how much did you weigh at the time?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

```
                                                       Page 118
   1       A     220.

   2       Q     220.  That you and Officer Kaminski likely

   3   would have been able to handcuff that man without

   4   another taser application without injury to you or

   5   Officer Kaminski?

   6            MS. SHAFAIE:  Form.  You can answer.

   7       A     And I'm going to go back to --

   8       Q     (By Mr. Dowd) I'm not asking you about the

   9   choice of force.  I'm asking you, could you have

  10   done that?

  11            MS. SHAFAIE:  Same objection.  You can

  12   answer.

  13       A     I don't think you're understanding that

  14   you have to assess -- he had to assess the

  15   situation.  I have to -- as an officer, when you

  16   show up and you see what's going on, you're doing

  17   what you can for the less amount of force, but I

  18   can't question why he's doing it because I don't

  19   know what happened before.

  20       Q     (By Mr. Dowd) Okay.

  21       A     So --

  22       Q     So you're -- you do know certain things.

  23   You know he's naked, you know he's unarmed, there's

  24   no report of a serious crime or a violent crime,

  25   correct?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 119

 1       **A**    I know that from starting, yes.

 2       **Q**    Okay.  So as you get out of your vehicle

 3  and you're running up to him, you're not saying to

 4  Officer Kaminski, okay, I got him, I got him, I got

 5  him, right?  You're not saying anything like that?

 6  You're just moving towards him and he's tasing him

 7  again, he starts tasing him again, right?

 8       **A**    I ran towards him and he started tasing

 9  him again.

10       **Q**    Okay.  And so what I'm asking you is --

11  I'm not asking you about whether he should have or

12  not under this question, okay?  I'm saying if you

13  had been in that situation in 2009, a man's on the

14  ground, he's not resisting -- or it's just --

15  because he's -- in this case he's just been tased.

16  I'm asking, if you go pre-taser, do you believe that

17  a man lying on the ground on his back that you and

18  Officer Kaminski, if you had arrived at that scene

19  without a taser, that the two of you likely would

20  have been able to handcuff him without serious

21  injury to Mr. Moore?

22            MS. SHAFAIE:  Form.  You can answer.

23       **A**    So now you're going back to pre-taser and

24  you're adding in different factors.  I mean, I don't

25  know what's going to happen when we go to handcuff

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 120

1    this guy on the ground.

2        **Q**    (By Mr. Dowd) What would you have done if

3    you didn't have a taser in that situation?

4            MS. SHAFAIE:  Form.  You can answer.

5        **A**    You know, use the tools that you have

6    optional.  You can try pepper spray and/or you just

7    have a drag out, you know, fight if this guy starts

8    fighting.  You do what you can to hold him down, get

9    the handcuffs -- as safe as possible get him

10   handcuffed.  But I'd rather use a taser and risk

11   less injury than have to go hands on and fight this

12   guy in a drag out, knock out fight.

13       **Q**    (By Mr. Dowd) I understand that.  But

14   there's a risk benefit analysis you have to make

15   when you're using force.  How -- what's the least

16   amount of force you can use to protect the suspect

17   and the officer, correct?

18       **A**    Yes.

19       **Q**    Do you believe that if you -- if there was

20   no taser on the scene but Mr. Moore was on the

21   ground on his back, as you have testified you

22   observed, don't you agree that you and Officer

23   Kaminski would have likely been able to handcuff him

24   without serious injury to you or Officer Kaminski?

25           MS. SHAFAIE:  Form.  You can answer.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                October 1, 2015

Page 121

 1      **A**    We probably would have been able to

 2   handcuff him.  But the situation that occurred, you

 3   never know what's going to happen from the time you

 4   try to handcuff him to the point of handcuffing.

 5   That's what I'm trying get at.

 6      **Q**    (By Mr. Dowd) And police officers have

 7   been handcuffing people, two officers on the scene,

 8   handcuffing people since handcuffs were invented.

 9   Would you agree with that statement?

10      **A**    Yes.

11      **Q**    It's only relatively recently that you've

12   had the tool known as a taser, right?

13      **A**    Yes.

14      **Q**    Every time two officers handcuff a suspect

15   who's on the ground but resisting, an officer does

16   not get hurt.  Do you agree with that?

17            MS. SHAFAIE:  Form.  You can answer.

18      **A**    Start the question from the beginning.

19   I'm sorry.

20      **Q**    (By Mr. Dowd) Would you agree that every

21   time two officers handcuff a person starting on the

22   ground at the beginning of the handcuffing process

23   that it's not guaranteed that one of the officers is

24   going to get hurt, is it?

25            MS. SHAFAIE:  Form.  You can answer.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

                                                                    Page 122

 1        **A**    There's never a guarantee for anything.

 2        **Q**    (By Mr. Dowd) All right.  It's more likely

 3    than not that the officers are going to be able to

 4    handcuff that person without injury to the officer.

 5    Do you agree with that?

 6             MS. SHAFAIE:  Same objection.

 7        **A**    It depends on the actions of the suspect.

 8        **Q**    (By Mr. Dowd) Understood.  But I'm saying

 9    in your experience, when you have two officers on

10    the scene, naked suspect on the ground, or a suspect

11    on the ground who weighs 135 pounds and you and

12    another officer are there, it's more likely than not

13    that you're going to be table to get him in

14    handcuffs without the use of a taser safely for the

15    officers?

16             MS. SHAFAIE:  Same objection.

17        **A**    If the subject's complying, well then yes.

18        **Q**    (By Mr. Dowd) Okay.  If the subject is

19    resisting, it's likely yes as well?

20             MS. SHAFAIE:  Same objection.

21        **A**    Not as likely, no.

22        **Q**    (By Mr. Dowd) Not as likely because

23    they're resisting?

24        **A**    I've had situations where it's escalated

25    completely quickly from people on the ground.  So

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                        October 1, 2015

Page 123

1   that's why I'm saying --

2         Q    I understand.

3         A    -- you have to base it off their actions

4   at the time and go from there.

5         Q    All right.  But you've successfully

6   handcuffed people without tasers who were resisting,

7   correct?

8         A    Yes.

9         Q    And you'd say the vast majority of the

10  people that were resisting that you handcuffed were

11  not under taser power.  Would you agree with that?

12            MS. SHAFAIE:  Form and foundation.  You

13  can answer.

14        Q    (By Mr. Dowd) You understand the question?

15        A    I understand the question.

16        Q    Do you agree with it?

17            MS. SHAFAIE:  Same objection.

18            THE WITNESS:  Rephrase the question.

19            MR. DOWD:  Would you read it back, please?

20            (The requested portion of the

21            record read by the reporter.)

22            MS. SHAFAIE:  Same objection.

23        A    Well, yes, because we didn't have tasers

24  until --

25        Q    (By Mr. Dowd) Right.  And how many times

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 124

1   have you been injured handcuffing a suspect?

2        **A**    Not exactly handcuffing, but trying to

3   force them to be handcuffed, it's -- I've gotten --

4   I've gotten injured.

5        **Q**    Can you give me your best estimate of how

6   many people you've handcuffed without the benefit of

7   a taser?

8        **A**    I couldn't give you an estimate.

9        **Q**    That were resisting.

10       **A**    I've been a cop for ten years.

11       **Q**    Understood.  More than a hundred that were

12  resisting?

13       **A**    Again, I couldn't give you a number.

14       **Q**    I'm not asking for a specific number.  I'm

15  asking for more or less than a hundred.

16       **A**    It's going to be less than a hundred.

17       **Q**    And have you been injured less than

18  5 percent of the time?

19       **A**    I would agree with that.

20       **Q**    Approximately how many times have you been

21  injured attempting to handcuff a suspect who was

22  resisting?

23       **A**    In ten years, again -- you know, you talk

24  about injuries.  You can talk from minor injuries to

25  excessive injuries.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 125

1       **Q**     Something requiring medical treatment.

2       **A**     I'd say a guesstimate of at least ten

3   times.

4       **Q**     Okay.  You required medical treatment, not

5   just first aid?

6       **A**     Medical treatment or first aid.

7       **Q**     Yeah.

8       **A**     Bleeding?

9       **Q**     I'm saying medical treatment.  How many

10  times have you received medical treatment?

11      **A**     At a hospital?

12      **Q**     Yes, after a handcuffing a suspect --

13      **A**     Five.

14      **Q**     -- who is resisting.

15      **A**     Five times.

16      **Q**     And that ranges from having your nose

17  broken at one time, I understand?

18      **A**     Yes.

19      **Q**     And can you recall the other injuries you

20  received?

21      **A**     Knee injury, twisted ankle.  I can't

22  remember what the other ones were.

23      **Q**     All right.  Let's go back to Exhibit 12 in

24  your report, sir.  The next line I believe we left

25  off at is, quote, I then requested paramedics and a

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                              October 1, 2015

Page 126

1    supervisor respond to the scene, parentheses, per

2    Ferguson policy, closed parentheses.

3            Do you see that?

4    **A**    Yes.

5    **Q**    And why did you not call the paramedics

6    before, before the handcuffing was completed?

7    **A**    Well, because you're handcuffing them.

8    **Q**    Okay.  I mean, at any time that morning as

9    you're coming up on the scene and you see the naked

10   man being tased, you didn't call for an ambulance at

11   that time or any time before that, correct?

12   **A**    I did not.

13   **Q**    That's consistent with the department

14   policy.  You don't call an ambulance out just

15   because you've got someone acting erratically and

16   running naked?

17   **A**    That would not require specifically an

18   ambulance.

19   **Q**    Okay.  Your next line is, quote,

20   Approximately one minute after handcuffing Moore it

21   was observed that he stopped breathing.

22           That was an observation that you made?

23   **A**    Yes.

24   **Q**    And what did you actually observe that led

25   you to that conclusion?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 127

1      **A**    Well, when I asked him for his name and I

2    didn't get a response, I kind of reached down and I

3    realized his chest wasn't going up and down.

4      **Q**    Okay.

5      **A**    His mouth wasn't moving.  So I assumed he

6    wasn't breathing.

7      **Q**    Did you notice anything about his face or

8    his lips?  Was anything blue?

9      **A**    I don't recall that.

10     **Q**    Okay.  Did you hear him breathe at any

11   time after that or see him breathe or any

12   observation that led you to believe he was breathing

13   after that?

14     **A**    After the chest compressions I thought he

15   was trying to breathe, but I don't know.

16     **Q**    Was that before the paramedics arrived?

17     **A**    Yes.

18     **Q**    The next sentence, I think, regarding you

19   calling EMS and unhandcuffed him and chest

20   compressions, we've covered all your observations

21   and recollections on that, sir?

22     **A**    Yes.

23     **Q**    So in the next part of your report, I'd

24   like to draw your attention to -- you had a

25   conversation with Officer O'Connor, correct?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 128

1        **A**    Yes.

2        **Q**    And he identified somebody that may have

3    witnessed Mr. Moore earlier that morning?

4        **A**    Yes.

5        **Q**    Mr. Alan Shilling, he was not at the scene

6    to your knowledge, with the tasing, I mean?

7        **A**    He was not at the tasing scene.

8        **Q**    So everything you learned from Officer

9    O'Connor and that you learned from Mr. Shilling was

10   learned after the tasing was over and the threat

11   assessment had already been made and the gentleman

12   had left the scene, correct?

13       **A**    Yes.

14       **Q**    Are you the one who confiscated the -- I

15   shouldn't say confiscated.  Took the taser to the

16   police station and placed it into evidence?

17       **A**    I don't recall doing that, no.

18       **Q**    Is there anything that you recall Officer

19   Kaminski saying at the scene before, during or after

20   the tasing that we haven't talked about?

21       **A**    No.

22       **Q**    How about Officer Bebe?  Do you recall him

23   saying anything at the scene?

24       **A**    No.

25       **Q**    Lieutenant Ballard?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 129

1       **A**    At the scene, Lieutenant Ballard was

2    just -- after the ambulance had got there, he got

3    our version of the events.  And I remember him

4    telling me to go try to find the witness.

5       **Q**    Okay.

6       **A**    And that's when I contacted O'Connor.

7       **Q**    Okay.  Anything else you recall Lieutenant

8    Ballard saying that morning?

9       **A**    At the scene?

10      **Q**    Yes, sir.

11      **A**    No.

12      **Q**    About this incident after you left the

13   scene, anything you recall Lieutenant Ballard

14   saying?

15      **A**    You know, we -- after the fact, obviously

16   we talked to him about it.  We go over what happened

17   again.  But I don't recall the exact conversations

18   about it.

19      **Q**    Who was present when you were completing

20   your narrative report that we've gone through in

21   Exhibit 12?

22      **A**    I don't recall who was there.

23      **Q**    Were you there by yourself or you guys sit

24   around a table and fill them out?

25      **A**    If it's the -- I'm trying to think of the

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                        October 1, 2015

Page 130

1    room we had at the time.  There was two computers in

2    there.  I just don't recall if there was anyone in

3    there.

4         **Q**    Do you recall anything that the EMTs said

5    that morning?

6         **A**    I didn't talk to the EMTs.  I left before,

7    before that.

8         **Q**    Okay.  Did you -- have you ever had any

9    contact with Tina Moore or, who is Jason Moore's

10   wife, or Delores Moore, who is his mother?

11        **A**    I have not.

12        **Q**    Okay.  You've never run into them

13   anywhere, never saw them at the police station,

14   anything like that?

15        **A**    I have not.

16        **Q**    Have you seen any statements that were

17   attributable to them?

18        **A**    I have not.

19        **Q**    Okay.  Did you hear anything that the

20   dispatcher said that morning that we haven't talked

21   about today?

22        **A**    No.

23        **Q**    Do you know in September of 2011 or at any

24   time after that, were the officers or any of the

25   civilian staff at Ferguson able to download the

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                     October 1, 2015

```
                                                        Page 131

 1   taser firing and timing sequence reports?

 2       A    I have no idea if anyone had access to

 3   that.  I know I definitely didn't.

 4       Q    Have you ever seen the taser firing and

 5   timing sequence report in this case?

 6       A    I have not.

 7       Q    Have you spoken to anyone other than your

 8   attorneys about it?

 9       A    No.

10            MR. DOWD:  Let's go off the record one

11   second, please.

12            VIDEOGRAPHER:  Off the record at 11:54.

13            (Off the record.)

14            VIDEOGRAPHER:  Back on the record at

15   11:58.

16       Q    (By Mr. Dowd) Officer White, I'm going to

17   hand you Exhibit 8.  Does that appear to be the City

18   of Ferguson General Order 410.00?  It's noted at the

19   top right as July 6, 2010.  Do you see that?

20       A    Uh-huh, yes.

21       Q    Is it your brief that these were the

22   policies of the City of Ferguson with regard to the

23   use of less than deadly force and lethal force when

24   this occurrence happened in September of 2011?

25       A    Yes.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                             October 1, 2015

Page 132

1      **Q**     And if you'd look at the third full

2   paragraph under section 410.01 Policy, do you see

3   that?  That third paragraph, second sentence states,

4   in part, It is the policy of this department that

5   police officers shall use only that force that

6   appears reasonably necessary to effectively bring an

7   incident under control or prevent unlawful behavior

8   and accomplish lawful objectives, comma, while

9   protecting the lives and safety of the officer or

10  another.

11          Did I read that correctly?

12     **A**    Yes.

13     **Q**    Is that the policy we've been talking

14  about today when you've been saying use the least

15  amount of force necessary depending on the threat

16  assessment?

17     **A**    Yes.

18     **Q**    If you would go to page 5 of that

19  Exhibit 8, section 410.06, Use of Less-Lethal

20  Force -- Regulations.  Do you see that?

21     **A**    Yes.

22     **Q**    So this is when you're -- you're to use

23  something besides -- most common example of lethal

24  force would be using your side arm, your weapon,

25  your gun, right?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                              October 1, 2015

Page 133

1        **A**     Yes.

2        **Q**     So if you're not using your gun, I believe

3     the second sentence that is applicable, it says,

4     quote, Only the appropriate amount of force

5     necessary to bring an incident under control is

6     authorized.

7                Did I read that correctly?

8        **A**     Yes.

9        **Q**     That means each time force is applied you

10    have to use only the appropriate amount of force

11    necessary to bring the incident under control,

12    correct?

13       **A**     Yes.

14       **Q**     The next sentence states, quote, In making

15    an arrest, comma, no more force shall be used than

16    is reasonably necessary for the safe custody of the

17    prisoner or for overcoming any resistance that may

18    be offered and for ensuring the delivery of the

19    prisoner into safekeeping.

20                Have I read that correctly?

21       **A**     Yes.

22       **Q**     That's consistent with our discussion

23    today about using the least amount of force

24    necessary in light of the threat assessment,

25    correct?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 134

1        **A**    Yes.

2        **Q**    If you would go to page 7 of Exhibit 8 at

3   Ferguson 0568.  Just to put it into context for you,

4   if you look at page 6, this is the use of -- part of

5   the use of force continuum.  Would you agree with

6   that?

7        **A**    Yes.

8        **Q**    These are the options that are available,

9   baton, pepper spray, aerosol irritant, advanced

10  taser electronic incapacitation device.  Do you see

11  that?

12       **A**    Yes.

13       **Q**    Then on to page 7, it states, the last

14  sentence of that section, quote, Guidelines for the

15  operation, comma, deployment and training on the

16  X-26 TASER are found in General Order 499.00.

17            Do you see that?

18       **A**    Yes.

19       **Q**    And that we have marked as Exhibit 9.  And

20  the reason I'm asking you about this this time is

21  there's no date on Exhibit 9, per se, as there are

22  on the other general orders.  But if this order was

23  in effect on July 6, 2010, would you agree that the

24  taser order that is policy number 499.00 would have

25  been in effect that day?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 135

1      **A**     With it noting it in here, I could agree

2      to that.

3      **Q**     Okay.  I'm going to give you Exhibit 9,

4      please.  Are you -- you were Taser certified on --

5      in September of 2011, correct?

6      **A**     Yes.

7      **Q**     And the second line of Exhibit 9, section

8      499.00 of that first full paragraph, states, quote,

9      The X-22 -- excuse me, X-26 TASER is considered a

10     conducted energy weapon, semicolon, an electronic

11     incapacitation device, closed quotes.

12            Is that what your understanding of that

13     tool is?

14     **A**     That's what it reads, yes.

15     **Q**     And that's a force option that is, to your

16     understanding, in the same -- as far as force

17     continuum as the OC spray or a baton?

18     **A**     Yes.

19     **Q**     Is it in the same force continuum as arm

20     locks, wrist locks, blunt blows, those kind of

21     things?

22     **A**     It might be.

23     **Q**     Then this policy goes on in section 499.01

24     of Exhibit 9 to state that the decision made must be

25     made dependent on the actions of the subjects or

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                      October 1, 2015

                                                        Page 136

 1   threat facing the officers.  That's part of it,

 2   correct?

 3        **A**     Where are you reading from?

 4        **Q**     I'm down in the second full paragraph

 5   under policy.

 6        **A**     Okay.

 7        **Q**     It states -- it's talking about the use of

 8   a taser, correct?  It states, quote, The decision

 9   must be made dependent on the actions of the

10   subjects or threat facing the officers.

11             That's one of the factors when you can use

12   a taser, correct?

13        **A**     That is one, yes.

14        **Q**     Then the next one says, quote, and the

15   totality of the circumstances surrounding the

16   incident.  That's a second factor, right?

17        **A**     Yes.

18        **Q**     Then it states, quote, In any event,

19   semicolon, the use of the X-26 TASER must be

20   reasonable and necessary, period, closed quotes,

21   right?

22        **A**     Yes.

23        **Q**     And you agree that all three of those need

24   to be factored each time an officer pulls a taser

25   trigger on a suspect, correct?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

                                                                Page 137

 1                MS. SHAFAIE:  Form.  You can answer.

 2        **A**    Yeah, yes.

 3        **Q**    (By Mr. Dowd) Do you understand the

 4   question?

 5        **A**    Yes, I do.

 6        **Q**    And you answered it yes?

 7        **A**    Yes.

 8        **Q**    And the next page, 499.03, Procedure for

 9   Use, states, The X-26 TASER may be used in those

10   situations where, colon, then it states, A, a

11   subject is threatening himself, comma, an officer,

12   comma, or another person with physical force and

13   other means of controlling the subject are

14   unreasonable or could cause injury to the officer,

15   the subject or others.

16                That's a factor in using the taser?

17        **A**    Yes.

18        **Q**    Do I'd ask you when Mr. Moore was lying

19   flat on his back and his arms were shaking out in

20   front of him, as you described earlier, was he a

21   threat to himself at that point --

22                MS. SHAFAIE:  Object to form.  You can

23   answer.

24        **Q**    (By Mr. Dowd) -- at that point?

25                MS. SHAFAIE:  Same objection.  You can

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 138

1    answer.

2        **A**     You're saying at that point.  But you

3    bring in the factors, all the other factors that

4    happened --

5        **Q**    (By Mr. Dowd) I'm saying --

6        **A**     And him getting up could be a threat to

7    the officer depending on what happens.

8        **Q**     If he got up at that point.  That's why I

9    used the phrase at the point that he's being tased

10   and his arms are shaking out in front of him and

11   he's on his back on the ground.  He's not a threat

12   to the officer at that point, correct?

13       **A**     Well, because he's being tased.

14           MS. SHAFAIE:  Form.

15       **Q**    (By Mr. Dowd) Right.  And he's not a

16   threat to himself at that point, correct?

17           MS. SHAFAIE:  Form.  You can answer.

18       **A**     Because he's being tased.

19       **Q**    (By Mr. Dowd) And he's not a threat to any

20   other citizens, correct, because they're not around

21   and he's being tased, right?

22           MS. SHAFAIE:  Same objection.

23       **A**     Yeah, because he's being tased.

24       **Q**    (By Mr. Dowd) Okay.  Immediately after

25   Mr. Moore was receiving the taser application that

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

```
                                            Page 139

 1    he received as you got out of your squad car and

 2    were approaching, which I am recalling the second

 3    taser application prior to the last application,

 4    immediately upon the cessation of the taser he was

 5    there and he was attempting to get up, would you

 6    agree that at that point he was not an actual threat

 7    to the officer?

 8              MS. SHAFAIE:  Object to form.  You can

 9    answer.

10       Q    (By Mr. Dowd) He could be in the future.

11    But at that point, he did not have a weapon, he was

12    not charging the officer.  He was not an immediate

13    threat at that point, correct?

14              MS. SHAFAIE:  Same objection.  You can

15    answer.

16       A    It's all about how you perceive it.

17       Q    (By Mr. Dowd) Right.

18       A    Again, with what happened beforehand,

19    Officer Kaminski perceives that as a threat, and he

20    addresses the situation.

21       Q    And pauses to assess the situation before

22    applying another taser application?

23              MS. SHAFAIE:  Same objection.

24       A    I said he assessed the situation.

25       Q    (By Mr. Dowd) So are you saying at that
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 140

1   point in time, immediately after the taser

2   application, that Mr. Moore was a threat to Officer

3   Kaminski and yourself, who are now on the scene,

4   after that second application?

5        A    I'm not saying immediately, but you have

6   to bring into factor what occurred beforehand.

7        Q    I'm saying was he an immediate threat to

8   you, unarmed, naked, on the ground, attempting to

9   get up, was he an immediate threat to Officer

10  Kaminski and your personal safety?

11       A    It wasn't to me because I wasn't out of

12  the car yet completely.

13       Q    After you're out of the car.

14       A    To Brian, he could have felt like he was a

15  physical threat.

16       Q    In your opinion, a naked man who's just

17  been tased with two officers on the scene is an

18  immediate threat, authorizing the use of a taser

19  application?

20            MS. SHAFAIE:  Form.  You can answer.

21       A    There are many other factors there.  And I

22  think we've established that.  What happened before

23  comes into play.

24       Q    (By Mr. Dowd) I know it comes into play.

25  But those factors have changed, okay?  Once he's

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

```
                                          Page 141
 1   tased -- I mean, I understand the difference between

 2   when he's charging Officer Kaminski as Officer

 3   Kaminski has reported, that he used the taser on him

 4   and he put him on the ground.  It's not the same

 5   situation, is it, when he's tasing him the second

 6   and third time?

 7            MS. SHAFAIE:  Form.

 8        Q   (By Mr. Dowd) He's no longer charging,

 9   right?

10        A   Right.

11        Q   Now he's got taser prongs on him that are

12   being effective and incapacitating him, correct?

13            MS. SHAFAIE:  Form.

14        A   While he's being tased, yes.

15        Q   (By Mr. Dowd) All right.  So he's at a

16   different threat level than prior to the first taser

17   application.  Would you agree with that?

18        A   Well, anybody that's being tased is a

19   different threat level.

20        Q   Right.  And anybody who's on the ground is

21   a different threat level than someone who's

22   allegedly charging, correct?

23            MS. SHAFAIE:  Form.

24        Q   (By Mr. Dowd) Unarmed and naked?

25            MS. SHAFAIE:  Form.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 142

1       **A**     But you're not going to let them get back

2   off the ground and be that threat again.

3       **Q**     (By Mr. Dowd) I'm just asking you a direct

4   question.  It's a different threat assessment at

5   that point, correct, a man charging without --

6       **A**     You assess it -- you assess the situation.

7       **Q**     Right.

8       **A**     It would be a different assessment.

9       **Q**     It would be a different assessment,

10  different factors, because now he's not charging,

11  now he's on the ground, still naked, but he also has

12  taser prongs in his chest, correct?  That's a

13  different threat assessment than a person who's

14  charging?

15              MS. SHAFAIE:  Form.

16      **A**     And your assessment of that situation is

17  probably going to be different than someone else's.

18  Mine might be different than Brian's.  But Brian

19  assessed that situation in his own way.

20      **Q**     (By Mr. Dowd) I'm asking you as a police

21  officer, are the factors different between a person

22  who's charging an officer as far as a threat

23  assessment as opposed to someone who's on the

24  ground, having been tased, fallen to the ground, and

25  is naked and unarmed as opposed to a person who's

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

                                                     Page 143
1    charging?  That's a different -- those factors are

2    changed, correct?

3        A    Those are different factors.  By the

4    assessment of those factors can be different.

5        Q    So again, you're saying that whatever the

6    officer assesses or whatever force he uses, you're

7    going to feel that that's appropriate because he's

8    the only one allowed to assess the factors --

9             MS. SHAFAIE:  Form.

10       Q    (By Mr. Dowd) -- before using the force?

11            MS. SHAFAIE:  Form.  You can answer.

12       Q    (By Mr. Dowd) Is that what you're saying?

13       A    I'm saying I trust another officer's

14   judgment in the situation at hand.  There's a lot of

15   things going on there, a lot of stress.

16       Q    Okay.  Back to Exhibit 9, section 499.03,

17   the second situation which tasers are authorized

18   are, quote, B, in cases where officer slash subject

19   factors indicate the officers, comma, offenders or

20   others would be in danger by the use of physical

21   force, period.

22            I think we've covered that, haven't we?

23            C, other means of lesser or equal force

24   have been infective and a threat still exists to the

25   officers, comma, subjects and others, period.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

                                                    Page 144

 1              Do you see that?

 2      **A**    Yes.

 3      **Q**    To your knowledge, the only force that

 4  Officer Kaminski ever used that morning was the

 5  taser?

 6      **A**    To my knowledge, yes.

 7      **Q**    He never attempted any alternative uses of

 8  force?

 9      **A**    To my knowledge.

10      **Q**    You see the next sentence that says,

11  quote, The lower center mass of the body should be

12  the target area for frontal discharges when firing

13  the X-26 TASER, comma, although back shots remain

14  the preferred area when practical, semicolon.

15              Do you see that?

16      **A**    Yes.

17      **Q**    And then below that is a picture which has

18  the preferred target areas in blue.  Do you see

19  that, even though this is black and white?

20      **A**    I do see that.

21      **Q**    Is that consistent with your training in

22  September -- prior to September of 2011, that target

23  area?

24      **A**    That statement there is consistent with

25  the training.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 145

1       **Q**    I'll give you Exhibit 7 -- 21, excuse me.

2  It's page Ferg 1483, which is the Taser Training

3  Academy Instructor Certification Lesson Plan,

4  Version 17 dated May 2010.  Have you ever seen that

5  document before, sir?

6       **A**    I don't recall the exact documents that

7  are shown, but --

8       **Q**    While saving your place there, do you see

9  the front of that document?

10      **A**    Yes.

11      **Q**    Are you certified on Version 17 from --

12  have you been --

13            MS. SHAFAIE:  Form.  Do you mean --

14      **Q**    (By Mr. Dowd) Have you been user certified

15  on Version 17 of the taser training?

16      **A**    I've been user certified, I mean, and I

17  understand what you're showing me.  But I'm saying I

18  don't exactly remember if this was the page or not.

19      **Q**    I understand.  You see that picture?

20      **A**    I do see the picture.

21      **Q**    It's similar to the picture at Ferguson

22  902 in Exhibit 9, correct?

23      **A**    Correct.

24      **Q**    And would you agree that if the taser --

25  the taser -- you saw it that morning when they were

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 146

1   taking him away, right?  You eventually were able to

2   see the taser prongs in his chest?

3        **A**    I didn't see the prongs in his chest

4   because of everything that was going on, the amount

5   of people that were working on him.  I was just told

6   where they were later on.

7                         (Plaintiff's Deposition Exhibit

8                         35 marked for identification.)

9        **Q**    (By Mr. Dowd) I'm going to give you

10  Exhibit 35 and represent to you, sir, that that is a

11  picture taken as part of the autopsy of Mr. Moore.

12  And that burn mark, as they say in the autopsy, is

13  the location of the upper taser prong that morning

14  on Mr. Moore's chest.  Do you see that?

15       **A**    Yes.

16       **Q**    Would you agree that that's pretty darn

17  close to center body mass?

18       **A**    It is.

19       **Q**    And would you agree that that's above the

20  line that's in Exhibit 9 as well as Exhibit 17 as

21  far as the preferred target area, several inches

22  above that line?

23       **A**    It is above the line.

24       **Q**    The department purpose and mission

25  statement in Exhibit 1, I'm done with that exhibit,

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                      October 1, 2015

Page 147

1    includes the law enforcement enclosed of ethics.

2    Are you familiar with those?

3        **A**    Yes.

4        **Q**    If you'd like to refer to Exhibit 1.  It's

5    the last page, sir, second to last page.  It states

6    on the first line at General Order 103, Law

7    Enforcement Code of Ethics, as a law enforcement

8    officer my fundamental duty is to serve mankind.  Is

9    that correct?

10       **A**    Correct.

11       **Q**    The last clause of that paragraph is, to

12   respect the constitutional rights of all men, to

13   liberty, comma, equality and justice, period.

14            Do you see that?

15       **A**    Yes.

16       **Q**    That includes the constitutional rights to

17   be free from use of excessive force by officers,

18   correct?

19       **A**    Correct.

20       **Q**    Officers are given a lot of responsibility

21   and a lot of authority in our society, aren't they?

22            MS. SHAFAIE:  Form.  You can answer.

23       **A**    Yes, we are.

24       **Q**    (By Mr. Dowd) And with that responsibility

25   comes the duty not to abuse the authority, including

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

                                                            Page 148

 1    the ability to use force that you've been trained to

 2    use, correct?

 3              MS. SHAFAIE:  Form.  You can answer.

 4        **A**    Correct.

 5        **Q**    (By Mr. Dowd) If you look down at the

 6    fourth paragraph, it states, quote, I recognize the

 7    badge of my office as a symbol of public faith.

 8              Do you agree with that statement?

 9        **A**    Yes.

10        **Q**    And it further states that you accept it

11    as a public trust to be held so long as I am true to

12    the ethics of the police service.

13              Do you agree with that statement?

14        **A**    Yes.

15        **Q**    Did you take an oath similar to that, sir,

16    before to become a peace officer?

17        **A**    Yes.

18        **Q**    Do you agree, sir, that when police

19    departments, police academies, train their officers

20    not to use excessive force that this is for the

21    public safety?

22              MS. SHAFAIE:  Form and foundation.  You

23    can answer.

24        **A**    They train it -- I can kind of agree to

25    that.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                      October 1, 2015

Page 149

1      **Q**    (By Mr. Dowd) I mean, when you're -- the
2  limitations on the amount of force you're allowed to
3  use are primarily for the protection of people upon
4  whom you're using the force, which are people in
5  this city, correct?
6              MS. SHAFAIE:  Same objection.
7      **A**    Yeah, the least amount of force possible.
8      **Q**    (By Mr. Dowd) And that's to protect those
9  people from having too much force used on them and
10 them suffering serious injury or death, right?
11             MS. SHAFAIE:  Same objection.
12     **A**    Yes.
13     **Q**    (By Mr. Dowd) Part of the excessive force
14 training and to use the least amount of force
15 necessary is to protect the public from officers
16 abusing that force, correct?
17     **A**    Yes.
18     **Q**    And it's the department's duty to
19 supervise its officers to ensure that excessive
20 force is not used?
21             MS. SHAFAIE:  Same objections.
22     **A**    I'd agree with that.
23     **Q**    (By Mr. Dowd) You'd agree it's the other
24 officers' duty as well to make sure that your fellow
25 officers aren't using excessive force?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

```
                                                        Page 150
 1                 MS. SHAFAIE:   Same objections.

 2        A     Yes.

 3        Q     (By Mr. Dowd) And that both the

 4   supervision by command and supervision by fellow

 5   officers is for the protection of the public?

 6                 MS. SHAFAIE:   Same objections.

 7        A     Yes.

 8        Q     (By Mr. Dowd) And it's to protect the

 9   public from serious injury and possibly death?

10                 MS. SHAFAIE:   Same objections.

11        A     Yes.

12        Q     (By Mr. Dowd) Would you also agree that

13   police departments must train their officers on how

14   to handle people with mental health issues who are

15   exhibiting erratic behavior or having a personal

16   crisis?

17                 MS. SHAFAIE:   Same objections.

18        A     I believe training should be there.

19        Q     (By Mr. Dowd) And do you agree that the

20   command and the superior officers have a duty to

21   supervise the officers in how they deal with people

22   in personal crisis or emotional distress or mental

23   issues?

24                 MS. SHAFAIE:   Same objections.

25        A     I believe there should be some
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 151

```
 1   supervision.
 2       Q    (By Mr. Dowd) You've been certified on a
 3   taser.  And that's on how to use the taser, correct?
 4       A    Yes.
 5       Q    And that's in -- it's anticipated the
 6   taser will be used on people who you need to
 7   apprehend, right, get under control, whatever term
 8   you like to use?
 9       A    Okay, yes.
10       Q    And the taser is a tool, just like tear
11   gas or pepper spray, OC spray, a baton.  Those are
12   all products that are sold to police departments to
13   be used as a tool, right?
14       A    Yes.
15       Q    And they all come with some kind of
16   instructions and warnings, right?
17       A    Yes.
18       Q    So these companies, including Taser and
19   the OC spray and the batons and the weapons company,
20   the Smith and Wessons of the world, Glock and those,
21   they give -- they provide the tools with how to --
22   and the instructions of how to maintain it and how
23   to safely use it to the best of their knowledge, but
24   they don't provide you with the use of force
25   training specifically, do they?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

```
                                              Page 152
  1            MS. SHAFAIE:  Form and foundation.  You
  2     can answer.
  3        A    I was trained --
  4        Q    (By Mr. Dowd) To your knowledge.  Do you
  5     understand the question?
  6        A    I was trained through the department.
  7        Q    Right.  The use of force training and the
  8     policies comes from the department, right?
  9        A    Yes.
 10        Q    And your training in September of 2011
 11     included that when you deploy a taser you should use
 12     the least number of charges to accomplish the lawful
 13     objective?
 14        A    Least amount of force to obtain the
 15     arrest.
 16        Q    And you're supposed to know when you're
 17     using that taser the current law in your
 18     jurisdiction?
 19            MS. SHAFAIE:  Foundation.  You can answer.
 20        A    Yes.
 21        Q    (By Mr. Dowd) Supposed to know your
 22     policies of the department?
 23        A    Yes.
 24        Q    You're supposed to know the taser's
 25     current training program when you use it?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 153

 1              MS. SHAFAIE:  Foundation.  You can answer.

 2       **A**    Yes.

 3       **Q**    (By Mr. Dowd) And you're supposed to use

 4    the -- you're supposed to be -- understand and

 5    adhere to Taser's current warnings, instructions and

 6    information that they provide?

 7              MS. SHAFAIE:  Same objection.

 8       **A**    Yes.

 9              MR. DOWD:  Can I ask what the basis of

10    your form objection is?

11              MS. SHAFAIE:  You haven't established any

12    of his knowledge regarding any of those things

13    you're asking him, the Taser -- whether he received

14    any of that information from Taser, when he received

15    it.

16              MR. DOWD:  That's fine.  That's fine.  If

17    that's your objection, that's fine.  If that's going

18    to be the basis of all your objections, you can have

19    a running objection until the next break.

20              MS. SHAFAIE:  I don't know what the

21    questions are, but I'm trying to keep them as --

22              MR. DOWD:  And you're doing good.  I

23    appreciate it.

24              MS. SHAFAIE:  -- not disruptive as

25    possible.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

                                                        Page 154

 1              MR. DOWD:  I appreciate it.  I'll go ahead

 2      and give you a running objection on that basis until

 3      the next break.

 4              MS. SHAFAIE:  Just for foundation as to --

 5              MR. DOWD:  Your objection, form --

 6              MS. SHAFAIE:  Form and foundation.

 7              MR. DOWD:  Form and foundation, yeah.

 8              MS. SHAFAIE:  Until the next break?

 9              MR. DOWD:  Right.

10      Q    (By Mr. Dowd) So you're also trained by

11      Taser and warned that when deploying a taser you

12      should avoid the chest?

13      A    If you can.  If it dictates, try to avoid

14      the chest.

15      Q    And the preferred target area for taser

16      prong applications is below the chest, lower body

17      mass?

18      A    If the situation dictates it.

19      Q    And you're not supposed to be using your

20      taser to try to kill someone, right?  It's a less

21      than lethal force weapon.  You agree with that?

22      A    We're never trained to kill anybody.  But

23      yes, it is a less --

24      Q    Unless you're discharging your weapon in a

25      lethal force situation.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 155

1        **A**    It is a less lethal situation.

2        **Q**    Were you trained as of September 2011 that

3    a taser application of a subject can cause

4    physiological or metabolic effects?

5        **A**    Not that I recall.

6        **Q**    You don't recall that?  And that those

7    are -- include but aren't limited to acidosis, heart

8    rate rhythm, respiration, things like that?  You

9    don't recall any training or warnings like that?

10       **A**    I don't recall exact warnings like that.

11       **Q**    Okay.  You understand that the taser

12   applications and you understood in 2011 that they

13   affect the sensory nervous system?

14       **A**    From what I can recall, yes.

15       **Q**    And that a neuromuscular incapacitation is

16   what occurs when the taser prongs are properly

17   spread?

18       **A**    Yes.

19       **Q**    And that it operates at a peak open gap

20   voltage of 50,000 volts?

21       **A**    I believe so.

22       **Q**    Tell the jury what you mean by -- what

23   your understanding of split the hemispheres or split

24   the beltline means in relationship to your taser

25   training.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                      October 1, 2015

Page 156

1      **A**     They use that phrase -- preferably, if the

2   situation dictates, try to aim for the beltline.

3   That would hopefully put one prong in the leg and

4   possibly another one just above the beltline and

5   give it enough spread to make effect.  But again,

6   it's if that's even possible in the situation.

7      **Q**     Do you agree that when Officer Kaminski

8   and you were on the scene with Mr. Moore prior to

9   the last taser application that that was not a

10  deadly force situation?

11     **A**     It was not a deadly force situation.

12             MR. DOWD:  We can go off the record,

13  please.

14             VIDEOGRAPHER:  Off the record at 12:27.

15             (Off the record.)

16             VIDEOGRAPHER:  Back on the record at

17  12:33.

18     **Q**     (By Mr. Dowd) Officer White, I notice in

19  Exhibit 12 there's a report from a Detective Wilson.

20  Do you know who that is?

21     **A**     Yes.

22     **Q**     And what was her -- she was a detective at

23  that time.  Is she still with the department to your

24  knowledge?

25     **A**     To my knowledge, yes.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                              October 1, 2015

Page 157

1      **Q**    All right.  And do you know what her role

2    is with regard to the investigation of the death of

3    Mr. Moore?

4      **A**    I -- I think a follow-up for an autopsy.

5    I'm not quite sure.

6      **Q**    And is that customary if a person were to

7    die during a use of force with a Ferguson police

8    officer that a detective is assigned to follow up

9    and complete the procedures necessary to

10   investigate?

11     **A**    I wouldn't say policy or customary.  I've

12   never dealt with it before.  But in that instance it

13   was.

14     **Q**    Have you ever spoken to Detective Wilson

15   about this incident?

16     **A**    I have not.

17     **Q**    Even after the -- immediately after the

18   occurrence, you didn't -- she didn't contact you or

19   talk to you?

20     **A**    No.  I don't talk to her.

21     **Q**    Did anyone at the department contact you

22   and ask you what happened other than tell you to

23   write your report?

24     **A**    Just the lieutenant, Lieutenant Ballard.

25     **Q**    Okay.  Do people in Detective Wilson's

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 158

1    position have any role in internal affairs

2    investigations?

3        **A**    No.

4        **Q**    Who would normally be involved in that if

5    there were to be an internal affair investigation at

6    Ferguson?

7        **A**    To my understanding, it would be a

8    lieutenant.

9        **Q**    And would it be the lieutenant that's

10   involved already like Lieutenant Ballard in this

11   case?

12       **A**    No.  From my understanding, it's

13   Lieutenant Nabdzyk that does internal affairs.

14       **Q**    He never interviewed you?

15       **A**    No.

16       **Q**    And there was no civilian review board in

17   Ferguson in September of 2011 that took an

18   independent look at what happened here?

19       **A**    There wasn't.

20       **Q**    Are you aware of any, anybody who

21   investigated this other than Officer Ballard and

22   yourself of Mr. Moore?

23       **A**    I'm not aware.

24       **Q**    Were you ever interviewed by anybody from

25   the Department of Justice during their

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                        October 1, 2015

                                                        Page 159

 1   investigation?

 2       **A**    I was not.

 3       **Q**    Okay.  Have you ever tased anyone in the

 4   line of duty?

 5       **A**    Yes.

 6       **Q**    All right.  How many times?

 7       **A**    I can't give you the exact number.

 8       **Q**    Approximately how many times before

 9   September of 2011?

10       **A**    Again, I couldn't give you an exact

11   number.

12       **Q**    Were they generally using the prong

13   application or the stun application?

14       **A**    Again, if I -- until I can see what I

15   wrote, I wouldn't remember.  That's --

16       **Q**    All right.  Have you ever tased any thin

17   or skinny man in the chest?

18       **A**    I'd have to see.  I mean, I can't -- it's

19   been five years almost since that happened.  I mean,

20   I've tased several people.  But as far as locations

21   go, I --

22       **Q**    You don't recall ever tasing anyone in the

23   chest the way Mr. Moore was tased with one in the

24   center body mass and one down around the groin?

25       **A**    I'd have to review all my points.  I don't

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

                                                        Page 160

 1    remember.

 2         **Q**    Well, I understand.  So I'm asking as you

 3    sit here, you don't remember one that you --

 4         **A**    I don't remember.

 5         **Q**    Do you -- are you aware of any incidents

 6    in which Officer Kaminski has tased anyone since

 7    this?

 8         **A**    I'm not aware.

 9         **Q**    Are you aware of whether he ever tased

10    anyone prior to September 2011?

11         **A**    I'm not aware.

12              MR. DOWD:  I don't have any further

13    questions.  I appreciate your time this morning,

14    sir, and your answering my questions very much.

15              I would make one reservation, that if

16    there are additional documents produced that we had

17    previously requested that should have been produced,

18    I reserve the right to inquire again.

19                         EXAMINATION

20    QUESTIONS BY MR. JOHNSON:

21         **Q**    Officer White, my name is Todd Johnson.

22    I'm an attorney for separate family members of

23    Mr. Moore.  I'm not going to tread over all the same

24    ground that Mr. Dowd did earlier, but I have some

25    follow-up questions, obviously about the same

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 161

 1    issues.

 2              You were in the Ferguson Police Department

 3    when you received the dispatch that dispatched you

 4    to the scene with Mr. Moore, correct?

 5        **A**    Yes.

 6        **Q**    Was Mr. Kaminski also present with you at

 7    the department when that dispatch was received?

 8        **A**    I would -- I can't exactly remember, but I

 9    mean, it was roll call time, so --

10        **Q**    Did you receive the dispatch while roll

11    call was being undertaken?

12        **A**    I don't recall exactly where in the

13    station I was.  I just know I was there.

14        **Q**    And how did you actually hear the

15    dispatch?  Is this over your walkie?

16        **A**    Yes.

17        **Q**    What zone or beat were you assigned to

18    that day?

19        **A**    I don't recall.

20        **Q**    What zone or beat was Officer Kaminski

21    assigned to that day?

22        **A**    I don't recall.

23        **Q**    Do you know if you were assigned to a zone

24    or beat as opposed to being an extra or additional

25    patrol car that day?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                      October 1, 2015

```
                                                        Page 162

  1        A     I don't remember where I was assigned that

  2   today.

  3        Q     Do you know if Officer Kaminski was

  4   assigned to a beat as opposed to being an extra or

  5   additional patrol car that day?

  6        A     I don't remember.

  7        Q     The gentleman that you encountered that's

  8   in your narrative before you got to the scene, you

  9   recall meeting with somebody before you got there?

 10        A     In the car.

 11        Q     Right.

 12        A     Yes.

 13        Q     And this is a person that gave you

 14   information about the events before you arrived to

 15   the scene, correct?

 16        A     Yes.

 17        Q     The demeanor of the person who gave you

 18   that information, did they appear frightened to you?

 19        A     I don't remember.  I just remember what

 20   they said.

 21        Q     Nothing in the way that they conveyed it

 22   to you, though, stands out that they were frightened

 23   for their safety?

 24        A     Again, I can't remember what their

 25   demeanor was.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 163

1       **Q**    At any point after you arrived to the
2   scene, did Mr. Moore strike you?
3       **A**    No.
4       **Q**    Did he strike Officer Kaminski that you
5   saw?
6       **A**    No.
7       **Q**    Did he physically resist you cuffing him?
8       **A**    He was under power of the taser, so no.
9       **Q**    Did he physically resist in any fashion
10  that you saw after the load was discharged?
11      **A**    No.
12      **Q**    Did you receive any information that he
13  had broken any property prior to you being summoned
14  to the scene?
15      **A**    Not that anything was broken, no.
16      **Q**    Did he break any property in your
17  presence?
18      **A**    No.
19      **Q**    Did you go straight from the Ferguson
20  Police Department station to the scene
21  September 17th, 2011?
22      **A**    I went straight to Airport, but I went
23  down a side street.
24      **Q**    That's what I was going to ask.  Did you
25  take Florissant?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 164

1      **A**    I took Florissant to Airport to Margo.

2      **Q**    Do you recall your earlier testimony where

3  EMS was summoned more than once?

4      **A**    Yes.

5      **Q**    And it was summoned for the purpose --

6  one, there was a discharge of a taser, correct?

7      **A**    Correct.

8      **Q**    And two, to request expedited service

9  because Mr. More had stopped breathing, correct?

10     **A**    Correct.

11     **Q**    What was the time in-between those two

12  communications to dispatch to dispatch EMS?

13     **A**    The timeframe is kind of hard to say.  It

14  was really quickly.  Everything happened very

15  quickly.  Thirty seconds to a minute maybe.  I mean,

16  it -- very quick scene there.

17     **Q**    What reason was Lieutenant Ballard

18  summoned to the scene?

19     **A**    Whenever there's a taser discharged we

20  automatically notify a supervisor.

21     **Q**    Who contacted Lieutenant Ballard to

22  arrive?

23     **A**    I want to say I did on the radio.  I wrote

24  that in my report, so that's --

25     **Q**    Did Lieutenant Ballard ever review Officer

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 165

```
 1   Kaminski's use of force with you?
 2       A    No.
 3       Q    Did Chief Jackson do that?
 4       A    No.
 5       Q    Did -- we heard a name in other testimony,
 6   Henke.
 7       A    Yes.
 8       Q    Is there a Mr. Henke, Captain Henke, that
 9   works at your department?
10       A    Yes.
11       Q    And was he working at the department in
12   September 2011?
13       A    Yes.
14       Q    And is he working at the department now?
15       A    No.
16       Q    When did he leave the department to your
17   knowledge?
18       A    Last year.
19       Q    And do you have any idea of the facts and
20   circumstances of why he left?
21       A    Yes.
22       Q    What do you know?
23       A    Rumors that he received an email that
24   wasn't to the best of the department, so --
25       Q    Was this -- and I don't want to try and
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

                                                              Page 166

 1   sensationalize anything.  But was this associated

 2   with the -- maybe a review of the department after

 3   the Michael Brown incident?

 4        **A**    Yes.

 5        **Q**    Did this have to do with allegedly some

 6   form of emails that were off-color or racist in some

 7   nature?

 8        **A**    Yes.

 9        **Q**    And to your knowledge, and I know you

10   weren't the one personally involved with that, but

11   to your knowledge, was Captain Henke the one who

12   received that email or sent the email?

13        **A**    I was told he received it.

14        **Q**    Were you told that he had forwarded it to

15   any other persons?

16        **A**    I was not.

17        **Q**    To your knowledge, was he terminated?

18        **A**    No.

19        **Q**    He separated employment?

20        **A**    Yes.

21        **Q**    Do you know if he's still in law

22   enforcement with a different agency?

23        **A**    I do not know.

24        **Q**    You don't know his whereabouts after he

25   left Ferguson?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 167

1       **A**     No.

2       **Q**     Have you, yourself, when you have used

3    force under the use of force policy of Ferguson,

4    have you ever had a supervisor review your use of

5    force with you?

6       **A**     Yes.

7       **Q**     And how did they go about doing that?

8       **A**     Well, they've completed the use of force

9    report and they just sit down, review it with you,

10   make sure that the statements in there are the

11   accurate statements that I gave them, and then they

12   sign it.  I believe we sign it and it gets sent up

13   to the chief.

14      **Q**     And is this done in a face-to-face meeting

15   where the two of you sit down and go through the

16   report?

17      **A**     Yes.

18      **Q**     And the actual use of force report, is

19   that authored -- is that authored by the -- your

20   superior?

21      **A**     Yes.

22      **Q**     You, as the officer, as the patrol officer

23   in most cases, you're not the one who is authoring

24   the use of force report?

25      **A**     Correct.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                      October 1, 2015

Page 168

1        **Q**      In the event of a discharge of a taser,

2    you are not the one who is authoring the taser use

3    report, correct?

4        **A**      Correct.

5        **Q**      In your own experience, has a supervisor

6    ever advised you that your use of force was

7    inappropriate?

8        **A**      No.

9        **Q**      Do you know if anybody informed you that

10   Officer Kaminski's use of force September 17th, 2011

11   was inappropriate under the department's use of

12   force policy?

13       **A**      No.

14       **Q**      Do you know if Officer Kaminski was

15   disciplined because of the Moore incident?

16       **A**      No.

17       **Q**      Were you?

18       **A**      No.

19       **Q**      To your knowledge, was anybody within your

20   department?

21       **A**      No.

22       **Q**      Have you ever been disciplined for an

23   inappropriate improper use of force under department

24   policy?

25       **A**      No.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 169

1      **Q**    Do you know if Officer Kaminski has?

2      **A**    I don't know.

3      **Q**    Do you know if anybody patrol officer has

4    within the Ferguson Police Department?

5      **A**    I don't know.

6      **Q**    Or any officer, period, at any level or

7    any rank?

8      **A**    I don't know.

9      **Q**    Do you know if the use of force report

10   that Lieutenant Ballard authored in Exhibit 12 was

11   reviewed by any superior of his within the

12   department?

13     **A**    I don't know.

14     **Q**    Have you ever had any citizen complaints

15   registered against you as a Ferguson Police

16   Department officer?

17     **A**    Yes.

18     **Q**    How many?

19     **A**    I believe it's two.

20     **Q**    What years were they?

21     **A**    One was last year, and the other one I

22   can't recall the year.

23     **Q**    And what was the nature of the complaints?

24     **A**    One was -- I'm trying to explain it.  I

25   gave a citizen the middle finger --

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

                                                            Page 170

 1        **Q**    Okay.

 2        **A**    -- and I got a complaint on that.  And the

 3   other one was a complaint related to a traffic

 4   ticket that I can remember.  There might be

 5   something else.  But just was written reprimands.

 6        **Q**    Is that the form of discipline that you

 7   received in both occasions, sir?

 8        **A**    Yes.

 9        **Q**    And were those placed in your file to your

10   knowledge?

11        **A**    To my knowledge, they should have been.

12        **Q**    And I know you're not the one that

13   maintains your personnel file, correct?

14        **A**    Correct.

15        **Q**    Where are those maintained now, if you

16   know?

17        **A**    They should be in the chief's office.

18        **Q**    Is there -- does the chief maintain an IA

19   file?  That's a terrible question.  Let me ask a

20   better one.  Back in 2011, when this occurred with

21   Mr. Moore, do you know if the chief maintained IA

22   files?

23        **A**    I don't know if he did or not.

24        **Q**    Do you know if the citizen complaints that

25   were registered against you were placed in some type

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 171

1    of IA file that the chief or the Ferguson Police

2    Department would maintain?

3        **A**    I don't know if they did.

4        **Q**    Once the citizen complaints were

5    registered against you, sir, was there any type of

6    internal review or follow-up within your department?

7        **A**    There was a -- there was a review.

8        **Q**    And how -- what's your knowledge?  How did

9    it -- how did it take place?  Who did it and what

10   did they do?

11       **A**    To my knowledge, the complaint is given to

12   a supervisor.  I write out a memo about what

13   happened.  They've got their side of what happened.

14   They forward it through the chain of command to the

15   chief of police.  He makes the decision.  It gets

16   sent back down to them.  They pull me in, tell me

17   the decision.  It goes back up to the chief to be

18   put in the personnel file.

19       **Q**    There's a number of decisions that could

20   be made on a citizen complaint, correct?

21       **A**    Yes.

22       **Q**    Could be warranted, not warranted, a lot

23   of different definitions, true?

24       **A**    Yes.

25       **Q**    In your own cases, do you know the outcome

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 172

1   of the complaints that were registered against you

2   in terms of how Ferguson determined if they were

3   warranted, not warranted, or otherwise?

4        **A**    They sustained the one.

5        **Q**    And the other one?

6        **A**    Don't recall the disposition on that one.

7        **Q**    Which one was sustained?

8        **A**    The middle finger.

9        **Q**    At roll call, before you go on shift, do

10  you ever -- have you ever received any information

11  about any type of use of force incident involving

12  one of your peers?

13       **A**    They don't go into details, but they might

14  explain like, hey, this happened here.  But they

15  don't go into extreme detail.

16       **Q**    It's not a scenario where they lay it out

17  in a Power Point or anything like that, true?

18       **A**    Exactly, it's not.

19       **Q**    It's just kind of anecdotal, hey, this

20  happened yesterday or last shift, period, true?

21       **A**    True.

22       **Q**    Anything involving Officer Kaminski that

23  you recall?

24       **A**    No.

25       **Q**    When you first saw Mr. Moore and his arms

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 173

1    were waiving around, as you told Mr. Dowd, were his

2    fists clenched in any fashion?

3        **A**    I believe they were.

4        **Q**    And did you associate that with the fact

5    that he was under load?

6        **A**    Yes.

7        **Q**    That there was some muscle contraction?

8        **A**    Yes.

9        **Q**    Did Mr. Moore make any verbal threats to

10   you that day?

11       **A**    No.

12       **Q**    Did he make any threats that you

13   considered to be verbal in fashion to Officer

14   Kaminski that day?

15       **A**    No.

16       **Q**    Do you have any knowledge as to whether

17   Officer Kaminski was certified on the use of the

18   taser as of September 2011?

19       **A**    I don't have knowledge.

20       **Q**    You know he was carrying it?

21       **A**    Yes.

22       **Q**    After that date, do you have any knowledge

23   as to whether or not Officer Kaminski continued to

24   train others on the use of the taser?

25       **A**    I don't recall.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 174

1       **Q**    The reason I ask that is there's been some

2   testimony that he wasn't selected as an instructor

3   after this incident.  I didn't know if you know

4   anything through the department as to your

5   understanding why that took place.

6       **A**    I know it at one point he became an

7   instructor, but I don't know further.

8       **Q**    You know he was an instructor, but you

9   don't know anything after that, right?

10      **A**    Yes.

11      **Q**    A guy named Eric Davis is the instructor

12  now, true?

13      **A**    I didn't know that.

14      **Q**    Didn't know that either?

15      **A**    No.

16      **Q**    Okay.  Did you ever place Mr. Moore under

17  arrest?

18      **A**    I handcuffed him.

19      **Q**    And based on your background, training and

20  experience in law enforcement, sir, is that you

21  effectuating an arrest on him?

22      **A**    In the situation that happened there, yes,

23  he was being placed under arrest.

24      **Q**    For what charge?

25      **A**    The indecent exposure and the assault of

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

```
                                              Page 175
 1   Kaminski, running at him.
 2       Q    You saw his indecent exposure because he
 3   was naked in public?
 4       A    Yes.
 5       Q    You did not see the assault on Officer
 6   Kaminski, correct?
 7       A    I did not.
 8       Q    When were you alerted that Mr. Moore
 9   passed?
10       A    It was after I made contact with that
11   witness, with O'Connor.  I was told by Lieutenant
12   Ballard later on.
13       Q    And what were the facts and circumstances
14   of why Lieutenant Ballard told you he passed?  Did
15   he give you any details?
16       A    Well, we didn't really have details at
17   that time because it had just happened.  He just
18   explained that he had passed.
19       Q    Did you check for any warrants on Mr.
20   Moore before you arrived to the scene?
21       A    I didn't know who Moore was when I
22   arrived.
23       Q    You didn't have a name?
24       A    No.
25       Q    Did you check for warrants after you
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 176

1    encountered him that day?

2        **A**    I didn't.

3        **Q**    And when you check for warrants on an

4    individual, what process do you go through in your

5    system?

6        **A**    It's a really easy process.  Just got that

7    one, one screen.  You put their name, date of birth,

8    social security if you have it, and it will tell you

9    yes or no.

10       **Q**    Is that through Mules?

11       **A**    Regis.

12       **Q**    Regis?

13       **A**    And Mules.

14       **Q**    Are they sync'd, connected?

15       **A**    Yes.

16       **Q**    Do you know if anybody checked for

17   warrants on Mr. Moore after the incident on

18   September 17, 2011?

19       **A**    I would assume so, but I don't know for

20   sure.

21       **Q**    And, you know, if somebody checks for a

22   warrant, how does that work?  Do you have to log in?

23   Do you have to put a user name, password?  Tell me

24   when you check for warrants what process or protocol

25   you go through.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 177

1        **A**     When we log on the computer each day, you

2    have to log in with a user name and password.  And

3    it's really one click of a button after you enter

4    their information and it pops up for you.

5        **Q**     And what program, what software?  Is it

6    Regis?

7        **A**     Regis.

8        **Q**     And do you still use Regis?

9        **A**     Ferguson does not, no.

10       **Q**     When did -- when did they switch from

11   Regis?

12       **A**     Approximately a year and a half, two years

13   ago, I think.

14       **Q**     What are they utilizing now?

15       **A**     Just Mules.

16       **Q**     Mr. Dowd asked you about any communication

17   you may have had with Mr. Moore's spouse.  Do you

18   recall that?

19       **A**     Yes.

20       **Q**     And his spouse at the time of his death

21   was named Tina more.  His mother's name is Delores

22   Moore.  You don't recall speaking with either of

23   these ladies?

24       **A**     I don't recall.

25       **Q**     He had a son named Anthony Rice.  You

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

                                                            Page 178

 1    speak with anybody you associate to be a family

 2    member such as a son of Mr. Moore?

 3        **A**    I have not.

 4        **Q**    Did anybody come up to you at any point,

 5    Officer, and tell you they saw the encounter between

 6    Jason Moore and Officer Kaminski before you arrived?

 7        **A**    No.

 8        **Q**    Did you speak with anybody you associate

 9    to be with Mr. Moore's family after September 17th,

10    2011?

11        **A**    I did not.

12        **Q**    Did Mr. Kaminski, Officer Kaminski, ever

13    to your knowledge communicate any aversion he had to

14    any type of use of force, any problems he had with

15    force?

16        **A**    No.

17        **Q**    Any problems he had with the forms of

18    force that were available to him under Ferguson

19    department policy?

20        **A**    It was not expressed to me.

21        **Q**    You were certified on crisis intervention

22    through St. Louis County March of 2010?

23        **A**    Sounds right.

24        **Q**    I'm holding your certificate.

25        **A**    Yeah.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 179

1      **Q**     I'm not trying to hide anything, sir.   At

2    any point after you received notice that there was a

3    naked individual in or about the streets, and I

4    think you said banging on cars, did you at any point

5    associate that with the training you received a year

6    and a half earlier?

7      **A**     Like I said earlier, there's so many

8    factors when you get a call like that.   There wasn't

9    enough information to say, you know, what's going on

10   here.   So I had not associated that to that.

11     **Q**     Did the county as part of their scenarios

12   that you received in your 40 -- approximately 40

13   hours of training a year and a half earlier go

14   through a scenario involving people who were naked?

15     **A**     Not that I recall.

16     **Q**     You talked about schizophrenics.   You

17   remember that?

18     **A**     Yes.

19     **Q**     You talked about -- what were the other

20   scenarios?   What were their diagnosed conditions you

21   went through at CIT?

22     **A**     There was plenty.   Autism, schizophrenia,

23   bipolar.   I mean, there's -- there's plenty.

24     **Q**     How about agitated delirium?

25     **A**     I don't recall exactly.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

```
                                                        Page 180

 1        Q     Excited delirium?

 2        A     I don't recall.

 3        Q     Did you read the DOJ report on your

 4   department?

 5        A     I elected not to.

 6        Q     Never did?

 7        A     Bits and pieces, but I didn't -- I didn't

 8   read it.

 9        Q     You made the conscious decision not to

10   read through the United States investigation into

11   your employer?

12        A     Yes.

13        Q     I want to ask you about data.  I'm not

14   asking you about opinions or about conclusions.  I

15   want to ask you about facts that are set forth in

16   this exhibit, which is Exhibit 11.  Do you see that

17   in front of you, sir?

18        A     Yes.

19        Q     I'm going to leaf around and jump around

20   just to about two or three different pages and ask

21   you really for your memory, okay?  Let's start on

22   page 29 of Exhibit 11.  And the subheading is

23   Ferguson Police Department's use of electronic

24   control weapons is unreasonable.  Do you see that

25   subsection, sir?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 181

1        **A**    I see it.

2        **Q**    I want to start with an encounter or

3    incident that they identified on page 29 of

4    Exhibit 11 in November of 2013 where they say that a

5    correctional officer fired an ECW at an

6    African-American woman's chest because she would not

7    follow his verbal commands to walk toward a cell.

8    Do you have any memory, sir, working at the

9    department for ten years of the facts and

10   circumstances of this incident?

11       **A**    I wasn't there.  I don't know that.

12       **Q**    Do you have a knowledge or identity of the

13   Ferguson Police Department officer or officers who

14   were involved in that encounter?

15       **A**    I wasn't there.  I don't know.

16       **Q**    Okay.  Next incident is on page 30 of

17   Exhibit 11.  It says, in September 2012, an officer

18   drive-stunned an African-American woman who he had

19   placed in the back of his patrol car but who had

20   stretched out her leg to block him from closing the

21   door.  The woman was in handcuffs.

22            Do you have any knowledge as to the facts

23   and circumstances of that incident, sir?

24       **A**    I wasn't there.

25       **Q**    Or to the officers involved?

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 182

1        **A**    I do not.

2        **Q**    Next incident is in May 2013, officers

3   drive-stunned a handcuffed African-American man who

4   verbally refused to get out of the back seat of a

5   police car once it arrived at the jail.

6              Do you have any personal knowledge of the

7   facts and circumstances of that incident, sir?

8        **A**    I don't recall that.

9        **Q**    Or to the police officers involved?

10       **A**    I don't recall that.

11       **Q**    Let's jump ahead to page 36 of Exhibit 11,

12   which is in the subsection Ferguson Police

13   Department officers have a pattern of resorting to

14   force too quickly when interacting with vulnerable

15   populations.  And this is the subheading of a

16   subheading that says, force used against people with

17   mental health conditions or intellectual

18   disabilities.  That's the subheading.  But the body

19   that I care about is on page 36.  Do you have that

20   available, sir?

21       **A**    Yes.

22       **Q**    I'm going to skip over Mr. Moore's case

23   because it's in the second paragraph and we've

24   talked about that at length today.  Do you agree?

25       **A**    Yes.

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                October 1, 2015

Page 183

1        **Q**     Let's go down to the next paragraph.   In

2    2013, Ferguson Police Department stopped a man

3    running with a shopping cart because he seemed

4    suspicious.   According to the file, the man was

5    obviously mentally handicapped.   And then apparently

6    it goes on to say they drive-stunned him in the side

7    of the neck.   Do you have any knowledge as to the

8    facts and circumstances of the 2013 incident?

9        **A**     I wasn't there, sir.   I don't know.

10       **Q**     And really -- and I'm not trying to be coy

11   on this.   I know you might -- you're going to tell

12   me if you were present for any of these because

13   you'd probably remember.   I'm asking for your

14   knowledge from being around the station, all right?

15   So with that caveat, does that change any of your

16   answers so far?

17       **A**     No.

18       **Q**     Gotcha.   Do you know the officer or

19   officers involved in this 2013 incident with the

20   obviously mentally handicapped individual?

21       **A**     I do not.

22       **Q**     One month before Mr. Moore's case, is the

23   next sentence, where officers used an ECW device

24   against a man with diabetes who had bit an EMT's

25   hand without breaking the skin.   The man had been

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

Page 184

1   having seizures when he did not comply with

2   officers' commands.

3            Do you have any knowledge as to the facts

4   and circumstances of that incident, sir?

5      **A**    I do not.

6      **Q**    Or of the officers involved?

7      **A**    I don't.

8      **Q**    Or of the EMT involved?

9      **A**    I do not.

10     **Q**    Next paragraph is in August 2010, an

11  officer responded to a call about an

12  African-American man walking onto the highway and

13  lying down on the pavement.  The officer struck the

14  man several times with his asp baton, including once

15  in the head, a form of deadly force, causing

16  significant bleeding.  Two other officers then

17  deployed their ECWs against the man a total of five

18  times.  Do you have any knowledge of the facts and

19  circumstances of that incident, sir?

20     **A**    I don't.

21     **Q**    And we saw in earlier questioning that the

22  taser -- there were some tasers purchased by your

23  department in 2010.  Is that your memory as to the

24  year Ferguson first obtained or received taser ECWs?

25     **A**    My years are sketchy, but I mean, 2010

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 185

1    sounds appropriate, but kind of sketchy there.

2         **Q**    All right.  And you don't know the

3    officers involved in that incident, sir?

4         **A**    I think I heard of one guy that was there.

5         **Q**    Who was that?

6         **A**    Officer Boyd.

7         **Q**    Is that Officer Boyd who used to be with

8    the St.~Louis Metropolitan Police Department?

9         **A**    Yes.

10        **Q**    Okay.  The final incident I'd like to ask

11   you about is at the bottom paragraph of page 36 of

12   Exhibit 11, where in 2011 in July a correctional

13   officer used an ECW to drive-stun an

14   African-American male inmate three times after he

15   tried to hang himself with material torn from a

16   medical dressing and banged his head on the cell

17   wall.

18        Do you know the facts and circumstances of

19   that incident beyonds what's reported?

20        **A**    I don't.

21        **Q**    And do you know the correctional or

22   officer involved in that incident?

23        **A**    I don't.

24        **Q**    Final one is that same month, in July of

25   2011, a correctional officer used an ECW against an

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 186

1   African-American inmate with bipolar disorder who

2   broke the overhead glass light fixture and tried to

3   use it to cut his wrists.

4          Do you know anything beyond what's

5   reported in Exhibit 11 as to that incident, sir?

6      **A**   I do not.

7      **Q**   Or the officer or officers involved?

8      **A**   I do not.

9      **Q**   I don't have any further questions on that

10  document, sir.  Do you have any knowledge, sir, as

11  to any department review of force as to any of the

12  incidents I just asked you about in the DOJ report?

13     **A**   I don't.

14     **Q**   Do you have any knowledge as to any

15  discipline rendered to any individual that you

16  associate with the incidents I asked you about in

17  the DOJ report?

18     **A**   There might have some on Eddie Boyd, but I

19  don't know exactly where they went or what they

20  entailed.

21     **Q**   And Eddie Boyd, that's the only officer

22  that you do remember ought of the incidents I asked

23  you about?

24     **A**   Yes.

25     **Q**   And do you recall what form or forms of

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 187

1    discipline Mr. Boyd may have received?

2         **A**    I just know that he did.  I'm the kind of

3    guy that that's not my place, not my opinion.  I

4    just overheard that he did, but I didn't listen to

5    the extent of it.

6         **Q**    Didn't pursue it?

7         **A**    Yes.

8         **Q**    Why didn't you review the DOJ report?

9         **A**    I don't -- they didn't come talk to us.

10   They didn't find out our sides of any of this.  So I

11   just assume it was one-sided and I didn't want to

12   read it.

13        **Q**    Did you feel as though you could learn

14   anything in the findings and opinions and

15   conclusions that the United States Department of

16   Justice has rendered so far?

17        **A**    Based on them not coming to talk to us, I

18   was ready and willing and aware that they had one

19   side in there.  I wasn't going to read it.

20        **Q**    Sounds like you're indifferent to what

21   they are saying.

22        **A**    I've read some things in there that I

23   don't agree with.

24        **Q**    Is there anything factually that I

25   mentioned in the report that you know is factually

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                      October 1, 2015

Page 188

1    inaccurate about just what I read to you?

2        A    I mean, I wasn't there for most of those

3    instances, so I don't know the facts behind those

4    cases, so --

5        Q    White's a common name like Johnson.

6    Michael A. White, correct?

7        A    Yes.

8        Q    We have the right Michael White?  There's

9    not two Michael Whites working at the Ferguson

10   department?

11       A    There's not.

12       Q    I'm sure your lawyers would have caught

13   that.  What evidence was seized from the scene

14   involving Mr. Moore?

15       A    I took a witness statement from that Alan

16   Shilling, I think.

17       Q    Yes, sir.

18       A    But that's -- that's all I had.

19       Q    Did you seize any evidence from the scene?

20       A    I did not.

21       Q    To your knowledge, are any of the persons

22   that work in communications or dispatch with the

23   Ferguson Police Department trained on CIT?

24       A    To my knowledge, I don't think they are.

25       Q    Do you know if that was ever discussed

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 189

 1    within the department itself as to whether those

 2    working in communications, in addition to the patrol

 3    officer such as yourselves who encounter individuals

 4    on the street, should receive CIT training?

 5         **A**    Yes.  They were trying to send as many

 6    people as possible to that training.  But with the

 7    size of the municipalities in St. Louis County it

 8    became hard to get schedules down to get people in

 9    there.

10         **Q**    Who was the person who was the liaison

11    with the county in terms of sending you to CIT

12    training?

13         **A**    I believe Captain Henke did the training.

14         **Q**    What is 10-23 in your parlance?

15         **A**    Arrived.

16         **Q**    When you radio 10-23, do you draw a

17    distinction between arriving in the area as opposed

18    to arriving at the scene?

19         **A**    It's used both ways.  I mean, I do it now

20    still where I'll call a 10-23 and I might be two

21    blocks away.  It's kind of an officer safety thing.

22         **Q**    Do you say 10-23 in the area as opposed to

23    10-23 at the scene, or does it depend on where you

24    are?

25         **A**    I just say 10-23, and then that could mean

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                October 1, 2015

                                                            Page 190

1    in the area or on the scene.

2       **Q**    Did you overhear any communications that

3    Officer Kaminski made that you overheard through

4    your walkie, radio, or otherwise between the time

5    you left the Ferguson Police Department and the time

6    you first observed Officer Kaminski and Mr. Moore?

7       **A**    I don't recall hearing the transmission of

8    where he found him.  I just remember dispatch

9    relaying what he said.

10      **Q**    And you told us already what you do recall

11   hearing, correct?

12      **A**    Yes.

13           MR. JOHNSON:  I don't have any further

14   questions.  Thank you, sir.

15           MR. DOWD:  I don't either.  Same

16   reservation I previously stated.  But other than

17   that, thank you for your time, sir.

18           MS. SHAFAIE:  I don't have any questions.

19           COURT REPORTER:  Signature?

20           MS. SHAFAIE:  We'll read.

21           VIDEOGRAPHER:  We're off the record at

22   1:07.

23   SIGNATURE NOT WAIVED, BY AGREEMENT OF COUNSEL

24   AND WITNESS

25

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 191

 1   State of Missouri

 2                     SS.

 3   County of St. Charles

 4        I, Julie A. Bulard, do hereby certify that

 5   pursuant to Notice in the civil cause now pending

 6   and undetermined in the United States District

 7   Court, Eastern District of Missouri, Eastern

 8   Division, to be used in the trial of said cause in

 9   said court, I was attended at the offices of Pitzer

10   Snodgrass, PC, 100 South Fourth Street, Suite 400,

11   in the City of St. Louis, State of Missouri, by the

12   aforesaid attorneys; on the 1st day of October,

13   2015.

14        The said witness, being of sound mind and being

15   by me first carefully examined and duly cautioned

16   and sworn to testify the truth, the whole truth, and

17   nothing but the truth in the case aforesaid,

18   thereupon testified as is shown in the foregoing

19   transcript, said testimony being by me reported in

20   shorthand and caused to be transcribed into

21   typewriting, and that the foregoing pages correctly

22   set forth the testimony of the aforementioned

23   witness, together with the questions propounded by

24   counsel and remarks and objections of counsel

25   thereto, and is in all respects a full, true,

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

                                                           Page 192

1    correct and complete transcript of the questions

2    propounded to and the answers given by said witness;

3    that signature of the deponent was not waived by

4    agreement of counsel.

5        I further certify that I am not of counsel or

6    attorney for either of the parties to said suit, not

7    related to nor interested in any of the parties or

8    their attorneys.

9        Witness my hand at St. Charles, Missouri, this

10   15th day of October, 2015.

11

12

13

14

15

16   ------------------- *Julie A. Bulard* -------------------

17              Julie A. Bulard

18              CCR MO #835

19

20

21

22

23

24

25

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

```
                                                      Page 193

   1    GorePerry Reporting & Video

   2    Friday, October 16, 2015

   3
        Ms. Ida S. Shafaie
   4    Pitzer Snodgrass
        100 South Fourth Street, Suite 400
   5    St. Louis, MO, 63102

   6    Re: Deposition of Michael White
        Date:Thursday, October 01, 2015
   7    Case:Tina Moore, et al. vs.
        Brian Kaminski, et al.

   8

   9    Ms. Ida S. Shafaie

  10    Your witness did not waive the right to read and sign
        his/her deposition in the above referenced matter.
  11    Enclosed is the copy of the deposition you ordered,
        together with errata sheets and additional signature
  12    page.  Please instruct your witness to read the
        transcript, list any corrections (including page and
  13    line number) on the errata sheets, sign and date the
        errata sheets and signature page.
  14
        Within 30 days, please return the errata sheets and
  15    signature page to our office for further processing.

  16    Your prompt cooperation will be appreciated.

  17

  18

  19

  20

  21    Sincerely,

  22

  23    Production Department
        GorePerry Reporting & Video
  24    515 Olive Street
        St. Louis, MO  63101
  25    (314) 241-6750
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

```
                                              Page 194

  1   Page Line Should Read:

  2   Reason for change:

  3

  4   Page Line Should Read:

  5   Reason for change:

  6

  7   Page Line Should Read:

  8   Reason for change:

  9

 10   Page Line Should Read:

 11   Reason for change:

 12

 13   Page Line Should Read:

 14   Reason for change:

 15

 16   Page Line Should Read:

 17   Reason for change:

 18

 19   Page Line Should Read:

 20   Reason for change:

 21

 22   Page Line Should Read:

 23   Reason for change:

 24

 25
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                    October 1, 2015

```
                                              Page 195

  1   Page Line Should Read:

  2   Reason for change:

  3

  4   Page Line Should Read:

  5   Reason for change:

  6

  7   Page Line Should Read:

  8   Reason for change:

  9

 10   Page Line Should Read:

 11   Reason for change:

 12

 13   Page Line Should Read:

 14   Reason for change:

 15

 16   Page Line Should Read:

 17   Reason for change:

 18

 19   Page Line Should Read:

 20   Reason for change:

 21

 22   Page Line Should Read:

 23   Reason for change:

 24

 25
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 196

1    Comes now the witness, Michael White,

2    and having read the foregoing transcript

3    of the deposition taken on 10/1/2015,

4    acknowledges by signature hereto that it is a

5    true and accurate transcript of the testimony given

6    on the date hereinabove mentioned.

7

8

9    _____

10   Michael White

11

12   Subscribed and sworn to me before this

13   _____ day of _____,20_____.

14   My Commission expires

15

16

17   _____

18   Notary Public

19

20

21

22

23

24

25

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

```
                                                        Page 197

  1   COURT MEMO

  2

  3

  4

  5   Tina Moore, et al. vs. Brian Kaminski, et al.

  6

  7

  8   CERTIFICATE OF OFFICER AND

  9   STATEMENT OF DEPOSITION CHARGES

 10

 11   DEPOSITION OF Michael White

 12

 13   10/1/2015

 14   Name and address of person or firm having custody of

 15   the original transcript:

 16

 17   Dowd & Dowd

 18   211 North Broadway, Suite 4050

 19   St. Louis, MO 63101

 20

 21

 22

 23

 24

 25
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                October 1, 2015

```
                                              Page 198
  1   ORIGINAL TRANSCRIPT TAXED IN FAVOR OF:

  2

  3   Dowd & Dowd

  4   211 North Broadway, Suite 4050

  5   St. Louis, MO 63101

  6   Total:

  7   1 ONE COPY - TAXED IN FAVOR OF:

  8

  9   Pitzer Snodgrass

 10   100 South Fourth Street, Suite 400

 11   St. Louis, MO 63102

 12   Total:

 13   1 ONE COPY - TAXED IN FAVOR OF:

 14

 15   Baty, Holm & Numrich, PC.

 16   4600 Madison Avenue, Suite 210

 17   Kansas City , MO 64112

 18   Total:

 19

 20

 21

 22

 23

 24

 25
```

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 199

1    Upon delivery of transcripts, the above

2    charges had not been paid.  It is anticipated

3    that all charges will be paid in the normal course

4    of business.

5    GORE PERRY GATEWAY & LIPA REPORTING COMPANY

6    515 Olive Street, Suite 700

7    St. Louis, Missouri 63101

8    IN WITNESS WHEREOF, I have hereunto set

9    STATEMENT OF DEPOSITION CHARGES

10   my hand and seal on this _____ day of _____

11   Commission expires

12   _____

13   Notary Public

14

15

16

17

18

19

20

21

22

23

24

25

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                                October 1, 2015

Page 200

---

**A**

**A.D.R** 1:5 2:9
**a.m** 74:1,6 85:6
**Abbott** 66:9
**abbreviations** 83:14
**ability** 148:1
**able** 11:12 14:11 23:25 26:16 43:8 43:17,20 47:4,10 53:10 54:22 55:1 56:6 57:2,2 59:16 66:23 73:9 77:12 92:7 102:11 111:21 113:4 117:11,20 118:3 119:20 120:23 121:1 122:3 130:25 146:1
**abuse** 147:25
**abusing** 149:16
**academies** 148:19
**academy** 7:19,24 8:1,6,15 9:3 18:14 29:4 101:7 117:23 145:3
**accelerated** 100:13 100:16
**accept** 148:10
**access** 131:2
**accident** 17:21
**accomplish** 132:8 152:12
**accurate** 77:8 85:20,22 167:11 196:5
**accurately** 76:23
**acidosis** 155:7
**acknowledge** 32:11
**acknowledges** 196:4
**acronym** 83:20
**act** 9:4 82:20
**acting** 126:15

**actions** 117:7 122:7 123:3 135:25 136:9
**actual** 22:2 139:6 167:18
**adding** 119:24
**addition** 189:2
**additional** 107:1 115:10 160:16 161:24 162:5 193:11
**address** 84:7 197:14
**addresses** 139:20
**adhere** 153:5
**adjacent** 27:25
**administered** 59:7
**advanced** 134:9
**advice** 29:10
**advised** 90:7 96:18 168:6
**advising** 46:6
**aerial** 41:10
**aerosol** 134:9
**affair** 158:5
**affairs** 158:1,13
**affect** 60:9 114:23 114:25 115:5 155:13
**aforementioned** 191:22
**aforesaid** 6:25 191:12,17
**African-American** 181:6,18 182:3 184:12 185:14 186:1
**age** 6:23
**agency** 166:22
**agitated** 76:6 100:20 179:24
**ago** 13:17 15:25 16:1 177:13
**agree** 72:5,12 88:10

94:25 97:5 105:10 114:6 120:22 121:9,16,20 122:5 123:11,16 124:19 134:5,23 135:1 136:23 139:6 141:17 145:24 146:16,19 148:8 148:13,18,24 149:22,23 150:12 150:19 154:21 156:7 182:24 187:23
**agreeable** 94:16
**agreement** 190:23 192:4
**ahead** 154:1 182:11
**aid** 125:5,6
**aim** 16:21 17:5 18:5,9,11 156:2
**aiming** 17:22
**airbags** 68:3
**Airport** 41:10 42:16,18 43:1,9 45:4,5 46:1 47:18 73:3 74:6 84:9,13 84:16 88:18 89:20 90:7 91:9 163:22 164:1
**al** 1:12 2:15 6:5,6 193:7,7 197:5,5
**Alan** 128:5 188:15
**alerted** 175:8
**allegedly** 141:22 166:5
**allow** 106:24 110:4
**allowed** 143:8 149:2
**allows** 98:17
**alternative** 144:7
**Alzheimer's** 80:25
**ambulance** 64:23 65:10,22 66:4,5 66:15 67:2,13

68:16,21,23 126:10,14,18 129:2
**ambulances** 46:23
**amount** 87:10 103:11 104:12,22 105:9 118:17 120:16 132:15 133:4,10,23 146:4 149:2,7,14 152:14
**analysis** 120:14
**and/or** 120:6
**anecdotal** 172:19
**angry** 20:15
**ankle** 125:21
**answer** 11:20 12:7 12:9 14:7 17:24 25:18 26:25 30:1 45:19 60:5 63:12 72:9,23 75:17 81:4,19 82:7 87:2 89:13 94:3,15 95:5,10 96:2,7,17 97:2,12,18 98:1,5 99:1,7,16 101:16 104:2,11 105:12 105:24 107:3,8,9 107:13,15 108:5 109:3,6 110:8 111:9,17 113:9,20 114:7,15 115:15 116:4 117:16 118:6,12 119:22 120:4,25 121:17 121:25 123:13 137:1,23 138:1,17 139:9,15 140:20 143:11 147:22 148:3,23 152:2,19 153:1
**answered** 137:6
**answering** 11:13 12:1 160:14
**answers** 11:12

183:16 192:2
**antennas** 47:4
**Anthony** 177:25
**anticipate** 11:12 34:5
**anticipated** 151:5 199:2
**anybody** 141:18,20 154:22 158:20,24 168:9,19 169:3 176:16 178:1,4,8
**apparently** 183:5
**appealed** 11:2
**appear** 41:9 72:18 72:19 116:9 131:17 162:18
**APPEARANCES** 3:1
**appeared** 90:25 91:5
**appears** 132:6
**applicable** 133:3
**application** 93:6,9 94:25 97:9,13 98:15,21 100:16 103:23 108:3 110:3 114:25 117:11,14 118:4 138:25 139:3,3,22 140:2,4,19 141:17 155:3 156:9 159:13,13
**applications** 108:25 110:20 116:1 154:16 155:12
**applied** 133:9
**apply** 108:19 110:1
**applying** 103:19 139:22
**appreciate** 12:2 69:17 153:23 154:1 160:13
**appreciated** 193:16
**apprehend** 98:16

---

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                     October 1, 2015

Page 201

151:7
**apprehending**
117:24
**approached** 72:17
**approaching** 41:15
49:3,21 50:3
53:22 69:13 70:19
72:7 73:2,23
100:7 139:2
**appropriate** 12:9
12:10 110:15
133:4,10 143:7
185:1
**approval** 86:20
**approve** 87:5
**approved** 86:24
**approximate** 40:10
42:22 52:5
**approximately** 9:10
13:16 15:23 21:25
24:17 39:23 40:1
40:9 41:13 43:23
44:2,2 45:10
48:17 50:5,22
51:21 58:2 62:1
62:15 67:20 68:15
73:18 85:11
124:20 126:20
159:8 177:12
179:12
**area** 83:19,21 84:1
84:23 88:18 90:6
90:14 96:10,21
100:23 144:12,14
144:23 146:21
154:15 189:17,22
190:1
**areas** 27:6 144:18
**arm** 59:12,13 98:10
101:5,6,10 102:6
102:9,13,16,17
103:3 132:24
135:19
**armed** 49:22

**arms** 47:25 48:1,2
48:4,11,16 56:17
56:24,25 108:22
113:4 137:19
138:10 172:25
**arrest** 94:9 95:24
96:15 97:9,20,24
104:13 115:13,18
115:21 133:15
152:15 174:17,21
174:23
**arrival** 35:23 37:18
82:24 83:6 85:12
89:18
**arrive** 34:11 164:22
**arrived** 63:21 64:1
64:9,12 67:13,21
67:25 75:3 83:10
106:9 109:16
116:8 117:20
119:18 127:16
162:14 163:1
175:20,22 178:6
182:5 189:15
**arriving** 63:23 64:3
64:5 103:13
106:17 189:17,18
**arrow** 41:13 42:1,5
42:8 43:22 52:10
**asked** 11:23 64:23
67:3 127:1 177:16
186:12,16,22
**asking** 11:4 14:9
28:23 45:14 73:22
81:10 82:10,11
98:3 107:5,21
108:6 117:19
118:8,9 119:10,11
119:16 124:14,15
134:20 142:3,20
153:13 160:2
180:14 183:13
**asp** 184:14
**asphyxiation** 62:24

**assault** 80:6,9,16
174:25 175:5
**assaulted** 109:21
**assess** 103:24
108:25 110:10,12
118:14,14 139:21
142:6,6 143:8
**assessed** 108:10
139:24 142:19
**assesses** 143:6
**assessment** 105:1,9
106:25 111:5
117:2,2 128:11
132:16 133:24
142:4,8,9,13,16
142:23 143:4
**assigned** 27:9 36:21
36:21 157:8
161:17,21,23
162:1,4
**assignments** 8:24
8:25 14:3,16
30:11 31:3
**assist** 110:24
111:11,11
**associate** 97:16
173:4 178:1,8
179:5 186:16
**associate's** 7:14
**associated** 166:1
179:10
**assume** 11:21,22
30:7 54:12,13
57:5,14 69:20
70:1,17,23 94:22
113:25 114:10
176:19 187:11
**assumed** 127:5
**assuming** 54:7
60:21 63:24 65:1
81:15 98:18 117:9
**assumption** 54:14
57:9 72:18
**assumptions** 70:21

70:24 89:5
**attack** 115:18,23
**attempt** 24:4 26:21
66:13 68:4 91:23
92:6,11 105:9
**attempted** 91:18
144:7
**attempting** 43:13
51:4,6,17 53:12
90:15,22 91:14
124:21 139:5
140:8
**attend** 29:17
**attended** 25:4
191:9
**attention** 94:1,5,9
94:11 127:24
**attorney** 10:2
160:22 192:6
**attorneys** 12:23
31:24 131:8
191:12 192:8
**attributable** 130:17
**attribute** 79:8
**August** 184:10
**authored** 167:19,19
169:10
**authoring** 167:23
168:2
**authority** 147:21
147:25
**authorized** 133:6
143:17
**authorizing** 140:18
**Autism** 179:22
**autistic** 23:21
**automatically**
164:20
**autopsy** 146:11,12
157:4
**available** 28:8
33:20 134:8
178:18 182:20
**Ave** 3:14

**Avenue** 198:16
**aversion** 178:13
**avoid** 96:10 154:12
154:13
**avoiding** 100:23
**aware** 14:23 66:18
70:9 115:10
158:20,23 160:5,8
160:9,11 187:18

**B**
**B** 143:18
**back** 23:24 32:10
36:13 42:14,18
43:1 47:22,23
50:19 51:5,12,18
51:19,22,22 53:12
54:1,19 56:20,20
56:23,23 59:6,10
59:14 62:2,8,22
63:7,25 67:7
68:16,21,22 69:11
77:11 82:20 87:8
87:9,11 95:1
96:23 97:4,23
98:10,23 101:6
103:15 107:4
108:10,21 109:4
109:11 111:16,21
112:2,5,7 117:17
118:7 119:17,23
120:21 123:19
125:23 131:14
137:19 138:11
142:1 143:16
144:13 156:16
170:20 171:16,17
181:19 182:4
**background** 7:11
174:19
**backup** 45:17
**badge** 148:7
**bag** 39:12 69:2
**Ballard** 14:20

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                              October 1, 2015

Page 202

32:22 64:3 128:25
129:1,8,13 157:24
158:10,21 164:17
164:21,25 169:10
175:12,14
**banged** 185:16
**banging** 38:10 40:6
71:4 179:4
**barb** 113:7,12,16
113:18 114:1,3,4
114:13,18,19
**bars** 101:10 102:6
**base** 57:8 123:3
**based** 14:9 69:14
69:22,24 70:24
72:16 88:14 89:21
93:6 95:10,20,22
96:24 106:4
107:23 110:1
114:19 115:6
117:22 174:19
187:17
**basic** 14:8
**basically** 16:24
104:25
**basis** 33:18 66:1
72:13,19 95:13
105:1 153:9,18
154:2
**baton** 99:11 103:21
104:7 134:9
135:17 151:11
184:14
**batons** 151:19
**Baty** 3:13 198:15
**beat** 27:12,25 84:2
109:10 161:17,20
161:24 162:4
**beating** 80:16
**beats** 27:7,9,22
**Bebe** 28:18 64:6,11
64:15,18 67:7
112:22 128:22
**began** 32:2 59:11

**beginning** 27:5
109:8 121:18,22
**behalf** 2:21
**behavior** 72:3
132:7 150:15
**belief** 50:16
**believe** 10:3 21:10
22:1 36:24 38:18
40:5 43:7 44:21
54:5 55:17 59:20
60:17 64:17 69:16
75:1 84:5 85:9
87:14 106:21
115:21 117:8
119:16 120:19
125:24 127:12
133:2 150:18,25
155:21 167:12
169:19 173:3
189:13
**belt** 39:15
**beltline** 155:24
156:2,4
**bends** 101:11
**beneficial** 76:4
**benefit** 120:14
124:6
**best** 65:8 85:23
103:11 105:15
116:21 124:5
151:23 165:24
**better** 20:18 32:18
34:25 47:4 83:25
113:5 170:20
**beyond** 186:4
**beyonds** 185:19
**bicycle** 31:17
**big** 61:22 115:4
**bigger** 47:4
**Bill** 6:15
**bill@dowdlaw.net**
3:9
**bipolar** 23:21
179:23 186:1

**bird** 33:25
**birth** 176:7
**bit** 7:10 13:7,22
16:25 29:15 57:12
63:24 76:15 91:1
183:24
**Bits** 180:7
**black** 89:19,25
144:19
**blank** 8:8 21:19
22:2 40:23 82:25
83:2,7
**bleeding** 125:8
184:16
**block** 181:20
**blocking** 69:4
**blocks** 189:21
**blows** 135:20
**blue** 127:8 144:18
**blunt** 135:20
**board** 158:16
**body** 16:22 17:5
60:1 93:16 101:11
101:22 103:4
144:11 146:17
154:16 159:24
182:18
**book** 24:11,12
**bottom** 77:24
185:11
**box** 52:1,7,7,11
80:3 84:5,22
**boxes** 84:21
**boy** 89:9
**Boyd** 185:6,7
186:18,21 187:1
**Brannan** 23:2
**break** 153:19 154:3
154:8 163:16
**breaking** 183:25
**breathe** 56:13
127:10,11,15
**breathing** 62:3
63:6,10 64:16,22

64:24 65:19 67:3
112:14,20 126:21
127:6,12 164:9
**Brian** 1:12 2:15 6:6
46:5 50:23 51:2
59:6 62:6,17
140:14 142:18
193:7 197:5
**Brian's** 142:18
**brief** 62:17 131:21
**Briefly** 62:8
**bring** 20:6 32:23
76:7 103:2 132:6
133:5,11 138:3
140:6
**Broadway** 3:6
197:18 198:4
**broke** 186:2
**broken** 27:5 125:17
163:13,15
**brought** 33:4 52:21
59:14
**Brown** 166:3
**build** 115:11
**built** 115:12 116:10
117:21
**Bulard** 2:25 6:10
191:4 192:17
**bulletins** 22:5,24
23:12
**burglary** 49:23
**burn** 146:12
**business** 199:4
**button** 177:3

**C**

**C** 143:23
**C-O-G-I-S** 83:15
**CAD** 35:15,17
37:10,13 53:3
66:14 78:18
**call** 26:13 27:20
30:20,21 35:21,22
38:6,8 46:8 53:25

63:8,14,14 64:21
65:11,14,18 66:5
81:13 85:8,9
89:10 90:15,22
91:3,5 126:5,10
126:14 161:9,11
172:9 179:8
184:11 189:20
**called** 63:17 65:1,3
65:11 83:10 101:5
**callers** 38:19
**calling** 46:5,14,15
46:23 127:19
**calls** 28:8 35:1
46:16 67:1 84:14
**calm** 20:6 76:2,7
**calmly** 20:16,17
**caps** 83:16
**captain** 29:21
165:8 166:11
189:13
**car** 15:3 36:9,22,23
39:9,11,25 40:8
42:19 45:6 52:1,2
52:6,11,21,25
53:9,23 54:5,10
65:2 69:16 73:6
89:25 92:8,22
106:13 139:1
140:12,13 161:25
162:5,10 181:19
182:5
**cardiac** 95:24
96:15 97:8,16,20
115:12,18,21
**care** 182:19
**career** 76:13
**carefully** 191:15
**carries** 15:20
**carrying** 173:20
**cars** 27:10 28:4
38:10 40:6 49:12
70:10 71:4,8,9,12
71:19 72:2 73:4

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 203

73:24 74:4,10,12
74:15,15,17 80:16
106:13 179:4
**cart** 183:3
**cartridge** 55:16
93:15,25 94:25
113:14
**cartridges** 93:18
**case** 6:25 9:24,25
10:1,4,23,24,25
11:1 13:7 17:20
37:11 77:5,11
79:2,14 119:15
131:5 158:11
182:22 183:22
191:17
**Case:Tina** 193:7
**cases** 9:22 87:3
143:18 167:23
171:25 188:4
**caught** 34:13
188:12
**cause** 1:9 6:5 34:23
137:14 155:3
191:5,8
**caused** 116:1,6
191:20
**causing** 184:15
**cautioned** 191:15
**caveat** 183:15
**CCR** 2:25 192:18
**cell** 181:7 185:16
**center** 16:21,22
17:5 18:9 144:11
146:17 159:24
**certain** 29:10 32:15
60:2 118:22
**certificate** 178:24
197:8
**certificates** 31:25
**Certification** 145:3
**certified** 6:9,11
21:5 135:4 145:11
145:14,16 151:2

173:17 178:21
**certify** 191:4 192:5
**cessation** 139:4
**chain** 171:14
**chance** 105:21
109:11
**change** 14:16 15:18
33:3 37:1 50:21
183:15 194:2,5,8
194:11,14,17,20
194:23 195:2,5,8
195:11,14,17,20
195:23
**changed** 15:15
140:25 143:2
**changes** 22:24 33:9
33:14 34:15
**charge** 26:22 80:9
80:12,13 81:17
174:24
**charged** 81:1 82:4
**charges** 152:12
197:9 199:2,3,9
**charging** 80:17,20
110:16 139:12
141:2,8,22 142:5
142:10,14,22
143:1
**Charles** 7:22 191:3
192:9
**check** 34:13,14
62:12 66:25
175:19,25 176:3
176:24
**checked** 62:19
64:18 67:7 176:16
**checking** 90:6
**checks** 31:3 176:21
**chest** 16:25 17:21
18:5 56:7 64:18
67:8,12,17,21
68:2,25 95:3,25
96:21 100:17,23
112:23 127:3,14

127:19 142:12
146:2,3,14 154:12
154:14,16 159:17
159:23 181:6
**chief** 12:19 29:21
32:22 64:2 165:3
167:13 170:18,21
171:1,15,17
**chief's** 170:17
**choice** 25:24 118:9
**Christian** 65:21
**circle** 58:7
**circumstance** 110:2
**circumstances**
136:15 165:20
175:13 181:10,23
182:7 183:8 184:4
184:19 185:18
**CIT** 23:16 24:6
25:1,18 26:9,10
29:1 31:10 74:25
179:21 188:23
189:4,11
**CIT-trained** 26:23
**citizen** 169:14,25
170:24 171:4,20
**citizens** 9:13
108:23 110:4
138:20
**city** 2:23 3:15 8:16
9:16 12:23 18:17
21:16 22:3 27:11
27:16 30:14 32:4
37:7 131:17,22
149:5 191:11
198:17
**civil** 9:25 10:4,17
10:19 191:5
**civilian** 130:25
158:16
**civilians** 78:24,25
**claim** 10:20
**class** 18:23 19:2,15
19:24,25 23:13,18

25:14 26:15 29:13
32:14
**classes** 19:20 31:21
32:13
**classified** 79:15
**classify** 81:24 82:1
**classroom** 29:5
**clause** 147:11
**clear** 11:17,18 12:5
42:14 79:9,10,16
112:20
**cleared** 37:18,21
79:3,4,22
**clearer** 84:22
**clenched** 173:2
**clerks** 78:20,23
**click** 177:3
**clocks** 66:14
**close** 43:12 44:15
44:16,19 51:21
55:18 56:5 57:20
99:21 102:10
146:17
**closed** 91:19 103:8
111:22 126:2
135:11 136:20
**closer** 45:9 47:18
**closest** 42:8 106:12
**closing** 181:20
**clothes** 40:6 89:19
**code** 84:24 147:7
**COGIS** 83:15,20
83:24 84:1
**COGISes** 84:2
**College** 7:13,22
**colon** 137:10
**come** 13:14 20:14
21:16 24:8 51:3
54:19 66:5,7
78:17 80:25 91:7
95:11 114:9
151:15 178:4
187:9
**comes** 105:14

108:15 111:2
140:23,24 147:25
152:8 196:1
**coming** 41:19,20
42:2,7 45:25
49:22 50:13 51:24
53:24 54:11 73:13
73:23 84:15 91:9
91:10 126:9
187:17
**comma** 88:3 91:17
111:20 132:8
133:15 134:15
137:11,12 143:19
143:25 144:13
147:13
**command** 30:4,5
75:14 77:16,16
150:4,20 171:14
**commands** 94:11
94:17 181:7 184:2
**Commission**
196:14 199:11
**common** 20:9
132:23 188:5
**communicate**
178:13
**communication**
177:16
**communications**
66:11 164:12
188:22 189:2
190:2
**communicator**
46:21
**Community** 7:13
7:22
**companies** 151:18
**company** 151:19
199:5
**complaint** 170:2,3
171:11,20
**complaints** 169:14
169:23 170:24

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 204

171:4 172:1
**complete** 77:2,8,9
  157:9 192:1
**completed** 11:14
  61:16 65:16 126:6
  167:8
**completely** 101:20
  122:25 140:12
**completing** 129:19
**completion** 112:2
**compliance** 94:20
  98:8,23 102:1
  103:20,24 106:25
**compliant** 44:13
**complied** 41:23
  43:5 52:9,13,16
  58:8,14,23
**comply** 60:1 94:17
  95:17 105:6,16,20
  105:21 108:2
  110:5,19 184:1
**complying** 104:1
  104:16 122:17
**compressions** 64:19
  67:12,17,21 68:2
  68:25 112:23
  127:14,20
**computer** 32:24
  36:17,20,24 78:17
  177:1
**computer-genera...**
  78:13
**computers** 25:17
  33:1 36:9,19 37:1
  37:7 130:1
**conclusion** 91:13
  126:25
**conclusions** 180:14
  187:15
**conditions** 179:20
  182:17
**conducted** 135:10
**confiscated** 128:14
  128:15

**connected** 176:14
**connection** 93:21
**conscious** 180:9
**considered** 72:1,2
  99:24 101:14
  135:9 173:13
**consistent** 74:5
  126:13 133:22
  144:21,24
**constitutional** 8:10
  8:11 147:12,16
**contact** 20:14 53:18
  53:20 57:18 130:9
  157:18,21 175:10
**contacted** 129:6
  164:21
**context** 30:9 37:25
  134:3
**continue** 106:2
**continued** 68:2
  173:23
**continuously** 67:13
**continuum** 75:14
  134:5 135:17,19
**contraction** 173:7
**control** 82:8,11
  101:4 102:19
  117:1 132:7 133:5
  133:11 151:7
  180:24
**controlling** 137:13
**conversation** 13:16
  62:17 75:25
  127:25
**conversations**
  23:11 129:17
**conveyed** 162:21
**cooperation** 193:16
**cop** 124:10
**copy** 84:21 193:11
  198:7,13
**corner** 43:8
**correct** 14:5 16:7
  17:22 25:21 26:5

28:21 33:15 36:6
38:17,22 42:16
49:4,5,8,10,15,16
49:23 50:1,2,8
55:15 56:18,21
63:19 67:3,4 70:6
70:14 71:2 72:20
73:16 74:11 75:15
76:20 80:11,22,23
83:16 86:5 87:24
89:22 90:1,4,5,16
90:17 92:4,18
93:11 95:16 96:25
98:16,24 99:14
106:5,6,19 108:19
111:16,24 112:10
112:11,17 113:7
118:25 120:17
123:7 126:11
127:25 128:12
133:12,25 135:5
136:2,8,12,25
138:12,16,20
139:13 141:12,22
142:5,12 143:2
145:22,23 147:9
147:10,18,19
148:2,4 149:5,16
151:3 161:4
162:15 164:6,7,9
164:10 167:25
168:3,4 170:13,14
171:20 175:6
188:6 190:11
192:1
**correctional** 9:3,5
  181:5 185:12,21
  185:25
**corrections** 14:21
  193:12
**correctly** 16:13
  87:5 88:10,21
  109:24 111:3
  132:11 133:7,20

191:21
**counsel** 3:1 6:13
  190:23 191:24,24
  192:4,5
**county** 19:3 29:4
  178:22 179:11
  189:7,11 191:3
**couple** 15:14 16:1
  113:6
**course** 8:2 16:11,13
  29:3 199:3
**court** 2:1 6:7,11
  11:15 12:4 22:17
  22:17 31:4 77:10
  190:19 191:7,9
  197:1
**covered** 91:22,24
  127:20 143:22
**coy** 183:10
**crap** 109:10
**crime** 38:17 49:10
  72:25 118:24,24
**crimes** 70:8
**criminal** 7:14 9:24
  10:1,16 49:20
  70:4,19 72:7,20
**crisis** 23:17,20 24:3
  25:12,14 26:9,12
  69:18,19 70:5,18
  74:25 75:2 76:5
  76:14 81:16 89:3
  150:16,22 178:21
**criticizing** 81:9
**cuffed** 59:15 60:22
  62:6
**cuffing** 60:21,24
  163:7
**current** 79:2,21
  152:17,25 153:5
**custody** 63:17 79:6
  95:18 133:16
  197:14
**customary** 157:6
  157:11

**cut** 186:3
**cycle** 57:16 59:7

**D**

**daily** 95:13
**damage** 70:11,13
**danger** 143:20
**darn** 146:16
**dart** 93:21
**darts** 93:10
**data** 180:13
**date** 21:6 24:19
  79:17,24 82:24
  85:2 86:4,9
  134:21 173:22
  176:7 193:13
  196:6
**date/time** 86:16
**Date:Thursday**
  193:6
**dated** 145:4
**Davis** 174:11
**day** 2:24 20:13
  25:18 27:15 29:7
  29:11 31:4 32:25
  33:23,24 36:13
  52:6 79:25 134:25
  161:18,21,25
  162:5 173:10,14
  176:1 177:1
  191:12 192:10
  196:13 199:10
**day-to-day** 20:12
  72:13
**days** 29:5 86:25
  193:14
**dead** 47:2
**deadly** 131:23
  156:10,11 184:15
**deal** 23:22 26:17
  72:12 150:21
**dealing** 19:23 29:6
  70:3 76:14 95:12
**dealt** 157:12

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 205

**death** 149:10 150:9
157:2 177:20
**decision** 107:13
135:24 136:8
171:15,17 180:9
**decisions** 95:16,20
171:19
**deescalate** 19:22
20:1,3
**deescalation** 18:15
18:18,20,23 19:7
19:13,15,19 20:10
20:24 31:8 74:24
**defendant** 10:21
**defendants** 1:14
2:16 3:19 6:19
12:24
**defense** 8:12
**defibrillation** 68:4
**defibrillator** 68:8
**definitely** 54:8
131:3
**definitions** 171:23
**definitive** 87:2
109:6
**degree** 7:14
**delirium** 100:9,15
100:21 179:24
180:1
**delivery** 133:18
199:1
**Delores** 1:3 2:8
6:17 130:10
177:21
**demeanor** 162:17
162:25
**dementia** 80:24
**demonstrate** 102:7
102:14
**demonstrating**
47:25
**department** 16:5,6
18:24 22:6 23:6
24:15 25:12 26:21

30:10,15 31:4,15
33:19 40:13 76:18
76:19 82:5 126:13
132:4 146:24
152:6,8,22 156:23
157:21 158:25
161:2,7 163:20
165:9,11,14,16,24
166:2 168:20,23
169:4,12,16 171:2
171:6 174:4
178:19 180:4
181:9,13 182:13
183:2 184:23
185:8 186:11
187:15 188:10,23
189:1 190:5
193:23
**department's**
149:18 168:11
180:23
**departments**
148:19 150:13
151:12
**depend** 189:23
**dependent** 135:25
136:9
**depending** 56:1
102:8 132:15
138:7
**depends** 28:12
109:7 122:7
**depict** 42:20 99:3
**depicts** 109:5
**deploy** 152:11
**deployed** 93:18
184:17
**deploying** 154:11
**deployment** 134:15
**deponent** 192:3
**deposed** 9:18,23
10:2,5,9
**deposes** 6:25
**deposition** 1:17

2:20 5:9,10,11 6:4
11:3 12:13 13:4,5
13:11,20 41:5
42:23 78:8 146:7
193:6,10,11 196:3
197:9,11 199:9
**depositions** 10:11
12:19
**describe** 90:21
100:1
**described** 20:11
21:2 49:24 56:15
56:16 113:3
137:20
**description** 83:25
**detail** 84:23,25
85:1 172:15
**details** 172:13
175:15,16
**detective** 156:19,22
157:8,14,25
**determine** 70:22
106:25 117:3
**determined** 172:2
**device** 103:21
134:10 135:11
183:23
**diabetes** 183:24
**diagnosed** 179:20
**diagnosis** 25:1 75:9
**dictate** 104:5
**dictates** 104:18
154:13,18 156:2
**die** 157:7
**difference** 70:3,7
114:20 115:17
141:1
**differences** 113:6
**different** 10:23
15:18 18:3,21
48:13 57:6,6 60:7
60:8 61:12 81:5,7
81:11,20 95:9,11
95:12,13 96:11

105:14,17 107:4
107:10,16 109:12
119:24 141:16,19
141:21 142:4,8,9
142:10,13,17,18
142:21 143:1,3,4
166:22 171:23
180:20
**differently** 107:17
109:5 114:23
115:3
**difficult** 12:4
**Dilworth** 86:21
87:12
**direct** 142:3
**directed** 32:3,5
**direction** 41:14,19
41:20,21 42:6
55:11 61:12 73:12
74:16
**directions** 74:14
**disabilities** 182:18
**discharge** 164:6
168:1
**discharged** 163:10
164:19
**discharges** 144:12
**discharging** 154:24
**discipline** 176:6
186:15 187:1
**disciplined** 168:15
168:22
**discretion** 110:1
111:5,16
**discussed** 30:25
31:1 188:25
**discussion** 133:22
**disorder** 186:1
**dispatch** 45:25 46:6
46:10,18,19 47:3
88:24 161:3,7,10
161:15 164:12,12
188:22 190:8
**dispatched** 35:23

35:23 38:5 65:24
161:3
**dispatcher** 35:3,22
36:3 38:22,25
39:5 52:23 63:15
66:6,14 71:24
130:20
**dispatchers** 34:20
34:23 35:6,9,10
35:13
**dispatches** 64:20
**disposition** 172:6
**disputes** 20:20,24
**disruptive** 153:24
**distinction** 189:17
**distress** 70:5,18
75:2 76:15 150:22
**distributed** 19:7
**District** 2:1,2 6:7,7
191:6,7
**districts** 27:21,22
83:23
**disturbances** 20:14
**divided** 83:19
**Division** 2:3 6:8
191:8
**document** 145:5,9
186:10
**documentation**
77:9 82:3
**documents** 84:23
145:6 160:16
**doing** 57:1 68:24
112:25 113:1
117:6 118:16,18
128:17 153:22
167:7
**DOJ** 180:3 186:12
186:17 187:8
**domestic** 20:20,24
49:6
**door** 181:21
**Dowd** 3:4,5,5 5:4
6:15,15 7:4 14:8

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                          October 1, 2015

Page 206

17:25 30:2 41:7
42:25 45:22 60:6
63:13 69:6,13
72:10 73:2 75:19
81:9,21 82:10
89:14 94:6,19
95:6,15 96:3,13
96:22 97:5,15,21
98:2,7 99:2,8,11
99:18 101:22
104:1,3,15 105:8
105:19 106:3
107:5,18 108:6,17
109:13 110:13
111:4,14,19
113:12,21 114:10
114:17 115:17
116:8 117:19
118:8,20 120:2,13
121:6,20 122:2,8
122:18,22 123:14
123:19,25 131:10
131:16 137:3,24
138:5,15,19,24
139:10,17,25
140:24 141:8,15
141:24 142:3,20
143:10,12 145:14
146:9 147:24
148:5 149:1,8,13
149:23 150:3,8,12
150:19 151:2
152:4,21 153:3,9
153:16,22 154:1,5
154:7,9,10 156:12
156:18 160:12,24
173:1 177:16
190:15 197:17,17
198:3,3
**download** 130:25
**drag** 120:7,12
**draw** 16:18 41:12
52:10 127:24
189:16

**drawing** 8:8 21:19
22:1 40:23 52:1
**dressing** 185:16
**drew** 42:1
**drive** 38:15
**drive-stun** 185:13
**drive-stunned**
181:18 182:3
183:6
**driver** 31:18
**driving** 28:5
**due** 14:22
**duly** 6:23 191:15
**duty** 15:1 39:12
147:8,25 149:18
149:24 150:20
159:4

_____
**E**
**ear** 101:24
**earlier** 56:15,16
70:2 71:20 76:16
83:9,23 90:24
112:6 113:4 117:3
128:3 137:20
160:24 164:2
179:6,7,13 184:21
**early** 33:25
**easier** 11:15 60:11
**easiest** 18:8
**easily** 42:20
**eastbound** 74:15,19
**Eastern** 2:2,3 6:7,8
7:18 191:7,7
**easy** 42:20 59:25
176:6
**ECW** 181:5 183:23
185:13,25
**ECWs** 184:17,24
**Eddie** 186:18,21
**educational** 7:10
**effect** 93:19,24
104:13 114:18
134:23,25 156:5

**effective** 98:16
114:12 141:12
**effectively** 57:4
106:22 117:22
132:6
**effects** 155:4
**effectuating** 174:21
**eight** 42:22
**eight-hour** 34:6,8,8
**either** 14:10 25:16
37:3 61:6 68:13
69:18 93:10 116:5
116:6 174:14
177:22 190:15
192:6
**elected** 180:5
**electricity** 60:3
**electrode** 68:10
**electronic** 134:10
135:10 180:23
**else's** 142:17
**email** 22:25 165:23
166:12,12
**emailed** 24:10
**emails** 25:6 34:13
166:6
**emergency** 44:3,9
52:17 73:15,20
**emotional** 20:21
69:18 70:5,18
75:2 76:15 89:2
150:22
**employer** 180:11
**employment**
166:19
**EMS** 127:19 164:3
164:12
**EMT** 65:14 67:20
184:8
**EMT's** 183:24
**EMTs** 65:3 130:4,6
**enclosed** 147:1
193:11
**encompass** 27:15

**encounter** 23:24
178:5 181:2,14
189:3
**encountered** 162:7
176:1
**ended** 86:10
**energy** 135:10
**enforcement** 19:21
147:1,7,7 166:22
174:20
**ensure** 149:19
**ensuring** 133:18
**entailed** 186:20
**entails** 16:9
**enter** 177:3
**entered** 58:13
86:15,16,16,18
87:5,5,23
**enters** 35:22
**episodes** 26:17
**equal** 143:23
**equality** 147:13
**equipment** 68:1
**Eric** 174:11
**Ermerling** 86:17
**errata** 193:11,13,13
193:14
**erratic** 72:2 150:15
**erratically** 126:15
**escalated** 122:24
**especially** 42:21
47:1 57:14
**essays** 25:24
**established** 140:22
153:11
**ESTATE** 1:3 2:7
**estimate** 103:11
116:14,21 124:5,8
**et** 1:12 2:15 6:5,6
193:7,7 197:5,5
**etcetera** 40:21
**ethics** 147:1,7
148:12
**evaluate** 105:13,15

**evaluating** 105:25
**event** 136:18 168:1
**event's** 95:19
**events** 31:2 77:10
129:3 162:14
**eventually** 146:1
**everybody** 11:17
27:15 34:18 89:8
**everything's** 87:4
**evidence** 128:16
188:13,19
**exact** 21:6 24:19
28:23 38:4 40:11
43:11 45:20 58:19
62:16 63:3 67:22
83:6,20 86:13
108:7 113:10
129:17 145:6
155:10 159:7,10
**exactly** 38:19 45:14
48:6 52:6 53:1
54:24 55:22 63:16
67:19 73:21 77:12
77:14,15,17 83:10
124:2 145:18
161:8,12 172:18
179:25 186:19
**EXAMINATION**
5:3 7:3 160:19
**examined** 191:15
**example** 8:25 79:6
81:12 114:4
132:23
**examples** 20:10
**exceeded** 45:16
**exception** 79:11,13
**exceptionally** 79:3
79:4,9,16,22
**excessive** 10:20
115:24 124:25
147:17 148:20
149:13,19,25
**excessively** 37:20
**excited** 100:9,15,20

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                October 1, 2015

Page 207

180:1
**excuse** 31:13 43:24
  56:16 64:2 75:14
  135:9 145:1
**exhibit** 5:9,10,11
  41:5,8 42:23 43:2
  43:6 51:25 58:6
  77:20 78:1,6,9
  79:2 87:19 99:19
  111:20 125:23
  129:21 131:17
  132:19 134:2,19
  134:21 135:3,7,24
  143:16 145:1,22
  146:7,10,20,20,25
  146:25 147:4
  156:19 169:10
  180:16,16,22
  181:4,17 182:11
  185:12 186:5
**exhibiting** 150:15
**EXHIBITS** 5:8
**existence** 23:20
  36:25
**existing** 33:3,15
  116:6
**exists** 143:24
**exited** 58:3,16,24
  91:17 117:9
**exiting** 53:9,15
  54:16,18
**expect** 82:12
**expectation** 28:24
  28:25
**expedite** 65:4,11,18
**expedited** 164:8
**experience** 57:3
  60:6 63:4 69:25
  76:13 82:11 88:15
  107:24 117:23,24
  122:9 168:5
  174:20
**expires** 196:14
  199:11

**explain** 91:1 169:24
  172:14
**explained** 175:18
**explanation** 83:7
**exposure** 70:9 80:7
  80:21 81:2,17
  82:2,6 174:25
  175:2
**expressed** 178:20
**extent** 187:5
**extra** 23:14 27:10
  161:24 162:4
**extreme** 172:15
**eye** 53:18,20
**eyes** 14:12

---

**F**
**face** 60:23 61:1,4,9
  61:12 100:6 112:9
  112:9 127:7
**face-to-face** 167:14
**facedown** 62:20
  97:23
**facilities** 29:8
**facing** 52:12 61:2,2
  61:5 112:10 136:1
  136:10
**fact** 13:10 49:19
  80:21 82:20
  109:17,18,19
  129:15 173:4
**factor** 117:2 136:16
  137:16 140:6
**factored** 136:24
**factors** 117:17
  119:24 136:11
  138:3,3 140:21,25
  142:10,21 143:1,3
  143:4,8,19 179:8
**facts** 72:19,21,24
  111:14 165:19
  175:13 180:15
  181:9,22 182:7
  183:8 184:3,18

185:18 188:3
**factually** 187:24,25
**fair** 54:14 72:18
**fairly** 88:2
**faith** 148:7
**fall** 24:23
**fallen** 142:24
**falls** 110:16
**familiar** 147:2
**families** 77:14
**family** 160:22
  178:1,9
**far** 9:13 17:4,9
  19:15 20:3 27:14
  32:12 42:18 43:23
  46:23 47:9 48:14
  58:2 70:8 72:10
  85:20 97:20
  135:16 142:22
  146:21 159:20
  183:16 187:16
**fashion** 163:9 173:2
  173:13
**fast** 45:10 65:13
**FAVOR** 198:1,7,13
**feel** 93:19 98:11,14
  143:7 187:13
**feet** 42:22 44:1,2
  47:13,18,20 48:17
  50:5,15,23,25
  51:2,24 55:17
  58:4,19
**fellow** 111:7 113:18
  149:24 150:4
**felony** 72:25
**felt** 110:25 140:14
**female** 35:9
**Ferg** 145:2
**Ferguson** 8:17 9:6
  9:16 12:23 14:22
  15:4 16:5,5 18:17
  18:24 21:16 22:4
  26:1 27:5,7,16
  29:16 30:9,14

31:15 32:2,4 37:7
  40:12 76:18 77:16
  77:25 78:2,12
  87:19 99:19 126:2
  130:25 131:18,22
  134:3 145:21
  157:7 158:6,17
  161:2 163:19
  166:25 167:3
  169:4,15 171:1
  172:2 177:9
  178:18 180:23
  181:13 182:12
  183:2 184:24
  188:9,23 190:5
**field** 107:23 113:17
**fight** 120:7,11,12
**fighting** 120:8
**file** 170:9,13,19
  171:1,18 183:4
**files** 170:22
**fill** 37:14 129:24
**filled** 30:13
**filling** 25:23
**final** 86:20 185:10
  185:24
**Finally** 12:1
**find** 48:25 73:10
  129:4 187:10
**findings** 187:14
**fine** 21:7 62:8
  153:16,17,17
**finger** 169:25 172:8
**finish** 61:19
**fire** 17:19
**firearm** 16:6,18
  17:10,19
**fired** 181:5
**firing** 131:1,4
  144:12
**firm** 6:3 197:14
**first** 6:23 9:15
  19:13 21:5 25:3
  29:4 38:1,12 43:8

47:10,15 48:15
  54:4 56:6,11,18
  57:23 64:9 65:10
  71:18 82:14,17
  88:2 89:1,10
  92:20 99:14
  103:12 125:5,6
  135:8 141:16
  147:6 172:25
  184:24 190:6
  191:15
**fists** 173:2
**fitness** 8:13
**five** 27:8 28:13,15
  30:23 40:2,4
  42:22 47:13 48:17
  50:5,15 67:22
  104:8 125:13,15
  159:19 184:17
**fixture** 186:2
**flailing** 48:3
**flap** 48:11
**flashlights** 39:14
**flat** 108:21 137:19
**fleeing** 72:19,25
**Florissant** 7:13,17
  163:25 164:1
**follow** 33:12 157:8
  181:7
**follow-up** 24:25
  85:17 157:4
  160:25 171:6
**following** 88:4
**follows** 7:1
**force** 9:13 10:20
  16:17,18 17:20
  20:7 25:20 32:3,9
  32:14,16 75:13
  80:14 94:8 95:3
  99:4 101:14
  102:23 103:19,23
  104:13,22,23,25
  105:5,8,10,22
  106:1,4 107:1,20

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White

October 1, 2015

Page 208

107:22 108:19
109:25 110:1,9,12
110:15 111:6,11
111:21 117:4
118:9,17 120:15
120:16 124:3
131:23,23 132:5
132:15,20,24
133:4,9,10,15,23
134:5 135:15,16
135:19 137:12
143:6,10,21,23
144:3,8 147:17
148:1,20 149:2,4
149:7,9,13,14,16
149:20,25 151:24
152:7,14 154:21
154:25 156:10,11
157:7 165:1 167:3
167:3,5,8,18,24
168:6,10,12,23
169:9 172:11
178:14,15,18
182:14,16 184:15
186:11
**forced** 33:19
**foregoing** 191:18
191:21 196:2
**form** 17:23 45:18
60:4 63:11 72:8
72:22 81:3,19
82:7 83:14 89:12
93:24 94:2,15,18
95:4 97:17,25
98:25 101:15
104:11 105:11
107:2 108:4 109:1
109:2 110:8,21
111:8,17 114:14
115:14 116:3
117:15 118:6
119:22 120:4,25
121:17,25 123:12
137:1,22 138:14

138:17 139:8
140:20 141:7,13
141:23,25 142:15
143:9,11 145:13
147:22 148:3,22
152:1 153:10
154:5,6,7 166:6
170:6 184:15
186:25
**formal** 19:13
**formally** 82:4
**format** 114:25
**forms** 39:13 178:17
186:25
**forth** 180:15
191:22
**forward** 11:11
50:11 171:14
**forwarded** 78:20
166:14
**found** 109:17
134:16 190:8
**foundation** 14:6
17:24 29:25 75:16
95:4 96:1,17 97:1
97:11,17,25 98:25
103:25 104:2
105:7,11,23 107:2
108:4 109:2
110:22 113:8,20
114:7,14 115:14
116:3 123:12
148:22 152:1,19
153:1 154:4,6,7
**four** 27:7,7,20
47:13 50:14 83:23
**fourth** 2:22 29:7
148:6 191:10
193:4 198:10
**frame** 31:9
**free** 147:17
**Friday** 79:18 86:21
193:2
**Friend** 1:5 2:9

**frightened** 162:18
162:22
**front** 56:24 78:21
108:22 137:20
138:10 145:9
180:17
**frontal** 144:12
**full** 11:14 132:1
135:8 136:4
191:25
**fundamental** 147:8
**further** 25:11 84:5
104:10 148:10
160:12 174:7
186:9 190:13
192:5 193:15
**future** 32:18
139:10

---

**G**

**gain** 117:1
**gap** 155:19
**gas** 151:11
**GATEWAY** 199:5
**gear** 39:14
**general** 13:18 16:16
16:19 26:1 33:11
39:13 75:25 81:10
131:18 134:16,22
147:6
**generally** 16:21
18:8 28:11 30:22
30:25 34:10,18
57:2,10 60:9 63:5
66:3 85:18 101:17
101:23 159:12
**gentleman** 49:17
50:4 67:10 70:16
128:11 162:7
**gentlemen** 11:22
47:24
**getting** 34:9 44:19
50:23 51:3 52:24
55:4 92:8 138:6

**give** 10:16 15:24
19:25 20:9 21:6
21:17 29:9,9 38:4
40:1,10 41:7
42:25 45:7 60:15
77:19 81:11 83:20
83:24 87:2 105:5
105:21 108:13,24
109:6,10 110:6
124:5,8,13 135:3
145:1 146:9
151:21 154:2
156:5 159:7,10
175:15
**given** 11:3 24:6
67:10,12 71:3
72:24 108:1
147:20 171:11
192:2 196:5
**giving** 57:16 68:8
81:21
**glass** 186:2
**Glock** 151:20
**go** 9:4 11:11 12:2
15:17 16:10 21:11
21:17,23 31:22
32:14 34:11 36:12
38:15 58:25 61:21
68:21 69:6 77:11
81:7,14 82:20
84:4,21 87:11,18
89:9 104:21 105:1
107:4 111:13
117:17 118:7
119:16,25 120:11
123:4 125:23
129:4,16 131:10
132:18 134:2
154:1 156:12
159:21 163:19
167:7,15 172:9,13
172:15 176:4,25
179:13 183:1
**goal** 104:14

**goes** 32:12 87:9
104:9 109:12
110:11 135:23
171:17 183:6
**going** 9:2 11:4,21
11:22 18:7 23:23
26:19 29:15,24
30:12,22 34:18
38:2 41:7,19,21
42:3,4,6,9,10,11
42:15 43:3,3
44:20 46:1,2,9
52:5 55:12,14
58:8 59:5 70:1
72:12 73:3 74:16
75:11,12 77:19
82:1,2 88:1,7,9
91:4,6 94:12
98:11,14 102:19
104:10 106:14
107:12 108:10,19
109:4,6,10 111:15
114:3,4 117:5,5
117:17 118:7,16
119:23,25 121:3
121:24 122:3,13
124:16 127:3
131:16 135:3
142:1,17 143:7,15
146:4,9 153:17
160:23 163:24
179:9 180:19
182:22 183:11
187:19
**good** 7:5 41:22 76:9
101:11 153:22
**Gore** 4:3 6:11
199:5
**GorePerry** 193:1
193:23
**Gotcha** 84:19
183:18
**gotten** 124:3,4
**grabbed** 59:13,13

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 209

**grabbing** 102:8,15
**graduate** 7:23
**graduated** 7:12,15
  7:16 8:15
**great** 23:18 26:14
  89:9 102:3
**greater** 104:23
**groin** 159:24
**ground** 47:17 50:4
  51:4,8,18 53:13
  54:19 57:15 90:16
  92:2,18 94:23
  102:12,20,22
  103:5 106:21
  107:25 110:16,17
  116:23 117:12,21
  119:14,17 120:1
  120:21 121:15,22
  122:10,11,25
  138:11 140:8
  141:4,20 142:2,11
  142:24,24 160:24
**group** 27:14 106:9
**guarantee** 122:1
**guaranteed** 121:23
**guess** 31:9 103:16
  116:20
**guessing** 47:14
  116:24
**guesstimate** 58:18
  125:2
**Guidelines** 134:14
**gun** 93:10 132:25
  133:2
**guy** 89:10 109:11
  120:1,7,12 174:11
  185:4 187:3
**guys** 15:3,9,9 27:13
  32:22 65:21 76:22
  129:23

**H**

**half** 114:5 177:12
  179:6,13

**half-inch** 114:18
**hand** 48:18,21 50:6
  131:17 143:14
  183:25 192:9
  199:10
**handcuff** 60:12,14
  63:6 111:22
  112:18 117:12
  118:3 119:20,25
  120:23 121:2,4,14
  121:21 122:4
  124:21
**handcuffed** 59:8,10
  62:20 98:24
  120:10 123:6,10
  124:3,6 174:18
  182:3
**handcuffing** 8:12
  59:11,23 60:18
  61:13,16,19 63:9
  63:24 65:15 112:2
  112:8,12 121:4,7
  121:8,22 124:1,2
  125:12 126:6,7,20
**handcuffs** 66:22,23
  112:17,22 120:9
  121:8 122:14
  181:21
**handicapped** 183:5
  183:20
**handle** 111:2
  150:14
**handouts** 25:6
**hands** 48:23 51:11
  51:13 59:14
  111:21 112:4
  120:11
**hang** 185:15
**hanging** 55:18
**happen** 29:16 35:1
  82:12 107:14
  119:25 121:3
**happened** 44:22
  65:5,6 77:12,15

77:15,17 82:13
  83:21 84:13 92:12
  92:14 103:17,17
  107:10 108:15
  109:7 110:24
  117:18 118:19
  129:16 131:24
  138:4 139:18
  140:22 157:22
  158:18 159:19
  164:14 171:13,13
  172:14,20 174:22
  175:17
**happening** 24:1
  81:8 95:19
**happens** 62:6 91:2
  99:3 138:7
**hard** 55:7 99:20,22
  164:13 189:8
**Harry** 86:21 87:12
**head** 12:3 47:19
  61:9,14 184:15
  185:16
**health** 24:3 29:8
  69:19 150:14
  182:17
**hear** 44:20 45:1
  46:20 47:2 50:24
  57:20 91:10
  109:22 127:10
  130:19 161:14
**heard** 17:8 35:2
  38:11,21 39:4
  45:24 46:4,9
  57:24 69:15 71:12
  71:18 92:20 96:3
  100:10 101:4
  109:20 113:13
  165:5 185:4
**hearing** 46:4 58:1
  100:24 190:7,11
**hears** 46:17
**heart** 97:10 98:11
  100:13,16 115:18

115:22,23,23
  155:7
**heartbeat** 115:24
  115:24
**heavier** 114:25
**heavily** 115:12
**heavy** 114:23
**height** 116:14
**held** 148:11
**help** 32:17 81:16
**helps** 101:25
**hemispheres**
  155:23
**Henke** 165:6,8,8
  166:11 189:13
**Henquin** 40:14
  41:10 42:2,3,8
  43:9 45:5 84:13
  84:20 90:8
**hereinabove** 196:6
**hereto** 196:4
**hereunto** 199:8
**hey** 62:7,9 94:12
  172:14,19
**hide** 179:1
**High** 7:12
**higher** 23:5 100:21
**highway** 184:12
**hill** 43:10,14,16
  44:17,23 45:4,25
  50:13 53:24 73:23
  73:24
**his/her** 193:10
**hit** 17:16,17,20
  18:7 104:7,8,9
**hitting** 49:11
**hold** 102:8,16
  120:8
**holding** 178:24
**Holm** 3:13 198:15
**hopefully** 28:15
  84:22,22 88:2
  156:3
**hospital** 125:11

**hour** 45:15
**hours** 179:13
**house** 80:25
**huh-uh** 12:3
**hundred** 42:22
  44:1,2 47:13
  50:15,23 51:1,1,2
  117:25 124:11,15
  124:16
**hurry** 45:16
**hurt** 20:8 121:16
  121:24

**I**

**IA** 170:18,21 171:1
**Ida** 3:20 6:19 13:25
  193:3,9
**idea** 131:2 165:19
**identification** 41:6
  42:24 146:8
**identified** 128:2
  181:3
**identify** 6:13 24:2,4
**identity** 73:9
  181:12
**ignoring** 101:20
**immediate** 139:12
  140:7,9,18
**immediately** 39:6
  59:1 65:19 67:6
  138:24 139:4
  140:1,5 157:17
**important** 77:7
  88:14
**importantly** 11:16
**impression** 89:1
**improper** 168:23
**in-between** 164:11
**inaccurate** 79:24
  188:1
**inappropriate**
  168:7,11,23
**incapacitating**
  114:12 141:12

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 210

**incapacitation** 134:10 135:11 155:15
**inch** 114:5
**inches** 114:5 146:21
**incident** 10:7 11:6 13:17,19 14:2,5 80:1 84:12 86:10 129:12 132:7 133:5,11 136:16 157:15 166:3 168:15 172:11 174:3 176:17 181:3,10,16,23 182:2,7 183:8,19 184:4,19 185:3,10 185:19,22 186:5
**incidents** 160:5 186:12,16,22
**include** 20:19 27:25 35:25 155:7
**included** 77:22 152:11
**includes** 75:14 147:1,16
**including** 32:21 147:25 151:18 184:14 193:12
**incorporated** 18:21 19:16 117:7
**incorrectly** 88:8
**indecent** 70:9 80:6 80:21 81:1,17 82:1,5,20 174:25 175:2
**independent** 158:18
**INDEX** 5:1
**indicate** 43:1,7 51:25 143:19
**indicated** 58:17
**indicates** 42:5
**indifferent** 187:20

**individual** 176:4 179:3 183:20 186:15
**Individually** 1:1 2:5
**individuals** 189:3
**infective** 143:24
**information** 22:20 46:25 69:20,25 70:25 71:1,3,22 75:10 76:10 78:15 78:17 87:22 153:6 153:14 162:14,18 163:12 172:10 177:4 179:9
**informed** 168:9
**Initially** 84:17,18
**initials** 52:14
**injured** 49:15 70:14,15 124:1,4 124:17,21
**injuries** 124:24,24 124:25 125:19
**injury** 70:13 118:4 119:21 120:11,24 122:4 125:21 137:14 149:10 150:9
**inmate** 185:14 186:1
**input** 78:15,16 83:3
**inputted** 78:22
**inquire** 160:18
**inside** 52:11
**instance** 17:15 157:12
**instances** 188:3
**instruct** 193:12
**instructions** 60:1 151:16,22 153:5
**instructor** 23:10 29:5 145:3 174:2 174:7,8,11
**intellectual** 182:17

**intentionally** 17:22 18:11
**interact** 23:19 26:16 29:8
**interacting** 182:14
**interested** 192:7
**internal** 158:1,5,13 171:6
**internship** 9:5
**interpret** 12:6
**interrogatories** 7:1
**intersection** 41:9 43:17 45:5 89:20
**intervention** 23:17 25:13 26:10,12 74:25 178:21
**interviewed** 158:14 158:24
**invented** 121:8
**investigate** 157:10
**investigated** 158:21
**investigation** 79:18 79:25 87:1,4 157:2 158:5 159:1 180:10
**investigations** 158:2
**involve** 38:13
**involved** 158:4,10 166:10 181:14,25 182:9 183:19 184:6,8 185:3,22 186:7
**involving** 172:11 172:22 179:14 188:14
**irritant** 134:9
**issue** 69:19
**issues** 14:22 24:3 81:16 89:3 115:23 150:14,23 161:1

**J**

**Jackson** 12:20

32:22 165:3
**jail** 8:25 9:7,12 14:21,22 182:5
**Jason** 1:3 2:7 91:18 130:9 178:6
**Jim** 10:3,6,24
**job** 11:15 20:12 27:4 110:11
**Johnson** 3:12 5:5 6:17,17 160:20,21 188:5 190:13
**judgment** 111:15 143:14
**Julie** 2:24 6:10 191:4 192:17
**July** 131:19 134:23 185:12,24
**jump** 180:19 182:11
**jumping** 18:6 49:11 71:4,6,7,9,12,19 72:2
**jurisdiction** 152:18
**jurors** 7:6 8:4 16:9 17:12 39:10 97:22
**jury** 11:22 23:15 35:20 47:25 63:2 75:22 93:5 155:22
**justice** 7:15 147:13 158:25 187:16
**justifiable** 17:20

**K**

**K-9** 31:19,20,21
**Kaminski** 1:12 2:15 6:6 12:20,25 14:11 28:19 48:14 49:18 50:5,11 53:15,19,22 54:4 58:15,19 59:7 60:18 61:2 62:13 63:19 72:6 80:17 80:20 90:7,14 92:1,17,21 98:20

103:7 106:13,16 106:19 109:14,15 109:21 111:24 112:25 117:13 118:2,5 119:4,18 120:23,24 128:19 139:19 140:3,10 141:2,3 144:4 156:7 160:6 161:6 161:20 162:3 163:4 168:14 169:1 172:22 173:14,17,23 175:1,6 178:6,12 178:12 190:3,6 193:7 197:5
**Kaminski's** 14:3,16 42:19 43:18,21 48:20 50:6 54:23 57:24 67:1 165:1 168:10
**Kansas** 3:15 198:17
**Kay** 86:16
**keep** 153:21
**keeping** 102:9,10 102:17
**kept** 24:14
**kick** 102:22,23
**kill** 154:20,22
**kind** 18:21 22:7,14 27:17 31:13 43:11 48:1,2 55:7 57:8 57:11,18,21,21 60:10 63:25 69:19 85:15 100:1 102:18,23 103:4 127:2 135:20 148:24 151:15 164:13 172:19 185:1 187:2 189:21
**knee** 61:19 62:22 125:21
**knees** 92:4

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                October 1, 2015

**knew** 40:25 54:7,12
55:14 72:6 117:20
**knock** 120:12
**know** 10:1 11:1,3
13:5 14:10,15,18
15:15,17,19 18:5
18:7 19:11 20:13
20:14 23:2 24:14
24:20 27:14 30:11
30:13 31:22 32:5
32:12,13,17 35:3
35:15 37:1,2,3,20
40:22 43:10 45:3
45:14,23 46:25
47:1 48:4 49:17
50:10 55:17,19
57:3,16 60:7,8,9
62:5,14,16,24
63:3,3 64:9 66:13
66:17 68:8,17
72:14,16 75:19
76:6 77:10,12,14
77:15,17 79:3,15
80:2,19 81:5,21
82:16 83:2,18
86:2,24 87:2
90:18,25 95:9
96:9 98:9 99:25
99:25 100:9 101:5
101:11 103:15
108:8,14 109:8
113:2 114:8,16
115:17 118:19,22
118:23,23 119:1
119:25 120:5,7
121:3 124:23
127:15 129:15
130:23 131:3
140:24 152:16,21
152:24 153:20
156:20 157:1
161:13,23 162:3
165:22 166:9,21
166:23,24 168:9

168:14 169:1,2,3
169:5,8,9,13
170:12,16,21,23
170:24 171:3,25
173:20 174:3,3,6
174:7,8,9,13,14
175:21 176:16,19
176:21 179:9
181:11,15 183:9
183:11,18 185:2
185:18,21 186:4
186:19 187:2,25
188:3,25
**knowing** 24:1 76:8
116:7
**knowledge** 14:2
25:25 66:10 67:18
68:5 80:19 128:6
144:3,6,9 151:23
152:4 153:12
156:24,25 165:17
166:9,11,17
168:19 170:10,11
171:8,11 173:16
173:19,22 178:13
181:12,22 182:6
183:7,14 184:3,18
186:10,14 188:21
188:24
**known** 54:6 121:12
**knows** 30:6

_____
**L**
**ladies** 11:21 47:24
177:23
**lanes** 74:10
**laptop** 36:9,13,17
36:20,24 37:7
**large** 114:23
**largely** 106:4
**larger** 63:5 115:1
**law** 6:3 8:7,8,10,11
19:20 147:1,6,7
152:17 166:21

174:20
**lawful** 6:23 132:8
152:12
**lawyers** 188:12
**lay** 172:16
**laying** 97:23 116:23
**laymen** 20:3
**leaf** 180:19
**lean** 51:7
**learn** 40:3,18 71:21
187:13
**learned** 38:1,2
46:13 49:25 128:8
128:9,10
**leave** 39:5 165:16
**led** 126:24 127:12
**left** 23:5 39:24,24
40:12 73:10,19
79:1 91:10 112:10
125:24 128:12
129:12 130:6
165:20 166:25
190:5
**leg** 55:15 93:25
156:3 181:20
**Legal** 6:9
**legs** 102:21 103:1
**length** 56:1 113:10
182:24
**Less-Lethal** 132:19
**lesser** 143:23
**Lesson** 145:3
**Let's** 88:1 125:23
131:10 180:21
182:11 183:1
**lethal** 16:18 17:20
131:23 132:23
154:21,25 155:1
**level** 80:14 141:16
141:19,21 169:6
**liaison** 189:10
**liberty** 147:13
**lieutenant** 14:19
32:21 64:3 128:25

129:1,7,13 157:24
157:24 158:8,9,10
158:13 164:17,21
164:25 169:10
175:11,14
**lieutenants** 26:22
29:21
**lifeline** 46:22
**light** 74:3,21
133:24 186:2
**lights** 44:4,10,12
52:17 54:10 73:15
73:20
**limit** 45:16
**limitations** 149:2
**limited** 155:7
**line** 41:13 42:1,3
56:3 79:17 82:23
86:4 88:2 89:18
90:6,13 91:16
92:17 99:18
111:19 125:24
126:19 135:7
146:20,22,23
147:6 159:4
193:13 194:1,4,7
194:10,13,16,19
194:22 195:1,4,7
195:10,13,16,19
195:22
**lines** 88:8 96:20
100:22
**LIPA** 199:5
**lips** 127:8
**list** 31:22 32:13
193:12
**listen** 75:8 187:4
**little** 13:7,22 16:25
29:15 57:12 63:24
76:15 84:4 91:1
114:5
**lives** 132:9
**load** 39:8,11,14
163:10 173:5

**located** 7:20 84:20
**location** 43:11 84:6
84:14 90:12 98:9
146:13
**locations** 159:20
**lock** 103:3
**locked** 57:11 102:9
**locks** 101:5,5
135:20,20
**log** 176:22 177:1,2
**long** 8:1,2 9:9 30:21
34:5 39:4,23 45:3
60:17 62:18 63:21
67:20 68:15 73:18
108:14 148:11
**longer** 43:16 141:8
**look** 32:12,24 41:8
45:8,9 78:11
85:15,21 103:15
132:1 134:4 148:5
158:18
**looked** 62:2,6,8
68:24 113:22
116:11
**looking** 42:21
53:23 54:1,24
61:12 90:25
**lookouts** 22:18
**looks** 41:22
**lot** 31:21,25 58:18
74:12,14,17 75:7
89:5 91:2 107:23
143:14,15 147:20
147:21 171:22
**loud** 12:1,7
**loudly** 92:18
**Louis** 2:23 3:7,23
4:5 6:3,12 19:3
29:4 178:22 185:8
189:7 191:11
193:5,24 197:19
198:5,11 199:7
**low** 76:2
**lower** 55:15 144:11

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 212

154:16
**lunge** 91:25
**lying** 47:21,22,22
  107:25 108:21
  119:17 137:18
  184:13

---

**M**

**mace** 99:11 103:22
**Madison** 3:14
  198:16
**mail** 22:25
**mailbox** 22:20
**mailboxes** 22:11,12
  22:15
**maintain** 151:22
  170:18 171:2
**maintained** 170:15
  170:21
**maintains** 170:13
**majority** 123:9
**making** 57:17
  133:14
**male** 35:9,13 38:9
  63:5 88:19 89:4
  185:14
**man** 7:8 38:16
  40:20 61:22 62:7
  62:9 81:25 89:25
  107:25 108:20
  117:21 118:3
  119:17 126:10
  140:16 142:5
  159:17 182:3
  183:2,4,24,25
  184:12,14,17
**man's** 119:13
**mandated** 33:21
**mandatory** 80:9,12
**mankind** 147:8
**manpower** 14:22
  15:16
**map** 41:12 42:21
  45:9

**March** 178:22
**Margo** 90:1 164:1
**Marguerite** 40:13
  84:9,16 88:18
  89:20
**mark** 43:13 146:12
**marked** 41:6,8
  42:24 77:19
  134:19 146:8
**marking** 58:5
**mass** 16:21,22 17:5
  18:9 144:11
  146:17 154:17
  159:24
**material** 185:15
**materials** 19:6 24:5
**matter** 13:24 77:20
  111:14 193:10
**max** 68:19
**McClure** 7:12
**mean** 13:17 19:20
  20:5 22:10,16
  25:23 28:23 31:17
  33:18 39:10 44:16
  45:20 46:14 47:13
  49:21 51:23 55:6
  55:20 57:14 60:20
  63:14 65:6,12
  68:18 69:24 71:6
  78:16 83:8,22
  84:12 85:5 88:13
  89:16 93:3 95:7
  95:10 98:12 99:25
  100:23 104:5
  107:19 114:24
  116:5,11,16 117:5
  119:24 126:8
  128:6 141:1
  145:13,16 149:1
  155:22 159:18,19
  161:9 164:15
  179:23 184:25
  188:2 189:19,25
**meaning** 42:11

**means** 20:2 27:4
  30:9 37:21 75:20
  75:22 79:3 83:18
  85:24 86:8 133:9
  137:13 143:23
  155:24
**meant** 46:13 90:22
**measured** 47:14
**medical** 125:1,4,6,9
  125:10 185:16
**meds** 26:18
**meet** 30:15
**meeting** 30:3 31:1
  34:12 162:9
  167:14
**meetings** 29:16
  31:6
**member** 178:2
**members** 160:22
**memo** 171:12 197:1
**memory** 17:9,9
  180:21 181:8
  184:23
**men** 147:12
**mental** 24:3 29:8
  69:19 81:15 89:2
  150:14,22 182:17
**mentally** 183:5,20
**mention** 90:3
**mentioned** 96:9,20
  187:25 196:6
**metabolic** 155:4
**Metropolitan** 185:8
**Michael** 1:17 2:20
  6:4,22 7:7 166:3
  188:6,8,9 193:6
  196:1,10 197:11
**microphone** 16:25
**Microsoft** 78:20
**middle** 16:24 38:9
  88:19 89:4,19
  169:25 172:8
**midnights** 15:17
**miles** 45:14

**mind** 52:14 58:5
  191:14
**Mine** 142:18
**minimum** 28:15
**minor** 1:5 2:9
  124:24
**minute** 62:16,19
  65:12 68:17
  126:20 164:15
**minutes** 30:24 40:2
  40:4,11,16,19
  65:6 67:23 68:17
  68:19
**mission** 146:24
**Missouri** 2:2,23 6:3
  6:7 7:18 191:1,7
  191:11 192:9
  199:7
**MO** 2:25 3:7,15,23
  4:5 192:18 193:5
  193:24 197:19
  198:5,11,17
**moment** 23:20
**month** 15:25
  183:22 185:24
**months** 7:19 8:3
  15:25 16:1,10,14
**Moore** 1:1,3,4 2:5,7
  2:8 6:5,16,18 38:3
  43:20,25 47:10,12
  48:15,15,25 50:7
  50:11,16 51:4
  53:10,17 54:17
  56:5,12 58:3,6,9
  59:2,7 60:23 61:8
  62:2 63:9 64:16
  64:17 66:22 67:2
  69:17 91:18,25
  92:7 98:18,20,22
  99:19 106:8,17,18
  112:1,13,21 115:7
  116:9 117:12
  119:21 120:20
  126:20 128:3

130:9,10 137:18
  138:25 140:2
  146:11 156:8
  157:3 158:22
  159:23 160:23
  161:4 163:2
  168:15 170:21
  172:25 173:9
  174:16 175:8,20
  175:21 176:17
  177:22 178:2,6
  188:14 190:6
  193:7 197:5
**Moore's** 48:19,23
  56:17 58:11 70:8
  111:21 130:9
  146:14 177:17
  178:9 182:22
  183:22
**morning** 7:5 28:21
  38:1 39:2,16
  43:18 44:22 56:11
  57:25 70:20 71:12
  71:19 74:1 77:22
  89:9 98:19 106:8
  115:6 117:11
  126:8 128:3 129:8
  130:5,20 144:4
  145:25 146:13
  160:13
**mornings** 74:6
**mother** 130:10
**mother's** 177:21
**mouth** 127:5
**mouth-to-mouth**
  67:9
**move** 60:1 61:9,9
  102:11,24
**moved** 30:12 55:20
**movements** 16:15
**moving** 48:2,4
  61:14,15 119:6
  127:5
**Mules** 176:10,13

177:15
**multiple** 25:24
**mumbling** 99:23,24
100:1
**municipalities**
189:7
**muscle** 17:9 173:7
**muscles** 60:10
**muscular** 116:11
**muster** 30:16 34:11
34:17 38:21 39:1
39:5,20,24 85:11
89:8

**N**

**Nabdzyk** 158:13
**naked** 38:9,16
40:20 50:4 70:16
71:2,4 72:1 80:22
80:25 81:7,14
82:21 88:19 89:4
89:10,25 95:2
106:21 107:25
108:20 110:3
118:23 122:10
126:9,16 140:8,16
141:24 142:11,25
175:3 179:3,14
**name** 6:9 7:6 30:18
31:16 58:11 62:9
62:13 67:3 127:1
160:21 165:5
175:23 176:7,23
177:2,21 188:5
197:14
**named** 174:11
177:21,25
**names** 19:4 35:12
**narcotic** 70:24
**narrative** 12:9
85:19 87:7,8,9,22
129:20 162:8
**narrow** 98:9
**nature** 13:18 82:19

82:23 166:7
169:23
**near** 48:25 108:23
**necessary** 105:10
107:1 132:6,15
133:5,11,16,24
136:20 149:15
157:9
**neck** 183:7
**need** 34:16 102:20
102:22 136:23
151:6
**needed** 110:25
**needs** 106:1
**neighbor** 81:13
**nervous** 155:13
**neuromuscular**
155:15
**never** 18:7 30:5,19
47:14 67:16 91:25
92:4 113:22
114:20 116:16
121:3 122:1
130:12,13 144:7
154:22 157:12
158:14 180:6
**new** 33:3,11 34:15
36:17,19 40:18
**nice** 26:16
**night** 35:1
**nod** 12:3
**noise** 57:9,21
**noncompliance**
101:20
**normal** 76:12 199:3
**normally** 28:1 81:1
158:4
**North** 3:6 84:9,15
88:18 197:18
198:4
**Northeast** 65:21
**Nos** 1:9 2:12
**nose** 125:16
**Notary** 196:18

199:13
**noted** 81:6 131:18
**notes** 35:22 36:1
**notice** 100:6 127:7
156:18 179:2
191:5
**noticed** 67:2
**noticing** 63:9
**notify** 164:20
**noting** 135:1
**November** 181:4
**number** 10:17
28:24 43:7 77:25
77:25 124:13,14
134:24 152:12
159:7,11 171:19
193:13
**Numrich** 3:13
198:15

**O**

**O'Connor** 127:25
128:9 129:6
175:11
**oath** 148:15
**Object** 14:6 17:23
29:25 45:18 60:4
63:11 72:8 75:16
89:12 94:2 96:1
97:1,11 101:15
103:25 110:21
111:8 113:8
117:15 137:22
139:8
**Objected** 81:3
**objection** 95:8 96:5
98:4 107:7 108:9
118:11 122:6,16
122:20 123:17,22
137:25 138:22
139:14,23 149:6
149:11 153:7,10
153:17,19 154:2,5
**objections** 99:6,9

99:15 149:21
150:1,6,10,17,24
153:18 191:24
**objective** 152:13
**objectives** 132:8
**observation** 50:7
57:9 108:20
126:22 127:12
**observations** 88:13
88:14 89:21 91:22
115:6 127:20
**observe** 14:12
47:10 50:21 53:10
54:22 56:6 67:24
68:22 92:7 117:21
126:24
**observed** 47:16
48:1,15 56:18
89:19 90:14
120:22 126:21
190:6
**obstructed** 43:16
**obtain** 98:23
152:14
**obtained** 184:24
**obviously** 58:18
129:15 160:25
183:5,20
**OC** 135:17 151:11
151:19
**occasion** 20:23
**occasions** 170:7
**occurred** 65:18
85:7 117:10 121:2
140:6 170:20
**occurrence** 84:25
85:1 131:24
157:18
**occurring** 84:15
**occurs** 30:3 155:16
**October** 1:19 2:24
6:2 191:12 192:10
193:2,6
**off-color** 166:6

**offenders** 82:14,15
82:17,17 143:19
**offense** 80:4
**offered** 133:18
**office** 148:7 170:17
193:15
**officer** 8:16,18,21
9:1,3,5,16 12:20
12:25 14:2,4,11
14:15,22 15:3
18:19 19:14 22:3
23:2,4 26:23 27:8
27:20,24,24 28:2
28:7,18,18,18
29:18 31:12,15,20
36:2,4 42:19
43:18,21,24 46:8
47:3 48:14,20
49:18 50:4,6,10
53:14,19,22 54:4
54:23 57:24 58:15
59:6 60:17 61:2
62:13 63:19 64:6
64:11,15 66:11,25
70:3 72:6 75:14
75:18 78:24 80:10
80:17,20 85:21
90:6 92:1,20 95:1
98:19 104:21
105:4,4,13 106:12
106:16,18,24
107:16,23 108:12
108:23 109:5,9,14
109:15,21,25
110:10,25 111:7
111:23 112:22,25
117:12 118:2,5,15
119:4,18 120:17
120:22,24 121:15
122:4,12 127:25
128:8,18,22
131:16 132:9
136:24 137:11,14
138:7,12 139:7,12

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White

October 1, 2015

Page 214

| | | | | |
|---|---|---|---|---|
| 139:19 140:2,9 | 13:1,3,6,12,15 | 129:5,7 130:8,12 | **order** 33:3 58:13 | **paperwork** 39:9,11 |
| 141:2,2 142:21,22 | 14:19 15:15 16:16 | 130:19 135:3 | 131:18 134:16,22 | **paragraph** 132:2,3 |
| 143:6,18 144:4 | 19:2,16 20:2,8,19 | 136:6 138:24 | 134:24 147:6 | 135:8 136:4 |
| 147:8 148:16 | 21:20 22:19,23 | 140:25 143:16 | **ordered** 193:11 | 147:11 148:6 |
| 156:7,18 157:8 | 23:15 24:5,12 | 151:9 155:11 | **orders** 26:2 33:11 | 182:23 183:1 |
| 158:21 160:6,21 | 26:20 27:23 28:3 | 157:25 159:3 | 134:22 | 184:10 185:11 |
| 161:20 162:3 | 28:15,17 30:25 | 170:1 174:16 | **original** 71:16 80:3 | **paramedic** 75:10 |
| 163:4 164:25 | 31:5,24 33:2,8,10 | 180:21 181:16 | 85:20 88:3 197:15 | **paramedics** 125:25 |
| 167:22,22 168:10 | 34:17 35:15 36:5 | 185:10 | 198:1 | 126:5 127:16 |
| 168:14 169:1,3,6 | 36:12,20 38:7,21 | **old** 7:8 101:11 | **Otto** 3:13 | **paren** 91:18 |
| 169:16 172:22 | 39:10 40:7,12,25 | **Olive** 4:4 6:12 | **ought** 186:22 | **parentheses** 91:19 |
| 173:13,17,23 | 41:18,24 42:5,13 | 193:24 199:6 | **outcome** 171:25 | 126:1,2 |
| 175:5 178:5,6,12 | 42:25 43:6,23 | **once** 43:16 64:21 | **outs** 63:8 64:21 | **park** 45:5 |
| 181:5,13,17 | 44:3,11,16 45:22 | 92:21 104:9 106:8 | **overcoming** 133:17 | **parked** 52:1,6,12 |
| 183:18 184:11,13 | 46:12,16 47:18 | 140:25 164:3 | **overhead** 186:2 | **parking** 54:11 |
| 185:6,7,13,22,25 | 49:13 51:5,19,21 | 171:4 182:5 | **overhear** 190:2 | 58:18 65:2 |
| 186:7,21 189:3,21 | 51:25 52:10,23 | 184:14 | **overheard** 187:4 | **parlance** 189:14 |
| 190:3,6 197:8 | 53:14,18 54:3,22 | **one's** 37:4 | 190:3 | **part** 24:22 30:7 |
| **officer's** 57:13 | 55:1,9,24 56:10 | **one-inch** 41:13 | | 32:25 75:13 79:20 |
| 107:12 109:25 | 57:2 58:5 59:3,9 | **one-sided** 187:11 | **P** | 83:25 97:13,19 |
| 111:5,10 143:13 | 59:16,19 60:13 | **ones** 65:23 113:16 | **P.C** 3:21 | 101:22 117:1 |
| **officers** 19:3 27:6 | 61:15,24 62:1,7 | 125:22 | **paddles** 68:7 | 127:23 132:4 |
| 27:10 28:10,19,20 | 63:18,21 64:2,6 | **ongoing** 16:4 87:1 | **pads** 68:11 | 134:4 136:1 |
| 32:21 34:21 35:24 | 64:11,14,20,25 | 87:4 | **page** 5:2 77:20,25 | 146:11 149:13 |
| 35:25 39:19 46:9 | 65:8,14 67:9,24 | **open** 155:19 | 78:11,21 79:1 | 179:11 |
| 46:18,20 56:15 | 68:4 69:1,4,22 | **operates** 155:19 | 87:18,20 132:18 | **particular** 56:2 |
| 77:7 91:3 113:19 | 71:11,14,21 73:8 | **operation** 134:15 | 134:2,4,13 137:8 | **parties** 192:6,7 |
| 121:6,7,14,21,23 | 73:22 74:5,13,24 | **opinion** 106:23 | 145:2,18 147:5,5 | **partner** 15:7,8 |
| 122:3,9,15 130:24 | 75:22,24 77:13,24 | 107:23 108:14 | 180:22 181:3,16 | **partners** 15:6 |
| 132:5 136:1,10 | 78:3,23 79:10,13 | 110:14 140:16 | 182:11,19 185:11 | **Pass** 32:6 33:6 |
| 140:17 143:19,25 | 79:23 80:21 82:14 | 187:3 | 193:12,12,13,15 | 34:14 |
| 147:17,20 148:19 | 82:23 83:5,11 | **opinions** 180:14 | 194:1,4,7,10,13 | **passed** 40:9 62:1 |
| 149:15,19,25 | 85:15 86:1,12 | 187:14 | 194:16,19,22 | 64:25 65:10 175:9 |
| 150:5,13,20,21 | 88:13 89:18 90:13 | **opportunity** 97:3 | 195:1,4,7,10,13 | 175:14,18 |
| 181:13,25 182:2,9 | 91:8,25 92:10 | **opposed** 24:1 70:4 | 195:16,19,22 | **passive** 101:19 |
| 182:13 183:19,23 | 93:13,23 94:6 | 113:16 142:23,25 | **pages** 180:20 | **password** 176:23 |
| 184:6,16 185:3 | 95:15 97:5,15 | 161:24 162:4 | 191:21 | 177:2 |
| 186:7 | 98:13 100:11 | 189:17,22 | **paid** 199:2,3 | **patrol** 8:18,21 9:1 |
| **officers'** 45:1 | 101:25 109:11 | **option** 98:22 99:2 | **pain** 94:20 98:8,23 | 14:4 15:1,10 |
| 149:24 184:2 | 113:17 114:1,2,10 | 135:15 | 103:20 | 26:24 27:4,11,14 |
| **offices** 2:21 191:9 | 115:25 118:20 | **optional** 120:6 | **painful** 114:3 | 27:24 28:1,5,11 |
| **oh** 33:22 71:9 76:17 | 119:2,4,10,12 | **options** 99:4,13,17 | **pamphlet** 24:9 | 28:19,20 30:22 |
| 89:9 102:2 | 122:18 125:4 | 134:8 | **pamphlets** 25:5 | 34:19 36:21 39:25 |
| **okay** 9:4,20 12:12 | 126:8,19 127:4,10 | **oral** 7:1 | **papers** 22:17 24:9 | 40:8 42:19 45:6 |

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                      October 1, 2015

Page 215

52:21 53:9,23
54:5,10 58:3 65:2
161:25 162:5
167:22 169:3
181:19 189:2
**patrolman** 14:18
23:7,8
**patrols** 31:3
**pattern** 182:13
**pauses** 139:21
**pavement** 184:13
**PC** 2:22 3:13
191:10 198:15
**peace** 9:16 18:18
19:14 70:3 148:16
**peak** 155:19
**peers** 172:12
**pending** 6:6 191:5
**people** 12:2 15:17
18:6 20:15,19
23:22 24:2 25:13
29:9 30:11,12
48:7,11,13 57:6
57:10 60:8,8
63:23 69:3 72:13
76:14 91:6 95:12
105:16,16,20,20
106:9,12,13 113:4
114:11,22,23
115:1,2,4 117:24
121:7,8 122:25
123:6,10 124:6
146:5 149:3,4,9
150:14,21 151:6
157:25 159:20
179:14 182:16
189:6,8
**pepper** 120:6 134:9
151:11
**perceive** 108:13
111:2 139:16
**perceived** 110:9
**perceives** 107:17
139:19

**percent** 124:18
**percentage** 96:19
**period** 87:6 99:21
103:7 111:22
136:20 143:21,25
147:13 169:6
172:20
**Perry** 4:2,3 6:9,11
199:5
**person** 45:8 49:10
49:14 57:4 69:17
70:5,17 75:1,4
80:24 81:15,15
86:15 87:23 89:2
93:24 94:22 95:2
95:2,2,24 96:22
97:22 101:4 102:3
103:19 104:16,20
107:1 108:24
110:3,5,15 116:25
121:21 122:4
137:12 142:13,21
142:25 157:6
162:13,17 189:10
197:14
**person's** 93:16,25
95:1 102:13
**personal** 1:2 2:6
24:3 25:13 69:18
70:5,18 75:2 76:5
76:14 81:16 89:3
140:10 150:15,22
182:6
**personally** 166:10
**personnel** 30:4,5
170:13 171:18
**persons** 70:14
100:20 106:7
115:11,11 166:15
188:21
**pertinent** 88:4,15
**phrase** 17:8 27:14
37:20 113:13
138:9 156:1

**phrases** 101:5
**physical** 8:13 22:11
24:9 101:2,8
137:12 140:15
143:20
**physically** 18:25
101:18 163:7,9
**physiological** 155:4
**picture** 144:17
145:19,20,21
146:11
**pieces** 180:7
**Pitzer** 2:22 3:21 6:2
191:9 193:4 198:9
**place** 97:4 145:8
171:9 174:5,16
187:3
**placed** 128:16
170:9,25 174:23
181:19
**Plaintiff's** 5:9,10,11
41:5 42:23 146:7
**Plaintiffs** 1:7 2:10
2:21 3:3,11
**Plan** 145:3
**play** 95:11 108:15
140:23,24
**please** 6:13,20 7:6
43:1,3 52:2,4,15
58:12 78:1 90:21
123:19 131:11
135:4 156:13
193:12,14
**plenty** 179:22,23
**plus** 28:13
**point** 14:20 15:13
20:1,7 37:24
46:19 50:11 51:23
52:19,24 53:16
56:25 57:16 59:23
60:10 61:5 69:15
72:14 73:16 85:25
101:23 102:4
121:4 137:21,24

138:2,8,9,12,16
139:6,11,13 140:1
142:5 163:1
172:17 174:6
178:4 179:2,4
**pointing** 42:2
**points** 101:10,13,17
159:25
**police** 7:18,24 8:1
8:15,16 9:2 12:15
12:16 16:5,6
18:24 29:4 30:10
30:15 31:15 39:9
39:13 40:13 76:18
77:16 111:1 121:6
128:16 130:13
132:5 142:20
148:12,18,19
150:13 151:12
157:7 161:2
163:20 169:4,15
171:1,15 180:23
181:13 182:5,9,12
183:2 185:8
188:23 190:5
**policies** 25:21 26:1
32:4,6 33:11,15
33:18 34:15 44:8
44:13 76:19
131:22 152:8,22
**policy** 33:3,4 126:2
126:14 132:2,4,13
134:24 135:23
136:5 157:11
167:3 168:12,24
178:19
**pop** 25:17
**pops** 177:4
**populations** 182:15
**portion** 12:15
77:21 78:13 83:4
123:20
**portions** 78:5,9
**pose** 106:5

**position** 12:6 45:17
47:15 51:16 53:11
54:17 78:24 158:1
**positional** 62:24
**positions** 50:21
**possibility** 96:9,15
116:2
**possible** 46:8 76:23
76:25 77:2 83:5,8
104:13 115:24
120:9 149:7
153:25 156:6
189:6
**possibly** 23:20
38:10 50:6 70:10
70:11 71:4,6,7
75:9 150:9 156:4
**pounds** 122:11
**power** 59:20 60:2
123:11 163:8
172:17
**practical** 144:14
**practice** 17:4
**pre-shift** 31:6
34:12
**pre-taser** 119:16,23
**preferably** 156:1
**preferred** 144:14
144:18 146:21
154:15
**presence** 28:7
75:15,18 163:17
**present** 101:8
129:19 161:6
183:12
**pressure** 101:10,13
101:17,23 102:4
**pretty** 20:13 68:20
74:5 115:22
146:16
**prevent** 132:7
**previous** 31:2
78:11 82:16 116:6
**previously** 72:15,17

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 216

160:17 190:16
**primarily** 106:18
149:3
**prior** 26:4 30:22
32:20 45:25 52:24
78:8 92:25 112:13
139:3 141:16
144:22 156:8
160:10 163:13
**prisoner** 133:17,19
**prisoners** 9:11
**probably** 30:11
51:23 116:6 121:1
142:17 183:13
**probes** 55:3,5
**problems** 178:14
178:17
**Procedure** 137:8
**procedures** 26:1
33:12,15,18 157:9
**proceeded** 46:7
**process** 11:2 60:24
121:22 176:4,6,24
**processing** 193:15
**produced** 160:16
160:17
**Production** 193:23
**products** 151:12
**profiling** 31:21
**program** 152:25
177:5
**prompt** 193:16
**prong** 114:25
146:13 154:16
156:3 159:12
**prongs** 55:22 56:6
56:8,11 96:14,23
114:24 141:11
142:12 146:2,3
155:16
**proper** 101:14
**properly** 57:17
155:16
**property** 18:25

70:11,13 163:13
163:16
**propounded** 7:1
191:23 192:2
**prosecutor** 82:5
**protect** 120:16
149:8,15 150:8
**protecting** 132:9
**protection** 149:3
150:5
**protocol** 176:24
**provide** 151:21,24
153:6
**provided** 19:19
31:24 87:23
**public** 82:21 148:7
148:11,21 149:15
150:5,9 175:3
196:18 199:13
**pull** 55:21 57:12,18
73:4,25 74:10
93:14,15 102:11
171:16
**pulled** 52:18
**pulling** 17:6 73:6
102:14
**pulls** 136:24
**pulse** 64:18 67:8
**purchased** 184:22
**purpose** 24:15
34:22 146:24
164:5
**purposes** 21:1
113:24
**pursuant** 191:5
**pursue** 187:6
**push** 93:15
**pushing** 51:12
70:10
**put** 22:14 41:18
53:7 58:10,11,11
58:20 62:5,22
68:10 71:14 85:10
85:13 86:13

114:11 134:3
141:4 156:3
171:18 176:7,23
**putting** 52:14
66:21 93:25

————————

**Q**

**qualifying** 16:11
**quarter-inch** 113:7
113:16 114:1,13
114:19
**question** 11:14,20
11:23 18:1,2
27:18 41:16 63:14
65:8 72:11 88:10
97:6 104:4 112:20
113:25 118:18
119:12 121:18
123:14,15,18
137:4 142:4 152:5
170:19
**questioning** 111:10
184:21
**questions** 5:4,5 7:4
11:5,7,11,13 14:9
14:10 16:4 153:21
160:13,14,20,25
186:9 190:14,18
191:23 192:1
**quick** 65:5,7 68:20
164:16
**quickly** 59:17,18
60:16 62:4 66:22
88:2 92:12,14
102:12 103:17,18
122:25 164:14,15
182:14
**quite** 20:20 40:10
157:5
**quizzes** 25:17
**quote** 91:17 99:19
103:7 111:20
125:25 126:19
133:4,14 134:14

135:8 136:8,14,18
143:18 144:11
148:6
**quotes** 99:21 103:8
111:22 135:11
136:20

————————

**R**

**Racial** 31:21
**racist** 166:6
**radio** 36:3 38:6,7
40:23 44:20 46:15
46:16 53:25 64:20
64:21 71:23 90:15
90:23 91:3,7,11
109:20,22 164:23
189:16 190:4
**radios** 47:1
**rain** 39:14
**ran** 59:1 89:25
119:8
**range** 16:10
**ranges** 125:16
**rank** 23:5 87:12
169:7
**rate** 100:13,16
155:8
**reach** 91:9
**reached** 91:14
127:2
**reaction** 38:12
**reactions** 57:6
**read** 12:19 32:8,10
34:16 87:8 88:7
88:10,21 123:19
123:21 132:11
133:7,20 180:3,8
180:10 187:12,19
187:22 188:1
190:20 193:10,12
194:1,4,7,10,13
194:16,19,22
195:1,4,7,10,13
195:16,19,22

196:2
**readily** 33:20
**reading** 136:3
**reads** 135:14
**ready** 38:15,15
50:23 51:3 187:18
**real** 38:17
**realize** 23:25
**realized** 56:13
62:10,11 64:16,21
65:19 112:19
127:3
**realizing** 112:13
**really** 10:16 12:4
26:25 28:12 55:5
65:6,13 83:11
86:9 95:10 103:16
164:14 175:16
176:6 177:3
180:21 183:10
**reason** 111:13
115:5 134:20
164:17 174:1
194:2,5,8,11,14
194:17,20,23
195:2,5,8,11,14
195:17,20,23
**reasonable** 105:5
105:21 106:24
107:24 110:2
136:20
**reasonableness**
106:4
**reasonably** 132:6
133:16
**reassess** 108:18
**recall** 13:15,18,21
18:16,20 21:18
22:4 23:1 24:24
25:7 29:12,14
33:24 34:7 35:5,8
36:14 37:6 38:7
38:14,19,24 39:3
39:17,18 44:7

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                October 1, 2015

Page 217

45:2,12,13 52:6
52:19 53:1,20,21
53:24 54:24 56:8
56:25 59:9 61:6,7
61:13,15 63:16
64:11 68:6,9,12
68:13 71:17 74:1
74:4,9,12,14,17
83:9 89:14,16
90:11,12 92:5,24
93:1,2,4 97:7,13
97:19 100:18,23
100:24 113:2,10
125:19 127:9
128:17,18,22
129:7,13,17,22
130:2,4 145:6
155:5,6,9,10,14
159:22 161:12,19
161:22 162:9
164:2 169:22
172:6,23 173:25
177:18,22,24
179:15,25 180:2
182:8,10 186:25
190:7,10
**recalling** 139:2
**receive** 24:17 47:5
161:10 163:12
189:4
**received** 18:18
22:19,21 25:5,11
29:1 31:12,14
38:6 100:19
125:10,20 139:1
153:13,14 161:3,7
165:23 166:12,13
170:7 172:10
179:2,5,12 184:24
187:1
**receiving** 22:4
67:17 138:25
**recertified** 21:20
**recognize** 148:6

**recollection** 25:9
61:8 74:18,22,23
**recollections**
127:21
**record** 6:1,14 11:16
12:5 69:6,9,10,11
123:21 131:10,12
131:13,14 156:12
156:14,15,16
190:21
**records** 11:21
**recovered** 83:9
**redundant** 42:15
**refer** 147:4
**reference** 24:15
88:3
**referenced** 193:10
**referred** 94:19
**referring** 12:8 33:5
**reflects** 28:13
**refused** 182:4
**regard** 14:3 16:19
46:2 97:9 100:15
101:3 115:12
131:22 157:2
**regarding** 11:5,5
13:17 25:6,13
44:8 91:23 127:18
153:12
**Regis** 176:11,12
177:6,7,8,11
**registered** 169:15
170:25 171:5
172:1
**regular** 25:20 33:18
65:25 105:1
**Regulations** 132:20
**related** 10:19 17:9
31:4 38:3 170:3
192:7
**relation** 12:13
**relationship** 23:8
66:18 155:24
**relatively** 59:17

60:16 62:4 66:22
121:11
**relay** 36:2 46:25
47:3 75:10
**relaying** 190:9
**rely** 85:19,21
**remain** 144:13
**remained** 8:21
**remarks** 191:24
**remember** 13:22
16:13 19:4 24:19
24:22 29:10 30:19
35:12 46:4 47:8
58:1 64:2,4,5,6,15
66:12 73:6 87:16
96:19 111:25
125:22 129:3
145:18 159:15
160:1,3,4 161:8
162:1,6,19,19,24
170:4 179:17
183:13 186:22
190:8
**rendered** 186:15
187:16
**Renee** 1:4 2:8 6:18
**repeated** 82:14
**repeatedly** 110:17
**rephrase** 11:8
27:19 30:2 72:11
123:18
**replaced** 37:4
**replacement** 37:6
**reply** 7:1
**report** 12:15,16
33:24 37:23,24
38:17 39:4 45:25
49:4,6,9 52:23
70:12 71:15,16
76:19 77:5,22
78:13 81:23,24
82:2,9 83:6 85:20
87:20,23 88:3,19
88:24 91:16 99:19

103:6 109:13
111:19 118:24
125:24 127:23
129:20 131:5
156:19 157:23
164:24 167:9,16
167:18,24 168:3
169:9 180:3
186:12,17 187:8
187:25
**reported** 53:6
141:3 185:19
186:5 191:19
**reporter** 6:11 12:4
123:21 190:19
**reporter's** 11:15
**reporting** 4:3 6:12
87:6 193:1,23
199:5
**reports** 22:17 34:14
37:14 49:14 76:22
77:8 78:19 85:16
102:23 131:1
**represent** 113:15
146:10
**Representative** 1:2
2:6
**representing** 12:23
**reprimands** 170:5
**request** 164:8
**requested** 123:20
125:25 160:17
**require** 126:17
**required** 76:22
103:23 125:4
**requiring** 125:1
**reservation** 160:15
190:16
**reserve** 160:18
**resist** 104:10 163:7
163:9
**resistance** 101:19
133:17
**resisting** 59:22

60:11 94:12 98:21
101:18 119:14
121:15 122:19,23
123:6,10 124:9,12
124:22 125:14
**resorting** 182:13
**respect** 147:12
**respects** 191:25
**respiration** 155:8
**respond** 28:8 94:10
126:1
**responded** 88:17
90:14 184:11
**response** 62:10
84:5,14 127:2
**responses** 25:2
**responsibility**
147:20,24
**responsible** 27:12
**restrain** 101:12
**restraint** 101:2,9
**resuscitation** 67:9
**return** 193:14
**returned** 14:25
**review** 31:22 32:5
32:16 33:1,9,21
36:13 77:11 78:8
85:18,19 158:16
159:25 164:25
166:2 167:4,9
171:6,7 186:11
187:8
**reviewed** 12:13,15
32:8 77:21 87:8
169:11
**rhythm** 155:8
**Rice** 177:25
**ride** 15:3,9
**right** 8:9,14 13:9
17:8 18:4 24:2
25:16 26:11,14
27:13 28:6,8 29:1
30:8 33:12 38:24
40:24 43:22 48:20

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 218

54:20 55:5,9,12
58:10 62:7 65:15
66:23 67:16 73:18
74:7 75:13,19
76:2 78:21 79:21
79:21 82:19 84:4
84:23 86:3,3
88:24 93:4,16
94:14 96:13,16,22
97:16,21 98:15,18
99:5 101:24
103:24 104:10,15
104:17,20,23
105:2,6,22 106:3
106:13 108:17
109:16,19,21
110:13 112:6,10
113:15 119:5,7
121:12 122:2
123:5,25 125:23
131:19 132:25
136:16,21 138:15
138:21 139:17
141:9,10,15,20
142:7 146:1
149:10 151:7,13
151:16 152:7,8
154:9,20 157:1
159:6,16 160:18
162:11 174:9
178:23 183:14
185:2 188:8
193:10
**rights** 147:12,16
**risk** 95:24 97:16,22
98:2 100:21 102:3
108:25 115:10
117:2 120:10,14
**Road** 41:10 42:16
42:18 43:1,9 45:4
46:1 47:19 73:4
74:6 84:9 91:9
**roadway** 38:10
**roaming** 27:10

**robbery** 49:23
**Rodgers** 1:4 2:8
6:18
**role** 157:1 158:1
**roll** 30:20,21
112:17,21 161:9
161:10 172:9
**rolled** 56:9,12
59:13 64:17 67:6
**room** 11:17 30:16
30:18,20,21 34:11
34:18 38:21 39:1
39:5,20,24 85:11
89:8,8 130:1
**rotate** 15:16
**roughly** 38:5 44:1
51:1
**rounds** 16:14 17:3
**route** 45:1
**routinely** 85:16
**row** 104:8
**rules** 9:11,12 16:16
16:19
**Rumors** 165:23
**run** 47:2 72:13 88:1
93:20 130:12
**running** 18:6 38:9
40:20 49:23 71:2
88:19 89:4,10
119:3 126:16
153:19 154:2
175:1 183:3

────────
**S**
**S** 3:22 193:3,9
**safe** 120:9 133:16
**safekeeping** 133:19
**safely** 117:12
122:14 151:23
**safer** 95:3,6 96:24
97:4
**safety** 132:9 140:10
148:21 162:23
189:21

**Saturday** 74:1,6
85:4 86:5 89:9
**saving** 145:8
**saw** 16:1 37:23
44:17,23 48:24
54:4 56:11 62:2
68:3,24 91:25
92:4,6,10 102:22
113:22 116:9
130:13 145:25
163:5,10 172:25
175:2 178:5
184:21
**saying** 32:11 38:25
56:3 90:11 95:22
96:14 108:19
109:24 111:5
119:3,5,12 122:8
123:1 125:9
128:19,23 129:8
129:14 132:14
138:2,5 139:25
140:5,7 143:5,12
143:13 145:17
187:21
**says** 6:25 79:2 80:6
82:19,24 83:15
84:5,5,7,9,23 85:2
86:4,16,20 88:17
133:3 136:14
144:10 181:17
182:16
**scenario** 172:16
179:14
**scenarios** 179:11,20
**scene** 40:8 41:1,15
42:7,11 43:4 45:1
46:3,14 49:1,3,21
49:23 50:3,15
52:24 53:2,22
54:11 63:22 64:3
64:7,12 67:25
68:5,11,16 69:14
70:19 72:7,18,20

73:3,12,23 75:4
75:15 76:5 83:6
90:18 92:21 100:7
103:13 105:2
106:8,9,17,23
110:24 111:24
116:9 117:9,20
119:18 120:20
121:7 122:10
126:1,9 128:5,7
128:12,19,23
129:1,9,13 140:3
140:17 156:8
161:4 162:8,15
163:2,14,20
164:16,18 175:20
188:13,19 189:18
189:23 190:1
**schedule** 15:18
30:13
**schedules** 15:17
189:8
**scheduling** 26:23
28:12
**schizophrenia**
23:21 179:22
**schizophrenics**
179:16
**School** 7:12
**Schottel** 10:3,3,6
10:24
**scratch** 97:6
**screen** 32:24 33:4
35:21 176:7
**se** 31:5 134:21
**seal** 199:10
**seat** 182:4
**second** 42:10 50:16
69:7 98:21 108:24
110:6,6,18,19
117:10 131:11
132:3 133:3 135:7
136:4,16 139:2
140:4 141:5

143:17 147:5
182:23
**seconds** 45:6,7
60:14 62:12,15
65:12 164:15
**section** 132:2,19
134:14 135:7,23
143:16
**security** 176:8
**see** 32:24 33:17
35:22 36:6,8
42:10,19 43:8,18
43:20,21,24 51:3
55:1,3,5,6,9,11,21
57:5,12 64:1 66:2
68:7,10 69:3
77:24 79:19 80:4
82:25 84:6,10
85:2 86:22 87:20
88:5,23 90:9 91:5
91:8,20 103:9
104:1,9,9,16
106:1,9 107:10
108:13 110:23
118:16 126:3,9
127:11 131:19
132:2,20 134:10
134:17 144:1,10
144:15,18,20
145:8,19,20 146:2
146:3,14 147:14
159:14,18 175:5
180:16,24 181:1
**seeing** 56:8 64:15
68:9
**seen** 24:16 37:10
48:7 82:17,18
114:20 116:16
130:16 131:4
145:4
**seize** 188:19
**seized** 188:13
**seizures** 184:1
**selected** 174:2

Gore Perry Reporting and Video

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                      October 1, 2015

Page 219

**self** 8:12
**semicolon** 135:10
  136:19 144:14
**send** 22:24 189:5
**sending** 189:11
**sensationalize**
  166:1
**sense** 37:25
**sensory** 155:13
**sent** 31:11 87:7
  166:12 167:12
  171:16
**sentence** 88:17
  103:6 127:18
  132:3 133:3,14
  134:14 144:10
  183:23
**separate** 160:22
**separated** 166:19
**September** 11:6
  14:17 15:1 26:4
  28:17 33:23 35:4
  36:10,18 69:14
  79:18 86:5 115:7
  130:23 131:24
  135:5 144:22,22
  152:10 155:2
  158:17 159:9
  160:10 163:21
  165:12 168:10
  173:18 176:18
  178:9 181:17
**sequence** 131:1,5
**sergeant** 34:19
  39:19 87:14,15,17
**sergeants** 26:22
  29:20
**series** 11:4
**serious** 72:6,20,25
  118:24 119:20
  120:24 149:10
  150:9
**serve** 147:8
**service** 66:5 148:12

164:8
**set** 180:15 191:22
  199:8
**Shafaie** 3:20 6:19
  6:19 14:6 17:23
  29:25 45:18 60:4
  63:11 69:8 72:8
  72:22 75:16 81:3
  81:19 82:7 89:12
  94:2,15 95:4,8
  96:1,5,7,17 97:1
  97:11,17,25 98:4
  98:25 99:6,9,15
  101:15 103:25
  104:2,11 105:7,11
  105:23 107:2,7
  108:4,9 109:2
  110:8,21 111:8,17
  113:8,20 114:7,14
  115:14 116:3
  117:15 118:6,11
  119:22 120:4,25
  121:17,25 122:6
  122:16,20 123:12
  123:17,22 137:1
  137:22,25 138:14
  138:17,22 139:8
  139:14,23 140:20
  141:7,13,23,25
  142:15 143:9,11
  145:13 147:22
  148:3,22 149:6,11
  149:21 150:1,6,10
  150:17,24 152:1
  152:19 153:1,7,11
  153:20,24 154:4,6
  154:8 190:18,20
  193:3,9
**shafaie@pspclaw...**
  3:25
**shaking** 48:16
  56:17,24 57:11
  108:22 137:19
  138:10

**sheets** 193:11,13,13
  193:14
**shift** 15:16 27:5,16
  28:11 30:14 31:2
  34:2 172:9,20
**shifts** 15:10 34:6,8
  34:9
**Shilling** 128:5,9
  188:16
**shock** 68:8
**shooting** 18:6
**shopping** 183:3
**shorthand** 191:20
**shortly** 117:10
**shots** 144:13
**shoulder** 90:25
  91:10
**show** 32:7 52:11
  75:11 109:9
  110:24 111:11
  118:16
**showing** 145:17
**shown** 145:7
  191:18
**shows** 79:17
**side** 47:22 61:9
  132:24 163:23
  171:13 183:6
  187:19
**sides** 187:10
**sign** 32:7,11 167:12
  167:12 193:10,13
**signals** 47:5
**signature** 190:19
  190:23 192:3
  193:11,13,15
  196:4
**significant** 184:16
**similar** 145:21
  148:15
**Sincerely** 193:21
**sir** 7:5 8:2 12:12
  15:12 52:7,7,8
  58:22 61:22 81:6

98:7 117:8 125:24
  127:21 129:10
  145:5 146:10
  147:5 148:15,18
  160:14 170:7
  171:5 174:20
  179:1 180:17,25
  181:8,23 182:7,20
  183:9 184:4,19
  185:3 186:5,10,10
  188:17 190:14,17
**siren** 44:6,9,12,23
  50:14 54:9
**sirens** 45:1
**sit** 25:8 51:9,17
  54:20 56:18
  108:21 129:23
  160:3 167:9,15
**sitting** 101:20
**situation** 16:17
  18:3 19:22 20:1,4
  20:6,18 40:4 81:5
  81:6,11,12 95:9
  98:17 104:18
  105:13,14,17,25
  107:4,6,9,16
  108:11 109:5,9,12
  110:10 111:2
  118:15 119:13
  120:3 121:2
  139:20,21,24
  141:5 142:6,16,19
  143:14,17 154:18
  154:25 155:1
  156:2,6,10,11
  174:22
**situations** 23:22
  32:15 81:7,20
  96:11 99:3 104:5
  122:24 137:10
**six** 7:19 8:3 15:25
  16:10,14 67:22
**six-foot** 116:17
**size** 116:25 189:7

**sketchy** 184:25
  185:1
**skin** 183:25
**skinnier** 115:1
**skinny** 159:17
**skip** 182:22
**slash** 80:6 82:24
  85:2 86:4 143:18
**slight** 115:1,11
  116:2
**slightly** 116:10
  117:21
**slowing** 51:2
**small** 55:7 96:9,14
  115:4
**smaller** 113:18
**Smith** 151:20
**SNLJ** 1:9,10 2:12
  2:13
**Snodgrass** 2:22
  3:21 6:3 191:10
  193:4 198:9
**social** 176:8
**society** 147:21
**soft** 75:15,20
**software** 177:5
**sold** 151:12
**solely** 109:25
**somebody** 27:25
  49:22 63:17 66:4
  70:4 72:14 86:14
  94:10 95:17
  108:16 109:20
  116:5,10 128:2
  162:9 176:21
**somebody's** 102:9
**someone's** 55:22
  94:4 101:6
**somewhat** 96:24
**son** 177:25 178:2
**sorry** 8:8 12:16
  50:24 72:22 92:13
  112:6,20 121:19
**sort** 9:5 41:18,22

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                                October 1, 2015

Page 220

51:9 78:12 102:7
**sound** 54:9,10
57:18 191:14
**sounds** 71:7 178:23
185:1 187:20
**South** 2:22 191:10
193:4 198:10
**spark** 57:22
**speak** 178:1,8
**speaking** 177:22
**Specialist** 6:10
**specific** 13:21
18:22 19:20,25
22:7 25:9 107:25
124:14
**specifically** 32:3
126:17 151:25
**speed** 45:16,21
**split** 155:23,23
**spoken** 12:22 13:23
131:7 157:14
**spot** 47:2 93:20
**spouse** 177:17,20
**spray** 120:6 134:9
135:17 151:11,11
151:19
**spraying** 103:22
**spread** 155:17
156:5
**spring** 24:23
**squad** 30:13 69:16
89:8 139:1
**SS** 191:2
**St** 2:23 3:7,23 4:5
6:3,12 7:22 19:3
29:4 178:22 185:8
189:7 191:3,11
192:9 193:5,24
197:19 198:5,11
199:7
**staff** 29:16,24
130:25
**staffing** 30:3,7,9
**stand** 23:24 66:21

66:25
**standing** 50:5 75:4
75:6 106:10
116:17
**stands** 26:10
162:22
**start** 11:13 56:16
79:25 108:11
112:23 121:18
180:21 181:2
**started** 8:16 34:3
64:18 67:8 86:10
119:8
**starting** 119:1
121:21
**starts** 119:7 120:7
**state** 2:23 45:15
90:13 135:24
191:1,11
**stated** 190:16
**statement** 121:9
144:24 146:25
148:8,13 188:15
197:9 199:9
**statements** 13:21
130:16 167:10,11
**states** 2:1 6:6 88:3
132:3 133:14
134:13 135:8
136:7,8,18 137:9
137:10 147:5
148:6,10 180:10
187:15 191:6
**static** 75:5,6
**stating** 42:3
**station** 21:19,24
32:23 39:25 73:12
73:14,19 128:16
130:13 161:13
163:20 183:14
**stature** 115:4,4
**status** 11:1 67:1
79:2
**statutory** 8:7

**stay** 53:17 92:18
**step** 64:24
**stomach** 47:21
59:14 60:25 61:1
94:22,24 98:19
112:4,8
**stop** 18:8,12 51:3
51:24 52:21 56:24
67:14 80:10 94:12
**stopped** 60:22
89:24 103:12
115:22 126:21
164:9 183:2
**straight** 56:3
102:10,13,17
163:19,22
**street** 2:22 3:22 4:4
6:12 9:1,13 14:4
15:21 16:2 40:21
71:2,5 81:14 82:1
84:6,7 88:20 89:5
89:11 163:23
189:4 191:10
193:4,24 198:10
199:6
**streets** 179:3
**stress** 143:15
**stretched** 181:20
**strike** 163:2,4
**striking** 103:21
**struck** 109:14
184:13
**studied** 8:5,7,7,11
**stun** 93:6,9,10,14
93:24 94:13,25
97:9,13,19,22
98:6,10,15,22
99:10 103:21
159:13
**stun's** 98:8
**stunning** 93:20
97:16
**subheading** 180:22
182:15,16,18

**subject** 38:9 88:19
89:24 90:7,15
91:18 122:18
137:11,13,15
143:18 155:3
**subject's** 122:17
**subjects** 23:19
26:17 29:6 63:5
114:12 135:25
136:10 143:25
**subpoenas** 22:16
**Subscribed** 196:12
**subsection** 180:25
182:12
**subsequent** 69:22
74:24
**successful** 76:16
**successfully** 123:5
**suffering** 149:10
**suit** 192:6
**Suite** 2:22 3:6,14
3:22 4:4 191:10
193:4 197:18
198:4,10,16 199:6
**summer** 24:23
**summoned** 163:13
164:3,5,18
**superior** 150:20
167:20 169:11
**supervise** 149:19
150:21
**supervision** 150:4,4
151:1
**supervisor** 28:14
65:15 126:1
164:20 167:4
168:5 171:12
**supplement** 22:23
85:19
**supposed** 152:16
152:21,24 153:3,4
154:19
**suppressions** 67:8
**sure** 22:9 27:1

34:13,14 40:11
60:22 69:8 85:13
103:16 112:9
149:24 157:5
167:10 176:20
188:12
**surrounding**
136:15
**suspect** 62:19 70:4
70:19 72:7 79:5,6
80:10 95:6 96:25
105:5 120:16
121:14 122:7,10
122:10 124:1,21
125:12 136:25
**suspected** 49:20
**suspects** 98:16
**suspicious** 183:4
**sustained** 172:4,7
**swear** 6:21
**sweep** 102:25
**switch** 177:10
**sworn** 6:23 9:15
191:16 196:12
**symbol** 148:7
**sync'd** 176:14
**synchronize** 66:14
**system** 32:7 33:6
34:14 36:16
155:13 176:5

---

**T**

**T** 3:4
**table** 122:13 129:24
**tactical** 19:3
**take** 39:23 93:21
95:17 102:11,19
102:21 103:4
112:22 148:15
163:25 171:9
**taken** 2:20 6:5 40:5
146:11 196:3
**talk** 13:1,6 20:5,16
20:17 23:24 29:6

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                              October 1, 2015

Page 221

29:8 30:6 32:14
32:17 33:22 73:7
76:11 124:23,24
130:6 157:19,20
187:9,17
**talked** 12:25 13:13
70:2 76:15 83:23
128:20 129:16
130:20 179:16,19
182:24
**talking** 13:10,22
40:25 74:13 75:7
75:23 76:12 79:20
91:6 132:13 136:7
**tangled** 55:19
**target** 17:16 144:12
144:18,22 146:21
154:15
**targeting** 16:20
**tase** 94:11,13 97:3
117:10
**tased** 48:7,9,12
50:7,11,16 57:4
57:10,14 90:16,19
94:23,24 95:25
96:23 103:14
106:22 110:16,17
112:7 113:5,19
117:22 119:15
126:10 138:9,13
138:18,21,23
140:17 141:1,14
141:18 142:24
159:3,16,20,23
160:6,9
**taser** 15:20,22 16:2
21:4,13 22:5,22
23:9,10 31:13
39:15 48:22 50:6
54:23,25 55:16
56:2,6,8,11 57:13
57:13,17,24 59:21
59:25 60:3 80:10
93:7 95:3 96:24

97:7 98:3,21
100:14,16,25
103:7,20 108:2,24
110:3,19 113:3,6
114:11,24,24,24
116:1 117:13
118:4 119:19
120:3,10,20
121:12 122:14
123:11 124:7
128:15 131:1,4
134:10,16,24
135:4,9 136:8,12
136:19,24 137:9
137:16 138:25
139:3,4,22 140:1
140:18 141:3,11
141:16 142:12
144:5,13 145:2,15
145:24,25 146:2
146:13 151:3,3,6
151:10,18 152:11
152:17 153:13,14
154:11,11,15,20
155:3,11,16,24
156:9 163:8 164:6
164:19 168:1,2
173:18,24 184:22
184:24
**taser's** 152:24
153:5
**tasering** 103:22
**tasers** 21:8 22:20
22:21 123:6,23
143:17 184:22
**tasing** 49:18 60:18
92:25 98:20 99:14
103:12 106:17
107:15 108:16
109:15 119:6,7,8
128:6,7,10,20
141:5 159:22
**taught** 19:2,23
23:21

**TAXED** 198:1,7,13
**team** 26:10
**tear** 151:10
**techniques** 8:12
18:15 20:11 25:1
75:3 76:16 101:3
101:9
**tell** 7:5,10 8:4 9:22
11:7 12:12 14:1
16:9 17:12 19:18
20:2 21:4 22:14
23:15 26:15 27:2
28:22 29:1 30:8
35:1,20 38:1
39:10 40:8 41:24
45:20 47:24 54:8
55:7,21,25 58:2
58:19 59:12 61:4
63:2 73:21 75:8,9
75:22 86:2,7 88:8
93:5 96:10 97:21
101:7 103:16
115:20 155:22
157:22 171:16
176:8,23 178:5
183:11
**telling** 53:1 113:25
129:4
**ten** 10:17 124:10,23
125:2 181:9
**tend** 15:9
**tense** 60:10
**term** 151:7
**terminated** 166:17
**terminology** 63:4
**terms** 20:3 172:2
189:11
**terrible** 170:19
**test** 25:23
**tested** 25:25
**testified** 10:13
72:17 120:21
191:18
**testify** 6:24 85:16

191:16
**testimony** 32:20
56:10 109:24
110:14,23 112:3
164:2 165:5 174:2
191:19,22 196:5
**testing** 25:1,16,20
25:23 29:12
**thank** 6:20 12:12
85:1 190:14,17
**thereto** 191:25
**thin** 116:12,13
159:16
**thing** 27:22,23 82:9
92:20 93:13
189:21
**things** 8:5 14:23
19:21 22:14 29:10
38:18 46:23 57:8
109:5 118:22
135:21 143:15
153:12 155:8
187:22
**think** 16:1 19:24
21:8,18 24:13
36:5,16 47:5,9
58:13 59:19 60:13
62:18 64:25 65:10
66:16 68:2 79:4
83:9 84:22 100:22
102:22 114:17
117:6 118:13
127:18 129:25
140:22 143:22
157:4 177:13
179:4 185:4
188:16,24
**third** 80:6,9 132:1
132:3 141:6
**Thirty** 65:12
164:15
**thought** 38:12,14
54:1 127:14
**threat** 18:8,12

106:5,16 107:25
108:18,25 117:2
128:10 132:15
133:24 136:1,10
137:21 138:6,11
138:16,19 139:6
139:13,19 140:2,7
140:9,15,18
141:16,19,21
142:2,4,13,22
143:24
**threatening** 137:11
**threats** 173:9,12
**three** 28:19 29:4
40:11,16,19 47:12
50:14 60:13
136:23 180:20
185:14
**thumb** 101:5
**tick** 57:21,21,21,21
**ticket** 170:4
**Tim** 6:9
**time** 7:21 8:19 9:15
11:6 14:4,20
15:21 29:17 31:9
32:6 33:23 34:2
35:7,23,23 36:14
37:17,18 38:15
39:24 40:7,9,11
40:12 43:21 44:4
44:25 47:1 49:21
50:8,17 52:20
53:21 54:3,4,17
56:11,12 57:23
61:25 62:1 63:18
63:24 64:25 65:1
65:2,9,10 66:2,2
66:11 67:16 68:11
70:9 71:18 78:19
79:17 81:22 82:14
82:17,24 83:6,10
85:2,7,8,9,12,21
85:24 86:4 87:13
87:14,16 92:6,9

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                          October 1, 2015

Page 222

92:10,16 103:12
103:13,14 105:6
106:23 107:22
108:1,7,18 109:14
110:2 111:20,23
112:13,21 117:25
121:3,14,21 123:4
124:18 125:17
126:8,11,11
127:11 130:1,24
133:9 134:20
136:24 140:1
141:6 156:23
160:13 161:9
164:11 175:17
177:20 190:4,5,17
**timeframe** 15:24
22:2 32:2 38:4
40:2 60:15 62:16
87:11 110:5
164:13
**times** 9:20 10:15
17:3 28:14 32:9
50:10 86:13 104:8
123:25 124:20
125:3,10,15 159:6
159:8 184:14,18
185:14
**timing** 66:15 67:22
68:17 131:1,5
**Timothy** 4:2
**Tina** 1:1 2:5 6:5,15
130:9 177:21
197:5
**tjohnson@batyh...**
3:17
**to-wit** 7:2
**today** 6:2,10 8:22
12:14 14:9 17:1
26:7 78:9 130:21
132:14 133:23
162:2 182:24
**Todd** 3:12 6:17
160:21

**told** 14:11 39:1,20
40:5,19,22 46:2
47:9 72:25 89:25
96:19 146:5
166:13,14 173:1
175:11,14 190:10
**tool** 121:12 135:13
151:10,13
**tools** 99:8,10 120:5
151:21
**top** 43:13 45:4 79:1
131:19
**topic** 30:7
**torn** 185:15
**total** 184:17 198:6
198:12,18
**totality** 136:15
**touch** 112:12,16
**touched** 112:21
**traffic** 39:14 74:3
74:21 170:3
**train** 17:14 148:19
148:24 150:13
173:24
**trained** 8:5 17:16
18:10 19:21 101:3
104:12 148:1
152:3,6 154:10,22
155:2 188:23
**training** 11:5 16:4
16:6,12 17:10
18:14,18,20,22
19:7,14,17,18,19
20:11,24 21:4,11
21:13,17 22:22
23:9,13,16,17
24:6,18,25 25:3
25:12,13,18 26:9
26:10,12 29:2
31:5,7,9,10,11,13
31:14,17,18,19,21
32:1,3,12 57:3
59:25 69:23 74:25
74:25 75:1 88:15

93:6 95:20,23
96:4,6,8,16,24
97:7,8 100:15,25
101:7 103:24
113:3,6,12,14,14
113:19 114:19
115:2 117:23
134:15 144:21,25
145:2,15 149:14
150:18 151:25
152:7,10,25 155:9
155:25 174:19
179:5,13 189:4,6
189:12,13
**transcribed** 191:20
**transcript** 11:16,18
35:15 37:10 53:4
66:15 191:19
192:1 193:12
196:2,5 197:15
198:1
**transcripts** 37:13
42:14 199:1
**transmission** 190:7
**travel** 43:24
**traveling** 45:11
73:11 74:9
**tread** 160:23
**treatment** 125:1,4
125:6,9,10
**trial** 10:13,18,19
191:8
**trials** 10:16
**tried** 56:17 185:15
186:2
**trigger** 17:6 57:19
93:15 136:25
**trouble** 63:6
**true** 26:4,7 47:6
148:11 171:23
172:17,20,21
174:12 191:25
196:5
**trust** 76:7 111:12

111:12,15 143:13
148:11
**truth** 6:24,24,25
191:16,16,17
**truthful** 77:8
**truthfully** 76:25
**try** 20:5,6,16,17
23:24 26:23 28:13
29:9 32:17 60:12
93:20 96:10
102:11 105:15
120:6 121:4 129:4
154:13,20 156:2
165:25
**trying** 17:5 18:11
19:24 27:17 31:16
34:7 45:23 51:7
53:25 54:19 59:6
75:7 81:11 83:11
91:3,5 92:9 94:8
94:16 95:17 97:24
101:12 102:18
108:1,21 117:1,3
121:5 124:2
127:15 129:25
153:21 169:24
179:1 183:10
189:5
**turn** 44:15,20
93:14 102:18,18
**turned** 44:18,23
50:14 54:2 63:25
73:19
**turning** 53:22
**twenty** 30:23
**twice** 9:21 10:9
**twisted** 125:21
**twisting** 101:6
**two** 9:22 13:2,16
27:7 28:20 40:11
40:16,18 50:22,25
51:1,1 60:13 65:6
66:19 68:17,19
84:2,21 93:17

115:25 119:19
121:7,14,21 122:9
130:1 140:17
164:8,11 167:15
169:19 177:12
180:20 184:16
188:9 189:20
**type** 68:10 78:16
170:25 171:5
172:11 178:14
**typed** 78:19,21
87:7
**types** 36:3
**typewriting** 191:21

_____
**U**
**Uh-huh** 84:8
131:20
**uh-uh** 12:3
**ultimate** 104:14
**unarmed** 70:16
71:2 95:2 97:24
108:21 118:23
140:8 141:24
142:25
**unclear** 11:7
**underneath** 58:20
83:15 101:24
**understand** 9:11
11:8,18,23 12:10
14:12 17:25 18:2
20:17 22:11 23:23
26:19 27:3,17
31:19 32:8 34:25
41:3,15 63:13
75:7,11 83:12
92:15 93:5 95:23
99:20,22 104:3
107:11 109:23
111:4 113:21
120:13 123:2,14
123:15 125:17
137:3 141:1
145:17,19 152:5

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

153:4 155:11
160:2
**understanding**
13:3 14:25 17:12
23:16 26:20 27:3
29:24 30:3 32:20
33:10 35:20 46:12
63:2 80:18 85:23
86:8 100:11
115:20 116:1,19
118:13 135:12,16
155:23 158:7,12
174:5
**understands** 86:11
**understood** 11:23
14:19 15:19 28:10
33:2 45:24 72:16
91:16 95:22 122:8
124:11 155:12
**undertaken** 161:11
**undetermined**
191:6
**unhandcuffed**
64:17 67:6 127:19
**United** 2:1 6:6
180:10 187:15
191:6
**unlawful** 132:7
**unquestioned**
111:6
**unreasonable**
137:14 180:24
**upper** 146:13
**upstairs** 87:10,11
**use** 9:13 16:18 17:3
17:20 20:10,23
21:12 25:20 27:13
32:3,14 37:13
39:13 55:16 75:3
79:5 93:9,10,10
93:17 94:4,6,8
95:3 101:14,17,23
102:21,23 104:12
104:23,25 105:8,9

106:1 109:1 110:9
111:6,10 113:4,7
113:12,14 117:4
117:13 120:5,10
120:16 122:14
131:23 132:5,14
132:19,22 133:10
134:4,5 136:7,11
136:19 137:9
140:18 143:20
147:17 148:1,2,20
149:3,14 151:3,8
151:23,24 152:7
152:11,25 153:3
156:1 157:7 165:1
167:3,4,8,18,24
168:2,6,10,11,23
169:9 172:11
173:17,24 177:8
178:14 180:23
186:3
**user** 145:14,16
176:23 177:2
**uses** 32:16 80:10
93:24 105:4
109:25 143:6
144:7
**usually** 28:13
101:12
**utilized** 103:7
**utilizing** 177:14

———————————
**V**
**vacation** 31:2
**Valley** 7:13,17
**variables** 95:11
**various** 16:14
18:21 19:21 29:7
**vary** 30:23 34:20
**vast** 123:9
**vehicle** 43:18,21
53:15 54:16,18
55:4 58:3,12,16
58:24 73:3 91:17

117:9 119:2
**verbal** 173:9,13
181:7
**verbally** 182:4
**version** 129:3 145:4
145:11,15
**versus** 6:5
**vest** 39:14
**victims** 77:15
**Video** 4:3 6:10,12
193:1,23
**VIDEOGRAPH...**
4:1 6:1,20 69:9,11
131:12,14 156:14
156:16 190:21
**videos** 32:16
**Videotaped** 1:17
2:20
**view** 41:10 43:17
69:4
**violence** 49:7,14
90:4
**violent** 38:17 49:9
70:18 118:24
**visited** 29:7
**voice** 75:15,20 76:2
**voltage** 155:20
**volts** 155:20
**vs** 1:9 2:12 193:7
197:5
**vulnerable** 182:14

———————————
**W**
**wait** 11:13 87:4
104:16
**waited** 107:22
**waive** 193:10
**waived** 190:23
192:3
**waiving** 173:1
**walk** 181:7
**walkie** 161:15
190:4
**walking** 81:14,25

184:12
**wall** 185:17
**want** 11:7 12:5
15:17 16:3 19:22
20:16 33:22 45:15
58:20 65:5 77:9
77:12,14 105:15
164:23 165:25
180:13,15 181:2
187:11
**wants** 11:17
**warned** 154:11
**warning** 97:8
**warnings** 22:4,24
22:24 23:12
100:19 151:16
153:5 155:9,10
**warrant** 79:7
176:22
**warranted** 171:22
171:22 172:3,3
**warrants** 175:19,25
176:3,17,24
**wasn't** 49:20 59:22
64:16,21,24 65:19
67:17,19 69:20
72:6 73:9 84:20
107:10,14 108:12
109:18 110:23
112:13,19,20
115:8 127:3,5,6
140:11,11 158:19
165:24 174:2
179:8 181:11,15
181:24 183:9
187:19 188:2
**watch** 31:3
**waving** 51:14
**way** 18:8 19:17
37:3 42:8 43:2,3
52:11 60:2 61:1,4
61:6 62:4 65:9
68:13 73:5,25
74:11 76:9 87:6

93:22 102:10,17
104:15 113:23
116:7 142:19
159:23 162:21
**ways** 93:17 189:19
**We'll** 190:20
**we're** 6:1,3,11 28:1
28:4 33:21 154:22
190:21
**we've** 19:23 22:21
89:10 127:20
129:20 132:13
140:22 143:22
182:23
**weapon** 49:4 70:13
90:3 93:14 110:4
132:24 135:10
139:11 154:21,24
**weapons** 151:19
180:24
**week-long** 29:3
**weekly** 29:16
**weeks** 13:2,16
**weigh** 61:24 117:25
**weighed** 116:19
**weighs** 122:11
**weight** 101:11
103:4 116:15,18
**went** 7:13,18 21:13
23:17 29:3,7
31:17,17 37:18
51:18,22 56:20,23
59:1 96:6,8
100:22 163:22,22
179:21 186:19
**weren't** 55:14
112:9 166:10
**Wessons** 151:20
**westbound** 42:15
46:1 73:3,11
74:10,15 91:9
**when's** 57:23
**whereabouts**
166:24

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                      October 1, 2015

Page 224

**WHEREOF** 199:8
**white** 1:17 2:20 6:4
  6:22 7:7 28:18
  131:16 144:19
  156:18 160:21
  188:6,8 193:6
  196:1,10 197:11
**White's** 188:5
**Whites** 188:9
**whoever's** 26:22
**wholesale** 37:6
**wife** 130:10
**William** 3:4
**willing** 76:11
  187:18
**Wilson** 156:19
  157:14
**Wilson's** 157:25
**winter** 24:23
**wires** 55:1,9,12,18
  55:21 56:2 57:13
  90:20
**wish** 83:24
**witness** 6:21 41:23
  43:5 52:9,13,16
  58:8,14,17,23
  123:18 129:4
  175:11 188:15
  190:24 191:14,23
  192:2,9 193:10,12
  196:1 199:8
**witnessed** 128:3
**woman** 181:18,21
**woman's** 181:6
**word** 30:9 78:20
  84:23
**words** 92:24 93:2
  99:20,22 100:4
**work** 26:18 29:5,9
  33:24,25 39:13
  65:21,25 66:3
  111:1 176:22
  188:22
**worked** 9:7 27:6

**working** 14:21
  146:5 165:11,14
  181:8 188:9 189:2
**works** 101:12 102:2
  102:7 165:9
**world** 151:20
**wouldn't** 17:21
  66:3 72:3 81:1,17
  82:12 114:8
  157:11 159:15
**wrist** 101:11
  102:15 135:20
**wrists** 102:9 186:3
**write** 58:8,19 71:16
  76:22 77:7 78:5
  82:9 157:23
  171:12
**writing** 76:19 81:22
  81:23
**written** 19:6 24:5
  170:5
**wrong** 62:11 75:8
**wrote** 41:24 42:2
  71:17 77:4 159:15
  164:23

                    **X**
**X-22** 135:9
**X-26** 134:16 135:9
  136:19 137:9
  144:13

                    **Y**
**yeah** 20:5 27:19
  31:20 33:9 41:22
  42:1 44:19 46:25
  51:15 59:18 61:20
  62:8 71:13 75:21
  79:4 83:13,19
  90:24 92:12,22
  95:19 103:1 104:5
  113:24 116:13
  125:7 137:2
  138:23 149:7

  154:7 178:25
**year** 7:23 9:10 16:7
  21:7,25 22:1
  24:22 165:18
  169:21,22 177:12
  179:5,13 184:24
**years** 10:17 15:14
  69:24 124:10,23
  159:19 169:20
  177:12 181:9
  184:25
**yell** 76:8
**yelling** 20:15 53:16
  76:1 92:17,23
  99:20,25 100:2
**yesterday** 172:20

                    **Z**
**zone** 161:17,20,23

                    **0**
**0005** 78:12
**0006** 78:2 99:19
**0007** 78:4
**006** 87:19,21
**01** 193:6
**0568** 134:3
**09/17/2011** 85:4
**09/30/11** 86:21

                    **1**
**1** 1:19 43:7 58:12
  146:25 147:4
  198:7,13
**1:07** 190:22
**10-23** 189:14,16,20
  189:22,23,25
**10-8** 37:19
**10/1/2015** 196:3
  197:13
**10:39** 69:9
**10:47** 69:12
**100** 2:22 3:22
  191:10 193:4
  198:10

**103** 147:6
**11** 26:5 79:1 87:20
  180:16,22 181:4
  181:17 182:11
  185:12 186:5
**11:54** 131:12
**11:58** 131:15
**12** 77:20 78:1,6,9
  79:2 87:19 99:19
  111:20 125:23
  129:21 156:19
  169:10
**12:27** 156:14
**12:33** 156:17
**13** 86:24
**135** 122:11
**145** 83:21 84:1
**1450** 83:18
**146** 5:11
**1483** 145:2
**15** 58:4
**15th** 192:10
**16** 193:2
**160** 5:5
**16B** 5:9 42:24,25
  43:6
**16th** 79:18
**17** 86:5 145:4,11,15
  146:20 176:18
**17B** 5:10 41:6,8
  51:25 52:4 58:6
**17th** 11:6 14:17
  15:1 28:17 33:23
  35:4 115:7 163:21
  168:10 178:9
**180** 116:22
**190** 116:22
**1st** 2:24 6:2 191:12

                    **2**
**2** 58:11
**2:30** 34:9
**20** 51:24 58:4
  196:13

**2003** 7:13
**2005** 7:15
**2006** 7:25 8:15 9:16
  32:2
**2009** 119:13
**2010** 21:9,10,21
  24:21 25:2 26:5
  131:19 134:23
  145:4 178:22
  184:10,23,25
**2011** 11:6 14:17
  15:1 21:8 23:18
  24:17,21 25:2
  28:17,25 31:9
  33:23 34:8 35:4
  35:14 36:10,18
  37:8 69:14 79:18
  86:5 93:3 115:7
  130:23 131:24
  135:5 144:22
  152:10 155:2,12
  158:17 159:9
  160:10 163:21
  165:12 168:10
  170:20 173:18
  176:18 178:10
  185:12,25
**2012** 181:17
**2013** 181:4 182:2
  183:2,8,19
**2015** 1:19 2:24 6:2
  191:13 192:10
  193:2,6
**21** 145:1
**210** 3:14 198:16
**211** 3:6 197:18
  198:4
**220** 61:25 118:1,2
**23** 45:14
**241-6750** 4:6
  193:25
**25** 55:17
**260** 61:25
**29** 180:22 181:3

Tina Moore, et al. v. Brian Kaminski, et al.

Michael White                                                    October 1, 2015

Page 225

**3**

**3** 58:20
**30** 45:6,7 181:16
   193:14
**300** 4:4
**31** 7:9
**314** 3:8,24 4:6
   193:25
**35** 5:11 146:8,10
**36** 16:14 17:3
   182:11,19 185:11

**4**

**4:09** 86:21
**4:14-CV1443** 1:9
   2:12
**4:14-CV1447** 1:10
   2:13
**40** 179:12,12
**400** 2:23 3:22
   191:10 193:4
   198:10
**4050** 3:6 197:18
   198:4
**41** 5:10
**410.00** 131:18
**410.01** 132:2
**410.06** 132:19
**42** 5:9
**421-5545** 3:24
**43** 45:14
**4600** 3:14 198:16
**499.00** 134:16,24
   135:8
**499.01** 135:23
**499.03** 137:8
   143:16
**4th** 3:22

**5**

**5** 61:23 79:1 117:24
   124:18 132:18
**5:30** 34:1
**50** 51:24

**50,000** 155:20
**515** 4:4 6:12 193:24
   199:6
**531-7200** 3:16
**55** 114:5
**586** 90:7

**6**

**6** 87:20 131:19
   134:4,23
**6'** 61:23 117:24
**6:30** 34:4 38:5 74:1
   74:6
**6:46** 79:18 85:4,6
**6:50** 86:5
**621-2500** 3:8
**63101** 4:5 193:24
   197:19 198:5
   199:7
**63102** 3:7,23 193:5
   198:11
**64112** 198:17
**64112-3012** 3:15

**7**

**7** 5:4 134:2,13
   145:1
**700** 199:6

**8**

**8** 131:17 132:19
   134:2
**816** 3:16
**835** 2:25 192:18

**9**

**9** 134:19,21 135:3,7
   135:24 143:16
   145:22 146:20
**9:31** 6:2
**90-year-old** 81:13
   81:25
**902** 145:22