UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | | |
|---|---|---|---|
| TINA MOORE, ET AL, | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | | |
| vs. | ) | Case No.: | 4:14-CV-1443 SNLJ |
| | ) | | 4:14-CV-1447 SNLJ |
| CITY OF FERGUSON, ET AL, | ) | | (Consolidated) |
| | ) | | |
| Defendants. | ) | | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION.

On the morning of September 17, 2011, Jason Moore, 31 years old, was experiencing a

mental health crisis. See Plaintiffs' Statement of Additional Uncontroverted Material Facts

("Add. Facts") at ¶ 1.  He was not intoxicated by drugs or alcohol.  *Id.*  He had taken all of his

clothes off, while shouting religious language such as "Glory to God" and "I am Jesus." Add.

Facts, ¶ 2.  Mr. Moore was yelling at vehicles as they drove by and struck at least one vehicle

with his bare hands. *Id.*  While individuals called 911 to report Mr. Moore's unusual conduct, the

responding police were *not* told by witnesses that Jason Moore was in possession of a weapon or

was threatening violence against anyone. Add. Facts, ¶¶ 4; 5

When Officer Kaminski, the initial responding officer, first saw him, Jason did not pose a

threat to himself or others.  Add. Facts, ¶¶ 5; 6.  He was standing, staring out at Airport Road.

Add. Facts, ¶ 7. As an adult male and only 135 pounds, Mr. Moore was an exceedingly thin and

lightly-built individual, while Officer Kaminski is a "good sized man", approximately 6 feet tall

and around 230 lbs. Add. Facts, ¶¶ 8 - 12.  Jason was unarmed and clearly suffering from a

mental disorder and demonstrating signs of mental illness. Add. Facts, ¶¶ 4; 13. Officer Kaminski made no effort to calm Jason. Add. Facts, ¶ 14. Kaminski stated that he approached Jason and first ordered him to walk towards the officer, which Jason did. Add. Facts, ¶¶ 14-15. Officer Kaminski asserts that he then ordered Jason to stop and get on the ground, but that Jason began running at the officer. Add. Facts, ¶ 15. Officer Kaminski ultimately claimed that Jason was "swinging his fist in a pinwheel motion towards me." *Id*. However, in a Memorandum written by Officer Kaminski shortly after the incident (and not disclosed by Defendants until after all depositions had been taken in the case and after the discovery deadline had closed) there is no mention of this unusual "pinwheel motion." Add. Facts, ¶ 16.[1]

Although Officer Kaminski had instigated the confrontation rather than waiting for backup, he deployed his X26 Taser (a device with known fatal risks), striking Jason in the left side of his chest, near the heart, as well as in the right thigh. Add. Facts, ¶17. The taser blast knocked Jason to the ground with enough force to lacerate his lower lip and cause abrasions to his right forehead, near his right eyelid, and on his left cheek. Add. Facts, ¶¶ 18-19. Kaminski then discharged his taser **three additional times** into Mr. Moore, with little or no break between the taser firings. Add. Facts, ¶20-24. The taser download, which Ferguson did not bother to obtain until contacted by Plaintiffs' counsel, demonstrates that Jason was tased nearly continuously, **receiving 50,000 volts from the X26 for approximately 21 of 23 seconds that the Taser was in use**. *Id*.

---

[1] Counsel for Defendants sent counsel for Plaintiffs a letter on April 22, 2016, accompanying the documents, which stated that this memorandum and other documents being produced for the first time had been in the possession of Captain Henke of the Ferguson Police Department, and had not been in the possession of counsel. Exhibit 19. Captain Henke was deposed on December 15, 2015, more than five (5) months prior to counsel's letter.

According to Kaminski's version of events, Jason was repeatedly tased because he ignored instructions to stay down and attempted to get up on his hands and knees, "**kind of doggy on his -- dog style**[.]" Add. Facts, ¶¶ 25; 41. Defendants' own expert testified that the level of resistance required to use the taser needed an overt action of assault, yet at the same time claims that the justification for the second, third and fourth taser shocks was Jason "refusing orders to stop, getting back up[.]" Add. Facts, ¶¶ 202-203. Kaminski admits that Jason was no more than approximately six inches off the ground when he was tased. See Add. Facts, ¶ 206.

But even the claim that Mr. Moore got "onto his knees" or even attempted to get up after being tased is controverted. The taser download of the incident, the testimony of Plaintiffs' expert witness on taser use and police practices, the eyewitness testimony of Officer White who arrived during the tasing, and other evidence demonstrates that Officer Kaminski's version of events was largely invented after the fact. The tasing was nearly continuous, with no opportunity for Kaminski to both give instructions and for Jason to comply or make significant efforts to get off the ground. Add. Facts, ¶20-24; 40; 42. Rather than attempting to get onto his knees, the evidence shows that Jason was tased while lying helplessly on his back or side. Add. Facts, ¶¶ 31-33; 43.

The Memorandum prepared by Officer Kaminski and withheld during the discovery process contains no reference to the Officer pausing between taser applications to give instructions to Jason and determine whether he was complying. Add. Facts, ¶ 44. Officer Kaminski has claimed throughout that Mr. Moore was only tased three times, not four, and no justification has been given for the fourth tasing shown by the taser download. Add. Facts, ¶¶ 45-46. Defendant Kaminski's own supervisor Lt. Ballard admitted that, if the taser download were accurate, then Kaminski did not perform a proper risk assessment or give Jason Moore

enough time to comply with instructions. Add. Facts, ¶ 47. In short, the evidence demonstrates that Mr. Moore was no threat after the first taser application, yet Kaminski continued to tase Jason again and again and again.

Officer Kaminski ignored his own training and tased Jason Moore to death without giving him any chance to comply with instructions, despite the lack of active resistance or aggression by Mr. Moore after the first taser shock. Add. Facts, ¶¶ 20-24; 29; 47. At the time of the incident, both the law and Taser International's own training and safety warnings demonstrated that the repetitive use of the taser was unreasonable and dangerous. Add. Facts, ¶ 48-50. Although the killing of Jason Moore means that he cannot offer his own testimony about what occurred, the jury is entitled to draw inferences from the numerous material facts and expert testimony contradicting Officer Kaminski's version of events. At the very least, a jury should hear the evidence and decide whether Officer Kaminski's use of force was unreasonable under the circumstances of Jason Moore's death.

The conduct of Defendants in attempting to conceal and manipulate evidence in this case demonstrates bad faith and that Defendants' only interest has been to conceal the excessive force used by Kaminski in the killing of Jason Moore. No meaningful investigation of this lethal use of force was performed. Indeed, material facts were demonstrably omitted or changed in order to justify the excessive tasing, including the addition of Officer Kaminski's claim that he gave instructions to Mr. Moore and an opportunity to comply in between the taser charges.[2] Add.

---

[2] Additional evidence that Defendants failed to preserve includes the audio tape of dispatcher and officers' reporting and discussions, which Defendants' expert testified he has found helpful in past investigations. Defendants' expert also admitted that there was no internal investigation of Officer Kaminski's use of force other than what is in the police report; there was no Taser data download done by the Department to compare with Officer Kaminski's story; and no determination was made as to whether or not Officer Kaminski's use of force was consistent with department policy. Add. Facts ¶¶ 51-55.

Facts ¶¶ 44.  Lt. Ballard of the Ferguson Police Department ("FPD") misrepresented material facts to the Medical Examiner, thus manipulating the outcome of the autopsy.  This includes stating that Jason "got up and started towards the officer again" after the first and second tasings; and stating that Jason "has a lengthy history of drugs and is on Probation/Parole for 'Dangerous Drugs'", apparently in reference to a marijuana conviction.  Add. Facts ¶ 51.  As noted, the FPD withheld crucial reports and memoranda created shortly after the incident, not disclosing them until discovery had closed and after all depositions had been taken.

The City of Ferguson also seeks summary judgment on the municipal liability claims against it, alleging that Jason's death was not caused by any policy or custom of the Ferguson Police Department.  This is untenable.  The United States Department of Justice has explicitly found that the officers of the FPD "seem to regard [Tasers] as an all-purpose tool bearing no risk[,]" and that this mentality has resulted in "officers' swift, at times automatic, resort to using ECWs against individuals who typically have committed low-level crimes and who pose no immediate threat," and a "**pattern of excessive force includ[ing] using ECW's in a manner that is unconstitutional, abusive, and unsafe**."  Add. Facts, ¶¶ 56-58.  The Department of Justice also found that the FPD's custom of excessive use of force has fallen heaviest on African-Americans and the mentally ill, and condemned the supervisory personnel of the FPD for their acquiescence in these patterns and customs of brutality, as well as their acceptance of officers' rote and boilerplate excuses for use of force, however excessive.  Add. Facts, ¶¶ 59-61.

These customs and practices were the driving force behind the death of Jason Moore.  This case is a reminder of how a police department's culture and customs of excessive use of force, left unchecked by superiors or appropriate policies and training, results in the use of unnecessary and unreasonable force on vulnerable populations.

## II.    SUMMARY JUDGMENT STANDARD

The Court may only grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court's function is not to weigh the evidence but to determine whether there is a genuine issue of material fact for trial. *Id.* at 249.

The moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor. *Dane v. Doe Run Co.*, 865 F.Supp. 581 (E.D. Mo. 1994), citing *City of Mt. Pleasant Iowa v. Associated Elec. Co-op*, 838 F.2d 268, 273 (8th Cir. 1988). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. A court may grant a motion for summary judgment only if all of the information before the court shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322. Summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries. *Coonley v. Fortis Benefit Ins. Co.*, 956 F.Supp. 841, 843 (N.D. Iowa 1997), affirmed by *Coonley v. Fortis Benefit Ins. Co.*, 128 F.3d 675 (8th Cir. 1997).

## III. DEFENDANT KAMINSKI IS NOT ENTITLED TO QUALIFIED IMMUNITY ON COUNT I EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT

Defendant Kaminski[3] contends that he is entitled to summary judgment on the basis of qualified immunity on Plaintiffs' Section 1983 claims in Count I for excessive force. Qualified immunity involves a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009).

Defendant Kaminski violated Jason Moore's right to be free from excessive force under the Fourth Amendment to the United States Constitution by repetitively tasing Mr. Moore four times, without giving him any meaningful chance to comply with instructions, and while Mr. Moore was not resisting or acting aggressively. The right of a passively resistant subject to be free from the repeated and abusive use of a taser was clearly established at the time of Jason Moore's death. Therefore, Defendant Kaminski is not entitled to summary judgment on the issue of qualified immunity.

### A. Officer Kaminski's knowledge of the risks of Taser devices.

The nature and risks associated with the use of force employed by an officer is of course highly relevant to the qualified immunity analysis. The Eighth Circuit has noted that tasers "used in dart-mode constitute an intermediate, significant level of force that must be justified by

---

[3] Plaintiffs will be filing a stipulation of dismissal signed by all parties and dismissing Plaintiffs' claims against Defendants Matthew Bebe, William Ballard, Michael White, James Knowles III, Mark Byrne, Kim Tihen, Dwayne James, Tim Larson, David Conway and Keith Kallstrom. Plaintiffs also do not contest Defendants' Motion for Summary Judgment on the claims under Count I of failure to render medical care and failure to intervene.

the government interest involved." *McKenney v. Harrison,* 635 F.3d 354, 364 (8th Cir.2011)(Murphy, J. concurring). The Eighth Circuit has observed that ECW-inflicted injuries are "sometimes severe and unexpected." *LaCross v. City of Duluth*, 713 F.3d 1155, 1158 (8th Cir. 2013). Taser shocks "inflict[] a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless." *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993). In March of 2011, prior to the incident in this case, the United States Department of Justice warned that ECWs such as Taser devices are "'less-lethal' and not 'nonlethal weapons'" and "have the potential to result in a fatal outcome." See Add. Facts, ¶ 62.

As set forth *infra*, Defendants rely heavily on *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 892, 899 (8th Cir. July 28, 2014), a case which held that the right to be free from multiple taser applications was not clearly established in 2008, based on the caselaw and risks associated with the device at that time. However, in the 3 years since the incident in *De Boise* and the events of this case in September of 2011, significant additional knowledge regarding the risks of tasers was disclosed by Taser International and communicated to police officers, including Officer Kaminski.

Taser's Version 17 training was supplied with the X26 Taser device in this case, and that training was received by Officer Kaminski, who was himself a Taser instructor. See Add. Facts ¶ 63. Ferguson's Chief Taser Officer, Jon Brannan, further testified that the Warnings issued by Taser on May 1, 2010 were provided to all taser instructors and certified users, including Officer Kaminski. Add. Facts. ¶¶ 64-65. Based on these and other Taser materials provided to Officer Kaminski, the testimony of Officer Brannan, and Kaminski's own testimony regarding his training, he was trained in and aware of the following risks and instructions associated with the X26 Taser:

- The X26 "can produce physiological or metabolic effects which include but are not limited to changes in …heart rate and rhythm"; Add. Facts. ¶¶ 66-67.

- Reasonable efforts should be made to minimize the number of [Taser] exposures and resulting physiological and metabolic effects; Add. Facts. ¶¶ 68-69.

- Taser users should use the lowest number of [Taser] exposures that are objectively reasonable to accomplish lawful objectives and **should re-assess the subject's behaviors, reactions and resistance level before initiating or continuing the exposure**. Add. Facts. ¶¶ 70-71.

- Tasers can produce physiological or metabolic effects which include but are not limited to changes in acidosis, blood pressure, calcium, creatinine, kinase (CK), electrolytes (including potassium), lactic acid, respiration, heart rate, rhythm capture, stress hormones or other biochemical neuromoderators, for example, catecholamines. Brannan, Add. Facts ¶ 72.

- "**Repeated**, prolonged, or **continuous [Taser] applications may cause** or contribute to cumulative exhaustion, stress, cardiac, physiological, metabolic, respiratory, and associated medical risks which could increase **the risk of death or serious injury**." Add Facts ¶ 48.

- X26 use on "low body mass index (BMI) person could increase **the risk of death** or serious injury." Add. Facts. ¶¶ 73-74.

- "The factors that may increase susceptibility for an ARD [arrest-related death] have not been fully characterized, but may include … alterations in brain function (agitated or excited delirium), cardiac disease[.]" Add. Facts ¶ 75.

- Officer Kaminski was also trained to know that some individuals are at a heightened risk of injury from a Taser, including someone that is emotionally distressed. Add. Facts ¶ 76.

- Avoid intentionally targeting the [Taser] on sensitive areas of the body such as **the … chest/breast**, or known pre-existing injury areas **without legal justification**. Add. Facts ¶ 77.

- **Proximity of the ECD or taser electrical discharge to or across the heart has been identified as a principle concern for [Taser] caused cardiac risks and safety.** Add. Facts ¶ 78.

- Taser has determined the **heart-to-dart distance** is a factor in whether or not the taser will affect the heart; namely, the farther you are away from the heart the less chance or likelihood of an effect. Add. Facts ¶ 79.

- The preferred target areas are below the neck area for back shots and the **lower center mass (below chest)** for front shots. The preferred target areas **increase dart-to-heart safety margin distance**. Add. Facts ¶ 80.

- The Taser Warnings state that "**Disregarding this information could result in death** or serious injury." Add. Facts ¶ 81.

- **When using a taser there is an increased risk of injury or death in tasing a person in the chest.** Add. Facts ¶¶ 82-83.

- Using **a taser increases the risk of injury or death** if tasering a person who is in a state of stress or mental distress, like excited delirium. Add. Facts ¶¶ 84-85.

- **Tasering a person repeatedly increases their risk of** injury or **death** to that person Add. Facts ¶¶ 86-88[4]

As Ferguson's Chief Taser Officer testified, the level of force you use is based on the risks, not only to the officer but to the person who is receiving the force. Add. Facts ¶89. These risks are highly relevant to an officer's decision regarding the level of force he can reasonably use when employing a Taser device, and were well-recognized prior to Jason Moore's death by continuous tasing to the chest.

**B. A dispute of material fact exists as to whether Defendant Kaminski used excessive force when he tased Jason Moore to death with four consecutive taser applications without giving Jason any chance to comply with the officer's instructions.**

The Fourth Amendment right to be free from unreasonable seizure protects against the use of excessive force in the apprehension or detention of a person. *Ward v. Olson*, 939 F. Supp. 2d 956, 961 (D. Minn. 2013). To establish a constitutional violation under this Fourth Amendment, the question is whether the amount of force used was objectively reasonable under the particular circumstances. *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 499. The test is an objective one,

---

[4] (Hereinafter referred to collectively as "**Kaminski Known Taser Risks**").

and an officer's good intentions will not make an objectively unreasonable use of force constitutional. *See Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872 (U.S. 1989).

For purposes of the qualified immunity analysis, circumstances relevant to the reasonableness of the officer's conduct include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). Courts have also noted that the severity of the injury the plaintiff suffered is also relevant. *See Crumley v. City of St. Paul,* 324 F.3d 1003, 1007 (8th Cir. 2003) ("In addition to the circumstances surrounding the use of force, we may also consider the result of the force"); *Dormu v. D.C.,* 795 F. Supp. 2d 7, 22 (D.D.C. 2011) (stating in a taser excessive force case that, although the severity of injury "is not by itself the basis for deciding whether the force used was excessive, ... it is a relevant factor"). Jason suffered the ultimate injury when he was killed by the repeated taser shocks to his chest.

### 1.     The severity of the suspected crime at issue was minimal.

Under this factor, courts have noted in the excessive force context that "more force is appropriate for a more serious offense and less force is appropriate for a less serious one." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002).

Here, the police report refers to offenses of Assault 3rd and Indecent Exposure. Add. Facts ¶ 90. Lieutenant Ballard of the FPD testified that both of these charges in the Police Report were ordinance violations. Add. Facts ¶ 91. See also Ferguson Code of Ordinances, Section 29-2, Code 1973, § 51.29 (indecent exposure); Sec. 29-36, Code 1973, §§ 51.01, 51.05 (assault). Violations of City of Ferguson Ordinances are punishable by a fine not exceeding one thousand dollars ($1,000.00) or by imprisonment in the city jail not exceeding three (3) months. *See* Ferguson Code of Ordinances, Section 29-2, Ord. No. 95-2804, § 1. *See McNally v. Eve*, No.

806-CV-2310-T-23EAJ, 2008 WL 1931317, at *7 (M.D. Fla. May 2, 2008) (crimes of violation of noise ordinance and obstruction were of "**minor severity**" for purposes of qualified immunity analysis); *Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009) (Misdemeanor open bottle violation, punishable by not more than ninety days' imprisonment or a fine of not more than $1,000, did not amount to a severe crime for purposes of qualified immunity analysis.)

Obviously, **indecent exposure** is not the type of serious crime that justifies significant use of force. Mr. Moore was not under the influence of drugs or alcohol at the time of his death. Add. Facts ¶ 1. Mr. Moore was experiencing a significant mental health issue. *Id*. Lt. Ballard testified that, if it was determined that Mr. Moore was having mental health issues or a personal crisis and he had not died, the Department would not have pursued charges against him. Add. Facts ¶ 92.

While assault may be a serious crime under some circumstances, Lieutenant Ballard testified that this charge was included because "the Taser has (sic) to be used" and because Jason purportedly "charged" Kaminski. Add. Facts ¶ 93. As set forth below, while that charge may relate to the initial use of force, Mr. Moore was in a **prone, non-threatening position** at the time Officer Kaminski fired the fatal second, third and fourth taser shocks into his body, and was not "assaulting" anyone at that time. At most, he engaged in "passive resistance" by trying to sit up, which is insufficient to justify the extraordinary lethal force used against him.

**2.      Jason Moore did not pose an immediate threat to the safety of Officer Kaminski or to himself and disputed questions of fact exist as to whether Mr. Moore was actively resisting arrest or attempting to flee during the second, third and fourth tasings.**

Even if Officer Kaminski's version of events is true that Jason was running towards him swinging his arm, Officer Kaminski, the training provided by Taser, Plaintiffs' police expert and Defendants' police expert all agree that an officer must conduct a risk assessment to justify *each*

use of the Taser device. Add. Facts ¶ 70, 94; 113; 114. Courts have similarly recognized that, even where an officer's initial use of force is reasonable, **subsequent** use of force may be unreasonable and excessive. *See Oliver v. Fiorino*, 586 F.3d 898, 906 (11th Cir. 2009) (Noting that, while "the use of an initial, single Taser shock to calm the suspect may have been justified," additional taser discharges constituted excessive force where "The justification for the repeated use of Taser force, at least beyond an initial Taser shock, was minimal" and "The plaintiff posed no immediate threat of danger to officers beyond the moment of struggle with [the] Officer"); *McCarthy et al. v. City of Charlotte, et al*., Docket No. 3:12-cv-00838 (W.D. N.C. July 18, 2014) (Denying summary judgment based on qualified immunity where first taser application was reasonable based on facts known to officer, but disputed questions of fact existed as to second and third tasings, including dispute as to whether plaintiff was attempting to get up at the time of the subsequent Taser application); *Blankenhorn v. City of Orange,* 485 F.3d 463, 477 (9th Cir.2007) ("[E]ven where some force is justified, the amount actually used may be excessive.") Plaintiff's expert witness in police practices has testified that, based on the record evidence, after the first taser shock, the three subsequent taser shocks were each unreasonable under the circumstances encountered by Kaminski. Add. Facts ¶¶ 37-38; 95-96.

i. **First taser shock.**

In his pre-contact threat assessment of Jason Moore, Officer Kaminski determined that Jason did not have any weapons and Officer Kaminski knew that other officers were on their way. Add. Facts ¶¶ 4-6. Jason was not clothed. Add. Facts ¶ 13. Officer Kaminski could see his hands and could see he had no weapons on him. *Id*. Jason was standing stationary when Officer Kaminski arrived, and didn't start to move until Kaminski spoke to him. Add. Facts, ¶ 7. Officer Kaminski made no attempt to delay contact with Jason until backup arrived. Add. Facts ¶ 97.

Officer Kaminski made no attempt to calm Jason before tasing him or approaching him. Add. Facts, ¶ 14.

Before Kaminski approached Jason he did not perceive Jason as a threat to him, he was only afraid that Jason would step off the curb into traffic. Add. Facts, ¶ 6. Kaminski acknowledged that, had he waited for backup to arrive, then it would have been possible to perform a "cuffing" under load on the first tase. Add. Facts, ¶ 98. Defendants' liability expert agrees that at this time, there was no evidence that Jason had injured anyone, he did not have information that led him to believe any citizens were at imminent risk of harm from Jason, or that Jason Moore posed an imminent risk of harm to Officer Kaminski. Add. Facts, ¶ 99.

Kaminski contends that he did not consider waiting for backup because he was close to the road, and even though the events occurred early on a Saturday morning at 6:30 a.m., Kaminski claims it was "rush hour" and a "highly traveled road." Add. Facts, ¶ 100. This is directly contradicted by the testimony of Officer White, who testified that "**Traffic was very, very light**" that morning, consistent with most Saturday mornings at 6:30 a.m. on Airport Road. Add. Facts, ¶ 101. In *Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009) the offending officer "was standing near passing traffic" as he confronted the non-compliant subject, similar to the facts here. Yet the Eighth Circuit held that this did not excuse his use of the taser device. *See Brown*, 574 F.3d at 497, n. 4.

According to the taser download, the first Taser shock lasted for approximately six seconds. Add. Facts, ¶ 38. This shock caused Mr. Moore to collapse forward and hit the asphalt, face down. Add. Facts, ¶¶ 18-19. Jason's multiple facial injuries show that he struck the ground with force. *Id*.

### ii. Second Taser shock

After the first taser shock, Jason never got back to his feet. Add. Facts, ¶ 102. There is no evidence that Jason threatened or was aggressive after the first taser shock. Add. Facts, ¶¶ 38; 96. While Kaminski testified that he gave Jason commands while under load, Kaminski was trained that a person under load often cannot hear commands they are given. Add. Facts, ¶¶ 38; 96. Officer Kaminski was trained to know that a person given a command while under load may not comply because they did not or could not comprehend the command, and therefore commands under load are not reliable in making a "submission recognition assessment". *Id.* Dr. Martinelli testified, based on peer reviewed and published research, that Jason Moore could not have disobeyed Officer Kaminski's orders while under load because there is a high probability that Mr. Moore could not hear, distinguish or comprehend the order while under load. Add. Facts, ¶ 95. Ferguson's Chief Taser Officer, Jon Brannan, similarly testified that a person under a taser application by an X26 is less able to follow commands. Add. Facts, ¶ 107.

Officer Kaminski claims that, following the end of the 5-second taser cycle, he gave two commands to stay down; but that Jason started to get back up, and managed to get to his knees before Kaminski tased him again. Add. Facts, ¶¶ 41; 108-112. This testimony is contradicted by the taser data download, which indicates that there was approximately ***one second*** between the first and second tasings. Add. Facts, ¶¶ 20; 23; 39; 42. Defendants' expert Steven Ijames testified regarding the gap between the first and second taser shock that "the TASER computer actually rounds depending on where in the cycle, so it could be up or down, but I'll say **the first one was a second or less. Basically, a release and a re-application almost instantly**." Add. Facts, ¶ 113. Plaintiff's taser and police practices expert, Dr. Martinelli testified that the second tasing was unreasonable because the officer in that amount of time would be unable to both give

orders and determine whether Jason was going to comply, and there is no information suggesting he had threatened the officer in any manner. Add. Facts, ¶¶ 37-38. Martinelli also testified that it would take longer than one second to raise up from the ground after being tased and disoriented by a TASER, and then attempt to get up into a different position. Add. Facts, ¶¶ 114-115.

Furthermore, the evidence that Kaminski gave commands in between the first and second tasing is contradicted by a Use of Force Memorandum, apparently prepared by Kaminski on the same day Jason Moore died. Add. Facts ¶ 44. In this Memorandum, and unlike the police report or Kaminski's testimony, there is no reference to giving commands between the taser applications. *Id*. Kaminski states only that "***during the second and third tasing,*** I clearly shouted several times for Jason to lie on the ground[.]" Add. Facts, ¶ 116. As stated, this document was not produced by the FPD until April 22, 2016, one week after the discovery deadline closed in this case.

According to Kaminski, when he delivered the second shock, Jason was on his knees. Add. Facts, ¶ 117. Kaminski states that the second Taser shock "straightened out" Jason and he fell forward again. Add. Facts, ¶ 118. The testimony regarding Jason getting onto his knees was contradicted by Officer White, who was approaching in his patrol vehicle. Add. Facts, ¶¶ 31-32. White first saw Jason **lying on the ground on his back**. *Id*. White testified that Jason was merely "trying to lean up off the ground" and "sort of do a sit up" immediately prior to being tased again by Officer Kaminski. *Id*. Jason did not have his hands behind him pushing himself up; they were "waving." Add. Facts, ¶ 34. Mr. Moore then went back down to the ground. Add. Facts, ¶ 33. At this time White was already coming to a stop in his vehicle, 20 to 50 feet away. *Id*.

Based on this evidence, a disputed question of fact exists as to whether Jason was continuing to resist or whether he posed an imminent threat of danger to Kaminski. A jury could reasonably conclude that (1) Kaminski gave no commands after the first tasing ended; (2) that Jason did not hear or could not comply with any commands given while under load, a likelihood well known to officers using Tasers; (3) Jason did not get up onto his knee, and (4) that any movements he made in the ***one second*** after the initial tasing were simply in response to the trauma and pain of receiving **50,000 volts of electricity through his body**. In short, a jury could reasonably conclude from these facts that Officer Kaminski unreasonably tased Jason a second time even though Jason was not failing to comply with a lawful order and was not an imminent threat to anyone. As Plaintiff's expert Dr. Martinelli has testified, the second taser shock was unreasonable. Add. Facts, ¶¶ 37-42.

### iii.    Third Taser shock

According to Kaminski, after the second tasing, Jason Moore went from a kneeling position to laying back on his belly. Add. Facts, ¶ 118. Kaminski contends that after the second taser shock, he again gave Jason two commands. Add. Facts, ¶ 119-120. Kaminski indicated he would have given commands such as: "Stay on the ground. Put your hands behind your back." Add. Facts, ¶ 26-27. Kaminski indicated that he gave Jason at least a second to comply with the commands. *Id*. He agrees that it probably took at least two seconds to deliver those warnings and then determine whether Jason was going to follow them. *Id*.

The problem with Kaminski's version of events is, once again, that the taser download shows only a ***one-second*** gap between the second and third tasings. Add. Facts, ¶¶ 20; 121-122. Again it is improbable that Jason would be able to get back up after he has "been tased twice [and] who is experiencing a psycho-medical emergency or they're already disoriented, now

being additionally disoriented by the introduction of load into their body and getting from a laying down position to more of an upwards position." Add. Facts, ¶ 123. Even Defendants' medical expert, Dr. Graham, agrees that there was not sufficient time for Kaminski to give multiple verbal warnings after he ended the tase and for Jason to start to get up before being tased for the **third time**. Add. Facts ¶ 124. Lt. Ballard has also testified that one or even two seconds between tasings would be insufficient. Add. Facts, ¶¶ 47, 125.

Kaminski contends that at the time of the third shock, Jason was on his left side and Jason's left shoulder was touching the ground, he was "kind of leaning onto his stomach." Add. Facts, ¶ 43. As Dr. Martinelli points out, this is not a threatening posture: "He's kind of over on the left side of his body and maybe trying to raise himself up, but he's not -- he's not up, and he's certainly not on his knees." Add. Facts, ¶ 126. Officer White's testimony is that Jason was trying to sit up again when he was tased for the third time. Add. Facts, ¶ 35.

During the third shock, Jason's body was again contracting, vibrating, and shaking. Add. Facts, ¶ 127. Dr. Martinelli has testified that, at the time of Jason's third tasing, there is no evidence from the officers that Mr. Moore was kicking or screaming or biting or injuring the officers, or presented any ongoing overt threat to the officers. Add. Facts, ¶ 128. Again, there is **no evidence** that Kaminski properly gave Jason a chance to comply, and **no evidence** that Jason was an imminent threat to anyone. Dr. Martinelli concluded that the third tasing was also unreasonable. Add. Facts, ¶95.

### iv. Fourth Taser shock

Officer Kaminski stated, in both the police report and his testimony, that he only tased Jason three times. Kaminski believes it was during the third tase that Officer White cuffed Jason. Add. Facts, ¶ 129. However, the taser download again contradicts Kaminski. The taser

download shows that there was a fourth taser shock shortly after the third, approximately one second later. **Defendants' Statement of Uncontroverted Facts does not mention a fourth taser shock**. Defendants do not make any attempt to demonstrate that the taser download was somehow false, defective or inaccurate. Defendants' own liability expert testified that "**I believe the download data is the most accurate record of what occurred**" and that therefore he believes there were four Taser cycles used on Jason. Add. Facts, ¶ 130. It is clear that there was at least one taser blast for which Defendants have offered *no factual or legal justification whatsoever*.

The reasonable inference from the taser download is that a fourth tasing was given after White arrived and Jason was either subdued or even in restraints. Plaintiffs' expert Dr. Martinelli testified that the fourth taser blast, given after Officer White arrived on the scene (and was now able to assist), was unreasonable: "I have no evidence from either officer of Mr. Moore acting in a violent manner. I've got no biting, no spitting, no hitting, no kicking, no radical or dynamic movement on the part of Mr. Moore, and yet I have a TASER being activated for a fourth time, which is contrary to the guidelines that officers would apply intermediate force." Add. Facts, ¶128. Philip Cuculich, M.D., a board-certified Washington University cardiac electrophysiologist, has testified that the third and fourth applications of the TASER more likely than not caused or contributed to Mr. Moore's death. Add. Facts, ¶131.

> **3. Courts have denied qualified immunity and found excessive force under similar facts.**

Courts have repeatedly held that, where a dispute of material fact exists as to whether or not the plaintiff was resisting or a threat at the time of the use of force, summary judgment on qualified immunity grounds is not appropriate. *See Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009)(Noting that whether officer reasonably interpreted refusal to comply as

a realistic threat to his personal safety or whether it constituted nothing more than an affront to his command authority was a matter for a jury to decide). *See also Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006) (Collecting cases); *see also Romo v. Largen*, 723 F.3d 670, 674, 675 n. 2 (6th Cir. 2013) (Where there is a genuine issue as to whether the suspect was still resisting, attempting to get up, or refusing to comply, the court must accept plaintiff's version of what occurred on summary judgment).

For example, in *Estate of Mathis ex rel. Babb v. Kingston*, 2009 WL 1033771, at *1 (D. Colo. Apr. 16, 2009), an opinion issued more than two years before the incident in this case, officers encountered an individual who was covered in blood, "jumping up and down like a monkey," and was "flailing his arms about wildly." *Id*. at *1. He "appeared highly agitated, and possibly mentally ill or under the influence of methamphetamine or other drugs." *Id*. According to the subsequent autopsy, the subject tested positive for and was under the influence of Methamphetamine, Amphetamine and Temazepan. *See Id*. at *6. The officers encountered the subject outside of a mobile home, which had a broken door which the officers believed to be the result of an attempt to enter the mobile home. *Id*. at *Id*. At some point before or during the struggle, he also picked up a brick, a potential weapon. *See Id*. at *1-2. The subject failed to comply with repeated commands from the officers, and he was tased. *Id*. At some point, the subject then got back up off the ground. An officer struck the deceased with several baton strokes to get him to drop the brick, and the officers again commanded the subject to get back on the ground, but he again failed to comply and was again tased, at which time he curled up on the ground and was restrained by the officers who shortly thereafter realized that he was not breathing. *See Id*. The court found that triable disputes of material fact existed as to whether the officers' use of force was reasonable: "While the Plaintiffs acknowledge that Mr. Mathis did not

respond to the Deputies verbal commands, the evidence when viewed in the light most favorable to Plaintiffs suggests that **this lack of compliance was not a 'refusal' to comply, but an inability to comply based on Mr. Mathis' diminished capacity**." *Id*., at *4 (D. Colo. Apr. 16, 2009).

In a recent case, *Van Raden v. Larsen*, Case No. CIV. 13-2283 DWF/LIB, 2015 WL 853592, (D. Minn. Feb. 26, 2015), the defendants asserted that they were entitled to qualified immunity and summary judgment on the plaintiff's excessive force claim because the officers' use of the taser did not violate clearly established rights because he was "physically and actively resisting being detained" during the encounter with the officers, relying on the 8th Circuit's opinion in *DeBoise. Id.* at *5.

In *Van Raden*, the officers were responding to a report of a suicidal male. The officers had a discussion with the subject and ultimately stated to him that, "because of the way Van Raden was talking, he would have to go talk to a doctor." *Id*. at *1. Van Raden became increasingly agitated and stated that he did not want to leave with the officers. *Id*. Despite the officers telling him that he had no choice and would be forcefully taken if necessary, Van Raden continued to refuse and told the Officers to "get the fuck out of my house" and "you are gonna have to fight me and knock me out." *Id*. at *2. Van Raden was seated in his office chair. The Officers grabbed his arms and legs to try to physically lift him out of the chair, and instructed him to let go of the chair or else he would use the taser. *Id*. One officer then deployed his taser in "drive-stun" mode to Van Raden's right shoulder area. As the officers continued to attempt to lift him out of the chair, the officers testified that Van Raden kicked at one of them. *Id*.

The officer then deployed his taser in "probe" mode into the subject's sternum and stomach and gave one five second application of the Taser device. *Id*. The court denied the

officers' motion for summary judgment based on qualified immunity, holding: "**If the jury were to conclude that Van Raden was not kicking at the Officers or that Van Raden's actions were not sufficiently threatening to make the Officers reasonably fear for their safety, then the jury could also reasonably conclude that the use of the taser was unreasonable. Therefore, a reasonable juror could conclude that Van Raden's constitutional rights were violated.**" *Id*. at *7.

The death of Jason Moore in this case was not a freak occurrence. Kaminski's use of force on a mentally ill subject was clearly unreasonable and created a significant risk of death or serious injury to Jason, based on Kaminski's own training and FPD policy regarding the use of force. Officer Kaminski was aware of the significant risks associated with repeated and continuous tasings, and that the risk of serious injury or death from a taser device was heightened by targeting the frontal chest near the heart, particularly in thin individuals like Mr. Moore. See Kaminski Known Taser Risks, supra pp. 8-10. Officer Kaminski knew from his Taser Training that with each use of the taser loads he delivered to Jason the risk of injury or death increased. Add. Facts, ¶ 132.

Defendants' liability expert Steven Ijames testified that TASER's Version 17 training, which Officer Kaminski underwent, teaches that **officers are not authorized to use Tasers to gain compliance when there is no imminent physical threat**. Add. Facts, ¶ 139. He further agrees that a TASER should not be used on an individual displaying passive resistance, meaning you don't cooperate, you don't physically try to hurt the officer or assault the officer. Add. Facts, ¶ 138.

Furthermore, both Kaminski and other officers of the FPD admit that the brief gaps between Taser discharges as shown on the Taser download were insufficient to evaluate Jason's

response.  Captain Henke testified that "There would have had to be a great deal of explanation given" if 21 seconds of Taser load were given without a proper assessment of the risk.  Add. Facts, ¶ 139.  Kaminski's own supervisor,  Lt. Ballard, testified that one second would be insufficient to make a risk assessment after a Taser discharge; and that even a two second interval between tasings would not have been enough time to evaluate Jason Moore's response:

> Q      And in the scenario
> that you're familiar with in which the man is on the
> ground and he's naked and he's attempting to get up,
> would you agree that two seconds is probably not
> even enough time for the subject to comply after
> he's hit the ground, after the first taser
> application and the officer's watching him?
>  A   **I don't think two seconds would be enough.**

Add. Facts, ¶ 47.

The reasonable inference is that 3 seconds or more would be needed to perform a threat and compliance assessment.  **Officer Kaminski himself agrees that, if the Taser download is correct, then his actions in repeatedly tasing Jason without giving him a chance to comply were inappropriate**:

> So this document, Exhibit Number 18, would
> suggest that Mr. Moore was Tased four times,
> five-second bursts of 50,000 volts and that there's
> only a one-second gap between the first Tase. And
> the last three Tases came consecutively without any
> time for you to do a submission recognition
> assessment. Would you agree?
> A I agree that's what it shows, yes.
> **Q Do you agree that issuing
> back-to-back-to-back Taser loads on a subject
> without performing an appropriate submission
> recognition assessment is inappropriate?
> A I would agree, yeah.**

Add. Facts, ¶ 140.

A jury is entitled to make reasonable inferences based on the circumstantial evidence and testimony, and Plaintiffs are entitled to all such inferences on summary judgment. *See Montoya v. City of Flandreau*, 669 F.3d 867, 871 (8th Cir. 2012)(On summary judgment in excessive force case, the court views the record and draws all reasonable inferences in the light most favorable to plaintiff, while simultaneously viewing the facts from the perspective of "a reasonable officer on the scene"). Here, Officer Kaminski's testimony of what occurred is contradicted by the Taser download, by the testimony of Officer White, and by common sense. A jury is required to resolve the substantial disputes of material fact as to what occurred immediately prior to Jason Moore's death and whether the officer's use of force was reasonable. An officer is not entitled to repetitively tase a subject while prone lying on their back or side, or in restraints. If Jason Moore was not a threat and was not actively resisting after the initial taser discharge, then no justification whatsoever existed under the law for Jason to be tased three more times. This is a factual dispute that can only be decided by a jury.

**C. The law was clearly established at the time of Jason Moore's death that an officer could not use repetitive taser applications on a mentally ill subject who was not actively resisting.**

"[T]he right to be free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures." *Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006), quoting *Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir.2006). A right is clearly established if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009).

Notably, the opinion in *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892 (8th Cir. July 28, 2014), on which Defendants entirely rely, held only that "***in 2008***, case law related to the use of tasers was still developing …. And, Appellants point to no previous case that could be said to have clearly established the unconstitutionality of the officers' actions here. Accordingly, the state of the law would not have placed 'an officer on notice that he must limit the use of his taser in certain circumstances, even though the subject continues to struggle and resist.'" *De Boise,* 760 F.3d at 897. [Internal cit. omit.]

The court addressed *only* the second prong of the two-prong qualified immunity analysis, i.e. whether the right to be free from repeated tasing was 'clearly established' in the law as of 2008. *See Id*. at 899 (8th Cir. 2014). The court conspicuously refrained from addressing the first prong of the qualified immunity analysis, i.e. whether a deprivation of constitutional rights in fact occurred.

Importantly, there have been a string of legal opinions since 2008 and September, 2011, that clearly establish that an officer **must** "limit the use of his taser in certain circumstances," particularly when dealing with mentally ill subjects, subjects who do not present an imminent risk of harm, and individuals who have ceased actively resisting. In 2009, a year after the incident at issue in *DeBoise*, the Eighth Circuit held that the law was sufficiently clear *as of 2005* to inform a reasonable officer that it was unlawful to Taser a nonviolent, suspected misdemeanant who offered only passive resistance. *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009). Also in 2009, the Eleventh Circuit recognized that repeatedly tasering a mentally ill individual, without offering the subject any opportunity to comply with instructions or submit, was both excessive and a violation of clearly established constitutional rights under the Fourth Amendment. See *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009) ("though the

initial use of force (a single Taser shock) may have been justified, **the repeated tasering of Oliver into and beyond his complete physical capitulation was grossly disproportionate to any threat posed and unreasonable under the circumstances**")

The factually similar case of *Estate of Mathis ex rel. Babb v. Kingston*, 2009 WL 1033771, at *1 (D. Colo. Apr. 16, 2009), discussed above, was also issued in 2009, as was *Orsak v. Metro. Airports Comm'n Airport Police Dep't*, 675 F. Supp. 2d 944, 954 (D. Minn. 2009). In that case a bicyclist was tased after refusing to comply with officers' lawful orders and attempted to leave the scene. The court denied summary judgment because there were genuine issues of material fact as to whether the bicyclist presented a risk to the officers and whether he was actively resisting arrest or attempting to evade arrest by flight at the time of the tasing.

These legal developments were matched with developments in Taser training provided to police officers, including Officer Kaminski in this case, as discussed above. This training is crucial in that it demonstrates that it was well-established that a reasonable officer would have been aware, in September of 2011, that he could not continuously and repetitively tase a subject without giving him an opportunity to submit and without performing a risk assessment. See Kaminski Known Taser Risks, supra pp. 8-10. Officer Kaminski was trained as a taser instructor, and as such was well aware of the risk of blasts to the chest near the heart, the need to limit exposure to reduce the risk of death, the risks of prolonged and continuous exposure, and the risks associated with using Tasers on smaller individuals and those suffering from emotional distress. Notably, **these developments and warnings associated with Taser use came after the incident in *DeBoise*, but prior to the incident at issue in this case**. The legal landscape and known risks associated with Taser devices were fundamentally different in 2008 than in 2011. These facts further demonstrate that Defendant Kaminski's repeated use of the Taser

device in this case, without giving Jason an opportunity to comply, was unreasonable and dangerous.

Further, *DeBoise* is entirely distinguishable on its facts. Defendants rely on superficial resemblances between the cases—namely they both involve subjects having mental episodes, who were naked and who were tased by the Police. The relevant similarities end there. De Boise suffered from schizophrenia, which caused serious psychotic episodes. On the evening of July 7, 2008, De Boise became delusional and left his home naked. The next morning, neighbors reported seeing De Boise roaming the neighborhood, beating houses with a stick, and claiming to be God. *De Boise,* 760 F.3d at 894. Jason Moore never used or had a weapon. The night De Boise returned home, still naked and delusional, he continued to claim he was God, demanded that his mother worship him, and assaulted her by holding her head down to the floor. *Id.* De Boise's mother immediately informed the first arriving officer of her son's behavior and physical aggression toward her. In this case there is *no* allegation that Jason Moore assaulted anyone prior to the arrival of the officers.

The first arriving officer observed De Boise exiting the home naked and claiming to be God. De Boise suddenly re-entered the house, tearing down the screen door in the process. *Id.* at 894-895. Five more police officers arrived on the scene, at which time De Boise's mother informed the officers that she had a firearm in the house and that her son was schizophrenic. *Id.* at 895. The officers heard loud noises from inside the house, including screaming, glass breaking, and heavy furniture being thrown, after which De Boise exited the house naked and called himself God. *Id.* at 895.

While pointing a Taser device at him, an officer instructed De Boise to walk out on the grass and lie face down on the ground. De Boise complied. Officer Percich holstered his taser

and began to approach De Boise to handcuff him. De Boise immediately jumped to his feet, clenching his fist, and glaring in Officer Percich's direction. After refusing further instructions to lie down, he was tased. *Id.* After being tased twice, De Boise stood up and continued to refuse to comply. *Id.* at 895. He was tased a third time and went down. He then rose to his knees and swung his arms around. *Id.* The officer delivered two more cycles, after which De Boise rose to his feet and walked toward the officers. Another officer fired a taser and delivered another taser blast. De Boise fell to the ground but rose to his feet *yet again*, as if he were getting ready to charge or attempt to run. *Id.* The officer delivered another cycle while two officers attempted to handcuff De Boise. De Boise kicked at the officers, and one took the cartridge out of his taser and shocked De Boise's leg twice, this time in drive stun mode. Finally, the officers were able to wrestle De Boise to the ground and deliver a sedative. De Boise then suffered cardiac arrest and died. *Id.* at 896.

The differences between De Boise and this case are clear: Jason Moore, a slightly built man of 135 lbs., was suspected of running naked in traffic and hitting cars with his bare hands; while Officer Kaminski is a "good sized man" approximately 6 feet tall, who currently weighs around 230 lbs. Add. Facts, ¶¶ 9-11. Evidence before the trial court in *De Boise* demonstrated that the subject was "physically strong and challenging." *DeBoise v. Taser Int'l, Inc.,* No. 4:10CV818 TIA, 2013 WL 3419730, at *5 (E.D. Mo. July 8, 2013). De Boise would have to be "physically strong and challenging" to demonstrate the remarkable level of resistance displayed in that case.

De Boise was also already known, prior to interacting with the police, to have violently assaulted his mother and violently destroyed property in her home, including tearing a door from its hinges and destroying large furniture. Officer Kaminski received no report about Jason

Moore breaking any property and Jason Moore did not break anything in Officer Kaminski's presence. Add. Facts, ¶ 147. There is no evidence in this record that any witnesses found Mr. Moore's behavior to be threatening or frightening. According to his own testimony, prior to Jason's death, Officer Kaminski spoke to one witness who had seen Jason naked, but Kaminski admitted that she did not seem frightened by Jason's conduct. Add. Facts, ¶ 148. Defendants either mishandled or failed to preserve crucial evidence which would have shown the information that was provided to Kaminski prior to arriving at the scene. After initially denying that any Computer Aided Dispatch (CAD) materials existed, Defendants produced an inaccurate CAD printout which did not preserve the transcript of communications between dispatch and the officers, and did not accurately reflect when officers arrived at the scene.[5] See Add. Facts, ¶ 52. The Defendants also failed to preserve the recording of the audio taped communications between the officers, command, and FPD dispatchers.

Defendants argue that "A computer check of the Decedent revealed he had at least one active warrant" and had an "extensive criminal history." Memo. In Support, p. 13. This information has nothing to do with this case. Neither Kaminski nor any of the other officers had this information prior to Jason's tasing. Thus, it could have had no effect on them or any "reasonable officer" at the scene. Kaminski testified that he did not check for any warrants before he arrived on the scene. Add. Facts, ¶ 149. Defendants appear to be relying on a criminal arrest record as character evidence, in blatant contravention of F.R.E. 404(b). It is clear that Defendants have disingenuously offered this inadmissible evidence in a barefaced attempt to prejudice the Court against Jason Moore, a beloved father, son and husband who unnecessarily and tragically died.

---

[5] Among other things, the CAD printout produced by City of Ferguson showed at least two other officers arriving at the same time as Officer Kaminski.

Importantly, in the *De Boise* case, the court **"found it undisputed that De Boise continued to actively resist despite the repeated tasings**." 760 F.3d at 896. Indeed, De Boise got up at least *four times* after being tased, and even after this, kicked at officers as they attempted to handcuff him. There were significant time intervals between the tasings, in which De Boise stood all the way up on his feet, and even advanced on the officers in a threatening manner. The facts in this case could not be more radically different than those in *De Boise*. Here, Officer Kaminski tased Jason Moore four times without giving him any chance to comply. Jason Moore was tased almost entirely on the ground, while on his back and trying to "sit up," or at most on his hands and knees a few inches off the ground, offering no more than passive resistance. There is at least a dispute of material fact as to whether Moore "continued to actively resist despite the repeated tasings" or whether his conduct constituted a threat of assault, as required to justify the use of the taser. See 138, 174, 202. *De Boise* is a fundamentally different case, and does not address the primary legal issue in this case: Whether Kaminski's repetitive use of the taser without giving Jason Moore any opportunity to comply or submit was unreasonable.

For all of the reasons set forth above, Defendant Kaminski's assertion of qualified immunity as a matter of law should be rejected by this Court.

## IV. DEFENDANTS CITY OF FERGUSON AND CHIEF JACKSON ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' §1983 MUNICIPAL LIABILITY CLAIMS

The Eighth Circuit has acknowledged that deliberate indifference is sufficient for a finding of municipal liability. *Lund v. Hennepin County*, 427 F.3d 1123, 1125 (8th Cir. 2005). "A municipality's failure to address or correct [a] known problem amount[s] to deliberate indifference to . . . violations of a citizen's constitutional rights sufficient to sustain municipal liability under §1983." *Harris v. City of Pagedale*, 821 F.2d 499, 507 (8th Cir. 1987). The

requisite causation is established by the custom or policy. *Mitchell v. City of Chicago*, 2010 WL 1930107 at *3 (N.D. Il. 2010).

**A. Plaintiffs have established an underlying violation of constitutional rights that caused Jason Moore's death.**

Defendants contend that Defendants City of Ferguson and Chief Thomas Jackson are entitled to judgment as a matter of law because Plaintiffs have purportedly not established an underlying violation of Jason Moore's Fourth Amendment right to be free from excessive force; nor that such right was clearly established at the time of the incident. For the reasons set forth in Section III, *supra*, this is false, and Defendants' motion for summary judgment on these grounds should be summarily denied.

**B. The Ferguson Police Department engaged in a custom of using excessive force, the City of Ferguson[6] and Chief Jackson tacitly authorized or demonstrated deliberate indifference to this misconduct, and these municipal customs and practices were the "moving force" behind Jason Moore's death.**

"'Official policy' in the relatively narrow sense of discrete, consciously chosen courses of action by 'policymakers' is not the only basis for imposing municipal liability. 'Custom, or usage,' in the exact language of § 1983, may also serve." *Spell v. McDaniel*, 824 F.2d 1380, 1386 (4th Cir. N.C. 1987), citing *Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658 (1978)(Municipal liability applies "when implementation of [municipalitiy's] official policies or established customs inflicts the constitutional injury.") "Local governments may also be sued for constitutional violations arising out of governmental custom, even if such custom 'has not received formal approval through the body's official decisionmaking channels.'" *Robinson v. St.*

---

[6] Plaintiffs note that the City of Ferguson previously had the Ferguson Police Department dismissed from this suit on the basis that any claim against the Department would be "duplicative and redundant" of the claim against the City of Ferguson. See Doc. 16 at 3-4.

*Louis County*, 2008 WL 1701170 (Mo. E.D. April 9, 2008), citing *Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 690-91 (1978).

Liability may be established through proof that the alleged misconduct was so pervasive among the non-policymaking employees of the municipality as to constitute a custom or usage with the force of law. *McGautha v. Jackson County, Mo., Collections Dept.*, 36 F.3d 53 (8th Cir. 1994). "'Custom and usage,' in the sense of 'persistent and widespread . . . practices' by municipal agents and employees, may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. N.C. 1987). Inaction or laxness by supervisory personnel can constitute government custom if it is permanent and well settled. *See Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 807 (8th Cir. 1994).

### 1.  The Ferguson Police Department customarily used excessive force.

In this case, the FPD conducted little or no investigation of Officer Kaminski's use of force. Although the Department was in possession of the Taser and had personnel capable of downloading the data, which would have shown whether Kaminski's version of events was true or not, the download was not performed until requested by Plaintiffs' counsel some **four years** after Jason was killed. Add. Facts, ¶ 151. Further, the U.S. Department of Justice has noted that Ferguson supervisory personnel have a custom of failing to "review critical evidence even when it is readily available." Add. Facts, ¶ 156. This is highly material. As discussed above, Officer Kaminski admitted that if the Taser download were correct then his conduct would be "inappropriate" and his own supervisor, Lt. Ballard, conceded that the one or two second intervals between tasings shown on the download would not be sufficient. Nevertheless, neither

Officer Kaminski nor any other personnel in the FPD was disciplined as a result of Jason Moore's death. Add. Facts, ¶152. Indeed, even in the present case, where a mentally ill man lost his life, the **FPD made no determination as to whether or not Officer Kaminski's use of force violated the FPD's written policies and procedures on use of force**. See Add. Facts, ¶ 55.

This failure to investigate and supervise officers in the use of force is part of a longstanding pattern and practice of the Ferguson Police Department, as demonstrated by the Department of Justice investigation of the department in the wake of the shooting death of Michael Brown by a FPD on August 9, 2014. During the Department of Justice investigation, the DOJ interviewed City officials, including Chief of Police Jackson, half of the FPD's officers, and others. Add. Facts, ¶154. The Department of Justice spent, collectively, approximately 100 person-days onsite in Ferguson. Add. Facts, ¶155. Department officials participated in ride-alongs with on-duty officers, reviewed over 35,000 pages of police records as well as thousands of emails and other electronic materials provided by the police department. *Id*.

The DOJ's findings from this expansive, in-depth federal investigation were set out in a report titled "Investigation of the Ferguson Police Department," dated March 4, 2015. See Exhibit 13. Among many other findings relevant to this case, the United States Department of Justice determined that the Ferguson Police Department **has engaged in a pattern of use of excessive force in violation of the Fourth Amendment in relation to (1) officers' use of TASER devices; (2) officers' use of excessive force on individuals with mental health conditions; and (3) officers' use of excessive force on African-Americans.** *See Id.* at 28. Of course, **Mr. Moore was an African-American with mental health issues who was tased to death by the Ferguson Police Department.** As set forth below, the Report also offers

substantial and probative evidence that supervisory personnel were deliberately indifferent by turning a "blind eye" to this excessive force.

The Justice Department found that the Ferguson Police Department had a custom and practice of engaging in excessive force, particularly in regard to the use of Taser ("ECW") devices:

- The Ferguson Police Department "**Engages in a Pattern of Excessive Force in Violation of the Fourth Amendment**." Add. Facts, ¶157.

- "Many [Ferguson Police Department] officers are quick to escalate encounters with subjects they perceive to be disobeying their orders and resisting arrest." Add. Facts, ¶ 158.

- Many Ferguson Police Department Officers "have come to rely on ECWs, specifically Tasers, **where less force - or no force at all - would do**." Add. Facts, ¶ 159.

- The Ferguson Police Department's use of "**force is routinely unreasonable and sometimes clearly punitive**." Add. Facts, ¶ 160.

- The Ferguson Police Department's "Use of Electronic Control Weapons Is Unreasonable." Add. Facts, ¶ 161.

- The Ferguson Police Department's "**pattern of excessive force includes using ECW's in a manner that is unconstitutional, abusive, and unsafe**." Add. Facts, ¶ 162.

- Ferguson Police Department "**officers seem to regard ECWs as an all-purpose tool bearing no risk**." Add. Facts, ¶ 56.

- Ferguson Police Department "officers' **swift, at times automatic, resort to using ECWs against individuals who typically have committed low-level crimes and who pose no immediate threat violates the Constitution**." Add. Facts, ¶57.

- The **"[o]verwhelming majority of force - almost 90% - is used against African Americans**" by the Ferguson Police Department. Add. Facts, ¶ 60. Jason Moore was an African-American male.

- Ferguson Police Department "Officers Have a Pattern of Resorting to Force Too Quickly When Interacting with Vulnerable Populations." The Ferguson Police Department has "**a tendency to use unnecessary force against vulnerable groups such as people with mental health conditions** or cognitive disabilities." Add. Facts, ¶ 59. Jason Moore's behavior was likely explained by a mental health condition because he was not under the influence of drugs or alcohol.

- A "dimension of FPD's pattern of unreasonable force is FPD's **overreliance on force when interacting with more vulnerable populations, such as people with mental health conditions** or intellectual disabilities and juvenile students." Add. Facts, ¶ 162.

- Ferguson Police Department "**officers do not adequately consider the mental health or cognitive disability of those they suspect of wrongdoing when deciding whether to use force**." Add. Facts, ¶ 163.

- The Ferguson Police Department has demonstrated "a pattern of insufficient sensitivity to, and training about, the limitations of those with mental health conditions or intellectual disabilities." Add. Facts, ¶ 164.

- The Department of Justice found that the Ferguson Police "Officers view mental illness as narcotic intoxication, or worse, willful defiance. **They apply excessive force to such subjects, not accounting for the possibility that the subjects may not understand their commands or be able to comply with them**." Add. Facts, ¶ 165. [Emphasis added]

In support of its findings on the customs and patterns of practice of the Ferguson Police Department, the Department of Justice cited similar instances of excessive force in the use of taser devices that are relevant and probative of the excessive force used in this case:[7]

- In August 2010, a Ferguson Police Department lieutenant used an ECW in drive-stun mode against an African-American woman in Ferguson City Jail because she had refused to remove her bracelets, even though there were five officers present and the woman posed no physical threat. Add. Facts, ¶ 167.

- In August 2010, an officer responded to a call about an African-American man walking onto the highway and lying down on the pavement. Seeing that the man was sweating, acting jittery, and had dilated pupils, the officer believed he was on drugs. The man was cooperative at first but balked, pushing the officer back when the officer tried to handcuff him for safety reasons. The officer struck the man several times with his Asp baton - including once in the head - causing significant bleeding. Two other officers then deployed their ECWs against the man a total of five times. Add. Facts, ¶ 168.

- In July 2011, a Ferguson correctional officer used an ECW to drive-stun an African-American male inmate three times after he tried to hang himself with

_____

[7] The death of Jason Moore is referenced in the Department of Justice Report as well. See Exhibit 13 at 36.

material torn from a medical dressing and banged his head on the cell wall. Add. Facts, ¶ 169.

- In July 2011, a Ferguson correctional officer used an ECW against an African-American inmate with bipolar disorder who broke the overhead glass light fixture and tried to use it to cut his wrists. According to the correctional officer, the glass was safety glass and could not be used to cut the skin. Add. Facts, ¶ 170.

- In August 2011, officers used an ECW device against a man with diabetes who bit an EMT's hand without breaking the skin. The man had been having seizures when he did not comply with officer commands. Add. Facts, ¶ 171.[8]

Notably, while the Ferguson Police Department had a procedure for documenting and reviewing use of force, the Department of Justice determined that "**These requirements are not adhered to in practice**." Add. Facts, ¶ 172. Furthermore, the Department of Justice Report notes that "we heard from community members about uses of force that do not appear within FPD's records, and **we learned of many uses of force that were never officially reported or investigated** from reviewing emails between FPD supervisors." Add. Facts, ¶ 173. Despite repeated requests from Plaintiffs, these "emails between FPD supervisors" provided to the

---

[8] The Department of Justice also found numerous incidents of the misuse of Taser devices, particularly directed against African-Americans and those with mental problems, occurring after the death of Jason Moore. These are set forth in Plaintiffs' Statement of Additional Facts. See Add. Facts at ¶¶ 182-190. While this evidence is not admissible to show notice or knowledge of the custom by the Municipal Defendants at the time of Jason Moore's death, courts have found such evidence admissible to show the existence of the underlying custom of failure to discipline and control officers. *See Grandstaff v. City of Borger,* 767 F.2d 161 (5th Cir.1985) ("the subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy"); *see also Bordanaro v. McLeod*, 871 F.2d 1151, 1166 (1st Cir. 1989).

Department of Justice have never been produced.[9]  Despite this failure to follow the Department's own policies, the Department of Justice identified **at least 151 total use of force incidents, only one of which was found by the Ferguson Police Department to have violated department policy.** See Add. Facts, ¶ 174.

Clearly, there is substantial and probative evidence in this case that the FPD had a custom and practice of unreasonable use of excessive force.

2.  **The City of Ferguson and Chief Jackson tacitly authorized or were deliberately indifferent to FPD officers' custom and practice of using unreasonable excessive force.**

The Department of Justice found that **this custom and practice of use of excessive force was the direct result of the failure to properly supervise and discipline officers by investigating and enforcing the Department's own use of force policies**:

- "It is in part FPD officers' approach to policing that leads them to violate the Constitution and FPD's own policies.  Officers across the country encounter drunkenness, passive defiance, and verbal challenges.  But in Ferguson, officers have not been trained or incentivized to use de-escalation techniques to avoid or minimize force in these situations.  Instead, they respond with impatience, frustration, and disproportionate force.  **FPD's weak oversight of officer use of force … facilitates this abuse**." Add. Facts, ¶ 175.

---

[9] Plaintiffs originally requested these "emails between FPD supervisors" eight months ago, in September of 2015.  Defendants initially denied that this language appeared in the Report on the page cited by Plaintiffs.  Once Plaintiffs' counsel sent the page in question with the referenced language highlighted, the City of Ferguson then took the position that its IT personnel were unable to search for these emails. Counsel for Defendants indicated on April 12, 2016 that an Affidavit would be provided to support this representation. See Exhibit 20.  On April 18, 2016, counsel for Plaintiff followed up on this request. Exhibit 21. The same day, counsel for Defendant sent an email stating that counsel was working on the Affidavit. *Id.*  The promised Affidavit has never been provided.

- **"[S]upervisors either do not understand or choose not to follow FPD's use-of-force policy. As discussed above, in many of the force incidents we reviewed, it is clear from the officers' offense reports that the force used was, at the very least, contrary to FPD policy. Nonetheless, based on records provided by FPD, it appears that first-line supervisors and the command staff found all but one of the 151 incidents we reviewed to be within policy. This includes the instances of unreasonable ECW use discussed above**. Add. Facts, ¶ 174.

- "Indeed, officers' unreasonable ECW use violates FPD's own policies. The department prohibits the use of force unless reasonable alternatives have been exhausted or would clearly be ineffective. FPD General Order 410.01. A separate ECW policy describes the weapon as 'designed to overcome active aggression or overt actions of assault.' FPD General Order 499.00. The policy states that an ECW 'will **never be deployed punitively** or for purposes of coercion. It is to be used as a way of averting a potentially injurious or dangerous situation.' FPD General Order 499.04. **Despite the existence of clearly established Fourth Amendment case law and explicit departmental policies in this area, FPD officers routinely engage in the unreasonable use of ECWs, and supervisors routinely approve their conduct.**" Add. Facts, ¶ 176.

- "**Supervisors seem to believe that any level of resistance justifies any level of force.** They routinely rely on boilerplate language, such as the statement that the subject took 'a fighting stance,' to justify force. Such language is not specific enough to understand the specific behavior the officer encountered and thus to determine whether the officer's response was reasonable. Indeed, a report from

September 2010 shows how such terms may obscure what happened. In that case, the supervisor wrote that the subject 'turned to [the officer] in a fighting stance' even though the officer's report makes clear that he chased and tackled the subject as the subject fled." Add. Facts, ¶ 61.

- "Even when force is reported, the force review process falls so short of FPD's policy requirements that it is ineffective at improving officer safety or ensuring that force is used properly. First, and most significantly, **supervisors almost never actually investigate force incidents**. In almost every case, supervisors appear to view force investigations as a ministerial task, merely summarizing the involved officers' version of events and sometimes relying on the officers' offense report alone. **The supervisory review starts and ends with the presumption that the officer's version of events is truthful and that the force was reasonable. As a consequence, though contrary to policy, supervisors almost never interview non-police witnesses, such as the arrestee or any independent witnesses. They do not review critical evidence even when it is readily available**." Add. Facts, ¶ 156.

- The Ferguson Police Department's own policies "**should have made clear to supervisors that the many uses of ECWs against subjects who were merely argumentative or passively resistant violated policy**." Add. Facts, ¶ 174 (Emphasis added).

These Department of Justice findings are admissible evidence, despite any hearsay objection, because the factual findings of a legally authorized investigation pursuant to Federal Rule of Evidence 803(8). *See Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703

F.3d 1104, 1109 (8th Cir. 2013) (Holding that F.R.E. 803(8) is to be "construed broadly.") The term "findings" as employed in Rule 803(8) is *not* limited to findings of fact, but permits the admission of **statements of facts, opinions, and conclusions of an agency** that would otherwise be hearsay. *See Beech Aerospace Services, Inc. v. Rainey,* 488 U.S. 153, 162, 109 S.Ct. 439 (1988); *Patterson v. Cent. Mills, Inc.,* 64 F. App'x 457, 462 (6th Cir. 2003).

In each of these use of force incidents, a use of force report should have been generated under Ferguson's policies and ultimately provided to Chief Jackson. Add. Facts, ¶ 172; 194. As the Chief of Police at the time of Jason Moore's death, Chief Jackson was the individual designated by the Mayor and City Council to "have general supervision and control of the police department, **including the enforcement of discipline among the members thereof and the instruction of the members in their duties**." *See* City of Ferguson Code of Ordinances, Sec. 33-18; see also Add. Facts, ¶ 193. Chief Jackson was responsible for establishing policy in the Ferguson Police Department, and did not have to go to the City Manager, City Council or the Mayor to review general orders he issued. Add. Facts, ¶ 193. Jackson also had final authority to exonerate police officers from a complaint of misconduct. Add. Facts, ¶ 177. Yet Jackson testified that **he did not recall ever disciplining an officer after reviewing a use of force report form**. Add. Facts, ¶ 178. Chief Jackson also testified that he never issued discipline to officers relating to the use of physical force or the use of a taser. Add. Facts, ¶ 196. *See Angarita v. St. Louis Cty.*, 981 F.2d 1537, 1547 (8th Cir. 1992); *Shannon v. Koehler*, 673 F. Supp. 2d 758, 802-803 (N.D. Iowa 2009) (Summary judgment on municipal liability claim denied where police chief failed to sustain even one complaint of excessive force, and chief was "clearly put on notice of the complaints due to his role in the complaint procedure.")

These facts demonstrate a dispute of material fact as to whether a custom and practice of misuse of taser devices, particularly against African-Americans and the mentally ill, existed within the Ferguson Police Department, and whether the policymakers within the Department and the City of Ferguson turned a blind eye to that custom and practice.

### 3. The custom and practice of misuse of taser devices was the moving force behind Jason Moore's death.

Municipal liability for a custom of unconstitutional conduct will lie where it can be "shown that the act was taken 'pursuant to' the custom, i.e., that the municipal custom was 'the moving force of the constitutional violation.'" *Shannon v. Koehler*, 673 F. Supp. 2d 758, 802 (N.D. Iowa 2009). In this context, the Eighth Circuit has noted that, where a "group of employees needs close and continuing supervision and 'the municipality fails to provide such supervision, the inevitable result is a continuation of the misconduct.'" *Ware v. Jackson Cty., Mo.*, 150 F.3d 873, 885 (8th Cir. 1998), quoting *Harris v. City of Pagedale*, 821 F.2d 499, 508 (8th Cir. 1987).

As set forth above, the evidence is overwhelming that a custom and practice of using excessive force existed at the time of Jason Moore's death, and that the use of taser devices and use of excessive force on African-Americans and the mentally ill were particularly egregious. There is evidence of a string of similar incidents in 2010 and 2011 leading up to the fatal tasing of Jason Moore in September of 2011. Nevertheless, the City of Ferguson and Chief Jackson failed to supervise and discipline the Department's officers and otherwise failed to enforce Ferguson's own policies on the use of force. Given this evidence, a reasonable jury could find that Officer Kaminski believed it acceptable to tase an individual four times, without giving them an opportunity to comply with instructions or submit, and that he would not be disciplined or

held accountable in any way by his chain of command, as in fact occurred. Therefore, Plaintiffs can show a direct causal relation between the municipality's customs and Jason Moore's death.

### C. The City of Ferguson was deliberately indifferent to Jason Moore and others by failing to provide (1) appropriate constitutional law use of force training relating to the use of Tasers and (2) Crisis Intervention Training and this failure to train was also a moving force behind Jason Moore's death.

A local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. *See Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1359 (2011). "If a municipality fails to train its police force…so that it inevitably results in police misconduct, the municipality may fairly be said to have authorized the violations." *Warren v. City of Lincoln, Nebraska*, 816 F.2d 1254, 1262 (8th Cir. 1987) (Ruling that district court committed reversible error by dismissing plaintiff's claims that municipality failed to train its police officers properly and that this failure caused his injuries). The inadequacy of police training may serve as the basis for §1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Deliberate indifference is demonstrated where "**in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need**." *Id*. at 390.

Furthermore, even if there were no such pattern and practice evidence, a §1983 failure-to-train claim "can succeed without showing a pattern of previous constitutional violations….where **'a violation of [a] federal right is a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'**" *Young v. City of*

*Providence,* 404 F.3d 4, 29 (1st Cir. 2005) citing *County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 409 (1997) and *City of Canton v. Harris*, 489 U.S. 378, 390 n. 10 (1989). Juries may infer deliberate indifference from a municipality's failure to have adequate safeguards for dealing with situations fraught with risk. *See Smith v. District of Columbia*, 413 F.3d 86, 100 (D.C. Cir. 2005).

Defendants rely on *Teasley v. Forler*, 548 F. Supp. 2d 694, 706 (E.D. Mo. 2008) to contend that the police academy training and police officer accreditation training received by Officer Kaminski was sufficient training as a matter of law. However, *Teasley* is distinguishable. In *Teasley*, the Deputy had not only received this training, but had also received additional training in use of force after a prior force incident. *Id*.

Further, it must be noted that a local government may be liable for failure to properly train its employees if the local government was on notice of its inadequate training. *Hinesley v. City of Lake Ozark, Mo.,* No. 08-04294-CV-C-NKL, 2010 WL 3613996, at *10 (W.D. Mo. Sept. 8, 2010). As set forth above, the Ferguson Police Department clearly had notice because of its officers' pattern and practice of using excessive force, particularly in their use of taser devices and in use of force on mentally ill people and African-Americans. Therefore, the Department had notice that training in principles of use of force was necessary and that its failure to do so, despite this knowledge, reflects a "deliberate and conscious choice" by the Department.

Officer Kaminski was a taser instructor, well versed in the operation of the taser device, and was aware of a number of its health risks as set forth in the training provided by Taser International. However, Taser International training addresses only *how* to use the Taser device, not *when* to use it or how often it is to be used, which is a matter of Department use of force policy. Add. Facts, ¶ 179. In this case there is simply no evidence that Defendant Kaminski

was trained in the use of force policies of the Department regarding tasers. Ferguson chose to outsource its taser training to the manufacturer, and did not go beyond that technical training to address when tasers should be used under constitutional law principles that were contained in Ferguson's own policies. These facts are entirely consistent with the Department of Justice's findings that Ferguson officers had a custom and practice of using tasers without regard to constitutional use of force principles.

The Department of Justice also found that Ferguson Police Officers **were insufficiently trained on tactics that would minimize force when dealing with individuals who are in mental health crisis**. Add. Facts, ¶ 166. In this case there is direct evidence that additional training in dealing with individuals in a mental health crisis would have prevented Jason Moore's death. Officer Kaminski testified that crisis intervention training he received after Jason Moore's death taught him to try to calm down someone like Jason Moore, state that he is there to help, and to keep his distance from Jason. See Add. Facts, ¶ 181. Officer Kaminski did not have that training prior to the taser use and so instead he approached Jason and ordered Jason to come towards him. *Id*. Had Officer Kaminski altered his approach and kept his distance from Jason until backup arrived, it is highly likely that, even if it were necessary to tase Jason, he could have been handcuffed by Officer White or another officer on the first tasing. Plaintiffs respectfully submit that it is crystal clear that had Officer Kaminski received additional training Jason Moore would not have died by tasing.

**D. Defendant Kaminski is not entitled to official immunity under Plaintiffs' claim for Wrongful Death under Missouri law in Count III.**

As this Honorable Court recognized in denying Defendants' Motion to Dismiss Count III, official immunity is a qualified immunity and **does not apply to those discretionary acts done in bad faith or with malice**. *Davis v. Board of Educ. of City of St. Louis,* 963 S.W.2d 679, 689

(Mo.App. E.D. 1998); *Teasley v. Forler*, 548 F. Supp. 2d 694, 711 (E.D. Mo. 2008). A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another. *Shell v. Ebker,* 2006 WL 1026982, *11 (E.D.Mo. 2006). An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others. *Id.* See also *Williamson v. Steele*, No. 4:12-CV-1548 CAS, 2015 WL 3620607, at *11 (E.D. Mo. June 9, 2015) (Denying correctional officers' motion for summary judgment based on official immunity where disputed question of fact existed as to whether officers acted maliciously). Where the plaintiffs' allegations encompass a **"conscious abuse of official duty and power"** which could fall within the scope of malice or bad faith, whether official immunity applies is a question of fact which must be considered by the jury. *Id*. [Emphasis supplied.] Missouri courts have held that "**The official immunity defense can also be overcome by showing conscious wrongdoing**." *Blue v. Harrah's N. Kansas City, LLC*, 170 S.W.3d 466, 479 (Mo.App. 2005).

In *Hendricks v. City of Bella Villa*, No. 4:08-CV-1836 (CEJ), 2010 WL 3024102 (E.D. Mo. Aug. 2, 2010), an officer tasered a woman after she refused to follow his instructions, refused to leave her vehicle, and struggled with the officer because she believed he was someone impersonating a police officer. The court denied a motion for summary judgment based on official immunity, stating "Assuming that Officer Nazzoli knew that plaintiff did not believe he was a real police officer and was genuinely concerned for her safety, official immunity would not protect him from his use of force against plaintiff. Based on plaintiff's allegations, a jury could find that the use of the Taser gun under these circumstances was a discretionary act done in bad faith or with malice." *Id*. at *6.

In *Teasley v. Forler*, 548 F. Supp. 2d 694 (E.D. Mo. 2008), an officer was in pursuit of a speeding truck which then pulled into a subdivision and "blacked out," turning off its engine and lights. *See Id*. at 699. The officer pulled his patrol car behind the truck, exited it, and walked between the two vehicles, giving verbal instructions to the occupants of the vehicle to show their hands. *Id*. The officer testified that the vehicle "lunged" back towards him, and the officer fired two shots. *Id*. The officer moved out of the way and the truck struck his patrol car. *Id*. Two of the car's six occupants were killed by the officer. *See Id*. As here, the officer asserted official immunity under Missouri law based on his "discretionary" actions. *See Id*. at 710. The court denied the officer's motion for summary judgment, finding that "a reasonable jury could infer from the evidence that Forler acted with malice or bad faith because firing two shots into the back of a truck was **contrary to his duty and intended to harm the occupants**." *Id*.

In this case, the facts show that Officer Kaminski tased Jason Moore four times, nearly continuously and without any opportunity for Jason to comply or submit. For the second, third and fourth taser blasts, it appears that Jason was lying on his back or his side, and at most trying to "sit up" and that this was the only reason he was tased. Defendant Kaminski himself admits that, after the first taser shock, Jason Moore never raised his torso more than approximately **six inches off the ground**. Add. Facts, ¶ 206. As in the above cases cited, a reasonable juror could find that this use of continuous force on a prone subject constituted a "conscious abuse of official duty and power" and demonstrates a wanton, reckless indifference to the risk of serious injury or death of Jason Moore. As such, genuine disputes of material fact exist as to Officer Kaminski's claim of official immunity, and his Motion for Summary Judgment on Count III should be denied.

WHEREFORE Plaintiffs respectfully request that the Court enter its Order denying Defendants' Motion for Summary Judgment.

Respectfully submitted,

DOWD & DOWD, P.C.

By:    /s/ William T. Dowd
     WILLIAM T. DOWD (#39648MO)
     ALEX R. LUMAGHI (#56569MO)
     Attorneys for Plaintiff
     211 North Broadway, Suite 4050
     St. Louis, Missouri   63102
     314/621-2500
     Fax, 314/621-2503
     bill@dowdlaw.net
     alex@dowdlaw.net

     MARK L. FLOYD (# 43643MO)
     THE FLOYD LAW FIRM, P.C.
     Attorneys for Plaintiff
     8151 Clayton Rd., Suite 202
     St. Louis, Missouri   63117
     314/863-4114
     Fax, 314/863-4150
     mark@thefloydlawfirm.com

     *Attorneys for Plaintiffs Tina Moore and*
     *Estate of Jason Moore*

     TODD M. JOHNSON  (48824MO)
     BATY, HOLM, NUMRICH & OTTO P.C.
     4600 Madison Avenue, Suite 210
     Kansas City, MO 64112-3012
     tjohnson@batyholm.com
     Telephone:     816-531-7200
     Telecopy:      816-531-7201

     *Attorneys for Plaintiffs*
     *Delores Moore and Renee Rodgers,*
     *As Next Friend Of A.D.R, A Minor*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the above pleading was served via the Court's electronic filing system this 1st day of June, 2016 to all counsel of record.

 /s/ William T. Dowd