UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TINA MOORE ET AL,                    )
                                     )
        Plaintiffs,                  )
                                     )
vs.                                  )   Case No.:    4:14-CV-1443 SNLJ
                                     )                4:14-CV-1447 SNLJ
CITY OF FERGUSON ET AL,              )                (Consolidated)
                                     )
        Defendants.                  )


**PLAINTIFFS' STATEMENT OF ADDITIONAL UNCONTROVERTED MATERIAL
FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

COME NOW Plaintiffs, by and through their counsel, and for Plaintiffs' Statement of
Additional Uncontroverted Material Facts in Support of Plaintiffs' Opposition to Defendants'
Motion for Summary Judgment, state as follows:

1.      The autopsy toxicology report shows that Jason Moore was not intoxicated by
drugs or alcohol on the day of his death. **Autopsy, Ex.1, at 11.**

2.      On the morning of his death, Jason Moore had taken all of his clothes off, while
shouting language such as "Glory to God" and "I am Jesus." **See Ferguson 1880-1882, Ex.2.**

3.      On the morning of his death, Jason Moore was yelling at vehicles as they drove
by and struck at least one vehicle with his bare hand. **See Ferguson 1882, Ex.2.**

4.      When Officer Kaminski received the dispatch, he knew there was a naked man
running around the neighborhood, that the naked man did not have a weapon, and from his
training and experience the man was likely to be emotionally disturbed.

        Q   I want to go back to the incident again and revisit a couple of things.  When
        you received the dispatch, were you informed that there was a naked man at the
        scene running around --

1

A  Yes.

Q  -- the neighborhood?

A  Yes.

Q  You understood that from your training and experience that he was likely emotionally disturbed?

MR. PLUNKERT:  Objection.  Foundation. Calls for speculation.  You may answer.

A  One of two, either emotionally disturbed or on some kind of narcotic.

Q  (By Mr. Floyd) And you knew that -- you understood the information was that he did not have a weapon; is that correct?

A  Correct.

**Kaminski, Brian (Pages 85:19 to 86:10), Ex.3.**

5.      Officer Kaminski had the option to return to his vehicle to wait for backup, never

believed that Jason Moore had a weapon, and never believed that Jason Moore was a threat to

other individuals.

Q  Was there an option for you to go back in your vehicle and wait for backup?

A  Yes.

Q  And at any point did you believe he had a weapon?

A  No.

Q  He wasn't a threat to any other individuals there, was he?

MR. PLUNKERT:  Object.  Calls for speculation.  You may answer.

Q  (By Mr. Floyd) From your perception?

MR. PLUNKERT:  The same.

A  No individuals were out, no.  It was just vehicles.

**Kaminski, Brian,(Pages 107:19 to 108:7), Ex.3.**

6.      When Officer Kaminski first approached Jason Moore, Officer Kaminski did not

believe Mr. Moore posed any threat to Officer Kaminski, but only posed a threat to himself.

Q  (By Mr. Floyd) The only -- were there any threats that you perceived?

A  Towards me?

Q  Yes.

A  Yes.  When he came towards me.

Q  Before.  Before you approached him?

A  No.  Just to himself.

**Kaminski, Brian (Page 108:8 to 108:14), Ex.3.**

7.      When Officer Kaminski arrived at the scene Jason Moore was standing stationary

and did not move until Officer Kaminski spoke to him.

Q   And he was standing stationary when you arrived, correct?
A   Correct.
Q   He wasn't running around, was he?
A   Not at this time, no.
Q   He didn't start to move around until you spoke to him, correct?
A   Correct.
**Kaminski, Brian (Pages 101:20 to 102:2), Ex.3.**

8.      Officer Kaminski testified that Jason Moore was a thin adult.

Q   Was Mr. Moore a thin adult?
A   He was pretty muscular.  I mean, he was thin but he was -- he was tone.
Q   If the coroner's report had his weight at about 132 pounds, would you dispute that?
A   No.
**Kaminski, Brian (Page 73:20 to 73:25), Ex.3.**

9.      The coroner's report listed Jason Moore's height at 72 inches and weight at 135

pounds.  **Ex. 1**.

10.     Chief Jackson testified that Officer Kaminski is a "good-size man" at around six

feet tall while Jason Moore was naked, unarmed and weighed 135.

Q   The man was naked, he was unarmed, weighed 135 pounds?
A   Yes.
Q   Can you describe how large Officer Kaminski is?
A   He's a good-size man.
Q   I think best estimate is he's six-two, 240?
A   I don't know that he's 240.
MR. PLUNKERT:  Lack of foundation, I  suppose.  Go ahead.  You may answer.
A   They're all tall to me.
BY MR. DOWD:
Q   Yeah.  In 2011, if you recall.
A   Yeah.  He's -- he's probably around six, six-two.
**Jackson, Thomas (Pages 224:23 to 225:13), Ex. 4.**

11.     At the time of his deposition, Officer Kaminski was 6 feet tall and weighed about

230 pounds.  **Kaminski, Brian (Page 28:8 to 28:10), Ex. 3.**

12.     Officer Kaminski testified that, in September of 2011, he was 6 feet tall and

weighed about 190 pounds. **Kaminski, Brian (Page 28:11 to 28:13), Ex. 3.**

13.     When Officer Kaminski saw Jason Moore, Mr. Moore was not clothed, Officer

Kaminski could see Mr. Moore's hands and could see he had no weapons on his person.

> Q   Okay.  And was Mr. Moore clothed when you saw him?
> A   No, sir.
> Q   Did he have any weapons on his person that you could see?
> A   No, sir.
> Q   Were you able to see his hands?
> A   Yes, sir.
> **Kaminski, Brian (Pages 99:21 to 100:3), Ex. 3.**

14.     Officer Kaminski's first engagement with Jason Moore was to walk towards Mr.

Moore and ordering Mr. Moore to come towards him, not to attempt to calm Mr. Moore down or

state that he is there to help Mr. Moore.

> Q   And did you say anything to calm him down like I'm here to help you; I'm not
> going to hurt you; everything is going to be okay?  Anything like that?
> A   No.  I stated, come over here away from the curb.
> Q   You told him to come towards you?
> A   Yes.
> Q   And you were walking towards him?
> A   Correct.
> Q   So while you're walking towards him, you're telling him to come towards you,
> correct?
> A   Correct.
> **Kaminski, Brian (Page 105:6 to 105:18), Ex. 3.**

15.     Officer Kaminski's testified that he then ordered Jason Moore to stop and get on

the ground, and that Jason instead began running at the officer "swinging his fists in a pinwheel

motion."  **Kaminski, Brian (Pages 48:12 to 49:4), Ex. 3; Police Report, Ex. 5**.

16.     Officer Kaminski completed a Use of Force Memorandum shortly after the

incident and does not describe Jason Moore swinging his arms in a "pinwheel fashion."

**Ferguson 1882, Ex. 2.**

17.	Officer Kaminski's X26 Taser darts struck Jason Moore in the left side of his chest, near the heart, as well as in the right thigh. **Autopsy, Ex. 1 at 6; Kaminski, Brian (Page 52:20 to 52:24), Ex. 3.**

18.	The autopsy indicates that Jason Moore had laceration on his lower lip, abrasions on his right forehead, abrasions near his right eyelid, and abrasions on his left cheek. **Autopsy, Ex. 1 at 6**.

19.	When the darts entered Jason Moore's body he dropped, face forward, hard onto the asphalt.

> Q   (By Mr. Floyd) What happened to Moore when the darts entered his body and the load entered his body?
> MR. PLUNKERT:  Object to form.  Go ahead.
> A   He fell down.
> Q   (By Mr. Floyd) Did he fall, drop hard?
> A   He fell, yes, face -- or face down, yes.
> Q   He went face first.  Not meaning his head hit first, but he just collapsed?  Did he collapse forward?
> A   Yes.
> Q   And hit the asphalt?
> A   Correct.
> **Kaminski, Brian (Pages 115:20 to 116:7), Ex. 3.**

20.	The Taser download sheet indicates that that Jason Moore was tased nearly continuously, receiving 50,000 volts from the X26 for approximately 21 of 23 seconds that the Taser was in use, with between zero (0) and one (1) seconds between each taser discharge.

**Taser Download, Ex. 6**.

21.	Officer Kaminski agrees that the Taser report shows no gap between the last three Taser bursts or five second loads into Jason Moore.

> Q   And if in fact the evidence that's contained on this document, Exhibit 18, which is the Taser download information, it would suggest that there was no gap between the last three Taser bursts and loads, of five-second loads into Mr. Moore?  Would you agree?
> A   I agree that's what it says, yes.

**Kaminski, Brian (Page 137:12 to 137:18), Ex. 3.**

22.     Ferguson Police Department's Taser officer, Officer Jon Brannan, testified that

the Taser download sheet shows that Officer Kaminski's Taser unloaded one (1) charge for at

least 5.1 seconds and three (3) charges for 5 (seconds), with the initial charge registering at

50,000 volts.

> Q    (By Mr. Dowd) Officer, I just want to clarify something with regard to the
> Taser discharges that we were talking about earlier and with regard to the Taser
> applications in this case. You indicated that the only time -- way you can stop a
> Taser from discharging for less than five seconds when the cartridge is attached
> and you pull the trigger is to turn off the device; correct?
> A   Yes, sir.
> Q   And it's my recollection of Officer Kaminski's testimony and there has been
> no other evidence that he turned off his Taser at any time. Can you assume that?
> A   I can assume that.
> Q   And you would assume that because in the heat of doing your job you
> couldn't turn off a Taser that is making contact with the suspect, would you?
> A   That is correct.
> Q   Okay.  So my question is if the Taser download report indicates that there was
> six second applications and then three five second applications, you would agree
> that those were all at least five second applications and one six second
> application?
> A   I would assume that they were three five second applications and one at least
> 5.1, according to the rounding up in the document you handed me earlier.
> Q   Okay.  And that's based on your belief that it would round up at 5.1 or 5.2 to
> six?
> A   Per the documentation you handed me earlier.
> Q   That would not affect the amount of voltage that was delivered to Mr. Moore
> at that time, would it?
> A   No.
> Q   And it's the initial application that, according to your testimony, is the 50,000
> volts in the first second?
> A   In the first pulse.  Once the unit -- Once the unit identifies the first pulse, has a
> good connection, it automatically drops the voltage down.
> Q   But the 19 pulses continue?
> A   The 19 pulses continue, yes.  Your pulse rate will always be 19.
> **Brannan, Jon (Pages 96:20 to 98:13), Ex. 7.**

23.     The Taser download shows that there is no gap between the last three (3) Taser

discharges and only a one second gap between the first and second Taser discharges.

Q   Okay.  And then move down to 948, which is the one below it.  And on 9/17/11, 6:53 and 17 seconds there is a charge, correct?
A   Correct.
Q   What's the duration?
A   It says six seconds.
 Q   And then there's a 949 directly below that on 9/17/11 at 6 minutes, 53 seconds -- 6 hours, 53 minutes and 22 seconds there is another charge.  And if you do the math from the 6:53:17 to 6:53:22, that's 18, 19, 20, 21, 22.  There's five seconds.
So this is documenting, as I understand it, the time that each discharge was made with the Taser, each load was given.  And based upon this document here, it would appear that there was no gap in between the last three discharges; that they were continuous; and that there was no three seconds or two seconds in between discharges; and that at best there was a one-second gap between the first one.  Do you see that?
A   Yes.
**Kaminski, Brian (Page 135:5 to 135:25), Ex. 3.**

24.     Officer Kaminski recognizes the Taser report shows no time in between the last

three (3) discharges.

Q   Okay.  So there were four bursts.  And there was no time in between the last three according to this document.  Do you see that?
A   I do see that.  And I can't tell you why because I know there was time in between them.
**Kaminski, Brian (Page 137:1 to 137:5), Ex. 3.**

25.     The police report states that Jason Moore was repeatedly tased because he ignored

instructions to stay down and attempted to get up off of his stomach.  **Ex. 5.**

26.     Officer Kaminski gave Jason Moore commands during the load and two

commands after the second load.  Officer Kaminski does not remember the exact commands but

typically would command "Stay on the ground.  Put your hands behind your back.  Stay on the

ground.  Put your hands behind your back."  After giving those commands Officer Kaminski

would have had to give him a second to recognize whether Jason Moore was going to comply.

Q   (By Mr. Floyd) So getting back to the second load, you gave a command to comply during the second load, correct?
A   During and after.
Q   After.  What commands did you issue to Mr. Moore during the load?

...

A  I can't recall exactly what I said.  It was most likely to stay on the ground.

Q  (By Mr. Floyd) And you gave him two commands verbal after the load?

A  Uh-huh.

Q  Is that yes?

A  Yes.

Q  And then he started to get back up?

A  Correct.

Q  And so give me an example of what you would say to him while he's -- after the load's administered?

A  Stay on the ground.  Put your hands behind your back.

Q  Stay on the ground.  Put your hands behind your back.  Stay on the ground.  Put your hands behind your back.  Okay.  Would that be one command and you would say that twice?

A  No.  That would be two commands.

Q  Okay.  Stay on the ground.  Put your hands behind your back.  Do you say them so that they're clear to him?

A  I believe so, yes.

Q  Okay.  And then he starts -- and then after you give that command, how long do you wait before you pull the trigger?  Do you give him a chance to respond to it, like whoa, he just told me to stay on the ground and put my hands behind my back?  Do you give him any time to respond to that?  Does he get like a second of leeway in order for him --

A  I would say a second.

Q  Okay.

A  Other than trying to get back up.

**Kaminski, Brian (Pages 125:9 to 127:5), Ex. 3.**

27.    Officer Kaminski admits that it would take no less than two seconds after he finished delivering the second load to deliver the two warnings to Jason Moore, wait to see if he would comply, and then watch Mr. Moore rise before administering the third load.

Q  So it might be a couple seconds to deliver the warning and then a second to see if he's going to respond to it?

A  I would say two seconds or so total, yeah.

Q  No less than two seconds though to deliver all that, to deliver those warnings and then make sure to determine whether he's going to follow them?

A  I would say probably.

**Kaminski, Brian (Page 127:6 to 127:13), Ex. 3.**

28.    Officer Kaminski agrees that the Taser report is inconsistent with his own testimony.

Q  So you're acknowledging that if this document reads the way that I believe it reads, that the evidence contained on the download from the Taser weapon is inconsistent with the testimony that you've given in this deposition?
A  I agree with that, yeah.
**Kaminski, Brian (Page 137:6 to 137:11), Ex. 3.**

29.    Officer Kaminski agrees that the Taser download report indicates three

consecutive Taser bursts with no gap in between discharges which would not leave any time for

him to do a submission recognition assessment.

Q  And you would agree from our testimony earlier that in order for a compliance command to be considered appropriate and proper, that you can't give those compliance commands while a subject is under load, correct?
A  On some subjects, correct.
Q  So this document, Exhibit Number 18, would suggest that Mr. Moore was Tased four times, five-second bursts of 50,000 volts and that there's only a one-second gap between the first Tase.  And the last three Tases came consecutively without any time for you to do a submission recognition assessment.  Would you agree?
A  I agree that's what it shows, yes.
**Kaminski, Brian (Pages 137:19 to 138:7), Ex. 3.**

30.    According to Officer Kaminski, after the second Tase, Jason Moore went from a

kneeling position to laying back on his belly.

Q  And what was Jason's body position after the second Tase?  During the second Tase what happened to him?  Did he fall back down?
A  Yes.  His body tightened up, and he went from the kneeling position to laying back on his belly.
**Kaminski, Brian (Page 117:7 to 117:12), Ex. 3.**

31.    When Officer White arrived on the scene he first observed Jason Moore lying on

his back.

Q  And what position was he in when you first observed him?
 A  He was on the ground.
Q  Okay.  And were his feet closer to Airport Road or his head?
A  His feet.
  Q  And was he lying on his stomach or was he lying on his side or was he lying on his back?
A  He was on his back.
**White, Michael (Page 47:15 to 47:23), Ex. 8.**

32.     Officer White testified that Jason Moore was merely "trying to lean up off the ground" and "sort of do a sit up" immediately prior to being tased by Officer Kaminski..

> A. I was slowing down getting ready to come to a stop. I could see Mr. Moore attempting to get up off the ground.
> Q   Okay.  And if he was -- from his back he was attempting to get up?
> A   Yes.  I was trying to lean up off the ground.
> Q   Okay.  Sort of do a sit up?
> A   Yes.
> **White, Michael (Page 51:2 to 51:10), Ex. 8.**

33.     Officer White testified that he saw Jason Moore lying on his back when he approached the scene from approximately twenty (20) to fifty (50) feet away.

> Q   Did his -- what was his next position as he was attempting to sit up?
> A   He went back down to the ground.
> Q   On his back?
> A   Yes.
> Q   And approximately how close to him were you when he went back down on his back?
> A   At that point, probably -- I mean, I was already coming to a stop, so 20 to 50 feet.
> **White, Michael (Page 51:16 to 51:24), Ex. 8.**

34.     When Officer White approached the scene, Jason Moore did not have his hands behind his pushing himself up; rather Officer White testified that Jason Moore's hands were "waving."

> Q   Okay.  Did he have his hands behind his back pushing himself up?
> A   No.  His hands were still --
> Q   Still waving?
> A   Yeah.
> **White, Michael (Page 51:11 to 51:15), Ex. 8.**

35.     Officer White testified that when he approached Jason Moore around the time of the third Taser discharge, Jason Moore was trying to sit up again.

> Q   Is -- as you're exiting your vehicle, what position was Mr. Moore in at that time?
> A   When I was exiting the vehicle he was trying to come back off the ground.

> Q   All right.  Sit up again?
> A   Yes.
> **White, Michael (Page 54:16 to 54:23), Ex. 8.**

36.     Dr. Martinelli testified that there is a conflict between Officer White and Officer

Kaminski as to Jason Moore's movements and positioning when Officer Kaminski delivered the

second tase:

> Q   And you understand that he tased him a second time because Jason Moore
> refused to comply with the commands and tried to get up?
> A   Jason Moore was -- was moving around. Officer White shows up at the scene
> at this point, and there is a conflict between the two officers' statements as to what
> the movements and position of Mr. Moore were at the time that Officer Kaminski
> delivered his second tase.  And I have a problem with the second tasing at that
> point.
> **Martinelli, Ron (Page 101:1 to 101:10), Ex. 9.**

37.     Officer Kaminski tasing Jason Moore the second time was unreasonable because

the TASER download report conflicts with Officer Kaminski's testimony that he gave Jason

Moore several orders and commands to get back on the ground, or any time to comply.  Dr.

Martinelli testified that:

> Q   Is it reasonable under Kaminski's testimony to administer that second tasing
> based on what he has here?
> A   Not necessarily.
> Q   Why not?
> A   Well, the officer has to have an objective reason to believe that Mr. Moore
> intends to -- to harm him or maybe escape.  And the officer also states that he
> requested Mr. Moore several times to get down on the ground before he
> administered the second tase. And in taking a look at the forensic download of the
> TASER, it does not provide me -- It does not support that evidence.  In other
> words, the evidence does not support that Officer Kaminski was able to give Mr.
> Moore several orders and commands to get back down on the ground before he
> tased him.
> **Martinelli, Ron (Page 105:8 to 105:24), Ex. 9.**

38.     Officer Kaminski could not have given Jason Moore enough time to comply with

his commands after applying the first six (6) second taser blast and before applying the second

tasing, according to the TASER download sheet.  Dr. Martinelli testified that:

A        As a matter of fact, on my report on page 33 when we go down to the bottom of the report where it shows the TASER cycles, and the TASER cycles are numbered.  So in the electronic download, and I'm sure you're familiar with this, every cycle, every time the TASER is fired there is an electronic report that's generated.  It's a time date stamped report. And the first cycle of the TASER would be 0948, and it shows that that TASER was activated, and this would have been the first time that Mr. Moore was tased by Officer Kaminski.

Q        Okay.

A        It shows that that went off at 0653 and 17 seconds.

Q        Okay.

A        And that was a tase of approximately six seconds.

Q        Okay.

A        All right.  The next tase was delivered at 0653 and 22.  So when the TASER goes off there -- that shows you when the -- the TASER goes off.  Okay.  Then we -- You go five seconds to six seconds, and you see the second tasing, which is the one that you and I are now speaking about, which is cycle 0949, and that time that TASER goes off at 0653 and 22 seconds.  To me that would provide one second of assessment and time for Officer Kaminski to give what he refers to as several orders, and Mr. Moore is on his knees at this point.  He gets up and he's on his knees.

**Martinelli, Ron (Pages 105:25 to 107:5), Ex. 9.**

39.        The TASER download sheet shows that Officer Kaminski could not have

properly determined whether Jason Moore was a threat to Officer Kaminski before applying the

second tasing.  Dr. Martinelli testified that:

A.        So in delivering that second tasing, to me it appears unreasonable because we don't know what Mr. Moore is going to do at that point.

We don't know if he's going to get up and run.  We don't know if he's going to be aggressive.  I don't have any information that he had threatened the officer any further.

**Martinelli, Ron (Page 107:6 to 107:12), Ex. 9.**

40.        Officer Kaminski's testimony that he gave Jason Moore multiple commands to

stay on the ground after he applied the first tase and before applying the second tase is

contradicted by the TASER download.  Officer Kaminski also knew that Jason Moore would not

be able to hear or comply with any commands Officer Kaminski gave while applying a taser

load.  Dr. Martinelli testified that:

A    It doesn't reconcile to me that the officer had enough time to give as many warnings as he said that he gave to Mr. -- to Mr. Moore. Because the officer states in his report in going -- I'm sorry. In his deposition that he requested Mr. Moore to stay down a few times. And if we just do that ourselves where you're yelling get on the ground, get on the ground, get on the ground, that in and of itself is going to take about three seconds.

So how am I reconciling when the TASER goes off against what Officer Kaminski has to say about all these warnings that he gave to Mr. Moore before he provided that, that next cycle of TASER?

Q    Does Officer Kaminski say how long it took for him to complete his commands of get -- stay down on the ground?

A    I believe there was a question during the course of the deposition that was asked by -- by plaintiffs' counsel, and I thought he said it took a -- a couple or three seconds to give these commands.

Q    Okay. And do you disagree with that?

A    Well, I don't -- I don't see a reconciliation of that.

Q    Okay.

A    Unless there is a reconciliation in one -- in one sense because Mr. Kaminski - - I'm sorry. Officer Kaminski also says that when he delivered that next tasing he was also giving commands to Mr. Moore to get down on the ground, and that is something that they are trained not to do.

As a matter of fact, my research shows that you shouldn't do that because people can't necessarily hear what you're saying when -- whether -- when they are under the influence of load.

**Martinelli, Ron (Pages 110:18 to 112:2), Ex. 9.**

41.    Officer Kaminski testified that between the first and second Taser cycle, Jason Moore went from a position on his stomach to a position on his hands and knees between one to two seconds.

Q    (By Mr. Floyd) How long did it take him to get from the position on his stomach to where he's almost up on his knees?

A    Within seconds.

MR. PLUNKERT:  Foundation. I'm sorry. Foundation.

THE WITNESS:  I'm sorry.

MR. PLUNKERT:  Go ahead and answer.

A    Within seconds.

Q    (By Mr. Floyd) Seconds?  Within two or three seconds?

MR. PLUNKERT:  Same objection.

A    I would say probably one to two seconds, yes.

Q    (By Mr. Floyd) And then what did do you?

A    That's when I administered the second burst.

Q  As he was starting to stand up onto his knees, were you able to now notice the dart in his chest?
A  No.  Because he was kind of doggy on his -- dog style on his knees and hands.
**Kaminski, Brian (Pages 59:13 to 60:8), Ex. 3.**

42.  Officer Kaminski's testimony that Jason Moore raised himself up after the first taser cycle is contradicted by the TASER download report because it would take Mr. Moore longer than one second to raise himself up from the ground after being tased and disoriented.  Dr. Martinelli testified that:

Q  Okay.  You believe that a second is enough for someone to raise themself up, Mr. Moore to raise himself up onto his knees; agree?
A  It -- It usually takes a little longer than a second.  I would say that it would take longer than a second to raise yourself up from the ground after being tased and disoriented by a TASER, and then attempting to get up into a different position.  I would have to say it would take probably a couple of seconds to do that.
**Martinelli, Ron (Page 112:13 to 112:22), Ex. 9.**

43.  Jason Moore was on his left hip and shoulder, leaning onto his stomach when Officer Kaminski delivered the third load.

Q  And then you -- where was Mr. Moore's body position when you delivered the third load?
A  He was on his left side.
Q  And how would he have -- when you say left side, was any part of his stomach touching the ground or both hips or just his left hip, left shoulder?
A  I would say -- I'm trying to remember.  Left shoulder kind of leaning onto his stomach.
**Kaminski, Brian (Page 127:14 to 127:22), Ex. 3.**

44.  The original use of force memorandum prepared by Officer Kaminski shortly after the incident contains no reference to the Officer pausing between taser applications to give instructions to Jason Moore and determine whether he was complying.  **Ex. 2.**

45.  The Taser download sheet shows that Officer Kaminski's Taser was discharged 4 times immediately prior to Jason Moore's death.  **Ex. 6.**

46.     Officer Kaminski's police report states that he only applied three (3) Taser loads

to Jason Moore.

> Q   And the police report did tell you though, didn't it?
> A   It states three, yes.
> Q   Three times.  And when you filled out that Taser -- or when you filled out that police report, you are required to fill that report out honestly, correct?
> A   Correct.
> Q   And you filled that out within 24 hours of the event, correct?
> A   Correct.
> Q   And in your report you indicated that there were three loads, correct?
> A   Correct.
> **Kaminski, Brian (Page 133:3 to 133:16), Ex. 3.**

47.     Lieutenant Ballard testified that only allowing two seconds between Taser

applications would not be sufficient for Jason Moore to comply or for Officer Kaminski to make

a submission assessment.

> Q   (By Mr. Dowd) Okay.  And in the scenario that you're familiar with in which the man is on the ground and he's naked and he's attempting to get up, would you agree that two seconds is probably not even enough time for the subject to comply after he's hit the ground, after the first taser application and the officer's watching him?
> MS. SHAFAIE:  Same objections.  You can answer.
> A   I don't think two seconds would be enough.
> Q   (By Mr. Dowd) Enough time to make a --
> A   Correct.
> Q   -- submission assessment?  That's correct?
> MS. SHAFAIE:  Same objections.
> A   Correct.
> **Ballard, William (Pages 183:14 to 184:3), Ex. 10.**

48.     Officer Kaminski was trained to know that "Repeated, prolonged, or continuous

CEW applications may cause or contribute to cumulative exhaustion, stress, cardiac,

physiological, metabolic, respiratory, and associated medical risks which could increase the risk

of death or serious injury."

> Q   And that, "Repeated, prolonged, or continuous CEW applications may cause or contribute to cumulative exhaustion, stress, cardiac, physiological, metabolic,

respiratory, and associated medical risks which could increase the risk of death or serious injury." Do you see that?

A   Yes, sir.

**Kaminski, Brian (Pages 69:24 to 70:5), Ex. 3.**

49.    Defendants' expert, Steven Ijames testified that a number of professional organizations, such as PERF, recommend against applying more than three Taser cycles or cycles lasting longer than 15 seconds.

> Q   The preference by the manufacturer is that an individual be subject to no more than three cycles, correct?
>
> A   I don't know that the manufacturer makes any reference to that. There are a number of professional organizations that recommend that certain steps be taken after three or for longer than 15 seconds. PERF, for example, in their most recent guideline basically says three cycles and there's no more. They're the only ones I think that do that. I don't recall if the manufacturer says three and no more.
>
> **Ijames, Steven (Page 90:13 to 94:1), Ex. 11.**

50.    Defendants' expert, Steven Ijames testified that the IACP "model policy and White paper both say [to use] the least number of cycles reasonable to get the job done and cycles more than three or for a total duration of longer than 15 should result in a medical assessment."

> Q   What about IACP? What was their guideline that they promulgated as of September 2011 on the number of cycles that is recommended?
>
> A   The model policy and White paper both say the least number of cycles reasonable to get the job done and cycles more than three or for a total duration of longer than 15 should result in a medical assessment.
>
> **Ijames, Steven (Page 94:13-20), Ex. 11.**

51.    Lieutenant Ballard of the Ferguson Police Department told the medical examiner at Jason Moore's autopsy that Mr. Moore "got up and started towards the officer again" after the first and second tasings; and also stated that Jason "has a lengthy history of drugs and is on Probation/Parole for 'Dangerous Drugs'", apparently in reference to a marijuana conviction.

**Autopsy, Ex. 1 at 3-4**.

52. Defendants failed to preserve the audio tape of dispatcher and officers' reporting and discussions, which Defendants' own expert testified he has found helpful in past investigations, and the CAD transcript inaccurately reflected how officers arrived at the scene, in what order and how much time passed between arrivals. **Ijames, Steven (Page 120:9-20), Ex. 11.**

53. Ferguson Police Captain Richard Henke and Defendants' liability expert Steven Ijames both admitted that there was no internal investigation of Officer Kaminski's use of force other than what is in the police report.

> Q. Okay, so is it safe to say that you did not do an independent investigation of Mr.--Officer Kaminski's use of force in this incident?
> A. I'm sure I did not.
> Q. Okay, you did not interview Officer Kaminski?
> A. I did not.
> Q. You did not interview Officer White?
> A. No, I did not.
> Q. You did not interview and make notes of any interviews with Lieutenant Ballard; correct?
> A. Correct.
> **Henke, Richard (Page 17:6 to 17:17), Ex. 12.**
>
> Q. In the case of Officer Kaminski's conduct, was anyone assigned to investigate that, to your knowledge?
> A. Again, I do not know. I don't recall if anyone was assigned.
> Q. Okay. Certainly, we know it wasn't you, correct?
> A. Correct.
> Q. And to your knowledge, as the field operations commander at that time, you are not aware of anybody who was assigned to do--
> A. No.
> **Q.** --an investigation, correct?
> **A.** I do not remember that being done.
> **Henke, Richard (Page 24:10 to 24:23), Ex. 12.**
>
> Q. Are you aware of any internal investigation that was performed by the Ferguson Police Department into Officer Kaminski's use of force that morning?

A   I'm not sure just beyond the normal process review and reports.

Q   Everything that's in what's been called Exhibit 12 basically the police report in this matter and the supplemental?

A   Yes, sir, that would be accurate.

Q   That would be the abuse of force report, the TASER use of force report, the narratives, all of that?

A   Yes, sir.

Q   Witness statements?

A   Yes, sir.

Q   You're not aware of any other documents other than that?

A   I'm not, sir.

Q   Okay.  So based on your review of the documents and the testimony, you agree there's been no internal affairs investigation of Officer Kaminski's use of force, correct?

A   That's correct.

Q   No other statements other than what are contained in the police report were taken, correct?

MS. SHAFAIE:  Object to form.

A   Not that I'm aware of, sir.

**Ijames, Steven (Pages 120:21 to 121:22), Ex. 11.**

54.   The Ferguson Police Department did not download the Taser data to compare

with Officer Kaminski's story with the information logged on the Taser.

Q    (By Mr. Dowd) Ferguson did not run a TASER download to compare Officer Kaminski's version of events with what the more accurate TASER download reports shows?

A   I don't believe they did.

Q   They had the capability to do that though, correct?

MS. SHAFAIE:  Object to foundation.

A   That, I don't know.  It's not a complicated process.  I just don't know if they actually had it in-house.

Q    (By Mr. Dowd) One of the officers who formerly with the police department has testified that they did have the capability to do that and they all were trained, all of the instructors, TASER instructors would have been able to do that during that time frame. Is that your understanding from review of the deposition testimony?

A   Yes, and any TASER instructor can do it if they have the mechanical implements necessary to do it.

Q   So if one of the former officers testified that he was the TASER officer at Ferguson and that they had the equipment and they had the capability, you would have no reason to disagree with that?

A   I would not, sir.

Q   And that would not surprise you either?

A   I would just say that my experience is most agencies have the capability to do so, so it would actually surprise me because most folks do if they have it.
**Ijames, Steven (Pages 121:23 to 123:4), Ex. 11.**

55.     The Ferguson Police Department made no determination as to whether or not

Officer Kaminski's use of force was consistent with department policy.

Q.   So as far as at least this record in front of us, there's no indication that the Department, either Lieutenant Ballard or yourself, ever came to a final conclusion about the proper use of force in this case.
MS. SHAFAIE:  Object,--
BY MR. DOWD:
Q.   (Continuing)  Is that a fair statement?
MS. SHAFAIE:  --form and foundation.  You can answer.
A.   Yes.
**Henke, Richard (Page 18:9 to 18:19), Ex. 12.**

Q   To your knowledge, there was never a determination made by any command officer whether the chief, Captain Henke or Lieutenant Ballard as to whether or not Officer Kaminski's use of force that morning was consistent with department policy?
MS. SHAFAIE:  Object to foundation.
A   I think their review of the report and use of force report would be their approval as communicated by Kaminski.  As far as any independent investigation approval, I'm not aware of that.
Q   (By Mr. Dowd) Right.  In fact, Officer Ballard in the use of force report left it blank as to whether or not, yes or no, Officer Kaminski's conduct was consistent with department policies?
A   I just don't recall that.
Q   You can assume that to be true?
A   Okay.
Q   And he was doing that because his testimony was because there had been a death I was passing that upstairs?
A   Okay.
Q   So he did not make a determination?
A   Agreed.
**Ijames, Steven (Pages to 123:5 to 124:2), Ex. 11.**

56.     The Department of Justice found that Ferguson Police Department "officers seem

to regard ECWs as an all-purpose tool bearing no risk." **Ex. 13, p. 30.**

57.     The Department of Justice found that Ferguson Police Department "officers'

swift, at times automatic, resort to using ECWs against individuals who typically have

committed low-level crimes and who pose no immediate threat violates the Constitution." **Ex. 13, p. 30.**

58.     The Department of Justice found that the Ferguson Police Department's "pattern of excessive force includes using ECW's in a manner that is unconstitutional, abusive, and unsafe." **Ex. 13, p. 29.**

59.     The Department of Justice found that the Ferguson Police Department has "a tendency to use unnecessary force against vulnerable groups such as people with mental health conditions or cognitive disabilities." **Ex. 13, p. 28.**

60.     The Department of Justice found that the "[o]verwhelming majority of force - almost 90% - is used against African Americans" by the Ferguson Police Department. **Ex. 13, p. 28.**

61.     The Department of Justice made the following finding in its Report:

> "Supervisors seem to believe that any level of resistance justifies any level of force. They routinely rely on boilerplate language, such as the statement that the subject took 'a fighting stance,' to justify force. Such language is not specific enough to understand the specific behavior the officer encountered and thus to determine whether the officer's response was reasonable. Indeed, a report from September 2010 shows how such terms may obscure what happened. In that case, the supervisor wrote that the subject 'turned to [the officer] in a fighting stance' even though the officer's report makes clear that he chased and tackled the subject as the subject fled. That particular use of force may have been reasonable, but the use-of-force report reveals how little attention supervisors give to their force investigations. Another common justification, frequently offered by officers who use ECWs to subdue individuals who do not readily put their hands behind their back after being put on the ground, is to claim that a subject's hands were near his waist, where he might have a weapon. Supervisors tend to accept this justification without question." **Ex. 13, p. 40.**

62.     In March of 2011, the United States Department of Justice warned that ECWs such as Taser devices are "'less-lethal' and not 'nonlethal weapons'" and "have the potential to result in a fatal outcome." **See 2011 Electronic Control Weapon Guidelines, Ex. 14, at 12**.

63.     Taser's Version 17 training was supplied with the X26 Taser device in this case,

and that training was received by Officer Kaminski.

> Q.   One thing I wanted to ask you on here, too.  Right where this paper clip is
> marked, this page in particular, it's Version 17.  It says Ferguson 1483.  And this
> page is paper clipped.  It says.  "Cardiac.  We have issued new Taser target
> guide."  And this is dated May of 2010?
> A   Correct.
> Q   I want to reference this page for you.  If you can identify the top of that page.
> You can take the exhibit.
> A   Yeah.  I know the page.
> Q   Okay.  And for the videographer.  You're familiar with the contents on this
> page?
> A   Yes, sir.
> Q   And you were familiar with the contents on this page before September 11 --
> September 17, 2011?
> A   Yes, sir.
> ...
> Q   (By Mr. Floyd) And then finally I want to hand you what's marked Plaintiff's
> Exhibit 20.  Can you identify that document for me? I represent that that would be
> more information and warnings released by Taser as of May of 2011.
> A   Yes, sir.
> Q   You're familiar with this document?
> A   Yes.  This is the new -- this was the new version, I would guess.
> Q   As of May of 2011?
> A   Correct.
> Q   And you received -- you received this information either in your -- and/or both
> the July 2011 training from Taser International, and you also receive emails from
> Taser?
> A   I used to, yes.
> Q   Back then you did?
> A   Back then I did, yes.
> Q   And you would have received this email?
> A   Correct.
> Q   You have seen this document?
> A   Yes, sir.
> Q   And you would have seen it before December 17, 2011?
> A   Yes, sir.
> Q   And you would have read it and been familiar with it, correct?
> A   Correct.
> **Kaminski, Brian (Pages 142:14 to 144:12), Ex. 3; Ex. 22.**

64.     Ferguson's Chief Taser Officer, Jon Brannan, testified that the Warnings issued

by Taser on May 1, 2010 were provided to all Taser instructors, including Officer Kaminski and

Brannan would have himself provided the warnings to all certified users, including Officer

Kaminski.

> Q  I will go ahead and give you what has previously been marked Exhibit 19.
> A  Taser warnings.
> Q  Yes.  Do you see the date in the lower left of that?
> A  May 1st, 2010.
> Q  Would you agree that is something that you would have received from Taser as an instructor?
> A  Yes.
> Q  And that you would have sent to the people that you certified as users?
> A  Yes.
> Q  Sometime the end of 2010?
> A  Yes.
> **Brannan, Jon (Pages 26:14 to 27:2), Ex. 7.**

65.    Ferguson's Chief Taser Officer, Jon Brannan, testified that the Warnings issued

by Taser on May 1, 2010 were provided to all Taser instructors, including Officer Kaminski and

Brannan would have himself provided the warnings to Officer Kaminski.

> Q   (By Mr. Dowd) But it's safe to say that if Officer Kaminski is a CEW Taser instructor --
> A   As a Taser instructor, he would have received this e-mail as well.
> Q   So if he was certified as an instructor in December of 2010, he would have received this Exhibit 19, the Taser instruction dated May 31st, 2011, around that same time as you did?
> A   Yes.  We should have received all warning and e-mail updates at the same time, unless for some reason the company decided not to send them out to him.
> Q   And you're not aware of any exception like that, are you?
> A   No, sir.
> **Brannan, Jon (Pages 74:25 to 75:14), Ex. 7.**

66.    The X26 "can produce physiological or metabolic effects which include but are

not limited to changes in …heart rate and rhythm" **See Ex.15 at 4**; See also, Brannan, Jon:

> Q   Would you agree that the Taser warnings at this time included that the ECD can produce physiological or metabolic effects which include but are not limited to heart rate and rhythm?
> A   Yes.
> **Brannan, Jon (Page 29:13 to 29:17), Ex. 7.**

67.     Officer Kaminski was trained to know that "CEW use causes physiologic and/or metabolic effects that may increase the risk of death or serious injury" and that those "effects include changes in blood chemistry, blood pressure, respiration, heart rate and rhythm."

> Q   And that, "Physiologic and metabolic effects:  CEW use causes physiologic and/or metabolic effects that may increase the risk of death or serious injury." Did you see that?
> A   Yes, sir.
> Q   And then right in the last sentence of that page, it says, "These effects include changes in blood chemistry, blood pressure, respiration, heart rate and rhythm." Do you see that?
> A   Yes.
> **Kaminski, Brian (Page 70:9 to 70:18), Ex. 3.**

68.     Reasonable efforts should be made to minimize the number of [Taser] exposures and resulting physiological and metabolic effects.  **See Ex. 15 at 4**; See also, Brannan, Jon:

> Q   That also reasonable efforts should be made to minimize the number of ECD exposures and resulting physiological and metabolic effects?
> A   Yes.
> **Brannan, Jon (Page 29:18 to 29:21), Ex. 7.**

69.     Officer Kaminski was trained to "minimize the number and duration" of CEW discharge exposures in individuals. **Kaminski, Brian (Page 71:13 to 71:16), Ex. 3.**

70.     Taser users should use the lowest number of [Taser] exposures that are objectively reasonable to accomplish lawful objectives and should re-assess the subject's behaviors, reactions and resistance level before initiating or continuing the exposure. **Ex. 15 at 2**; See also, Brannan, Jon:

> Q   ECD or Taser users should use the lowest number of ECD exposures that are objectively reasonable to accomplish lawful objectives and should re-assess the subject's behaviors, reactions and resistance level before initiating or continuing the exposure.  Do you see that?
> A   I'm going to take your word for it, sir, and I don't have my reading glasses.
> Q   If I read it incorrectly, I presume your counsel would correct me.
> A   I assume she would.
> Q   Is that consistent with your training and understanding of how the Taser is to be used?

A   Yes.
**Brannan, Jon (Page 83:4 to 83:17), Ex. 7.**

71.     Officer Kaminski knew since he started using a Taser, and indeed any use of

force, that an officer, when deploying a CEW, should use the least number of CEW discharges to

accomplish lawful objectives.

>       Q   (By Mr. Floyd) Well, for instance, in deploying a CEW, the officer should,
>       and did you answer, "Use the least number of CEW discharges to accomplish
>       lawful objectives"?
>       MR. PLUNKERT:  Object to foundation.  You may answer.
>       A   If that's what I answered on the page, yes. I don't --
>       Q   (By Mr. Floyd) You agree with that though, right?
>       A   Yes.
>       MR. PLUNKERT:  Same objections.
>       Q   (By Mr. Floyd) I mean, you've known that since you started using a Taser,
>       didn't you?
>       A   Any use of force, yes.
>       **Kaminski, Brian (Pages 75:25 to 76:14), Ex. 3.**

72.     Tasers can produce physiological or metabolic effects which include but are not

limited to changes in acidosis, blood pressure, calcium, creatinine, kinase (CK), electrolytes

(including potassium), lactic acid, respiration, heart rate, rhythm capture, stress hormones or

other biochemical neuromoderators, for example, catecholamines.  **Ex. 15 at 4**; See also

Brannan, Jon:

>       Q   So if you would go to page two of Exhibit 20.  Again, these warnings,
>       assuming they were communicated to Officer Kaminski and the other instructors,
>       agree that this communicates in the section titled psychological and metabolic
>       effects again that, "The ECD can produce physiological" -- excuse me --
>       "physiological or metabolic effects which include but are not limited to changes
>       in acidosis, blood pressure, calcium, creatinine, kinase (CK), electrolytes
>       including potassium, lactic acid, respiration, heart rate, rhythm, capture, stress
>       hormones or other biochemical neuromoderators, for example, catecholamines."
>       That is consistent with your training and that is information that was conveyed to
>       you prior to December of 2011?
>       A   That is consistent with this document that I would have received, yes.
>       Q   So this is why it is important to minimize the number of ECD applications,
>       would you agree with that?
>       MS. SHAFAIE:  Objection.  Foundation.  You can answer.

A   I would agree.

Q   (By Mr. Dowd) In fact, it states in the next sentence, "Therefore, reasonable efforts should be made to minimize the number of ECD exposures and resulting physiologic and metabolic effects"; correct?

A   I would agree with that as well.

Q   And you and Officer Kaminski would have been aware of this warning in September of 2011?

MS. SHAFAIE:  Object to foundation.  You can answer.

A   If it was sent to him via e-mail, as he was a certified instructor, yes.

Q   (By Mr. Dowd) And it also states in the last sentence of that section adverse physiologic or metabolic affects may increase risk of death or serious injury.  That would have also been communicated to him, assuming he received it?

MS. SHAFAIE:  Foundation.  You can answer.

A   Everything there in document he would have received, or he should have received, I should say.

**Brannan, Jon (Pages 75:15 to 77:8), Ex. 7.**

73.    X26 use on "low body mass index (BMI) person could increase the risk of death

or serious injury." Ex. 19 at 4; See also Brannan, Jon:

Q   Okay.  I know the problem.  I'm going to read it to you then and ask you if it's consistent with your understanding of the training.  So high risk population states, "ECD use on pregnant, infirm, elderly, small child or low body mass index (BMI) person could increase the risk of death or serious injury."  I'm going to rely on your attorney to make sure I read that correctly, and does that sound consistent with the training and instruction -- the training you received and the instruction that you gave to officers that you were certifying as users?

A   Yes.

Q   Okay.  And it's likely that Officer Kaminski would have been trained as an instructor and a user on that risk as well?

A   Yes.

**Brannan, Jon (Pages 30:10 to 31:1), Ex. 7.**

74.    Officer Kaminski knew from his training that Jason Moore, as a thinly built

subject, was at a heightened risk of injury or death from a Taser.

Q   You understand that a thin build places an individual at a heightened risk of injury or death from a Taser, correct?

A   Correct.

Q   And you could see he had a thin build, correct?

A   He was thin, yes, but he also had a lot of muscle to him.

**Kaminski, Brian (Pages 131:19 to 132:1) Ex. 3.**

75. "The factors that may increase susceptibility for an ARD [arrest-related death] have not been fully characterized, but may include … alterations in brain function (agitated or excited delirium), cardiac disease[.]" **Ex. 15 at 4**; See also Brannan, Jon:

> Q    (By Mr. Dowd) Yes.  So I will repeat the question just so we are clear for the record.  The factors may increase susceptibility for an ARD or arrest-related death have not been fully characterized, but may include, now I'm dropping down to alterations and brain function (agitated or excited delirium), cardiac disease.  Do you see that?  Is that consistent with the training that you received and the instructions that you gave in the 2010 and after time frame?
> A    Yes, sir.
> **Brannan, Jon, (Pages 31:17 to 32:2), Ex. 7.**

76. Officer Kaminski was trained to know that some individuals are at a heightened risk of injury from a Taser, including the elderly, people with a heart condition and someone that is emotionally distressed.

> Q    Okay.  And then did you know that some individuals are at heightened risk of injury from a Taser?
> A    There are some, yes.
> Q    Would you agree that some of those people that are at heightened risk could be elderly people?
> MR. PLUNKERT:  Objection to foundation.
> A    Yes, sir.
> Q    (By Mr. Floyd) And would you agree that some of the people at heightened risk of injury from a Taser could be an individual with a heart condition?
> MR. PLUNKERT:  Objection to foundation.
> A    Yes, sir.
> Q    (By Mr. Floyd) And that a person that is emotionally distressed?
> MR. PLUNKERT:  Same.
> A    Yes, sir.
> Q    (By Mr. Floyd) In fact, on the document that you have before you, which is part of your Taser training, does it indicate that, "Emotional stress and physical exertion, both likely in incidents involving CEW and other uses of force, are reported as seizure-precipitating factors"?  That's down -- it's below the second warning.
> A    Yes.
> **Kaminski, Brian (Pages 68:13 to 69:12), Ex. 3.**

77. Taser warned to avoid intentionally targeting the [Taser] on sensitive areas of the body such as the … chest/breast, or known pre-existing injury areas without legal justification. **Ex. 15 at 2**.

78. Proximity of the ECD or Taser electrical discharge to or across the heart has been identified as a principle concern for [Taser] caused cardiac risks and safety. **Ex. 16 at footnote 11**; See also Brannan, Jon:

> Q   If you look at the bottom, there is a footnote 11 that states and it's even smaller print and you have indicated that you don't have your glasses so I'm going to read this for the record. It says proximity of the ECD or Taser electrical discharge to or across the heart has been identified as a principle concern for ECD caused cardiac risks and safety.  That's consistent with your training and understanding; correct?
> A   Yes.
> Q   And that would have been communicated to you and Officer Kaminski on or about May 31st, 2011?
> MS. SHAFAIE:  Foundation.  You can answer.
> Q   (By Mr. Dowd) Is that your belief?
> A   Should have been, yes.
> Q   In your belief it was?
> A   Yes.
> **Brannan, Jon (Page 85:3 to 85:19), Ex. 7.**

79. Taser has determined the heart-to-dart distance is a factor in whether or not the taser will affect the heart; namely, the farther you are away from the heart the less chance or likelihood of an effect.

> Q   Do you understand that based on your Taser training, that there is some risk, and based on the portions of the warnings we just covered, that there are some risks for involvement of cardiac rhythm if a Taser probe is at or near the heart?
> MS. SHAFAIE:  Object to foundation.  You can answer.
> A   Yes.  Taser has identified the heart-to-dart distance as a factor and determined whether or not it will affect the rhythm of the heart.
> Q   (By Mr. Dowd) And would you agree that because of that risk any time you Tase away from the heart you're reducing that risk of interfering with the cardiac rhythm?
> MS. SHAFAIE:  Foundation.  You can answer.

A    I'm not a doctor.  I only go off what I'm trained for by Taser, and Taser has determined the heart-to-dart distance being the farther you are away from the heart the less chance or likelihood of an effect.

Q    (By Mr. Dowd) Right.  So the farther away from the heart the dart is, the less likely there is going to be a cardiac effect just logically?

A    According to the training I have received, yes.

**Brannan, Jon (Pages 35:19 to 36:18), Ex. 7.**

80.    The preferred target areas are below the neck area for back shots and the lower center mass (below chest) for front shots. The preferred target areas increase dart-to-heart safety margin distance.  **Ex. 16 at 4.**

81.    The Taser Warnings stated that "Disregarding this information could result in death or serious injury."  **Ex. 16**; See also Brannan, Jon:

Q    On the front page of that, the very first warning states, "These safety warnings are for your protection as well as the safety of others."  Do you agree with that?

A    Yes, sir.

Q    And also states, "Disregarding this information could result in death or serious injury."  Do you see that?

A    Yes, sir.

Q    Do you agree with that?

A    Yes, I do.

Q    And you do agree with that?

A    Yes, I do.

**Brannan, Jon (Pages 72:19 to 73:6), Ex. 7.**

82.    Officer Brannan testified that Officer Kaminski was trained to know that when using a Taser there is an increased risk of injury or death in Tasing a person in the chest:

Q    You would agree also when using a Taser there is an increased risk of injury or death in Tasing a person in the chest?

A    Yes, that is also in the warnings and the training itself.

Q    Okay.  So that means you and Officer Kaminski would have both known about it in September of 2011?

A    Every officer who has ever taken the training would know about that.

**Brannan, Jon (Pages 94:25 to 95:9), Ex. 7.**

83.    Officer Kaminski knew since he started using a Taser that citizens Tased in the chest area are at an increased risk of injury or death compared to citizens Tased in the back or lower body.

> Q   (By Mr. Floyd) Okay.  And you agree that citizens Tased in the chest area are at an increased risk of injury or death compared to citizens Tased in the back or lower body?  Do you see with that?
> MR. PLUNKERT:  Same objections.
> A   I agree.
> Q   (By Mr. Floyd) And you've known that since you started using a Taser, correct?
> MR. PLUNKERT:  Same objections.
> A   Yes, sir.
> **Kaminski, Brian (Pages 80:17 to 81:1), Ex. 3.**

84.    Officer Brannan testified that Taser trainings warned that using a Taser on a person who is in a state of stress or mental distress, like excited delirium, increases the risk of injury or death.

> Q   Further agree that using a Taser increases the risk of injury or death if Tasering a person is in a state of stress or mental distress, like excited delirium?
> A   That is alluded to in this, yes.
> **Brannan, Jon (Page 95:10 to 95:14), Ex. 7.**

85.    Officer Kaminski knew since 2004 that citizens that are in an agitated state, emotionally distressed or suffering from excited delirium are at an increased risk of injury or death when Tased as compared to an otherwise healthy, normal, calm person.

> Q   (By Mr. Floyd) But you do agree with the statement that citizens in the agitated state, emotionally distressed or excited delirium are at an increased risk of injury or death when Tased as compared to an otherwise healthy, normal, calm person?
> MR. PLUNKERT:  Object to form and foundation.
> Q   (By Mr. Floyd) Do you agree with that?
> A   That I do agree with.
> Q   Based upon your Taser training and the years that you've been using a Taser?
> MR. PLUNKERT:  Same objections.
> A   Correct.
> Q   (By Mr. Floyd) And you've known that for years, correct?
> MR. PLUNKERT:  Same objections.

Q   (By Mr. Floyd) Is that yes?
A   Yes, sir.
Q   Since 2004, correct?
MR. PLUNKERT:  Same objections.
A   Yes, sir.
**Kaminski, Brian (Pages 79:20 to 80:16), Ex. 3.**

86.     Officer Brannan testified that Taser trainings warned that Tasering a person

repeatedly increases their risk of injury or death to that person.

Q   Would you also agree that Tasering a person repeatedly increases their risk of
injury or death to that person?
A   I would agree with that.
**Brannan, Jon (Page 95:15 to 95:18), Ex. 7.**

87.     Officer Kaminski knew since he started using a Taser that citizens that are Tased

repeatedly are at an increased risk of injury or death as compared to citizens Tasered one time.

Q   (By Mr. Floyd) Citizens that are Tased repeatedly are at increased risk of
injury or death compared to citizens Tasered one time.  Do agree with that?
MR. PLUNKERT:  Same objections.
A   Through the manual, yes.
Q   (By Mr. Floyd) And you've known that since you started using a Taser,
correct?
MR. PLUNKERT:  Same objections.
A   Yes.
**Kaminski, Brian (Page 81:2 to 81:11), Ex. 3.**

88.     Officer Kaminski has known since he started using a Taser in 2004 that the

greater number of times a person is Tasered, the greater the person's risk of injury or death.

Q   (By Mr. Floyd) The greater number -- and you agree that the greater number
of times a person is Tasered, the greater the risk of injury or death. Do you agree
with that?
MR. PLUNKERT:  Same objections.
A   Yes.
Q   (By Mr. Floyd) And you've known that since you started using a Taser in
2004, correct?
MR. PLUNKERT:  Same objections.
A   Yes.
**Kaminski, Brian (Page 81:12 to 81:21), Ex. 3.**

89.     Officer Brannan testified that the level of force an officer uses is based on the risks, not only to the officer but to the person who is receiving the force.

> Q   But the level of force you use is based on the risks, not only to the officer but to the person who is receiving the force; correct?
> A   And the public as a whole in that vicinity.
> Q   Correct.  And if there is no public as a whole in the vicinity, the focus of the officer --
> A   Should be on the person and themselves.
> Q   Exactly.  And so that officer's use of force has to have some basis in the amount of risks they are putting that person who is subject to the force in?
> MS. SHAFAIE:  Objection.  Form.
> Q    (By Mr. Dowd) You would agree with that?
> A   I would agree with that.
> **Brannan, Jon (Pages 79:21 to 80:9), Ex. 7.**

90.     The police report refers to offenses of Assault 3rd and Indecent Exposure.  **Ex. 5 at 1.**

91.     Lieutenant Ballard of the Ferguson Police Department testified that Jason Moore's cited offenses of Assault 3rd and Indecent Exposure were ordinance violations.  **Ballard, William, 9-25-2015 (Page 110:12 to 110:24), Ex. 10**.

92.     Lieutenant Ballard testified that, if it was determined that Mr. Moore was having mental health issues or a personal crisis and he had not died, the Department would not have pursued charges against him.  **Ballard, William, 9-25-2015 (Page 111:6 to 111:17), Ex. 10.**

93.     Lieutenant Ballard testified that Jason Moore's Assault 3rd charge stemming from the incident with was included because "the Taser has to be used" and because Jason purportedly "charged" Kaminski.  **Ballard, William, 9-25-2015 (Pages 111:18 to 112:1), Ex. 10.**

94.     Officer Kaminski agrees that an officer must conduct a risk assessment to justify each Tase.

> Q   (By Mr. Floyd) Do you agree that an officer must conduct a risk assessment to justify each Tase?
> A   I would agree with that, yes.

95.     Dr. Martinelli testified that the third tasing of Jason Moore was unreasonable

because Mr. More could not have disobeyed Officer Kaminski's orders while under load as Mr.

Moore could not hear, distinguish or comprehend the order while under load.  Dr. Martinelli

testified that:

> Q     Okay.  And you believe that third tasing was unreasonable?
> A     I do.
> Q     Why?
> A     Because the officer had not done an appropriate assessment again.  Mr.
> Moore was still under load.  Officer Kaminski states that he gave the commands
> to stay on the ground and to get on the ground while Mr. Moore was under the
> influence of load. My research, which is peer reviewed and published research,
> shows that there is a high probability that Mr. Moore could not either hear or
> distinguish the order or comprehend the order, and that's even if he was sober and
> not under the influence of anything, not experiencing a psycho-medical
> emergency.  That's just a normal person being tased.  And then the time element.
> Right.  And also in consideration of what another officer who observed this stated
> that Mr. Moore's actions were at that time.
> **Martinelli, Ron (Pages 114:12 to 115:8), Ex. 9.**

96.     Plaintiff's expert Dr. Martinelli has testified that the additional fourth Taser

shock, given after Officer White had arrived at the scene and was able to assist, and particularly

given the lack of significant resistance from Jason, was unreasonable because there is no

evidence that Mr. Moore acted in a violent manner, stating that there was "no biting, no spitting,

no hitting, no kicking, no radical or dynamic movement on the part of the -- Mr. Moore."

> Q     But you still believe it's unreasonable?
> A     Yes, I think any activation of a TASER when a person at that point is -- been
> restrained with handcuffs, and you have two people on the scene, which we would
> now refer to as a disparity of force, in other words, two officers against one
> person.  One officer has the opportunity to both introduce electronic energy back
> into that person and/or goes hands-on.
> The second officer, which would be Officer White, has already gone hands-on
> with Mr. Moore. Mr. Moore is in a prone position, which means that he's on his
> stomach.  He's -- He's restrained with his hands behind his back.
> I have no evidence from either officer of Mr. Moore acting in a violent manner.
> I've got no biting, no spitting, no hitting, no kicking, no radical or dynamic

movement on the part of the -- Mr. Moore, and yet I have a TASER being activated for a fourth time, which is contrary to the guidelines that officers would apply intermediate force.

**Martinelli, Ron (Pages 118:14 to 119:9), Ex. 9.**

97.  Officer Kaminski did not make any attempt to delay contact with Mr. Moore until

backup arrived.

Q   Did you make any attempt to delay contact with Mr. Moore until backup arrived?
A   No.

**Kaminski, Brian (Page 113:21 to 113:23), Ex. 3.**

98.  Officer Kaminski could have waited for backup to arrive so that he could cuff

Jason Moore under load.

Q   Would you agree if backup had been on the scene with you, that it would have been possible to perform a cuffing under load on the first Tase?
MR. PLUNKERT:  Calls for speculation.  You may answer.
A   If an officer was there with me quicker, yes.
Q   (By Mr. Floyd) Have you been trained to cuff under load?
A   Yes.
Q   Has Officer White been trained to cuff under load?
MR. PLUNKERT:  Object to foundation.  You may answer.
A   He should have been, yes.
Q   (By Mr. Floyd) As far as you know, are all Ferguson officers trained to cuff under load?
A   Yes.
MR. PLUNKERT:  Object to foundation.
Q   (By Mr. Floyd) Is that a yes?
A   Yes.

**Kaminski, Brian (Pages 113:24 to 114:19), Ex. 3.**

99.  Defendants' expert, Steven Ijames saw no evidence that Mr. Moore had injured a

person or himself and saw no evidence that Jason Moore posed an imminent risk of harm to

Officer Kaminski.

Q   When Officer Kaminski first arrived, there is no evidence that Mr. Moore had injured a person?
A   No, sir.
Q   Including himself?
A   Correct.

Q   When Officer Kaminski first arrived to the scene of the encounter at or about the intersection of North Marguerite and Airport Road, he did not have information from citizens he spoke with that led him to believe that any citizens were at an imminent risk of harm by Mr. Moore?

A   I agree.

Q   When Officer Kaminski first arrived at the scene, did Jason Moore pose an imminent risk of harm to Officer Kaminski?

A   No, sir.

**Ijames, Steven (Page 60:3 to 60:18), Ex. 11.**

100.    Kaminski contends that he did not consider waiting for backup because he was close to the road, and even though this event occurred early on a Saturday morning, Kaminski claims it was "rush hour" and a "highly traveled road."

Q   Did you consider waiting for backup before approaching Mr. Moore?

A   No, sir.

Q   Why not?

A   Because he was close to the road, a highly trafficked flowing area.  It was rush hour.  It was rush hour on a Saturday morning, but it was still -- it's still a highly traveled road.

**Kaminski, Brian (Page 93:3 to 93:10), Ex. 3.**

101.    Officer White testified that "Traffic was very, very light" on the morning of Jason Moore's death, consistent with most Saturday mornings at 6:30 a.m. on Airport Road.

Q   Okay.  What I'm asking is, as you were approaching the scene, coming up towards the hill and over had the hill, were there cars that were having to pull over to get out of your way at 6:30 a.m. on that Saturday morning?  Do you recall any?

A   Traffic was very, very light.  I don't recall what cars were there.

Q   Okay.  That's pretty consistent with most Saturday mornings at 6:30 a.m. on Airport Road, right?

A   Yes.

Q   So you don't recall as you were traveling westbound cars in both lanes having to pull over to get out of your way, correct?

A   I don't recall a lot of cars at all.

Q   Okay.  Same -- you're talking about both directions when you say you don't recall a lot of cars at all, eastbound and westbound, not many cars?

A   The direction that I'm going, I don't recall a lot of cars.

Q   And do you have any recollection of the eastbound?

A   No.

Q   Was that light traffic also to your recollection?

A   I have no recollection of that.

**White, Michael (Pages 73:22 to 74:23), Ex. 8.**

102.   After the first Taser burst, Jason Moore never got back onto his feet.

   Q   I mean, the report doesn't indicate that he ever got back up on his feet, does it?
   A   He never got back to his feet.  He was onto his knees both times when I administered the other bursts.
   **Kaminski, Brian (Page 112:21 to 112:25), Ex. 3.**

103.   Officer Kaminski understands that a person under load often cannot hear

commands they are given.

   Q   Okay.  And do you understand that a person under load often cannot hear commands while they're under load?
   A   Correct.
   **Kaminski, Brian (Page 118:15 to 118:18), Ex. 3.**

104.   Officer Kaminski was trained to know that a person under load often cannot hear

commands while they are under load.

   Q   (By Mr. Floyd) Are you guessing about that or have you been trained on that?
   A   That they sometimes do not respond?
   Q   Yes.
   A   Yes, I've been trained on that.
   **Kaminski, Brian (Page 119:1 to 119:5), Ex. 3.**

105.   Officer Kaminski was trained to know that a person given a command while

under load may not comply because they did not or could not comprehend the command, and

therefore commands under load are not reliable in making a submission recognition assessment.

   Q   And does the training also suggest that commands under load aren't reliable in making a submission recognition assessment?
   A   Yes.
   Q   So what I mean by that is if you give a command while someone is under load and they don't comply, it may very well be because they didn't comprehend the command because they were under load and couldn't comprehend it.  Do you understand that?
    MR. PLUNKERT:  Lack of foundation.  Calls for speculation.  You may answer.
   A   Yes, sir.
   Q   (By Mr. Floyd) You do understand that.  And what I'm stating is what you understand the training to dictate, correct?
   A   Correct.

**Kaminski, Brian (Page 119:6 to 119:21), Ex. 3.**

106.     Officer Kaminski was trained to know that a command given to a person under

load may not be effective because the charge affects the sensory function and nervous system of

the subject and therefore the subject sometimes cannot hear what is being said while under load.

> Q   (By Mr. Floyd) Did they tell you, did any of the training instructors or anyone
> tell you why a command while someone is under load isn't effective or might not
> be comprehended?
> A   Because a lot of times they cannot physically do the commands that you're
> stating.
> Q   Do they sometimes have trouble since it affects their sensory function and
> their nervous system that the subject sometimes can't hear what's being said while
> he is being Tased?
> MR. PLUNKERT:  Object to foundation.  You may answer.
> A   I believe so, yes.
> **Kaminski, Brian (Pages 119:23 to 120:10), Ex. 3.**

107.     Ferguson's Chief Taser Officer, Jon Brannan, testified that a person under a Taser

application by an X26 is less able to follow commands.

> Q   So when a person is under a Taser application by an X26, they are less able to
> follow commands; correct?
> A   That is correct, provided you have a good circuit and good contact.
> Q   Okay.  And good circuit and good contact, you would assume that is occurring
> on a person who is naked and they have a dart in their chest area and one in their
> grown, they have sufficient spread?
> MS. SHAFAIE:  Foundation.  Answer.
> A   Yes, sir.
> Q    (By Mr. Dowd) And you said you have personal experience, and I understood
> your comment to be referring to being unable to follow commands?
> A   I have been Tased before during my instructor certification and, yes, during
> the application of the five second cycle, you are not able to virtually do anything.
> **Brannan, Jon (Page 82:3 to 82:20), Ex. 7.**

108.     Officer Kaminski gave Jason Moore commands under load and also gave him two

commands after the load was finished.  Although he did not state it in his report, Officer

Kaminski testified that he got up to the level of his knees.

Q   And you indicated that during this period, that you gave commands to Mr. Moore, correct?
A   Correct.
Q   You gave him commands while he was under load?
A   Correct.
Q   And you gave him commands when the load was finished?
A   Correct.
Q   And you previously indicated that you gave him a couple of commands after the load was finished, correct?
A   I would say probably two, yes.
Q   Okay.  And then he started to get back up, correct?
A   Correct.
Q   And although it doesn't state it in the report, you indicated that he got up to the level of his knees, correct?
A   Correct.
Q   And then you Tased him again?
A   Yes, sir.
Q   Is that correct?
A   Yes, sir.
**Kaminski, Brian (Pages 116:8 to 117:6), Ex. 3.**

109.    Officer Kaminski tased Jason Moore for five (5) seconds on the first Taser

discharge and Mr. Moore tried to get up after the first Taser discharge cycle ended.

Q   And then what happened?
A   After the five seconds was up, he started to try and pull himself up off the ground, which I requested him to stay down a few times, and he refused.  And once he got up to his knees, I administered the second.
Q   And what's a few times?  Is that three times?
A   Two to three times.
Q   So two to three times once he's -- this is after of the load had discharged, correct?
A   Correct.
Q   So after the five-second load two to three times, he -- let me go through the sequence.  After the five-second load, he tried to get up, correct?
A   Correct.
**Kaminski, Brian (Pages 56:20 to 57:10), Ex. 3.**

110.    Officer Kaminski claims that he gave two separate instructions to Jason Moore to

stay on the ground after Officer Kaminski had finished the first five (5) second Taser discharge.

Q   Did you give two warnings after the Taser quit cycling to stay down?
A   If I can remember right, yes.
Q   Do you remember what your words were, what you said to him?

A   Stay down on the ground.
Q   Is that documented in your report?
A   It's in there, "I clearly shouted get on the ground."
**Kaminski, Brian (Pages 57:20 to 58:3), Ex. 3.**

111.   Officer Kaminski's report claims that Officer Kaminski finished the initial five (5)

second Taser discharge, then Jason Moore attempted to get back on his feet, then Officer

Kaminski noticed him attempting to get back on his feet, then Officer Kaminski twice instructed

Mr. Moore to "get back on the ground" before initiating the second Taser discharge.

Q   And if I understand the report, unless I'm reading it wrong, it says, "After the
five-second burst, Jason attempted to get back onto his feet. Once I noticed Jason
attempt to get back on his feet, I clearly shouted get back on the ground."  So
would that have been when the warnings were issued after the load had
discharged?
A   That one, yes.
**Kaminski, Brian (Page 58:9 to 58:16), Ex. 3.**

112.   Officer Kaminski claims that after the initial Taser discharge, Jason Moore went

from lying prone on his stomach to getting up on his knees and trying to get to his feet, all while

not following multiple verbal commands from Officer Kaminski, before Officer Kaminski

unloaded the second Taser discharge.  Officer Kaminski asserts that this entire interaction took

between one (1) and two (2) seconds.

Q   (By Mr. Floyd) What happened after that, after he started to get back up and
you gave him the two commands and he -- what happened after that?
MR. PLUNKERT:  Object to the form.
A   He was -- he was up almost on his knees trying to get up with -- and not doing
the verbal commands.  I then administered a second burst of the Taser.
Q   (By Mr. Floyd) How long did it take him to get from the position on his
stomach to where he's almost up on his knees?
A   Within seconds.
**Kaminski, Brian (Page 59:5 to 59:16), Ex. 3.**

Q   (By Mr. Floyd) Seconds?  Within two or three seconds?
MR. PLUNKERT:  Same objection.
A   I would say probably one to two seconds, yes.
Q   (By Mr. Floyd) And then what did do you?
A   That's when I administered the second burst.

**Kaminski, Brian (Pages 59:22 to 60:3), Ex. 3.**

113.     Defendants' expert, Steven Ijames that, regarding the gap between the first and

second Taser shock, "the TASER computer actually rounds depending on where in the cycle, so

it could be up or down, but I'll say the first one was a second or less.  Basically, a release and a

re-application almost instantly."

> Q        How much time elapsed between the various uses of the TASER ECW by
> Officer Kaminski?
> A        A second on the final three.  The first one, the TASER computer actually
> rounds depending on where in the cycle, so it could be up or down, but I'll say the
> first one was a second or less.  Basically, a release and a re-application almost
> instantly.
> Q        And the evidence provided through the testimony of Officer Kaminski is
> that in between the applications or deployments of the TASER ECW in this case,
> what conduct was Officer Kaminski engaging in between the uses or the cycles of
> the TASER ECW.
> A        He testified that he was giving commands to stay down during the cycles
> and continuing between the cycles.
> Q        Each use of force exercised by Officer Kaminski required a separate threat
> assessment, true?
> A        I believe so.
> Q        The proper procedure is to give time for the person to hear the commands,
> correct?
> A        That's the preferred procedure, yes, sir.
> Q        Give him specific directions for submission?
> A        Correct.
> Q        And give him specific directions for what they're supposed to do?
> A        If it's practical to do that, yes, sir.
> Q        Applying that to the facts at hand, that would be to get on your stomach,
> put your hands behind your back and then ideally Officer Kaminski could safely
> move forward to cuff the suspect?
> A        In a perfect world, yes, sir.
> **Ijames, Steven (Page 86:1 to 87:8), Ex. 11.**

114.     Officer Kaminski knew that Jason Moore would be disoriented and have

involuntary muscle contractions after being tased, but still unreasonably tased Jason Moore

without taking the adequate amount of time to determine if Mr. Moore would comply.  Dr.

Martinelli testified that:

A.	Officer Kaminski also acknowledges that he's been trained as a TASER instructor, and so in the instructor's book TASER has warnings in the book that says you need to remember that when you have a person under the influence of a TASER, we refer that to load, electronic energy going in the body is referred to as load, that the persons might be disoriented or might even have involuntary muscle contractions.

Having been tased at least 20 times myself, several times by the probe, and it's not pleasant, I know that disorientation is -- is certainly one of the things that you're going to feel besides extreme pain.

So all of that put together, I don't believe that there was sufficient assessment time for Officer Kaminski to make a decision as to whether Mr. Moore was going to be assaultive towards him, or that another officer or officers coming onto the scene couldn't attempt to restrain him physically and handcuff him.

**Martinelli, Ron (Pages 107:13 to 108:6), Ex. 9.**

115.	Dr. Martinelli testified that Officer Kaminski's testimony regarding the events is improbable because Jason Moore could have recovered from the neuromuscular incapacitation and disorientation of his tasing to have attempted to get back up one second after the first taser charge was completed.  Dr. Martinelli testified that:

A	It's more like whether it's probable that someone that just got disoriented by a TASER, had suffered neuromuscular incapacitation, as I said I have many times, and then attempted to get up, recovered from that and attempted to get back up.  I find that whereas anything is possible, to me it's not probable.

**Martinelli, Ron (Page 113:3 to 113:9), Ex. 9.**

116.	In the Use of Force Memorandum prepared the same day as the Tasing, Officer Kaminski states only that "during the second and third tasing, I clearly shouted several times for Jason to lie on the ground[.]"  **Ex. 2**.

117.	While Officer Kaminski now states that Jason Moore was on his knees when Officer Kaminski administered the second and third Taser bursts, Officer Kaminski's Police Report never states Mr. Moore was on his knees and only states Mr. Moore attempted to get back up onto his feet.

Q	I mean, the report doesn't indicate that he ever got back up on his feet, does it?

A  He never got back to his feet.  He was onto his knees both times when I administered the other bursts.

Q  Is there anywhere in your report that indicates that he was on his knees?

A  No.  It just states that he attempted to get back up onto his feet.

**Kaminski, Brian (Pages 112:21 to 113:4), Ex. 3.**

118.  The second load Officer Kaminski delivered was five seconds long, supplied

50,000 volts of electricity and caused Jason Moore to undergo muscle contractions and straighten

out.

Q  What did you do when -- what did Jason do when you delivered the second load?

A  He was on his knees.  When I delivered the second load, he straighted out, was muscular, you know.

Q  Muscular contractions?

A  Yeah.  The contractions straightened him out and he fell forward again.

Q  And these were five-second loads?

A  Yes, sir.

Q  50,000 volts?

A  Yes, sir.

**Kaminski, Brian (Pages 122:18 to 123:4), Ex. 3.**

119.  Officer Kaminski states that after the second five-second Taser burst he again

gave Jason Moore commands to stay on the ground, then Mr. Moore attempted to get up so

Officer Kaminski discharged a third Taser burst.

Q  Okay.  And then -- and I'm going to -- I just want to kind of get some of the general details at this point, but then what happened after that? Did he -- did he comply?

A  No.

Q  What did you do then?

A  After the five-second, the second five-second burst still giving him the commands to stay on the ground, he was still attempting to get up; so I administered the third.

**Kaminski, Brian (Pages 60:18 to 61:2), Ex. 3.**

120.  Officer Kaminski claims that he gave Jason Moore commands to stay on the

ground throughout all of the Tasings, and specifically that he gave Mr. Moore approximately two

commands to stay on the ground after administering the second Taser discharge and before

administering the third Taser discharge.

> Q   And when did you -- did you give him a warning to stay down?
> A   Yeah.
> Q   How many warnings did you give him?
> A   Between the second and third time?  I mean, throughout the whole course, he was getting commands to stay on the ground throughout the whole time.
> Q   Okay.
> A   While he was being Tased and while it wasn't in effect.
> Q   And so in between the first and second Tase, you gave him a couple of warnings.  And then in between the second and third Tase, how many warnings did you give him?
> A   Approximately probably the same.  Two.
> Q   And then you gave him the third Tase?
> A   Correct.
> **Kaminski, Brian (Page 61:3 to 61:19), Ex. 3.**

121.   The TASER download shows that there was only one second between the second

and third tasings.  Dr. Martinelli testified:

> Q    And do you believe that on the time element here that -- How many seconds were in between the second and third tasing in your opinion?
> A    Well, don't forget that for sequence 0949, which is at 653, 22, and cycle number 950, which is the third tasing at 663 -- I'm sorry.  It should be 53, 28, you'll see that there is a six second gap of time between those two tasings, but you'll notice that the second TASER cycle at 949 says that that tasing took five seconds. So if you take the 22 and you add five seconds to it, and you get 27, you'll see that there is a one second gap between the second and third tasing.  So that's -- That's another second.
> **Martinelli, Ron (Page 115:9 to 115:22), Ex. 9.**

122.   Dr. Martinelli testified that there was only one second between the second and

third tasings:

> Q    And so in your opinion there was one second between the second and third tasing?
> A    Yes, sir, I do.
> **Martinelli, Ron (Page 116:4 to 116:6), Ex. 9.**

123.    Dr. Martinelli testified that Jason Moore probably did not have enough time to get

up between the tasings as reported by the TASER download because he was disoriented, laying

down and experiencing a psycho-medical emergency.  Dr. Martinelli testified:

> Q    And, again, it's possible that that was enough time for Jason Moore to try and
> get up; right?
> A    I would say that, again, where -- Where anything is possible, it's more what it
> -- what would be probable after now having a person that's been say -- that's been
> tased twice who is experiencing a psycho-medical emergency or they're already
> disoriented, now being additionally disoriented by the introduction of load into
> their body and getting from a laying down position to more of an upwards
> position.
> **Martinelli, Ron (Page 116:7 to 116:17), Ex. 9.**

124.    Defendants' medical expert, Dr. Graham, agreed that there was not sufficient time

for Kaminski to give multiple verbal warnings after he ended the tase and for Jason to begin to

get up before being tased the third time:

> Q    I did ask him and that's why I'm asking you. Because what he told me in his
> deposition is that I gave Mr. Moore multiple verbal warnings after I ended the
> tase.  I gave him multiple warnings to stay down, you're going to be tased.  Stay
> down or you're going to be tased.  He said, Mr. Moore began to get up and that's
> when I tased him again. And I'm suggesting that, based upon this TASER
> download, I don't believe there was enough time for any of that that happened.
> Do you agree?
> MS. SHAFAIE:  Form.
> A    He had -- while he could have been giving him orders while he was under
> load.
> Q    He said they weren't under load, while he was not under load.
> MS. SHAFAIE:  Form, foundation.
> A    In that case I agree with you.
> **Graham, M.D., Michael (Page 75:4 to 75:21), Ex. 17.**

125.    Lieutenant Ballard testified that only allowing one second or less than one second

between Taser applications would not be sufficient for Jason Moore to comply or for Officer

Kaminski to make a submission assessment.

> Q    Would you think that under the scenario I just described it's the basis of your
> opinion that if less than one second between one of the taser applications would

be sufficient for the gentleman to comply or for Officer Kaminski to make a submission assessment?

MS. SHAFAIE: Form and foundation. You may answer.

A   I don't think one second would be enough.

**Ballard, William, 9-25-15 (Pages 182:22 to 183:5), Ex. 10.**

…

Q   Yes, it was. So same question, but less than one second would not be enough either, correct?

MS. SHAFAIE: Same objection. You may not answer.

A   That's correct, less than a second wouldn't be enough.

**Ballard, William, 9-25-15 (Page 183:8 to 183:13), Ex. 10.**

126.   Plaintiffs' expert Ron Martinelli, testified that Jason Moore laying on the left side of his body after the second taser discharge:

A   With regards to, you know, what was his positioning at that time. Officer Kaminski, on his deposition page 60, lines 7 and 8 states that Moore was kind of doggy or dog style on his knees and hands. And we find out later that that position that he's describing is more like on his left side. So he's been tased a second time and he's kind of propping himself, you know, up where his -- I believe his hand is up. He's kind of over on the left side of his body and maybe trying to raise himself up, but he's not -- he's not up, and he's certainly not on his knees.

**Martinelli, Ron (Pages 116:22 to 117:9), Ex. 9.**

127.   Officer Kaminski testified that during the third shock Jason Moore's body was again contracting, vibrating and shaking. **Kaminski, Brian (Page 127:23 to 127:25), Ex. 3.**

128.   Plaintiff's expert Dr. Martinelli has testified that the additional fourth Taser shock, given after Officer White had arrived at the scene and was able to assist, and particularly given the lack of significant resistance from Jason, was unreasonable because there is no evidence that Mr. Moore acted in a violent manner, stating that there was "no biting, no spitting, no hitting, no kicking, no radical or dynamic movement on the part of the -- Mr. Moore."

Q   But you still believe it's unreasonable?

A   Yes, I think any activation of a TASER when a person at that point is -- been restrained with handcuffs, and you have two people on the scene, which we would now refer to as a disparity of force, in other words, two officers against one person. One officer has the opportunity to both introduce electronic energy back into that person and/or goes hands-on.

The second officer, which would be Officer White, has already gone hands-on with Mr. Moore. Mr. Moore is in a prone position, which means that he's on his stomach. He's -- He's restrained with his hands behind his back.

I have no evidence from either officer of Mr. Moore acting in a violent manner. I've got no biting, no spitting, no hitting, no kicking, no radical or dynamic movement on the part of the -- Mr. Moore, and yet I have a TASER being activated for a fourth time, which is contrary to the guidelines that officers would apply intermediate force.

**Martinelli, Ron (Pages 118:14 to 119:9), Ex. 9.**

129. Officer Kaminski testified that Officer White handcuffed Mr. Moore during the third Taser discharge:

> Q  And what happened after the third Tase?
> A  After the third Tase, Officer White was able to come over to me and was able to handcuff Mr. Moore while the Tasing or while the third burst was being administered.
> **Kaminski, Brian (Pages 61:25 to 62:4), Ex. 3.**
> ….
> Q  And during that five-second load, is that when, around that time is that when Officer White came up?
> A  Correct. Around that time.
> Q  And cuffed him?
> A  Correct.
> **Kaminski, Brian (Page 128:1 to 128:6), Ex. 3.**

130. Defendants' expert, Steven Ijames believes that the download data is the most accurate record of what occurred:

> Q  Officer Kaminski wrote in his use of force report that he used this device on Mr. Moore three times?
> A  That was his understanding, yes, sir.
> Q  After having the benefit of the download data, we know that that's not accurate, correct?
> A  Yes, sir. I believe the download data is the most accurate record of what occurred.
> Q  And the download data indicates that there were four cycles used on Mr. Moore, correct?
> A  Correct.
> **Ijames, Steven (Page 93:3 to 93:13), Ex. 11.**

131. Cuculich, M.D., a board-certified Washington University cardiac electrophysiologist, has testified that the third and fourth applications of the TASER more likely

than not caused or contributed to Mr. Moore's death. **Cuculich, Phi1 M.D. (Page 48:17 to 48:23), Ex. 18.**

132.     Officer Kaminski knew from his Taser Training that with each of the Taser loads he delivered to Jason Moore, Mr. Moore's risk of injury or death increased. **Kaminski, Brian (Page 131:7 to 131:12), Ex. 3.**

133.     Officer Kaminski was trained to know that "CEW exposure in the chest area near the heart has a low probability of including extra heart beats (cardiac capture). In rare circumstances, cardiac capture could lead to cardiac arrest. When possible, avoid targeting the frontal chest area near the heart to reduce the risk of potential serious injury or death." **Kaminski, Brian (Page 73:7 to 73:15), Ex. 3.**

134.     Officer Kaminski was trained to know that "cardiac capture may be more likely... in thin adults." **Kaminski, Brian (Page 73:16 to 73:19), Ex. 3.**

135.     Officer Kaminski was trained to know that the cumulative effect of CEW exposure include psychological and metabolic changes, stress and pain. **Kaminski, Brian (Page 69:13 to 69:19), Ex. 3.**

136.     Officer Kaminski was trained to know that the cumulative effect of CEW exposure increases a person's risk of death or serious injury. **Kaminski, Brian (Page 69:20 to 69:23), Ex. 3.**

137.     Defendants' expert, Steven Ijames testified that, as a Taser instructor, Officer Kaminski would have been trained on TASER's Version 17 which states that officers are not authorized to use Tasers to gain compliance when there is no imminent physical threat. **Ijames, Steven (Pages 65:9 to 66:23), Ex. 11; Ex. 22.**

138.     Defendants' expert, Steven Ijames agrees that a TASER should not be used on an individual displaying passive resistance, meaning you don't cooperate, you don't physically try to hurt the officer or assault the officer.

> Q       You agree that a TASER should not be used on an individual displaying passive resistance?
> A       I do agree with that.
> Q       Passive resistance meaning non-compliance that doesn't help or hurt the officer's efforts.
> A       That sounds very familiar language.
> Q       It should be.  Passive resistance meaning you don't cooperate, you don't physically try to hurt the officer or assault the officer?
> A       I agree, sir.
> Q       That's passive resistance.
> A       I agree.
> Q       Another definition is you don't do what you're told to do?
> A       Yeah, I agree.
> Q       And agencies you have worked with believe that, that a TASER should not be used on passive resisters.  This goes back to 2001 or 2002in your experience?
> A       Well, there was a big transition.  Certainly I've advocated that forever, but in the early 2000's, agencies that were advocating policy and training on passive, thankfully began to transition away from that.
> **Ijames, Steven (Page 81:14 to 82:13), Ex. 11.**

139.     Captain Henke testified that "There would have had to be a great deal of explanation given" if 21 seconds of Taser load were given without a proper assessment of the risk.

> Q.   But assuming those facts to be true without admitting them, if someone were to be tased, go down on the initial tase and be tased continuously for 21 seconds, approximately, without any interval for a threat assessment, a change in the threat assessment, or compliance assessment, you would agree that in most situations, that would be, that force, that amount of force would be unjustified?
> MS. SHAFAIE:   Same objections.  You can answer.
> A.   It's hard to put a number on it, but therewould certainly be a reason to wonder why, in fact,that had to happen.  There would have had to be agreat deal of explanation given as to why 21 seconds' interval was given.
> BY MR. DOWD:
> Q.   A 21-second application of taser electricity?
> A.   Right.  Correct.

Q.   Without those gaps sufficient for the officer to make those assessments of compliance and changes in the risk assessment?
MS. SHAFAIE:  Same objections.
BY MR. DOWD:
Q.   (Continuing)  Threat assessment?
MS. SHAFAIE:  Same objection.
A.   I would agree.
**Henke, Richard (Pages 32:18 to 33:19), Ex. 12.**

140.     Officer Kaminski agrees that issuing back-to-back-to-back Taser loads on a

subject without performing a submission recognition assessment is inappropriate.

Q   So this document, Exhibit Number 18, would
suggest that Mr. Moore was Tased four times,
five-second bursts of 50,000 volts and that there's
only a one-second gap between the first Tase. And
the last three Tases came consecutively without any
time for you to do a submission recognition
assessment. Would you agree?
**A** I agree that's what it shows, yes.
Do you agree that issuing back-to-back-to-back Taser loads on a subject without
performing an appropriate submission recognition assessment is  inappropriate?
A   I would agree, yeah.
**Kaminski, Brian (Page 138:8 to 138:12), Ex. 3.**

141.     Officer Kaminski was a certified Taser instructor at the time the incident with

Jason Moore. **Kaminski, Brian (Page 74:1 to 74:12), Ex. 3.**

142.     Officer Kaminski was trained to know that individuals particularly susceptible to

the effects of CEW use include "people suffering from excited delirium, profound agitation."

**Kaminski, Brian (Page 71:4 to 71:7), Ex. 3.**

143.     Officer Kaminski agrees that, no matter what the circumstances, officers should

use the minimum number of loads to accomplish the officer's lawful objectives.  **Kaminski,**

**Brian (Page 75:2 to 75:8), Ex. 3.**

144.     In his precontact threat assessment of Jason Moore, Officer Kaminski determined

that Mr. Moore did not have any weapons and Officer Kaminski knew that other officers had

been dispatched.

> Q   Well, tell me about that.  What was your threat?  What was your precontact,
> well, precontact threat assessment?  Let's make sure we're on the same terms here.
> Do you know what a precontact threat assessment is?
> A   Yeah.  Before I made any kind of contact with him.
> Q   Is that something you're required to do?
> A   Yes.
> Q   And what would have been the things that you went through on your
> precontact threat assessment?
> A   Weapons.
> Q   He had none?
> A   He had none.  Stature to where, you know, body language, and verbal
> language.
> Q   And you knew that other officers had been dispatched, correct?
> A   Correct.
> **Kaminski, Brian (Page 101:2 to 101:19), Ex. 3.**

145.     Officer Kaminski only received information from dispatch about the occurrence

before arriving on the scene.

> Q   The information that you were provided that dispatched you to Henquin and
> Airport, is all of the information that you recall receiving from dispatch about this
> occurrence listed in your reports?
> A   I believe so.  I'll take a look at it again.
> Q   Feel free to do so.
> A   I believe it is, yes.
> Q   Those are all the words you recall hearing?
> A   Yes.
> **Kaminski, Brian (Page 145:16 to 145:24), Ex. 3.**

146.     Officer Kaminski had no information of Jason Moore striking people, Jason

Moore never struck Officer Kaminski, and he did not strike anybody else that day.

**Kaminski, Brian (Page 147:17 to 148:1), Ex. 3.**

147. Officer Kaminski received no report about Jason Moore breaking any property and Jason Moore did not break anything in Officer Kaminski's presence. **Kaminski, Brian (Page 148:2 to 148:7), Ex. 3.**

148. When Officer Kaminski arrived on the scene he encountered a lady in a white Pontiac who described seeing Jason Moore. The witness was not frightened.

> Q When you arrived to the scene and you encountered the lady that you set forth in your report who gave you another description of what had happened -- and feel free to look at that as well, sir.
> A Let me take a look at that.
> Q I think it's by Abson Road. Abston. I'm sorry.
> A Yeah. The lady in the white Pontiac, yes.
> Q The lady in the white Pontiac, the words that she gave you about this occurrence, are those all the words that you remember this lady telling you about the occurrences that are set forth in your report?
> A Yeah. Pretty much.
> Q Do you recall this lady's demeanor when she was providing you that information?
> A She was excited.
> Q Was she frightened?
> A I wouldn't say frightened, no.
> **Kaminski, Brian (Pages 146:7 to 147:1), Ex. 3.**

149. Officer Kaminski testified that he did not check for any warrants before he arrived on the scene. **Kaminski, Brian (Page 173:16 to 173:18), Ex. 3.**

150. Dr. Martinelli cross referenced Officers Kaminski and White's statements with the TASER download:

> Q Okay. And you rely upon that in rendering your opinions, don't you?
> A I relied on everything to render my opinions. Mr. -- I'm sorry, Officer Kaminski's statements and Officer White's statements in concert with the TASER download.
> **Martinelli, Ron (Page 101:15 to 101:20), Ex. 9.**

151. The Ferguson Police Department was in possession of the Taser Officer Kaminski used and had personnel capable of downloading the data, but the download was never performed.

Defendants' Chief Taser Officer testified that "we could have, but did not." **Brannan, Jon**

**(Pages 56:8 to 59:7), Ex. 7.**

152.     Chief Jackson testified that no member of the Ferguson Police Department was

disciplined as a result of the death of Jason Moore.

> Q    Was any member of the Ferguson Police Department disciplined as it relates
> to the incident involving Mr. Moore?
> A    Not that I'm aware of.
> **Jackson, Thomas (Page 180:3 to 180:8), Ex. 4.**

153.     On March 4, 2015, the United States Department of Justice released a report,

attached as Exhibit 13, detailing its findings arising from an investigation of the Ferguson Police

Department (henceforth the "Department of Justice Report").  The Department of Justice Report

reflects the Department of Justice's findings regarding certain policies, patterns and practices of

the Ferguson Police Department. **Ex. 13.**

154.     Over the course of the Department of Justice investigation, the Department

interviewed City officials, including the City Manager, Mayor, Chief of Police, a municipal

judge, the municipal court clerk, half of the Ferguson Police Department's sworn officers, and

others. **Ex. 13, p. 1**.

155.     The Department of Justice spent, collectively, approximately 100 person-days

onsite in Ferguson. Department officials participated in ride-alongs with on-duty officers,

reviewed over 35,000 pages of police records as well as thousands of emails and other electronic

materials provided by the police department. **Ex. 13, p. 1.**

156.     The Department of Justice made the following finding in its Report:

> "Even when force is reported, the force review process falls so short of FPD's
> policy requirements that it is ineffective at improving officer safety or ensuring
> that force is used properly. First, and most significantly, supervisors almost never
> actually investigate force incidents. In almost every case, supervisors appear to
> view force investigations as a ministerial task, merely summarizing the involved

officers' version of events and sometimes relying on the officers' offense report alone. The supervisory review starts and ends with the presumption that the officer's version of events is truthful and that the force was reasonable. As a consequence, though contrary to policy, supervisors almost never interview non-police witnesses, such as the arrestee or any independent witnesses. They do not review critical evidence even when it is readily available."
**Ex. 13, p. 39.**

157.　　The Department of Justice Report found that the Ferguson Police Department "Engages in a Pattern of Excessive Force in Violation of the Fourth Amendment." **Ex. 13, p. 28.**

158.　　The Department of Justice found that "[m]any [Ferguson Police Department] officers are quick to escalate encounters with subjects they perceive to be disobeying their orders and resisting arrest." **Ex. 13, p. 28.**

159.　　The Department of Justice found that many Ferguson Police Department Officers "have come to rely on ECWs, specifically Tasers, where less force - or no force at all - would do." **Ex. 13, p. 28.**

160.　　The Department of Justice found that the Ferguson Police Department's use of "force is routinely unreasonable and sometimes clearly punitive." **Ex. 13, p. 28.**

161.　　The Department of Justice found that the Ferguson Police Department's "Use of Electronic Control Weapons Is Unreasonable." **Ex. 13, p. 29.**

162.　　The Department of Justice found that a "dimension of FPD's pattern of unreasonable force is FPD's overreliance on force when interacting with more vulnerable populations, such as people with mental health conditions or intellectual disabilities and juvenile students." **Ex. 13, p. 35.**

163.　　The Department of Justice found that Ferguson Police Department "officers do not adequately consider the mental health or cognitive disability of those they suspect of wrongdoing when deciding whether to use force." **Ex. 13, p. 36.**

164.    The Department of Justice found that the Ferguson Police Department has demonstrated "a pattern of insufficient sensitivity to, and training about, the limitations of those with mental health conditions or intellectual disabilities." **Ex. 13, p. 37.**

165.    The Department of Justice found that the Ferguson Police "Officers view mental illness as narcotic intoxication, or worse, willful defiance.  They apply excessive force to such subjects, not accounting for the possibility that the subjects may not understand their commands or be able to comply with them." **Ex. 13, p. 37.**

166.    The Department of Justice found that Ferguson Police Officers "have been insufficiently trained on tactics that would minimize force when dealing with individuals who are in mental health crisis or who have intellectual disabilities." **Ex. 13, p. 37.**

167.    The Department of Justice found that, in August of 2010, a Ferguson Police Department lieutenant used an ECW in drive-stun mode against an African-American woman in Ferguson City Jail because she had refused to remove her bracelets, even though there were five officers present and the woman posed no physical threat. **Ex. 13, p. 29.**

168.    The Department of Justice found that, in August 2010, an officer responded to a call about an African-American man walking onto the highway and lying down on the pavement. Seeing that the man was sweating, acting jittery, and had dilated pupils, the officer believed he was on drugs. The man was cooperative at first but balked, pushing the officer back when the officer tried to handcuff him for safety reasons. The officer struck the man several times with his Asp baton - including once in the head - causing significant bleeding. Two other officers then deployed their ECWs against the man a total of five times.  **Ex. 13, p. 36.**

169.    The Department of Justice found that, in July 2011, a Ferguson correctional officer used an ECW to drive-stun an African-American male inmate three times after he tried to

hang himself with material torn from a medical dressing and banged his head on the cell wall. **Ex. 13, p. 36.**

170.    The Department of Justice found that, in July 2011, a Ferguson correctional officer used an ECW against an African-American inmate with bipolar disorder who broke the overhead glass light fixture and tried to use it to cut his wrists.  According to the correctional officer, the glass was safety glass and could not be used to cut the skin. **Ex. 13, p. 36.**

171.    The Department of Justice made the following finding in its Report:

> "In August 2011, officers used an ECW device against a man with diabetes who bit an EMT's hand without breaking the skin. The man had been having seizures when he did not comply with officer commands." **Ex. 13, p. 36.**

172.    The Department of Justice made the following finding in its Report:

> While Chief Jackson implemented new department policies when he joined FPD in 2010, including on use-of-force reporting and review, these policies are routinely ignored. Under FPD General Order 410.00, when an officer uses or attempts to use any force, a supervisor must respond to the scene to investigate. The supervisor must complete a two-page use-of-force report assessing whether the use of force complied with FPD's force policy. Additional forms are required for ECW uses and vehicle pursuits. According to policy and our interviews with Chief Jackson, a use-of-force packet is assembled—which should include the use-of-force report and supplemental forms, all police reports, any photographs, and any other supporting materials—and forwarded up the chain of command to the Chief. The force reporting and review system is intended to "help identify trends, improve training and officer safety, and provide timely information for the department addressing use-of-force issues with the public." FPD General Order 410.07. The policy even requires that a professional standards officer conduct an annual review of all force incidents. *Id.* These requirements are not adhered to in practice. **Ex. 13, p. 38.**

173.    The Department of Justice made the following finding in its Report:

> Perhaps the greatest deviation from FPD's use-of-force policies is that officers frequently do not report the force they use at all. There are many indications that this underreporting is widespread. First, we located information in FPD's internal affairs files indicating instances of force that were not included in the force files provided by FPD. Second, in reviewing randomly selected reports from FPD's records management system, we found several offense reports that described officers using force with no corresponding use-of-force report. Third, we found

evidence that force had been used but not documented in officers' workers compensation claims. Of the nine cases between 2010 and 2014 in which officers claimed injury sustained from using force on the job, three had no corresponding use-of-force paperwork. Fourth, the set of force investigations provided by FPD contains lengthy gaps, including six stretches of time ranging from two to four months in which no incidents of force are reported. Otherwise, the files typically reflect between two and six force incidents per month. Fifth, we heard from community members about uses of force that do not appear within FPD's records, and we learned of many uses of force that were never officially reported or investigated from reviewing emails between FPD supervisors. Finally, FPD's force files reflect an overrepresentation of ECW uses—a type of force that creates a physical record (a spent ECW cartridge with discharged confetti) and that requires a separate form be filled out. It is much easier for officers to use physical blows and baton strikes without documenting them. Thus, the evidence indicates that a significant amount of force goes unreported within FPD. This in turn raises the possibility that the pattern of unreasonable force is even greater than we found. **Ex. 13, p. 38-39.**

174.    The Department of Justice made the following finding in its Report:

"Second, supervisors either do not understand or choose not to follow FPD's use-of-force policy. As discussed above, in many of the force incidents we reviewed, it is clear from the officers' offense reports that the force used was, at the very least, contrary to FPD policy. Nonetheless, based on records provided by FPD, it appears that first-line supervisors and the command staff found all but one of the 151 incidents we reviewed to be within policy. This includes the instances of unreasonable ECW use discussed above. FPD policy advises that ECWs are to be used to 'overcome active aggression or overt actions of assault.' FPD General Order 499.00. They are to be used to 'avert[] a potentially injurious or dangerous situation,' and never 'punitively or for purposes of coercion.' FPD General Order 499.04. Simply referring back to these policies should have made clear to supervisors that the many uses of ECWs against subjects who were merely argumentative or passively resistant violated policy." **Ex. 13, p. 39-40.**

175.    The Department of Justice made the following finding in its Report:

"It is in part FPD officers' approach to policing that leads them to violate the Constitution and FPD's own policies. Officers across the country encounter drunkenness, passive defiance, and verbal challenges. But in Ferguson, officers have not been trained or incentivized to use de- escalation techniques to avoid or minimize force in these situations. Instead, they respond with impatience, frustration, and disproportionate force. FPD's weak oversight of officer use of force, described in greater detail below, facilitates this abuse. Officers should be required to view the ECW as one tool among many, and 'a weapon of need, not a tool of convenience.' *2011 ECW Guidelines* at 11. Effective policing requires that officers not depend on ECWs, or any type of force, 'at the expense of

diminishing the fundamental skills of communicating with subjects and de-escalating tense encounters.' *Id.* at 12." **Ex. 13, p. 31.**

176. The Department of Justice made the following finding in its Report:

"Indeed, officers' unreasonable ECW use violates FPD's own policies. The department prohibits the use of force unless reasonable alternatives have been exhausted or would clearly be ineffective. FPD General Order 410.01. A separate ECW policy describes the weapon as 'designed to overcome active aggression or overt actions of assault.' FPD General Order 499.00. The policy states that an ECW 'will never be deployed punitively or for purposes of coercion. It is to be used as a way of averting a potentially injurious or dangerous situation.' FPD General Order 499.04. Despite the existence of clearly established Fourth Amendment case law and explicit departmental policies in this area, FPD officers routinely engage in the unreasonable use of ECWs, and supervisors routinely approve their conduct." **Ex. 13, p. 31**

177. Chief Jackson had final authority to exonerate police officers from a complaint of misconduct. **Jackson, Thomas (Page 124:10 to 124:23), Ex. 4.**

178. Chief Jackson testified that he did not recall ever disciplining an officer after reviewing a use of force report form.

Q And do you ever recall, after reviewing a use-of-force report form, where you went back and disciplined the officer involved?
A I don't remember any specific example.
**Jackson, Thomas (Page 254:5 to 254:8), Ex. 4.**

179. Officer Ballard testified that Ferguson determines when and how often Tasers are to be used and that Taser International specifically states that Taser does not recommend or endorse use of force policies in their training.

Q The purpose of the training for use of a Taser is initially to understand how the Taser works?
A That's a portion of the training, yes.
Q It's also when to use it and how to use it?
A It's how to use it, yes. When to use it depends on department use of force policy.
Q Right. So that's -- Ferguson determines when it is to be used and how often it is to be used?
A Yes.
Q Okay. Not Taser International?

A   No.  I believe it specifically says in there they do not recommend nor endorse use of force policies in their training.
**Brannan, Jon (Pages 21:18 to 22:7), Ex. 7.**

180.    Officer Ballard testified that, as a Taser Instructor and a user, Taser specifically states that "Taser does not establish, recommend or endorse any use of force procedures policies or tactics."

Q   If you would go to page 1449 of Exhibit 21. I believe you referred to this earlier and the print is larger as well.
A   Thank you.
Q   That states in slide five, "Taser does not establish, recommend, or endorse any use of force procedures, policies, or tactics."  Did I read that correctly?
A   Yes, sir.
Q   And that's consistent with your understanding and training as an instructor and a user?
A   Yes, sir.
**Brannan, Jon (Pages 32:18 to 33:5), Ex. 7.**

181.    Officer Kaminski's subsequent crisis intervention training taught him to try to calm someone like Jason Moore down, state that he is there to help Mr. Moore, and keep his distance from Mr. Moore.  Officer Kaminski did not have that training at the time and so instead he approached Mr. Moore and ordered Mr. Moore to come towards him.

Q   Would you agree that crisis intervention training that you've subsequently had would suggest that you try to calm someone in his situation and say -- and say something to the tune of I'm not going to hurt you; I'm here to help you; I'm going to keep my distance?  Would you agree with that?
MR. PLUNKERT:  Form and foundation.
A   With the training I've had prior to that, yes.
Q   (By Mr. Floyd) Yes.  But that you didn't have the training at that time, correct?
A   Correct.
Q   And you didn't do those things, correct?
A   Correct.
Q   Instead you walked towards him while he was standing stationary at the time, and you told him to come towards you, correct?
A   Correct.
**Kaminski, Brian (Pages 105:19 to 106:11), Ex. 4.**

182.    The Department of Justice found that, according to Ferguson Police Department Records, in 2013, Ferguson Police Officers stopped a man running with a shopping cart because he seemed suspicious. According to the file, the man was "obviously mentally handicapped." Officers took the man to the ground and attempted to arrest him for Failure to Comply after he refused to submit to a pat-down.  In the officers' view, the man resisted arrest by pulling his arms away. The officers drive-stunned him in the side of the neck. They charged him only with Failure to Comply and Resisting Arrest.  **Ex. 13, p. 36.**

183.    The Department of Justice made the following finding in its Report:

> "[I]n April 2014, an intoxicated jail detainee climbed up on the bars in his cell and refused to get down when ordered to by the arresting officer and the correctional officer on duty.  The correctional officer then fired an ECW at him, from outside the closed cell door, striking the detainee in the chest and causing him to fall to the ground.  In addition to being excessive, this force violated explicit FPD policy that '[p]roper consideration and care should be taken when deploying the X26 TASER on subjects who are in an elevated position or in other circumstance where a fall may cause substantial injury or death.'  FPD General Order 499.04. The reviewing supervisor deemed the use of force within policy." **Ex. 13, p. 40.**

184.    The Department of Justice found that, in November 2013, a Ferguson correctional officer fired an ECW at an African-American woman's chest because she would not follow his verbal commands to walk toward a cell.  **Ex. 13, p. 29.**

185.    The Department of Justice found that, in September 2012, a Ferguson Police officer drive-stunned a handcuffed African-American woman who he had placed in the back of his patrol car but who had stretched out her leg to block him from closing the door.  **Ex. 13, p. 30.**

186.    The Department of Justice found that, in May 2013, Ferguson Police officers drive-stunned a handcuffed African-American man who verbally refused to get out of the back

seat of a police car once it had arrived at the jail, even though the man did not physically resist arrest or attempt to assault the officers. **Ex. 13, p. 30.**

187. The Department of Justice made the following finding in its Report:

"In April 2013, for example, a correctional officer deployed an ECW against an African-American prisoner, delivering a five-second shock, because the man ,had urinated out of his cell onto the jail floor. The correctional officer observed the man on his security camera feed inside the booking office. When the officer came out, some of the urine hit his pant leg and, he said, almost caused him to slip. 'Due to the possibility of contagion,' the correctional officer claimed, he deployed his ECW 'to cease the assault.' The ECW prongs, however, both struck the prisoner in the back. The correctional officer's claim that he deployed the ECW to stop the ongoing threat of urine is not credible, particularly given that the prisoner was in his locked cell with his back to the officer at the time the ECW was deployed. Using less- lethal force to counter urination, especially when done punitively as appears to be the case here, is unreasonable." **Ex. 13, p. 33.**

188. The Department of Justice made the following finding in its Report:

"In January 2013, a patrol sergeant stopped an African-American man after he saw the man talk to an individual in a truck and then walk away. The sergeant detained the man, although he did not articulate any reasonable suspicion that criminal activity was afoot. When the man declined to answer questions or submit to a frisk—which the sergeant sought to execute despite articulating no reason to believe the man was armed—the sergeant grabbed the man by the belt, drew his ECW, and ordered the man to comply. The man crossed his arms and objected that he had not done anything wrong. Video captured by the ECW's built-in camera shows that the man made no aggressive movement toward the officer. The sergeant fired the ECW, applying a five-second cycle of electricity and causing the man to fall to the ground. The sergeant almost immediately applied the ECW again, which he later justified in his report by claiming that the man tried to stand up. The video makes clear, however, that the man never tried to stand—he only writhed in pain on the ground. The video also shows that the sergeant applied the ECW nearly continuously for 20 seconds, longer than represented in his report. The man was charged with Failure to Comply and Resisting Arrest, but no independent criminal violation." **Ex. 13, p. 44.**

189. The Department of Justice made the following finding in its Report:

"In a January 2014 incident, officers attempted to arrest a young African-American man for trespassing on his girlfriend's grandparents' property, even though the man had been invited into the home by the girlfriend. According to officers, he resisted arrest, requiring several officers to subdue him. Seven officers repeatedly struck and used their ECWs against the subject, who was 5'8" and 170

pounds.  The young man suffered head lacerations with significant bleeding." **Ex. 13, p. 34.**

190.    The Department of Justice made the following finding in its Report:

"Even where FPD officers have legal grounds to stop or arrest, however, they frequently take actions that ratchet up tensions and needlessly escalate the situation to the point that they feel force is necessary.  One illustrative instance from October 2012 began as a purported check on a pedestrian's well-being and ended with the man being taken to the ground, drive-stunned twice, and arrested for Manner of Walking in Roadway and Failure to Comply.  In that case, an African-American man was walking after midnight in the outer lane of West Florissant Avenue when an officer asked him to stop. The officer reported that he believed the man might be under the influence of an 'impairing substance.' When the man, who was 5'5" and 135 pounds, kept walking, the officer grabbed his arm; when the man pulled away, the officer forced him to the ground.  Then, for reasons not articulated in the officer's report, the officer decided to handcuff the man, applying his ECW in drive-stun mode twice, reportedly because the man would not provide his hand for cuffing.  The man was arrested but there is no indication in the report that he was in fact impaired or indeed doing anything other than walking down the street when approached by the officer."
**Ex. 13, p. 35.**

191.    Chief Jackson testified that, each time a taser is discharged, the officer should review the circumstances then existing.  **Jackson, Thomas (138:16-139:5), Ex. 4.**

192.    Chief Jackson testified that the taser would not be used on someone passively resistant.  **Jackson, Thomas (136:3-9), Ex. 4.**

193.    Chief Jackson was responsible for establishing policy in the Ferguson Police Department, and did not have to go to the City Manager, City Council or the Mayor to review general orders he issued.  **Jackson, Thomas (33:1-5; 34:10-18; 38:11-14), Ex. 4.** Chief Jackson had general supervision and control of the Ferguson Police Department, including the enforcement of discipline and the instruction of the members in their duties.  Jackson had ultimate authority to train officers.  **Jackson, Thomas (39:23-40:3; 101:15-19), Ex. 4.**

194.    All citizen or peer complaints routed to Jackson.  Chief Jackson had the ultimate discretion to determine whether a citizen complaint was warranted. **Jackson, Thomas (83:25-84:7; 85:18-22), Ex. 4.**

195.    Chief Jackson testified that the FPD had (1) no orders limiting the number of TASER cycles on subjects; (2) no orders on the use of tasers on mentally unstable persons; (3) no orders requiring that each application of the taser should be independently justifiable; and (4) no orders or training regarding in-custody deaths. **Jackson, Thomas (101:23-102:4; 153:5-10; 153:19-4; 156:15-20), Ex. 4.**

196.    Chief Jackson testified that he never issued discipline to officers relating to the use of physical force or the use of a taser.  **Jackson, Thomas (115:4-14), Ex. 4.**

197.    Chief Jackson did not hand out any discipline after the DOJ report was issued. **Jackson, Thomas (198:23-199:2), Ex. 4.**

198.    Officer Kaminski was warned in his yearly Taser training that CEW discharge was so strong it could cause muscle contractions that may result in bone fractures, tears of soft tissue, organ muscle, tendon, ligament, cartilage, discs and nerves and compression fractures in vertebrae.

> Q   (By Mr. Floyd) Take a look at that.  This is the information that your attorneys provided us that came from a Taser training class you took?
> A   Correct.
> Q   Do you see in there this is the "Instructor and User:  Warnings, Risks, Releases & Indemnification Agreement" at the top?  Do you see that?
> A   Yes, sir.
> Q   And if you look down the page where I start the highlight, it says "Safety Information:  CEW Risks, Avoidance."  Do you see that below that warning?
> A   Yes, sir.
> Q   Do you see where it indicates that "Muscle contraction or strain-related injury: CEWs in probe-deployment mode can cause muscle contractions that may result in injury including bone fractures"? Do you see that?
> A   I do see that.

Q   Does it go on to say that it can cause tears of other soft tissue, organ, muscle, tendon, ligament, cartilage, disc, nerve and bone?  Do you see that?
A   I do see that
Q   It can cause fractures to the bone, including compression fractures to vertebrae?
MR. PLUNKERT:  Object to the form and foundation.
Q   (By Mr. Floyd) Do you see that in there, in the report?
A   I do see that.
**Kaminski, Brian (Page 67:6 to 68:12), Ex. 3.**

199.    Officer Kaminski agrees that between each Taser load that is delivered to a subject, the officer should reassess the subject's behavior, reaction and resistance before initiating continued exposure.

Q   And that in between each Tase that's delivered, each load that's delivered to a subject, that the officer should reassess the subject's behavior, reaction and resistance before initiating continued exposure.  Would you agree with that?
A   I agree with that.
**Kaminski, Brian (Page 75:9 to 75:14), Ex. 3.**

200.    Officer Kaminski was trained to know that an unarmed citizen should never be Tased unless they pose a serious threat of injury or death to themselves or another person.

**Kaminski, Brian (Pages 82:23 to 83:2), Ex. 3.**

201.    Defendants' expert, Steven Ijames saw no evidence that, after the first Taser discharge, Jason Moore ever threw any blows, ever raised himself above his hands and knees, ever lunged at Officer Kaminski, or ever clenched his fists.  **Ijames, Steven (Pages 77:24 to 79:1), Ex. 11.**

202.    Steven Ijames testified that the level of resistance required to use an advanced TASER ECW by a Ferguson Police Department officer in September of 2011 needed an overt action of assault.  However, when Officer White said he observed Mr. Moore on his back 5 feet away from Officer Kaminski, Mr. Moore was not actively and overtly assaulting Officer Kaminski.  **Ijames, Steven (Page 83:19 to 84:5), Ex. 11.**

203.     Steven Ijames testified that the justification for the second, third and fourth taser shocks was "refusing orders to stop, getting back up[.]" **Ijames, Steven (Page 98:25 to 99:21), Ex. 11.**

204.     Steven Ijames testified that the Taser X26's internal computer offers a wealth of information for those who care about in-house force accountability and that Taser data should be downloaded by a first line supervisor level immediately following every deployment and at random intervals no longer than 90 days. **Ijames, Steven (Page 90:13 to 90:23), Ex. 11.**

205.     Steven Ijames testified that the fact that situation is rapidly evolving is not an excuse to use unreasonable force. **Ijames, Steven (Page 108:13 to 109:13), Ex. 11.**

206.     After the first taser shock, Jason Moore never raised his torso more than approximately six inches off the ground. **Kaminski, Brian (Page 163:19 to 164:1; 164:2 to 164:12), Ex. 3.**

Respectfully submitted,

DOWD & DOWD, P.C.

By:     /s/ William T. Dowd
     WILLIAM T. DOWD (#39648MO)
     ALEX R. LUMAGHI (#56569MO)
     Attorneys for Plaintiff
     211 North Broadway, Suite 4050
     St. Louis, Missouri   63102
     314/621-2500
     Fax, 314/621-2503
     bill@dowdlaw.net
     alex@dowdlaw.net

     MARK L. FLOYD (# 43643MO)
     THE FLOYD LAW FIRM, P.C.
     Attorneys for Plaintiff
     8151 Clayton Rd., Suite 202
     St. Louis, Missouri   63117
     314/863-4114
     Fax, 314/863-4150

[mark@thefloydlawfirm.com](mailto:mark@thefloydlawfirm.com)

*Attorneys for Plaintiffs Tina Moore and
Estate of Jason Moore*

TODD M. JOHNSON (48824MO)
BATY, HOLM, NUMRICH & OTTO P.C.
4600 Madison Avenue, Suite 210
Kansas City, MO 64112-3012
tjohnson@batyholm.com
Telephone:    816-531-7200
Telecopy:     816-531-7201

*Attorneys For Plaintiffs
Delores Moore And Renee Rodgers,
As Next Friend Of A.D.R, A Minor*

## CERTIFICATE OF SERVICE

 The undersigned hereby certifies that a copy of the above pleading was served via the Court's electronic filing system this 1st day of June, 2016 to all counsel of record.


    /s/ William T. Dowd