# Case: Tina Moore, et al.  v. Brian Kaminski, et al.

### 4:14-CV1443 SNLJ

# Transcript of: Thomas Jackson

## **Date:** September 18, 2015

This transcript is printed on 100% recycled paper



515 Olive Street, Suite 300
St. Louis, MO  63101
(314) 241-6750
1-800-878-6750
Fax: (314) 241-5070
Email: schedule@goreperry.com
Internet: <<<www.goreperry.com>>>



**EXHIBIT**

4

**1**

TINA MOORE, Individually and as Personal
Representative of the ESTATE OF JASON
MOORE, DELORES MOORE, and
RENEE ROGERS, as Next Friend for
A.D.R., a Minor,

                    PLAINTIFF(s),

vs.

BRIAN KAMINSKI, ET AL.,

                    DEFENDANT(s).

VIDEOTAPED DEPOSITION OF THOMAS JACKSON
SEPTEMBER 18, 2015

**2**

```
 1             UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF MISSOURI
 3                   EASTERN DIVISION
 4
 5 TINA MOORE, Individually and as Personal
 6 Representative of the ESTATE OF JASON
 7 MOORE, DELORES MOORE, and
 8 RENEE ROGERS, as Next Friend for
 9 A.D.R., a Minor,
10
11            PLAINTIFF(s),
12
13 vs.                      Case Nos. 4:14-CV1443 SNLJ
14                                    4:14-CV1447 SNLJ
15 BRIAN KAMINSKI, ET AL.,           (Consolidated)
16
17            DEFENDANT(s).
18
19
20
21
22
23 //
24 //
25
```

**3**

```
 1      VIDEOTAPED DEPOSITION OF THOMAS JACKSON, taken
 2 on behalf of the Plaintiffs, at the offices of
 3 Pitzer Snodgrass, P.C., 100 South 4th Street,
 4 Suite 400, in the City of St. Louis, State of
 5 Missouri, between the hours of 9:00 a.m. and
 6 2:55 p.m., on the 18th day of September, 2015,
 7 before Nancy N. Abdallah, RPR, MO-CCR #888, and
 8 Notary Public.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1 APPEARANCES OF COUNSEL:
 2
 3 FOR THE PLAINTIFF DELORES MOORE AND RENEE ROGERS, AS
 4 NEXT FRIEND OF A.D.R., A MINOR:
 5 Todd M. Johnson, Esq.
 6 Baty, Holm, Numrich & Otto, P.C.
 7 4600 Madison Avenue, Suite 210
 8 Kansas City, MO  64122
 9 816.531.7200
10 tjohnson@batholm.com
11
12 FOR THE PLAINTIFF TINA MOORE:
13 William T. Dowd, Esq.
14 Dowd & Dowd, P.C.
15 211 North Broadway, Suite 4050
16 St. Louis, MO  63102
17 314.621.2500
18 bill@dowdlaw.net
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

**5**

1   APPEARANCES OF COUNSEL:  (CONTINUED)
2
3   FOR THE DEFENDANT(s):
4   Robert T. Plunkert, Esq.
5   Ida S. Shafaie, Esq.
6   Pitzer Snodgrass, P.C.
7   100 South 4th Street, Suite 400
8   St. Louis, MO  63102
9   314.421.5545
10   plunkert@pspclaw.com
11   shafaie@pspclaw.com
12
13   THE VIDEOGRAPHER:
14   Mr. Tom Nickeson
15
16
17
18
19
20
21
22
23
24
25

**6**

1                    INDEX
2                                    PAGE
3   Examination by Mr. Johnson           7
4   Examination by Mr. Plunkert        206
5   Examination by Mr. Johnson         207
6   Examination by Mr. Dowd            207
7   Examination by Mr. Plunkert        241
8   Examination by Mr. Dowd            244
9   Examination by Mr. Johnson         250
10   Examination by Mr. Dowd            255
11
12            PLAINTIFFS' EXHIBITS
13   Deposition Exhibit 1                35
14   Deposition Exhibit 2                42
15   Deposition Exhibit 3                72
16   Deposition Exhibit 4                78
17   Deposition Exhibit 5               103
18   Deposition Exhibit 6               117
19   Deposition Exhibit 7               120
20   Deposition Exhibit 8               130
21   Deposition Exhibit 9               145
22   Deposition Exhibit 10              160
23   Deposition Exhibit 11              180
24
25   [Exhibits retained by Mr. Dowd.]

**7**

1        THE VIDEOGRAPHER:  We're on the record at
2   9:20 a.m.  Today's date is September 18th,
3   2015.  This is the deposition of Chief Thomas
4   Jackson, to be taken in the matter of Tina
5   Moore versus Brian Kaminski, et al.
6        At this time would counsel please identify
7   themselves for the record.
8        MR. JOHNSON:  Todd Johnson for Plaintiffs
9   Renee Rogers and Delores Moore.
10        MR. DOWD:  Bill Dowd also for Plaintiff
11   Tina Moore.
12        MR. PLUNKERT:  Bob Plunkert for the
13   defendants.
14        MS. SHAFAIE:  Ida Shafaie for the
15   defendants.
16        THE VIDEOGRAPHER:  Thank you.  Would the
17   court reporter please swear in the witness.
18             THOMAS JACKSON,
19   having been first duly sworn to testify the truth,
20   the whole truth, and nothing but the truth in the
21   case aforesaid, deposes and says in reply to oral
22   interrogatories, propounded as follows, to-wit:
23             EXAMINATION
24   QUESTIONS BY MR. JOHNSON:
25        Q   Sir, would you state your name for the

**8**

1   record.
2        A   Thomas Jackson.
3        Q   Mr. Jackson, Chief Jackson, my name is
4   Todd Johnson.  I'm an attorney that's been retained
5   by some family members of an individual that passed
6   away in 2011.  We're here this morning at your
7   attorney's office for you to give a deposition in
8   that case that's now pending in federal court in
9   St. Louis.  Do you understand that, sir?
10        A   I do.
11        Q   I'm going to ask you a series of questions
12   probably primarily about the operations of the
13   Ferguson Police Department and obviously when you
14   were chief of that department.
15        If you don't understand any of my
16   questions, sir, just ask me to repeat or rephrase my
17   question.  Can we have that understanding?
18        A   We do.
19        Q   Sir, if you don't ask me to repeat or
20   rephrase my question, I'll presume that you
21   understand my question and you'll give me an answer
22   to the best of your ability.
23        A   Understood.
24        Q   If you need to take break, please let me
25   know, I'd be happy to accommodate you in that

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

**9**

1  request, okay?
2      **A**   Yeah.
3      **Q**   Verbal answers are preferred.
4      **A**   Yes.  I know, I know.
5      **Q**   I know you've met with lawyers who
6  represent the defendants in this case.  If you hear
7  me suggest that I need a verbal answer, sir, I'm not
8  trying to be rude, I just want to make sure that you
9  give a verbal answer so I know what you've said here
10  today.
11      **A**   I understand.
12      **Q**   We do have the benefit of a court
13  reporter, we have a videographer, but unlike
14  everyday conversation where you may nod your head or
15  cut me you off because you know what question's
16  coming, it's a little more literal process.
17          So I'll do my best also, sir, to let you
18  get your answer out, and I'd ask the same courtesy
19  to try and let me get my question out.  I have a
20  tendency to drag on at times, but --
21      **A**   Okay.
22      **Q**   -- I'll try and do that for you as well.
23          Can we have that understanding?
24      **A**   We do.
25          MR. PLUNKERT:  And I'll help out, too,

---

**10**

1      whenever I can.
2          MR. JOHNSON:  That's right.  We'll all --
3      it will be a joint effort.
4  BY MR. JOHNSON:
5      **Q**   Are you currently working, sir?
6      **A**   Not -- not really.  I have sort of a
7  part-time gig as a project manager for a personnel
8  firm, but I don't have a project right now.
9      **Q**   Have you had law enforcement jobs since
10  resigning with the Ferguson Police Department?
11      **A**   No.
12      **Q**   I understand that you resigned with the
13  Ferguson Police Department last year or earlier this
14  year?
15      **A**   It was this year, yes.
16      **Q**   It was March of 2015?
17      **A**   It was.
18      **Q**   And what's the name of the personnel firm
19  that you're doing work through or certain projects
20  with right now, sir?
21      **A**   Griffin Personnel Group.
22      **Q**   And what's the nature of their business?
23  What -- what do they do?
24      **A**   They provide temporary security for
25  corporations that may be having job actions.  I just

---

**11**

1  line up the part-time security.
2      **Q**   Have you actually done projects with
3  Griffin since resigning at Ferguson?
4      **A**   Yes, I have.
5      **Q**   How many?
6      **A**   One.
7      **Q**   And where was that located?
8      **A**   Well, two, but the second one we canceled,
9  we're not doing it, so ...
10      **Q**   And where were the projects, sir?
11      **A**   The first one was in Denver, outside of
12  Denver, and the second one was in Buffalo, New York.
13      **Q**   And is this private security services --
14      **A**   Yes.
15      **Q**   -- that are being furnished?
16      **A**   Yes.
17      **Q**   And where are Griffin's offices located?
18      **A**   O'Fallon, Missouri.
19      **Q**   And are you a principal or an owner of
20  that company, sir?
21      **A**   No.  Just an occasional employee.
22      **Q**   Sure.  On an as-needed basis when projects
23  come up?
24      **A**   Yes.
25      **Q**   When the projects occur, are you actually

---

**12**

1  dispatched to the location and provide the services?
2      **A**   On the one -- the one project that went
3  through, yes.
4      **Q**   And that was the one in Denver or Buffalo?
5      **A**   Yes, Denver.
6      **Q**   Denver.  Okay.  The last public agency in
7  law enforcement you worked for was the Ferguson
8  Police Department, correct?
9      **A**   Yes.
10      **Q**   And I understand your tenure at Ferguson
11  was from approximately 2010 to 2015?
12      **A**   March to March, yes, sir.
13      **Q**   And when you were working in Ferguson, did
14  you always hold the title of Chief of Police?
15      **A**   Yes, I did.
16      **Q**   And March to March, is there some term of
17  employment that runs annually as chief?
18      **A**   No.  No.  I was under no contract.
19      **Q**   Prior to working at Ferguson as police
20  chief, you worked for the St. Louis Metropolitan
21  Police Department?
22      **A**   No, that's not correct.  I worked for the
23  St. Louis County Police Department.
24      **Q**   I'm sorry.  You worked for the county
25  police department as opposed to the city?

---

3  (Pages 9 to 12)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

13

1    A   I did.
2    Q   And it looks like you worked there for
3 approximately 20 years?
4    A   Thirty-one.
5    Q   Thirty-one.
6    A   But thank you.
7    Q   It won't be the last time I make a
8 mathematical error.
9        What different departments or divisions
10 did you work at with the county police department,
11 sir?
12   A   Started out in patrol.  I worked
13 undercover drug enforcement from '81 to '85.  I was
14 in the tactical operations unit as an operator for
15 five years, from I believe '88 -- '87 to '92, was
16 promoted, was a burglary sergeant, went back into
17 tactical operations as a sergeant.
18       I was also the chief helicopter pilot and
19 flight instructor for the county.  And my last 12
20 years I was deputy commander and then commander of
21 the Bureau of Drug Enforcement in the
22 Multijurisdictional Drug Task Force.  I think that's
23 about it.
24   Q   How many years did you work patrol at the
25 county?

---

14

1    A   Total, four as a patrolman, two as a
2 sergeant, and less than one as a lieutenant.
3    Q   And obviously for the people who are
4 uneducated, it goes officer, then sergeant, then
5 lieutenant, correct, as far as chain of command?
6    A   Yes.
7    Q   I understand, prior to working at the
8 county as an officer and then later above an officer
9 grade, you worked as an EMS or an EMT?
10   A   Yes.  I was -- at the time I joined
11 St. Louis County Police Department I was a paramedic
12 supervisor at Christian Hospital.
13   Q   During the period of time you worked for
14 the county in law enforcement, did you also work
15 either full or part time as an EMS?
16   A   No, I did not.
17   Q   So you went directly from the EMS
18 affiliated with Christian Hospital to the county in
19 law enforcement?
20   A   Correct.
21   Q   And it looked like you worked as an EMS
22 worker back in the 1970s?
23   A   Actually, I went to college in '74 and
24 immediately started working for the county
25 ambulance, and that's where I got my EMT license at

---

15

1 Mizzou.  So from '74 to '79.
2    Q   Did you work at Howard County first?
3    A   I did, yeah.
4    Q   Did you work at Fayette?
5    A   Mm-hmm.
6    Q   Yeah?
7    A   Yeah.
8    Q   I've been there.
9    A   Central Methodist College.
10   Q   Is that where you went to school, sir?
11   A   Yes.  For the first two years.
12   Q   Then finished at Mizzou?
13   A   No.  No.  I just got my EMT license at
14 Mizzou in the evening.
15   Q   And then you -- after working at Howard
16 County in their county ambulance district, you then
17 worked for the EMS service out of Christian
18 Hospital?
19   A   I did.
20   Q   And were you an EMT?
21   A   I was a paramedic.
22   Q   Paramedic.  When did you obtain your
23 certification as a paramedic?
24   A   Through Christian Hospital.
25   Q   In what year?

---

16

1    A   '76.  At the time they had a program.
2    Q   And then what training did you receive to
3 go into law enforcement with the county after your
4 career working as an EMS -- or EMS worker?
5    A   I went to the Metro Police Academy,
6 St. Louis Metro.
7    Q   And when did you graduate or obtain a
8 certification from the academy?
9    A   September of 1979.
10   Q   And then went to work directly for the
11 county?
12   A   Yes.  I was already employed by the county
13 when I was in the academy.
14   Q   Ever certified on the use of a Taser?
15   A   No.
16   Q   Ever apply for certification on the use of
17 a Taser?
18   A   No.
19   Q   Who hired you at Ferguson?
20   A   John Shaw.
21   Q   Was Mr. Shaw the city manager the entire
22 period of time you were at Ferguson?
23   A   He was.
24   Q   And how did you become affiliated or
25 acquainted with Mr. Shaw or Ferguson that caused you

---

Gore Perry Reporting and Video

17

1  to make the leap from the county to work at the
2  Ferguson Police Department?
3      A   Well, the position for chief of police
4  came open, I was eligible for retirement, you know,
5  I had a long history with Ferguson, and applied for
6  the position and was hired.
7      Q   Who did you interview with?
8      A   Many -- many people.  There was an
9  interview process with outside city managers.  I
10  couldn't tell you where they were from.  And I
11  interviewed with City Council and I interviewed with
12  the staff, the department heads of the City of
13  Ferguson.
14      Q   Whose place did you take as chief at
15  Ferguson?
16      A   Tom Moonier.
17      Q   And could you spell his last name?
18      A   M-o-o-n-i-e-r.  Thomas, actually.
19      Q   And where did Mr. Moonier go after
20  Ferguson?  If you know.
21      A   To the gambling boat, best I could tell.
22      Q   Yeah.
23      A   Yeah, he -- he retired.
24      Q   Retired.
25      A   He was well into his 70s.

18

1      Q   Okay.  Who took your place as police chief
2  of Ferguson?
3      A   Temporarily, Al Eickhoff.
4      Q   And filled full time eventually by who?
5      A   It's not filled full time.  There is a
6  interim chief there now.
7      Q   Somebody after Mr. Eickhoff?
8      A   Yes.
9      Q   Who is that?  If you know.
10      A   Andre Anderson.
11      Q   And I understand Mr. Shaw resigned as well
12  at Ferguson?
13      A   He did.
14      Q   Did he resign before you?
15      A   I don't remember.
16      Q   And do you know who took Mr. Shaw's place
17  as city manager at Ferguson?
18      A   I don't know his name.  I do know his
19  name, and if it comes to me I will tell you.
20      Q   Fair enough.  When you resigned, did
21  somebody come to you and ask you to resign, or was
22  it your idea?
23      A   No.  It was my idea.
24      Q   And who did you go to to inform Ferguson
25  that you wished to resign?

19

1      A   Initially it was just a conversation with
2  the mayor, James Knowles, discussing the -- the
3  prospect, yeah.
4      Q   Tell me about --
5      A   What was -- what was in the best interest
6  of the city.
7      Q   Was it at Mr. Knowles' office?
8      A   No.  We were just in the council chambers.
9      Q   About when was the meeting, sir?
10      A   Probably the first week of March, around
11  then, of this year, 2015.
12      Q   Did you have to go to Mr. Shaw to inform
13  him that you wished to resign, or was he already
14  gone by that point?
15      A   No.  He was still there.  But I had the
16  same conversation with him.
17      Q   Do you have an understanding why Mr. Shaw
18  resigned?
19          MR. PLUNKERT:  Let me object.  It calls
20  for speculation.
21          MR. JOHNSON:  I'm asking if he knows.
22  BY MR. JOHNSON:
23      Q   Go ahead.
24      A   I don't.
25      Q   Was there any threat made of you that you

20

1  needed to resign in lieu of termination?
2      A   No, not at all.
3      Q   Do you know if there was any threat made
4  to Mr. Shaw that he needed to resign in lieu of
5  termination?
6      A   No, I don't know that.
7      Q   Any other Ferguson Police Department
8  employees at any level resigned other than you this
9  year?
10      A   There were two that retired.
11      Q   Any Ferguson Police Department employees
12  that were terminated this year that you know of?
13      A   Not that I'm aware of.
14      Q   And I understand the arrangement, at least
15  me as a layperson, is the arrangement that you
16  voluntarily resigned, and in exchange for that you
17  would receive one year salary plus benefits through
18  the City of Ferguson?
19      A   Correct.
20      Q   So that will expire in March of 2016?
21      A   Yes, it will.
22      Q   So technically you're still on the payroll
23  of the city, as far as you know?
24      A   No.
25      Q   What is -- and I don't care about the

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                        September 18, 2015

---

21

1  finances, I just care about the arrangement.
2      A    The arrangement was that the payment was
3  final and that there was no other compensation due
4  to me from the City of Ferguson.
5      Q    Was that an arrangement that you
6  negotiated with the assistance of counsel?
7      A    No.
8      Q    Even -- even union or labor counsel?
9      A    No.
10     Q    Is there a written agreement -- separation
11  agreement as between you and the city?
12     A    Yes.
13     Q    Did you resign after the Department of
14  Justice came out with their report on police
15  practices at the City of Ferguson?
16     A    Yes, I did.
17     Q    Datewise it was after that --
18     A    Yes.
19     Q    -- the issuance of that, correct?
20     A    Yes, it was.
21     Q    How long after that did you go to
22  Mayor Knowles and tell him what you told me about
23  resigning?
24     A    Within a couple weeks, if that.
25     Q    You received the report, correct?

---

22

1      A    Yes.
2      Q    Did you read the report?
3      A    I did.
4      Q    In its entirety?
5      A    Yes.
6      Q    And did you receive and read the report
7  from the Department of Justice on police practices
8  at Ferguson before you made the decision to resign?
9      A    Yes.
10     Q    Did it play some role in your mind?
11     A    No.  I -- no.
12     Q    You mentioned earlier, Mr. Jackson -- is
13  it okay Mr. Jackson or Chief, I want to make sure --
14     A    You can call me Tom.
15     Q    Well, sometimes we -- we can't do that.
16     A    I know we're adversarial, but -- here, but
17  yeah.
18     Q    I get it.
19     A    I get it.
20     Q    Tell me about the -- when you were with
21  the county over the 30-plus years you were there,
22  what type of law enforcement relationship you had
23  with Ferguson.
24     A    During the final 12 years of my tenure at
25  St. Louis County, as I said, I was promoted to

---

23

1  captain while I was the deputy commander there and
2  made commander of the drug task force.  And there
3  were 15 or so municipalities that supplied officers
4  to the drug task force and Ferguson was one of them.
5      So I met regularly with police chiefs of
6  the -- of those officers were the de facto board of
7  directors for the drug task force, so I had monthly
8  meetings with them.
9      Q    On site at Ferguson?
10     A    No.  Usually at the police academy.
11     Q    And so it sounds like your law enforcement
12  involvement with Ferguson prior to working there
13  would have been on tactical drug operations?
14     A    Yes.
15     Q    In other words, there may be some Ferguson
16  officers that are part of the drug unit or drug task
17  force that you were also a part of?
18     A    Yes.  Yes.
19     Q    And -- and insofar only as it relates to
20  that task force, you would be directing in part some
21  Ferguson officers that were on part of the task
22  force?
23     A    Yes.
24     Q    And were you the actual supervisor of that
25  drug task force that at times was comprised of

---

24

1  Ferguson Police Department officers?
2      A    I was the commander.  So the Ferguson
3  police officer would have a sergeant and then a
4  lieutenant.
5      Q    Right.  And then as commander are you
6  directly above the lieutenant?
7      A    Yes.
8      Q    Is there anybody that you reported to on
9  the task force as commander?
10     A    Reported to?
11     Q    Well, if there's a -- if there's an
12  operational question, is there somebody above you
13  within the drug task force that you would report to?
14     A    No.  I was the top person in the drug task
15  force, but I had a -- I reported to the Chief of
16  Detectives, St. Louis County.
17     Q    I understand.  When you arrived at
18  Ferguson as chief, it looks to me like there were
19  some general orders that you either created or
20  revised.
21     A    Yes.
22     Q    Tell me about when you first arrived at
23  Ferguson and what you saw as the need to create a
24  revised different general orders for the police
25  department.

Gore Perry Reporting and Video
FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                          September 18, 2015

25

```
 1      A   Well, it was my intention when I went to,
 2   Ferguson to make it a -- an accredited agency, and
 3   that required having general orders and policies
 4   that complied with either the Missouri state
 5   accreditation or CALEA accreditation.
 6      Q   And what does CALEA stand for, sir?
 7      A   The Council for Accreditation of Law
 8   Enforcement Agencies.
 9      Q   Okay.
10      A   It's an international accrediting agency.
11      Q   Prior to you arriving at Ferguson, was
12   Ferguson an unaccredited police agency?
13      A   Yes.
14      Q   Did it receive accreditation during the
15   period of time you were chief?
16      A   We were in our final year.  It's about a
17   three- or four-year process, and we were in our
18   final year last year.
19      Q   As of 2014 it sounds like you were in the
20   process of getting accredited?
21      A   Correct.
22      Q   And do you know if they actually received
23   an accreditation since you separated employment with
24   the agency?
25      A   I don't believe that the -- that it's been
```

26

```
 1   finalized yet.
 2      Q   Do you know if they're still in the
 3   process?
 4      A   Yes, they are.
 5      Q   Did Ferguson's police department have
 6   general orders prior to you acting as police chief?
 7      A   Yes.
 8      Q   They were just in a different form?
 9      A   They were.
10      Q   Did you determine them to be deficient in
11   any way?
12      A   Some of them I felt were not up to date
13   and -- but I revised the entire manual regardless.
14      Q   So regardless of if you thought -- you
15   know, I'm just going to make something up.
16      A   Sure.
17      Q   If there's a bomb scare, for example, if
18   you thought that was deficient, you just didn't
19   attack that general order itself, you went through
20   agency and tried to revamp the whole set of general
21   orders?
22          MR. PLUNKERT:  Object to the form.  You
23      may answer.  I objected to the form.  You may
24      answer.
25
```

27

```
 1   BY MR. JOHNSON:
 2      Q   Go ahead, sir.
 3      A   Yes.
 4      Q   I just want to understand what you were
 5   doing.
 6      A   Sure.
 7      Q   Were you the person who drafted the
 8   revised or new general orders for Ferguson?
 9      A   Initially, yes.
10      Q   And what do you mean by "initially"?
11      A   I started the process.  I met with several
12   other chiefs and the director of the Missouri State
13   Police Chief Association, determined that we would
14   start out with the Missouri accreditation because it
15   basically mirrored the CALEA accreditation, and got
16   lots of help, met with several chiefs from
17   accredited agencies and reviewed their policies, got
18   copies of their policies, and I started, you know,
19   revising the general order manual myself.
20          It became time consuming and I was able
21   to -- to get my boss to allow me to assign a
22   full-time person to -- to work on accreditation.
23   It's generally what most agencies do.
24      Q   Right.  Let's start with the sources of
25   information that you look to, Mr. Jackson.  When you
```

28

```
 1   first set forth to revise the general orders, what
 2   outside law enforcement sources of information did
 3   you go to?
 4      A   The chiefs of police, St. Louis --
 5      Q   Of where?
 6      A   -- St. Louis County, Maryland Heights,
 7   Bellefontaine Neighbors, Olivette.  The director of
 8   the Missouri Chiefs Association, which is who
 9   ultimately coordinates the -- the accreditation.
10      Q   And I take it the representatives with the
11   county, Maryland Heights, Olivette, Bellefontaine,
12   are peers or people that you know and trust?
13      A   Yes.
14      Q   And did you go to the police chiefs
15   themselves of those agencies --
16      A   Yes.
17      Q   -- for assistance?
18      A   I'm sorry.
19      Q   That's okay.
20      A   I didn't mean to interrupt you.  I
21   apologize.
22      Q   No problem.
23          Were they the police chiefs you went to?
24      A   Yes, they were.
25      Q   And it looks like some of the orders began
```

7 (Pages 25 to 28)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

29

1  to be revised almost the same year you got to
2  Ferguson, true?  2010?
3     A   True.
4     Q   So your meetings with these different
5  outside law enforcement agencies, were they done in
6  2010, when you started working at Ferguson?
7     A   Yes.
8     Q   Was it an ongoing process where you were
9  continuing to meet with outside agencies to further
10 get information about their orders?
11    A   Yes.
12    Q   Are there agencies that you know that you
13 copied either identically or closely in drafting the
14 new general orders at Ferguson?
15    A   St. Louis County's, Maryland Heights,
16 Olivette's.
17    Q   The reason I ask that is, I do see an
18 annotation or a reference in some of the general
19 orders to the Missouri Police Chiefs Uniform Orders.
20        Did you use that as a source of
21 information as well, sir?
22    A   That's -- that's an assistant or -- that
23 assistant accreditation process, because there are
24 hundreds of standards, thousands of standards, so
25 when you have a general order you reference the

---

30

1  standard or standards that it may apply to, so that
2  when you're going through your proofs they're
3  looking for a policy that meets this standard and
4  you can say here it is.
5     Q   Right.  And so when we see a reference
6  to -- and I think it's MPC -- MPCCF, Missouri Police
7  Chiefs?
8     A   Yes.  Charitable Foundation is actually
9  the accrediting agency.
10    Q   Did you go to the IACP for a source of
11 information in revising general orders?
12    A   Actually, once I assigned a full-time
13 person, we got him a log-on to access the resources
14 the IACP has, so yes, they were used.  Not by me.
15    Q   Right.  But by the person you delegated
16 the responsibility to?
17    A   Yes.
18    Q   And who was that person?
19    A   Dennis McBride.
20    Q   And is Mr. McBride still with Ferguson?
21    A   I think so.
22    Q   What is his job title, at least when you
23 left.
24    A   He was captain, but he was assigned -- in
25 addition to this, he was also overseeing code

---

31

1  enforcement.
2     Q   Other than the outside law enforcement
3  agencies you told me about, IACP and the Missouri
4  Police Chiefs Charitable Foundation, any other
5  outside resources that you, or Mr. McBride, to your
6  knowledge, utilized in formulating the general
7  orders that bear your signature?
8     A   Nothing specific, but use law, case law,
9  constitutional law, things like that, make sure
10 things were in compliance with our agency, our city,
11 our state.
12    Q   Did your law enforcement agency actually
13 do the legal research yourself in order to determine
14 whether or not the general orders were compliant
15 with existing constitutional law?
16    A   Initially I was doing that, but then that
17 was delegated.
18    Q   To Mr. McBride?
19    A   Yes.
20    Q   And when you did it, what sources did you
21 go to to do the legal research necessary to
22 determine whether or not the general orders that
23 bear your signature were in conformance with
24 existing constitutional law?
25    A   I can't say any specific attorneys.  We

---

32

1  had our city attorney, Stephanie Karr.  I relied on
2  her a lot for a variety of things.
3     Q   Sure.  Was it all in house, then?  In
4  other words, did you use outside counsel?
5     A   Outside counsel, no.
6     Q   Okay.
7     A   Outside sources, yes.
8     Q   Do you know what outside sources
9  Mr. McBride went to to do the legal research
10 necessary to evaluate whether the general orders
11 that bear your signature were in conformance with
12 existing constitutional law at the time?
13    A   As I said, generally it's the IACP's -- I
14 can't remember the name of the site, but it's a
15 research site specifically set up for this type of
16 thing.
17    Q   Did you have to go to Mr. Shaw at all in
18 terms of determining whether or not you needed to
19 revise the general orders?
20    A   We -- when we discussed this, I let him
21 know, and I think this was part of my interview
22 process, but that this was my intention to do an
23 accreditation, and therefore I was going to require
24 funds, so I had to go to him so we could go to the
25 council and get the funding authorized to do this.

---

Gore Perry Reporting and Video

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                          September 18, 2015

---

33

1    **Q**   The actual workmanship, though, in
2  drafting, revising, and then issuing the general
3  orders that bear your signature, sir, did you have
4  to go to Mr. Shaw for approval to do that?
5    **A**   No.
6    **Q**   Were there any general orders that you
7  presented to Mr. Shaw at all for his review and
8  approval?
9    **A**   I'm sure there were, yeah.  I can't say
10 any specific ones.
11   **Q**   Okay.  And for what reason would you
12 present those to Mr. Shaw for his review and
13 approval?
14   **A**   He was my boss and he liked --
15   **Q**   He was your direct report?
16   **A**   He liked to be kept informed, so ...
17   **Q**   Is he heavy-handed?
18   **A**   No.
19   **Q**   Did he let you -- did he give you
20 discretion to do your job?
21   **A**   Quite a bit.
22   **Q**   Were there any general orders that you
23 presented to Mr. Shaw that were rejected by him?
24   **A**   Not that I can remember.
25        Do you mind if I grab a little more

---

34

1  coffee?
2    **Q**   Go ahead.  No problem.
3        THE VIDEOGRAPHER:  Do you want to go off
4  the record?
5        (Discussion off the record.)
6        THE WITNESS:  Thank you, sir.
7        MR. JOHNSON:  You bet.  Are we back on?
8        THE VIDEOGRAPHER:  Yes, sir.
9  BY MR. JOHNSON:
10   **Q**   Did you have to go to the City Council to
11 have anybody with the City Council review and
12 approve the general orders that you formulated?
13   **A**   No.
14   **Q**   Did you go to Mayor Knowles or any mayor
15 at the time you were drafting and formulating the
16 new general orders for their -- for the mayor's
17 review and approval?
18   **A**   No.
19   **Q**   And I understood at no point between 2010
20 and 2015 did you directly report to the mayor of
21 Ferguson, correct?
22   **A**   That's correct.
23   **Q**   Your only report was to Mr. Shaw or
24 whoever was the city manager?
25   **A**   Yes.

---

35

1    **Q**   And as the -- let's do this.  I'm going to
2  mark as Exhibit 1 one of these orders, and depending
3  on how the answers go, it may short-circuit a lot of
4  things --
5    **A**   Okay.
6    **Q**   -- but I want to make sure I understand
7  some of the principles of these orders.
8        (Deposition Exhibit Number 1
9        marked for identification.)
10 BY MR. JOHNSON:
11   **Q**   Mr. Jackson, I'm going to first hand you
12 what I marked as Exhibit 1 and ask if you could
13 please identify that for me.
14   **A**   Yes.  Essentially our mission statement.
15   **Q**   And for the record, this is General Order
16 103.00, correct?
17   **A**   That's correct.
18   **Q**   And Exhibit 1 is a four- --- five-page
19 document.  Is this one of the general orders that
20 you drafted when you became Chief of Police at
21 Ferguson?
22   **A**   Yes, it is.
23   **Q**   And just so I understand the layout and
24 the lay of the land in terms of these orders that we
25 may go through today, this bears your signature on

---

36

1  the third page, correct?
2    **A**   Correct.
3    **Q**   And at the time you were listed as Colonel
4  Thomas Jackson, Chief of Police, true?
5    **A**   True.
6    **Q**   And is that the job title that you held
7  during the period of time you were at Ferguson?
8    **A**   That's correct.
9    **Q**   And in terms of chain of command, colonel
10 would fit where in terms of the other job titles and
11 designations we talked about with law enforcement?
12   **A**   It's an honorary title that is the head of
13 the law enforcement agency, chief of police.
14   **Q**   And then when we see underneath your
15 signature on the third page of Exhibit 1 an
16 attachment, obviously that refers to the Code of
17 Ethics that is -- goes with that general order,
18 true?
19   **A**   True.
20   **Q**   And then the distribution, meaning it
21 would go to all the department -- Ferguson Police
22 Department personnel?
23   **A**   Correct.
24   **Q**   And then the reference, if there is a
25 reference, that would reference back to the Uniform

---

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                     September 18, 2015

---

37

1   Missouri Police Chiefs Charitable Foundation 1.3 in
2   this case, true?
3       **A**   True.
4       **Q**   And the date of the general order in
5   Exhibit 1 on the first page is April 26, 2011?
6       **A**   Yes.
7       **Q**   Walk me through when a general order, any
8   general order that you formulated at Ferguson, what
9   the process is for you to -- after you've created it
10  to then have that issued with a date affixed to it.
11      What did you have to do, sir?
12      **A**   So, for example, in this case I --
13  anything that had the MPC reference was after
14  Captain McBride took over, so he would have
15  presented this general order to me and I would have
16  reviewed it, revised it if I felt it was necessary,
17  and then returned it for distribution as a draft to
18  the command staff, and then we would meet on these
19  orders.
20      And then if we agreed that it -- I also
21  made sure that it was in compliance with the city
22  personnel manual and ordinances, and then if that
23  was all in order, then that's when I would sign off
24  on it.
25      **Q**   After you signed off on a general order,

---

38

1   would it then become part of a book or volume of
2   general orders applicable to the operations of your
3   police department?
4       **A**   Yes.
5       **Q**   So, in effect, once you reviewed in this
6   case what Mr. McBride gave you, met with your
7   command staff, reviewed it in conformance with
8   Ferguson's personnel ordinances, then it -- in your
9   terms, it became effective for your department?
10      **A**   Yes.
11      **Q**   Because as I understand, in a separate
12  general order, as Chief of Police you're responsible
13  for establishing policy within the department?
14      **A**   Yes.
15      **Q**   You're responsible --
16      **A**   Yes.
17      **Q**   -- for overall operation of the police
18  department?
19      **A**   Yes.
20      **Q**   And you have authority over all the
21  bureaus units and personnel in the police
22  department?
23      **A**   Yes.
24      **Q**   And all general orders are issued under
25  your authority as chief of police?

---

39

1       **A**   Yes.
2       **Q**   I saw in a different general order that
3   you're also referred to as the chief executive
4   officer for the Ferguson Police Department as
5   determined by the City of Ferguson ordinances,
6   correct?
7       **A**   That's correct.
8       **Q**   And to quote somebody from my side of the
9   state, the buck stops with you --
10      **A**   Yes.
11      MR. PLUNKERT:  Objection.
12  BY MR. JOHNSON:
13      **Q**   -- in terms of the police department?
14      MR. PLUNKERT:  Objection to the form.  You
15  can answer.
16      **A**   Yes.
17  BY MR. JOHNSON:
18      **Q**   And as chief executive officer, you have
19  total authority and responsible for the management,
20  direction, and control of operations in the
21  administration of your agency?
22      **A**   Yes.
23      **Q**   And you have general supervision and
24  control of the police department, including the
25  enforcement of discipline, among the members thereof

---

40

1   and the instruction of the members in their duties,
2   correct?
3       **A**   That's correct.
4       **Q**   The mission statement, as you refer to
5   Exhibit 1, was that a mission statement that was in
6   effect with the Ferguson Police Department at all
7   times during the period of time you were chief,
8   General Order 103.00?
9       **A**   From the time of its inception, yes.
10      **Q**   So from the time of its inception
11  April 26, 2011, until your resignation March of
12  2015, Exhibit 1 was a general order of the Ferguson
13  Police Department?
14      **A**   Yes.
15      **Q**   And there are different values that you've
16  set forth in Exhibit 1, correct?
17      **A**   That's correct.
18      **Q**   One of the values is teamwork, correct?
19      **A**   Yes.
20      **Q**   One of the values is professionalism?
21      **A**   Correct.
22      **Q**   And one of the values is you want to be a
23  humane organization, correct?
24      **A**   Yes.
25      **Q**   Which values the constitutional, civil,

---

10  (Pages 37 to 40)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                                September 18, 2015

---

41

1   and human rights of all citizens?
2       A    That's correct.
3       Q    Police officers and nonpolice officers?
4       A    Yes.
5       Q    Is there a mission statement with the
6   Ferguson Police Department during the period of time
7   you were there that -- that you considered to be
8   separate and apart from the mission statements we
9   see in Exhibit 1?  Is there a credo that you used?
10          MR. PLUNKERT:  Objection -- object to the
11      form.
12      A    Not that I'm familiar with.  I'm not sure
13  I understand what you're asking me.
14  BY MR. JOHNSON:
15      Q    Well -- and I appreciate that.
16          What I'm asking is, sometimes leaders of
17  organizations such as yourself have their own credo
18  or mission statement.  Sometimes it could be on a
19  letterhead, sometimes it could be on the side of a
20  car door.
21          Was there a separate mission statement
22  that you used as police chief at Ferguson during the
23  period of time you were there?
24      A    Nothing official, no.
25      Q    What does it say on the side of the door

---

42

1   of the Ferguson police cruiser during the period of
2   time you were there?
3       A    Ferguson Police Department.
4       Q    It didn't have any type of credo or
5   saying?
6       A    I don't -- I don't remember.
7       Q    We hear "To serve and to protect"?
8       A    Sure.
9       Q    We know a lot of different catch phrases
10  that law enforcement uses.  Anything like that at
11  Ferguson?
12      A    Not that I can recall.
13      Q    When it comes to the training of the
14  personnel that worked for you when you were at
15  Ferguson, were you the person who had ultimate
16  responsibility in the area of training?
17          MR. PLUNKERT:  Object to the form,
18      foundation.  You may answer.
19      A    Okay.  Again, that would be a delegated
20  responsibility, but as -- as we pointed out,
21  ultimately everything comes to me, but sure.
22
23          (Deposition Exhibit Number 2
24          marked for identification.)
25

---

43

1   BY MR. JOHNSON:
2       Q    I'll lay some foundation.  Here's
3   Exhibit 2.  What is Exhibit 2, sir?
4       A    Exhibit 2 is the general order titled
5   "Training, General Order 222.00," dated August 23rd,
6   2011.
7       Q    Is this a general order that you created
8   or drafted during your period of time as chief of
9   Ferguson?
10      A    I'm sure it is.  Let me just verify.  Yes.
11      Q    The training that -- first of all, it is a
12  policy of the department to provide training to
13  police officers that work there, correct?
14      A    Correct.
15      Q    And that training can come from any number
16  of sources.  Some are enumerated in Exhibit 2,
17  aren't they?
18      A    Yes, they are.
19      Q    An officer at Ferguson can receive
20  training through approved provider training,
21  correct?
22      A    Correct.
23      Q    In-service training?
24      A    Yes.
25      Q    Initial training, meaning before Ferguson?

---

44

1       A    Yes.
2       Q    And then continuing education as they're
3   working there, correct?
4       A    That's correct.
5       Q    The in-service training, does that mean in
6   house?
7       A    It can.  It can also be with another
8   outside agency as well, but generally that refers to
9   in-house training.
10      Q    Between 2010 and 2015, when you were at
11  Ferguson, did they have in-house training that they
12  provided their officers on any aspect of law
13  enforcement?
14      A    Yes.
15      Q    Describe for me, you know, in terms of who
16  did the training and generally what type of topics
17  you were familiar with that were the in-house
18  training.
19      A    Some of the in-house training we did was
20  on, for example, racial profiling is required by the
21  state, and I had two certified instructors in that.
22          Firearms training would be in house,
23  use-of-force training would be in house.  What we're
24  talking about here, Taser training, would be in
25  house.

---

11  (Pages 41 to 44)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

45

1     **Q**    Okay.
2     **A**    We also would have brief role call
3  trainings, like maybe review of a general order, a
4  new general order, review of a new constitutional
5  decision.  Those types of things.
6     **Q**    When you first got to Ferguson in 2010,
7  did they have in-house training?
8     **A**    They had -- yes, they had in-house
9  training.
10    **Q**    Did they have in-house training that
11 utilized use-of-force topics?
12    **A**    Yes.
13    **Q**    Did they have in-house training that
14 utilized Taser training?
15    **A**    No.
16    **Q**    Who made the decision to use Taser
17 in-house training at Ferguson after you came on as
18 chief?
19    **A**    That would have been me.
20    **Q**    And why did you do that?
21    **A**    There was a lot of discussion about Taser.
22 St. Louis County had it and most of the surrounding
23 agencies in -- in Ferguson had it.  And
24 with lots of discussions amongst my officers and
25 command staff, it was determined that it was a safer

---

46

1  way to get compliance of hostile individuals, in
2  particular, rather than hand fighting.  And so I
3  had -- I had one officer who was an instructor, and
4  he essentially put the package together to -- to get
5  the training going.
6     **Q**    Who was that?
7     **A**    John Brannon.
8     **Q**    Mr. Brannon, was he Taser certified when
9  he came on board?
10    **A**    Yes, he was.
11    **Q**    And do you know where Mr. Brannon worked
12 at, if he did, before Ferguson?
13    **A**    No, I don't.
14    **Q**    And what sources -- similar to the sources
15 you looked to in drafting the general orders, sir,
16 did you look to sources of information prior to
17 determining to undertake in-house Taser training at
18 Ferguson?
19    **A**    Yes.  And I was actually part of the
20 process as command staff at St. Louis County when we
21 were viewing -- reviewing whether or not to
22 implement a Taser program there, so I was familiar
23 with a lot of the research and background.
24    **Q**    Were you part of undertaking an in-house
25 Taser training program at St. Louis County?

---

47

1     **A**    No.
2     **Q**    Because you had never been Taser
3  certified, correct?
4     **A**    No.
5     **Q**    Have you ever sat in on Taser training in
6  St. Louis County?
7     **A**    No.
8     **Q**    Ever sit in on any of the training that
9  was in house at Ferguson in Taser training?
10    **A**    Yes.
11    **Q**    And was that always conducted by
12 Mr. Brannon?
13    **A**    Yes.
14    **Q**    Any other in-house instructors on the use
15 of a Taser at Ferguson during the period of time you
16 were there other than Mr. Brannon?
17    **A**    No.
18    **Q**    What in-house training did Mr. Brannon
19 perform, if you know, when it came to in-house Taser
20 training at Ferguson?  What did he do?
21    **A**    He certified all the officers in the use
22 of the Taser.
23    **Q**    Every officer?
24    **A**    I can't say that with certainty.  I was
25 not one of them.

---

48

1     **Q**    How was it selected that an officer would
2  receive Taser training at Ferguson?
3     **A**    Well, the intent was for all the officers
4  to receive the Taser training.  I just can't say
5  with certainty that everybody actually did, if
6  someone was injured or --
7     **Q**    Sure.
8     **A**    -- you know, somewhere.
9     **Q**    Right.  Did Ferguson have Taser devices
10 when you came there?
11    **A**    No.
12    **Q**    Tell me about the decision to purchase
13 Taser devices.  First of all, was that your
14 decision?
15    **A**    Yes.
16    **Q**    And you -- you told me earlier that there
17 was some discussion about the use of a Taser as a
18 device to obtain cooperation, correct?
19    **A**    That's correct.
20    **Q**    And when the decision was made to purchase
21 Tasers, were you the one to make the decision?
22    **A**    Yes.
23    **Q**    And where did you go to purchase Tasers?
24    **A**    Taser International.
25    **Q**    Did you speak with anybody from Taser

---

12  (Pages 45 to 48)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                           September 18, 2015

---

49

1  International prior to determining to purchase Taser
2  ECWs?
3      A   No.  I had that delegated.
4      Q   To who?
5      A   John Brannon.
6      Q   Did Mr. Brannon speak with any
7  representatives of Taser International before you
8  made the decision to purchase Taser ECWs?
9          MR. PLUNKERT:  It calls for speculation.
10  You can answer.
11     A   Yes.  He told me that he did many times.
12  BY MR. JOHNSON:
13     Q   What did he tell you that the substance of
14  his conversations were with Taser?
15     A   Well, it surrounded training and purchase
16  of the Tasers.
17     Q   Did Taser train Mr. Brannon?
18     A   I'm not sure.  I -- I can't -- I can't
19  recall that.
20     Q   Did Taser ever send any representatives to
21  Ferguson for the purpose of training?
22     A   I don't remember.
23     Q   Did Taser send any representatives to
24  Ferguson prior to your decision to purchase Taser
25  ECWs?

---

50

1      A   I don't remember.
2      Q   Do you know what ECW means?
3      A   Electronic --
4      Q   Okay.
5      A   -- weapon.
6      Q   I want to make sure we're on the same
7  page.
8      A   Yes.
9      Q   I'll probably use that a couple times
10  today.
11     A   That's fine.  Yes, it means electronic
12  control compliance weapon.
13     Q   Does Taser provide use-of-force training
14  for the use of the Taser device?
15     A   Yes.  They provide the certification.
16     Q   But do they provide use-of-force training
17  as part of the training on certifying you on the use
18  of the device?
19     A   I don't remember that.
20     Q   Approximately when did Ferguson first
21  obtain Taser ECWs?
22     A   Like 2010 or maybe early 2011.
23     Q   Once they obtained the Taser devices, how
24  did training then follow?  Was Mr. Brannon in charge
25  of this?

---

51

1      A   Yes.  He scheduled the training.
2      Q   During the period of time you were at
3  Ferguson, did anybody take outside training on the
4  use of the Taser device, to your knowledge?
5      A   To my knowledge, there were officers who
6  were previously certified, but I couldn't tell you
7  their names.  I do recall that that was the case.
8      Q   Do you know Brian Kaminski?
9      A   I do.
10     Q   And how do you know Mr. Kaminski?
11     A   He was one of my officers at Ferguson
12  Police Department.
13     Q   Is your relationship with him just a
14  professional one limited to the workplace?
15     A   Yes.
16     Q   Did you know Mr. Kaminski to have ever
17  received Taser training?
18     A   Yes.
19     Q   How?
20     A   Through John Brannon.
21     Q   Any other training other than through
22  Mr. Brannon that Mr. Kaminski received?
23     A   Not that I'm aware.
24     Q   Do you know if Mr. Kaminski was
25  recertified on the use of the Taser?

---

52

1      A   No, I don't.
2      Q   Do you know if Mr. Kaminski received Taser
3  training from any outside sources other than the
4  Ferguson Police Department?
5      A   No, I don't.
6      Q   What materials did Mr. Brannon use to
7  train on the use of the Taser?
8      A   He used written presentations as well as
9  actual demonstrations in the use of the Taser.  Most
10  of the officers were tased.
11     Q   Where did Mr. Brannon get the materials to
12  train on the use of Taser?
13     A   I don't know.
14     Q   Do you know if the materials, if they
15  used, if there was written materials that were
16  utilized, do you know if they were kept by
17  Mr. Brannon or by somebody else with the department?
18     A   I don't know if he had somebody else keep
19  them.
20     Q   What was Mr. Brannon's job title within
21  the department during the period of time he was a
22  Taser trainer?
23     A   He was a police officer and he was also a
24  firearms instructor.
25     Q   Was he officer or sergeant, lieutenant?

---

13  (Pages 49 to 52)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                September 18, 2015

---

53

1     **A**   Officer.
2     **Q**   Officer.  Was he a patrol officer?
3     **A**   Yes, he was.  When I first arrived there,
4   he was a community relations officer.
5     **Q**   Back to Exhibit 2, the training general
6   order.  On page 2 of Exhibit 2, there's a subheading
7   called "Required Training."  Do you see that,
8   Mr. Jackson?
9     **A**   I do.
10     **Q**   And bullet point number 3 reads, "The
11   Ferguson Police Department acknowledges that
12   graduates of approved provider initial recruit
13   training do not receive training specific to the
14   policies and procedure of the Ferguson Police
15   Department."
16        Did I read that correctly?
17     **A**   You did.
18     **Q**   When -- when I see that phrase, are you
19   referring to academies as initial recruit training,
20   or is that something different?
21     **A**   Yes, police academies.
22     **Q**   So Ferguson acknowledges that any training
23   that a police officer at Ferguson receives through
24   an academy isn't specific to the trainings that
25   Ferguson gives the officer?

---

54

1        MR. PLUNKERT:  Object to the form.
2   BY MR. JOHNSON:
3     **Q**   I mean, is that paraphrased correctly, or
4   does that mean something different?
5     **A**   No.
6        MR. PLUNKERT:  Same.  Go ahead.
7     **A**   The training that the officer will receive
8   in field training is in addition to, it's
9   supplemental to, initial training.
10   BY MR. JOHNSON:
11     **Q**   In other words, there's initial training
12   sometimes through an academy, but then the police
13   department will give additional training specific to
14   the operations of that department?
15     **A**   Yes.
16     **Q**   Did Ferguson rely solely on a police
17   officer's academy training as sufficient?
18        MR. PLUNKERT:  Object to the form.
19   BY MR. JOHNSON:
20     **Q**   You can answer.
21        MR. PLUNKERT:  You may answer.
22     **A**   As sufficient for --
23   BY MR. JOHNSON:
24     **Q**   Let me give you a hypothetical.
25        If a police officer came in and was a

---

55

1   graduate of the Eastern Missouri Police Academy --
2     **A**   Yes.
3     **Q**   -- and -- did you determine that to be
4   sufficient training to be a Ferguson Police
5   Department officer, without any other training
6   whatsoever?
7     **A**   Again, we're talking about one factor that
8   would go into someone's qualifications for
9   employment, so we look at a lot of things.  But as
10   far as initial training as being the basic
11   requirement for the job, yes.
12     **Q**   But that on top of that this policy states
13   that they would receive additional training specific
14   to the job?
15     **A**   Yes.
16     **Q**   So that's necessary, correct?
17        MR. PLUNKERT:  Object to the form.
18     **A**   Yes.
19   BY MR. JOHNSON:
20     **Q**   And that training they received is from an
21   FTO, correct, field training officer?
22     **A**   Yes.  Yes.
23     **Q**   Who was the field training officer when
24   you started working in 2010?
25     **A**   We had Dominica Fuller, John Beaird.  I

---

56

1   think there were about four that were qualified at
2   the time, but I'm -- I would be guessing if I gave
3   you the other names.
4     **Q**   Is there a representative with the
5   Ferguson Police Department who maintains or keeps
6   the training records of each officer?
7     **A**   Yes.
8     **Q**   And who was that when you started?
9     **A**   Captain Henke.
10     **Q**   H-e-n-k-e?
11     **A**   Yes.
12     **Q**   And what was his job title?
13     **A**   He was the commander of field operations.
14     **Q**   And did he report directly to you?
15     **A**   Yes.
16     **Q**   And what types -- if you know, what types
17   of training materials did Mr. Henke keep on an
18   officer?
19     **A**   Generally the records, the sign-in sheets,
20   and then the copies of the certificates that
21   officers would receive.
22     **Q**   For example, if they went to an approved
23   provider program outside of Ferguson and they got a
24   certificate of completion, Mr. Henke would keep one
25   of those, correct?

---

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                        September 18, 2015

---

57

1      A   Yes.
2      Q   If there was in-house training that
3  Ferguson rendered to an officer, would there be some
4  documentation that Mr. Henke would keep?
5      A   It would be a sign-in sheet, just an
6  acknowledgment that the training was given.
7      Q   And specific to Taser training that
8  Mr. Brannon did, how would that be memorialized that
9  Mr. Brannon gave in-house Taser training to a
10  Ferguson Police Department officer?
11     A   We actually went to an electronic form of
12  maintaining training records, and Officer Greg
13  McDanel was then the custodian of that because it
14  was on his evidence program.  And then John Brannon
15  would keep a record of that, too.
16     Q   Prior to -- I've seen some of the
17  electronic records, and we'll go through those
18  later.  When was that switch made?
19     A   I don't remember.
20     Q   The reason I ask that is, some of those
21  obviously don't have some of the earlier dates to
22  the extent the training existed.
23         Was it kept by the sign-in sheet before it
24  went to an electronic basis?
25     A   There would still be a sign-in sheet.

---

58

1      Q   So, for example, if an individual took
2  Taser training through Mr. Brannon and didn't
3  receive a certificate of completion, the best
4  evidence would be a sign-in sheet?
5      A   Yes.
6      Q   And if you use an electronic database to
7  track the trainings, it would be logged in the
8  electronic database?
9      A   It should be, yes.
10     Q   What is CIT?
11     A   Crisis Intervention Team.
12     Q   Did you --
13     A   It's -- I'll expand on it.  Sorry.
14     Q   Absolutely.  It's a broad term.
15     A   Yes, it is.  It's -- it's a program to
16  train officers to deal with individuals in emotional
17  or other type of distress.  It was our intention --
18  my intention to have all our officers trained in
19  CIT.
20     Q   When did you first encounter CIT or that
21  concept, sir?
22     A   When I was at St. Louis County Police
23  Department.
24     Q   In what way did you first encounter that
25  concept?

---

59

1      A   The police department adopted CIT training
2  and actually had -- one of their sergeants was a
3  trainer and brought the program into the police
4  academy.
5      Q   What year did you first encounter CIT at
6  the county?
7      A   I don't know.
8      Q   Are you CIT certified or trained?
9      A   I am not.
10     Q   Have you ever applied?
11     A   No.
12     Q   What officers within the county were
13  CIT-trained?  Patrol officers, detectives?  I mean,
14  was there a specific --
15     A   Generally patrol officers, because they
16  would be most likely to use that training --
17     Q   They encounter individuals.
18     A   -- and some sergeants, yes.
19     Q   Sure.  They're the people on the street.
20     A   Yes.
21     Q   And did you understand, when you worked at
22  the county, that CIT focuses on deescalation
23  strategies?
24     A   Yes.
25         MR. PLUNKERT:  I'm not sure he was done

---

60

1  answering the question on the general --
2  BY MR. JOHNSON:
3      Q   I'm sorry.  And I didn't mean to interrupt
4  you, sir.
5         MR. PLUNKERT:  I think you said started to
6  say sar -- I don't know, you said patrolmen,
7  and you take over from there.
8         Did you -- did you finish answering?
9      A   Some sergeants --
10         MR. PLUNKERT:  Okay.
11     A   -- some supervisors, street supervisors,
12  would also be trained.
13  BY MR. JOHNSON:
14     Q   Certainly.
15         When you first learned of CIT, or Crisis
16  Intervention Team training, do you remember the
17  person at the county that you first learned that
18  from?
19     A   I think it was Sergeant Barry Armfield was
20  talking about it.
21     Q   And what did he do within the department,
22  sir?
23     A   He basically made it his own; it became
24  his -- his project.
25     Q   Was he the advocate within the county for

---

15  (Pages 57 to 60)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

61

1  CIT?
2      A   I can't say he was the only advocate for
3  it.  There were others.
4      Q   He was to you?  You knew him to be
5  associated with CIT?
6      A   Well, there was also Bob Trittler, who
7  ended up being a major with the county police
8  department, and he was a very big proponent of it as
9  well.
10     Q   Do you remember what department or
11  division within the county you were working for when
12  you first learned of CIT from Mr. Armfield or
13  otherwise?
14     A   I'm pretty sure that I was by then in the
15  drug task force.
16     Q   And when you learned of this topic, this
17  general topic, did you endeavor to undertake or
18  learn more about it or did you just hear it?
19     A   No, we talked about it quite a bit,
20  command staff.
21     Q   Because you were command staff at the
22  time?
23     A   Yes.
24     Q   So at a county level, how did the command
25  staff address that topic?  What -- how did it come

62

1  up and what did they do to promulgate or implement
2  things associated with that topic?
3      A   I think they -- we made the decision to
4  implement that training and to make it available
5  through the St. Louis County Police Academy.
6      Q   Is that a separate academy from the
7  Eastern Missouri Academy?
8      A   Yes, it is.
9      Q   Is that the same academy you graduated
10  from, the St. Louis academy?
11     A   No.  No.  I graduated from the St. Louis
12  Metro Academy right down the street here,
13  St. Louis -- it's actually the St. Louis County and
14  Municipal Police Academy, which is in Wellston.
15     Q   Okay.
16     A   Eastern Missouri there is out in
17  St. Charles.
18     Q   Did you ever teach at that academy when
19  you were with the county?
20     A   Sure.
21     Q   What topics did you train at the St. Louis
22  County Academy, the county?
23     A   Blood-borne pathogens response, taught a
24  section in that.  Informant management.
25     Q   Did you understand that CIT, especially at

63

1  a patrol level, is because police are the ones who
2  are called often to a crisis situation?
3      A   That that was the idea, yeah, for the
4  first responders.
5      Q   How did the county then train and certify
6  their own personnel on CIT?
7      A   Through the -- through the St. Louis
8  County Police Academy.
9      Q   So there was a separate module or
10  component of training for CIT through the county
11  academy during the time you worked for the county?
12     A   Yes.
13     Q   And do you know who directed that?
14     A   I'm pretty sure it was Major Trittler and
15  Sergeant Armfield.
16     Q   Do they still do that to this day?
17     A   No.
18     Q   Are they retired?
19     A   I think so, yeah.
20     Q   Do you know if that program still exists
21  as a training module with the county academy?
22     A   They're still teaching it, yes.
23     Q   Did it have -- when you were command
24  staff, did it have a favorable or beneficial
25  outcome?  I mean, did you receive feedback on the

64

1  effectiveness of CIT?
2      A   Yes.
3      Q   What feedback did you receive when you
4  were a commander at the county about the
5  effectiveness of CIT?
6      A   In general terms, just that that was the
7  case and that it was a program worth retaining.
8      Q   Did you receive feedback that it increases
9  officer and citizen safety?
10     A   That was generally the -- the attitude
11  towards it, yeah.
12     Q   Did you receive feedback that it decreased
13  police liability or litigation?
14     A   I didn't know about that.
15     Q   Did you receive anecdotal evidence that
16  the use of CIT within the county prevented some
17  unfortunate occurrence with a certain individual or
18  suspect?
19         I mean, was there any specific occurrence
20  that somebody addressed and said, "Thank God we had
21  CIT because that prevented a bad outcome"?
22     A   There was generally an award given for a
23  particular case throughout the year involving a CIT
24  and crisis intervention.  Yes, there was anecdotal
25  evidence that that was the case.

16  (Pages 61 to 64)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                                        September 18, 2015

---

65

1    **Q**   Was there a survey or tracking data used
2  to track the effectiveness of the CIT program?
3    **A**   Not that I'm aware of.
4    **Q**   Once you left the county and went to
5  Ferguson, did you have any concerns with the
6  effectiveness of CIT within law enforcement?
7        I mean, when you left, I mean, is there
8  something that changed your mind that it was a bad
9  program as opposed to a beneficial one?
10   **A**   No.
11   **Q**   When you got to Ferguson, what efforts did
12 you undertake to train your own police staff in CIT?
13   **A**   I started sending officers, having the
14 commanders send officers to the CIT training.  We
15 could only do a few at a time because it's a --
16   **Q**   It's intensive.
17   **A**   It's an intense and long program, it takes
18 an officer off the street for a while and that it
19 decreases manpower.  But I let the command staff
20 know that it was my intention to have everybody
21 trained on the patrol level.
22   **Q**   And how did you do that?  Did you send an
23 email?  Did you do it at a command staff meeting?
24       How did that -- how was that known?
25   **A**   Regular meetings, command staff meetings.

---

66

1    **Q**   Verbally?
2    **A**   Just talking about it, this is what we
3  want to do.
4    **Q**   You started in March of 2010.
5        At what point after that at Ferguson did
6  you first send officers for CIT training?
7    **A**   I don't remember.  It was -- it was up on
8  the priority list, so it would have been not too
9  long after that.
10   **Q**   Why was it a priority?
11   **A**   I thought the training would be good --
12 good for the officers.
13   **Q**   And was there a training person such as
14 Mr. Henke that was in charge of enrolling people for
15 CIT training at Ferguson?
16   **A**   It was up to the supervisors to -- you
17 know, the lieutenants, to make training available
18 for their officers, and then it was Greg McDanel who
19 would -- he was the official person to make the
20 applications.  Each agency has one person that
21 applies for training at the academy.
22   **Q**   Exhibit 2, which again discusses training,
23 it's a general order you drafted, on page 2, the
24 lower portion of page 2 talks about post-commission
25 requirements for education or training, correct?

---

67

1    **A**   Yes.
2    **Q**   And there are different modules or topics
3  that you can take continuing education in law
4  enforcement in.  Among those are interpersonal -- or
5  I'm sorry -- legal studies, interpersonal
6  perspectives, technical studies and firearms.
7        Those are just some of them, correct?
8    **A**   Yes.
9    **Q**   What module, if it's one of them, is CIT?
10       Is that interpersonal to you, or is CIT
11 separate and apart?
12   **A**   It would -- it would actually have -- it's
13 an assigned through the academy.  It would have an
14 assigned one of these four core areas.  So I don't
15 know which one they assigned to it, I don't
16 remember, but I -- presumably that would be it.
17   **Q**   When you undertook it to instruct or ask
18 your supervisors to have their officers receive CIT
19 training, did you follow up to make sure that that
20 was being done?
21   **A**   I -- yes.  I actually went to the first
22 graduation of my officers.
23   **Q**   Can you name for me any of the Ferguson
24 Police Department officers who were CIT trained
25 during your tenure as chief?

---

68

1    **A**   Not at the moment, no.
2    **Q**   Do you have an estimate as to the
3  percentage of Ferguson Police Department officers
4  who are CIT trained as of the first year you were
5  there?
6    **A**   No, I don't.
7    **Q**   And the training that you had the officers
8  receive was taken where?
9    **A**   At the St. Louis County Police Academy.
10   **Q**   Where you used to work?
11   **A**   Yes.
12   **Q**   And when you started at Ferguson in 2010,
13 was there a different CIT trainer at the St. Louis
14 County Academy other than the names of the retirees
15 you told me about before?
16   **A**   I don't know.  I don't remember.
17   **Q**   And part of this is you're taking
18 patrolmen off the street?  I mean, they're there 40
19 hours for the training or so, correct?
20   **A**   Yes.
21   **Q**   It's training that they're there basically
22 for a workweek?
23   **A**   Yes.
24   **Q**   And -- meaning they can't work as a patrol
25 officer?

---

17 (Pages 65 to 68)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                     September 18, 2015

---

69

1  **A**   Yes.
2  **Q**   Was there budgetary concerns at Ferguson
3  for taking too many people off the street to do CIT
4  training?
5  **A**   Budgetary, no.
6  **Q**   Was it a money issue to you that we didn't
7  want people to take CIT training because they
8  couldn't be working for us?
9  **A**   No.  It was a staffing issue.
10 **Q**   So when the decision was made -- strike
11 that.  Was the decision, to your knowledge, to take
12 CIT training voluntary to the officer, or were some
13 selected and instructed to take CIT training?
14 **A**   It was my intention to make it mandatory.
15 **Q**   For everybody?
16 **A**   Yes.
17 **Q**   At some point?
18 **A**   Yes.
19 **Q**   And did you have a rotation or schedule
20 where your officers were to take it?
21 **A**   I -- I didn't.
22 **Q**   You understood that CIT training was
23 offered at various points during the calendar year,
24 correct?
25 **A**   Yes.

---

70

1  **Q**   Not just a one-shot deal?
2  **A**   Right.
3  **Q**   Did you, as Chief of Police of Ferguson,
4  make sure that every rotation of CIT training was
5  staffed by as many people as you could get in it?
6         MR. PLUNKERT:  Object to form and
7  foundation.
8         MR. JOHNSON:  That was a poorly worded
9  question.  Let me ask a better one.
10 BY MR. JOHNSON:
11 **Q**   As chief of police, when there was
12 openings, if there were openings for CIT training,
13 did you take it upon yourself to ensure that you had
14 enrolled as many police officers as you feasibly
15 could?
16 **A**   There would be another factor there, and
17 that would be staffing.
18 **Q**   Sure.  Because you have staffing of
19 shifts, correct?
20 **A**   Yes.
21 **Q**   Did Ferguson sending officers to the
22 county academy for CIT training become a staffing
23 issue, to your knowledge?
24 **A**   I don't have any specific memory of that.
25 **Q**   No complaints, no concerns, you know, why

---

71

1  can't this guy show up, oh, he's at training, you
2  know --
3  **A**   Always staffing complaints, but ...
4  **Q**   People are going to complain about
5  everything.
6  **A**   Nothing -- yeah.  Nothing specific to this
7  that I remember.
8  **Q**   Did you receive feedback from the officers
9  that went to CIT training?
10 **A**   Yes, I did.
11 **Q**   What was their feedback to you, sir?
12 **A**   They loved it.
13 **Q**   Why?
14 **A**   They felt the training was excellent and
15 the presentation was -- was really well rehearsed.
16 **Q**   Between you starting as chief in March of
17 2010 and let's say a year later, within that first
18 year, did you receive anecdotal evidence similar to
19 what you received at the county about the
20 effectiveness of CIT training?
21 **A**   I don't remember anything specific.
22 **Q**   Did you give out any commendations or
23 awards to officers for having an effective use of
24 CIT?
25 **A**   I gave out a lot of awards, so I can't put

---

72

1  my finger on any one right now.
2  **Q**   Okay.  Staffing, when it came to staffing,
3  first of all, who did it?  Who was in charge of
4  staffing the shifts during the time you were chief?
5  **A**   In general, the commander of field
6  operations, Captain Henke.  And he actually did a
7  lot of the scheduling, although the -- the watch
8  commanders, the lieutenants, and then sometimes the
9  sergeants, had the option of moving those around
10 to -- to make sure that all beats were manned.
11 **Q**   And what -- how many shifts did you guys
12 operate at Ferguson?  How did it work?
13 **A**   When I started there, it was three
14 eight-hour shifts backward rotation.  Ultimately, we
15 went to the 12-hour shift.
16        (Deposition Exhibit Number 3
17         marked for identification.)
18 BY MR. JOHNSON:
19 **Q**   I'm going to hand you Exhibit 3,
20 Mr. Jackson, which I understand to be another
21 general order that was utilized in Ferguson.
22        Do you see that, sir?
23 **A**   Yes.
24 **Q**   What is Exhibit 3?
25 **A**   Daily assignments and monthly work

---

18  (Pages 69 to 72)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                          September 18, 2015

---

73

1    schedules, General Order 200, November 30th, 2011.
2    **Q**   Is this the staffing schedule that you
3   created as chief of police, sir?
4    **A**   It is.
5    **Q**   And it's dated November 30th, 2011.
6    Do you know if there was a prior general
7   order that would have been in effect between March
8   of 2010 and November 30th of 2011 as it pertains to
9   daily assignments and monthly work schedules?
10    **A**   I don't have specific memory of that.
11    **Q**   You don't have specific memory whether you
12   created a new general order on this topic or just
13   revised an old one?
14    **A**   That's correct.
15    **Q**   And in -- let's say between 2010 and
16   midpoint of 2011, okay, was it Mr. Henke who was the
17   one who did staffing?
18    **A**   Yes.  And if I may interject, this general
19   order has obviously been -- was for the 12-hour
20   shift, not the backward rotating eight-hour shift.
21   Let me clarify that.
22    **Q**   Would Exhibit 3 apply to patrol officers
23   at Ferguson for their staffing and their scheduling?
24    **A**   Yes.
25    **Q**   And if you know, how did Mr. Henke

---

74

1   actually implement the staffing?  Did he -- first of
2   all, did he do it on his own?
3    **A**   Yes.  He took large responsibility for
4   making out the schedule and did it with paper and
5   pencil for quite a long time.  Eventually we went to
6   electronic, but the officers and supervisors still
7   maintained the paper and pencil because of the
8   potential need to revise that on short notice,
9   someone calls in sick or something to that effect.
10    **Q**   Do you know if Mr. Henke ever used as a
11   staffing consideration ensuring that a CIT-trained
12   officer was on each staff, on each shift?
13    **A**   That was my instruction.
14    **Q**   When did you provide that instruction?
15    **A**   I don't recall.  It just was the -- the
16   intention that we -- we had as a staff, part of
17   the -- implementing the CIT.
18    **Q**   And why did you want a CIT-trained
19   patrolman on each shift?
20    **A**   To provide that extra expertise in
21   situations where it may be warranted.
22    **Q**   And those situations obviously could be
23   somebody who's emotionally unstable?
24    **A**   Yes.
25    **Q**   Did you -- how did you track whether

---

75

1   Mr. Henke was complying with your directive to
2   ensure that a CIT-trained patrolman was on each
3   shift?
4    **A**   There was no specific tracking of that.
5    **Q**   Did you extend your implementation of the
6   CIT program to the communications division?
7    **A**   Yes.  Yes, we did.
8    **Q**   When did you do that, sir?
9    **A**   Again, specific dates I -- I can't recall.
10    **Q**   Do you know whether, as of September 2011,
11   that you had CIT-trained personnel working in
12   communications?
13    **A**   Yes.  Say that date again.
14    **Q**   September 2011.
15    **A**   I don't --
16    **Q**   So about a year and a half into your
17   tenure?
18    **A**   I don't know.
19    **Q**   Do you know within the first 18 months of
20   your tenure whether you had sent any communications
21   personnel for CIT training?
22    **A**   I -- I just can't give you a specific date
23   on when that happened.
24    **Q**   At St. Louis County did you have a
25   communications division?

---

76

1    **A**   Yes.
2    **Q**   Use your own 911 operators?
3    **A**   Yes.
4    **Q**   Use your own dispatchers?
5    **A**   Yes.
6    **Q**   When you were at St. Louis County, were
7   your own communications department personnel trained
8   in CIT?
9    **A**   I don't know.
10    **Q**   When you signed on at Ferguson to be the
11   chief executive officer, did you make it a priority
12   to make sure that not only the patrolmen on the
13   street but also the communications division who
14   would deal with individuals were CIT trained?
15    **A**   My first priority with communications was
16   to make sure that they had a procedure manual and
17   specific initial training guidelines.
18    **Q**   And the procedure manual, is that the
19   general orders or is that something different?
20    **A**   It's a specific set of general orders
21   specifically for communications officers.  It's
22   rolled in.
23    **Q**   I'm sorry.  No, go ahead, go ahead.
24    **A**   It's rolled into the general orders
25   manual, but we made it a separate manual also for

---

19 (Pages 73 to 76)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                      September 18, 2015

---

77

1  communications.
2      Q   Similar to the patrol, what efforts did
3  you undertake to ensure that there was a CIT-trained
4  individual working on each shift in communications?
5      A   That was up to the supervisor of
6  communications.  Communications is a lot more
7  problematic because there's a lot of turnover, so
8  that was -- that would be a difficult proposition at
9  best.
10     Q   In 2011 who was the supervisor of the
11 communications department at Ferguson?
12     A   Sergeant ... Sergeant Bill Mudd was
13 initially, and I started there and then it was
14 Sergeant Mike Wood.  The first one was -- well, I'm
15 sorry.  The first one was Bill Mudd, and he was
16 followed by Sergeant Mike Wood.
17         MR. PLUNKERT:  Do you want to take a
18 break?
19         MR. JOHNSON:  Yeah, let's do that.
20         THE VIDEOGRAPHER:  We're off the record at
21 10:32.
22         (Recess taken.)
23         THE VIDEOGRAPHER:  We're back on the
24 record at 10:49.  This begins disk number 2 in
25 the deposition of Chief Thomas Jackson.  Please

---

78

1      continue.
2  BY MR. JOHNSON:
3      Q   I want to switch topics for a second,
4  Mr. Jackson, and I want to focus on a couple of
5  other policies.  I'm not going to show you every
6  general order that you ever signed, but I do want to
7  make sure I understand some of the different aspects
8  of some of them, so I'm probably going to mark a
9  handful of these general orders and make sure I
10 understand some of the different topics
11 operationally that would have existed within the
12 police department at Ferguson.
13         I want to bypass and kind of jump all the
14 way back to an allegation of employee misconduct and
15 then kind of go from there on some discipline issues
16 just to give you a roadmap where I'm headed.
17         First of all, I'm going to mark as
18 Exhibit 4 another general order that I received in
19 this case and ask if you could please identify that
20 for me, sir.
21         (Deposition Exhibit Number 4
22         marked for identification.)
23     A   General Order 301.00, dated May 21st,
24 2010, Allegations of Employee Misconduct Internal
25 Affairs Investigations.

---

79

1  BY MR. JOHNSON:
2      Q   This is a general order that you
3  promulgated, sir?
4      A   Yes.
5      Q   And it was effective two months or so
6  after you started?
7      A   Yes.
8      Q   Do you remember wanting to address
9  employee misconduct early in your tenure?
10     A   Yes.
11     Q   Why?
12     A   There are several things that are
13 important to a police chief, those being use of
14 force, internal affairs investigations, domestic
15 violence and other issues.  It's just a matter of
16 prioritizing.
17     Q   Absolutely.  And under this general order,
18 that, again, would have been applicable your entire
19 period of time as chief?  I didn't get any others.
20     A   Unless there's a revision, then yes.
21     Q   Okay.  So this general order,
22 Exhibit Number 4 --
23     A   Seven.  Oh.
24     Q   That's my handwriting.
25     A   Okay.  Sorry.

---

80

1      Q   Totally my fault.
2      A   I apologize.
3      Q   It's 4.
4      A   Got it.
5      Q   Who was the professional standards
6  inspector at Ferguson when you were chief?
7      A   That is a position that I rotated among
8  the command staff.
9      Q   So there was no set person?
10     A   No, there was not.
11     Q   How often was it rotated?
12     A   Probably every six months.
13     Q   And how many different members of the
14 Ferguson Police Department were called command staff
15 during the time you were chief?
16     A   Three captains and three lieutenants.
17     Q   Six?
18     A   Yes.
19     Q   All overseeing a different department of
20 the department -- division of the department?
21     A   Some worked in the same division.  Patrol
22 captain had two lieutenants.
23     Q   I've seen the name of a Lieutenant
24 Ballard.
25     A   Yes.

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al. v. Brian Kaminski, et al.

Thomas Jackson                                              September 18, 2015

---

81

1    **Q**    Are you familiar with Mr. Ballard?
2    **A**    Yes.
3    **Q**    And was he a patrol captain in September
4    of 2011, if you know?
5    **A**    He was a patrol lieutenant.
6    **Q**    Patrol lieutenant, meaning he oversaw the
7    sergeants who then oversaw the police officers who
8    were on patrol, correct?
9    **A**    Yes.
10   **Q**    And so was Mr. Ballard at one point a
11   professional standards inspector at Ferguson?
12   **A**    No.
13   **Q**    And the professional standards inspectors,
14   whoever that may have been at the time, would
15   receive and review allegations of brutality?
16   **A**    Yes.
17   **Q**    Misuse of force?
18   **A**    Yes.
19   **Q**    Breach of civil rights?
20   **A**    Yes.
21   **Q**    Corruption?
22   **A**    Yes.
23   **Q**    And criminal misconduct?
24   **A**    Yes.
25   **Q**    And those complaints, if they were

---

82

1    provided by a citizen, could be complaints made
2    verbally?
3    **A**    Yes.
4    **Q**    They could be made in writing?
5    **A**    Yes.
6    **Q**    They could be made verbally and reduced to
7    writing?
8    **A**    Yes.
9    **Q**    And just so I understand how things
10   operationally worked when it came to citizen
11   complaints, if a citizen comes off the street and
12   makes a complaint, are they referred to the
13   professional standards inspector, or do they give
14   that complaint to somebody else within the
15   department?
16   **A**    So the complaint -- do you have the form
17   in here?
18   **Q**    I probably do have a template in there, if
19   you want to look at it.
20   **A**    Okay. This is the complaint form that I
21   created.
22       MR. PLUNKERT: Was that Bates stamped 495?
23       MR. JOHNSON: Thank you.
24       THE WITNESS: Yes. And if a citizen
25   wanted to make a complaint, they would fill

---

83

1    this out. It would come to me. I would assign
2    it a -- an internal affairs decision file
3    that -- division file number and then assign it
4    to a commander.
5    BY MR. JOHNSON:
6    **Q**    Did all complaints made by citizens come
7    to you?
8    **A**    All written complaints, yes.
9    **Q**    Through all written?
10   **A**    Yes.
11   **Q**    What about verbal?
12   **A**    Sometimes those could be handled by a
13   supervisor on the street and I wouldn't be aware of
14   it.
15   **Q**    And if they were written, how were they
16   routed to you? Who would provide them to you?
17   **A**    The commander that was assigned to the
18   investigation would give me a written memorandum
19   detailing the investigation, the conclusions.
20   **Q**    Would the conclusions as to whether the
21   complaint was warranted be made before it was
22   presented to you for your review?
23   **A**    It would be an opinion of the
24   investigator, yes.
25   **Q**    So the investigator would make the

---

84

1    preliminary opinion, you would then review the
2    complaint yourself?
3    **A**    No.
4    **Q**    And you obviously had the discretion to
5    determine whether or not the complaint was warranted
6    or not warranted?
7    **A**    Yes.
8    **Q**    Once the complaint left your desk, where
9    did it go, sir?
10   **A**    Into a file, a locked file.
11   **Q**    And what's that file called?
12   **A**    Complaints file.
13   **Q**    Who maintained the file in 2010, when you
14   started?
15   **A**    Prior to me?
16   **Q**    Well, when you started who maintained it?
17   **A**    Oh. Me.
18   **Q**    And were you the person who maintained the
19   complaint file that were written complaints made
20   about representatives of the Ferguson Police
21   Department the entire period of time you were chief?
22   **A**    Yes.
23   **Q**    So the five years that you were chief
24   executive officer, if it was a written complaint
25   routed to you, you kept it?

---

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

85

1    **A**   Yes.
2    **Q**   The reason I ask is, I'm not sure that I
3    have -- and counsel can correct me if I'm wrong.
4    I'm not sure that we have any written complaints
5    that predate September of 2011.
6         Do you know what you did with all the
7    complaints, to the extent they were made, that you
8    had in your possession?
9    **A**   They were all in that file.
10   **Q**   And the file was just called complaints?
11   **A**   It was -- it was the internal affairs
12   complaints file.
13   **Q**   Is there a difference between citizen
14   complaints and internal-affairs-related complaints?
15   **A**   If a supervisor made a complaint against
16   an officer, it was still maintained in the same
17   file, so technically, no.
18   **Q**   So whether the complaint came from a
19   citizen against an officer or an officer against an
20   officer, all of those complaints were routed to you
21   for your review?
22   **A**   Yes.
23   **Q**   And is there a different approach that
24   Ferguson undertook when you were chief in reviewing
25   citizen complaints of an officer versus officer

---

86

1    complaints of an officer?
2    **A**   Only in that in a citizen complaint, you
3    know, we would communicate the finding.
4    **Q**   If you know, did you receive complaints
5    about officers from citizens in the first year you
6    were in office?  For any reason.
7    **A**   I can't say for certainty any specific
8    one, but it seemed that -- it seemed that there
9    were.
10   **Q**   Did you receive a complaint that you
11   deemed to be a complaint involving physical abuse of
12   an officer by a citizen the first year you were
13   chief?
14   **A**   I don't remember any specific examples.
15   **Q**   Did you ever receive a citizen complaint
16   about an officer of the Ferguson Police Department
17   involving an improper or inappropriate use of force
18   during the first year you were chief?
19   **A**   I don't remember.
20   **Q**   Have you ever received a complaint about
21   an officer inappropriately using a Taser device on a
22   citizen during the time you were Ferguson police
23   chief other than the complaint I'm here for today?
24   **A**   I don't remember.
25   **Q**   If a complaint was made against a Ferguson

---

87

1    Police Department officer, did that complaint become
2    part of the officer's personnel file?
3         MR. PLUNKERT:  Object to the form.
4    BY MR. JOHNSON:
5    **Q**   If you know.
6    **A**   That became a part of his police file.
7    **Q**   Okay.  Let's talk about files for a
8    second.  Are there personnel files maintained on
9    officers by Ferguson Police Department?
10   **A**   Yes.
11   **Q**   Did you do that when you were chief?  Were
12   you the one who actually maintained the personnel
13   files of the department officers?
14   **A**   No.  We -- we took them all immediately
15   and turned them over to Human Resources, so they
16   were all -- all city employees were essentially
17   located in City Hall.
18   **Q**   So when you started as police chief in
19   March of 2010, all police department personnel files
20   were sent to the City of Ferguson City Hall?
21   **A**   Yes.
22   **Q**   To be maintained by City of Ferguson human
23   resources representatives?
24   **A**   Correct.
25   **Q**   Did you maintain a separate personnel file

---

88

1    in addition to the file maintained by HR?
2    **A**   Only the internal affairs investigations.
3    Any -- any discipline would be reported to human
4    resources.
5    **Q**   And what documents generally are comprised
6    in an internal affairs file?
7    **A**   Generally it's going to be this form,
8    0495.
9    **Q**   Okay.
10   **A**   And then a memorandum from the
11   investigating supervisor who would detail
12   interviews, any evidence, any investigation that was
13   conducted, the listing of the general orders that
14   was alleged to have been violated, and then a
15   conclusion by that investigator on whether or not
16   they believe the allegations were in full or in part
17   valid.
18   **Q**   Would citizen complaints against an
19   officer be part of the internal affairs files that
20   you kept?
21   **A**   Yes.
22   **Q**   Would the investigation into those citizen
23   complaints be kept in the internal affairs files you
24   kept?
25   **A**   Yes.

---

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                         September 18, 2015

---

89

1    Q    We used the term "complaint files"
2  earlier.
3    A    Yes.
4    Q    Is complaint file and internal affair file
5  one and the same in your mind?
6    A    Yes.
7    Q    Got it.  Did you continue the process of
8  your predecessor in doing that, sir?
9    A    I don't actually know what his process
10  was.
11    Q    When you got to your office and moved in,
12  were there personnel files there or internal affair
13  files, as you said earlier?
14        That's two questions.  Let me break it up.
15    A    Okay.
16    Q    When you moved in, were there old
17  complaint or internal affair files present in your
18  office for officers?
19    A    The files were kept by the individual
20  supervisors or commanders.
21    Q    Okay.
22    A    I consolidated them.
23    Q    So the six supervisors or commanders, I
24  think you told me earlier, they were kept kind of
25  department by department?

---

90

1    A    By division.
2    Q    Division.  I'm sorry.
3    A    Yes.
4    Q    And how many divisions were there when you
5  started as chief?
6    A    Just the two, but there was also a
7  separate unit that -- that oversaw the civilian
8  employees, and that was maintained separately as
9  well.
10    Q    So going forward, after you started as
11  chief, you then maintained internal affair files for
12  five years on each officer?
13    A    Yes.
14    Q    And if discipline was rendered relating to
15  a complaint, HR in the city would be the one to
16  receive the disposition?
17    A    Yes.
18    Q    Did you provide a copy of the internal
19  affair files to HR at the City of Ferguson, or did
20  you keep that separate?
21    A    I kept that separate.
22    Q    When you resigned, you still had the
23  internal affair files in your office?
24    A    Yes.
25    Q    And there were things in those files?

---

91

1    A    Yes.
2    Q    Describe for me the size of it.  Big,
3  small, medium?
4    A    It was --
5    Q    One cabinet, two cabinets?  You tell me.
6    A    One file drawer.
7    Q    You're kind of gesturing, and we're on a
8  tape, we can see these things, but describe for me
9  what it looked like.
10    A    One standard-size file drawer, desk-type
11  file drawer.
12    Q    And was that kept a folder per officer?
13    A    No.  It was kept by the IAB number which
14  you see at the top of the complaint form, 0495.
15    Q    So did you try and keep that
16  chronologically, then?
17    A    I kept it chronologically, yes.
18    Q    If there was a lawsuit against an officer
19  for whatever claim, did you keep the lawsuit as part
20  of the internal affairs file?
21    A    No.
22    Q    Would you consider a lawsuit to be a
23  citizen complaint against an officer?
24    A    No, not in the -- not in the sense that
25  this is a direct complaint to the police department

---

92

1  from a citizen, so no.
2    Q    So lawsuits, to the extent they existed,
3  would not be maintained in the IA files?
4    A    They were managed separately.
5    Q    By who?
6    A    By counsel.
7    Q    In-house counsel or outside?
8    A    Both.
9    Q    And so when I say "in house," that's
10  somebody at City Hall?
11    A    Yes.
12    Q    Ms. Karr?
13    A    Yes.
14    Q    Is she still there?
15    A    To the best of my knowledge, yes.
16    Q    Do you know whether there were complaints
17  that were written for any reason between 2010 and
18  2014 that you received about an officer?
19    A    Yes.
20    Q    How many?
21    A    It seemed to me, when I was reviewing this
22  last year, we had an average of three per month over
23  that time, which included supervisor complaints.
24    Q    Sure.  Meaning complaints against a
25  supervisor or a supervisor complaining about a

---

23 (Pages 89 to 92)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                           September 18, 2015

---

93

1  subordinate?
2      **A**    What I meant is a supervisor complaining
3  against a subordinate, but it would work both ways.
4      **Q**    Sure.
5      **A**    A subordinate could make a complaint
6  against a supervisor.
7      **Q**    It could be an HR issue, I mean, it could
8  be he's working me too much, something like that?
9      **A**    Often, yeah.
10     **Q**    You kept all types of complaints, correct?
11     **A**    Anything that was put in writing and
12  investigated -- or anything that was investigated
13  was -- I kept a file on.
14     **Q**    Out of the 36 per year, on average, and
15  I'm using your numbers, so tell me if I'm wrong, out
16  of the 36 per year on average, how many of them did
17  you find to be warranted?
18     **A**    I couldn't give you an accurate number on
19  that.
20     **Q**    Did you find any complaint to be warranted
21  for any reason?
22     **A**    Yes.
23     **Q**    Was that commonplace with you, or was that
24  unusual that you found a complaint to be
25  substantiated or warranted?

---

94

1      **A**    Probably less often than not.
2      **Q**    And to be fair to you, there are
3  definitions on page 6 of Exhibit 4.
4      **A**    Yes.
5      **Q**    We see unfounded, exonerated, withdrawn,
6  not sustained, and sustained.  Are those terms that
7  you used?
8      **A**    Yes.
9      **Q**    So when you would make a recommendation or
10  disposition of a complaint, did you utilize the
11  terms we see on page 6 of Exhibit 4?
12     **A**    Yes.
13     **Q**    And the Annual Statistical Summaries that
14  are referenced on page 8 of Exhibit 4, where were
15  those maintained or located at Ferguson?
16     **A**    I kept a log of all complaints, and they
17  were all kept by the complaint number and
18  complainant, officer complained against, and the
19  disposition.  And that was made in an annual report
20  that went to the city manager.
21     **Q**    When did you make that report?  Was there
22  a certain month, fiscal year, calendar year that you
23  made that to the city manager?
24     **A**    Usually after the first of the year.
25     **Q**    So in your tenure, early 2011, 2012, 2013,

---

95

1  2014, 2015, five years, did you make five reports to
2  the city manager compiling IA statistics?
3      **A**    Did you say 2010?
4      **Q**    Well, starting in 2011.
5      **A**    Then yes, my administrative assistant
6  would just come to me and ask me for the stats, and
7  I would give them to her and she would ...
8      **Q**    Did you draft the log yourself, sir?
9      **A**    I kept the log myself, yes.
10     **Q**    And so was that a separate document that
11  you maintained along with the various
12  chronologically ordered complaints?
13     **A**    Yes.
14     **Q**    Do you still have copies of any of these
15  documents since you separated employment?
16     **A**    No.
17     **Q**    Did you take any operational documents
18  with you, sir?
19     **A**    No, I did not.  I tried to take my own
20  documents with me and they weren't on the disk, the
21  thumb drive.
22     **Q**    Yeah.
23     **A**    I lost them all.
24     **Q**    Technology.
25     **A**    Yeah.

---

96

1      **Q**    Did you categorize the statistical
2  summaries in any type of complaint fashion, such as
3  this is one about corruption, this is one about use
4  of force?  Was it set forth in that manner?
5      **A**    Not -- no, it was not.
6      **Q**    Tell me the layout and design of the log.
7  Was it -- you told me before.  Is it just number,
8  complainant, disposition?
9      **A**    Number, complainant, who the complaint was
10  against, and disposition.
11     **Q**    And it says the professional standards
12  inspector is the one that compiled it.  You did it
13  yourself?
14     **A**    I did it myself.
15     **Q**    The inspectors did not do it?
16     **A**    No.
17     **Q**    Did you get feedback from Mr. Shaw when
18  you would meet with him about the statistical
19  summaries?  Strike that.  Let me ask a better
20  question.
21         Did you meet with him about the
22  statistical summaries?
23     **A**    Yes.  I met with him about almost
24  everything.
25     **Q**    Any concerns that he made to you with the

---

24  (Pages 93 to 96)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

97

1  nature of the complaints?
2      A   Not in general terms, no.
3      Q   The numerosity of the complaints?
4      A   No.
5      Q   Did you consider the complaints to be
6  excessive in number?
7      A   No.
8      Q   Did you actually give Mr. Shaw a copy of
9  the log or did you just meet with him about it?
10     A   No.  My administrative assistant did
11  the -- did the log.
12     Q   So you think, and I know I'm not holding
13  you to anything too specific here, but you think
14  there may be five logs that you would have given
15  Mr. Shaw during your tenure as Ferguson police
16  chief?
17     A   Yes.
18     Q   And the logs would be kept --
19     A   It's --
20     Q   Go ahead.
21     A   Let me -- because you're saying "log," and
22  these would be summaries.
23     Q   Summaries.
24     A   Summaries of the complaints for the
25  previous year.

---

98

1      Q   And you were the one to determine how the
2  complaint would be characterized when you put in the
3  summary?
4      A   Yes.
5      Q   So if we see -- and I'm going to make
6  something up here -- we see a use-of-force
7  complaint, you know, somebody hogtied a suspect,
8  would you put down use of force as the category?
9      A   Yes.
10         MR. PLUNKERT:  Todd, when you're done with
11  this line of questioning, I wanted to bring
12  something up I just now remembered --
13         MR. JOHNSON:  Okay.
14         MR. PLUNKERT:  -- but I don't want to
15  get --
16         MR. JOHNSON:  Well, don't get in my way.
17         MR. PLUNKERT:  There was a -- something
18  that I think he wanted to clarify on the record
19  that we forgot to say when he came back on from
20  the break.
21         MR. JOHNSON:  Okay.
22         THE WITNESS:  Yes.
23         MR. PLUNKERT:  A previously asked question
24  that was --
25         MR. JOHNSON:  And I appreciate that and I

---

99

1  asked you to do that.
2         THE WITNESS:  Yeah.  When we were talking
3  about every officer receiving the Taser
4  training --
5         MR. JOHNSON:  Yes, sir.
6         THE WITNESS:  -- that -- that was an
7  assumption.  I'm -- if officers came over and
8  were certified, I don't know for certain that
9  they sat through a second certification.
10  BY MR. JOHNSON:
11     Q   Okay.  So to your knowledge, there were --
12  were there any recertifications of Taser-certified
13  Ferguson Police Department officers, period?
14     A   Recertifications ...
15     Q   Meaning they got a certification, whether
16  it be in house or prior to or outside of Ferguson,
17  did you ever, to your knowledge, recertify any
18  officer on the use of the Taser ECW?
19     A   What I'm referring to is an officer going
20  through the initial certification a second time.  I
21  don't know that everybody, in fact, did that.
22     Q   Okay.  And then my followup question would
23  be, if an officer was certified, to your knowledge,
24  was any officer ever recertified?
25     A   It was my understanding that there was

---

100

1  recertification training.
2      Q   By Mr. Brannon?
3      A   Yes.
4      Q   Anybody else?
5      A   Not that I remember.
6      Q   Do you know the identity of any personnel
7  who are recertified?
8      A   No.  I can't say off the --
9      Q   Do you know why Mr. Brannon recertified
10  certain officers?
11     A   It would only be a recertification if
12  their certification expired or if there was --
13     Q   Like a driver's license?
14     A   Yes.
15     Q   Was there any recertification on the Taser
16  ECW because of different guidelines that had been
17  promulgated?
18         MR. PLUNKERT:  Object to foundation.
19         MR. JOHNSON:  We'll get there on that one.
20  BY MR. JOHNSON:
21     Q   Go ahead.
22     A   I -- I can't recall any specific
23  certification trainings that happened beyond the
24  initial.
25     Q   Fair to say you weren't personally

---

25  (Pages 97 to 100)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

101

1   involved in the Taser certification of your
2   officers?
3       **A**   That's very fair to say, yes.
4       **Q**   Fair to say you were not personally
5   involved in the CIT certification of any of your
6   officers?
7       **A**   That's correct.
8       **Q**   Fair to say that you just knew whether or
9   not maybe they had it or didn't have it and that's
10  about it?
11      **A**   Yes.
12      **Q**   And in some cases you may not know whether
13  they had it at all?
14      **A**   Directed it to be done.
15      **Q**   But you agree with me that under the
16  general orders that you promulgated, you had the
17  ultimate responsibility at the end of the road for
18  the training of your officers?
19      **A**   Yes.
20          MR. PLUNKERT:  Object to the form and
21  foundation.
22  BY MR. JOHNSON:
23      **Q**   Was there any, first of all, any general
24  order that you promulgated at Ferguson on in-custody
25  deaths?

---

102

1       **A**   I don't remember specifically.
2       **Q**   Any trainings that you directed on
3   in-custody deaths?
4       **A**   I don't remember any specifically.
5       **Q**   Whether that in-custody death is as the
6   result of a firearm, a ECW, or any other use of
7   force?
8       **A**   Well, there were procedures to be
9   followed, you know, after such an incident.
10      **Q**   Procedures to be followed after the death
11  of a suspect?
12      **A**   Yes.
13      **Q**   And we'll get to those.
14      **A**   Okay.
15      **Q**   That would be notification of the kin,
16  et cetera?
17      **A**   Yes.
18      **Q**   I gotcha.  Were you the -- as chief
19  executive officer of the Ferguson Police Department,
20  ultimately responsible for any discipline and
21  counseling of your police officers?
22      **A**   Yes.
23      **Q**   And when it came to the discipline and
24  counseling for somebody who had been alleged to have
25  engaged in some inappropriate conduct, was there

---

103

1   progressive discipline at Ferguson?
2       **A**   Yes.
3       **Q**   And if discipline was necessary, was there
4   a chain of command in terms of who handed out the
5   discipline for a patrol officer?
6       **A**   Yes.
7       **Q**   And what was the chain of command when it
8   came to the discipline of a patrol officer in terms
9   of who was to mete out the discipline first?
10      **A**   In minor offenses it would often be the
11  first-line supervisor, and that would be usually in
12  the form of an oral reprimand or admonishment.
13          (Deposition Exhibit Number 5
14          marked for identification.)
15  BY MR. JOHNSON:
16      **Q**   I'm going to hand you Exhibit 5, sir, and
17  ask if you can identify this general order for me,
18  Mr. Jackson.
19      **A**   Progressive Discipline and Counseling,
20  General Order 303.0, July 6, 2010.
21      **Q**   Again, early in your tenure at Ferguson?
22      **A**   Yes.
23      **Q**   Did you see progressive discipline and
24  counseling as a priority when you started as chief?
25      **A**   Yes.  As I -- I'm sorry.

---

104

1       **Q**   Why?
2       **A**   As I stated earlier, taking over as chief,
3   there were -- I prioritized certain functions within
4   the department and felt that complaint practices and
5   subsequent discipline was important and a priority.
6       **Q**   They go hand in hand?
7       **A**   They do.
8       **Q**   And minor violations and major violations
9   are set forth in Exhibit 5, true?
10      **A**   That's true.
11      **Q**   And there is a progressive chain of
12  discipline that's set forth for minor violations on
13  page 2 of Exhibit 5, true?
14      **A**   Yes.
15      **Q**   Is the first page of Exhibit 5, the minor
16  violations, is that an exhaustive list of minor
17  violations, or are there other minor violations that
18  can lead to some form of discipline?
19      **A**   That is not an exhaustive list; there
20  could be others.
21      **Q**   What do you consider to be clerical
22  errors?
23      **A**   Putting the wrong ordinance number on a
24  traffic violation.
25      **Q**   Things of that nature?

26  (Pages 101 to 104)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                        September 18, 2015

---

105

1    **A**   I'm blank.
2    **Q**   That's okay.  How about an inaccurate
3    reporting on the use of force?  Is that clerical in
4    your mind?
5    **A**   If it was an unintentional inaccuracy,
6    then yes.
7    **Q**   You draw that distinction, intentional
8    versus unintentional?
9    **A**   If it's something that could be corrected
10   with --
11   **Q**   Go ahead, sir.
12   **A**   If the error is something that could be
13   corrected with a pen stroke, then it's a clerical
14   error.  If it's an intentional misrepresentation,
15   then it would be otherwise.
16   **Q**   Do you consider clerical errors that are
17   made that are unintentional, do you expect that the
18   officer will correct that clerical error?
19       MR. PLUNKERT:  It calls for speculation.
20   You may answer.
21   **A**   It would be my intention that if the
22   officer didn't catch it that the supervisor would
23   and direct it to be corrected.
24   BY MR. JOHNSON:
25   **Q**   Because you have police report procedures

---

106

1    within your department when you were chief, correct?
2    **A**   Yes.
3    **Q**   And you want, consistent with those police
4    report procedures for your officers and/or their
5    supervisors who are reviewing those reports, to be
6    truthful and accurate in the reporting of a
7    situation?
8    **A**   Yes.
9    **Q**   And if an unintentional clerical error is
10   caught, whether it be by the officer or the
11   supervisor, you would expect that that error would
12   be remedied?
13   **A**   Yes.
14       MR. PLUNKERT:  Same objection.
15   BY MR. JOHNSON:
16   **Q**   If it's not, does that transform a minor
17   violation into some other violation, a clerical
18   error that's not -- an unintentional clerical error
19   that is not remedied?
20   **A**   If it's not caught at any point, then I
21   guess we wouldn't know about it.
22   **Q**   Well, you have a -- what is --
23   **A**   If it's -- if it's caught and not
24   corrected, then it would still probably be a minor
25   violation, but there would be discipline involved as

---

107

1    opposed to a correction.
2    **Q**   And that could be something on the
3    continuum of discipline --
4    **A**   Yes.
5    **Q**   -- from verbal all the way up to
6    termination?
7    **A**   Yes.
8    **Q**   If it was bad enough, correct?
9    **A**   It could be.
10   **Q**   Is the supervisor the first line of review
11   of an officer report?
12   **A**   Yes.
13   **Q**   And that supervisor, if that officer is on
14   a patrol division, is that a shift supervisor who is
15   the first line of review of an officer report?
16   **A**   Yes.
17   **Q**   And is there more or additional review
18   beyond the supervisor of a patrol officer's report,
19   offense report?
20   **A**   It would depend on the report, but in
21   general circumstances, no.
22   **Q**   It generally stops at the supervisor?
23   **A**   Yes.
24   **Q**   Generally?
25   **A**   Generally, but also the commanders will

---

108

1    spot check and review those reports.
2    **Q**   Because is that the next in the chain of
3    command --
4    **A**   Yes.
5    **Q**   -- would be officer, shift supervisor,
6    commander?
7    **A**   Yes.
8    **Q**   And as I understand, in your police report
9    procedures general order an officer generally is
10   required to submit a completed report to their
11   supervisor for approval prior to the termination of
12   their tour of duty or shift?
13   **A**   Generally, yes.
14   **Q**   Obviously there can be exigent
15   circumstances that cause a change in that
16   expectation, but if there are exigent circumstances,
17   is there kind of a date certain that that report
18   needs to be turned in for review?
19   **A**   That would be as soon as possible.
20   **Q**   And is it the supervisor's responsibility
21   to make sure that reports are submitted in a timely
22   manner?
23   **A**   Yes, it is.
24   **Q**   And with all applicable attachments or
25   enclosures?

---

27  (Pages 105 to 108)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                            September 18, 2015

---

109

1      **A**   Yes.
2      **Q**   And a written police report is required
3  when an individual violates the law, correct?
4      **A**   Yes.
5      **Q**   When there is a use of force involved?
6      **A**   Yes.
7      **Q**   And any situation which may result in
8  civil action or a complaint against the department,
9  true?
10     **A**   True.
11     **Q**   Specific to use of force, there are
12 additional forms beyond the report itself that are
13 required, is that correct, sir?
14     **A**   That's correct.
15     **Q**   And that was also correct as of
16 September of 2011, true?
17     **A**   Yes.
18     **Q**   And are there even more or other forms
19 that are required if the use of force involves the
20 use of a Taser ECW?
21     **A**   Yes.
22     **Q**   And whether it be a use of force not
23 involving a Taser or a use of force involving a
24 Taser, is the expectation the same that the
25 supervisor is the first line of review of those

---

110

1  reports?
2      **A**   Yes.
3      **Q**   Do you factually know who Mr. Kaminski's
4  supervisor was the morning hours of September 17th,
5  2011?
6      **A**   No, I don't.
7      **Q**   Would that normally be a sergeant?
8      **A**   Either the sergeant or the lieutenant.
9      **Q**   It's a weekend, so ...
10     **A**   Yeah, sergeant.
11     **Q**   Yeah. Definitely not a commander. I
12 gotcha. Lieutenant Ballard is actually identified
13 in this case.
14         Is it unusual that Lieutenant Ballard
15 could be working as shift supervisor for the patrol
16 division?
17     **A**   Not unusual.
18     MR. PLUNKERT:  Object to the form, but ...
19 BY MR. JOHNSON:
20     **Q**   Are you the sole person who decides
21 whether a complaint of misconduct from a citizen is
22 warranted or not warranted?
23     **A**   I wouldn't say sole, but in general, yes.
24 You know, the city manager could -- could intervene.
25     **Q**   Has that ever happened during your tenure

---

111

1  as chief?
2      **A**   No.
3      **Q**   When it came to discipline and you
4  received a complaint that you considered to be in
5  your IA file, did you go to Mr. Shaw at all in
6  reviewing the merits of the complaint?
7      **A**   Yes. There were times when I discussed
8  with him the severity of the discipline. Usually
9  that would involve suspension or termination.
10     **Q**   Did that ever occur, where you conferred
11 with Mr. Shaw and it then resulted in a termination?
12     **A**   Yes.
13     **Q**   What was the officer involved or officers?
14     **A**   There were more than one occasion. One
15 was Sergeant Norwood and another one involved a
16 couple of officers.
17     **Q**   Let's start with Mr. Norwood. What was
18 the complaint against him?
19     MR. PLUNKERT:  Let me object at this
20 point. In discovery we've -- we've objected to
21 complaints regarding -- not regarding excessive
22 force or not regarding the allegations in this
23 case; it's not reasonably calculated to lead to
24 discovery of admissible evidence.
25         You know, the complaints that I believe we

---

112

1  went into and to produce were subject to that
2  objection. And right now we're trying to go
3  into an area that we have objected to, so I'm
4  wondering if this is reasonably calculated to
5  discovery or if this is a method to bypass the
6  previous objections to discovery.
7      MR. JOHNSON:  Well, I think that this
8  could be remedied down the road. I'm not doing
9  this to harass you. And if it's limited in
10 facts and circumstances, I'm not here to
11 embarrass anybody, including the person who was
12 terminated.
13         What I am interested in knowing, though,
14 is general -- very general facts and
15 circumstances as to why the decision was made
16 to terminate certain members of the department.
17     MR. DOWD:  And then we'll agree further
18 that it's subject to the protective order that
19 has been entered.
20     MR. JOHNSON:  Protective order that's been
21 entered, as well as we'll agree that you don't
22 have to have a continuing objection to these
23 and they can be addressed through a motion
24 filed with the court at a later date.
25     MR. PLUNKERT:  Sure. The proceedings at

---

28  (Pages 109 to 112)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                        September 18, 2015

---

113

1   this point for these individuals to be pursuant
2   to the protective order is a good way to handle
3   it and also to ask them generally so that we
4   don't delve into things that -- that are
5   established through questioning aren't related
6   to the claims or at least the nature of the
7   claims that are at issue here in this case.  I
8   think that's -- that's good.
9   BY MR. JOHNSON:
10      Q   With those safeguards in place, why don't
11  you walk me through, to your knowledge, the general
12  facts and circumstances of the police department
13  members that you terminated during your period as
14  chief, the names and the reasons.
15      A   As I said, Sergeant Norwood was terminated
16  following an incident at a school in town where his
17  son, I believe, attended.  Sergeant Norwood, I
18  believe that his son was being bullied and went into
19  the classroom in uniform and made threats against
20  the alleged perpetrator.
21      Q   Understood.  The other names, and you said
22  there were other names, if you can recall the facts
23  and circumstances, sir, please let me know.
24          MR. PLUNKERT:  And again, are you asking
25      for generally, too?

---

114

1          MR. JOHNSON:  Yep.
2      A   Yeah.  I can't remember their names.  You
3   know, on the tip of my tongue I can see them
4   standing in front of me.  But they pulled a prank on
5   an officer who had a take-home car.  They took the
6   car, moved it and parked it in the city park.
7   BY MR. JOHNSON:
8      Q   And did that lead to a termination of more
9   than one individual --
10      A   Yes.
11      Q   -- as far as there was more than one
12  individual involved?
13      A   Yes.
14      Q   Any others, sir?
15      A   I terminated a jail employee for, among
16  other things, letting a -- letting a prisoner out
17  when I think the city was supposed to be coming and
18  picking that prisoner up.
19      Q   Any communications division terminations?
20      A   Pardon me?
21      Q   Any communications divisions --
22      A   Yes.
23      Q   -- terminations?
24      A   Yes.  General for a drug-related offense.
25      Q   Any suspensions of any individual within

---

115

1   the police department related to the use of force?
2      A   Use of force, no, I don't think so.  I
3   don't remember any specific example.
4      Q   Any form of discipline where you had to be
5   involved as chief --
6      A   Yes.
7      Q   -- against any individual related to the
8   use of force?
9      A   The use of physical force, no, I don't
10  remember any of those.
11      Q   How about the use of Taser ECW?  Any
12  discipline that you had to be involved with that
13  relates to an officer in the use of a Taser device?
14      A   None that I can remember.
15      Q   And to be fair, would any complaints about
16  officers and any claimed inappropriate use of force
17  be contained in the IA log you told me about
18  earlier?
19      A   Yes.
20      Q   They may also be verbal and just not got
21  to you, is that fair as well --
22      A   That's --
23      Q   -- as you said earlier?
24      A   Yes.
25      Q   Easiest way to say it, Mr. Jackson, would

---

116

1   be, any complaints that I know about and was
2   involved with, I logged in the files I maintain that
3   I call the IA log, is that correct?
4      A   Yes.
5      Q   Okay.  When you received a complaint from
6   a citizen about the conduct of an officer and you
7   were asked to weigh only the complaint of the
8   citizen versus the word of the officer in
9   determining whether that was substantiated, did you
10  always give the benefit of the doubt to the officer?
11          MR. PLUNKERT:  Object to form and
12      foundation.
13  BY MR. JOHNSON:
14      Q   Go ahead.
15          MR. PLUNKERT:  You may answer.
16      A   Absent any other factors, you know, if we
17  couldn't prove an allegation, then it could be one
18  of those categories where it's just not sustained,
19  but it wouldn't necessarily be unfounded.
20  BY MR. JOHNSON:
21      Q   What information is given to the citizen
22  who complains about the outcome of your
23  investigation?
24      A   Generally I would send them a letter.
25  When I had addresses for them, I'd send them a

---

29  (Pages 113 to 116)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                      September 18, 2015

---

117

1  letter stating what the outcome was.
2      **Q**   Do you maintain copies of the letters you
3  sent to the citizens who complained that you were
4  able to provide an outcome to?
5      **A**   I did.
6      **Q**   And were those also kept in the IA log?
7      **A**   No.  They were just kept in my Word
8  documents.
9      **Q**   Just on your --
10     **A**   Oh, there was a copy of them.  There
11  wouldn't necessarily be a copy in the investigative
12  logs.  But I just send it to my administrative
13  assistant, and she would fill out the letter and the
14  envelope, I'd sign it and then they'd send it off.
15     **Q**   Did you save on your computer all of the
16  letters you sent to the citizens responding to their
17  complaints?
18     **A**   I don't know that I saved them all.  Some
19  of them I wrote over.
20     **Q**   Okay.
21     **A**   But there were quite a few of them in
22  there.
23                  (Deposition Exhibit Number 6
24                  marked for identification.)
25

---

118

1  BY MR. JOHNSON:
2      **Q**   I'm going to hand you Exhibit 6, and I
3  think this is somewhat similar with what we've been
4  asking about, but I'm going to jump around a little
5  bit on a couple of these.
6          What is Exhibit 6, Mr. Jackson?
7      **A**   General Order 304.0, January 24th, 2011,
8  Standards of Conduct.
9      **Q**   These are standards of conduct for both
10  sworn and nonsworn department employees, correct?
11     **A**   Yes.
12     **Q**   Starting January 24th, 2011, under your
13  watch and extending all the way through March of
14  2015, when you resigned?
15     **A**   Yes.
16     **Q**   And would these be applicable to patrol
17  officers working for the City of Ferguson Police
18  Department?
19     **A**   Yes, they would.
20     **Q**   Is the discipline policy we just looked at
21  in Exhibit 5, is that the policy that would exist in
22  the event an officer violates one of these
23  standards?
24     **A**   Generally, yes.
25     **Q**   Is there any other discipline policy that

---

119

1  Ferguson utilized other than Exhibit 5 in the event
2  an officer violated a standard of conduct set forth
3  in Exhibit 6?
4          MR. PLUNKERT:  Object to form.
5      **A**   So there's also a personnel manual, and
6  I -- one of the early general orders that I put out
7  stated that if there was any conflict between a
8  general order and a personnel manual, that that
9  would have to be addressed.  But in general, the --
10  if there was discipline to be meted out, it would be
11  in accordance with 303.
12  BY MR. JOHNSON:
13     **Q**   And are these standards to ensure, at
14  least in part -- let me point to the one I care
15  about.  Number 38, page 6, this is reporting again,
16  sir.  Do you see that, Reporting?
17     **A**   Okay.
18     **Q**   "Reports be truthful and complete," true?
19     **A**   Yes.
20     **Q**   "Personnel will not normally enter or
21  cause to be entered any inaccurate, false, or
22  improper information," correct?
23     **A**   Correct.
24     **Q**   That's to ensure that officers provide
25  honest, truthful information in their reports,

---

120

1  correct?
2      **A**   Yes, it is.
3      **Q**   And is that also to ensure that they
4  provide honest and truthful testimony if they're
5  asked questions under oath?
6      **A**   Yes.
7      **Q**   Next I'm going to mark Exhibit 7 and ask
8  if you could please identify this general order for
9  me, Mr. Jackson.
10                  (Deposition Exhibit Number 7
11                  marked for identification.)
12     **A**   It's titled "Personnel Responsibilities,
13  General Order 111.0."
14  BY MR. JOHNSON:
15     **Q**   Are these job descriptions, essentially,
16  for the different people that work at the Ferguson
17  Police Department?
18     **A**   Yes, in general.
19     **Q**   So the standards that we see in Exhibit 6,
20  are they applicable to all different jobs within the
21  Ferguson Police Department, meaning both sworn and
22  nonsworn personnel?
23          MR. PLUNKERT:  Object to form.
24     **A**   The question is --
25

---

Gore Perry Reporting and Video

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

121

1  BY MR. JOHNSON:
2      Q   Let me ask a better question.
3          We see 18 different job descriptions in
4  Exhibit 7, okay, at the top.
5          Are the standards of conduct found in
6  Exhibit 6 applicable to all 18 job descriptions in
7  Exhibit 7?
8      A   Yes, if they were working for the police
9  department.
10     Q   And are the goals and objectives -- strike
11  that.  Is the mission statement that we went through
12  in Exhibit 1 applicable to all 18 job descriptions
13  we see in Exhibit 7?
14         MR. PLUNKERT:  Object to form.
15     A   Yes.
16  BY MR. JOHNSON:
17     Q   Do any of the policies that we've looked
18  at so far, do they apply to all different types of
19  people that Ferguson Police Department officers
20  would encounter on the street?
21         MR. PLUNKERT:  Object to form.
22  BY MR. JOHNSON:
23     Q   Both mentally healthy and mentally
24  unhealthy?
25         MR. PLUNKERT:  Object to form.

---

122

1      A   Yes.
2  BY MR. JOHNSON:
3      Q   Was there ever a time where you had
4  discussions about promulgating policy for patrol
5  officers encountering people who may be mentally
6  unstable?
7      A   I believe there's a general order for it.
8      Q   And what is the general order, sir?  What
9  is the title of it?
10     A   I don't remember.
11     Q   What is the substance of it?  If you
12  recall.
13     A   Procedure to be followed when dealing with
14  mentally unstable personnel.
15     Q   And you drafted that?
16     A   I need to take a look at it.  I've been
17  away from these for a while.
18     Q   I can't give you that lifeline yet.
19         Did you sign it similar to the other ones
20  we've seen?
21     A   If it's a general order that was
22  promulgated post-2010, then yes.
23     Q   Tell me about the formulation of that
24  policy, how it came to be.
25     A   It would be designed off of

---

123

1  internationally accepted standards, specifically
2  CALEA.
3      Q   Did you refer to the -- your time at the
4  county and their CIT program in formulating that
5  policy?
6      A   That informed the policy, but the policy
7  was -- as with all the policies, were designed to
8  meet the highest standards.
9      Q   Best practices?
10     A   Yes.
11     Q   Did you strive for best practices in the
12  formulation of all the general orders that you
13  signed off on?
14     A   Yes.
15     Q   Once you signed off on a general order,
16  whenever that date is, and I know we've looked at
17  different dates, was there a time where you went
18  back and revised that policy before you resigned?
19     A   Yes.
20     Q   Was that common?
21     A   It wasn't uncommon.
22     Q   When you would have to revise the policy,
23  what were the factors or variables that went into
24  the revision of a general order after you had
25  drafted the first general order?

---

124

1      A   For example, when we went from rotating
2  backward eight-hour shifts to, say, 12-hour shifts,
3  those general orders would need to be revised.  We
4  also stopped using the REJIS criminal justice system
5  and switched over to MULES.  We switched to a
6  different CAD, computer-aided dispatching service,
7  so any time those things were referenced in a
8  general order, we would need to go back and change
9  that reference.
10     Q   Did you have the ability to modify
11  discipline that a supervisor would have handed out?
12     A   Well, supervisors would not mete out
13  discipline.
14     Q   Let's say a supervisor verbally
15  disciplined a subordinate.  Do you as chief have the
16  ability to modify that discipline to some other form
17  of discipline?
18     A   Yes.
19     Q   Have you had to do that in the past?
20     A   I -- I have, yes.
21     Q   Did you have final authority to exonerate
22  police officers from a complaint of misconduct?
23     A   Yes.
24     Q   Did you draft a document retention policy
25  at Ferguson?

---

Gore Perry Reporting and Video

FAX 314-241-6750            314-241-6750            www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

125

1     **A**   Yes.
2     **Q**   Was that something that was lacking before
3   you arrived as chief?
4     **A**   I don't remember.
5        MR. PLUNKERT:  It calls for speculation.
6   Go ahead.  I'm sorry.
7     **A**   I don't remember.
8   BY MR. JOHNSON:
9     **Q**   Do you have a memory as to whether or not
10  you created for the first time, to your knowledge, a
11  document retention policy at the Ferguson Police
12  Department?
13    **A**   Again, I don't remember seeing one.
14    **Q**   Is the only statistical information
15  regarding allegations of police officer misconduct
16  the IA log that you just told me about --
17    **A**   Yes.
18    **Q**   -- and the summary you presented to the
19  city manager?
20    **A**   Yes.
21    **Q**   And so any statistical data we would see
22  of officer misconduct would be found in the log and
23  the summary?
24       MR. PLUNKERT:  Object to the form.
25    **A**   Yes.

---

126

1   BY MR. JOHNSON:
2     **Q**   Were any -- any statistical data on
3   employee -- employee misconduct destroyed pursuant
4   to a document retention policy?
5        MR. PLUNKERT:  Object to the form.
6   BY MR. JOHNSON:
7     **Q**   That you know of.
8     **A**   Not that I know of.
9     **Q**   What, when it comes to the IA log, is your
10  understanding of the document retention policy?
11    **A**   I'd need to see the -- the document at
12  this point.
13    **Q**   The retention?
14    **A**   Yeah.
15    **Q**   Okay.  Do you know whether any of the
16  employee misconduct claims that form the basis of
17  the IA log, were they destroyed pursuant to some
18  document retention policy during your time as police
19  chief?
20    **A**   Not that I'm aware of.
21    **Q**   Because you're the one that maintains
22  them?
23    **A**   Right.
24    **Q**   Were they all there when you left?
25    **A**   Yes, they were.

---

127

1     **Q**   And were all the summaries there when you
2   left --
3     **A**   The --
4     **Q**   -- of the IA logs that you would have
5   presented to Mr. Shaw?
6     **A**   I don't know.
7     **Q**   Did you maintain the summaries with the
8   logs themselves?
9     **A**   No.
10    **Q**   Just the raw data?
11    **A**   Yes.
12    **Q**   Did you draft a summary on your computer
13  similar to letters you told me about?
14    **A**   No.  That's why my administrative
15  assistant would ask me for the data, and then she
16  would create the summary.
17    **Q**   And who was that?
18    **A**   Mary Simmons.
19    **Q**   And is Ms. Simmons still with the
20  department?
21    **A**   Yes.
22    **Q**   She's the current chief's administrative
23  assistant?
24    **A**   Yes.
25    **Q**   So did you rely on Ms. Simmons to

---

128

1   characterize a complaint as a -- to fall in a
2   certain category?
3     **A**   No.
4     **Q**   But she would draft the summary?
5     **A**   Based on the information that I gave her,
6   she just -- I gave it to her verbally, she did it in
7   her computer, and ...
8     **Q**   So just so I understand the process, did
9   you take all of these complaints and give them to
10  Ms. Simmons, or did you just verbally tell her?
11    **A**   I verbally told her.
12    **Q**   What did you verbally tell her?
13    **A**   For example, she would come in; it was
14  time for her to do the summary.  She would come in
15  and say, "I need the complaint numbers for the past
16  year."  I'd pull them up on my computer and say that
17  we had so many complaints against so many officers
18  and these were the results.
19    **Q**   But not the nature of the complaints?
20    **A**   No.
21    **Q**   So Mr. Shaw never knew the nature of the
22  complaints against your officers?
23       MR. PLUNKERT:  Objection.  Lacks
24  foundation.  You can answer.
25

---

Gore Perry Reporting and Video

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                September 18, 2015

---

129

1  BY MR. JOHNSON:
2      Q   You never told Mr. Shaw through the
3  summary the nature of any of the complaints against
4  your officers?
5      A   Not through the summary, no.
6      Q   Right.  He may have known otherwise?
7      A   Yes.
8      Q   But when it came only to the summary, that
9  was not told to him, the nature of the complaints?
10     A   No.
11     Q   Did he ever come to you and ask for the
12 nature of the complaints that he was seeing?
13     A   I'm pretty sure that I told him about
14 every written complaint that we got.
15     Q   But you had final authority to discipline
16 those officers, correct?
17     A   I -- I say that.  But if he had -- he
18 would have had the authority if he felt -- if he had
19 knowledge of a complaint and felt it needed to be
20 more severe, then --
21     Q   Did he ever exercise that authority?
22     A   I think we always discussed those cases
23 and came to an agreement.
24     Q   What do you mean by "those cases"?
25     A   Any case where he would have an opinion on

---

130

1  discipline.
2      Q   Well, when did he get involved?  Was there
3  some severity or numerosity that he got involved in?
4          I mean, he wasn't involved in each and
5  every complaint, was he?
6      A   No.
7      Q   So the ones that you remember,
8  Mr. Jackson -- I'm sorry, I didn't mean to cut you
9  off.
10         The ones that you remember, do you
11 remember anything that stand out in your mind as to
12 where Mr. Shaw intervened in reviewing the
13 complaint?
14     A   Nothing in particular, no.
15         (Deposition Exhibit Number 8
16         marked for identification.)
17 BY MR. JOHNSON:
18     Q   Let's talk about use of force, primarily
19 why we're here.  I'm going to give you Exhibit 8,
20 ask you to please identify that for me.
21     A   "Use of Lethal and Less Lethal Weapons,
22 Use of Force Continuum, General Order 410.0."
23     Q   Dated July 6, 2010?
24     A   Correct.
25     Q   Again, early in your tenure?

---

131

1      A   Yes.
2      Q   Did you see use of lethal and less lethal
3  weapons and use of force as a priority when you
4  first started?
5      A   Yes.
6      Q   Why?
7      A   It's a specific and unique authority and
8  responsibility that's given to police officers to
9  use force on citizens, and throughout my career it's
10 been important to me that that has been used
11 responsibly and kept in check.
12     Q   Because the Ferguson Department recognize
13 and respects the value and integrity of human life?
14
15     A   Correct.
16         MR. PLUNKERT:  Objection to the form of
17     that question.
18 BY MR. JOHNSON:
19     Q   I'll just read it.
20         Doesn't the policy say, "The Department
21 recognizes and respects the value and special
22 integrity of each human life"?
23     A   Yes, it does.
24     Q   And did you have that same value and
25 respect when you worked at the county?

---

132

1      A   Yes.
2      Q   The use-of-force policy, Exhibit 8,
3  contains definitions on page 2, correct?
4      A   Correct.
5      Q   And were these definitions utilized as of
6  September 2011, to your knowledge, by the Ferguson
7  Police Department?
8      A   Yes.
9      Q   Does the policy also contain a subheader
10 on less lethal force?
11     A   Yes.
12     Q   And what do you consider to be the use of
13 less lethal force, Mr. Jackson?
14     A   In general, it's any type of weapon that
15 could potentially cause death but is not designed to
16 cause death.
17     Q   Is it your belief, when you promulgated
18 Exhibit 8, that a less lethal weapon best
19 deescalates an incident?
20         MR. PLUNKERT:  Object to the form and
21     foundation.
22     A   I wouldn't use that as the definition.  I
23 would say that it's -- it's a tool that could
24 prevent other types of force in a use-of-force
25 scenario where the other types of force could cause

---

33  (Pages 129 to 132)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

133

1  severe injury.
2  BY MR. JOHNSON:
3      Q   Can less lethal force be utilized,
4  different forms in conjunction with one another?
5      A   Yes.
6      Q   The weapons regulations for less lethal
7  force, obviously there are different forms of less
8  lethal force, correct?
9      A   Yes.
10     Q   In fact, there are examples on page 6 of
11 Exhibit 8, which include batons?
12     A   Yes.
13     Q   Chemical agents?
14     A   Yes.
15     Q   Aerosol irritants?
16     A   Yes.
17     Q   And the advanced Taser electric
18 incapacitation device?
19     A   Yes.
20     Q   IED for short, right?
21     A   Yes.
22     Q   Did you equip in September of 2011 your
23 patrol division with batons?
24     A   Yes.
25     Q   Did you equip them with chemical agents?

134

1      A   Yes.
2      Q   Did you equip them with aerosol irritants?
3      A   Yes.
4      Q   Did you equip them with Taser --
5      A   Let me back up.
6      Q   Go ahead.
7      A   Chemical agents, you're referring to tear
8  gas, so no, if that's separate from the aerosol.
9      Q   What do you consider to be a CS chemical
10 agent, sir?
11     A   Tear gas that's deployed either through a
12 shotgun or canister.
13     Q   And what do you consider to be an aerosol
14 irritant, Mr. Jackson?
15     A   In general, a pepper Mace.
16     Q   Was the Ferguson Police Department patrol
17 division officers equipped with tear gas rifle in
18 September of 2011?
19     A   No.
20     Q   Were they equipped with pepper Mace?
21     A   Yes.
22     Q   And were they equipped with the Taser ECW?
23     A   Yes.
24     Q   If they were certified --
25     A   Yes.

135

1      Q   -- right?
2      A   Yes.
3      Q   You didn't put any noncertified Taser
4  users out on the street, did you?
5      A   No.
6      Q   Did that ever happen, where an officer
7  used a Taser device not certified on it, to your
8  knowledge?
9      A   Not to my knowledge, no.
10     Q   Is the use of the Taser in -- in terms of
11 it being a less lethal weapon, as you say under your
12 policy, is the use of it based on the same criteria
13 as the batons, chemical agents, and aerosol
14 irritants?
15     A   In general terms, it's -- it's the type of
16 weapon that would be used where it can replace
17 physical force, so it wouldn't necessarily be all
18 the same criteria as pepper spray, but ...
19     Q   What variables do you consider to be
20 different in terms of the use of pepper Mace versus
21 the use of a Taser?
22     A   Passive resistance.  Someone is blocking
23 the roadway, refuses to move, rather than wrestling
24 with them, the pepper spray could be used, but not
25 necessarily other forms.  You wouldn't use a

136

1  nightstick on someone who is passive resistant.
2      Q   You wouldn't use a Taser on somebody
3  that's passively resistant?
4          MR. PLUNKERT:  Object to the form.
5      A   No.
6  BY MR. JOHNSON:
7      Q   That would be improper under your
8  use-of-force continuum?
9      A   Yes.
10         MR. PLUNKERT:  Object to form and
11 foundation.
12 BY MR. JOHNSON:
13     Q   Correct?
14     A   Correct.
15     Q   The use of force -- the Resistance Control
16 Guidelines Use-of-Force Continuum starts on page 11
17 and goes on to page 12 of Exhibit 8, is that true,
18 sir?
19     A   Yes, it is.
20     Q   And is that a continuum that was drafted
21 by you?
22     A   This is the -- specific answer to your
23 question is yes.  This is widely accepted force
24 continuum.
25     Q   And what source of information did you

34  (Pages 133 to 136)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

137

1  refer to in or around July of 2010 to utilize this
2  continuum as the use-of-force continuum utilized by
3  the Ferguson Police Department?
4      A   That would be the international standards,
5  the state standards, and standards used by ICP --
6  IACP.  I'm sorry.
7      Q   Sir, did you go to any of the outside law
8  enforcement agencies locally in the St. Louis
9  metropolitan area to copy in whole or in part copy
10 their use-of-force continuum?
11     A   We used as -- yes.  We used as guidelines
12 those standards that were already accepted under an
13 international standards.
14     Q   And did this continuum change at any point
15 between July 6, 2010 and September of 2011, sir?
16     A   Absent any revised standard, which I don't
17 recall having done, then yes.
18     Q   Was it in effect as of the time you left
19 your position at Ferguson?
20     A   Yes.
21     Q   And do you agree that the decision on what
22 type of force to be utilized should be considered
23 each time that officer utilizes force?
24     MR. PLUNKERT:  Object to form and
25     foundation.  You may answer.

---

138

1      A   If I understand the question correctly,
2  each case is individual.
3  BY MR. JOHNSON:
4      Q   We'll start there.  First of all, each
5  case or each encounter is individual, correct?
6      A   Yes.
7      Q   But within the encounter itself, if a --
8  if a form of force is used, should that officer then
9  reflect on the circumstances then existing before
10 exercising force again in some fashion?
11     MR. PLUNKERT:  Same objections.
12     A   Each time force is used the criteria have
13 to be met, and of course it has to be reviewed
14 afterwards.
15 BY MR. JOHNSON:
16     Q   And each -- and this would apply to the
17 use of a Taser device?  Each time the Taser is
18 discharged, should that officer review the
19 circumstances then existing?
20     MR. PLUNKERT:  Same objection.
21     A   Talking heat-of-the-moment situation, so
22 the officer --
23 BY MR. JOHNSON:
24     Q   I'm talking discharge of the Taser.
25     A   Yeah, discharge of a Taser.  Each time the

---

139

1  Taser is discharged it has to meet the requirements.
2      MR. DOWD:  I'm sorry, I didn't hear your
3      answer.
4      THE WITNESS:  Yeah.  Each time it has to
5      meet the requirements to use a Taser.
6  BY MR. JOHNSON:
7      Q   And where lethal force is not authorized,
8  you agree that the officer should assess the
9  incident in order to determine which nondeadly
10 technique or less lethal weapon will best deescalate
11 the incident and bring it under control in a safe
12 manner, correct?
13     A   Correct.
14     Q   And would you agree before even less
15 lethal force is used and you are dealing with a
16 mentally unstable individual, that CIT protocols
17 should be used to deescalate the situation even
18 before the use of force?
19     MR. PLUNKERT:  Object to form and
20     foundation.
21 BY MR. JOHNSON:
22     Q   Go ahead, sir.
23     A   If available.
24     Q   And by "available," do you mean an officer
25 who is CIT trained?

---

140

1      A   Yes.  With the standards, yes.
2      Q   Do you expect, or was it the expectation
3  of you as chief, that if you went to the time and
4  expense of training an officer on CIT that they
5  would implement it in the field?
6      MR. PLUNKERT:  It calls for speculation.
7      You may answer.
8      A   That -- what we wanted to do was make
9  every possible tool available to the officers.
10 Ultimately, on scene, they have the discretion.
11 BY MR. JOHNSON:
12     Q   Is the discretion whether to engage in CIT
13 techniques at the scene unlimited discretion?
14     MR. PLUNKERT:  Object to form and
15     foundation.
16     A   No.  That was probably a bad choice of
17 words, "discretion."  The officer is going to have
18 tools available to him and it's going to be up to
19 him on the scene; he's going to be the one who
20 decides which is the best tool under those
21 circumstances.
22 BY MR. JOHNSON:
23     Q   So if the officer is CIT trained, are they
24 constrained in exercising their discretion whether
25 to implement CIT techniques based on the training

---

35  (Pages 137 to 140)

Gore Perry Reporting and Video
FAX 314-241-6750                314-241-6750                www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

141

1  they did receive?
2        MR. PLUNKERT:  Same objections.
3  BY MR. JOHNSON:
4     Q   It's a fancy way of me saying this:  Do
5  you expect that officer to implement his or her CIT
6  training in the field if they encounter a mentally
7  unstable individual where CIT may deescalate the
8  situation?
9        MR. PLUNKERT:  Same objections.
10    A   If the circumstances allow it.
11  BY MR. JOHNSON:
12    Q   And, again, similar to -- are you saying
13  that similar to the totality of the circumstances in
14  determining whether to utilize force, they should
15  also look at the totality of the circumstances in
16  determining whether to use CIT techniques?
17    A   I couldn't have said it better myself.
18    Q   I'll never be able to repeat that.
19    A   It's on tape.
20    Q   There, too.
21        Does the totality of the circumstances
22  surrounding the decision to utilize a Taser, does
23  that take into account the suspect's mental state?
24    A   Yes.
25    Q   At some point, sir, did you learn that the

---

142

1  guidelines for the use of the Taser ECW were revised
2  during your period of time as police chief?
3     A   I don't have any memory of that, no.
4     Q   Are you familiar with an organization
5  called the Police Executive Research Forum, PERF?
6     A   Yes.
7     Q   What is that?
8     A   It's an organization of some form of
9  police executives, current police executives and
10  others, researchers, who do essentially scholarly
11  papers on various topics involving police work.
12    Q   Are you familiar with an entity known as
13  the Community Oriented Policing Services within the
14  U.S. Department of Justice?
15    A   Yes.
16    Q   And what is that entity?  What do they do?
17        MR. PLUNKERT:  Foundation.
18    A   They do --
19  BY MR. JOHNSON:
20    Q   What do you understand they do?
21    A   They do a variety of different things, one
22  of which is to provide training to police
23  departments and others in police community
24  relations, biased-based policing.  They also provide
25  grants, things like traffic enforcement and

---

143

1  equipment and training and things like that.
2     Q   Have you professionally in law
3  enforcement, sir, had interaction with the Police
4  Executive Research Forum?
5     A   Yes.  I met with the president.
6     Q   In what ways?
7     A   I met with the president of PERF, Chuck
8  Wexler.
9     Q   When was that?
10    A   Late last year.
11    Q   Was that related to the Michael Brown
12  incident?
13    A   Generally, yeah.
14    Q   Okay.  Did you have interaction with PERF
15  before assuming your position as chief of police of
16  Ferguson?
17    A   No.
18    Q   Did you have association with PERF for a
19  professional reason between you assuming your duty
20  as police chief and when the Michael Brown incident
21  occurred in 2014?
22    A   No.
23    Q   But did you generally know what PERF was
24  when you assumed your role as police chief of
25  Ferguson?

---

144

1     A   Yes.
2     Q   Did you also generally know what the COPS
3  division of the U.S. Department of Justice was
4  before you assumed your position as police chief of
5  Ferguson?
6     A   Yes.
7     Q   Okay.  Is PERF or COPS, are those entities
8  that provided some type of training to you as an
9  officer?
10    A   I don't know that I got any specific PERF
11  training.  Generally, they provide articles,
12  opinions, things like that.  But through COPS, I
13  think I took advantage of their grants from time to
14  time.
15    Q   Certainly.  Did you look to PERF in terms
16  of drafting the general orders we went through today
17  or any of your general orders?
18    A   I'm sure that I did.  I used lots of
19  sources, and PERF is ...
20    Q   Do you consider PERF to be authoritative
21  in your field?
22    A   Authoritative?
23    Q   Yes.  Is it some --
24    A   No.  I would consider it --
25    Q   -- accepted --

36  (Pages 141 to 144)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                    September 18, 2015

145

1      A   -- to be advisory.
2      Q   Advisory.
3      A   Yeah.
4      Q   That's a good word.
5      A   Yeah.
6      Q   The use-of-force policy we looked at in
7   Exhibit 8, do you recall what sources you went --
8   looked to to formulate that policy or that general
9   order?
10     A   Again, just a lot of sources, but -- you
11  know, a lot of it was my own training and experience
12  at St. Louis County and their general orders as well
13  as others that met international criteria.
14     Q   And then I forgot to give you Exhibit 9.
15  That's the Taser order.  I'll ask you some questions
16  about that, too.
17     A   Okay.
18           (Deposition Exhibit Number 9
19           marked for identification.)
20  BY MR. JOHNSON:
21     Q   Here you go, sir.  What is Exhibit 9,
22  Mr. Jackson?
23     A   Taser Electronic Incapacitation Device.
24     Q   It's not dated.  Do you know what date
25  this was a general order within your department?

146

1      A   No, I don't.
2      Q   Do you know if this general order was in
3   existence as of September 2011?
4      A   Absent any revision, then it would have
5   been, yes.
6      Q   How can you tell me that?  I mean, I know
7   we see dates on some.  I'm just --
8      A   Yeah.
9      Q   Is there something that you can see in
10  Exhibit 9 that suggests to you that I -- I have an
11  idea when this was formulated and promulgated by me?
12     A   I can't tell you what the date is.
13     Q   Is there some resource that you utilized
14  within the City of Ferguson that would help you
15  better understand when Exhibit 9 may have been
16  signed by you?
17     A   Well, it would have been prior to the
18  deployment of Taser, clearly, so prior to the
19  training.  So I could ...
20     Q   Let me ask it this way:  Do you know if
21  you signed off on Exhibit 9 before you made the
22  decision to purchase the Tasers?
23     A   I made that decision around the same time
24  as the decision -- I mean that signature, the --
25  around the same time that we decided to purchase

147

1   Tasers.
2      Q   Would you have deployed Tasers in the
3   field without a general order?
4      A   No.
5      Q   And what sources of information did you
6   look to to create Exhibit 9?
7      A   Again, the standards, the CALEA standards,
8   the international standards --
9      Q   How about any --
10     A   -- taser training.
11     Q   Exactly.  Anything directly from Taser
12  International, sir?
13     A   Yes.  I do know that John Brannon
14  contributed quite a bit to this.
15     Q   Do you know if there was a specific
16  version of the Taser training manual that you looked
17  to in drafting Exhibit 9?
18     A   No, I don't.
19     Q   Do you know, based on your experience --
20  background, training and experience in law
21  enforcement, that there are different versions of
22  Taser training manuals?
23     A   I'm not aware of that.
24     Q   So if I asked you if there was a specific
25  version of the Taser training manual that was

148

1   incorporated into Exhibit 9, you could not tell me
2   that?
3      A   No, I couldn't.
4      Q   Did Mr. Brannon actually draft Exhibit 9?
5      A   I can't say with certainty, but my best
6   recollection is that he sent me the model for my
7   review and we compared it to, you know, the
8   standards that I previously stated.
9      Q   Because you yourself, again, aren't
10  certified on the Taser?
11     A   No.
12     Q   It would be kind of a heavy burden for you
13  to write all the verbiage in Exhibit 9, not being
14  certified, true?
15     A   True.
16     Q   So you looked in part to Mr. Brannon to
17  help you because he was certified?
18     A   Yes.
19     Q   Any other department personnel who
20  assisted in Exhibit 9 other than possibly
21  Mr. Brannon?
22     A   Not that I remember.
23     Q   Do you know of any updates to Exhibit 9
24  that were made during your time working with the
25  Ferguson department?

37 (Pages 145 to 148)

Tina Moore, et al. v. Brian Kaminski, et al.

Thomas Jackson September 18, 2015

149

1    A   No, I don't.
2    Q   And Exhibit 9 cross-references Exhibit 8
3 on the second page, is that true, sir, General Order
4 410.00?
5    A   Yes.
6    Q   Is the lower portion of the second page of
7 Exhibit 9, when it comes to parts of the body to
8 target, is that the only instruction Ferguson
9 provided its officers on the use of the Taser?
10   A   I don't know if that was ever modified.
11   Q   Is a discharge of a Taser causing a probe
12 to strike an individual's heart area contrary to
13 this order?
14       MR. PLUNKERT:  Object.  Foundation.  You
15 can answer.
16   A   I'm sorry, could you ...
17       MR. JOHNSON:  Could you repeat that?
18       (Record read by the reporter as follows:
19       "Q  Is a discharge of a Taser causing a
20       probe to strike an individual's heart area
21       contrary to this order?")
22   A   When you say "heart area," just talking
23 about the upper torso, right?
24 BY MR. JOHNSON:
25   Q   Yes, sir.

150

1    A   I don't believe so.
2    Q   You believe it's consistent?
3    A   Yes.
4    Q   So it reads, "The head, face, and heart
5 area should not be specifically targeted unless the
6 appropriate level of force can be justified."
7       Did I read that correctly?
8    A   Yes.
9    Q   So a discharge of a Taser probe causing --
10 the discharge of a Taser device, causing a probe to
11 strike an individual's heart area, is that
12 consistent or not consistent with Exhibit 9?
13   A   It is consistent.
14   Q   It's accepted?
15   A   It's consistent.
16   Q   Okay.  Is it acceptable --
17       MR. PLUNKERT:  Objection.  Foun --
18 BY MR. JOHNSON:
19   Q   -- under this order?
20       MR. PLUNKERT:  Objection on the grounds of
21 foundation.
22 BY MR. JOHNSON:
23   Q   Go ahead, sir.  Is it acceptable under
24 this order?
25   A   To ...

151

1    Q   The discharge of a Taser device causing a
2 probe to strike an individual's heart area, is that
3 acceptable under Exhibit 9?
4       MR. PLUNKERT:  Same.
5 BY MR. JOHNSON:
6    Q   Let me ask it a different way.  Is it a
7 violation of Exhibit 9?
8    A   It says in here, "The head, face, and
9 heart area should not be specifically targeted
10 unless the appropriate level of force can be
11 justified."
12   Q   So it would be a violation?
13       MR. PLUNKERT:  Objection on foundation.
14 You may answer.  And form.
15   A   Yes.  It would be inconsistent with the
16 order.
17 BY MR. JOHNSON:
18   Q   Do you use the word "inconsistent"
19 synonymously with "violation"?
20   A   Well, if it's -- if it's intentional.  A
21 Taser is not a necessarily precise device,
22 particularly when one or more people may be moving,
23 but an intentional strike to that area would be a
24 violation.
25   Q   Were there any other written general

152

1 orders or policies for the use of the Taser device
2 used at Ferguson as of September 2011 other than
3 Exhibit 9?
4    A   Just the ones referenced in Exhibit 9.
5 410.
6    Q   Which would be the general use of force?
7    A   Yes.
8    Q   Anything else, sir?
9    A   There's a Taser Deployment Form that would
10 be filled out.
11   Q   Okay.  And I'm really asking more about
12 rules.
13   A   Okay.
14   Q   Any other rules that your department used
15 for the use of the Taser as of September 2011 other
16 than Exhibits 8 and 9?
17   A   None that I can think of.
18   Q   Were there any policies in place that
19 talked about a limitation on the number of cycles
20 that a Taser could be used?
21   A   I'd have to review the general order again
22 to -- to know that.
23   Q   Let's look at it.
24   A   Okay.
25   Q   And feel free to take a break and review

Gore Perry Reporting and Video

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                        September 18, 2015

---

153

1  this entire general order if you'd like to, sir,
2  because I'm going to ask you a series of questions
3  about it.
4      **A**  All right.
5      **Q**  My question, Mr. Jackson, is, is there
6  anything found in Exhibit 9 or other policies that
7  you're aware of utilized by Ferguson as of
8  September 2011 that discuss a limitation on the
9  number of cycles of the Taser device?
10     **A**  No.
11        MR. PLUNKERT:  Objection on the grounds of
12  the foundation.
13  BY MR. JOHNSON:
14     **Q**  Same question for any policies on cuffing
15  under load.
16        MR. PLUNKERT:  Same objection.
17     **A**  No.
18  BY MR. JOHNSON:
19     **Q**  Any policies you're aware of in Exhibit 9
20  or otherwise, as of September 2011, on using the
21  Taser on an emotionally or mentally unstable
22  individual?
23        MR. PLUNKERT:  Same objection.
24     **A**  No.
25

---

154

1  BY MR. JOHNSON:
2      **Q**  Anything that discusses any prohibition
3  that activation of the X26 cannot extend beyond five
4  seconds?
5        MR. PLUNKERT:  Same objection.
6      **A**  That's in the training.  I don't see it in
7  here.
8  BY MR. JOHNSON:
9      **Q**  Which training?
10     **A**  The Taser training.
11     **Q**  Which Taser training as of September 2011?
12        MR. PLUNKERT:  Lack of foundation.
13  BY MR. JOHNSON:
14     **Q**  Go ahead, sir.  I'm just asking what
15  you're referring to.
16     **A**  I'm referring to the training their
17  officers received from Brannon.
18     **Q**  So you're referring generally to training
19  that Mr. Brannon would have given Ferguson officers
20  as of and before September 2011?
21     **A**  Yes.
22     **Q**  Which you don't know the substance of?
23     **A**  I witnessed some of it.
24     **Q**  Okay.  Did any of that that you witnessed
25  contain a prohibition that you cannot utilize the

---

155

1  Taser X26 on an individual beyond five seconds per
2  discharge?
3      **A**  Yes.
4      **Q**  And how was that relayed from Mr. Brannon
5  to a trainee that you observed?
6      **A**  That was in his oral presentation.
7      **Q**  That was a prohibition that he made?
8      **A**  Yes.
9      **Q**  And did he discuss with you in your
10  presence why you cannot activate a Taser device, a
11  discharge of that device on an individual beyond
12  five seconds?
13     **A**  No, we didn't have specific discussion.
14     **Q**  Did you have that understanding
15  independent of Mr. Brannon --
16     **A**  Yes.
17     **Q**  -- yourself?  What is your understanding
18  of why that discharge cannot last more than five
19  seconds per use?
20     **A**  That was the rules.
21     **Q**  Would it have any risk of serious injury
22  or death associated with it, that you know of?
23     **A**  I would have to assume that, yeah.
24     **Q**  Any policies or procedures in Exhibit 9 or
25  otherwise used by Ferguson as of September 2011

---

156

1  associated with using the Taser on individuals that
2  may be at a heightened risk for serious injury or
3  death, such as the pregnant, the elderly, children,
4  emotionally unstable people, anybody like that?
5        MR. PLUNKERT:  Lack of foundation.
6      **A**  In this order?
7  BY MR. JOHNSON:
8      **Q**  Yes, sir.
9        MR. PLUNKERT:  Also form.
10  BY MR. JOHNSON:
11     **Q**  Or Exhibit 8.
12        MR. PLUNKERT:  Same objections.
13     **A**  No specific mentions that I can see.
14  BY MR. JOHNSON:
15     **Q**  Any mentions in these policies, Exhibits 8
16  and 9, or otherwise in use at Ferguson as of
17  September 2011, that the application of a Taser
18  after the first application should be independently
19  justifiable?
20     **A**  That's not written in this order.
21     **Q**  And weighed against other force options?
22     **A**  In general it says it should be weighed
23  against.  The general order determines that the
24  officer must determine which is the appropriate use
25  of force, so yes.

---

39  (Pages 153 to 156)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

157

1    **Q**   And that's Exhibit 8, sir?
2    **A**   Exhibit 8, yes.
3    **Q**   Any policy or procedure found in
4    Exhibits 8 or 9 or otherwise in use at Ferguson as
5    of September 2011 that discuss positional
6    asphyxiation -- positional asphyxia and how it can
7    exacerbate an individual's condition who has
8    received use of a Taser application?
9        MR. PLUNKERT:  Lack of foundation.  You
10   can answer.
11   **A**   No, I don't see that in there.
12   BY MR. JOHNSON:
13   **Q**   How about the words "excited delirium"?
14   Were those ever used in any policy or general order
15   that you signed?
16   **A**   Any general order, I don't know.
17   **Q**   How about any general order as it relates
18   to the Taser device?  Do you recall that phrase
19   coming up --
20   **A**   No.
21   **Q**   -- in your general orders, sir?
22   **A**   No, I do not.
23   **Q**   Did Taser ever train Ferguson on excited
24   delirium?  Taser International.
25       MR. PLUNKERT:  Lack of foundation.

---

158

1    BY MR. JOHNSON:
2    **Q**   To your knowledge.
3    **A**   I don't know.
4    **Q**   I think you said earlier, Taser
5    International never sent anybody to Ferguson, to
6    your knowledge, did they?
7    **A**   Not that I saw.  I don't know if Brannon
8    met with them.
9    **Q**   Would he be the best person to talk to
10   about that, about any interfacing with Taser
11   International?
12   **A**   Yes.
13   **Q**   Was there any policy, procedure, or
14   general order that you signed in effect as of
15   September 2011 that Taser can cause or contribute to
16   cause death?
17       MR. PLUNKERT:  Form and foundation.  You
18       may answer.
19   **A**   That's specifically in the general order,
20   no, but that is -- that's why they're called less
21   lethal weapons as opposed to nonlethal weapons.
22   BY MR. JOHNSON:
23   **Q**   They still have the capacity to cause
24   death, true?
25   **A**   Yes.

---

159

1        MR. PLUNKERT:  Objection.  Foundation.
2    BY MR. JOHNSON:
3    **Q**   Did you, police chief, ever provide that
4    admonition to any of your officers, that the use of
5    the Taser device can cause death?
6    **A**   That's implicit in the training and in its
7    title.
8    **Q**   Did you yourself do it?
9    **A**   Me personally --
10   **Q**   Yeah.
11   **A**   -- I didn't do a whole lot of training.
12   **Q**   Do you know if Mr. Brannon, prior to
13   September 2011, ever gave that admonition to any of
14   the trainees that he trained on the use of the Taser
15   device?
16   **A**   I don't know.
17   **Q**   Because you obviously didn't sit in every
18   second with him in the training?
19   **A**   I did not.
20   **Q**   And -- strike that.  I don't want to be
21   too repetitive here, but I need to cover one other
22   aspect.  I want to focus -- instead of policies and
23   procedures and general orders and rules, I want to
24   focus on training for a second.
25   **A**   Okay.

---

160

1    **Q**   To your knowledge, did Ferguson ever train
2    its officers on the use of the Taser that there
3    should be a limitation on the number of cycles
4    before September 2011?
5        MR. PLUNKERT:  Objection.  Lack of
6        foundation.  You may answer.
7    **A**   I don't know.  I wasn't in on that
8    specific training.
9    BY MR. JOHNSON:
10   **Q**   I'll cut to the chase.
11       Do you know any specific topic or aspect
12   of Taser training that Mr. Brannon gave officers of
13   the Ferguson Police Department on the use of the
14   Taser before September 2011?
15   **A**   No.
16   **Q**   Did you -- did Mr. Brannon ever come to
17   you and say that PERF had changed the Electronic
18   Control Weapon Guidelines in 2011, and specifically
19   in March?
20   **A**   I don't remember the conversation.  I
21   don't remember if we had one, no, I don't.
22       (Deposition Exhibit Number 10
23       marked for identification.)
24   BY MR. JOHNSON:
25   **Q**   I'm going to show you Exhibit 10 --

---

40  (Pages 157 to 160)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                September 18, 2015

161

1       MR. PLUNKERT:  We've been going for about
2  another hour.  Do you want to take a break now?
3       MR. JOHNSON:  Can we -- really quick, he's
4  not going to know anything about this, but I'll
5  ask him.
6       THE WITNESS:  Thanks for your confidence.
7       MR. JOHNSON:  That's all right.  We'll get
8  there.  Just making a record.
9       THE WITNESS:  Okay.
10 BY MR. JOHNSON:
11      Q    What is -- do you know Exhibit 10?  Have
12 you seen Exhibit 10?  This is the PERF/COPS 2011
13 Electronic Control Weapon Guidelines, and it's a
14 multiple-page document.
15      A    I don't think I reviewed this document; I
16 think you're correct.
17      Q    Do you ever recall, in your time at
18 Ferguson, Mr. Jackson, recall receiving Exhibit 10?
19      A    No.
20      Q    Do you recall the substance of Exhibit 10
21 ever coming up in any conversation around the
22 station as far as an updating of guidelines for the
23 use of electronic control weapons?
24      A    I don't recall any conversation I was
25 involved in.

163

1       A    It was no more or less than anybody
2  else's.  The officers -- I actually put together a
3  chief's committee when I started there where I
4  had -- a representative from each work unit would
5  meet with me to discuss concerns and
6  recommendations, things like that, so this -- this
7  was one of the early topics in those meetings.
8       Q    Was there a chief's committee dedicated
9  solely to the acquisition of Taser ECWs?
10      A    No.
11      Q    Was Mr. Kaminski on the chief's committee
12 generally as it relates to any number of
13 recommendations?
14      A    At various points, yes.
15      Q    And what do you recall Mr. Kaminski
16 chiming in on as far as recommendations on your
17 committee?
18      A    Nothing specific.  Just that he knew, as
19 well as everybody else, that we were the only agency
20 in the area that didn't have Tasers.
21      Q    Did he say it was a good idea to get them?
22      A    I don't remember.
23      Q    Did he ever train, "he" meaning
24 Mr. Kaminski, ever train other Ferguson officers on
25 the use of the Taser ECW?

162

1       Q    Do you know if the training curriculum
2  Mr. Brannon administered to Ferguson officers was
3  provided only by Taser International?
4       A    I don't know if he only used that.
5       Q    Do you know if Mr. Ballard was trained on
6  the use of a Taser ECW?
7       A    I do not.
8       Q    Do you know if Mr. White was?
9       A    Again, it was my understanding that
10 everybody received the training.
11      Q    Do you know if Mr. Kaminski was?
12      A    Yes.  I believe he -- he was -- he trained
13 at a different department.
14      Q    Which department was that?
15      A    Cool Valley.
16      Q    Okay.  And do you know who he trained
17 through at Cool Valley?
18      A    No, I don't.
19      Q    And how do you know Mr. Kaminski trained
20 through Cool Valley?
21      A    He was one of the people, when we were
22 talking about getting the Tasers, that had some
23 knowledge of it.
24      Q    Tell me about Mr. Kaminski's input into
25 making the decision to purchase Tasers at Ferguson.

164

1       A    Not that I'm aware of.
2       MR. PLUNKERT:  Objection.  Lack of
3  foundation.
4       A    No.
5       THE COURT REPORTER:  Your answer again?
6       THE WITNESS:  Hmm?
7       THE COURT REPORTER:  Your answer?
8       THE WITNESS:  No.  No.
9       MR. PLUNKERT:  Are we all right to break
10 or ...
11      MR. JOHNSON:  Yeah.
12      THE VIDEOGRAPHER:  We're off the record at
13 12:32.  This will end disk number 2.
14      (Recess taken.)
15      MR. PLUNKERT:  Counsel for Plaintiffs and
16 Defendants had a conversation off the record
17 actually not really related to the question
18 that just happened, but it has to do with the
19 Taser records that may or may not be in Cool
20 Valley's possession.
21      Brian Malone stated that he was willing to
22 tender any of the documents and was aware that
23 we had a motion for protective order or quash
24 regarding the subpoena to Cool Valley, so what
25 we've now agreed upon was that Brian Malone

41 (Pages 161 to 164)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

165

1  will produce the personnel file of Kaminski to
2  defense counsel and that we will look through
3  it and take upon any other objections, and
4  Brian Malone will thereby have complied with
5  the subpoena to the extent of Plaintiffs'
6  request.  Do I have that summarized pretty
7  much?
8       MR. DOWD:  I think pretty much that you
9  were then going to redact that and produce it
10  to us, and the redaction would be consistent
11  with what we've agreed to with regard to
12  Kaminski and White's files that were produced
13  from Ferguson, financial information, medical
14  information.
15      MS. SHAFAIE:  Psychotherapist privilege.
16      MR. DOWD:  Stuff that you considered
17  privileged, yeah.
18      MR. PLUNKERT:  I was operating
19  under the -- that we were going to reassess all
20  of that and really reconsider the Taser part
21  and hopefully produce the Taser part after we
22  meet and confer as a group.
23      And then the other things, we can possibly
24  do that, we're going to work on that, but it's
25  to reassess and not -- I can't agree right now

---

166

1  to produce it with redactions; I just haven't
2  seen it.
3       MR. DOWD:  Okay.  My understanding was you
4  would produce it with redactions, but I
5  understand your concern.  I would just say, if
6  you see something that you don't want to
7  produce, you would redact it and state why, as
8  you've done in the past.  But your procedure is
9  fine, you get it, make an assessment, we'll
10  meet and confer and move down the road.
11      MR. PLUNKERT:  Great.  Yeah, we will -- we
12  will definitely meet and confer.  That sounds
13  good.
14      MR. DOWD:  Thank you.
15      MR. PLUNKERT:  Now we can do video.
16      THE VIDEOGRAPHER:  We're back on record at
17  1:00.  This begins disk number 3 in the
18  deposition of Chief Thomas Jackson.  Please
19  continue.
20  BY MR. JOHNSON:
21      Q   Mr. Jackson, I want to refer your
22  attention back to the Exhibit 8, which is the
23  general use-of-force policy or general order that
24  was utilized at Ferguson during the period of time
25  you were police chief.  Do you see that, sir?

---

167

1       A   I do.
2       Q   What -- after there is a method of force
3  that's utilized by a Ferguson Police Department
4  officer, what additional administrative requirements
5  exist once that force has been utilized?
6       A   In addition to the normal reporting, the
7  supervisor has to conduct an investigation
8  immediately on that use of force and submit that
9  through the chain with a recommendation on whether
10  the use of force did or did not meet policy.
11      Q   And did the use of a Taser then
12  necessitate even additional administrative
13  procedures?
14      A   Yes.  There's an additional Taser report
15  that goes into more detail about the use of the
16  Taser, specifically where the prongs hit and so
17  forth.
18      Q   And who completes the Taser use report?
19      Is it the supervisor or the officer that
20  completes the --
21      A   Well, the officer is going to complete it
22  under the supervisor's watch and the supervisor will
23  approve the entire package.
24      Q   There we go.  Okay.  I'm sorry, sir.
25      A   That's okay.

---

168

1       Q   So on page 8 of Exhibit 8, as far as the
2  administrative procedures to follow, once less
3  lethal force is utilized -- actually, it starts on
4  page 7 temporally.  Do you see the lower portion
5  under subsection F?
6       A   Yes.
7       Q   So the first administrative procedure to
8  be followed once less lethal force is utilized, it
9  looks like, "The watch commander or appropriate
10  bureau commander must be notified in the event
11  extraordinary circumstances varying from standard
12  handcuffing or detention is utilized."
13      Is that the first administrative followup
14  procedure once less lethal force is utilized?
15      A   Yes.
16      Q   And can they be notified verbally that
17  less lethal force has been used?
18      A   The ...
19      Q   The watch commander or bureau commander.
20      A   Yes.
21      Q   And "If there is physical injury or death
22  to a person," it looks like, "the watch commander,
23  supervisor and/or bureau commander supervisor must
24  respond to the scene."
25      Did I read that correctly?

Gore Perry Reporting and Video

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                          September 18, 2015

---

169

1      A    Yes.  Yes.
2      Q    So if Lieutenant Ballard is the one who
3   responds to the scene on September 17th, 2011,
4   involving Mr. Moore, is Mr. Ballard considered the
5   watch commander supervisor or bureau commander
6   supervisor?
7      A    Yes.  He would be the watch commander.
8      Q    Okay.  So was he the highest-ranking
9   patrol officer working at the time, then?
10     A    I'm sure he was.
11     Q    On that shift?
12     A    (Nods head.)
13     Q    And so at the scene, under the
14  use-of-force policy, who is the commander or
15  supervisor then responsible for ensuring the
16  investigation and any type of reporting that we see
17  in the middle portion of page 8 of Exhibit 8?
18     A    Well, that would be -- that would be
19  Lieutenant Ballard, the commander.
20     Q    And is he then also the individual who is
21  in charge of reviewing for accuracy any police
22  report authored by the police officer who has used
23  force in those circumstances?
24     A    Yes.
25     Q    And it looks like the last step would be

---

170

1   to forward the use-of-force report, the police
2   report, and any supplemental reports to you.
3      A    Yes.
4      Q    Do you know if that was done in the case
5   of Mr. Moore?  And that's a vague question.  Let me
6   break it up.
7      A    Yeah.
8      Q    Let's start at the beginning.
9          Do you know if Mr. Ballard went to the
10  scene?
11     A    I didn't witness it, but it's my
12  understanding that he did.
13     Q    Do you know if Mr. Ballard is the one who
14  reviewed the accuracy of any reporting of the
15  incident and use of force by Mr. Kaminski?
16     A    I believe he was.
17     Q    And do you know, from memory or otherwise,
18  whether you were sent any of the reports associated
19  with Mr. Moore's incident?
20     A    It would have been either me or, if I was
21  gone, the acting chief of police.
22     Q    Was there anything in your life going on
23  in September of 2011 that caused you to be away from
24  the department for any reason?
25     A    That -- that particular time I am

---

171

1   generally in the Boundary Waters Canoe Area
2   Wilderness.
3      Q    Whereabouts?
4      A    Minnesota-Canada border.
5      Q    Okay.
6      A    It was a condition of my employment.
7      Q    All right.  How many weeks do you go up
8   there?
9      A    We usually go up for -- it's a total of
10  about two weeks.  We're going later this -- this
11  year.
12     Q    Post-Labor Day?
13     A    Yes.
14     Q    So just from memory and vacation work, you
15  know, things like that can catch your attention, do
16  you recall this being brought to your attention at
17  the time, that there was an incident involving an
18  officer, a Taser, and a death of an individual.
19     A    Yes.
20     Q    In what way were you notified of this
21  incident with Mr. Moore?
22     A    By telephone.
23     Q    And who contacted you?
24     A    That I don't remember.  Again, I'm pretty
25  sure I was on my way back from Minnesota at the

---

172

1   time.
2      Q    Up there with family?
3      A    No.  No.  It's a wilderness trip, canoeing
4   and portage and fishing, backpacking.
5      Q    Do you go with friends or family or ...
6      A    Both.
7      Q    Both.  Okay.  Regardless of who contacted
8   you, do you recall what was said about the facts and
9   circumstances of the incident?
10     A    Yes.
11     Q    What was said to you?
12     A    In general --
13         MR. PLUNKERT:  Can I ask him this?  Was it
14  an attorney that said any of this to you?
15         THE WITNESS:  Hmm?
16         MR. PLUNKERT:  Was it an attorney or a
17  nonattorney that said this to you?
18         THE WITNESS:  Nonattorney.
19         MR. PLUNKERT:  Go ahead.  Thank you.
20     A    That officers got called to Airport Road
21  6, 6:30 in the morning, early in the morning; there
22  was a man running around naked punching cars.
23  Officers arrived on the scene.  Refused to respond;
24  charged the officer.  He was tased, stopped
25  breathing.  The officers began CPR on him and

---

43  (Pages 169 to 172)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                          September 18, 2015

173

1  maintained that until the ambulance arrived.
2  BY MR. JOHNSON:
3      Q    Any other facts and circumstances you
4  heard in the first phone call?
5      A    Not that I remember.
6      Q    Did you have any further involvement with
7  this incident with Mr. Moore between receiving the
8  call and returning to work?
9      A    Not that I remember.  Not that I remember.
10  I would have, you know, maintained contact and kept
11  apprised, but I don't -- I don't remember
12  conversations.
13     Q    Is there a calendar document, Day Planner,
14  some form of that nature, that would show when you
15  did return from your trip in 2011?
16     A    I haven't been able to locate it.  It's --
17  it's on the documents that I lost.
18     Q    Would there be a personnel form or HR form
19  with the City of Ferguson that would show when you
20  had your vacation that year?
21     A    It's possible, but it wouldn't necessarily
22  be accurate since I'm salaried department head.
23     Q    Right.  Do you recall receiving the
24  use-of-force report, the police report, and any
25  supplemental reports as it relates to the incident

174

1  involving Mr. Moore for your review?
2      A    I don't.  I don't remember.
3      Q    Do you recall conducting any type of
4  evaluation or audit of the police activities as it
5  relates to the incident with Mr. Moore?
6      A    Just getting briefs from my commanders on
7  the incident.
8      Q    Did you receive further information about
9  the facts and circumstances of the incident
10  involving Mr. Moore other than the initial phone
11  call?
12     A    Pretty much the same information.  It was
13  not a whole lot new.
14     Q    Did you ever speak with Mr. Kaminski about
15  the incident?
16     A    I'm sure I did.  I don't remember the
17  conversation.
18     Q    Do you know how --
19     A    Usually when my officers are involved in
20  something traumatic, you know, that I would -- I
21  would talk to them.
22     Q    Do you remember anything about the
23  conversation?
24     A    No, I don't.
25     Q    Did you speak with Mr. Ballard about the

175

1  incident?
2      A    Again, I'm sure I did.  I don't remember
3  the conversation.  He's probably the one that called
4  me.
5      Q    Did you speak with Officer White about the
6  incident?
7      A    I don't remember.
8      Q    Did you speak with anybody that you
9  understand to have witnessed the occurrence
10  involving Mr. Moore?
11     A    No.
12     Q    Did you speak with anybody that you
13  understand to have responded after the fact, had
14  been in the area where Mr. Moore was involved in the
15  incident with Mr. Kaminski?
16     A    Again, Lieutenant Ballard, most likely.
17     Q    How about any other persons from any other
18  agency such as EMS, fire, or other law enforcement?
19     A    No.
20     Q    Did Ferguson use the services of EMS in
21  calls?
22     A    Yes.
23     Q    Was that conducted through Ferguson's
24  communications department?
25     A    It's the fire department that dispatches

176

1  the ambulances.  And when officers call for an
2  ambulance over the walkie-talkie, that's referred
3  from our communications to the fire department.
4      Q    So if an officer calls for ambulance
5  assistance, does it go to the fire department first
6  and then the fire department dispatches EMS?
7      A    No.  It goes to -- police radios go to
8  police communications --
9      Q    Right.
10     A    -- and then they -- they transfer the
11  information.
12     Q    So police communications transfers the
13  call over to fire communications?
14     A    If the call is done on the walkie-talkie
15  or the radio, yes.
16     Q    And then fire communications dispatches
17  EMS to the scene?
18     A    Yes.
19     Q    And the service provider for EMS as of
20  September of 2011 is who?
21     A    Christian -- BJC -- Christian Hospital
22  Ambulance Service.
23     Q    And is the fire department communications
24  housed where the police department communications
25  is?

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

177

1     A    No, it's not.
2     Q    Separate buildings?
3     A    Yes.
4     Q    Did you ever speak with anybody that you
5  understand to have been a family member of Jason
6  Moore about the incident involving him?
7     A    Yes.
8     Q    Who did you speak with, sir?
9     A    I believe it was his wife and mother.
10    Q    And where was this meeting?
11    A    In the lobby of the police station.
12    Q    And when was it?  When did you have ...
13    A    It was not too long after the incident.
14    Q    Within a week?
15        MR. PLUNKERT:  Objection.  Lack of
16  foundation.
17  BY MR. JOHNSON:
18    Q    If you know.  Go ahead.
19    A    I couldn't say that with any certainty.
20    Q    And tell me about the conversation, sir.
21    A    They were angry and, you know, hurled
22  quite a few insults at me.  I simply told them that
23  I was deeply sorry for the tragic loss, I can't
24  imagine how it feels, and that ... that's pretty
25  much it.

---

178

1     Q    Were they critical of the department?
2     A    They were critical of me, yeah, they were.
3     Q    And what was their criticism of you, sir?
4     A    That I was a racist and an atheist.
5     Q    Anything else?
6     A    Nothing worth repeating.
7     Q    Okay.  Were they critical of the officer's
8  conduct?
9     A    I don't remember that specifically.
10    Q    Did you view this as something where some
11  form of review was necessary of the officer's
12  conduct?
13    A    There's always -- yeah, always in a use of
14  force --
15    Q    We know there's the review of the use of
16  force -- go ahead.
17    A    There's always the procedure that we
18  called for in the use of force.
19    Q    What use-of-force review was done in the
20  incident involving Mr. Kaminski and Mr. Moore?
21    A    The supervisor's investigative report
22  would have been done.
23    Q    Anything else, sir?
24    A    No.  That would -- if there was a finding
25  that it was not in -- not in keeping with policy,

---

179

1  then that would have triggered a complaint.
2     Q    Was there any further review of the use of
3  force that Mr. Kaminski used against Mr. Moore once
4  a lawsuit was filed?
5        MR. PLUNKERT:  Let me object on the
6     grounds that if it's work done in anticipation
7     of litigation it's covered by the work-product
8     doctrine.
9        Subject to that, if it's a departmental
10    normal business routine thing, you're free to
11    answer that.
12  BY MR. JOHNSON:
13    Q    That's all I'm asking for, sir.
14        Through the normal business channels, was
15  there any further review or additional evaluation
16  done once a lawsuit was filed claiming that
17  Mr. Kaminski had engaged in excessive force?
18    A    Not that I recall.
19    Q    Any further communication you had with
20  anybody that you associate to be a family member of
21  Mr. Moore about this incident?
22    A    No.
23    Q    Do you know if anybody in your department
24  had any communication with any member of the Moore
25  family, wife, mother, siblings, et cetera, about

---

180

1  this incident?
2     A    I don't know.
3     Q    Was any member of the Ferguson Police
4  Department disciplined as it relates to the incident
5  involving Mr. Moore?
6     A    Not that I'm aware of.
7     Q    Did Mr. Kaminski take any leave of
8  absence, to your knowledge?
9     A    I'd have to check on that.  That would
10  normally be the procedure, we would send them to
11  counseling prior to returning to work, but I don't
12  remember.
13    Q    We touched upon the Department of Justice
14  report that was issued in 2015 earlier.
15        Do you recall that testimony, sir?
16    A    Yes, I do.
17    Q    I'm going to hand you a copy of the
18  report.  It's lengthy, as you know.  And I'm going
19  to ask you some questions about it.  I'm going to
20  mark it as Exhibit 11.
21        (Deposition Exhibit Number 11
22        marked for identification.)
23  BY MR. JOHNSON:
24    Q    Feel free to leaf through Exhibit 11 to
25  make sure it's complete as you believe it to be,

45 (Pages 177 to 180)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                September 18, 2015

181

1  sir, and I'm going to bounce around with some
2  questions.
3        MR. PLUNKERT:  You want him to read the
4     whole thing?
5        MR. JOHNSON:  No, I don't.
6  BY MR. JOHNSON:
7     Q    I just want to say, is it approximately
8  102 pages?  As best as you recall.
9     A    Yeah.
10    Q    I'm not trying to hide anything from you.
11        This report was issued by the United
12 States Department of Justice, Civil Rights Division,
13 is that true?
14    A    It is.
15    Q    And you did receive Exhibit 11 in the
16 course of your work working for the Ferguson Police
17 Department?
18    A    I did.
19    Q    And before you resigned you did review the
20 findings of the investigation of the DOJ, correct?
21    A    Yes.
22    Q    Were you contacted by the DOJ for them to
23 come out and perform an investigation yourself?
24        Did they go through you or somebody else
25 to make those arrangements?

182

1     A    Through mostly me, yeah.
2     Q    Okay.  And I'm not here to pour through
3  every detail of that investigation, but I want to
4  understand some of the contours, okay?
5     A    Mm-hmm.
6     Q    First of all, how long did it take?
7     A    It was rushed.
8     Q    Oh, this is -- it was rushed?
9     A    It was a rushed -- it was a rushed
10 investigation and I have no confidence in it at all.
11    Q    I'm here just to ask factual questions.
12    A    I understand.
13    Q    I understand that this may be a source of
14 consternation.
15    A    Saying it on the record, yeah.
16    Q    Is it a source of consternation for you?
17        MR. PLUNKERT:  Let me object.  It's
18    calling for an opinion, it calls for
19    speculation.  You know, feel free to answer.
20    A    Again, they -- they ignored evidence to
21 the contrary what they said.  They used unverified
22 statements, unsubstantiated statements.  They
23 have -- had clearly no knowledge of police work.
24        And the fact that they ignored strong
25 evidence to the contrary what they put in here, and

183

1  they ignored the efforts that I had put in, which
2  I've -- some of it is before you, again, makes me
3  have no confidence in this report.  I consider it a
4  worthless document.
5  BY MR. JOHNSON:
6     Q    How many people were assigned to the
7  investigation that you observed?
8     A    About four.
9     Q    And you said "rush job," but what do you
10 mean to be "rush job"?
11    A    Their pattern-and-practice investigations
12 that were started before Ferguson that are not
13 complete, as I understand.  It was timed to -- to a
14 press conference.
15        And as a matter of fact, when they met
16 with us initially, they -- we told them all the --
17 the good stuff we were doing in Ferguson and
18 particularly in the apartment complex areas.  And
19 they said they were going to go back to D.C. and
20 have some conversations and decide whether or not we
21 would have a pattern and practices, a collaborative
22 agreement, or nothing.
23        I walked out of that meeting and was met
24 by CNN, who said that the attorney general said they
25 were opening a pattern-and-practice investigation on

184

1  us.  That was my initial hint that this was not
2  going to be a fair investigation, but we cooperated
3  fully.
4     Q    The information requests that were made,
5  sir, what form of information requests did the
6  Department of Justice make of you, of your
7  department?
8     A    Tens of thousands of documents, anything
9  you can possibly imagine.
10    Q    Were they through --
11    A    It was at a time when we were undergoing
12 riots and our police station was being renovated, so
13 all our -- all our documents were in boxes, and
14 so ...
15    Q    Were they letter requests, were they
16 subpoenas, were they document requests?
17        How do you describe what information
18 requests the DOJ made that they believe formed the
19 basis of the report?
20    A    Some of it was in writing, some of it they
21 just asked me for.  Some of it was by email.
22    Q    Were there document preservation notices
23 served to the department to keep and maintain
24 certain documents?
25    A    I don't know.  I didn't get served with

46 (Pages 181 to 184)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                           September 18, 2015

185

1  anything.
2     **Q**   Okay.  Did you receive what you understand
3  to be a letter demanding that you preserve certain
4  information from the Department of Justice?
5     **A**   Yes, I believe I did.
6     **Q**   To your knowledge, was it still in effect
7  as of the date you left your position as chief?
8     **A**   I don't know.
9     **Q**   Were you the main liaison between the
10 Ferguson Police Department and the Department of
11 Justice in terms of providing information to the DOJ
12 for their investigation?
13    **A**   I'd say that it bounced around a lot.  It
14 was me, my administrative assistant sometimes, and
15 the city clerk.  It was a busy time, so they were
16 very imposing.
17    **Q**   Did the four people who appeared at the
18 police department to perform the investigation
19 conduct any witness interview of you?
20    **A**   Did they interview me, are you saying?
21    **Q**   Yes.
22    **A**   We spoke many times.
23    **Q**   Did you consider to meet with them for
24 purposes of an interview, similar to what we're
25 doing here today, where they're asking you certain

186

1  questions about the practices of the department?
2     **A**   It was never -- never seemed adversarial
3  at all.
4     **Q**   Did you ever give what you understood to
5  be a deposition relating to the DOJ investigation?
6     **A**   No.
7     **Q**   Were you ever represented by counsel in
8  any of your communication with the DOJ about the
9  practices of the police department?
10    **A**   I don't think so.
11    **Q**   Do you know if --
12       MR. PLUNKERT:  Do you mean aside --
13    well --
14       THE WITNESS:  That's what I'm saying.
15       MR. PLUNKERT:  Well -- and you can go on.
16    That's fine.  I can ask him.  I'll follow up.
17       MR. JOHNSON:  That's fine.  I'm just
18    trying to get the sources of information.
19 BY MR. JOHNSON:
20    **Q**   Do you know if any of your police officers
21 were interviewed by the DOJ?
22    **A**   Yes.
23    **Q**   The incidents -- and I don't want to
24 discuss every chapter of this.
25    **A**   Sure.

187

1     **Q**   I want to focus on some.  Let's start with
2  the incidents that are identified on page 28.  It
3  talks about Fourth Amendment practices.
4     **A**   Mm-hmm.
5     **Q**   And I'll let you get to that first.
6     **A**   Did you say page 28?
7     **Q**   Page 28 of Exhibit 11.  And I actually
8  want to go to page 29 under a subparagraph of that
9  subheader.  Do you see on page 29 starting with an
10 incident identified in August of 2010?
11    **A**   Yes.
12    **Q**   What sources of information that you know
13 of did the DOJ look to obtain the different
14 anecdotes that we see?  For example, we see an
15 "August 2010 ECW drive stun mode," okay?
16       Do you know what they located to put this
17 type of information in Exhibit 11?
18       MR. PLUNKERT:  Lack of foundation.  You
19    can answer.
20    **A**   No, I don't.
21 BY MR. JOHNSON:
22    **Q**   Do you know if it's an offense report, do
23 you know if it's -- do you have any idea?
24       MR. PLUNKERT:  Same --
25    **A**   I have no idea.

188

1       MR. PLUNKERT:  Same objection.
2  BY MR. JOHNSON:
3     **Q**   Were you provided with the foundational
4  support for these different incidents by the DOJ
5  once they released the report?  Did they return to
6  you, for example -- let me -- let me do it this way:
7       We see, for example, "In August 2010, a
8  lieutenant used an ECW in drive stun mode against an
9  African-American woman in the Ferguson City Jail
10 because she had refused to remove her bracelets."
11       Did the DOJ then give to you or others
12 within the department, to your knowledge, the
13 supporting documentation underneath that event?
14       MR. PLUNKERT:  Object to the form of that
15    question.  You may answer.
16    **A**   No, they did not.
17 BY MR. JOHNSON:
18    **Q**   So if we were to go through each of the
19 anecdotal events underneath a claimed ECW event, a
20 claimed Fourth Amendment violation, a claimed
21 escalation, you are not aware of the factual or
22 supporting data for that?
23    **A**   That's correct.
24    **Q**   At least through the DOJ?
25    **A**   Yes.

47 (Pages 185 to 188)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                September 18, 2015

189

1    Q   Do you recall, though, independent of this
2  investigation in this document, this incident in
3  August of 2010 involving the use of the ECW against
4  the lady in jail?
5    A   No, I do not.
6    Q   If I asked you for the facts and
7  circumstances of that event, including the officer
8  involved, the person involved, and the use of force
9  involved, could you give me any further information?
10   A   No, I could not.
11   Q   Could you give me any further information
12 about any of the events involving the use of an ECW
13 that are contained in Exhibit 11?
14      MR. PLUNKERT: Object to the form.
15 BY MR. JOHNSON:
16   Q   We can go through them, if you want.
17   A   No.
18   Q   Do you know?
19   A   No.
20   Q   I mean, I know it's 2015 and these events
21 happened some time ago --
22   A   Yeah.
23   Q   -- but having looked at the report, having
24 disagreed with the report and having me ask you more
25 questions about the report today, do you think it

190

1  would refresh your memory as to any of the facts and
2  circumstances of any of the events we see in
3  Exhibit 11?
4      MR. PLUNKERT: Object to the form. You
5    may answer.
6    A   No, I don't.
7    Q   Do you know whether -- let's start with
8  the August 2010 event at the jail.
9      Do you know whether the source of this
10 would have been a citizen complaint or other source
11 of information?
12      MR. PLUNKERT: Objection. Lack of
13    foundation. You may answer.
14   A   I do not know.
15 BY MR. JOHNSON:
16   Q   The different ways that Ferguson
17 memorializes their activity, one would be an offense
18 report, correct?
19   A   Correct.
20   Q   If there's an incident involving a jail
21 inmate, is that different than an incident
22 involving, for example, a pedestrian on the street?
23      Would there be a different form used for
24 an offense report?

191

1    A   No.
2    Q   So the offense report -- I'm not going to
3  mark this, but Ferguson 0008 Investigative Report,
4  would that be the same for activity on the street as
5  opposed to activity at the jail?
6    A   Yes.
7    Q   Thank you.
8      Reading through the incidents involving
9  the use of the ECW in Exhibit 11, did it refresh
10 your memory as to any of the officers involved?
11      MR. PLUNKERT: Objection as to form. You
12    may answer.
13   A   No.
14 BY MR. JOHNSON:
15   Q   Now, the DOJ document we marked as
16 Exhibit 11 does identify the FPD, Ferguson Police
17 Department's, internal affairs files.
18      Is that the same files that you testified
19 to earlier today that you maintained in your office?
20   A   Yes, it is.
21   Q   So the DOJ representatives did review
22 those?
23      MR. PLUNKERT: Objection. Lack of
24    foundation. You may answer.
25

192

1  BY MR. JOHNSON:
2    Q   Did they?
3    A   They received copies of all of them.
4    Q   Are you the one that provided copies to
5  them?
6    A   Yes.
7    Q   Or your administrative assistant?
8    A   Yes.
9    Q   Do you know the scope in terms of time of
10 the internal affairs files you provided to the DOJ?
11   A   I'm pretty sure I gave them everything I
12 had.
13   Q   As of late 2014, do you know the scope
14 temporally of what you had in your office of the
15 internal affairs files, how many years back?
16   A   To 2010.
17   Q   To your start date?
18   A   Yes.
19   Q   Who maintains officers' workers'
20 compensation paperwork at the Ferguson Police
21 Department?
22   A   That would be human resources.
23   Q   City Hall?
24   A   HR, yes.
25   Q   And then when the DOJ refers to something

48   (Pages 189 to 192)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                  September 18, 2015

193

 1   known as the force files, do you know what they were
 2   referring to, Mr. Jackson?
 3       A   No, I don't.
 4       Q   I'm going to read the sentence just to
 5   give you the proper context.
 6       A   Okay.
 7       Q   "First, we located information in FPD's
 8   internal affairs files indicating instances of force
 9   that were not included in the force files provided
10   by FPD."
11           Does that refresh your memory as to what
12   "force files" means as defined by the DOJ?
13       MR. PLUNKERT:  Do you mind telling me what
14   page you're --
15       MR. JOHNSON:  Page 38, last paragraph of
16   Exhibit 11.
17       MR. PLUNKERT:  Oh, yeah.
18       MR. JOHNSON:  Wrong big document.
19       MR. PLUNKERT:  How about Exhibit 11?
20   Sound right?
21       MS. SHAFAIE:  Page 38.
22       MR. JOHNSON:  Page 38, bottom paragraph.
23       MR. DOWD:  Of Exhibit 11.
24       MR. JOHNSON:  Of Exhibit 11.
25       MR. PLUNKERT:  Do you remember his

194

 1   question?
 2       A   Yeah.  Do I know specifically what they
 3   were referring to in "force files."  I don't know
 4   how they classified things.  It looks like they're
 5   talking about use-of-force reports.
 6   BY MR. JOHNSON:
 7       Q   I think that may be true because the
 8   paragraph preceding refers to use-of-force reports,
 9   but I didn't know whether or not that was a term of
10   art that you recall discussing with the DOJ, the
11   word "force files."
12       MR. PLUNKERT:  Objection to form and
13   foundation.  You can answer.
14       A   I'm sorry, would you say that again?
15   BY MR. JOHNSON:
16       Q   I'll withdraw it.  I'll move on.
17       A   I was reading.  Sorry.
18       Q   Do you disagree factually with their
19   finding on the top of page 39 of Exhibit 11 that the
20   use-of-force files typically reflect between two and
21   six force incidents per month?
22       A   Yes.
23       Q   You disagree with that finding?
24       A   No, I do not.
25       Q   Okay.

195

 1       A   As I said, we averaged about three a
 2   month.
 3       Q   And the source or basis of that, would
 4   that be the use-of-force reports, the IA reports?
 5       A   That would be the log, yes, the
 6   use-of-force reports.
 7       Q   Okay.  And similar to your internal
 8   affairs log or summary that was presented to
 9   Mr. Shaw, is there a use-of-force summary that
10   Ferguson created over your time as chief?
11       MR. PLUNKERT:  Objection.  Lack of
12   foundation.  You may answer.
13       A   Well, we were also required to provide
14   that as part of the accreditation process, so
15   Captain McBride would also get that information from
16   me for his file.
17   BY MR. JOHNSON:
18       Q   Thank you, sir.
19           Do you know of any type of video, whether
20   that be dash-cam video, body video, or Taser device
21   video, that exists of the Moore incident in 2011?
22       A   None that I'm aware of.
23       Q   Were there forms of video that were used
24   by your officers in 2011 as it relates to their
25   patrol duties?

196

 1       A   No, there was not.
 2       Q   Not even dash-cam video?
 3       A   No.
 4       Q   Okay.  Do you know if it was protocol for
 5   officers to take any photographs as it relates to
 6   the use of force as of September 2011 in your
 7   department?  As part of their investigation into the
 8   use of force, were photographs part of the process?
 9       A   Required process, no.
10       Q   When the -- I'm on page 41, sir, of
11   Exhibit 11.
12       A   Okay.
13       Q   When the DOJ notes that the two-page
14   use-of-force report, meaning the supervisor's
15   summary of the incident goes to the chief, do you
16   disagree with that, that that was not your practice?
17       A   To get the use-of-force report?
18       Q   Well, that you only received the two-page
19   supervisor's summary when you were reviewing use of
20   force.
21       A   No.  That's not true.
22       Q   You're saying you received other
23   information?
24       A   Yes.
25       Q   So when they note that during some

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                           September 18, 2015

197

1  communication you apparently uttered to them that
2  "Chief Jackson told us he rarely retrieves offense
3  reports when reviewing use of force," that's not an
4  accurate statement?
5      A   That is not an accurate statement.
6      Q    When they note in the report that "Chief
7  Jackson told us he has never overturned a
8  supervisor's determination of whether a use of force
9  fell within with FPD policy," is that accurate or
10  not?
11     A   I don't think so.
12     Q    So when have you overturned a supervisor's
13  determination of whether a use of force fell within
14  FPD policy?
15     A   I can't cite any specific example.
16     Q    Did the issuance of Exhibit 11, and while
17  you were still chief, cause you to go back and
18  review any incident where force was used?
19     A   I had gotten started on that process.  I
20  was looking to try to verify, confirm, or -- or
21  otherwise review these findings.
22     Q    What efforts did you undertake, sir, to
23  attempt to do that?
24     A   Just looked through my reports, my files,
25  and we had lots of discussions among the officers.

198

1  But a lot of this is unverified and unsubstantiated
2  by their own statement.
3      Q    When we see a month and year attached to a
4  certain event in Exhibit 11, would the sources, to
5  the extent they exist, be the offense report?
6      A   I can't speak to what they did.  They got
7  everything we had.
8      Q    So we see all these dates and all these
9  events that they claim occurred, and then you claim
10  that you went back to try and undertake a review
11  after the issuance of Exhibit 11.
12         Did you actually locate any of these
13  offense reports, citizen complaints, or other
14  sources of information that would have enabled you
15  to conduct a meaningful review of the facts and
16  circumstances of when force was used?
17     A   I found one complaint, it wasn't a use of
18  force, but found one complaint in there where they
19  neglected to put in that the officers were
20  disciplined for their verbal comments.
21     Q    Anything else, sir?
22     A   Nothing comes to mind.
23     Q    Did you yourself hand out any discipline,
24  in accordance with your general order, to any member
25  of the police department after your receipt of

199

1  Exhibit 11 --
2      A   No.
3      Q    -- and based on what is contained in
4  Exhibit 11?
5      A   No.
6      Q    Do you know if Mr. Shaw did that?
7      A   I don't.
8      Q    Did you meet with Mr. Shaw about the
9  findings in Exhibit 11 while you were still both
10  employed?
11     A   Yes.
12     Q    And what do you recall about that
13  conversation?
14         MR. PLUNKERT:  Let me object to the extent
15     that if this was a meeting that was directed by
16     counsel for pending lawsuits, you might be
17     getting into an area.  So maybe if you can
18     narrow the question, it might help, I guess.
19     A   Counsel was present during those.
20  BY MR. JOHNSON:
21     Q    During all of them?
22         Here's what I'm getting at.  In the course
23  of your status as him being a direct report and in
24  the chain of command related to the business
25  operations in the City of Ferguson, did you

200

1  communicate with Mr. Shaw about the findings of the
2  report?
3         MR. PLUNKERT:  Same thing if it's in the
4     presence of counsel.
5         You mean without counsel present and not
6     directed by counsel?
7         MR. JOHNSON:  For business purposes only.
8         MR. PLUNKERT:  Okay.
9      A   No, we didn't talk about this outside of
10  counsel.  And I wasn't there much longer.
11  BY MR. JOHNSON:
12     Q    This was issued March 4th, 2015.  What was
13  your last day of employment?
14     A   My official last day of employment was
15  March 19th, I believe.
16     Q    When did you --
17     A   But I submitted my resignation, I think,
18  around the 8th.
19     Q    Four days after the issuance of the
20  report?
21     A   (Nods head.)
22     Q    Did you receive the report the same day
23  it's dated?
24     A   I received the report the day before it
25  was released.

Gore Perry Reporting and Video
FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                          September 18, 2015

---

201

1    **Q**   From who?
2    **A**   Christy Lopez.
3    **Q**   Was she the main investigator?
4    **A**   Yes.
5    **Q**   What did she tell you when she gave it to
6    you?
7    **A**   And she was -- her supervisor, John
8    Smith, was also there.
9    **Q**   And what did the DOJ say to you when they
10   provided the report to you, sir?
11       THE WITNESS:  Counsel was present at the
12   time.  Does it matter?
13       MR. PLUNKERT:  If the DOJ was present in
14   the room with counsel, then you're free to
15   answer.
16   **A**   Okay.  They simply said that sometimes
17   people with blindfolds putting their hands on an
18   elephant can't tell it's an elephant, and as they
19   were going to go through the report, which they did.
20   We objected a great deal to what they had in it, but
21   in the end they released it.
22   BY MR. JOHNSON:
23   **Q**   Finally, on page 85, in the footnote on
24   that page of Exhibit 11, sir, where we see the
25   phrase in footnote 57, "Chief's log of internal

---

202

1    affairs," is that the log that you referred to in
2    earlier testimony?
3        MR. PLUNKERT:  Objection.  Lack of
4    foundation.  You may answer.
5    **A**   Yes.
6    BY MR. JOHNSON:
7    **Q**   And is that the summary or is that the --
8    a separate document?
9        MR. PLUNKERT:  Same objection.  You may
10   answer.
11   **A**   That's -- that's the log, not the summary.
12   BY MR. JOHNSON:
13   **Q**   Okay.  And I may be thickheaded about
14   this, but explain for me the difference again.
15       Because you would get the report with a
16   number, the complaint, right?
17   **A**   Mm-hmm.
18   **Q**   Then there's a log and then there's a
19   summary --
20       MR. PLUNKERT:  Is that a yes to his
21   question?
22   **A**   Yes.
23   BY MR. JOHNSON:
24   **Q**   Then explain for me the difference between
25   log and summary.

---

203

1    **A**   The log is -- is simply the log that I
2    kept, which had every complaint number, complainant,
3    officers complained against, and the finding.  And
4    that was a continuous document that went from 2010
5    to when I left.
6    **Q**   Yes, sir.
7    **A**   The summaries were submitted annually,
8    which was a summary of complaints throughout that
9    year.  My log was ...
10   **Q**   Your log was --
11   **A**   Five years.
12   **Q**   -- a living, breathing document?
13   **A**   Yes.
14   **Q**   I get it.
15       Do you know of any efforts that Mr. Shaw
16   undertook in an attempt to verify any of the factual
17   circumstances contained in Exhibit 11?
18   **A**   No, not at the time.
19   **Q**   And when was his last day of employment
20   vis-a-vis March 4th, 2015, that you know of?
21   **A**   It was not long after that.
22   **Q**   Do you disagree with the assertion that
23   underreporting of use of force in the Ferguson
24   Police Department is widespread?
25   **A**   No.  I disagree with that.  Is that what

---

204

1    you asked me?
2    **Q**   That's what I asked.
3    **A**   I disagree.
4        MR. JOHNSON:  Take a short break.
5        MR. PLUNKERT:  Sure.
6        MR. JOHNSON:  Talk to Bill real quick.
7        MR. PLUNKERT:  Okay.
8        THE VIDEOGRAPHER:  We're off record at
9    1:46.
10       (Recess taken.)
11       THE VIDEOGRAPHER:  Back on record at 1:58.
12   Please continue.
13   BY MR. JOHNSON:
14   **Q**   Mr. Jackson, when you sent your summaries
15   of the complaints for accreditation purposes, do you
16   recall that testimony?
17   **A**   Yes.
18   **Q**   What entity did you send those to?
19   **A**   I didn't send them, I said I gave them to
20   Captain McBride, because part of the accreditation
21   process is that we maintain proofs that we're doing
22   certain things, and that has to stay in a file in
23   our accreditation office, basically.  So that would
24   have just gone into those -- those proof files in
25   house.

---

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                      September 18, 2015

---

205

1    **Q**   So were any of the complaints themselves,
2    the log of complaints, or the summaries of the
3    complaints ever sent to any type of accrediting
4    agency for its review?
5    **A**   No.  We wouldn't in any sense send them
6    things; they come and do an inspection is how it
7    works.
8    **Q**   And what entity would that be?
9    **A**   That would be the Missouri Police Chiefs
10   Charitable Foundation.
11   **Q**   How about the Department of Public Safety?
12   Were they ever involved in the accreditation
13   process?
14   **A**   No.
15   **Q**   And who is the liaison or representative
16   with the Chiefs Foundation that Ferguson had
17   assigned?
18   **A**   Well, the director there is Sheldon
19   Lineback, but I don't recall who -- who from there
20   Captain McBride was dealing with directly.
21   **Q**   So two places, then, where this
22   information would be contained in summary form would
23   be Mr. McBride's office and your office?
24   **A**   Yes.
25        MR. JOHNSON:  I have no further questions.

---

206

1                  EXAMINATION
2    QUESTIONS BY MR. PLUNKERT:
3    **Q**   And that was as of the date that you left,
4    right?
5    **A**   Right.  I -- I don't know where it is now.
6    **Q**   The clarification, over the break it was
7    determined there was one question that you had an
8    additional response to.  I think it had to do with,
9    oh, the statements that were made in the lobby of
10   the police department with the plaintiffs present,
11   is that right?
12        Is that what the substance was, that there
13   was some more information on it?
14   **A**   Yes.  The plaintiffs, yeah.
15   **Q**   And, specifically, you -- you testified
16   that there wasn't anything more that was worth
17   repeating, but now you remember other information
18   worth repeating, correct?
19   **A**   The one thing, yes.  The one thing that --
20   **Q**   Go ahead.
21   **A**   -- that the family stated was that the
22   reason Mr. Moore was behaving the way he was is
23   because he had just received the Holy Spirit, and
24   that's what you do when you receive the Holy Spirit.
25

---

207

1                  EXAMINATION
2    QUESTIONS BY MR. JOHNSON:
3    **Q**   Who said that?
4    **A**   I can't say with certainty.
5    **Q**   Were the only two people present where
6    that statement could have been made the people you
7    understand to be Mr. Moore's spouse and his mother?
8    **A**   Yes.
9    **Q**   And no other persons?
10   **A**   No.
11   **Q**   And the meeting, was it only you and the
12   people you understood to be Mr. Moore's spouse and
13   his mother?
14   **A**   That's correct.
15        MR. JOHNSON:  I have no further questions.
16   Thank you for coming in today.  Mr. Dowd might
17   have some.
18                  EXAMINATION
19   QUESTIONS BY MR. DOWD:
20   **Q**   Good afternoon, Mr. Jackson.  My name is
21   Bill Dowd.  I represent Tina Moore, the spouse
22   who -- of Mr. -- Mr. Moore.  I'm going to ask you a
23   few questions.  I'm going to do my best not to go
24   over anything we've covered, maybe a couple new
25   subjects, and just a couple followup questions on

---

208

1    things you covered, all right?
2        When you went through the process of
3    obtaining Tasers for the use by the Ferguson Police
4    Department, you were obviously intimately involved
5    in that process, correct?
6    **A**   Intimately I was -- I delegated that to
7    John Brannon, and he kept me apprised of the process
8    as it went along.
9    **Q**   You were one of the leaders in the
10   decision to bring Tasers on board as a tool,
11   correct?
12   **A**   That's true.
13   **Q**   And the police department at Ferguson is
14   the one who actually trains the officers on the
15   levels of force that are permitted to be consistent
16   with your policies and the -- and the constitution,
17   correct?
18   **A**   That's -- that's one entity, but the
19   police academy also offers --
20   **Q**   Right.
21   **A**   -- such training.
22   **Q**   Right.  Fair enough.
23        So you relied on Taser International for
24   their product training just like you would rely on
25   the tear gas company or the Mace company to put

---

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                      September 18, 2015

---

209

1  warnings and say here's generally how it's to be
2  used, but when and how much it's used is controlled
3  by the police department training and any training
4  they had when they -- before they got to the police
5  department?
6      A   To a large degree, yes.
7      Q   Okay. So that's what I mean by the levels
8  of force. That's under the training and policies
9  and procedures of the police department, correct?
10     A   Correct.
11     Q   We talked a little earlier about crisis
12 intervention training --
13     A   Yes, sir.
14     Q   -- and I want to broaden that just a
15 little bit and ask you what -- you've been an
16 officer a long time, including before you were the
17 chief.
18         What kind of people would you anticipate
19 your officers seeing on the street that may be in a
20 personal crisis or having an emotional crisis?
21     A   Oh, that could be a wide variety of folks,
22 anywhere from people involved in domestic disputes
23 to people with organic brain disorders.
24     Q   Okay. People in domestic disputes may not
25 be committing a crime except for disturbing the

---

210

1  peace because they're yelling at each other and an
2  officer is called to try to calm them down, right?
3      A   Yes.
4      Q   Okay. Other than people in domestic
5  situations and people with organic brain injuries,
6  can you think of any other people that are
7  commonly -- that the police have to commonly
8  confront that may not be committing a crime, per se,
9  but are more having a personal crisis?
10     A   Well, sure. There's lots of situations,
11 you know, suicidal individuals, manic depre --
12 bipolar individuals, people with various types of
13 psychosis. There's -- there's just a wide -- wide
14 variety.
15     Q   And what is your understanding of what a
16 person who's suffering from excited delirium or
17 agitated delirium, would you agree that that's a
18 psychological or personal crisis --
19         MR. PLUNKERT: Objection.
20 BY MR. DOWD:
21     Q   -- as opposed to a crime?
22         MR. PLUNKERT: Objection. Lack of
23 foundation.
24 BY MR. DOWD:
25     Q   If you know.

---

211

1      A   I can't speak intelligently to those types
2  of things.
3      Q   Let me just ask you, what is your
4  understanding of what excited delirium is?
5      A   It's just a heightened state of agitation
6  where an individual could be -- could become
7  combative and violent.
8      Q   And are they to be managed by the officers
9  within their CIT training, to your understanding?
10         MR. PLUNKERT: Objection. Lack of
11 foundation. You may answer.
12     A   If possible. Officers always have to
13 consider safety of both themselves and the
14 individual.
15 BY MR. DOWD:
16     Q   In a general sense, why is it important
17 from the -- as a chief of police, former chief of
18 police, and the police in general -- when I say
19 police, I'm talking about all law enforcement, from
20 the FBI, DEA, federal enforcement, county sheriffs,
21 city police, municipal police, highway patrol -- why
22 is it important, in your opinion, why they should
23 not use excessive force on -- on people?
24         MR. PLUNKERT: Objection. Lack of
25 foundation.

---

212

1  BY MR. DOWD:
2      Q   Let me rephrase the question.
3         Is it important that the law enforcement
4  officers, from the FBI, the DEA, all federal agents,
5  municipal police, highway patrolmen, county police,
6  sheriffs, why -- do you agree that it's important
7  that they not use excessive force on people?
8         MR. PLUNKERT: Objection. Form and
9  foundation. You may answer.
10     A   Okay. Of course. Excessive force is not
11 allowed; that's why it's called excessive.
12         As I said previously, the ability -- or
13 the -- the authority to use force is one that comes
14 with a lot of responsibility and it's -- it's --
15 that's why it's important to monitor it, use the
16 level of force necessary.
17 BY MR. DOWD:
18     Q   Okay. On one -- one level it's because
19 it's illegal, right, to use excessive force, right?
20
21         MR. PLUNKERT: Objection. Foundation.
22 You may answer.
23 BY MR. DOWD:
24     Q   Do you agree with that?
25     A   Yes.

---

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

213

1     **Q**   Okay.  But on the other part -- other side
2  of it is, not just because it's illegal, but people
3  can get hurt when officers use that authorized force
4  in an excessive way, in an unreasonably, unnecessary
5  way, correct?
6          MR. PLUNKERT: Objection.  Lack of
7  foundation.  You may answer.
8  BY MR. DOWD:
9     **Q**   How long have you been a police officer?
10    **A**   Thirty-six years.
11    **Q**   Okay.  So you know a little bit about
12 excessive force, right?
13         MR. PLUNKERT:  Object to form.
14    **A**   I've never killed anyone.
15 BY MR. DOWD:
16    **Q**   I'm sorry?
17    **A**   I've never killed anyone.  But --
18    **Q**   Well, excessive force isn't only killing.
19    **A**   Yeah, I understand that.  I thought you
20 were referring to me personally.
21    **Q**   My question is this, sir:  The purpose of
22 you training and having policies on -- for your
23 officers to not use excessive force is to comply
24 with the law, number one, but number two is also to
25 protect members of the public from being injured by

214

1  an officer using excessive force?
2     **A**   Yes, that's correct.
3     **Q**   So these excessive-force laws that we've
4  been talking about and will talk about are designed,
5  at least partially, to protect the public from abuse
6  by the officers?
7     **A**   Yes.
8          MR. PLUNKERT:  Object to foundation.  You
9  may answer.
10 BY MR. DOWD:
11    **Q**   What types of statistics does the
12 department of Ferguson use, or did it use prior to
13 you leaving, in analyzing whether the members of the
14 force are using the appropriate level of force?
15    **A**   Well, that's -- that's the use-of-force
16 policy and the use-of-force report.  That's the --
17 it's not the primary.  The primary method is
18 supervisory oversight and peer oversight.  So they
19 police each other, they're monitored by their
20 supervisors, but when they use force, it's reported
21 and investigated.
22    **Q**   Okay.  Do you use any statistics, do you
23 maintain any statistics, that we haven't talked
24 about today?
25    **A**   None other than the ones we've discussed.

215

1     **Q**   So if I understand what you just said, you
2  would concede that the police -- it's the police
3  department's obligation to train their officers on
4  how to safely apprehend people, including people in
5  personal crisis?
6     **A**   Yes.
7     **Q**   It's also, you would concede, that the
8  police department must supervise their officers on
9  how to safely help people who are in personal
10 crisis?
11         MR. PLUNKERT:  Objection to foundation.
12 You may answer.
13    **A**   Yes.
14 BY MR. DOWD:
15    **Q**   That includes people that are -- have
16 mental health issues or engage in noncriminal
17 conduct or exhibiting erratic or bizarre behavior,
18 correct?
19    **A**   Yes.
20    **Q**   Now, with regard to the Taser, it's your
21 understanding on a general level that it's designed
22 to incapacitate a person so that the officer can
23 either gain compliance or handcuff them, correct?
24         MR. PLUNKERT:  Objection.  Foundation.
25 You may answer.

216

1  BY MR. DOWD:
2     **Q**   If you know.
3     **A**   Yes, it is.
4     **Q**   Designed to incapacitate, to make their
5  muscles flex and make them unable to resist for --
6  while the trigger is being held, right?
7     **A**   Again, I haven't had the --
8          MR. PLUNKERT:  Sorry.  Same objections.
9  You may answer.
10    **A**   I haven't had the Taser-specific training,
11 so I'm not going to try to testify to the specifics
12 of it, but it is designed to make the arrest
13 possible without injury to the officer or the
14 others.
15 BY MR. DOWD:
16    **Q**   To the officer or others, including the
17 person being apprehended?
18    **A**   The person being apprehended, yes.
19         THE COURT REPORTER:  I'm sorry, you have
20 to go one at a time.  "To the officer or
21 others."
22 BY MR. DOWD:
23    **Q**   Including the person being apprehended,
24 that's correct?
25    **A**   I agree with that.

54  (Pages 213 to 216)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                        September 18, 2015

217

1     **Q**   Okay.  So the -- so the officer -- and you
2   would agree that any time an officer uses any level
3   of force, and I'm talking about from command
4   presence to soft hands on the subject, to Mace, to
5   baton, to Taser, any time an officer uses any -- any
6   of those levels of force, they have to allow a
7   reasonable time, give the person a chance to comply
8   with that order, correct?
9          MR. PLUNKERT:  Objection to form and
10   foundation.  You may answer.
11          MR. DOWD:  May I ask Counsel what's the
12   matter with the foundation?  The man's been a
13   police officer for 36 years; I think he knows a
14   little bit about the force continuum and how
15   it's to be used.
16          MR. PLUNKERT:  Yes.  It's vague and it's
17   an improper hypothetical because it doesn't
18   give enough facts for the witness to respond,
19   doesn't assist the jury to come to any
20   conclusion.  It does -- reasonable time under
21   the -- I mean, I can go on if you want, but
22   there are several problems that I had with that
23   question.  So if you can narrow it to make it
24   not so vague and if you can give facts
25   sufficient for the witness to -- if you want an

218

1   opinion, he hasn't been designated as such.
2          Now, to the extent that he eventually is
3   designated, I -- I suggest that sufficient
4   facts are given so that he can properly answer.
5   That's -- that's my objection.
6   BY MR. DOWD:
7     **Q**   Do you recall the question?  I will
8   rephrase it.
9     **A**   Okay.
10     **Q**   I'm asking you in a general sense, when an
11   officer determines to use some level of force,
12   whether it's command presence, whether it's soft
13   hands on the -- a person, baton or Mace or Taser,
14   that in a general sense the officer is required to
15   give the person an interval, a chance, to comply
16   with the order while they're -- before they use more
17   force or use a greater level of force?  Would you
18   agree with that as a general proposition?
19          MR. PLUNKERT:  Subject to the same
20   objections, you may answer.
21     **A**   When -- when time allows, yes, of course.
22   BY MR. DOWD:
23     **Q**   Okay.  And when you say "time allows,"
24   meaning depending on the level of threat that that
25   person is posing?

219

1          MR. PLUNKERT:  Same.
2     **A**   That's what I'm talking about, yes.
3     **Q**   Thank you.
4          THE WITNESS:  Sorry.
5          MR. PLUNKERT:  That's okay.  Sorry.  You
6   need to give me a second to say same.  Sorry.
7          THE WITNESS:  Four cups of coffee, I'm
8   just talking too fast.
9   BY MR. DOWD:
10     **Q**   Are there any general orders or other
11   policies and procedures at Ferguson with regard to a
12   call related to a person who's having a personal
13   crisis, as we discussed earlier, to always wait for
14   backup before engaging that person, if possible, if
15   the circumstances allow it?
16     **A**   I can't -- I can't cite the specific
17   general order, but there are policies and procedures
18   that address threat levels.
19     **Q**   Okay.  So if a person is in a static
20   situation, but the officer is going to need to deal
21   with them, if they have time to wait for a backup,
22   they should wait for a backup?
23          MR. PLUNKERT:  Same objections.  You may
24   answer.
25

220

1   BY MR. DOWD:
2     **Q**   Fair statement?
3     **A**   Yeah.  It's situational in -- in that it's
4   hard to second-guess something that, you know, is
5   hypothetical, but it's -- it's preferred to have
6   backup.
7     **Q**   Depending on the threat level that the
8   person is posing, correct?
9          MR. PLUNKERT:  Same objections.  Go ahead.
10     **A**   That would be one factor, yes.
11   BY MR. DOWD:
12     **Q**   Okay.  What would be the other factors?
13     **A**   The threat level --
14          MR. PLUNKERT:  Same objections.  Sorry.
15   Go ahead.
16     **A**   Threat level to one's self, the
17   environment.  A lot of factors can go into that.
18   BY MR. DOWD:
19     **Q**   I'm going to give you back Exhibit 9 from
20   earlier and ask you to turn to page 3 of that,
21   please.  And there's a section called Limitations.
22          Do you see that?
23     **A**   Yes, I do.
24     **Q**   Would you just read that first sentence
25   into the record, please?

Gore Perry Reporting and Video

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                September 18, 2015

---

221

1     MR. PLUNKERT:  Bill, do you want to have
2  him use this Exhibit 9?
3     MR. DOWD:  That's fine.
4     MR. PLUNKERT:  I think you might have some
5  notes on yours.
6     MR. DOWD:  That's fine.
7     A  "Limitations.  The X26 Taser will never be
8  deployed punitively or for purposes of coercion.  It
9  is to be used" --
10  BY MR. DOWD:
11     Q   Okay.  That's all I was asking you to
12  read, yeah.  My question relates to that in the
13  context of, what is your understanding, and you tell
14  the jury what your understanding of pain compliance
15  is in the -- in a context of officers' use of force?
16     A   Pain compliance is --
17     MR. PLUNKERT:  Lack of foundation.
18  Subject to that you can answer.
19     THE WITNESS:  Sorry.
20     MR. PLUNKERT:  No, that's okay.
21  BY MR. DOWD:
22     Q   Do you understand the question?
23     A   I do.  Pain compliance is a term that's
24  been around for a while.  It generally applies to --
25  for -- to passive -- passive resistance type thing.

---

222

1  It's usually pressure point, that type of thing.
2     Q   Okay.  So per that general order that's
3  contained in Exhibit 9 regarding electronic
4  incapacitation devices, it says that "The X26 Taser
5  will never be deployed punitively or for purposes of
6  coercion," and that's another way of saying it's not
7  to be used for pain compliance, correct?
8     A   Correct.
9     Q   Can you tell us what you reviewed prior to
10  your deposition today, in preparation of your
11  deposition, whether it was today or yesterday or ...
12     MR. PLUNKERT:  And to be clear, it's not
13  conversations that you had with attorneys, it's
14  just documents.  Fair, Bill?
15     MR. DOWD:  Yes, that's correct.
16     A   I just generally reviewed the complaint.
17  BY MR. DOWD:
18     Q   Just the complaint?
19     A   The -- the lawsuit.
20     Q   I'm sorry.  You didn't review the police
21  report in this matter?
22     A   No, I did not.
23     Q   When is the last time you saw the police
24  report?
25     A   Mr. Dowd, I have no idea.  I don't know.

---

223

1     Q   It may have been -- do you believe you've
2  ever seen the police report in the Moore matter?
3     A   Yes, I've seen the report.
4     Q   You saw it maybe the last time in
5  September or October of 2011?
6     MR. PLUNKERT:  Lack of foundation.  You
7  may answer.
8  BY MR. DOWD:
9     Q   Is that your belief?
10     A   That's my belief.
11     Q   Okay.  Fair enough.
12     Have you spoken to anyone, other than your
13  attorneys, about your deposition today and the
14  circumstances surrounding the Moore case other than
15  what you've told us about in preparation for your
16  deposition?
17     A   No.  I haven't spoken to anybody about
18  this case other than my wife.
19     Q   And do you -- as you sit here today, do
20  you have any opinions about how Officer Kaminski and
21  Officer White handled the situation with Mr. Moore
22  that morning?
23     MR. PLUNKERT:  Let me object to lack of
24  foundation.  Subject to that you may answer.
25     A   Not being on the scene, I go by -- I have

---

224

1  to go by what my commanders conclude, and the
2  conclusion was that the amount of force used was the
3  amount necessary.
4  BY MR. DOWD:
5     Q   And I'm asking you, is that your
6  opinion -- other than what your supervisors have
7  told you, do you have an independent opinion that
8  you're prepared to tell me about with regard to the
9  facts and circumstances of this case today that the
10  level of force was appropriate?
11     MR. PLUNKERT:  Same objection.  You can
12  answer.
13     A   Nothing that's in conflict with that.
14  BY MR. DOWD:
15     Q   Do you agree that the Moore scenario, as
16  you understand it, was not a situation that would
17  have justified the use of deadly force?
18     MR. PLUNKERT:  Objection.  Lack of
19  foundation.  You may answer.
20     A   I believe that's the case given that there
21  was less lethal options available.
22  BY MR. DOWD:
23     Q   The man was naked, he was unarmed, weighed
24  135 pounds?
25     A   Yes.

---

56  (Pages 221 to 224)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                              September 18, 2015

225

1   **Q**   Can you describe how large Officer
2   Kaminski is?
3       **A**   He's a good-size man.
4       **Q**   I think best estimate is he's six-two,
5   240?
6       **A**   I don't know that he's 240.
7           MR. PLUNKERT: Lack of foundation, I
8   suppose.  Go ahead.  You may answer.
9       **A**   They're all tall to me.
10  BY MR. DOWD:
11      **Q**   Yeah.  In 2011, if you recall.
12      **A**   Yeah.  He's -- he's probably around six,
13  six-two.
14      **Q**   You touched earlier on the situation with
15  regard to the -- some changes in the general orders
16  because there was a change in the REJIS system that
17  you were associated with, and I've had some
18  conversation with your counsel, so this is sort of a
19  housekeeping thing, but I wanted to ask you what you
20  knew about -- we're looking for CAD transcripts.
21          Do you know what those are?
22      **A**   Yes.
23      **Q**   How were those maintained at the
24  department when you were there?
25      **A**   We had switched from I think it was

226

1   new World Technologies over to ITI CAD.  And
2   which -- which entry -- are you referring to the
3   dispatchers?
4       **Q**   I'm trying to be as general as possible,
5   but yeah, tell me about the dispatchers first.
6       **A**   Well, all our CAD information is kept on a
7   cloud.  We don't store it in house anymore.
8       **Q**   Okay.  Prior -- so there was a conversion
9   in, let's say, 2012.  Does that sound roughly close
10  to it?
11      **A**   That sounds about right.
12      **Q**   Okay.  Who was responsible for that
13  conversion from the one software to the other?
14      **A**   You mean the decision?
15      **Q**   Yeah.  Who are -- who was the individual
16  that was responsible, the IT person, presumably?
17      **A**   Actually, our IT person was involved, but
18  we had someone in house that became very proficient
19  at the --
20      **Q**   And who was that?
21      **A**   With the software and the technology.
22      **Q**   And who is that?
23      **A**   Sergeant Mike Wood.
24      **Q**   The last name again, please?
25      **A**   Wood.

227

1       **Q**   And to your knowledge is he still employed
2   by Ferguson?
3       **A**   He retired.
4       **Q**   Do you recall there being a -- an issue
5   with the computer crashing after the conversion to
6   ITI or ITA?
7       **A**   They had quite a few problems during the
8   conversion.
9       **Q**   Were the transcripts kept in hard copy
10  anywhere, to your knowledge, the CAD transcripts?
11      **A**   No, not to my knowledge.
12      **Q**   Were your internal affairs reports that
13  you kept in your file drawer in your office, were
14  those scanned or kept anywhere other than in
15  hard-copy form?
16      **A**   Just hard copy.
17      **Q**   Do you know -- in our initial review of
18  the documents produced with regard to citizen
19  complaints, it appears they're all either right
20  before September 2011 or -- and by large majority
21  after that date.
22          Do you know what happened to the citizen
23  complaints prior to September of 2011?
24      **A**   No.  To the best of my knowledge, they
25  were in my -- in that file.

228

1       **Q**   So to your knowledge there was no
2   intentional destruction of those?
3       **A**   No.
4       **Q**   What about the audiotapes?
5          What's your understanding of how long the
6   audiotapes are kept consistent with Ferguson police
7   policy?
8       **A**   Again, we went to a digital -- not that
9   that changed policy.  I want to say 90 days, but I
10  don't know if the digital system had a shorter cycle
11  on it.
12      **Q**   All right.  Do you agree that records
13  regarding citizen complaints could be relevant not
14  only to litigation brought by that complainant but
15  in other cases claiming municipal liability?
16          MR. PLUNKERT: Objection.  Lack of
17  foundation, form.  You may answer.
18      **A**   Would you say that again?
19  BY MR. DOWD:
20      **Q**   Sure.  Do you understand citizen
21  complaints, the documents and the information
22  contained in those documents could be relevant to a
23  lawsuit or an investigation brought about that
24  incident as well as other incidents that might
25  relate to the City of Ferguson's liability?

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                    September 18, 2015

229

1        MR. PLUNKERT:  Objection.  Lack of -- lack
2    of foundation, form.  You may answer.
3    A   Yes.
4    BY MR. DOWD:
5    Q   You understood the question?
6    A   Yes, I did.
7    Q   When you took over as the chief, did you
8    take all those supervisor complaints that had
9    been -- all the complaints that the supervisors had
10   previously kept, did you acquire those and put those
11   all in a central location?
12   A   No.
13   Q   Do you know what happened to those?  I
14   know you changed -- let me ask a new question.
15       My understanding is you changed the way
16   and the location that those were collected and kept,
17   correct?
18   A   Yes.
19   Q   And do you know what happened to the prior
20   complaints that the supervisors previously
21   maintained in their office?
22   A   No.  I mean, they kept those, but moving
23   forward I created a central file, so they were all
24   in one place.
25   Q   So the ones -- the complaint forms that

230

1    came in after you were chief, you kept those, but
2    you did not keep the ones that were in existence
3    prior, you did not acquire and keep those, correct?
4        MR. PLUNKERT:  Object to form.  You can
5    answer.
6        THE WITNESS:  Huh?
7        MR. PLUNKERT:  I objected to form.  You
8    can answer.
9    A   No, I didn't -- I didn't collect those.
10   BY MR. DOWD:
11   Q   So to your knowledge the last people in
12   possession of those would have been the two
13   supervisors, correct?
14   A   Three.
15   Q   Three.  Are you including the third who is
16   in charge of the non-police-officer employees of the
17   city?
18   A   Yes.
19   Q   Okay.  Did you tell us earlier who you
20   thought those supervisors were, their names?
21   A   Captain Henke, Captain McBride, and
22   Lieutenant Nabdzyk.
23   Q   Thank you.
24   A   Common spelling.  N-a-b-d-z-y-k.
25   Q   I want to go back, if I may, for a minute,

231

1    to use of force and compliance.
2        An officer is permitted to use reasonable
3    force necessary under the circumstances to gain
4    compliance with his lawful orders, correct?
5    A   Yes.
6    Q   And when he does use that level of force,
7    he's required to allow that person some time to
8    comply with his orders, correct?
9        MR. PLUNKERT:  Same objection, form and
10   foundation, as the last.  Go ahead.
11   BY MR. DOWD:
12   Q   And when I say "a reasonable time," it
13   means under the circumstances.  Do you understand
14   that?
15   A   Under the circumstances, yes.
16   Q   Right.  So I'm going to ask you, if a
17   person is on the ground, they've been tased, they've
18   been tased for six seconds, they're naked, they
19   don't have any weapons, there's no one within reach
20   to be grabbed or kicked or anything like that, how
21   much time would be reasonable to allow that person
22   to comply with the officer's orders to stay down,
23   for example?
24       MR. PLUNKERT:  Object -- sorry.  Are you
25   done with your question, Bill?

232

1        MR. DOWD:  Mm-hmm.
2        MR. PLUNKERT:  Objection to form and
3    foundation.  You may answer.
4    A   Is this person continuing to be
5    aggressive?
6    BY MR. DOWD:
7    Q   Attempting to get up.
8        MR. PLUNKERT:  Same objections.
9    A   A reasonable amount of time to comply
10   would be appropriate.
11   BY MR. DOWD:
12   Q   Would that be less than one second after
13   the person -- after the Taser trigger was released?
14   A   That would be --
15       MR. PLUNKERT:  Same -- same objections as
16   to form and foundation.  You can answer.
17   A   That would be completely situational.
18   I -- it would be way too hypothetical.
19   BY MR. DOWD:
20   Q   Excuse me.  Can you ever imagine a
21   situation where less than one second to comply with
22   the officer's orders would be sufficient time?
23       MR. PLUNKERT:  Objection to form and
24   foundation.  You may answer.
25   A   I can't.

58  (Pages 229 to 232)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

233

```
 1  BY MR. DOWD:
 2     Q   Can you think of any situation in which an
 3  officer has just tased someone who's on the ground
 4  naked, without a weapon, where one second would be
 5  sufficient time for the officer to determine if he's
 6  getting compliance?
 7        MR. PLUNKERT:  Same objection.  You may
 8  answer.
 9     A   I'd say I have to see the totality of the
10  circumstances.  I can't think of any.
11  BY MR. DOWD:
12     Q   You can't think of any with the facts I've
13  given you, that the person is naked, unarmed,
14  there's no citizens within reach, the officer has
15  just tased them and he's telling them to stay down
16  and there's one second to comply?  Is that a
17  reasonable time, in your opinion?
18        MR. PLUNKERT:  Same objections.  You may
19  answer.
20     A   Under the circumstances it seems brief,
21  that you've cited.
22  BY MR. DOWD:
23     Q   It seems brief, meaning not enough time
24  for the person to have a chance to comply?
25        MR. PLUNKERT:  Same objections.  You may
```

---

234

```
 1  answer.
 2     A   Again, with the circumstances you've given
 3  me, yes.
 4  BY MR. DOWD:
 5     Q   Okay.  Does the City of Ferguson Police
 6  Department submit information to the Federal Bureau
 7  of Justice Statistics regarding use of force or
 8  arrest-related deaths?
 9     A   Yes, sir.
10     Q   What forms does it use to do that?  Is it
11  a portal you go onto and enter on a computer or is
12  it a preprinted form that you all fill out and send to
13  a designated site?
14        MR. PLUNKERT:  Form and foundation.  You
15  may answer.
16  BY MR. DOWD:
17     Q   If you know.
18        MR. PLUNKERT:  Same objections.
19     A   Yeah.  It's -- the statistics are kept --
20  I think they do it online now.  I think they do it
21  through a portal.
22  BY MR. DOWD:
23     Q   So when you started at the department,
24  Ferguson Police Department, were they doing those
25  reports to the Bureau of Justice Statistics online?
```

---

235

```
 1     A   I don't know if they were doing it online
 2  then.
 3     Q   It's your belief, when you left as the
 4  chief, they were doing it online?
 5     A   I believe so, yeah.  My administrative
 6  assistant.
 7     Q   Your administrative assistant did that?
 8     A   She filed those reports, yeah.
 9     Q   And what is her name?  I'm sorry.
10     A   Mary Simmons.
11     Q   Mary Simms?
12     A   Simmons.
13     Q   Simmons.  Thank you.
14     A   Yes, sir.
15     Q   How often would she enter those reports
16  into the system?  After each occurrence or on an
17  annual basis?
18     A   No.  No.  It's a --
19        MR. PLUNKERT:  Foundation.  You may
20  answer.
21     A   I don't remember if it's quarterly or
22  monthly, but ...
23  BY MR. DOWD:
24     Q   But it wasn't after each incident, it was
25  on some kind of a regular calendar basis?
```

---

236

```
 1     A   Yes.
 2     Q   I respect Counsel's objections, but I
 3  really only want you to tell me what you --
 4  reasonably was true, okay?
 5     A   Yeah.
 6     Q   And I think we had understood that, right?
 7     A   Mm-hmm.  Yes.
 8        MR. PLUNKERT:  Although that calls for
 9  speculation as to what you understood.  We're
10  joking, no.
11  BY MR. DOWD:
12     Q   In your 36 years as a police officer,
13  including many years in command at the St. Louis
14  County Police Department, would you agree that it
15  would be rare for an officer who had, in fact,
16  violated the policies and procedures of the
17  department to write a fully detailed report
18  admitting to facts that proved his own violation?
19        MR. PLUNKERT:  Form and foundation.  You
20  may answer.
21     A   What was the question again?
22  BY MR. DOWD:
23     Q   In your 36 years as an officer, including
24  as a command officer and the chief of police, wasn't
25  it rare -- a rare occurrence that you would find an
```

---

Gore Perry Reporting and Video

FAX 314-241-6750                314-241-6750                www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                          September 18, 2015

237

1 officer who would fill out a report that would
2 include all of the facts necessary to find them in
3 violation of the policies and procedures of his
4 department?
5     MR. PLUNKERT:  Same objection.
6     A   I expect the officers to fill out reports
7 that are fully factual.
8 BY MR. DOWD:
9     Q   I didn't --
10    A   To do otherwise would be inappropriate.
11    Q   I didn't mean to ask you what your
12 expectation was.  What I meant to ask you was, in
13 your experience, how many times did you see a
14 report, a police report, in which the officer
15 included all of the facts necessary for him to be
16 found in violation of his department policies?
17    A   Many times.
18    MR. PLUNKERT:  Objection.  Foundation.
19 BY MR. DOWD:
20    Q   Many times?
21    A   Yes.
22    Q   Can you give us some examples?
23    A   Not any specific examples, but officers
24 often have been disciplined based on their own
25 reporting of their actions.

238

1     Q   Would you agree, sir, that it's more
2 common that they're disciplined based on the
3 statements and reports of others than they are on
4 their own admissions?
5     MR. PLUNKERT:  Lack of foundation.  You
6 may answer.
7 BY MR. DOWD:
8     Q   In your experience.
9     A   Yeah.  Yes.
10    MR. DOWD:  Let's go off the record for a
11 second, please.
12    THE VIDEOGRAPHER:  We're off the record at
13 2:34.
14        (Recess taken.)
15    THE VIDEOGRAPHER:  Back on record at 2:37.
16 BY MR. DOWD:
17    Q   Sir, I've given you the front page of the
18 police report in this case, which is Ferguson Bates
19 number 0008.  Just for reference to that form, on
20 the top left do you see where it says "CAD Detail"?
21    A   Yes.
22    Q   And do you know where that information
23 comes from?  There's -- there's then a date and a
24 time right after that, right below that.  Do you see
25 it?

239

1     A   Yes.
2     Q   Do you know where that CAD Detail
3 information comes from?
4     A   From -- from dispatch.
5     Q   And then we talked earlier about where the
6 actual dispatch transcripts might be.  Do you recall
7 that?
8     A   Yes.
9     Q   Is there other information on the CAD
10 transcript other than times?  Is there narrative on
11 there as to what was being said actually?
12    A   Very briefly.
13    Q   Such as "Officer Dispatched," period?
14    A   Yes.
15    Q   "Officer Arrives," period?
16    A   Yes.
17    Q   So that would be a timeline of what --
18 when people were arriving at the scene, when people
19 were dispatched to the scene, when people left the
20 scene, correct?
21    A   Yes.
22    Q   Is that an actual transcript of a tape
23 that -- of the voices of the people on the radio
24 system or is it something that is typed in with some
25 sort of preapproved language, like "Left Scene,

240

1 Arrived at Scene"?
2     A   This would be typed in.  The dispatcher
3 would get the call and would be entering the
4 information into the CAD system as it was coming --
5     Q   Right.
6     A   -- and the time that she was making that
7 entry would be recorded with that entry.
8     Q   Right.  So the time is -- go ahead, sir.
9     A   The recordings would be on a separate
10 system --
11    Q   Okay.
12    A   -- that's not tied to the CAD system.
13    Q   There's no policy or procedure at the
14 Ferguson Police Department -- there was not when you
15 were chief -- that if somebody died during an arrest
16 that they would keep the CAD transcripts, the
17 dispatch tapes, and other things separately as part
18 of an investigation or a later investigation?
19    A   If the -- if the tapes were requested,
20 then they would be retained.
21    Q   But there was no policy they would just
22 automatically retain them in the event there was a
23 later investigation as to the cause of death?
24    A   Not that I'm aware of.
25    Q   Have all of the answers you've given us

Gore Perry Reporting and Video

FAX 314-241-6750            314-241-6750            www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                September 18, 2015

---

241

1  today been to your best belief?
2      A   Yes.
3          MR. DOWD:  I don't have any further
4  questions.  Thank you, sir.
5      THE WITNESS:  Thank you, sir.
6          EXAMINATION
7  QUESTIONS BY MR. PLUNKERT:
8      Q   Very briefly, a couple of followups.
9          Do you remember earlier there was a
10  question about whether the -- the department --
11  police department for the City of Ferguson was
12  equipped with pepper spray or Tasers?  Do you
13  remember that?
14     A   Yes.
15     Q   And you said it was, correct?
16     A   Yes.
17     Q   Does every officer then use or take with
18  them the Taser or pepper spray when they went out on
19  patrol?
20     A   No.  And as I said, when we started there
21  we didn't have Tasers and I had to piecemeal buy
22  them.  So the first batch we bought, I think we
23  bought five.  And so it wasn't everybody that was
24  able to carry one.
25     Q   So in other words, if qualified -- or

---

242

1  certified, I should say, to carry it, it was an
2  option to the officers, correct?
3      A   Yes.
4      Q   You were asked earlier a question
5  regarding the -- whether the totality of the
6  circumstances contemplated the mental state of the
7  suspect or subject.  Do you recall that?
8      A   I do.
9      Q   Okay.  And does that -- with respect to
10  the totality of the circumstances, that's with
11  respect to what the officer knows at the time the
12  officer confronts the subject or suspect?
13     A   Yes, that's correct.
14     Q   The -- there was a question regarding the
15  city attorneys -- actually, I'm sorry -- with
16  respect to the Department of Justice, whether you
17  were personally represented by counsel.
18         Do you recall that question?
19     A   Yes, I do.
20     Q   And you were not personally represented by
21  counsel regarding the Department of Justice
22  proceeding specifically, correct?
23     A   That's correct.
24     Q   However, you are represented by attorneys,
25  at least by some matters that are involved, me being

---

243

1  your attorney, correct?
2      A   Yes.
3      Q   And also the city has counsel, Stephanie
4  Karr, to the extent that if you wanted to seek legal
5  advice you could go to Stephanie Karr for that,
6  correct?
7      A   Yes.
8      Q   And that included if you had any questions
9  regarding the Department of Justice investigation,
10  correct?
11     A   Yes.
12     Q   You have been asked questions regarding
13  training by the City of Ferguson.  Do you recall
14  that?
15     A   Yes.
16     Q   Okay.  Could you -- could you describe --
17  well, P.O.S.T., what is P.O.S.T.?
18     A   It's the standard by -- police officers
19  standards training.  And it's the standard by which
20  the state -- most states certify officers, license
21  them, if you were.  So it's initial training that's
22  required, and then it's ongoing on-the-job or
23  in-service or in-academy training where there's a
24  minimum amount of training that's required over a
25  three-year period.

---

244

1      Q   And that minimum amount of training, at
2  least with respect to P.O.S.T., is managed by the
3  state of Missouri, correct?
4      A   Yes.
5      Q   And Ferguson complies with the P.O.S.T.
6  requirements, correct?
7      A   Yes.
8      Q   And with respect to your officers while
9  you were chief at the City of Ferguson, you required
10  your officers to comply with the hours required by
11  P.O.S.T., correct?
12     A   Yes.
13     Q   And specifically that was the training
14  which the officers were to maintain in order to keep
15  their licensure and also their employment as a
16  police officer with the City of Ferguson, correct?
17     A   Yes.
18     Q   Again, that was state required, right?
19     A   Yes, it is.
20         MR. PLUNKERT:  Those were the questions
21  that I had.
22         EXAMINATION
23  QUESTIONS BY MR. DOWD:
24     Q   Okay.  Just two followups, sir, if I may.
25         Just so I'm clear, counsel asked you

---

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                                 September 18, 2015

---

245

1  something about officers, when they start their
2  shift, would have Tasers or pepper spray, not --
3  never both?
4      A   No, that's not correct.  They could have
5  both.
6      Q   Okay.
7      A   They wouldn't necessarily have a Taser.
8      Q   Understood.  So kind of is it safe to say
9  logically that they would all have Mace and some
10  would have Taser when they went out on their shift
11  in September of 2011?
12         MR. PLUNKERT:  Object to foundation.  You
13      may answer.
14  BY MR. DOWD:
15      Q   I say -- keep saying Mace, but Mace and
16  pepper spray are the same thing?
17      A   Yes.
18      Q   Okay.
19         MR. PLUNKERT:  Same objection.
20      A   For these purposes.
21  BY MR. DOWD:
22      Q   Yeah.
23      A   But as part of their assigned equipment
24  pepper spray was assigned to officers.
25      Q   All right.  So what other tools would he

---

246

1  have had on his belt, Officer Kaminski, on
2  September 11th?  He would have had pepper spray, a
3  Taser, a revolver or a sidearm, right?
4         MR. PLUNKERT:  Let me object that that --
5      if your question is done, lack of foundation.
6      You may answer.
7  BY MR. DOWD:
8      Q   Let me say, as part of the policies and
9  procedures, your expectation would be that an
10  officer going on duty in September of 2011 would
11  have pepper spray, correct?
12      A   Yes.
13      Q   He would have -- could have a Taser?
14      A   Yes.
15      Q   Would have a gun?
16      A   Yes.
17      Q   What else would he have as far as
18  use-of-force tools at his disposal?
19      A   Beyond that would be the handcuffs and the
20  magazines for the pistol.
21      Q   What about batons?
22      A   Some could have a baton.
23      Q   Of course they always had their open
24  hands, correct, and their feet?
25      A   Yes, sir.

---

247

1      Q   And officers that are certified by
2  P.O.S.T. are all trained in hand-to-hand combat,
3  correct?
4      A   To some degree, yes.
5      Q   And all use-of-force options have positive
6  features and negative features, correct?
7      A   Yes.
8         MR. PLUNKERT:  Lack of foundation.  Go
9      ahead.
10  BY MR. DOWD:
11      Q   And I've learned -- my understanding
12  anyway, for example, pepper spray or Mace, you know,
13  officers don't like to use it if they're in a
14  confined space with someone because they might get
15  it in their own eyes, correct?
16      A   Correct.
17      Q   You understand that the Moore incident
18  happened outside in a wide-open area, correct?
19      A   Yes.
20      Q   What are the downsides of using pepper
21  spray with somebody who is in an agitated state?
22         MR. PLUNKERT:  Object to foundation.  You
23      can answer.
24  BY MR. DOWD:
25      Q   If you know after 36 years of police --

---

248

1      A   Yeah.  Pepper spray --
2         MR. PLUNKERT:  Form as well.  Go ahead.
3      A   Pepper spray is often, in my experience
4  and experience of others, less effective on someone
5  in a highly agitated state.  It's more for a lower
6  level of aggression and, for example, passive
7  resistance, you know, those situations.
8  BY MR. DOWD:
9      Q   What is the effect of pepper spray?  I've
10  luckily never had it used on me.  Have you
11  experienced it in your training?
12      A   Oh, yeah.  Oh, yeah.  Yes.  I was an
13  instructor when I was on the SWAT Team when we first
14  got the pepper spray, and so we all had to get
15  sprayed.
16      Q   And what is the effect on your ability to
17  engage in a combat after being pepper sprayed in the
18  eyes?
19      A   Well, that's -- that's part of the
20  training, is to get pepper sprayed and to continue
21  to fight.
22      Q   Okay.  Are you as good a fighter with
23  pepper spray in your eyes as before you had it?
24      A   In a lot more pain --
25      Q   Yeah.

62  (Pages 245 to 248)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

249

1      **A**  -- but no.
2      **Q**   Understood.  But it makes it more
3  difficult to see, correct?
4      **A**   Yes.
5      **Q**   Any other -- any other negatives in using
6  pepper spray besides the risk that the officer might
7  get it in their own eyes while they're trying to do
8  their job?
9      **A**   That's a big -- big risk of it, but the
10  other factors, as I said, no.
11     **Q**   Okay.  And did the Ferguson Police
12  Department consider the risks of any side effects,
13  like cardiac arrest or anything, when they were
14  advising their officers when using pepper spray or
15  Mace?
16         MR. PLUNKERT: Object to the form and
17     foundation.  You may answer.
18     **A**   The officers are always prepared to render
19  first aid if necessary.  It's -- it's a given, as we
20  said before, that these are called less lethal
21  weapons, not nonlethal weapons.
22  BY MR. DOWD:
23     **Q**   Not what weapons?
24     **A**   Nonlethal.
25         MR. DOWD:  Okay.  I don't have any further

250

1      questions of this witness.  Do you?
2          MR. JOHNSON:  A little bit.  Not much.
3          MR. DOWD:  Thank you, sir, for your time
4      today.
5          THE WITNESS:  Thank you, sir.
6              EXAMINATION
7  QUESTIONS BY MR. JOHNSON:
8      **Q**   Mr. Jackson, I want to refer you one more
9  time back to the DOJ report which we marked as
10  Exhibit 11, and I don't have anything specific to
11  any page number, I kind of have a catch-all
12  question.
13         During the period of time that you were
14  chief of police in Ferguson and from your own
15  perspective and your own involvement, did you
16  attempt to follow the review of any use-of-force
17  reports that were sent to you for review?  From your
18  own perspective and your own involvement.
19         MR. PLUNKERT:  I apologize, could you
20     repeat the question for my benefit, see if I
21     can object.
22         MR. JOHNSON:  Let me rephrase it.  Let me
23     rephrase it.
24  BY MR. JOHNSON:
25     **Q**   During the period of time you were police

251

1  chief in Ferguson and from your own personal
2  involvement, not the involvement of others, did you
3  attempt to comply with the use-of-force report
4  reviews that you were asked to review?
5      **A**   Yes.
6      **Q**   I mean, it's not an obligation you
7  ignored, was it?
8      **A**   No.
9      **Q**   And the report forms that were completed
10  and presented to you, did you attempt to fairly and
11  accurately evaluate whether the force used was
12  appropriate?
13     **A**   Yes, I did.
14     **Q**   When we see different occasions contained
15  in the DOJ report where there was force used under
16  any form of force, do you have any reason to believe
17  that you would not have reviewed those reports in
18  your day-to-day activities as police chief at the
19  time?
20         MR. PLUNKERT:  Form and foundation.  You
21     may answer.
22     **A**   I can't qualify what's in that report.
23  BY MR. JOHNSON:
24     **Q**   The anecdotal information that was
25  identified in the DOJ report, such as in August of

252

1  2010 we had the incident with the bracelets,
2  remember, in the jail?
3      **A**   Yes.
4      **Q**   So when you're looking through examples
5  like that, is that news to you?
6          Is that something where you reviewed it
7  and said, "I didn't even know about that event"?
8          MR. PLUNKERT:  Object to form.  Go ahead.
9      **A**   Yeah.  When I -- when I read something
10  like that, I question the context, I question the
11  thoroughness of the review.  That is absurd to think
12  that something like that happened and it's certainly
13  not something I would have overlooked.
14  BY MR. JOHNSON:
15     **Q**   That would be unconstitutional, wouldn't
16  it?
17         MR. PLUNKERT:  Objection.  Foundation.  Go
18     ahead, you may answer.  And form.  Go ahead,
19     you may answer.
20     **A**   To tase someone for not taking their
21  bracelets off, yeah.
22  BY MR. JOHNSON:
23     **Q**   Especially in stun drive?
24     **A**   Yeah.
25         MR. PLUNKERT:  Same.

63  (Pages 249 to 252)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                            September 18, 2015

253

1  BY MR. JOHNSON:
2     **Q**   So going back to my earlier question,
3  then, just based on the -- whether you disagree with
4  the context of it, seeing that there was a report of
5  somebody injured in the jail due to a use of a Taser
6  application in August of 2010, I think I read that
7  correctly, if you were following your review
8  procedures for use-of-force report forms, any reason
9  not to believe you would have reviewed some
10  use-of-force report back when this occurred, whether
11  or not you agree or disagree it was appropriate?
12     MR. PLUNKERT:  Objection.  Form and
13  foundation.  You may answer.
14     **A**   Yes, I would have reviewed it.  That
15  doesn't even state if it was one of my officers.
16  BY MR. JOHNSON:
17     **Q**   Certainly.
18     So applying that rationale, then, to each
19  of the different occasions where we see some form of
20  force used against some citizen, any reason not to
21  believe that if you were following your -- your
22  review portion of the use-of-force report forms, you
23  would have reviewed all these reports back when they
24  occurred?
25     MR. PLUNKERT:  Same objections.  You can

254

1     answer.
2  BY MR. JOHNSON:
3     **Q**   Right?
4     **A**   Yes.
5     **Q**   And do you ever recall, after reviewing a
6  use-of-force report form, where you went back and
7  disciplined the officer involved?
8     **A**   I don't remember any specific example.
9     **Q**   And after reviewing any use-of-force
10  report form, do you recall ever endeavoring to alter
11  the training given to your officers in that use of
12  force?
13     MR. PLUNKERT:  Object to the form.  You
14  may answer.
15     **A**   I pretty much tripled the amount of
16  training that officers were receiving in Ferguson.
17  We provided training in all types of facets of
18  police work, so ...
19  BY MR. JOHNSON:
20     **Q**   And specifically the facet of police work
21  that would deal with the application and use of a
22  Taser ECW, do you ever recall altering the trainings
23  after you reviewing a use-of-force report?
24     **A**   I don't specifically remember any -- any
25  instant.

255

1     MR. JOHNSON:  I don't have any further
2  questions.  Thank you for your time, sir.
3     EXAMINATION
4  QUESTIONS BY MR. DOWD:
5     **Q**   If I could just ask one followup, sir.
6     After you received the Department of
7  Justice report, did you go back and look at any of
8  these incidents?  Did you go back and say, "I don't
9  remember this, I can't believe this happened," and
10  go pull your IAD file or ask -- go back and look at
11  the records or investigate yourself how --
12     **A**   Yes.
13     MR. PLUNKERT:  Let me interpose an
14  objection.  You know, to the extent that
15  counsel advised you to do such, that is -- that
16  is -- well, I guess if I were to understand the
17  question correctly, you're asking for the
18  regular business purpose --
19     MR. DOWD:  Yes.
20     MR. PLUNKERT:  -- and not at the
21  instruction of counsel?
22     MR. DOWD:  Absolutely.
23     MR. PLUNKERT:  Okay.  With that qualifier,
24  you may answer.
25     **A**   Yeah.  Well, for my own benefit I --

256

1  BY MR. DOWD:
2     **Q**   Right.
3     **A**   -- went back and for the amount of time
4  that I was still there looked at -- looked up many
5  examples, and we objected to some of this stuff
6  initially.
7     **Q**   In writing, sir?
8     **A**   Hmm?
9     **Q**   In writing you objected?
10     **A**   No.
11     **Q**   Okay.  I'm just --
12     **A**   No, I didn't.  But as I said, they were
13  half stories and specious conclusions that they were
14  making.  Their lack of knowledge of police work was
15  apparent when they told us that if we have a
16  burglary in progress that we shouldn't use a canine
17  to make an apprehension unless we're certain that
18  the individual inside is armed.
19     Those are the types of things that -- you
20  know, the conclusions that they were making.  So
21  they were -- that's simply an officer safety issue.
22     **Q**   So they were giving you their assessment
23  of the appropriate level of force that they
24  thought --
25     **A**   One of the --

64  (Pages 253 to 256)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

257

```
 1        MR. PLUNKERT:  Wait.  Wait.  Wait.  Let
 2   me -- go ahead and ask the full question.  Let
 3   him ask his question.
 4   BY MR. DOWD:
 5      Q   You were disagreeing with their opinion
 6   that the use of the dog on a burglary in progress
 7   was excessive force, in their opinion, and you
 8   thought it was an officer safety issue?
 9      A   Yes.
10        MR. DOWD:  I don't have anything further.
11        MR. PLUNKERT:  No.  We'll read.
12        THE VIDEOGRAPHER:  This will conclude
13   today's deposition of Chief Thomas Jackson.
14   We're off the record at 2:55.  Thank you all
15   very much.
16
17
18   ----------------------------
19
20
21
22
23
24
25
```

---

259

```
 1   set forth the testimony of the aforementioned
 2   witness, together with the questions propounded by
 3   counsel and remarks and objections of counsel
 4   thereto, and is in all respects a full, true,
 5   correct and complete transcript of the questions
 6   propounded to and the answers given by said witness;
 7   that signature of the deponent was not waived by
 8   agreement of counsel.
 9        I further certify that I am not of counsel or
10   attorney for either of the parties to said suit, not
11   related to nor interested in any of the parties or
12   their attorneys.
13        Witness my hand and notarial seal at St. Louis,
14   Missouri, this 27th day of September, 2015.
15        My Commission expires April 26, 2016.
16
17
18        Nancy N. Abdallah
19        COMMISSION NUMBER 12513162
20        Notary Public in and for the
21        State of Missouri
22
23
24
25
```

---

258

```
 1   State of Missouri
 2                  SS.
 3   County of St. Louis
 4      I, Nancy N. Abdallah, RPR, MO-CCR #888, IL-CSR
 5   #084-004460, and Notary Public in and for the State
 6   of Missouri, duly commissioned, qualified and
 7   authorized to administer oaths and to certify to
 8   depositions, do hereby certify that pursuant to
 9   Notice in the civil cause now pending and
10   undetermined in the United States District Court,
11   For the Eastern District of Missouri, Eastern
12   Division, to be used in the trial of said cause in
13   said court, I was attended at the offices of Pitzer
14   Snodgrass, P.C., 100 South Fourth Street, Suite 400,
15   in the City of St. Louis, State of Missouri, by the
16   aforesaid attorneys; on the 18th day of September,
17   2015.
18        The said witness, being of sound mind and being
19   by me first carefully examined and duly cautioned
20   and sworn to testify the truth, the whole truth, and
21   nothing but the truth in the case aforesaid,
22   thereupon testified as is shown in the foregoing
23   transcript, said testimony being by me reported in
24   shorthand and caused to be transcribed into
25   typewriting, and that the foregoing page correctly
```

---

260

```
 1   GorePerry Reporting & Video
 2   Monday, September 28, 2015
 3
     Mr. Robert T. Plunkert, Esq.
 4   Pitzer Snodgrass
     100 South Fourth Street Suite 400
 5   St. Louis, MO, 63102
 6   Re: Deposition of Thomas Jackson
     Date:Friday, September 18, 2015
 7   Case:Tina Moore, et al. vs.
     Brian Kaminski, et al.
 8
 9   Mr. Robert T. Plunkert, Esq.
10   Your witness did not waive the right to read and sign
     his/her deposition in the above referenced matter.
11   Enclosed is the copy of the deposition you ordered,
     together with errata sheets and additional signature
12   page.  Please instruct your witness to read the
     transcript, list any corrections (including page and
13   line number) on the errata sheets, sign and date the
     errata sheets and signature page.
14
     Within 30 days, please return the errata sheets and
15   signature page to our office for further processing.
16   Your prompt cooperation will be appreciated.
17
18
19
20
21   Sincerely,
22
23   Production Department
     GorePerry Reporting & Video
24   515 Olive Street
     St. Louis, MO  63101
25   (314) 241-6750
```

---

65  (Pages 257 to 260)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

---

261

```
 1   Page Line Should Read:
 2   Reason for change:
 3
 4   Page Line Should Read:
 5   Reason for change:
 6
 7   Page Line Should Read:
 8   Reason for change:
 9
10   Page Line Should Read:
11   Reason for change:
12
13   Page Line Should Read:
14   Reason for change:
15
16   Page Line Should Read:
17   Reason for change:
18
19   Page Line Should Read:
20   Reason for change:
21
22   Page Line Should Read:
23   Reason for change:
24
25
```

---

263

```
 1   Comes now the witness, Thomas Jackson,
 2   and having read the foregoing transcript
 3   of the deposition taken on 9/18/2015,
 4   acknowledges by signature hereto that it is a
 5   true and accurate transcript of the testimony given
 6   on the date hereinabove mentioned.
 7
 8
 9   _____
10   Thomas Jackson
11
12   Subscribed and sworn to me before this
13   _____ day of _____,20_____.
14   My Commission expires
15
16
17   _____
18   Notary Public
19
20
21
22
23
24
25
```

---

262

```
 1   Page Line Should Read:
 2   Reason for change:
 3
 4   Page Line Should Read:
 5   Reason for change:
 6
 7   Page Line Should Read:
 8   Reason for change:
 9
10   Page Line Should Read:
11   Reason for change:
12
13   Page Line Should Read:
14   Reason for change:
15
16   Page Line Should Read:
17   Reason for change:
18
19   Page Line Should Read:
20   Reason for change:
21
22   Page Line Should Read:
23   Reason for change:
24
25
```

---

264

```
 1   COURT MEMO
 2
 3
 4
 5   Tina Moore, et al. vs. Brian Kaminski, et al.
 6
 7
 8   CERTIFICATE OF OFFICER AND
 9   STATEMENT OF DEPOSITION CHARGES
10
11   DEPOSITION OF Thomas Jackson
12
13   9/18/2015
14   Name and address of person or firm having custody of
15   the original transcript:
16
17   Dowd & Dowd
18   211 North Broadway, Suite 4050
19   St. Louis, MO 63101
20
21
22
23
24
25
```

66  (Pages 261 to 264)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                            September 18, 2015

265

1  ORIGINAL TRANSCRIPT TAXED IN FAVOR OF:
2
3  Dowd & Dowd
4  211 North Broadway, Suite 4050
5  St. Louis, MO 63101
6  Total:
7  1 ONE COPY - TAXED IN FAVOR OF:
8
9  Pitzer Snodgrass
10  100 South Fourth Street Suite 400
11  St. Louis, MO 63102
12  Total:
13
14
15
16
17
18
19
20
21
22
23
24
25

266

1  Upon delivery of transcripts, the above
2  charges had not been paid.  It is anticipated
3  that all charges will be paid in the normal course
4  of business.
5  GORE PERRY GATEWAY & LIPA REPORTING COMPANY
6  515 Olive Street, Suite 700
7  St. Louis, Missouri 63101
8  IN WITNESS WHEREOF, I have hereunto set
9  STATEMENT OF DEPOSITION CHARGES
10  my hand and seal on this _____ day of _____
11  Commission expires
12  _____
13  Notary Public
14
15
16
17
18
19
20
21
22
23
24
25

67 (Pages 265 to 266)

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                        September 18, 2015

Page 267

**A**

**abdallah** 3:7 258:4
**ability** 8:22 124:10
124:16 212:12
248:16
**absence** 180:8
**absent** 116:16
137:16 146:4
**absolutely** 58:14
79:17 255:22
**absurd** 252:11
**abuse** 86:11 214:5
**academies** 53:19,21
**academy** 16:5,8,13
23:10 53:24 54:12
54:17 55:1 59:4
62:5,6,7,9,10,12
62:14,18,22 63:8
63:11,21 66:21
67:13 68:9,14
70:22 208:19
**acceptable** 150:16
150:23 151:3
**accepted** 123:1
136:23 137:12
144:25 150:14
**access** 30:13
**accommodate** 8:25
**account** 141:23
**accreditation** 25:5
25:5,7,14,23
27:14,15,22 28:9
29:23 32:23
195:14 204:15,20
204:23 205:12
**accredited** 25:2,20
27:17
**accrediting** 25:10
30:9 205:3
**accuracy** 169:21
170:14

**accurate** 93:18
106:6 173:22
197:4,5,9 263:5
**accurately** 251:11
**acknowledges**
53:11,22 263:4
**acknowledgment**
57:6
**acquainted** 16:25
**acquire** 229:10
230:3
**acquisition** 163:9
**acting** 26:6 170:21
**action** 109:8
**actions** 10:25
237:25
**activate** 155:10
**activation** 154:3
**activities** 174:4
251:18
**activity** 190:18
191:4,5
**actual** 23:24 33:1
52:9 239:6,22
**addition** 30:25 54:8
88:1 167:6
**additional** 54:13
55:13 107:17
109:12 167:4,12
167:14 179:15
206:8 260:11
**address** 61:25 79:8
219:18 264:14
**addressed** 64:20
112:23 119:9
**addresses** 116:25
**administer** 258:7
**administered** 162:2
**administration**
39:21
**administrative**
95:5 97:10 117:12
127:14,22 167:4
167:12 168:2,7,13

185:14 192:7
235:5,7
**admissible** 111:24
**admissions** 238:4
**admitting** 236:18
**admonishment**
103:12
**admonition** 159:4
159:13
**adopted** 59:1
**advanced** 133:17
**advantage** 144:13
**adversarial** 22:16
186:2
**advice** 243:5
**advised** 255:15
**advising** 249:14
**advisory** 145:1,2
**advocate** 60:25
61:2
**aerosol** 133:15
134:2,8,13 135:13
**affair** 89:4,12,17
90:11,19,23
**affairs** 78:25 79:14
83:2 85:11 88:2,6
88:19,23 91:20
191:17 192:10,15
193:8 195:8 202:1
227:12
**affiliated** 14:18
16:24
**affixed** 37:10
**aforementioned**
259:1
**aforesaid** 7:21
258:16,21
**africanamerican**
188:9
**afternoon** 207:20
**agencies** 25:8 27:17
27:23 28:15 29:5
29:9,12 31:3
45:23 137:8

**agency** 12:6 25:2
25:10,12,24 26:20
30:9 31:10,12
36:13 39:21 44:8
66:20 163:19
175:18 205:4
**agent** 134:10
**agents** 133:13,25
134:7 135:13
212:4
**aggression** 248:6
**aggressive** 232:5
**agitated** 210:17
247:21 248:5
**agitation** 211:5
**ago** 189:21
**agree** 101:15
112:17,21 137:21
139:8,14 165:25
210:17 212:6,24
216:25 217:2
218:18 224:15
228:12 236:14
238:1 253:11
**agreed** 37:20
164:25 165:11
**agreement** 21:10
21:11 129:23
183:22 259:8
**ahead** 19:23 27:2
34:2 54:6 76:23
76:23 97:20
100:21 105:11
116:14 125:6
134:6 139:22
150:23 154:14
172:19 177:18
178:16 206:20
220:9,15 225:8
231:10 240:8
247:9 248:2 252:8
252:18,18 257:2
**aid** 249:19
**airport** 172:20

**al** 1:11 2:15 7:5
18:3 260:7,7
264:5,5
**allegation** 78:14
116:17
**allegations** 78:24
81:15 88:16
111:22 125:15
**alleged** 88:14
102:24 113:20
**allow** 27:21 141:10
217:6 219:15
231:7,21
**allowed** 212:11
**allows** 218:21,23
**alter** 254:10
**altering** 254:22
**ambulance** 14:25
15:16 173:1 176:2
176:4,22
**ambulances** 176:1
**amendment** 187:3
188:20
**amount** 224:2,3
232:9 243:24
244:1 254:15
256:3
**analyzing** 214:13
**anderson** 18:10
**andre** 18:10
**anecdotal** 64:15,24
71:18 188:19
251:24
**anecdotes** 187:14
**angry** 177:21
**annotation** 29:18
**annual** 94:13,19
235:17
**annually** 12:17
203:7
**answer** 8:21 9:7,9
9:18 26:23,24
39:15 42:18 49:10
54:20,21 105:20

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                          September 18, 2015

Page 268

116:15 128:24
136:22 137:25
139:3 140:7
149:15 151:14
157:10 158:18
160:6 164:5,7
179:11 182:19
187:19 188:15
190:5,14 191:12
191:24 194:13
195:12 201:15
202:4,10 211:11
212:9,22 213:7
214:9 215:12,25
216:9 217:10
218:4,20 219:24
221:18 223:7,24
224:12,19 225:8
228:17 229:2
230:5,8 232:3,16
232:24 233:8,19
234:1,15 235:20
236:20 238:6
245:13 246:6
247:23 249:17
251:21 252:18,19
253:13 254:1,14
255:24
**answering** 60:1,8
**answers** 9:3 35:3
240:25 259:6
**anticipate** 209:18
**anticipated** 266:2
**anticipation** 179:6
**anybody** 24:8
34:11 48:25 51:3
100:4 112:11
156:4 158:5 163:1
175:8,12 177:4
179:20,23 223:17
**anymore** 226:7
**anyway** 247:12
**apart** 41:8 67:11
**apartment** 183:18

**apologize** 28:21
80:2 250:19
**apparent** 256:15
**apparently** 197:1
**appearances** 4:1
5:1
**appeared** 185:17
**appears** 227:19
**applicable** 38:2
79:18 108:24
118:16 120:20
121:6,12
**application** 156:17
156:18 157:8
253:6 254:21
**applications** 66:20
**applied** 17:5 59:10
**applies** 66:21
221:24
**apply** 16:16 30:1
73:22 121:18
138:16
**applying** 253:18
**appreciate** 41:15
98:25
**appreciated** 260:16
**apprehend** 215:4
**apprehended**
216:17,18,23
**apprehension**
256:17
**apprised** 173:11
208:7
**approach** 85:23
**appropriate** 150:6
151:10 156:24
168:9 214:14
224:10 232:10
251:12 253:11
256:23
**approval** 33:4,8,13
34:17 108:11
**approve** 34:12
167:23

**approved** 43:20
53:12 56:22
**approximately**
12:11 13:3 50:20
181:7
**april** 37:5 40:11
259:15
**area** 42:16 112:3
137:9 149:12,20
149:22 150:5,11
151:2,9,23 163:20
171:1 175:14
199:17 247:18
**areas** 67:14 183:18
**arent** 43:17 113:5
148:9
**armed** 256:18
**armfield** 60:19
61:12 63:15
**arrangement** 20:14
20:15 21:1,2,5
**arrangements**
181:25
**arrest** 216:12
240:15 249:13
**arrestrelated** 234:8
**arrived** 24:17,22
53:3 125:3 172:23
173:1 240:1
**arrives** 239:15
**arriving** 25:11
239:18
**art** 194:10
**articles** 144:11
**aside** 186:12
**asked** 98:23 99:1
116:7 120:5
147:24 184:21
189:6 204:1,2
242:4 243:12
244:25 251:4
**asking** 19:21 41:13
41:16 113:24
118:4 152:11

154:14 179:13
185:25 218:10
221:11 224:5
255:17
**asneeded** 11:22
**aspect** 44:12
159:22 160:11
**aspects** 78:7
**asphyxia** 157:6
**asphyxiation** 157:6
**assertion** 203:22
**assess** 139:8
**assessment** 166:9
256:22
**assign** 27:21 83:1,3
**assigned** 30:12,24
67:13,14,15 83:17
183:6 205:17
245:23,24
**assignments** 72:25
73:9
**assist** 217:19
**assistance** 21:6
28:17 176:5
**assistant** 29:22,23
95:5 97:10 117:13
127:15,23 185:14
192:7 235:6,7
**assisted** 148:20
**associate** 179:20
**associated** 61:5
62:2 155:22 156:1
170:18 225:17
**association** 27:13
28:8 143:18
**assume** 155:23
**assumed** 143:24
144:4
**assuming** 143:15
143:19
**assumption** 99:7
**atheist** 178:4
**attached** 198:3
**attachment** 36:16

**attachments**
108:24
**attack** 26:19
**attempt** 197:23
203:16 250:16
251:3,10
**attempting** 232:7
**attended** 113:17
258:13
**attention** 166:22
171:15,16
**attitude** 64:10
**attorney** 8:4 32:1
172:14,16 183:24
243:1 259:10
**attorneys** 8:7 31:25
222:13 223:13
242:15,24 258:16
259:12
**audiotapes** 228:4,6
**audit** 174:4
**august** 43:5 187:10
187:15 188:7
189:3 190:9
251:25 253:6
**authored** 169:22
**authoritative**
144:20,22
**authority** 38:20,25
39:19 124:21
129:15,18,21
131:7 212:13
**authorized** 32:25
139:7 213:3 258:7
**automatically**
240:22
**available** 62:4
66:17 139:23,24
140:9,18 224:21
**avenue** 4:7
**average** 92:22
93:14,16
**averaged** 195:1
**award** 64:22

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

Page 269

**awards** 71:23,25
**aware** 20:13 51:23
 65:3 83:13 126:20
 147:23 153:7,19
 164:1,22 180:6
 188:21 195:22
 240:24

**B**

**back** 13:16 14:22
 34:7 36:25 53:5
 77:23 78:14 98:19
 123:18 124:8
 134:5 166:16,22
 171:25 183:19
 192:15 197:17
 198:10 204:11
 220:19 230:25
 238:15 250:9
 253:2,10,23 254:6
 255:7,8,10 256:3
**background** 46:23
 147:20
**backpacking** 172:4
**backup** 219:14,21
 219:22 220:6
**backward** 72:14
 73:20 124:2
**bad** 64:21 65:8
 107:8 140:16
**ballard** 80:24 81:1
 81:10 110:12,14
 162:5 169:2,4,19
 170:9,13 174:25
 175:16
**barry** 60:19
**based** 128:5 135:12
 140:25 147:19
 199:3 237:24
 238:2 253:3
**basic** 55:10
**basically** 27:15
 60:23 68:21
 204:23

**basis** 11:22 57:24
 126:16 184:19
 195:3 235:17,25
**batch** 241:22
**bates** 82:22 238:18
**batholm** 4:10
**baton** 217:5 218:13
 246:22
**batons** 133:11,23
 135:13 246:21
**baty** 4:6
**beaird** 55:25
**bear** 31:7,23 32:11
 33:3
**bears** 35:25
**beats** 72:10
**began** 28:25 172:25
**beginning** 170:8
**begins** 77:24
 166:17
**behalf** 3:2
**behaving** 206:22
**behavior** 215:17
**belief** 132:17 223:9
 223:10 235:3
 241:1
**believe** 13:15 25:25
 88:16 111:25
 113:17,18 122:7
 150:1,2 162:12
 170:16 177:9
 180:25 184:18
 185:5 200:15
 223:1 224:20
 235:5 251:16
 253:9,21 255:9
**bellefontaine** 28:7
 28:11
**belt** 246:1
**beneficial** 63:24
 65:9
**benefit** 9:12 116:10
 250:20 255:25
**benefits** 20:17

**best** 8:22 9:17
 17:21 19:5 58:3
 77:9 92:15 123:9
 123:11 132:18
 139:10 140:20
 148:5 158:9 181:8
 207:23 225:4
 227:24 241:1
**bet** 34:7
**better** 70:9 96:19
 121:2 141:17
 146:15
**beyond** 100:23
 107:18 109:12
 154:3 155:1,11
 246:19
**biasedbased**
 142:24
**big** 61:8 91:2
 193:18 249:9,9
**bill** 4:18 7:10 77:12
 77:15 204:6
 207:21 221:1
 222:14 231:25
**bipolar** 210:12
**bit** 33:21 61:19
 118:5 147:14
 209:15 213:11
 217:14 250:2
**bizarre** 215:17
**bjc** 176:21
**blank** 105:1
**blindfolds** 201:17
**blocking** 135:22
**bloodborne** 62:23
**board** 23:6 46:9
 208:10
**boat** 17:21
**bob** 7:12 61:6
**body** 149:7 195:20
**bomb** 26:17
**book** 38:1
**border** 171:4
**boss** 27:21 33:14

**bottom** 193:22
**bought** 241:22,23
**bounce** 181:1
**bounced** 185:13
**boundary** 171:1
**boxes** 184:13
**bracelets** 188:10
 252:1,21
**brain** 209:23 210:5
**brannon** 46:7,8,11
 47:12,16,18 49:5
 49:6,17 50:24
 51:20,22 52:6,11
 52:17 57:8,9,14
 58:2 100:2,9
 147:13 148:4,16
 148:21 154:17,19
 155:4,15 158:7
 159:12 160:12,16
 162:2 208:7
**brannons** 52:20
**breach** 81:19
**break** 8:24 77:18
 89:14 98:20
 152:25 161:2
 164:9 170:6 204:4
 206:6
**breathing** 172:25
 203:12
**brian** 1:11 2:15 7:5
 51:8 164:21,25
 165:4 260:7 264:5
**brief** 45:2 233:20
 233:23
**briefly** 239:12
 241:8
**briefs** 174:6
**bring** 98:11 139:11
 208:10
**broad** 58:14
**broaden** 209:14
**broadway** 4:15
 264:18 265:4
**brought** 59:3

**171:16** 228:14,23
**brown** 143:11,20
**brutality** 81:15
**buck** 39:9
**budgetary** 69:2,5
**buffalo** 11:12 12:4
**buildings** 177:2
**bullet** 53:10
**bullied** 113:18
**burden** 148:12
**bureau** 13:21
 168:10,19,23
 169:5 234:6,25
**bureaus** 38:21
**burglary** 13:16
 256:16 257:6
**business** 10:22
 179:10,14 199:24
 200:7 255:18
 266:4
**busy** 185:15
**buy** 241:21
**bypass** 78:13 112:5

**C**

**c** 3:3 4:6,14 5:6
 183:19 258:14
**cabinet** 91:5
**cabinets** 91:5
**cad** 124:6 225:20
 226:1,6 227:10
 238:20 239:2,9
 240:4,12,16
**calculated** 111:23
 112:4
**calea** 25:5,6 27:15
 123:2 147:7
**calendar** 69:23
 94:22 173:13
 235:25
**call** 22:14 45:2
 116:3 173:4,8
 174:11 176:1,13
 176:14 219:12

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                    September 18, 2015

Page 270

240:3
called 53:7 63:2
  80:14 84:11 85:10
  142:5 158:20
  172:20 175:3
  178:18 210:2
  212:11 220:21
  249:20
calling 182:18
calls 19:19 49:9
  74:9 105:19 125:5
  140:6 175:21
  176:4 182:18
  236:8
calm 210:2
canceled 11:8
canine 256:16
canister 134:12
canoe 171:1
canoeing 172:3
cant 22:15 31:25
  32:14 33:9 47:24
  48:4 49:18,18
  61:2 68:24 71:1
  71:25 75:9,22
  86:7 100:8,22
  114:2 122:18
  146:12 148:5
  165:25 177:23
  197:15 198:6
  201:18 207:4
  211:1 219:16,16
  232:25 233:10,12
  251:22 255:9
capacity 158:23
captain 23:1 30:24
  37:14 56:9 72:6
  80:22 81:3 195:15
  204:20 205:20
  230:21,21
captains 80:16
car 41:20 114:5,6
cardiac 249:13
care 20:25 21:1

119:14
career 16:4 131:9
carefully 258:19
carry 241:24 242:1
cars 172:22
case 2:13 7:21 8:8
  9:6 31:8 37:2,12
  38:6 51:7 64:7,23
  64:25 78:19
  110:13 111:23
  113:7 129:25
  138:2,5 170:4
  223:14,18 224:9
  224:20 238:18
  258:21 260:7
cases 101:12
  129:22,24 228:15
catch 42:9 105:22
  171:15
catchall 250:11
categories 116:18
categorize 96:1
category 98:8
  128:2
caught 106:10,20
  106:23
cause 108:15
  119:21 132:15,16
  132:25 158:15,16
  158:23 159:5
  197:17 240:23
  258:9,12
caused 16:25
  170:23 258:24
causing 149:11,19
  150:9,10 151:1
cautioned 258:19
central 15:9 229:11
  229:23
certain 10:19 64:17
  94:22 99:8 100:10
  104:3 108:17
  112:16 128:2
  184:24 185:3,25

198:4 204:22
  256:17
certainly 60:14
  144:15 252:12
  253:17
certainty 47:24
  48:5 86:7 148:5
  177:19 207:4
certificate 56:24
  58:3 264:8
certificates 56:20
certification 15:23
  16:8,16 50:15
  99:9,15,20 100:12
  100:23 101:1,5
certified 16:14
  44:21 46:8 47:3
  47:21 51:6 59:8
  99:8,23 134:24
  135:7 148:10,14
  148:17 242:1
  247:1
certify 63:5 243:20
  258:7,8 259:9
certifying 50:17
cetera 102:16
  179:25
chain 14:5 36:9
  103:4,7 104:11
  108:2 167:9
  199:24
chambers 19:8
chance 217:7
  218:15 233:24
change 108:15
  124:8 137:14
  225:16 261:2,5,8
  261:11,14,17,20
  261:23 262:2,5,8
  262:11,14,17,20
  262:23
changed 65:8
  160:17 228:9
  229:14,15

changes 225:15
channels 179:14
chapter 186:24
characterize 128:1
characterized 98:2
charge 50:24 66:14
  72:3 169:21
  230:16
charged 172:24
charges 264:9
  266:2,3,9
charitable 30:8
  31:4 37:1 205:10
charles 62:17
chase 160:10
check 108:1 131:11
  180:9
chemical 133:13,25
  134:7,9 135:13
chief 7:3 8:3,14
  12:14,17,20 13:18
  17:3,14 18:1,6
  22:13 24:15,18
  25:15 26:6 27:13
  35:20 36:4,13
  38:12,25 39:3,18
  40:7 41:22 43:8
  45:18 67:25 70:3
  70:11 71:16 72:4
  73:3 76:11 77:25
  79:13,19 80:6,15
  84:21,23 85:24
  86:13,18,23 87:11
  87:18 90:5,11
  97:16 102:18
  103:24 104:2
  106:1 111:1
  113:14 115:5
  124:15 125:3
  126:19 140:3
  142:2 143:15,20
  143:24 144:4
  159:3 166:18,25
  170:21 185:7

195:10 196:15
  197:2,6,17 209:17
  211:17,17 229:7
  230:1 235:4
  236:24 240:15
  244:9 250:14
  251:1,18 257:13
chiefs 23:5 27:12
  27:16 28:4,8,14
  28:23 29:19 30:7
  31:4 37:1 127:22
  163:3,8,11 201:25
  205:9,16
children 156:3
chiming 163:16
choice 140:16
christian 14:12,18
  15:17,24 176:21
  176:21
christy 201:2
chronologically
  91:16,17 95:12
chuck 143:7
circumstances
  107:21 108:15,16
  112:10,15 113:12
  113:23 138:9,19
  140:21 141:10,13
  141:15,21 168:11
  169:23 172:9
  173:3 174:9 189:7
  190:2 198:16
  203:17 219:15
  223:14 224:9
  231:3,13,15
  233:10,20 234:2
  242:6,10
cit 58:10,19,20 59:1
  59:5,8,22 60:15
  61:1,5,12 62:25
  63:6,10 64:1,5,16
  64:21,23 65:2,6
  65:12,14 66:6,15
  67:9,10,18,24

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                    September 18, 2015

Page 271

68:4,13 69:3,7,12
69:13,22 70:4,12
70:22 71:9,20,24
74:17 75:6,21
76:8,14 101:5
123:4 139:16,25
140:4,12,23,25
141:5,7,16 211:9
**cite** 197:15 219:16
**cited** 233:21
**citizen** 64:9 82:1,10
82:11,24 85:13,19
85:25 86:2,12,15
86:22 88:18,22
91:23 92:1 110:21
116:6,8,21 190:11
198:13 227:18,22
228:13,20 253:20
**citizens** 41:1 83:6
86:5 117:3,16
131:9 233:14
**cittrained** 59:13
74:11,18 75:2,11
77:3
**city** 3:4 4:8 12:25
16:21 17:9,11,12
18:17 19:6 20:18
20:23 21:4,11,15
31:10 32:1 34:10
34:11,24 37:21
39:5 87:16,17,20
87:20,22 90:15,19
92:10 94:20,23
95:2 110:24 114:6
114:17 118:17
125:19 146:14
173:19 185:15
188:9 192:23
199:25 211:21
228:25 230:17
234:5 241:11
242:15 243:3,13
244:9,16 258:15
**civil** 40:25 81:19

109:8 181:12
258:9
**civilian** 90:7
**claim** 91:19 198:9,9
**claimed** 115:16
188:19,20,20
**claiming** 179:16
228:15
**claims** 113:6,7
126:16
**clarification** 206:6
**clarify** 73:21 98:18
**classified** 194:4
**classroom** 113:19
**clear** 222:12 244:25
**clearly** 146:18
182:23
**clerical** 104:21
105:3,13,16,18
106:9,17,18
**clerk** 185:15
**close** 226:9
**closely** 29:13
**cloud** 226:7
**cnn** 183:24
**code** 30:25 36:16
**coercion** 221:8
222:6
**coffee** 34:1 219:7
**collaborative**
183:21
**collect** 230:9
**collected** 229:16
**college** 14:23 15:9
**colonel** 36:3,9
**com** 4:10 5:10,11
**combat** 247:2
248:17
**combative** 211:7
**come** 11:23 18:21
43:15 61:25 83:1
83:6 95:6 128:13
128:14 129:11
160:16 181:23

205:6 217:19
**comes** 18:19 42:13
42:21 82:11 126:9
149:7 198:22
212:13 238:23
239:3 263:1
**coming** 9:16 114:17
157:19 161:21
207:16 240:4
**command** 14:5
36:9 37:18 38:7
45:25 46:20 61:20
61:21,24 63:23
65:19,23,25 80:8
80:14 103:4,7
108:3 199:24
217:3 218:12
236:13,24
**commander** 13:20
13:20 23:1,2 24:2
24:5,9 56:13 64:4
72:5 83:4,17
108:6 110:11
168:9,10,19,19,22
168:23 169:5,5,7
169:14,19
**commanders** 65:14
72:8 89:20,23
107:25 174:6
224:1
**commendations**
71:22
**comments** 198:20
**commission** 259:15
259:19 263:14
266:11
**commissioned**
258:6
**committee** 163:3,8
163:11,17
**committing** 209:25
210:8
**common** 123:20
230:24 238:2

**commonly** 210:7,7
**commonplace**
93:23
**communicate** 86:3
200:1
**communication**
179:19,24 186:8
197:1
**communications**
75:6,12,20,25
76:7,13,15,21
77:1,4,6,6,11
114:19,21 175:24
176:3,8,12,13,16
176:23,24
**community** 53:4
142:13,23
**company** 11:20
208:25,25 266:5
**compared** 148:7
**compensation** 21:3
192:20
**compiled** 96:12
**compiling** 95:2
**complain** 71:4
**complainant** 94:18
96:8,9 203:2
228:14
**complained** 94:18
117:3 203:3
**complaining** 92:25
93:2
**complains** 116:22
**complaint** 82:12,14
82:16,20,25 83:21
84:2,5,8,19,24
85:15,18 86:2,10
86:11,15,20,23,25
87:1 89:1,4,17
90:15 91:14,23,25
93:5,20,24 94:10
94:17 96:2,9 98:2
98:7 104:4 109:8
110:21 111:4,6,18

116:5,7 124:22
128:1,15 129:14
129:19 130:5,13
179:1 190:11
198:17,18 202:16
203:2 222:16,18
229:25
**complaints** 70:25
71:3 81:25 82:1
82:11 83:6,8
84:12,19 85:4,7
85:10,12,14,14,20
85:25 86:1,4
88:18,23 92:16,23
92:24 93:10 94:16
95:12 97:1,3,5,24
111:21,25 115:15
116:1 117:17
128:9,17,19,22
129:3,9,12 198:13
203:8 204:15
205:1,2,3 227:19
227:23 228:13,21
229:8,9,20
**complete** 119:18
167:21 180:25
183:13 259:5
**completed** 108:10
251:9
**completely** 232:17
**completes** 167:18
167:20
**completion** 56:24
58:3
**complex** 183:18
**compliance** 31:10
37:21 46:1 50:12
215:23 221:14,16
221:23 222:7
231:1,4 233:6
**compliant** 31:14
**complied** 25:4
165:4
**complies** 244:5

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                     September 18, 2015

Page 272

**comply** 213:23 217:7 218:15 231:8,22 232:9,21 233:16,24 244:10 251:3
**complying** 75:1
**component** 63:10
**comprised** 23:25 88:5
**computer** 117:15 127:12 128:7,16 227:5 234:11
**computeraided** 124:6
**concede** 215:2,7
**concept** 58:21,25
**concern** 166:5
**concerns** 65:5 69:2 70:25 96:25 163:5
**conclude** 224:1 257:12
**conclusion** 88:15 217:20 224:2
**conclusions** 83:19 83:20 256:13,20
**condition** 157:7 171:6
**conduct** 102:25 116:6 118:8,9 119:2 121:5 167:7 178:8,12 185:19 198:15 215:17
**conducted** 47:11 88:13 175:23
**conducting** 174:3
**confer** 165:22 166:10,12
**conference** 183:14
**conferred** 111:10
**confidence** 161:6 182:10 183:3
**confined** 247:14
**confirm** 197:20
**conflict** 119:7

224:13
**conformance** 31:23 32:11 38:7
**confront** 210:8
**confronts** 242:12
**conjunction** 133:4
**consider** 91:22 97:5 104:21 105:16 132:12 134:9,13 135:19 144:20,24 183:3 185:23 211:13 249:12
**consideration** 74:11
**considered** 41:7 111:4 137:22 165:16 169:4
**consistent** 106:3 150:2,12,12,13,15 165:10 208:15 228:6
**consolidated** 2:15 89:22
**consternation** 182:14,16
**constitution** 208:16
**constitutional** 31:9 31:15,24 32:12 40:25 45:4
**constrained** 140:24
**consuming** 27:20
**contact** 173:10
**contacted** 171:23 172:7 181:22
**contain** 132:9 154:25
**contained** 115:17 189:13 199:3 203:17 205:22 222:3 228:22 251:14
**contains** 132:3
**contemplated** 242:6

**context** 193:5 221:13,15 252:10 253:4
**continue** 78:1 89:7 166:19 204:12 248:20
**continued** 5:1
**continuing** 29:9 44:2 67:3 112:22 232:4
**continuous** 203:4
**continuum** 107:3 130:22 136:8,16 136:20,24 137:2,2 137:10,14 217:14
**contours** 182:4
**contract** 12:18
**contrary** 149:12,21 182:21,25
**contribute** 158:15
**contributed** 147:14
**control** 39:20,24 50:12 136:15 139:11 160:18 161:13,23
**controlled** 209:2
**conversation** 9:14 19:1,16 160:20 161:21,24 164:16 174:17,23 175:3 177:20 199:13 225:18
**conversations** 49:14 173:12 183:20 222:13
**conversion** 226:8 226:13 227:5,8
**cool** 162:15,17,20 164:19,24
**cooperated** 184:2
**cooperation** 48:18 260:16
**coordinates** 28:9
**copied** 29:13

**copies** 27:18 56:20 95:14 117:2 192:3 192:4
**cops** 144:2,7,12 161:12
**copy** 90:18 97:8 117:10,11 137:9,9 180:17 227:9,16 260:11 265:7
**core** 67:14
**corporations** 10:25
**correct** 12:8,22 14:5,20 20:19 21:19,25 25:21 34:21,22 35:16,17 36:1,2,8,23 39:6,7 40:2,3,16,17,18 40:21,23 41:2 43:13,14,21,22 44:3,4 47:3 48:18 48:19 55:16,21 56:25 66:25 67:7 68:19 69:24 70:19 73:14 81:8 85:3 87:24 93:10 101:7 105:18 106:1 107:8 109:3,13,14 109:15 116:3 118:10 119:22,23 120:1 129:16 130:24 131:15 132:3,4 133:8 136:13,14 138:5 139:12,13 161:16 181:20 188:23 190:19,20 206:18 207:14 208:5,11 208:17 209:9,10 213:5 214:2 215:18,23 216:24 217:8 220:8 222:7 222:8,15 229:17 230:3,13 231:4,8 239:20 241:15

242:2,13,22,23 243:1,6,10 244:3 244:6,11,16 245:4 246:11,24 247:3,6 247:15,16,18 249:3 259:5
**corrected** 105:9,13 105:23 106:24
**correction** 107:1
**corrections** 260:12
**correctly** 53:16 54:3 138:1 150:7 168:25 253:7 255:17 258:25
**corruption** 81:21 96:3
**couldnt** 17:10 51:6 69:4 93:18 116:17 141:17 148:3 177:19
**council** 17:11 19:8 25:7 32:25 34:10 34:11
**counsel** 4:1 5:1 7:6 21:6,8 32:4,5 85:3 92:6,7 164:15 165:2 186:7 199:16,19 200:4,5 200:6,10 201:11 201:14 217:11 225:18 242:17,21 243:3 244:25 255:15,21 259:3,3 259:8,9
**counseling** 102:21 102:24 103:19,24 180:11
**counsels** 236:2
**county** 12:23,24 13:10,19,25 14:8 14:11,14,18,24 15:2,16,16 16:3 16:11,12 17:1 22:21,25 24:16

Tina Moore, et al.  v. Brian Kaminski, et al.
Thomas Jackson                                                September 18, 2015

28:6,11 45:22
46:20,25 47:6
58:22 59:6,12,22
60:17,25 61:7,11
61:24 62:5,13,19
62:22,22 63:5,8
63:10,11,21 64:4
64:16 65:4 68:9
68:14 70:22 71:19
75:24 76:6 123:4
131:25 145:12
211:20 212:5
236:14 258:3
**countys** 29:15
**couple** 21:24 50:9
78:4 111:16 118:5
207:24,25 241:8
**course** 138:13
181:16 199:22
212:10 218:21
246:23 266:3
**court** 2:1 7:17 8:8
9:12 112:24 164:5
164:7 216:19
258:10,13 264:1
**courtesy** 9:18
**cover** 159:21
**covered** 179:7
207:24 208:1
**cpr** 172:25
**crashing** 227:5
**create** 24:23 127:16
147:6
**created** 24:19 37:9
43:7 73:3,12
82:21 125:10
195:10 229:23
**credo** 41:9,17 42:4
**crime** 209:25 210:8
210:21
**criminal** 81:23
124:4
**crisis** 58:11 60:15
63:2 64:24 209:11

209:20,20 210:9
210:18 215:5,10
219:13
**criteria** 135:12,18
138:12 145:13
**critical** 178:1,2,7
**criticism** 178:3
**crossreferences**
149:2
**cruiser** 42:1
**cs** 134:9
**cuffing** 153:14
**cups** 219:7
**current** 127:22
142:9
**currently** 10:5
**curriculum** 162:1
**custodian** 57:13
**custody** 264:14
**cut** 9:15 130:8
160:10
**cycle** 228:10
**cycles** 152:19 153:9
160:3

――――――――――

**D**

**d** 1:5 2:9 4:4 183:19
**daily** 72:25 73:9
**dashcam** 195:20
196:2
**data** 65:1 125:21
126:2 127:10,15
188:22
**database** 58:6,8
**date** 7:2 26:12 37:4
37:10 75:13,22
108:17 112:24
123:16 145:24
146:12 185:7
192:17 206:3
227:21 238:23
260:6,13 263:6
**dated** 43:5 73:5
78:23 130:23

145:24 200:23
**dates** 57:21 75:9
123:17 146:7
198:8
**datewise** 21:17
**day** 3:6 63:16
171:12 173:13
200:13,14,22,24
203:19 258:16
259:14 263:13
266:10
**days** 200:19 228:9
260:14
**daytoday** 251:18
**de** 23:6
**dea** 211:20 212:4
**deadly** 224:17
**deal** 58:16 70:1
76:14 201:20
219:20 254:21
**dealing** 122:13
139:15 205:20
**death** 102:5,10
132:15,16 155:22
156:3 158:16,24
159:5 168:21
171:18 240:23
**deaths** 101:25
102:3 234:8
**decide** 183:20
**decided** 146:25
**decides** 110:20
140:20
**decision** 22:8 45:5
45:16 48:12,14,20
48:21 49:8,24
62:3 69:10,11
83:2 112:15
137:21 141:22
146:22,23,24
162:25 208:10
226:14
**decreased** 64:12
**decreases** 65:19

**dedicated** 163:8
**deemed** 86:11
**deeply** 177:23
**deescalate** 139:10
139:17 141:7
**deescalates** 132:19
**deescalation** 59:22
**defendant** 1:13
2:17 5:3
**defendants** 7:13,15
9:6 164:16
**defense** 165:2
**deficient** 26:10,18
**defined** 193:12
**definitely** 110:11
166:12
**definition** 132:22
**definitions** 94:3
132:3,5
**degree** 209:6 247:4
**delegated** 30:15
31:17 42:19 49:3
208:6
**delirium** 157:13,24
210:16,17 211:4
**delivery** 266:1
**delores** 1:3 2:7 4:3
7:9
**delve** 113:4
**demanding** 185:3
**demonstrations**
52:9
**dennis** 30:19
**denver** 11:11,12
12:4,5,6
**department** 8:13
8:14 10:10,13
12:8,21,23,25
13:10 14:11 17:2
17:12 20:7,11
21:13 22:7 24:1
24:25 26:5 36:21
36:22 38:3,9,13
38:18,22 39:4,13

39:24 40:6,13
41:6 42:3 43:12
51:12 52:4,17,21
53:11,15 54:13,14
55:5 56:5 57:10
58:23 59:1 60:21
61:8,10 67:24
68:3 76:7 77:11
78:12 80:14,19,20
80:20 82:15 84:21
86:16 87:1,9,13
87:19 89:25,25
91:25 99:13
102:19 104:4
106:1 109:8
112:16 113:12
115:1 118:10,18
120:17,21 121:9
121:19 125:12
127:20 131:12,20
132:7 134:16
137:3 142:14
144:3 145:25
148:19,25 152:14
160:13 162:13,14
167:3 170:24
173:22 175:24,25
176:3,5,6,23,24
178:1 179:23
180:4,13 181:12
181:17 184:6,7,23
185:4,10,10,18
186:1,9 188:12
192:21 196:7
198:25 203:24
205:11 206:10
208:4,13 209:3,5
209:9 214:12
215:8 225:24
234:6,23,24
236:14,17 237:4
237:16 240:14
241:10,11 242:16
242:21 243:9

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                    September 18, 2015

Page 274

249:12 255:6 260:23

**departmental** 179:9

**departments** 13:9 142:23 191:17 215:3

**depend** 107:20

**depending** 35:2 218:24 220:7

**deployed** 134:11 147:2 221:8 222:5

**deployment** 146:18 152:9

**deponent** 259:7

**deposes** 7:21

**deposition** 1:16 3:1 6:13,14,15,16,17 6:18,19,20,21,22 6:23 7:3 8:7 35:8 42:23 72:16 77:25 78:21 103:13 117:23 120:10 130:15 145:18 160:22 166:18 180:21 186:5 222:10,11 223:13 223:16 257:13 260:6,10,11 263:3 264:9,11 266:9

**depositions** 258:8

**depre** 210:11

**deputy** 13:20 23:1

**describe** 44:15 91:2 91:8 184:17 225:1 243:16

**descriptions** 120:15 121:3,6,12

**design** 96:6

**designated** 218:1,3 234:13

**designations** 36:11

**designed** 122:25 123:7 132:15

214:4 215:21 216:4,12

**desk** 84:8

**desktype** 91:10

**destroyed** 126:3,17

**destruction** 228:2

**detail** 88:11 167:15 182:3 238:20 239:2

**detailed** 236:17

**detailing** 83:19

**detectives** 24:16 59:13

**detention** 168:12

**determination** 197:8,13

**determine** 26:10 31:13,22 55:3 84:5 98:1 139:9 156:24 233:5

**determined** 27:13 39:5 45:25 206:7

**determines** 156:23 218:11

**determining** 32:18 46:17 49:1 116:9 141:14,16

**device** 48:18 50:14 50:18 51:4 86:21 115:13 133:18 135:7 138:17 145:23 150:10 151:1,21 152:1 153:9 155:10,11 157:18 159:5,15 195:20

**devices** 48:9,13 50:23 222:4

**didnt** 26:18 28:20 42:4 58:2 60:3 64:14 69:6,21 79:19 101:9 105:22 130:8 135:3 139:2

155:13 159:11,17 163:20 170:11 184:25 194:9 200:9 204:19 222:20 230:9,9 237:9,11 241:21 252:7 256:12

**died** 240:15

**difference** 85:13 202:14,24

**different** 13:9 24:24 26:8 29:4 39:2 40:15 42:9 53:20 54:4 67:2 68:13 76:19 78:7 78:10 80:13,19 85:23 100:16 120:16,20 121:3 121:18 123:17 124:6 133:4,7 135:20 142:21 147:21 151:6 162:13 179:15 187:13 188:4 190:17,22,24 251:14 253:19

**difficult** 77:8 249:3

**digital** 228:8,10

**direct** 33:15 91:25 105:23 199:23

**directed** 63:13 101:14 102:2 199:15 200:6

**directing** 23:20

**direction** 39:20

**directive** 75:1

**directly** 14:17 16:10 24:6 34:20 56:14 147:11 205:20

**director** 27:12 28:7 205:18

**directors** 23:7

**disagree** 194:18,23

196:16 203:22,25 204:3 253:3,11

**disagreed** 189:24

**disagreeing** 257:5

**discharge** 138:24 138:25 149:11,19 150:9,10 151:1 155:2,11,18

**discharged** 138:18 139:1

**discipline** 39:25 78:15 88:3 90:14 102:20,23 103:1,3 103:5,8,9,19,23 104:5,12,18 106:25 107:3 111:3,8 115:4,12 118:20,25 119:10 124:11,13,16,17 129:15 130:1 198:23

**disciplined** 124:15 180:4 198:20 237:24 238:2 254:7

**discovery** 111:20 111:24 112:5,6

**discretion** 33:20 84:4 140:10,12,13 140:17,24

**discuss** 153:8 155:9 157:5 163:5 186:24

**discussed** 32:20 111:7 129:22 214:25 219:13

**discusses** 66:22 154:2

**discussing** 19:2 194:10

**discussion** 34:5 45:21 48:17 155:13

**discussions** 45:24

122:4 197:25

**disk** 77:24 95:20 164:13 166:17

**disorders** 209:23

**dispatch** 239:4,6 240:17

**dispatched** 12:1 239:13,19

**dispatcher** 240:2

**dispatchers** 76:4 226:3,5

**dispatches** 175:25 176:6,16

**dispatching** 124:6

**disposal** 246:18

**disposition** 90:16 94:10,19 96:8,10

**disputes** 209:22,24

**distinction** 105:7

**distress** 58:17

**distribution** 36:20 37:17

**district** 2:1,2 15:16 258:10,11

**disturbing** 209:25

**division** 2:3 61:11 75:6,25 76:13 80:20,21 83:3 90:1,2 107:14 110:16 114:19 133:23 134:17 144:3 181:12 258:12

**divisions** 13:9 90:4 114:21

**doctrine** 179:8

**document** 35:19 95:10 124:24 125:11 126:4,10 126:11,18 161:14 161:15 173:13 183:4 184:16,22 189:2 191:15 193:18 202:8

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

Page 275

| | | | | |
|---|---|---|---|---|
| 203:4,12 | 112:21 113:4,10 | 221:3,6,10,21 | **duty** 108:12 143:19 | 183:1 197:22 |
| **documentation** | 115:2,3,9 117:18 | 222:15,17,25 | 246:10 | 203:15 |
| 57:4 188:13 | 122:10 125:4,7,13 | 223:8 224:4,14,22 | ———————— | **eickhoff** 18:3,7 |
| **documents** 88:5 | 127:6 137:16 | 225:10 228:19 | **E** | **eighthour** 72:14 |
| 95:15,17,20 117:8 | 142:3 144:10 | 229:4 230:10 | **earlier** 10:13 22:12 | 73:20 124:2 |
| 164:22 173:17 | 146:1 147:18 | 231:11 232:1,6,11 | 48:16 57:21 89:2 | **either** 14:15 24:19 |
| 184:8,13,24 | 149:1,10 150:1 | 232:19 233:1,11 | 89:13,24 104:2 | 25:4 29:13 110:8 |
| 222:14 227:18 | 154:6,22 157:11 | 233:22 234:4,16 | 115:18,23 158:4 | 134:11 170:20 |
| 228:21,22 | 157:16 158:3,7 | 234:22 235:23 | 180:14 191:19 | 215:23 227:19 |
| **doesnt** 131:20 | 159:16,20 160:7 | 236:11,22 237:8 | 202:2 209:11 | 259:10 |
| 217:17,19 253:15 | 160:20,21,21 | 237:19 238:7,10 | 219:13 220:20 | **elderly** 156:3 |
| **dog** 257:6 | 161:15,24 162:4 | 238:16 241:3 | 225:14 230:19 | **electric** 133:17 |
| **doing** 10:19 11:9 | 162:18 163:22 | 244:23 245:14,21 | 239:5 241:9 242:4 | **electronic** 50:3,11 |
| 27:5 31:16 89:8 | 166:6 171:24 | 246:7 247:10,24 | 253:2 | 57:11,17,24 58:6 |
| 112:8 183:17 | 173:11,11 174:2,2 | 248:8 249:22,25 | **early** 50:22 79:9 | 58:8 74:6 145:23 |
| 185:25 204:21 | 174:16,24 175:2,7 | 250:3 255:4,19,22 | 94:25 103:21 | 160:17 161:13,23 |
| 234:24 235:1,4 | 178:9 180:2,11 | 256:1 257:4,10 | 119:6 130:25 | 222:3 |
| **doj** 181:20,22 | 181:5 184:25 | 264:17,17 265:3,3 | 163:7 172:21 | **elephant** 201:18,18 |
| 184:18 185:11 | 185:8 186:10,23 | **dowdlaw** 4:18 | **easiest** 115:25 | **eligible** 17:4 |
| 186:5,8,21 187:13 | 187:20 190:6 | **downsides** 247:20 | **eastern** 2:2,3 55:1 | **elses** 163:2 |
| 188:4,11,24 | 193:3 194:3 | **draft** 37:17 95:8 | 62:7,16 258:11,11 | **email** 65:23 184:21 |
| 191:15,21 192:10 | 197:11 199:7 | 124:24 127:12 | **ecw** 50:2 99:18 | **embarrass** 112:11 |
| 192:25 193:12 | 205:19 206:5 | 128:4 148:4 | 100:16 102:6 | **emotional** 58:16 |
| 194:10 196:13 | 222:25 225:6 | **drafted** 27:7 35:20 | 109:20 115:11 | 209:20 |
| 201:9,13 250:9 | 226:7 228:10 | 43:8 66:23 122:15 | 134:22 142:1 | **emotionally** 74:23 |
| 251:15,25 | 231:19 235:1,21 | 123:25 136:20 | 162:6 163:25 | 153:21 156:4 |
| **domestic** 79:14 | 241:3 247:13 | **drafting** 29:13 33:2 | 187:15 188:8,19 | **employed** 16:12 |
| 209:22,24 210:4 | 249:25 250:10 | 34:15 46:15 | 189:3,12 191:9 | 199:10 227:1 |
| **dominica** 55:25 | 254:8,24 255:1,8 | 144:16 147:17 | 254:22 | **employee** 11:21 |
| **dont** 8:15,19 10:8 | 257:10 | **drag** 9:20 | **ecws** 49:2,8,25 | 78:14,24 79:9 |
| 18:15,18 19:24 | **door** 41:20,25 | **draw** 105:7 | 50:21 163:9 | 114:15 126:3,3,16 |
| 20:6,25 25:25 | **doubt** 116:10 | **drawer** 91:6,10,11 | **education** 44:2 | **employees** 20:8,11 |
| 42:6,6 46:13 | **dowd** 4:13,14,14 | 227:13 | 66:25 67:3 | 87:16 90:8 118:10 |
| 49:22 50:1,19 | 6:6,8,10,25 7:10 | **drive** 95:21 187:15 | **effect** 38:5 40:6 | 230:16 |
| 52:1,5,13,18 | 7:10 112:17 139:2 | 188:8 252:23 | 73:7 74:9 137:18 | **employment** 12:17 |
| 57:19,21 59:7 | 165:8,16 166:3,14 | **drivers** 100:13 | 158:14 185:6 | 25:23 55:9 95:15 |
| 60:6 66:7 67:14 | 193:23 207:16,19 | **drug** 13:13,21,22 | 248:9,16 | 171:6 200:13,14 |
| 67:15 68:6,16,16 | 207:21 210:20,24 | 23:2,4,7,13,16,16 | **effective** 38:9 71:23 | 203:19 244:15 |
| 70:24 71:21 73:10 | 211:15 212:1,17 | 23:25 24:13,14 | 79:5 248:4 | **ems** 14:9,15,17,21 |
| 73:11 74:15 75:15 | 212:23 213:8,15 | 61:15 | **effectiveness** 64:1,5 | 15:17 16:4,4 |
| 75:18 76:9 86:14 | 214:10 215:14 | **drugrelated** 114:24 | 65:2,6 71:20 | 175:18,20 176:6 |
| 86:19,24 89:9 | 216:1,15,22 | **due** 21:3 253:5 | **effects** 249:12 | 176:17,19 |
| 98:14,16 99:8,21 | 217:11 218:6,22 | **duly** 7:19 258:6,19 | **effort** 10:3 | **emt** 14:9,25 15:13 |
| 102:1,4 110:6 | 219:9 220:1,11,18 | **duties** 40:1 195:25 | **efforts** 65:11 77:2 | 15:20 |

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                   September 18, 2015

Page 276

**enabled** 198:14
**enclosed** 260:11
**enclosures** 108:25
**encounter** 58:20,24
  59:5,17 121:20
  138:5,7 141:6
**encountering** 122:5
**endeavor** 61:17
**endeavoring**
  254:10
**ended** 61:7
**enforcement** 10:9
  12:7 13:13,21
  14:14,19 16:3
  22:22 23:11 25:8
  28:2 29:5 31:1,2
  31:12 36:11,13
  39:25 42:10 44:13
  65:6 67:4 137:8
  142:25 143:3
  147:21 175:18
  211:19,20 212:3
**engage** 140:12
  215:16 248:17
**engaged** 102:25
  179:17
**engaging** 219:14
**enrolled** 70:14
**enrolling** 66:14
**ensure** 70:13 75:2
  77:3 119:13,24
  120:3
**ensuring** 74:11
  169:15
**enter** 119:20
  234:11 235:15
**entered** 112:19,21
  119:21
**entering** 240:3
**entire** 16:21 26:13
  79:18 84:21 153:1
  167:23
**entirety** 22:4
**entities** 144:7

**entity** 142:12,16
  204:18 205:8
  208:18
**entry** 226:2 240:7,7
**enumerated** 43:16
**envelope** 117:14
**environment**
  220:17
**equip** 133:22,25
  134:2,4
**equipment** 143:1
  245:23
**equipped** 134:17
  134:20,22 241:12
**errata** 260:11,13,13
  260:14
**erratic** 215:17
**error** 13:8 105:12
  105:14,18 106:9
  106:11,18,18
**errors** 104:22
  105:16
**escalation** 188:21
**especially** 62:25
  252:23
**esq** 4:5,13 5:4,5
  260:3,9
**essentially** 35:14
  46:4 87:16 120:15
  142:10
**established** 113:5
**establishing** 38:13
**estate** 1:2 2:6
**estimate** 68:2 225:4
**et** 1:11 2:15 7:5
  102:16 179:25
  260:7,7 264:5,5
**ethics** 36:17
**evaluate** 32:10
  251:11
**evaluation** 174:4
  179:15
**evening** 15:14
**event** 118:22 119:1

  168:10 188:13,19
  189:7 190:9 198:4
  240:22 252:7
**events** 188:19
  189:12,20 190:2
  198:9
**eventually** 18:4
  74:5 218:2
**everybody** 48:5
  65:20 69:15 99:21
  162:10 163:19
  241:23
**everyday** 9:14
**evidence** 57:14
  58:4 64:15,25
  71:18 88:12
  111:24 182:20,25
**exacerbate** 157:7
**exactly** 147:11
**examination** 6:3,4
  6:5,6,7,8,9,10
  7:23 206:1 207:1
  207:18 241:6
  244:22 250:6
  255:3
**examined** 258:19
**example** 26:17
  37:12 44:20 56:22
  58:1 115:3 124:1
  128:13 187:14
  188:6,7 190:23
  197:15 231:23
  247:12 248:6
  254:8
**examples** 86:14
  133:10 237:22,23
  252:4 256:5
**excellent** 71:14
**excessive** 97:6
  111:21 179:17
  211:23 212:7,10
  212:11,19 213:4
  213:12,18,23
  214:1 257:7

**excessiveforce**
  214:3
**exchange** 20:16
**excited** 157:13,23
  210:16 211:4
**excuse** 232:20
**executive** 39:3,18
  76:11 84:24
  102:19 142:5
  143:4
**executives** 142:9,9
**exercise** 129:21
**exercising** 138:10
  140:24
**exhaustive** 104:16
  104:19
**exhibit** 6:13,14,15
  6:16,17,18,19,20
  6:21,22,23 35:2,8
  35:12,18 36:15
  37:5 40:5,12,16
  41:9 42:23 43:3,3
  43:4,16 53:5,6
  66:22 72:16,19,24
  73:22 78:18,21
  79:22 94:3,11,14
  103:13,16 104:9
  104:13,15 117:23
  118:2,6,21 119:1
  119:3 120:7,10,19
  121:4,6,7,12,13
  130:15,19 132:2
  132:18 133:11
  136:17 145:7,14
  145:18,21 146:10
  146:15,21 147:6
  147:17 148:1,4,13
  148:20,23 149:2,2
  149:7 150:12
  151:3,7 152:3,4
  153:6,19 155:24
  156:11 157:1,2
  160:22,25 161:11
  161:12,18,20

  166:22 168:1
  169:17 180:20,21
  180:24 181:15
  187:7,17 189:13
  190:3 191:9,16
  193:16,19,23,24
  194:19 196:11
  197:16 198:4,11
  199:1,4,9 201:24
  203:17 220:19
  221:2 222:3
  250:10
**exhibiting** 215:17
**exhibits** 6:12,25
  152:16 156:15
  157:4
**exigent** 108:14,16
**exist** 118:21 167:5
  198:5
**existed** 57:22 78:11
  92:2
**existence** 146:3
  230:2
**existing** 31:15,24
  32:12 138:9,19
**exists** 63:20 195:21
**exonerate** 124:21
**exonerated** 94:5
**expand** 58:13
**expect** 105:17
  106:11 140:2
  141:5 237:6
**expectation** 108:16
  109:24 140:2
  237:12 246:9
**expense** 140:4
**experience** 145:11
  147:19,20 237:13
  238:8 248:3,4
**experienced** 248:11
**expertise** 74:20
**expire** 20:20
**expired** 100:12
**expires** 259:15

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

Page 277

263:14 266:11
**explain** 202:14,24
**extend** 75:5 154:3
**extending** 118:13
**extent** 57:22 85:7
  92:2 165:5 198:5
  199:14 218:2
  243:4 255:14
**extra** 74:20
**extraordinary**
  168:11
**eyes** 247:15 248:18
  248:23 249:7

_____

**F**

**f** 168:5
**face** 150:4 151:8
**facet** 254:20
**facets** 254:17
**fact** 99:21 133:10
  175:13 182:24
  183:15 236:15
**facto** 23:6
**factor** 55:7 70:16
  220:10
**factors** 116:16
  123:23 220:12,17
  249:10
**facts** 112:10,14
  113:12,22 172:8
  173:3 174:9 189:6
  190:1 198:15
  217:18,24 218:4
  224:9 233:12
  236:18 237:2,15
**factual** 182:11
  188:21 203:16
  237:7
**factually** 110:3
  194:18
**fair** 18:20 94:2
  100:25 101:3,4,8
  115:15,21 184:2
  208:22 220:2

222:14 223:11
**fairly** 251:10
**fall** 128:1
**false** 119:21
**familiar** 41:12
  44:17 46:22 81:1
  142:4,12
**family** 8:5 172:2,5
  177:5 179:20,25
  206:21
**fancy** 141:4
**far** 14:5 20:23
  55:10 114:11
  121:18 161:22
  163:16 168:1
  246:17
**fashion** 96:2
  138:10
**fast** 219:8
**fault** 80:1
**favor** 265:1,7
**favorable** 63:24
**fayette** 15:4
**fbi** 211:20 212:4
**feasibly** 70:14
**features** 247:6,6
**federal** 8:8 211:20
  212:4 234:6
**feedback** 63:25
  64:3,8,12 71:8,11
  96:17
**feel** 152:25 180:24
  182:19
**feels** 177:24
**feet** 246:24
**fell** 197:9,13
**felt** 26:12 37:16
  71:14 104:4
  129:18,19
**ferguson** 8:13
  10:10,13 11:3
  12:7,10,13,19
  16:19,22,25 17:2
  17:5,13,15,20

18:2,12,17,24
20:7,11,18 21:4
21:15 22:8,23
23:4,9,12,15,21
24:1,2,18,23 25:2
25:11,12 27:8
29:2,6,14 30:20
34:21 35:21 36:7
36:21 37:8 39:4,5
40:6,12 41:6,22
42:1,3,11,15 43:9
43:19,25 44:11
45:6,17,23,23
46:12,18 47:9,15
47:20 48:2,9
49:21,24 50:20
51:3,11 52:4
53:11,14,22,23,25
54:16 55:4 56:5
56:23 57:3,10
65:5,11 66:5,15
67:23 68:3,12
69:2 70:3,21
72:12,21 73:23
76:10 77:11 78:12
80:6,14 81:11
84:20 85:24 86:16
86:22,25 87:9,20
87:22 90:19 94:15
97:15 99:13,16
101:24 102:19
103:1,21 118:17
119:1 120:16,21
121:19 124:25
125:11 131:12
132:6 134:16
137:3,19 143:16
143:25 144:5
146:14 148:25
149:8 152:2 153:7
154:19 155:25
156:16 157:4,23
158:5 160:1,13
161:18 162:2,25

163:24 165:13
166:24 167:3
173:19 175:20
180:3 181:16
183:12,17 185:10
188:9 190:17
191:3,16 192:20
195:10 199:25
203:23 205:16
208:3,13 214:12
219:11 227:2
228:6 234:5,24
238:18 240:14
241:11 243:13
244:5,9,16 249:11
250:14 251:1
254:16
**fergusons** 26:5 38:8
  175:23 228:25
**field** 54:8 55:21,23
  56:13 72:5 140:5
  141:6 144:21
  147:3
**fight** 248:21
**fighter** 248:22
**fighting** 46:2
**file** 83:2,3 84:10,10
  84:11,12,13,19
  85:9,10,12,17
  87:2,6,25 88:1,6
  89:4,4 91:6,10,11
  91:20 93:13 111:5
  165:1 195:16
  204:22 227:13,25
  229:23 255:10
**filed** 112:24 179:4
  179:16 235:8
**files** 87:7,8,13,19
  88:19,23 89:1,12
  89:13,17,19 90:11
  90:19,23,25 92:3
  116:2 165:12
  191:17,18 192:10
  192:15 193:1,8,9

193:12 194:3,11
194:20 197:24
204:24
**fill** 82:25 117:13
  234:12 237:1,6
**filled** 18:4,5 152:10
**final** 21:3 22:24
  25:16,18 124:21
  129:15
**finalized** 26:1
**finally** 201:23
**finances** 21:1
**financial** 165:13
**find** 93:17,20
  236:25 237:2
**finding** 86:3 178:24
  194:19,23 203:3
**findings** 181:20
  197:21 199:9
  200:1
**fine** 50:11 166:9
  186:16,17 221:3,6
**finger** 72:1
**finish** 60:8
**finished** 15:12
**fire** 175:18,25
  176:3,5,6,13,16
  176:23
**firearm** 102:6
**firearms** 44:22
  52:24 67:6
**firm** 10:8,18
  264:14
**first** 7:19 11:11
  15:2,11 19:10
  24:22 28:1 35:11
  37:5 43:11 45:6
  48:13 50:20 53:3
  58:20,24 59:5
  60:15,17 61:12
  63:4 66:6 67:21
  68:4 71:17 72:3
  74:1 75:19 76:15
  77:14,15 78:17

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                          September 18, 2015

Page 278

86:5,12,18 94:24
101:23 103:9
104:15 107:10,15
109:25 123:25
125:10 131:4
138:4 156:18
168:7,13 173:4
176:5 182:6 187:5
193:7 220:24
226:5 241:22
248:13 249:19
258:19
**firstline** 103:11
**fiscal** 94:22
**fishing** 172:4
**fit** 36:10
**five** 13:15 84:23
90:12 95:1,1
97:14 154:3 155:1
155:12,18 203:11
241:23
**fivepage** 35:18
**flex** 216:5
**flight** 13:19
**focus** 78:4 159:22
159:24 187:1
**focuses** 59:22
**folder** 91:12
**folks** 209:21
**follow** 50:24 67:19
168:2 186:16
250:16
**followed** 77:16
102:9,10 122:13
168:8
**following** 113:16
253:7,21
**follows** 7:22 149:18
**followup** 99:22
168:13 207:25
255:5
**followups** 241:8
244:24
**footnote** 201:23,25

**force** 13:22 23:2,4
23:7,17,20,22,25
24:9,13,15 61:15
79:14 81:17 86:17
96:4 98:8 102:7
105:3 109:5,11,19
109:22,23 111:22
115:1,2,8,9,16
130:18,22 131:3,9
132:10,13,24,25
133:3,7,8 135:17
136:15,23 137:22
137:23 138:8,10
138:12 139:7,15
139:18 141:14
150:6 151:10
152:6 156:21,25
167:2,5,8,10
168:3,8,14,17
169:23 170:15
178:14,16,18
179:3,17 189:8
193:1,8,9,12
194:3,11,21 196:6
196:8,20 197:3,8
197:13,18 198:16
198:18 203:23
208:15 209:8
211:23 212:7,10
212:13,16,19
213:3,12,18,23
214:1,14,14,20
217:3,6,14 218:11
218:17,17 221:15
224:2,10,17 231:1
231:3,6 234:7
251:11,15,16
253:20 254:12
256:23 257:7
**foregoing** 258:22
258:25 263:2
**forgot** 98:19 145:14
**form** 26:8,22,23
39:14 41:11 42:17

54:1,18 55:17
57:11 70:6 82:16
82:20 87:3 88:7
91:14 101:20
103:12 104:18
110:18 115:4
116:11 119:4
120:23 121:14,21
121:25 124:16
125:24 126:5,16
131:16 132:20
136:4,10 137:24
138:8 139:19
140:14 142:8
151:14 152:9
156:9 158:17
173:14,18,18
178:11 184:5
188:14 189:14
190:4,24 191:11
194:12 205:22
212:8 213:13
217:9 227:15
228:17 229:2
230:4,7 231:9
232:2,16,23
234:12,14 236:19
238:19 248:2
249:16 251:16,20
252:8,18 253:12
253:19 254:6,10
254:13
**formed** 184:18
**former** 211:17
**forms** 109:12,18
133:4,7 135:25
195:23 229:25
234:10 251:9
253:8,22
**formulate** 145:8
**formulated** 34:12
37:8 146:11
**formulating** 31:6
34:15 123:4

**formulation** 122:23
123:12
**forth** 28:1 40:16
96:4 104:9,12
119:2 167:17
259:1
**forum** 142:5 143:4
**forward** 90:10
170:1 229:23
**foun** 150:17
**found** 93:24 121:5
125:22 153:6
157:3 198:17,18
237:16
**foundation** 30:8
31:4 37:1 42:18
43:2 70:7 100:18
101:21 116:12
128:24 132:21
136:11 137:25
139:20 140:15
142:17 149:14
150:21 151:13
153:12 154:12
156:5 157:9,25
158:17 159:1
160:6 164:3
177:16 187:18
190:14 191:24
194:13 195:12
202:4 205:10,16
210:23 211:11,25
212:9,21 213:7
214:8 215:11,24
217:10,12 221:17
223:6,24 224:19
225:7 228:17
229:2 231:10
232:3,16,24
234:14 235:19
236:19 237:18
238:5 245:12
246:5 247:8,22
249:17 251:20

252:17 253:13
**foundational** 188:3
**four** 14:1 35:18
56:1 67:14 183:8
185:17 200:19
219:7
**fourth** 187:3
188:20 258:14
260:4 265:10
**fouryear** 25:17
**fpd** 191:16 193:10
197:9,14
**fpds** 193:7
**free** 152:25 179:10
180:24 182:19
201:14
**friday** 260:6
**friend** 1:4 2:8 4:4
**friends** 172:5
**front** 114:4 238:17
**fto** 55:21
**full** 14:15 18:4,5
88:16 257:2 259:4
**fuller** 55:25
**fulltime** 27:22
30:12
**fully** 184:3 236:17
237:7
**functions** 104:3
**funding** 32:25
**funds** 32:24
**furnished** 11:15
**further** 29:9 112:17
173:6 174:8 179:2
179:15,19 189:9
189:11 205:25
207:15 241:3
249:25 255:1
257:10 259:9
260:15

---
**G**

**gain** 215:23 231:3
**gambling** 17:21

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

**gas** 134:8,11,17
208:25
**gateway** 266:5
**general** 24:19,24
25:3 26:6,19,20
27:8,19 28:1
29:14,18,25 30:11
31:6,14,22 32:10
32:19 33:2,6,22
34:12,16 35:15,19
36:17 37:4,7,8,15
37:25 38:2,12,24
39:2,23 40:8,12
43:4,5,7 45:3,4
46:15 53:5 60:1
61:17 64:6 66:23
72:5,21 73:1,6,12
73:18 76:19,20,24
78:6,9,18,23 79:2
79:17,21 88:13
97:2 101:16,23
103:17,20 107:21
108:9 110:23
112:14,14 113:11
114:24 118:7
119:6,8,9 120:8
120:13,18 122:7,8
122:21 123:12,15
123:24,25 124:3,8
130:22 132:14
134:15 135:15
144:16,17 145:8
145:12,25 146:2
147:3 149:3
151:25 152:6,21
153:1 156:22,23
157:14,16,17,21
158:14,19 159:23
166:23,23 172:12
183:24 198:24
211:16,18 215:21
218:10,14,18
219:10,17 222:2
225:15 226:4

**generally** 27:23
32:13 44:8,16
56:19 59:15 64:10
64:22 88:5,7
107:22,24,25
108:9,13 113:3,25
116:24 118:24
143:13,23 144:2
144:11 154:18
163:12 171:1
209:1 221:24
222:16
**gesturing** 91:7
**getting** 25:20
162:22 174:6
199:17,22 233:6
**gig** 10:7
**give** 8:7,21 9:9
33:19 54:13,24
71:22 75:22 78:16
82:13 83:18 93:18
95:7 97:8 116:10
122:18 128:9
130:19 145:14
186:4 188:11
189:9,11 193:5
217:7,18,24
218:15 219:6
220:19 237:22
**given** 57:6 64:22
97:14 116:21
131:8 154:19
218:4 224:20
233:13 234:2
238:17 240:25
249:19 254:11
259:6 263:5
**gives** 53:25
**giving** 256:22
**go** 16:3 17:19 18:24
19:12,23 21:21
27:2 28:3,14
30:10 31:21 32:17
32:24,24 33:4

34:2,3,10,14 35:3
35:25 36:21 48:23
54:6 55:8 57:17
76:23,23 78:15
84:9 97:20 100:21
104:6 105:11
111:5 112:2
116:14 124:8
125:6 134:6 137:7
139:22 145:21
150:23 154:14
167:24 171:7,9
172:5,19 176:5,7
177:18 178:16
181:24 183:19
186:15 187:8
188:18 189:16
197:17 201:19
206:20 207:23
216:20 217:21
220:9,15,17
223:25 224:1
225:8 230:25
231:10 234:11
238:10 240:8
241:18 243:5
247:8 248:2 252:8
252:17,18 255:7,8
255:10,10 257:2
**goals** 121:10
**god** 64:20
**goes** 14:4 36:17
136:17 167:15
176:7 196:15
**going** 8:11 26:15
30:2 32:23 35:1
35:11 46:5 71:4
72:19 78:5,8,17
88:7 90:10 98:5
99:19 103:16
118:2,4 120:7
130:19 140:17,18
140:19 153:2
160:25 161:1,4

165:9,19,24
167:21 170:22
171:10 180:17,18
180:19 181:1
183:19 184:2
191:2 193:4
201:19 207:22,23
216:11 219:20
220:19 231:16
246:10 253:2
**good** 66:11,12
113:2,8 145:4
163:21 166:13
183:17 207:20
248:22
**goodsize** 225:3
**gore** 266:5
**goreperry** 260:1,23
**gotcha** 102:18
110:12
**gotten** 197:19
**grab** 33:25
**grabbed** 231:20
**grade** 14:9
**graduate** 16:7 55:1
**graduated** 62:9,11
**graduates** 53:12
**graduation** 67:22
**grants** 142:25
144:13
**great** 166:11
201:20
**greater** 218:17
**greg** 57:12 66:18
**griffin** 10:21 11:3
**griffins** 11:17
**ground** 231:17
233:3
**grounds** 150:20
153:11 179:6
**group** 10:21 165:22
**guess** 106:21
199:18 255:16
**guessing** 56:2

**guidelines** 76:17
100:16 136:16
137:11 142:1
160:18 161:13,22
**gun** 246:15
**guy** 71:1
**guys** 72:11

**H**
**half** 75:16 256:13
**hall** 87:17,20 92:10
192:23
**hand** 35:11 46:2
72:19 103:16
104:6,6 118:2
180:17 198:23
259:13 266:10
**handcuff** 215:23
**handcuffing**
168:12
**handcuffs** 246:19
**handed** 103:4
124:11
**handful** 78:9
**handle** 113:2
**handled** 83:12
223:21
**hands** 201:17 217:4
218:13 246:24
**handtohand** 247:2
**handwriting** 79:24
**happen** 135:6
**happened** 75:23
100:23 110:25
164:18 189:21
227:22 229:13,19
247:18 252:12
255:9
**happy** 8:25
**harass** 112:9
**hard** 220:4 227:9
227:16
**hardcopy** 227:15
**hasnt** 218:1

Tina Moore, et al.  v. Brian Kaminski, et al.
Thomas Jackson                                                    September 18, 2015

Page 280

havent 166:1
    173:16 214:23
    216:7,10 223:17
head 9:14 36:12
    150:4 151:8
    169:12 173:22
    200:21
headed 78:16
heads 17:12
health 215:16
healthy 121:23
hear 9:6 42:7 61:18
    139:2
heard 173:4
heart 149:12,20,22
    150:4,11 151:2,9
heatofthemoment
    138:21
heavy 148:12
heavyhanded
    33:17
heightened 156:2
    211:5
heights 28:6,11
    29:15
held 36:6 216:6
helicopter 13:18
help 9:25 27:16
    146:14 148:17
    199:18 215:9
henke 56:9,10,17
    56:24 57:4 66:14
    72:6 73:16,25
    74:10 75:1 230:21
hereinabove 263:6
heres 43:2 199:22
    209:1
hereto 263:4
hereunto 266:8
hes 71:1 93:8
    140:19 161:3
    175:3 225:3,4,6
    225:12,12 231:7
    233:5,15

hide 181:10
highest 123:8
highstranking
    169:8
highly 248:5
highway 211:21
    212:5
hint 184:1
hired 16:19 17:6
history 17:5
hit 167:16
hmm 164:6 172:15
    256:8
hogtied 98:7
hold 12:14
holding 97:12
holm 4:6
holy 206:23,24
honest 119:25
    120:4
honorary 36:12
hopefully 165:21
hospital 14:12,18
    15:18,24 176:21
hostile 46:1
hour 161:2
hours 3:5 68:19
    110:4 244:10
house 32:3 44:6,22
    44:23,25 47:9
    92:9 99:16 204:25
    226:7,18
housed 176:24
housekeeping
    225:19
howard 15:2,15
hr 88:1 90:15,19
    93:7 173:18
    192:24
huh 230:6
human 41:1 87:15
    87:22 88:3 131:13
    131:22 192:22
humane 40:23

hundreds 29:24
hurled 177:21
hurt 213:3
hypothetical 54:24
    217:17 220:5
    232:18

————————

**I**

ia 92:3 95:2 111:5
    115:17 116:3
    117:6 125:16
    126:9,17 127:4
    195:4
iab 91:13
iacp 30:10,14 31:3
    137:6
iacps 32:13
iad 255:10
icp 137:5
id 8:25 9:18 116:25
    117:14 126:11
    128:16 152:21
    180:9 185:13
    233:9
ida 5:5 7:14
idea 18:22,23 63:3
    146:11 163:21
    187:23,25 222:25
identically 29:13
identification 35:9
    42:24 72:17 78:22
    103:14 117:24
    120:11 130:16
    145:19 160:23
    180:22
identified 110:12
    187:2,10 251:25
identify 7:6 35:13
    78:19 103:17
    120:8 130:20
    191:16
identity 100:6
ied 133:20
ignored 182:20,24

183:1 251:7
ilcsr 258:4
ill 8:20 9:17,22,25
    43:2 50:9 58:13
    131:19 141:18
    145:15 160:10
    161:4 186:16
    187:5 194:16,16
illegal 212:19 213:2
im 8:4,11 9:7 12:24
    19:21 20:13 26:15
    28:18 33:9 35:1
    35:11 41:12,12,16
    43:10 49:18 51:23
    56:2 59:25 60:3
    61:14 63:14 65:3
    67:5 72:19 76:23
    77:14 78:5,8,16
    78:17 85:2,3,4
    86:23 90:2 93:15
    93:15 97:12 98:5
    99:7,19 103:16,25
    105:1 112:3,8,10
    118:2,4 120:7
    125:6 126:20
    129:13 130:8,19
    137:6 138:24
    139:2 144:18
    146:7 147:23
    149:16 152:11
    153:2 154:14,16
    160:25 164:1
    167:24 169:10
    171:24 173:22
    174:16 175:2
    179:13 180:6,17
    180:18,19 181:1
    181:10 182:2,11
    186:14,17 191:2
    192:11 193:4
    194:14 195:22
    196:10 199:22
    207:22,23 211:19
    213:16 216:11,19

217:3 218:10
    219:2,7 220:19
    222:20 224:5
    226:4 231:16
    235:9 240:24
    242:15 244:25
    256:11
imagine 177:24
    184:9 232:20
immediately 14:24
    87:14 167:8
implement 46:22
    62:1,4 74:1 140:5
    140:25 141:5
implementation
    75:5
implementing
    74:17
implicit 159:6
important 79:13
    104:5 131:10
    211:16,22 212:3,6
    212:15
imposing 185:16
improper 86:17
    119:22 136:7
    217:17
inacademy 243:23
inaccuracy 105:5
inaccurate 105:2
    119:21
inappropriate
    86:17 102:25
    115:16 237:10
inappropriately
    86:21
incapacitate
    215:22 216:4
incapacitation
    133:18 145:23
    222:4
inception 40:9,10
incident 102:9
    113:16 132:19

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                          September 18, 2015

139:9,11 143:12
143:20 170:15,19
171:17,21 172:9
173:7,25 174:5,7
174:9,15 175:1,6
175:15 177:6,13
178:20 179:21
180:1,4 187:10
189:2 190:21,22
195:21 196:15
197:18 228:24
235:24 247:17
252:1
**incidents** 186:23
187:2 188:4 191:8
194:21 228:24
255:8
**include** 133:11
237:2
**included** 92:23
193:9 237:15
243:8
**includes** 215:15
**including** 39:24
112:11 189:7
209:16 215:4
216:16,23 230:15
236:13,23 260:12
**inconsistent** 151:15
151:18
**incorporated** 148:1
**increases** 64:8
**incustody** 101:24
102:3,5
**independent**
155:15 189:1
224:7
**independently**
156:18
**index** 6:1
**indicating** 193:8
**individual** 8:5 58:1
64:17 77:4 89:19
109:3 114:9,12,25

115:7 138:2,5
139:16 141:7
153:22 155:1,11
169:20 171:18
211:6,14 226:15
256:18
**individually** 1:1
2:5
**individuals** 46:1
58:16 59:17 76:14
113:1 149:12,20
150:11 151:2
156:1 157:7
210:11,12
**inform** 18:24 19:12
**informant** 62:24
**information** 27:25
28:2 29:10,21
30:11 46:16
116:21 119:22,25
125:14 128:5
136:25 147:5
165:13,14 174:8
174:12 176:11
184:4,5,17 185:4
185:11 186:18
187:12,17 189:9
189:11 190:12
193:7 195:15
196:23 198:14
205:22 206:13,17
226:6 228:21
234:6 238:22
239:3,9 240:4
251:24
**informed** 33:16
123:6
**inhouse** 44:9,11,17
44:19 45:7,8,10
45:13,17 46:17,24
47:14,18,19 57:2
57:9 92:7
**initial** 43:25 53:12
53:19 54:9,11

55:10 76:17 99:20
100:24 174:10
184:1 227:17
243:21
**initially** 19:1 27:9
27:10 31:16 77:13
183:16 256:6
**injured** 48:6
213:25 253:5
**injuries** 210:5
**injury** 133:1
155:21 156:2
168:21 216:13
**inmate** 190:22
**input** 162:24
**inservice** 43:23
44:5 243:23
**inside** 256:18
**insofar** 23:19
**inspection** 205:6
**inspector** 80:6
81:11 82:13 96:12
**inspectors** 81:13
96:15
**instances** 193:8
**instant** 254:25
**instruct** 67:17
260:12
**instructed** 69:13
**instruction** 40:1
74:13,14 149:8
255:21
**instructor** 13:19
46:3 52:24 248:13
**instructors** 44:21
47:14
**insults** 177:22
**integrity** 131:13,22
**intelligently** 211:1
**intense** 65:17
**intensive** 65:16
**intent** 48:3
**intention** 25:1
32:22 58:17,18

65:20 69:14 74:16
105:21
**intentional** 105:7
105:14 151:20,23
228:2
**interaction** 143:3
143:14
**interest** 19:5
**interested** 112:13
259:11
**interfacing** 158:10
**interim** 18:6
**interject** 73:18
**internal** 78:24
79:14 83:2 85:11
88:2,6,19,23 89:4
89:12,17 90:11,18
90:23 91:20
191:17 192:10,15
193:8 195:7
201:25 227:12
**internalaffairsrel...**
85:14
**international** 25:10
48:24 49:1,7
137:4,13 145:13
147:8,12 157:24
158:5,11 162:3
208:23
**internationally**
123:1
**interpersonal** 67:4
67:5,10
**interpose** 255:13
**interrogatories**
7:22
**interrupt** 28:20
60:3
**interval** 218:15
**intervene** 110:24
**intervened** 130:12
**intervention** 58:11
60:16 64:24
209:12

**interview** 17:7,9
32:21 185:19,20
185:24
**interviewed** 17:11
17:11 186:21
**interviews** 88:12
**intimately** 208:4,6
**investigate** 255:11
**investigated** 93:12
93:12 214:21
**investigating** 88:11
**investigation** 83:18
83:19 88:12,22
116:23 167:7
169:16 181:20,23
182:3,10 183:7,25
184:2 185:12,18
186:5 189:2 196:7
228:23 240:18,18
240:23 243:9
**investigations**
78:25 79:14 88:2
183:11
**investigative**
117:11 178:21
191:3
**investigator** 83:24
83:25 88:15 201:3
**involve** 111:9
**involved** 101:1,5
106:25 109:5
111:13,15 114:12
115:5,12 116:2
130:2,3,4 161:25
174:19 175:14
189:8,8,9 191:10
205:12 208:4
209:22 226:17
242:25 254:7
**involvement** 23:12
173:6 250:15,18
251:2,2
**involves** 109:19
**involving** 64:23

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                September 18, 2015

Page 282

| | | | | |
|---|---|---|---|---|
| 86:11,17 109:23 | 204:14 207:20 | 136:6,12 138:3,15 | **justified** 150:6 | 89:24 91:7 108:17 |
| 109:23 142:11 | 250:8 257:13 | 138:23 139:6,21 | 151:11 224:17 | 148:12 209:18 |
| 169:4 171:17 | 260:6 263:1,10 | 140:11,22 141:3 | | 235:25 245:8 |
| 174:1,10 175:10 | 264:11 | 141:11 142:19 | **K** | 250:11 |
| 177:6 178:20 | **jail** 114:15 188:9 | 145:20 149:17,24 | **kaminski** 1:11 2:15 | **knew** 61:4 101:8 |
| 180:5 189:3,12 | 189:4 190:9,21 | 150:18,22 151:5 | 7:5 51:8,10,16,22 | 128:21 163:18 |
| 190:21,23 191:8 | 191:5 252:2 253:5 | 151:17 153:13,18 | 51:24 52:2 162:11 | 225:20 |
| **irritant** 134:14 | **james** 19:2 | 154:1,8,13 156:7 | 162:19 163:11,15 | **know** 8:25 9:4,4,5,9 |
| **irritants** 133:15 | **january** 118:7,12 | 156:10,14 157:12 | 163:24 165:1,12 | 9:15 17:4,20 18:9 |
| 134:2 135:14 | **jason** 1:2 2:6 177:5 | 158:1,22 159:2 | 170:15 174:14 | 18:16,18,18 20:3 |
| **isnt** 53:24 213:18 | **job** 10:25 30:22 | 160:9,24 161:3,7 | 175:15 178:20 | 20:6,12,23 22:16 |
| **issuance** 21:19 | 33:20 36:6,10 | 161:10 164:11 | 179:3,17 180:7 | 25:22 26:2,15 |
| 197:16 198:11 | 52:20 55:11,14 | 166:20 173:2 | 223:20 225:2 | 27:18 28:12 29:12 |
| 200:19 | 56:12 120:15 | 177:17 179:12 | 246:1 260:7 264:5 | 32:8,21 42:9 |
| **issue** 69:6,9 70:23 | 121:3,6,12 183:9 | 180:23 181:5,6 | **kaminskis** 110:3 | 44:15 46:11 47:19 |
| 93:7 113:7 227:4 | 183:10 249:8 | 183:5 186:17,19 | 162:24 | 48:8 50:2 51:8,10 |
| 256:21 257:8 | **jobs** 10:9 120:20 | 187:21 188:2,17 | **kansas** 4:8 | 51:16,24 52:2,13 |
| **issued** 37:10 38:24 | **john** 16:20 46:7 | 189:15 190:7,16 | **karr** 32:1 92:12 | 52:14,16,18 56:16 |
| 180:14 181:11 | 49:5 51:20 55:25 | 191:14 192:1 | 243:4,5 | 59:7 60:6 63:13 |
| 200:12 | 57:14 147:13 | 193:15,18,22,24 | **keep** 52:18 56:17 | 63:20 64:14 65:20 |
| **issues** 78:15 79:15 | 201:7 208:7 | 194:6,15 195:17 | 56:24 57:4,15 | 66:17 67:15 68:16 |
| 215:16 | **johnson** 4:5 6:3,5,9 | 199:20 200:7,11 | 90:20 91:15,19 | 70:25 71:2 73:6 |
| **issuing** 33:2 | 7:8,8,24 8:4 10:2 | 201:22 202:6,12 | 184:23 230:2,3 | 73:25 74:10 75:10 |
| **ita** 227:6 | 10:4 19:21,22 | 202:23 204:4,6,13 | 240:16 244:14 | 75:18,19 76:9 |
| **iti** 226:1 227:6 | 27:1 34:7,9 35:10 | 205:25 207:2,15 | 245:15 | 81:4 85:6 86:3,4 |
| **ive** 15:8 57:16 | 39:12,17 41:14 | 250:2,7,22,24 | **keeping** 178:25 | 87:5 89:9 92:16 |
| 80:23 122:16 | 43:1 49:12 54:2 | 251:23 252:14,22 | **keeps** 56:5 | 97:12 98:7 99:8 |
| 183:2 213:14,17 | 54:10,19,23 55:19 | 253:1,16 254:2,19 | **kept** 33:16 52:16 | 99:21 100:6,9 |
| 223:3 225:17 | 60:2,13 70:8,10 | 255:1 | 57:23 84:25 88:20 | 101:12 102:9 |
| 233:12 238:17 | 72:18 77:19 78:2 | **joined** 14:10 | 88:23,24 89:19,24 | 106:21 110:3,24 |
| 247:11 248:9 | 79:1 82:23 83:5 | **joint** 10:3 | 90:21 91:12,13,17 | 111:25 113:23 |
| | 87:4 98:13,16,21 | **joking** 236:10 | 93:10,13 94:16,17 | 114:3 116:1,16 |
| **J** | 98:25 99:5,10 | **july** 103:20 130:23 | 95:9 97:18 117:6 | 117:18 123:16 |
| **jackson** 1:16 3:1 | 100:19,20 101:22 | 137:1,15 | 117:7 131:11 | 126:7,8,15 127:6 |
| 7:4,18 8:2,3,3 | 103:15 105:24 | **jump** 78:13 118:4 | 173:10 203:2 | 143:23 144:2,10 |
| 22:12,13 27:25 | 106:15 110:19 | **jury** 217:19 221:14 | 208:7 226:6 227:9 | 145:11,24 146:2,6 |
| 35:11 36:4 53:8 | 112:7,20 113:9 | **justice** 21:14 22:7 | 227:13,14 228:6 | 146:20 147:13,15 |
| 72:20 77:25 78:4 | 114:1,7 116:13,20 | 124:4 142:14 | 229:10,16,22 | 147:19 148:7,23 |
| 103:18 115:25 | 118:1 119:12 | 144:3 180:13 | 230:1 234:19 | 149:10 152:22 |
| 118:6 120:9 130:8 | 120:14 121:1,16 | 181:12 184:6 | **kicked** 231:20 | 154:22 155:22 |
| 132:13 134:14 | 121:22 122:2 | 185:4,11 234:7,25 | **killed** 213:14,17 | 157:16 158:3,7 |
| 145:22 153:5 | 125:8 126:1,6 | 242:16,21 243:9 | **killing** 213:18 | 159:12,16 160:7 |
| 161:18 166:18,21 | 129:1 130:17 | 255:7 | **kin** 102:15 | 160:11 161:4,11 |
| 193:2 197:2,7 | 131:18 133:2 | **justifiable** 156:19 | **kind** 78:13,15 | 162:1,4,5,8,11,16 |

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                September 18, 2015

Page 283

162:19 170:4,9,13
170:17 171:15
173:10 174:18,20
177:18,21 178:15
179:23 180:2,18
182:19 184:25
185:8 186:11,20
187:12,16,22,23
189:18,20 190:8
190:10,15 192:9
192:13 193:1
194:2,3,9 195:19
196:4 199:6
203:15,20 206:5
210:11,25 213:11
216:2 220:4
222:25 225:6,21
227:17,22 228:10
229:13,14,19
234:17 235:1
238:22 239:2
247:12,25 248:7
252:7 255:14
256:20
**knowing** 112:13
**knowledge** 31:6
51:4,5 69:11
70:23 92:15 99:11
99:17,23 113:11
125:10 129:19
132:6 135:8,9
158:2,6 160:1
162:23 180:8
182:23 185:6
188:12 227:1,10
227:11,24 228:1
230:11 256:14
**knowles** 19:2,7
21:22 34:14
**known** 65:24 129:6
142:12 193:1
**knows** 19:21
217:13 242:11

**L**

**labor** 21:8
**lack** 154:12 156:5
157:9,25 160:5
164:2 177:15
187:18 190:13
191:23 195:11
202:3 210:22
211:10,24 213:6
221:17 223:6,23
224:18 225:7
228:16 229:1,1
238:5 246:5 247:8
256:14
**lacking** 125:2
**lacks** 128:23
**lady** 189:4
**land** 35:24
**language** 239:25
**large** 74:3 209:6
225:1 227:20
**late** 143:10 192:13
**law** 10:9 12:7 14:14
14:19 16:3 22:22
23:11 25:7 28:2
29:5 31:2,8,8,9,12
31:15,24 32:12
36:11,13 42:10
44:12 65:6 67:3
109:3 137:7 143:2
147:20 175:18
211:19 212:3
213:24
**lawful** 231:4
**laws** 214:3
**lawsuit** 91:18,19,22
179:4,16 222:19
228:23
**lawsuits** 92:2
199:16
**lawyers** 9:5
**lay** 35:24 43:2
**layout** 35:23 96:6
**layperson** 20:15

**lead** 104:18 111:23
114:8
**leaders** 41:16 208:9
**leaf** 180:24
**leap** 17:1
**learn** 61:18 141:25
**learned** 60:15,17
61:12,16 247:11
**leave** 180:7
**leaving** 214:13
**left** 30:23 65:4,7
84:8 126:24 127:2
137:18 185:7
203:5 206:3 235:3
238:20 239:19,25
**legal** 31:13,21 32:9
67:5 243:4
**lengthy** 180:18
**lethal** 130:21,21
131:2,2 132:10,13
132:18 133:3,6,8
135:11 139:7,10
139:15 158:21
168:3,8,14,17
224:21 249:20
**letter** 116:24 117:1
117:13 184:15
185:3
**letterhead** 41:19
**letters** 117:2,16
127:13
**letting** 114:16,16
**level** 20:8 61:24
63:1 65:21 150:6
151:10 212:16,18
214:14 215:21
217:2 218:11,17
218:24 220:7,13
220:16 224:10
231:6 248:6
256:23
**levels** 208:15 209:7
217:6 219:18
**liability** 64:13

228:15,25
**liaison** 185:9
205:15
**license** 14:25 15:13
100:13 243:20
**licensure** 244:15
**lieu** 20:1,4
**lieutenant** 14:2,5
24:4,6 52:25
80:23 81:5,6
110:8,12,14 169:2
169:19 175:16
188:8 230:22
**lieutenants** 66:17
72:8 80:16,22
**life** 131:13,22
170:22
**lifeline** 122:18
**liked** 33:14,16
**limitation** 152:19
153:8 160:3
**limitations** 220:21
221:7
**limited** 51:14 112:9
**line** 11:1 98:11
107:10,15 109:25
260:13 261:1,4,7
261:10,13,16,19
261:22 262:1,4,7
262:10,13,16,19
262:22
**lineback** 205:19
**lipa** 266:5
**list** 66:8 104:16,19
260:12
**listed** 36:3
**listing** 88:13
**literal** 9:16
**litigation** 64:13
179:7 228:14
**little** 9:16 33:25
118:4 209:11,15
213:11 217:14
250:2

**living** 203:12
**load** 153:15
**lobby** 177:11 206:9
**locally** 137:8
**locate** 173:16
198:12
**located** 11:7,17
87:17 94:15
187:16 193:7
**location** 12:1
229:11,16
**locked** 84:10
**log** 94:16 95:8,9
96:6 97:9,11,21
115:17 116:3
117:6 125:16,22
126:9,17 195:5,8
201:25 202:1,11
202:18,25 203:1,1
203:9,10 205:2
**logged** 58:7 116:2
**logically** 245:9
**logon** 30:13
**logs** 97:14,18
117:12 127:4,8
**long** 17:5 21:21
65:17 66:9 74:5
177:13 182:6
203:21 209:16
213:9 228:5
**longer** 200:10
**look** 27:25 46:16
55:9 82:19 122:16
141:15 144:15
147:6 152:23
165:2 187:13
255:7,10
**looked** 14:21 46:15
91:9 118:20
121:17 123:16
145:6,8 147:16
148:16 189:23
197:24 256:4,4
**looking** 30:3

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-2   Filed: 06/01/16   Page: 86 of 103 PageID #: 2252
Tina Moore, et al.  v. Brian Kaminski, et al.
Thomas Jackson                                    September 18, 2015

Page 284

197:20 225:20 252:4
**looks** 13:2 24:18 28:25 168:9,22 169:25 194:4
**lopez** 201:2
**loss** 177:23
**lost** 95:23 173:17
**lot** 32:3 35:3 42:9 45:21 46:23 55:9 71:25 72:7 77:6,7 145:10,11 159:11 174:13 185:13 198:1 212:14 220:17 248:24
**lots** 27:16 45:24 144:18 197:25 210:10
**louis** 3:4 4:16 5:8 8:9 12:20,23 14:11 16:6 22:25 24:16 28:4,6 29:15 45:22 46:20 46:25 47:6 58:22 62:5,10,11,13,13 62:21 63:7 68:9 68:13 75:24 76:6 137:8 145:12 236:13 258:3,15 259:13 260:5,24 264:19 265:5,11 266:7
**loved** 71:12
**lower** 66:24 149:6 168:4 248:5
**luckily** 248:10

**M**

**m** 3:5,6 4:5 7:2
**mace** 134:15,20 135:20 208:25 217:4 218:13 245:9,15,15 247:12 249:15

**madison** 4:7
**magazines** 246:20
**main** 185:9 201:3
**maintain** 87:25 116:2 117:2 127:7 184:23 204:21 214:23 244:14
**maintained** 74:7 84:13,16,18 85:16 87:8,12,22 88:1 90:8,11 92:3 94:15 95:11 173:1 173:10 191:19 225:23 229:21
**maintaining** 57:12
**maintains** 56:5 126:21 192:19
**major** 61:7 63:14 104:8
**majority** 227:20
**making** 74:4 161:8 162:25 240:6 256:14,20
**malone** 164:21,25 165:4
**man** 172:22 224:23 225:3
**managed** 92:4 211:8 244:2
**management** 39:19 62:24
**manager** 10:7 16:21 18:17 34:24 94:20,23 95:2 110:24 125:19
**managers** 17:9
**mandatory** 69:14
**manic** 210:11
**manned** 72:10
**manner** 96:4 108:22 139:12
**manpower** 65:19
**mans** 217:12
**manual** 26:13

27:19 37:22 76:16 76:18,25,25 119:5 119:8 147:16,25
**manuals** 147:22
**march** 10:16 12:12 12:12,16,16 19:10 20:20 40:11 66:4 71:16 73:7 87:19 118:13 160:19 200:12,15 203:20
**mark** 35:2 78:8,17 120:7 180:20 191:3
**marked** 35:9,12 42:24 72:17 78:22 103:14 117:24 120:11 130:16 145:19 160:23 180:22 191:15 250:9
**mary** 127:18 235:10,11
**maryland** 28:6,11 29:15
**materials** 52:6,11 52:14,15 56:17
**mathematical** 13:8
**matter** 7:4 79:15 183:15 201:12 217:12 222:21 223:2 260:10
**matters** 242:25
**mayor** 19:2 21:22 34:14,14,20
**mayors** 34:16
**mcbride** 30:19,20 31:5,18 32:9 37:14 38:6 195:15 204:20 205:20 230:21
**mcbrides** 205:23
**mcdanel** 57:13 66:18
**mean** 27:10 28:20

44:5 54:3,4 59:13 60:3 63:25 64:19 65:7,7 68:18 93:7 129:24 130:4,8 139:24 146:6,24 183:10 186:12 189:20 200:5 209:7 217:21 226:14 229:22 237:11 251:6
**meaning** 36:20 43:25 68:24 81:6 92:24 99:15 120:21 163:23 196:14 218:24 233:23
**meaningful** 198:15
**means** 50:2,11 193:12 231:13
**meant** 93:2 237:12
**medical** 165:13
**medium** 91:3
**meet** 29:9 37:18 96:18,21 97:9 123:8 139:1,5 163:5 165:22 166:10,12 167:10 185:23 199:8
**meeting** 19:9 65:23 177:10 183:23 199:15 207:11
**meetings** 23:8 29:4 65:25,25 163:7
**meets** 30:3
**member** 177:5 179:20,24 180:3 198:24
**members** 8:5 39:25 40:1 80:13 112:16 113:13 213:25 214:13
**memo** 264:1
**memorandum** 83:18 88:10

**memorialized** 57:8
**memorializes** 190:18
**memory** 70:24 73:10,11 125:9 142:3 170:17 171:14 190:1 191:10 193:11
**mental** 141:23 215:16 242:6
**mentally** 121:23,23 122:5,14 139:16 141:6 153:21
**mentioned** 22:12 263:6
**mentions** 156:13,15
**merits** 111:6
**met** 9:5 23:5 27:11 27:16 38:6 96:23 138:13 143:5,7 145:13 158:8 183:15,23
**mete** 103:9 124:12
**meted** 119:10
**method** 112:5 167:2 214:17
**methodist** 15:9
**metro** 16:5,6 62:12
**metropolitan** 12:20 137:9
**michael** 143:11,20
**middle** 169:17
**midpoint** 73:16
**mike** 77:14,16 226:23
**mind** 22:10 33:25 65:8 89:5 105:4 130:11 193:13 198:22 258:18
**minimum** 243:24 244:1
**minnesota** 171:25
**minnesotacanada** 171:4

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                         September 18, 2015

Page 285

**minor** 1:5 2:9 4:4 103:10 104:8,12 104:15,16,17 106:16,24
**minute** 230:25
**mirrored** 27:15
**misconduct** 78:14 78:24 79:9 81:23 110:21 124:22 125:15,22 126:3 126:16
**misrepresentation** 105:14
**mission** 35:14 40:4 40:5 41:5,8,18,21 121:11
**missouri** 2:2 3:5 11:18 25:4 27:12 27:14 28:8 29:19 30:6 31:3 37:1 55:1 62:7,16 205:9 244:3 258:1 258:6,11,15 259:14,21 266:7
**misuse** 81:17
**mizzou** 15:1,12,14
**mmhmm** 15:5 182:5 187:4 202:17 232:1 236:7
**mo** 4:8,16 5:8 260:5 260:24 264:19 265:5,11
**moccr** 3:7 258:4
**mode** 187:15 188:8
**model** 148:6
**modified** 149:10
**modify** 124:10,16
**module** 63:9,21 67:9
**modules** 67:2
**moment** 68:1
**monday** 260:2
**money** 69:6

**monitor** 212:15
**monitored** 214:19
**month** 92:22 94:22 194:21 195:2 198:3
**monthly** 23:7 72:25 73:9 235:22
**months** 75:19 79:5 80:12
**moonier** 17:16,18 17:19
**moore** 1:1,3,3 2:5,7 2:7 4:3,12 7:5,9 7:11 169:4 170:5 171:21 173:7 174:1,5,10 175:10 175:14 177:6 178:20 179:3,21 179:24 180:5 195:21 206:22 207:21,22 223:2 223:14,21 224:15 247:17 260:7 264:5
**moores** 170:19 207:7,12
**morning** 8:6 110:4 172:21,21 223:22
**mother** 177:9 179:25 207:7,13
**motion** 112:23 164:23
**move** 135:23 166:10 194:16
**moved** 89:11,16 114:6
**moving** 72:9 151:22 229:22
**mpc** 30:6 37:13
**mpccf** 30:6
**mudd** 77:12,15
**mules** 124:5
**multijurisdictional** 13:22

**multiplepage** 161:14
**municipal** 62:14 211:21 212:5 228:15
**municipalities** 23:3
**muscles** 216:5

___

**N**

**n** 3:7 258:4
**nabdzyk** 230:22,24
**naked** 172:22 224:23 231:18 233:4,13
**name** 7:25 8:3 10:18 17:17 18:18 18:19 32:14 67:23 80:23 207:20 226:24 235:9 264:14
**names** 51:7 56:3 68:14 113:14,21 113:22 114:2 230:20
**nancy** 3:7 258:4
**narrative** 239:10
**narrow** 199:18 217:23
**nature** 10:22 97:1 104:25 113:6 128:19,21 129:3,9 129:12 173:14
**necessarily** 116:19 117:11 135:17,25 151:21 173:21 245:7
**necessary** 31:21 32:10 37:16 55:16 103:3 178:11 212:16 224:3 231:3 237:2,15 249:19
**necessitate** 167:12
**need** 8:24 9:7 24:23

74:8 122:16 124:3 124:8 126:11 128:15 159:21 219:6,20
**needed** 20:1,4 32:18 129:19
**needs** 108:18
**negative** 247:6
**negatives** 249:5
**neglected** 198:19
**negotiated** 21:6
**neighbors** 28:7
**net** 4:18
**never** 47:2 128:21 129:2 141:18 158:5 186:2,2 197:7 213:14,17 221:7 222:5 245:3 248:10
**new** 11:12 27:8 29:14 34:16 45:4 45:4 73:12 174:13 207:24 226:1 229:14
**news** 252:5
**nickeson** 5:14
**nightstick** 136:1
**nod** 9:14
**nods** 169:12 200:21
**nonattorney** 172:17,18
**noncertified** 135:3
**noncriminal** 215:16
**nondeadly** 139:9
**nonlethal** 158:21 249:21,24
**nonpolice** 41:3
**nonpoliceofficer** 230:16
**nonsworn** 118:10 120:22
**normal** 167:6 179:10,14 266:3

**normally** 110:7 119:20 180:10
**north** 4:15 264:18 265:4
**norwood** 111:15,17 113:15,17
**nos** 2:13
**notarial** 259:13
**notary** 3:8 258:5 259:20 263:18 266:13
**note** 196:25 197:6
**notes** 196:13 221:5
**notice** 74:8 258:9
**notices** 184:22
**notification** 102:15
**notified** 168:10,16 171:20
**november** 73:1,5,8
**number** 35:8 42:23 43:15 53:10 72:16 77:24 78:21 79:22 83:3 91:13 93:18 94:17 96:7,9 97:6 103:13 104:23 117:23 119:15 120:10 130:15 145:18 152:19 153:9 160:3,22 163:12 164:13 166:17 180:21 202:16 203:2 213:24,24 238:19 250:11 259:19 260:13
**numbers** 93:15 128:15
**numerosity** 97:3 130:3
**numrich** 4:6

___

**O**

**o** 243:17,17 244:2,5 244:11 247:2

Tina Moore, et al. v. Brian Kaminski, et al.

Thomas Jackson                                      September 18, 2015

Page 286

| | | | | |
|---|---|---|---|---|
| **oath** 120:5 | 232:23 233:7 | **offenses** 103:10 | 216:20 217:1,2,5 | 203:3 208:14 |
| **oaths** 258:7 | 237:5,18 245:19 | **offered** 69:23 | 217:13 218:11,14 | 209:19 211:8,12 |
| **object** 19:19 26:22 | 252:17 253:12 | **offers** 208:19 | 219:20 223:20,21 | 212:4 213:3,23 |
| 41:10 42:17 54:1 | 255:14 | **office** 8:7 19:7 86:6 | 225:1 231:2 233:3 | 214:6 215:3,8 |
| 54:18 55:17 70:6 | **objections** 112:6 | 89:11,18 90:23 | 233:5,14 236:12 | 221:15 231:22 |
| 87:3 100:18 | 138:11 141:2,9 | 191:19 192:14 | 236:15,23,24 | 232:22 237:6,23 |
| 101:20 110:18 | 156:12 165:3 | 204:23 205:23,23 | 237:1,14 239:13 | 242:2 243:18,20 |
| 111:19 116:11 | 216:8 218:20 | 227:13 229:21 | 239:15 241:17 | 244:8,10,14 245:1 |
| 119:4 120:23 | 219:23 220:9,14 | 260:15 | 242:11,12 244:16 | 245:24 247:1,13 |
| 121:14,21,25 | 232:8,15 233:18 | **officer** 14:4,8,8 | 246:1,10 249:6 | 249:14,18 253:15 |
| 125:24 126:5 | 233:25 234:18 | 24:3 39:4,18 | 254:7 256:21 | 254:11,16 |
| 132:20 136:4,10 | 236:2 253:25 | 43:19 46:3 47:23 | 257:8 264:8 | **offices** 3:2 11:17 |
| 137:24 139:19 | 259:3 | 48:1 52:23,25 | **officers** 23:3,6,16 | 258:13 |
| 140:14 149:14 | **objectives** 121:10 | 53:1,2,2,4,23,25 | 23:21 24:1 41:3,3 | **official** 41:24 66:19 |
| 179:5 182:17 | **obligation** 215:3 | 54:7,25 55:5,21 | 43:13 44:12 45:24 | 200:14 |
| 188:14 189:14 | 251:6 | 55:23 56:6,18 | 47:21 48:3 51:5 | **oh** 71:1 79:23 84:17 |
| 190:4 199:14 | **observed** 155:5 | 57:3,10,12 64:9 | 51:11 52:10 54:17 | 117:10 182:8 |
| 213:13 214:8 | 183:7 | 65:18 68:25 69:12 | 56:21 58:16,18 | 193:17 206:9 |
| 223:23 230:4 | **obtain** 15:22 16:7 | 74:12 76:11 84:24 | 59:12,13,15 65:13 | 209:21 248:12,12 |
| 231:24 245:12 | 48:18 50:21 | 85:16,19,19,20,25 | 65:14 66:6,12,18 | **okay** 9:1,21 12:6 |
| 246:4 247:22 | 187:13 | 85:25 86:1,12,16 | 67:18,22,24 68:3 | 18:1 22:13 25:9 |
| 249:16 250:21 | **obtained** 50:23 | 86:21 87:1 88:19 | 68:7 69:20 70:14 | 28:19 32:6 33:11 |
| 252:8 254:13 | **obtaining** 208:3 | 90:12 91:12,18,23 | 70:21 71:8,23 | 35:5 42:19 45:1 |
| **objected** 26:23 | **obviously** 8:13 14:3 | 92:18 94:18 99:3 | 73:22 74:6 76:21 | 50:4 60:10 62:15 |
| 111:20 112:3 | 36:16 57:21 73:19 | 99:18,19,23,24 | 81:7 86:5 87:2,9 | 72:2 73:16 79:21 |
| 201:20 230:7 | 74:22 84:4 108:14 | 102:19 103:5,8 | 87:13 89:18 99:7 | 79:25 82:20 87:7 |
| 256:5,9 | 133:7 159:17 | 105:18,22 106:10 | 99:13 100:10 | 88:9 89:15,21 |
| **objection** 39:11,14 | 208:4 | 107:11,13,15 | 101:2,6,18 102:21 | 98:13,21 99:11,22 |
| 41:10 106:14 | **occasion** 111:14 | 108:5,9 111:13 | 106:4 107:18 | 102:14 105:2 |
| 112:2,22 128:23 | **occasional** 11:21 | 114:5 115:13 | 111:13,16 115:16 | 116:5 117:20 |
| 131:16 138:20 | **occasions** 251:14 | 116:6,8,10 118:22 | 118:17 119:24 | 119:17 121:4 |
| 150:17,20 151:13 | 253:19 | 119:2 125:15,22 | 121:19 122:5 | 126:15 143:14 |
| 153:11,16,23 | **occur** 11:25 111:10 | 135:6 137:23 | 124:22 128:17,22 | 144:7 145:17 |
| 154:5 159:1 160:5 | **occurred** 143:21 | 138:8,18,22 139:8 | 129:4,16 131:8 | 150:16 152:11,13 |
| 164:2 177:15 | 198:9 253:10,24 | 139:24 140:4,17 | 134:17 140:9 | 152:24 154:24 |
| 188:1 190:13 | **occurrence** 64:17 | 140:23 141:5 | 149:9 154:17,19 | 159:25 161:9 |
| 191:11,23 194:12 | 64:19 175:9 | 144:9 156:24 | 159:4 160:2,12 | 162:16 166:3 |
| 195:11 202:3,9 | 235:16 236:25 | 167:4,19,21 169:9 | 162:2 163:2,24 | 167:24,25 169:8 |
| 210:19,22 211:10 | **october** 223:5 | 169:22 171:18 | 172:20,23,25 | 171:5 172:7 178:7 |
| 211:24 212:8,21 | **ofallon** 11:18 | 172:24 175:5 | 174:19 176:1 | 182:2,4 185:2 |
| 213:6 215:11,24 | **offense** 107:19 | 176:4 189:7 | 178:7,11 186:20 | 187:15 193:6 |
| 217:9 218:5 | 114:24 187:22 | 209:16 210:2 | 191:10 192:19 | 194:25 195:7 |
| 224:11,18 228:16 | 190:18,25 191:2 | 213:9 214:1 | 195:24 196:5 | 196:4,12 200:8 |
| 229:1 231:9 232:2 | 197:2 198:5,13 | 215:22 216:13,16 | 197:25 198:19 | 201:16 202:13 |

Tina Moore, et al.   v. Brian Kaminski, et al.
Thomas Jackson                                                    September 18, 2015

Page 287

204:7 209:7,24
210:4 212:10,18
213:1,11 214:22
217:1 218:9,23
219:5,19 220:12
221:11,20 222:2
223:11 226:8,12
230:19 234:5
236:4 240:11
242:9 243:16
244:24 245:6,18
248:22 249:11,25
255:23 256:11
**old** 73:13 89:16
**olive** 260:24 266:6
**olivette** 28:7,11
**olivettes** 29:16
**once** 30:12 38:5
   50:23 65:4 84:8
   123:15 167:5
   168:2,8,14 179:3
   179:16 188:5
**ones** 33:10 63:1
   122:19 130:7,10
   152:4 214:25
   220:16 229:25
   230:2
**oneshot** 70:1
**ongoing** 29:8
   243:22
**online** 234:20,25
   235:1,4
**onthejob** 243:22
**open** 17:4 246:23
**opening** 183:25
**openings** 70:12,12
**operate** 72:12
**operating** 165:18
**operation** 38:17
**operational** 24:12
   95:17
**operationally**
   78:11 82:10
**operations** 8:12

13:14,17 23:13
38:2 39:20 54:14
56:13 72:6 199:25
**operator** 13:14
**operators** 76:2
**opinion** 83:23 84:1
   129:25 182:18
   211:22 218:1
   224:6,7 233:17
   257:5,7
**opinions** 144:12
   223:20
**opposed** 12:25 65:9
   107:1 158:21
   191:5 210:21
**option** 72:9 242:2
**options** 156:21
   224:21 247:5
**oral** 7:21 103:12
   155:6
**order** 26:19 27:19
   29:25 31:13 35:15
   36:17 37:4,7,8,15
   37:23,25 38:12
   39:2 40:8,12 43:4
   43:5,7 45:3,4 53:6
   66:23 72:21 73:1
   73:7,12,19 78:6
   78:18,23 79:2,17
   79:21 101:24
   103:17,20 108:9
   112:18,20 113:2
   118:7 119:8 120:8
   120:13 122:7,8,21
   123:15,24,25
   124:8 130:22
   139:9 145:9,15,25
   146:2 147:3 149:3
   149:13,21 150:19
   150:24 151:16
   152:21 153:1
   156:6,20,23
   157:14,16,17
   158:14,19 164:23

166:23 198:24
   217:8 218:16
   219:17 222:2
   244:14
**ordered** 95:12
   260:11
**orders** 24:19,24
   25:3 26:6,21 27:8
   28:1,25 29:10,14
   29:19,19 30:11
   31:7,14,22 32:10
   32:19 33:3,6,22
   34:12,16 35:2,7
   35:19,24 37:19
   38:2,24 46:15
   76:19,20,24 78:9
   88:13 101:16
   119:6 123:12
   124:3 144:16,17
   145:12 152:1
   157:21 159:23
   219:10 225:15
   231:4,8,22 232:22
**ordinance** 104:23
**ordinances** 37:22
   38:8 39:5
**organic** 209:23
   210:5
**organization** 40:23
   142:4,8
**organizations**
   41:17
**oriented** 142:13
**original** 264:15
   265:1
**otto** 4:6
**outcome** 63:25
   64:21 116:22
   117:1,4
**outside** 11:11 17:9
   28:2 29:5,9 31:2,5
   32:4,5,7,8 44:8
   51:3 52:3 56:23
   92:7 99:16 137:7

200:9 247:18
**overall** 38:17
**overlooked** 252:13
**oversaw** 81:6,7
   90:7
**overseeing** 30:25
   80:19
**oversight** 214:18
   214:18
**overturned** 197:7
   197:12
**owner** 11:19

_____

**P**

**p** 3:3,6 4:6,14 5:6
   243:17,17 244:2,5
   244:11 247:2
   258:14
**package** 46:4
   167:23
**page** 6:2 36:1,15
   37:5 50:7 53:6
   66:23,24 94:3,11
   94:14 104:13,15
   119:15 132:3
   133:10 136:16,17
   149:3,6 168:1,4
   169:17 187:2,6,7
   187:8,9 193:14,15
   193:21,22 194:19
   196:10 201:23,24
   220:20 238:17
   250:11 258:25
   260:12,12,13,15
   261:1,4,7,10,13
   261:16,19,22
   262:1,4,7,10,13
   262:16,19,22
**pages** 181:8
**paid** 266:2,3
**pain** 221:14,16,23
   222:7 248:24
**paper** 74:4,7
**papers** 142:11

**paperwork** 192:20
**paragraph** 193:15
   193:22 194:8
**paramedic** 14:11
   15:21,22,23
**paraphrased** 54:3
**pardon** 114:20
**park** 114:6
**parked** 114:6
**part** 14:15 23:16,17
   23:20,21 32:21
   38:1 46:19,24
   50:17 68:17 74:16
   87:2,6 88:16,19
   91:19 119:14
   137:9 148:16
   165:20,21 195:14
   196:7,8 204:20
   213:1 240:17
   245:23 246:8
   248:19
**partially** 214:5
**particular** 46:2
   64:23 130:14
   170:25
**particularly** 151:22
   183:18
**parties** 259:10,11
**parts** 149:7
**parttime** 10:7 11:1
**passed** 8:5
**passive** 135:22
   136:1 221:25,25
   248:6
**passively** 136:3
**pathogens** 62:23
**patrol** 13:12,24
   53:2 59:13,15
   63:1 65:21 68:24
   73:22 77:2 80:21
   81:3,5,6,8 103:5,8
   107:14,18 110:15
   118:16 122:4
   133:23 134:16

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                             September 18, 2015

Page 288

169:9 195:25
211:21 241:19
**patrolman** 14:1
74:19 75:2
**patrolmen** 60:6
68:18 76:12 212:5
**pattern** 183:21
**patternandpracti...**
183:11,25
**payment** 21:2
**payroll** 20:22
**peace** 210:1
**pedestrian** 190:23
**peer** 214:18
**peers** 28:12
**pen** 105:13
**pencil** 74:5,7
**pending** 8:8 199:16
258:9
**people** 14:3 17:8
28:12 59:19 66:14
69:3,7 70:5 71:4
120:16 121:19
122:5 151:22
156:4 162:21
183:6 185:17
201:17 207:5,6,12
209:18,22,23,24
210:4,5,6,12
211:23 212:7
213:2 215:4,4,9
215:15 230:11
239:18,18,19,23
**pepper** 134:15,20
135:18,20,24
241:12,18 245:2
245:16,24 246:2
246:11 247:12,20
248:1,3,9,14,17
248:20,23 249:6
249:14
**percentage** 68:3
**perf** 142:5 143:7,14
143:18,23 144:7

144:10,15,19,20
160:17 161:12
**perform** 47:19
181:23 185:18
**period** 14:13 16:22
25:15 36:7 40:7
41:6,23 42:1 43:8
47:15 51:2 52:21
79:19 84:21 99:13
113:13 142:2
166:24 239:13,15
243:25 250:13,25
**permitted** 208:15
231:2
**perpetrator** 113:20
**perry** 266:5
**person** 24:14 27:7
27:22 30:13,15,18
42:15 60:17 66:13
66:19,20 80:9
84:18 110:20
112:11 158:9
168:22 189:8
210:16 215:22
216:17,18,23
217:7 218:13,15
218:25 219:12,14
219:19 220:8
226:16,17 231:7
231:17,21 232:4
232:13 233:13,24
264:14
**personal** 1:1 2:5
209:20 210:9,18
215:5,9 219:12
251:1
**personally** 100:25
101:4 159:9
213:20 242:17,20
**personnel** 10:7,18
10:21 36:22 37:22
38:8,21 42:14
63:6 75:11,21
76:7 87:2,8,12,19

87:25 89:12 100:6
119:5,8,20 120:12
120:22 122:14
148:19 165:1
173:18
**persons** 175:17
207:9
**perspective** 250:15
250:18
**perspectives** 67:6
**pertains** 73:8
**phone** 173:4 174:10
**photographs** 196:5
196:8
**phrase** 53:18
157:18 201:25
**phrases** 42:9
**physical** 86:11
115:9 135:17
168:21
**picking** 114:18
**piecemeal** 241:21
**pilot** 13:18
**pistol** 246:20
**pitzer** 3:3 5:6
258:13 260:4
265:9
**place** 17:14 18:1,16
113:10 152:18
229:24
**places** 205:21
**plaintiff** 1:7 2:11
4:3,12 7:10
**plaintiffs** 3:2 6:12
7:8 164:15 165:5
206:10,14
**planner** 173:13
**play** 22:10
**please** 7:6,17 8:24
35:13 77:25 78:19
113:23 120:8
130:20 166:18
204:12 220:21,25
226:24 238:11

260:12,14
**plunkett** 5:4,10 6:4
6:7 7:12,12 9:25
19:19 26:22 39:11
39:14 41:10 42:17
49:9 54:1,6,18,21
55:17 59:25 60:5
60:10 70:6 77:17
82:22 87:3 98:10
98:14,17,23
100:18 101:20
105:19 106:14
110:18 111:19
112:25 113:24
116:11,15 119:4
120:23 121:14,21
121:25 125:5,24
126:5 128:23
131:16 132:20
136:4,10 137:24
138:11,20 139:19
140:6,14 141:2,9
142:17 149:14
150:17,20 151:4
151:13 153:11,16
153:23 154:5,12
156:5,9,12 157:9
157:25 158:17
159:1 160:5 161:1
164:2,9,15 165:18
166:11,15 172:13
172:16,19 177:15
179:5 181:3
182:17 186:12,15
187:18,24 188:1
188:14 189:14
190:4,13 191:11
191:23 193:13,17
193:19,25 194:12
195:11 199:14
200:3,8 201:13
202:3,9,20 204:5
204:7 206:2
210:19,22 211:10

211:24 212:8,21
213:6,13 214:8
215:11,24 216:8
217:9,16 218:19
219:1,5,23 220:9
220:14 221:1,4,17
221:20 222:12
223:6,23 224:11
224:18 225:7
228:16 229:1
230:4,7 231:9,24
232:2,8,15,23
233:7,18,25
234:14,18 235:19
236:8,19 237:5,18
238:5 241:7
244:20 245:12,19
246:4 247:8,22
248:2 249:16
250:19 251:20
252:8,17,25
253:12,25 254:13
255:13,20,23
257:1,11 260:3,9
**plus** 20:17
**point** 19:14 34:19
53:10 66:5 69:17
81:10 106:20
111:20 113:1
119:14 126:12
137:14 141:25
222:1
**pointed** 42:20
**points** 69:23 163:14
**police** 8:13 10:10
10:13 12:8,14,19
12:21,23,25 13:10
14:11 16:5 17:2,3
18:1 20:7,11
21:14 22:7 23:5
23:10 24:1,3,24
25:12 26:5,6
27:13 28:4,14,23
29:19 30:6 31:4

Tina Moore, et al.  v. Brian Kaminski, et al.
Thomas Jackson                                    September 18, 2015

Page 289

35:20 36:4,13,21
37:1 38:3,12,17
38:21,25 39:4,13
39:24 40:6,13
41:3,6,22 42:1,3
43:13 51:12 52:4
52:23 53:11,14,21
53:23 54:12,16,25
55:1,4 56:5 57:10
58:22 59:1,3 61:7
62:5,14 63:1,8
64:13 65:12 67:24
68:3,9 70:3,11,14
73:3 78:12 79:13
80:14 81:7 84:20
86:16,22 87:1,6,9
87:18,19 91:25
97:15 99:13
102:19,21 105:25
106:3 108:8 109:2
113:12 115:1
118:17 120:17,21
121:8,19 124:22
125:11,15 126:18
131:8 132:7
134:16 137:3
142:2,5,9,9,11,22
142:23 143:3,15
143:20,24 144:4
159:3 160:13
166:25 167:3
169:21,22 170:1
170:21 173:24
174:4 176:7,8,12
176:24 177:11
180:3 181:16
182:23 184:12
185:10,18 186:9
186:20 191:16
192:20 198:25
203:24 205:9
206:10 208:3,13
208:19 209:3,4,9
210:7 211:17,18

211:18,19,21,21
212:5,5 213:9
214:19 215:2,2,8
217:13 222:20,23
223:2 228:6 234:5
234:24 236:12,14
236:24 237:14
238:18 240:14
241:11 243:18
244:16 247:25
249:11 250:14,25
251:18 254:18,20
256:14
**policies** 25:3 27:17
  27:18 53:14 78:5
  121:17 123:7
  152:1,18 153:6,14
  153:19 155:24
  156:15 159:22
  208:16 209:8
  213:22 219:11,17
  236:16 237:3,16
  246:8
**policing** 142:13,24
**policy** 30:3 38:13
  43:12 55:12
  118:20,21,25
  122:4,24 123:5,6
  123:6,18,22
  124:24 125:11
  126:4,10,18
  131:20 132:2,9
  135:12 145:6,8
  157:3,14 158:13
  166:23 167:10
  169:14 178:25
  197:9,14 214:16
  228:7,9 240:13,21
**poorly** 70:8
**portage** 172:4
**portal** 234:11,21
**portion** 66:24
  149:6 168:4
  169:17 253:22

**posing** 218:25
  220:8
**position** 17:3,6
  80:7 137:19
  143:15 144:4
  185:7
**positional** 157:5,6
**positive** 247:5
**possession** 85:8
  164:20 230:12
**possible** 108:19
  140:9 173:21
  211:12 216:13
  219:14 226:4
**possibly** 148:20
  165:23 184:9
**post2010** 122:22
**postcommission**
  66:24
**postlabor** 171:12
**potential** 74:8
**potentially** 132:15
**pounds** 224:24
**pour** 182:2
**practice** 196:16
**practices** 21:15
  22:7 104:4 123:9
  123:11 183:21
  186:1,9 187:3
**prank** 114:4
**preapproved**
  239:25
**preceding** 194:8
**precise** 151:21
**predate** 85:5
**predecessor** 89:8
**preferred** 9:3 220:5
**pregnant** 156:3
**preliminary** 84:1
**preparation** 222:10
  223:15
**prepared** 224:8
  249:18
**preprinted** 234:12

**presence** 155:10
  200:4 217:4
  218:12
**present** 33:12
  89:17 199:19
  200:5 201:11,13
  206:10 207:5
**presentation** 71:15
  155:6
**presentations** 52:8
**presented** 33:7,23
  37:15 83:22
  125:18 127:5
  195:8 251:10
**preservation**
  184:22
**preserve** 185:3
**president** 143:5,7
**press** 183:14
**pressure** 222:1
**presumably** 67:16
  226:16
**presume** 8:20
**pretty** 61:14 63:14
  129:13 165:6,8
  171:24 174:12
  177:24 192:11
  254:15
**prevent** 132:24
**prevented** 64:16,21
**previous** 97:25
  112:6
**previously** 51:6
  98:23 148:8
  212:12 229:10,20
**primarily** 8:12
  130:18
**primary** 214:17,17
**principal** 11:19
**principles** 35:7
**prior** 12:19 14:7
  23:12 25:11 26:6
  46:16 49:1,24
  57:16 73:6 84:15

99:16 108:11
  146:17,18 159:12
  180:11 214:12
  222:9 226:8
  227:23 229:19
  230:3
**prioritized** 104:3
**prioritizing** 79:16
**priority** 66:8,10
  76:11,15 103:24
  104:5 131:3
**prisoner** 114:16,18
**private** 11:13
**privilege** 165:15
**privileged** 165:17
**probably** 8:12
  19:10 50:9 78:8
  80:12 82:18 94:1
  106:24 140:16
  175:3 225:12
**probe** 149:11,20
  150:9,10 151:2
**problem** 28:22 34:2
**problematic** 77:7
**problems** 217:22
  227:7
**procedure** 53:14
  76:16,18 122:13
  157:3 158:13
  166:8 168:7,14
  178:17 180:10
  240:13
**procedures** 102:8
  102:10 105:25
  106:4 108:9
  155:24 159:23
  167:13 168:2
  209:9 219:11,17
  236:16 237:3
  246:9 253:8
**proceeding** 242:22
**proceedings** 112:25
**process** 9:16 17:9
  25:17,20 26:3

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                    September 18, 2015

Page 290

27:11 29:8,23
32:22 37:9 46:20
89:7,9 128:8
195:14 196:8,9
197:19 204:21
205:13 208:2,5,7
**processing** 260:15
**produce** 112:1
165:1,9,21 166:1
166:4,7
**produced** 165:12
227:18
**product** 208:24
**production** 260:23
**professional** 51:14
80:5 81:11,13
82:13 96:11
143:19
**professionalism**
40:20
**professionally**
143:2
**proficient** 226:18
**profiling** 44:20
**program** 16:1
46:22,25 56:23
57:14 58:15 59:3
63:20 64:7 65:2,9
65:17 75:6 123:4
**progress** 256:16
257:6
**progressive** 103:1
103:19,23 104:11
**prohibition** 154:2
154:25 155:7
**project** 10:7,8 12:2
60:24
**projects** 10:19 11:2
11:10,22,25
**promoted** 13:16
22:25
**prompt** 260:16
**promulgate** 62:1
**promulgated** 79:3

100:17 101:16,24
122:22 132:17
146:11
**promulgating**
122:4
**prongs** 167:16
**proof** 204:24
**proofs** 30:2 204:21
**proper** 193:5
**properly** 218:4
**proponent** 61:8
**proposition** 77:8
218:18
**propounded** 7:22
259:2,6
**prospect** 19:3
**protect** 42:7 213:25
214:5
**protective** 112:18
112:20 113:2
164:23
**protocol** 196:4
**protocols** 139:16
**prove** 116:17
**proved** 236:18
**provide** 10:24 12:1
43:12 50:13,15,16
74:14,20 83:16
90:18 117:4
119:24 120:4
142:22,24 144:11
159:3 195:13
**provided** 44:12
82:1 144:8 149:9
162:3 188:3 192:4
192:10 193:9
201:10 254:17
**provider** 43:20
53:12 56:23
176:19
**providing** 185:11
**pspclaw** 5:10,11
**psychological**
210:18

**psychosis** 210:13
**psychotherapist**
165:15
**public** 3:8 12:6
205:11 213:25
214:5 258:5
259:20 263:18
266:13
**pull** 128:16 255:10
**pulled** 114:4
**punching** 172:22
**punitively** 221:8
222:5
**purchase** 48:12,20
48:23 49:1,8,15
49:24 146:22,25
162:25
**purpose** 49:21
213:21 255:18
**purposes** 185:24
200:7 204:15
221:8 222:5
245:20
**pursuant** 113:1
126:3,17 258:8
**put** 46:4 71:25
93:11 98:2,8
119:6 135:3 163:2
182:25 183:1
187:16 198:19
208:25 229:10
**putting** 104:23
201:17

───────── **Q** ─────────

**qualifications** 55:8
**qualified** 56:1
241:25 258:6
**qualifier** 255:23
**qualify** 251:22
**quarterly** 235:21
**quash** 164:23
**question** 8:17,20,21
9:19 24:12 60:1

70:9 96:20 98:23
99:22 120:24
121:2 131:17
136:23 138:1
153:5,14 164:17
170:5 188:15
194:1 199:18
202:21 206:7
212:2 213:21
217:23 218:7
221:12,22 229:5
229:14 231:25
236:21 241:10
242:4,14,18 246:5
250:12,20 252:10
252:10 253:2
255:17 257:2,3
**questioning** 98:11
113:5
**questions** 7:24 8:11
8:16 9:15 89:14
120:5 145:15
153:2 180:19
181:2 182:11
186:1 189:25
205:25 206:2
207:2,15,19,23,25
241:4,7 243:8,12
244:20,23 250:1,7
255:2,4 259:2,5
**quick** 161:3 204:6
**quite** 33:21 61:19
74:5 117:21
147:14 177:22
227:7
**quote** 39:8

───────── **R** ─────────

**r** 1:5 2:9 4:4
**racial** 44:20
**racist** 178:4
**radio** 176:15
239:23
**radios** 176:7

**rare** 236:15,25,25
**rarely** 197:2
**rationale** 253:18
**raw** 127:10
**reach** 231:19
233:14
**read** 22:2,6 53:16
131:19 149:18
150:7 168:25
181:3 193:4
220:24 221:12
252:9 253:6
257:11 260:10,12
261:1,4,7,10,13
261:16,19,22
262:1,4,7,10,13
262:16,19,22
263:2
**reading** 191:8
194:17
**reads** 53:10 150:4
**real** 204:6
**really** 10:6 71:15
152:11 161:3
164:17 165:20
236:3
**reason** 29:17 33:11
57:20 85:2 86:6
92:17 93:21
143:19 170:24
206:22 251:16
253:8,20 261:2,5
261:8,11,14,17,20
261:23 262:2,5,8
262:11,14,17,20
262:23
**reasonable** 217:7
217:20 231:2,12
231:21 232:9
233:17
**reasonably** 111:23
112:4 236:4
**reasons** 113:14
**reassess** 165:19,25

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                September 18, 2015

**recall** 42:12 49:19 51:7 74:15 75:9 100:22 113:22 122:12 137:17 145:7 157:18 161:17,18,20,24 163:15 171:16 172:8 173:23 174:3 179:18 180:15 181:8 189:1 194:10 199:12 204:16 205:19 218:7 225:11 227:4 239:6 242:7,18 243:13 254:5,10 254:22
**receipt** 198:25
**receive** 16:2 20:17 22:6 25:14 43:19 48:2,4 53:13 54:7 55:13 56:21 58:3 63:25 64:3,8,12 64:15 67:18 68:8 71:8,18 81:15 86:4,10,15 90:16 141:1 174:8 181:15 185:2 200:22 206:24
**received** 21:25 25:22 51:17,22 52:2 55:20 71:19 78:18 86:20 92:18 111:4 116:5 154:17 157:8 162:10 192:3 196:18,22 200:24 206:23 255:6
**receives** 53:23
**receiving** 99:3 161:18 173:7,23 254:16
**recertification** 100:1,11,15

**recertifications** 99:12,14
**recertified** 51:25 99:24 100:7,9
**recertify** 99:17
**recess** 77:22 164:14 204:10 238:14
**recognize** 131:12
**recognizes** 131:21
**recollection** 148:6
**recommendation** 94:9 167:9
**recommendations** 163:6,13,16
**reconsider** 165:20
**record** 7:1,7 8:1 34:4,5 35:15 57:15 77:20,24 98:18 149:18 161:8 164:12,16 166:16 182:15 204:8,11 220:25 238:10,12,15 257:14
**recorded** 240:7
**recordings** 240:9
**records** 56:6,19 57:12,17 164:19 228:12 255:11
**recruit** 53:12,19
**redact** 165:9 166:7
**redaction** 165:10
**redactions** 166:1,4
**reduced** 82:6
**refer** 40:4 123:3 137:1 166:21 250:8
**reference** 29:18,25 30:5 36:24,25,25 37:13 124:9 238:19
**referenced** 94:14 124:7 152:4 260:10

**referred** 39:3 82:12 176:2 202:1
**referring** 53:19 99:19 134:7 154:15,16,18 193:2 194:3 213:20 226:2
**refers** 36:16 44:8 192:25 194:8
**reflect** 138:9 194:20
**refresh** 190:1 191:9 193:11
**refused** 172:23 188:10
**refuses** 135:23
**regard** 165:11 215:20 219:11 224:8 225:15 227:18
**regarding** 111:21 111:21,22 125:15 164:24 222:3 228:13 234:7 242:5,14,21 243:9 243:12
**regardless** 26:13,14 172:7
**regular** 65:25 235:25 255:18
**regularly** 23:5
**regulations** 133:6
**rehearsed** 71:15
**rejected** 33:23
**rejis** 124:4 225:16
**relate** 228:25
**related** 113:5 115:1 115:7 143:11 164:17 199:24 219:12 259:11
**relates** 23:19 115:13 157:17 163:12 173:25 174:5 180:4

195:24 196:5 221:12
**relating** 90:14 186:5
**relations** 53:4 142:24
**relationship** 22:22 51:13
**relayed** 155:4
**released** 188:5 200:25 201:21 232:13
**relevant** 228:13,22
**relied** 32:1 208:23
**rely** 54:16 127:25 208:24
**remarks** 259:3
**remedied** 106:12 106:19 112:8
**remember** 18:15 32:14 33:24 42:6 49:22 50:1,19 57:19 60:16 61:10 66:7 67:16 68:16 71:7,21 79:8 86:14,19,24 100:5 102:1,4 114:2 115:3,10,14 122:10 125:4,7,13 130:7,10,11 148:22 160:20,21 163:22 171:24 173:5,9,9,11 174:2,16,22 175:2 175:7 178:9 180:12 193:25 206:17 235:21 241:9,13 252:2 254:8,24 255:9
**remembered** 98:12
**remove** 188:10
**render** 249:18
**rendered** 57:3 90:14

**renee** 1:4 2:8 4:3 7:9
**renovated** 184:12
**repeat** 8:16,19 141:18 149:17 250:20
**repeating** 178:6 206:17,18
**repetitive** 159:21
**rephrase** 8:16,20 212:2 218:8 250:22,23
**replace** 135:16
**reply** 7:21
**report** 21:14,25 22:2,6 24:13 33:15 34:20,23 56:14 94:19,21 105:25 106:4 107:11,15,18,19 107:20 108:8,10 108:17 109:2,12 167:14,18 169:22 170:1,2 173:24,24 178:21 180:14,18 181:11 183:3 184:19 187:22 188:5 189:23,24 189:25 190:19,25 191:2,3 196:14,17 197:6 198:5 199:23 200:2,20 200:22,24 201:10 201:19 202:15 214:16 222:21,24 223:2,3 236:17 237:1,14,14 238:18 250:9 251:3,9,15,22,25 253:4,8,10,22 254:6,10,23 255:7
**reported** 24:8,10 24:15 88:3 214:20 258:23

Tina Moore, et al.   v. Brian Kaminski, et al.

Thomas Jackson                                    September 18, 2015

**reporter** 7:17 9:13 149:18 164:5,7 216:19

**reporting** 105:3 106:6 119:15,16 167:6 169:16 170:14 237:25 260:1,23 266:5

**reports** 95:1 106:5 108:1,21 110:1 119:18,25 170:2 170:18 173:25 194:5,8 195:4,4,6 197:3,24 198:13 227:12 234:25 235:8,15 237:6 238:3 250:17 251:17 253:23

**represent** 9:6 207:21

**representative** 1:2 2:6 56:4 163:4 205:15

**representatives** 28:10 49:7,20,23 84:20 87:23 191:21

**represented** 186:7 242:17,20,24

**reprimand** 103:12

**request** 9:1 165:6

**requested** 240:19

**requests** 184:4,5,15 184:16,18

**require** 32:23

**required** 25:3 44:20 53:7 108:10 109:2,13,19 195:13 196:9 218:14 231:7 243:22,24 244:9 244:10,18

**requirement** 55:11

**requirements**

66:25 139:1,5 167:4 244:6

**research** 31:13,21 32:9,15 46:23 142:5 143:4

**researchers** 142:10

**resign** 18:14,21,25 19:13 20:1,4 21:13 22:8

**resignation** 40:11 200:17

**resigned** 10:12 18:11,20 19:18 20:8,16 90:22 118:14 123:18 181:19

**resigning** 10:10 11:3 21:23

**resist** 216:5

**resistance** 135:22 136:15 221:25 248:7

**resistant** 136:1,3

**resource** 146:13

**resources** 30:13 31:5 87:15,23 88:4 192:22

**respect** 131:25 236:2 242:9,11,16 244:2,8

**respects** 131:13,21 259:4

**respond** 168:24 172:23 217:18

**responded** 175:13

**responders** 63:4

**responding** 117:16

**responds** 169:3

**response** 62:23 206:8

**responsibilities** 120:12

**responsibility** 30:16 42:16,20

74:3 101:17 108:20 131:8 212:14

**responsible** 38:12 38:15 39:19 102:20 169:15 226:12,16

**responsibly** 131:11

**result** 102:6 109:7

**resulted** 111:11

**results** 128:18

**retain** 240:22

**retained** 6:25 8:4 240:20

**retaining** 64:7

**retention** 124:24 125:11 126:4,10 126:13,18

**retired** 17:23,24 20:10 63:18 227:3

**retirees** 68:14

**retirement** 17:4

**retrieves** 197:2

**return** 173:15 188:5 260:14

**returned** 37:17

**returning** 173:8 180:11

**revamp** 26:20

**review** 33:7,12 34:11,17 45:3,4 81:15 83:22 84:1 85:21 107:10,15 107:17 108:1,18 109:25 138:18 148:7 152:21,25 174:1 178:11,15 178:19 179:2 181:19 191:21 197:18,21 198:10 198:15 205:4 222:20 227:17 250:16,17 251:4 252:11 253:7,22

**reviewed** 27:17 37:16 38:5,7 138:13 161:15 170:14 222:9,16 251:17 252:6 253:9,14,23

**reviewing** 46:21 85:24 92:21 106:5 111:6 130:12 169:21 196:19 197:3 254:5,9,23

**reviews** 251:4

**revise** 28:1 32:19 74:8 123:22

**revised** 24:20,24 26:13 27:8 29:1 37:16 73:13 123:18 124:3 137:16 142:1

**revising** 27:19 30:11 33:2

**revision** 79:20 123:24 146:4

**revolver** 246:3

**rifle** 134:17

**right** 10:2,8,20 24:5 27:24 30:5,15 48:9 62:12 70:2 72:1 112:2 126:23 129:6 133:20 135:1 149:23 153:4 161:7 164:9 165:25 171:7 173:23 176:9 193:20 202:16 206:4,5,11 208:1 208:20,22 210:2 212:19,19 213:12 216:6 226:11 227:19 228:12 231:16 236:6 238:24,24 240:5,8 244:18 245:25 246:3 254:3 256:2

260:10

**rights** 41:1 81:19 181:12

**riots** 184:12

**risk** 155:21 156:2 249:6,9

**risks** 249:12

**road** 101:17 112:8 166:10 172:20

**roadmap** 78:16

**roadway** 135:23

**robert** 5:4 260:3,9

**rogers** 1:4 2:8 4:3 7:9

**role** 22:10 45:2 143:24

**rolled** 76:22,24

**room** 201:14

**rotated** 80:7,11

**rotating** 73:20 124:1

**rotation** 69:19 70:4 72:14

**roughly** 226:9

**routed** 83:16 84:25 85:20

**routine** 179:10

**rpr** 3:7 258:4

**rude** 9:8

**rules** 152:12,14 155:20 159:23

**running** 172:22

**runs** 12:17

**rush** 183:9,10

**rushed** 182:7,8,9,9

---

**S**

**s** 1:7,13 2:11,17 5:3 5:5 142:14 144:3 243:17,17 244:2,5 244:11 247:2

**safe** 139:11 245:8

**safeguards** 113:10

**safely** 215:4,9

Tina Moore, et al.   v. Brian Kaminski, et al.
Thomas Jackson                                                      September 18, 2015

**safer** 45:25
**safety** 64:9 205:11
  211:13 256:21
  257:8
**salaried** 173:22
**salary** 20:17
**sar** 60:6
**sat** 47:5 99:9
**save** 117:15
**saved** 117:18
**saw** 24:23 39:2
  158:7 222:23
  223:4
**saying** 42:5 97:21
  141:4,12 182:15
  185:20 186:14
  196:22 222:6
  245:15
**says** 7:21 96:11
  151:8 156:22
  222:4 238:20
**scanned** 227:14
**scare** 26:17
**scenario** 132:25
  224:15
**scene** 140:10,13,19
  168:24 169:3,13
  170:10 172:23
  176:17 223:25
  239:18,19,20,25
  240:1
**schedule** 69:19
  73:2 74:4
**scheduled** 51:1
**schedules** 73:1,9
**scheduling** 72:7
  73:23
**scholarly** 142:10
**school** 15:10
  113:16
**scope** 192:9,13
**se** 210:8
**seal** 259:13 266:10
**second** 11:8,12

78:3 87:8 99:9,20
149:3,6 159:18,24
219:6 232:12,21
233:4,16 238:11
**secondguess** 220:4
**seconds** 154:4
  155:1,12,19
  231:18
**section** 62:24
  220:21
**security** 10:24 11:1
  11:13
**see** 29:17 30:5
  36:14 41:9 53:7
  53:18 72:22 91:8
  91:14 94:5,11
  98:5,6 103:23
  114:3 119:16
  120:19 121:3,13
  125:21 126:11
  131:2 146:7,9
  154:6 156:13
  157:11 166:6,25
  168:4 169:16
  187:9,14,14 188:7
  190:2 198:3,8
  201:24 220:22
  233:9 237:13
  238:20,24 249:3
  250:20 251:14
  253:19
**seeing** 125:13
  129:12 209:19
  253:4
**seek** 243:4
**seen** 57:16 80:23
  122:20 161:12
  166:2 223:2,3
**selected** 48:1 69:13
**self** 220:16
**send** 49:20,23
  65:14,22 66:6
  116:24,25 117:12
  117:14 180:10

204:18,19 205:5
234:12
**sending** 65:13
  70:21
**sense** 91:24 205:5
  211:16 218:10,14
**sent** 75:20 87:20
  117:3,16 148:6
  158:5 170:18
  204:14 205:3
  250:17
**sentence** 193:4
  220:24
**separate** 38:11 41:8
  41:21 62:6 63:9
  67:11 76:25 87:25
  90:7,20,21 95:10
  134:8 177:2 202:8
  240:9
**separated** 25:23
  95:15
**separately** 90:8
  92:4 240:17
**separation** 21:10
**september** 1:17 3:6
  7:2 16:9 75:10,14
  81:3 85:5 109:16
  110:4 132:6
  133:22 134:18
  137:15 146:3
  152:2,15 153:8,20
  154:11,20 155:25
  156:17 157:5
  158:15 159:13
  160:4,14 169:3
  170:23 176:20
  196:6 223:5
  227:20,23 245:11
  246:2,10 258:16
  259:14 260:2,6
**sergeant** 13:16,17
  14:2,4 24:3 52:25
  60:19 63:15 77:12
  77:12,14,16 110:7

110:8,10 111:15
113:15,17 226:23
**sergeants** 59:2,18
  60:9 72:9 81:7
**series** 8:11 153:2
**serious** 155:21
  156:2
**serve** 42:7
**served** 184:23,25
**service** 15:17 124:6
  176:19,22
**services** 11:13 12:1
  142:13 175:20
**set** 26:20 28:1
  32:15 40:16 76:20
  80:9 96:4 104:9
  104:12 119:2
  259:1 266:8
**seven** 79:23
**severe** 129:20
  133:1
**severity** 111:8
  130:3
**shafaie** 5:5,11 7:14
  7:14 165:15
  193:21
**shaw** 16:20,21,25
  18:11 19:12,17
  20:4 32:17 33:4,7
  33:12,23 34:23
  96:17 97:8,15
  111:5,11 127:5
  128:21 129:7
  130:12 195:9
  199:6,8 200:1
  203:15
**shaws** 18:16
**sheet** 57:5,23,25
  58:4
**sheets** 56:19 260:11
  260:13,13,14
**sheldon** 205:18
**sheriffs** 211:20
  212:6

**shes** 127:22
**shift** 72:15 73:20
  73:20 74:12,19
  75:3 77:4 107:14
  108:5,12 110:15
  169:11 245:2,10
**shifts** 70:19 72:4,11
  72:14 124:2,2
**short** 74:8 133:20
  204:4
**shortcircuit** 35:3
**shorter** 228:10
**shorthand** 258:24
**shotgun** 134:12
**shouldnt** 256:16
**show** 71:1 78:5
  160:25 173:14,19
**shown** 258:22
**siblings** 179:25
**sick** 74:9
**side** 39:8 41:19,25
  213:1 249:12
**sidearm** 246:3
**sign** 37:23 117:14
  122:19 260:10,13
**signature** 31:7,23
  32:11 33:3 35:25
  36:15 146:24
  259:7 260:11,13
  260:15 263:4
**signed** 37:25 76:10
  78:6 123:13,15
  146:16,21 157:15
  158:14
**signin** 56:19 57:5
  57:23,25 58:4
**similar** 46:14 71:18
  77:2 118:3 122:19
  127:13 141:12,13
  185:24 195:7
**simmons** 127:18,19
  127:25 128:10
  235:10,12,13
**simms** 235:11

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                          September 18, 2015

Page 294

**simply** 177:22
201:16 203:1
256:21
**sincerely** 260:21
**sir** 7:25 8:9,16,19
9:7,17 10:5,20
11:10,20 12:12
13:11 15:10 19:9
25:6 27:2 29:21
33:3 34:6,8 37:11
43:3 46:15 58:21
60:4,22 71:11
72:22 73:3 75:8
78:20 79:3 84:9
89:8 95:8,18 99:5
103:16 105:11
109:13 113:23
114:14 119:16
122:8 134:10
136:18 137:7,15
139:22 141:25
143:3 145:21
147:12 149:3,25
150:23 152:8
153:1 154:14
156:8 157:1,21
166:25 167:24
177:8,20 178:3,23
179:13 180:15
181:1 184:5
195:18 196:10
197:22 198:21
201:10,24 203:6
209:13 213:21
234:9 235:14
238:1,17 240:8
241:4,5 244:24
246:25 250:3,5
255:2,5 256:7
**sit** 47:8 159:17
223:19
**site** 23:9 32:14,15
234:13
**situation** 63:2

106:7 109:7
138:21 139:17
141:8 219:20
223:21 224:16
225:14 232:21
233:2
**situational** 220:3
232:17
**situations** 74:21,22
210:5,10 248:7
**six** 80:12,17 89:23
194:21 225:12
231:18
**sixtwo** 225:4,13
**size** 91:2
**small** 91:3
**smith** 201:8
**snlj** 2:13,14
**snodgrass** 3:3 5:6
258:14 260:4
265:9
**soft** 217:4 218:12
**software** 226:13,21
**sole** 110:20,23
**solely** 54:16 163:9
**somebody** 18:7,21
24:12 39:8 52:17
52:18 64:20 74:23
82:14 92:10 98:7
102:24 136:2
181:24 240:15
247:21 253:5
**someones** 55:8
**somewhat** 118:3
**son** 113:17,18
**soon** 108:19
**sorry** 12:24 28:18
58:13 60:3 67:5
76:23 77:15 79:25
90:2 103:25 125:6
130:8 137:6 139:2
149:16 167:24
177:23 194:14,17
213:16 216:8,19

219:4,5,6 220:14
221:19 222:20
231:24 235:9
242:15
**sort** 10:6 225:18
239:25
**sound** 193:20 226:9
258:18
**sounds** 23:11 25:19
166:12 226:11
**source** 29:20 30:10
136:25 182:13,16
190:10,11 195:3
**sources** 27:24 28:2
31:20 32:7,8
43:16 46:14,14,16
52:3 144:19 145:7
145:10 147:5
186:18 187:12
198:4,14
**south** 3:3 5:7
258:14 260:4
265:10
**space** 247:14
**speak** 48:25 49:6
174:14,25 175:5,8
175:12 177:4,8
198:6 211:1
**special** 131:21
**specific** 31:8,25
33:10 53:13,24
54:13 55:13 57:7
59:14 64:19 70:24
71:6,21 73:10,11
75:4,9,22 76:17
76:20 86:7,14
97:13 100:22
109:11 115:3
131:7 136:22
144:10 147:15,24
155:13 156:13
160:8,11 163:18
197:15 219:16
237:23 250:10

254:8
**specifically** 32:15
76:21 102:1,4
123:1 150:5 151:9
158:19 160:18
167:16 178:9
194:2 206:15
242:22 244:13
254:20,24
**specifics** 216:11
**specious** 256:13
**speculation** 19:20
49:9 105:19 125:5
140:6 182:19
236:9
**spell** 17:17
**spelling** 230:24
**spirit** 206:23,24
**spoke** 185:22
**spoken** 223:12,17
**spot** 108:1
**spouse** 207:7,12,21
**spray** 135:18,24
241:12,18 245:2
245:16,24 246:2
246:11 247:12,21
248:1,3,9,14,23
249:6,14
**sprayed** 248:15,17
248:20
**ss** 258:2
**st** 3:4 4:16 5:8 8:9
12:20,23 14:11
16:6 22:25 24:16
28:4,6 29:15
45:22 46:20,25
47:6 58:22 62:5
62:10,11,13,13,17
62:21 63:7 68:9
68:13 75:24 76:6
137:8 145:12
236:13 258:3,15
259:13 260:5,24
264:19 265:5,11

266:7
**staff** 17:12 37:18
38:7 45:25 46:20
61:20,21,25 63:24
65:12,19,23,25
74:12,16 80:8,14
**staffed** 70:5
**staffing** 69:9 70:17
70:18,22 71:3
72:2,2,4 73:2,17
73:23 74:1,11
**stamped** 82:22
**stand** 25:6 130:11
**standard** 30:1,3
119:2 137:16
168:11 243:18,19
**standards** 29:24,24
30:1 80:5 81:11
81:13 82:13 96:11
118:8,9,23 119:13
120:19 121:5
123:1,8 137:4,5,5
137:12,13 140:1
147:7,7,8 148:8
243:19
**standardsize** 91:10
**standing** 114:4
**start** 27:14,24
111:17 138:4
170:8 187:1 190:8
192:17 245:1
**started** 13:12 14:24
27:11,18 29:6
55:24 56:8 60:5
65:13 66:4 68:12
72:13 77:13 79:6
84:14,16 87:18
90:5,10 103:24
131:4 163:3
183:12 197:19
234:23 241:20
**starting** 71:16 95:4
118:12 187:9
**starts** 136:16 168:3

Tina Moore, et al.  v. Brian Kaminski, et al.
Thomas Jackson                                                    September 18, 2015

Page 295

state 3:4 7:25 25:4
    27:12 31:11 39:9
    44:21 137:5
    141:23 166:7
    211:5 242:6
    243:20 244:3,18
    247:21 248:5
    253:15 258:1,5,15
    259:21
stated 104:2 119:7
    148:8 164:21
    206:21
statement 35:14
    40:4,5 41:5,18,21
    121:11 197:4,5
    198:2 207:6 220:2
    264:9 266:9
statements 41:8
    182:22,22 206:9
    238:3
states 2:1 55:12
    181:12 243:20
    258:10
static 219:19
stating 117:1
station 161:22
    177:11 184:12
statistical 94:13
    96:1,18,22 125:14
    125:21 126:2
statistics 95:2
    214:11,22,23
    234:7,19,25
stats 95:6
status 199:23
stay 204:22 231:22
    233:15
step 169:25
stephanie 32:1
    243:3,5
stopped 124:4
    172:24
stops 39:9 107:22
store 226:7

stories 256:13
strategies 59:23
street 3:3 5:7 59:19
    60:11 62:12 65:18
    68:18 69:3 76:13
    82:11 83:13
    121:20 135:4
    190:23 191:4
    209:19 258:14
    260:4,24 265:10
    266:6
strike 69:10 96:19
    121:10 149:12,20
    150:11 151:2,23
    159:20
strive 123:11
stroke 105:13
strong 182:24
studies 67:5,6
stuff 165:16 183:17
    256:5
stun 187:15 188:8
    252:23
subheader 132:9
    187:9
subheading 53:6
subject 112:1,18
    179:9 217:4
    218:19 221:18
    223:24 242:7,12
subjects 207:25
submit 108:10
    167:8 234:6
submitted 108:21
    200:17 203:7
subordinate 93:1,3
    93:5 124:15
subparagraph
    187:8
subpoena 164:24
    165:5
subpoenas 184:16
subscribed 263:12
subsection 168:5

subsequent 104:5
substance 49:13
    122:11 154:22
    161:20 206:12
substantiated
    93:25 116:9
suffering 210:16
sufficient 54:17,22
    55:4 217:25 218:3
    232:22 233:5
suggest 9:7 218:3
suggests 146:10
suicidal 210:11
suit 259:10
suite 3:4 4:7,15 5:7
    258:14 260:4
    264:18 265:4,10
    266:6
summaries 94:13
    96:2,19,22 97:22
    97:23,24 127:1,7
    203:7 204:14
    205:2
summarized 165:6
summary 98:3
    125:18,23 127:12
    127:16 128:4,14
    129:3,5,8 195:8,9
    196:15,19 202:7
    202:11,19,25
    203:8 205:22
supervise 215:8
supervision 39:23
supervisor 14:12
    23:24 77:5,10
    83:13 85:15 88:11
    92:23,25,25 93:2
    93:6 103:11
    105:22 106:11
    107:10,13,14,18
    107:22 108:5,11
    109:25 110:4,15
    124:11,14 167:7
    167:19,22 168:23

168:23 169:5,6,15
    201:7 229:8
supervisors 60:11
    60:11 66:16 67:18
    74:6 89:20,23
    106:5 108:20
    124:12 167:22
    178:21 196:14,19
    197:8,12 214:20
    224:6 229:9,20
    230:13,20
supervisory 214:18
supplemental 54:9
    170:2 173:25
supplied 23:3
support 188:4
supporting 188:13
    188:22
suppose 225:8
supposed 114:17
sure 9:8 11:22
    22:13 26:16 27:6
    31:9 32:3 33:9
    35:6 37:21 41:12
    42:8,21 43:10
    48:7 49:18 50:6
    59:19,25 61:14
    62:20 63:14 67:19
    70:4,18 72:10
    76:12,16 78:7,9
    85:2,4 92:24 93:4
    108:21 112:25
    129:13 144:18
    169:10 171:25
    174:16 175:2
    180:25 186:25
    192:11 204:5
    210:10 228:20
surrounded 49:15
surrounding 45:22
    141:22 223:14
survey 65:1
suspect 64:18 98:7
    102:11 242:7,12

suspects 141:23
suspension 111:9
suspensions 114:25
sustained 94:6,6
    116:18
swat 248:13
swear 7:17
switch 57:18 78:3
switched 124:5,5
    225:25
sworn 7:19 118:10
    120:21 258:20
    263:12
synonymously
    151:19
system 124:4
    225:16 228:10
    235:16 239:24
    240:4,10,12

_____
             T
t 4:13 5:4 243:17,17
    244:2,5,11 247:2
    260:3,9
tactical 13:14,17
    23:13
take 8:24 17:14
    28:10 51:3 60:7
    67:3 69:7,11,13
    69:20 70:13 77:17
    95:17,19 122:16
    128:9 141:23
    152:25 161:2
    165:3 180:7 182:6
    196:5 204:4 229:8
    241:17
takehome 114:5
taken 3:1 7:4 68:8
    77:22 164:14
    204:10 238:14
    263:3
takes 65:17
talk 87:7 130:18
    158:9 174:21

Tina Moore, et al.  v. Brian Kaminski, et al.
Thomas Jackson                                    September 18, 2015

200:9 204:6 214:4
**talked** 36:11 61:19
  152:19 209:11
  214:23 239:5
**talking** 44:24 55:7
  60:20 66:2 99:2
  138:21,24 149:22
  162:22 194:5
  211:19 214:4
  217:3 219:2,8
**talks** 66:24 187:3
**tall** 225:9
**tape** 91:8 141:19
  239:22
**tapes** 240:17,19
**target** 149:8
**targeted** 150:5
  151:9
**tase** 252:20
**tased** 52:10 172:24
  231:17,18 233:3
  233:15
**taser** 16:14,17
  44:24 45:14,16,21
  46:8,17,22,25
  47:2,5,9,15,19,22
  48:2,4,9,13,17,24
  48:25 49:1,7,8,14
  49:17,20,23,24
  50:13,14,21,23
  51:4,17,25 52:2,7
  52:9,12,22 57:7,9
  58:2 86:21 99:3
  99:18 100:15
  101:1 109:20,23
  109:24 115:11,13
  133:17 134:4,22
  135:3,7,10,21
  136:2 138:17,17
  138:24,25 139:1,5
  141:22 142:1
  145:15,23 146:18
  147:10,11,16,22
  147:25 148:10

149:9,11,19 150:9
  150:10 151:1,21
  152:1,9,15,20
  153:9,21 154:10
  154:11 155:1,10
  156:1,17 157:8,18
  157:23,24 158:4
  158:10,15 159:5
  159:14 160:2,12
  160:14 162:3,6
  163:9,25 164:19
  165:20,21 167:11
  167:14,16,18
  171:18 195:20
  208:23 215:20
  217:5 218:13
  221:7 222:4
  232:13 241:18
  245:7,10 246:3,13
  253:5 254:22
**tasercertified** 99:12
**tasers** 48:21,23
  49:16 146:22
  147:1,2 162:22,25
  163:20 208:3,10
  241:12,21 245:2
**taserspecific**
  216:10
**task** 13:22 23:2,4,7
  23:16,20,21,25
  24:9,13,14 61:15
**taught** 62:23
**taxed** 265:1,7
**teach** 62:18
**teaching** 63:22
**team** 58:11 60:16
  248:13
**teamwork** 40:18
**tear** 134:7,11,17
  208:25
**technical** 67:6
**technically** 20:22
  85:17
**technique** 139:10

**techniques** 140:13
  140:25 141:16
**technologies** 226:1
**technology** 95:24
  226:21
**telephone** 171:22
**tell** 17:10,21 18:19
  19:4 21:22 22:20
  24:22 48:12 49:13
  51:6 91:5 93:15
  96:6 122:23
  128:10,12 146:6
  146:12 148:1
  162:24 177:20
  201:5,18 221:13
  222:9 224:8 226:5
  230:19 236:3
**telling** 193:13
  233:15
**template** 82:18
**temporally** 168:4
  192:14
**temporarily** 18:3
**temporary** 10:24
**tendency** 9:20
**tender** 164:22
**tens** 184:8
**tenure** 12:10 22:24
  67:25 75:17,20
  79:9 94:25 97:15
  103:21 110:25
  130:25
**term** 12:16 58:14
  89:1 194:9 221:23
**terminate** 112:16
**terminated** 20:12
  112:12 113:13,15
  114:15
**termination** 20:1,5
  107:6 108:11
  111:9,11 114:8
**terminations**
  114:19,23
**terms** 32:18 35:24

36:9,10 38:9
  39:13 44:15 64:6
  94:6,11 97:2
  103:4,8 135:10,15
  135:20 144:15
  185:11 192:9
**testified** 191:18
  206:15 258:22
**testify** 7:19 216:11
  258:20
**testimony** 120:4
  180:15 202:2
  204:16 258:23
  259:1 263:5
**thank** 7:16 13:6
  34:6 64:20 82:23
  166:14 172:19
  191:7 195:18
  207:16 219:3
  230:23 235:13
  241:4,5 250:3,5
  255:2 257:14
**thanks** 161:6
**thats** 8:4,8 10:2
  12:22 13:22 14:25
  28:19 29:22,22
  34:22 35:17 36:8
  37:23 39:7 40:3
  40:17 41:2 44:4
  48:19 50:11 55:16
  73:14 79:24 89:14
  92:9 101:3,7,9
  104:10,12 105:2
  106:18 109:14
  112:20 113:8,8
  115:22 119:24
  127:14 131:8
  134:8,11 136:3
  145:4,15 154:6
  156:20 157:1
  158:19,20 159:6
  161:7 167:3,25
  170:5 176:2
  177:24 179:13

186:14,16,17
  188:23 196:21
  197:3 202:11,11
  204:2 206:24
  207:14 208:12,18
  208:18 209:7,8
  210:17 212:11,15
  214:2,15,15,16
  216:24 218:5,5
  219:2,5 221:3,6
  221:11,20,23
  222:2,6,15 223:10
  224:13,20 240:12
  242:10,13,23
  243:21,24 245:4
  248:19,19 249:9
  256:21
**thereof** 39:25
**theres** 24:11,11
  26:17 53:6 54:11
  77:7 79:20 119:5
  122:7 152:9
  167:14 178:13,15
  178:17 190:21
  202:18,18 210:10
  210:13,13 220:21
  231:19 233:14,16
  238:23,23 240:13
  243:23
**thereto** 259:4
**theyre** 26:2 30:2
  44:2 59:19 63:22
  68:18,21 120:4
  158:20 185:25
  194:4 210:1
  214:19 218:16
  225:9 227:19
  231:18 238:2
  247:13 249:7
**theyve** 231:17,17
**thickheaded**
  202:13
**thing** 32:16 179:10
  181:4 200:3

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                      September 18, 2015

Page 297

| | | | |
|---|---|---|---|
| 206:19,19 221:25 | thought 26:14,18 | 219:21 222:23 | 224:7 256:15 | 159:14 162:5,12 |
| 222:1 225:19 | 66:11 213:19 | 223:4 231:7,12,21 | tom 5:14 17:16 | 162:16,19 247:2 |
| 245:16 | 230:20 256:24 | 232:9,22 233:5,17 | 22:14 | trainee 155:5 |
| things 31:9,10 32:2 | 257:8 | 233:23 238:24 | tongue 114:3 | trainees 159:14 |
| 35:4 45:5 55:9 | thousands 29:24 | 240:6,8 242:11 | tool 132:23 140:9 | trainer 52:22 59:3 |
| 62:2 79:12 82:9 | 184:8 | 250:3,9,13,25 | 140:20 208:10 | 68:13 |
| 90:25 91:8 104:25 | threat 19:25 20:3 | 251:19 255:2 | tools 140:18 245:25 | training 16:2 42:13 |
| 113:4 114:16 | 218:24 219:18 | 256:3 | 246:18 | 42:16 43:5,11,12 |
| 124:7 142:21,25 | 220:7,13,16 | timed 183:13 | top 24:14 55:12 | 43:15,20,20,23,25 |
| 143:1 144:12 | threats 113:19 | timeline 239:17 | 91:14 121:4 | 44:5,9,11,16,18 |
| 163:6 165:23 | three 25:17 72:13 | timely 108:21 | 194:19 238:20 | 44:19,22,23,24 |
| 171:15 194:4 | 80:16,16 92:22 | times 9:20 23:25 | topic 61:16,17,25 | 45:7,9,10,13,14 |
| 204:22 205:6 | 195:1 230:14,15 | 40:7 49:11 50:9 | 62:2 73:12 160:11 | 45:17 46:5,17,25 |
| 208:1 211:2 | threeyear 243:25 | 111:7 185:22 | topics 44:16 45:11 | 47:5,8,9,18,20 |
| 240:17 256:19 | thumb 95:21 | 237:13,17,20 | 62:21 67:2 78:3 | 48:2,4 49:15,21 |
| think 13:22 30:6,21 | tied 240:12 | 239:10 | 78:10 142:11 | 50:13,16,17,24 |
| 32:21 56:1 60:5 | time 7:6 13:7 14:10 | tina 1:1 2:5 4:12 | 163:7 | 51:1,3,17,21 52:3 |
| 60:19 62:3 63:19 | 14:13,15 16:1,22 | 7:4,11 207:21 | torso 149:23 | 53:5,7,13,13,19 |
| 89:24 97:12,13 | 18:4,5 25:15 | 260:7 264:5 | total 14:1 39:19 | 53:22 54:7,8,9,11 |
| 98:18 112:7 113:8 | 27:20 32:12 34:15 | tip 114:3 | 171:9 265:6,12 | 54:13,17 55:4,5 |
| 114:17 115:2 | 36:3,7 40:7,9,10 | title 12:14 30:22 | totality 141:13,15 | 55:10,13,20,21,23 |
| 118:3 129:22 | 41:6,23 42:2 43:8 | 36:6,12 52:20 | 141:21 233:9 | 56:6,17 57:2,6,7,9 |
| 144:13 152:17 | 47:15 51:2 52:21 | 56:12 122:9 159:7 | 242:5,10 | 57:12,22 58:2 |
| 158:4 161:15,16 | 56:2 61:22 63:11 | titled 43:4 120:12 | totally 80:1 | 59:1,16 60:16 |
| 165:8 186:10 | 65:15 72:4 74:5 | titles 36:10 | touched 180:13 | 62:4 63:10,21 |
| 189:25 194:7 | 79:19 80:15 81:14 | tjohnson 4:10 | 225:14 | 65:14 66:6,11,13 |
| 197:11 200:17 | 84:21 86:22 92:23 | today 9:10 35:25 | tour 108:12 | 66:15,17,21,22,25 |
| 206:8 210:6 | 99:20 122:3 123:3 | 50:10 86:23 | towit 7:22 | 67:19 68:7,19,21 |
| 217:13 221:4 | 123:17 124:7 | 144:16 185:25 | town 113:16 | 69:4,7,12,13,22 |
| 225:4,25 233:2,10 | 125:10 126:18 | 189:25 191:19 | track 58:7 65:2 | 70:4,12,22 71:1,9 |
| 233:12 234:20,20 | 128:14 137:18,23 | 207:16 214:24 | 74:25 | 71:14,20 75:21 |
| 236:6 241:22 | 138:12,17,25 | 222:10,11 223:13 | tracking 65:1 75:4 | 76:17 99:4 100:1 |
| 252:11 253:6 | 139:4 140:3 142:2 | 223:19 224:9 | traffic 104:24 | 101:18 140:4,25 |
| third 36:1,15 | 144:13,14 146:23 | 241:1 250:4 | 142:25 | 141:6 142:22 |
| 230:15 | 146:25 148:24 | todays 7:2 257:13 | tragic 177:23 | 143:1 144:8,11 |
| thirtyone 13:4,5 | 161:17 166:24 | todd 4:5 7:8 8:4 | train 49:17 52:7,12 | 145:11 146:19 |
| thirtysix 213:10 | 169:9 170:25 | 98:10 | 58:16 62:21 63:5 | 147:10,16,20,22 |
| thomas 1:16 3:1 | 171:17 172:1 | told 21:22 31:3 | 65:12 157:23 | 147:25 154:6,9,10 |
| 7:3,18 8:2 17:18 | 184:11 185:15 | 48:16 49:11 68:15 | 160:1 163:23,24 | 154:11,16,18 |
| 36:4 77:25 166:18 | 189:21 192:9 | 89:24 96:7 115:17 | 215:3 | 159:6,11,18,24 |
| 257:13 260:6 | 195:10 201:12 | 125:16 127:13 | trained 58:18 59:8 | 160:8,12 162:1,10 |
| 263:1,10 264:11 | 203:18 209:16 | 128:11 129:2,9,13 | 60:12 65:21 67:24 | 208:21,24 209:3,3 |
| thoroughness | 216:20 217:2,5,7 | 177:22 183:16 | 68:4 76:7,14 | 209:8,12 211:9 |
| 252:11 | 217:20 218:21,23 | 197:2,7 223:15 | 139:25 140:23 | 213:22 216:10 |

Tina Moore, et al.   v. Brian Kaminski, et al.

Thomas Jackson                                        September 18, 2015

Page 298

243:13,19,21,23
243:24 244:1,13
248:11,20 254:11
254:16,17
**trainings** 45:3
53:24 58:7 100:23
102:2 254:22
**trains** 208:14
**transcribed** 258:24
**transcript** 239:10
239:22 258:23
259:5 260:12
263:2,5 264:15
265:1
**transcripts** 225:20
227:9,10 239:6
240:16 266:1
**transfer** 176:10
**transfers** 176:12
**transform** 106:16
**traumatic** 174:20
**trial** 258:12
**tried** 26:20 95:19
**trigger** 216:6
232:13
**triggered** 179:1
**trip** 172:3 173:15
**tripled** 254:15
**trittler** 61:6 63:14
**true** 29:2,3 36:4,5
36:18,19 37:2,3
104:9,10,13 109:9
109:10,16 119:18
136:17 148:14,15
149:3 158:24
181:13 194:7
196:21 208:12
236:4 259:4 263:5
**trust** 28:12
**truth** 7:19,20,20
258:20,20,21
**truthful** 106:6
119:18,25 120:4
**try** 9:19,22 91:15

197:20 198:10
210:2 216:11
**trying** 9:8 112:2
181:10 186:18
226:4 249:7
**turn** 220:20
**turned** 87:15
108:18
**turnover** 77:7
**two** 11:8 14:1 15:11
20:10 44:21 79:5
80:22 89:14 90:6
91:5 171:10
194:20 205:21
207:5 213:24
230:12 244:24
**twopage** 196:13,18
**type** 22:22 32:15
42:4 44:16 58:17
96:2 132:14
135:15 137:22
144:8 169:16
174:3 187:17
195:19 205:3
221:25 222:1
**typed** 239:24 240:2
**types** 45:5 56:16,16
93:10 121:18
132:24,25 210:12
211:1 214:11
254:17 256:19
**typewriting** 258:25
**typically** 194:20

**U**

**u** 142:14 144:3
**ultimate** 42:15
101:17
**ultimately** 28:9
42:21 72:14
102:20 140:10
**unable** 216:5
**unaccredited** 25:12
**unarmed** 224:23

233:13
**uncommon** 123:21
**unconstitutional**
252:15
**undercover** 13:13
**undergoing** 184:11
**underneath** 36:14
188:13,19
**underreporting**
203:23
**understand** 8:9,15
8:21 9:11 10:12
12:10 14:7 18:11
20:14 24:17 27:4
35:6,23 38:11
41:13 59:21 62:25
72:20 78:7,10
82:9 108:8 128:8
138:1 142:20
146:15 166:5
175:9,13 177:5
182:4,12,13
183:13 185:2
207:7 213:19
215:1 221:22
224:16 228:20
231:13 247:17
255:16
**understanding**
8:17 9:23 19:17
99:25 126:10
155:14,17 162:9
166:3 170:12
210:15 211:4,9
215:21 221:13,14
228:5 229:15
247:11
**understood** 8:23
34:19 69:22
113:21 186:4
207:12 229:5
236:6,9 245:8
249:2
**undertake** 46:17

61:17 65:12 77:3
197:22 198:10
**undertaking** 46:24
**undertook** 67:17
85:24 203:16
**undetermined**
258:10
**uneducated** 14:4
**unfortunate** 64:17
**unfounded** 94:5
116:19
**unhealthy** 121:24
**uniform** 29:19
36:25 113:19
**unintentional**
105:5,8,17 106:9
106:18
**union** 21:8
**unique** 131:7
**unit** 13:14 23:16
90:7 163:4
**united** 2:1 181:11
258:10
**units** 38:21
**unless** 79:20
**unlimited** 140:13
**unnecessary** 213:4
**unreasonably**
213:4
**unstable** 74:23
122:6,14 139:16
141:7 153:21
156:4
**unsubstantiated**
182:22 198:1
**unusual** 93:24
110:14,17
**unverified** 182:21
198:1
**updates** 148:23
**updating** 161:22
**upper** 149:23
**use** 16:14,16 29:20
31:8 32:4 45:16

47:14,21 48:17
50:9,14,17 51:4
51:25 52:6,7,9,12
58:6 59:16 64:16
71:23 76:2,4
79:13 86:17 96:3
98:8 99:18 102:6
105:3 109:5,11,19
109:20,22,23
115:1,2,8,9,11,13
115:16 130:18,21
130:22 131:2,3,9
132:12,22 135:10
135:12,20,21,25
136:2,15 138:17
139:5,18 141:16
142:1 149:9
151:18 152:1,6,15
155:19 156:16,24
157:4,8 159:4,14
160:2,13 161:23
162:6 163:25
167:8,10,11,15,18
170:15 175:20
178:13,15,18
179:2 189:3,8,12
191:9 196:6,8,19
197:3,8,13 198:17
203:23 208:3
211:23 212:7,13
212:15,19 213:3
213:23 214:12,12
214:20,22 218:11
218:16,17 221:2
221:15 224:17
231:1,2,6 234:7
234:10 241:17
247:13 253:5
254:11,21 256:16
257:6
**useofforce** 44:23
45:11 50:13,16
98:6 132:2,24
136:8,16 137:2,10

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                September 18, 2015

Page 299

145:6 166:23
169:14 170:1
173:24 178:19
194:5,8,20 195:4
195:6,9 196:14,17
214:15,16 246:18
247:5 250:16
251:3 253:8,10,22
254:6,9,23
**users** 135:4
**uses** 42:10 217:2,5
**usually** 23:10 94:24
103:11 111:8
171:9 174:19
222:1
**utilize** 94:10 137:1
141:14,22 154:25
**utilized** 31:6 45:11
45:14 52:16 72:21
119:1 132:5 133:3
137:2,22 146:13
153:7 166:24
167:3,5 168:3,8
168:12,14
**utilizes** 137:23
**uttered** 197:1

—— V ——
**vacation** 171:14
173:20
**vague** 170:5 217:16
217:24
**valid** 88:17
**valley** 162:15,17,20
164:24
**valleys** 164:20
**value** 131:13,21,24
**values** 40:15,18,20
40:22,25
**variables** 123:23
135:19
**variety** 32:2 142:21
209:21 210:14
**various** 69:23

95:11 142:11
163:14 210:12
**varying** 168:11
**verbal** 9:3,7,9
83:11 107:5
115:20 198:20
**verbally** 66:1 82:2
82:6 124:14 128:6
128:10,11,12
168:16
**verbiage** 148:13
**verify** 43:10 197:20
203:16
**version** 147:16,25
**versions** 147:21
**versus** 7:5 85:25
105:8 116:8
135:20
**video** 166:15
195:19,20,20,21
195:23 196:2
260:1,23
**videographer** 5:13
7:1,16 9:13 34:3,8
77:20,23 164:12
166:16 204:8,11
238:12,15 257:12
**videotaped** 1:16
3:1
**view** 178:10
**viewing** 46:21
**violated** 88:14
119:2 236:16
**violates** 109:3
118:22
**violation** 104:24
106:17,17,25
151:7,12,19,24
188:20 236:18
237:3,16
**violations** 104:8,8
104:12,16,17,17
**violence** 79:15
**violent** 211:7

**visavis** 203:20
**voices** 239:23
**volume** 38:1
**voluntarily** 20:16
**voluntary** 69:12
**vs** 1:9 2:13 260:7
264:5

—— W ——
**wait** 219:13,21,22
257:1,1,1
**waive** 260:10
**waived** 259:7
**walk** 37:7 113:11
**walked** 183:23
**walkietalkie** 176:2
176:14
**want** 9:8 22:13
27:4 34:3 35:6
40:22 50:6 66:3
69:7 74:18 77:17
78:3,4,6,13 82:19
98:14 106:3
159:20,22,23
161:2 166:6,21
181:3,7 182:3
186:23 187:1,8
189:16 209:14
217:21,25 221:1
228:9 230:25
236:3 250:8
**wanted** 82:25 98:11
98:18 140:8
225:19 243:4
**wanting** 79:8
**warnings** 209:1
**warranted** 74:21
83:21 84:5,6
93:17,20,25
110:22,22
**wasnt** 123:21 130:4
160:7 198:17
200:10 206:16
235:24 236:24

241:23
**watch** 72:7 118:13
167:22 168:9,19
168:22 169:5,7
**waters** 171:1
**way** 26:11 46:1
58:24 78:14 98:16
107:5 113:2
115:25 118:13
141:4 146:20
151:6 171:20,25
188:6 206:22
213:4,5 222:6
229:15 232:18
**ways** 93:3 143:6
190:17
**weapon** 50:5,12
132:14,18 135:11
135:16 139:10
160:18 161:13
233:4
**weapons** 130:21
131:3 133:6
158:21,21 161:23
231:19 249:21,21
249:23
**week** 19:10 177:14
**weekend** 110:9
**weeks** 21:24 171:7
171:10
**weigh** 116:7
**weighed** 156:21,22
224:23
**wellston** 62:14
**went** 12:2 13:16
14:17,23 15:10
16:5,10 25:1
26:19 28:23 32:9
56:22 57:11,24
65:4 67:21 71:9
72:15 74:5 94:20
112:1 113:18
121:11 123:17,23
124:1 140:3

144:16 145:7
170:9 198:10
203:4 208:2,8
228:8 245:10
254:6 256:3
**weve** 111:20,20
118:3 121:17
122:20 123:16
161:1 164:25
165:11 207:24
214:3,25
**wexler** 143:8
**whats** 10:18,22
84:11 217:11
228:5 251:22
**whatsoever** 55:6
**whereabouts** 171:3
**whereof** 266:8
**white** 162:8 175:5
223:21
**whites** 165:12
**whos** 74:23 210:16
219:12 233:3
**wide** 209:21 210:13
210:13
**widely** 136:23
**wideopen** 247:18
**widespread** 203:24
**wife** 177:9 179:25
223:18
**wilderness** 171:2
172:3
**william** 4:13
**willing** 164:21
**wished** 18:25 19:13
**withdraw** 194:16
**withdrawn** 94:5
**witness** 7:17 34:6
82:24 98:22 99:2
99:6 139:4 161:6
161:9 164:6,8
170:11 172:15,18
185:19 186:14
201:11 217:18,25

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                                    September 18, 2015

Page 300

| | | | | |
|---|---|---|---|---|
| 219:4,7 221:19 | 61:11 69:8 75:11 | 22:17 33:9 63:3 | **yesterday** 222:11 | **103** 6:17 35:16 40:8 |
| 230:6 241:5 250:1 | 77:4 93:8 110:15 | 63:19 64:11 71:6 | **york** 11:12 | **11** 6:23 136:16 |
| 250:5 258:18 | 118:17 121:8 | 77:19 93:9 95:22 | **youd** 153:1 | 180:20,21,24 |
| 259:2,6,13 260:10 | 148:24 169:9 | 95:25 99:2 110:10 | **youll** 8:21 | 181:15 187:7,17 |
| 260:12 263:1 | 181:16 | 110:11 114:2 | **youre** 10:19 20:22 | 189:13 190:3 |
| 266:8 | **workmanship** 33:1 | 126:14 138:25 | 30:2 38:12,15 | 191:9,16 193:16 |
| **witnessed** 154:23 | **workplace** 51:14 | 139:4 143:13 | 39:3 41:13 68:17 | 193:19,23,24 |
| 154:24 175:9 | **workproduct** 179:7 | 145:3,5 146:8 | 91:7 97:21 98:10 | 194:19 196:11 |
| **woman** 188:9 | **works** 205:7 | 155:23 159:10 | 126:21 134:7 | 197:16 198:4,11 |
| **wondering** 112:4 | **workweek** 68:22 | 164:11 165:17 | 153:7,19 154:15 | 199:1,4,9 201:24 |
| **wont** 13:7 | **world** 226:1 | 166:11 170:7 | 154:18 161:16 | 203:17 250:10 |
| **wood** 77:14,16 | **worth** 64:7 178:6 | 178:2,13 181:9 | 179:10 193:14 | **111** 120:13 |
| 226:23,25 | 206:16,18 | 182:1,15 189:22 | 196:22 201:14 | **117** 6:18 |
| **word** 116:8 117:7 | **worthless** 183:4 | 193:17 194:2 | 224:8 252:4 | **11th** 246:2 |
| 145:4 151:18 | **wouldnt** 83:13 | 206:14 213:19 | 255:17 | **12** 13:19 22:24 |
| 194:11 | 106:21 110:23 | 220:3 221:12 | **youve** 9:5,9 37:9 | 136:17 164:13 |
| **worded** 70:8 | 116:19 117:11 | 225:11,12 226:5 | 40:15 166:8 | **120** 6:19 |
| **words** 23:15 32:4 | 132:22 135:17,25 | 226:15 234:19 | 209:15 223:1,15 | **12513162** 259:19 |
| 54:11 140:17 | 136:2 173:21 | 235:5,8 236:5 | 233:21 234:2 | **12hour** 72:15 73:19 |
| 157:13 241:25 | 205:5 245:7 | 238:9 245:22 | 240:25 | 124:2 |
| **work** 10:19 13:10 | 252:15 | 248:1,12,12,25 | | **130** 6:20 |
| 13:24 14:14 15:2 | **wrestling** 135:23 | 252:9,21,24 | **Z** | **135** 224:24 |
| 15:4 16:10 17:1 | **write** 148:13 | 255:25 | | **145** 6:21 |
| 27:22 43:13 68:10 | 236:17 | **year** 10:13,14,15 | **0** | **14cv1443** 2:13 |
| 68:24 72:12,25 | **writing** 82:4,7 | 15:25 19:11 20:9 | **0** 103:20 118:7 | **14cv1447** 2:14 |
| 73:9 93:3 120:16 | 93:11 184:20 | 20:12,17 25:16,18 | 120:13 130:22 | **15** 23:3 |
| 142:11 163:4 | 256:7,9 | 25:18 29:1 59:5 | **00** 3:5 35:16 40:8 | **160** 6:22 |
| 165:24 171:14 | **written** 21:10 52:8 | 64:23 68:4 69:23 | 43:5 78:23 149:4 | **17th** 110:4 169:3 |
| 173:8 179:6 | 52:15 83:8,9,15 | 71:17,18 75:16 | 166:17 | **18** 1:17 75:19 121:3 |
| 180:11 181:16 | 83:18 84:19,24 | 86:5,12,18 92:22 | **0008** 191:3 238:19 | 121:6,12 260:6 |
| 182:23 254:18,20 | 85:4 92:17 109:2 | 93:14,16 94:22,22 | **0495** 88:8 91:14 | 263:3 264:13 |
| 256:14 | 129:14 151:25 | 94:24 97:25 | **084004460** 258:5 | **180** 6:23 |
| **worked** 12:7,20,22 | 156:20 | 128:16 143:10 | | **18th** 3:6 7:2 258:16 |
| 12:24 13:2,12 | **wrong** 85:3 93:15 | 171:11 173:20 | **1** | **1970s** 14:22 |
| 14:9,13,21 15:17 | 104:23 193:18 | 198:3 203:9 | **1** 6:13 35:2,8,12,18 | **1979** 16:9 |
| 42:14 46:11 59:21 | **wrote** 117:19 | **years** 13:3,15,20,24 | 36:15 37:1,5 40:5 | **19th** 200:15 |
| 63:11 80:21 82:10 | | 15:11 22:21,24 | 40:12,16 41:9 | |
| 131:25 | **X** | 84:23 90:12 95:1 | 121:12 166:17 | **2** |
| **worker** 14:22 16:4 | **x26** 154:3 155:1 | 192:15 203:11 | 204:9,11 265:7 | **2** 3:6 6:14 42:23 |
| **workers** 192:19 | 221:7 222:4 | 213:10 217:13 | **10** 6:22 77:21,24 | 43:3,3,4,16 53:5,6 |
| **working** 10:5 12:13 | | 236:12,13,23 | 160:22,25 161:11 | 53:6 66:22,23,24 |
| 12:19 14:7,24 | **Y** | 247:25 | 161:12,18,20 | 77:24 104:13 |
| 15:15 16:4 23:12 | **yeah** 9:2 15:3,6,7 | **yelling** 210:1 | **100** 3:3 5:7 258:14 | 132:3 164:13 |
| 29:6 44:3 55:24 | 17:22,23 19:3 | **yep** 114:1 | 260:4 265:10 | 238:13,15 257:14 |
| | | | **102** 181:8 | |

Tina Moore, et al.  v. Brian Kaminski, et al.

Thomas Jackson                                                    September 18, 2015

**20** 7:2 13:3 263:13
**200** 73:1
**2010** 12:11 29:2,6
  34:19 44:10 45:6
  50:22 55:24 66:4
  68:12 71:17 73:8
  73:15 78:24 84:13
  87:19 92:17 95:3
  103:20 130:23
  137:1,15 187:10
  187:15 188:7
  189:3 190:9
  192:16 203:4
  252:1 253:6
**2011** 8:6 37:5 40:11
  43:6 50:22 73:1,5
  73:8,16 75:10,14
  77:10 81:4 85:5
  94:25 95:4 109:16
  110:5 118:7,12
  132:6 133:22
  134:18 137:15
  146:3 152:2,15
  153:8,20 154:11
  154:20 155:25
  156:17 157:5
  158:15 159:13
  160:4,14,18
  161:12 169:3
  170:23 173:15
  176:20 195:21,24
  196:6 223:5
  225:11 227:20,23
  245:11 246:10
**2012** 94:25 226:9
**2013** 94:25
**2014** 25:19 92:18
  95:1 143:21
  192:13
**2015** 1:17 3:6 7:3
  10:16 12:11 19:11
  34:20 40:12 44:10
  95:1 118:14
  180:14 189:20

200:12 203:20
258:17 259:14
260:2,6 263:3
264:13
**2016** 20:20 259:15
**206** 6:4
**207** 6:5,6
**210** 4:7
**211** 4:15 264:18
  265:4
**21st** 78:23
**222** 43:5
**23rd** 43:5
**240** 225:5,6
**241** 6:7
**2416750** 260:25
**244** 6:8
**24th** 118:7,12
**250** 6:9
**2500** 4:17
**255** 6:10
**26** 37:5 40:11
  259:15
**27th** 259:14
**28** 187:2,6,7 260:2
**29** 187:8,9

—————

**3**

**3** 6:15 37:1 53:10
  72:16,19,24 73:22
  166:17 220:20
**30** 172:21 260:14
**301** 78:23
**303** 103:20 119:11
**304** 118:7
**30plus** 22:21
**30th** 73:1,5,8
**314** 4:17 5:9 260:25
**32** 77:21 164:13
**34** 238:13
**35** 6:13
**36** 93:14,16 217:13
  236:12,23 247:25
**37** 238:15

**38** 119:15 193:15
  193:21,22
**39** 194:19

—————

**4**

**4** 2:13,14 6:16
  78:18,21 79:22
  80:3 94:3,11,14
**40** 68:18
**400** 3:4 5:7 258:14
  260:4 265:10
**4050** 4:15 264:18
  265:4
**41** 196:10
**410** 130:22 149:4
  152:5
**42** 6:14
**421** 5:9
**46** 204:9
**4600** 4:7
**49** 77:24
**495** 82:22
**4th** 3:3 5:7 200:12
  203:20

—————

**5**

**5** 6:17 103:13,16
  104:9,13,15
  118:21 119:1
**515** 260:24 266:6
**531** 4:9
**55** 3:6 257:14
**5545** 5:9
**57** 201:25
**58** 204:11

—————

**6**

**6** 6:18 94:3,11
  103:20 117:23
  118:2,6 119:3,15
  120:19 121:6
  130:23 133:10
  137:15 172:21,21
**621** 4:17
**63101** 260:24

264:19 265:5
266:7
**63102** 4:16 5:8
  260:5 265:11
**64122** 4:8

—————

**7**

**7** 6:3,19 120:7,10
  121:4,7,13 168:4
**700** 266:6
**70s** 17:25
**72** 6:15
**7200** 4:9
**74** 14:23 15:1
**76** 16:1
**78** 6:16
**79** 15:1

—————

**8**

**8** 6:20 94:14 130:15
  130:19 132:2,18
  133:11 136:17
  145:7 149:2
  152:16 156:11,15
  157:1,2,4 166:22
  168:1,1 169:17,17
**81** 13:13
**816** 4:9
**85** 13:13 201:23
**87** 13:15
**88** 13:15
**888** 3:7 258:4
**8th** 200:18

—————

**9**

**9** 3:5 6:21 7:2
  145:14,18,21
  146:10,15,21
  147:6,17 148:1,4
  148:13,20,23
  149:2,7 150:12
  151:3,7 152:3,4
  152:16 153:6,19
  155:24 156:16
  157:4 220:19

221:2 222:3 263:3
264:13
**90** 228:9
**911** 76:2
**92** 13:15