# Case: Tina Moore v. Brian Kaminski, et al.

4:14-CV1443 SNLJ, etc.

## Transcript of: Steven Ijames

**Date:** March 8, 2016

This transcript is printed on 100% recycled paper



515 Olive Street, Suite 300
St. Louis, MO  63101
(314) 241-6750
1-800-878-6750
Fax: (314) 241-5070
Email: schedule@goreperry.com
Internet: <<<www.goreperry.com>>>



EXHIBIT

11

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                          March 8, 2016

---

**1**

TINA MOORE, INDIVIDUALLY AND AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF JASON MOORE, DELORES
MOORE, AND RENEE RODGERS, AS NEXT FRIEND FOR A.D.R.,
A MINOR,


            PLAINTIFFS,


VS.


BRIAN KAMINSKI, ET AL.,


            DEFENDANTS.


VIDEO DEPOSITION OF
STEVEN IJAMES

MARCH 8, 2016

---

**2**

```
 1              IN THE DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF MISSOURI
 3              EASTERN DIVISION
 4
 5 TINA MOORE, INDIVIDUALLY AND AS PERSONAL
 6 REPRESENTATIVE OF THE ESTATE OF JASON MOORE, DELORES
 7 MOORE, AND RENEE RODGERS, AS NEXT FRIEND FOR A.D.R.,
 8 A MINOR,
 9
10           PLAINTIFFS,
11
12 Vs.                         No. 4:14-CV1443 SNLJ
13                                 4:14-CV1447 SNLJ
14                             (Consolidated)
15 BRIAN KAMINSKI, ET AL,
16
17           DEFENDANTS.
18
19      Deposition of STEVEN IJAMES, taken on behalf of
20 the Plaintiffs, at Pitzer & Snodgrass, 100 South
21 Fourth Street, 4th Floor, St. Louis, Missouri,
22 63102, on the 8th day of March, 2016, between the
23 hours of 9:00 a.m.and 11:34 a.m., before Linda
24 DeBisschop, CSR, CCR, Illinois CSR No. 084.004741
25 and Missouri CCR No. 779.
```

---

**3**

```
 1 APPEARANCES OF COUNSEL:
 2
 3  FOR THE PLAINTIFFS, Delores Moore and Renee
 4     Rodgers:
 5     Mr. Todd M. Johnson
 6     Baty, Holm, Numrich & Otto, P.C.
 7     4600 Madison Avenue, Suite 210
 8     Kansas City, MO  64112-3012
 9     816-531-7200
10     tjohnson@batyholm.com
11
12 FOR THE PLAINTIFF, Tina Moore
13     Mr. William T. Dowd
14     Dowd & Dowd, P.C.
15     211 North Broadway, Suite 4050
16     St. Louis, MO  63102
17     bill@dowdlaw.net
18
19  FOR THE DEFENDANTS:
20     Ms. Ida Shafaie
21     Pitzer & Snodgrass, P.C.
22     100 South Fourth Street, Suite 400
23     St. Louis, MO  63102
24     (314) 421-5545
25     shafaie@pspclaw.com
```

---

**4**

```
 1  THE VIDEOGRAPHER:
 2     Mr. Steve Johnston
 3     Gore, Perry, Gateway & Lipa Reporting Company
 4     515 Olive Street, Suite 700
 5     St. Louis, MO  63101
 6     (314) 241-6750
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Gore Perry Reporting and Video

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                        March 8, 2016

---

5

1          INDEX OF EXAMINATION
2   QUESTIONS BY MR. JOHNSON ................7
3   QUESTIONS BY MR. DOWD .................107
4
5          INDEX OF EXHIBITS
6   Exhibit 1, ..............................23
7   Exhibit 2, ..............................23
8   Exhibit 3, ..............................23
9   Exhibit 4, ..............................22
10
11
12        (Exhibits are attached to transcript.)
13
14
15
16
17
18
19
20
21
22
23
24
25

---

6

1        VIDEOGRAPHER:  We are on the record at 9:00.
2   Today's date is March 8, 2016 and we are here today
3   at the office Pitzer Snodgrass.  The address is 100
4   South Fourth Street, St. Louis, Missouri.  We are
5   here for the deposition of Steve Ijames to be taken
6   in the case of Tina Moore versus Brian Kaminiski, et
7   al.
8        At this time would counsel identify
9   themselves for the record, please.
10       MR. JOHNSON:  Todd Johnson for Plaintiffs,
11  Delores Moore and Renee Rodgers.
12       MR. DOWD:  Bill Dowd for Plaintiff, Tina
13  Moore.
14       MS. SHAFAIE:  Ida Shafaie for Defendants.
15       VIDEOGRAPHER:  Thank you.  Would the court
16  reporter please swear in the witness.
17
18            STEVEN IJAMES,
19  Of lawful age, having been first duly sworn to
20  Testify the truth, the whole truth, and
21  Nothing but the truth in the case aforesaid,
22  Deposes and says in reply to oral
23  Interrogatories, propounded as follows, to-wit:
24
25

---

7

1            [EXAMINATION]
2   QUESTIONS BY MR. JOHNSON:
3     Q   Mr. Ijames, would you state your name for
4   the record.
5     A   Steven Bradford Ijames.
6     Q   My name is Todd Johnson.  We had the
7   opportunity to meet briefly before your deposition
8   here this morning.  I represent some of the
9   plaintiffs in a case that's pending in Federal Court
10  in St. Louis against the Ferguson Police Department
11  and some of their individuals that are associated
12  with the police department in the city.
13           You've given other depositions, true,
14  sir?
15    A   Yes, sir.
16    Q   I've seen Major Ijames, I've seen Mr.
17  Ijames.
18           Is there any preference that you have
19  this morning, sir?
20    A   No, sir.
21    Q   I'll do my best to be consistent.
22           What is your business address, Mr.
23  Ijames?
24    A   Well, I have an office in Hammons Tower in
25  Springfield, Missouri.  I actually don't know the

---

8

1   mailing address.  I don't receive mail there.  I
2   would actually say my business address is my home
3   which is 1020 East University Street, Springfield,
4   Missouri.
5     Q   And how long have you been in the business
6   of consulting on police matters?
7     A   The first case that I did that involved a
8   civil action was in 1994.
9     Q   Do you practice with any other individuals
10  in this business that you operate?
11    A   No, sir.  I do my billing through a company
12  called Watch House International.  That's a company
13  that myself and an FBI agent, Chris Whitcomb,
14  created in 2007.  Watch House does some cause an
15  origin fire work.  They have some ATF experts, but
16  as far as anybody else that does police work
17  assessment like I do, the answer would be no.
18    Q   And how long have you engaged in this type
19  of forensic police work?  Is it since 1994?
20    A   Yes, sir.  That -- when you asked about
21  consulting, I've probably done police consulting
22  since the mid-'80s as in responding to a question or
23  an inquiry as it relates to an area that I might
24  have some expertise.  But from a legal perspective,
25  as in a civil case, would have been 1994.

Gore Perry Reporting and Video
FAX 314-241-6750            314-241-6750            www.goreperry.com

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                    March 8, 2016

---

**9**

1    **Q**   Do you consider yourself to be an expert in
2  fields other than police practices?
3    **A**  I don't, sir.
4    **Q**   You are not a medical expert, true?
5    **A**  Correct, I'm not.
6    **Q**   Did you attend medical school?
7    **A**  No, sir.
8    **Q**   Do you hold yourself to be an expert in
9  psychology?
10   **A**  No, sir.
11   **Q**   Psychiatry?
12   **A**  No, sir.
13   **Q**   Accident reconstruction?
14   **A**  No, sir.
15   **Q**   Human factors?
16   **A**  No, sir.
17   **Q**   Do you consider yourself to be a certified
18  medical examiner?
19   **A**  No, sir.
20   **Q**   Have you taken any course work in that
21  field, sir?
22   **A**  I probably have sat through some courses
23  that would be reflective of that curriculum, but I
24  don't know what they are and I certainly don't say
25  that I'm an expert in that area.

---

**10**

1    **Q**   Do you hold yourself out to be an expert,
2  sir, in toxicology?
3    **A**  No, sir.
4    **Q**   Or an engineer?
5    **A**  No, sir.
6    **Q**   Or a physicist?
7    **A**  No, sir.
8    **Q**   Or a lawyer?
9    **A**  No, sir.
10   **Q**   Do you agree with me that you are not
11  permitted to give legal opinions?
12   **A**  I do.
13   **Q**   The last time you worked as a police officer
14  in a department was 2007 in Springfield, Missouri,
15  correct?
16   **A**  No, sir.  I was chief of police in Ozark,
17  Missouri until I think November 1st of last year.
18  I've maintained a full police commission in Missouri
19  since '78 or '79.  I retired from Springfield PD in
20  '07.  I maintained the sheriff's commission, but was
21  chief of police in Republic, Missouri and then Ozark
22  in, like I said, I believe November 1st of last
23  year.
24   **Q**   Is that a job that you held concurrently
25  between those two agencies; Ozark, Republic?

---

**11**

1    **A**  No, sir.  I did Republic first and then I
2  left Republic for about a month and then went to
3  Ozark.
4    **Q**   When is the last deposition you gave before
5  today?
6    **A**  I think I gave one early in January of this
7  year.
8    **Q**   How many cases are you currently consulting
9  on for your police work?
10   **A**  I probably have around thirty of which ten
11  of those I would consider active.
12   **Q**   Have you worked with the Pitzer Firm on
13  other cases?
14   **A**  I have one other case for sure.  It's
15  conceivable I have over the years, but I'm certain I
16  have one other right now.
17   **Q**   One other matter involving Ferguson or
18  different agencies, if you can disclose it?
19   **A**  I'm sorry, sir, I didn't understand it.
20   **Q**   The one other matter, does that involve
21  Ferguson or can you disclose that at this time?
22   **A**  Sure.  It's not.  The other matter I've been
23  retained in is another St. Louis County
24  municipality, but not -- not Ferguson.
25   **Q**   Have you worked with the Pitzer Firm on

---

**12**

1  other Ferguson matters that you've been identified
2  as an expert witness?
3    **A**  Not that I'm aware of.
4    **Q**   What percent of your income currently is
5  derived from litigation work?
6    **A**  I would estimate about half.
7    **Q**   The other half is through some consulting
8  role?
9    **A**  I've got a police pension from the City of
10  Springfield and I probably do some type of police
11  training twice a month, whether it be presenting at
12  a state chiefs conference or consulting on policies
13  and procedures, that sort of thing.
14   **Q**   Do you advertise for your services, sir?
15   **A**  No, sir.
16   **Q**   Have you ever been named as defendant in a
17  police misconduct case?
18   **A**  As in being sued?
19   **Q**   Yes, sir.
20   **A**  No, sir.
21   **Q**   I assume you met with Ms. Shafaie to prepare
22  for your deposition this morning?
23   **A**  For about ten minutes, yes, sir.
24   **Q**   Other than traveling here, anything else
25  that you did to prepare for your deposition, Mr.

---

3  (Pages 9 to 12)

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                          March 8, 2016

---

13

1  Ijames?
2      **A**  I printed my report in the hotel last night
3  and I reviewed it.  That was it.
4      **Q**   The records that you received, were they on
5  disc?
6      **A**  I received a CD which I do happen to have
7  with me and then, I believe as depositions and other
8  things were developed, I think those were sent to me
9  by email.
10     **Q**   So without going through an exhaustive list,
11  what records were on the disc versus what records
12  did you get as matters happen contemporaneously
13  through email?
14     **A**  I think I'd mostly be guessing.  The disc I
15  received would have been the initial pleadings, the
16  officers' reports.  I don't think I had any of the
17  depositions until I received those by email.
18     **Q**   When were you hired in this matter?
19     **A**  And I apologize.  It sounds like I guess a
20  lot.  It would have been summer or fall of last
21  year.  I don't have an exact date.
22     **Q**   Who hired you?
23     **A**  I believe Mr. Plunkett is who called me and
24  I think that's my answer.
25     **Q**   The opinions that you're offering today, are

---

14

1  they -- there's a number of defendants.
2          You understand that, sir?
3      **A**  Yes, sir.
4      **Q**   Are you offering opinions about particular
5  or specific defendants as opposed to the defendants
6  generally?
7      **A**  I think what I was asked to do primarily was
8  assess the particulars as it relates to the
9  interaction between the first responding officer and
10  the deceased, and so I don't think I was told just
11  give opinions concerning this, but that's the crux
12  of my opinions or that event there.
13     **Q**   Would it be fair to characterize your
14  opinions as primarily focusing on conduct of
15  Officers Kaminski and White?
16     **A**  Yes, sir, that would be accurate.
17     **Q**   In addition to the review of records given
18  to you on disc and via email, did you conduct any
19  other work as part of your work in this matter such
20  as interviewing witnesses?
21     **A**  I did not.
22     **Q**   Did you ever interview Officers Kaminski or
23  White?
24     **A**  No, sir.
25     **Q**   Did you interview any persons you associate

---

15

1  to be associated with the City of Ferguson or the
2  Ferguson Police Department as part of your work in
3  this matter?
4      **A**  No, sir.
5      **Q**   Did you go to the scene of the incident?
6      **A**  I have driven to the scene, but I was by
7  myself.
8      **Q**   When did you do that, sir?
9      **A**  Last night.
10     **Q**   And when you were at the scene, how long
11  were you there?
12     **A**  Three minutes just to visually lay eyes upon
13  the scene, since obviously no officers or vehicles
14  were there, I just wanted to drive through the
15  scene.
16     **Q**   So you were there in the darkness hours?
17     **A**  It was.
18     **Q**   For three minutes?
19     **A**  That would be about approximate, yes, sir.
20     **Q**   Did you get out of your vehicle?
21     **A**  I did not.
22     **Q**   In your career, how many times have you
23  testified for the plaintiff in an excessive force
24  case?
25     **A**  I think total number I couldn't give you.  I

---

16

1  can tell you with the current cases I have, I think
2  there are two that are active that are plaintiffs
3  cases, but the vast majority of my work has been
4  defense work, but I think I have two plaintiffs
5  cases right now.
6      **Q**   I've seen that you in your -- historically
7  have done 95 percent defense work.
8          Is that a fair estimate?
9      **A**  I believe so, yes, sir.
10     **Q**   And when I say where you testify for the
11  plaintiff, I'm asking about an occasion where you
12  have given testimony via deposition or at trial on
13  behalf of a person seeking money damages against a
14  law enforcement agency, and your testimony has been
15  on behalf of the plaintiff who made a claim of
16  excessive force.
17          That was a really long definition,
18  but what I'm getting at is, I've seen historically
19  in your testimony where sometimes you've testified
20  about an officer's license or certification,
21  correct?
22     **A**  I have done a lot of personnel hearings
23  where an agency is trying to fire an officer and I
24  testified in those cases.
25     **Q**   And in support of some of those personnel

---

Gore Perry Reporting and Video

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                      March 8, 2016

---

**17**

1  hearings, you've given testimony that the officer
2  engaged in some form of misconduct, correct?
3      **A**  Just to be clear, I don't know that I've
4  ever been engaged in one of those different than
5  that.  They've all been misconduct cases.
6      **Q**  Sure.  And in those occasions where there
7  has been a claim of officer misconduct, were any of
8  those agency or personnel actions involved a claim
9  that the officer engaged in excessive force?
10     **A**  In most of those cases I would say yes, sir.
11     **Q**  And let's set that aside, okay?
12         Outside of the personnel actions, in
13 your career, how many times have you offered
14 deposition or trial testimony on behalf of the
15 plaintiff in an excessive force claim?
16     **A**  Four or five total.
17     **Q**  Since 1994?
18     **A**  That would be accurate.
19     **Q**  And that's out of the hundreds of excessive
20 force cases in which you've been retained, correct?
21     **A**  Yes, sir.
22     **Q**  You believe as an expert witness you must
23 take the facts as they exist, you cannot make up
24 facts that suit you, correct?
25     **A**  Yes, sir, I do.

---

**18**

1      **Q**  Do you believe you should consider all of
2  the evidence objectively in reaching your opinions?
3      **A**  Yes, sir.
4      **Q**  You agree that you should not be an advocate
5  for either side?
6      **A**  I agree with that.
7      **Q**  Is there anything in this matter that you
8  wanted to see, but you weren't afforded the
9  opportunity?
10     **A**  I don't think so.
11     **Q**  Any limitations put on your work, sir?
12     **A**  No, sir.
13     **Q**  When you were given depositions, did you
14 review them?
15     **A**  I did.
16     **Q**  The methodology in which you work as a
17 person identified as an expert witness, do you take
18 notes, do you make summaries, do you flag, do you
19 highlight?
20         Walk me through your methodology when
21 reviewing materials.
22     **A**  Sure.  What I do basically is I have a
23 format that I use for a narrative and I write facts
24 as I receive them.  So if I'm doing a deposition,
25 when I read a relevant issue, I'll transpose that

---

**19**

1  onto my format and then just continue working.
2         Historically for me I found
3  sequential processes make more sense, so I try to
4  just follow a timeline and I create a single
5  document that, at the end of the process, I'll
6  modify, adjust to make sense sequentially as to how
7  I formulate my opinions.
8      **Q**  Does that sequence or timeline ultimately
9  transform into a report if you issue one?
10     **A**  Yes, sir.
11     **Q**  So what I gather is your report is somewhat
12 of a living breathing document that is formulated
13 based on your review of the materials and you're
14 typing into that report as you work through the
15 materials culminating in a report that you would
16 sign?
17     **A**  Yes, sir.
18     **Q**  Did you look at any versions of the
19 complaint that the plaintiffs have filed in this
20 case?
21     **A**  Yes, sir, I did.
22     **Q**  Were you provided summaries of depositions?
23     **A**  First, as actual depositions?
24     **Q**  Yes, sir.
25     **A**  No, sir.

---

**20**

1      **Q**  Were you provided summaries of records?
2      **A**  No, sir, none.
3      **Q**  Is there anything that you specifically
4  created in response to the requirements of Rule 26
5  such as obviously a report is one, correct?
6      **A**  Yes, sir.
7      **Q**  On top of the report, anything that you
8  created that you did not have before in response to
9  your designation under Rule 26 in this matter?
10     **A**  The specific answer would be no.  I may have
11 updated, for example, a deposition that I had, an
12 article, something of that nature.
13     **Q**  You have not spoken with anybody associated
14 with the Moore family about this matter?
15     **A**  No, sir.
16     **Q**  Have you spoken to any treating physicians
17 or medical providers of Jason Moore?
18     **A**  No, sir.
19     **Q**  You've rendered billings to the firm that
20 hired you, correct?
21     **A**  I have not yet, sir, in this case.
22     **Q**  And what form of billing do you intend to
23 render in this matter to the firm that hired you?
24     **A**  It will be an hourly rate.  I've not done a
25 site visit, per se, in this case that I would bill

---

5  (Pages 17 to 20)

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                          March 8, 2016

---

**21**

1 for, so it would just be for the time committed to
2 reviewing material and creating my report.
3    **Q** ·A site visit, is that something that you
4 would like to do that you haven't yet had the
5 opportunity to do, sir?
6    **A**  No, sir.  In many cases there is in my mind
7 a need to perhaps meet at the scene with the
8 officers, if I have some confusion from either their
9 narrative or deposition.  I didn't have that in this
10 case so, no, sir, I would not expect to do that.
11    **Q**  What is your hourly rate for litigation
12 work?
13    **A**  $295 per hour.
14    **Q**  Does that fluctuate at all when it comes to
15 testimony or forensic work or trial appearances?
16    **A**  The only deviation I have, and I think I
17 included that in my report how my fee structure is
18 set up, that it's a straight fee for time committed
19 to review, and then if I travel, I have a per day
20 fee whether it's a deposition for you or a site
21 visit, it's all the same.
22    **Q**  Did you get my check?
23    **A**  I haven't, but I received an email from Mr.
24 Yoder at Watch House that he had received a check,
25 so I'm sure it's there.

---

**22**

1    **Q**  Thank you.
2    **A**  Thank you.
3    **Q**  Any idea of how much time you spent to date
4 in this case?
5    **A**  Just looking through my report, I thought
6 you might ask that because, it's not that I don't
7 want to bill, I just haven't had time.
8       I've probably got 25 hours in this
9 case, but that would truly be an estimate.  Just
10 based on my knowledge of the size of the case, I
11 would estimate about 25 hours.
12    **Q**  And what has that 25 hours been comprised
13 of, sir?
14    **A**  It's primarily been reviewing the material
15 and then creating the report that I submitted.
16       (Exhibit 4 was marked for
17       identification by the court
18       reporter.)
19    **Q**  Exhibit 4, out of order, of course, is your
20 report, correct, Mr. Ijames?
21    **A**  Yes, sir.
22    **Q**  Is that the only report that you have issued
23 in this matter?
24    **A**  The only clarification I would give is the
25 one I printed I think is 41 pages because all of the

---

**23**

1 Rule 26 material was with it, but this is the only
2 report narrative that I've done, yes, sir.
3    **Q**  And I use the report very narrowly.  I'll
4 hand you other portions of your disclosure in this
5 matter.
6       (Exhibit 1 was marked for
7       identification by the court
8       reporter.)
9    **Q**  Exhibit 1, is that a current CV, Mr. Ijames?
10    **A**  It's current within the last couple of
11 months.  There may have been an adjustment from when
12 I submitted this to you and today.
13       (Exhibit 2 was marked for
14       identification by the court
15       reporter.)
16    **Q**  Exhibit 2 would be publications and other
17 background in the field that you've been associated
18 with, sir?
19    **A**  I think this document here, sir, is
20 exclusively articles, publications.
21    **Q**  And are those articles or publications that
22 you would be primarily or collaboratively authored?
23    **A**  I think, yes, sir, maybe one or two were
24 collaborations.  I think they are almost all mine.
25       (Exhibit 3 was marked for

---

**24**

1       identification by the court
2       reporter.)
3    **Q**  And Exhibit 3 would be a rolling list of
4 testimony you've given in the past four years either
5 at deposition or trial?
6    **A**  Yes, sir, and the exception would be, I
7 believe I think I've had a deposition, one since
8 then, but just didn't make it onto this when you
9 received it.
10    **Q**  What kind of case was it, the one in
11 January?
12    **A**  I'm thinking.  It is an excessive force
13 case, but the crux of the case is an accidental
14 shooting where an officer fired at a suspect who was
15 shooting at him and behind him to the left 58 yards
16 a young girl was hit in the shoulder.
17    **Q**  Now that I've shown you the different
18 components of your disclosure in this matter,
19 whether it's my definition of report or your
20 definition of report, have we covered all the
21 different components of your disclosure in this
22 matter?
23    **A**  Yes, sir.
24    **Q**  You have not brought any correspondence
25 between counsel who retained you and you or your

---

Gore Perry Reporting and Video

FAX 314-241-6750                314-241-6750                www.goreperry.com

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                    March 8, 2016

---

25

1  offices, correct?
2      **A**  Correct, sir.
3      **Q**  Did you rely on any of the opinions of
4  anybody else for your work in this case?
5      **A**  No, sir.
6      **Q**  The criticisms, if any, that you have of
7  Mr. Martinelli, are they found in your report that
8  we marked as Exhibit 4?
9      **A**  They would be.
10      **Q**  We will get to your opinions obviously at
11  some point today, but can you think of any
12  differences of opinion or criticisms that you have
13  of Mr. Martinelli that are not contained in your
14  report?
15      **A**  Based on his deposition testimony, I would
16  have a lot of disagreements, but they weren't such
17  that I needed to formulate them in an opinion, if
18  that makes sense.
19      **Q**  In other words, it didn't lead to a
20  supplemental report?
21      **A**  No, sir.
22      **Q**  Has your testimony ever been limited or
23  stricken, to your knowledge?
24      **A**  Not that I'm aware of.
25      **Q**  Do you plan to do anything today -- strike

---

26

1  that.
2              Do you plan to do anything after
3  today other than potentially appearing at trial?
4      **A**  Unless something is provided that would
5  cause me to have a different opinion, something
6  late, the answer would be no.
7      **Q**  In doing your work, is there any piece of
8  evidence that you consider to be out and out
9  factually inaccurate?
10      **A**  Well, the only thing that comes to mind, and
11  this may be reflective of what you're asking.  I
12  think Mr. Martinelli at his deposition suggested
13  that Officer White was there basically after the
14  first five-second cycle and I think that's factually
15  inaccurate.
16              That may not be responsive to what
17  you're asking, but that's the only thing that I
18  think is significant that comes to mind.
19      **Q**  Has your commission or certification or
20  licensure in the police field ever been subject to
21  challenge?
22      **A**  No, sir.
23      **Q**  Did you receive any additional material
24  after issuing your January 28, 2016 report in this
25  matter?

---

27

1      **A**  I don't believe that I have, sir.
2      **Q**  Did you review any publications as part of
3  your work on this case?
4      **A**  I did some.  They would all be footnoted.  I
5  think I looked at the IACP model policy on TASER
6  use.  I think looked at a power point presentation,
7  a CIT power point presentation that relates to the
8  escalation, but they would all be footnoted if I did
9  review something beyond the material provided.
10      **Q**  And is there a model number for the IACP
11  policy that you reviewed as part of your work in
12  this case?
13      **A**  I don't believe they do sequential
14  numbering.  It's simply referred to as the
15  electronic control device policy.
16      **Q**  Is there a version of that that you looked
17  at?
18      **A**  The version that would be relevant in this
19  case was the one updated in October of 2010.
20      **Q**  The power point presentations, whether they
21  be the CIT power point or the other training, was
22  that a power point presentation that you authored or
23  that somebody else authored?
24      **A**  The particular one I referenced in this case
25  was the actual standard power point that comes from

---

28

1  the CIT program in Memphis, the 2007 edition.  Most,
2  I can't speak for all, many CIT components nation
3  wide with the approval of the national headquarters
4  will modify them to make more contemporaneous to
5  their area.  I've done that for the Springfield
6  region, but the particular one that I referenced was
7  the standard without any input from me at all.
8      **Q**  And is the IACP model effective
9  October 2010, would that be an IACP policy as it
10  relates to ECW use and effect as of September of
11  2011?
12      **A**  It would have been the X26, yes, sir.
13      **Q**  The CIT training power point presentation
14  that is the 2007 edition, would that be in place to
15  the extent an agency adopted it as of September of
16  2011?
17      **A**  To my knowledge there had not been an update
18  from the 2007, so to the best of my understanding,
19  yes, sir.
20      **Q**  Is there any evidence you saw in this case
21  that the City of Ferguson had adopted the Memphis
22  model at the CIT training as of September of 2011?
23      **A**  I can't speak for the entire agency.  I
24  believe Kaminski testified that he participated, but
25  after this incident.

---

Gore Perry Reporting and Video

FAX 314-241-6750                314-241-6750                www.goreperry.com

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                    March 8, 2016

---

29

1    **Q**   Any evidence that you saw that Ferguson had
2  sent officers to any form of CIT training prior to
3  September of 2011?
4    **A**   I don't recall.
5    **Q**   Any evidence that you saw that Ferguson had
6  adopted the IACP model number revised in October of
7  2010 for ECW use?
8    **A**   I'm certain that they didn't, and just to
9  clarify, the IACP models are not specifically
10 designed for adoption.  Most agencies are members of
11 the IACP.  They use those as a format.  I'm not
12 suggesting that there is no one in the U.S. that
13 takes it and adopts it word for word, but most
14 people don't.
15        I am a member of the national policy
16 center board.  I actually wrote that document, so
17 I'm very familiar with what the process is, and just
18 for clarification.
19        So the answer is no and I don't know
20 that very many people do actually take it and put
21 their name on it and use it in that format.
22   **Q**   You saw the City of Ferguson TASER standing
23 order in effect as of September of 2011, correct?
24   **A**   I did.
25   **Q**   Based on your background, training and

---

30

1  experience working with the IACP organization or
2  otherwise, is there anything that stood out to you
3  that that was, in essence, a verbatim adoption of
4  the IACP model in effect or revised in October of
5  2010?
6    **A**   It didn't appear to be a verbatim adoption.
7    **Q**   Is there anything in reviewing that TASER
8  use policy that was produced as a standing order by
9  Ferguson in this case that suggested to you that
10 that was adopted from TASER International?
11   **A**   I know the answer is no specifically, but I
12 know that they were trained through the TASER
13 format.  It clearly would have influenced it, but as
14 far as them literally adopting a TASER policy, I
15 think TASER on principle says they don't create one.
16   **Q**   What is PERF?
17   **A**   Police Executive Research Forum.
18   **Q**   Are you familiar with your law enforcement
19 background or consulting background that PERF also
20 offers standards?
21   **A**   I've specifically been involved in their
22 TASER standards up until 2007, yes, sir.
23   **Q**   Do you know of any further revisions of the
24 PERF standards after 2007 as it relates to TASER
25 use?

---

31

1    **A**   Yes, sir.
2    **Q**   When was the last PERF revision of TASER use
3  prior to September of 2011?
4    **A**   I just can't say for certain to give you a
5  date, but they have done at least one update since
6  2007.  I'm reasonably certain one in 2010.  They may
7  have done one since then.  I have not been involved
8  with PERF since 2007 to the degree that I was before
9  that.
10   **Q**   Any -- through your review of the TASER use
11 policy or standing order by the City of Ferguson,
12 did it stand out to you that there was any adoption
13 of any PERF standard or model found in that document
14 that was produced in this case?
15   **A**   I just don't recall from memory, sir.
16   **Q**   You also mentioned one other form of power
17 point training that you reviewed as part of your
18 work in this case.  We had the IACP model standard,
19 we had the CIT training, power point presentation
20 and you referenced another more generic power point
21 training presentation, did I hear that correctly
22 that you referred to in this case or was it just the
23 CIT?
24   **A**   I would just have to look.  I don't recall
25 referencing another power point except the -- beside

---

32

1  the CIT.
2    **Q**   Have you authored a power point presentation
3  that you've given to the City of Springfield and
4  other agencies about the use of the TASER X26?
5    **A**   I'm not confused.  I'm just thinking.  I
6  have done a lot of training in the TASER for the
7  City of Springfield Police Department, not in recent
8  years since I retired in 2007, but I would have
9  created basically the parent document of everything
10 that SPD used per TASER from our first acquisition
11 in the mid-'90s until I left in 2007.  I was the
12 deputy chief then, so I wouldn't have done a lot of
13 the hands-on training, but because of expertise in
14 that area, I would have either created it or have
15 vetted it.
16        So my hand would be on anything there
17 at least up to 2007.  I know as recent as 2010 I did
18 a reassessment at the current chief's request of
19 their policy specifically related to fall-down risk.
20 So the answer would be not necessarily just a power
21 point, but the lesson plans themselves I definitely
22 would have had a hand in.
23   **Q**   You took your TASER basic training in 1995?
24   **A**   I would have done a TASER-tron class which
25 was before TASER International existed.  That's

---

8  (Pages 29 to 32)

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                    March 8, 2016

---

33

1  where I got my first instructor rating, yes, sir.
2      Q   And your instructor courses was taken when?
3      A   The first one was in, I think, Prince
4  William County in 1995 in Virginia, and then in 1999
5  when the M26 was widely distributed, I went through
6  a master instructor class. I believe we hosted that
7  in Springfield in 1999.
8      Q   And when did you take your master instructor
9  course?
10     A   I really can't recall, sir, whether in '99 I
11 had the instructor trainer rating then or just an
12 instructor rating. I certainly had a master rating
13 for a number of years. I just don't recall if it
14 was the very first block or not.
15     Q   You let your master rating expire in 2010,
16 correct, sir?
17     A   I think it was around 2010, yes, sir.
18     Q   You've, in the course of your law
19 enforcement employment, you discharged your TASER
20 weapon one time?
21     A   On a suspect. On a natural suspect, yes,
22 sir.
23     Q   And that was one time in an actual police
24 encounter?
25     A   Correct.

---

34

1      Q   That was 2006 when you shot an individual in
2  the back, correct?
3      A   For some reason I thought that was 2007. It
4  was shortly before I retired, but it would have been
5  close to that.
6      Q   And no other point in your law enforcement
7  career where there was an encounter where you had to
8  discharge your TASER on an individual or suspect?
9      A   Correct, sir.
10     Q   Have you had the X26 used against you?
11     A   Many times.
12     Q   You referenced earlier that there were a
13 handful of occasions where you testified for the
14 plaintiff in an excessive force case.
15         Was one of those times a case in
16 Iowa?
17     A   Yes, sir.
18     Q   Mr. French, was he the attorney involved?
19     A   I think so. John French, yes, sir.
20     Q   What were the facts and circumstances of
21 that case, sir?
22     A   It was a car chase in which the officer in
23 my opinion had intentionally pulled out in front of
24 a motorcycle that was being pursued resulting in a
25 serious injury car crash.

---

35

1      Q   Have you ever testified for the plaintiff in
2  an excessive force case involving the use of a
3  TASER?
4      A   I don't believe so.
5      Q   Have you ever been retained by TASER
6  International for any work under any set of
7  circumstances?
8      A   No, sir.
9      Q   Have you ever been paid or employed by TASER
10 International for any research studies?
11     A   No, sir.
12     Q   Any other articles on your publication list
13 or your CV other than those listed where you have
14 written about the use of a TASER?
15     A   I don't think so.
16     Q   Have you ever been retained by the plaintiff
17 in a TASER -- strike that.
18         Were you involved in the
19 Hernandez-Rojas case in some way?
20     A   I was.
21     Q   What was your involvement in the
22 Hernandez-Rojas case for the Border Patrol down by
23 San Diego?
24     A   Thanks for that last part because I was
25 trying to recall the case. I was hired by the

---

36

1  Department of Justice, I think is who actually does
2  that for the Border Patrol in reference to rendering
3  opinions concerning whether the deployment of the
4  TASER in that case was reasonable.
5      Q   Was that a DOJ action against the Border
6  Patrol or the Federal government, if you know?
7      A   No, sir. It was a defense case. I believe
8  the family of Mr. Hernandez-Rojas who was injured
9  filed the action and I was hired to defend that use.
10     Q   So you were retained to defend the Border
11 Patrol agents who were accused of engaging in
12 excessive force?
13     A   I need to clarify. I'm thinking we got two
14 cases mixed up. Was Hernandez-Rojas the case where
15 there were multiple agents standing? Okay.
16     Q   And that case is still pending.
17     A   Okay. That -- that was the case, where if
18 you'd like me to clarify, a rare case where I
19 rendered opinions in writing that the force was
20 unreasonable and excessive and they had me document
21 that. Most people when they ask to look at a case,
22 when you tell them this is inappropriate and
23 excessive, they say thank you, we'll go elsewhere.
24 I communicated that and hung the phone up and
25 thought that was that.

---

9  (Pages 33 to 36)

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                    March 8, 2016

---

37

1        And about a week later they called me
2   and said we'd like you to memorialize that in a
3   report.  I wrote a very detailed report basically
4   saying that the use of force in that case was
5   excessive, so that may not have been responsive to
6   your earlier question, but I think you asked if I
7   was hired by the plaintiff to testify against the
8   TASER use.  In that case I wrote a report against
9   the TASER use, but it happened to be for the
10  defense.
11      Q   And I know that you're not a lawyer and some
12  of the procedural posture may be lost on you.
13      A   Right.
14      Q   What I'm understanding is there was civil
15  litigation related to the use of a TASER ECW in the
16  Hernandez-Rojas case, true?
17      A   Yes, sir.  I had that confused with another
18  case, sorry.
19      Q   And you were retained by the people
20  representing the Border Patrol agents and they asked
21  you to author a written report as it relates to
22  those agents or officers' use of the TASER?
23      A   Yes, sir.  It was actually the U.S.
24  Attorney's Office who asked me to do that.
25      Q   Okay.  Which office, Southern District of

---

38

1   California?
2       A   I could certainly find it since I authored
3   the report for them, but I don't recall.
4       Q   What year was that report?
5       A   I'm not sure.  Probably 2011, 2012,
6   somewhere in that area.
7       Q   Did you give a deposition in that case?
8       A   No, sir, just my report.
9       Q   And the case hasn't been tried so no trial
10  testimony?
11      A   No, sir.  Just the report and I don't
12  believe I've ever been contacted since then.
13      Q   Do you know if you were even identified as
14  an expert witness in that matter?
15      A   I don't know.  As I mentioned earlier, that
16  is a very rare occurrence and you mentioned the
17  lawyer posturing.  I always felt like that was
18  probably done to memorialize my position and then X
19  me out for any future concern they might have,
20  because I was very critical of the deployment.
21      Q   Sure.  Are you offering any opinions about
22  the cause of Mr. Moore's death?
23      A   No, sir.
24      Q   Are you offering any opinions about whether
25  he was in a state of excited delirium at or about

---

39

1   the time of the police encounter?
2       A   I have not offered any written opinions on
3   that, no, sir.
4       Q   Or agitated delirium?
5       A   No, sir.
6       Q   Are there publications in your law
7   enforcement field that you consider to be
8   authoritative?
9       A   Yes, sir.
10      Q   Police Chiefs?
11      A   Police Chief Magazine, yes.
12      Q   Tactic Ledge?
13      A   Yes, sir.
14      Q   Law and Order?
15      A   Yes, sir.
16      Q   Any others?
17      A   I can't say just from memory.  I would say
18  there are a number of others that I can't recall.
19  As long as there's a peer-reviewed process to it, I
20  know there is many.  That would be my best answer.
21      Q   Have you actually authored articles that
22  have been published in those three magazines?
23      A   I have.
24      Q   We mentioned IACP.  We mentioned PERF.
25  Let's start with IACP.

---

40

1        Do you consider that body to be
2   authoritative in the field of police practices?
3       A   I do, sir.
4       Q   Do you consider PERF to be authoritative in
5   the field of police practices?
6       A   I do.
7       Q   Do you consider the National Sheriffs
8   Association to be authoritative on police practices?
9       A   I do, sir.
10      Q   Do you believe the Missouri Police Chiefs
11  Organization to be authoritative at the Missouri
12  state level on police practices?
13      A   I do.
14      Q   Are there any other bodies, such as the ones
15  I've just mentioned, that you consider to be
16  authoritative on police practices in your field?
17      A   I think there are many others, various state
18  associations, but those four would be the primary
19  ones that I'm familiar with.
20      Q   How do you define officer safety, sir?
21      A   I would define that as a process by which an
22  officer balances their risks compared to the
23  circumstances they are in and potential benefit.
24      Q   Do you consider officer safety to be an
25  important characteristic?

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                    March 8, 2016

---

41

1      **A**   Maintaining officer safety is important.  It
2  is certainly not the only thing we focus on, but it
3  is important.
4      **Q**   Should an officer use safety as
5  consideration in assessing a law enforcement
6  situation or encounter?
7      **A**   They should.
8      **Q**   And should they approach the situation in
9  the safest manner possible while still carrying out
10 their duties?
11     **A**   I believe so.
12     **Q**   What does de-escalation of force mean, sir?
13     **A**   De-escalation of force, in my opinion, is an
14 officer using tactics, tools and techniques to focus
15 on accomplishing a mission objective, but likewise,
16 reducing the potential negativity or scope of the
17 outcome.
18     **Q**   And can you de-escalate when practical when
19 consistent with the mission objective?
20     **A**   I believe you should, yes, sir.
21     **Q**   You've used the term or phrase rapidly
22 evolving in several points in your report that we
23 marked as Exhibit 4, true?
24     **A**   Yes, sir.
25     **Q**   What do you mean when you use the phrase

---

42

1  rapidly evolving?  What does that mean in your
2  field, sir?
3      **A**   A set of circumstances that are quickly
4  developing where an officer might have competing
5  priorities related to time.  Where it is not a
6  static environment, but a quickly-moving environment
7  to where things have to occur because people are
8  moving, circumstances are changing.
9      **Q**   Let's go back to the de-escalation for a
10 second.
11            Is a common theme on de-escalation
12 and where the most trouble lies in your opinion
13 interacting with the mentally ill where officers
14 push tactically into an environment?
15     **A**   I do agree with that.
16     **Q**   The goal is to de-escalate by trying to
17 solve without a physical confrontation, sir,
18 correct?
19     **A**   I agree.
20     **Q**   You have testified that sometimes officers
21 inappropriately take direct action when interacting
22 with the mentally ill?
23     **A**   We have done that, yes, sir.
24     **Q**   Can you give me an example going back to
25 rapidly evolving an example on a certain law

---

43

1  enforcement encounter or a certain mission where
2  something is rapidly evolving?
3      **A**   I would use the immediate case.  When a
4  person is encountered in a unique set of
5  circumstances, unusual in that they are not clothed
6  and acting in an erratic fashion.  When you
7  initially verbally communicate with them, they turn
8  to you, but then they basically rush you.  That
9  rushing would, in my mind, be a rapidly evolving
10 situation.
11     **Q**   Can an officer's actions cause a situation
12 to become rapidly evolving as well?
13     **A**   They may.  We don't truly control people.
14 We simply control ourselves.  How a person reacts to
15 that is in many cases, of course, unknown.  So an
16 officer certainly could do something that is good
17 police practice with good intentions that have a
18 negative outcome.
19     **Q**   Have you written articles on a phrase that's
20 known as officer created jeopardy?
21     **A**   I think I wrote the first one in the mid
22 '90s.
23     **Q**   And one scenario of officer created jeopardy
24 is, if you step close to a mentally ill person with
25 a knife, why are they supposed to do something with

---

44

1  that knife, correct?
2      **A**   I didn't hear that.
3      **Q**   Let me break it up into two questions.
4             Did one of your articles focus on
5  officer created jeopardy in the context of dealing
6  with the mentally ill?
7      **A**   Yes, sir.
8      **Q**   And one scenario that you wrote about for
9  officer created jeopardy is, if you step close to a
10 mentally ill person with a knife, you shouldn't be
11 surprised if they do something with that knife?
12     **A**   Well said, yes, sir.
13     **Q**   In that scenario with a mentally ill
14 individual, it's best to focus on the primary
15 mission objective which is to make the scene safe
16 and figure out a way absent the person taking
17 aggressive action, to de-escalate, true?
18     **A**   That's exactly what I believe, yes, sir.
19     **Q**   The reason an officer wants to de-escalate
20 is the person is not thinking clearly, the mentally
21 ill scenario we talked about?
22     **A**   Well, that's not the only reason, but that's
23 a primary reason, yes, sir.
24     **Q**   Sometimes that person will see you as a
25 police officer and they don't recognize the

---

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                    March 8, 2016

---

45

1   obligation to submit?
2       **A**   Agreed.
3       **Q**   As compared to other people, they're not
4   likely to react to a police officer's orders as
5   compared to the general population?
6       **A**   That's a good way to characterize it, yes,
7   sir.
8       **Q**   What is a reactionary gap, sir?
9       **A**   That's space or distance in which an officer
10  is reasonably expected to be able to make a quick
11  decision should that situation become dangerous, the
12  person advance.  Different instructors teach it
13  different.
14              In a common interview situation,
15  about 6 feet is considered the reactionary gap, and
16  I've seen trainers go back to as far as 21 feet, but
17  in my experience, about 6 feet is ordinarily
18  referred to as the reactionary gap.
19      **Q**   Are there certain variables or factors that
20  affect the distance that a reactionary gap must be
21  maintained between the officer and the suspect or
22  individual?
23      **A**   Yes, sir.
24      **Q**   And what are some of those variables or
25  factors?

---

46

1       **A**   The most significant factor being the
2   potential for immediate jeopardy.  If an individual
3   was armed with a knife, you would certainly want to
4   keep a much greater distance than that with an
5   unarmed person, so it's basically a concept of
6   reactionary gap for threat assessment.  You are
7   trying to give yourself time to make decisions, be
8   close enough to communicate and work with the call,
9   but also be far enough back that you have time to
10  make a decision.
11      **Q**   If there is a threat assessment through open
12  hand, through closed hand, through knife, through
13  gun?  Obviously, that officer should leave a
14  reactionary gap until they can assess the situation,
15  correct?
16      **A**   If they can.  If safe and practical, yes,
17  sir.
18      **Q**   Can that reactionary gap be closed, be
19  narrowed, be limited?
20      **A**   It can by both officer suspect or
21  combination of the two.
22      **Q**   What happens when officers close a
23  reactionary gap?
24      **A**   It certainly depends on what the suspect
25  does, but clearly if you're closer to a suspect,

---

47

1   your potential for physical interaction goes up and
2   when that potential goes up, the potential for
3   injury arises as well.
4       **Q**   As the reactionary gap closes, your time to
5   react to contingencies become shorter?
6       **A**   It does.
7       **Q**   The closer you are to a suspect, the greater
8   possibility there is a risk?
9       **A**   That's statistically true, yes, sir.
10      **Q**   As officer risk goes up, there is oftentimes
11  a parallel with subject risk?
12      **A**   No doubt about that.
13      **Q**   In some cases as the officer risk increases,
14  so does the potential for force being used?
15      **A**   No doubt about that.
16      **Q**   Especially when you're dealing with somebody
17  who is mentally unstable or on drugs?
18      **A**   The only clarification I would give you is
19  that that perception exists that, for example,
20  persons who are affected by mental illness are
21  inherently more dangerous.  I don't think statistics
22  bear that out.  I think unpredictable would be a
23  better assessment.  Just not likely to be able to
24  predict what they'll do.
25      **Q**   Is it your -- I think you said this, but is

---

48

1   it your belief that closing the reactionary gap
2   increases the likelihood of injury or death to the
3   officer or the citizens?
4       **A**   All things equal, the closer you are to a
5   person, the more likely you are to be susceptible to
6   an attack, so generally, that would be true, but
7   obviously, the vast majority of police encounters
8   closely with citizens don't result in anybody being
9   injured.
10      **Q**   Going back to officer created jeopardy for
11  one second, can the officer's actions create their
12  own jeopardy where it causes them to use force when
13  it would not have been otherwise necessary?
14      **A**   It can.
15      **Q**   Let's take a short break.
16              (Recess taken.)
17      VIDEOGRAPHER:  Off the record at 9:44.
18              (Recess taken.)
19      VIDEOGRAPHER:  Back on the record at 9:53 in
20  the deposition of Steve Ijames.  This begins disc
21  two.
22  QUESTIONS BY MR. JOHNSON:
23      **Q**   Mr. Ijames, we understand in this case that
24  on September 17, 2011 at approximately 6:45 a.m.
25  Ferguson Police Department officers were dispatched

---

Gore Perry Reporting and Video
FAX 314-241-6750                314-241-6750                www.goreperry.com

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                                          March 8, 2016

---

**49**

1  to the area of Airport and North Marguerite Roads in
2  Ferguson, Missouri, true?
3      **A**  True.
4      **Q**  Is that the factual backdrop to the law
5  enforcement canon that we're here for this morning?
6      **A**  Yes, sir.
7      **Q**  What was the reason that officers were
8  dispatched to that scene?
9      **A**  There were multiple 911 calls concerning an
10 individual who was in the road, was pushing on cars,
11 was -- had disrobed and I don't recall the exact
12 number.  I listened to all of them, but there were
13 multiple calls from people who had an individual who
14 was concerning to them.
15     **Q**  I understand, based on the documents
16 produced in this case, Officer White received his
17 dispatch at approximately 6:46 a.m.?
18     **A**  I think it was very close to the time of the
19 calls, yes, sir.
20     **Q**  And what time did Officer Kaminski arrive to
21 the scene after receiving dispatch?
22     **A**  I don't recall the exact time from memory,
23 sir.
24     **Q**  Any reason to dispute it's 6:49 a.m.?
25     **A**  Oh, no, sir.  It was close to the call time.

---

**50**

1      **Q**  And Officer White, did he arrive one minute
2  later?
3      **A**  I think approximately one minute later, yes,
4  sir.
5      **Q**  What was the operational objective at
6  arrival of Officer Kaminski?
7      **A**  In my opinion it would have been initial
8  scene stabilization.  It's impossible to determine
9  what is factually occurring until you make the scene
10 safe, so the primary mission objective initially
11 would be scene stabilization.
12     **Q**  There are three law enforcement encounters
13 that a law enforcement officer can have, correct?
14     **A**  Generally.
15     **Q**  Arrest?
16     **A**  Detention and then consensual encounter.
17 There may be something else out there, but those are
18 the three we mostly operate under.
19     **Q**  How does investigatory stop, where does that
20 fit into the matrix?
21     **A**  It's a detention.  I mean, that's the
22 answer, it's a detention.
23     **Q**  If there is an investigatory stop, is there
24 probable cause that a crime has been committed?
25     **A**  Not necessarily.  I mean, in most cases it's

---

**51**

1  lower than that, but you could have probable cause,
2  but go ahead and just handle it as a detention to
3  investigate.
4      **Q**  Was there probable cause to arrest Mr. Moore
5  based solely on the telephone calls of the Ferguson
6  Police Department from the citizenry?
7      **A**  I think from the 911 calls and what was
8  dispatched, and the officer arriving, I think there
9  would have been probable cause to make an arrest if
10 the officer had chose to.
11     **Q**  For what offense or crime?
12     **A**  There would have been a number.  It would
13 have met the burden of probable cause, and to
14 clarify, not necessarily saying an officer would
15 have done that.  But under Missouri statute, you
16 would have at least an exposure, you could have
17 obstruction of traffic, you could have a peace
18 disturbance.  There are a number of things that
19 conceivably you could have the elements of a crime
20 and probable cause to arrest.
21     **Q**  Do you know whether the City of Ferguson in
22 its code of ordinances as of September of 2011 had
23 an ordinance concerning indecent exposure?
24     **A**  I just don't know if they did or not.  I
25 know the state statute is there.

---

**52**

1      **Q**  And the state statute, the similar provision
2  at least existing at one point in our lifetime in
3  Missouri, was 566.130?
4      **A**  I will believe that's correct, sir.
5      **Q**  It's now been codified into 566.093.
6          Any reason to dispute that, sir?
7      **A**  No, sir, I don't.
8      **Q**  The Ferguson ordinance on indecent exposure,
9  I'll represent to you, it cites to a similar
10 provision under Missouri law and it states, "A
11 person commits the offense of indecent exposure if
12 he" I guess she can do it "knowingly exposes his
13 genitals under circumstances in which he knows that
14 his conduct is likely to cause affront or alarm."
15          Based on your background, training,
16 experience in law enforcement, is that a fair
17 characterization of indecent exposure?
18     **A**  It is, sir.
19     **Q**  And under Missouri law, that offense, if
20 committed, is a Class B misdemeanor?
21     **A**  Agreed.
22     **Q**  Class A if it's done more than once?
23     **A**  Agreed.
24     **Q**  So is it your understanding in this matter
25 that Mr. Moore, at least through the contact made by

---

13  (Pages 49 to 52)

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                March 8, 2016

---

53

1  the citizenry to the Ferguson Police Department, had
2  been accused of violating a municipal code?
3      A  Well, from the citizen contacting, I don't
4  think they know municipal from state statute, but
5  those elements we discussed and I left one out.
6  Conceivably an assault where you have citizens on
7  the roadway with that suspect, I'm confident many
8  would be having the elements, not that they're you
9  know, physically threatened, but they would be
10 alarmed and fear, et cetera, so you would have other
11 elements including assault, but I don't know if
12 citizens get that.  The officers would.
13     Q  What facts did Mr. -- Officer Kaminski have
14 that suggested that Mr. Moore had committed assault
15 on a person prior to him arriving at the scene the
16 morning of September 17?
17     A  The only thing he would have had, and again
18 we're talking probable cause which is relatively
19 weak, would be that a naked individual in the
20 roadway hitting on vehicles.
21         When you look at the Missouri statute
22 elements of assault, that would certainly create
23 fear and affront and alarm.  Would we ultimately
24 prosecute someone for that, probably not, but I
25 think the elements would be there.

---

54

1      Q  You agree that Officer Kaminski spoke to one
2  citizen on the street before arriving at the scene?
3      A  Yes, sir.  There was a black female driver
4  just moments before that he interacted with.
5      Q  Officer Kaminski described this black female
6  as not frightened, true?
7      A  I believe that's what he said, right.
8      Q  And the call Officer Kaminski received was
9  for a naked man beating on cars?
10     A  Yes, sir, correct.
11     Q  The very first document that the defendants
12 produced in this case is the face or cover sheet of
13 the Ferguson Police Department Investigative Report.
14         You recall seeing this report,
15 correct?
16     A  I have read that, yes, sir.
17     Q  In the upper left hand portion of Bates
18 Number 1 produced by Ferguson in this case, the
19 offense cited as assault third slash indecent
20 exposure.
21         Did I read that correctly?
22     A  I don't have it in front of me, but I
23 believe that's what it said.
24     Q  And I apologize, I don't have more than one
25 copy, but I'll represent to you that's what it says?

---

55

1      A  True.
2      Q  And surely, based on your review of the
3  materials in this case, you have reviewed this
4  report?
5      A  I have.
6      Q  The assault third, did you gain an
7  understanding from your review of records in this
8  case, that this was being reported as a third degree
9  assault on Officer Kaminski?
10     A  Correct.
11     Q  And the indecent exposure obviously would be
12 related to the fact that we had a naked man running
13 around?
14     A  Yes, sir.
15     Q  In your background, training and experience
16 working in law enforcement in the State of Missouri,
17 are the two offenses cited on Ferguson based on one,
18 misdemeanor level offenses?
19     A  They are, sir.
20     Q  Was any of the conduct engaged in by Mr.
21 Moore that was the subject of the statements made by
22 the citizenry to the Ferguson Police Department
23 dispatch committed in Officer Kaminski's presence?
24     A  The only one obviously would be the nudity.
25     Q  Were any -- was any of that conduct engaged

---

56

1  in by Mr. Moore that was the subject of the
2  statements made by the citizenry to the Ferguson
3  Police Department committed in any, in the presence
4  of any Ferguson Police Department officer prior to
5  Officer Kaminski arriving at the scene of North
6  Marguerite and Airport?
7      A  No, sir.
8      Q  In Missouri, in 2011, could Officer Kaminski
9  have arrested Mr. Moore for indecent exposure based
10 only on the citizenry telephone calls to the police
11 department?
12     A  He could have.  You're saying if he arrived
13 and found him clothed could he have?
14     Q  Sure.
15     A  Sure, he could have.
16     Q  When Mr. -- when Officer Kaminski arrived at
17 North Marguerite and Airport, were there any
18 citizens in the area other than Mr. Moore?
19     A  I can only say that the officer at that
20 point had characterized the traffic as for that
21 morning heavy, but I don't recall if there was
22 anyone else on foot that he saw.
23     Q  And consistent with your obligations to
24 objectively look at the facts presented to you,
25 there is some conflict as to the description of the

---

14  (Pages 53 to 56)

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                        March 8, 2016

---

**57**

1    traffic patterns that morning, correct?
2        **A**   Yes, sir.  I could clarify if you want me
3    to, but yes, the answer is yes.
4        **Q**   Absolutely.
5        **A**   I recall Officer White saying that his lane
6    of traffic was in his mind very light and then you
7    likewise have the witnesses, citizen witnesses, who
8    said that it's always a busy area and then
9    Lieutenant Ballard testifying that he was directing
10   traffic, but ultimately what matters is what
11   Kaminski had when he was there at that moment, and
12   of course, no one knows that but Kaminski.
13       **Q**   Because the other witness to that law
14   enforcement encounter is deceased?
15       **A**   That's correct, sir.
16       **Q**   When Officer Kaminski arrived to the scene
17   of the encounter with Mr. Moore, he knew that there
18   were other Officers dispatched on this occurrence,
19   correct?
20       **A**   He did.
21       **Q**   Through your review of dispatch records or
22   reports or other documents presented to you, do you
23   have an understanding how many different Officers in
24   this quadrant or section or however they describe it
25   or the zone or the beat that Ferguson had in

---

**58**

1    September of 2011, how many different officers were
2    dispatched on this particular call?
3        **A**   I don't recall how many were dispatched.  I
4    believe that four ultimately arrived and frequently
5    officers will show up who weren't dispatched, so I
6    can't give you an exact number.
7        **Q**   Were there any citizens, other than Mr.
8    Moore, in harm's way as you write in your report
9    when Officer Kaminski first encountered him?
10       **A**   I would answer yes, generally, that being
11   any motorist who would have drove along who he might
12   have jumped out in front of, and I'm talking
13   hypothetically because we don't know that to have
14   occurred, so the harm is a potential harm, not an
15   inherent one as though someone was standing right
16   next to him.
17       **Q**   Sure.  When Officer Kaminski first arrived
18   to the encounter with Mr. Moore, you write that Mr.
19   Moore was in immediate danger.
20            Did I read that correctly, sir?
21       **A**   I believe so.
22       **Q**   How was Mr. Moore in immediate danger upon
23   Officer Kaminski's initial arrival to this law
24   enforcement encounter?
25       **A**   It's my opinion, if you're standing along a

---

**59**

1    traffic roadway in the condition where you might be
2    jumping in and out of traffic, that places you in
3    harm or potential danger.
4        **Q**   Tell me all the evidence you relied on in
5    this case that the law enforcement encounter between
6    Mr. Moore and Officer Kaminski was tense?
7        **A**   The -- the evidence I'm relying on would
8    mostly be personal knowledge, training and
9    experience.  When you receive a call of that nature,
10   though it isn't unheard of, it's not a regular daily
11   call that a naked person is jumping in and out of
12   traffic and slamming on vehicles, and just to be
13   candid, persons in that particular circumstance are
14   unpredictable and I guess my answer would be mostly
15   on personal experience there's tension there and
16   concern about what this person might do and what
17   they might do with other citizens, so it's simply
18   not a calm call for service because it's an unusual
19   call for service.
20       **Q**   And would you rely on the same background,
21   training and experience in general evidence to
22   describe this situation as uncertain?
23       **A**   I would, sir.
24       **Q**   And rapidly evolving?
25       **A**   It wasn't rapidly evolving immediately.  It

---

**60**

1    became rapidly evolving, but yes, sir, that's
2    correct.
3        **Q**   When Officer Kaminski first arrived, there
4    is no evidence that Mr. Moore had injured a person?
5        **A**   No, sir.
6        **Q**   Including himself?
7        **A**   Correct.
8        **Q**   When Officer Kaminski first arrived to the
9    scene of the encounter at or about the intersection
10   of North Marguerite and Airport Road, he did not
11   have information from citizens he spoke with that
12   led him to believe that any citizens were at an
13   imminent risk of harm by Mr. Moore?
14       **A**   I agree.
15       **Q**   When Officer Kaminski first arrived at the
16   scene, did Jason Moore pose an imminent risk of harm
17   to Officer Kaminski?
18       **A**   No, sir.
19       **Q**   Did Officer Kaminski radio dispatch with the
20   City of Ferguson to determine whether Officers
21   White, Bebe or other law enforcement personnel as to
22   their locations before he encountered Mr. Moore?
23       **A**   I don't believe that he did.
24       **Q**   When Officer Kaminski first arrived to the
25   scene of his encounter with Mr. Moore, would you

---

15  (Pages 57 to 60)

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                                    March 8, 2016

---

**61**

1  agree with me that Mr. Moore was displaying evidence
2  of a psyche or medical emergency situation?
3      **A**  From a police officer's perspective, I would
4  not.
5      **Q**  Would you agree with me that, when Officer
6  Kaminski first arrived to the encounter with Mr.
7  Moore, that Mr. Moore was naked?
8      **A**  I would agree with that.
9      **Q**  That Officer Kaminski had heard that he was
10  running around in the street?
11      **A**  Correct, sir.
12      **Q**  That officers with the City of Ferguson had
13  heard Mr. Moore yelling I am King?
14      **A**  At the point that he arrived officers had
15  heard that?
16      **Q**  Yes.
17      **A**  I'm not aware of that that officers heard
18  that before Kaminski arrived.
19      **Q**  That officers had heard that Mr. Moore was
20  beating on property?
21      **A**  That was dispatched to them, yes, sir.
22      **Q**  When Officer Kaminski first arrived to the
23  scene of this encounter with Mr. Moore, Mr. Moore
24  was mumbling?
25      **A**  I believe so, yes, sir.

---

**62**

1      **Q**  Is mumbling evidence or a verbal cue
2  associated with a person in psyche or medical
3  emergency or a psyche or medical situation?
4          MS. SHAFAIE:  Object to foundation.  You can
5  answer.
6      **A**  I would simply say that an officer, a
7  reasonably trained prudent officer in Missouri would
8  characterize that as unusual there.  Statistical
9  common sense what that probably is is more likely a
10  drug-induced problem, but certainly an officer can't
11  say for certain.
12          So your description of that
13  particular characteristic I would simply say an
14  officer would recognize that as unusual but, as far
15  as a diagnosis there at the patrol car, I don't
16  think that's going to happen.
17      **Q**  What were the differential diagnoses that
18  Officer Kaminski thought of Mr. Moore when he first
19  encountered him?
20      **A**  Potentially mentally ill on some type of
21  drugs or alcohol, that sort of thing.
22      **Q**  Can mumbling be a verbal cue of a person in
23  a psyche or medical emergency?
24          MS. SHAFAIE:  Foundation.  You can answer.
25      **A**  Yes, sir.

---

**63**

1      **Q**  When Officer Kaminski first encountered Mr.
2  Moore, Mr. Moore did not possess a weapon?
3      **A**  Never did that I know of.
4      **Q**  Based on your review of the documents and
5  evidence in this case, did Mr. Moore ever possess a
6  weapon such as a handgun?
7      **A**  No, sir.
8      **Q**  Or firearm?
9      **A**  No, sir.
10      **Q**  Knife?
11      **A**  No, sir.
12      **Q**  When Officer Kaminski first encountered Mr.
13  Moore, he was 25 to 30 feet away from Mr. Moore,
14  true?
15      **A**  Approximately, yes, sir.
16      **Q**  And where was Mr. Moore positioned with
17  respect to any vehicles whether they be vehicles
18  operating on Airport Road or vehicles that were
19  located in the parking lot where this encounter
20  occurred?
21      **A**  I don't recall any reference to vehicles on
22  the roadway at that particular moment, nor do I on
23  any parked in the parking lot.
24      **Q**  How far from the roadway was Mr. Moore when
25  Officer Kaminski first encountered him September

---

**64**

1  17th?
2      **A**  I think he was right along the curb.
3      **Q**  Would that be the curb adjacent to Airport
4  Road?
5      **A**  I believe so.
6      **Q**  This case involves a use of force, true?
7      **A**  It does, sir.
8      **Q**  This case involves the use of force
9  involving a TASER?
10      **A**  It does, sir.
11      **Q**  Is there a specific model of TASER that this
12  case involves?
13      **A**  An X26.
14      **Q**  What's the difference, and without getting
15  too technical, between the X26 and the M26?
16      **A**  The primary difference and I will avoid
17  technical info.  I'll just say that TASER claims
18  there's circuitry from M to X has dramatically
19  improved, more efficient.  It provides enhanced
20  download data capability and it uses a different
21  kind of battery system.  That's pretty much it.
22      **Q**  Is a generic way of saying that the M26 was
23  the predecessor to the X26?
24      **A**  It is.
25      **Q**  You wrote about the M26, true?

Gore Perry Reporting and Video

FAX 314-241-6750                    314-241-6750                    www.goreperry.com

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                    March 8, 2016

---

65

1    **A**  I did.
2    **Q**  You described it as hand-held lightning?
3    **A**  I think that's what the article was titled.
4    **Q**  Your article?
5    **A**  My article.
6    **Q**  You reviewed the Ferguson use of force
7    policy?
8    **A**  I did.
9    **Q**  And did you review the Ferguson use of force
10   policy as it relates to the use of the TASER ECW?
11   **A**  I did, sir.
12   **Q**  What training did Officer Kaminski receive
13   through the Ferguson Police Department agency only
14   as it relates to the use of the TASER?
15   **A**  He was a Taser instructor that was
16   coordinated by the agency.  I don't recall if the
17   master instructor was a Ferguson person or not, but
18   he was an instructor at the time of this incident.
19   **Q**  Did your review of the materials indicate
20   that the City of Ferguson utilized any training on
21   the use of the Taser ECW as promulgated by IACP?
22   **A**  Not that I'm aware of.
23   **Q**  Or PERF?
24   **A**  Not that I'm aware of.
25   **Q**  Or TASER International?

---

66

1    **A**  I think the training material would have
2    been TASER's Version 17 which continues today to be
3    basically the gold standard.  The manufacturer
4    training of what pretty much everybody does.
5    **Q**  Is the Version 17 of TASER International's
6    literature on its devices, was that the version in
7    effect as of September 17, 2011?
8    **A**  Yes, sir, I believe it was.
9    **Q**  What evidence did you see in this case that
10   Officer Kaminski was educated on the most recent
11   version of TASER International's literature on its
12   product prior to September 17, 2011?
13   **A**  The only thing I had was the Version 17
14   handout which was what I believe was in effect from
15   2010 until 2012.
16   **Q**  Do you know whether or not officers with the
17   Ferguson Police Department would have been trained
18   that TASERS are not authorized to gain compliance
19   where there is no imminent physical threat?
20   **A**  That's consistent with the lesson plan and
21   if we're assuming that they actually got every slide
22   of the lesson plan they would have been trained in
23   that.
24   **Q**  Do you know whether or not officers within
25   the Ferguson Police Department would have been

---

67

1    trained that TASERs are not authorized to coerce
2    compliance when there is no imminent physical
3    threat?
4    **A**  I would have to answer that the same way,
5    sir.
6    **Q**  Did the Ferguson Police Department adopt
7    IACP policy that, if you're firing the ECW, the
8    officer shall engage the subject in the least number
9    of times and no longer necessary to accomplish the
10   legitimate operational objective?
11   **A**  In the first part of that, sir, are you
12   saying in this case is what they did?
13   **Q**  Right.
14   **A**  I believe so.
15   **Q**  And did they adopt that through their use of
16   force policies, their standing orders?
17   **A**  I don't recall if that was specifically
18   referenced in their -- their policy.
19   **Q**  What on the use of force continuum that
20   Ferguson had in effect as of September of 2011,
21   where did the TASER fall into that use of force
22   continuum, sir?
23   **A**  I believe they had it characterized as an
24   intermediate weapon.
25   **Q**  Are you familiar with the warning from TASER

---

68

1    International with regard to the use of the TASER in
2    and around the upper chest air area?
3    **A**  I am, sir.
4    **Q**  When did that first come into effect in your
5    field?
6    **A**  November 2010.
7    **Q**  Do you have an understanding or have you
8    gained an understanding based on your work in this
9    field why TASER International issued that warning?
10   **A**  Yes, sir.
11   **Q**  What is that?
12   **A**  I believe that TASER in November of 2010
13   made the chest area not a quote preferred target but
14   a prohibited target because they believed that there
15   was evidence that shots, as it relates to their
16   terminology heart to dart proximity, increased the
17   possibility of a negative outcome and I think that's
18   the reason they did that.
19   **Q**  Negative outcome including serious injury or
20   death?
21   **A**  Correct.
22   **Q**  And as of September 2011, do you know if the
23   standing orders within the Ferguson Police
24   Department attempted to incorporate that warning by
25   TASER International into their use of force

---

17  (Pages 65 to 68)

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                                    March 8, 2016

---

69

1  policies?
2     **A**  I don't believe it was written down the
3  policies, no, sir.
4     **Q**  Was it even referenced through a diagram or
5  through a schematic in those policies?
6     **A**  Not on the policies.  It would have been in
7  the training, again, assuming that the version put
8  forth was in fact taught and I believe that it was.
9     **Q**  The TASER X26 has if it's used in the probe
10  function, there are two probes, is that correct,
11  sir?
12     **A**  Yes, sir.
13     **Q**  Do you define or identify those probes as an
14  upper probe, lower probe, controlled probe,
15  non-controlled probe?  Are there definitional --
16     **A**  Top and bottom.
17     **Q**  -- top and bottom?
18     **A**  That would describe it, yes, sir.
19     **Q**  And when an individual sights or aims the
20  TASER X26, which of those probes is supposed to go
21  where the sight is aimed?
22     **A**  The top row.
23     **Q**  And the top to me means the spread on those
24  probes means the top would be on the top and the
25  bottom would be on the bottom?

---

70

1     **A**  Yes, sir.  The top probe in theory is
2  aligned with the sights and the laser, and the
3  bottom probe leads at an 8-degree angle.  So if the
4  device is held perfectly straight for about every
5  7 feet you fly, you get about a 12-inch spread.
6     **Q**  So absent malfunction, the top probe would
7  enter and anchor into the individual above the lower
8  probe?
9     **A**  It should always unless the device is turned
10  in some odd fashion, yes, sir.
11     **Q**  Upside down, sideways?
12     **A**  Yes, sir.  Certainly.
13     **Q**  Officers are trained to hold it up and down?
14     **A**  And avoid canting it so the idea is to hold
15  it straight up and down, yes, sir.
16     **Q**  The top probe in this case was in Mr.
17  Moore's left upper chest area, true?
18     **A**  In my opinion, yes, sir, that would be the
19  top probe.
20     **Q**  The lower probe was in his -- near his groin
21  or his hip area, true?
22     **A**  Yes, sir.
23     **Q**  You reviewed photographs in this case of Mr.
24  Moore in his autopsy, correct?
25     **A**  I believe that I did.

---

71

1     **Q**  And your review of the testimony in this
2  case is that -- and the documents, I'm sorry, is it
3  Officer Kaminski fired his TASER X26 at Mr. Moore
4  from a distance of 8 to 10 feet?
5     **A**  I believe so.
6     **Q**  Did your review of the documents and
7  testimony in this case indicate that there were any
8  officers at the scene of the occurrence with Officer
9  Kaminski before he discharged his TASER ECW for the
10  first time?
11     **A**  No, sir.
12     **Q**  The second time?
13     **A**  Not for the material I reviewed, no, sir.
14     **Q**  The third time?
15     **A**  I believe, based on the material I reviewed,
16  White would have been arriving, but probably not out
17  of his vehicle at about the third time.
18     **Q**  The fourth time?
19     **A**  I think he was running up while the fourth
20  was in progress and that's when he was able to
21  handcuff under power.
22     **Q**  He, meaning Officer White?
23     **A**  Yes, sir.
24     **Q**  The fifth time?
25     **A**  I don't think there was a fifth.

---

72

1     **Q**  You think there were four cycles?
2     **A**  I think that's what the download data
3  reveals, yes, sir.
4     **Q**  Did you listen to the citizenry calls to the
5  Ferguson dispatch or communications department
6  September 17, 2011?
7     **A**  I listened to all of them, yes, sir.
8     **Q**  Do you recall the 6:51 and 50 second call
9  where the Ferguson dispatch or communications
10  individual indicated that officers are out there?
11     **A**  I do recall a male dispatch call taker
12  answering a number of questions and, as you
13  mentioned that one, I actually do now recall what I
14  think was probably not accurate.  I think he meant
15  officers are on the way, but the timing of that I
16  recall thinking there was a reference made to
17  officers being there when in fact they were still
18  getting calls, if that's what you're asking.
19          I believe there was a bit of a
20  conflict in my mind that certainly the evidence
21  doesn't indicate to be factual.  It was a person
22  responding to lots of calls who was basically
23  hanging up and answering one after another we're
24  coming, et cetera.
25     **Q**  I'll be more specific then.  There is a call

---

Gore Perry Reporting and Video

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                                    March 8, 2016

---

73

1  two minutes later at 6:53:10.
2       Do you recall that Ferguson
3  communications or dispatch person indicating to the
4  citizen that officers are out there with him now?
5     A  I do.
6     Q  And that dispatcher is a Ferguson Police
7  Department employee as you understand it, correct?
8     A  I believe so.
9     Q  The first use or initial deployment or
10 application of the TASER ECW in this case is at
11 6:53:17.
12       Is that what the download data shows?
13    A  That is what the date time stamp is on the
14 TASER itself, yes, sir.
15    Q  So if you were to attempt to correlate or
16 coalesce the 6:53 at 10 second call that said
17 officers are out there with him now, and the first
18 use of the TASER seven seconds later, that would
19 mean that a Ferguson Police Department employee is
20 using his TASER weapon on Mr. Moore seven seconds
21 after a Ferguson Police Department employee informs
22 the public that officers are out there with him now?
23    MS. SHAFIE:  Object to form and foundation.
24 You can answer.
25    A  That would have to assume, sir, that the

---

74

1  TASER clock time was accurate with the dispatch time
2  which, in my experience, never occurs.
3     Q  (By Mr. Johnson) If it is accurate, it is
4  more than three minutes after Officer White writes
5  down in his report that at 6:50 a.m. he is at North
6  Marguerite and Airport Road?
7     A  If it's assumed those times are accurate,
8  that would be true.
9     Q  Mr. Moore did not physically batter Officer
10 Kaminski, did he?
11    A  He did not.
12    Q  Did he physically batter Officer White?
13    A  He did not.
14    Q  Did he physically batter any Ferguson Police
15 Department Officer September 17, 2011?
16    A  No, sir.
17    Q  Did he physically injury any member of the
18 public or any citizen on that date?
19    A  No, sir.
20    Q  The first application of the TASER, the top
21 probe connected with Mr. Moore in his upper left
22 chest area?
23    A  Yes, sir.
24    Q  Near his heart?
25    A  Yes, sir.

---

75

1     Q  What was the probe spread of the two darts
2  that struck Mr. Moore?
3     A  I think it's about 2 feet.
4     Q  Is there a spread distance that results in
5  solid neuromusculature incapacitation, sir?
6     A  It does vary on individuals but, in my
7  opinion, less than 12 inches is not likely to result
8  in that.
9     Q  And what was the spread distance between the
10 upper probe and lower probe top dart and lower dart
11 in this case?
12    A  I think about 2 feet.
13    Q  Did Mr. Moore go to the ground after the
14 first application?
15    A  He did, sir.
16    Q  Did he brace himself before he struck the
17 pavement?
18    A  He did not that I'm aware of.
19    Q  You agree that Mr. Moore experienced
20 neuromuscular incapacitation to some degree after
21 the first deployment of the TASER?
22    A  I think it was effective based on what the
23 officer said.
24    Q  The evidence in this case is that Kaminski
25 observed Mr. Moore lock up after the first use,

---

76

1  correct?
2     A  Yes, sir.
3     Q  At no point did Mr. Moore fully rise to his
4  feet after the first application of the TASER,
5  correct?
6     A  I don't believe so.
7     Q  After the first application of the TASER by
8  Officer Kaminski, Mr. Moore did not attempt to flee?
9     A  I can only say that the officer's perception
10 was he was attempting to get backup.  I don't know
11 what he intended to do.
12    Q  You believe that PERF says you cannot use a
13 TASER on a fleeing suspect when flight alone is the
14 only reason you are using it?
15    A  That's what PERF says, yes, sir.
16    Q  And that was in effect that PERF policy
17 generically, generally was in effect as of
18 September 17, 2011?
19    A  That was a PERF guideline at that point,
20 yes, sir.
21    Q  In other words, you can't tase the runner?
22    A  For only running, I agree with that.
23    Q  After the first application of the TASER by
24 Officer Kaminski, Mr. Moore did not continue to
25 assault him, did he?

Gore Perry Reporting and Video

FAX 314-241-6750                    314-241-6750                    www.goreperry.com

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                    March 8, 2016

---

77

1    **A**  I think the officer's testimony is that his
2    attempts to get back up caused him to be concerned
3    that the assault that he had previously observed
4    would continue, but I don't think he ever was back
5    into a position to attempt to throw punches, that
6    sort of thing.
7        **Q**  The only bodily movements that Officer
8    Kaminski observed after his first use of the TASER
9    was Mr. Moore getting up to his hands and knees,
10   true?
11       **A**  That's true, sir.
12       **Q**  No blows were thrown at any point once Mr.
13   Moore was down on his chest, hands and knees?
14       **A**  No, sir.
15       **Q**  Officer Kaminski described Mr. Moore after
16   the first use of the TASER as on his knees with his
17   torso facing the ground, correct?
18       **A**  Correct, sir.
19       **Q**  And his torso was approximately 6 inches
20   from the pavement after the first use of the TASER,
21   true?
22       **A**  I just don't recall that.  I believe you.  I
23   just don't recall that from memory.
24       **Q**  The evidence you reviewed in this case is
25   that at no point did Mr. Moore ever rise completely

---

78

1    to his knees?
2        **A**  He did not.  Or to his knees?
3        **Q**  Yes, sir.  That's an important question.
4    Let me rephrase it.
5        **A**  Okay.
6        **Q**  At no point after the first deployment of
7    the TASER by Officer Kaminski did Mr. Moore rise to
8    where his knees only were on the ground as opposed
9    to his hands and knees?
10       **A**  I agree, sir.
11       **Q**  Mr. Moore did not lunge at Officer Kaminski
12   after the first use of the TASER?
13       **A**  No, sir.
14       **Q**  His hands were never clenched after the
15   first use of the TASER, correct?
16       **A**  Correct.
17       **Q**  You agree that each use of force must
18   contain an independent justification for using that
19   force?
20       **A**  I do, sir.
21       **Q**  So as we apply it to the facts that you've
22   been hired on, the four times that Officer Kaminski
23   used the TASER X26 on Mr. Moore, each of those four
24   occasions where force was used have to contain an
25   independent justification for that force?

---

79

1        **A**  They do, sir.
2        **Q**  Once the TASER was used a second time on Mr.
3    Moore, you agree that the evidence showed Mr. Moore
4    stiffened up?
5        **A**  Yes, sir.
6        **Q**  Would that cause you to believe that he
7    experienced neuromuscular incapacitation to some
8    degree after the use the second time?
9        **A**  It would.
10       **Q**  Did your review of records in this case
11   indicate that Officer Kaminski was giving commands
12   to Mr. Moore while he was using the TASER on him?
13       **A**  Yes, sir.
14       **Q**  Did you review Officer White's deposition in
15   this case, sir?
16       **A**  Yes, sir.
17       **Q**  And you agree with me that Officer White's
18   testimony was that, when he first arrived to the
19   scene of the encounter between Officer Kaminski and
20   Mr. Moore, Mr. Moore was on his back at a distance
21   of 5 feet from Officer Kaminski with a probe in his
22   chest area?
23       **A**  I agree with everything except the end.  I
24   don't recall that Officer White ever said he saw the
25   probe location until he had rolled him over during

---

80

1    the handcuffing process.
2        **Q**  You agree that the first time Officer White
3    observed Officer Kaminski and Mr. Moore in some
4    proximity to each other, he was approximately 200
5    feet away while exiting his vehicle?
6        **A**  Again, sir, just to be accurate, I don't
7    think he exited from 200 feet or he certainly
8    wouldn't have got there during the TASER cycle.  I
9    think he was 100 or 200 away in his vehicle and I
10   think he drove much closer, but that is the first
11   time I think he said he laid eyes on him from about
12   that distance.
13       **Q**  The IACP that you have been affiliated with
14   in the past, correct, sir?
15       **A**  Yes, sir.
16       **Q**  Do their guidelines and materials indicate
17   that an Officer must have grounds to arrest or
18   detain and based on the totality of the
19   circumstances that the Officer believes a physical
20   altercation is about to occur?
21       **A**  I think that's verbatim out of the model
22   policy.
23       **Q**  The TASER takes the fight out of the fire?
24       **A**  That's the plan.  That's the theory.
25       **Q**  You don't use a TASER once the blows are

---

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                           March 8, 2016

---

81

1  already thrown?
2     A  Well, I mean, you do to stop a continuous
3  assault.  I mean, there are cases where on this case
4  where you are approaching with fists and we use the
5  TASER, but then, once you start to get up, if there
6  is concern about the recurring of the threat, you
7  would sure it.  I hope I'm being responsive.  But
8  just because blows are thrown doesn't mean you stop
9  using the TASER.
10          The idea there is to reduce the
11  probabilty of injury to all involved.  So if they
12  are still combative or reasonably believed to be,
13  you might use it again.
14     Q  You agree that a TASER should not be used on
15  an individual displaying passive resistance?
16     A  I do agree with that.
17     Q  Passive resistance meaning non-compliance
18  that doesn't help or hurt the officer's efforts.
19     A  That sounds very familiar language.
20     Q  It should be.  Passive resistance meaning
21  you don't cooperate, you don't physically try to
22  hurt the officer or assault the officer?
23     A  I agree, sir.
24     Q  That's passive resistance.
25     A  I agree.

---

82

1     Q  Another definition is you don't do what
2  you're told to do?
3     A  Yeah, I agree.
4     Q  And agencies you have worked with believe
5  that, that a TASER should not be used on passive
6  resisters.
7          This goes back to 2001 or 2002 in
8  your experience?
9     A  Well, there was a big transition.  Certainly
10  I've advocated that forever, but in the early 2000s,
11  agencies that were advocating policy and training on
12  passive, thankfully began to transition away from
13  that.
14     Q  After the first use of the TASER by Officer
15  Kaminski, is it your opinion that Mr. Moore was
16  actively or verbally assaulting Officer Kaminski
17  from his hands and knees?
18     A  He was not assaulting him in my opinion in
19  the same context as when he was advancing, but a
20  reasonable officer in that circumstance as a person
21  is believed to be trying to regain their feet would
22  be perceiving that to be an immediate threat in that
23  you are preventing the continuation of the assault
24  that got him to the ground in the first place.
25     Q  What commands was Officer Kaminski

---

83

1  administering to Mr. Moore after the first use of
2  the TASER and while Mr. Moore was on the ground?
3     A  Stay on the ground, lay flat, get on the
4  ground.  I think that was repetitively what he was
5  saying.
6     Q  Mr. Moore's acts then after those commands
7  were given or administered would be Mr. Moore not
8  doing what he was told to do?
9     A  It would be non-compliance with that, but
10  that's not why you tase him.  He's tased to prevent
11  that non-compliance from turning into assaultive
12  behavior.
13     Q  So while he was on his hands and knees,
14  torso 6 inches away from the ground, was he actively
15  and overtly assaulting Officer Kaminski at that
16  point?
17     A  Based on your question, sir, my answer would
18  be no.
19     Q  When Mr. Moore is on his back 5 feet away
20  from Officer Kaminski, is he actively and overtly
21  assaulting Officer Kaminski at that point?
22     A  Is he under the TASER cycle at that moment?
23     Q  Well, you reviewed Mr. White's testimony?
24  Officer White, I'm sorry.
25     A  Right.

---

84

1     Q  When Officer White said he observed Mr.
2  Moore on his back 5 feet away from Officer Kaminski,
3  at that point with that observation, was Mr. Moore
4  actively and overtly assaulting Officer Kaminski?
5     A  He would not be.
6     Q  You agree that the Ferguson use of force
7  policy, Deposition Exhibit 8, in existence as of
8  September of 2011 does not permit a TASER to be used
9  against an individual who may engage in an overt act
10  of assault?
11     A  I'm not following your question, sir.
12     Q  Let me rephrase it.  You agree that the
13  level of resistance required to use an advanced
14  TASER ECW by a Ferguson Police Department officer in
15  September of 2011 needed an overt action of assault?
16     A  Yes, sir, I do.
17     Q  Is there anything in the documents you
18  reviewed, sir, that indicates Mr. Moore overtly
19  attacked Officer Kaminski after the first TASER
20  deployment?
21     A  My answer would be, sir, that attempts to
22  get backup in the face of commands to do otherwise
23  following the initial assault would cause a
24  reasonable officer to perceive that, under the
25  language of assault, that that activity is in

---

Gore Perry Reporting and Video

FAX 314-241-6750                314-241-6750                www.goreperry.com

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                          March 8, 2016

---

85

1  furtherance of regaining speed to assault him.
2         So my answer would be he's not
3  directly punching, kicking, et cetera when he's in
4  that position, but immediately trying to get backup
5  when you are told to stay down would cause a
6  reasonable officer to believe that the TASER use
7  would be preventing further assaultive behavior.
8     Q    Mr. Moore is engaging in non-assaultive
9  behavior when he's on his hands and knees, true?
10        MR. DOWD:  I also move that that prior
11  answer be stricken as non-responsive.  Go ahead, I'm
12  sorry.
13     A    I don't want to just split hairs on the
14  definition of assault.  At what point does your
15  attempt to get back up become a physical assault.  I
16  would simply say that his attempts to regain his
17  feet is a part of an officer would perceive that
18  reasonably as a part of an ongoing and continuous
19  process of assaultive behavior, but to be
20  responsive, he's not punching at that moment, but
21  we're talking about a second in time when, as they
22  regain their feet, a reasonable officer would
23  believe that that behavior would continue.
24     Q    (By Mr. Johnson) You raise an interesting
25  point.

---

86

1         How much time elapsed between the
2  various uses of the TASER ECW by Officer Kaminski?
3     A    A second on the final three.  The first one,
4  the TASER computer actually rounds depending on
5  where in the cycle, so it could be up or down, but
6  I'll say the first one was a second or less.
7  Basically, a release and a re-application almost
8  instantly.
9     Q    And the evidence provided through the
10  testimony of Officer Kaminski is that in between the
11  applications or deployments of the TASER ECW in this
12  case, what conduct was Officer Kaminski engaging in
13  between the uses or the cycles of the TASER ECW?
14     A    He testified that he was giving commands to
15  stay down during the cycles and continuing between
16  the cycles.
17     Q    Each use of force exercised by Officer
18  Kaminski required a separate threat assessment,
19  true?
20     A    I believe so.
21     Q    The proper procedure is to give time for the
22  person to hear the commands, correct?
23     A    That's the preferred procedure, yes, sir.
24     Q    Give him specific directions for submission?
25     A    Correct.

---

87

1     Q    And give him specific directions for what
2  they're supposed to do?
3     A    If it's practical to do that, yes, sir.
4     Q    Applying that to the facts at hand, that
5  would be to get on your stomach, put your hands
6  behind your back and then ideally Officer Kaminski
7  could safely move forward to cuff the suspect?
8     A    In a perfect world, yes, sir.
9     Q    When a TASER is deployed, does it always --
10  almost always lock a person up to a varying agreeing
11  of NMI, neuromuscular incapacitation?
12     A    It depends on probe spread, but my response
13  would be generally it's one of the most reliable
14  tools we have, so most always it does that if you
15  have adequate probe spread and it is functioning
16  properly.
17     Q    Are you familiar with the concept or phrase
18  of cuffing under power?
19     A    Very familiar.
20     Q    What does what mean in your field, sir?
21     A    It means when two officers are present, that
22  when possible, the second officer, the contact
23  officer would move during the cycle to secure the
24  person because they will have the least opportunity
25  to physically resist the handcuffing during that

---

88

1  cycle.
2     Q    At any point following the first TASER
3  deployment, did Officer Kaminski attempt to close
4  the gap between himself and Mr. Moore?
5     A    He didn't, no, sir.
6     Q    At any point after the first TASER
7  deployment, did Officer Kaminski attempt to
8  handcuff, Mr. Moore?
9     A    No, sir.
10     Q    Did Officer Kaminski even attempt to cuff
11  Mr. Moore while he was under the power of the TASER
12  ECW?
13     A    He did not, no,sir.
14     Q    If you believe that Officer White was not on
15  the scene when Officer Kaminski first entered Mr.
16  Moore, which you believe, correct?
17     A    That's right.
18     Q    Would that mean that Officer Kaminski never
19  waited for backup to arrive before he interacted
20  with Mr. Moore?
21     A    That would be accurate.
22     Q    Can other officers arrive to the scene such
23  as Officers White or Bebe under these facts, could
24  have assisted in dealing with Mr. Moore?
25     A    If they were there?

---

22  (Pages 85 to 88)

89

1   **Q**  Sure.
2   **A**  Sure.
3   **Q**  ·Before the first application of the TASER.
4   I mean, you certainly agree extra officers could
5   have been helpful?
6   **A**  If they had been there like physically with
7   Officer Kaminski, sure.  That would have been better
8   in my opinion.
9   **Q**  And in what way would that have been better?
10  **A**  Just two officers versus one reduces the
11  potential or inherent risk and increases the
12  officers opportunity to consider other options.
13  **Q**  Do you agree that one reading of the police
14  report and dispatch logs leads to the inference that
15  Officer White was on the scene with Officer
16  Kaminski and Mr. Moore before the very first
17  deployment of the TASER?
18  **A**  I don't.
19  **Q**  After the first TASER application, is there
20  a window of opportunity that exists if it's safe and
21  practical and have adequate resources for an officer
22  to take the individual into custody?
23  **A**  Is that a hypothetical or is that about the
24  facts of this case?
25  **Q**  Well, I'm asking you a hypothetical first.

90

1   **A**  Okay.  Could you ask me that again?
2   **Q**  Sure.  It was a convoluted question.
3       After an application of a TASER,
4   whether it's the first or the second, third, fourth,
5   doesn't matter.
6       Is there a window of opportunity
7   after the use of the TASER that exists when, if it's
8   safe and practical and you have adequate resources,
9   that an officer can then take the individual into
10  custody?
11  **A**  That's the preferred process, yes, sir.
12  **Q**  Officer Kaminski -- strike that.
13      You instruct that the TASER X26's
14  internal computer offers a wealth of information for
15  those who care about in-house force accountability?
16  **A**  Yes, sir.
17  **Q**  You wrote that?
18  **A**  I did.
19  **Q**  The TASER X26 which modified the M26, did
20  that increase the ability to capture data on use of
21  the device?
22  **A**  Yes, sir.  It gave duration which was the
23  critical issue that we didn't have with the M.
24  **Q**  You also instruct that the TASER should be
25  downloaded at the very first -- at the first line of

91

1   supervisor level immediately following every
2   deployment and at random intervals of no longer than
3   90 days?
4   **A**  That's my opinion, yes, sir.
5   **Q**  You believe that all applications, other
6   than the spark test, need to be accounted for?
7   **A**  Every application, yes, sir.
8   **Q**  In this case what evidence did you see that
9   at any point the Ferguson Police Department did or
10  attempted to download the data off of the X26 used
11  by Officer Kaminski in September 2011?
12  **A**  You're asking were they doing something
13  independent of the download after this case?
14  **Q**  Yes.  What I'm trying to figure out is, and
15  I haven't seen it yet.  That's why I'm asking you.
16      If at any point following the four
17  uses of this device by Officer Kaminski on Mr. Moore
18  that anybody within the Ferguson Police Department
19  attempted to contemporaneously identify and download
20  the use data?
21      MS. SHAFAIE:  Form.  You can answer.
22  **A**  I know that it was downloaded.  As far as
23  exactly when, sir, I don't know.  I have the -- I
24  have the record, but I don't know exactly when.
25  **Q**  (By Mr. Johnson) Sure.  You've been

92

1   provided the record of download data, you just don't
2   know when that was done?
3   **A**  I don't.
4   **Q**  Your preference would be that it would be
5   downloaded following every use?
6   **A**  Yes, sir, that's what I recommend.
7   **Q**  And the reason you want that downloaded
8   after every use is for in-house force
9   accountability?
10  **A**  Yes, sir.
11  **Q**  Policing the police?
12  **A**  Correct.
13  **Q**  And who is the first line supervisor level?
14  I don't know that term in police jargon.
15  **A**  That would be a sergeant for most agencies.
16  **Q**  In this case is that Lieutenant Ballard or
17  is that somebody else?
18  **A**  In this particular case, Lieutenant Ballard,
19  as I recall, was the first ranking person to get
20  there.  So even though he may not have been
21  Kaminski's sergeant, he would have certainly been
22  the supervisor on the scene.
23  **Q**  Did your review of records in this case
24  indicate that the Ferguson Police Department
25  downloaded TASER use data at random and within 90

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                       March 8, 2016

---

93

1  days?
2     **A**  I'm not aware of them doing that, no, sir.
3     **Q**  Officer Kaminski wrote in his use of force
4  report that he used this device on Mr. Moore three
5  times?
6     **A**  That was his understanding, yes, sir.
7     **Q**  After having the benefit of the download
8  data, we know that that's not accurate, correct?
9     **A**  Yes, sir.  I believe the download data is
10 the most accurate record of what occurred.
11    **Q**  And the download data indicates that there
12 were four cycles used on Mr. Moore, correct?
13    **A**  Correct.
14    **Q**  The preference by the manufacturer is that
15 an individual is subject to no more than three
16 cycles, correct?
17    **A**  I don't know that the manufacturer makes any
18 reference to that.  There are a number of
19 professional organizations that recommend that
20 certain steps be taken after three or for longer
21 than 15 seconds.
22           PERF, for example, in their most
23 recent guideline basically says three cycles and
24 there's no more.  They're the only ones I think that
25 do that.  I don't recall if the manufacturer says

---

94

1  three and no more.
2     **Q**  As of September of 2011, what organizations
3  do you consider to be authoritative in your field
4  recommended no more than three cycles of a use of a
5  TASER X26 on an individual?
6     **A**  I don't know for certain when PERF came up
7  with that recommendation.  As I said, after 2007 to
8  be candid, because of disagreements on the direction
9  they were going, I didn't have as much involvement,
10 so I can't tell you whether at that time PERF had
11 said three and no more.  I do believe that's their
12 position today.
13    **Q**  What about IACP?  What was their guideline
14 that they promulgated as of September 2011 on the
15 number of cycles that is recommended?
16    **A**  The model policy and White paper both say
17 the least number of cycles reasonable to get the job
18 done and cycles more than three or for a total
19 duration of longer than 15 should result in a
20 medical assessment.
21    **Q**  What medical assessment was performed on Mr.
22 Moore by Officer Kaminski?
23    **A**  A medical assessment that directly with the
24 outcome didn't have any impact, but by having an
25 ambulance come to the scene, that would be the best

---

95

1  example of what you would want an officer to do in
2  that case.  The medical assessment is not done by
3  the officer.  I should clarify.  A medical expert is
4  supposed to come assess them and not the Officer.
5     **Q**  Downloading the data.  We see the printout
6  and you've seen that in this case true, sir?
7     **A**  Yes, sir, I have.
8     **Q**  Walk me through how a department downloads
9  the data?
10    **A**  It's a relatively simple process where the
11 battery is removed on the X and a battery with a
12 wire attachment is stuck in it, and there is a
13 software program that is set up on usually a single
14 computer to get consistency of the date time
15 stamping and you just plug it in and the device
16 basically does all the work for you and you get the
17 printout or the document that you have there and you
18 can realign the clock which is one of the reasons I
19 recommend the 90-day problem resolution of the clock
20 drift.
21           If you don't do that every 90 days,
22 you can have a little bit of what you've got there
23 with some minutes of deviation between a dispatch
24 time stamp, but it's a relatively simple process of
25 just plugging and then following the instructions.

---

96

1     **Q**  What capabilities did the Ferguson Police
2  Department have to download the data off the device
3  utilized by Officer Kaminski in September 2011?
4        MS. SHAFAIE:  Object to foundation.  You can
5  answer.
6     **A**  They would have had the same capabilities I
7  just described.  Whether they exercised it or not, I
8  didn't see any evidence of a regular process to do
9  that, but I'm confident they would have had the same
10 capability I just described.
11    **Q**  (By Mr. Johnson) Do you know if they had
12 the capability prior to September 17, 2011?
13    **A**  Let me just clarify my answer.  I guess
14 that's assuming an agency has the plug in.  It is
15 something you have to get from TASER.  I have seen
16 some agencies that don't, but so my assumption is
17 that the process would be relatively simple if they
18 had the physical capability to do so.
19    **Q**  Does the plug and the software program in
20 your background, training and experience, sir, does
21 that come with the purchase of the device itself?
22    **A**  It doesn't.  I'm not suggesting some
23 manufacturer or vendor wouldn't throw it in, but
24 it's not standard with the device.
25    **Q**  Is that something that has to be ordered

---

24  (Pages 93 to 96)

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                          March 8, 2016

---

97

1  separately?
2      **A**  It is.
3      **Q**  I want to refer to page 11 of your report,
4  sir.
5      **A**  Do you want me to use this one here, sir, or
6  does it matter?
7      **Q**  It doesn't matter.  Whatever's most
8  convenient for you, sir.  I have a couple of just
9  questions where I'm bouncing around here.
10     **A**  Okay.
11     **Q**  It's at the lower portion of page 11, sir,
12  and the paragraph starts in summary.  Do you see
13  that, sir?
14     **A**  Yes, sir.
15     **Q**  "In summary, the four cycles were initiated
16  in response to Mr. Moore advancing naked toward
17  Officer Kaminski refusing orders to stop and
18  swinging his fist in an aggressive and assaultive
19  manner."
20           Did I read that correctly, sir?
21     **A**  Yes, sir.
22     **Q**  I want to break that down between the four
23  cycles that were actually utilized by Officer
24  Kaminski September 17, 2011.
25     **A**  Okay.

---

98

1      **Q**  Can you break up that sentence to have each
2  of the justifications or rationales that you believe
3  the TASER was used on Mr. Moore?  Can you allocate
4  those to each of the four cycles for me?
5      **A**  Certainly.
6      **Q**  Go ahead.
7      **A**  The initial one was when he was advancing
8  and what he described as an aggressive manner with
9  his swinging fists.  That did result in what appears
10  to be immediate incapacitation.
11           About a second between the first
12  release and the second release Kaminski describes
13  him as attempting to get back up and a reasonable
14  officer would perceive an assaultive suspect who had
15  done what he just did who then does not remain down
16  as ordered and begins to get back up on his feet as
17  a continuation of that assault and that is exactly
18  what happened in the following two documents, about
19  a second of release and the attempt to get back up
20  and not comply with the order would cause a
21  reasonable officer to believe the assaulting process
22  is ongoing and continuous and that's why it would
23  have been justified to continue to use the TASER to
24  terminate that apparent assaultive effort.
25     **Q**  I want to ask the question a little

---

99

1  differently.  We see on page 11 of Exhibit 4, we see
2  that you have written three justifications for the
3  use of the four cycles, correct?
4           One, advancing naked.  Two, refusing
5  orders to stop, and three, swinging fists in
6  aggressive and assaultive manner?
7      **A**  Yes, sir.
8      **Q**  So of those three justifications for the use
9  of force in this case, which of those three
10  justifications caused Officer Kaminski to use the
11  TASER the first time?
12     **A**  I think all three of them the first time.
13     **Q**  Okay.  What about the second time?
14     **A**  I think to accurately characterize that
15  response, it would be refusing orders to stop
16  getting back up.
17     **Q**  And the third time?
18     **A**  The same.
19     **Q**  Fourth time?
20     **A**  It would be the same on each of them after
21  the initial one.
22     **Q**  I want to go back to the material you
23  reviewed which is at the rear of Exhibit 4, it's the
24  last three pages, sir, starting at page 14.
25           There are a number of bullet points

---

100

1  that you have set forth over three pages of material
2  you reviewed as part of your work in this case.
3           Is that correct, sir?
4      **A**  Yes, sir.
5      **Q**  Do you know which of the material came on
6  the disc versus which of the material you were
7  emailed?
8      **A**  I do not, sir.
9      **Q**  No problem.  It's a lot.
10     **A**  I can provide it to you.  I just --
11     **Q**  It would get pretty exhaustive and that's
12  not necessary.
13           Fair to say that the material you
14  reviewed all came from the Pitzer Law Firm?
15     **A**  It did, sir, with the exception of the few
16  things we talked about, the CIT power point, that
17  sort of thing.
18     **Q**  Would you agree to furnish to Ms. Shafaie
19  the power points to the extent they form the basis
20  of your opinion in this case?
21     **A**  Certainly.  And I think the model policy and
22  the IACP.
23     **Q**  Sure.  So that would be three additional
24  items:  A general power point, CIT power point and
25  IACP policy?

25  (Pages 97 to 100)

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                               March 8, 2016

---

101

1    A  I'm not sure on the general power point
2   you're talking -- what are we talking about there?
3    Q  I think you mentioned earlier, but if I'm
4   incorrect.
5    A  Basically I can go through here and whatever
6   is footnoted, it was not in the material provided.
7   I would be happy to get that to her.  I have it in
8   my file.
9    Q  Thank you, sir.  On page 14 of Exhibit 4
10  there is a bullet point referenced about seven or
11  eight down "Video of TASER and envelope from TASER."
12        What is that, sir?
13   A  There was apparently in house at the PD I
14  believe a video taken that had the TASER device
15  itself, I think the X in question, and it showed
16  someone taking it out of an envelope.  I'm not sure
17  what the context was, but it was there so --
18        MS. SHAFAIE:  We can go off the record.
19  Let's go off the record really quickly.
20        VIDEOGRAPHER:  Off the record at 10:52.
21        (Recess taken.)
22        VIDEOGRAPHER:  Back on the record at 10:53.
23   Q  Mr. Ijames, also in the material reviewed
24  starting on page 14 of Exhibit 4 actually moving to
25  page 16 of the last page, sir.

---

102

1        Are the last half dozen or so calls,
2   is that all of the audio calls made by the citizens
3   to the Ferguson Police Department?
4    A  Yes, sir.
5    Q  Fair to say that some of the material you
6   reviewed in this case did not form the basis of your
7   opinions in this case?
8    A  That's true, sir.
9    Q  You just want to be thorough in terms of
10  what you received to make sure it was listed,
11  correct?
12   A  That's correct, sir.
13   Q  Is there any material that is listed on
14  these three pages of Exhibit 4 that were not
15  furnished to you by the Pitzer Law Firm?
16   A  I think the way I normally do this, sir, and
17  I did it the same in this case, I think everything
18  that's here is what I received from the firm and
19  then anything else would be just footnoted and
20  referenced, so my answer would be this all came from
21  the firm.
22   Q  The only things from your own personal
23  library would be the two items you mentioned before
24  meaning the power point presentation and the IACP
25  policy?

---

103

1    A  And maybe a third.  There was some confusion
2   about a third power point, but yes, sir, true.
3    Q  Did you look at the DOJ report against
4   Ferguson?
5    A  I have read that, yes, sir.
6    Q  Did you read it in terms of your work on
7   this case or did you read it just for wanting to
8   read it?
9    A  I read it when it first came out and then I
10  think it was added later on this case and I don't
11  recall that I read it additionally after I did
12  receive it in this case, but I have definitely read
13  it.
14   Q  And did it form any basis for any opinion
15  you are offering in this case?
16   A  It did not, sir.
17   Q  Are you offering any Monell opinions in this
18  case?
19   A  The only opinions I'm offering, sir, is
20  what's listed there.
21   Q  So the answer is no?
22   A  I don't think I gave a Monell opinion.  I
23  don't recall that I did.
24   Q  Are you offering any opinions about any type
25  of claimed deficiencies in Ferguson's training of

---

104

1   its police officer including Officer Kaminski?
2    A  No, sir.
3    Q  Are you offering any opinions as they may
4   relate to any allegation of pattern and practice
5   violations committed by the City of Ferguson?
6    A  No, sir.
7    Q  Are you rendering any opinions about the
8   adequacy of the Ferguson Police Department's
9   investigative process in investigating their own
10  officers' use of force?
11   A  No, sir.
12   Q  Did you review citizen complaints made
13  against Ferguson Police Department personnel as part
14  of your work in this case?
15   A  I did, sir.
16   Q  Did you review any of the underlying
17  documents of the DOJ Report as they relate to
18  different police encounters between Ferguson Police
19  Department officers and the public where force was
20  used?
21   A  I did review a voluminous file of many other
22  uses of force, but I don't recall if that was an
23  addendum to the DOJ Report.
24   Q  A fair way to characterize it would be you
25  reviewed the documents produced in the litigation?

Gore Perry Reporting and Video

FAX 314-241-6750            314-241-6750            www.goreperry.com

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                      March 8, 2016

---

105

1    **A**   That's correct.
2    **Q**   And if they ultimately were part of a DOJ
3  report or not, you just don't know?
4    **A**   That's true, sir.
5    **Q**   Do you agree citizens complaints should be
6  investigated thoroughly?
7    **A**   I do, sir.
8    **Q**   Do you agree that thoroughly investigating
9  citizen complaints would perpetuate the officers
10  being held accountable for their actions?
11    **A**   Yes, sir, I do.
12    **Q**   Do you agree that thoroughly investigating
13  citizen complaints helps improve the level of
14  misconduct within the police department?
15    **A**   You said improved, you mean reduce the level
16  of misconduct?
17    **Q**   Sure.
18    **A**   Yes, sir, I do.
19    **Q**   You want to have policies and procedures in
20  place that minimize the incidents of an officer
21  misconduct for any reason, correct?
22    **A**   I do, sir.
23    **Q**   Did you review any standing order or any
24  other document in this case that citizen complaints,
25  if they were made against Ferguson Police Department

---

106

1  officers, were that the officer was notified of that
2  complaint?
3    **A**   I don't recall that, sir.  The policy is
4  that they are notified.
5    **Q**   Are or are not, either way?
6    **A**   I don't.
7    **Q**   As part of your work in this case, were you
8  aware of any collective bargaining or other
9  agreements where complaints against officers were
10  deleted or eliminated after a certain period of
11  time?
12    **A**   I'm not aware of that, sir.
13    **Q**   Even outside this case, do you know that as
14  it relates to the Ferguson Police Department?
15    **A**   I don't, sir.
16    **Q**   Did the incidents of force that were
17  identified in the DOJ Report form any basis for the
18  opinions that you're offering in this case?
19       MS. SHAFAIE:  Object to form.  You can
20  answer.
21    **A**   They did not, sir.
22    **Q**   (By Mr. Johnson) Did you review any type of
23  psychological report on Officer Kaminski for any
24  type of pre-random or even post-employment test?
25    **A**   I had his entire background file and I just

---

107

1  can't tell you from memory that I did, but I did
2  look at in its entirety.  So if that was contained
3  in there, I would have.  I'm certain I didn't see
4  anything that caused me concern or I would have
5  remembered that.
6    **Q**   Sure.  Let's take a short break.
7       VIDEOGRAPHER:  Off the record at 11:01.
8          (Recess taken.)
9       VIDEOGRAPHER:  Back on the record at 11:14.
10    **Q**   (By Mr. Johnson) I have no further
11  questions at this time.  Thank you for your time,
12  Mr. Ijames.
13    **A**   Thank you, sir.
14       [EXAMINATION]
15  BY MR. DOWD:
16    **Q**   Good afternoon, Mr. Ijames.  My name is Bill
17  Dowd and we met at the beginning of the deposition.
18  Just a few follow-up questions, if I may.  I
19  represent Tina Moore, the surviving widow of Mr.
20  Moore.
21    **A**   Yes, sir.
22    **Q**   Have you done any research or other
23  investigation other than what you've previously
24  described in your testimony today?
25    **A**   In reference to forming my opinions?

---

108

1    **Q**   Yes, sir.
2    **A**   No, sir.
3    **Q**   Have you had any contact with TASER
4  International related to this case?
5    **A**   I have not, sir.
6    **Q**   What regular contact do you have with TASER
7  International?
8    **A**   I have no regular contact with them at all.
9  I probably spoke to Rick Smith, the owner, a year
10  ago on a personal matter of a friend of a friend
11  issue, but I don't even know who their director of
12  training is.  I don't talk to anyone at TASER.
13    **Q**   You testified that this situation was a
14  rapidly evolving situation with Mr. Moore and
15  Officer Kaminski, is that correct?
16    **A**   Yes, sir.
17    **Q**   And you agree that an officer of
18  Mr. Kaminski's ten-years experience, his training at
19  the academy, his training at the prior police
20  departments and his training at Ferguson Police
21  Department are all designed to train and prepare
22  them for rapidly evolving situations, correct?
23    **A**   I do, sir.
24    **Q**   And this cannot be used by officers as a
25  defense to the use of all levels of force.

27  (Pages 105 to 108)

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                    March 8, 2016

---

109

1        Would you agree with that?
2        MS. SHAFAIE:  Object to form.  You can
3    answer.
4    **Q**   (By Mr. Dowd) That it was a rapidly
5    evolving situation?
6        MS. SHAFAIE:  Same objection.
7    **A**  I would just -- if I'm understanding your
8    question, sir, I would say that it's not an excuse
9    to use unreasonable force.
10   **Q**   (By Mr. Dowd) Okay.
11   **A**  I mean, they may have to use all levels of
12   force and be justified if that makes sense.  It's
13   not a justification to do something wrong.
14   **Q**   Okay.  Fair enough.  Let me direct your
15   attention to Exhibit 4 which is your report that
16   you've issued in this case your opinion three.
17   **A**  Yes, sir.
18       MS. SHAFAIE:  What page are we on?
19       MR. DOWD:  It looks like it's page eight.
20   **Q**   (By Mr. Dowd) The conclusion of your
21   opinion that force was not excessive and was quote
22   consistent with contemporary police training, policy
23   and practice?
24   **A**  Yes, sir.
25   **Q**   How do you stay current on the laws as it

---

110

1    relates to established rights of citizens to be free
2    from excessive force?
3    **A**  I just do case reviews.  I do continuous
4    training.  I'm still a Class A post-certified peace
5    officer, do 80 hours of training a year through my
6    original department which has legal updates as a
7    part of that and just stay up with contemporary
8    police business.
9        I think I mentioned earlier that I'm
10   on the national policy center board of the IACP.  I
11   fly tomorrow to San Diego for our quarterly meeting.
12   That is an in-depth process every meeting to bring
13   us up on current case law, so that's what I do.
14   **Q**   And what are the legal updates that you
15   referred to, how do you receive those?
16   **A**  I'm not like on a mailing list or anything
17   like that.  I think it would mostly be reading, or
18   as with the IACP quarterly meeting, there's normally
19   there's two attorneys that are on our board.
20   They'll just bring us, the group I'm on, the
21   national policy center board, up to date on recent
22   Supreme Court relevant circuit case decisions and
23   then just reading and trying to stay up on the
24   business as most recently a fourth circuit case came
25   out that affected on passive resisters and that just

---

111

1    seems to run a circle of people like me so I read
2    all of that material that I can.
3    **Q**   That's important for police departments to
4    keep their officers up to speed on the current state
5    of the law so that they're aware of the rights of
6    the citizens as declared by these courts?
7    **A**  I would agree in the context where it would
8    affect policy and practice if that makes sense.  The
9    answer is yes, but not necessarily like I would do
10   it.  It's more for the policy makers to make sure
11   their current process is consistent with that law
12   versus just exposing the officers to the law.
13   **Q**   All right.  And based on your review of the
14   depositions and the standing orders of the Ferguson
15   Police Department and their chief, captains,
16   lieutenants, police officers, how do they keep their
17   officers up to date on the current state of the law?
18   **A**  I can't answer that in particular.  I know
19   they have in-service training, but I don't recall
20   any specific blocks that would meet or how you are
21   characterizing that.
22   **Q**   Is there any testing, to your knowledge, on
23   the current state of the law and how the officers
24   are made aware of that?
25   **A**  The only testing that I saw in their

---

112

1    training was specifically in this case to TASER, but
2    I don't recall reading of any written tests to
3    indicate that they were up to date on the state of
4    the law.
5    **Q**   And you have not received any documents from
6    the defense counsel on that subject?
7    **A**  I have not, sir.
8    **Q**   You did not request any such documents,
9    correct?
10   **A**  I didn't.
11   **Q**   In your factual description and your
12   understanding of Mr. -- Officer Kaminski's encounter
13   with Mr. Moore that morning, he refers to him as
14   being on his knees in a push-up or doggy-style
15   position.
16       Do you recall that testimony?
17   **A**  At one point, yes, sir.
18   **Q**   Do you recall any of that description being
19   in the original report that he wrote the day of the
20   incident?
21   **A**  I don't.
22   **Q**   It's not in there, is it?
23   **A**  I don't think so.
24   **Q**   And that contradicts and is in conflict with
25   Officer White's observation when he gets to the

---

28  (Pages 109 to 112)

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                                March 8, 2016

---

113

1   scene that the citizen is actually in a sit-up
2   position?
3        MS. SHAFAIE:  Object to form.  You can
4   answer.
5    **Q**   (By Mr. Dowd) Would you agree with that?
6    **A**  I do.
7    **Q**   Would you also agree that, if Mr. Moore is
8   in a sit-up position as Officer White has observed
9   and testified, that it would have been easier for
10  Mr. -- Officer Kaminski to have observed the X26
11  probe in his chest area?
12   **A**  In that hypothetical certainly.  If you
13  could see the chest versus a prone position, it
14  would potentially be easier, yes, sir.
15   **Q**   Right.  And if Mr. Moore has the X26 XP, the
16  extra penetrating dart in his chest and Officer
17  Kaminski is aware of that and he -- it would be a
18  different scenario on your use of force analysis.
19  Would you agree with that?
20       MS. SHAFAIE:  Object to form.
21   **A**  I think the best one to answer that, sir, is
22  that the use in that case would not be prohibited.
23  It is a non-preferred aiming area.  It's not a
24  prohibited area.  Whether the officer would have
25  re-assessed the next step, I simply can't speak for

---

114

1   him.  That is something an officer could have
2   considered, but it would not have been prohibited to
3   do an additional cycle if he knew that.
4    **Q**   (By Mr. Dowd) You would agree that he would
5   have been aware of a greater risk to the citizen if
6   he was aware that the probe was in his chest when he
7   was pulling the trigger and delivering the
8   electricity the second, third and forth time.  Do
9   you agree with that?
10   **A**  I do agree that the training would suggest
11  that that is an enhanced or increased risk, yes,
12  sir.
13   **Q**   And you would agree that Officer Kaminski
14  was intentionally pulling the trigger each time he
15  pulled the trigger?
16   **A**  Yes, sir, I do believe he did on purpose.
17   **Q**   And he was conscious of pulling the trigger
18  each time he pulled the trigger?
19   **A**  I believe so.
20   **Q**   So if Officer White is correct and the man
21  is sitting up and also assuming for purposes of my
22  question that Officer Kaminski is aware that the XP,
23  extra penetrating dart, is in Mr. Moore's chest area
24  near his heart, that each time he consciously and
25  intentionally pulls that trigger, he is creating a

---

115

1   greater risk to Mr. Moore's health as opposed to if
2   he had tased him on some other body part?
3    **A**   My response, sir, to accurately characterize
4   my understanding of the research is that there's a
5   potential for increased risk.  It's not -- that's my
6   answer, that that area the body based on training
7   suggests an enhanced risk, not a guaranteed risk,
8   but the answer would be yes.
9    **Q**   You testified previously that you basically
10  have seen everything that you wanted to see as part
11  of your analysis and the basis of your opinions in
12  this case, is that correct?
13   **A**  Yes, sir.
14   **Q**   A couple of things you have not seen are the
15  dispatch recording, the conversations between the
16  Ferguson dispatcher and the Ferguson police
17  officers.
18        You have not seen that, correct, or
19  heard that I should say, the audio recordings?
20       MS. SHAFAIE:  Object to foundation.  You can
21  answer.
22   **A**  I just don't remember.  I'm certain of
23  listening to each of the 911 calls.  I just don't
24  recall if I had the dispatch log itself.
25   **Q**   (By Mr. Dowd) Right.  And the 911 calls are

---

116

1   citizens to the dispatcher, correct?
2    **A**  Yes, sir, correct.
3    **Q**   And so the Ferguson Police Department
4   maintained those and those were available for us in
5   the investigation of this case, correct?
6    **A**  I believe that's where they came from, yes,
7   sir.
8    **Q**   To your knowledge, what we don't have and
9   what was not preserved in this case by the Ferguson
10  Police Department are the communications by the
11  officers and the dispatcher which one time were
12  recorded audio recordings, but we do not have them,
13  to your knowledge, correct?
14       MS. SHAFAIE:  Form and foundation.  You can
15  answer.
16   **A**  Again, sir, I don't recall listening to
17  those.  I'm not aware that they're not available.  I
18  just don't recall that I had them.
19   **Q**   (By Mr. Dowd) In your investigation of your
20  prior use of force cases in the defense of multiple
21  police departments, have you ever listened to the
22  dispatched tapes as between the officers and the
23  dispatcher?
24   **A**  I have, many times.
25   **Q**   And you have found those to be helpful in

29  (Pages 113 to 116)

Steven Ijames                                   March 8, 2016

---

117

1  many cases?
2      **A**  It just depends on the facts in the case.
3      **Q**  Certainly.
4      **A**  So in some cases it has been helpful, yes,
5  sir.
6      **Q**  If they were available, you would like to
7  hear them?
8      **A**  I would certainly have listened to them if
9  they were available, yes, sir.
10     **Q**  And as you sit here, you do not recall
11  listening to them?
12     **A**  I don't believe that I did.
13     **Q**  Have you reviewed the CAD transcript in this
14  case?
15     **A**  You mean the CAD report?
16     **Q**  Yes, sir.
17     **A**  The typed report?
18     **Q**  Yes.
19     **A**  Yes, sir, I believe I have.
20     **Q**  Okay.  Does that form the basis of your
21  opinions?
22     **A**  No, sir.  I didn't see anything that led to
23  a concern or conflict in my mind as to the
24  chronological order of basically who went when and
25  where and that's what the CAD data generally

---

118

1  supports, so the answer is no.
2      **Q**  Did you find that the information in there
3  to be reliable or was it somewhat of a scrambled
4  record?
5      **A**  I just don't recall.  I just know from CAD
6  systems that quite frequently dispatchers punch in
7  things that aren't perfect and they are in my
8  opinion actually there is a common sense of
9  confusion in some cases on timing, but in this
10  particular case I didn't see that as a relevant
11  issue for my opinions, and so I just can't recall
12  that it had any weight or emphasis on the opinions
13  that I've brought.
14     **Q**  Did you read the deposition of the lady that
15  we took at the Ferguson Police Department who
16  produced the CAD transcript?
17     **A**  Do you know what her name is?  I'm looking.
18     MS. SHAFAIE:  Shannon Dandridge.
19     **Q**  Is that Dandridge, okay.
20     **A**  I don't recall reading the deposition of a
21  person who was a custodian of records or anything at
22  Ferguson.  If I did, it would be on this list.
23     **Q**  (By Mr. Dowd) I'm going to represent to you
24  that transcript indicates that all of the officers
25  all arrived at the exact same time.

---

119

1      **A**  Very normal in my experience, though not
2  factual.
3      **Q**  So inaccurate and no help in the analysis of
4  what occurred that day?
5      **A**  That's true, based upon the sworn deposition
6  testimony of when the officers said they arrived
7  which I did not think was in dispute.  I ran a
8  dispatch center and also dispatch to 1983 and I'm
9  aware that frequently things like you're describing
10  happen and it doesn't make it accurate, it's just
11  the way dispatchers lump things together that later
12  becomes important, but at the time they're just
13  trying to get stuff logged, but it did not impact my
14  opinion, no, sir.
15     MR. DOWD:  I move to strike your testimony
16  as non-responsive.
17     **Q**  My question was, I believe, that that CAD
18  transcript showed that all of the officers arrived
19  at the same time, okay?
20     **A**  Correct.
21     **Q**  That is not helpful in your analysis in
22  determining who was on the scene first, when the
23  second officer arrived and what he may have
24  observed.  Would you agree to that?
25     MS. SHAFAIE:  Object to form.  You can

---

120

1  answer.
2      **A**  I agree.
3      **Q**  (By Mr. Dowd) So far we have the citizen
4  calls which show the man running in the street
5  pushing off cars, naked, screaming.  The police
6  department preserved that, correct, and you have
7  that?
8      **A**  I do.
9      **Q**  The police department did not preserve the
10  transcript of what the officers were saying to each
11  other or to the dispatcher.
12     We don't have that, correct?
13     MS. SHAFAIE:  Form and foundation.
14     **A**  I'm not sure.  I think we discussed I didn't
15  get it.
16     **Q**  (By Mr. Dowd) And we have a CAD transcript
17  that is of little or no use to determine who arrived
18  at the scene in what order and how much time passed
19  between arrivals, correct?
20     **A**  Correct.
21     **Q**  Are you aware of any internal investigation
22  that was performed by the Ferguson Police Department
23  into Officer Kaminski's use of force that morning?
24     **A**  I'm not sure just beyond the normal process
25  review and reports.

---

Gore Perry Reporting and Video

FAX 314-241-6750          314-241-6750          www.goreperry.com

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                    March 8, 2016

---

121

1    **Q**  Everything that's in what's been called
2  Exhibit 12 basically the police report in this
3  matter and the supplemental?
4    **A**  Yes, sir, that would be accurate.
5    **Q**  That would be the abuse of force report, the
6  TASER use of force report, the narratives, all of
7  that?
8    **A**  Yes, sir.
9    **Q**  Witness statements?
10   **A**  Yes, sir.
11   **Q**  You're not aware of any other documents
12  other than that?
13   **A**  I'm not, sir.
14   **Q**  Okay.  So based on your review of the
15  documents and the testimony, you agree there's been
16  no internal affairs investigation of Officer
17  Kaminski's use of force, correct?
18   **A**  That's correct.
19   **Q**  No other statements other than what are
20  contained in the police report were taken, correct?
21      MS. SHAFAIE:  Object to form.
22   **A**  Not that I'm aware of, sir.
23   **Q**  (By Mr. Dowd) Ferguson did not run a TASER
24  download to compare Officer Kaminski's version of
25  events with what the more accurate TASER download

---

122

1  reports shows?
2    **A**  I don't believe they did.
3    **Q**  They had the capability to do that though,
4  correct?
5      MS. SHAFAIE:  Object to foundation.
6    **A**  That, I don't know.  It's not a complicated
7  process.  I just don't know if they actually had it
8  in-house.
9    **Q**  (By Mr. Dowd) One of the officers who
10  formerly with the police department has testified
11  that they did have the capability to do that and
12  they all were trained, all of the instructors, TASER
13  instructors would have been able to do that during
14  that time frame.
15      Is that your understanding from
16  review of the deposition testimony?
17   **A**  Yes, and any TASER instructor can do it if
18  they have the mechanical implements necessary to do
19  it.
20   **Q**  So if one of the former officers testified
21  that he was the TASER officer at Ferguson and that
22  they had the equipment and they had the capability,
23  you would have no reason to disagree with that?
24   **A**  I would not, sir.
25   **Q**  And that would not surprise you either?

---

123

1    **A**  I would just say that my experience is most
2  agencies have the capability to do so, so it would
3  actually surprise me because most folks do if they
4  have it.
5    **Q**  To your knowledge, there was never a
6  determination made by any command officer whether
7  the chief, Captain Henke or Lieutenant Ballard as to
8  whether or not Officer Kaminski's use of force that
9  morning was consistent with department policy?
10      MS. SHAFAIE:  Object to foundation.
11   **A**  I think their review of the report and use
12  of force report would be their approval as
13  communicated by Kaminski.  As far as any independent
14  investigation approval, I'm not aware of that.
15   **Q**  (By Mr. Dowd) Right.  In fact, Officer
16  Ballard in the use of force report left it blank as
17  to whether or not, yes or no, Officer Kaminski's
18  conduct was consistent with department policies?
19   **A**  I just don't recall that.
20   **Q**  You can assume that to be true?
21   **A**  Okay.
22   **Q**  And he was doing that because his testimony
23  was because there had been a death I was passing
24  that upstairs?
25   **A**  Okay.

---

124

1    **Q**  So he did not make a determination?
2    **A**  Agreed.
3    **Q**  Let's go off the record.
4      VIDEOGRAPHER:  Off the record at 11:31.
5          (Recess taken.)
6      VIDEOGRAPHER:  Back on the record at 11:32.
7  BY MR. DOWD:
8    **Q**  Sir, would you agree that investigating the
9  facts of a use of force incident which a person dies
10  is important from a police department perspective
11  including finding out what happened so as to prevent
12  future incidents?
13      MS. SHAFAIE:  Form.
14   **A**  I do if the assumption is something
15  occurred that was wrong on the police performance
16  side.
17   **Q**  (By Mr. Dowd) Yes, sir, but that's why it's
18  a good practice to get into so you are investigating
19  these use of force incidents so that you can prevent
20  future harm to other citizens of the community?
21      MS. SHAFAIE:  Form.
22   **A**  Yes, sir.
23   **Q**  (By Mr. Dowd) You understand in this case,
24  -- strike that question, please.
25      TASER dart probes come in different

---

31  (Pages 121 to 124)

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                                      March 8, 2016

---

**125**

1  lengths, correct?
2      A   They do.
3      Q   And you testified earlier regarding the
4  association, your understanding by TASER
5  International that dart to heart distance is an
6  important factor in determining the relationship
7  between some heart malfunction and a cardiac problem
8  and the use of the TASER?
9      A   Or a potential for that.  I think the
10  scientists still are a little gray, but that's the
11  obvious concern.
12      Q   And in this case you understand that they
13  had the longest possible XP dart?
14      A   XP.
15      Q   Which is over half an inch long, correct?
16      A   Correct.
17      Q   I don't have anything further.  Thank you,
18  sir.
19          MS. SHAFAIE:  I don't have any questions.
20          VIDEOGRAPHER:  This concludes the deposition
21  of Steve Ijames.  We are off the record at 11:34.
22  This ends disc two.
23          MS. SHAFAIE:  We will waive.
24
25

---

**126**

1          I, Linda DeBisschop, duly commissioned,
2  qualified and authorized to administer oaths and to
3  certify to depositions, do hereby certify that
4  pursuant to Notice in the civil cause now pending
5  and undetermined in the United States District
6  Court, State of Missouri, to be used in the trial of
7  said cause in said court, I was attended at the
8  offices of Pitzer & Snodgrass, 100 South Fourth
9  Street, 4th Floor, St. Louis, Missouri, 63102, by
10  the aforesaid attorneys; on the 8th day of March,
11  2016.
12          The said witness, being of sound mind and being
13  by me first carefully examined and duly cautioned
14  and sworn to testify the truth, the whole truth, and
15  nothing but the truth in the case aforesaid,
16  thereupon testified as is shown in the foregoing
17  transcript, said testimony being by me reported in
18  shorthand and caused to be transcribed into
19  typewriting, and that the foregoing pages correctly
20  set forth the testimony of the aforementioned
21  witness, together with the questions propounded by
22  counsel and remarks and objections of counsel
23  thereto, and is in all respects a full, true,
24  correct and complete transcript of the questions
25  propounded to and the answers given by said witness;

---

**127**

1  that signature of the deponent was waived by
2  agreement of counsel.
3          I further certify that I am not of counsel or
4  attorney for either of the parties to said suit, nor
5  related to nor interested in any of the parties or
6  their attorneys.
7
8  Dated this 13th of March, 2016.
9
10
11  _Linda DeBisschop_
11  Linda DeBisschop, CSR, CCR,
12  Illinois CSR No. 084.004741
12  Missouri CCR No. 779
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**128**

1  COURT MEMO
2
3
4
5  Tina Moore vs. Brian Kaminski, et al.
6
7
8  CERTIFICATE OF OFFICER AND
9  STATEMENT OF DEPOSITION CHARGES
10
11  DEPOSITION OF Steven Ijames
12
13  3/8/2016
14  Name and address of person or firm having custody of
15  the original transcript:
16
17  Baty, Holm & Numrich, PC.
18  4600 Madison Avenue, Suite 210
19  Kansas City , MO 64112
20
21
22
23
24
25

---

Gore Perry Reporting and Video

FAX 314-241-6750          314-241-6750          www.goreperry.com

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                   March 8, 2016

---

129

1  ORIGINAL TRANSCRIPT TAXED IN FAVOR OF:
2
3  Baty, Holm & Numrich, PC.
4  4600 Madison Avenue, Suite 210
5  Kansas City , MO 64112
6  Total:
7  1 ONE COPY - TAXED IN FAVOR OF:
8
9  Pitzer Snodgrass
10  100 South Fourth Street, Suite 400
11  St. Louis, MO 63102
12  Total:
13
14
15
16
17
18
19
20
21
22
23
24
25

---

130

1  Upon delivery of transcripts, the above
2  charges had not been paid.  It is anticipated
3  that all charges will be paid in the normal course
4  of business.
5  GORE PERRY GATEWAY & LIPA REPORTING COMPANY
6  515 Olive Street, Suite 700
7  St. Louis, Missouri 63101
8  IN WITNESS WHEREOF, I have hereunto set
9  STATEMENT OF DEPOSITION CHARGES
10  my hand and seal on this _____ day of _____
11  Commission expires
12  _____
13  Notary Public
14
15
16
17
18
19
20
21
22
23
24
25

33  (Pages 129 to 130)

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                                March 8, 2016

Page 131

| **A** | | | | |
|---|---|---|---|---|
| **ability** 90:20 | 100:23 114:3 | 17:8 28:15,23 | **allocate** 98:3 | **approaching** 81:4 |
| **able** 45:10 47:23 | **additionally** 103:11 | 65:13,16 96:14 | **altercation** 80:20 | **approval** 28:3 |
| 71:20 122:13 | **address** 6:3 7:22 | **agent** 8:13 | **ambulance** 94:25 | 123:12,14 |
| **absent** 44:16 70:6 | 8:1,2 128:14 | **agents** 36:11,15 | **analysis** 113:18 | **approximate** 15:19 |
| **absolutely** 57:4 | **adequacy** 104:8 | 37:20,22 | 115:11 119:3,21 | **approximately** |
| **abuse** 121:5 | **adequate** 87:15 | **aggressive** 44:17 | **anchor** 70:7 | 48:24 49:17 50:3 |
| **academy** 108:19 | 89:21 90:8 | 97:18 98:8 99:6 | **angle** 70:3 | 63:15 77:19 80:4 |
| **accident** 9:13 | **adjacent** 64:3 | **agitated** 39:4 | **answer** 8:17 13:24 | **area** 8:23 9:25 28:5 |
| **accidental** 24:13 | **adjust** 19:6 | **ago** 108:10 | 20:10 26:6 29:19 | 32:14 38:6 49:1 |
| **accomplish** 67:9 | **adjustment** 23:11 | **agree** 10:10 18:4,6 | 30:11 32:20 39:20 | 56:18 57:8 68:2 |
| **accomplishing** | **administer** 126:2 | 42:15,19 54:1 | 50:22 57:3 58:10 | 68:13 70:17,21 |
| 41:15 | **administered** 83:7 | 60:14 61:1,5,8 | 59:14 62:5,24 | 74:22 79:22 |
| **accountability** | **administering** 83:1 | 75:19 76:22 78:10 | 67:4 73:24 83:17 | 113:11,23,24 |
| 90:15 92:9 | **adopt** 67:6,15 | 78:17 79:3,17,23 | 84:21 85:2,11 | 114:23 115:6 |
| **accountable** 105:10 | **adopted** 28:15,21 | 80:2 81:14,16,23 | 91:21 96:5,13 | **arent** 118:7 |
| **accounted** 91:6 | 29:6 30:10 | 81:25 82:3 84:6 | 102:20 103:21 | **arises** 47:3 |
| **accurate** 14:16 | **adopting** 30:14 | 84:12 89:4,13 | 106:20 109:3 | **armed** 46:3 |
| 17:18 72:14 74:1 | **adoption** 29:10 | 100:18 105:5,8,12 | 111:9,18 113:4,21 | **arrest** 50:15 51:4,9 |
| 74:3,7 80:6 88:21 | 30:3,6 31:12 | 108:17 109:1 | 115:6,8,21 116:15 | 51:20 80:17 |
| 93:8,10 119:10 | **adopts** 29:13 | 111:7 113:5,7,19 | 118:1 120:1 | **arrested** 56:9 |
| 121:4,25 | **advance** 45:12 | 114:4,9,10,13 | **answering** 72:12,23 | **arrival** 50:6 58:23 |
| **accurately** 99:14 | **advanced** 84:13 | 119:24 120:2 | **answers** 126:25 | **arrivals** 120:19 |
| 115:3 | **advancing** 82:19 | 121:15 124:8 | **anticipated** 130:2 | **arrive** 49:20 50:1 |
| **accused** 36:11 53:2 | 97:16 98:7 99:4 | **agreed** 45:2 52:21 | **anybody** 8:16 | 88:19,22 |
| **acquisition** 32:10 | **advertise** 12:14 | 52:23 124:2 | 20:13 25:4 48:8 | **arrived** 56:12,16 |
| **act** 84:9 | **advocate** 18:4 | **agreeing** 87:10 | 91:18 | 57:16 58:4,17 |
| **acting** 43:6 | **advocated** 82:10 | **agreement** 127:2 | **apologize** 13:19 | 60:3,8,15,24 61:6 |
| **action** 8:8 36:5,9 | **advocating** 82:11 | **agreements** 106:9 | 54:24 | 61:14,18,22 79:18 |
| 42:21 44:17 84:15 | **affairs** 121:16 | **ahead** 51:2 85:11 | **apparent** 98:24 | 118:25 119:6,18 |
| **actions** 17:8,12 | **affect** 45:20 111:8 | 98:6 | **apparently** 101:13 | 119:23 120:17 |
| 43:11 48:11 | **affiliated** 80:13 | **aimed** 69:21 | **appear** 30:6 | **arriving** 51:8 53:15 |
| 105:10 | **afforded** 18:8 | **aiming** 113:23 | **appearances** 3:1 | 54:2 56:5 71:16 |
| **active** 11:11 16:2 | **affront** 52:14 53:23 | **aims** 69:19 | 21:15 | **article** 20:12 65:3,4 |
| **actively** 82:16 | **aforementioned** | **air** 68:2 | **appearing** 26:3 | 65:5 |
| 83:14,20 84:4 | 126:20 | **airport** 49:1 56:6 | **appears** 98:9 | **articles** 23:20,21 |
| **activity** 84:25 | **aforesaid** 6:21 | 56:17 60:10 63:18 | **application** 73:10 | 35:12 39:21 43:19 |
| **acts** 83:6 | 126:10,15 | 64:3 74:6 | 74:20 75:14 76:4 | 44:4 |
| **actual** 19:23 27:25 | **afternoon** 107:16 | **al** 1:12 2:15 6:7 | 76:7,23 89:3,19 | **aside** 17:11 |
| 33:23 | **age** 6:19 | 128:5 | 90:3 91:7 | **asked** 8:20 14:7 |
| **added** 103:10 | **agencies** 10:25 | **alarm** 52:14 53:23 | **applications** 86:11 | 37:6,20,24 |
| **addendum** 104:23 | 11:18 29:10 32:4 | **alarmed** 53:10 | 91:5 | **asking** 16:11 26:11 |
| **addition** 14:17 | 82:4,11 92:15 | **alcohol** 62:21 | **apply** 78:21 | 26:17 72:18 89:25 |
| **additional** 26:23 | 96:16 123:2 | **aligned** 70:2 | **applying** 87:4 | 91:12,15 |
|  | **agency** 16:14,23 | **allegation** 104:4 | **approach** 41:8 | **assault** 53:6,11,14 |

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                                    March 8, 2016

Page 132

53:22 54:19 55:6
55:9 76:25 77:3
81:3,22 82:23
84:10,15,23,25
85:1,14,15 98:17
**assaulting** 82:16,18
83:15,21 84:4
98:21
**assaultive** 83:11
85:7,19 97:18
98:14,24 99:6
**assess** 14:8 46:14
95:4
**assessing** 41:5
**assessment** 8:17
46:6,11 47:23
86:18 94:20,21,23
95:2
**assisted** 88:24
**associate** 14:25
**associated** 7:11
15:1 20:13 23:17
62:2
**association** 40:8
125:4
**associations** 40:18
**assume** 12:21 73:25
123:20
**assumed** 74:7
**assuming** 66:21
69:7 96:14 114:21
**assumption** 96:16
124:14
**atf** 8:15
**attached** 5:12
**attachment** 95:12
**attack** 48:6
**attacked** 84:19
**attempt** 73:15 76:8
77:5 85:15 88:3,7
88:10 98:19
**attempted** 68:24
91:10,19
**attempting** 76:10

98:13
**attempts** 77:2
84:21 85:16
**attend** 9:6
**attended** 126:7
**attention** 109:15
**attorney** 34:18
127:4
**attorneys** 37:24
110:19 126:10
127:6
**audio** 102:2 115:19
116:12
**author** 37:21
**authored** 23:22
27:22,23 32:2
38:2 39:21
**authoritative** 39:8
40:2,4,8,11,16
94:3
**authorized** 66:18
67:1 126:2
**autopsy** 70:24
**available** 116:4,17
117:6,9
**avenue** 3:7 128:18
129:4
**avoid** 64:16 70:14
**aware** 12:3 25:24
61:17 65:22,24
75:18 93:2 106:8
106:12 111:5,24
113:17 114:5,6,22
116:17 119:9
120:21 121:11,22
123:14

**B**
**b** 52:20
**back** 34:2 42:9,24
45:16 46:9 48:10
48:19 77:2,4
79:20 82:7 83:19
84:2 85:15 87:6

98:13,16,19 99:16
99:22 101:22
107:9 124:6
**backdrop** 49:4
**background** 23:17
29:25 30:19,19
52:15 55:15 59:20
96:20 106:25
**backup** 76:10
84:22 85:4 88:19
**balances** 40:22
**ballard** 57:9 92:16
92:18 123:7,16
**bargaining** 106:8
**based** 19:13 22:10
25:15 29:25 49:15
51:5 52:15 55:2
55:17 56:9 63:4
68:8 71:15 75:22
80:18 83:17
111:13 115:6
119:5 121:14
**basic** 32:23
**basically** 18:22
26:13 32:9 37:3
43:8 46:5 66:3
72:22 86:7 93:23
95:16 101:5 115:9
117:24 121:2
**basis** 100:19 102:6
103:14 106:17
115:11 117:20
**bates** 54:17
**batter** 74:9,12,14
**battery** 64:21 95:11
95:11
**baty** 3:6 128:17
129:3
**batyholm** 3:10
**bear** 47:22
**beat** 57:25
**beating** 54:9 61:20
**bebe** 60:21 88:23
**began** 82:12

**beginning** 107:17
**begins** 48:20 98:16
**behalf** 2:19 16:13
16:15 17:14
**behavior** 83:12
85:7,9,19,23
**belief** 48:1
**believe** 10:22 13:7
13:23 16:9 17:22
18:1 24:7 27:1,13
28:24 33:6 35:4
36:7 38:12 40:10
41:11,20 44:18
52:4 54:7,23 58:4
58:21 60:12,23
61:25 64:5 66:8
66:14 67:14,23
68:12 69:2,8
70:25 71:5,15
72:19 73:8 76:6
76:12 77:22 79:6
82:4 85:6,23
86:20 88:14,16
91:5 93:9 94:11
98:2,21 101:14
114:16,19 116:6
117:12,19 119:17
122:2
**believed** 68:14
81:12 82:21
**believes** 80:19
**benefit** 40:23 93:7
**best** 7:21 28:18
39:20 44:14 94:25
113:21
**better** 47:23 89:7,9
**beyond** 27:9 120:24
**big** 82:9
**bill** 3:17 6:12 20:25
22:7 107:16
**billing** 8:11 20:22
**billings** 20:19
**bit** 72:19 95:22
**black** 54:3,5

**blank** 123:16
**block** 33:14
**blocks** 111:20
**blows** 77:12 80:25
81:8
**board** 29:16 110:10
110:19,21
**bodies** 40:14
**bodily** 77:7
**body** 40:1 115:2,6
**border** 35:22 36:2
36:5,10 37:20
**bottom** 69:16,17,25
69:25 70:3
**bouncing** 97:9
**brace** 75:16
**bradford** 7:5
**break** 44:3 48:15
97:22 98:1 107:6
**breathing** 19:12
**brian** 1:12 2:15 6:6
128:5
**briefly** 7:7
**bring** 110:12,20
**broadway** 3:15
**brought** 24:24
118:13
**bullet** 99:25 101:10
**burden** 51:13
**business** 7:22 8:2,5
8:10 110:8,24
130:4
**busy** 57:8

**C**
**c** 3:6,14,21
**cad** 117:13,15,25
118:5,16 119:17
120:16
**california** 38:1
**call** 46:8 49:25 54:8
58:2 59:9,11,18
59:19 72:8,11,25
73:16

Tina Moore v. Brian Kaminski, et al.

Steven Ijames

March 8, 2016

Page 133

**called** 8:12 13:23
37:1 121:1
**calls** 49:9,13,19
51:5,7 56:10 72:4
72:18,22 102:1,2
115:23,25 120:4
**calm** 59:18
**candid** 59:13 94:8
**canon** 49:5
**cant** 28:2,23 31:4
33:10 39:17,18
58:6 62:10 76:21
94:10 107:1
111:18 113:25
118:11
**canting** 70:14
**capabilities** 96:1,6
**capability** 64:20
96:10,12,18 122:3
122:11,22 123:2
**captain** 123:7
**captains** 111:15
**capture** 90:20
**car** 34:22,25 62:15
**cardiac** 125:7
**care** 90:15
**career** 15:22 17:13
34:7
**carefully** 126:13
**carrying** 41:9
**cars** 49:10 54:9
120:5
**case** 6:6,21 7:9 8:7
8:25 11:14 12:17
15:24 19:20 20:21
20:25 21:10 22:4
22:9,10 24:10,13
24:13 25:4 27:3
27:12,19,24 28:20
30:9 31:14,18,22
34:14,15,21 35:2
35:19,22,25 36:4
36:7,14,16,17,18
36:21 37:4,8,16

37:18 38:7,9 43:3
48:23 49:16 54:12
54:18 55:3,8 59:5
63:5 64:6,8,12
66:9 67:12 70:16
70:23 71:2,7
73:10 75:11,24
77:24 79:10,15
81:3 86:12 89:24
91:8,13 92:16,18
92:23 95:2,6 99:9
100:2,20 102:6,7
102:17 103:7,10
103:12,15,18
104:14 105:24
106:7,13,18 108:4
109:16 110:3,13
110:22,24 112:1
113:22 115:12
116:5,9 117:2,14
118:10 124:23
125:12 126:15
**cases** 11:8,13 16:1
16:3,5,24 17:5,10
17:20 21:6 36:14
43:15 47:13 50:25
81:3 116:20 117:1
117:4 118:9
**cause** 8:14 26:5
38:22 43:11 50:24
51:1,4,9,13,20
52:14 53:18 79:6
84:23 85:5 98:20
126:4,7
**caused** 77:2 99:10
107:4 126:18
**causes** 48:12
**cautioned** 126:13
**ccr** 2:24,25 127:11
127:12
**cd** 13:6
**center** 29:16
110:10,21 119:8
**certain** 11:15 29:8

31:4,6 42:25 43:1
45:19 62:11 93:20
94:6 106:10 107:3
115:22
**certainly** 9:24
33:12 38:2 41:2
43:16 46:3,24
53:22 62:10 70:12
72:20 80:7 82:9
89:4 92:21 98:5
100:21 113:12
117:3,8
**certificate** 128:8
**certification** 16:20
26:19
**certified** 9:17
**certify** 126:3,3
127:3
**cetera** 53:10 72:24
85:3
**challenge** 26:21
**changing** 42:8
**characteristic**
40:25 62:13
**characterization**
52:17
**characterize** 14:13
45:6 62:8 99:14
104:24 115:3
**characterized**
56:20 67:23
**characterizing**
111:21
**charges** 128:9
130:2,3,9
**chase** 34:22
**check** 21:22,24
**chest** 68:2,13 70:17
74:22 77:13 79:22
113:11,13,16
114:6,23
**chief** 10:16,21
32:12 39:11
111:15 123:7

**chiefs** 12:12 32:18
39:10 40:10
**chose** 51:10
**chris** 8:13
**chronological**
117:24
**circle** 111:1
**circuit** 110:22,24
**circuitry** 64:18
**circumstance** 59:13
82:20
**circumstances**
34:20 35:7 40:23
42:3,8 43:5 52:13
80:19
**cit** 27:7,21 28:1,2
28:13,22 29:2
31:19,23 32:1
100:16,24
**cited** 54:19 55:17
**cites** 52:9
**citizen** 53:3 54:2
57:7 73:4 74:18
104:12 105:9,13
105:24 113:1
114:5 120:3
**citizenry** 51:6 53:1
55:22 56:2,10
72:4
**citizens** 48:3,8 53:6
53:12 56:18 58:7
59:17 60:11,12
102:2 105:5 110:1
111:6 116:1
124:20
**city** 3:8 7:12 12:9
15:1 28:21 29:22
31:11 32:3,7
51:21 60:20 61:12
65:20 104:5
128:19 129:5
**civil** 8:8,25 37:14
126:4
**claim** 16:15 17:7,8

17:15
**claimed** 103:25
**claims** 64:17
**clarification** 22:24
29:18 47:18
**clarify** 29:9 36:13
36:18 51:14 57:2
95:3 96:13
**class** 32:24 33:6
52:20,22 110:4
**clear** 17:3
**clearly** 30:13 44:20
46:25
**clenched** 78:14
**clock** 74:1 95:18,19
**close** 34:5 43:24
44:9 46:8,22
49:18,25 88:3
**closed** 46:12,18
**closely** 48:6
**closer** 46:25 47:7
48:4 80:10
**closes** 47:4
**closing** 48:1
**clothed** 43:5 56:13
**coalesce** 73:16
**code** 51:22 53:2
**codified** 52:5
**coerce** 67:1
**collaborations**
23:24
**collaboratively**
23:22
**collective** 106:8
**com** 3:10,25
**combative** 81:12
**combination** 46:21
**come** 68:4 94:25
95:4 96:21 124:25
**comes** 21:14 26:10
26:18 27:25
**coming** 72:24
**command** 123:6
**commands** 79:11

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                                    March 8, 2016

Page 134

| | | | | |
|---|---|---|---|---|
| 82:25 83:6 84:22 86:14,22 | conceivably 51:19 53:6 | consolidated 2:14 | 20:5,20 22:20 25:1,2 29:23 | courts 111:6 |
| **commission** 10:18 10:20 26:19 130:11 | **concept** 46:5 87:17 | **consulting** 8:6,21 8:21 11:8 12:7,12 30:19 | 33:16,25 34:2,9 42:18 44:1 46:15 | **cover** 54:12 |
| | **concern** 38:19 59:16 81:6 107:4 117:23 125:11 | **contact** 52:25 87:22 108:3,6,8 | 50:13 52:4 54:10 54:15 55:10 57:1 | **covered** 24:20 |
| **commissioned** 126:1 | | | 57:15,19 60:2,7 61:11 68:21 69:10 | **crash** 24:20 |
| **commits** 52:11 | **concerned** 77:2 | **contacted** 38:12 | 70:24 73:7 76:1,5 | **create** 19:4 30:15 48:11 53:22 |
| **committed** 21:1,18 50:24 52:20 53:14 55:23 56:3 104:5 | **concerning** 14:11 36:3 49:9,14 51:23 | **contacting** 53:3 | 77:17,18 78:15,16 80:14 86:22,25 | **created** 8:14 20:4,8 32:9,14 43:20,23 44:5,9 48:10 |
| **common** 42:11 45:14 62:9 118:8 | **concludes** 125:20 | **contain** 78:18,24 | 88:16 92:12 93:8 93:12,13,16 99:3 | **creating** 21:2 22:15 114:25 |
| **communicate** 43:7 46:8 | **conclusion** 109:20 | **contained** 25:13 107:2 121:20 | 100:3 102:11,12 105:1,21 108:15 | **crime** 50:24 51:11 51:19 |
| **communicated** 36:24 123:13 | **concurrently** 10:24 | **contemporaneous** 28:4 | 108:22 112:9 114:20 115:12,18 | **critical** 38:20 90:23 |
| **communications** 72:5,9 73:3 116:10 | **condition** 59:1 | **contemporaneou...** 13:12 91:19 | 116:1,2,5,13 119:20 120:6,12 | **criticisms** 25:6,12 |
| | **conduct** 14:14,18 52:14 55:20,25 86:12 123:18 | **contemporary** 109:22 110:7 | 120:19,20 121:17 121:18,20 122:4 | **crux** 14:11 24:13 |
| **community** 124:20 | **conference** 12:12 | **context** 44:5 82:19 101:17 111:7 | 125:1,15,16 126:24 | **csr** 2:24,24 127:11 127:12 |
| **company** 4:3 8:11 8:12 130:5 | **confident** 53:7 96:9 | **contingencies** 47:5 | **correctly** 31:21 54:21 58:20 97:20 | **cue** 62:1,22 |
| **compare** 121:24 | **conflict** 56:25 72:20 112:24 117:23 | **continuation** 82:23 98:17 | 126:19 | **cuff** 87:7 88:10 |
| **compared** 40:22 45:3,5 | **confrontation** 42:17 | **continue** 19:1 76:24 77:4 85:23 98:23 | **correlate** 73:15 | **cuffing** 87:18 |
| **competing** 42:4 | **confused** 32:5 37:17 | **continues** 66:2 | **correspondence** 24:24 | **culminating** 19:15 |
| **complaint** 19:19 106:2 | **confusion** 21:8 103:1 118:9 | **continuing** 86:15 | **couldnt** 15:25 | **curb** 64:2,3 |
| **complaints** 104:12 105:5,9,13,24 106:9 | **connected** 74:21 | **continuous** 81:2 85:18 98:22 110:3 | **counsel** 3:1 6:8 24:25 112:6 126:22,22 127:2,3 | **current** 16:1 23:9 23:10 32:18 109:25 110:13 111:4,11,17,23 |
| **complete** 126:24 | **conscious** 114:17 | **continuum** 67:19 67:22 | **county** 11:23 33:4 | **currently** 11:8 12:4 |
| **completely** 77:25 | **consciously** 114:24 | **contradicts** 112:24 | **couple** 23:10 97:8 115:14 | **curriculum** 9:23 |
| **compliance** 66:18 67:2 | **consensual** 50:16 | **control** 27:15 43:13 43:14 | **course** 9:20 22:19 33:9,18 43:15 | **custodian** 118:21 |
| **complicated** 122:6 | **consider** 9:1,17 11:11 18:1 26:8 39:7 40:1,4,7,15 40:24 89:12 94:3 | **controlled** 69:14 | 57:12 130:3 | **custody** 89:22 90:10 128:14 |
| **comply** 98:20 | **consideration** 41:5 | **convenient** 97:8 | **courses** 9:22 33:2 | **cv** 23:9 35:13 |
| **components** 24:18 24:21 28:2 | **considered** 45:15 114:2 | **conversations** 115:15 | **court** 2:1 6:15 7:9 22:17 23:7,14 | **cycle** 26:14 80:8 83:22 86:5 87:23 88:1 114:3 |
| **comprised** 22:12 | **consistency** 95:14 | **convoluted** 90:2 | 24:1 110:22 126:6 | **cycles** 72:1 86:13 86:15,16 93:12,16 93:23 94:4,15,17 94:18 97:15,23 98:4 99:3 |
| **computer** 86:4 90:14 95:14 | **consistent** 7:21 41:19 56:23 66:20 109:22 111:11 123:9,18 | **cooperate** 81:21 | 126:7 128:1 | |
| **conceivable** 11:15 | | **coordinated** 65:16 | | |
| | | **copy** 54:25 129:7 | | **D** |
| | | **correct** 9:5 10:15 16:21 17:2,20,24 | | **d** 1:3 2:7 |

Tina Moore v. Brian Kaminski, et al.
Steven Ijames
March 8, 2016

Page 135

daily 59:10
damages 16:13
dandridge 118:18
  118:19
danger 58:19,22
  59:3
dangerous 45:11
  47:21
darkness 15:16
dart 68:16 75:10,10
  113:16 114:23
  124:25 125:5,13
darts 75:1
data 64:20 72:2
  73:12 90:20 91:10
  91:20 92:1,25
  93:8,9,11 95:5,9
  96:2 117:25
date 6:2 13:21 22:3
  31:5 73:13 74:18
  95:14 110:21
  111:17 112:3
dated 127:8
day 2:22 21:19
  112:19 119:4
  126:10 130:10
days 91:3 93:1
  95:21
dealing 44:5 47:16
  88:24
death 38:22 48:2
  68:20 123:23
debisschop 2:24
  126:1 127:11
deceased 14:10
  57:14
decision 45:11
  46:10
decisions 46:7
  110:22
declared 111:6
deescalate 41:18
  42:16 44:17,19
deescalation 41:12

41:13 42:9,11
defend 36:9,10
defendant 12:16
defendants 1:15
  2:17 3:19 6:14
  14:1,5,5 54:11
defense 16:4,7 36:7
  37:10 108:25
  112:6 116:20
deficiencies 103:25
define 40:20,21
  69:13
definitely 32:21
  103:12
definition 16:17
  24:19,20 82:1
  85:14
definitional 69:15
degree 31:8 55:8
  75:20 79:8
deleted 106:10
delirium 38:25 39:4
delivering 114:7
delivery 130:1
delores 1:2 2:6 3:3
  6:11
department 7:10
  7:12 10:14 15:2
  32:7 36:1 48:25
  51:6 53:1 54:13
  55:22 56:3,4,11
  65:13 66:17,25
  67:6 68:24 72:5
  73:7,19,21 74:15
  84:14 91:9,18
  92:24 95:8 96:2
  102:3 104:13,19
  105:14,25 106:14
  108:21 110:6
  111:15 116:3,10
  118:15 120:6,9,22
  122:10 123:9,18
  124:10
departments 104:8

108:20 111:3
  116:21
depending 86:4
depends 46:24
  87:12 117:2
deployed 87:9
deployment 36:3
  38:20 73:9 75:21
  78:6 84:20 88:3,7
  89:17 91:2
deployments 86:11
deponent 127:1
deposes 6:22
deposition 1:17
  2:19 6:5 7:7 11:4
  12:22,25 16:12
  17:14 18:24 20:11
  21:9,20 24:5,7
  25:15 26:12 38:7
  48:20 79:14 84:7
  107:17 118:14,20
  119:5 122:16
  125:20 128:9,11
  130:9
depositions 7:13
  13:7,17 18:13
  19:22,23 111:14
  126:3
deputy 32:12
derived 12:5
describe 57:24
  59:22 69:18
described 54:5 65:2
  77:15 96:7,10
  98:8 107:24
describes 98:12
describing 119:9
description 56:25
  62:12 112:11,18
designation 20:9
designed 29:10
  108:21
detailed 37:3
detain 80:18

detention 50:16,21
  50:22 51:2
determination
  123:6 124:1
determine 50:8
  60:20 120:17
determining
  119:22 125:6
developed 13:8
developing 42:4
deviation 21:16
  95:23
device 27:15 70:4,9
  90:21 91:17 93:4
  95:15 96:2,21,24
  101:14
devices 66:6
diagnoses 62:17
diagnosis 62:15
diagram 69:4
didnt 11:19 21:9
  24:8 25:19 29:8
  30:6 44:2 88:5
  90:23 94:9,24
  96:8 107:3 112:10
  117:22 118:10
  120:14
diego 35:23 110:11
dies 124:9
difference 64:14,16
differences 25:12
different 11:18
  17:4 24:17,21
  26:5 45:12,13
  57:23 58:1 64:20
  104:18 113:18
  124:25
differential 62:17
differently 99:1
direct 42:21 109:14
directing 57:9
direction 94:8
directions 86:24
  87:1

directly 85:3 94:23
director 108:11
disagree 122:23
disagreements
  25:16 94:8
disc 13:5,11,14
  14:18 48:20 100:6
  125:22
discharge 34:8
discharged 33:19
  71:9
disclose 11:18,21
disclosure 23:4
  24:18,21
discussed 53:5
  120:14
dispatch 49:17,21
  55:23 57:21 60:19
  72:5,9,11 73:3
  74:1 89:14 95:23
  115:15,24 119:8,8
dispatched 48:25
  49:8 51:8 57:18
  58:2,3,5 61:21
  116:22
dispatcher 73:6
  115:16 116:1,11
  116:23 120:11
dispatchers 118:6
  119:11
displaying 61:1
  81:15
dispute 49:24 52:6
  119:7
disrobed 49:11
distance 45:9,20
  46:4 71:4 75:4,9
  79:20 80:12 125:5
distributed 33:5
district 2:1,2 37:25
  126:5
disturbance 51:18
division 2:3
document 19:5,12

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-8   Filed: 06/01/16   Page: 40 of 55 PageID #: 2596
Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                    March 8, 2016

Page 136

23:19 29:16 31:13
32:9 36:20 54:11
95:17 105:24
**documents** 49:15
57:22 63:4 71:2,6
84:17 98:18
104:17,25 112:5,8
121:11,15
**doesnt** 72:21 81:8
81:18 90:5 96:22
97:7 119:10
**doggystyle** 112:14
**doing** 18:24 26:7
83:8 91:12 93:2
123:22
**doj** 36:5 103:3
104:17,23 105:2
106:17
**dont** 7:25 8:1 9:3
9:24,24 13:16,21
14:10 17:3 18:10
22:6 27:1,13 29:4
29:14,19 30:15
31:15,24 33:13
35:4,15 38:3,11
38:15 43:13 44:25
47:21 48:8 49:11
49:22 51:24 52:7
53:3,11 54:22,24
56:21 58:3,13
60:23 62:15 63:21
65:16 67:17 69:2
71:25 76:6,10
77:4,22,23 79:24
80:6,25 81:21,21
82:1 85:13 89:18
91:23,24 92:1,3
92:14 93:17,25
94:6 95:21 96:16
103:10,22,23
104:22 105:3
106:3,6,15 108:11
108:12 111:19
112:2,21,23

115:22,23 116:8
116:16,18 117:12
118:5,20 120:12
122:2,6,7 123:19
125:17,19
**doubt** 47:12,15
**dowd** 3:13,14,14
5:3 6:12,12 85:10
107:15,17 109:4
109:10,19,20
113:5 114:4
115:25 116:19
118:23 119:15
120:3,16 121:23
122:9 123:15
124:7,17,23
**dowdlaw** 3:17
**download** 64:20
72:2 73:12 91:10
91:13,19 92:1
93:7,9,11 96:2
121:24,25
**downloaded** 90:25
91:22 92:5,7,25
**downloading** 95:5
**downloads** 95:8
**dozen** 102:1
**dramatically** 64:18
**drift** 95:20
**drive** 15:14
**driven** 15:6
**driver** 54:3
**drove** 58:11 80:10
**druginduced** 62:10
**drugs** 47:17 62:21
**duly** 6:19 126:1,13
**duration** 90:22
94:19
**duties** 41:10

───────────────
**E**
───────────────
**earlier** 34:12 37:6
38:15 101:3 110:9
125:3

**early** 11:6 82:10
**easier** 113:9,14
**east** 8:3
**eastern** 2:2,3
**ecw** 28:10 29:7
37:15 65:10,21
67:7 71:9 73:10
84:14 86:2,11,13
88:12
**edition** 28:1,14
**educated** 66:10
**effect** 28:10 29:23
30:4 66:7,14
67:20 68:4 76:16
76:17
**effective** 28:8 75:22
**efficient** 64:19
**effort** 98:24
**efforts** 81:18
**eight** 101:11 109:19
**either** 18:5 21:8
24:4 32:14 106:5
122:25 127:4
**elapsed** 86:1
**electricity** 114:8
**electronic** 27:15
**elements** 51:19
53:5,8,11,22,25
**eliminated** 106:10
**email** 13:9,13,17
14:18 21:23
**emailed** 100:7
**emergency** 61:2
62:3,23
**emphasis** 118:12
**employed** 35:9
**employee** 73:7,19
73:21
**employment** 33:19
**encounter** 33:24
34:7 39:1 41:6
43:1 50:16 57:14
57:17 58:18,24
59:5 60:9,25 61:6

61:23 63:19 79:19
112:12
**encountered** 43:4
58:9 60:22 62:19
63:1,12,25
**encounters** 48:7
50:12 104:18
**ends** 125:22
**enforcement** 16:14
30:18 33:19 34:6
39:7 41:5 43:1
49:5 50:12,13
52:16 55:16 57:14
58:24 59:5 60:21
**engage** 67:8 84:9
**engaged** 8:18 17:2
17:4,9 55:20,25
**engaging** 36:11
85:8 86:12
**engineer** 10:4
**enhanced** 64:19
114:11 115:7
**enter** 70:7
**entered** 88:15
**entire** 28:23 106:25
**entirety** 107:2
**envelope** 101:11,16
**environment** 42:6
42:6,14
**equal** 48:4
**equipment** 122:22
**erratic** 43:6
**escalation** 27:8
**especially** 47:16
**essence** 30:3
**established** 110:1
**estate** 1:2 2:6
**estimate** 12:6 16:8
22:9,11
**et** 1:12 2:15 6:6
53:10 72:24 85:3
128:5
**event** 14:12
**events** 121:25

**everybody** 66:4
**evidence** 18:2 26:8
28:20 29:1,5 59:4
59:7,21 60:4 61:1
62:1 63:5 66:9
68:15 72:20 75:24
77:24 79:3 86:9
91:8 96:8
**evolving** 41:22 42:1
42:25 43:2,9,12
59:24,25 60:1
108:14,22 109:5
**exact** 13:21 49:11
49:22 58:6 118:25
**exactly** 44:18 91:23
91:24 98:17
**examination** 5:1
7:1 107:14
**examined** 126:13
**examiner** 9:18
**example** 20:11
42:24,25 47:19
93:22 95:1
**exception** 24:6
100:15
**excessive** 15:23
16:16 17:9,15,19
24:12 34:14 35:2
36:12,20,23 37:5
109:21 110:2
**excited** 38:25
**exclusively** 23:20
**excuse** 109:8
**executive** 30:17
**exercised** 86:17
96:7
**exhaustive** 13:10
100:11
**exhibit** 5:6,7,8,9
22:16,19 23:6,9
23:13,16,25 24:3
25:8 41:23 84:7
99:1,23 101:9,24
102:14 109:15

Tina Moore v. Brian Kaminski, et al.

Steven Ijames

March 8, 2016

Page 137

121:2
**exhibits** 5:5,12
**exist** 17:23
**existed** 32:25
**existence** 84:7
**existing** 52:2
**exists** 47:19 89:20
    90:7
**exited** 80:7
**exiting** 80:5
**expect** 21:10
**expected** 45:10
**experience** 30:1
    45:17 52:16 55:15
    59:9,15,21 74:2
    82:8 96:20 108:18
    119:1 123:1
**experienced** 75:19
    79:7
**expert** 9:1,4,8,25
    10:1 12:2 17:22
    18:17 38:14 95:3
**expertise** 8:24
    32:13
**experts** 8:15
**expire** 33:15
**expires** 130:11
**exposes** 52:12
**exposing** 111:12
**exposure** 51:16,23
    52:8,11,17 54:20
    55:11 56:9
**extent** 28:15 100:19
**extra** 89:4 113:16
    114:23
**eyes** 15:12 80:11

---

**F**

**face** 54:12 84:22
**facing** 77:17
**fact** 55:12 69:8
    72:17 123:15
**factor** 46:1 125:6
**factors** 9:15 45:19

45:25
**facts** 17:23,24
    18:23 34:20 53:13
    56:24 78:21 87:4
    88:23 89:24 117:2
    124:9
**factual** 49:4 72:21
    112:11 119:2
**factually** 26:9,14
    50:9
**fair** 14:13 16:8
    52:16 100:13
    102:5 104:24
    109:14
**fall** 13:20 67:21
**falldown** 32:19
**familiar** 29:17
    30:18 40:19 67:25
    81:19 87:17,19
**family** 20:14 36:8
**far** 8:16 30:14
    45:16 46:9 62:14
    63:24 91:22 120:3
    123:13
**fashion** 43:6 70:10
**favor** 129:1,7
**fbi** 8:13
**fear** 53:10,23
**federal** 7:9 36:6
**fee** 21:17,18,20
**feet** 45:15,16,17
    63:13 70:5 71:4
    75:3,12 76:4
    79:21 80:5,7
    82:21 83:19 84:2
    85:17,22 98:16
**felt** 38:17
**female** 54:3,5
**ferguson** 7:10
    11:17,21,24 12:1
    15:1,2 28:21 29:1
    29:5,22 30:9
    31:11 48:25 49:2
    51:5,21 52:8 53:1

54:13,18 55:17,22
    56:2,4 57:25
    60:20 61:12 65:6
    65:9,13,17,20
    66:17,25 67:6,20
    68:23 72:5,9 73:2
    73:6,19,21 74:14
    84:6,14 91:9,18
    92:24 96:1 102:3
    103:4 104:5,8,13
    104:18 105:25
    106:14 108:20
    111:14 115:16,16
    116:3,9 118:15,22
    120:22 121:23
    122:21
**fergusons** 103:25
**field** 9:21 23:17
    26:20 39:7 40:2,5
    40:16 42:2 68:5,9
    87:20 94:3
**fields** 9:2
**fifth** 71:24,25
**fight** 80:23
**figure** 44:16 91:14
**file** 101:8 104:21
    106:25
**filed** 19:19 36:9
**final** 86:3
**find** 38:2 118:2
**finding** 124:11
**fire** 8:15 16:23
    80:23
**firearm** 63:8
**fired** 24:14 71:3
**firing** 67:7
**firm** 11:12,25 20:19
    20:21 100:14
    102:15,18,21
    128:14
**first** 6:19 8:7 11:1
    14:9 19:23 26:14
    32:10 33:1,3,14
    43:21 54:11 58:9

58:17 60:3,8,15
    60:24 61:6,22
    62:18 63:1,12,25
    67:11 68:4 71:10
    73:9,17 74:20
    75:14,21,25 76:4
    76:7,23 77:8,16
    77:20 78:6,12,15
    79:18 80:2,10
    82:14,24 83:1
    84:19 86:3,6 88:2
    88:6,15 89:3,16
    89:19,25 90:4,25
    90:25 92:13,19
    98:11 99:11,12
    103:9 119:22
    126:13
**fist** 97:18
**fists** 81:4 98:9 99:5
**fit** 50:20
**five** 17:16
**fivesecond** 26:14
**flag** 18:18
**flat** 83:3
**flee** 76:8
**fleeing** 76:13
**flight** 76:13
**floor** 2:21 126:9
**fluctuate** 21:14
**fly** 70:5 110:11
**focus** 41:2,14 44:4
    44:14
**focusing** 14:14
**folks** 123:3
**follow** 19:4
**following** 84:11,23
    88:2 91:1,16 92:5
    95:25 98:18
**follows** 6:23
**followup** 107:18
**foot** 56:22
**footnoted** 27:4,8
    101:6 102:19
**force** 15:23 16:16

17:9,15,20 24:12
    34:14 35:2 36:12
    36:19 37:4 41:12
    41:13 47:14 48:12
    64:6,8 65:6,9
    67:16,19,21 68:25
    78:17,19,24,25
    84:6 86:17 90:15
    92:8 93:3 99:9
    104:10,19,22
    106:16 108:25
    109:9,12,21 110:2
    113:18 116:20
    120:23 121:5,6,17
    123:8,12,16 124:9
    124:19
**foregoing** 126:16
    126:19
**forensic** 8:19 21:15
**forever** 82:10
**form** 17:2 20:22
    29:2 31:16 73:23
    91:21 100:19
    102:6 103:14
    106:17,19 109:2
    113:3,20 116:14
    117:20 119:25
    120:13 121:21
    124:13,21
**format** 18:23 19:1
    29:11,21 30:13
**former** 122:20
**formerly** 122:10
**forming** 107:25
**formulate** 19:7
    25:17
**formulated** 19:12
**forth** 69:8 100:1
    114:8 126:20
**forum** 30:17
**forward** 87:7
**found** 19:2 25:7
    31:13 56:13
    116:25

Tina Moore v. Brian Kaminski, et al.

Steven Ijames

March 8, 2016

Page 138

**foundation** 62:4,24 73:23 96:4 115:20 116:14 120:13 122:5 123:10
**four** 17:16 24:4 40:18 58:4 72:1 78:22,23 91:16 93:12 97:15,22 98:4 99:3
**fourth** 2:21 3:22 6:4 71:18,19 90:4 99:19 110:24 126:8 129:10
**frame** 122:14
**free** 110:1
**french** 34:18,19
**frequently** 58:4 118:6 119:9
**friend** 1:3 2:7 108:10,10
**frightened** 54:6
**front** 34:23 54:22 58:12
**full** 10:18 126:23
**fully** 76:3
**function** 69:10
**functioning** 87:15
**furnish** 100:18
**furnished** 102:15
**further** 30:23 85:7 107:10 125:17 127:3
**furtherance** 85:1
**future** 38:19 124:12,20

**G**

**gain** 55:6 66:18
**gained** 68:8
**gap** 45:8,15,18,20 46:6,14,18,23 47:4 48:1 88:4
**gateway** 4:3 130:5
**gather** 19:11

**general** 45:5 59:21 100:24 101:1
**generally** 14:6 48:6 50:14 58:10 76:17 87:13 117:25
**generic** 31:20 64:22
**generically** 76:17
**genitals** 52:13
**getting** 16:18 64:14 72:18 77:9 99:16
**girl** 24:16
**give** 10:11 14:11 15:25 22:24 31:4 38:7 42:24 46:7 47:18 58:6 86:21 86:24 87:1
**given** 7:13 14:17 16:12 17:1 18:13 24:4 32:3 83:7 126:25
**giving** 79:11 86:14
**go** 15:5 36:23 42:9 45:16 51:2 69:20 75:13 85:11 98:6 99:22 101:5,18,19 124:3
**goal** 42:16
**goes** 47:1,2,10 82:7
**going** 13:10 42:24 48:10 62:16 94:9 118:23
**gold** 66:3
**good** 43:16,17 45:6 107:16 124:18
**gore** 4:3 130:5
**government** 36:6
**gray** 125:10
**greater** 46:4 47:7 114:5 115:1
**groin** 70:20
**ground** 75:13 77:17 78:8 82:24 83:2,3 83:4,14
**grounds** 80:17

**group** 110:20
**guaranteed** 115:7
**guess** 13:19 52:12 59:14 96:13
**guessing** 13:14
**guideline** 76:19 93:23 94:13
**guidelines** 80:16
**gun** 46:13

**H**

**hairs** 85:13
**half** 12:6,7 102:1 125:15
**hammons** 7:24
**hand** 23:4 32:16,22 46:12,12 54:17 87:4 130:10
**handcuff** 71:21 88:8
**handcuffing** 80:1 87:25
**handful** 34:13
**handgun** 63:6
**handheld** 65:2
**handle** 51:2
**handout** 66:14
**hands** 77:9,13 78:9 78:14 82:17 83:13 85:9 87:5
**handson** 32:13
**hanging** 72:23
**happen** 13:6,12 62:16 119:10
**happened** 37:9 98:18 124:11
**happens** 46:22
**happy** 101:7
**harm** 58:14,14 59:3 60:13,16 124:20
**harms** 58:8
**hasnt** 38:9
**havent** 21:4,23 22:7 91:15

**headquarters** 28:3
**health** 115:1
**hear** 31:21 44:2 86:22 117:7
**heard** 61:9,13,15 61:17,19 115:19
**hearings** 16:22 17:1
**heart** 68:16 74:24 114:24 125:5,7
**heavy** 56:21
**held** 10:24 70:4 105:10
**help** 81:18 119:3
**helpful** 89:5 116:25 117:4 119:21
**helps** 105:13
**henke** 123:7
**hereunto** 130:8
**hernandezrojas** 35:19,22 36:8,14 37:16
**hes** 83:10 85:2,3,9 85:20
**highlight** 18:19
**hip** 70:21
**hired** 13:18,22 20:20,23 35:25 36:9 37:7 78:22
**historically** 16:6,18 19:2
**hit** 24:16
**hitting** 53:20
**hold** 9:8 10:1 70:13 70:14
**holm** 3:6 128:17 129:3
**home** 8:2
**hope** 81:7
**hosted** 33:6
**hotel** 13:2
**hour** 21:13
**hourly** 20:24 21:11
**hours** 2:23 15:16

22:8,11,12 110:5
**house** 8:12,14 21:24 101:13
**human** 9:15
**hundreds** 17:19
**hung** 36:24
**hurt** 81:18,22
**hypothetical** 89:23 89:25 113:12
**hypothetically** 58:13

**I**

**iacp** 27:5,10 28:8,9 29:6,9,11 30:1,4 31:18 39:24,25 65:21 67:7 80:13 94:13 100:22,25 102:24 110:10,18
**id** 13:14
**ida** 3:20 6:14
**idea** 22:3 70:14 81:10
**ideally** 87:6
**identification** 22:17 23:7,14 24:1
**identified** 12:1 18:17 38:13 106:17
**identify** 6:8 69:13 91:19
**ijames** 1:18 2:19 6:5,18 7:3,5,16,17 7:23 13:1 22:20 23:9 48:20,23 101:23 107:12,16 125:21 128:11
**ill** 7:21 18:25 19:5 23:3 42:13,22 43:24 44:6,10,13 44:21 52:9 54:25 62:20 64:17 72:25 86:6

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                                                   March 8, 2016

**illinois** 2:24 127:12
**illness** 47:20
**im** 9:5,25 11:15,19
12:3 16:11,18
18:24 21:25 24:12
25:24 29:8,11,17
31:6 32:5,5 36:13
37:14 38:5 40:19
53:7 58:12 59:7
61:17 65:22,24
71:2 75:18 81:7
83:24 84:11 85:11
89:25 91:14,15
93:2 96:9,22 97:9
101:1,3,16 103:19
106:12 107:3
109:7 110:4,9,16
110:20 115:22
116:17 118:17,23
119:8 120:14,24
121:13,22 123:14
**immediate** 43:3
46:2 58:19,22
82:22 98:10
**immediately** 59:25
85:4 91:1
**imminent** 60:13,16
66:19 67:2
**impact** 94:24
119:13
**implements** 122:18
**important** 40:25
41:1,3 78:3 111:3
119:12 124:10
125:6
**impossible** 50:8
**improve** 105:13
**improved** 64:19
105:15
**inaccurate** 26:9,15
119:3
**inappropriate**
36:22
**inappropriately**

42:21
**incapacitation** 75:5
75:20 79:7 87:11
98:10
**inch** 125:15
**inches** 75:7 77:19
83:14
**incident** 15:5 28:25
65:18 112:20
124:9
**incidents** 105:20
106:16 124:12,19
**included** 21:17
**including** 53:11
60:6 68:19 104:1
124:11
**income** 12:4
**incorporate** 68:24
**incorrect** 101:4
**increase** 90:20
**increased** 68:16
114:11 115:5
**increases** 47:13
48:2 89:11
**indecent** 51:23 52:8
52:11,17 54:19
55:11 56:9
**independent** 78:18
78:25 91:13
123:13
**indepth** 110:12
**index** 5:1,5
**indicate** 65:19 71:7
72:21 79:11 80:16
92:24 112:3
**indicated** 72:10
**indicates** 84:18
93:11 118:24
**indicating** 73:3
**individual** 34:1,8
44:14 45:22 46:2
49:10,13 53:19
69:19 70:7 72:10
81:15 84:9 89:22

90:9 93:15 94:5
**individually** 1:1 2:5
**individuals** 7:11
8:9 75:6
**inference** 89:14
**influenced** 30:13
**info** 64:17
**information** 60:11
90:14 118:2
**informs** 73:21
**inherent** 58:15
89:11
**inherently** 47:21
**inhouse** 90:15 92:8
122:8
**initial** 13:15 50:7
58:23 73:9 84:23
98:7 99:21
**initially** 43:7 50:10
**initiated** 97:15
**injured** 36:8 48:9
60:4
**injury** 34:25 47:3
48:2 68:19 74:17
81:11
**input** 28:7
**inquiry** 8:23
**inservice** 111:19
**instantly** 86:8
**instruct** 90:13,24
**instructions** 95:25
**instructor** 33:1,2,6
33:8,11,12 65:15
65:17,18 122:17
**instructors** 45:12
122:12,13
**intend** 20:22
**intended** 76:11
**intentionally** 34:23
114:14,25
**intentions** 43:17
**interacted** 54:4
88:19
**interacting** 42:13

42:21
**interaction** 14:9
47:1
**interested** 127:5
**interesting** 85:24
**intermediate** 67:24
**internal** 90:14
120:21 121:16
**international** 8:12
30:10 32:25 35:6
35:10 65:25 68:1
68:9,25 108:4,7
125:5
**internationals** 66:5
66:11
**interrogatories**
6:23
**intersection** 60:9
**intervals** 91:2
**interview** 14:22,25
45:14
**interviewing** 14:20
**investigate** 51:3
**investigated** 105:6
**investigating** 104:9
105:8,12 124:8,18
**investigation**
107:23 116:5,19
120:21 121:16
123:14
**investigative** 54:13
104:9
**investigatory** 50:19
50:23
**involve** 11:20
**involved** 8:7 17:8
30:21 31:7 34:18
35:18 81:11
**involvement** 35:21
94:9
**involves** 64:6,8,12
**involving** 11:17
35:2 64:9
**iowa** 34:16

**isnt** 59:10
**issue** 18:25 19:9
90:23 108:11
118:11
**issued** 22:22 68:9
109:16
**issuing** 26:24
**items** 100:24
102:23
**ive** 7:16,16 8:21
10:18 11:22 12:9
16:6,18 17:3
20:24 22:8 23:2
24:7,17 28:5
30:21 38:12 40:15
45:16 82:10
118:13

———————————————

**J**

**january** 11:6 24:11
26:24
**jargon** 92:14
**jason** 1:2 2:6 20:17
60:16
**jeopardy** 43:20,23
44:5,9 46:2 48:10
48:12
**job** 10:24 94:17
**john** 34:19
**johnson** 3:5 5:2
6:10,10 7:2,6
48:22 74:3 85:24
91:25 96:11
106:22 107:10
**johnston** 4:2
**jumped** 58:12
**jumping** 59:2,11
**justice** 36:1
**justification** 78:18
78:25 109:13
**justifications** 98:2
99:2,8,10
**justified** 98:23
109:12

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                    March 8, 2016

Page 140

**K**

**kaminiski** 6:6 74:10 89:16

**kaminski** 1:12 2:15 14:15,22 28:24 49:20 50:6 53:13 54:1,5,8 55:9 56:5 56:8,16 57:11,12 57:16 58:9,17 59:6 60:3,8,15,17 60:19,24 61:6,9 61:18,22 62:18 63:1,12,25 65:12 66:10 71:3,9 75:24 76:8,24 77:8,15 78:7,11 78:22 79:11,19,21 80:3 82:15,16,25 83:15,20,21 84:2 84:4,19 86:2,10 86:12,18 87:6 88:3,7,10,15,18 89:7 90:12 91:11 91:17 93:3 94:22 96:3 97:17,24 98:12 99:10 104:1 106:23 108:15 113:10,17 114:13 114:22 123:13 128:5

**kaminskis** 55:23 58:23 92:21 108:18 112:12 120:23 121:17,24 123:8,17

**kansas** 3:8 128:19 129:5

**keep** 46:4 111:4,16

**kicking** 85:3

**kind** 24:10 64:21

**king** 61:13

**knees** 77:9,13,16 78:1,2,8,9 82:17 83:13 85:9 112:14

**knew** 57:17 114:3

**knife** 43:25 44:1,10 44:11 46:3,12 63:10

**know** 7:25 9:24 17:3 29:19 30:11 30:12,23 32:17 36:6 37:11 38:13 38:15 39:20 51:21 51:24,25 53:4,9 53:11 58:13 63:3 66:16,24 68:22 76:10 91:22,23,24 92:2,14 93:8,17 94:6 96:11 100:5 105:3 106:13 108:11 111:18 118:5,17 122:6,7

**knowingly** 52:12

**knowledge** 22:10 25:23 28:17 59:8 111:22 116:8,13 123:5

**known** 43:20

**knows** 52:13 57:12

**L**

**lady** 118:14

**laid** 80:11

**lane** 57:5

**language** 81:19 84:25

**laser** 70:2

**late** 26:6

**law** 16:14 30:18 33:18 34:6 39:6 39:14 41:5 42:25 49:4 50:12,13 52:10,16,19 55:16 57:13 58:23 59:5 60:21 100:14 102:15 110:13 111:5,11,12,17,23 112:4

**lawful** 6:19

**laws** 109:25

**lawyer** 10:8 37:11 38:17

**lay** 15:12 83:3

**lead** 25:19

**leads** 70:3 89:14

**leave** 46:13

**led** 60:12 117:22

**ledge** 39:12

**left** 11:2 24:15 32:11 53:5 54:17 70:17 74:21 123:16

**legal** 8:24 10:11 110:6,14

**legitimate** 67:10

**lengths** 125:1

**lesson** 32:21 66:20 66:22

**level** 40:12 55:18 84:13 91:1 92:13 105:13,15

**levels** 108:25 109:11

**library** 102:23

**license** 16:20

**licensure** 26:20

**lies** 42:12

**lieutenant** 57:9 92:16,18 123:7

**lieutenants** 111:16

**lifetime** 52:2

**light** 57:6

**lightning** 65:2

**likelihood** 48:2

**likewise** 41:15 57:7

**limitations** 18:11

**limited** 25:22 46:19

**linda** 2:23 126:1 127:11

**line** 90:25 92:13

**lipa** 4:3 130:5

**list** 13:10 24:3

35:12 110:16 118:22

**listed** 35:13 102:10 102:13 103:20

**listen** 72:4

**listened** 49:12 72:7 116:21 117:8

**listening** 115:23 116:16 117:11

**literally** 30:14

**literature** 66:6,11

**litigation** 12:5 21:11 37:15 104:25

**little** 95:22 98:25 120:17 125:10

**living** 19:12

**located** 63:19

**location** 79:25

**locations** 60:22

**lock** 75:25 87:10

**log** 115:24

**logged** 119:13

**logs** 89:14

**long** 8:5,18 15:10 16:17 39:19 125:15

**longer** 67:9 91:2 93:20 94:19

**longest** 125:13

**look** 19:18 31:24 36:21 53:21 56:24 103:3 107:2

**looked** 27:5,6,16

**looking** 22:5 118:17

**looks** 109:19

**lost** 37:12

**lot** 13:20 16:22 25:16 32:6,12 63:19,23 100:9

**lots** 72:22

**louis** 2:21 3:16,23 4:5 6:4 7:10

11:23 126:9 129:11 130:7

**lower** 51:1 69:14 70:7,20 75:10,10 97:11

**lump** 119:11

**lunge** 78:11

**M**

**m** 2:23,23 3:5 48:24 49:17,24 64:18 74:5 90:23

**m26** 33:5 64:15,22 64:25 90:19

**madison** 3:7 128:18 129:4

**magazine** 39:11

**magazines** 39:22

**mail** 8:1

**mailing** 8:1 110:16 10:20 45:21 116:4

**maintained** 10:18 10:20 45:21 116:4

**maintaining** 41:1

**major** 7:16

**majority** 16:3 48:7

**makers** 111:10

**male** 72:11

**malfunction** 70:6 125:7

**man** 54:9 55:12 114:20 120:4

**manner** 41:9 97:19 98:8 99:6

**manufacturer** 66:3 93:14,17,25 96:23

**march** 1:20 2:22 6:2 126:10 127:8

**marguerite** 49:1 56:6,17 60:10 74:6

**marked** 22:16 23:6 23:13,25 25:8 41:23

**martinelli** 25:7,13

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-8   Filed: 06/01/16   Page: 45 of 55 PageID #: 2601
Tina Moore v. Brian Kaminski, et al.
Steven Ijames                                                    March 8, 2016

Page 141

26:12
**master** 33:6,8,12
  33:15 65:17
**material** 21:2 22:14
  23:1 26:23 27:9
  66:1 71:13,15
  99:22 100:1,5,6
  100:13 101:6,23
  102:5,13 111:2
**materials** 18:21
  19:13,15 55:3
  65:19 80:16
**matrix** 50:20
**matter** 11:17,20,22
  13:18 14:19 15:3
  18:7 20:9,14,23
  22:23 23:5 24:18
  24:22 26:25 38:14
  52:24 90:5 97:6,7
  108:10 121:3
**matters** 8:6 12:1
  13:12 57:10
**mean** 41:12,25 42:1
  50:21,25 73:19
  81:2,3,8 87:20
  88:18 89:4 105:15
  109:11 117:15
**meaning** 71:22
  81:17,20 102:24
**means** 69:23,24
  87:21
**meant** 72:14
**mechanical** 122:18
**medical** 9:4,6,18
  20:17 61:2 62:2,3
  62:23 94:20,21,23
  95:2,3
**meet** 7:7 21:7
  111:20
**meeting** 110:11,12
  110:18
**member** 29:15
  74:17
**members** 29:10

**memo** 128:1
**memorialize** 37:2
  38:18
**memory** 31:15
  39:17 49:22 77:23
  107:1
**memphis** 28:1,21
**mental** 47:20
**mentally** 42:13,22
  43:24 44:6,10,13
  44:20 47:17 62:20
**mentioned** 31:16
  38:15,16 39:24,24
  40:15 72:13 101:3
  102:23 110:9
**met** 12:21 51:13
  107:17
**methodology** 18:16
  18:20
**mid** 43:21
**mid80s** 8:22
**mid90s** 32:11
**mind** 21:6 26:10,18
  43:9 57:6 72:20
  117:23 126:12
**mine** 23:24
**minimize** 105:20
**minor** 1:4 2:8
**minute** 50:1,3
**minutes** 12:23
  15:12,18 73:1
  74:4 95:23
**misconduct** 12:17
  17:2,5,7 105:14
  105:16,21
**misdemeanor**
  52:20 55:18
**mission** 41:15,19
  43:1 44:15 50:10
**missouri** 2:2,21,25
  6:4 7:25 8:4
  10:14,17,18,21
  40:10,11 49:2
  51:15 52:3,10,19

53:21 55:16 56:8
  62:7 126:6,9
  127:12 130:7
**mixed** 36:14
**mo** 3:8,16,23 4:5
  128:19 129:5,11
**model** 27:5,10 28:8
  28:22 29:6 30:4
  31:13,18 64:11
  80:21 94:16
  100:21
**models** 29:9
**modified** 90:19
**modify** 19:6 28:4
**moment** 57:11
  63:22 83:22 85:20
**moments** 54:4
**monell** 103:17,22
**money** 16:13
**month** 11:2 12:11
**months** 23:11
**moore** 1:1,2,3 2:5,6
  2:7 3:3,12 6:6,11
  6:13 20:14,17
  51:4 52:25 53:14
  55:21 56:1,9,18
  57:17 58:8,18,19
  58:22 59:6 60:4
  60:13,16,22,25
  61:1,7,7,13,19,23
  61:23 62:18 63:2
  63:2,5,13,13,16
  63:24 70:24 71:3
  73:20 74:9,21
  75:2,13,19,25
  76:3,8,24 77:9,13
  77:15,25 78:7,11
  78:23 79:3,3,12
  79:20,20 80:3
  82:15 83:1,2,7,19
  84:2,3,18 85:8
  88:4,8,11,16,20
  88:24 89:16 91:17
  93:4,12 94:22

97:16 98:3 107:19
  107:20 108:14
  112:13 113:7,15
  128:5
**moores** 38:22 70:17
  83:6 114:23 115:1
**morning** 7:8,19
  12:22 49:5 53:16
  56:21 57:1 112:13
  120:23 123:9
**motorcycle** 34:24
**motorist** 58:11
**move** 85:10 87:7,23
  119:15
**movements** 77:7
**moving** 42:8
  101:24
**multiple** 36:15 49:9
  49:13 116:20
**mumbling** 61:24
  62:1,22
**municipal** 53:2,4
**municipality** 11:24

_____

**N**

**naked** 53:19 54:9
  55:12 59:11 61:7
  97:16 99:4 120:5
**name** 7:3,6 29:21
  107:16 118:17
  128:14
**named** 12:16
**narrative** 18:23
  21:9 23:2
**narratives** 121:6
**narrowed** 46:19
**narrowly** 23:3
**nation** 28:2
**national** 28:3 29:15
  40:7 110:10,21
**natural** 33:21
**nature** 20:12 59:9
**near** 70:20 74:24
  114:24

**necessarily** 32:20
  50:25 51:14 111:9
**necessary** 48:13
  67:9 100:12
  122:18
**need** 21:7 36:13
  91:6
**needed** 25:17 84:15
**negative** 43:18
  68:17,19
**negativity** 41:16
**net** 3:17
**neuromuscular**
  75:20 79:7 87:11
**neuromusculature**
  75:5
**never** 63:3 74:2
  78:14 88:18 123:5
**night** 13:2 15:9
**nmi** 87:11
**nonassaultive** 85:8
**noncompliance**
  81:17 83:9,11
**noncontrolled**
  69:15
**nonpreferred**
  113:23
**nonresponsive**
  85:11 119:16
**normal** 119:1
  120:24 130:3
**normally** 102:16
  110:18
**north** 3:15 49:1
  56:5,17 60:10
  74:5
**notary** 130:13
**notes** 18:18
**notice** 126:4
**notified** 106:1,4
**november** 10:17,22
  68:6,12
**nudity** 55:24
**number** 14:1 15:25

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                   March 8, 2016

27:10 29:6 33:13
39:18 49:12 51:12
51:18 54:18 58:6
67:8 72:12 93:18
94:15,17 99:25
**numbering** 27:14
**numrich** 3:6
128:17 129:3

**O**

**oaths** 126:2
**object** 62:4 73:23
96:4 106:19 109:2
113:3,20 115:20
119:25 121:21
122:5 123:10
**objection** 109:6
**objections** 126:22
**objective** 41:15,19
44:15 50:5,10
67:10
**objectively** 18:2
56:24
**obligation** 45:1
**obligations** 56:23
**observation** 84:3
112:25
**observed** 75:25
77:3,8 80:3 84:1
113:8,10 119:24
**obstruction** 51:17
**obvious** 125:11
**obviously** 15:13
20:5 25:10 46:13
48:7 55:11,24
**occasion** 16:11
**occasions** 17:6
34:13 78:24
**occur** 42:7 80:20
**occurred** 58:14
63:20 93:10 119:4
124:15
**occurrence** 38:16
57:18 71:8

**occurring** 50:9
**occurs** 74:2
**october** 27:19 28:9
29:6 30:4
**odd** 70:10
**offense** 51:11 52:11
52:19 54:19
**offenses** 55:17,18
**offered** 17:13 39:2
**offering** 13:25 14:4
38:21,24 103:15
103:17,19,24
104:3 106:18
**offers** 30:20 90:14
**office** 6:3 7:24
37:24,25
**officer** 10:13 14:9
16:23 17:1,7,9
24:14 26:13 34:22
40:20,22,24 41:1
41:4,14 42:4
43:16,20,23 44:5
44:9,19,25 45:9
45:21 46:13,20
47:10,13 48:3,10
49:16,20 50:1,6
50:13 51:8,10,14
53:13 54:1,5,8
55:9,23 56:4,5,8
56:16,19 57:5,16
58:9,17,23 59:6
60:3,8,15,17,19
60:24 61:5,9,22
62:6,7,10,14,18
63:1,12,25 65:12
66:10 67:8 71:3,8
71:22 74:4,9,12
74:15 75:23 76:8
76:24 77:7,15
78:7,11,22 79:11
79:14,17,19,21,24
80:2,3,17,19
81:22,22 82:14,16
82:20,25 83:15,20

83:21,24 84:1,2,4
84:14,19,24 85:6
85:17,22 86:2,10
86:12,17 87:6,22
87:23 88:3,7,10
88:14,15,18 89:7
89:15,15,21 90:9
90:12 91:11,17
93:3 94:22 95:1,3
95:4 96:3 97:17
97:23 98:14,21
99:10 104:1,1
105:20 106:1,23
108:15,17 110:5
112:12,25 113:8
113:10,16,24
114:1,13,20,22
119:23 120:23
121:16,24 122:21
123:6,8,15,17
128:8
**officers** 13:16 14:15
14:22 15:13 16:20
21:8 29:2 37:22
42:13,20 43:11
45:4 46:22 48:11
48:25 49:7 53:12
57:18,23 58:1,5
60:20 61:3,12,14
61:17,19 66:16,24
70:13 71:8 72:10
72:15,17 73:4,17
73:22 76:9 77:1
81:18 87:21 88:22
88:23 89:4,10,12
104:10,19 105:9
106:1,9 108:24
111:4,12,16,17,23
115:17 116:11,22
118:24 119:6,18
120:10 122:9,20
**offices** 25:1 126:8
**oftentimes** 47:10
**oh** 49:25

**okay** 17:11 36:15
36:17 37:25 78:5
90:1 97:10,25
99:13 109:10,14
117:20 118:19
119:19 121:14
123:21,25
**olive** 4:4 130:6
**once** 52:22 77:12
79:2 80:25 81:5
**ones** 40:14,19
93:24
**ongoing** 85:18
98:22
**open** 46:11
**operate** 8:10 50:18
**operating** 63:18
**operational** 50:5
67:10
**opinion** 25:12,17
26:5 34:23 41:13
42:12 50:7 58:25
70:18 75:7 82:15
82:18 89:8 91:4
100:20 103:14,22
109:16,21 118:8
119:14
**opinions** 10:11
13:25 14:4,11,12
14:14 18:2 19:7
25:3,10 36:3,19
38:21,24 39:2
102:7 103:17,19
103:24 104:3,7
106:18 107:25
115:11 117:21
118:11,12
**opportunity** 7:7
18:9 21:5 87:24
89:12,20 90:6
**opposed** 14:5 78:8
115:1
**options** 89:12
**oral** 6:22

**order** 22:19 29:23
30:8 31:11 39:14
98:20 105:23
117:24 120:18
**ordered** 96:25
98:16
**orders** 45:4 67:16
68:23 97:17 99:5
99:15 111:14
**ordinance** 51:23
52:8
**ordinances** 51:22
**ordinarily** 45:17
**organization** 30:1
40:11
**organizations**
93:19 94:2
**origin** 8:15
**original** 110:6
112:19 128:15
129:1
**otto** 3:6
**outcome** 41:17
43:18 68:17,19
94:24
**outside** 17:12
106:13
**overt** 84:9,15
**overtly** 83:15,20
84:4,18
**owner** 108:9
**ozark** 10:16,21,25
11:3

**P**

**p** 3:6,14,21
**page** 97:3,11 99:1
99:24 101:9,24,25
101:25 109:18,19
**pages** 22:25 99:24
100:1 102:14
126:19
**paid** 35:9 130:2,3
**paper** 94:16

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                March 8, 2016

Page 143

**paragraph** 97:12
**parallel** 47:11
**parent** 32:9
**parked** 63:23
**parking** 63:19,23
**part** 14:19 15:2
27:2,11 31:17
35:24 67:11 85:17
85:18 100:2
104:13 105:2
106:7 110:7 115:2
115:10
**participated** 28:24
**particular** 14:4
27:24 28:6 58:2
59:13 62:13 63:22
92:18 111:18
118:10
**particulars** 14:8
**parties** 127:4,5
**passed** 120:18
**passing** 123:23
**passive** 81:15,17,20
81:24 82:5,12
110:25
**patrol** 35:22 36:2,6
36:11 37:20 62:15
**pattern** 104:4
**patterns** 57:1
**pavement** 75:17
77:20
**pc** 128:17 129:3
**pd** 10:19 101:13
**peace** 51:17 110:4
**peerreviewed** 39:19
**pending** 7:9 36:16
126:4
**penetrating** 113:16
114:23
**pension** 12:9
**people** 29:14,20
36:21 37:19 42:7
43:13 45:3 49:13
111:1

**perceive** 84:24
85:17 98:14
**perceiving** 82:22
**percent** 12:4 16:7
**perception** 47:19
76:9
**perf** 30:16,19,24
31:2,8,13 39:24
40:4 65:23 76:12
76:15,16,19 93:22
94:6,10
**perfect** 87:8 118:7
**perfectly** 70:4
**performance**
124:15
**performed** 94:21
120:22
**period** 106:10
**permit** 84:8
**permitted** 10:11
**perpetuate** 105:9
**perry** 4:3 130:5
**person** 16:13 18:17
43:4,14,24 44:10
44:16,20,24 45:12
46:5 48:5 52:11
53:15 59:11,16
60:4 62:2,22
65:17 72:21 73:3
82:20 86:22 87:10
87:24 92:19
118:21 124:9
128:14
**personal** 1:1 2:5
59:8,15 102:22
108:10
**personnel** 16:22,25
17:8,12 60:21
104:13
**persons** 14:25
47:20 59:13
**perspective** 8:24
61:3 124:10
**phone** 36:24

**photographs** 70:23
**phrase** 41:21,25
43:19 87:17
**physical** 42:17 47:1
66:19 67:2 80:19
85:15 96:18
**physically** 53:9
74:9,12,14,17
81:21 87:25 89:6
**physicians** 20:16
**physicist** 10:6
**piece** 26:7
**pitzer** 2:20 3:21 6:3
11:1,25 100:14
102:15 126:8
129:9
**place** 28:14 82:24
105:20
**places** 59:2
**plaintiff** 3:12 6:12
15:23 16:11,15
17:15 34:14 35:1
35:16 37:7
**plaintiffs** 1:7 2:10
2:20 3:3 6:10 7:9
16:2,4 19:19
**plan** 25:25 26:2
66:20,22 80:24
**plans** 32:21
**pleadings** 13:15
**please** 6:9,16
124:24
**plug** 95:15 96:14
96:19
**plugging** 95:25
**plunkett** 13:23
**point** 25:11 27:6,7
27:20,21,22,25
28:13 31:17,19,20
31:25 32:2,21
34:6 52:2 56:20
61:14 76:3,19
77:12,25 78:6
83:16,21 84:3

85:14,25 88:2,6
91:9,16 100:16,24
100:24 101:1,10
102:24 103:2
112:17
**points** 41:22 99:25
100:19
**police** 7:10,12 8:6
8:16,19,21 9:2
10:13,16,18,21
11:9 12:9,10,17
15:2 26:20 30:17
32:7 33:23 39:1
39:10,11 40:2,5,8
40:10,12,16 43:17
44:25 45:4 48:7
48:25 51:6 53:1
54:13 55:22 56:3
56:4,10 61:3
65:13 66:17,25
67:6 68:23 73:6
73:19,21 74:14
84:14 89:13 91:9
91:18 92:11,14,24
96:1 102:3 104:1
104:8,13,18,18
105:14,25 106:14
108:19,20 109:22
110:8 111:3,15,16
115:16 116:3,10
116:21 118:15
120:5,9,22 121:2
121:20 122:10
124:10,15
**policies** 12:12
67:16 69:1,3,5,6
105:19 123:18
**policing** 92:11
**policy** 27:5,11,15
28:9 29:15 30:8
30:14 31:11 32:19
65:7,10 67:7,18
76:16 80:22 82:11
84:7 94:16 100:21

**100**:25 102:25
106:3 109:22
110:10,21 111:8
111:10 123:9
**population** 45:5
**portion** 54:17
97:11
**portions** 23:4
**pose** 60:16
**position** 38:18 77:5
85:4 94:12 112:15
113:2,8,13
**positioned** 63:16
**possess** 63:2,5
**possibility** 47:8
68:17
**possible** 41:9 87:22
125:13
**postcertified** 110:4
**postemployment**
106:24
**posture** 37:12
**posturing** 38:17
**potential** 40:23
41:16 46:2 47:1,2
47:2,14 58:14
59:3 89:11 115:5
125:9
**potentially** 26:3
62:20 113:14
**power** 27:6,7,20,21
27:22,25 28:13
31:16,19,20,25
32:2,20 71:21
87:18 88:11
100:16,19,24,24
101:1 102:24
103:2
**practical** 41:18
46:16 87:3 89:21
90:8
**practice** 8:9 43:17
104:4 109:23
111:8 124:18

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                    March 8, 2016

Page 144

| | | | | |
|---|---|---|---|---|
| **practices** 9:2 40:2,5 40:8,12,16 | 85:10 96:12 108:19 116:20 | 113:22,24 114:2 | **pursuant** 126:4 | **rating** 33:1,11,12 33:12,15 |
| **predecessor** 64:23 | **priorities** 42:5 | **promulgated** 65:21 94:14 | **pursued** 34:24 | **rationales** 98:2 |
| **predict** 47:24 | **probabilty** 81:11 | **prone** 113:13 | **push** 42:14 | **reaching** 18:2 |
| **preference** 7:18 92:4 93:14 | **probable** 50:24 51:1,4,9,13,20 53:18 | **proper** 86:21 | **pushing** 49:10 120:5 | **react** 45:4 47:5 |
| **preferred** 68:13 86:23 90:11 | **probably** 8:21 9:22 11:10 12:10 22:8 | **properly** 87:16 | **pushup** 112:14 | **reactionary** 45:8,15 45:18,20 46:6,14 |
| **prepare** 12:21,25 108:21 | 38:5,18 53:24 62:9 71:16 72:14 | **property** 61:20 | **put** 18:11 29:20 69:7 87:5 | 46:18,23 47:4 48:1 |
| **prerandom** 106:24 | 108:9 | **propounded** 6:23 126:21,25 | | **reacts** 43:14 |
| **presence** 55:23 56:3 | **probe** 69:9,14,14 69:14,15 70:1,3,6 | **prosecute** 53:24 | **Q** | **read** 18:25 54:16 54:21 58:20 97:20 |
| **present** 87:21 | 70:8,16,19,20 74:21 75:1,10,10 | **provide** 100:10 | **quadrant** 57:24 | 103:5,6,7,8,9,11 103:12 111:1 |
| **presentation** 27:6,7 27:22 28:13 31:19 | 79:21,25 87:12,15 113:11 114:6 | **provided** 19:22 20:1 26:4 27:9 | **qualified** 126:2 | 118:14 |
| 31:21 32:2 102:24 | **probes** 69:10,13,20 | 86:9 92:1 101:6 | **quarterly** 110:11 110:18 | **reading** 89:13 110:17,23 112:2 |
| **presentations** 27:20 | 69:24 124:25 | **providers** 20:17 | **question** 8:22 37:6 78:3 83:17 84:11 | 118:20 |
| **presented** 56:24 57:22 | **problem** 62:10 95:19 100:9 125:7 | **provides** 64:19 | 90:2 98:25 101:15 109:8 114:22 | **realign** 95:18 |
| **presenting** 12:11 | **procedural** 37:12 | **provision** 52:1,10 | 119:17 124:24 | **really** 16:17 33:10 101:19 |
| **preserve** 120:9 | **procedure** 86:21,23 | **proximity** 68:16 80:4 | **questions** 5:2,3 7:2 44:3 48:22 72:12 | **reapplication** 86:7 |
| **preserved** 116:9 120:6 | **procedures** 12:13 105:19 | **prudent** 62:7 | 97:9 107:11,18 125:19 126:21,24 | **rear** 99:23 |
| **pretty** 64:21 66:4 100:11 | **process** 19:5 29:17 39:19 40:21 80:1 | **pspclaw** 3:25 | **quick** 45:10 | **reason** 34:3 44:19 44:22,23 49:7,24 |
| **prevent** 83:10 124:11,19 | 85:19 90:11 95:10 95:24 96:8,17 | **psyche** 61:2 62:2,3 62:23 | **quickly** 42:3 101:19 | 52:6 68:18 76:14 92:7 105:21 |
| **preventing** 82:23 85:7 | 98:21 104:9 110:12 111:11 | **psychiatry** 9:11 | **quicklymoving** 42:6 | 122:23 |
| **previously** 77:3 107:23 115:9 | 120:24 122:7 | **psychological** 106:23 | **quite** 118:6 | **reasonable** 36:4 82:20 84:24 85:6 |
| **primarily** 14:7,14 22:14 23:22 | **processes** 19:3 | **psychology** 9:9 | **quote** 68:13 109:21 | 85:22 94:17 98:13 98:21 |
| **primary** 40:18 44:14,23 50:10 | **produced** 30:8 31:14 49:16 54:12 | **public** 73:22 74:18 104:19 130:13 | **R** | **reasonably** 31:6 45:10 62:7 81:12 |
| 64:16 | 54:18 104:25 118:16 | **publication** 35:12 | **r** 1:3 2:7 | 85:18 |
| **prince** 33:3 | **product** 66:12 | **publications** 23:16 23:20,21 27:2 | **radio** 60:19 | **reasons** 95:18 |
| **principle** 30:15 | **professional** 93:19 | 39:6 | **raise** 85:24 | **reassessed** 113:25 |
| **printed** 13:2 22:25 | **program** 28:1 95:13 96:19 | **published** 39:22 | **ran** 119:7 | **reassessment** 32:18 |
| **printout** 95:5,17 | **progress** 71:20 | **pulled** 34:23 114:15,18 | **random** 91:2 92:25 | **recall** 29:4 31:15,24 33:10,13 35:25 |
| **prior** 29:2 31:3 53:15 56:4 66:12 | **prohibited** 68:14 | **pulling** 114:7,14,17 | **ranking** 92:19 | 38:3 39:18 49:11 |
| | | **pulls** 114:25 | **rapidly** 41:21 42:1 42:25 43:2,9,12 | 49:22 54:14 56:21 |
| | | **punch** 118:6 | 59:24,25 60:1 | 57:5 58:3 63:21 |
| | | **punches** 77:5 | 108:14,22 109:4 | 65:16 67:17 72:8 |
| | | **punching** 85:3,20 | **rare** 36:18 38:16 | |
| | | **purchase** 96:21 | **rate** 20:24 21:11 | |
| | | **purpose** 114:16 | | |
| | | **purposes** 114:21 | | |

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-8   Filed: 06/01/16   Page: 49 of 55 PageID #: 2605
Tina Moore v. Brian Kaminski, et al.
Steven Ijames                                                    March 8, 2016

Page 145

72:11,13,16 73:2
77:22,23 79:24
92:19 93:25
103:11,23 104:22
106:3 111:19
112:2,16,18
115:24 116:16,18
117:10 118:5,11
118:20 123:19
**receive** 8:1 18:24
26:23 59:9 65:12
103:12 110:15
**received** 13:4,6,15
13:17 21:23,24
24:9 49:16 54:8
102:10,18 112:5
**receiving** 49:21
**recess** 48:16,18
101:21 107:8
124:5
**recognize** 44:25
62:14
**recommend** 92:6
93:19 95:19
**recommendation**
94:7
**recommended** 94:4
94:15
**reconstruction**
9:13
**record** 6:1,9 7:4
48:17,19 91:24
92:1 93:10 101:18
101:19,20,22
107:7,9 118:4
124:3,4,6 125:21
**recorded** 116:12
**recording** 115:15
**recordings** 115:19
116:12
**records** 13:4,11,11
14:17 20:1 55:7
57:21 79:10 92:23
118:21

**recurring** 81:6
**reduce** 81:10
105:15
**reduces** 89:10
**reducing** 41:16
**refer** 97:3
**reference** 36:2
63:21 72:16 93:18
107:25
**referenced** 27:24
28:6 31:20 34:12
67:18 69:4 101:10
102:20
**referencing** 31:25
**referred** 27:14
31:22 45:18
110:15
**refers** 112:13
**reflective** 9:23
26:11
**refusing** 97:17 99:4
99:15
**regain** 82:21 85:16
85:22
**regaining** 85:1
**regard** 68:1
**regarding** 125:3
**region** 28:6
**regular** 59:10 96:8
108:6,8
**relate** 104:4,17
**related** 32:19 37:15
42:5 55:12 108:4
127:5
**relates** 8:23 14:8
27:7 28:10 30:24
37:21 65:10,14
68:15 106:14
110:1
**relationship** 125:6
**relatively** 53:18
95:10,24 96:17
**release** 86:7 98:12
98:12,19

**relevant** 18:25
27:18 110:22
118:10
**reliable** 87:13
118:3
**relied** 59:4
**rely** 25:3 59:20
**relying** 59:7
**remain** 98:15
**remarks** 126:22
**remember** 115:22
**remembered** 107:5
**removed** 95:11
**render** 20:23
**rendered** 20:19
36:19
**rendering** 36:2
104:7
**renee** 1:3 2:7 3:3
6:11
**repetitively** 83:4
**rephrase** 78:4
84:12
**reply** 6:22
**report** 13:2 19:9,11
19:14,15 20:5,7
21:2,17 22:5,15
22:20,22 23:2,3
24:19,20 25:7,14
25:20 26:24 37:3
37:3,8,21 38:3,4,8
38:11 41:22 54:13
54:14 55:4 58:8
74:5 89:14 93:4
97:3 103:3 104:17
104:23 105:3
106:17,23 109:15
112:19 117:15,17
121:2,5,6,20
123:11,12,16
**reported** 55:8
126:17
**reporter** 6:16 22:18
23:8,15 24:2

**reporting** 4:3 130:5
**reports** 13:16 57:22
120:25 122:1
**represent** 7:8 52:9
54:25 107:19
118:23
**representative** 1:2
2:6
**representing** 37:20
**republic** 10:21,25
11:1,2
**request** 32:18
112:8
**required** 84:13
86:18
**requirements** 20:4
**research** 30:17
35:10 107:22
115:4
**resist** 87:25
**resistance** 81:15,17
81:20,24 84:13
**resisters** 82:6
110:25
**resolution** 95:19
**resources** 89:21
90:8
**respect** 63:17
**respects** 126:23
**responding** 8:22
14:9 72:22
**response** 20:4,8
87:12 97:16 99:15
115:3
**responsive** 26:16
37:5 81:7 85:20
**result** 48:8 75:7
94:19 98:9
**resulting** 34:24
**results** 75:4
**retained** 11:23
17:20 24:25 35:5
35:16 36:10 37:19
**retired** 10:19 32:8

34:4
**reveals** 72:3
**review** 14:17 18:14
19:13 21:19 27:2
27:9 31:19 55:2,7
57:21 63:4 65:9
65:19 71:1,6
79:10,14 92:23
104:12,16,21
105:23 106:22
111:13 120:25
121:14 122:16
123:11
**reviewed** 13:3
27:11 31:17 55:3
65:6 70:23 71:13
71:15 77:24 83:23
84:18 99:23 100:2
100:14 101:23
102:6 104:25
117:13
**reviewing** 18:21
21:2 22:14 30:7
**reviews** 110:3
**revised** 29:6 30:4
**revision** 31:2
**revisions** 30:23
**rick** 108:9
**right** 11:16 16:5
37:13 54:7 58:15
64:2 67:13 83:25
88:17 111:13
113:15 115:25
123:15
**rights** 110:1 111:5
**rise** 76:3 77:25 78:7
**risk** 32:19 47:8,10
47:11,13 60:13,16
89:11 114:5,11
115:1,5,7,7
**risks** 40:22
**road** 49:10 60:10
63:18 64:4 74:6
**roads** 49:1

**roadway** 53:7,20
  59:1 63:22,24
**rodgers** 1:3 2:7 3:4
  6:11
**role** 12:8
**rolled** 79:25
**rolling** 24:3
**rounds** 86:4
**row** 69:22
**rule** 20:4,9 23:1
**run** 111:1 121:23
**runner** 76:21
**running** 55:12
  61:10 71:19 76:22
  120:4
**rush** 43:8
**rushing** 43:9

**S**

**s** 29:12 37:23
**safe** 44:15 46:16
  50:10 89:20 90:8
**safely** 87:7
**safest** 41:9
**safety** 40:20,24
  41:1,4
**san** 35:23 110:11
**sat** 9:22
**saw** 28:20 29:1,5,22
  56:22 79:24
  111:25
**saying** 37:4 51:14
  56:12 57:5 64:22
  67:12 83:5 120:10
**says** 6:22 30:15
  54:25 76:12,15
  93:23,25
**scenario** 43:23 44:8
  44:13,21 113:18
**scene** 15:5,6,10,13
  15:15 21:7 44:15
  49:8,21 50:8,9,11
  53:15 54:2 56:5
  57:16 60:9,16,25

**61:23 71:8 79:19**
  88:15,22 89:15
  92:22 94:25 113:1
  119:22 120:18
**schematic** 69:5
**school** 9:6
**scientists** 125:10
**scope** 41:16
**scrambled** 118:3
**screaming** 120:5
**se** 20:25
**seal** 130:10
**second** 42:10 48:11
  71:12 72:8 73:16
  79:2,8 85:21 86:3
  86:6 87:22 90:4
  98:11,12,19 99:13
  114:8 119:23
**seconds** 73:18,20
  93:21
**section** 57:24
**secure** 87:23
**see** 18:8 44:24 66:9
  91:8 95:5 96:8
  97:12 99:1,1
  107:3 113:13
  115:10 117:22
  118:10
**seeing** 54:14
**seeking** 16:13
**seen** 7:16,16 16:6
  16:18 45:16 91:15
  95:6 96:15 115:10
  115:14,18
**sense** 19:3,6 25:18
  62:9 109:12 111:8
  118:8
**sent** 13:8 29:2
**sentence** 98:1
**separate** 86:18
**separately** 97:1
**september** 28:10,15
  28:22 29:3,23
  31:3 48:24 51:22

**53:16 58:1 63:25**
  66:7,12 67:20
  68:22 72:6 74:15
  76:18 84:8,15
  91:11 94:2,14
  96:3,12 97:24
**sequence** 19:8
**sequential** 19:3
  27:13
**sequentially** 19:6
**sergeant** 92:15,21
**serious** 34:25 68:19
**service** 59:18,19
**services** 12:14
**set** 17:11 21:18
  35:6 42:3 43:4
  95:13 100:1
  126:20 130:8
**seven** 73:18,20
  101:10
**shafaie** 3:20,25
  6:14,14 12:21
  62:4,24 73:23
  91:21 96:4 100:18
  101:18 106:19
  109:2,6,18 113:3
  113:20 115:20
  116:14 118:18
  119:25 120:13
  121:21 122:5
  123:10 124:13,21
  125:19,23
**shannon** 118:18
**sheet** 54:12
**sheriffs** 10:20 40:7
**shooting** 24:14,15
**short** 48:15 107:6
**shorter** 47:5
**shorthand** 126:18
**shortly** 34:4
**shot** 34:1
**shots** 68:15
**shoulder** 24:16
**shouldnt** 44:10

**show** 58:5 120:4
**showed** 79:3
  101:15 119:18
**shown** 24:17
  126:16
**shows** 73:12 122:1
**side** 18:5 124:16
**sideways** 70:11
**sight** 69:21
**sights** 69:19 70:2
**sign** 19:16
**signature** 127:1
**significant** 26:18
  46:1
**similar** 52:1,9
**simple** 95:10,24
  96:17
**simply** 27:14 43:14
  59:17 62:6,13
  85:16 113:25
**single** 19:4 95:13
**sir** 7:14,15,19,20
  8:11,20 9:3,7,10
  9:12,14,16,19,21
  10:2,3,5,7,9,16
  11:1,19 12:14,15
  12:19,20,23 14:2
  14:3,16,24 15:4,8
  15:19 16:9 17:10
  17:21,25 18:3,11
  18:12 19:10,17,21
  19:24,25 20:2,6
  20:15,18,21 21:5
  21:6,10 22:13,21
  23:2,18,19,23
  24:6,23 25:2,5,21
  26:22 27:1 28:12
  28:19 30:22 31:1
  31:15 33:1,10,16
  33:17,22 34:9,17
  34:19,21 35:8,11
  36:7 37:17,23
  38:8,11,23 39:3,5
  39:9,13,15 40:3,9

**40:20 41:12,20,24**
  42:2,17,23 44:7
  44:12,18,23 45:7
  45:8,23 46:17
  47:9 49:6,19,23
  49:25 50:4 52:4,6
  52:7,18 54:3,10
  54:16 55:14,19
  56:7 57:2,15
  58:20 59:23 60:1
  60:5,18 61:11,21
  61:25 62:25 63:7
  63:9,11,15 64:7
  64:10 65:11 66:8
  67:5,11,22 68:3
  68:10 69:3,11,12
  69:18 70:1,10,12
  70:15,18,22 71:11
  71:13,23 72:3,7
  73:14,25 74:16,19
  74:23,25 75:5,15
  76:2,15,20 77:11
  77:14,18 78:3,10
  78:13,20 79:1,5
  79:13,15,16 80:6
  80:14,15 81:23
  83:17 84:11,16,18
  84:21 86:23 87:3
  87:8,20 88:5,9,13
  90:11,16,22 91:4
  91:7,23 92:6,10
  93:2,6,9 95:6,7
  96:20 97:4,5,8,11
  97:13,14,20,21
  99:7,24 100:3,4,8
  100:15 101:9,12
  101:25 102:4,8,12
  102:16 103:2,5,16
  103:19 104:2,6,11
  104:15 105:4,7,11
  105:18,22 106:3
  106:12,15,21
  107:13,21 108:1,2
  108:5,16,23 109:8

109:17,24 112:7
112:17 113:14,21
114:12,16 115:3
115:13 116:2,7,16
117:5,9,16,19,22
119:14 121:4,8,10
121:13,22 122:24
124:8,17,22
125:18
**sit** 117:10
**site** 20:25 21:3,20
**sitting** 114:21
**situation** 41:6,8
43:10,11 45:11,14
46:14 59:22 61:2
62:3 108:13,14
109:5
**situations** 108:22
**situp** 113:1,8
**size** 22:10
**slamming** 59:12
**slash** 54:19
**slide** 66:21
**smith** 108:9
**snlj** 2:12,13
**snodgrass** 2:20
3:21 6:3 126:8
129:9
**software** 95:13
96:19
**solely** 51:5
**solid** 75:5
**solve** 42:17
**somebody** 27:23
47:16 92:17
**somewhat** 19:11
118:3
**sorry** 11:19 37:18
71:2 83:24 85:12
**sort** 12:13 62:21
77:6 100:17
**sound** 126:12
**sounds** 13:19 81:19
**south** 2:20 3:22 6:4

126:8 129:10
**southern** 37:25
**space** 45:9
**spark** 91:6
**spd** 32:10
**speak** 28:2,23
113:25
**specific** 14:5 20:10
64:11 72:25 86:24
87:1 111:20
**specifically** 20:3
29:9 30:11,21
32:19 67:17 112:1
**speed** 85:1 111:4
**spent** 22:3
**split** 85:13
**spoke** 54:1 60:11
108:9
**spoken** 20:13,16
**spread** 69:23 70:5
75:1,4,9 87:12,15
**springfield** 7:25 8:3
10:14,19 12:10
28:5 32:3,7 33:7
**st** 2:21 3:16,23 4:5
6:4 7:10 11:23
126:9 129:11
130:7
**stabilization** 50:8
50:11
**stamp** 73:13 95:24
**stamping** 95:15
**stand** 31:12
**standard** 27:25
28:7 31:13,18
66:3 96:24
**standards** 30:20,22
30:24
**standing** 29:22
30:8 31:11 36:15
58:15,25 67:16
68:23 105:23
111:14
**start** 39:25 81:5

**starting** 99:24
101:24
**starts** 97:12
**state** 7:3 12:12
38:25 40:12,17
51:25 52:1 53:4
55:16 111:4,17,23
112:3 126:6
**statement** 128:9
130:9
**statements** 55:21
56:2 121:9,19
**states** 52:10 126:5
**static** 42:6
**statistical** 62:8
**statistically** 47:9
**statistics** 47:21
**statute** 51:15,25
52:1 53:4,21
**stay** 83:3 85:5
86:15 109:25
110:7,23
**step** 43:24 44:9
113:25
**steps** 93:20
**steve** 4:2 6:5 48:20
125:21
**steven** 1:18 2:19
6:18 7:5 128:11
**stiffened** 79:4
**stomach** 87:5
**stood** 30:2
**stop** 50:19,23 81:2
81:8 97:17 99:5
99:15
**straight** 21:18 70:4
70:15
**street** 2:21 3:22 4:4
6:4 8:3 54:2
61:10 120:4 126:9
129:10 130:6
**stricken** 25:23
85:11
**strike** 25:25 35:17

90:12 119:15
124:24
**struck** 75:2,16
**structure** 21:17
**stuck** 95:12
**studies** 35:10
**stuff** 119:13
**subject** 26:20 47:11
55:21 56:1 67:8
93:15 112:6
**submission** 86:24
**submit** 45:1
**submitted** 22:15
23:12
**sued** 12:18
**suggest** 114:10
**suggested** 26:12
30:9 53:14
**suggesting** 29:12
96:22
**suggests** 115:7
**suit** 17:24 127:4
**suite** 3:7,15,22 4:4
128:18 129:4,10
130:6
**summaries** 18:18
19:22 20:1
**summary** 97:12,15
**summer** 13:20
**supervisor** 91:1
92:13,22
**supplemental**
25:20 121:3
**support** 16:25
**supports** 118:1
**supposed** 43:25
69:20 87:2 95:4
**supreme** 110:22
**sure** 11:14,22 17:6
18:22 21:25 38:5
38:21 56:14,15
58:17 81:7 89:1,2
89:7 90:2 91:25
100:23 101:1,16

102:10 105:17
107:6 111:10
120:14,24
**surely** 55:2
**surprise** 122:25
123:3
**surprised** 44:11
**surviving** 107:19
**susceptible** 48:5
**suspect** 24:14 33:21
33:21 34:8 45:21
46:20,24,25 47:7
53:7 76:13 87:7
98:14
**swear** 6:16
**swinging** 97:18
98:9 99:5
**sworn** 6:19 119:5
126:14
**system** 64:21
**systems** 118:6

_____
**T**
**t** 3:13
**tactic** 39:12
**tactically** 42:14
**tactics** 41:14
**take** 17:23 18:17
29:20 33:8 42:21
48:15 89:22 90:9
107:6
**taken** 2:19 6:5 9:20
33:2 48:16,18
93:20 101:14,21
107:8 121:20
124:5
**taker** 72:11
**takes** 29:13 80:23
**talk** 108:12
**talked** 44:21
100:16
**talking** 53:18 58:12
85:21 101:2,2
**tapes** 116:22

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-8   Filed: 06/01/16   Page: 52 of 55 PageID #: 2608
Tina Moore v. Brian Kaminski, et al.
Steven Ijames                                                   March 8, 2016

Page 148

**target** 68:13,14
**tase** 76:21 83:10
**tased** 83:10 115:2
**taser** 27:5 29:22
   30:7,10,12,14,15
   30:22,24 31:2,10
   32:4,6,10,23,25
   33:19 34:8 35:3,5
   35:9,14,17 36:4
   37:8,9,15,22 64:9
   64:11,17 65:10,14
   65:15,21,25 66:5
   66:11 67:21,25
   68:1,9,12,25 69:9
   69:20 71:3,9
   73:10,14,18,20
   74:1,20 75:21
   76:4,7,13,23 77:8
   77:16,20 78:7,12
   78:15,23 79:2,12
   80:8,23,25 81:5,9
   81:14 82:5,14
   83:2,22 84:8,14
   84:19 85:6 86:2,4
   86:11,13 87:9
   88:2,6,11 89:3,17
   89:19 90:3,7,13
   90:19,24 92:25
   94:5 96:15 98:3
   98:23 99:11
   101:11,11,14
   108:3,6,12 112:1
   121:6,23,25
   122:12,17,21
   124:25 125:4,8
**tasers** 66:2,18 67:1
**tasertron** 32:24
**taught** 69:8
**taxed** 129:1,7
**teach** 45:12
**technical** 64:15,17
**techniques** 41:14
**telephone** 51:5
   56:10

**tell** 16:1 36:22 59:4
   94:10 107:1
**ten** 11:10 12:23
**tense** 59:6
**tension** 59:15
**tenyears** 108:18
**term** 41:21 92:14
**terminate** 98:24
**terminology** 68:16
**terms** 102:9 103:6
**test** 91:6 106:24
**testified** 15:23
   16:19,24 28:24
   34:13 35:1 42:20
   86:14 108:13
   113:9 115:9
   122:10,20 125:3
   126:16
**testify** 6:20 16:10
   37:7 126:14
**testifying** 57:9
**testimony** 16:12,14
   16:19 17:1,14
   21:15 24:4 25:15
   25:22 38:10 71:1
   71:7 77:1 79:18
   83:23 86:10
   107:24 112:16
   119:6,15 121:15
   122:16 123:22
   126:17,20
**testing** 111:22,25
**tests** 112:2
**thank** 6:15 22:1,2
   36:23 101:9
   107:11,13 125:17
**thankfully** 82:12
**thanks** 35:24
**thats** 7:9 8:12
   13:24 14:11 17:19
   26:14,17 32:25
   43:19 44:18,22,22
   45:6,9 47:9 50:21
   52:4 54:7,23,25

57:15 60:1 62:16
   64:21 65:3 66:20
   68:17 71:20 72:2
   72:18 76:15 77:11
   78:3 80:21,24,24
   81:24 83:10 86:23
   88:17 90:11 91:4
   91:15 92:6 93:8
   94:11 96:14 98:22
   100:11 102:8,12
   102:18 105:1,4
   110:13 111:3
   115:5 116:6
   117:25 119:5
   121:1,18 124:17
   125:10
**theme** 42:11
**theory** 70:1 80:24
**theres** 14:1 39:19
   59:15 64:18 93:24
   110:18,19 115:4
   121:15
**thereto** 126:23
**theyll** 47:24 110:20
**theyre** 45:3 53:8
   87:2 93:24 111:5
   116:17 119:12
**theyve** 17:5
**thing** 12:13 26:10
   26:17 41:2 53:17
   62:21 66:13 77:6
   100:17
**things** 13:8 42:7
   48:4 51:18 100:16
   102:22 115:14
   118:7 119:9,11
**think** 10:17 11:6
   13:8,14,16,24
   14:7,10 15:25
   16:1,4 18:10
   21:16 22:25 23:19
   23:23,24 24:7
   25:11 26:12,14,18
   27:5,6 30:15 33:3

33:17 34:19 35:15
   36:1 37:6 40:17
   43:21 47:21,22,25
   49:18 50:3 51:17,8
   53:4,25 62:16
   64:2 65:3 66:1
   68:17 71:19,25
   72:1,2,14,14 75:3
   75:12,22 77:1,4
   80:7,9,10,11,21
   83:4 93:24 99:12
   99:14 100:21
   101:3,15 102:16
   102:17 103:10,22
   110:9,17 112:23
   113:21 119:7
   120:14 123:11
   125:9
**thinking** 24:12 32:5
   36:13 44:20 72:16
**third** 54:19 55:6,8
   71:14,17 90:4
   99:17 103:1,2
   114:8
**thirty** 11:10
**thorough** 102:9
**thoroughly** 105:6,8
   105:12
**thought** 22:5 34:3
   36:25 62:18
**threat** 46:6,11
   66:19 67:3 81:6
   82:22 86:18
**threatened** 53:9
**three** 15:12,18
   39:22 50:12,18
   74:4 86:3 93:4,15
   93:20,23 94:1,4
   94:11,18 99:2,5,8
   99:9,12,24 100:1
   100:23 102:14
   109:16
**throw** 77:5 96:23
**thrown** 77:12 81:1

81:8
**time** 6:8 10:13
   11:21 21:1,18
   22:3,7 33:20,23
   39:1 42:5 46:7,9
   47:4 49:18,20,22
   49:25 65:18 71:10
   71:12,14,17,18,24
   73:13 74:1,1 79:2
   79:8 80:2,11
   85:21 86:1,21
   94:10 95:14,24
   99:11,12,13,17,19
   106:11 107:11,11
   114:8,14,18,24
   116:11 118:25
   119:12,19 120:18
   122:14
**timeline** 19:4,8
**times** 15:22 17:13
   34:11,15 67:9
   74:7 78:22 93:5
   116:24
**timing** 72:15 118:9
**tina** 1:1 2:5 3:12
   6:6,12 107:19
   128:5
**titled** 65:3
**tjohnson** 3:10
**today** 6:2 11:5
   13:25 23:12 25:11
   25:25 26:3 66:2
   94:12 107:24
**todays** 6:2
**todd** 3:5 6:10 7:6
**told** 14:10 82:2
   83:8 85:5
**tomorrow** 110:11
**tools** 41:14 87:14
**top** 20:7 69:16,17
   69:22,23,24,24
   70:1,6,16,19
   74:20 75:10
**torso** 77:17,19

83:14
**total** 15:25 17:16
  94:18 129:6,12
**totality** 80:18
**tower** 7:24
**towit** 6:23
**toxicology** 10:2
**traffic** 51:17 56:20
  57:1,6,10 59:1,2
  59:12
**train** 108:21
**trained** 30:12 62:7
  66:17,22 67:1
  70:13 122:12
**trainer** 33:11
**trainers** 45:16
**training** 12:11
  27:21 28:13,22
  29:2,25 31:17,19
  31:21 32:6,13,23
  52:15 55:15 59:8
  59:21 65:12,20
  66:1,4 69:7 82:11
  96:20 103:25
  108:12,18,19,20
  109:22 110:4,5
  111:19 112:1
  114:10 115:6
**transcribed** 126:18
**transcript** 5:12
  117:13 118:16,24
  119:18 120:10,16
  126:17,24 128:15
  129:1
**transcripts** 130:1
**transform** 19:9
**transition** 82:9,12
**transpose** 18:25
**travel** 21:19
**traveling** 12:24
**treating** 20:16
**trial** 16:12 17:14
  21:15 24:5 26:3
  38:9 126:6

**tried** 38:9
**trigger** 114:7,14,15
  114:17,18,25
**trouble** 42:12
**true** 7:13 9:4 37:16
  41:23 44:17 47:9
  48:6 49:2,3 54:6
  55:1 63:14 64:6
  64:25 70:17,21
  74:8 77:10,11,21
  85:9 86:19 95:6
  102:8 103:2 105:4
  119:5 123:20
  126:23
**truly** 22:9 43:13
**truth** 6:20,20,21
  126:14,14,15
**try** 19:3 81:21
**trying** 16:23 35:25
  42:16 46:7 82:21
  85:4 91:14 110:23
  119:13
**turn** 43:7
**turned** 70:9
**turning** 83:11
**twice** 12:11
**two** 10:25 16:2,4
  23:23 36:13 44:3
  46:21 48:21 55:17
  69:10 73:1 75:1
  87:21 89:10 98:18
  99:4 102:23
  119:10 125:22
**type** 8:18 12:10
  62:20 103:24
  106:22,24
**typed** 117:17
**typewriting** 126:19
**typing** 19:14

___
**U**
**u** 29:12 37:23
**ultimately** 19:8
  53:23 57:10 58:4

105:2
**unarmed** 46:5
**uncertain** 59:22
**underlying** 104:16
**understand** 11:19
  14:2 48:23 49:15
  73:7 124:23
  125:12
**understanding**
  28:18 37:14 52:24
  55:7 57:23 68:7,8
  93:6 109:7 112:12
  115:4 122:15
  125:4
**undetermined**
  126:5
**unheard** 59:10
**unique** 43:4
**united** 126:5
**university** 8:3
**unknown** 43:15
**unpredictable**
  47:22 59:14
**unreasonable**
  36:20 109:9
**unstable** 47:17
**unusual** 43:5 59:18
  62:8,14
**update** 28:17 31:5
**updated** 20:11
  27:19
**updates** 110:6,14
**upper** 54:17 68:2
  69:14 70:17 74:21
  75:10
**upside** 70:11
**upstairs** 123:24
**use** 18:23 23:3 27:6
  28:10 29:7,11,21
  30:8,25 31:2,10
  32:4 35:2,14 36:9
  37:4,8,9,15,22
  41:4,25 43:3
  48:12 64:6,8 65:6

65:9,10,14,21
  67:15,19,21 68:1
  68:25 73:9,18
  75:25 76:12 77:8
  77:16,20 78:12,15
  78:17 79:8 80:25
  81:4,13 82:14
  83:1 84:6,13 85:6
  86:17 90:7,20
  91:20 92:5,8,25
  93:3 94:4 97:5
  98:23 99:3,8,10
  104:10 108:25
  109:9,11 113:18
  113:22 116:20
  120:17,23 121:6
  121:17 123:8,11
  123:16 124:9,19
  125:8
**uses** 64:20 86:2,13
  91:17 104:22
**usually** 95:13
**utilized** 65:20 96:3
  97:23

___
**V**
**variables** 45:19,24
**various** 40:17 86:2
**vary** 75:6
**varying** 87:10
**vast** 16:3 48:7
**vehicle** 15:20 71:17
  80:5,9
**vehicles** 15:13
  53:20 59:12 63:17
  63:17,18,21
**vendor** 96:23
**verbal** 62:1,22
**verbally** 43:7 82:16
**verbatim** 30:3,6
  80:21
**version** 27:16,18
  66:2,5,6,11,13
  69:7 121:24

**versions** 19:18
**versus** 6:6 13:11
  89:10 100:6
  111:12 113:13
**vetted** 32:15
**video** 1:17 101:11
  101:14
**videographer** 4:1
  6:1,15 48:17,19
  101:10,22 107:7,9
  124:4,6 125:20
**violating** 53:2
**violations** 104:5
**virginia** 33:4
**visit** 20:25 21:3,21
**visually** 15:12
**voluminous** 104:21
**vs** 1:10 2:12 128:5

___
**W**
**waited** 88:19
**waive** 125:23
**waived** 127:1
**walk** 18:20 95:8
**want** 22:7 46:3
  57:2 85:13 92:7
  95:1 97:3,5,22
  98:25 99:22 102:9
  105:19
**wanted** 15:14 18:8
  115:10
**wanting** 103:7
**wants** 44:19
**warning** 67:25 68:9
  68:24
**wasnt** 59:25
**watch** 8:12,14
  21:24
**way** 35:19 44:16
  45:6 58:8 64:22
  67:4 72:15 89:9
  102:16 104:24
  106:5 119:11
**weak** 53:19

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                    March 8, 2016

Page 150

**wealth** 90:14
**weapon** 33:20 63:2
  63:6 67:24 73:20
**wed** 37:2
**week** 37:1
**weight** 118:12
**went** 11:2 33:5
  117:24
**whatevers** 97:7
**whats** 64:14 103:20
  121:1
**whereof** 130:8
**whitcomb** 8:13
**white** 14:15,23
  26:13 49:16 50:1
  57:5 60:21 71:16
  71:22 74:4,12
  79:24 80:2 83:24
  84:1 88:14,23
  89:15 94:16 113:8
  114:20
**whites** 79:14,17
  83:23 112:25
**wide** 28:3
**widely** 33:5
**widow** 107:19
**william** 3:13 33:4
**window** 89:20 90:6
**wire** 95:12
**witness** 6:16 12:2
  17:22 18:17 38:14
  57:13 121:9
  126:12,21,25
  130:8
**witnesses** 14:20
  57:7,7
**word** 29:13,13
**words** 25:19 76:21
**work** 8:15,16,19
  9:20 11:9 12:5
  14:19,19 15:2
  16:3,4,7 18:11,16
  19:14 21:12,15
  25:4 26:7 27:3,11

31:18 35:6 46:8
  68:8 95:16 100:2
  103:6 104:14
  106:7
**worked** 10:13
  11:12,25 82:4
**working** 19:1 30:1
  55:16
**world** 87:8
**wouldnt** 32:12 80:8
  96:23
**write** 18:23 58:8,18
**writes** 74:4
**writing** 36:19
**written** 35:14 37:21
  39:2 43:19 69:2
  99:2 112:2
**wrong** 109:13
  124:15
**wrote** 29:16 37:3,8
  43:21 44:8 64:25
  90:17 93:3 112:19

___

**X**

**x** 38:18 64:18 95:11
  101:15
**x26** 28:12 32:4
  34:10 64:13,15,23
  69:9,20 71:3
  78:23 90:19 91:10
  94:5 113:10,15
**x26s** 90:13
**xp** 113:15 114:22
  125:13,14

___

**Y**

**yards** 24:15
**yeah** 82:3
**year** 10:17,23 11:7
  13:21 38:4 108:9
  110:5
**years** 11:15 24:4
  32:8 33:13
**yelling** 61:13

**yoder** 21:24
**youd** 36:18
**young** 24:16
**youre** 13:25 19:13
  26:11,17 37:11
  46:25 47:16 56:12
  58:25 67:7 72:18
  82:2 91:12 101:2
  106:18 119:9
  121:11
**youve** 7:13 12:1
  16:19 17:1,20
  20:19 23:17 24:4
  32:3 33:18 41:21
  78:21 91:25 95:6
  95:22 107:23
  109:16

___

**Z**

**zone** 57:25

___

**0**

**00** 2:23 6:1
**004741** 2:24 127:12
**01** 107:7
**07** 10:20
**084** 2:24 127:12
**093** 52:5

___

**1**

**1** 5:6 23:6,9 54:18
  129:7
**10** 71:4 73:1,16
  101:20,22
**100** 2:20 3:22 6:3
  80:9 126:8 129:10
**1020** 8:3
**107** 5:3
**11** 2:23 97:3,11
  99:1 107:7,9
  124:4,6 125:21
**12** 75:7 121:2
**12inch** 70:5
**130** 52:3
**13th** 127:8

**14** 99:24 101:9,24
  107:9
**14cv1443** 2:12
**14cv1447** 2:13
**15** 93:21 94:19
**16** 101:25
**17** 48:24 53:16 66:2
  66:5,7,12,13 72:6
  73:11 74:15 76:18
  96:12 97:24
**17th** 64:1
**1983** 119:8
**1994** 8:8,19,25
  17:17
**1995** 32:23 33:4
**1999** 33:4,7
**1st** 10:17,22

___

**2**

**2** 5:7 23:13,16 75:3
  75:12
**200** 80:4,7,9
**2000s** 82:10
**2001** 82:7
**2002** 82:7
**2006** 34:1
**2007** 8:14 10:14
  28:1,14,18 30:22
  30:24 31:6,8 32:8
  32:11,17 34:3
  94:7
**2010** 27:19 28:9
  29:7 30:5 31:6
  32:17 33:15,17
  66:15 68:6,12
**2011** 28:11,16,22
  29:3,23 31:3 38:5
  48:24 51:22 56:8
  58:1 66:7,12
  67:20 68:22 72:6
  74:15 76:18 84:8
  84:15 91:11 94:2
  94:14 96:3,12
  97:24

**2012** 38:5 66:15
**2016** 1:20 2:22 6:2
  26:24 126:11
  127:8 128:13
**21** 45:16
**210** 3:7 128:18
  129:4
**211** 3:15
**22** 5:9
**23** 5:6,7,8
**2416750** 4:6
**25** 22:8,11,12 63:13
**26** 20:4,9 23:1
**28** 26:24
**295** 21:13

___

**3**

**3** 5:8 23:25 24:3
  128:13
**30** 63:13
**31** 124:4
**314** 3:24 4:6
**32** 124:6
**34** 2:23 125:21

___

**4**

**4** 2:12,13 5:9 22:16
  22:19 25:8 41:23
  99:1,23 101:9,24
  102:14 109:15
**400** 3:22 129:10
**4050** 3:15
**41** 22:25
**4215545** 3:24
**44** 48:17
**45** 48:24
**46** 49:17
**4600** 3:7 128:18
  129:4
**49** 49:24
**4th** 2:21 126:9

___

**5**

**5** 79:21 83:19 84:2
**50** 72:8 74:5

Tina Moore v. Brian Kaminski, et al.

Steven Ijames                                                March 8, 2016

Page 151

**51** 72:8
**515** 4:4 130:6
**52** 101:20
**53** 48:19 73:1,11,16
    101:22
**566** 52:3,5
**58** 24:15

**6**

**6** 45:15,17 48:24
    49:17,24 72:8
    73:1,11,16 74:5
    77:19 83:14
**63101** 4:5 130:7
**63102** 2:22 3:16,23
    126:9 129:11
**64112** 128:19 129:5
**6411230012** 3:8

**7**

**7** 5:2 70:5
**700** 4:4 130:6
**779** 2:25 127:12
**78** 10:19
**79** 10:19

**8**

**8** 1:20 6:2 71:4 84:7
    128:13
**80** 110:5
**8165317200** 3:9
**8degree** 70:3
**8th** 2:22 126:10

**9**

**9** 2:23 6:1 48:17,19
**90** 91:3 92:25 95:21
**90day** 95:19
**90s** 43:22
**911** 49:9 51:7
    115:23,25
**95** 16:7
**99** 33:10