# Case: Tina Moore, et al. v. Brian Kaminski, et al.

4:14-CV1443 SNLJ

# Transcript of: Richard Henke

**Date:** December 14, 2015

This transcript is printed on 100% recycled paper



515 Olive Street, Suite 300
St. Louis, MO  63101
(314) 241-6750
1-800-878-6750
Fax: (314) 241-5070
Email: schedule@goreperry.com
Internet: <<<www.goreperry.com>>>

EXHIBIT
12

Case: 4:14-cv-01443-SNLJ   Doc. #:  76-9   Filed: 06/01/16   Page: 2 of 97 PageID #: 2613

Tina Moore, et al. v. Brian Kaminski, et al.
Richard Henke                                      December 14, 2015

Page 1

In Re:


Tina Moore, Individually, et al.,

          vs.

Brian Kaminski, et al.




December 14, 2015


Deposition of RICHARD HENKE







                GORE PERRY REPORTING & VIDEO

                515 Olive Street, Suite 300

                   St. Louis, MO  63101

                     (314) 241-6750

                    (314) 241-5070 Fax

                    www.goreperry.com

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                      December 14, 2015

Page 2

 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE ASTERN DISTRICT OF MISSOURI

 3                      EASTERN DIVISION

 4

 5   TINA MOORE, Individually and as Personal

 6   Representative of the ESATATE OF JASON

 7   MOORE, DELORES MOORE, and RENEE RODGERS,

 8   as Next Friend for A.D.R., a Minor,

 9              Plaintiffs,

10                      Case Nos.    4:14-CV1443 SNLJ

11   v.                              4:14-CV1447 SNLJ

12                              (Consolidated)

13   BRIAN KAMINSKI, et al.,

14          Defendants.

15

16

17

18

19   Videotaped Deposition of RICHARD HENKE, taken on

20   behalf of the Plaintiffs, at the offices of Pitzer

21   Snodgrass, 100 South Fourth Street, Suite 400,

22   St. Louis, Missouri, between 3:35 P.M. and 4:59 P.M.,

23   December 14, 2015, before J. Bryan Jordan, Certified

24   Court Reporter No. 00532, State of Missouri.

25

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                          December 14, 2015

```
                                                            Page 3

 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4    William T. Dowd, Esq.

 5    DOWD & DOWD, P.C.

 6    211 North Broadway, Suite 4050

 7    St. Louis, MO  63102

 8    (314) 621-2500

 9    (314) 621-2503 Fax

10    bill@dowdlaw.net

11

12    FOR THE DEFENDANTS:

13    Ida S. Shafaie, Esq.

14    PITZER SNODGRASS, P.C.

15    100 South Fourth Street, Suite 400

16    St. Louis, MO  63102

17    (314) 335-1332 Direct

18    (314) 421-5545 Office

19    (314) 421-3144 Fax

20    shafaie@pspclaw.com

21

22                   - - - - - - - - - -

23

24

25
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                                    December 14, 2015

```
                                                        Page 4

  1                        INDEX

  2                                                     PAGE

  3    Examination by Mr. Dowd                             6

  4    Examination by Ms. Shafaie                         71

  5    Further Examination by Mr. Dowd                    74

  6

  7

  8

  9

 10

 11                      EXHIBITS

 12    Plaintiff's 12 (Previously marked)                13

 13    Plaintiff's 37                                     49

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                      December 14, 2015

Page 5

1          THE VIDEOGRAPHER:  We're on the record at

2    3:35.  Today is December 14th, 2015, and we are at

3    Pitzer Snodgrass in St. Louis, Missouri.  This is the

4    deposition of Richard Henke, being taken in the cause

5    of Tina Moore, et al., vs. Brian Kaminski, et al.,

6    pending in the United States District Court for the

7    Eastern District of Missouri, Eastern Division.

8          My name is Tim Perry, Certified Legal Video

9    Specialist, here today with Jerry Jordan, our

10   Certified Court Reporter.  We're with Gore Perry

11   Reporting & Video, a 515 Olive Street in St. Louis,

12   Missouri.

13         Counsel, please identify yourselves for the

14   record.

15         MR. DOWD:  My name is Bill Dowd.  I'm here

16   on behalf of Tina Moore, and Delores Moore, and the

17   minor son.

18         MS. SHAFAIE:  Ida Shafaie, for Defendants

19   and Richard Henke individually.

20         THE VIDEOGRAPHER:  Thank you.

21         Jerry, please swear in the witness.

22              RICHARD HENKE,

23   of lawful age, having been first duly sworn to testify

24   the truth, the whole truth, and nothing but the truth

25   in the case aforesaid, deposes and says in reply to

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                        December 14, 2015

```
                                                      Page 6
 1   oral interrogatories propounded as follows, to-wit:

 2                         EXAMINATION

 3   QUESTIONS BY MR. DOWD:

 4       Q.   Sir, would you tell the jury your name,

 5   please?

 6       A.   Richard Henke.

 7       Q.   My name is Bill Dowd.  As you know, I'm a--I

 8   represent some of the family of Jason Moore, who died

 9   on September 17th, 2011, and I'm here to ask you some

10   questions about that incident and the Ferguson Police

11   Department in general.  Do you understand that?

12       A.   Yes.

13       Q.   Have you given your deposition before?

14       A.   In this case?  No.

15       Q.   In any case?

16       A.   I've given deposition before, yes.

17       Q.   Approximately how many?

18       A.   At least two.

19       Q.   Okay, and were they involving your

20   professional capacity as a police officer?

21       A.   Yes.

22       Q.   Okay, do you recall which, either of those

23   cases, what they were about?

24       A.   One, specifically, that I remember was a

25   lawsuit involving a ex-Ferguson employee.  The second,
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                          December 14, 2015

Page 7

1    I'm totally drawing a blank on it, but I remember I

2    had to give a deposition, but I cannot remember what

3    it was about.

4         **Q.**   Okay.

5         **A.**   I honestly can't.

6         **Q.**   Okay.  I'll remind you as we're going

7    through here, we have a court reporter to take down

8    the transcription of what you and I say, and to keep

9    it clear, the transcript clear, I will try to let--let

10   you finish your answers before I begin my next

11   question.  Sometimes in conversation, we might, you

12   know, step on each other.  Same is true when I'm

13   asking my questions, if you'd be kind enough to let me

14   finish it completely.

15            If I say you have to out loud--answer out

16   loud, what I'm referring to is sometimes, we get

17   conversational.  You and I will be able to communicate

18   nodding head, "Huh-uh," "Uh-uh," but we don't want to

19   put the court reporter in a position of having to

20   interpret any of that, so if I say you have to answer

21   out loud, that's what I'm referring to.  Okay?

22        **A.**   Understood.

23        **Q.**   If, at any time, you don't understand my

24   questions, I'm going to ask you to tell me so I can

25   rephrase them, and if you answer my questions, we are

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                                    December 14, 2015

Page 8

```
 1   going to assuming for the record, and the Court, and

 2   the jury that you did understand the question as

 3   asked.  Do you understand that?

 4        A.    Understand that.

 5        Q.    Okay.  Can you tell us a little bit about

 6   your educational history?

 7        A.    College educated, Bachelor's degree in

 8   management.  Went to the FBI national Academy School

 9   of Management, as well.

10        Q.    And what year was that?

11        A.    Nineteen ninety--good question.  1997, I

12   believe.

13        Q.    And what did you do after you left the FBI

14   School of Management?

15        A.    I was employed with the Ferguson Police

16   Department at that time, and I continued my

17   employment.

18        Q.    When did you start with Ferguson Police?

19        A.    1978.

20        Q.    And when did you leave Ferguson?

21        A.    2015, March.

22        Q.    Had you worked for any other police

23   department prior to Ferguson?

24        A.    No.

25        Q.    And were you a patrol officer when you began
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                        December 14, 2015

                                                          Page 9

1   at Ferguson?

2       **A.**    Yes.

3       **Q.**    And just give us in summary fashion, if you

4   would, your history at Ferguson as far as your

5   positions.

6       **A.**    My first promotion was nine years after I

7   started in '78, I was promoted to Sergeant.  I don't

8   recall exactly when the other promotions were made,

9   but eventually, I rose to the rank of Captain of

10  Police.

11      **Q.**    And were you a Lieutenant in between

12  Sergeant and--

13      **A.**    Yes.

14      **Q.**    --Captain?  Okay, and approximately, when

15  did you achieve the rank of Captain?

16      **A.**    There was actually a restructuring.  I was

17  actually promoted to the rank of Major, but we stopped

18  using the Major rank, and I became a Captain at that

19  time, but I want to say probably around 1996-1997,

20  somewhere around there.

21      **Q.**    So did you go--was the FBI, you graduated

22  from the FBI School of Management, was that something

23  that helped you become a Captain, or was that

24  something--

25      **A.**    No, I was--made the rank prior to that.

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

```
                                            Page 10

 1        Q.    Okay, so you were a Captain and then you

 2    went to that school?

 3        A.    Correct.

 4        Q.    Understood.  So when you left Ferguson in

 5    March of 2015, can you tell me under what

 6    circumstances you left?

 7        A.    I retired.

 8        Q.    And was that in any way involved with the

 9    Michael Brown investigation and the Officer Wilson

10    shooting?

11        A.    It sure helped, but that wasn't the exact

12    reason.  The previous year, 2014, I had had a

13    conversation with Chief Jackson that I was interested

14    in retiring.  I had a--pretty sure I had a job lined

15    up with Emerson Electric, and--but in August, prior to

16    going on with Emerson, the incident occurred involving

17    Michael Brown, and I decided to stay with Ferguson.  I

18    didn't want to leave them at that time.  Things calmed

19    down, and again, I told the Chief that I would be

20    still wanting to retire as soon as I possibly could.

21        Q.    Okay, did something come out in the Ferguson

22    investigation that prompted you finally to retire?

23        A.    There was a lot of negative stories being

24    put out in the press.  I had indicated--again, Chief

25    Jackson and I spoke at one time, and I was curious if
```

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-9   Filed: 06/01/16   Page: 12 of 97 PageID #: 2623

1    he thought he would be able to keep his job as the

2    Chief of Police, and he really didn't know if that was

3    going to happen, and I said, "Well, my opinion is that

4    there's going to be two people that will lose their

5    job.  That will be Chief Jackson and myself," I said,

6    and I compared it to baseball.  I said if your

7    baseball team doesn't win, they don't fire the third

8    baseman, they fire the manager.  At that time, I was

9    in charge of field operations, or the Patrol Division,

10   and they were under fire for practices more so than

11   anyone else, so I just assumed my job was probably in

12   jeopardy, and thus, I retired.

13       Q.   Was there accusations of some improper

14   e-mails involved in your retirement?

15       A.   Involved in my retirement?  No, but involved

16   during the investigation, yes.

17       Q.   And what were those, please?

18       A.   There were supposedly--and I never saw them

19   other than what was printed in the press, but I never

20   saw them officially, there was no report shown to me,

21   but the, the--the release was made to the press that

22   there were e-mails sent to my e-mail account from a

23   Ferguson employee that had to deal with what was

24   considered to be racist comments.

25       Q.   They were reported to be from your e-mail

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

```
                                              Page 12
  1   address?

  2        A.    They were sent to me.

  3        Q.    To you.  Thank you.

  4        A.    There was another e-mail that also was

  5   construed as being racist that was sent from my

  6   account, although it wasn't, but it was construed that

  7   it was--

  8        Q.    Okay, construed that--

  9        A.    --by the press.

 10        Q.    Excuse me.  I'm sorry, construed that it was

 11   sent from your account?

 12        A.    No, construed that it was racism that I had

 13   sent, but it was--certainly was not.  As a matter of

 14   fact, it was just the opposite.

 15        Q.    May I ask you what you have reviewed as far

 16   as documents in preparation for your deposition today?

 17        A.    I reviewed the original police report, the

 18   use-of-force report, and the use-of-taser report.

 19        Q.    Anything else?

 20        A.    No.

 21        Q.    And when was the last time you saw those

 22   prior to reviewing them in preparation for your

 23   deposition?

 24        A.    Well, I would imagine it was shortly after

 25   the incident.  The exact date and time, I don't know.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 13

 1       **Q.**    Okay, do you have a specific recollection of

 2   reviewing the police report, the use-of-force report,

 3   and the use-of-taser report in this case in--in the

 4   September or October 2011?

 5       **A.**    Specifically, no, I do not remember.

 6       **Q.**    Okay.  Did you write any reports as a result

 7   of the encounter between Officer Kaminski and

 8   Mr. Moore?

 9       **A.**    Did I write?

10       **Q.**    Yes, sir.

11       **A.**    No, I do not believe I wrote any kind of

12   report, no.

13       **Q.**    Okay, and when I--I mean "report" in the

14   broadest sense.  Let's go through a couple of

15   examples, and we were calling--Exhibit 12 in this case

16   is the police report, the investigative report.  Did

17   you write any portions of that?

18       **A.**    No.

19       **Q.**    Okay.  Did you write any reports from you to

20   Chief Jackson?

21       **A.**    Again, I may have.  It may have been--and if

22   it had been, they would have been an e-mail sent to

23   the Chief just updating him, possibly, but I don't

24   remember.

25       **Q.**    Okay, no written paper report that you

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

                                                          Page 14

 1    filled out as far as any disciplinary action that was

 2    evaluated?

 3         **A.**    No.  No.

 4         **Q.**    Did you evaluate Officer Kaminski's use of

 5    force in this case?

 6         **A.**    I reviewed and found it to be accurate.

 7         **Q.**    What do you mean by that?

 8         **A.**    All of the proper spaces that needed to be

 9    completed on the report were completed, it was

10    reviewed by the supervisor, properly reviewed by the

11    supervisor, and I--and again, I don't recall if I

12    actually had signed off on the report because I don't

13    even remember if I was working that day or the next

14    day, when the report came in, so my review would have

15    been just as I explained, that the report, itself, was

16    done completely.

17         **Q.**    Okay, so the report, itself, was done

18    completely, and you said that the supervisor had

19    written the use-of-force report.  That would be

20    Lieutenant Ballard in this case?

21         **A.**    Correct.

22         **Q.**    And he did not indicate, on the use-of-force

23    form report, whether the use of force was proper or

24    improper; correct?

25         **A.**    Well, actually, he has to--he will--he

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                December 14, 2015

                                                    Page 15

 1   should not have signed off on the report unless it was

 2   completed properly.

 3        **Q.**   So it's my understanding from Officer--

 4   Lieutenant Ballard's report that he left--so I'm going

 5   to give you Exhibit 12 and refer you to Ferguson 0014,

 6   which is page 1 of 3 of the use-of-force report in

 7   this case.  Would you mind looking at that, please?

 8   Thank you.

 9             (Witness peruses said document.)

10             This appears to be the use-of-force report

11   with regard to Jason Moore; correct?

12        **A.**   Yes.

13        **Q.**   All right, and it's signed by Lieutenant

14   Ballard?

15        **A.**   Yes.

16        **Q.**   Looks like he signed it on September 17th,

17   2011?

18        **A.**   Correct.

19        **Q.**   Okay, and then below that, it says,

20   "Officer's actions comply with Department policy," and

21   he did not check "Yes," and he did not check "No."  Do

22   you see that?

23        **A.**   Yes.

24        **Q.**   And then underneath, it says, "Division

25   commander," and that is blank?

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                         December 14, 2015

```
                                                    Page 16

  1        A.    Yes.

  2        Q.    Would that be you?

  3        A.    It would have been, yes.  That would have

  4   been me.

  5        Q.    This is the only record that the City of

  6   Ferguson has produced as far as use-of-force reports.

  7   Would you agree with me that you did not sign off as a

  8   division commander, and--is that, first of all, that

  9   statement accurate?

 10            MS. SHAFAIE:   Object to form.  You can

 11   answer.

 12        A.    Um, correct, I did not sign this report.

 13   BY MR. DOWD:

 14        Q.    Okay, and if Lieutenant Ballard indicated

 15   that the reason he did not indicate whether or not the

 16   officer's actions complied with Department policy is

 17   that he was sending that upstairs to you to make that

 18   determination because there had been a death, would

 19   that be consistent with your experiences at Ferguson?

 20        A.    No, normally, they would have still--because

 21   the supervisor completes this, so the supervisor would

 22   have signed off on it and made the determination

 23   because more than likely, he was at the scene.  I was

 24   not at the scene.

 25        Q.    Understood, so you would rely on
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                          December 14, 2015

Page 17

1   Officer--excuse me.  I keep saying "Officer"--

2   Lieutenant Ballard's evaluation because he was, in

3   fact, at the scene of this case and was involved with

4   with the officers?

5       **A.**    Correct.

6       **Q.**    Okay, so is it safe to say that you did not

7   do an independent investigation of Mr.--Officer

8   Kaminski's use of force in this incident?

9       **A.**    I'm sure I did not.

10      **Q.**    Okay, you did not interview Officer

11  Kaminski?

12      **A.**    I did not.

13      **Q.**    You did not interview Officer White?

14      **A.**    No, I did not.

15      **Q.**    You did not interview and make notes of any

16  interviews with Lieutenant Ballard; correct?

17      **A.**    Correct.

18      **Q.**    Okay.  Do you know if you ever saw this

19  use-of-force report prior to reviewing it this week?

20      **A.**    I can only assume that I did, because again,

21  I was the division commander.  I would have thought

22  somewhere, I would have reviewed this, but on that

23  specific date and time, I may have been off.  I do not

24  know.  I just don't remember.

25      **Q.**    If you had reviewed it, would you have

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 18

 1   signed off and put your DSN and dated it?

 2      **A.**   Um--

 3      **Q.**   As part of your custom and practice?

 4      **A.**   Not until I would have found out if--what

 5   Lieutenant Ballard wanted to put down, whether this

 6   was--complied with the Department policy or not.  I

 7   would have wanted that done first, before it's signed

 8   off on.

 9      **Q.**   So as far as at least this record in front

10   of us, there's no indication that the Department,

11   either Lieutenant Ballard or yourself, ever came to a

12   final conclusion about the proper use of force in this

13   case.

14            MS. SHAFAIE:  Object,--

15   BY MR. DOWD:

16      **Q.**   (Continuing)  Is that a fair statement?

17            MS. SHAFAIE:  --form and foundation.  You

18   can answer.

19      **A.**   Yes.

20   BY MR. DOWD:

21      **Q.**   Okay.  Would there be any other documents

22   that would contain a memorandum or notes of what may

23   have taken place as far as determining whether Officer

24   Kaminski's use of force was justified?

25      **A.**   With this being a taser incident, there

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 19

1    would have been a taser report completed, as well, and

2    then, of course, the police report.

3        **Q.**   Okay.  Other than the taser use-of-force

4    report, and this police report and this use-of-force

5    report, anything else?

6        **A.**   No.  There would not have been.

7        **Q.**   Were you aware of any of the officers who

8    were trained as instructors in the use of taser?  Were

9    they able to download the taser firing sequences at

10   the station?

11       **A.**   I do not know if--

12           MS. SHAFAIE:   Object.

13       **A.**   --if they were capable to do that, or--

14           THE WITNESS:  Sorry.

15           MS. SHAFAIE:  That's okay.

16   BY MR. DOWD:

17       **Q.**   Do you remember--

18           Excuse me.

19           Do you remember Officer Brannon?

20       **A.**   Yes.  Yes.

21       **Q.**   Okay, and my understanding is he was one of

22   the taser officers, the lead taser officers at

23   Ferguson.  Is that consistent with your understanding?

24       **A.**   Yes.  That was correct.

25       **Q.**   So if he said he was able to technically

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                      December 14, 2015

```
                                            Page 20

 1   download the taser firing sequence at the station, you

 2   would have no reason to disagree with that?

 3        A.   Agreed.

 4        Q.   Okay.

 5        A.   I would not have.

 6        Q.   At the time--and assume that the only taser

 7   download that was done was not done at Ferguson but

 8   was done at Taser International and then sent back to

 9   Officer Brannon in early 2014.  Can you assume that

10   for me?  That's what the records we have indicate.

11        A.   Oh, then if that's what they show, yes.

12        Q.   Okay.  Would you agree, then, that at the

13   time of Lieutenant Ballard, and to the extent you were

14   involved at all, that you would not have had the

15   actual firing sequence of the taser downloads but, in

16   fact, would have had to solely rely on Officer

17   Kaminski's report of what happened?

18             MS. SHAFAIE:   Foundation.  You can answer.

19        A.   Correct, but I--that still would have been

20   part of the investigation.

21   BY MR. DOWD:

22        Q.   What would have been part?

23        A.   The sequences.  I would have wanted that

24   information sometime or another, so--

25        Q.   Right.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                      December 14, 2015

```
                                            Page 21
  1       A.   But I don't know how long it takes to get
  2   that.  I--do not know if Officer Brannon could do that
  3   right away or how long it would take Taser to do that.
  4       Q.   Okay.  As you sit here today, have you ever
  5   seen the taser firing sequence download?
  6       A.   No.  I did not.
  7       Q.   Do you know how many times Mr. Moore was
  8   tased the morning of September 17th, 2011?
  9       A.   Only by what the report states.
 10       Q.   Okay, the narrative report of Officer
 11   Kaminski?
 12       A.   Correct.
 13       Q.   Do you know, other than what Officer
 14   Kaminski has reported to you, do you know how long the
 15   duration of each of those taser applications was?
 16       A.   They are five-second--
 17       Q.   Okay.
 18       A.   --application.
 19       Q.   So at the time of the incident, and the time
 20   this report was written, and at the time that you were
 21   involved to the extent you were involved, it was your
 22   understanding that there were three five-second taser
 23   applications with time in between each for--to
 24   determine if the subject was complying and to assess
 25   the threat?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

```
                                              Page 22
 1             MS. SHAFAIE:   Form--
 2       A.    Yes.
 3             MS. SHAFAIE:  --and foundation.  You can
 4   answer.
 5             THE WITNESS:  Sorry.
 6             MS. SHAFAIE:   That's okay.
 7       A.    (Continuing)  Yes.
 8   BY MR. DOWD:
 9       Q.    Did you ask anyone to do a taser download so
10   that you could determine what the firing sequences
11   were according to the computer onboard that Taser X26?
12       A.    Did I ask?  No.
13       Q.    Are you aware if anyone at the Department
14   asked for that to be done?
15       A.    Who it would have been, no, but it would
16   have been customary, when we have a taser incident, to
17   receive that information.
18       Q.    Okay, where would you receive it from,
19   customarily?
20       A.    Eventually, in more times than not, I
21   believe it would have been--it would have come from
22   Officer Brannon.
23       Q.    Have you had any discussions with Officer
24   Brannon about this case?
25       A.    Yes, but only from the respect that he
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                           December 14, 2015

```
                                                        Page  23
  1    advised me that we were short tasers because this
  2    specific taser had to be sent back to Taser
  3    International.
  4        Q.    Okay, had to be pulled out of service and
  5    put in evidence first, right?
  6        A.    Correct.
  7        Q.    Okay, and then you are not sure exactly when
  8    it was sent to taser for analysis?
  9        A.    No, I do not know.
 10        Q.    So that's the only conversation you recall
 11    regarding Officer Brannon and Officer Kaminski's
 12    conduct?  Do you have any recollection of any
 13    conversations with Lieutenant Ballard?
 14        A.    Specifically, no.
 15        Q.    Okay.
 16        A.    I do not.
 17        Q.    Any--do you recall any conversations that
 18    you had with Officers Kaminski, Bebe, or White?
 19        A.    No, I--I don't recall a conversation.  I can
 20    only assume--well, as a matter of fact, Officer
 21    Kaminski, I'm sure I would have spoke to him at one
 22    time.  I don't remember what was said, but I just
 23    asked how he was doing.  I do recall that, but I don't
 24    remember any specifics about a conversation;
 25    certainly, not about the investigation.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 24

```
 1        Q.    Okay.  Was there an Internal Affairs

 2   investigation undertaken by anyone at the City of

 3   Ferguson?

 4        A.    To my knowledge, no.

 5        Q.    Okay.  Who would have been the Internal

 6   Affairs officers at that time in September of 2011?

 7        A.    Any type of investigation like that is

 8   determined by the Chief, and he decides who is to do

 9   the investigation.

10        Q.    In the case of Officer Kaminski's conduct,

11   was anyone assigned to investigate that, to your

12   knowledge?

13        A.    Again, I do not know.  I don't recall if

14   anyone was assigned.

15        Q.    Okay.  Certainly, we know it wasn't you,

16   correct?

17        A.    Correct.

18        Q.    And to your knowledge, as the field

19   operations commander at that time, you are not aware

20   of anybody who was assigned to do--

21        A.    No.

22        Q.    --an investigation, correct?

23        A.    I do not remember that being done.

24        Q.    Okay.  To your knowledge, it was not done?

25        A.    I don't remember if it was.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

```
                                                    Page 25
  1         Q.   Okay.

  2         A.   If it was brought to my attention, I don't

  3    recall.

  4         Q.   If it was done, would there be any documents

  5    that would have contained that, assigned officers' or

  6    commanders'--

  7         A.   I would hope so,--

  8         Q.   --findings?  Okay.

  9         A.   --but I, again, I have not--I don't recall

 10    seeing them if there were.

 11         Q.   Okay, who would have them if there were?

 12         A.   It would have been Chief Jackson.

 13         Q.   It would have been in his papers?

 14         A.   Yes.

 15         Q.   Okay, so if Chief Jackson says he

 16    doesn't--is not aware of any investigation, no papers

 17    have been produced with regard to an investigation,

 18    would you agree it's unlikely there was an

 19    investigation?

 20         A.   I would agree with that.

 21         Q.   Based on your review of the police report,

 22    and the use-of-force report, and the taser report,

 23    would you agree that Officer Kaminski is the only

 24    member of the Department who saw the alleged charge by

 25    Mr. Moore that morning?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 26

1      **A.**    Based on his, Officer Kaminski's, report?

2    Yes.

3      **Q.**    Okay.  There's no corroborating officers

4    that were able to say they saw him charge, right?

5      **A.**    Not that I'm aware of, no.

6      **Q.**    And you agree, based on what we've talked

7    about today, that there was no attempt to verify what

8    he reported?  Assuming there wasn't a taser download

9    done, for example, until 2014?

10            MS. SHAFAIE:  Object to form and foundation.

11    You can answer.

12      **A.**    That--that who?  I'm not sure who you are

13    asking about.

14    BY MR. DOWD:

15      **Q.**    I'm asking, agree that there was no attempt

16    to verify what Officer Kaminski reported?  For

17    example, the taser download wasn't received back until

18    February of 20--

19      **A.**    Okay.

20      **Q.**    --14?

21            MS. SHAFAIE:   Same objection.

22      **A.**    I--agreed.  I--I don't know.

23    BY MR. DOWD:

24      **Q.**    Okay.  Were you ever interviewed by anyone

25    from the Department of Justice, as far as their

Page 27

1   investigation into the Officer Wilson shooting?

2       A.   Yes.

3       Q.   And who, who interviewed you?  Do you

4   recall?

5       A.   There were several people in the room at the

6   time, and they all had questions.

7       Q.   Okay, and approximately, when did that

8   occur?

9       A.   I don't know if it was early 2015 or late

10  2014.

11      Q.   Did that take place at the Police

12  Department, or at the Department of Justice, or--

13      A.   I believe that was at City Hall.

14      Q.   City Hall in Ferguson?

15      A.   Yes.  I'm sorry, yes.

16      Q.   That's all right, and approximately how long

17  did that interview take?

18      A.   Approximately 20 minutes, 20 to 30 minutes.

19      Q.   And what was discussed in the meeting?

20      A.   Hundreds of different topics, from training

21  to use of force, to the policies in place.  Again,

22  they--there were so many people and so many questions,

23  it's hard to really even remember what they asked.

24      Q.   Okay.  Did they ask you about specific

25  incidents with individual citizens, that the Ferguson

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                December 14, 2015

                                                    Page 28

 1    Police Department encounters with individual citizens?

 2        A.    Specific ones, I don't recall them asking

 3    specific questions.

 4        Q.    Okay.  Was Jason Moore's incident with

 5    Officer Kaminski discussed?

 6        A.    Not that I remember.

 7        Q.    Did you have any notes from that meeting--

 8        A.    No.

 9        Q.    --that you had?

10        A.    I did not.

11        Q.    Did you report to Officer--Chief Jackson

12    anything about that meeting?  Would there be a memo or

13    e-mail to Chief Jackson?

14        A.    No.

15        Q.    Okay.

16        A.    There was not.

17        Q.    Do you recall who else may have been

18    interviewed around the time you were interviewed?  Did

19    you see other people coming in, or coming into the

20    conference room after--as you were leaving or people

21    coming out as you were going in?

22        A.    They interviewed several people, but that

23    specific day, I don't recall if anybody followed me or

24    it was before me.

25        Q.    Okay, and do you recall who any of those

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                          December 14, 2015

Page 29

1   several other people that were interviewed might be?

2        **A.**   Certainly, Chief Jackson.  I think he had

3   several interviews, as a matter of fact.  It was--it

4   was sort of bizarre.  They picked and chose random

5   individuals, but I believe Captain DeCarli was

6   interviewed.  Assistant Chief Eickhoff was

7   interviewed, if I recall.  Sergeant Diller, I believe,

8   was interviewed.  I'd be guessing at the rest of them.

9   I don't recall if--I know they did interview some

10  patrol officers.  They--they interviewed all ranks,

11  but I just don't remember exactly who was interviewed.

12       **Q.**   There was one name you just said that I

13  didn't quite catch.

14            (Speaking to the court reporter:)  Did you

15  catch them all?

16            THE COURT REPORTER:  Phonetically.

17            MR. DOWD:  Okay, phonetically.   Right

18  before Chief--Assistant Chief Eickhoff, you said

19  somebody.  Do you recall--

20       **A.**   DeCarli.

21       **Q.**   DeCarli?

22       **A.**   Yes, Captain DeCarli.

23       **Q.**   And how do you spell that, if you know?

24       **A.**   D-e capital C-a-r-li.

25       **Q.**   Thank you.  Based on what we've talked about

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 30

1   so far today, would you agree that if Chief Jackson

2   has testified that he relies heavily on his command,

3   in this case, that would be yourself and Lieutenant

4   Ballard, correct?

5        **A.**    Correct.

6        **Q.**    As far as the appropriate use of force, and

7   if Officer--the evidence is that Lieutenant Ballard

8   and, to a lesser extent, yourself relied solely on the

9   reports of Officer Kaminski as to what occurred that

10   morning, as to the use of force, I mean, that there

11   really was no independent supervision or investigation

12   of the occurrence that morning?

13        MS. SHAFAIE:   Form.  You can answer.

14        **A.**   I would agree.

15   BY MR. DOWD:

16        **Q.**    If Officer White has testified that

17   Lieutenant Ballard never reviewed Officer--Officer

18   Kaminski's use of force with him, meaning Officer

19   White, would you have any reason to disagree with

20   that?

21        **A.**    No reason.

22        **Q.**    Same question with regard to Chief Jackson:

23   If he never interviewed or spoke to Officer Kaminski

24   according to White, do you have any reason to disagree

25   with Officer White on that testimony?

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                            December 14, 2015

                                                              Page 31

     1            MS. SHAFAIE:  Form and foundation.  You can

     2     answer.

     3     BY MR. DOWD:

     4         Q.   Let me rephrase the question.

     5            If Officer White testified that he was never

     6     interviewed by Chief Jackson with regard to what

     7     happened that morning, would you have any reason to

     8     disagree with that?

     9         A.   No.

    10         Q.   And you did not review the report with

    11     Officers White or Officer Kaminski; correct?

    12         A.   Correct.

    13         Q.   Where are you working now, sir, if you are,

    14     now that you are successfully retired?

    15         A.   No, unfortunately, I am working with

    16     L. Keeley Construction Company.

    17         Q.   And where is that located?

    18         A.   Sauget, Illinois.

    19         Q.   I wanted to ask you if you could assume from

    20     a use-of-force perspective if an officer were to

    21     successfully tase a person in the chest, one prong in

    22     the chest, one prong in the leg, and that it appeared

    23     to have good contact, and good effect, and brought the

    24     subject to the ground, the subject was unarmed and

    25     naked, the subject was not within reach of any other

Page 32

1    citizens that he could harm, that if the officer were

2    to, hypothetically, tase the individual for 20, 21, 22

3    seconds nonstop, without any attempt to comply--or

4    assess compliance of that person, or to do a risk

5    assessment during that time period, would you agree

6    that that would be the unjustified use of force?

7              MS. SHAFAIE:  Form and foundation.  You can

8    answer.

9         A.    That one is hard to answer, because I--I

10   don't--not seeing what the action of the individual

11   was, based on what you are saying, that the individual

12   was compliant and remained on the ground, I would have

13   to agree, but not knowing exactly--I don't know

14   exactly what you are referring to, but--

15   BY MR. DOWD:

16        Q.    I understand.

17        A.    --but I would think--

18        Q.    But assuming those facts to be true without

19   admitting them, if someone were to be tased, go down

20   on the initial tase and be tased continuously for 21

21   seconds, approximately, without any interval for a

22   threat assessment, a change in the threat assessment,

23   or compliance assessment, you would agree that in most

24   situations, that would be, that force, that amount of

25   force would be unjustified?

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

```
                                            Page 33
  1            MS. SHAFAIE:   Same objections.  You can
  2    answer.
  3       A.   It's hard to put a number on it, but there
  4    would certainly be a reason to wonder why, in fact,
  5    that had to happen.  There would have had to be a
  6    great deal of explanation given as to why 21 seconds'
  7    interval was given.
  8    BY MR. DOWD:
  9       Q.   A 21-second application of taser
 10    electricity?
 11       A.   Right.  Correct.
 12       Q.   Without those gaps sufficient for the
 13    officer to make those assessments of compliance and
 14    changes in the risk assessment?
 15            MS. SHAFAIE:   Same objections.
 16    BY MR. DOWD:
 17       Q.   (Continuing)  Threat assessment?
 18            MS. SHAFAIE:   Same objection.
 19       A.   I would agree.
 20    BY MR. DOWD:
 21       Q.   Okay, because obviously, the--if a person is
 22    charging you, you are making a threat assessment that
 23    he's charging me, and I'm--and I tase him and bring
 24    him down, correct?
 25            MS. SHAFAIE:   Same--
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                        December 14, 2015

Page 34

1       **A.**    Correct.

2               MS. SHAFAIE:  --objection.

3   BY MR. DOWD:

4       **Q.**    If that officer--if that person does, in

5   fact, now go to the ground, a charge has ended and

6   they're now on the ground, that's a different threat

7   assessment.  Do you agree with that?

8       **A.**    Depends what that person is doing on the

9   ground, but I would agree.

10      **Q.**    All right, so from the instant they hit the

11  ground, if they're static, that's a different risk

12  assessment, right, than the charging?

13              MS. SHAFAIE:  Foundation.  You can answer.

14  BY MR. DOWD:

15      **Q.**    (Continuing)  There's a different risk

16  assessment for an officer--a charging person versus a

17  person lying on the ground?

18      **A.**    Yes.

19              MS. SHAFAIE:   Foundation.

20  BY MR. DOWD:

21      **Q.**    Okay, and if that person starts to move, it

22  might change the risk assessment on the dial?

23      **A.**    There's a lot of dynamics that could happen

24  that would change that, yes.

25      **Q.**    All right, if they're just moving, like

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 35

1    groaning and moving around, that's a different threat

2    assessment than somebody who jumps up on their feet

3    and starts charging again, right?

4             MS. SHAFAIE:  Foundation.

5        A.    The way you described it, yes.

6    BY MR. DOWD:

7        Q.    Then there's things in between there.  There

8    is putting one hand on the ground to start to get up,

9    maybe another hand on the ground to start to get up

10   that's changing the threat assessment for that

11   officer.  Would you agree?

12            MS. SHAFAIE:   Same objection.

13       A.    Yes.

14   BY MR. DOWD:

15       Q.    Doesn't it also change the threat assessment

16   for an officer if he has a second officer on the

17   scene?  Two officers versus one naked, unarmed man

18   changes that threat assessment from one officer with

19   taser bars in the chest that are being effective?

20            MS. SHAFAIE:  Same objection.

21       A.    That would help; doesn't necessarily change

22   it, because depending upon the angle that the other

23   officer had, the other officer may be able to see

24   something that one officer doesn't, so--

25   BY MR. DOWD:

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                           December 14, 2015

Page 36

1      **Q.**   Seeing--

2      **A.**   It would help, though.

3      **Q.**   Seeing something like a weapon?

4      **A.**   Yes.  Anything.

5      **Q.**   Okay, so assuming that there's two officers

6   on the scene and neither one of them suspects a

7   weapon, and there's a taser application occurring, you

8   would agree that that threat assessment by that

9   suspect to the officers is different than when there's

10  one officer?

11           MS. SHAFAIE:  Form and foundation.

12  BY MR. DOWD:

13     **Q.**   Because they're better able to manage the

14  situation physically?

15     **A.**   Correct.

16           MS. SHAFAIE:   Same objection.

17     **A.**   (Continuing)  Correct.

18  BY MR. DOWD:

19     **Q.**   Can you tell me the general policy and

20  procedure at Ferguson when you were there,

21  specifically in the 2011 time frame, when there was a

22  decision made that a use-of-force analysis needed to

23  be done regarding a officer's interaction with a

24  citizen?

25     **A.**   Um, actually, anytime that there was a--

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-9   Filed: 06/01/16   Page: 38 of 97 PageID #: 2649

1  everything from voice commands to hands-on situations

2  or weapons situations, a use-of-force report was to

3  be--use-of-force was to be completed.

4     **Q.**   Okay, a use-of-force report was to be

5  completed?

6     **A.**   Yes.

7     **Q.**   All right, is that the same thing as a

8  use-of-force analysis by the Department to make sure

9  the use of force was appropriate?

10    **A.**   Correct.

11         MS. SHAFAIE:  Form, foundation.

12  BY MR. DOWD:

13    **Q.**   Okay, and sometimes, it would end there with

14  the supervisor, for example, Lieutenant Ballard, and

15  other times, it would be kicked upstairs to you and

16  the Chief?

17    **A.**   They always--the, the--the end result was

18  that the Chief received all use-of-force reports.

19    **Q.**   Okay, so it's your belief that in this case,

20  he would have received a use-of-force report even if

21  you hadn't signed off?

22    **A.**   Um, yes.  Yes.

23    **Q.**   And assuming the use-of-force report is the

24  one we were talking about earlier that Lieutenant

25  Ballard had signed without indicating whether he

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 38

1    thought it was within the Ferguson policies and

2    procedures to use the force in the way they did and

3    that that form did not have your signature on it, and

4    DSN and date, that that's all they would have as far

5    as that use-of-force report, would be sort of no

6    opinion as with regard to the supervisor and yourself

7    as the Captain?

8              MS. SHAFAIE:   Form.  You can answer.

9        A.    That's the way it appears, yes.

10   BY MR. DOWD:

11       Q.    And as you sit here today, you are not aware

12   of anything different than what it appears, correct?

13       A.    No, I know nothing.

14       Q.    I understand you were responsible, as the

15   commander of field operations, to keep track of

16   training records?

17       A.    Keep track of them?  No.

18       Q.    Was it your responsibility to make sure the

19   training was done?  Maybe I'm--

20       A.    Yes, but that would be reported to me.

21   There was a--I'm trying to think which officer was--

22   kept track of the training, and usually on a quarterly

23   basis would send out a report as to the training

24   records for that quarter.

25   BY MR. DOWD:

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 39

1        **Q.**    Okay, would the report be like a summary
2    report,--
3        **A.**    Basically.
4        **Q.**    --a spreadsheet showing the officer's name
5    and what they received?
6        **A.**    Basically, yes, that's what it was, and
7    the---also, the St. Louis County Police Academy, where
8    most of our training was conducted, would also send
9    out a report to that individual officer.  They would
10   then forward it to all of the commanders.
11       **Q.**    Okay, and how would they forward that?  In a
12   hard copy, or would that be e-mailed around?
13       **A.**    Usually would be the hard copy.
14       **Q.**    And what I'm particularly interested in
15   today is, I've heard a couple of different
16   descriptions of shout the officers were kept up-to-
17   date on changes in policies and changes in
18   constitutional law, the legal issues that were out
19   there, so I wanted to ask you about your knowledge of
20   that.  Tell me first of all what your understanding is
21   as to how how the officers were updated with regard
22   to, you know, the proper use of force, Fourth
23   Amendment-type issues.
24       **A.**    That came from--court decisions and things
25   like that?

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 40

1      **Q.**    Yes.

2      **A.**    Is that what you are referring to?

3      **Q.**    Yes.

4      **A.**    Well, how was that done?  We would get a

5    report occasionally, specifically for constitutional

6    law, through--the FBI would send out reports to--and I

7    don't remember the exact sequence, but more than

8    likely, they were sent to Chief Jackson, who would

9    then forward them out, but I don't really remember the

10   track, how that happened.

11     **Q.**    And I may be using this term incorrectly,

12   but a communications officer, would they be involved

13   in distributing communications from the Chief and

14   making sure people got what the Chief wanted them to

15   receive, or is that more of a dispatch, is that more

16   of a dispatch type--

17     **A.**    No, it was not dispatch, but we really

18   didn't have a communications officer.  If anything,

19   the Chief's secretary would distribute the flyer.

20   She'd probably run copies of the FBI training forms or

21   training reports and send them out again by squad or

22   by division, something like that.

23     **Q.**    And would they--did the officers have

24   mailboxes that she could put them in so when they came

25   on duty, they could grab them?

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                      December 14, 2015

Page 41

1      **A.**    Yes.

2      **Q.**    Okay, and is that how you believe

3    constitutional issues, case law and things like that,

4    were communicated to the officers?

5      **A.**    Yes.

6      **Q.**    And about how frequently do you think they

7    would have been updated on those issues?

8      **A.**    Well, it always varied, because if it was a

9    constitutional--it might be once a year--

10     **Q.**    Okay.

11     **A.**    --before anything was changed on a

12   constitutional basis.  It could be as many as three or

13   four times a year.

14     **Q.**    All right.

15     **A.**    Just depended on what, what the Supreme

16   Court--whether it went as far as the Supreme Court had

17   decided on.

18     **Q.**    Okay, so as the Supreme Court or the courts

19   that are cited in that handout would issue their

20   opinions, sometime after that, you would receive a

21   bulletin from the FBI?

22     **A.**    Correct.

23     **Q.**    Okay.

24     **A.**    Correct.

25     **Q.**    And do you have a sense of how much time

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                     December 14, 2015

Page 42

1   would pass between those court rulings and when you

2   received them?

3       A.   It's easy to say that usually, it's as slow

4   as mail, but on the other hand, it was within a

5   reasonable amount of time.  Exact dates and times, it

6   was within, let's say, two months.  I would think that

7   would be normal, but it could be as--as rapid as just

8   a couple of weeks, actually.

9       Q.   From the time that the court rules, that you

10  would have gotten that FBI bulletin on it?  Is that

11  what we're talking about?

12      A.   Yes.  Correct.

13      Q.   All right, and then there'd be a short delay

14  while Ms. Simmons would make the copies and distribute

15  them to the--

16      A.   Yes.

17      Q.   --officers?  Okay.

18           Do you know what the PASS system is at

19  Ferguson, as far as what the officers may have when

20  they sign in in the morning on their computers?

21      A.   PASS system?  I'm drawing a blank on that

22  one.

23      Q.   That's all right.  I understood that there

24  was ways to communicate changes in policy and

25  procedures?

Case: 4:14-cv-01443-SNLJ   Doc. #:  76-9   Filed: 06/01/16   Page: 44 of 97 PageID #: 2655

Page  43

1        **A.**    I do remember that now.

2        **Q.**    Okay.

3        **A.**    I do recall that now.

4        **Q.**    Okay.

5        **A.**    That is correct, we do have a system that

6   updates, whether it be from--whoever it might be from,

7   were put into the PASS system, but thank you for

8   reminding me.

9        **Q.**    You are welcome.  Do you have anymore

10  details of how that worked?  It was your

11  understanding, I guess, that they would--let me tell

12  you what my understanding is from the prior testimony,

13  and that is, if there were changes in the policies or

14  there was a new policy, those would be issued to the

15  officers--I'm going to use the phrase, "Dropbox," or

16  some kind of a mailing, and they would have to look at

17  that on the date that it was distributed.

18       **A.**    Absolutely correct.

19       **Q.**    But that there wasn't any follow-up testing,

20  like monthly or quarterly, where you give them a

21  series of questions based on the new constitutional

22  law, or the new procedures, or policies, or changes in

23  the old policies?

24       **A.**    There was not.

25       **Q.**    I understand--tell us what your involvement

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                          December 14, 2015

Page 44

1    was as you recall it with regard to the crisis

2    intervention training or the CIT training.

3        **A.**    Only to the respect that we tried, through

4    St. Louis County Police Academy, to have all of the

5    officers attend.  However, it was usually very small

6    groups would be able to attend, two, maybe three

7    officers, tops, at a time, just so the street wasn't

8    cut short or the Detective Bureau wasn't cut short,

9    and the classes filled up so fast that usually,

10   departments were only awarded one or two seats for

11   each department that attended St. Louis County, and

12   then we would be informed that we do have other

13   openings if you want to send somebody, so that was

14   the--that was the hope, that we would get everybody

15   certified.

16       **Q.**    Okay, and I understand you were in charge of

17   staffing during the end of September--

18       **A.**    For the Patrol Division.

19       **Q.**    For the Patrol Division, as opposed to the

20   civilians, correct?

21       **A.**    The Detective Bureau, and the jail, and so

22   forth.

23       **Q.**    Okay.

24       **A.**    I was just at the Patrol Division.

25       **Q.**    I understand.  Thank you.  Did you attempt

Case: 4:14-cv-01443-SNLJ   Doc. #:  76-9   Filed: 06/01/16   Page: 46 of 97 PageID #: 2657

Page 45

1   in your staffing to have a CIT-trained officer in each

2   patrol?

3       A.   What we did.  I mean, that was--there was

4   some--somebody trained.  As a matter of fact--and I'm

5   not sure when, but we had several--and I want to say

6   new officers that had two to three years of

7   experience, and if, in fact, they attended the Academy

8   within two or three years, they had already received

9   the CIT training, so there--it would be hard to

10  believe that there was no one with CIT training on--at

11  any--at any time.

12      Q.   Okay, and was it the--was it your attempt or

13  your instructions that if a CIT officer was in a

14  patrol area and there was a citizen who was having a

15  crisis, either, you know, a psychotic, or emotional,

16  or whatever, somebody who is not committing a crime,

17  per se, but was in need of help, was in a crisis

18  situation, that that officer, that CIT-trained officer

19  would be involved as soon as possible?

20      A.   Yes.

21           MS. SHAFAIE:  Form and foundation.

22  BY MR. DOWD:

23      Q.   And would that being involved as soon as

24  possible include the officer first on scene attempting

25  to wait until that trained crisis intervention officer

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 46

1    could get to the scene?

2         **A.**    Depends on what was going on at the time.

3         **Q.**    Okay, if possible under the circumstances,

4    they would--you would hope--

5         **A.**    If possible.

6         **Q.**    --they would wait?

7         **A.**    If possible, yes.

8         **Q.**    Okay.  Are you aware of, from the time that

9    you were Captain, when you might have been involved in

10   reviewing these use-of-force reports?

11             Let me scratch the question.

12             When did you begin looking at use-of-force

13   reports after you left being a patrolman?  Did you

14   look at them as a Sergeant?

15        **A.**    I don't believe we had them at that time.

16        **Q.**    Okay.

17        **A.**    I'm not sure.  I don't know if it shows when

18   the report was originated.  This says 2010.

19        **Q.**    That could be a version?

20        **A.**    Right, could be a version, but the actual

21   use-of-force report--well--I don't know how long it

22   would have been.  Whenever the policy was approved on

23   'em, that's when I started, but I don't know what year

24   that was.

25        **Q.**    So if there's a use-of-force report policy,

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 47

1    when that became in effect, that's when the form

2    likely became in use, and that's when you would have

3    started reviewing them?

4        **A.**   That's correct.

5        **Q.**   Okay.  From the time that you started

6    reviewing them and to the time that you left in March

7    of 2015, could you tell us approximately how many

8    use-of-force reports you may have reviewed as a

9    Captain or Lieutenant?

10       **A.**   Um--

11       **Q.**   Just your best estimate.

12       **A.**   Oh, I would have no idea, because again, it

13   involved anytime if we had a simple incident as a

14   shoplifter, if there would have been a--you know, the

15   refusal to stop by the individual who may have been

16   running or whatever, just if the officer had to yell

17   commands, he would have sent out or he would have

18   wrote down a report, so it's--there would have been

19   hundreds.

20       **Q.**   Okay.

21       **A.**   Hundreds.

22       **Q.**   And there's everything from that example you

23   gave all the way to hands-on, personal handcuffing,

24   because use of batons, use of Mace, use of tasers?

25       **A.**   Correct.

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

```
                                               Page  48
 1        Q.    Do you recall how many deadly force

 2   use-of-force reports you reviewed during your time at

 3   Ferguson?

 4        A.    Do I recall exactly?  No.  I don't recall.

 5   Deadly force, though, there certainly wasn't very

 6   many.

 7        Q.    When you say "deadly force," can we agree

 8   you are basically talking about an officer using his

 9   firearm?  Discharging his firearm?

10        A.    Correct.

11        Q.    Okay, on the approximately hundreds, as you

12   said it could be hundreds of use-of-force reports that

13   you looked at, do you recall how many times an officer

14   was disciplined for excessive force based on those

15   use-of-force reports?

16        A.    Exact number?  Not a clue.

17        Q.    Just your best estimate.

18        A.    It certainly happened, but if I were to

19   throw something out, I'd say less than five times.

20   Five times or less, I should say.

21             MR. DOWD:  Okay.  Okay, let go off the

22   record, please.

23             THE VIDEOGRAPHER:  Off the record at 4:26.

24                (Recess.)

25             THE VIDEOGRAPHER:  Back on the record at
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

```
                                                    Page 49
 1   4:28.
 2   BY MR. DOWD:
 3       Q.   Captain Henke, I had a couple of people I
 4   forgot to ask you about.  Did you talk to the Medical
 5   Examiner or anyone at the Medical Examiner's Office
 6   regarding Jason Moore?
 7       A.   No, I don't believe so.
 8       Q.   There's a Detective Wilson who I believe did
 9   talk to them.  Did you ever talk to Detective Wilson
10   about Officer Kaminski's use of force on Jason Moore?
11       A.   Not that I recall, no.
12       Q.   Okay, did you review any medical records of
13   Jason Moore's as part of your duties at Ferguson?
14       A.   I may have; I just don't recall.
15       Q.   Okay.
16       A.   All of that would have been turned over to
17   Captain DeCarli.
18       Q.   I'm sorry?
19       A.   Captain DeCarli was the division commander
20   of the detectives, and Officer Wilson, I believe, was
21   a detective during that time, so she reported directly
22   to Captain DeCarli.
23                 (Plaintiff's Exhibit 37 marked for
24                  identification.)
25       Q.   You may not know anything about these, but I
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                     December 14, 2015

```
                                                 Page 50
 1   have--while I have you here, and based upon your
 2   experience, let me give you what's been marked Exhibit
 3   37, and I'll give your attorney a copy, as well.
 4   These are the--do you know what the CAD is, the
 5   computer--is it the dispatch?
 6        A.   Yes.
 7        Q.   Would you tell the jury how that works in
 8   general terms at the Ferguson Police Department while
 9   you were there?
10        A.   General terms, the dispatcher would receive
11   a call for police of some sort by a resident, a
12   citizen.  If it required that a police officer
13   respond, then a CAD report or a computer-aided
14   dispatching report would be generated in the computer
15   by the dispatcher and sent to whichever car or
16   whichever officer was to respond to that call.
17        Q.   We may be deposing someone else on this
18   document, but I wanted to ask you, if I may while I
19   have you, if we could look at Exhibit 37, does that
20   look like a--a CAD transcript to you?  You can--you
21   are welcome to page through that, if you like.
22        A.   Yes, that's what it looks like.
23        Q.   Do you notice any part of the CAD transcript
24   missing that you would normally expect to see?
25        A.   Off the top of my head, not that I recall.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 51

1      **Q.**    Okay, so the first page is "Incident

2  Maintenance."  Do you know what that means?

3      **A.**    No.  I don't know what the terminology is.

4      **Q.**    As we go down that left side of that first

5  page, it says, "Call date and time, 9/17/2011,

6  6:46:09."  Would that be the date the call was

7  received at the Department by the citizen?

8      **A.**    That would have been the date and time, yes.

9      **Q.**    Okay, and so under that is the dispatch

10  time.  Can you tell us what that time is?  It's just

11  one second later.

12      **A.**    Yeah, those two usually coincide when the

13  call came in, and the dispatch time is when they would

14  put the call out.

15      **Q.**    Okay, and when you put the call out, do you

16  put it out to a specific patrol area?

17      **A.**    Well, one, it's entered into the CAD system,

18  which the officers had a computer in their car also,

19  and then it was verbally given to a specific unit, a

20  specific car.

21      **Q.**    Okay, and then this one shows the third

22  line, "Arrive date/time 6:46:27," which would be 17--

23      **A.**    Second later.

24      **Q.**    --seconds after it was dispatched, correct?

25      **A.**    That's correct.

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 52

1      Q.    Okay, and then it shows "Cleared date and

2    time."  Tell us what that means.

3      A.    That's when all units have finally gone 10/8

4    from the call or released themselves from that call.

5      Q.    Okay, so some may release themselves

6    earlier, but this was when the last officer or

7    commander released the call?

8      A.    Yes.

9      Q.    And that states 14:26:46.  That would be

10   about 3:26 in the afternoon?

11     A.    2:26.

12     Q.    2:26.  Thank you.  Just subtract 12, right?

13     A.    Correct, or add 12, either way.

14     Q.    Right.  Then it says, "Disposition:  RPT" to

15   the right of that.  Can you tell us what your

16   understanding of that is, please?

17     A.    "Report."

18     Q.    "Report"?

19     A.    Yes.

20     Q.    And what does that mean?

21     A.    That there would actually be a hard-copy

22   report written on this incident.

23     Q.    Okay.  It shows the location, Airport Road;

24   cross street, North Marguerite; nature of call,

25   suspicious person.  Correct?

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 53

```
 1        A.    Correct.

 2        Q.    So then it has "Caller" and "Complainant,"

 3   and there's just some hash marks there.  Do those have

 4   any meaning to you?

 5        A.    Not to me.

 6        Q.    Okay, then it says, "Incident Type:  7191 P"

 7   S-u-s-p P-e-r-s.

 8        A.    The four-digit number is just a code in the

 9   computer that indicates this is a suspicious person.

10        Q.    Okay.

11        A.    As an example, there are--like, under a

12   traffic accident would be 10:50.  I don't know what

13   the four-digit number would be, but there might be

14   twenty different types of 1050 reports, so that's--

15   "7191" apparently is a suspicious person.

16        Q.    Okay, then it says "Report Required"?

17        A.    Yes.

18        Q.    And how is that determined?

19        A.    Usually, once the officer calls back in, but

20   in this case, when they know that there is an arrest,

21   the dispatcher just automatically knows that there's

22   going to be a report, so they complete the "Yes"

23   requirement.

24        Q.    Okay, whether there's an arrest, it says

25   it's sort of the same as taking somebody into custody?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 54

```
 1        A.    Correct.

 2        Q.    Okay, then it says "Unit Number 1, F25."  Is

 3   that the car number?

 4        A.    Yes.  It stands for Frank 25.

 5        Q.    Okay, so if it says "F25 on scene," the

 6   dispatcher knows that that's Bebe; correct?

 7        A.    Correct.

 8        Q.    And what is "ID number"--so then it says

 9   "I"--"ID number 1, Bebe, Matthew," then it says, "ID

10   number 3, White, Michael."  Do you see that?

11        A.    I do.  You know, and I honestly don't know

12   what it is.

13        Q.    Okay.

14        A.    Don't recall.

15        Q.    Okay.  If you go to the next page, please,

16   looks like the first part is the same as it was on the

17   previous page?

18        A.    Yes.

19        Q.    The only--looks like the only real

20   additional information is the "WM."  What does that

21   stand for?

22        A.    Usually, it indicates white male.

23        Q.    "White male nude running and screaming in

24   the middle of the street, multiple 9/11 calls"?

25        A.    Correct.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 55

1      **Q.**    It doesn't say anything here on this call

2    about him beating on cars or pushing off cars;

3    correct?

4      **A.**    Correct.

5      **Q.**    Okay.  If you would go to the third page,

6    please.

7      **A.**    Mm-hmm.

8      **Q.**    This page is completely different, and it

9    says, "Free Form Document" at the top.  Do you see

10   that?

11     **A.**    The free form--oh, yes, I see.  Okay.

12     **Q.**    And then underneath that, it says, "Dispatch

13   Narrative," "information on the units assigned to the

14   call follows."  Could you tell us first generally what

15   this report is?

16     **A.**    This indicates all of the officers that

17   either were dispatched or took it upon themselves to

18   arrive at the scene to assist, or, like, in the case

19   of a supervisor, would arrive at the scene.  If they

20   actually called out that they were at the scene, then

21   the dispatcher would include them or add them to the

22   list of who they--who--who it was, what car it was,

23   and what time they arrived, and what time they were

24   cleared from the scene.

25     **Q.**    Okay, so on the first page, it looks like

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                      December 14, 2015

```
                                             Page 56
 1  F25 is Officer Bebe and F26 is Officer White.  Do you
 2  see that?
 3      A.   Yes.
 4      Q.   So if we look back on page 3, it looks like
 5  Officer Bebe was dispatched at 6:46.  Do you agree
 6  with that?
 7      A.   Yes.
 8      Q.   And then he arrives at 6:46?
 9      A.   Yes.
10      Q.   And then he's cleared at 8:39.
11      A.   Agreed.
12      Q.   Okay, and what does "cleared" mean?
13      A.   He is re--removed from the scene.
14      Q.   Okay.
15      A.   He's going back in service.
16      Q.   Okay, so back in service, he may have been
17  back at the station, working on his report, but now
18  he's basically done with that call?  Do you know what
19  that means?  From the scene, or does that just mean
20  released back in service, cleared for service?
21      A.   Usually, that means it's cleared for
22  service.  He could have gone 10/8 from--he may have
23  gone 10/8 from the scene but still remaining on the
24  call, so he would still, still be attached to the
25  call.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 57

```
1        Q.    Okay, you say he could have been 10/8 from

2   the scene?

3        A.    Yes, back in service from the scene.

4        Q.    Okay, then looks like unit F26 is Officer

5   White.  It looks like he was dispatched at 6:46 and he

6   arrived at 6:46, and he was cleared either from the

7   scene or from the matter at 7:31 A.M.  Is that--

8        A.    Yes.

9        Q.    --correct?

10       A.    Correct.

11       Q.    Do you know who unit F24 is?

12       A.    586; no, I don't remember who that was, no.

13       Q.    So if you would look at that Exhibit 12,

14  that front page, down the left--second box from the

15  left, it looks like unit number F24 is Officer

16  Kaminski.  Do you see where it says, "Unit number 24"?

17       A.    Yes.

18       Q.    On the right, it says "Reporting Officer...

19  Kaminski"?

20       A.    Yes.

21       Q.    So would you agree that back over on Exhibit

22  37, if we talk about F24, we're talking about Officer

23  Kaminski's car?

24       A.    Um, well, if the dates are the same, because

25  they--they change assignments all the time.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 58

 1       **Q.**    Sure.   The dates do appear to be the same,
 2    9/17/11, 6:46.   The time is the same?
 3       **A.**    Yes.
 4       **Q.**    Okay, so the dispatch time comes from the
 5    dispatcher.   The arrival time would come from the
 6    officer, right?   There's no one--
 7       **A.**    Yes.   Correct.
 8       **Q.**    And then he is cleared at--also on September
 9    17, 2011, at 14:26.   It looks like he is the last
10    officer cleared.
11       **A.**    Correct.
12       **Q.**    Do you know why that is?
13       **A.**    Why he was the last officer?
14       **Q.**    Cleared, yes.
15       **A.**    Apparently, he finished everything that he
16    had to finish--
17       **Q.**    Okay.
18       **A.**    --at that time.
19       **Q.**    Excuse me.   Does the officer clear
20    themselves from the scene, or does the dispatcher
21    record that?
22       **A.**    Well, the officer will notify Dispatch,
23    letting them know that they are 10/8, or clear.
24       **Q.**    Okay, and then the dispatcher enters these?
25       **A.**    Correct.

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 59

1       **Q.**    Okay, so the--Dispatch is the actual

2    transcriber on a CAD transcript?

3       **A.**    That is correct.

4       **Q.**    And so if you would go down to the bottom,

5    it says, "Information on the units assigned to the

6    call follows," and that's where we're still on page 3

7    of Exhibit 37.

8       **A.**    Yes.

9       **Q.**    So again, it looks like Officer Bebe is F25,

10   and Officer White is F26, and Officer Kaminski is F24.

11      **A.**    Right.

12      **Q.**    The only thing I see that is different is--

13   well, for Unit 25, it says, "Radio 25.  Does that have

14   any significance?  He's just saying 25?

15      **A.**    They--the series of 20 indicates a day

16   watch.  "5" means what sector he was in, so

17   apparently, he was riding twenty--25 sector, which

18   means day watch, 5 sector.

19      **Q.**    Okay, and then it looks like the arrival

20   time--I'm sorry, dispatch time and arrival times are

21   the same as above, and then the clear time is four

22   seconds different for Officer Bebe.  Do you see that?

23      **A.**    Right.

24      **Q.**    Do you know why that would be?

25      **A.**    Don't have a clue.

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                        December 14, 2015

```
                                                   Page 60

 1        Q.   I'm sorry?

 2        A.   No, I have no idea.

 3        Q.   Okay.  All right.  The next one is Officer

 4   White.  Again, it shows the same dispatch time, same

 5   arrival time, and the exact the same clear time.  Do

 6   you see that?

 7        A.   Yes.

 8        Q.   And Exhibit 24, for whatever reason, it

 9   doesn't show it on this page.

10        A.   Right.

11        Q.   Does that make sense, that it's the top one

12   on the next page?  The times seem to be the same as

13   above.

14             See where it says dispatched 6:426, arrive

15   6:46, cleared--this cleared says 8:35, which is

16   different than Officer Bebe--excuse me, Officer

17   Kaminski's cleared time on the--

18        A.   Correct.

19        Q.   --previous page.

20        A.   That's totally different.  I don't know why.

21        Q.   Do you happen to know who Unit 20 or Unit 21

22   are?

23        A.   Frank 20 would have been Lieutenant Ballard.

24        Q.   Okay.

25        A.   20 signifies--or the zero signifies the
```

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-9   Filed: 06/01/16   Page: 62 of 97 PageID #: 2673

Page 61

1    supervisor on duty or the lieutenant on duty.

2        **Q.**    Got you.

3        **A.**    The Frank 21, I don't know--by DSN 602, I do

4    not know who that would have been.

5        **Q.**    So that--above that, that 299 is Lieutenant

6    Ballard's--

7        **A.**    Correct.

8        **Q.**    --DSM?  Okay?

9        **A.**    That is correct.

10       **Q.**    Do the DSM numbers tell you the higher they

11   are, the lower the rank?

12       **A.**    Yes.

13       **Q.**    Okay, so that's likely a patrol officer?

14       **A.**    Yes, it would have been a patrol officer.

15       **Q.**    All right.  Okay, so if we could go to this

16   next section where it says, "Dispatch received by Unit

17   Frank 25" at 6:46:16, so that's Officer Bebe, the next

18   line is "Dispatch received by Unit F26" at 6:46:18.

19   That's Office White, correct?

20       **A.**    Correct.

21       **Q.**    And the next one, "Dispatch received by Unit

22   F24," 7:11:05, that's Officer Kaminski; correct?

23       **A.**    That's correct.

24       **Q.**    Okay.  What does that mean, "Dispatch

25   received by"?

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                      December 14, 2015

```
                                              Page 62
  1        A.    Well, that's a good question.  I don't know.

  2        Q.    Okay.

  3        A.    Don't know.

  4        Q.    Then it shows below, there, dispatch

  5   received by Lieutenant Ballard at 7:12:44.

  6        A.    Right.

  7        Q.    Could that mean that's a communication

  8   through their radio to dispatcher?

  9        A.    It could very well be.  I really don't know.

 10        Q.    But there's no way to tell from this report

 11   what's being said, whether it's on scene, leaving

 12   scene?

 13        A.    Correct.

 14        Q.    As we go down, we see another dispatch by

 15   Officer White, Frank 26, at 7:22:03; correct?

 16        A.    Mm-hmm, correct.

 17        Q.    If he, if Officer White testified that an

 18   ambulance was called at the completion of the tasering

 19   and then the ambulance was asked to hurry once they

 20   realized he wasn't breathing, is there any way, from

 21   what we've seen in this report, to determine which of

 22   these calls would have been for ambulance?  They

 23   call--

 24        A.    No.

 25        Q.    They call Dispatch for ambulance, right?
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                                    December 14, 2015

```
                                                        Page  63
     1        A.    Yes.

     2        Q.    And the dispatcher calls the ambulance

     3   service?

     4        A.    That is correct.

     5        Q.    Okay, so the next one is--that I'd like to

     6   ask you about is "F002 WAS ADVISED AT 7:38 A.M.," then

     7   it says, "COLLINS" at 7:21:45.  Do you know who

     8   Collins is?

     9        A.    The dispatcher.

    10        Q.    Okay.  Does "F002" mean anything to you as

    11   far as what was being advised of?

    12        A.    Frank 2 is the Assistant Chief.

    13        Q.    Okay, is that Ulrich we talked about

    14   earlier?

    15        A.    Eickhoff.

    16        Q.    Eickhoff.  Thank you.  Sorry.

    17        A.    Well, no, let me go back.  Frank--at that

    18   time, Frank 2 was me.

    19        Q.    Okay.

    20        A.    I was advised, at 7:38 in the morning.

    21        Q.    That's when you would have first learned of

    22   this incident?

    23        A.    Yes.

    24        Q.    And then it says, "F25 STATION."  I

    25   understand F25 is Bebe, and then under the "CLR"
```

Page 64

1    column, it says "Henke," and then the time is 7--7:47

2    in the morning, correct?

3         **A.**   Correct.

4         **Q.**   And what does that mean to you?

5         **A.**   Well, by the way, that's not my spelling.

6         **Q.**   Okay.

7         **A.**   So--and now that I recall, we did actually

8    have a dispatcher by the name of Hanke, but it was

9    spelled with an "a" instead of an "e."

10        **Q.**   Okay, thank you.

11             So the rest of that page, it says "Dispatch

12   received by unit"--that's something that the

13   dispatcher was telling F25, and then right below that,

14   Officer Kaminski, Frank 24, and that can be anything

15   from giving him information to saying that you can

16   copy, right?  You understood you got, you received a

17   dispatch and you copy?

18        **A.**   Basically, yes.

19        **Q.**   How much of this is actually computerized,

20   to your knowledge, where it happens automatically if

21   there's a communication that puts it in there?  Is

22   that dispatcher literally trying--looking at a clock

23   and typing in "8:39:09"?

24        **A.**   No, I--whenever an--whenever the entry key

25   is hit, there's a time stamp to it.

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

```
                                                      Page 65

  1        Q.    So the time stamp is automatic, then?

  2        A.    Automatic.

  3        Q.    I got you.  If you would go to the next

  4   page, please, at the top of this, this column on the

  5   left, where it says "Received," above that number,

  6   it's "ORI."  Can you--do you understand what "ORI"

  7   means?

  8        A.    That's just our department number--

  9        Q.    Okay.

 10        A.    --in St. Louis County.

 11        Q.    That's Ferguson?

 12        A.    That's Dispatch, our Dispatch number.

 13        Q.    Okay, then it says, "597 Jeremy Evans,

 14   CAD1A1."  Is that a dispatcher's identification?

 15        A.    I don't--I don't remember who Jeremy Evans

 16   is, but it had to be some--it had to be a dispatcher,

 17   yes.

 18        Q.    Okay, do you know who Connie Glasgow is?

 19        A.    That was a dispatcher.

 20        Q.    So they would have been the dispatchers

 21   along with Collins who would have been involved in

 22   these calls?  Fair statement?  And Henke, maybe?

 23        A.    Well, and--well, it's interesting, because

 24   Collins was also--that's a maiden name--

 25        Q.    Okay.
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                      December 14, 2015

Page 66

1      **A.**    --for Connie Glasgow, so I just wondered if

2   that was somehow slipped through there,--

3      **Q.**    Uh-huh.

4      **A.**    --because normally, we wouldn't have had

5   more than two dispatchers on at a time unless we had

6   someone in training, which that could have been Jeremy

7   Evans.

8      **Q.**    Mm-hmm.  Understood.  If you would, on that

9   page I think that we're on that I asked you where

10   Jeremy Evans and Connie Glasgow, who they were, on the

11   column right below their names, it says, "Source:

12   Telephone."  Do you see that?

13      **A.**    Correct.

14      **Q.**    That's where the source of the call was

15   from?  Correct?

16      **A.**    That is correct.

17      **Q.**    What does "Mutual Aid" mean right below

18   that?

19      **A.**    If that was Dispatch, Mutual Aid is with

20   Police and Fire.  We may have called another police

21   department,--

22      **Q.**    Okay.

23      **A.**    --and they would have aided us.

24      **Q.**    Okay, and that's blank, so it looks like you

25   did not--there was no aid given by a neighboring

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 67

1    department, correct?

2         A.    Correct.

3         Q.    And you--that would not be completed just

4    for an ambulance response, right?

5         A.    That's correct.

6         Q.    If you would go to the next page, please, I

7    think I understand most of the entries here.  If you

8    would look on the right lower box, the first entry is

9    "E911."  Do you see that?

10        A.    Yes.

11        Q.    And then there's a zero time.  What does

12   that indicate to you?

13        A.    That it was not a 911 call.  It was received

14   at the Police Department--

15        Q.    Okay, so this is--

16        A.    --on a regular--

17        Q.    --someone calling in not as a 911 routing

18   call?

19        A.    Correct.

20        Q.    Okay.  Again, it shows the call at 6:46:09

21   on the date in question.  It shows the dispatch at

22   6:46:10, shows someone is "Enroute" 6:46:10, shows

23   someone, "Arrive 1," at 6:26:27.

24        A.    Yes.

25        Q.    Do you know who, who--who "1" was that

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                                    December 14, 2015

                                                                    Page 68

1    arrived at 6:46:27?

2         A.    On the previous column, ID number 1 is Bebe.

3         Q.    Okay.

4         A.    So it should have been Bebe that arrived.

5         Q.    Okay, so this is recording his arrival time?

6         A.    Yes.

7         Q.    Does it indicate to you that he's the first

8    one the scene?

9         A.    That's what it indicates.

10        Q.    The report indicates Officer Kaminski was

11   the first one to encounter Mr. Moore, right?

12        A.    Agreed.

13        Q.    This doesn't indicate when Officer White or

14   Officer Kaminski arrived; correct?

15        A.    This page does not, no.

16        Q.    Yes, sir.

17        A.    Does not.

18        Q.    The next page is "Incident Recalled From,"

19   and there's a bunch of numbers after that.  Do you

20   know what that means?

21        A.    Hmm:  No.  I'm really not familiar with that

22   at all.

23        Q.    Okay, thank you.

24              Captain Henke, would you agree that when

25   police departments create policies, and procedures,

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 69

1   and train the officers not to use excessive force,

2   that this is for the public safety of all citizens?

3          MS. SHAFAIE:  Form and foundation.  You can

4   answer.

5      **A.**   I would agree.

6   BY MR. DOWD:

7      **Q.**   Okay.  Would you agree that police

8   departments' excessive force analysis and supervision

9   of the departments' officers should be designed to

10  protect the public from abuse by police officers?

11         MS. SHAFAIE:  Same objections.

12     **A.**   Well, again, I would agree, but that's not

13  the only reason.

14  BY MR. DOWD:

15     **Q.**   Understood.  You will concede, sir, that

16  police departments must train their officers on how to

17  safely hold people in certainly crisis?

18         MS. SHAFAIE:  Same objections.

19     **A.**   I would agree.

20  BY MR. DOWD:

21     **Q.**   And based on your training and experience,

22  you agree that this is important to protect the

23  public?

24         MS. SHAFAIE:   Same.

25     **A.**   I would agree, but for other reasons, as

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

```
                                                   Page 70
 1   well.
 2   BY MR. DOWD:
 3       Q.    Okay, why don't you tell me why it's
 4   important?
 5       A.    Well, it's part of our training.  It's part
 6   of our professional status is to--we're to safeguard
 7   ourselves, we're to safeguard citizens, we're to
 8   safeguard everybody, so it's not--we don't make policy
 9   just to protect one resource.
10       Q.    Understood, and while everyone understands
11   that the Department and police officers in general are
12   there for law enforcement to enforce the laws and
13   apprehend people, there's also a community caretaking
14   aspect to the police profession, correct?
15            MS. SHAFAIE:   Same objection.
16       A.    Oh, absolutely.
17   BY MR. DOWD:
18       Q.    All right, and what's your experience with
19   community caretaking aspects of the police profession?
20       A.    It's probably the single thing that we do
21   the most.  It's just--that's what police do.
22       Q.    Helping people in non-criminal situations,
23   everything from being stranded on the highway, to
24   people being sick, domestic disputes, psychotic
25   reactions, people just in need of help, as opposed to
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 71

1    being apprehended and put in jail?

2        A.    Absolutely.

3            MS. SHAFAIE:   Same objection.

4    BY MR. DOWD:

5        Q.    And you would agree, concede that police

6    officers must never use more force than is reasonably

7    necessary when dealing with people?

8            MS. SHAFAIE:   Same.

9        A.    I would agree with that statement, yes.

10   BY MR. DOWD:

11       Q.    And agree that that is also to protect

12   everyone from serious injury or possibly death?

13           MS. SHAFAIE:   Same.

14       A.    Agreed.

15           MR. DOWD:  All right, I don't have any

16   further questions.  I appreciate your time today.

17   Thank you, so much.

18           THE WITNESS:  You are welcome.

19                         EXAMINATION

20   QUESTIONS BY BY MS. SHAFAIE:

21       Q.    I just have really quick follow-up.  Can I

22   get you to look back at Exhibit 37, and can I have you

23   turn to the page that's Bates labeled at the bottom

24   1847?  This is a page that you discussed with

25   Mr. Dowd, and it lists all of the law enforcement

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 72

1    officers that apparently were involved in this

2    incident, correct?

3        **A.**    I don't know if all of them were listed on

4    this page, but there are some that were listed, yes.

5        **Q.**    Okay, and you talked about how they can be

6    identified by the "F" and then the number which I

7    think you said was Frank 20-something.

8        **A.**    Correct.

9        **Q.**    And that's one way of identification, then

10   you also pointed to some numbers which I think are

11   more to the right of the page, which are DSN numbers.

12   Is that correct?

13       **A.**    Correct.

14       **Q.**    Now, as you look at this page, do you see

15   that all of the arrival times for Frank 25, Frank 26,

16   Frank 24, Frank 20 and Frank 21 are listed as 6:46?

17       **A.**    Agreed.

18       **Q.**    Okay, and do you know, when an officer gets

19   on scene to the scene of an incident that they've been

20   dispatched for, will they always let the dispatchers

21   know that they're on scene?

22       **A.**    No.

23       **Q.**    Okay.  If they don't let the dispatcher know

24   that they're on scene, do you know what the dispatcher

25   might do when they're filling out a report like this?

Tina Moore, et al. v. Brian Kaminski, et al.
Richard Henke                                          December 14, 2015

Page 73

1              MR. DOWD:  Objection to the extent it may

2    call for speculation, but go ahead, sir, please.

3        A.    Based on the training of the dispatcher,

4    they often will put in the time themselves instead of

5    relying on the officer to do it.

6    BY MS. SHAFAIE:

7        Q.    Okay, and if the dispatcher doesn't have any

8    information about when officers arrived on scene,

9    would it be common for them to assign the number of

10   the first officer that was on scene?

11       A.    It is common, but we prefer that they do

12   not.

13       Q.    Okay.

14       A.    But it is common, yes.

15       Q.    So, for instance, in this case, if the first

16   officer on scene was Officer Kaminski and he arrived

17   around approximately 6:46 A.M. but the other officers

18   did not report to the dispatchers when they arrived,

19   is it possible that the dispatcher just put in the

20   arrival time of Officer Kaminski for all of the other

21   officers that came subsequently?

22       A.    It's very possible.

23             MS. SHAFAIE:   Okay.

24             Do you have any questions based on that?

25

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

                                                        Page 74

 1                      FURTHER EXAMINATION

 2    BY MR. DOWD:

 3        Q.    I was just going to say, is there any way to

 4    know who--if Officer Kaminski, from looking at this

 5    CAD, was the first to report to the dispatcher that he

 6    was on scene?

 7        A.    There's no way to--no way to say this.

 8              MR. DOWD:  Okay, and--okay.  Again, I thank

 9    you for your time, sir.

10              THE WITNESS:  Anything else?

11              MS. SHAFAIE:  No.

12              THE VIDEOGRAPHER:  Off.

13              MR. DOWD:  Signature?

14              MS. SHAFAIE:   We'll read, review.

15              THE VIDEOGRAPHER:  We're off the record at

16    4:59.

17                   (Whereupon, at 4:59 P.M., the

18                   deposition was concluded.)

19

20

21

22

23

24

25

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

                                                        Page 75

1   State of Missouri.        )

2                             ) SS.

3   City of St. Louis         )

4               I, J. Bryan Jordan, a Certified Court

5   Reporter in and for the State of Missouri, duly

6   commissioned, qualified and authorized to administer

7   oaths and to certify to depositions, do hereby certify

8   that pursuant to Notice in the civil cause now pending

9   and undetermined in the United States District Court

10  for the Eastern District of Missouri, Eastern

11  Division, to be used in the trial of said cause in

12  said court, I was attended at the offices of Pitzer

13  Snodgrass, P.C., in the City of St. Louis, State of

14  Missouri, by the aforesaid witness and by the

15  aforesaid attorneys, on the 14th day of December,

16  2015.

17              The said witness, being of sound mind

18  and being by me first carefully examined and duly

19  cautioned and sworn to testify the truth, the whole

20  truth, and nothing but the truth in the case

21  aforesaid, thereupon testified as is shown in the

22  foregoing transcript, said testimony being by me

23  reported in shorthand and caused to be transcribed

24  into typewriting, and that the foregoing pages

25  correctly set forth the testimony of the

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                          December 14, 2015

                                                          Page 76

 1   aforementioned witness, together with the questions

 2   propounded by counsel and remarks and objections of

 3   counsel thereto, and is in all respects a full, true,

 4   correct and complete transcript of the questions

 5   propounded to and the answers given by said witness;

 6   that signature of the deponent was not waived by

 7   agreement of counsel.

 8                   I further certify that I am not of

 9   counsel or attorney for either of the parties to said

10   suit, not related to nor interested in any of the

11   parties or their attorneys.

12                   Witness my hand and seal at St. Louis,

13   Missouri, this 21st day of December, 2015.

14

15

16

17

18

19

20                   J. Bryan Jordan

21                   Certified Court Reporter

22                   State of Missouri No. 532

23

24

25

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                              December 14, 2015

Page 77

```
 1   GorePerry Reporting & Video

 2   Monday, December 21, 2015

 3
     Ms. Ida S. Shafaie
 4   Pitzer Snodgrass
     100 South Fourth Street, Suite 400
 5   St. Louis, MO, 63102

 6   Re: Deposition of Richard Henke
     Date:Monday, December 14, 2015
 7   Case:Tina Moore, et al. vs.
     Brian Kaminski, et al.

 8

 9   Ms. Ida S. Shafaie

10   Your witness did not waive the right to read and sign
     his/her deposition in the above referenced matter.
11   Enclosed is the copy of the deposition you ordered,
     together with errata sheets and additional signature
12   page.  Please instruct your witness to read the
     transcript, list any corrections (including page and
13   line number) on the errata sheets, sign and date the
     errata sheets and signature page.

14
     Within 30 days, please return the errata sheets and
15   signature page to our office for further processing.

16   Your prompt cooperation will be appreciated.

17

18

19

20

21   Sincerely,

22

23   Production Department
     GorePerry Reporting & Video
24   515 Olive Street
     St. Louis, MO  63101
25   (314) 241-6750
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

```
                                                      Page  78

 1    Page Line Should Read:

 2    Reason for change:

 3

 4    Page Line Should Read:

 5    Reason for change:

 6

 7    Page Line Should Read:

 8    Reason for change:

 9

10    Page Line Should Read:

11    Reason for change:

12

13    Page Line Should Read:

14    Reason for change:

15

16    Page Line Should Read:

17    Reason for change:

18

19    Page Line Should Read:

20    Reason for change:

21

22    Page Line Should Read:

23    Reason for change:

24

25
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                            December 14, 2015

```
                                                    Page  79

  1   Page Line Should Read:

  2   Reason for change:

  3

  4   Page Line Should Read:

  5   Reason for change:

  6

  7   Page Line Should Read:

  8   Reason for change:

  9

 10   Page Line Should Read:

 11   Reason for change:

 12

 13   Page Line Should Read:

 14   Reason for change:

 15

 16   Page Line Should Read:

 17   Reason for change:

 18

 19   Page Line Should Read:

 20   Reason for change:

 21

 22   Page Line Should Read:

 23   Reason for change:

 24

 25
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

Page 80

1    Comes now the witness, Richard Henke,

2    and having read the foregoing transcript

3    of the deposition taken on 12/14/2015,

4    acknowledges by signature hereto that it is a

5    true and accurate transcript of the testimony given

6    on the date hereinabove mentioned.

7

8

9    _____

10   Richard Henke

11

12   Subscribed and sworn to me before this

13   _____ day of _____,20____.

14   My Commission expires

15

16

17   _____

18   Notary Public

19

20

21

22

23

24

25

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                December 14, 2015

Page 81

```
 1   COURT MEMO

 2

 3

 4

 5   Tina Moore, et al. vs. Brian Kaminski, et al.

 6

 7

 8   CERTIFICATE OF OFFICER AND

 9   STATEMENT OF DEPOSITION CHARGES

10

11   DEPOSITION OF Richard Henke

12

13   12/14/2015

14   Name and address of person or firm having custody of

15   the original transcript:

16

17   Dowd & Dowd

18   211 North Broadway, Suite 4050

19   St. Louis, MO 63101

20

21

22

23

24

25
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                    December 14, 2015

```
                                                  Page 82

   1   ORIGINAL TRANSCRIPT TAXED IN FAVOR OF:

   2

   3   Dowd & Dowd

   4   211 North Broadway, Suite 4050

   5   St. Louis, MO 63101

   6   Total:

   7   1 ONE COPY - TAXED IN FAVOR OF:

   8

   9   Pitzer Snodgrass

  10   100 South Fourth Street, Suite 400

  11   St. Louis, MO 63102

  12   Total:

  13

  14

  15

  16

  17

  18

  19

  20

  21

  22

  23

  24

  25
```

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                                    December 14, 2015

Page 83

1    Upon delivery of transcripts, the above

2    charges had not been paid.  It is anticipated

3    that all charges will be paid in the normal course

4    of business.

5    GORE PERRY GATEWAY & LIPA REPORTING COMPANY

6    515 Olive Street, Suite 700

7    St. Louis, Missouri 63101

8    IN WITNESS WHEREOF, I have hereunto set

9    STATEMENT OF DEPOSITION CHARGES

10   my hand and seal on this _____ day of _____

11   Commission expires

12   _____

13   Notary Public

14

15

16

17

18

19

20

21

22

23

24

25

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                          December 14, 2015

Page 84

---

**A**

a-- 36:25
a--a 50:20
a--I 6:7
a--I'm 38:21
a--pretty 10:14
a--you 47:14
A.D.R 2:8
A.M 57:7 63:6
  73:17
able 7:17 11:1 19:9
  19:25 26:4 35:23
  36:13 44:6
absolutely 43:18
  70:16 71:2
abuse 69:10
Academy 8:8 39:7
  44:4 45:7
accident 53:12
account 11:22 12:6
  12:11
accurate 14:6 16:9
  80:5
accusations 11:13
achieve 9:15
acknowledges 80:4
action 14:1 32:10
actions 15:20 16:16
actual 20:15 46:20
  59:1
add 52:13 55:21
additional 54:20
  77:11
address 12:1 81:14
administer 75:6
admitting 32:19
advised 23:1 63:6
  63:11,20
Affairs 24:1,6
aforementioned
  76:1
aforesaid 5:25
  75:14,15,21
after--as 28:20

afternoon 52:10
age 5:23
agree 16:7 20:12
  25:18,20,23 26:6
  26:15 30:1,14
  32:5,13,23 33:19
  34:7,9 35:11 36:8
  48:7 56:5 57:21
  68:24 69:5,7,12
  69:19,22,25 71:5
  71:9,11
Agreed 20:3 56:11
  68:12 71:14 72:17
agreement 76:7
ahead 73:2
aid 66:17,19,25
aided 66:23
Airport 52:23
al 1:3,5 2:13 5:5,5
  77:7,7 81:5,5
alleged 25:24
also--that's 65:24
always--the 37:17
ambulance 62:18
  62:19,22,25 63:2
  67:4
Amendment-type
  39:23
amount 32:24 42:5
an--whenever
  64:24
analysis 23:8 36:22
  37:8 69:8
and-- 9:12
and--but 10:15
and--is 16:8
and--okay 74:8
and--well 65:23
angle 35:22
answer 7:20,25
  16:11 18:18 20:18
  22:4 26:11 30:13
  31:2 32:8,9 33:2
  34:13 38:8 69:4

answers 7:10 76:5
anticipated 83:2
any--at 45:11
Any--do 23:17
anybody 24:20
  28:23
anymore 43:9
anytime 36:25
  47:13
apparently 53:15
  58:15 59:17 72:1
appear 58:1
APPEARANCES
  3:1
appeared 31:22
appears 15:10 38:9
  38:12
application 21:18
  33:9 36:7
applications 21:15
  21:23
appreciate 71:16
appreciated 77:16
apprehend 70:13
apprehended 71:1
appropriate 30:6
  37:9
approved 46:22
approximately 6:17
  9:14 27:7,16,18
  32:21 47:7 48:11
  73:17
are--like 53:11
area 45:14 51:16
arrest 53:20,24
arrival 58:5 59:19
  59:20 60:5 68:5
  72:15 73:20
arrive 51:22 55:18
  55:19 60:14 67:23
arrived 55:23 57:6
  68:1,4,14 73:8,16
  73:18
arrives 56:8

as--as 42:7
asked 8:3 22:14
  23:23 27:23 62:19
  66:9
asking 7:13 26:13
  26:15 28:2
aspect 70:14
aspects 70:19
assess 21:24 32:4
assessment 32:5,22
  32:22,23 33:14,17
  33:22 34:7,12,16
  34:22 35:2,10,15
  35:18 36:8
assessments 33:13
assign 73:9
assigned 24:11,14
  24:20 25:5 55:13
  59:5
assignments 57:25
assist 55:18
Assistant 29:6
  63:12
assume 17:20 20:6
  20:9 31:19
assume--well 23:20
assumed 11:11
assuming 8:1 26:8
  32:18 36:5 37:23
ASTERN 2:2
at--also 58:8
attached 56:24
attempt 26:7,15
  32:3 44:25 45:12
attempting 45:24
attend 44:5,6
attended 44:11
  45:7 75:12
attention 25:2
attorney 50:3 76:9
attorneys 75:15
  76:11
August 10:15
authorized 75:6

automatic 65:1,2
automatically
  53:21 64:20
awarded 44:10
aware 19:7 22:13
  24:19 25:16 26:5
  38:11 46:8

---

**B**

Bachelor's 8:7
back 20:8 23:2
  26:17 48:25 53:19
  56:4,15,16,17,20
  57:3,21 63:17
  71:22
Ballard 14:20
  15:14 16:14 17:16
  18:5,11 20:13
  23:13 30:4,7,17
  37:14,25 60:23
  62:5
Ballard's 15:4 17:2
Ballard's-- 61:6
bars 35:19
baseball 11:6,7
based 25:21 26:1,6
  29:25 32:11 43:21
  48:14 50:1 69:21
  73:3,24
baseman 11:8
basically 39:3,6
  48:8 56:18 64:18
basis 38:23 41:12
Bates 71:23
batons 47:24
be--use-of-force
  37:3
beating 55:2
Bebe 23:18 54:6,9
  56:1,5 59:9,22
  61:17 63:25 68:2
  68:4
Bebe--excuse 60:16
been--and 13:21

---

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke

December 14, 2015

Page 85

been--it 22:21
began 8:25
behalf 2:20 5:16
belief 37:19
believe 8:12 13:11
  22:21 27:13 29:5
  29:7 41:2 45:10
  46:15 49:7,8,20
best 47:11 48:17
better 36:13
Bill 5:15 6:7
bill@dowdlaw.net
  3:10
bit 8:5
bizarre 29:4
blank 7:1 15:25
  42:21 66:24
bottom 59:4 71:23
box 57:14 67:8
Brannon 19:19
  20:9 21:2 22:22
  22:24 23:11
breathing 62:20
Brian 1:5 2:13 5:5
  77:7 81:5
bring 33:23
broadest 13:14
Broadway 3:6
  81:18 82:4
brought 25:2 31:23
Brown 10:9,17
Bryan 2:23 75:4
  76:20
bulletin 41:21
  42:10
bunch 68:19
Bureau 44:8,21
business 83:4
but-- 32:14

**C**

C-a-r-li 29:24
CAD 50:4,13,20,23
  51:17 59:2 74:5

CAD1A1 65:14
call 50:11,16 51:5,6
  51:13,14,15 52:4
  52:4,7,24 55:1,14
  56:18,24,25 59:6
  62:25 66:14 67:13
  67:18,20 73:2
call-- 62:23
called 55:20 62:18
  66:20
Caller 53:2
calling 67:17
calling--Exhibit
  13:15
calls 53:19 54:24
  62:22 63:2 65:22
calmed 10:18
can--you 50:20
capable 19:13
capacity 6:20
capital 29:24
Captain 9:9,14,15
  9:18,23 10:1 29:5
  29:22 38:7 46:9
  47:9 49:3,17,19
  49:22 68:24
car 50:15 51:18,20
  54:3 55:22 57:23
carefully 75:18
caretaking 70:13
  70:19
cars 55:2,2
case 2:10 5:25 6:14
  6:15 13:3,15 14:5
  14:20 15:7 17:3
  18:13 22:24 24:10
  30:3 37:19 41:3
  53:20 55:18 73:15
  75:20
Case:Tina 77:7
cases 6:23
catch 29:13,15
cause 5:4 75:8,11
caused 75:23

cautioned 75:19
certainly 23:25
  24:15 29:2 33:4
  48:5,18 69:17
CERTIFICATE
  81:8
certified 2:23 5:8
  5:10 44:15 75:4
  76:21
certify 75:7,7 76:8
change 32:22 34:22
  34:24 35:15,21
  57:25 78:2,5,8,11
  78:14,17,20,23
  79:2,5,8,11,14,17
  79:20,23
changed 41:11
changes 33:14
  35:18 39:17,17
  42:24 43:13,22
changing 35:10
charge 11:9 25:24
  26:4 34:5 44:16
charges 81:9 83:2,3
  83:9
charging 33:22,23
  34:12,16 35:3
check 15:21,21
chest 31:21,22
  35:19
Chief 10:13,19,24
  11:2,5 13:20,23
  24:8 25:12,15
  28:13 29:2,6,18
  30:1,22 31:6
  37:16,18 40:8,13
  40:14 63:12
Chief's 40:19
Chief--Assistant
  29:18
chose 29:4
circumstances 10:6
  46:3
CIT 44:2 45:9,10

45:13
CIT-trained 45:1
  45:18
cited 41:19
citizen 36:24 45:14
  50:12 51:7
citizens 27:25 28:1
  32:1 69:2 70:7
City 16:5 24:2
  27:13,14 75:3,13
civil 75:8
civilians 44:20
classes 44:9
clear 7:9,9 58:19,23
  59:21 60:5
cleared 52:1 55:24
  56:10,12,20,21
  57:6 58:8,10,14
  60:15,17
cleared--this 60:15
clock 64:22
CLR 63:25
clue 48:16 59:25
code 53:8
coincide 51:12
College 8:7
Collins 63:7,8
  65:21,24
column 64:1 65:4
  66:11 68:2
come 10:21 22:21
  58:5
comes 58:4 80:1
coming 28:19,19,21
command 30:2
commander 15:25
  16:8 17:21 24:19
  38:15 49:19 52:7
commanders 39:10
commanders'--
  25:6
commands 37:1
  47:17
comments 11:24

Commission 80:14
  83:11
commissioned 75:6
committing 45:16
common 73:9,11,14
communicate 7:17
  42:24
communicated
  41:4
communication
  62:7 64:21
communications
  40:12,13,18
community 70:13
  70:19
Company 31:16
  83:5
compared 11:6
Complainant 53:2
complete 53:22
  76:4
completed 14:9,9
  15:2 19:1 37:3,5
  67:3
completely 7:14
  14:16,18 55:8
completes 16:21
completion 62:18
compliance 32:4,23
  33:13
compliant 32:12
complied 16:16
comply 15:20
comply--or 32:3
complying 21:24
computer 22:11
  50:14 51:18 53:9
computer--is 50:5
computer-aided
  50:13
computerized
  64:19
computers 42:20
concede 69:15 71:5

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                                                December 14, 2015

Page 86

concluded 74:18
conclusion 18:12
conduct 23:12
  24:10
conducted 39:8
conference 28:20
Connie 65:18 66:1
  66:10
considered 11:24
consistent 16:19
  19:23
Consolidated 2:12
constitutional
  39:18 40:5 41:3
  41:12 43:21
constitutional--it
  41:9
Construction 31:16
construed 12:5,6,8
  12:10,12
contact 31:23
contain 18:22
contained 25:5
continued 8:16
Continuing 18:16
  22:7 33:17 34:15
  36:17
continuously 32:20
conversation 7:11
  10:13 23:10,19,24
conversational
  7:17
conversations
  23:13,17
cooperation 77:16
copies 40:20 42:14
copy 39:12,13 50:3
  64:16,17 77:11
  82:7
correct 10:3 14:21
  14:24 15:11,18
  16:12 17:5,16,17
  19:24 20:19 21:12
  23:6 24:16,17,22

30:4,5 31:11,12
33:11,24 34:1
36:15,17 37:10
38:12 41:22,24
42:12 43:5,18
44:20 47:4,25
48:10 51:24,25
52:13,25 53:1
54:1,6,7,25 55:3,4
57:9,10 58:7,11
58:25 59:3 60:18
61:7,9,19,20,22
61:23 62:13,15,16
63:4 64:2,3 66:13
66:15,16 67:1,2,5
67:19 68:14 70:14
72:2,8,12,13 76:4
corrections 77:12
correctly 75:25
corroborating 26:3
counsel 3:1 5:13
  76:2,3,7,9
County 39:7 44:4
  44:11 65:10
couple 13:14 39:15
  42:8 49:3
course 19:2 83:3
court 2:1,24 5:6,10
  7:7,19 8:1 29:14
  29:16 41:16,18
  42:1,9 75:4,9,12
  76:21 81:1
Court--whether
  41:16
courts 41:18
create 68:25
crime 45:16
crisis 44:1 45:15,17
  45:25 69:17
cross 52:24
curious 10:25
custody 53:25
  81:14
custom 18:3

customarily 22:19
customary 22:16
cut 44:8,8

## D

D-e 29:24
date 12:25 17:23
  38:4 39:17 43:17
  51:5,6,8 52:1
  67:21 77:13 80:6
date/time 51:22
Date:Monday 77:6
dated 18:1
dates 42:5 57:24
  58:1
day 14:13,14 28:23
  59:15,18 75:15
  76:13 80:13 83:10
days 77:14
deadly 48:1,5,7
deal 11:23 33:6
dealing 71:7
death 16:18 71:12
DeCarli 29:5,20,21
  29:22 49:17,19,22
December 1:10
  2:23 5:2 75:15
  76:13 77:2,6
decided 10:17
  41:17
decides 24:8
decision 36:22
decisions 39:24
Defendants 2:14
  3:12 5:18
degree 8:7
delay 42:13
delivery 83:1
Delores 2:7 5:16
department 6:11
  8:16,23 15:20
  16:16 18:6,10
  22:13 25:24 26:25
  27:12,12 28:1

37:8 44:11 50:8
51:7 65:8 67:1
70:11 77:23
Department--
  67:14
department,--
  66:21
departments 44:10
  68:25 69:16
departments' 69:8
  69:9
depended 41:15
depending 35:22
Depends 34:8 46:2
deponent 76:6
deposes 5:25
deposing 50:17
deposition 1:12
  2:19 5:4 6:13,16
  7:2 12:16,23
  74:18 77:6,10,11
  80:3 81:9,11 83:9
depositions 75:7
described 35:5
descriptions 39:16
designed 69:9
details 43:10
detective 44:8,21
  49:8,9,21
detectives 49:20
determination
  16:18,22
determine 21:24
  22:10 62:21
determined 24:8
  53:18
determining 18:23
dial 34:22
died 6:8
different 27:20
  34:6,11,15 35:1
  36:9 38:12 39:15
  53:14 55:8 59:12
  59:22 60:16,20

Diller 29:7
Direct 3:17
directly 49:21
disagree 20:2 30:19
  30:24 31:8
Discharging 48:9
disciplinary 14:1
disciplined 48:14
discussed 27:19
  28:5 71:24
discussions 22:23
dispatch 40:15,16
  40:17 50:5 51:9
  51:13 55:12 58:4
  58:22 59:20 60:4
  61:16,18,21,24
  62:4,14,25 64:11
  64:17 65:12,12
  66:19 67:21
dispatched 51:24
  55:17 56:5 57:5
  60:14 72:20
dispatcher 50:10
  50:15 53:21 54:6
  55:21 58:5,20,24
  62:8 63:2,9 64:8
  64:13,22 65:16,19
  72:23,24 73:3,7
  73:19 74:5
dispatcher's 65:14
dispatchers 65:20
  66:5 72:20 73:18
dispatching 50:14
Disposition 52:14
disputes 70:24
distribute 40:19
  42:14
distributed 43:17
distributing 40:13
District 2:1,2 5:6,7
  75:9,10
division 2:3 5:7
  11:9 15:24 16:8
  17:21 40:22 44:18

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke

December 14, 2015

Page 87

44:19,24 49:19
  75:11
**do--** 24:20
**document** 15:9
  50:18 55:9
**documents** 12:16
  18:21 25:4
**doesn't--is** 25:16
**doing** 23:23 34:8
**domestic** 70:24
**don't--I** 65:15
**don't--not** 32:10
**Dowd** 3:4,5,5 4:3,5
  5:15,15 6:3,7
  16:13 18:15,20
  19:16 20:21 22:8
  26:14,23 29:17
  30:15 31:3 32:15
  33:8,16,20 34:3
  34:14,20 35:6,14
  35:25 36:12,18
  37:12 38:10,25
  45:22 48:21 49:2
  69:6,14,20 70:2
  70:17 71:4,10,15
  71:25 73:1 74:2,8
  74:13 81:17,17
  82:3,3
**download** 19:9
  20:1,7 21:5 22:9
  26:8,17
**downloads** 20:15
**drawing** 7:1 42:21
**Dropbox** 43:15
**DSM** 61:8,10
**DSN** 18:1 38:4 61:3
  72:11
**duly** 5:23 75:5,18
**duration** 21:15
**duties** 49:13
**duty** 40:25 61:1,1
**dynamics** 34:23

**E**

**e** 64:9
**e-mail** 11:22,25
  12:4 13:22 28:13
**e-mailed** 39:12
**e-mails** 11:14,22
**E911** 67:9
**earlier** 37:24 52:6
  63:14
**early** 20:9 27:9
**Eastern** 2:3 5:7,7
  75:10,10
**easy** 42:3
**educated** 8:7
**educational** 8:6
**effect** 31:23 47:1
**effective** 35:19
**Eickhoff** 29:6,18
  63:15,16
**either** 6:22 18:11
  45:15 52:13 55:17
  57:6 76:9
**Electric** 10:15
**electricity** 33:10
**em** 46:23
**Emerson** 10:15,16
**emotional** 45:15
**employed** 8:15
**employee** 6:25
  11:23
**employment** 8:17
**Enclosed** 77:11
**encounter** 13:7
  68:11
**encounters** 28:1
**ended** 34:5
**enforce** 70:12
**enforcement** 70:12
  71:25
**Enroute** 67:22
**entered** 51:17
**enters** 58:24
**entries** 67:7
**entry** 64:24 67:8
**errata** 77:11,13,13

77:14
**ESATATE** 2:6
**Esq** 3:4,13
**estimate** 47:11
  48:17
**et** 1:3,5 2:13 5:5,5
  77:7,7 81:5,5
**evaluate** 14:4
**evaluated** 14:2
**evaluation** 17:2
**Evans** 65:13,15
  66:7,10
**eventually** 9:9
  22:20
**everybody** 44:14
  70:8
**evidence** 23:5 30:7
**ex-Ferguson** 6:25
**exact** 10:11 12:25
  40:7 42:5 48:16
  60:5
**exactly** 9:8 23:7
  29:11 32:14 48:4
**exactly--I** 32:13
**Examination** 4:3,4
  4:5 6:2 71:19
  74:1
**examined** 75:18
**Examiner** 49:5
**Examiner's** 49:5
**example** 26:9,17
  37:14 47:22 53:11
**examples** 13:15
**excessive** 48:14
  69:1,8
**Excuse** 12:10 19:18
  58:19
**Exhibit** 15:5 49:23
  50:2,19 57:13,21
  59:7 60:8 71:22
**EXHIBITS** 4:11
**expect** 50:24
**experience** 45:7
  50:2 69:21 70:18

**experiences** 16:19
**expires** 80:14 83:11
**explained** 14:15
**explanation** 33:6
**extent** 20:13 21:21
  30:8 73:1

**F**

**F** 72:6
**F002** 63:6,10
**F24** 57:11,15,22
  59:10 61:22
**F25** 54:2,5 56:1
  59:9 63:24,25
  64:13
**F26** 56:1 57:4
  59:10 61:18
**fact** 12:14 17:3
  20:16 23:20 29:3
  33:4 34:5 45:7
**fact--and** 45:4
**facts** 32:18
**fair** 18:16 65:22
**familiar** 68:21
**family** 6:8
**far** 9:4 12:15 14:1
  16:6 18:9,23
  26:25 30:1,6 38:4
  41:16 42:19 63:11
**fashion** 9:3
**fast** 44:9
**FAVOR** 82:1,7
**Fax** 1:23 3:9,19
**FBI** 8:8,13 9:21,22
  40:6,20 41:21
  42:10
**February** 26:18
**feet** 35:2
**Ferguson** 6:10 8:15
  8:18,20,23 9:1,4
  10:4,17,21 11:23
  15:5 16:6,19
  19:23 20:7 24:3
  27:14,25 36:20

38:1 42:19 48:3
  49:13 50:8 65:11
**field** 11:9 24:18
  38:15
**filled** 14:1 44:9
**filling** 72:25
**final** 18:12
**finally** 10:22 52:3
**findings** 25:8
**finish** 7:10,14
**finish--** 58:16
**finished** 58:15
**fire** 11:7,8,10 66:20
**firearm** 48:9,9
**firing** 19:9 20:1,15
  21:5 22:10
**firm** 81:14
**first** 5:23 9:6 16:8
  18:7 23:5 39:20
  45:24 51:1,4
  54:16 55:14,25
  63:21 67:8 68:7
  68:11 73:10,15
  74:5 75:18
**five** 48:19,20
**five-second** 21:22
**five-second--** 21:16
**flyer** 40:19
**follow-up** 43:19
  71:21
**followed** 28:23
**follows** 6:1 55:14
  59:6
**for--to** 21:23
**force** 14:5,23 17:8
  18:12,24 27:21
  30:6,10,18 32:6
  32:24,25 37:9
  38:2 39:22 48:1,5
  48:7,14 49:10
  69:1,8 71:6
**foregoing** 75:22,24
  80:2
**forgot** 49:4

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                                    December 14, 2015

**form** 14:23 16:10 18:17 26:10 30:13 31:1 32:7 36:11 37:11 38:3,8 45:21 47:1 55:9 69:3
**Form--** 22:1
**form--oh** 55:11
**forms** 40:20
**forth** 44:22 75:25
**forward** 39:10,11 40:9
**found** 14:6 18:4
**foundation** 18:17 20:18 22:3 26:10 31:1 32:7 34:13 34:19 35:4 36:11 37:11 45:21 69:3
**four** 41:13 59:21
**four-digit** 53:8,13
**Fourth** 2:21 3:15 39:22 77:4 82:10
**frame** 36:21
**Frank** 54:4 60:23 61:3,17 62:15 63:12,18 64:14 72:7,15,15,16,16 72:16
**Frank--at** 63:17
**free** 55:9,11
**frequently** 41:6
**Friend** 2:8
**from--court** 39:24
**from--he** 56:22
**from--whoever** 43:6
**front** 18:9 57:14
**full** 76:3
**further** 4:5 71:16 74:1 76:8 77:15

**G**
**gaps** 33:12
**GATEWAY** 83:5

**general** 6:11 36:19 50:8,10 70:11
**generally** 55:14
**generated** 50:14
**give** 7:2 9:3 15:5 43:20 50:2,3
**given** 6:13,16 33:6 33:7 51:19 66:25 76:5 80:5
**giving** 64:15
**Glasgow** 65:18 66:1,10
**go** 13:14 32:19 34:5 48:21 51:4 54:15 55:5 59:4 61:15 62:14 63:17 65:3 67:6 73:2
**go--was** 9:21
**going** 7:6,24 8:1 10:16 11:3,4 15:4 28:21 43:15 46:2 53:22 56:15 74:3
**good** 31:23,23 62:1
**Gore** 1:19 5:10 83:5
**GorePerry** 77:1,23
**gotten** 42:10
**grab** 40:25
**graduated** 9:21
**great** 33:6
**groaning** 35:1
**ground** 31:24 32:12 34:5,6,9,11,17 35:8,9
**groups** 44:6
**guess** 43:11
**guessing** 29:8

**H**
**Hall** 27:13,14
**hand** 35:8,9 42:4 76:12 83:10
**handcuffing** 47:23
**handout** 41:19

**hands-on** 37:1 47:23
**Hanke** 64:8
**happen** 11:3 33:5 34:23 60:21
**happened** 20:17 31:7 40:10 48:18
**happens** 64:20
**hard** 27:23 32:9 33:3 39:12,13 45:9
**hard-copy** 52:21
**harm** 32:1
**hash** 53:3
**have--while** 50:1
**head** 7:18 50:25
**heard** 39:15
**heavily** 30:2
**help** 35:21 36:2 45:17 70:25
**helped** 9:23 10:11
**Helping** 70:22
**Henke** 1:12 2:19 5:4,19,22 6:6 49:3 64:1 65:22 68:24 77:6 80:1,10 81:11
**hereinabove** 80:6
**hereto** 80:4
**hereunto** 83:8
**higher** 61:10
**highway** 70:23
**his/her** 77:10
**history** 8:6 9:4
**hit** 34:10 64:25
**Hmm** 68:21
**hold** 69:17
**honestly** 7:5 54:11
**hope** 25:7 44:14
**hope--** 46:4
**Huh-uh** 7:18
**hundreds** 27:20 47:19,21 48:11,12
**hurry** 62:19

**hypothetically** 32:2

**I**
**I'm--** 38:19
**I'm--and** 33:23
**I--agreed** 26:22
**I--and** 14:11
**I--do** 21:2
**I--I** 13:13 23:19 26:22 32:9
**I--that** 20:19
**I--whenever** 64:24
**I"--"ID** 54:9
**ID** 54:8,9 68:2
**Ida** 3:13 5:18 77:3 77:9
**idea** 47:12 60:2
**identification** 49:24 65:14 72:9
**identified** 72:6
**identify** 5:13
**if--** 19:11
**if--I** 29:9
**if--what** 18:4
**Illinois** 31:18
**imagine** 12:24
**important** 69:22 70:4
**improper** 11:13 14:24
**in--in** 13:3
**incident** 6:10 10:16 12:25 17:8 18:25 21:19 22:16 28:4 47:13 51:1 52:22 53:6 63:22 68:18 72:2,19
**incidents** 27:25
**include** 45:24 55:21
**including** 77:12
**incorrectly** 40:11
**independent** 17:7 30:11
**INDEX** 4:1

**indicate** 14:22 16:15 20:10 67:12 68:7,13
**indicated** 16:14
**indicated--again** 10:24
**indicates** 53:9 54:22 55:16 59:15 68:9,10
**indicating** 37:25
**indication** 18:10
**individual** 27:25 28:1 32:2,10,11 39:9 47:15
**individually** 1:3 2:5 5:19
**individuals** 29:5
**information** 20:24 22:17 54:20 55:13 59:5 64:15 73:8
**informed** 44:12
**initial** 32:20
**injury** 71:12
**instance** 73:15
**instant** 34:10
**instruct** 77:12
**instructions** 45:13
**instructors** 19:8
**interaction** 36:23
**interested** 10:13 39:14 76:10
**interesting** 65:23
**Internal** 24:1,5
**International** 20:8 23:3
**interpret** 7:20
**interrogatories** 6:1
**interval** 32:21 33:7
**intervention** 44:2 45:25
**interview** 17:10,13 17:15 27:17 29:9
**interviewed** 26:24 27:3 28:18,18,22

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                                December 14, 2015

Page 89

29:1,6,7,8,10,11
30:23 31:6
**interviews** 17:16
29:3
**investigate** 24:11
**investigation** 10:9
10:22 11:16 17:7
20:20 23:25 24:2
24:7,9,22 25:16
25:17,19 27:1
30:11
**investigative** 13:16
**involved** 10:8 11:14
11:15,15 17:3
20:14 21:21,21
40:12 45:19,23
46:9 47:13 65:21
72:1
**involvement** 43:25
**involving** 6:19,25
10:16
**is--** 59:12 67:15
**is--that** 63:5
**issue** 41:19
**issued** 43:14
**issues** 39:18,23
41:3,7
**it's--there** 47:18

___

**J**

**J** 2:23 75:4 76:20
**Jackson** 10:13,25
11:5 13:20 25:12
25:15 28:11,13
29:2 30:1,22 31:6
40:8
**jail** 44:21 71:1
**Jason** 2:6 6:8 15:11
28:4 49:6,10,13
**jeopardy** 11:12
**Jeremy** 65:13,15
66:6,10
**Jerry** 5:9,21
**job** 10:14 11:1,5,11

**Jordan** 2:23 5:9
75:4 76:20
**jumps** 35:2
**jury** 6:4 8:2 50:7
**just--that's** 70:21
**Justice** 26:25 27:12
**justified** 18:24

___

**K**

**Kaminski** 1:5 2:13
5:5 13:7 17:11
21:11,14 23:18,21
25:23 26:16 28:5
30:9,23 31:11
57:16,19 59:10
61:22 64:14 68:10
68:14 73:16,20
74:4 77:7 81:5
**Kaminski's** 14:4
17:8 18:24 20:17
23:11 24:10 26:1
30:18 49:10 57:23
60:17
**Keeley** 31:16
**keep** 7:8 11:1 17:1
38:15,17
**kept** 38:22 39:16
**key** 64:24
**kicked** 37:15
**kind** 7:13 13:11
43:16
**know** 6:7 7:12 11:2
12:25 17:18,24
19:11 21:1,2,7,13
21:14 23:9 24:13
24:15 26:22 27:9
29:9,23 32:13
38:13 39:22 42:18
45:15 46:17,21,23
47:14 49:25 50:4
51:2,3 53:12,20
54:11,11 56:18
57:11 58:12,23
59:24 60:20,21

61:4 62:1,3,9 63:7
65:18 67:25 68:20
72:3,18,21,23,24
74:4
**know--by** 61:3
**knowing** 32:13
**knowledge** 24:4,12
24:18,24 39:19
64:20
**knows** 53:21 54:6

___

**L**

**L** 31:16
**labeled** 71:23
**late** 27:9
**law** 39:18 40:6 41:3
43:22 70:12 71:25
**lawful** 5:23
**laws** 70:12
**lawsuit** 6:25
**lead** 19:22
**learned** 63:21
**leave** 8:20 10:18
**leaving** 28:20 62:11
**left** 8:13 10:4,6
46:13 47:6 51:4
57:15 65:5
**left--second** 57:14
**left--so** 15:4
**leg** 31:22
**legal** 5:8 39:18
**lesser** 30:8
**let's** 13:14 42:6
**let--let** 7:9
**letting** 58:23
**lieutenant** 9:11
14:20 15:4,13
16:14 17:2,16
18:5,11 20:13
23:13 30:3,7,17
37:14,24 47:9
60:23 61:1,5 62:5
**line** 51:22 61:18
77:13 78:1,4,7,10

78:13,16,19,22
79:1,4,7,10,13,16
79:19,22
**lined** 10:14
**LIPA** 83:5
**list** 55:22 77:12
**listed** 72:3,4,16
**lists** 71:25
**literally** 64:22
**little** 8:5
**located** 31:17
**location** 52:23
**long** 21:1,3,14
27:16 46:21
**look** 43:16 46:14
50:19,20 56:4
57:13 67:8 71:22
72:14
**looked** 48:13
**looking** 15:7 46:12
74:4
**looks** 15:16 50:22
54:16 55:25 56:4
57:4,5,15 58:9
59:9,19 66:24
**lose** 11:4
**lot** 10:23 34:23
**loud** 7:16,21
**loud--answer** 7:15
**Louis** 1:21 2:22 3:7
3:16 5:3,11 39:7
44:4,11 65:10
75:3,13 76:12
77:5,24 81:19
82:5,11 83:7
**lower** 61:11 67:8
**lying** 34:17

___

**M**

**Mace** 47:24
**maiden** 65:24
**mail** 42:4
**mailboxes** 40:24
**mailing** 43:16

**Maintenance** 51:2
**Major** 9:17,18
**making** 33:22
40:14
**male** 54:22,23
**man** 35:17
**manage** 36:13
**management** 8:8,9
8:14 9:22
**manager** 11:8
**March** 8:21 10:5
47:6
**Marguerite** 52:24
**marked** 4:12 49:23
50:2
**marks** 53:3
**matter** 12:13 23:20
29:3 45:4 57:7
77:10
**Matthew** 54:9
**mean** 13:13 14:7
30:10 45:3 52:20
56:12,19 61:24
62:7 63:10 64:4
66:17
**meaning** 30:18
53:4
**means** 51:2 52:2
56:19,21 59:16,18
65:7 68:20
**medical** 49:4,5,12
**meeting** 27:19
28:12
**meeting--** 28:7
**member** 25:24
**memo** 28:12 81:1
**memorandum**
18:22
**mentioned** 80:6
**Michael** 10:9,17
54:10
**middle** 54:24
**mind** 15:7 75:17
**minor** 2:8 5:17

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke

December 14, 2015

Page 90

minutes 27:18,18
missing 50:24
Missouri 2:2,22,24
  5:3,7,12 75:1,5,10
  75:14 76:13,22
  83:7
Mm-hmm 55:7
  62:16 66:8
MO 1:21 3:7,16
  77:5,24 81:19
  82:5,11
Monday 77:2
monthly 43:20
months 42:6
Moore 1:3 2:5,7,7
  5:5,16,16 6:8 13:8
  15:11 21:7 25:25
  49:6,10 68:11
  77:7 81:5
Moore's 28:4 49:13
morning 21:8
  25:25 30:10,12
  31:7 42:20 63:20
  64:2
move 34:21
moving 34:25 35:1
Mr.--Officer 17:7
multiple 54:24
Mutual 66:17,19

**N**

naked 31:25 35:17
name 5:8,15 6:4,7
  29:12 39:4 64:8
  81:14
name-- 65:24
names 66:11
narrative 21:10
  55:13
national 8:8
nature 52:24
necessarily 35:21
necessary 71:7
need 45:17 70:25

needed 14:8 36:22
negative 10:23
neighboring 66:25
neither 36:6
never 11:18,19
  30:17,23 31:5
  71:6
new 43:14,21,22
  45:6
nine 9:6
Nineteen 8:11
ninety--good 8:11
nodding 7:18
non-criminal 70:22
nonstop 32:3
normal 42:7 83:3
normally 16:20
  50:24 66:4
North 3:6 52:24
  81:18 82:4
Nos 2:10
not--I 25:9
not--there 66:25
not--we 70:8
Notary 80:18 83:13
notes 17:15 18:22
  28:7
notice 50:23 75:8
notify 58:22
nude 54:23
number 33:3 48:16
  53:8,13 54:2,3,9
  54:10 57:15,16
  65:5,12 68:2 72:6
  73:9 77:13
number-- 65:8
number"--so 54:8
numbers 61:10
  68:19 72:10,11

**O**

oaths 75:7
Object 16:10 19:12
  26:10

Object,-- 18:14
objection 26:21
  33:18 34:2 35:12
  35:20 36:16 70:15
  71:3 73:1
objections 33:1,15
  69:11,18 76:2
obviously 33:21
occasionally 40:5
occur 27:8
occurred 10:16
  30:9
occurrence 30:12
occurring 36:7
October 13:4
office 3:18 49:5
  61:19 77:15
officer 6:20 8:25
  10:9 13:7 14:4
  17:10,13 18:23
  19:19 20:9,16
  21:2,10,13 22:22
  22:23 23:11,11,20
  24:10 25:23 26:1
  26:16 27:1 28:5
  30:9,16,18,23,25
  31:5,11,20 32:1
  33:13 35:11,16,16
  35:18,23,23,24
  36:10 38:21 39:9
  40:12,18 45:1,13
  45:18,18,24,25
  47:16 48:8,13
  49:10,20 50:12,16
  52:6 53:19 56:1,1
  56:5 57:4,15,18
  57:22 58:6,10,13
  58:19,22 59:9,10
  59:10,22 60:3,16
  60:16 61:13,14,17
  61:22 62:15,17
  64:14 68:10,13,14
  72:18 73:5,10,16
  73:16,20 74:4

81:8
officer's 15:20
  16:16 36:23 39:4
Officer-- 15:3
officer--a 34:16
Officer--Chief
  28:11
Officer--excuse
  17:1
officer--if 34:4
Officer--Officer
  30:17
Officer--the 30:7
Officer"-- 17:1
officers 17:4 19:7
  19:22,22 23:18
  24:6 26:3 29:10
  31:11 35:17 36:5
  36:9 39:16,21
  40:23 41:4 42:17
  42:19 44:5,7 45:6
  51:18 55:16 69:1
  69:9,10,16 70:11
  71:6 72:1 73:8,17
  73:21
officers' 25:5
officers--I'm 43:15
offices 2:20 75:12
officially 11:20
Oh 20:11 47:12
  70:16
okay 6:19,22 7:4,6
  7:21 8:5 9:14
  10:1,21 12:8 13:1
  13:6,13,19,25
  14:17 15:19 16:14
  17:6,10,18 18:21
  19:3,15,21 20:4
  20:12 21:4,10,17
  22:6,18 23:4,7,15
  24:1,5,15,24 25:1
  25:8,11,15 26:3
  26:19,24 27:7,24
  28:4,15,25 29:17

33:21 34:21 36:5
  37:4,13,19 39:1
  39:11 41:2,10,18
  41:23 42:17 43:2
  43:4 44:16,23
  45:12 46:3,8,16
  47:5,20 48:11,21
  48:21 49:12,15
  51:1,9,15,21 52:1
  52:5,23 53:6,10
  53:16,24 54:2,5
  54:13,15 55:5,11
  55:25 56:12,14,16
  57:1,4 58:4,17,24
  59:1,19 60:3,24
  61:8,13,15,24
  62:2 63:5,10,13
  63:19 64:6,10
  65:9,13,18,25
  66:22,24 67:15,20
  68:3,5,23 69:7
  70:3 72:5,18,23
  73:7,13,23 74:8
old 43:23
Olive 1:20 5:11
  77:24 83:6
on--at 45:10
onboard 22:11
once 41:9 53:19
  62:19
one-- 58:6
ones 28:2
only--looks 54:19
openings 44:13
operations 11:9
  24:19 38:15
opinion 11:3 38:6
opinions 41:20
opposed 44:19
  70:25
opposite 12:14
or-- 19:13 27:12
oral 6:1
ordered 77:11

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-9   Filed: 06/01/16   Page: 92 of 97 PageID #: 2703
Tina Moore, et al. v. Brian Kaminski, et al.
Richard Henke                                                      December 14, 2015

Page 91

**ORI** 65:6,6
**original** 12:17
  81:15 82:1
**originated** 46:18

**P**

**P** 53:6
**P-e-r-s** 53:7
**P.C** 3:5,14 75:13
**P.M** 2:22,22 74:17
**page** 4:2 15:6 50:21
  51:1,5 54:15,17
  55:5,8,25 56:4
  57:14 59:6 60:9
  60:12,19 64:11
  65:4 66:9 67:6
  68:15,18 71:23,24
  72:4,11,14 77:12
  77:12,13,15 78:1
  78:4,7,10,13,16
  78:19,22 79:1,4,7
  79:10,13,16,19,22
**pages** 75:24
**paid** 83:2,3
**paper** 13:25
**papers** 25:13,16
**part** 18:3 20:20,22
  49:13 50:23 54:16
  70:5,5
**particularly** 39:14
**parties** 76:9,11
**pass** 42:1,18,21
  43:7
**patrol** 8:25 11:9
  29:10 44:18,19,24
  45:2,14 51:16
  61:13,14
**patrolman** 46:13
**pending** 5:6 75:8
**people** 11:4 27:5,22
  28:19,20,22 29:1
  40:14 49:3 69:17
  70:13,22,24,25
  71:7

**period** 32:5
**Perry** 1:19 5:8,10
  83:5
**person** 31:21 32:4
  33:21 34:4,8,16
  34:17,21 52:25
  53:9,15 81:14
**personal** 2:5 47:23
**perspective** 31:20
**peruses** 15:9
**phonetically** 29:16
  29:17
**phrase** 43:15
**physically** 36:14
**picked** 29:4
**Pitzer** 2:20 3:14 5:3
  75:12 77:4 82:9
**place** 18:23 27:11
  27:21
**PLAINTIFF** 3:3
**Plaintiff's** 4:12,13
  49:23
**Plaintiffs** 2:9,20
**please** 5:13,21 6:5
  11:17 15:7 48:22
  52:16 54:15 55:6
  65:4 67:6 73:2
  77:12,14
**pointed** 72:10
**police** 6:10,20 8:15
  8:18,22 9:10 11:2
  12:17 13:2,16
  19:2,4 25:21
  27:11 28:1 39:7
  44:4 50:8,11,12
  66:20,20 67:14
  68:25 69:7,10,16
  70:11,14,19,21
  71:5
**policies** 27:21 38:1
  39:17 43:13,22,23
  68:25
**policy** 15:20 16:16
  18:6 36:19 42:24

43:14 46:22,25
  70:8
**portions** 13:17
**position** 7:19
**positions** 9:5
**possible** 45:19,24
  46:3,5,7 73:19,22
**possibly** 10:20
  13:23 71:12
**practice** 18:3
**practices** 11:10
**prefer** 73:11
**preparation** 12:16
  12:22
**press** 10:24 11:19
  11:21 12:9
**previous** 10:12
  54:17 60:19 68:2
**Previously** 4:12
**printed** 11:19
**prior** 8:23 9:25
  10:15 12:22 17:19
  43:12
**probably** 9:19
  11:11 40:20 70:20
**procedure** 36:20
**procedures** 38:2
  42:25 43:22 68:25
**processing** 77:15
**produced** 16:6
  25:17
**Production** 77:23
**profession** 70:14,19
**professional** 6:20
  70:6
**promoted** 9:7,17
**promotion** 9:6
**promotions** 9:8
**prompt** 77:16
**prompted** 10:22
**prong** 31:21,22
**proper** 14:8,23
  18:12 39:22
**properly** 14:10

15:2
**propounded** 6:1
  76:2,5
**protect** 69:10,22
  70:9 71:11
**psychotic** 45:15
  70:24
**public** 69:2,10,23
  80:18 83:13
**pulled** 23:4
**pursuant** 75:8
**pushing** 55:2
**put** 7:19 10:24 18:1
  18:5 23:5 33:3
  40:24 43:7 51:14
  51:15,16 71:1
  73:4,19
**puts** 64:21
**putting** 35:8

**Q**

**qualified** 75:6
**quarter** 38:24
**quarterly** 38:22
  43:20
**question** 7:11 8:2
  8:11 30:22 31:4
  46:11 62:1 67:21
**questions** 6:3,10
  7:13,24,25 27:6
  27:22 28:3 43:21
  71:16,20 73:24
  76:1,4
**quick** 71:21
**quite** 29:13

**R**

**racism** 12:12
**racist** 11:24 12:5
**radio** 59:13 62:8
**random** 29:4
**rank** 9:9,15,17,18
  9:25 61:11
**ranks** 29:10

**rapid** 42:7
**re--removed** 56:13
**reach** 31:25
**reactions** 70:25
**read** 74:14 77:10
  77:12 78:1,4,7,10
  78:13,16,19,22
  79:1,4,7,10,13,16
  79:19,22 80:2
**real** 54:19
**realized** 62:20
**really** 11:2 27:23
  30:11 40:9,17
  62:9 68:21 71:21
**reason** 10:12 16:15
  20:2 30:19,21,24
  31:7 33:4 60:8
  69:13 78:2,5,8,11
  78:14,17,20,23
  79:2,5,8,11,14,17
  79:20,23
**reasonable** 42:5
**reasonably** 71:6
**reasons** 69:25
**recall** 6:22 9:8
  14:11 23:10,17,19
  23:23 24:13 25:3
  25:9 27:4 28:2,17
  28:23,25 29:7,9
  43:3 44:1 48:1,4,4
  48:13 49:11,14
  50:25 54:14 64:7
**recall--** 29:19
**Recalled** 68:18
**receive** 22:17,18
  40:15 41:20 50:10
**received** 26:17
  37:18,20 39:5
  42:2 45:8 51:7
  61:16,18,21,25
  62:5 64:12,16
  65:5 67:13
**Recess** 48:24
**recollection** 13:1

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-9   Filed: 06/01/16   Page: 93 of 97 PageID #: 2704
Tina Moore, et al. v. Brian Kaminski, et al.
Richard Henke                                              December 14, 2015

Page 92

23:12
record 5:1,14 8:1
  16:5 18:9 48:22
  48:23,25 58:21
  74:15
recording 68:5
records 20:10
  38:16,24 49:12
refer 15:5
referenced 77:10
referring 7:16,21
  32:14 40:2
refusal 47:15
regard 15:11 25:17
  30:22 31:6 38:6
  39:21 44:1
regarding 23:11
  36:23 49:6
regular-- 67:16
related 76:10
release 11:21 52:5
released 52:4,7
  56:20
relied 30:8
relies 30:2
rely 16:25 20:16
relying 73:5
remained 32:12
remaining 56:23
remarks 76:2
remember 6:24 7:1
  7:2 13:5,24 14:13
  17:24 19:19 23:22
  23:24 24:23,25
  27:23 28:6 29:11
  40:7,9 43:1 57:12
  65:15
remember-- 19:17
remind 7:6
reminding 43:8
RENEE 2:7
rephrase 7:25 31:4
reply 5:25
report 11:20 12:17

12:18,18 13:2,2,3
  13:12,13,16,16,25
  14:9,12,14,15,17
  14:19,23 15:1,4,6
  15:10 16:12 17:19
  19:1,2,4,4,5 20:17
  21:9,10,20 25:21
  25:22,22 26:1
  28:11 31:10 37:2
  37:4,20,23 38:5
  38:23 39:1,9 40:5
  46:18,25 47:18
  50:13,14 52:17,18
  52:22 53:16,22
  55:15 56:17 62:10
  62:21 68:10 72:25
  73:18 74:5
report--well--I
  46:21
report,-- 39:2
reported 11:25
  21:14 26:8,16
  38:20 49:21 75:23
reporter 2:24 5:10
  7:7,19 29:14,16
  75:5 76:21
Reporting 1:19
  5:11 57:18 77:1
  77:23 83:5
reports 13:6,19
  16:6 30:9 37:18
  40:6,21 46:10,13
  47:8 48:2,12,15
  53:14
represent 6:8
Representative 2:6
required 50:12
  53:16
requirement 53:23
resident 50:11
resource 70:9
respect 22:25 44:3
respects 76:3
respond 50:13,16

response 67:4
responsibility
  38:18
responsible 38:14
rest 29:8 64:11
restructuring 9:16
result 13:6 37:17
retire 10:20,22
retired 10:7 11:12
  31:14
retirement 11:14
  11:15
retiring 10:14
return 77:14
review 14:14 25:21
  31:10 49:12 74:14
reviewed 12:15,17
  14:6,10,10 17:22
  17:25 30:17 47:8
  48:2
reviewing 12:22
  13:2 17:19 46:10
  47:3,6
Richard 1:12 2:19
  5:4,19,22 6:6 77:6
  80:1,10 81:11
riding 59:17
right 15:13 20:25
  21:3 23:5 26:4
  27:16 29:17 33:11
  34:10,12,25 35:3
  37:7 41:14 42:13
  42:23 46:20 52:12
  52:14,15 57:18
  58:6 59:11,23
  60:3,10 61:15
  62:6,25 64:13,16
  66:11,17 67:4,8
  68:11 70:18 71:15
  72:11 77:10
risk 32:4 33:14
  34:11,15,22
Road 52:23
RODGERS 2:7

room 27:5 28:20
rose 9:9
routing 67:17
RPT 52:14
rules 42:9
rulings 42:1
run 40:20
running 47:16
  54:23

S
S 3:13 77:3,9
S-u-s-p 53:7
safe 17:6
safeguard 70:6,7,8
safely 69:17
safety 69:2
Same-- 33:25
Sauget 31:18
saw 11:18,20 12:21
  17:18 25:24 26:4
saying 17:1 32:11
  59:14 64:15
says 5:25 15:19,24
  25:15 46:18 51:5
  52:14 53:6,16,24
  54:2,5,8,9 55:9,12
  57:16,18 59:5,13
  60:14,15 61:16
  63:7,24 64:1,11
  65:5,13 66:11
scene 16:23,24 17:3
  35:17 36:6 45:24
  46:1 54:5 55:18
  55:19,20,24 56:13
  56:19,23 57:2,3,7
  58:20 62:11,12
  68:8 72:19,19,21
  72:24 73:8,10,16
  74:6
school 8:8,14 9:22
  10:2
scratch 46:11
screaming 54:23

se 45:17
seal 76:12 83:10
seats 44:10
second 6:25 35:16
  51:11,23
seconds 32:3,21
  51:24 59:22
seconds' 33:6
secretary 40:19
section 61:16
sector 59:16,17,18
see 15:22 28:19
  35:23 50:24 54:10
  55:9,11 56:2
  57:16 59:12,22
  60:6,14 62:14
  66:12 67:9 72:14
seeing 25:10 32:10
  36:3
Seeing-- 36:1
seen 21:5 62:21
send 38:23 39:8
  40:6,21 44:13
sending 16:17
sense 13:14 41:25
  60:11
sent 11:22 12:2,5
  12:11,13 13:22
  20:8 23:2,8 40:8
  47:17 50:15
September 6:9 13:4
  15:16 21:8 24:6
  58:8
September-- 44:17
sequence 20:1,15
  21:5 40:7
sequences 19:9
  20:23 22:10
Sergeant 9:7,12
  29:7 46:14
series 43:21 59:15
serious 71:12
service 23:4 56:15
  56:16,20,20,22

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                                    December 14, 2015

Page 93

57:3 63:3
set 75:25 83:8
several--and 45:5
Shafaie 3:13 4:4
  5:18,18 16:10
  18:14,17 19:12,15
  20:18 22:1,3,6
  26:10,21 30:13
  31:1 32:7 33:1,15
  33:18,25 34:2,13
  34:19 35:4,12,20
  36:11,16 37:11
  38:8 45:21 69:3
  69:11,18,24 70:15
  71:3,8,13,20 73:6
  73:23 74:11,14
  77:3,9
shafaie@pspclaw...
  3:20
She'd 40:20
sheets 77:11,13,13
  77:14
shooting 10:10 27:1
shoplifter 47:14
short 23:1 42:13
  44:8,8
shorthand 75:23
shortly 12:24
shout 39:16
show 20:11 60:9
showing 39:4
shown 11:20 75:21
shows 46:17 51:21
  52:1,23 60:4 62:4
  67:20,21,22,22
sick 70:24
side 51:4
sign 16:7,12 42:20
  77:10,13
signature 38:3
  74:13 76:6 77:11
  77:13,15 80:4
signed 14:12 15:1
  15:13,16 16:22

18:1,7 37:21,25
significance 59:14
signifies 60:25
signifies--or 60:25
Simmons 42:14
simple 47:13
Sincerely 77:21
single 70:20
sir 6:4 13:10 31:13
  68:16 69:15 73:2
  74:9
sit 21:4 38:11
situation 36:14
  45:18
situations 32:24
  37:1,2 70:22
slipped 66:2
slow 42:3
small 44:5
SNLJ 2:10,11
Snodgrass 2:21
  3:14 5:3 75:13
  77:4 82:9
so-- 20:24 35:24
So--and 64:7
so,-- 25:7
solely 20:16 30:8
some--it 65:16
some--somebody
  45:4
somebody 29:19
  35:2 44:13 45:16
  53:25
something-- 9:24
son 5:17
soon 10:20 45:19
  45:23
sorry 12:10 19:14
  22:5 27:15 49:18
  59:20 60:1 63:16
sort 29:4 38:5
  50:11 53:25
sound 75:17
source 66:11,14

South 2:21 3:15
  77:4 82:10
spaces 14:8
Speaking 29:14
Specialist 5:9
specific 13:1 17:23
  23:2 27:24 28:2,3
  28:23 51:16,19,20
specifically 6:24
  13:5 23:14 36:21
  40:5
specifics 23:24
speculation 73:2
spell 29:23
spelled 64:9
spelling 64:5
spoke 10:25 23:21
  30:23
spreadsheet 39:4
squad 40:21
SS 75:2
St 1:21 2:22 3:7,16
  5:3,11 39:7 44:4
  44:11 65:10 75:3
  75:13 76:12 77:5
  77:24 81:19 82:5
  82:11 83:7
staffing 44:17 45:1
stamp 64:25 65:1
stand 54:21
stands 54:4
start 8:18 35:8,9
started 9:7 46:23
  47:3,5
starts 34:21 35:3
State 2:24 75:1,5
  75:13 76:22
statement 16:9
  18:16 65:22 71:9
  81:9 83:9
states 2:1 5:6 21:9
  52:9 75:9
static 34:11
station 19:10 20:1

56:17 63:24
status 70:6
stay 10:17
step 7:12
still--because 16:20
stop 47:15
stopped 9:17
stories 10:23
stranded 70:23
street 1:20 2:21
  3:15 5:11 44:7
  52:24 54:24 77:4
  77:24 82:10 83:6
subject 21:24 31:24
  31:24,25
Subscribed 80:12
subsequently 73:21
subtract 52:12
successfully 31:14
  31:21
sufficient 33:12
suit 76:10
Suite 1:20 2:21 3:6
  3:15 77:4 81:18
  82:4,10 83:6
summary 9:3 39:1
supervision 30:11
  69:8
supervisor 14:10
  14:11,18 16:21,21
  37:14 38:6 55:19
  61:1
supposedly--and
  11:18
Supreme 41:15,16
  41:18
sure 10:11,14 17:9
  23:7,21 26:12
  37:8 38:18 40:14
  45:5 46:17 58:1
suspect 36:9
suspects 36:6
suspicious 52:25
  53:9,15

swear 5:21
sworn 5:23 75:19
  80:12
system 42:18,21
  43:5,7 51:17

_____

T

T 3:4
take 7:7 21:3 27:11
  27:17
taken 2:19 5:4
  18:23 80:3
takes 21:1
talk 49:4,9,9 57:22
talked 26:6 29:25
  63:13 72:5
talking 37:24 42:11
  48:8 57:22
tase 31:21 32:2,20
  33:23
tased 21:8 32:19,20
taser 18:25 19:1,3,8
  19:9,22,22 20:1,6
  20:8,15 21:3,5,15
  21:22 22:9,11,16
  23:2,2,8 25:22
  26:8,17 33:9
  35:19 36:7
tasering 62:18
tasers 23:1 47:24
TAXED 82:1,7
team 11:7
technically 19:25
Telephone 66:12
tell 6:4 7:24 8:5
  10:5 36:19 39:20
  43:11 47:7 50:7
  51:10 52:2,15
  55:14 61:10 62:10
  70:3
telling 64:13
term 40:11
terminology 51:3
terms 50:8,10

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-9   Filed: 06/01/16   Page: 95 of 97 PageID #: 2706
Tina Moore, et al. v. Brian Kaminski, et al.
Richard Henke                                                December 14, 2015

Page 94

testified 30:2,16
 31:5 62:17 75:21
testify 5:23 75:19
testimony 30:25
 43:12 75:22,25
 80:5
testing 43:19
thank 5:20 12:3
 15:8 29:25 43:7
 44:25 52:12 63:16
 64:10 68:23 71:17
 74:8
that's-- 53:14
that-- 12:8 57:7
that--above 61:5
That--that 26:12
the-- 42:15 60:17
the---also 39:7
the--Dispatch 59:1
the--do 50:4
the--if 33:21
the--that 44:14
the--the 11:21
 37:17
the--was 45:12
there--it 45:9
there,-- 66:2
thereto 76:3
they--did 40:23
They--the 59:15
they--there 27:22
they--they 29:10
 57:25
they--who--who
 55:22
thing 37:7 59:12
 70:20
things 10:18 35:7
 39:24 41:3
think 29:2 38:21
 41:6 42:6 66:9
 67:7 72:7,10
think-- 32:17
third 11:7 51:21

55:5
thought 11:1 17:21
 38:1
threat 21:25 32:22
 32:22 33:17,22
 34:6 35:1,10,15
 35:18 36:8
three 21:22 41:12
 44:6 45:6,8
through--the 40:6
throw 48:19
Tim 5:8
time 7:23 8:16 9:19
 10:18,25 11:8
 12:21,25 17:23
 20:13 21:19,19,20
 21:23 23:22 24:6
 24:19 27:6 28:18
 32:5 36:21 41:25
 42:5,9 44:7 45:11
 46:2,8,15 47:5,6
 48:2 49:21 51:5,8
 51:10,10,13 52:2
 55:23,23 57:25
 58:2,4,5,18 59:20
 59:21 60:4,5,5,17
 63:18 64:1,25
 65:1 66:5 67:11
 68:5 71:16 73:4
 73:20 74:9
time--and 20:6
time--I'm 59:20
times 21:7 22:20
 37:15 41:13 42:5
 48:13,19,20 59:20
 60:12 72:15
Tina 1:3 2:5 5:5,16
 81:5
to--and 40:6
to--he 14:25
to--no 74:7
to--we're 70:6
to-wit 6:1
today 5:2,9 12:16

21:4 26:7 30:1
 38:11 39:15 71:16
told 10:19
top 50:25 55:9
 60:11 65:4
topics 27:20
tops 44:7
Total 82:6,12
totally 7:1 60:20
track 38:15,17,22
 40:10
traffic 53:12
train 69:1,16
trained 19:8 45:4
 45:25
training 27:20
 38:16,19,22,23
 39:8 40:20,21
 44:2,2 45:9,10
 66:6 69:21 70:5
 73:3
transcribed 75:23
transcriber 59:2
transcript 7:9
 50:20,23 59:2
 75:22 76:4 77:12
 80:2,5 81:15 82:1
transcription 7:8
transcripts 83:1
trial 75:11
tried 44:3
true 7:12 32:18
 76:3 80:5
truth 5:24,24,24
 75:19,20,20
try 7:9
trying 38:21
trying--looking
 64:22
turn 71:23
turned 49:16
twenty 53:14
twenty--25 59:17
two 6:18 11:4 35:17

36:5 42:6 44:6,10
 45:6,8 51:12 66:5
type 24:7 53:6
type-- 40:16
types 53:14
typewriting 75:24
typing 64:23

——————————
U
——————————
Uh-huh 66:3
Uh-uh 7:18
Ulrich 63:13
Um 16:12 36:25
 37:22 57:24
Um-- 18:2 47:10
unarmed 31:24
 35:17
underneath 15:24
 55:12
understand 6:11
 7:23 8:2,3,4 32:16
 38:14 44:16,25
 63:25 65:6 67:7
understand--tell
 43:25
understanding
 15:3 19:21,23
 21:22 39:20 43:11
 43:12 52:16
understands 70:10
understood 7:22
 10:4 16:25 42:23
 64:16 66:8 69:15
 70:10
undertaken 24:2
undetermined 75:9
unfortunately
 31:15
unit 51:19 54:2
 57:4,11,15,16
 59:13 60:21,21
 61:16,18,21
unit"--that's 64:12
United 2:1 5:6 75:9

units 52:3 55:13
 59:5
unjustified 32:6,25
up-to- 39:16
updated 39:21 41:7
updates 43:6
updating 13:23
upstairs 16:17
 37:15
use 14:4,23 17:8
 18:12,24 19:8
 27:21 30:6,10,18
 32:6 37:9 38:2
 39:22 43:15 47:2
 47:24,24,24 49:10
 69:1 71:6
use-of-force 12:18
 13:2 14:19,22
 15:6,10 16:6
 17:19 19:3,4
 25:22 31:20 36:22
 37:2,4,8,18,20,23
 38:5 46:10,12,21
 46:25 47:8 48:2
 48:12,15
use-of-taser 12:18
 13:3
usually 38:22 39:13
 42:3 44:5,9 51:12
 53:19 54:22 56:21

——————————
V
——————————
v 2:11
varied 41:8
verbally 51:19
verify 26:7,16
version 46:19,20
versus 34:16 35:17
Video 1:19 5:8,11
 77:1,23
VIDEOGRAPH...
 5:1,20 48:23,25
 74:12,15
Videotaped 2:19

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                                    December 14, 2015

Page 95

**voice** 37:1
**vs** 1:4 5:5 77:7 81:5

---

**W**

**wait** 45:25 46:6
**waive** 77:10
**waived** 76:6
**want** 7:18 9:19
  10:18 44:13 45:5
**wanted** 18:5,7
  20:23 31:19 39:19
  40:14 50:18
**wanting** 10:20
**was--** 12:7 38:21
**was--certainly**
  12:13
**was--complied** 18:6
**was--it** 29:3
**was--made** 9:25
**was--there** 45:3
**wasn't** 10:11 12:6
  24:15 26:8,17
  43:19 44:7,8 48:5
  62:20
**watch** 59:16,18
**way** 10:8 35:5 38:2
  38:9 47:23 52:13
  62:10,20 64:5
  72:9 74:3,7,7
**ways** 42:24
**We'll** 74:14
**we're** 5:1,10 7:6
  42:11 57:22 59:6
  66:9 70:7,7 74:15
**we've** 26:6 29:25
  62:21
**weapon** 36:3,7
**weapons** 37:2
**week** 17:19
**weeks** 42:8
**welcome** 43:9 50:21
  71:18
**went** 8:8 10:2 41:16
**WHEREOF** 83:8

**whichever** 50:15,16
**white** 17:13 23:18
  30:16,19,24,25
  31:5,11 54:10,22
  54:23 56:1 57:5
  59:10 60:4 61:19
  62:15,17 68:13
**who--if** 74:4
**who--who** 67:25
**will--he** 14:25
**William** 3:4
**Wilson** 10:9 27:1
  49:8,9,20
**win** 11:7
**witness** 5:21 15:9
  19:14 22:5 71:18
  74:10 75:14,17
  76:1,5,12 77:10
  77:12 80:1 83:8
**WM** 54:20
**wonder** 33:4
**wondered** 66:1
**worked** 8:22 43:10
**working** 14:13
  31:13,15 56:17
**works** 50:7
**would--let** 43:11
**would--you** 46:4
**wouldn't** 66:4
**write** 13:6,9,17,19
**written** 13:25 14:19
  21:20 52:22
**wrote** 13:11 47:18
**www.goreperry.c...**
  1:24

---

**X**

**X26** 22:11

---

**Y**

**Yeah** 51:12
**year** 8:10 10:12
  41:13 46:23
**year--** 41:9

**years** 9:6 45:6,8
**yell** 47:16
**you--do** 65:6
**you--that** 67:3

---

**Z**

**zero** 60:25 67:11

---

**0**

**0014** 15:5
**00532** 2:24

---

**1**

**1** 15:6 54:2,9 67:23
  67:25 68:2 82:7
**10/8** 52:3 56:22,23
  57:1 58:23
**10:50** 53:12
**100** 2:21 3:15 77:4
  82:10
**1050** 53:14
**12** 4:12 13:15 15:5
  52:12,13 57:13
**12/14/2015** 80:3
  81:13
**13** 4:12
**14** 1:10 2:23 26:20
  77:6
**14:26** 58:9
**14:26:46** 52:9
**14th** 5:2 75:15
**17** 58:9
**17--** 51:22
**17th** 6:9 15:16 21:8
**1847** 71:24
**1978** 8:19
**1996-1997** 9:19
**1997** 8:11

---

**2**

**2** 63:12,18
**2:26** 52:11,12
**20** 27:18,18 32:2
  59:15 60:21,23,25
  72:16 80:13

**20--** 26:18
**20-something** 72:7
**2010** 46:18
**2011** 6:9 13:4 15:17
  21:8 24:6 36:21
  58:9
**2014** 10:12 20:9
  26:9 27:10
**2015** 1:10 2:23 5:2
  8:21 10:5 27:9
  47:7 75:16 76:13
  77:2,6
**21** 32:2,20 33:6
  60:21 61:3 72:16
  77:2
**21-second** 33:9
**211** 3:6 81:18 82:4
**21st** 76:13
**22** 32:2
**24** 57:16 60:8 64:14
  72:16
**241-5070** 1:23
**241-6750** 1:22
  77:25
**25** 54:4 59:13,13,14
  61:17 72:15
**26** 62:15 72:15
**299** 61:5

---

**3**

**3** 15:6 54:10 56:4
  59:6
**3:26** 52:10
**3:35** 2:22 5:2
**30** 27:18 77:14
**300** 1:20
**314** 1:22,23 3:8,9
  3:17,18,19 77:25
**335-1332** 3:17
**37** 4:13 49:23 50:3
  50:19 57:22 59:7
  71:22

---

**4**

**4:14-CV1443** 2:10
**4:14-CV1447** 2:11
**4:26** 48:23
**4:28** 49:1
**4:59** 2:22 74:16,17
**400** 2:21 3:15 77:4
  82:10
**4050** 3:6 81:18 82:4
**421-3144** 3:19
**421-5545** 3:18
**49** 4:13

---

**5**

**5** 59:16,18
**515** 1:20 5:11 77:24
  83:6
**532** 76:22
**586** 57:12
**597** 65:13

---

**6**

**6** 4:3
**6:26:27** 67:23
**6:426** 60:14
**6:46** 56:5,8 57:5,6
  58:2 60:15 72:16
  73:17
**6:46:09** 51:6 67:20
**6:46:10** 67:22,22
**6:46:16** 61:17
**6:46:18** 61:18
**6:46:27** 51:22 68:1
**602** 61:3
**621-2500** 3:8
**621-2503** 3:9
**63101** 1:21 77:24
  81:19 82:5 83:7
**63102** 3:7,16 77:5
  82:11

---

**7**

**7--7:47** 64:1
**7:11:05** 61:22
**7:12:44** 62:5
**7:21:45** 63:7

Tina Moore, et al. v. Brian Kaminski, et al.

Richard Henke                                          December 14, 2015

**7:22:03** 62:15
**7:31** 57:7
**7:38** 63:6,20
**700** 83:6
**71** 4:4
**7191** 53:6,15
**74** 4:5
**78** 9:7

_____
**8**
**8:35** 60:15
**8:39** 56:10
**8:39:09** 64:23

_____
**9**
**9/11** 54:24
**9/17/11** 58:2
**9/17/2011** 51:5
**911** 67:13,17