# Case: Tina Moore v. Brian Kaminski, et al.

4:14-CV1443 SNLJ, etc.

# Transcript of: Michael Graham, M.D.

## **Date:** March 8, 2016

This transcript is printed on 100% recycled paper



515 Olive Street, Suite 300
St. Louis, MO  63101
(314) 241-6750
1-800-878-6750
Fax: (314) 241-5070
Email: schedule@goreperry.com
Internet: <<<www.goreperry.com>>>



**EXHIBIT**

17

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-14   Filed: 06/01/16   Page: 2 of 158 PageID #: 2889
Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 1

TINA MOORE, INDIVIDUALLY AND AS PERSONAL

REPRESENTATIVE OF THE ESTATE OF JASON MOORE, DELORES

MOORE, AND RENEE RODGERS, AS NEXT FRIEND FOR A.D.R.,

A MINOR,


PLAINTIFFS,


VS.


BRIAN KAMINSKI, ET AL.,


DEFENDANTS.


DEPOSITION OF

MICHAEL GRAHAM, M.D.


MARCH 8, 2016

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                            March 8, 2016

Page 2

 1                    IN THE DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF MISSOURI

 3                     EASTERN DIVISION

 4

 5   TINA MOORE, INDIVIDUALLY AND AS PERSONAL

 6   REPRESENTATIVE OF THE ESTATE OF JASON MOORE, DELORES

 7   MOORE, AND RENEE RODGERS, AS NEXT FRIEND FOR A.D.R.,

 8   A MINOR,

 9

10              PLAINTIFFS,

11

12   Vs.                           No. 4:14-CV1443 SNLJ

13                                 4:14-CV1447 SNLJ

14                                 (Consolidated)

15   BRIAN KAMINSKI, ET AL,

16

17              DEFENDANTS.

18

19      Deposition of MICHAEL GRAHAM, M.D., taken on

20   behalf of the Plaintiffs, at St. Louis University

21   School of Medicine, 1402 S. Grand, St. Louis,

22   Missouri 63104, on the 8th day of March, 2016,

23   between the hours of 2:08 p.m. and 4:44 p.m., before

24   Linda DeBisschop, CSR, CCR, Illinois CSR No.

25   084.004741 and Missouri CCR No. 779.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

```
                                                         Page 3

  1    APPEARANCES OF COUNSEL:

  2

  3     FOR THE PLAINTIFFS, Delores Moore and Renee

  4    Rodgers:

  5        Mr. Todd M. Johnson

  6        Baty, Holm, Numrich & Otto, P.C.

  7        4600 Madison Avenue, Suite 210

  8        Kansas City, MO  64112-3012

  9        816-531-7200

 10        tjohnson@batyholm.com

 11

 12    FOR THE PLAINTIFF, Tina Moore:

 13        Mr. Mark L. Floyd

 14        The Floyd Law Firm, P.C.

 15        8151 Clayton Road, Suite 202

 16        St. Louis, MO  63117

 17        (314) 863-4114

 18        mark@thefloydlawfirm.com

 19

 20    FOR THE PLAINTIFF, Tina Moore

 21        Mr. William T. Dowd

 22        Dowd & Dowd, P.C.

 23        211 North Broadway, Suite 4050

 24        St. Louis, MO  63102

 25        bill@dowdlaw.net
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                      March 8, 2016

```
                                                    Page 4

 1    FOR THE DEFENDANTS:

 2        Ms. Ida Shafaie

 3        Pitzer & Snodgrass, P.C.

 4        100 South Fourth Street, Suite 400

 5        St. Louis, MO  63102

 6        (314) 421-5545

 7        shafaie@pspclaw.com

 8

 9    THE VIDEOGRAPHER:

10        Mr. Steve Johnston

11        Gore, Perry, Gateway & Lipa Reporting Company

12        515 Olive Street, Suite 700

13        St. Louis, MO  63101

14        (314) 241-6750

15

16

17

18

19

20

21

22

23

24

25
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                                    March 8, 2016

Page 5

1                          INDEX OF EXAMINATION

2      QUESTIONS BY MR. FLOYD ...................7

3

4                          INDEX OF EXHIBITS

5      Exhibit 1, .............................60

6      Exhibit 2, ............................110

7      Exhibit 3, ............................111

8      Exhibit 4, ............................132

9

10

11

12

13                 (Exhibits are attached to transcript.)

14

15

16

17

18

19

20

21

22

23

24

25

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                        March 8, 2016

Page 6

```
 1              VIDEOGRAPHER:  We are on the record at 2:08.
 2   Today's date is March 8, 2016 and we are at the
 3   office Dr. Michael Graham.  We are here today for
 4   the deposition of Dr. Michael Graham to be taken in
 5   the case of Tina Moore versus Brian Kaminiski, et
 6   al.
 7              At this time would counsel identify
 8   themselves for the record, please.
 9              MR. FLOYD:  Mark Floyd representing Tina
10   Moore.
11              MR. DOWD:  Bill Dowd representing Tina
12   Moore.
13              MR. JOHNSON:  Todd Johnson representing
14   Delores Moore and Renee Rodgers.
15              MS. SHAFAIE:  Ida Shafaie representing
16   defendants.
17              VIDEOGRAPHER:  Thank you.  Would the court
18   reporter please swear in the witness.
19
20                    MICHAEL GRAHAM, M.D.,
21   Of lawful age, having been first duly sworn to
22   Testify the truth, the whole truth, and
23   Nothing but the truth in the case aforesaid,
24   Deposes and says in reply to oral
25   Interrogatories, propounded as follows, to-wit:
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 7

 1

 2                        [EXAMINATION]

 3    BY MR. FLOYD:

 4        Q    Good afternoon, Doctor.

 5        A    Hi.

 6        Q    My name is Mark Floyd, and as I just stated,

 7    I'm representing Tina Moore.  We've asked you here

 8    today to take your deposition so we can learn a

 9    little bit about some of the opinions that you're

10    going to giving in this case at trial.

11                    Before we get started, could I take a

12    look at your file there?

13        A    Sure.

14        Q    Does this folder contain all of the

15    documents that you have related to this case?

16        A    I have documents that I reviewed that are

17    too voluminous to put in there.

18        Q    Do you have any e-mails that aren't

19    contained in this file?

20        A    I think they are just related to logistics.

21    I didn't keep them.  Nothing with any substance in

22    them.

23        Q    Are your billing records in this file?

24        A    Yes.

25        Q    I don't see like an engagement letter.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 8

```
 1                   Do you have an engagement letter from
 2    Mr. Dunne?
 3       A   I just have the first page there or that
 4    first cover letter accompanying the materials.
 5       Q   When I read that letter, it looks like he's
 6    sending you a list of materials to be reviewed
 7    without asking you what to do with those materials.
 8                   I almost read into it that there had
 9    to be a conversation in addition to this letter?
10       A   They probably called me on the phone.
11       Q   Do you recall what your conversation was
12    with Mr. Dunne when he asked you to be involved in
13    this case?
14       A   I mean, vaguely.  I think he just asked me
15    if I had time to review an arrest-related death.
16       Q   And you knew that Peter was defending the
17    City of Ferguson and a police officer?
18       A   I didn't, but he probably told me.
19       Q   I mean, you certainly knew that before you
20    generated any report, correct?
21       A   Yes.
22       Q   In fact, you have reviewed the pleadings in
23    this filed that we filed, that the attorneys filed.
24                   You reviewed the pleadings, have you
25    not?
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 9

1      **A**    I probably took a look at them.

2      **Q**    Why do you want to review the pleadings?

3      **A**    They were sent to me.

4      **Q**    Do you know why they were sent to you?

5      **A**    No idea.

6      **Q**    Did you review them?

7      **A**    You know, I think I glanced at them, but all

8    the legal talk and stuff, I kind of gloss over it.

9    It doesn't mean anything to me.

10     **Q**    You've been involved in legal depositions

11   for decades, have you not, Doctor?

12     **A**    I have.

13     **Q**    So you know a little bit more about legal

14   talk than maybe what you're letting on?

15     **A**    Not really, no.  I try to stay out of the

16   legal side.

17     **Q**    How many depositions do you think you've

18   given?

19     **A**    Over my career?

20     **Q**    Yeah.

21     **A**    Oh, geez, I don't know, over 100 easily.

22     **Q**    I mean, more than a thousand, isn't it?

23     **A**    I doubt it.

24     **Q**    How many times have you testified in court?

25     **A**    Oh, in court including the work I do as a

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 10

1    medical examiner?

2        **Q**    Yes.

3        **A**    Hundreds.

4        **Q**    And getting into your work in legal medical

5    situations, you've testified in asbestos cases for

6    20 or 30 years, haven't you?

7        **A**    About thirty.

8        **Q**    And you testified primarily for on the

9    defense of asbestos manufacturers that were being

10   sued for exposing individuals to asbestos who

11   oftentimes would die in alleged claims from asbestos

12   exposure, is that correct?

13       **A**    Yes.

14       **Q**    And what years did you start providing

15   expert testimony on behalf of the asbestos

16   manufacturers?

17       **A**    Mid-'80s.

18       **Q**    And at what frequency were you doing that a

19   year?

20                When I say frequency, how many cases

21   a year were you consulting or reviewing on behalf of

22   asbestos defendants?

23       **A**    I mean, currently several dozen.

24       **Q**    But going back into the '80s, the litigation

25   was at a higher rate in the '90s and -- wasn't it?

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 11

1       **A**   I couldn't tell you.  I mean, in the '80s I

2   didn't look at that many cases because I was just

3   starting out doing them and then it just kind of

4   built up over the years.

5       **Q**   Was there a time in the past where you

6   handled more asbestos cases than you do today?

7       **A**   Probably not.  It's been pretty steady

8   probably the last eight to ten years.

9       **Q**   And in addition to testifying on behalf of

10  asbestos defendants, you also handled police custody

11  death cases, is that correct?

12      **A**   I look at some, yeah.

13      **Q**   And the jury is going to hear TASER

14  International throughout this case and you know who

15  TASER International is, correct?

16      **A**   Sure.

17      **Q**   Are you still on their advisory board?

18      **A**   I am.

19      **Q**   How long have you been associated with TASER

20  International?

21      **A**   Well, I'd have to look at my CV.  Ten or

22  fifteen years maybe.

23      **Q**   And TASER International manufactures the

24  TASER weapons, is that correct?

25      **A**   Sure.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                          March 8, 2016

Page 12

1      **Q**   And TASER International has been involved in

2   litigation over the years when people sue them when

3   there's a death that follows a tasing incident on an

4   individual.

5                Do you agree with that?

6      **A**   Yes.

7      **Q**   And TASER has asked you to be on their

8   advisory board, is that correct?

9      **A**   Yes.

10     **Q**   Ten or fifteen years?

11     **A**   I think that's about right.

12     **Q**   How did you develop that relationship with

13  them?

14     **A**   At least my understanding is they asked a

15  variety of forensic pathologists who they would

16  recommend to offer advice to TASER about

17  arrest-related deaths.  Apparently, my name came up

18  a lot.

19     **Q**   Have you ever been to TASER International

20  headquarters?

21     **A**   Yes.

22     **Q**   Is that this Arizona?

23     **A**   Yes.

24     **Q**   Have you accepted anything of any value for

25  them?

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                           March 8, 2016

Page 13

```
 1       A   I get compensated for being on the advisory

 2    board and I review cases for them.

 3       Q   Have they taken you on any trips?

 4       A   I mean, they pay for my trip when I go to,

 5    you know, speak on their behalf or, you know, take

 6    part in the meetings, but as far as sending me on

 7    vacation, no.

 8       Q   And have you -- have you given lectures for

 9    them?

10       A   Yeah, I think once.

11       Q   Were there power points for them or

12    materials for the lecture?

13       A   I did have a power point for that lecture,

14    yeah.

15       Q   Do you still have those materials?

16       A   I doubt that I got that one.  That was a

17    long time ago and it was actually not so much about

18    TASERS, but about just arrest-related or

19    custody-related deaths in general.

20       Q   And I also understand that you are the City

21    of St. Louis Medical Examiner, correct?

22       A   I am.

23       Q   And you're Deputy Examiner in Jefferson

24    County and St. Louis County?

25       A   I am.
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                        March 8, 2016

Page 14

1     **Q**   Do you have access to the files and medical

2   records in St. Louis County from their coroner's

3   office?

4     **A**   I've got access to the cases that I do.  I

5   suppose I could get a hold of other cases but I

6   don't.

7     **Q**   I was just curious because at one point in

8   your report you indicated that you would like to see

9   the heart pathology slides of Mr. Moore?

10    **A**   Yes.

11    **Q**   And those were done in St. Louis County --

12    **A**   Right.

13    **Q**   -- where you're a deputy.  I'm wondering, do

14  you have access to that file?

15    **A**   Well, I mean, theoretically I could go get

16  it, but since I'm not involved in the case as a

17  medical examiner, I would not.

18    **Q**   Have you had a chance to review those

19  slides?

20    **A**   No.

21    **Q**   Getting back to the legal work, how many --

22  let's talk about that a little bit.  You know,

23  taking into consideration cases involving TASER or

24  cases against police departments or police officers,

25  okay.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 15

```
 1                 Focusing on cases against police
 2    departments and police officers, how many cases a
 3    year do you consult on those?
 4         A    Oh, I doubt that it's more than a couple.
 5         Q    And how many years have you been doing that?
 6         A    Probably 15, 20 years.
 7         Q    And do you have any other cases, like
 8    excessive force cases, do you ever handle any of
 9    those or are they only death cases?
10         A    It would be anything that would involve
11    forensic pathology, so it may not be a death case
12    but it would involve injury or something like that.
13    As far as whether or not excessive force was used, I
14    don't have any opinions about that.
15         Q    But when you say a few cases a year, does
16    that include even the non-death cases?
17         A    Sure.
18         Q    And besides this case right now, this City
19    of Ferguson case and Kaminiski case, do you have any
20    other cases where you're consulting or been
21    designated as an expert on behalf of a police
22    department or police officer?
23         A    I think maybe -- maybe one.
24         Q    Okay.  And you indicated that your fees, at
25    least in the materials you gave us, were $500 an
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 16

1    hour?

2        **A**    Yes.

3        **Q**    And does that include $500 for reviewing

4    medical records that come to you?

5        **A**    All my time is billed the same.

6        **Q**    So even reviewing those pleadings, you would

7    have been billed for reviewing the pleadings that

8    were sent, the petition we filed and scheduling

9    order and all of that?

10       **A**    Everything is billed at the same rate.

11       **Q**    Okay.  And then when you write a report,

12   that's another source of billing, correct?

13       **A**    Yes.

14       **Q**    And then for testimony, is your testimony

15   like the time that you're charging for your time

16   here today, is that $500 or is that more?

17       **A**    Same.

18       **Q**    And for live testimony in the courtroom,

19   what's your fee for that?

20       **A**    Same.

21       **Q**    Okay.  Have you been asked in the past to

22   estimate what your annual revenue is each year from

23   your involvement with legal cases?

24       **A**    I have for asbestos.

25       **Q**    And do you recall -- when was the last time

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 17

```
 1   you were asked that?

 2       A    Probably last week.

 3       Q    Do you recall what those figures are?

 4       A    Yeah, about $300,000.

 5       Q    $300,000 a year just for asbestos?

 6       A    Yes.

 7       Q    Okay.  Then in addition to that, there would

 8   be income that you would make on police custody

 9   cases, correct?

10       A    A little bit, yeah.

11       Q    When I say police custody, I'm being loose

12   with my words.

13       A    I understand.

14       Q    You understand legal expert, I think.

15            Is there any other medical legal work

16   that you do outside of your employer, St. Louis

17   University, St. Louis County, St. Louis City?

18       A    All of my consultation work is done through

19   the university.

20       Q    Okay.  And the fees that you generate on

21   these expert arrangements, does that go to you?

22       A    I get 60 percent of it.  The university gets

23   40 percent.

24       Q    Okay.  And then you also earn a salary

25   through St. Louis University as a professor?
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

                                                        Page 18

 1      **A**   I mean, my compensation includes my
 2   consultation work, my university compensation.
 3      **Q**   And you -- you get a salary from the City of
 4   St. Louis?
 5      **A**   No.  That's contract with the university.
 6      **Q**   Okay.  And do you get a salary through
 7   Jefferson County or St. Louis County?
 8      **A**   St. Louis County I do.  Jefferson County I
 9   don't.
10      **Q**   Okay.  So you get a salary through St. Louis
11   University and then you also get a percentage,
12   60 percent of the money that you bring in on these
13   expert fees?
14      **A**   Yes.
15      **Q**   Okay.  And you estimate that's about three
16   hundred thousand a year?
17      **A**   About that.
18      **Q**   Is that your 60 percent or is that --
19      **A**   No, that's mine, yeah.
20      **Q**   So the total that's brought in then is --
21   I'm not very good at math.
22      **A**   About half million.
23      **Q**   40 percent, yeah, about a half million,
24   okay.
25                  Now, I mentioned before that your

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 19

1   testimony on behalf of asbestos cases is primarily

2   when you've been hired by the asbestos manufacturers

3   when they're being sued and you're testifying on

4   behalf of the asbestos manufacturers, correct?

5       **A**    Not so much on asbestos manufacturers.  It's

6   more end users.

7       **Q**    End users.  It's where people get exposed to

8   it, maybe it's a premises liability now or Work Comp

9   case, anything?

10      **A**    Some of them.

11      **Q**    But it's usually a person being sued that is

12  responsible for exposing someone to asbestos,

13  correct?

14      **A**    That's the allegation.

15      **Q**    Okay.  And then on these police cases, your

16  role is typically testifying on behalf of defending

17  the police officer of the police department,

18  correct?

19      **A**    You know, actually over the years it's

20  broken up pretty even between plaintiff and defense.

21      **Q**    Are you handling any cases right now where

22  you are testifying on behalf of a plaintiff that is

23  suing any local police department or police officer?

24      **A**    No.  I think I just have one other case and

25  I think it's for the defense.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 20

1    **Q**    When is the last time that you testified on

2  behalf of a plaintiff that sued a local police

3  department or police officer?

4    **A**    Boy, I don't remember.

5    **Q**    Could you even name one case?

6    **A**    Not off the top of my head I couldn't, no.

7    **Q**    So as we sit here today, you can't name one

8  case where you've testified on behalf of a plaintiff

9  that sued a local police officer or police

10  department?

11    **A**    Oh, I mean, as far as the most recent one I

12  can't.  I mean, I can in the past.  It was an

13  officer who was intoxicated while on the job I think

14  working secondary security and shot somebody and I

15  testified on behalf of the family in that one.  A

16  couple seminars.

17    **Q**    Would you agree that the percentage of you

18  testifying on behalf of the plaintiff is quite a bit

19  less than on behalf of the police department or a

20  police officer?

21        MS. SHAFAIE:  Object to form.

22    **A**    I think over the years it's been pretty

23  even.  More recently probably a little more defense.

24    **Q**    (By Mr. Floyd) And I want to talk a little

25  bit about your background.  I've seen your CV.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

                                                        Page 21

 1                    I understand that you are a

 2    pathologist, board certified pathologist?

 3        **A**    I am.

 4        **Q**    You've been with St. Louis University for

 5    quite a number of years?

 6        **A**    Basically forever.

 7        **Q**    And you've been the chief medical examiner

 8    since 1989?

 9        **A**    Yes.

10        **Q**    And you're a professor of pathology here as

11    well?

12        **A**    I am.

13        **Q**    And we're going to hear from doctors in this

14    case that are cardiologists or electrophysiologists.

15    Do you know what they are?

16        **A**    Yes.

17        **Q**    Tell us what a pathologist is.

18        **A**    Say a physician who practices pathology

19    which is the study of the basic nature of disease

20    and injury, how they occur, what they look like,

21    what effects they have on people.

22        **Q**    And when I hear the word pathology, to me

23    looking at slides of cells and human tissue and in

24    my field when we talk about, well, let's say was

25    there a change in pathology, is there a definition

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 22

1   that pathology somehow relates to the anatomy or the

2   tissue of a human being?

3       **A**   No.  Although that is an integral part of

4   pathology.  It's not present in all the cases that

5   we do, but of the physicians who look at tissues,

6   we're the ones that do it the most.

7       **Q**   Most of the pathology work that you do is on

8   decedents, is that correct?

9       **A**   Yes.

10      **Q**   I mean, I suppose there could be some

11  pathology work on biopsies from cancer and things

12  like that?

13      **A**   Yes.

14      **Q**   Would that be your department or oncology?

15      **A**   No, no.  That's pathology.  The people who

16  look at the tissue are the pathologists.

17      **Q**   Do you do that?

18      **A**   I do.

19      **Q**   But the great majority of what you do is

20  dealing with tissues from decedents and

21  investigating that?

22      **A**   Yes.

23      **Q**   And what is your understanding of what a

24  cardiologist does?

25      **A**   A cardiologist is a specialty within or a

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 23

1   subspecialty within internal medicine that diagnoses

2   and treats heart diseases.

3        **Q**   And what about an electrophysiologist?

4        **A**   Cardiac electrophysiologist?

5        **Q**   Cardiac electrophysiologist.

6        **A**   They deal primarily with the electrical

7   system of the heart.  They're kind of the arrhythmia

8   doctors.

9        **Q**   Do you understand the electrical system of

10  the heart?

11       **A**   In general I do, yeah, certainly not to the

12  extent that a cardiac electrophysiologist should.

13       **Q**   Have you ever heard of a doctor named

14  Dr. Douglas Zipes?

15       **A**   Yes.

16       **Q**   And you've read his articles?

17       **A**   I have or at least the ones related to

18  TASERs I have, yeah.

19       **Q**   Have you had cases in which he's testified

20  on cases that you're involved in as well?

21       **A**   You know, I think he and I were both on one

22  case that I recall and I think we had the same

23  opinion.  I don't know that it was a TASER case.  I

24  think it was something else.

25       **Q**   Dr. Zipes, did he graduate from Harvard

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                        March 8, 2016

Page 24

1    Medical School?

2         A    I have no idea.

3         Q    You've looked at his CV before?

4         A    No.

5         Q    Would you agree that he's a very well-known

6    cardiac electrophysiologist?

7         A    Yes.

8         Q    Well known in the United States?

9         A    Yes.

10        Q    And that he's had articles published in the

11   Journal of American Heart Association?

12        A    I don't know.  He's published widespread.  I

13   don't know what articles or journals in particular.

14        Q    And I think asked this, but you've read some

15   of Dr. Zipes' articles, have you not?

16        A    I have.

17        Q    Can you tell me what cardiac capture is?

18        A    It's the response of the heart to electrical

19   stimulus.

20        Q    And you indicated earlier that the heart has

21   electrical, I think you started to indicate this

22   when we talked about what a, you know, cardiac

23   electro-physicist does -- physiologist does.

24             That cardia capture, is that

25   capturing the rhythm of the heart, the electrical

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                        March 8, 2016

Page 25

1   pulse?

2       **A**   Yes.

3       **Q**   And you understand that in one of Dr. Zipes'

4   articles he indicates that he concludes that ECDs,

5   TASERS can result in cardiac capture and death.

6                   Are you aware of that?

7       **A**   Yes.

8       **Q**   And he is, in fact, a cardiac

9   electrophysiologist, correct?

10      **A**   He is.

11      **Q**   And that's directly in the specialty of what

12  he handles that subject matter, correct?

13      **A**   Cardiac capture, yes.

14      **Q**   And do you -- do you disagree with Dr.

15  Zipes?

16      **A**   I disagree with the death part.  The cardiac

17  capture I think is pretty straightforward, that

18  rarely TASER has been shown to cause cardiac capture

19  that has not been unequivocably shown to cause death

20  of a spike direct by electrocution, if you will.

21      **Q**   Do you agree that there are many cases, even

22  hundreds of cases, where people have been tased and

23  then following the tase they've died?

24      **A**   No.

25      **Q**   Okay.  You read articles, I'm sure, right,

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 26

1    of what's going on since 2001 and even before that
2    where there have been TASER-involved deaths?
3        A    There have been deaths that are temporally
4    related to Tasers.  I don't think it's in the
5    hundreds.  I mean, I think Dr. Zipes found eight
6    cases he thought qualified.
7        Q    I don't know if he said that there were
8    eight cases that qualified.  I know that he reviewed
9    eight cases and found that all of those are related
10   to TASER death, but I don't know if he's saying
11   those are the only eight that ever happened.
12       A    No, I mean I thought he said he found eight
13   that he attributed.
14       Q    That article, are you suggesting that that
15   article states that there were only eight cases?
16       A    No.
17       Q    Okay.  Because that's not what it states,
18   correct?
19       A    Correct.  He reviewed eight and that he
20   thought qualified as being related to TASER.
21       Q    You would agree that your position that
22   TASER, that a TASER load sustained by an individual
23   cannot cause death, that that position that you hold
24   is opposed by many qualified physicians?
25       A    First of all, I've never said TASER can't

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 27

1    cause death because certainly there has been a

2    variety of mechanical injuries consequent to a TASER

3    discharge where death has occurred.  I don't think

4    anybody would argue about the head injuries and a

5    few fires and some drownings.

6                    As far as the electrical stimulation

7    of the heart, now I think I'm in the majority of the

8    opinion that has not been unequivocably shown to

9    cause death although theoretically it could.

10       Q    Okay.  But you agree there are many

11   competent physicians who disagree with you?

12       A    I don't know that there are many.  People

13   who have studied the area.  I don't know that there

14   are many.

15       Q    Dr. Zipes, one of the most prominent cardiac

16   electrophysiologists, disagrees with you, correct?

17       A    Yes.

18       Q    And when you were hired on this case, this

19   Moore case, who hired you?

20       A    Pitzer Snodgrass.

21       Q    And have you worked for Pitzer Snodgrass in

22   the past?

23       A    A few times.

24       Q    Have you worked for Peter Dunne in the past?

25       A    That I couldn't tell you.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 28

1     **Q**   When was the first time that you talked to
2   anybody about this case?

3     **A**   It would have been when they called me and
4   asked me if I had time to review it.

5     **Q**   When would that have been?

6     **A**   I mean, obviously, some time before October
7   -- I'm sorry, August 18th of last year, but how long
8   it took them to send materials I don't know.

9     **Q**   It could have been a year before that?

10    **A**   No, I don't think so.  I think it was pretty
11  close to it.  That's what usually happens.

12    **Q**   But you don't have that document?

13    **A**   Well, there's no document.  Somebody calls
14  me on the phone and says do you have time and I
15  never write that stuff down because most of the time
16  there is no followup with it.

17    **Q**   When did you come to your first opinions on
18  this case?

19    **A**   I mean, after I reviewed the material.  I
20  couldn't tell you what day it was.

21    **Q**   Do you have notes from when you reviewed the
22  material?

23    **A**   I do.

24    **Q**   Did you date your notes?

25    **A**   No, I never do.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 29

1    **Q**    How come you don't date them?

2    **A**    No reason to.  It doesn't matter to me what

3    day I do it.  The ends result is what matters to me.

4    **Q**    What about if you view additional

5    information, would that change your opinion?

6    **A**    Of course.

7    **Q**    You don't want to keep dates as to when you

8    reviewed materials and when you didn't?

9    **A**    No.  That doesn't do me any good.

10   **Q**    Okay.  Tell me what you reviewed before you

11   arrived at your opinions?

12   **A**    I had the death certificate, the autopsy

13   report, medical records from Christian Hospital, the

14   Ferguson Police Department records, statements by

15   Fatima Shurn, Alan Schilling, TASER firing data, the

16   first amended consolidated complaint, the amended

17   case management order, photographs, documents from

18   TASER, depositions of Brian Kaminiski, Michael

19   White, Matthew Bebe, Jon Brannan, William Ballard,

20   Delores Moore, Tina Moore, Renee Rodgers, Anthony

21   Rice, Dr. Cuculich, Shannon Dandridge, Claudette

22   Boyce-Rice, expert reports by Dr. Cuculich and Ron

23   Martinelli along with their accompanying documents.

24   Dr. Cuculich's power presentation or power point

25   presentation and Plaintiff's Rule 26 Disclosures.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                     March 8, 2016

Page 30

```
 1      Q   I didn't see your billing records in the
 2   file.  Could you pull those up for me?
 3      A   Sure.  Right there.
 4      Q   How much have you billed so far in the case?
 5      A   Seven and a quarter hours.
 6      Q   Now, did you read all the depositions?
 7      A   You know, I glanced at some of them.  Some
 8   talked about his, you know, kind of family life and
 9   stuff like that which really had nothing to do with
10   what I did, so I didn't read parts like that.
11      Q   Do you know Mike Brave?
12      A   I do.
13      Q   And who is he?
14      A   He's a lawyer for TASER.
15      Q   Do you know Patrick Smith?
16          MR. DOWD:  Rick Smith.
17      A   Oh, Rick Smith, yeah, I do.
18      Q   And who is he?
19      A   He used to be president of TASER.
20      Q   And have you spoken with TASER International
21   or any of their representatives about this case?
22      A   No.
23      Q   Did you speak to -- well, let's go back.
24              In preparation for this deposition,
25   what did you do?
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                          March 8, 2016

Page 31

 1      **A**   I just reviewed my file.

 2      **Q**   And in addition to the documents that you've

 3   listed there, have you spoken to anybody that's not

 4   included in your document list there?

 5      **A**   No.

 6      **Q**   Have you spoken to anybody about this case

 7   other than Peter Dunne or your attorneys?

 8      **A**   I don't think so.

 9      **Q**   Have you spoken to Officer Kaminski?

10      **A**   Oh, no.  I know I have not spoken to any

11   police officers at all.

12      **Q**   Have you consulted with any cardiologists on

13   this case?

14      **A**   No.

15      **Q**   Have you consulted with any cardiac

16   electrophysiologists?

17      **A**   No.

18      **Q**   Have you contacted or spoke with, is it Dr.

19   Sabharwal?  What's his name in St. Louis County

20   Medical Examiner's Office?

21      **A**   Oh, Sabharwal?

22      **Q**   Yeah, Sabharwal.  Have you spoken with him?

23      **A**   You know, I may have mentioned that I was

24   looking at one of his cases, but I didn't discuss it

25   with him.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 32

 1      **Q**    You haven't consulted with any other

 2   physicians, is that what you're telling me?

 3      **A**    I haven't consulted with anybody on this

 4   case.

 5      **Q**    All right.  And there's some mention in your

 6   report about agitated delirium and psychosis, so

 7   when we talk about agitated delirium, we probably

 8   should talk about excited delirium, too.  Are those

 9   two --

10      **A**    I think it's the same thing.

11      **Q**    Okay.  What is agitated delirium?

12      **A**    It's a syndrome characterized by

13   intermittent excessive agitation, often anxiety,

14   often violence.

15               In many cases hyperthermia, but

16   certainly not the majority at least in this area of

17   the country.  Often paranoia generally induced by

18   stimulants, but occasionally seen in the setting of

19   psychosis.

20      **Q**    How common is agitated delirium?

21      **A**    I think it depends on the definition that

22   you use and then how strict your criteria are.  If

23   you look at people brought into emergency

24   departments by the police, it's actually fairly

25   common.  The full blown syndrome is fairly unusual.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 33

1     **Q**   But individuals that are brought in by

2   police with at least some level of agitated delirium

3   is pretty common?

4     **A**   Yeah.  That's what the current literature

5   would indicate, yeah.

6     **Q**   And you having been involved and being

7   involved in police custody, arrests slash death

8   cases, it's almost mandatory for you to become

9   familiar with agitated delirium and excited

10   delirium.  Is that a fair statement?

11    **A**   We've been familiar with it for 35 years.

12    **Q**   And you would agree that it's next to

13   impossible for a police officer to expect to conduct

14   his daily activities and not come in contact or have

15   to deal with an agitated delirium situation?

16         MS. SHAFAIE:  Objection to foundation.  You

17   can answer.

18    **A**   I don't know that that's true.  Yeah, I

19   don't know if that's true or not.

20    **Q**   (By Mr. Floyd) Well, with you having told

21   me how common it is and how you've been dealing with

22   it for 35 years, if an officer is gonna -- let's

23   take it a step further.

24         I mean, a police department should

25   certainly be prepared to deal with that condition,

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                        March 8, 2016

Page 34

1    wouldn't you agree?

2            MS. SHAFAIE:  Form and foundation.  You can

3    answer.

4       **Q**    (By Mr. Floyd) Based upon the frequency in

5    which it comes up for your testimony?

6            MS. SHAFAIE:  Same objection.

7       **A**    Well, what a police department should or

8    should not do I'll leave up to the police experts.

9       **Q**    (By Mr. Floyd) But you would agree that you

10   can expect them to come -- toc come into contact

11   with agitated delirium situations?

12           MS. SHAFAIE:  Same objection.

13      **A**    Large municipal police departments or large

14   urban departments I would expect the department to,

15   the individual officer most probably don't.

16      **Q**    (By Mr. Floyd) I mean, would you agree that

17   a police department would have to pretty much have

18   their head buried in the sand not to have heard

19   about excited delirium or agitated delirium over the

20   last twenty years?

21           MS. SHAFAIE:  Same objection.

22      **A**    Probably in the last few years that's true.

23   Prior to that, especially a small police department,

24   maybe not.

25      **Q**    (By Mr. Floyd) And you would agree there

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                        March 8, 2016

Page 35

 1  are cases in the Eighth Circuit that go back to the

 2  1990s dealing with agitated and excited delirium.

 3  Would you agree with that?

 4       MS. SHAFAIE:  Foundation.

 5    **A**   I have no idea what's in the Eighth Circuit.

 6  I don't even know where the Eighth Circuit is.

 7    **Q**    (By Mr. Floyd) When did -- when did you

 8  first give testimony in a case about excited

 9  delirium or agitated delirium, what year?

10    **A**   I have no idea.

11    **Q**   Would it have been the 1980s?

12    **A**   We certainly recognized it in the '80s, I

13  don't know if I ever testified about it back then,

14  be we certainly recognized it then.

15    **Q**   You would have certainly testified about it

16  in the last 20 years, wouldn't you?

17    **A**   Yes.

18    **Q**   And in the last twenty years you would have

19  -- even twenty years ago you would have attributed

20  deaths in police custody to excited delirium or

21  agitated delirium, wouldn't you?

22    **A**   Yes.

23    **Q**   And you've been doing that for twenty years,

24  correct.

25    **A**   More than twenty.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

---

Page 36

1      **Q**    And you work closely with police

2    departments, right, in dealing with deaths?

3           MS. SHAFAIE:  Foundation.

4      **A**    We're an independent agency.  I mean, we

5    obviously work with investigators from the police,

6    but we're not part of the police.

7      **Q**    (By Mr. Floyd) But they have to communicate

8    with you, correct?

9      **A**    Sure.

10     **Q**    And so there's a level of communication

11   between the medical examiner's office and the

12   various police departments, fair statement?

13     **A**    Fair statement.

14     **Q**    And you've communicated to police officers

15   your understanding of excited delirium and agitated

16   delirium, have you not?

17     **A**    I have.

18     **Q**    You've lectured over it?

19     **A**    I have.

20     **Q**    This information is widely available for any

21   police department if they want to obtain it,

22   correct?

23           MS. SHAFAIE:  Foundation.

24     **A**    I don't know how widely distributed it is

25   among the law enforcement literature.  I know it is

---

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

---

Page 37

1    in the law enforcement literature, but I don't know

2    to what extent.  It's also in the medical literature

3    that most police departments aren't real rigorous in

4    looking at the medical literature.

5        **Q**    (By Mr. Floyd) Is that responsible?

6            MS. SHAFAIE:  Foundation.

7        **A**    I don't -- I mean, any more than I would

8    look at or know the law enforcement literature, I

9    don't expect them to know the medical literature.

10       **Q**    (By Mr. Floyd) Knowing what you know and

11   I'm taking into consideration that you've been

12   testifying in legal cases for better than 30 years,

13   if you were running a police department, would you

14   want your police officers to be knowledgable about

15   agitated and excited delirium?

16           MS. SHAFAIE:  Form and foundation.

17       **A**    Yes.

18       **Q**    (By Mr. Floyd) Okay.  No question about it,

19   is there?

20       **A**    Not really.

21       **Q**    And if you Google excited delirium or

22   agitated delirium, your result screen will just be

23   full of articles and stories, correct?

24           MS. SHAFAIE:  Same objection.

25       **A**    I have no idea.  Never done it.

---

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 38

1      **Q**    (By Mr. Floyd) What is the psychosis that
2   you're referring to in your January 28, 2016 report?
3      **A**    People who are psychotic can develop
4   agitated delirium without the use of exogenous
5   agents.
6      **Q**    Dr. Sabharwal, is that how you say his name?
7      **A**    Sabharwal.
8      **Q**    Sabharwal.
9      **A**    Uh-huh.
10     **Q**    Dr. Sabharwal reported that cause of death
11  was agitated delirium and you say that cause of
12  death was, and maybe you had the same cause of
13  death.
14               Cause of death as agitated delirium
15  secondary to psychosis, is that right?
16     **A**    Yes.
17     **Q**    Can you describe for me or explain to me the
18  mechanism of death from agitated delirium secondary
19  to psychosis?
20     **A**    The mechanism through which excited delirium
21  kills people isn't clear yet, whether it is
22  primarily a central mediated event or a metabolic
23  perturbation isn't known.
24     **Q**    You were asked back in 2009, at least that
25  far back almost seven years ago in court, to

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 39

1    describe the mechanism of death from agitated

2    delirium and at that time you were not able to

3    describe the mechanism of death, is that correct?

4       **A**   Yeah, we still don't know.

5       **Q**   You had seven years to work on it and you

6    still don't have an answer?

7       **A**   Collectively, you really can't work on it

8    because there is no good laboratory model to use to

9    try to study it and you certainly can't study it on

10   humans.

11      **Q**   As a pathologist, can you put your finger on

12   one piece of pathology that supports that Mr. Moore

13   died from agitated delirium secondary to psychosis?

14      **A**   Well, certainly you would never give a cause

15   of death opinion in somebody by looking just at one

16   thing and taking it out of context.  The context of

17   this particular death is fairly typical of an

18   agitated delirium related death.

19      **Q**   And what is that?

20      **A**   In that you have somebody who shows signs of

21   agitated delirium typically is forcibly restrained

22   and then shortly thereafter has a cardiorespiratory

23   arrest.

24      **Q**   Do you believe that the TASER discharge

25   captures and disrupts heart rhythm, that it can?

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 40

1      **A**   It can.

2      **Q**   And we discussed what cardiac capture is.

3            Does cardiac capture cause a heart to

4   go into ventricular fibrillation?

5      **A**   No.  The energy needed for fibrillation is

6   stronger than that needed for capture.

7      **Q**   Explain that to me.

8      **A**   It takes more power or more energy, more

9   electrons or more charge, probably the better term,

10   to induce v-fib than it does to just cause capture.

11     **Q**   Okay.  So if a heart has an electrical

12   insult, whether it be from touching a 220-volt hot

13   wire some type of an electrical insult --

14     **A**   Okay.

15     **Q**   -- that interferes with the rhythm of the

16   heart, can that result in ventricular fibrillation?

17     **A**   I mean, your parameters are too vague, but

18   you can supply enough energy to the heart to cause

19   ventricular fibrillation.  That's what electrocution

20   is.

21     **Q**   Well, electrocution can cause ventricular

22   fibrillation, correct?

23     **A**   Electrocution, that's the way electrocution

24   works.  It causes v-fib.

25     **Q**   And we'll call it v-fib instead of

Gore Perry Reporting and Video
FAX 314-241-6750            314-241-6750            www.goreperry.com

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 41

1   ventricular fibrillation.  It's shorter that way.

2                    With regard to what cardiac

3   electrophysiologists do, they can actually use

4   electrical energy to cause a heart to go into v-fib,

5   correct?

6        **A**   Do it every day.

7        **Q**   And they can use electrical energy to get a

8   heart out of v-fib, correct?

9        **A**   They do it every day.

10        **Q**   And the electrical energy applied to the

11   heart is directly related to v-fib.  Do you agree

12   with that?

13        **A**   If you supply enough energy it is.  If you

14   don't, then it won't.  But there are thresholds for

15   the human heart below which it won't fibrillate, and

16   if you give it enough energy in the right manner,

17   then it can, sure.

18        **Q**   Are there doctors that disagree with you as

19   to the level of energy necessary to induce a v-fib?

20        **A**   I wouldn't know.  I mean, that is pretty

21   well into the cardiac literature as to how much

22   charge it takes.

23        **Q**   And electro -- a cardiac electrophysiologist

24   would be certainly within his area of specialty to

25   answer that question, would he not?

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                        March 8, 2016

Page 42

 1      **A**   I would think so.

 2      **Q**   Okay.  And when we talk about v-fib just for

 3   the jury, can you tell us what v-fib is?

 4      **A**   It's basically that the muscle fibers are no

 5   longer contracting in an organized fashion.  The

 6   muscle fibers still contract on their own, but they

 7   have no organized rhythmic contractions, so they're

 8   just -- basically it sits there and quivers.

 9      **Q**   And from a lay person's understanding, I

10   understand that is it the myocardium in the heart

11   that produces electrical pulse?

12      **A**   No.  The myocardium --

13      **Q**   What part produces the electrical pulse?

14      **A**   Well, each cardiac muscle fiber is capable

15   of beating on its own.  That is what cardiac or

16   heart muscle fibers can do.  The myocardium is the

17   heart muscle fibers.

18      **Q**   Okay.

19      **A**   The organized rhythmic beating of the heart

20   is related to the generation of electricity by

21   usually the sinoatrial mode and then that's

22   modulated by the atrial ventricular node, and then

23   as the current passes through there, it then goes to

24   the working myocardium where basically it tells all

25   the fibers when to contract.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 43

1     Q    And this electrical pulse that's created by
2  the heart, that causes a contraction in the heart
3  and causes the heart to pump?
4     A    It causes the -- a coordinated contraction.
5  I mean, if you just take heart muscle fibers and,
6  you know, put them in a jar, they'll contract all by
7  themselves.  They have the innate ability to do
8  that, but it wouldn't be in organized fashion and
9  you'd need an organized contraction.
10    Q    And so this electrical pulse and the heart
11 rhythm that's an organized contraction of the
12 electrical pulse causing the heart to contract which
13 pumps blood through the valves, correct?
14    A    Correct.
15    Q    Okay.  And when someone gets in v-fib, that
16 means that, and this is layman's terms, that that
17 rhythm has been disrupted and it could be almost
18 spasming or quivering and the heart is not getting
19 pumped to the blood?
20    A    The -- it's not just the disruption of the
21 rhythm.  There are lots of ways you can disrupt the
22 rhythm.  Some of them may be --
23    Q    Knocked out of rhythm.  The rhythm has been
24 changed?
25    A    Yeah.  Basically, you have no rhythm

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 44

1    anymore.

2         Q    Okay.  So you have an uncoordinated event?

3         A    You have uncoordinated contraction of the

4    muscle.

5         Q    Uncoordinated contraction.  And I've read

6    and seen and heard the term that they are just kind

7    of quivering?

8         A    That's correct.

9         Q    And that since it's not coordinated, the

10   blood is not getting through the heart?

11        A    That's correct.

12        Q    And that's what v-fib is?

13        A    That's what v-fib is, yeah.

14        Q    Okay.  And atrial fibrillation, that happens

15   in a different part of the heart and it's not really

16   that dangerous.

17                 Is that a fair statement?

18        A    I mean, it's a substantial risk factor for

19   stroke if the person isn't treated --

20        Q    Because of --

21        A    -- again the coagulants.

22             MS. SHAFAIE:  Let him finish.  Go ahead.

23        A    Yeah.  Yeah, the atria are the receiving

24   chambers of the heart, they are the upper chambers.

25   In someone who is otherwise healthy, they don't add

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 45

1    a whole lot to the function of the heart, but if

2    they're not working, you can get eddies and stasis

3    of blood.

4              And if you get blood clots, then they

5    can break off and go to the brain or things like

6    that, which is the real danger of atrial

7    fibrillation.  For somebody with a compromised

8    heart, atrial fibrillation can be detrimental, but

9    it certainly doesn't carry the import of ventricular

10   fibrillation.

11      Q    So when we're talking about v-fib and

12   a-fib---

13      A    Totally different things.

14      Q    -- totally different things?

15      A    Yes.

16      Q    V-fib is very dangerous?

17      A    Oh, yeah.

18      Q    Lethal, correct?

19      A    Lethal unless you are somewhat taking over

20   for the circulation.  Well, without therapy or some

21   other intervention, yes, it's lethal.

22      Q    So interfering with the coordinated rhythm

23   of the electrical heart beat can lead to v-fib?

24      A    I don't know that that's necessarily

25   correct.  I mean, the v-fib is an uncoordinated

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 46

1    beating of the heart in and of itself.

2        Q    I was saying interfering with the

3    coordinated heart beat?

4        A    It depends on whether it's -- you have

5    sufficient incoordination to lead to v-fib.  You can

6    certainly have all kinds of heart rhythm

7    disturbances that don't lead to v-fib.

8        Q    What's the most common things to cause a

9    heart rhythm disturbance?

10       A    I mean, it depends on how you define

11   disturbance.  Just getting excited can disturb your

12   heart.  It beats faster.

13       Q    How about where the rhythm is off?

14       A    I don't know what the most common is.

15       Q    Would you agree that a cardiac

16   electrophysiologist would know, should no?

17       A    Cardiologists, I'm not sure.  Usually the

18   cardiac electrophysiologist by the time somebody

19   gets to them, something other than just very minor

20   is going on, so cardiologist.  And, so yeah, cardiac

21   electrophysiologist or cardiologist, they should

22   know, yeah.

23       Q    Have you written any peer-reviewed articles

24   related to heart function?

25       A    To function, no.  To sudden death related to

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 47

1    the heart, yes.

2        **Q**    But you haven't written any peer-reviewed

3    articles related to heart function?

4        **A**    I mean, other than the fact when it doesn't

5    function, but as far as how it normally functions,

6    no.

7        **Q**    You don't treat patients for heart problems,

8    correct?

9        **A**    You know, I do look at heart biopsies from

10   mostly transplant patients or patients in heart

11   failure to try to figure out why they're having

12   problems or if they're going to have problems, but

13   as far as seeing living patients and ordering

14   diagnostic tests and treating them, no, I don't.

15       **Q**    You don't treat heart problems?

16       **A**    No, I don't.

17       **Q**    What kind of a specialist treats heart

18   rhythm problems?

19       **A**    Internist is probably the most common and

20   then, if they're having problems, probably a general

21   cardiologist and then maybe a cardiac

22   electrophysiologist.

23       **Q**    Is that the order of expertise?

24       **A**    That's the order of more sophistication

25   probably, yeah.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 48

1     **Q**   And you don't perform surgeries to treat
2     heart conditions, is that correct?
3     **A**   Correct.
4     **Q**   From a cardiac electrophysiological
5     standpoint, can you describe to me the mechanism by
6     which a human heart is paced into sinus rhythm after
7     it's in v-fib?
8     **A**   Usually you deliver an electrical shock to
9     the heart which restores the rhythm.  It's called
10    defibrillation.
11    **Q**   Can you describe how a human heart is paced
12    out of sinus rhythm and into v-fib?
13    **A**   In the cardiac cath lab they administer
14    electricity to the heart with electricity or usually
15    in the heart although you can do transthoracic.
16    **Q**   Okay.  So when they are wanting to get the
17    heart into v-fib, they do it by electricity?
18    **A**   Usually, yeah.
19    **Q**   Okay.  Do you agree that v-fib is the
20    signature heart rhythm found on a monitor after an
21    electrical insult to the heart?
22    **A**   For what we usually see with common
23    electrocutions, yes, it is.  For things like
24    lightening, no, but that's not really an issue here,
25    but that's the rhythm you would expect, electrically

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 49

1    induced.

2        Q    Do you agree that v-fib is the most likely

3    heart rhythm to be found on a monitor after a

4    cardiac capture?

5        A    After capture, no.

6        Q    You don't?

7        A    No.

8        Q    Have you had any training in the use of

9    TASERs?

10       A    Not formally, no.

11       Q    Have you performed any studies involving

12   TASERs?

13       A    Some studies on the appearance of TASER

14   injury under the microscope, yes.

15       Q    Tell me about those.

16       A    Looked at various biopsies from both the

17   drive study and the probe deployments to see what

18   the characteristics were both fresh and healing.

19       Q    Have you published any articles?

20       A    I have.

21       Q    Can you -- do you have a list of those

22   articles regarding TASERs?

23       A    I don't know if I have a list.  I can -- one

24   is a book chapter in the atlas of -- I can't

25   remember the name of the full name of the book.  It

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 50

1    really has nothing to do with what we're doing here

2    today.  It describes, but then there's an article

3    that I wrote about arrest-related deaths that's in

4    Academic Forensic Pathology that discusses

5    electronic-controlled devices.

6        **Q**    Is that listed on your CV or your list --

7        **A**    It's on my CV.  Or it's on my CV yeah, if

8    you want a copy, I'll give you a copy.

9        **Q**    Okay.  Do you understand that the TASER that

10   was used on Jason Moore was the TASER X26?

11       **A**    Yes.

12       **Q**    And that was manufactured by TASER

13   International?

14       **A**    Presumably, yeah.

15       **Q**    Which is the company that you're on their

16   advisory board that we talked about before, correct?

17       **A**    On their scientific advisory board, yes.

18       **Q**    Did you know that the TASER X26 discharges

19   50,000-volts of electrical current on the first

20   pulse of each cycle?

21       **A**    The 50,000-volts is the air gap of voltage.

22   That's not what is administered to a person.

23       **Q**    But it produces the 50,000-volts?

24       **A**    Through an air gap, yeah.

25       **Q**    And that's what the literature says?

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                      March 8, 2016

                                                          Page 51

 1      **A**    Sure.

 2      **Q**    And then the volts that come after that, do

 3   you know what the voltage is on the pulses after

 4   that?

 5      **A**    The average delivers about 400.  I think the

 6   literature reflects somewhere between 4- and 600 per

 7   pulse.

 8      **Q**    How many volts are there if you grab a 110

 9   outlet?

10      **A**    One-tenth.

11      **Q**    Okay.  So this would be over six times what

12   you'd get from touching an outlet?

13      **A**    I don't know.  If you want to look at it

14   that way, it's -- you can go out to the Magic House,

15   and if you want to touch a million volts, you can do

16   that.

17      **Q**    Are you suggesting that four to six hundred

18   volts of electricity is not harmful?

19      **A**    It depends on what the charge is.

20      **Q**    Are you --

21      **A**    Well, you're looking at current charge.  The

22   voltage itself isn't what hurts you, it's the

23   current, the charge.  And I mention that million

24   volts, because if you see those Van De Graaff

25   generators that all the little kids touch and their

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                        March 8, 2016

Page 52

1    hair stands on end, that's a million volts and

2    they're not getting hurt.

3        **Q**   I read something about 1,200 and

4    1,400-volts, have you heard any of that associated

5    with TASERs?

6        **A**   No.

7        **Q**   What's the charge with the TASER?

8        **A**   Let's see, charge about 2.1-milliamps -- or,

9    I'm sorry, that's charge, no not the current.  The

10   charge somewhere between 85 and 100 microcoulombs.

11       **Q**   What's the charge from a 110 outlet?

12       **A**   I think it's about 14 amps.  Oh, I'm sorry,

13   that's the current.  The charge I would have to

14   figure it out.  I don't remember what it is.

15       **Q**   Would you agree that this isn't your area of

16   expertise, electrical physics?

17       **A**   I'm not an expert in it.  Yeah, I understand

18   the basics of it, but I'm not a physicist.

19       **Q**   So you're not going to dispute the

20   literature from TASER International that says that

21   the first volts -- volt produces 50,000-volt charge,

22   is that correct?

23       **A**   That's the -- well, voltage isn't charge,

24   but the voltage is that's the air gap.

25       **Q**   But their literature is correct in what it

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 53

1    states, correct?

2       **A**   As far as I know, yeah, you can get

3    50,000-volts.

4       **Q**   Okay.  And was there a burn mark on Mr.

5    Moore's chest where one of the TASER probes was in

6    his chest?

7       **A**   You know it was described as that.  I'm not

8    sure that it was really a burn or whether it was

9    just an abrasion from the hub striking.

10      **Q**   So do you think the St. Louis County Coroner

11   made a mistake on that?

12      **A**   I mean, I haven't seen any microscopic

13   slides of it and I don't think I've seen a high

14   quality photograph of it.

15      **Q**   Is there any reason for you to doubt his

16   finding?

17      **A**   Not particularly.  I mean, it's irrelevant

18   either way.

19      **Q**   Well, I mean, we're talking about how

20   powerful the charge are, so I just thought well if

21   it burned his skin and it left a big burn mark on

22   his chest, I thought that might be relevant.

23      **A**   Well, there's certainly no big burn mark on

24   the chest.  There's what looks like either an

25   abrasion or there could be a little burning of the

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 54

1   epidermis, but that's neither here nor there.

2        Q    That's not important?

3        A    That's not so important.

4        Q    Okay.  What's more important is that he's

5   deceased.

6                    Would you agree with that?

7        A    Yes.

8        Q    Have you read any studies on a person's

9   ability to comprehend verbal commands while they are

10  receiving electrical shock to their body from a

11  TASER X26?

12       A    During, no.

13       Q    So you have no reason to dispute that, if

14  police experts that have conducted studies testified

15  that it's very difficult to understand verbal

16  commands while you are under TASER load, you

17  wouldn't have any reason to dispute that?

18       A    I'd have to see the studies.

19       Q    But as you sit here right now, you have no

20  reason to dispute it?

21       A    I don't have any basis to agree or disagree

22  with it.

23       Q    Well, you're a doctor and you deal with

24  police custody cases and deaths and you're an

25  adviser for TASER, so I'm assuming that you have a

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 55

1   lot more knowledge than the average person does, and

2   with your involvement in these types of cases for 15

3   to 30 years, I just thought it was a relevant

4   question to ask and with everything that you have,

5   all the knowledge that you've acquired at this

6   point, there is nothing there to dispute that

7   statement I made, is there?

8       MS. SHAFAIE:  Object to form.

9    **A**   I would have to see what studies you're

10  talking about and see what they say.

11   **Q**   (By Mr. Floyd) Just the conclusion, that

12  while an individual is under load from a TASER X26,

13  that it's very difficult for them to understand

14  verbal commands?

15   **A**   I'm not sure that that's necessarily

16  correct.  I mean, I certainly could understand

17  everything going on while I was tasered.

18   **Q**   You don't want to agree with that?

19   **A**   I mean, from my persona perspective as I

20  knew what was going on when I was getting tasered.

21   **Q**   Were people making statements to you and

22  talking to you while you were being tasered?

23   **A**   I don't know if they were talking to me, but

24  I certainly knew exactly what was going on.

25   **Q**   But you weren't -- you weren't tested where

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 56

1   someone made verbal statements to you or read

2   numbers or gave you commands and then afterwards

3   asked you to repeat what those were?

4       **A**   That's correct.

5       **Q**   You weren't in a scientific test, correct?

6       **A**   That's correct.

7       **Q**   Okay.  And you're not trying to say that

8   that stands for some type of proposition as to what

9   you can and can't understand on a verbal command

10  while you are under a TASER X26 load?

11          MS. SHAFAIE:  Form.

12      **A**   Right.  You have to look at the science.

13      **Q**   (By Mr. Floyd) Particularly, if someone is

14  already in an emotional agitated state, correct?

15  That would be different than the state that you were

16  in when you were tased?

17      **A**   Yes, I was definitely not in agitated

18  delirium.

19      **Q**   And are you aware of any studies where

20  people who have been in an agitated delirium state

21  have been tased in the chest with a TASER?

22      **A**   Studies?

23      **Q**   Yes.

24      **A**   No, you could never do that.

25      **Q**   Okay.  But there are no studies like that,

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                        March 8, 2016

Page 57

1    are there?

2        **A**    Well, you could never do a study like that.

3        **Q**    Whether you could or couldn't, there just

4    are none, correct?

5        **A**    Yeah.  I mean, you couldn't and there are

6    none.

7        **Q**    And I always like to say, when we talk about

8    studies, it's kind of like polls, you know,

9    comparing apples and oranges.  If you take a

10   healthy, relaxed or even mildly fatigued person and

11   you tase them and say, look there, he did just fine.

12   I tased him in the leg, I tased him in the back,

13   versus take someone who is in the condition that

14   you've described excited delirium or agitated

15   delirium with a chemical process going on their

16   brain, they have anxiety, they're paranoid, you tase

17   them in the chest over the heart and you hit them

18   four times in rapid succession.

19                That's going to have a different

20   effect on that individual potentially than it would

21   on an otherwise healthy calm individual.  Fair

22   statement?

23       **A**    No.  You can't say it's going to have a

24   different effect.  You have to try to study it, but

25   you can't say that it's going to have an effect.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 58

 1     **Q**   But you don't have any studies one way or
 2   another on the proposition, do you?
 3     **A**   No.  You certainly can't study agitated
 4   delirium patients in a formalized study and do
 5   anything to them.  You will never have that until
 6   you get an animal model for the disease process or
 7   for the process, and so you have to extrapolate from
 8   other things.
 9     **Q**   You can theorize though, correct, without
10   the studies?
11     **A**   Theorizing doesn't do you any good.  You've
12   got to test it.
13     **Q**   And getting to that point then let's go back
14   to your report because you made a statement in your
15   report that kind of maybe I thought that that's what
16   you were suggesting.  It was on page four of your
17   report and you indicate that.  It's the last
18   sentence in the second paragraph.
19              "However the emotional response to
20   sustaining a TASER discharge, notably the response
21   to pain, is highly individualized and in some
22   individuals could conceivably add to whatever
23   emotional stress was already present," true?
24     **A**   True.
25     **Q**   Were you suggesting that that could in some

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                          March 8, 2016

Page 59

1   way contribute to someone in an agitated state

2   dying?

3       **A**   It's possible.

4       **Q**   Okay.  Which is sort of related to why I was

5   asking that question about there are no tests on

6   people with agitated delirium, correct, with tasing?

7       **A**   Correct.

8       **Q**   Okay.  Did you read the report of Christine

9   Keim, the forensic investigator?

10      **A**   I don't know if I -- yeah, I probably did

11  actually.

12      **Q**   Okay.  Pardon me while I go through.

13              First of all, do you know who

14  Christine -- do you know Christine Keim?

15      **A**   Peripherally.  I mean, she's an investigator

16  at the county office.

17      **Q**   What is a forensic investigator?

18      **A**   It's an investigator for the medical

19  examiner's office.

20      **Q**   Okay.  And so can you tell me what she does?

21      **A**   Collects information about death cases.

22      **Q**   Okay.  And who pays her?

23      **A**   St. Louis County.

24      **Q**   Do you know what kind of credentials she

25  needs to have that job?

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                        March 8, 2016

Page 60

1      **A**   I don't know what her credentials are.

2      **Q**   She documents statements that she took from

3   Officer Ballard.

4              Did you see those statements?

5      **A**   I don't recall.

6      **Q**   I kind of highlighted -- let's see.  I've

7   kind of highlighted the section.  We don't have to

8   read it out.  I just want you to look at it first.

9      **A**   Okay.

10     **Q**   I'll give you a second to look at it.

11  That's the only portion.  There might be a little

12  bit on the next page.  That's the only portion I'm

13  going to ask you about.

14     **A**   Okay.

15     **Q**   So she gives a statement.  Let's see.  She

16  says, "I contacted Ferguson Police and talked with

17  Lieutenant Ballard" and I'm reading from the St.

18  Louis County Health Records from Christine Keim,

19  that's K-E-I-M, forensic investigator, and I don't

20  know if it's been marked as an exhibit yet, but

21  there's an affidavit attached.  We can attach it to

22  this deposition as exhibit -- do you guys know what

23  number we're on?  Exhibit 1 of this deposition.

24                        (Exhibit 1 was marked for

25                         identification by the court

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 61

```
 1                         reporter.)

 2       Q     (By Mr. Floyd) Okay.  On the first page, "I

 3   contacted Ferguson Police and I talked with

 4   Lieutenant Ballard who gave me the following account

 5   of his officers encounters with the decedent.  At

 6   approximately 6:46 a.m., the Ferguson Police

 7   Department received numerous 911 calls reporting a

 8   black male nude in the area of Hennequin and Airport

 9   Road running in the street.  Officers responded and

10   found the decedent in the middle of the

11   intersection.  As the first officer was getting out

12   of his patrol car, he heard the decedent yelling God

13   is good, glory to God, I am Jesus.  The decedent

14   then charged at the officer swinging his arms and

15   his hands were in fists.  The officer pulled his

16   TASER, tased the decedent, the decedent fell to the

17   ground.  The TASER lasted approximately five

18   seconds.  The decedent got up." I'm assuming she

19   means stood on his feet.  "And started towards the

20   officer again.  The Officer activated his TASER

21   again and the decedent went to the ground.  The

22   decedent got up a third time and started at the

23   officer again and the officer activated his TASER.

24   The decedent fell face down this time and stayed

25   down."
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 62

1              Okay.  So I wanted to talk to you

2     about that history because there are different

3     histories in here, but this is a history that was

4     given, I suppose, on the night of the event and it's

5     from Officer Ballard and he's recounting what other

6     officers told him and it's close in proximity, and

7     I'm just wanting to compare those statements to

8     maybe some facts that we have, okay?

9        **A**   Okay.

10       **Q**   Okay.  And a couple of things that caught my

11    attention were that, first of all, without any

12    provocation, it appears that the history they gave

13    is that Mr. Moore just charged the officer, but

14    we've seen Officer Kaminiski's notes that he saw Mr.

15    Moore standing in a parking lot and he made the

16    first contact with Officer Moore (sic) and told him

17    to put his hands up, come towards him or get down or

18    he gave him some commands and it was after that that

19    Mr. Moore reacted.

20              Is that what you remember from the

21    police report?

22       **A**   Yes.

23       **Q**   Okay.  And then the other thing that caught

24    me is that she describes that Officer Kaminski tases

25    Mr. Moore, knocks him to the ground and then Mr.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                      March 8, 2016

Page 63

1    Moore gets up and charges him.

2                    I don't ever remember Kaminiski ever

3    saying that Mr. Moore got up and charged him, but

4    that's what she says there, correct?  She said that

5    happened twice?

6        **A**   Yes.

7        **Q**   Okay.  So with that in mind, Officer

8    Kaminiski also testified in his deposition that he

9    understands the law to be that he's not allowed to

10   give somebody, you know, to apply force to somebody

11   without having a legal justification, so after the

12   first tase he said the guy charged me, Mr. Moore

13   charged me so I tased him, but before I gave him

14   that second tase, I gave him commands to stay down,

15   stay down and it's in the deposition.  He says he

16   gave him multiple commands to stay down and that

17   there was a gap in between the first tase and the

18   second and a gap between the second and third and so

19   forth.

20                    But in this one it's a little

21   different history given early on and I just want to

22   make sure because I wouldn't want this history being

23   presented without being vetted out to see if it's

24   realistic or not because it's different, and I think

25   the jury needs to hear about all histories to

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 64

1    determine, you know, if there is something wrong

2    with them, or if there is, why.  And in this

3    situation she's describing Mr. Moore getting up and

4    charging, and I want to bring your attention to

5    something that we acquired which I know you've seen

6    and it's the TASER download.  Have you seen that?

7         MS. SHAFAIE:  Object to form and foundation

8    on that prior narrative.

9    **Q**   Do you have a -- did you -- do you have a

10   copy of the TASER download?

11   **A**   No, not that I can put my hands on.

12   **Q**   I think in your notes you had the notes

13   of it.  I think I saw in your notes you had the

14   notes with the timing on it.

15   **A**   Right.

16   **Q**   Okay.  So let me see if I have it here.  I'm

17   looking for the one that had the TASER.  Okay.  I'm

18   going to hand you what's been marked as Plaintiff's

19   Exhibit 36.  This is from TASER International, and I

20   guess this is where I got the, you know, the 1,400

21   to 2,520-volts.  Take a look at that first page and

22   we will hit two issues here.

23           Does that help you in understanding

24   what the peak load --

25   **A**   The peak load and main phase voltage?

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 65

 1    **Q**    Yeah.  It's 1,400 to 2,520 volts.

 2    **A**    Right.  Those are the specifications.

 3    **Q**    And pulse rate gives 16-1/2 to 20 pulses per

 4    second?

 5    **A**    That's what the specs are.  I think it's --

 6    it should be 19 pulses per second.

 7    **Q**    Okay.  And then let's move on to the other

 8    page which is, I guess, it says it's page 1 of 36.

 9    It's really like three pages into it.  It indicates

10    when it gets into the download, it's talking about

11    the activation log and download analysis, and I

12    understand that this is actually some type of a

13    computer chip in the weapon itself that keeps a

14    record in sequence of when the gun was discharged,

15    how many volts it let out, how long it was

16    discharged, and how much time there was in between

17    the last discharge and the next discharge, is that

18    accurate.

19    **A**    It can't tell you how many volts a

20    particular person got, at least with the current --

21    or with the technology back then, but it does tell

22    you what the output of the device is when the

23    trigger was pulled using the internal clock which

24    may not be accurate or synchronized with everything

25    else, and then how long the duration of the

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 66

1   discharge, but it doesn't tell you at least in the

2   older stuff whether it was actually current flowing

3   through the probes.

4       **Q**   And let's be clear about the accuracy

5   statement.  The clock, I indicate that it says it

6   can have some floating or something, but when it

7   says that there was a -- that when it says that the

8   blast was five seconds, or there was one second in

9   between the tase, now that information doesn't have

10  any accuracy problems, does it?

11      **A**   That's correct.

12      **Q**   Okay.  Now, there is also, and I know with

13  your involvement with TASER, I'm assuming you're

14  familiar with this that the activation durations

15  recorded in the activation logs are rounded up to

16  the next second after ten milliseconds.

17              Do you understand that?

18      **A**   Yes.

19      **Q**   Tell me what you understand about that.

20      **A**   Basically, if you say it's five seconds, it

21  actually may be 4 point something seconds.

22      **Q**   Okay.  And if there's a second in between

23  the tases, let's say that Mr. --Officer Kaminiski

24  tases Mr. Moore and it says that he's got a five or

25  six second tase, and then the next tase it says

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                        March 8, 2016

Page 67

1   there's a second in between that tase and the next

2   one.  That would mean that's the most that there

3   could have been in between, correct?  Because if it

4   was a half a second in between the tases, it would

5   have just rounded it up to a second?

6       **A**   No.  It could be a little over a second

7   actually, because it --

8       **Q**   And then it would round it up to two

9   seconds.

10      **A**   No, not if you're within the before the

11  rounding up period comes over.

12      **Q**   That's only one millisecond.

13      **A**   Well, nevertheless theoretically, it could

14  still be for realistically it could still be a

15  second.  It doesn't have to be less than that.

16      **Q**   Okay.  But it could be less than a second?

17      **A**   It could be less than a second.

18      **Q**   More likely less than a second than more

19  than a second according to odds, figures and numbers

20  and math?

21      **A**   I mean, when you look at a particular case,

22  you can't tell.

23      **Q**   Okay.  But you would agree that, if there

24  was a half second in between the first tase and

25  second tase, that this device is going to round it

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                March 8, 2016

Page 68

 1   up to a second?

 2       **A**   That's my understanding.

 3       **Q**   Okay.  So let's take a look at the actual

 4   download then which is on page two of it and it

 5   shows, and I know you've review this.

 6              It was in your notes and you're

 7   familiar with this, correct?

 8       **A**   Yes.

 9       **Q**   And you know how to interpret it, correct?

10       **A**   I think I do.

11       **Q**   Okay.  So how long was the, you know, there

12   was the warmup which is line 947.  That's when he I

13   guess was at work and they sparked it in the parking

14   lot.  He testified to that.

15              For the record, can you say yes?  I

16   know you nodded.

17       **A**   Okay.  Yes.

18       **Q**   And then on line 948 it indicates that it

19   was 6:53:17.

20              How long of duration was that tase?

21       **A**   Realistically, probably five seconds.

22       **Q**   It says six seconds.

23       **A**   It does, but again, it's probably rounding,

24   because when you actually look at the time, six

25   seconds doesn't fit.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 69

```
 1     Q   It was probably 5.1 or something, correct?

 2     A   I don't think you can say that.  At least,

 3   it's somewhere right around 5.

 4     Q   But then when does the next tase start?  How

 5   much time is there between that tase and the next

 6   tase?

 7     A   Five seconds.

 8     Q   Okay.  So that tase starts at 6:53:17 and it

 9   goes for six seconds, but there's five seconds till

10   the next one, correct?

11     A   That's why I say it probably didn't go for 6

12   seconds.  It probably went for 5 seconds, or a

13   little under 5 seconds.

14     Q   So looking at this download, how much time

15   was there from the end of the first tase, until the

16   second tase again?

17     A   Basically, it was sequential.

18     Q   So he didn't stop at all, he just kept

19   going?

20     A   He stopped because it doesn't indicate -- it

21   indicates a second discharge, not a continuous

22   discharge.  But it looks like the output was

23   consecutive, but if he would have released the

24   trigger, he would still get a five-second burst.  So

25   it may have been four seconds after he pulled the
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                      March 8, 2016

Page 70

1    trigger before he pulled it again.

2                Because, if you pull the trigger

3    once, you get a five-second discharge.

4        Q    Yes.

5        A    And release it right away.  And so, if then

6    four seconds later he pulled it again, it's going to

7    look like it started right after this one, although

8    the time sequence where the trigger is released

9    could be another -- could be four seconds.

10       Q    I'm asking from the time that he gave him

11   the first tase and that tase ends, how much time

12   elapsed before the second load starts?

13       A    It's almost continuous.

14       Q    Almost continuous?

15       A    Although it's not continuous, it's almost

16   continuous.

17       Q    So it's almost continuous which means

18   there's hardly any time in between the first tase

19   and when that one ends and the second one starts,

20   they're almost like rapid succession back to back,

21   fair statement?

22       A    That's what this would indicate, yes.

23       Q    And this is from a computer, correct, from

24   the computer chip?

25       A    From the chip, yeah.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                        March 8, 2016

```
                                                    Page 71

    1      Q    Okay.  Now, I bring you back to the

    2   statement from Christine Keim.  She describes that

    3   Mr. Moore was tased, he hit the ground, he got back

    4   up.  Says he got up and started charging him again.

    5   I mean, that seems unlikely if he had two back to

    6   back tases, doesn't it?  That would have to assume

    7   that Mr. Moore was able to get up and stand while

    8   under load?

    9      A    Yes.

   10      Q    And that's very unlikely, isn't it?

   11      A    At least what was described, yeah, it is.

   12      Q    Very unlikely?

   13      A    Yeah.  If, in fact, the description of him

   14   locking up and falling is true, then it's very

   15   unlikely that it happened like this as in this

   16   report.

   17      Q    So as a pathologist and a guy who solves

   18   factual disputes as a living, you would have to say

   19   that you've got to call into suspect that history

   20   that's in that forensic investigator's report that

   21   works for St. Louis County, correct?

   22      A    The details of it, yes.

   23      Q    Okay.  Then we move on to second.  We're

   24   into the second tase.  He's already been hit once

   25   and now he's -- now we're into -- we talked about
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 72

 1    the second one.

 2                    Now that second tase ends.  How long

 3    is that second tase?

 4        **A**    Five seconds.

 5        **Q**    And then how much time is there between when

 6    that second five -- you know, that second,

 7    five-second load ends before the third one starts?

 8        **A**    A second.

 9        **Q**    One second.  Now, are you familiar with the

10    studies that measure when an officer makes the

11    decision that he's got to pull the trigger from the

12    time that he decides to pull the trigger, it's the

13    reaction time and the time for the device to work

14    when you pull the trigger before it starts to

15    measure the electricity coming out.

16                    Are you familiar with that study?

17        **A**    No.

18        **Q**    It says it's about a third of a second.

19        **A**    Okay.

20        **Q**    Okay.  So I want you to assume that there

21    will be evidence in the case of this.  If I'm wrong,

22    I'm wrong and we'll deal with it, but I don't think

23    I am.

24                    But let's assume then, that when

25    Officer Kaminiski decides I need to pull the trigger

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 73

1    again.  That, from the time he makes that decision,

2    he burns up a third of a second.  So, if there's

3    only a second in between the second tase and the

4    third tase, and if it took him a third of a second

5    to decide to pull the trigger to get a start, that

6    would mean that he had two-thirds of a second to

7    decide what to do, to decide whether from the end of

8    the second tase until the beginning of the third, he

9    had two-thirds of a second to decide either I'm

10   going to pull this trigger or I'm not and he decided

11   I'm going to pull it.

12       **A**    No.  He had -- basically, he had almost five

13   seconds.

14       **Q**    Oh, you're saying that's because while he's

15   under load he's watching him. I'm saying between the

16   time the load ended because the guy is locked down

17   on the ground.

18       **A**    If that's what's described, that's correct.

19       **Q**    Mr. Moore is on the ground shaking in

20   convulsions from the electrical pulse?

21       **A**    No.  There is no evidence of that.

22       **Q**    Well, that's what Mr. Kaminiski testified

23   to?

24       **A**    Of convulsions?

25       **Q**    Well, that he's --

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 74

1      **A**    There is no --

2      **Q**    He said he was flopping around on the

3   ground.

4      **A**    That's not convulsions.  That's just

5   muscular contractions.

6      **Q**    Well muscular contractions.  Well, I didn't

7   mean to mis-describe it medically as like a brain

8   seizure or something, but he was -- contractions.

9   He was moving around on the ground as a results of

10   the effect of the electricity going through him.

11             So his determination to pull the

12   trigger a second time is after the second tase is

13   ended and before the third one started there was one

14   second?

15      **A**    Well, theoretically, he could have decided

16   earlier, so he has basically a five-second window

17   there.

18      **Q**    Sure.  What's he basing it on then?  There's

19   a gentleman on the ground under load bouncing around

20   from the electrical contractions.

21             What information is he processing

22   that's telling him whether he needs to pull the

23   trigger or not?

24             MS. SHAFAIE:  Form and foundation.

25      **A**    You would have to ask him that.  But you're

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 75

1    asking me what the time sequence is and there's a

2    five-second interval in there where he potentially

3    could pull the trigger again.

4         Q    I did ask him and that's why I'm asking you.

5    Because what he told me in his deposition is that I

6    gave Mr. Moore multiple verbal warnings after I

7    ended the tase.  I gave him multiple warnings to

8    stay down, you're going to be tased.  Stay down or

9    you're going to be tased.  He said, Mr. Moore began

10   to get up and that's when I tased him again.

11                   And I'm suggesting that, based upon

12   this TASER download, I don't believe there was

13   enough time for any of that that happened.  Do you

14   agree?

15              MS. SHAFAIE:  Form.

16        A    He had -- while he could have been giving

17   him orders while he was under load.

18        Q    He said they weren't under load, while he

19   was not under load.

20              MS. SHAFAIE:  Form, foundation.

21        A    In that case I agree with you.

22        Q    Okay.  And we go into the fourth tase.  Now

23   we're getting into the fourth tase.  Once again,

24   it's a five-second tase with one second in between

25   the tases.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                          March 8, 2016

```
                                                       Page 76
 1                    Just pretty much like the other ones,
 2   correct?
 3        A    Yes.
 4        Q    Okay.  Sure we can take a break.
 5             VIDEOGRAPHER:  Off the record at 3:24.
 6                    (Recess taken.)
 7             VIDEOGRAPHER:  Back on the record at 3:34 in
 8   the deposition of Dr. Michael Graham.  This will
 9   begin disc two.
10   BY MR. FLOYD:
11        Q    I want to talk to you a little bit about
12   this load with the TASER and I -- where is that
13   exhibit again?  This was Exhibit 36 and you had
14   looked at it and I had asked you about the pulse
15   rate and TASER X26 says 16.5 to 20 pulses per
16   second, but you said actually it should be, did you
17   say 19?
18        A    No.  I think it's designed for 19 pulses per
19   second, but the specs will allow some variance from
20   that.
21        Q    Okay.
22        A    So as long as you are within spec, but I
23   think theoretically it's 19 pulses per second.
24        Q    Okay.  So looking at this download, can you
25   tell me, approximately, how many seconds Mr. Moore
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 77

1   was under load?

2       A    You can't, because the -- back in this time

3   period you can measure whether the device is in spec

4   or not, you can measure whether the trigger was

5   pulled, but you don't know how long somebody was

6   under load.  There was no way to measure that.  They

7   didn't measure delivery current.

8       Q    Just assume that there was good contact?

9       A    But the machine doesn't describe that.  Now,

10  if you want to assume that all of this electricity

11  was delivered to him.

12      Q    Yes.

13      A    That there was actually delivery through the

14  probes to him.

15      Q    Yes.

16      A    Then you're looking at probably 20 seconds,

17  basically 20 seconds.

18      Q    Okay.  So how many pulses would he have

19  received in those 20 seconds approximately?

20      A    19 times 20.

21      Q    380?

22      A    Yeah, 380.

23      Q    What is the relationship between the pulses

24  and the contractions, muscle contractions?

25      A    Right, yeah.  The pulse rate is designed to

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                March 8, 2016

Page 78

1   stimulate the nerves, and so it's not like a

2   one-on-one situation where every time you get a

3   pulse you get a contraction, it doesn't work that

4   way.

5            You are trying to basically stimulate

6   the nerve in the most efficient way possible, and

7   that 19 pulses per second, give or take, is an

8   efficient way to do that so it's not a strict

9   correlation.

10   **Q**   And I think that I asked Officer Kaminski

11   this, but I'll ask you.

12            Have you ever seen like I think it's

13   TASER promotional tape of I think it is the X26

14   Tasing at Texas longhorn bolt?

15   **A**   No.

16   **Q**   Have you ever heard of it?

17   **A**   No.

18   **Q**   Okay.  I want to talk to you a little bit

19   about the TASER warnings.

20            Are you familiar with the TASER

21   warnings?

22   **A**   Very generally.  I'm not a warnings expert.

23   I had nothing to do with formulating TASER warnings.

24   **Q**   I want to ask you about them to some degree.

25   Let's see how -- do you want the highlighted one to

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                          March 8, 2016

Page 79

1    make it easier?  I have highlighted stuff that I

2    wasn't going to use, but that's Exhibit 19.  Do you

3    need a copy of that?  Okay.

4                    Exhibit 19, and looking at the

5    warnings, this is warnings that are produced by

6    TASER International.  Do you agree with that?

7        **A**   Yes.

8        **Q**   Important ECD product safety and health

9    information.  Okay.  Moving into the second page, I

10   wanted to know if you were aware and it talks about,

11   it's the first highlighted section.

12                   "Minimized, repeated, continuous or

13   simultaneous exposures."  And it states "Reasonable

14   effort should be made to minimize the number of

15   ECDs, ECD exposures, electrical conductive device,"

16   correct?

17       **A**   Yes.

18       **Q**   That's the TASER is what an ECD is, correct?

19       **A**   A TASER is one type.

20       **Q**   Yeah.  But when they use ECD, that's what

21   they're referring to?  That would apply to the TASER

22   X26?

23       **A**   It applies to a variety of their devices

24   included the X26.

25       **Q**   Okay.  And that "The user should use the

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 80

1    lowest number of ECD exposures that are objectively

2    reasonable to accomplish lawful objectives and

3    should assess the subject's resistance level before

4    initiating or continuing exposure."

5                    Did you see that warning?

6        **A**   Yes.

7        **Q**   Okay.  And Officer Kaminiski has testified

8    that he knew about them.  He was a certified TASER

9    trainer and had been for many years.  So I want to

10   ask you, looking at this statement here, and I don't

11   know how far you've gotten into these issues with

12   the cases you've testified on involving police

13   deaths and custody, but there's a statement in here,

14   number one, "They should minimize the number of

15   loads that they deliver to someone."

16                   But number two, "Try not to make them

17   simultaneous."

18                   And number three that "They should

19   assess the subject's resistance level before

20   initiating or continuing to give another load."

21                   Did you see that?

22       **A**   Yes.

23       **Q**   Do you think that a second or less than a

24   second is enough time to assess somebody's reaction

25   to a load?

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 81

```
 1          MS. SHAFAIE:  Form and foundation.

 2     A    I would defer to the experts on use of

 3  force.

 4     Q    Okay.  And it talks about sensitive body

 5  part hazard, it's the next portion that's probably

 6  underlined.

 7          It says, "When possible, avoid

 8  intentionally targeting the ECD on sensitive areas

 9  of the body such as the head, throat, chest, breast

10  or other pre-existing injury areas."  Okay.  Well, I

11  want to focus on the chest part.  This warning here

12  says to avoid that area.

13          Do you agree with that warning?

14     A    I don't think based upon what we know now, I

15  don't think you need to intentionally avoid that,

16  although the effectiveness of the device, if you go

17  lower is more effective because you can incorporate

18  the core muscles is what you really want to do.

19  Targeting the chest you have less likelihood of

20  stimulating the core muscles.

21     Q    So you may disagree with TASER on this one

22  because TASER says warning sensitive body part

23  hazards?

24     A    Again, I'm not a warnings expert.  From a

25  scientific standpoint from what we've written right
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                          March 8, 2016

Page 82

1   now, I don't think that -- that for me is not a big

2   issue.

3       **Q**   Okay.  There's a warning here and here we're

4   talking about I guess the force and whether the

5   voltage is legitimate or not.  I don't know how we

6   want to phrase that or how to set that up, but on

7   the next page eye injury hazard I have it

8   highlighted.

9               "If a TASER probe, electrode or

10  electrical discharge contacts or comes close, comes

11  into close proximity of an eye, it could result in

12  serious injury including permanent vision loss."

13              Were you aware that the TASER could

14  cause that much damage?

15      **A**   Well, yeah.  If you stick a dart in

16  somebody's eye, sure, it's going to be a big

17  problem.

18      **Q**   Even near the eye?  It doesn't have to be in

19  the eye?

20      **A**   It's a suggestion that it would be in the

21  orbit or something like that.  So, yes, obviously it

22  could cause problems.

23      **Q**   Okay.  And then we talk about these muscle

24  contractions on the next page, and it indicates here

25  that it can cause strong to moderate muscle

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 83

1    contractions.  It goes on to state that it can cause

2    fracture to the bones including compression

3    fractures.  It can cause tears of muscles,

4    ligaments, tendons.

5              Were you aware that it could do all

6    of that damage?

7    **A**    I don't know about the compression

8    fractures.  I know that there's been some discussion

9    about that, whether it really happens or not is not

10   entirely clear but, sure, you are causing, you know,

11   muscle contraction, you know, not anywhere near the

12   maximum muscle contraction possible.  Probably 40

13   percent or so of it, but yeah, that can cause

14   sprains and things like that, sure.

15   **Q**    Here it says that it can cause, I guess it's

16   because -- it's because of the involuntary muscle

17   contractions, right, that the TASER is causing?

18   **A**    Well, you are not dealing with involuntary

19   muscles.  You're dealing with voluntary muscle

20   contraction, but not volitional, and so I mean, even

21   if it's a volitional muscle contraction, if you

22   contract your muscle 40, 45 percent of its maximum,

23   you can cause strains, especially if it's not

24   stretched out or -- yeah.

25   **Q**    But I've heard of cases where there's been

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 84

1    disc herniations and compression fractures and

2    that's what's listed in this warning?

3        **A**   Yeah.  It's -- it's not clear to me whether

4    the compression fractures are really related to this

5    or not.

6        **Q**   But TASER seems to think it's important

7    enough to put in their warning?

8        **A**   Well, again, I'm not a warnings expert, but

9    a lot of things typically go into warnings.

10       **Q**   This next one is of relative importance that

11   I want to ask you about.  It's the physiological or

12   metabolic effects, and without using those words to

13   confuse anybody, it says that "The ECD can produce

14   physiologic or metabolic effects which include but

15   are not limited to" and then I go to the part that I

16   was focusing on heart rate and rhythm.

17                   Did you see that?

18       **A**   I did.

19       **Q**   TASER is giving a warning that the ECD can

20   produce physiological or metabolic effects which

21   include but are not related to heart rate and

22   rhythm.  Do you agree with that?

23       **A**   Yeah, it can certainly change your rate.

24       **Q**   And rhythm?

25       **A**   I'm not sure about the rhythm part.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 85

1      **Q**   So you would -- so you're disagreeing with

2   TASER's own warning then?

3      **A**   Again, it's a warning and I'm not a warnings

4   expert, but a lot of things go into warnings that

5   the science may not entirely support.

6      **Q**   Okay.  But I just -- I mean, I thought it

7   was important because you've testified here that you

8   don't believe that a TASER can affect heart rhythm.

9   You've acknowledged that there are other experts

10   that disagree with you and now I wanted to point out

11   that even TASER International has given a warning

12   not to shoot the chest and that it can cause a heart

13   rhythm problem?

14         MS. SHAFAIE:  Form and foundation.

15      **Q**    (By Mr. Floyd) Do you agree with these

16   warnings in there?

17         MS. SHAFAIE:  Same objection.

18      **A**   Let me go back to your first statement.  I

19   have never said that the TASER cannot at least

20   theoretically cause changes in heart rhythm.

21      **Q**   Okay.

22      **A**   I said that it can.

23      **Q**   Okay.  Well then you're on record that it

24   can then.

25      **A**   But under normal usage and under a normal

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                      March 8, 2016

                                                          Page 86

 1   size individual, it has not been shown to do so, but

 2   theoretically, I think I said earlier on in this

 3   deposition that you potentially could.

 4       Q    Then we go on to the -- just so that I'm

 5   clear that we have a record of this, you're on

 6   record of acknowledging that the TASER can affect

 7   the heart rhythm?

 8       A    It theoretically can.  Whether it actually

 9   does in practice has not been shown to do so, but it

10   theoretically can, yes.

11       Q    Of course, Dr. Zipes would disagree with you

12   on that statement you just made, wouldn't he?

13       A    You have to ask Dr. Zipes.

14       Q    Okay.  But you've read his articles?

15       A    I've read his articles.

16       Q    And they disagree with that statement you

17   made?

18       A    I'd have to read exactly how he has it

19   written, but yeah, he believes it can.

20       Q    Okay.  Then we go on to the higher-risk

21   population.  What I wanted to point out here is it

22   says that the ECD use on and it talks about

23   different types of people and we'll skip pregnant,

24   infirmed, elderly, small child but it says low body

25   mass index, BMI.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

```
                                                  Page 87

 1                  And it goes to say that the "ECD

 2    should not be used on members of these populations

 3    unless the situation justifies possible higher risk

 4    of death or serious injury."  Okay.

 5                  So TASER is warning that, if you use

 6    -- and because I understand they are warning that,

 7    if you use a TASER on somebody that has a low body

 8    mass index, that you really shouldn't be doing it

 9    unless the situation justifies a higher risk of

10    death or serious injury.  Did you see that?

11         MS. SHAFAIE:  Form and foundation.

12      A   It doesn't say that it does increase the

13    risk of death.  It said it could.

14      Q   (By Mr. Floyd) And it says --

15      A   Let me finish.  Hang on.  And the reason

16    they say it could is based on theoretic

17    considerations and the sentence says it has not been

18    tested on these populations.  But again, it says it

19    can be used if the situation justifies it.

20      Q   And I want to ask you about that, low body

21    mass index.  That's basically -- we do that formula

22    by somebody's height and weight, correct?

23      A   Yes.

24      Q   And Mr. Moore, according to the death

25    certificate, had him listed at 72-inches long?
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                      March 8, 2016

Page 88

1       **A**   I don't remember how tall he was, but he was

2   like 130 pounds.  I mean, he's a skinny guy.

3       **Q**   And the body mass index was somewhere around

4   18 which is below normal, it's low.  It's under

5   weight from what I looked up?

6       **A**   I guess it depends on what table you use,

7   but he's a skinny guy.

8       **Q**   I think I used the government's statistics

9   and they said it was underweight.  So now, and I

10  want to ask you about that.  You know, we've got --

11  and I mention it because, you know, we've got some

12  of these warnings, you know, maybe you don't agree

13  with them, but maybe there's going to be some other

14  people in this case that do, but if you tase

15  somebody in the chest, you're getting it in the area

16  near the heart, and if someone is of slight build,

17  and you've referenced this a bit in your report and

18  I think you know where I'm going.  If someone is of

19  a slight build and they're shot in their chest, the

20  thinner built they are, the more likelihood that

21  that dart could potentially, if it's shot in the

22  right spot, could get closer to the heart.

23                  Do you agree?

24      **A**   Yes.

25      **Q**   And if someone is naked, they don't have a

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 89

1   layer of clothing to prevent that dart from going

2   in, correct?

3       **A**   I mean, thin clothing -- thin clothing

4   probably doesn't make a whole heck of a lot of

5   difference.  But a skinny guy you can get the probe

6   tip closer to the heart than you can the bigger guy.

7       **Q**   And then let's say, and I've read some

8   things on this and I would just kind of like your

9   thoughts on it, other people probably comment on it

10  and you've probably read some of these articles.

11              But when an individual gets shot in

12  the chest with the dart and they fall flat down on

13  their chest, that I've read some articles where

14  experts have said that that can cause the darts to

15  actually penetrate deeper into the chest to get

16  closer to the heart.

17              Do you agree with that?

18      **A**   It's never been shown.  Theoretically, that

19  could happen, but that so far hasn't been tested

20  yet.  Whether that really occurs or not, I don't

21  think anybody knows.

22      **Q**   You've read probably some of the same stuff

23  I have then.  You seen that out in the literature?

24      **A**   I've heard it.  I don't know that I've seen

25  any data that would indicate that.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 90

1     **Q**   The other aspect of that is that, when

2   somebody falls flat on their chest, is that -- the

3   literature I read is that the heart can move around

4   inside the chest cavity to some degree and that when

5   you're laying on your chest that the heart moves

6   closer to the chest wall which makes it closer to

7   the dart again.

8              So it's two factors.  One, when

9   you're on your chest, the heart is dropping closer

10   to the chest wall.  And number two, the prong is

11   being driven into the chest deeper making the

12   proximity between the dart and the heart even

13   closer.

14              Do you agree with that?

15     **A**   The latter part has not been shown that the

16   dart is driven in deeper.  I think it's generally

17   recognized that, if you're laying flat down, the

18   heart does move forward a little bit.

19     **Q**   Which would -- if the dart gets driven in

20   further and if the heart gets moved closer to the

21   chest in that position, that increases the

22   likelihood of the TASER electrical current

23   interfering with heart rhythm?

24     **A**    Only if you're within probably less than

25   5 millimeters of the heart.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

```
                                              Page 91
  1      Q    Others would disagree with you on that
  2   distance, correct?
  3      A    I don't know if that's true or not.
  4      Q    Your testimony is that the dart has to be
  5   within five millimeters of the heart to cause --
  6      A    It's probably got to be within three or four
  7   in a human because v-fib.
  8      Q    Would you be surprised if a cardiac
  9   electrophysiologist were able to effect a heart
 10   rhythm with electrical pulse from further distances
 11   than that?
 12      A    Well, it depends upon how much charge you
 13   are delivering.  I mean, you can do transcutaneous
 14   pacing, you can do -- obviously, you can do
 15   transcutaneous defibrillations, but that's a huge
 16   amount of charge.  We're talking about, you know,
 17   100 microcoulombs or less, and so I would be
 18   surprised if somebody could do transcutaneous
 19   changes in heart rhythm with 100 microcoulombs.
 20      Q    Did you state in your report that -- you
 21   didn't give the number of 5 millimeters in your
 22   report, did you?
 23      A    What I gave is what has been seen in pigs
 24   and things.
 25      Q    Which was 23 millimeters?
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 92

 1      **A**    Per capture.  For fibrillation that's about

 2    eight.

 3      **Q**    But for cardiac capture?

 4      **A**    Oh, for capture, yeah, it's about an inch in

 5    a pig.  There's been a human captured about

 6    17 millimeters, but no non-perfusing rhythms.  So

 7    for v-fib you're looking at, you know, if the

 8    average pig that you can even fibrillate is

 9    6 millimeters, you know, then you're looking, you

10    know, maybe two-thirds of that, so about 4

11    millimeters.

12      **Q**    And looking at your report, you indicated

13    that Dr. Sabharwal noted that there was a

14    7-millimeter circular burn with a central puncture

15    on the left anterior chest, correct?

16      **A**    Right.  That's from the probe in the hub on

17    the skin.

18      **Q**    How close in proximity is that to the heart?

19      **A**    Oh, in this case it's over an inch.  I mean,

20    he measured the skin and fat was 7 millimeters.

21    Chest wall muscle was 15, the intercostal was 10.

22    It's well over an inch.

23      **Q**    Okay.  But we don't know how deep the probe

24    went into the skin, do we?

25      **A**    We do.  Because if you do have the circular

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 93

1   abrasion, that means it went into the hub and so

2   it's in 9 millimeters.

3       Q   Do you know how long this probe was on this

4   dart?

5       A   I don't know if this was the 9 or the

6   13-millimeter probe.  Let me see if it's got

7   anything in here.

8           MR. DOWD:  .55 inches.

9           THE WITNESS:  No.  The probe is not five

10  inches long.

11          MR. DOWD:  .55.  It's slightly over a half

12  an inch.

13          THE WITNESS:  So it's the 13-millimeter

14  dart, the extended dart.

15      Q   (By Mr. Floyd) So we've got a probe that's

16  over a half inch long going into his chest?

17      A   Yeah.

18      Q   We've got him driven into the ground and

19  we've got the chest dropping down close -- the heart

20  dropping down closer to the chest cavity as he's on

21  his chest.

22          MS. SHAFAIE:  Object to form and foundation.

23      A   So you don't know actually if the probe is

24  driven in.  You've got --

25      Q   (By Mr. Floyd) Well, we've got the burn

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                      March 8, 2016

Page 94

1   marks and the 7 millimeters which you indicate.

2       A    Yeah.  It means it's into the hub which is

3   what you typically see.

4       Q    Full depth?

5       A    Yeah, 13 millimeters, and so you're still

6   almost 20 millimeters away from the heart.

7       Q    But as that -- you put pressure on it, it

8   could press through some of the fat just like I can

9   stick my finger on my chest, I can press deeper into

10  it?

11      A    He hasn't shown any wound track that is

12  deeper than that though.  I mean, you're guessing.

13  You have no science to show that.

14      Q    It's theory.  Other doctors have theorized

15  that.

16      A    You can theorize all you want, but there's

17  no evidence to support it.

18      Q    In any event, we have a large probe.  Are

19  you able to do the measurements of how close that

20  probe would have been to his heart if he was laying

21  on his chest and the heart dropping down?

22      A    32 millimeters, 19 millimeters.

23      Q    And how did you do that math?

24      A    32 minus 13.

25      Q    And the 32 came from the depth?

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                      March 8, 2016

Page 95

```
1      A    The measurement inside the wall.  So the

2   chest wall --

3      Q    And that's assuming that the dart didn't

4   penetrate any deeper when he got pressed onto the

5   ground, correct?

6      A    And it also doesn't allow for the heart

7   being away from the sternum at all either.  So, it's

8   actually probably longer than that.

9      Q    And where did you deduct the 19?

10              I mean, where did you deduct the 13

11  from the millimeters?

12     A    Like you said, it's a 13-millimeter probe.

13     Q    And I believe that you testified that a

14  discharge -- you were referencing studies that

15  indicate that there were cardiac capture within

16  23 millimeters on swine, correct?

17     A    Yes.

18     Q    And pigs are commonly used to test products

19  for safety for humans, correct?

20     A    Not so much for safety.  Pigs are so easy to

21  fibrillate.  They're not really -- they use them

22  because they are easy to fibrillate.  To fibrillate

23  a pig, the average heart to heart distance was six

24  millimeters and they can't get big pigs to

25  fibrillate at all without manipulating them.
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                          March 8, 2016

Page 96

 1      **Q**    And don't you have pig valves that have been

 2    used in humans, is that correct?  Pig heart valves?

 3      **A**    Yeah, tissue from pig heart valves, sure,

 4    yeah.  It's got nothing to do with this.

 5      **Q**    Okay.  Now, there are some other warnings

 6    that TASER has given and I won't go through the

 7    documents to add more on here, I'll just ask you if

 8    you know about them.  They've already been put into

 9    evidence in other depositions.  I've got the

10    documents here, but in order to save some time, that

11    the statements were that an increased risk of death

12    when used on a person with -- well, just strike

13    that.

14                    Physiological or

15    metabolically-compromised persons at risk of death

16    when they're tased with a TASER.  It increases their

17    risk of injury or death.

18                    Do you agree with that or not?

19      **A**    That's not been shown, no.

20      **Q**    Okay.  So then I'll just go to this

21    statement here.  I guess it's the physiologically

22    and metabolically compromised person.  It is on that

23    Exhibit.

24      **A**    Yeah, I got it.

25      **Q**    I have it highlighted.  It says, "Law

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 97

1   enforcement personnel are called upon to deal with

2   individuals in crisis that are often physiologically

3   or metabolically compromised and may be susceptible

4   to arrest-related deaths.  The factors that may

5   increase susceptibility for arrest-related deaths

6   have not been fully characterized but may include"

7   and then you state it and it states in here

8   "Agitated or excited delirium."  And there's other

9   warnings that state just emotionally distressed.

10              And you would agree that that warning

11  is given by TASER?

12      **A**   I don't see anything about it just being

13  emotionally distressed in here.

14      **Q**   That's in other warnings.  They're in

15  evidence.  It's on another document.

16      **A**   Yeah, it's not in this one, but agitated

17  delirium certainly we recognize that those

18  individuals are subject to sudden death often

19  temporally related to forcible restraint.

20      **Q**   Or being shot with a TASER multiple times?

21      **A**   It's never really been shown to be increased

22  incidents.

23      **Q**   Then why give the warning?

24          MS. SHAFAIE:  Object to foundation.

25      **A**   You have to talk to the warnings experts.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 98

1      **Q**     (By Mr. Floyd) But they state on here that
2  may cause or contribute to death or serious injury
3  ECD use?
4      **A**    What it says is that the factors that may
5  increase susceptibility for any arrest-related death
6  have not been fully characterized but may include
7  and they give a whole laundry list of things.  And
8  just as a general statement for people subject to
9  sudden death during arrest.
10      **Q**   Are you saying that officers should
11  disregard these warnings?
12      **A**   I have nothing to say about warnings.  I'm
13  not a warnings expert.
14      **Q**   Okay.  Because my understanding is and you
15  worked for TASER -- I mean, you worked for TASER and
16  you're on their safety --
17      **A**   I don't work for TASER.  I'm on their
18  scientific advisory board.  I don't -- I'm not a
19  TASER employee.
20      **Q**   My understanding is that, if you're going to
21  use a TASER, that TASER requires that you adhere to
22  their warnings.
23                 Is that your understanding?
24      **A**   I don't know.  I don't use TASER in my daily
25  job.  You'll have to talk to the business folks

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 99

1     about that.

2        Q     Okay.  Well, my understanding is that, if we

3     read through this, I think even in this document 19

4     it probably states and I've read it on multiple

5     occasions that they don't want you using this TASER

6     if you're not going to follow these warnings?

7             MS. SHAFAIE:  Form and foundation.

8        Q     (By Mr. Floyd) Do you disagree with that?

9             MS. SHAFAIE:  Same objection.

10       Q     (By Mr. Floyd) But right on the top of the

11    page, "These safety warnings are for your protection

12    as well as the safety of others.  Disregarding this

13    information could result in death or serious

14    injury."

15            You see that?  It's the very first

16    thing they state.

17       A     Okay.

18       Q     And the way I look at it, sometimes the

19    first thing you state in a document is often the

20    most important and that's what they've got listed as

21    their first thing.  Follow these instructions, or

22    someone might die?

23            MS. SHAFAIE:  Form.

24       A     Yeah.

25       Q     (By Mr. Floyd) We'll move on.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                        March 8, 2016

```
                                                        Page 100
 1                    Do you agree that there's increased

 2    risk of death or injury if an individual is tased in

 3    the chest?

 4        A    From being tased in the chest, no.

 5        Q    Okay.  Do you agree that there's increased

 6    risk of injury or death if someone is tased multiple

 7    times?

 8        A    No.

 9        Q    And I think I've testified to this, but I

10    wanted to ask you, did you know from the materials

11    that you read that prior to tasing Mr. Moore that

12    Officer Kaminiski had been a certified TASER

13    instructor for many years?

14        A    I think I read that.

15        Q    And that he had trained other officers

16    regarding the TASER warnings that we discussed in

17    Exhibit 19?

18        A    Well, if he was a trainer, I would assume

19    so.

20        Q    Okay.  Was there a toxicology report or

21    study performed in conjunction with the autopsy on

22    Mr. Moore?

23        A    Yes.

24        Q    And am I correct in stating that that

25    toxicology report was entirely negative for drugs or
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

```
                                                    Page 101
  1   alcohol?

  2       A    I think there was Lidocaine, but that was

  3   probably from resuscitation.  Other than that,

  4   nothing that they tested for showed up.

  5       Q    Lidocaine would have been part of the

  6   treatment that he was receiving in the ambulance and

  7   the hospital?

  8       A    For the resuscitation, yes.

  9       Q    And there were no significant abnormalities

 10   of the myocardium, correct?

 11       A    No.  It's bigger than it should be.  He's

 12   130 pounds and he had a 400-gram heart.  That's too

 13   big.

 14       Q    But Dr. Sabharwal said there were no

 15   significant findings.  So you two disagree on the

 16   significance --

 17       A    That's why I've asked to look at the slides.

 18       Q    Okay.  That scenario that you disagree on,

 19   he didn't find it to be significant?

 20       A    I have to look at the slides and I can tell

 21   you.

 22       Q    And right now --

 23       A    Right now I am suspicious that it was not

 24   normal because that is just too much heart weight

 25   for a 134 pound guy.
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 102

 1    **Q**   Okay.  You indicated that the -- there was
 2  increase in the left --
 3    **A**   Ventricle.
 4    **Q**   -- ventricle, and my readings on that
 5  indicated that it was just slightly large?
 6    **A**   400 grams is pretty big for somebody that's
 7  only 130 pounds.
 8    **Q**   Well, I mean, the left ventricle I think it
 9  was 13 millimeters?
10    **A**   Well, but you don't look at that.  It's the
11  heart weight actually is more important.
12    **Q**   Okay.  And you would agree that there are
13  many, many people walking around in the streets that
14  have enlarged hearts or other problems, you know,
15  clogged arteries, hardened arteries.
16              You agree, right?
17    **A**   Yes.
18    **Q**   And it would be completely irresponsible for
19  any police officer to assume that everybody that
20  he's preparing to tase has a completely healthy
21  heart.  Do you agree?
22          MS. SHAFAIE:  Form and foundation.
23    **A**   Yeah.  I don't think that you can try to
24  assess somebody's overall health in a situation like
25  this.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 103

1      **Q**    But you have to realize that the general

2   public is susceptible to heart susceptibilities?

3      **A**    You know actually in the population that the

4   police officers are most commonly asked to get

5   involved with where there is the potential for

6   forcible strength, those usually healthy people

7   because you're not dealing with the older population

8   generally.  You're dealing with young people and

9   most of them are healthy.  I mean, officers usually

10  aren't going around wrestling 70-year old, 75-year

11  old guys.

12     **Q**    Yeah.  But the young --

13     **A**    The young --

14     **Q**    How about in the 30's and 40's?

15     **A**    Yeah, but the -- you know, the probability

16  is, when you're dealing with somebody in a young

17  age, they are going to be normal.  You can't

18  categorically say they are going to be normal.

19  There is a chance that they will be abnormal, but

20  it's really not very big.  I mean, most 20-year old

21  guys are healthy.

22     **Q**    I think we'll have to challenge that to an

23  extent that, are you telling this jury that police

24  officers don't need to worry about potential

25  underlying heart conditions because they are only

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 104

1   dealing with youth and young people?

2       A   No.  I didn't say that at all.  I said there

3   is potential there, but it's a very, very small

4   potential.  The vast majority of people walking

5   around in their teens and early twenties are

6   healthy.  If they look healthy, most of them are

7   healthy.

8       Q   And --

9       A   But not everybody.

10      Q   Not everybody.  And many of the cases that

11  I've read in Federal courts regarding TASERs did

12  involve people that were older than Mr. Moore?

13      A   Correct.  But still most of them are fairly

14  young.

15      Q   But the bottom line is, is that we have to

16  -- police officers should assume -- you don't know.

17  I've got a friend that's in his 30s and had a

18  pacemaker put in and you know that happens at that

19  young of an age, correct?

20          MS. SHAFAIE:  Form and foundation.

21      A   Sure.

22      Q   Correct?

23      A   Yes.

24      Q   Okay.  So these police officers have to

25  realize that this weapon, it's a great tool in most

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 105

1   situations, but in some situations it can be very

2   dangerous.  Do you agree?

3           MS. SHAFAIE:  Same objection.

4       **A**   I don't think it's very dangerous.  There

5   are complications that can arise from tasing people,

6   the biggest one is falling down and hitting your

7   head uncontrolled, falling off heights, being around

8   flammables.  All of that's recognized.  I mean if --

9   the bottom line is these are great tools, as you

10  said, but they have to be used appropriately.

11      **Q**   (By Mr. Floyd) Great.  And I want to ask

12  you this.

13              Do you agree that it's never

14  appropriate for an officer to use force on an

15  individual that's not necessary?

16          MS. SHAFAIE:  Form and foundation.

17      **A**   If the officer thinks it's necessary, then I

18  think he's warranted to use force.

19      **Q**   (By Mr. Floyd) If he reasonably knows that,

20  it shouldn't be necessary?

21          MS. SHAFAIE:  Same objection.

22      **A**   If he -- yeah, if he thinks that force isn't

23  needed and he uses force, then yeah, I don't think

24  that's appropriate.

25      **Q**   (By Mr. Floyd) It's not appropriate for an

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 106

1    officer just to disregard an individual's safety and

2    say, you know what, I'm going to make my job easier.

3    I'm going to disregard his safety, it will expose

4    him to some risks, but I'm going to do it.

5              You don't agree with that philosophy,

6    do you?

7         MS. SHAFAIE:  Same objections.

8     A   I mean, obviously, officers do things that

9    they know are not safe to people like they shoot

10   them occasionally.

11    Q   (By Mr. Floyd) When it's not necessary,

12   though?

13    A   Yeah.  They shouldn't do things that are not

14   necessary.

15    Q   We covered some of this already, so I'm

16   skipping it.  Okay.  We've talked about cardiac

17   capture and v-fib.

18              Do you agree that v-fib occurs when

19   the heart's electrical rhythm is knocked out of

20   sequence and the heart isn't pumping blood?

21    A   That's -- not necessarily.  In some cases it

22   does.  Once you're in v-fib, then your heart is not

23   pumping blood.

24    Q   Okay.  But you agree that v-fib occurs when

25   the heart's rhythm is out of sequence?

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 107

1      **A**   No.  No.  There are lots of different rhythm
2   disturbances other than v-fib that can occur.  But
3   V-fib is one of the rhythm disturbances where the
4   heart is no longer pumping in a coordinated fashion.
5      **Q**   Okay.  So v-fib is when the heart is not
6   pumping in a coordinated fashion and that's related
7   to the heart rhythm?
8      **A**   It's actually a lack of a rhythm.
9      **Q**   Lack of a rhythm, okay.
10     **A**   But it is a very particular type of an
11  event.  There are other abnormalities or lacks of
12  rhythm where you're not pumping blood either, but
13  just to say that the rhythm is off, therefore, it
14  must be v-fib, that's not true.
15     **Q**   And do you agree that v-fib can be detected
16  on a heart monitor?
17     **A**   Yes.
18     **Q**   No question about that, is there?
19     **A**   Assuming that it's probably working correct.
20     **Q**   And when you explained excited delirium
21  psychosis, you didn't mention v-fib, did you?
22     **A**   In my report?
23     **Q**   Yeah.
24     **A**   Yeah, I did.  I said usually you don't see
25  it in that situation but you can.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                     March 8, 2016

```
                                                 Page 108

  1      Q   But it's pretty rare, isn't it?

  2      A   It is unusual.

  3      Q   Okay.  And you agree that an electrical

  4   shock can cause v-fib, correct?

  5      A   If there is enough charge there, yes.

  6      Q   But to be fair to you, you just don't

  7   believe that a TASER X26 is powerful enough to

  8   capture the heart's electrical pulse and throw it

  9   out of rhythm?  I've probably butchered that in

 10   layman's terms.

 11      A   You did.  Let me -- I think if you get the

 12   darts or one of the darts close enough to the heart

 13   and discharge them, an X26, I think you can induce

 14   v-fib.

 15      Q   Okay.  Do you agree that Moore's heart was

 16   in v-fib after he was tased four times?

 17      A   Eventually he was in v-fib.  I think that is

 18   the rhythm that was identified but let me see.  Yes.

 19      Q   Okay.

 20      A   He eventually went into v-fib.

 21      Q   And how many times was he in it?

 22      A   Oh, I don't think it matters.  The only

 23   rhythm that's really important is the first rhythm,

 24   because once you start resuscitating and giving

 25   drugs, you can cause any kind of rhythms.  It's the
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

```
                                               Page 109
 1   initial rhythm that you're interested in.

 2      Q    So they tried to defibrillate and then he

 3   went back into v-fib?

 4      A    No, he went into asystole.  He was in v-fib.

 5   They tried to defibrillate him and that put him into

 6   asystole.

 7      Q    And asystole, for the jury, that's flat

 8   line?

 9      A    Yes.

10      Q    That's what a common person understands,

11   correct?

12      A    Yes.

13      Q    That is where there is no pulse?

14      A    Well, you don't have a pulse with v-fib

15   either.  You have no electrical activity with

16   asystole.

17      Q    It would be flat line?

18      A    Yes.

19      Q    And then they got him back into v-fib from

20   flat line?

21      A    You know, I didn't pay much attention to it

22   after that.  It really doesn't matter.

23      Q    Okay.  Didn't you note in your report that

24   Officer White reported he cuffed Moore while Moore

25   was receiving the fourth TASER load, and within
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

                                                      Page 110

 1   seconds of cuffing Mr. Moore, White noticed

 2   something was wrong with Moore?

 3      **A**   He said it could also have been a minute.

 4   It's unclear.

 5      **Q**   And I wanted to explore that a bit because

 6   we look at a Christian Hospital statement from the

 7   police department discussing tased was more than --

 8   Moore was tased and then he became unresponsive.

 9   Let me see what I have here.  And this is on -- I

10   guess I should mark this as Exhibit 2.  Do you want

11   a copy of this item?  I don't know if it's easier

12   for to you read the highlight or not.

13      **A**   Yes.

14                      (Exhibit 2 was marked for

15                      identification by the court

16                      reporter.)

17      **Q**   (By Mr. Floyd) And this is a record from

18   Christian Hospital and it was on the evening of Mr.

19   Moore's death.  And reading at the top I think it

20   says --

21      **A**   I think this is the EMS report actually.

22      **Q**   The EMS report.  And it states that he

23   arrived, that 317.

24                      Do you know who, that 317 minutes is?

25   Is that the ambulance, is that the paramedic or who

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 111

1    is that?

2        **A**   No idea.

3        **Q**   Okay.  "317 arrived at scene to find above

4    patient in care of Ferguson Police Department with

5    CPR in progress.  Patient lying on ground advised by

6    police department that patient was running naked

7    around parking lot when police department tased

8    patient.  Patient then went unresponsive."

9        **A**   Right.

10       **Q**   And then another one we will mark this as

11   Exhibit 3.

12                          (Exhibit 3 was marked for

13                          identification by the court

14                          reporter.)

15       **Q**   (By Mr. Floyd) This is from Northwest

16   Health Care, it's Exhibit 3 and it was the evening

17   of his death.  And the portion that I've highlighted

18   doesn't it state that, "Per report by Ferguson

19   police officer, patient was running around naked out

20   doors banging on cars with his fists.  Patient was

21   tased and soon stopped breathing."

22       **A**   Yes.

23       **Q**   Okay.  And then there was a deposition which

24   I won't mark because it's in evidence.  It was

25   deposition of Brian Kaminiski.  I'm sorry, no.  It

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 112

1   was the deposition of Lieutenant Ballard, and I'll

2   just read a portion of it to you because there's a

3   lot on here that's highlighted and it's confusing.

4   It's on page 88, line 21.

5                   "Sir, if I could draw your attention

6   back to Exhibit 12 two pages, if I could direct your

7   attention back to Exhibit 12 to Ferguson 15.  The

8   next sentence in your report is quote, as I

9   approached Mr. Moore and the officers, Mr. Moore let

10  out a raspy sound and appeared to stop breathing."

11  Period close quotes.  Have I read that correctly?

12                  "Yes."  And then there's follow-up on

13  that.  Okay.  Question -- this is on page 89, line

14  23.

15                  "Okay.  Do you think --let me just

16  ask you then.  Based upon that statement that, as

17  you approach the officers, Mr. Moore let out a raspy

18  sound and appeared to stop breathing.  Is that the

19  last time you saw him breathe?"  And now we're on

20  page 90, line 3.

21                  "Yes.  When he made that sound, I

22  turned around and looked and I noticed that he

23  wasn't breathing and that's when Officer White" and

24  then this is the important part I wanted to ask you

25  about because it gives us some information about the

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

```
                                              Page 113
 1   timing of the tasing and when he stopped breathing.
 2                "Okay.  So as you approach the
 3   officer, I think you said, when you got on the scene
 4   and got out of your car, Officer White was coming up
 5   from the handcuffing.  Then you got up to the
 6   officers, then you heard the raspy breathing?"
 7                Answer, "Yes."
 8                So that line of questioning would
 9   suggest that, as Officer White was coming up from
10   handcuffing Moore, that's when they heard the raspy
11   breathing.  That would suggest that the difficulty
12   breathing started in very close proximity to the
13   last tase?
14        MS. SHAFAIE:  Form and foundation.
15     A   It's kind of hard to tell.
16     Q   (By Mr. Floyd) That would support that
17   though, that statement, would you agree?
18        MS. SHAFAIE:  Same objection.
19     A   I'd have to look at the whole thing.  I
20   can't really tell from that.
21     Q   Okay.  Just to review a couple of things and
22   then we'll be finished, almost finished.
23                You were hired by the Ferguson Police
24   Department, correct?
25     A   Well, I was hired by Pitzer Snodgrass.
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                      March 8, 2016

                                                          Page 114

 1    Whether it's the officers of the department, I don't

 2    know.

 3        **Q**    Which is who they represent?

 4        **A**    Okay.  That's fine.

 5        **Q**    And you acknowledge, as a pathologist, that

 6    there is no pathology to support that Mr. Moore died

 7    from agitated delirium or psychosis, correct?

 8        **A**    No.  I don't agree with that at all.  I

 9    think that the -- when you determine the cause of

10    death, you don't look just at the tissues, you look

11    at all the information to do that.  As far as an

12    anatomic marker that you can point at, yes, that's

13    correct, but there is never an anatomic marker with

14    excited delirium that you point to that shows us why

15    somebody died.

16        **Q**    And you can agree that, although this is the

17    cause of death that you and Dr. Sabharwal have

18    signed off on, you can't explain the mechanism of

19    that death, can you?

20        **A**    We don't know the mechanism, that's correct.

21        **Q**    You agree that cardiac capture can lead to

22    v-fib?

23        **A**    No.  Cardiac capture in itself does not lead

24    to v-fib.  You have to have more energy then to

25    induce capture.

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

                                                        Page 115

1     **Q**   You can agree that a heart rhythm

2  disturbance from an electrical insult can lead to

3  v-fib?

4     **A**   Yes.

5     **Q**   And you agree that TASER warns against this

6  charge into the chest?

7     **A**   They used to.  I don't know if they still do

8  or not.

9     **Q**   Well, on this warning at the time, the

10 latest warning before he was tased there was a

11 warning against tasing into the chest.

12            We went over that.  Do you remember

13 that?

14      MS. SHAFAIE:  Form and foundation.

15    **A**   No, right.  What I'm saying is I don't know

16 if the current warnings indicate that, but at least

17 at one point, yes, they did.

18    **Q**   (By Mr. Floyd) I believe that the current

19 warnings are even stronger now?

20      MS. SHAFAIE:  Foundation.

21    **A**   I haven't seen them.

22    **Q**   (By Mr. Floyd) Okay.  All right, but since

23 you haven't seen them, then you can't say -- I don't

24 want this jury to walk away with the impression that

25 you're suggesting that TASER has backed off any of

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 116

1   their warnings?

2       **A**   I don't know if they have or not.

3       **Q**   I mean, my understanding is they've gotten

4   even stronger as time goes on?

5           MS. SHAFAIE:  Foundation.

6       **A**   I'd have to look and see what the current

7   warnings are.

8       **Q**   (By Mr. Floyd) Okay.  Well, we'll leave

9   that issue to be decided.  I don't want it to be

10  decided over speculation.

11              You'd be speculating if you said

12  that, correct?

13      **A**   Oh, I'm not a warnings expert anyway, so I'm

14  not going to comment on warnings.

15      **Q**   But we can agree that we covered some

16  warnings here and that one of the TASER warnings

17  warrants against tasing into the chest, correct?

18      **A**   In the document you showed me, that is

19  correct.

20      **Q**   And that, in fact, Moore received four TASER

21  loads through his chest, directly over his heart,

22  correct?

23      **A**   Probably did.

24      **Q**   Assuming that it was good load and

25  connection which Kaminiski confirmed?

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 117

1     **A**   Yes.

2     **Q**   Okay.  And that TASER warns against tasing

3   emotionally distressed or agitated subjects and

4   Moore was emotionally distressed when he was tased,

5   correct?

6         MS. SHAFAIE:  Foundation.

7     **A**   I think the warnings say unless the

8   situation warrants it, yeah.

9     **Q**   (By Mr. Floyd) Okay.  And then the risk of

10  injury increases with each additional tase, correct?

11    **A**   No.

12    **Q**   With each additional load.  There is not

13  another risk of injury with each additional load?

14    **A**   Same risk as the single one.  The fact that

15  you tase somebody four times --

16    **Q**   You're not risking tearing more muscles,

17  more fractures?

18    **A**   No.

19    **Q**   Lactic acid buildup?

20    **A**   No.

21    **Q**   Getting punched in the face once is just as

22  risky as getting punched five times?

23    **A**   I don't know about that, but I will tell you

24  what --

25    **Q**   Well --

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                         March 8, 2016

Page 118

1    **A**   Let me finish my question.

2          MS. SHAFAIE:  Let him finish.

3    **A**   But the repeated discharge of the TASER and

4    its effect on the metabolic parameters has been

5    studied.  It's in the literature doesn't show any

6    significant changes.

7    **Q**   (By Mr. Floyd) I just want the jury to hear

8    your answer.

9    **A**   Yes.

10   **Q**   There will be other experts who have their

11   opinions on whether more loads are more dangerous.

12   The risk of injury -- okay.

13               Finally, do you acknowledge that

14   within seconds or up to one minute after Kaminiski

15   delivered the last of the four TASER loads to Moore,

16   that Moore lost consciousness and eventually died?

17   **A**   Yeah, maybe as long as a minute or so, yeah.

18   **Q**   A minute or so.  There's been nothing to go

19   beyond a minute.  I mean, that's a stretch to even

20   take it to a minute.  Do you agree?  I mean, that's

21   the furthest you could stretch it by any of

22   the history --

23               MS. SHAFAIE:  Form and foundation.

24   **A**   I think they said it could have been around

25   a minute, so that -- but give or take but somewhere

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 119

1    right around there.

2        **Q**    (By Mr. Floyd) But we just went over other

3    documents here that show suddenly and after,

4    correct?

5        **A**    Well, we know it's after.

6        **Q**    We know it was sudden too, right?

7        **A**    And it was a sudden death, yeah, I don't

8    think there's any argument, but there is no

9    definition of when they say after.  I mean after --

10       **Q**    He soon stopped breathing?

11       **A**    Yeah.  There is no definition of soon.

12       **Q**    Suddenly became unresponsive?

13       **A**    Yeah.  Well, you would expect suddenly.

14   Suddenly unresponsive, that doesn't give you a

15   timeframe though.

16       **Q**    And White describes it as -- or Ballard

17   described it as, "White was standing up from cuffing

18   him he started having breathing problems."

19              So we've got those descriptions,

20   correct?

21       **A**    And the descriptions say it could have been

22   a minute.

23       **Q**    And we'll let the jury decide that, but at

24   the end of the day, all arguments aside one thing we

25   know is that after Moore had sustained four TASER

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                        March 8, 2016

```
                                                    Page 120
 1   loads to his chest in rapid succession within
 2   seconds to a minute he lost consciousness and died.
 3   Fair statement?
 4      A    Within a minute or thereabouts, yes.  I
 5   don't think you consider them seconds.
 6           VIDEOGRAPHER:  Off the record at 4:22.
 7                    (Recess taken.)
 8           VIDEOGRAPHER:  Back on the record at 4:31.
 9      Q    (By Mr. Floyd) Okay.  A couple questions.
10   With regard to the diagnosis or conclusion that Mr.
11   Moore was suffering from psychosis or agitated
12   delirium, I want to talk to you about that.
13              What other criteria that you need to
14   find in order to make a diagnosis of agitated
15   delirium?
16      A    I think you have to show intermittent marked
17   agitation often accompanied by paranoia, you may or
18   may not have hyperthermia, and you can look at the
19   other -- some of the other features, you know, the
20   more features you have of the typical case and then
21   I think you can make the diagnosis reliably.  I
22   mean, there is a list that's probably 30 things
23   long.
24      Q    Exactly.  And let's kind of go through the
25   longer list.
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                      March 8, 2016

Page 121

1      A    Well, I mean, I'd have to pull up the

2    articles just to enumerate them all, but generally

3    somebody inappropriately markedly agitated showing

4    lack of touch with reality, bizarre behavior, often

5    deistic, the nudity is very common --

6      Q    How about --

7      A    -- and the violence, the aggression.

8      Q    Okay.  Now, I've read that one of the

9    findings with excited or agitated delirium is that

10   the body is producing this chemical in the brain and

11   it causes the body, internal body temperature to

12   heat up to sometimes 107 degrees and 105 degrees, is

13   that true?

14     A    In some cases that is true.

15     Q    I thought it was true in most cases?

16     A    In warm climates such as where the syndrome,

17   the acute syndrome was named Miami, they did find

18   it.  When we looked at ours, we only found it in

19   about 40 percent of the cases.

20     Q    So Mr. Moore did not have a high --

21     A    Yeah, he was not hyperthermic.

22     Q    And he didn't have that heat and he wasn't

23   sweating, correct?

24     A    He was not.  As far as I know he was not

25   sweating, but there is no evidence of the

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 122

1   hyperthermia.

2       Q   So really what you've got is just him acting

3   peculiarly?

4       A   Yeah, this goes beyond that.  I think, it's

5   kind of like the old story of pornography.  It's

6   hard to define, but you know it when you see it.

7               You know an agitated delirium when

8   you see one.  I mean, they are spectacular and they

9   go well beyond somebody who is just agitated or

10  disturbed.

11      Q   But you weren't there?

12      A   No, but the descriptions of it are pretty

13  typical.  The descriptions that -- the descriptions

14  of what he was doing pretty typical.

15      Q   But it's missing some of the ingredients

16  that I've seen in criteria I should say in other

17  cases which is hypothermia --

18      A   Hyperthermia you mean?

19      Q   Yeah.

20      A   Yeah.  I mean, that's one feature but it's

21  not always there.  Like I said, when I reviewed our

22  cases from around here, we only saw hyperthermia in

23  about 40 percent of the cases.

24      Q   And you had mentioned something else that

25  there were no anatomical markers.  Explain that to

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                      March 8, 2016

Page 123

1    the jury.

2                    What's that mean, there are no

3    anatomical markers of psychosis or agitated

4    delirium?

5        **A**    When it causes death.

6        **Q**    Okay.  Now --

7        **A**    So it means you can't -- there are -- there

8    are some studies at least in the cocaine-induced

9    agitated deliriums where a very specialized

10   laboratory can look at some of the Dopamine

11   receptors in the brain and tell you whether or not

12   there is agitated delirium.  Whether that works for

13   non-cocaine deaths or non-cocaine cases or not is

14   not clear and it doesn't tell you whether that's

15   what killed somebody or not.

16       **Q**    Most cases of excited or agitated delirium

17   -- or well, let me ask you this.

18                    Are a lot of the cases of excited or

19   agitated delirium drug induced?

20       **A**    Most of them are.

21       **Q**    Okay.  In this case we've got an individual

22   that has a negative tox screen.

23       **A**    You have to take that with the grain of salt

24   because there are certain things that aren't tested

25   for in toxicology and that can't be tested for or

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 124

 1    weren't tested for back then.

 2                  For example, we've seen some cases of

 3    agitated delirium related to the ingestion of bath

 4    salts.

 5        Q    But you have to --

 6             MS. SHAFAIE:  Let him finish.

 7        A    Let me finish.  Let me finish this.  And

 8    routine toxicology screening doesn't pick that up,

 9    so they come up as negative tox screens unless you

10    look for it specifically.

11                  And so I don't know that you can

12    absolutely rule out this being a drug-induced

13    agitated delirium, but there is nothing that

14    establishes that at this point.

15        Q    But, I mean, here we are throughout this

16    deposition you're saying well I'm not going to agree

17    with that because there are no studies to support it

18    or, you know, that's just in theory, but isn't that

19    --

20        A    What's that?

21        Q    -- kind of what you're trying to do here?

22    You're suggesting that, even though, you know, when

23    you're talking about cardiac capture and these types

24    of things, but when we get to this issue here,

25    you're talking about hey maybe he was on bath salts,

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                      March 8, 2016

Page 125

1    but they just didn't test for them and we can't rule

2    that out?

3              MS. SHAFAIE:   Form.

4         **A**   No, that's not what I said.  You said it's a

5    negative toxicology study, yes, but that does not

6    exclude the possibility of something being there

7    that wasn't tested for, and so it's agitated

8    delirium no matter how you cut it.  It's either

9    related to psychosis or to some substance that we

10   haven't identified.

11        **Q**   Well, you don't have any evidence though to

12   acknowledge that?  There is no evidence to support

13   that this guy was under the influence of any drugs

14   at this time.

15              In fact, what evidence we do have

16   suggest he wasn't?

17        **A**   No.  I agree with you, but you can't

18   categorically say he wasn't under because we know

19   now that we've seen cases of material that look like

20   tox negative or cases of agitated delirium that we

21   thought were toxicology negative, until we

22   specifically looked for some other substances that

23   you don't normally look for.

24        **Q**   Have you shared this theory with defense

25   counsel?

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                          March 8, 2016

Page 126

1     **A**   It's not a theory.  I mean, that's just a

2   reality of it.  I'm not saying that he is under the

3   influence of something.  I'm saying you can't

4   exclude the possibility and it really doesn't matter

5   because it's still agitated delirium.

6            Once you got agitated delirium, it

7   really doesn't matter what caused it.

8     **Q**   But --

9     **A**   It seems to be, the behavior seems to be the

10  same.

11    **Q**   But you're making this diagnosis of agitated

12  delirium, and would you agree that the diagnosis of

13  agitated delirium is a diagnosis of exclusion?

14    **A**   No.

15    **Q**   Other doctors would disagree with you on

16  that.  Do you agree?

17    **A**   I don't know about that.  I don't think it's

18  a diagnosis of exclusion.  You look for the

19  features, and if they're there, you call it.  That's

20  not an exclusion diagnosis.

21    **Q**   There is no objective physical evidence or,

22  you know, pathological evidence, pathology that you

23  can put your finger on?  It's not like there's, you

24  know, some change in his body.  This is all theory

25  that you're coming up with, correct?

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 127

1            MS. SHAFAIE:  Form.

2      A   No, not at all.  It's observations that are

3   well grounded, that they're well accepted in the

4   medical community.

5      Q   So cover a couple things here.

6                There is no slides, no -- no blood

7   samples that show that he had excited delirium or

8   agitated delirium or any psychosis, correct?

9            MS. SHAFAIE:  Form and foundation.

10     A   There is no such test.

11     Q   Okay.  And there is no studies of on the

12  autopsy that support that he had agitated delirium,

13  correct?

14     A   You mean examining the tissues?  Like I

15  said, there is no -- there is nothing in a routine

16  autopsy that establishes that diagnosis.

17     Q   And the physical evidence -- so there is no

18  physical evidence to show that he had objective

19  physical evidence that showed that he had agitated

20  delirium, correct?

21     A   Well, again, you're looking at the tissues,

22  yes.  Yeah, you can't in a routine autopsy make that

23  diagnosis.  It's based on what the patient does,

24  what it's like clinically, the circumstances.

25     Q   Okay.  And in addition to that, he was never

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 128

1    diagnosed with any pre-existing, you know, any prior

2    mental illness, was he?

3        **A**    You know, I hadn't heard that he was.

4        **Q**    Nothing in the record shows he was, correct?

5        **A**    That's correct.

6        **Q**    So we've got nothing in the records showing

7    that he was ever diagnosed with any mental or

8    psychosis, correct?

9        **A**    Prior to this event.

10       **Q**    And we've got a body temperature which is

11   inconsistent with agitated delirium, correct?

12           MS. SHAFAIE:   Foundation.

13       **A**    No.   It's absolutely consistent with it.

14   You can have normal body temperature and have

15   agitated delirium.

16       **Q**    (By Mr. Floyd) And was there any acidic

17   blood -- any signs of acidic blood?

18       **A**    Acidosis.   I'm sure he's got acidosis.   He

19   had arrested.   He would have gotten acidosis after

20   that.

21       **Q**    Have you ever diagnosed a cause of death as

22   v-fib from a TASER?

23       **A**    I saw one case where I was reasonably

24   convinced or I think that the TASER probably did it,

25   although there are problems with that particular

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                          March 8, 2016

Page 129

1    case, so I'm not entirely sure that it has.  I

2    wouldn't go to the wall and say it had to have been

3    that, but there is one that is pretty suspicious.

4        Q   So we can say there is one case that you

5    believe more likely than not?

6        A   Yeah, I'm pretty suspicious.  I don't think

7    it more likely than not even, but I'm pretty

8    suspicious that it was.

9        Q   What percentage of excited delirium deaths

10   show a v-fib, result in v-fib?

11       A   Don't know.  It's a small percentage, but I

12   don't know what the number is.  I'm kind of looking

13   into that.  Starting to look into that now.

14       Q   Pretty rare, correct?

15       A   It's uncommon.  I don't know if I would go

16   rare, but it's uncommon.

17       Q   Rare is what you used earlier?

18       A   But yeah, I think I said uncommon.  I think

19   you used rare.

20       Q   Can you point me to the cardiac findings

21   that led to your diagnosis that there was left

22   ventricular --

23       A   Ventricular hypertrophy?

24       Q   Yes.

25       A   Yeah, it's a 400 gram heart and he weighs

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 130

1    134 pounds.

2       Q    We talked about that before, but you're just

3    doing it on the mass of the heart?

4       A    Yes.

5       Q    And I thought maybe I've read some of your

6    writings before, maybe I'm mistaken on this, but do

7    you believe that African Americans as a general

8    population have a tendency to have enlarged hearts

9    more so than other portions of the population?

10      A    Because hypertension is more common in the

11   African American population, yes, but I don't think

12   there is any evidence that he has hypertension, but

13   I can't exclude that.

14      Q    But you agree that African Americans have a

15   higher rate of enlarged heart than other risks?

16      A    Everything else being equal, I'm not sure

17   that that's true.

18      Q    I thought that was maybe in some of the

19   literature.

20              Are you saying it's not?

21      A    No.  I think -- are you sure you're not

22   talking about agitated delirium --

23      Q    No.

24      A    -- because I've certainly written that.  No,

25   I don't remember saying that African Americans

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 131

1    having larger hearts, everything else being equal.

2        **Q**    Because of high blood pressure?

3        **A**    Yeah, if you're in a hypertensive -- if

4    you're looking at including hypertensive hearts,

5    yeah, then they would because hypertension is more

6    common in the black population, but excluding that

7    and just taking all the parameters being equal

8    among, you know, Caucasian and African American, I

9    wouldn't expect that.

10       **Q**    Because African Americans have a higher

11   incidence of hypertension?

12       **A**    Yes.

13       **Q**    And hypertension is one of those kind of

14   silent things that many people have and they don't

15   know they have it, right?

16       **A**    Probably not at that age so much but older,

17   yes.

18       **Q**    And I know you're leading back to that

19   statement earlier and we're both going there and I

20   believe that the statement that your writings

21   previously that the African American population has

22   a higher incidence of enlarged heart, that supports

23   the idea that you never know what condition

24   somebody's heart is in when you tase them, and

25   officers can never know exactly what underlying

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                      March 8, 2016

Page 132

1    conditions a subject may or may not have?

2           MS. SHAFAIE:  Form and foundation.

3     **A**    That's true.

4     **Q**    Those are all the questions I have.

5           MR. DOWD:  I don't have any.

6           MR. JOHNSON:  No questions.  Thank you, sir.

7           VIDEOGRAPHER:  This concludes the deposition

8    of Michael Graham.  We are off the record at 4:44.

9    This ends disc two.

10                          (Exhibit 4 was marked for

11                          identification by the court

12                          reporter.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 133

```
 1        I, Linda DeBisschop, duly commissioned,

 2   qualified and authorized to administer oaths and to

 3   certify to depositions, do hereby certify that

 4   pursuant to Notice in the civil cause now pending

 5   and undetermined in the United States District

 6   Court, State of Missouri, to be used in the trial of

 7   said cause in said court, I was attended at the

 8   offices of St. Louis University, 1402 South Grand,

 9   St. Louis, Missouri, 63104, by the aforesaid

10   attorneys; on the 8th day of March, 2016.

11        The said witness, being of sound mind and being

12   by me first carefully examined and duly cautioned

13   and sworn to testify the truth, the whole truth, and

14   nothing but the truth in the case aforesaid,

15   thereupon testified as is shown in the foregoing

16   transcript, said testimony being by me reported in

17   shorthand and caused to be transcribed into

18   typewriting, and that the foregoing pages correctly

19   set forth the testimony of the aforementioned

20   witness, together with the questions propounded by

21   counsel and remarks and objections of counsel

22   thereto, and is in all respects a full, true,

23   correct and complete transcript of the questions

24   propounded to and the answers given by said witness;

25   that signature of the deponent was waived by
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 134

1    agreement of counsel.

2        I further certify that I am not of counsel or

3    attorney for either of the parties to said suit, not

4    related to nor interested in any of the parties or

5    their attorneys.

6

7    Dated this 13th of March, 2016.

8

9

10                _____

11                Linda DeBisschop, CSR, CCR,
                  Illinois CSR No. 084.004741
                  Missouri CCR No. 779

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                      March 8, 2016

```
                                                   Page 135

 1   COURT MEMO

 2

 3

 4

 5   Tina Moore vs. Brian Kaminski, et al.

 6

 7

 8   CERTIFICATE OF OFFICER AND

 9   STATEMENT OF DEPOSITION CHARGES

10

11   DEPOSITION OF Michael Graham, M.D.

12

13   3/8/2016

14   Name and address of person or firm having custody of

15   the original transcript:

16

17   Dowd & Dowd

18   211 North Broadway, Suite 4050

19   St. Louis, MO 63101

20

21

22

23

24

25
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                                March 8, 2016

```
                                                        Page 136

 1   ORIGINAL TRANSCRIPT TAXED IN FAVOR OF:

 2

 3   Dowd & Dowd

 4   211 North Broadway, Suite 4050

 5   St. Louis, MO 63101

 6   Total:

 7   1 ONE COPY - TAXED IN FAVOR OF:

 8

 9   Pitzer Snodgrass

10   100 South Fourth Street, Suite 400

11   St. Louis, MO 63102

12   Total:

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 137

1   Upon delivery of transcripts, the above

2   charges had not been paid.  It is anticipated

3   that all charges will be paid in the normal course

4   of business.

5   GORE PERRY GATEWAY & LIPA REPORTING COMPANY

6   515 Olive Street, Suite 700

7   St. Louis, Missouri 63101

8   IN WITNESS WHEREOF, I have hereunto set

9   STATEMENT OF DEPOSITION CHARGES

10  my hand and seal on this _____ day of _____

11  Commission expires

12  _____

13  Notary Public

14

15

16

17

18

19

20

21

22

23

24

25

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.

March 8, 2016

Page 138

| A | | | | |
|---|---|---|---|---|
| **a-fib---** 45:12 | **add** 44:25 58:22 | 124:3,13 125:7,20 | 130:11 131:8,21 | **approximately** 61:6 |
| **A.D.R** 1:3 2:7 | 96:7 | 126:5,6,11,13 | **Americans** 130:7 | 61:17 76:25 77:19 |
| **a.m** 61:6 | **addition** 8:9 11:9 | 127:8,12,19 | 130:14,25 131:10 | **area** 27:13 32:16 |
| **ability** 43:7 54:9 | 17:7 31:2 127:25 | 128:11,15 130:22 | **amount** 91:16 | 41:24 52:15 61:8 |
| **able** 39:2 71:7 91:9 | **additional** 29:4 | **agitation** 32:13 | **amps** 52:12 | 81:12 88:15 |
| 94:19 | 117:10,12,13 | 120:17 | **analysis** 65:11 | **areas** 81:8,10 |
| **abnormal** 103:19 | **address** 135:14 | **ago** 13:17 35:19 | **anatomic** 114:12 | **argue** 27:4 |
| **abnormalities** | **adhere** 98:21 | 38:25 | 114:13 | **argument** 119:8 |
| 101:9 107:11 | **administer** 48:13 | **agree** 12:5 20:17 | **anatomical** 122:25 | **arguments** 119:24 |
| **abrasion** 53:9,25 | 133:2 | 24:5 25:21 26:21 | 123:3 | **Arizona** 12:22 |
| 93:1 | **administered** 50:22 | 27:10 33:12 34:1 | **anatomy** 22:1 | **arms** 61:14 |
| **absolutely** 124:12 | **advice** 12:16 | 34:9,16,25 35:3 | **animal** 58:6 | **arrangements** |
| 128:13 | **advised** 111:5 | 41:11 46:15 48:19 | **annual** 16:22 | 17:21 |
| **Academic** 50:4 | **adviser** 54:25 | 49:2 52:15 54:6 | **answer** 33:17 34:3 | **arrest** 39:23 98:9 |
| **accepted** 12:24 | **advisory** 11:17 | 54:21 55:18 67:23 | 39:6 41:25 113:7 | **arrest-related** 8:15 |
| 127:3 | 12:8 13:1 50:16 | 75:14,21 79:6 | 118:8 | 12:17 13:18 50:3 |
| **access** 14:1,4,14 | 50:17 98:18 | 81:13 84:22 85:15 | **answers** 133:24 | 97:4,5 98:5 |
| **accompanied** | **affect** 85:8 86:6 | 88:12,23 89:17 | **anterior** 92:15 | **arrested** 128:19 |
| 120:17 | **affidavit** 60:21 | 90:14 96:18 97:10 | **Anthony** 29:20 | **arrests** 33:7 |
| **accompanying** 8:4 | **aforementioned** | 100:1,5 102:12,16 | **anticipated** 137:2 | **arrhythmia** 23:7 |
| 29:23 | 133:19 | 102:21 105:2,13 | **anxiety** 32:13 57:16 | **arrived** 29:11 |
| **accomplish** 80:2 | **aforesaid** 6:23 | 106:5,18,24 | **anybody** 27:4 28:2 | 110:23 111:3 |
| **account** 61:4 | 133:9,14 | 107:15 108:3,15 | 31:3,6 32:3 84:13 | **arteries** 102:15,15 |
| **accuracy** 66:4,10 | **African** 130:7,11 | 113:17 114:8,16 | 89:21 | **article** 26:14,15 |
| **accurate** 65:18,24 | 130:14,25 131:8 | 114:21 115:1,5 | **anymore** 44:1 | 50:2 |
| **acid** 117:19 | 131:10,21 | 116:15 118:20 | **anyway** 116:13 | **articles** 23:16 24:10 |
| **acidic** 128:16,17 | **afternoon** 7:4 | 124:16 125:17 | **Apparently** 12:17 | 24:13,15 25:4,25 |
| **acidosis** 128:18,18 | **age** 6:21 103:17 | 126:12,16 130:14 | **appearance** 49:13 | 37:23 46:23 47:3 |
| 128:19 | 104:19 131:16 | **agreement** 134:1 | **APPEARANCES** | 49:19,22 86:14,15 |
| **acknowledge** 114:5 | **agency** 36:4 | **ahead** 44:22 | 3:1 | 89:10,13 121:2 |
| 118:13 125:12 | **agents** 38:5 | **air** 50:21,24 52:24 | **appeared** 112:10 | **asbestos** 10:5,9,10 |
| **acknowledged** 85:9 | **aggression** 121:7 | **Airport** 61:8 | 112:18 | 10:11,15,22 11:6 |
| **acknowledging** | **agitated** 32:6,7,11 | **al** 1:12 2:15 6:6 | **appears** 62:12 | 11:10 16:24 17:5 |
| 86:6 | 32:20 33:2,9,15 | 135:5 | **apples** 57:9 | 19:1,2,4,5,12 |
| **acquired** 55:5 64:5 | 34:11,19 35:2,9 | **Alan** 29:15 | **applied** 41:10 | **aside** 119:24 |
| **acting** 122:2 | 35:21 36:15 37:15 | **alcohol** 101:1 | **applies** 79:23 | **asked** 7:7 8:12,14 |
| **activated** 61:20,23 | 37:22 38:4,11,14 | **allegation** 19:14 | **apply** 63:10 79:21 | 12:7,14 16:21 |
| **activation** 65:11 | 38:18 39:1,13,18 | **alleged** 10:11 | **approach** 112:17 | 17:1 24:14 28:4 |
| 66:14,15 | 39:21 56:14,17,20 | **allow** 76:19 95:6 | 113:2 | 38:24 56:3 76:14 |
| **activities** 33:14 | 57:14 58:3 59:1,6 | **allowed** 63:9 | **approached** 112:9 | 78:10 101:17 |
| **activity** 109:15 | 97:8,16 114:7 | **ambulance** 101:6 | **appropriate** 105:14 | 103:4 |
| **actual** 68:3 | 117:3 120:11,14 | 110:25 | 105:24,25 | **asking** 8:7 59:5 |
| **acute** 121:17 | 121:3,9 122:7,9 | **amended** 29:16,16 | **appropriately** | 70:10 75:1,4 |
| | 123:3,9,12,16,19 | **American** 24:11 | 105:10 | **aspect** 90:1 |

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.

March 8, 2016

Page 139

**assess** 80:3,19,24 102:24
**associated** 11:19 52:4
**Association** 24:11
**assume** 71:6 72:20 72:24 77:8,10 100:18 102:19 104:16
**assuming** 54:25 61:18 66:13 95:3 107:19 116:24
**asystole** 109:4,6,7 109:16
**atlas** 49:24
**atria** 44:23
**atrial** 42:22 44:14 45:6,8
**attach** 60:21
**attached** 5:13 60:21
**attended** 133:7
**attention** 62:11 64:4 109:21 112:5 112:7
**attorney** 134:3
**attorneys** 8:23 31:7 133:10 134:5
**attributed** 26:13 35:19
**August** 28:7
**authorized** 133:2
**autopsy** 29:12 100:21 127:12,16 127:22
**available** 36:20
**Avenue** 3:7
**average** 51:5 55:1 92:8 95:23
**avoid** 81:7,12,15
**aware** 25:6 56:19 79:10 82:13 83:5

**B**

**back** 10:24 14:21 30:23 35:1,13 38:24,25 57:12 58:13 65:21 70:20 70:20 71:1,3,5,6 76:7 77:2 85:18 109:3,19 112:6,7 120:8 124:1 131:18
**backed** 115:25
**background** 20:25
**Ballard** 29:19 60:3 60:17 61:4 62:5 112:1 119:16
**banging** 111:20
**based** 34:4 75:11 81:14 87:16 112:16 127:23
**basic** 21:19
**basically** 21:6 42:4 42:8,24 43:25 66:20 69:17 73:12 74:16 77:17 78:5 87:21
**basics** 52:18
**basing** 74:18
**basis** 54:21
**bath** 124:3,25
**Baty** 3:6
**beat** 45:23 46:3
**beating** 42:15,19 46:1
**beats** 46:12
**Bebe** 29:19
**began** 75:9
**beginning** 73:8
**behalf** 2:20 10:15 10:21 11:9 13:5 15:21 19:1,4,16 19:22 20:2,8,15 20:18,19
**behavior** 121:4 126:9
**believe** 39:24 75:12

85:8 95:13 108:7 115:18 129:5 130:7 131:20
**believes** 86:19
**better** 37:12 40:9
**beyond** 118:19 122:4,9
**big** 53:21,23 82:1 82:16 95:24 101:13 102:6 103:20
**bigger** 89:6 101:11
**biggest** 105:6
**Bill** 6:11
**bill@dowdlaw.net** 3:25
**billed** 16:5,7,10 30:4
**billing** 7:23 16:12 30:1
**biopsies** 22:11 47:9 49:16
**bit** 7:9 9:13 14:22 17:10 20:18,25 60:12 76:11 78:18 88:17 90:18 110:5
**bizarre** 121:4
**black** 61:8 131:6
**blast** 66:8
**blood** 43:13,19 44:10 45:3,4 106:20,23 107:12 127:6 128:17,17 131:2
**blown** 32:25
**BMI** 86:25
**board** 11:17 12:8 13:2 21:2 50:16 50:17 98:18
**body** 54:10 81:4,9 81:22 86:24 87:7 87:20 88:3 121:10 121:11,11 126:24 128:10,14

**bolt** 78:14
**bones** 83:2
**book** 49:24,25
**bottom** 104:15 105:9
**bouncing** 74:19
**Boy** 20:4
**Boyce-Rice** 29:22
**brain** 45:5 57:16 74:7 121:10 123:11
**Brannan** 29:19
**Brave** 30:11
**break** 45:5 76:4
**breast** 81:9
**breathe** 112:19
**breathing** 111:21 112:10,18,23 113:1,6,11,12 119:10,18
**Brian** 1:12 2:15 6:5 29:18 111:25 135:5
**bring** 18:12 64:4 71:1
**Broadway** 3:23 135:18 136:4
**broken** 19:20
**brought** 18:20 32:23 33:1
**build** 88:16,19
**buildup** 117:19
**built** 11:4 88:20
**buried** 34:18
**burn** 53:4,8,21,23 92:14 93:25
**burned** 53:21
**burning** 53:25
**burns** 73:2
**burst** 69:24
**business** 98:25 137:4
**butchered** 108:9

**C**

**call** 40:25 71:19 126:19
**called** 8:10 28:3 48:9 97:1
**calls** 28:13 61:7
**calm** 57:21
**cancer** 22:11
**capable** 42:14
**capture** 24:17,24 25:5,13,17,18 40:2,3,6,10 49:4,5 92:1,3,4 95:15 106:17 108:8 114:21,23,25 124:23
**captured** 92:5
**captures** 39:25
**capturing** 24:25
**car** 61:12 113:4
**cardia** 24:24
**cardiac** 23:4,5,12 24:6,17,22 25:5,8 25:13,16,18 27:15 31:15 40:2,3 41:2 41:21,23 42:14,15 46:15,18,20 47:21 48:4,13 49:4 91:8 92:3 95:15 106:16 114:21,23 124:23 129:20
**cardiologist** 22:24 22:25 46:20,21 47:21
**cardiologists** 21:14 31:12 46:17
**cardiorespiratory** 39:22
**care** 111:4,16
**career** 9:19
**carefully** 133:12
**carry** 45:9
**cars** 111:20
**case** 6:5,23 7:10,15

Tina Moore v. Brian Kaminski, et al.
Michael Graham, M.D.                                    March 8, 2016

Page 140

8:13 11:14 14:16
15:11,18,19,19
19:9,24 20:5,8
21:14 23:22,23
27:18,19 28:2,18
29:17 30:4,21
31:6,13 32:4 35:8
67:21 72:21 75:21
88:14 92:19
120:20 123:21
128:23 129:1,4
133:14
**cases** 10:5,20 11:2
11:6,11 13:2 14:4
14:5,23,24 15:1,2
15:7,8,9,15,16,20
16:23 17:9 19:1
19:15,21 22:4
23:19,20 25:21,22
26:6,8,9,15 31:24
32:15 33:8 35:1
37:12 54:24 55:2
59:21 80:12 83:25
104:10 106:21
121:14,15,19
122:17,22,23
123:13,16,18
124:2 125:19,20
**categorically**
103:18 125:18
**cath** 48:13
**Caucasian** 131:8
**caught** 62:10,23
**cause** 25:18,19
26:23 27:1,9
38:10,11,12,14
39:14 40:3,10,18
40:21 41:4 46:8
82:14,22,25 83:1
83:3,13,15,23
85:12,20 89:14
91:5 98:2 108:4
108:25 114:9,17
128:21 133:4,7

**caused** 126:7
133:17
**causes** 40:24 43:2,3
43:4 121:11 123:5
**causing** 43:12
83:10,17
**cautioned** 133:12
**cavity** 90:4 93:20
**CCR** 2:24,25
134:10,11
**cells** 21:23
**central** 38:22 92:14
**certain** 123:24
**certainly** 8:19
23:11 27:1 32:16
33:25 35:12,14,15
39:9,14 41:24
45:9 46:6 53:23
55:16,24 58:3
84:23 97:17
130:24
**certificate** 29:12
87:25 135:8
**certified** 21:2 80:8
100:12
**certify** 133:3,3
134:2
**challenge** 103:22
**chambers** 44:24,24
**chance** 14:18
103:19
**change** 21:25 29:5
84:23 126:24
**changed** 43:24
**changes** 85:20
91:19 118:6
**chapter** 49:24
**characteristics**
49:18
**characterized**
32:12 97:6 98:6
**charge** 40:9 41:22
51:19,21,23 52:7
52:8,9,10,11,13

52:21,23 53:20
91:12,16 108:5
115:6
**charged** 61:14
62:13 63:3,12,13
**charges** 63:1 135:9
137:2,3,9
**charging** 16:15
64:4 71:4
**chemical** 57:15
121:10
**chest** 53:5,6,22,24
56:21 57:17 81:9
81:11,19 85:12
88:15,19 89:12,13
89:15 90:2,4,5,6,9
90:10,11,21 92:15
92:21 93:16,19,20
93:21 94:9,21
95:2 100:3,4
115:6,11 116:17
116:21 120:1
**chief** 21:7
**child** 86:24
**chip** 65:13 70:24,25
**Christian** 29:13
110:6,18
**Christine** 59:8,14
59:14 60:18 71:2
**Circuit** 35:1,5,6
**circular** 92:14,25
**circulation** 45:20
**circumstances**
127:24
**City** 3:8 8:17 13:20
15:18 17:17 18:3
**civil** 133:4
**claims** 10:11
**Claudette** 29:21
**Clayton** 3:15
**clear** 38:21 66:4
83:10 84:3 86:5
123:14
**climates** 121:16

**clinically** 127:24
**clock** 65:23 66:5
**clogged** 102:15
**close** 28:11 62:6
82:10,11 92:18
93:19 94:19
108:12 112:11
113:12
**closely** 36:1
**closer** 88:22 89:6
89:16 90:6,6,9,13
90:20 93:20
**clothing** 89:1,3,3
**clots** 45:4
**coagulants** 44:21
**cocaine-induced**
123:8
**Collectively** 39:7
**Collects** 59:21
**come** 16:4 28:17
29:1 33:14 34:10
34:10 51:2 62:17
124:9
**comes** 34:5 67:11
82:10,10
**coming** 72:15 113:4
113:9 126:25
**command** 56:9
**commands** 54:9,16
55:14 56:2 62:18
63:14,16
**comment** 89:9
116:14
**Commission**
137:11
**commissioned**
133:1
**common** 32:20,25
33:3,21 46:8,14
47:19 48:22
109:10 121:5
130:10 131:6
**commonly** 95:18
103:4

**communicate** 36:7
**communicated**
36:14
**communication**
36:10
**community** 127:4
**Comp** 19:8
**company** 4:11
50:15 137:5
**compare** 62:7
**comparing** 57:9
**compensated** 13:1
**compensation** 18:1
18:2
**competent** 27:11
**complaint** 29:16
**complete** 133:23
**completely** 102:18
102:20
**complications**
105:5
**comprehend** 54:9
**compression** 83:2,7
84:1,4
**compromised** 45:7
96:22 97:3
**computer** 65:13
70:23,24
**conceivably** 58:22
**concludes** 25:4
132:7
**conclusion** 55:11
120:10
**condition** 33:25
57:13 131:23
**conditions** 48:2
103:25 132:1
**conduct** 33:13
**conducted** 54:14
**conductive** 79:15
**confirmed** 116:25
**confuse** 84:13
**confusing** 112:3
**conjunction** 100:21

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-14   Filed: 06/01/16   Page: 142 of 158 PageID #: 3029
Tina Moore v. Brian Kaminski, et al.
Michael Graham, M.D.                                                  March 8, 2016

Page 141

**connection** 116:25
**consciousness** 118:16 120:2
**consecutive** 69:23
**consequent** 27:2
**consider** 120:5
**consideration** 14:23 37:11
**considerations** 87:17
**consistent** 128:13
**consolidated** 2:14 29:16
**consult** 15:3
**consultation** 17:18 18:2
**consulted** 31:12,15 32:1,3
**consulting** 10:21 15:20
**contact** 33:14 34:10 62:16 77:8
**contacted** 31:18 60:16 61:3
**contacts** 82:10
**contain** 7:14
**contained** 7:19
**context** 39:16,16
**continuing** 80:4,20
**continuous** 69:21 70:13,14,15,16,17 79:12
**contract** 18:5 42:6 42:25 43:6,12 83:22
**contracting** 42:5
**contraction** 43:2,4 43:9,11 44:3,5 78:3 83:11,12,20 83:21
**contractions** 42:7 74:5,6,8,20 77:24 77:24 82:24 83:1 83:17

**contribute** 59:1 98:2
**conversation** 8:9 8:11
**convinced** 128:24
**convulsions** 73:20 73:24 74:4
**coordinated** 43:4 44:9 45:22 46:3 107:4,6
**copy** 50:8,8 64:10 79:3 110:11 136:7
**core** 81:18,20
**Coroner** 53:10
**coroner's** 14:2
**correct** 8:20 10:12 11:11,15,24 12:8 13:21 16:12 17:9 19:4,13,18 22:8 25:9,12 26:18,19 27:16 35:24 36:8 36:22 37:23 39:3 40:22 41:5,8 43:13,14 44:8,11 45:18,25 47:8 48:2,3 50:16 52:22,25 53:1 55:16 56:4,5,6,14 57:4 58:9 59:6,7 63:4 66:11 67:3 68:7,9 69:1,10 70:23 71:21 73:18 76:2 79:16,18 87:22 89:2 91:2 92:15 95:5,16,19 96:2 100:24 101:10 104:13,19 104:22 107:19 108:4 109:11 113:24 114:7,13 114:20 116:12,17 116:19,22 117:5 117:10 119:4,20 121:23 126:25

127:8,13,20 128:4 128:5,8,11 129:14 133:23
**correctly** 112:11 133:18
**correlation** 78:9
**counsel** 3:1 6:7 125:25 133:21,21 134:1,2
**country** 32:17
**county** 13:24,24 14:2,11 17:17 18:7,7,8,8 31:19 53:10 59:16,23 60:18 71:21
**couple** 15:4 20:16 62:10 113:21 120:9 127:5
**course** 29:6 86:11 137:3
**court** 2:1 6:17 9:24 9:25 38:25 60:25 110:15 111:13 132:11 133:6,7 135:1
**courtroom** 16:18
**courts** 104:11
**cover** 8:4 127:5
**covered** 106:15 116:15
**CPR** 111:5
**created** 43:1
**credentials** 59:24 60:1
**crisis** 97:2
**criteria** 32:22 120:13 122:16
**CSR** 2:24,24 134:10,11
**Cuculich** 29:21,22
**Cuculich's** 29:24
**cuffed** 109:24
**cuffing** 110:1 119:17

**curious** 14:7
**current** 33:4 42:23 50:19 51:21,23 52:9,13 65:20 66:2 77:7 90:22 115:16,18 116:6
**currently** 10:23
**custody** 11:10 17:8 17:11 33:7 35:20 54:24 80:13 135:14
**custody-related** 13:19
**cut** 125:8
**CV** 11:21 20:25 24:3 50:6,7,7
**cycle** 50:20

— **D** —
**daily** 33:14 98:24
**damage** 82:14 83:6
**Dandridge** 29:21
**danger** 45:6
**dangerous** 44:16 45:16 105:2,4 118:11
**dart** 82:15 88:21 89:1,12 90:7,12 90:16,19 91:4 93:4,14,14 95:3
**darts** 89:14 108:12 108:12
**data** 29:15 89:25
**date** 6:2 28:24 29:1
**Dated** 134:7
**dates** 29:7
**day** 2:22 28:20 29:3 41:6,9 119:24 133:10 137:10
**De** 51:24
**deal** 23:6 33:15,25 54:23 72:22 97:1
**dealing** 22:20 33:21 35:2 36:2 83:18

83:19 103:7,8,16 104:1
**death** 8:15 11:11 12:3 15:9,11 25:5 25:16,19 26:10,23 27:1,3,9 29:12 33:7 38:10,12,13 38:14,18 39:1,3 39:15,17,18 46:25 59:21 87:4,10,13 87:24 96:11,15,17 97:18 98:2,5,9 99:13 100:2,6 110:19 111:17 114:10,17,19 119:7 123:5 128:21
**deaths** 12:17 13:19 26:2,3 35:20 36:2 50:3 54:24 80:13 97:4,5 123:13 129:9
**DeBisschop** 2:24 133:1 134:10
**decades** 9:11
**deceased** 54:5
**decedent** 61:5,10 61:12,13,16,16,18 61:21,22,24
**decedents** 22:8,20
**decide** 73:5,7,7,9 119:23
**decided** 73:10 74:15 116:9,10
**decides** 72:12,25
**decision** 72:11 73:1
**deduct** 95:9,10
**deep** 92:23
**deeper** 89:15 90:11 90:16 94:9,12 95:4
**defendants** 1:15 2:17 4:1 6:16 10:22 11:10

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                                    March 8, 2016

Page 142

| | | | | |
|---|---|---|---|---|
| **defending** 8:16 19:16 | **Delores** 1:2 2:6 3:3 6:14 29:20 | 122:13 | 101:15,18 126:15 | **disturbed** 122:10 |
| **defense** 10:9 19:20 19:25 20:23 125:24 | **department** 15:22 19:17,23 20:3,10 20:19 22:14 29:14 | **designated** 15:21 **designed** 76:18 77:25 | **disagreeing** 85:1 **disagrees** 27:16 **disc** 76:9 84:1 | **DIVISION** 2:3 **doctor** 7:4 9:11 23:13 54:23 |
| **defer** 81:2 | 33:24 34:7,14,17 | **details** 71:22 | 132:9 | **doctors** 21:13 23:8 |
| **defibrillate** 109:2,5 | 34:23 36:21 37:13 | **detected** 107:15 | **discharge** 27:3 | 41:18 94:14 |
| **defibrillation** 48:10 | 61:7 110:7 111:4 | **determination** | 39:24 58:20 65:17 | 126:15 |
| **defibrillations** 91:15 | 111:6,7 113:24 114:1 | 74:11 **determine** 64:1 | 65:17 66:1 69:21 69:22 70:3 82:10 | **document** 28:12,13 31:4 97:15 99:3 |
| **define** 46:10 122:6 | **departments** 14:24 | 114:9 | 95:14 108:13 | 99:19 116:18 |
| **definitely** 56:17 | 15:2 32:24 34:13 | **detrimental** 45:8 | 118:3 | **documents** 7:15,16 |
| **definition** 21:25 | 34:14 36:2,12 | **develop** 12:12 38:3 | **discharged** 65:14 | 29:17,23 31:2 |
| 32:21 119:9,11 | 37:3 | **device** 65:22 67:25 | 65:16 | 60:2 96:7,10 |
| **degree** 78:24 90:4 | **depends** 32:21 46:4 | 72:13 77:3 79:15 | **discharges** 50:18 | 119:3 |
| **degrees** 121:12,12 | 46:10 51:19 88:6 | 81:16 | **Disclosures** 29:25 | **doing** 10:18 11:3 |
| **deistic** 121:5 | 91:12 | **devices** 50:5 79:23 | **discuss** 31:24 | 15:5 35:23 50:1 |
| **delirium** 32:6,7,8 | **deployments** 49:17 | **diagnosed** 128:1,7 | **discussed** 40:2 | 87:8 122:14 130:3 |
| 32:11,20 33:2,9 | **deponent** 133:25 | 128:21 | 100:16 | **doors** 111:20 |
| 33:10,15 34:11,19 | **Deposes** 6:24 | **diagnoses** 23:1 | **discusses** 50:4 | **Dopamine** 123:10 |
| 34:19 35:2,9,9,20 | **deposition** 1:17 | **diagnosis** 120:10 | **discussing** 110:7 | **doubt** 9:23 13:16 |
| 35:21 36:15,16 | 2:19 6:4 7:8 | 120:14,21 126:11 | **discussion** 83:8 | 15:4 53:15 |
| 37:15,21,22 38:4 | 30:24 60:22,23 | 126:12,13,18,20 | **disease** 21:19 58:6 | **Douglas** 23:14 |
| 38:11,14,18,20 | 63:8,15 75:5 76:8 | 127:16,23 129:21 | **diseases** 23:2 | **Dowd** 3:21,22,22 |
| 39:2,13,18,21 | 86:3 111:23,25 | **diagnostic** 47:14 | **dispute** 52:19 54:13 | 6:11,11 30:16 |
| 56:18,20 57:14,15 | 112:1 124:16 | **die** 10:11 99:22 | 54:17,20 55:6 | 93:8,11 132:5 |
| 58:4 59:6 97:8,17 | 132:7 135:9,11 | **died** 25:23 39:13 | **disputes** 71:18 | 135:17,17 136:3,3 |
| 107:20 114:7,14 | 137:9 | 114:6,15 118:16 | **disregard** 98:11 | **download** 64:6,10 |
| 120:12,15 121:9 | **depositions** 9:10,17 | 120:2 | 106:1,3 | 65:10,11 68:4 |
| 122:7 123:4,12,16 | 29:18 30:6 96:9 | **difference** 89:5 | **Disregarding** 99:12 | 69:14 75:12 76:24 |
| 123:19 124:3,13 | 133:3 | **different** 44:15 | **disrupt** 43:21 | **dozen** 10:23 |
| 125:8,20 126:5,6 | **depth** 94:4,25 | 45:13,14 56:15 | **disrupted** 43:17 | **Dr** 6:3,4 23:14,25 |
| 126:12,13 127:7,8 | **deputy** 13:23 14:13 | 57:19,24 62:2 | **disruption** 43:20 | 24:15 25:3,14 |
| 127:12,20 128:11 | **describe** 38:17 39:1 | 63:21,24 86:23 | **disrupts** 39:25 | 26:5 27:15 29:21 |
| 128:15 129:9 | 39:3 48:5,11 77:9 | 107:1 | **distance** 91:2 95:23 | 29:22,24 31:18 |
| 130:22 | **described** 53:7 | **difficult** 54:15 | **distances** 91:10 | 38:6,10 76:8 |
| **deliriums** 123:9 | 57:14 71:11 73:18 | 55:13 | **distressed** 97:9,13 | 86:11,13 92:13 |
| **deliver** 48:8 80:15 | 119:17 | **difficulty** 113:11 | 117:3,4 | 101:14 114:17 |
| **delivered** 77:11 | **describes** 50:2 | **direct** 25:20 112:6 | **distributed** 36:24 | **draw** 112:5 |
| 118:15 | 62:24 71:2 119:16 | **directly** 25:11 | **District** 2:1,2 133:5 | **drive** 49:17 |
| **delivering** 91:13 | **describing** 64:3 | 41:11 116:21 | **disturb** 46:11 | **driven** 90:11,16,19 |
| **delivers** 51:5 | **description** 71:13 | **disagree** 25:14,16 | **disturbance** 46:9 | 93:18,24 |
| **delivery** 77:7,13 | **descriptions** 119:19 | 27:11 41:18 54:21 | 46:11 115:2 | **dropping** 90:9 |
| 137:1 | 119:21 122:12,13 | 81:21 85:10 86:11 | **disturbances** 46:7 | 93:19,20 94:21 |
| | | 86:16 91:1 99:8 | 107:2,3 | **drownings** 27:5 |

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                                                March 8, 2016

Page 143

**drug** 123:19
**drug-induced** 124:12
**drugs** 100:25 108:25 125:13
**duly** 6:21 133:1,12
**Dunne** 8:2,12 27:24 31:7
**duration** 65:25 68:20
**durations** 66:14
**dying** 59:2

**E**

**e-mails** 7:18
**earlier** 24:20 74:16 86:2 129:17 131:19
**early** 63:21 104:5
**earn** 17:24
**easier** 79:1 106:2 110:11
**easily** 9:21
**EASTERN** 2:2,3
**easy** 95:20,22
**ECD** 79:8,15,18,20 80:1 81:8 84:13 84:19 86:22 87:1 98:3
**ECDs** 25:4 79:15
**eddies** 45:2
**effect** 57:20,24,25 74:10 91:9 118:4
**effective** 81:17
**effectiveness** 81:16
**effects** 21:21 84:12 84:14,20
**efficient** 78:6,8
**effort** 79:14
**eight** 11:8 26:5,8,9 26:11,12,15,19 92:2
**Eighth** 35:1,5,6
**either** 53:18,24

73:9 95:7 107:12 109:15 125:8 134:3
**elapsed** 70:12
**elderly** 86:24
**electrical** 23:6,9 24:18,21,25 27:6 40:11,13 41:4,7 41:10 42:11,13 43:1,10,12 45:23 48:8,21 50:19 52:16 54:10 73:20 74:20 79:15 82:10 90:22 91:10 106:19 108:3,8 109:15 115:2
**electrically** 48:25
**electricity** 42:20 48:14,14,17 51:18 72:15 74:10 77:10
**electro** 41:23
**electro-physicist** 24:23
**electrocution** 25:20 40:19,21,23,23
**electrocutions** 48:23
**electrode** 82:9
**electronic-contro...** 50:5
**electrons** 40:9
**electrophysiologi...** 48:4
**electrophysiologist** 23:3,4,5,12 24:6 25:9 41:23 46:16 46:18,21 47:22 91:9
**electrophysiologi...** 21:14 27:16 31:16 41:3
**emergency** 32:23
**emotional** 56:14 58:19,23

**emotionally** 97:9 97:13 117:3,4
**employee** 98:19
**employer** 17:16
**EMS** 110:21,22
**encounters** 61:5
**ended** 73:16 74:13 75:7
**ends** 29:3 70:11,19 72:2,7 132:9
**energy** 40:5,8,18 41:4,7,10,13,16 41:19 114:24
**enforcement** 36:25 37:1,8 97:1
**engagement** 7:25 8:1
**enlarged** 102:14 130:8,15 131:22
**entirely** 83:10 85:5 100:25 129:1
**enumerate** 121:2
**epidermis** 54:1
**equal** 130:16 131:1 131:7
**especially** 34:23 83:23
**establishes** 124:14 127:16
**ESTATE** 1:2 2:6
**estimate** 16:22 18:15
**et** 1:12 2:15 6:5 135:5
**evening** 110:18 111:16
**event** 38:22 44:2 62:4 94:18 107:11 128:9
**eventually** 108:17 108:20 118:16
**everybody** 102:19 104:9,10
**evidence** 72:21

73:21 94:17 96:9 97:15 111:24 121:25 125:11,12 125:15 126:21,22 127:17,18,19 130:12
**exactly** 55:24 86:18 120:24 131:25
**EXAMINATION** 5:1 7:2
**examined** 133:12
**examiner** 10:1 13:21,23 14:17 21:7
**examiner's** 31:20 36:11 59:19
**examining** 127:14
**example** 124:2
**excessive** 15:8,13 32:13
**excited** 32:8 33:9 34:19 35:2,8,20 36:15 37:15,21 38:20 46:11 57:14 97:8 107:20 114:14 121:9 123:16,18 127:7 129:9
**exclude** 125:6 126:4 130:13
**excluding** 131:6
**exclusion** 126:13,18 126:20
**exhibit** 5:5,6,7,8 60:20,22,23,24 64:19 76:13,13 79:2,4 96:23 100:17 110:10,14 111:11,12,16 112:6,7 132:10
**Exhibits** 5:4,13
**exogenous** 38:4
**expect** 33:13 34:10 34:14 37:9 48:25

119:13 131:9
**expert** 10:15 15:21 17:14,21 18:13 29:22 52:17 78:22 81:24 84:8 85:4 98:13 116:13
**expertise** 47:23 52:16
**experts** 34:8 54:14 81:2 85:9 89:14 97:25 118:10
**expires** 137:11
**explain** 38:17 40:7 114:18 122:25
**explained** 107:20
**explore** 110:5
**expose** 106:3
**exposed** 19:7
**exposing** 10:10 19:12
**exposure** 10:12 80:4
**exposures** 79:13,15 80:1
**extended** 93:14
**extent** 23:12 37:2 103:23
**extrapolate** 58:7
**eye** 82:7,11,16,18 82:19

**F**

**face** 61:24 117:21
**fact** 8:22 25:8 47:4 71:13 116:20 117:14 125:15
**factor** 44:18
**factors** 90:8 97:4 98:4
**facts** 62:8
**factual** 71:18
**failure** 47:11
**fair** 33:10 36:12,13 44:17 57:21 70:21

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                                      March 8, 2016

Page 144

108:6 120:3
**fairly** 32:24,25
  39:17 104:13
**fall** 89:12
**falling** 71:14 105:6
  105:7
**falls** 90:2
**familiar** 33:9,11
  66:14 68:7 72:9
  72:16 78:20
**family** 20:15 30:8
**far** 13:6 15:13
  20:11 27:6 30:4
  38:25 47:5,13
  53:2 80:11 89:19
  114:11 121:24
**fashion** 42:5 43:8
  107:4,6
**faster** 46:12
**fat** 92:20 94:8
**fatigued** 57:10
**Fatima** 29:15
**FAVOR** 136:1,7
**feature** 122:20
**features** 120:19,20
  126:19
**Federal** 104:11
**fee** 16:19
**fees** 15:24 17:20
  18:13
**feet** 61:19
**fell** 61:16,24
**Ferguson** 8:17
  15:19 29:14 60:16
  61:3,6 111:4,18
  112:7 113:23
**fiber** 42:14
**fibers** 42:4,6,16,17
  42:25 43:5
**fibrillate** 41:15
  92:8 95:21,22,22
  95:25
**fibrillation** 40:4,5
  40:16,19,22 41:1

44:14 45:7,8,10
  92:1
**field** 21:24
**fifteen** 11:22 12:10
**figure** 47:11 52:14
**figures** 17:3 67:19
**file** 7:12,19,23
  14:14 30:2 31:1
**filed** 8:23,23,23
  16:8
**files** 14:1
**Finally** 118:13
**find** 101:19 111:3
  120:14 121:17
**finding** 53:16
**findings** 101:15
  121:9 129:20
**fine** 57:11 114:4
**finger** 39:11 94:9
  126:23
**finish** 44:22 87:15
  118:1,2 124:6,7,7
**finished** 113:22,22
**fires** 27:5
**firing** 29:15
**firm** 3:14 135:14
**first** 6:21 8:3,4
  26:25 28:1,17
  29:16 35:8 50:19
  52:21 59:13 60:8
  61:2,11 62:11,16
  63:12,17 64:21
  67:24 69:15 70:11
  70:18 79:11 85:18
  99:15,19,21
  108:23 133:12
**fists** 61:15 111:20
**fit** 68:25
**five** 61:17 66:8,20
  66:24 68:21 69:7
  69:9 72:4,6 73:12
  91:5 93:9 117:22
**five-second** 69:24
  70:3 72:7 74:16

75:2,24
**flammables** 105:8
**flat** 89:12 90:2,17
  109:7,17,20
**floating** 66:6
**flopping** 74:2
**flowing** 66:2
**Floyd** 3:13,14 5:2
  6:9,9 7:3,6 20:24
  33:20 34:4,9,16
  34:25 35:7 36:7
  37:5,10,18 38:1
  55:11 56:13 61:2
  76:10 85:15 87:14
  93:15,25 98:1
  99:8,10,25 105:11
  105:19,25 106:11
  110:17 111:15
  113:16 115:18,22
  116:8 117:9 118:7
  119:2 120:9
  128:16
**focus** 81:11
**focusing** 15:1 84:16
**folder** 7:14
**folks** 98:25
**follow** 99:6,21
**follow-up** 112:12
**following** 25:23
  61:4
**follows** 6:25 12:3
**followup** 28:16
**force** 15:8,13 63:10
  81:3 82:4 105:14
  105:18,22,23
**forcible** 97:19
  103:6
**forcibly** 39:21
**foregoing** 133:15
  133:18
**forensic** 12:15
  15:11 50:4 59:9
  59:17 60:19 71:20
**forever** 21:6

**form** 20:21 34:2
  37:16 55:8 56:11
  64:7 74:24 75:15
  75:20 81:1 85:14
  87:11 93:22 99:7
  99:23 102:22
  104:20 105:16
  113:14 115:14
  118:23 125:3
  127:1,9 132:2
**formalized** 58:4
**formally** 49:10
**formula** 87:21
**formulating** 78:23
**forth** 63:19 133:19
**forward** 90:18
**found** 26:5,9,12
  48:20 49:3 61:10
  121:18
**foundation** 33:16
  34:2 35:4 36:3,23
  37:6,16 64:7
  74:24 75:20 81:1
  85:14 87:11 93:22
  97:24 99:7 102:22
  104:20 105:16
  113:14 115:14,20
  116:5 117:6
  118:23 127:9
  128:12 132:2
**four** 51:17 57:18
  58:16 69:25 70:6
  70:9 91:6 108:16
  116:20 117:15
  118:15 119:25
**fourth** 4:4 75:22,23
  109:25 136:10
**fracture** 83:2
**fractures** 83:3,8
  84:1,4 117:17
**frequency** 10:18,20
  34:4
**fresh** 49:18
**friend** 1:3 2:7

104:17
**full** 32:25 37:23
  49:25 94:4 133:22
**fully** 97:6 98:6
**function** 45:1 46:24
  46:25 47:3,5
**functions** 47:5
**further** 33:23 90:20
  91:10 134:2
**furthest** 118:21

### G

**gap** 50:21,24 52:24
  63:17,18
**Gateway** 4:11
  137:5
**geez** 9:21
**general** 13:19 23:11
  47:20 98:8 103:1
  130:7
**generally** 32:17
  78:22 90:16 103:8
  121:2
**generate** 17:20
**generated** 8:20
**generation** 42:20
**generators** 51:25
**gentleman** 74:19
**getting** 10:4 14:21
  43:18 44:10 46:11
  52:2 55:20 58:13
  61:11 64:3 75:23
  88:15 117:21,22
**give** 35:8 39:14
  41:16 50:8 60:10
  63:10 78:7 80:20
  91:21 97:23 98:7
  118:25 119:14
**given** 9:18 13:8
  62:4 63:21 85:11
  96:6 97:11 133:24
**gives** 60:15 65:3
  112:25
**giving** 7:10 75:16

Tina Moore v. Brian Kaminski, et al.
Michael Graham, M.D.                                          March 8, 2016

Page 145

84:19 108:24
**glanced** 9:7 30:7
**glory** 61:13
**gloss** 9:8
**go** 13:4 14:15 17:21
  30:23 35:1 40:4
  41:4 44:22 45:5
  51:14 58:13 59:12
  69:11 75:22 81:16
  84:9,15 85:4,18
  86:4,20 96:6,20
  118:18 120:24
  122:9 129:2,15
**God** 61:12,13
**goes** 42:23 69:9
  83:1 87:1 116:4
  122:4
**going** 7:10 10:24
  11:13 21:13 26:1
  46:20 47:12 52:19
  55:17,20,24 57:15
  57:19,23,25 60:13
  64:18 67:25 69:19
  70:6 73:10,11
  74:10 75:8,9 79:2
  82:16 88:13,18
  89:1 93:16 98:20
  99:6 103:10,17,18
  106:2,3,4 116:14
  124:16 131:19
**gonna** 33:22
**good** 7:4 18:21 29:9
  39:8 58:11 61:13
  77:8 116:24
**Google** 37:21
**Gore** 4:11 137:5
**gotten** 80:11 116:3
  128:19
**government's** 88:8
**Graaff** 51:24
**grab** 51:8
**graduate** 23:25
**Graham** 1:18 2:19
  6:3,4,20 76:8

132:8 135:11
**grain** 123:23
**gram** 129:25
**grams** 102:6
**Grand** 2:21 133:8
**great** 22:19 104:25
  105:9,11
**ground** 61:17,21
  62:25 71:3 73:17
  73:19 74:3,9,19
  93:18 95:5 111:5
**grounded** 127:3
**guess** 64:20 65:8
  68:13 82:4 83:15
  88:6 96:21 110:10
**guessing** 94:12
**gun** 65:14
**guy** 63:12 71:17
  73:16 88:2,7 89:5
  89:6 101:25
  125:13
**guys** 60:22 103:11
  103:21

---

**H**

**hair** 52:1
**half** 18:22,23 67:4
  67:24 93:11,16
**hand** 64:18 137:10
**handcuffing** 113:5
  113:10
**handle** 15:8
**handled** 11:6,10
**handles** 25:12
**handling** 19:21
**hands** 61:15 62:17
  64:11
**Hang** 87:15
**happen** 89:19
**happened** 26:11
  63:5 71:15 75:13
**happens** 28:11
  44:14 83:9 104:18
**hard** 113:15 122:6

**hardened** 102:15
**harmful** 51:18
**Harvard** 23:25
**hazard** 81:5 82:7
**hazards** 81:23
**head** 20:6 27:4
  34:18 81:9 105:7
**headquarters**
  12:20
**healing** 49:18
**health** 60:18 79:8
  102:24 111:16
**healthy** 44:25
  57:10,21 102:20
  103:6,9,21 104:6
  104:6,7
**hear** 11:13 21:13
  21:22 63:25 118:7
**heard** 23:13 34:18
  44:6 52:4 61:12
  78:16 83:25 89:24
  113:6,10 128:3
**heart** 14:9 23:2,7
  23:10 24:11,18,20
  24:25 27:7 39:25
  40:3,11,16,18
  41:4,8,11,15
  42:10,16,17,19
  43:2,2,3,5,10,12
  43:18 44:10,15,24
  45:1,8,23 46:1,3,6
  46:9,12,24 47:1,3
  47:7,9,10,15,17
  48:2,6,9,11,14,15
  48:17,20,21 49:3
  57:17 84:16,21
  85:8,12,20 86:7
  88:16,22 89:6,16
  90:3,5,9,12,18,20
  90:23,25 91:5,9
  91:19 92:18 93:19
  94:6,20,21 95:6
  95:23,23 96:2,3
  101:12,24 102:11

102:21 103:2,25
  106:20,22 107:4,5
  107:7,16 108:12
  108:15 115:1
  116:21 129:25
  130:3,15 131:22
  131:24
**heart's** 106:19,25
  108:8
**hearts** 102:14
  130:8 131:1,4
**heat** 121:12,22
**heck** 89:4
**height** 87:22
**heights** 105:7
**help** 64:23
**Hennequin** 61:8
**hereunto** 137:8
**herniations** 84:1
**hey** 124:25
**Hi** 7:5
**high** 53:13 121:20
  131:2
**higher** 10:25 87:3,9
  130:15 131:10,22
**higher-risk** 86:20
**highlight** 110:12
**highlighted** 60:6,7
  78:25 79:1,11
  82:8 96:25 111:17
  112:3
**highly** 58:21
**hired** 19:2 27:18,19
  113:23,25
**histories** 62:3 63:25
**history** 62:2,3,12
  63:21,22 71:19
  118:22
**hit** 57:17 64:22
  71:3,24
**hitting** 105:6
**hold** 14:5 26:23
**Holm** 3:6
**hospital** 29:13

101:7 110:6,18
**hot** 40:12
**hour** 16:1
**hours** 2:23 30:5
**House** 51:14
**hub** 53:9 92:16
  93:1 94:2
**huge** 91:15
**human** 21:23 22:2
  41:15 48:6,11
  91:7 92:5
**humans** 39:10
  95:19 96:2
**hundred** 18:16
  51:17
**hundreds** 10:3
  25:22 26:5
**hurt** 52:2
**hurts** 51:22
**hypertension**
  130:10,12 131:5
  131:11,13
**hypertensive** 131:3
  131:4
**hyperthermia**
  32:15 120:18
  122:1,18,22
**hyperthermic**
  121:21
**hypertrophy**
  129:23
**hypothermia**
  122:17

---

**I**

**Ida** 4:2 6:15
**idea** 9:5 24:2 35:5
  35:10 37:25 111:2
  131:23
**identification**
  60:25 110:15
  111:13 132:11
**identified** 108:18
  125:10

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-14   Filed: 06/01/16   Page: 147 of 158 PageID #: 3034
Tina Moore v. Brian Kaminski, et al.
Michael Graham, M.D.                                                      March 8, 2016

Page 146

**identify** 6:7
**Illinois** 2:24 134:11
**illness** 128:2
**import** 45:9
**importance** 84:10
**important** 54:2,3,4
  79:8 84:6 85:7
  99:20 102:11
  108:23 112:24
**impossible** 33:13
**impression** 115:24
**inappropriately**
  121:3
**inch** 92:4,19,22
  93:12,16
**inches** 93:8,10
**incidence** 131:11
  131:22
**incident** 12:3
**incidents** 97:22
**include** 15:16 16:3
  84:14,21 97:6
  98:6
**included** 31:4
  79:24
**includes** 18:1
**including** 9:25
  82:12 83:2 131:4
**income** 17:8
**inconsistent** 128:11
**incoordination**
  46:5
**incorporate** 81:17
**increase** 87:12 97:5
  98:5 102:2
**increased** 96:11
  97:21 100:1,5
**increases** 90:21
  96:16 117:10
**independent** 36:4
**index** 5:1,4 86:25
  87:8,21 88:3
**indicate** 24:21 33:5
  58:17 66:5 69:20

**70**:22 89:25 94:1
  95:15 115:16
**indicated** 14:8
  15:24 24:20 92:12
  102:1,5
**indicates** 25:4 65:9
  68:18 69:21 82:24
**individual** 17:4
  26:22 34:15 55:12
  57:20,21 86:1
  89:11 100:2
  105:15 123:21
**individual's** 106:1
**individualized**
  58:21
**INDIVIDUALLY**
  1:1 2:5
**individuals** 10:10
  33:1 58:22 97:2
  97:18
**induce** 40:10 41:19
  108:13 114:25
**induced** 32:17 49:1
  123:19
**infirmed** 86:24
**influence** 125:13
  126:3
**information** 29:5
  36:20 59:21 66:9
  74:21 79:9 99:13
  112:25 114:11
**ingestion** 124:3
**ingredients** 122:15
**initial** 109:1
**initiating** 80:4,20
**injuries** 27:2,4
**injury** 15:12 21:20
  49:14 81:10 82:7
  82:12 87:4,10
  96:17 98:2 99:14
  100:2,6 117:10,13
  118:12
**innate** 43:7
**inside** 90:4 95:1

**instructions** 99:21
**instructor** 100:13
**insult** 40:12,13
  48:21 115:2
**integral** 22:3
**intentionally** 81:8
  81:15
**intercostal** 92:21
**interested** 109:1
  134:4
**interferes** 40:15
**interfering** 45:22
  46:2 90:23
**intermittent** 32:13
  120:16
**internal** 23:1 65:23
  121:11
**International** 11:14
  11:15,20,23 12:1
  12:19 30:20 50:13
  52:20 64:19 79:6
  85:11
**Internist** 47:19
**interpret** 68:9
**Interrogatories**
  6:25
**intersection** 61:11
**interval** 75:2
**intervention** 45:21
**intoxicated** 20:13
**investigating** 22:21
**investigator** 59:9
  59:15,17,18 60:19
**investigator's**
  71:20
**investigators** 36:5
**involuntary** 83:16
  83:18
**involve** 15:10,12
  104:12
**involved** 8:12 9:10
  12:1 14:16 23:20
  33:6,7 103:5
**involvement** 16:23

**55**:2 66:13
**involving** 14:23
  49:11 80:12
**irrelevant** 53:17
**irresponsible**
  102:18
**issue** 48:24 82:2
  116:9 124:24
**issues** 64:22 80:11
**item** 110:11

―――――――
**J**
**January** 38:2
**jar** 43:6
**Jason** 1:2 2:6 50:10
**Jefferson** 13:23
  18:7,8
**Jesus** 61:13
**job** 20:13 59:25
  98:25 106:2
**Johnson** 3:5 6:13
  6:13 132:6
**Johnston** 4:10
**Jon** 29:19
**Journal** 24:11
**journals** 24:13
**jury** 11:13 42:3
  63:25 103:23
  109:7 115:24
  118:7 119:23
  123:1
**justification** 63:11
**justifies** 87:3,9,19

―――――――
**K**
**K-E-I-M** 60:19
**Kaminski** 6:5
  15:19 29:18 63:2
  63:8 66:23 72:25
  73:22 80:7 100:12
  111:25 116:25
  118:14
**Kaminski's** 62:14
**Kaminski** 1:12

**2**:15 31:9 62:24
  78:10 135:5
**Kansas** 3:8
**keep** 7:21 29:7
**keeps** 65:13
**Keim** 59:9,14 60:18
  71:2
**kept** 69:18
**kids** 51:25
**killed** 123:15
**kills** 38:21
**kind** 9:8 11:3 23:7
  30:8 44:6 47:17
  57:8 58:15 59:24
  60:6,7 89:8
  108:25 113:15
  120:24 122:5
  124:21 129:12
  131:13
**kinds** 46:6
**knew** 8:16,19 55:20
  55:24 80:8
**knocked** 43:23
  106:19
**knocks** 62:25
**know** 9:4,7,13,21
  11:14 13:5,5
  14:22 19:19 21:15
  23:21,23 24:12,13
  24:22 26:7,8,10
  27:12,13 28:8
  30:7,8,11,15
  31:10,23 33:18,19
  35:6,13 36:24,25
  37:1,8,9,10 39:4
  41:20 43:6 45:24
  46:14,16,22 47:9
  49:23 50:18 51:3
  51:13 53:2,7
  55:23 57:8 59:10
  59:13,14,24 60:1
  60:20,22 63:10
  64:1,5,20 66:12
  68:5,9,11,16 72:6

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                                    March 8, 2016

Page 147

77:5 79:10 80:11
81:14 82:5 83:7,8
83:10,11 88:10,11
88:12,18 89:24
91:3,16 92:7,9,10
92:23 93:3,5,23
96:8 98:24 100:10
102:14 103:3,15
104:16,18 106:2,9
109:21 110:11,24
114:2,20 115:7,15
116:2 117:23
119:5,6,25 120:19
121:24 122:6,7
124:11,18,22
125:18 126:17,22
126:24 128:1,3
129:11,12,15
131:8,15,18,23,25
**Knowing** 37:10
**knowledgable**
37:14
**knowledge** 55:1,5
**known** 24:8 38:23
**knows** 89:21
105:19

**L**

**L** 3:13
**lab** 48:13
**laboratory** 39:8
123:10
**lack** 107:8,9 121:4
**lacks** 107:11
**Lactic** 117:19
**large** 34:13,13
94:18 102:5
**larger** 131:1
**lasted** 61:17
**latest** 115:10
**laundry** 98:7
**law** 3:14 36:25 37:1
37:8 63:9 96:25
**lawful** 6:21 80:2

**lawyer** 30:14
**lay** 42:9
**layer** 89:1
**laying** 90:5,17
94:20
**layman's** 43:16
108:10
**lead** 45:23 46:5,7
114:21,23 115:2
**leading** 131:18
**learn** 7:8
**leave** 34:8 116:8
**lecture** 13:12,13
**lectured** 36:18
**lectures** 13:8
**led** 129:21
**left** 53:21 92:15
102:2,8 129:21
**leg** 57:12
**legal** 9:8,10,13,16
10:4 14:21 16:23
17:14,15 37:12
63:11
**legitimate** 82:5
**let's** 14:22 21:24
30:23 33:22 52:8
58:13 60:6,15
65:7 66:4,23 68:3
72:24 78:25 89:7
120:24
**lethal** 45:18,19,21
**letter** 7:25 8:1,4,5,9
**letting** 9:14
**level** 33:2 36:10
41:19 80:3,19
**liability** 19:8
**Lidocaine** 101:2,5
**Lieutenant** 60:17
61:4 112:1
**life** 30:8
**ligaments** 83:4
**lightening** 48:24
**likelihood** 81:19
88:20 90:22

**limited** 84:15
**Linda** 2:24 133:1
134:10
**line** 68:12,18
104:15 105:9
109:8,17,20 112:4
112:13,20 113:8
**Lipa** 4:11 137:5
**list** 8:6 31:4 49:21
49:23 50:6 98:7
120:22,25
**listed** 31:3 50:6
84:2 87:25 99:20
**literature** 33:4
36:25 37:1,2,4,8,9
41:21 50:25 51:6
52:20,25 89:23
90:3 118:5 130:19
**litigation** 10:24
12:2
**little** 7:9 9:13 14:22
17:10 20:23,24
51:25 53:25 60:11
63:20 67:6 69:13
76:11 78:18 90:18
**live** 16:18
**living** 47:13 71:18
**load** 26:22 54:16
55:12 56:10 64:24
64:25 70:12 71:8
72:7 73:15,16
74:19 75:17,18,19
76:12 77:1,6
80:20,25 109:25
116:24 117:12,13
**loads** 80:15 116:21
118:11,15 120:1
**local** 19:23 20:2,9
**locked** 73:16
**locking** 71:14
**log** 65:11
**logistics** 7:20
**logs** 66:15
**long** 11:19 13:17

28:7 65:15,25
68:11,20 72:2
76:22 77:5 87:25
93:3,10,16 118:17
120:23
**longer** 42:5 95:8
107:4 120:25
**longhorn** 78:14
**look** 7:12 9:1 11:2
11:12,21 21:20
22:5,16 32:23
37:8 47:9 51:13
56:12 57:11 60:8
60:10 64:21 67:21
68:3,24 70:7
99:18 101:17,20
102:10 104:6
110:6 113:19
114:10,10 116:6
120:18 123:10
124:10 125:19,23
126:18 129:13
**looked** 24:3 49:16
76:14 88:5 112:22
121:18 125:22
**looking** 21:23
31:24 37:4 39:15
51:21 64:17 69:14
76:24 77:16 79:4
80:10 92:7,9,12
127:21 129:12
131:4
**looks** 8:5 53:24
69:22
**loose** 17:11
**loss** 82:12
**lost** 118:16 120:2
**lot** 12:18 45:1 55:1
62:15 68:14 84:9
85:4 89:4 111:7
112:3 123:18
**lots** 43:21 107:1
**Louis** 2:20,21 3:16
3:24 4:5,13 13:21

13:24 14:2,11
17:16,17,17,25
18:4,7,8,10 21:4
31:19 53:10 59:23
60:18 71:21 133:8
133:9 135:19
136:5,11 137:7
**low** 86:24 87:7,20
88:4
**lower** 81:17
**lowest** 80:1
**lying** 111:5

**M**

**M** 3:5
**M.D** 1:18 2:19 6:20
135:11
**machine** 77:9
**Madison** 3:7
**Magic** 51:14
**main** 64:25
**majority** 22:19
27:7 32:16 104:4
**making** 55:21
90:11 126:11
**male** 61:8
**management** 29:17
**mandatory** 33:8
**manipulating**
95:25
**manner** 41:16
**manufactured**
50:12
**manufacturers**
10:9,16 19:2,4,5
**manufactures**
11:23
**March** 1:23 2:22
6:2 133:10 134:7
**mark** 3:13 6:9 7:6
53:4,21,23 110:10
111:10,24
**mark@thefloydl...**
3:18

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                                    March 8, 2016

Page 148

marked 60:20,24
   64:18 110:14
   111:12 120:16
   132:10
markedly 121:3
marker 114:12,13
markers 122:25
   123:3
marks 94:1
Martinelli 29:23
mass 86:25 87:8,21
   88:3 130:3
material 28:19,22
   125:19
materials 8:4,6,7
   13:12,15 15:25
   28:8 29:8 100:10
math 18:21 67:20
   94:23
matter 25:12 29:2
   109:22 125:8
   126:4,7
matters 29:3
   108:22
Matthew 29:19
maximum 83:12,22
mean 8:14,19 9:9
   9:22 10:23 11:1
   13:4 14:15 18:1
   20:11,12 22:10
   26:5,12 28:6,19
   33:24 34:16 36:4
   37:7 40:17 41:20
   43:5 44:18 45:25
   46:10 47:4 53:12
   53:17,19 55:16,19
   57:5 59:15 67:2
   67:21 71:5 73:6
   74:7 83:20 85:6
   88:2 89:3 91:13
   92:19 94:12 95:10
   98:15 102:8 103:9
   103:20 105:8
   106:8 118:19,20

119:9 120:22
   121:1 122:8,18,20
   123:2 124:15
   126:1 127:14
mean,my 116:3
means 43:16 61:19
   70:17 93:1 94:2
   123:7
measure 72:10,15
   77:3,4,6,7
measured 92:20
measurement 95:1
measurements
   94:19
mechanical 27:2
mechanism 38:18
   38:20 39:1,3 48:5
   114:18,20
mediated 38:22
medical 10:1,4
   13:21 14:1,17
   16:4 17:15 21:7
   24:1 29:13 31:20
   36:11 37:2,4,9
   59:18 127:4
medically 74:7
medicine 2:21 23:1
meetings 13:6
members 87:2
MEMO 135:1
mental 128:2,7
mention 32:5 51:23
   88:11 107:21
mentioned 18:25
   31:23 122:24
metabolic 38:22
   84:12,14,20 118:4
metabolically 96:22
   97:3
metabolically-co...
   96:15
Miami 121:17
Michael 1:18 2:19
   6:3,4,20 29:18

76:8 132:8 135:11
microcoulombs
   52:10 91:17,19
microscope 49:14
microscopic 53:12
Mid-'80s 10:17
middle 61:10
Mike 30:11
mildly 57:10
millimeters 90:25
   91:5,21,25 92:6,9
   92:11,20 93:2
   94:1,5,6,22,22
   95:11,16,24 102:9
million 18:22,23
   51:15,23 52:1
millisecond 67:12
milliseconds 66:16
mind 63:7 133:11
mine 18:19
minimize 79:14
   80:14
Minimized 79:12
minor 1:4 2:8 46:19
minus 94:24
minute 110:3
   118:14,17,18,19
   118:20,25 119:22
   120:2,4
minutes 110:24
mis-describe 74:7
missing 122:15
Missouri 2:2,22,25
   133:6,9 134:11
   137:7
mistake 53:11
mistaken 130:6
MO 3:8,16,24 4:5
   4:13 135:19 136:5
   136:11
mode 42:21
model 39:8 58:6
moderate 82:25
modulated 42:22

money 18:12
monitor 48:20 49:3
   107:16
Moore 1:1,2,3 2:5,6
   2:7 3:3,12,20 6:5
   6:10,12,14 7:7
   14:9 27:19 29:20
   29:20 39:12 50:10
   62:13,15,16,19,25
   63:1,3,12 64:3
   66:24 71:3,7
   73:19 75:6,9
   76:25 87:24
   100:11,22 104:12
   109:24,24 110:1,2
   110:8 112:9,9,17
   113:10 114:6
   116:20 117:4
   118:15,16 119:25
   120:11 121:20
   135:5
Moore's 53:5
   108:15 110:19
move 65:7 71:23
   90:3,18 99:25
moved 90:20
moves 90:5
moving 74:9 79:9
multiple 63:16 75:6
   75:7 97:20 99:4
   100:6
municipal 34:13
muscle 42:4,6,14
   42:16,17 43:5
   44:4 77:24 82:23
   82:25 83:11,12,16
   83:19,21,22 92:21
muscles 81:18,20
   83:3,19 117:16
muscular 74:5,6
myocardium 42:10
   42:12,16,24
   101:10

N

naked 88:25 111:6
   111:19
name 7:6 12:17
   20:5,7 31:19 38:6
   49:25,25 135:14
named 23:13
   121:17
narrative 64:8
nature 21:19
near 82:18 83:11
   88:16
necessarily 45:24
   55:15 106:21
necessary 41:19
   105:15,17,20
   106:11,14
need 43:9 72:25
   79:3 81:15 103:24
   120:13
needed 40:5,6
   105:23
needs 59:25 63:25
   74:22
negative 100:25
   123:22 124:9
   125:5,20,21
neither 54:1
nerve 78:6
nerves 78:1
never 26:25 28:15
   28:25 37:25 39:14
   56:24 57:2 58:5
   85:19 89:18 97:21
   105:13 114:13
   127:25 131:23,25
nevertheless 67:13
night 62:4
nodded 68:16
node 42:22
non-cocaine 123:13
   123:13
non-death 15:16
non-perfusing 92:6

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                                    March 8, 2016

Page 149

**normal** 85:25,25
  88:4 101:24
  103:17,18 128:14
  137:3
**normally** 47:5
  125:23
**North** 3:23 135:18
  136:4
**Northwest** 111:15
**notably** 58:20
**Notary** 137:13
**note** 109:23
**noted** 92:13
**notes** 28:21,24
  62:14 64:12,12,13
  64:14 68:6
**Notice** 133:4
**noticed** 110:1
  112:22
**nude** 61:8
**nudity** 121:5
**number** 21:5 60:23
  79:14 80:1,14,14
  80:16,18 90:10
  91:21 129:12
**numbers** 56:2
  67:19
**numerous** 61:7
**Numrich** 3:6

**O**

**oaths** 133:2
**Object** 20:21 55:8
  64:7 93:22 97:24
**objection** 33:16
  34:6,12,21 37:24
  85:17 99:9 105:3
  105:21 113:18
**objections** 106:7
  133:21
**objective** 126:21
  127:18
**objectively** 80:1
**objectives** 80:2

**observations** 127:2
**obtain** 36:21
**obviously** 28:6 36:5
  82:21 91:14 106:8
**occasionally** 32:18
  106:10
**occasions** 99:5
**occur** 21:20 107:2
**occurred** 27:3
**occurs** 89:20
  106:18,24
**October** 28:6
**odds** 67:19
**offer** 12:16
**office** 6:3 14:3
  31:20 36:11 59:16
  59:19
**officer** 8:17 15:22
  19:17,23 20:3,9
  20:13,20 31:9
  33:13,22 34:15
  60:3 61:11,14,15
  61:20,20,23,23
  62:5,13,14,16,24
  63:7 66:23 72:10
  72:25 78:10 80:7
  100:12 102:19
  105:14,17 106:1
  109:24 111:19
  112:23 113:3,4,9
  135:8
**officers** 14:24 15:2
  31:11 36:14 37:14
  61:5,9 62:6 98:10
  100:15 103:4,9,24
  104:16,24 106:8
  112:9,17 113:6
  114:1 131:25
**offices** 133:8
**oftentimes** 10:11
**Oh** 9:21,25 15:4
  20:11 30:17 31:10
  31:21 45:17 52:12
  73:14 92:4,19

108:22 116:13
**okay** 14:25 15:24
  16:11,21 17:7,20
  17:24 18:6,10,15
  18:24 19:15 25:25
  26:17 27:10 29:10
  32:11 37:18 40:11
  40:14 42:2,18
  43:15 44:2,14
  48:16,19 50:9
  51:11 53:4 54:4
  56:7,25 59:4,8,12
  59:20,22 60:9,14
  61:2 62:1,8,9,10
  62:23 63:7 64:16
  64:17 65:7 66:12
  66:22 67:16,23
  68:3,11,17 69:8
  71:1,23 72:19,20
  75:22 76:4,21,24
  77:18 78:18 79:3
  79:9,25 80:7 81:4
  81:10 82:3,23
  85:6,21,23 86:14
  86:20 87:4 92:23
  96:5,20 98:14
  99:2,17 100:5,20
  101:18 102:1,12
  104:24 106:16,24
  107:5,9 108:3,15
  108:19 109:23
  111:3,23 112:13
  112:15 113:2,21
  114:4 115:22
  116:8 117:2,9
  118:12 120:9
  121:8 123:6,21
  127:11,25
**old** 103:10,11,20
  122:5
**older** 66:2 103:7
  104:12 131:16
**Olive** 4:12 137:6
**once** 13:10 70:3

71:24 75:23
  106:22 108:24
  117:21 126:6
**oncology** 22:14
**one-on-one** 78:2
**One-tenth** 51:10
**ones** 22:6 23:17
  76:1
**opinion** 23:23 27:8
  29:5 39:15
**opinions** 7:9 15:14
  28:17 29:11
  118:11
**opposed** 26:24
**oral** 6:24
**oranges** 57:9
**orbit** 82:21
**order** 16:9 29:17
  47:23,24 96:10
  120:14
**ordering** 47:13
**orders** 75:17
**organized** 42:5,7
  42:19 43:8,9,11
**original** 135:15
  136:1
**Otto** 3:6
**outlet** 51:9,12
  52:11
**output** 65:22 69:22
**outside** 17:16
**overall** 102:24

**P**

**P.C** 3:6,14,22 4:3
**p.m** 2:23,23
**paced** 48:6,11
**pacemaker** 104:18
**pacing** 91:14
**page** 8:3 58:16
  60:12 61:2 64:21
  65:8,8 68:4 79:9
  82:7,24 99:11
  112:4,13,20

**pages** 65:9 112:6
  133:18
**paid** 137:2,3
**pain** 58:21
**paragraph** 58:18
**paramedic** 110:25
**parameters** 40:17
  118:4 131:7
**paranoia** 32:17
  120:17
**paranoid** 57:16
**Pardon** 59:12
**parking** 62:15
  68:13 111:7
**part** 13:6 22:3
  25:16 36:6 42:13
  44:15 81:5,11,22
  84:15,25 90:15
  101:5 112:24
**particular** 24:13
  39:17 65:20 67:21
  107:10 128:25
**particularly** 53:17
  56:13
**parties** 134:3,4
**parts** 30:10
**passes** 42:23
**pathological**
  126:22
**pathologist** 21:2,2
  21:17 39:11 71:17
  114:5
**pathologists** 12:15
  22:16
**pathology** 14:9
  15:11 21:10,18,22
  21:25 22:1,4,7,11
  22:15 39:12 50:4
  114:6 126:22
**patient** 111:4,5,6,8
  111:8,19,20
  127:23
**patients** 47:7,10,10
  47:13 58:4

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                                    March 8, 2016

Page 150

| | | | | |
|---|---|---|---|---|
| **Patrick** 30:15 | **perspective** 55:19 | 66:21 85:10 86:21 | **power** 13:11,13 | 95:8 99:4 101:3 |
| **patrol** 61:12 | **perturbation** 38:23 | 114:12,14 115:17 | 29:24,24 40:8 | 107:19 108:9 |
| **pay** 13:4 109:21 | **Peter** 8:16 27:24 | 124:14 129:20 | **powerful** 53:20 | 116:23 120:22 |
| **pays** 59:22 | 31:7 | **points** 13:11 | 108:7 | 128:24 131:16 |
| **peak** 64:24,25 | **petition** 16:8 | **police** 8:17 11:10 | **practice** 86:9 | **probe** 49:17 82:9 |
| **peculiarly** 122:3 | **phase** 64:25 | 14:24,24 15:1,2 | **practices** 21:18 | 89:5 92:16,23 |
| **peer-reviewed** | **philosophy** 106:5 | 15:21,22 17:8,11 | **pre-existing** 81:10 | 93:3,6,9,15,23 |
| 46:23 47:2 | **phone** 8:10 28:14 | 19:15,17,17,23,23 | 128:1 | 94:18,20 95:12 |
| **pending** 133:4 | **photograph** 53:14 | 20:2,3,9,9,19,20 | **pregnant** 86:23 | **probes** 53:5 66:3 |
| **penetrate** 89:15 | **photographs** 29:17 | 29:14 31:11 32:24 | **premises** 19:8 | 77:14 |
| 95:4 | **phrase** 82:6 | 33:2,7,13,24 34:7 | **preparation** 30:24 | **problem** 82:17 |
| **people** 12:2 19:7 | **physical** 126:21 | 34:8,13,17,23 | **prepared** 33:25 | 85:13 |
| 21:21 22:15 25:22 | 127:17,18,19 | 35:20 36:1,5,6,12 | **preparing** 102:20 | **problems** 47:7,12 |
| 27:12 32:23 38:3 | **physician** 21:18 | 36:14,21 37:3,13 | **present** 22:4 58:23 | 47:12,15,18,20 |
| 38:21 55:21 56:20 | **physicians** 22:5 | 37:14 54:14,24 | **presentation** 29:24 | 66:10 82:22 |
| 59:6 86:23 88:14 | 26:24 27:11 32:2 | 60:16 61:3,6 | 29:25 | 102:14 119:18 |
| 89:9 98:8 102:13 | **physicist** 52:18 | 62:21 80:12 | **presented** 63:23 | 128:25 |
| 103:6,8 104:1,4 | **physics** 52:16 | 102:19 103:4,23 | **president** 30:19 | **process** 57:15 58:6 |
| 104:12 105:5 | **physiologic** 84:14 | 104:16,24 110:7 | **press** 94:8,9 | 58:7 |
| 106:9 131:14 | **physiological** 84:11 | 111:4,6,7,19 | **pressed** 95:4 | **processing** 74:21 |
| **percent** 17:22,23 | 84:20 96:14 | 113:23 | **pressure** 94:7 131:2 | **produce** 84:13,20 |
| 18:12,18,23 83:13 | **physiologically** | **polls** 57:8 | **Presumably** 50:14 | **produced** 79:5 |
| 83:22 121:19 | 96:21 97:2 | **population** 86:21 | **pretty** 11:7 19:20 | **produces** 42:11,13 |
| 122:23 | **physiologist** 24:23 | 103:3,7 130:8,9 | 20:22 25:17 28:10 | 50:23 52:21 |
| **percentage** 18:11 | **pick** 124:8 | 130:11 131:6,21 | 33:3 34:17 41:20 | **producing** 121:10 |
| 20:17 129:9,11 | **piece** 39:12 | **populations** 87:2 | 76:1 102:6 108:1 | **product** 79:8 |
| **perform** 48:1 | **pig** 92:5,8 95:23 | 87:18 | 122:12,14 129:3,6 | **products** 95:18 |
| **performed** 49:11 | 96:1,2,3 | **pornography** 122:5 | 129:7,14 | **professor** 17:25 |
| 100:21 | **pigs** 91:23 95:18,20 | **portion** 60:11,12 | **prevent** 89:1 | 21:10 |
| **period** 67:11 77:3 | 95:24 | 81:5 111:17 112:2 | **previously** 131:21 | **progress** 111:5 |
| 112:11 | **Pitzer** 4:3 27:20,21 | **portions** 130:9 | **primarily** 10:8 19:1 | **prominent** 27:15 |
| **Peripherally** 59:15 | 113:25 136:9 | **position** 26:21,23 | 23:6 38:22 | **promotional** 78:13 |
| **permanent** 82:12 | **plaintiff** 3:12,20 | 90:21 | **prior** 34:23 64:8 | **prong** 90:10 |
| **Perry** 4:11 137:5 | 19:20,22 20:2,8 | **possibility** 125:6 | 100:11 128:1,9 | **proposition** 56:8 |
| **person** 19:11 44:19 | 20:18 | 126:4 | **probability** 103:15 | 58:2 |
| 50:22 55:1 57:10 | **Plaintiff's** 29:25 | **possible** 59:3 78:6 | **probably** 8:10,18 | **propounded** 6:25 |
| 65:20 96:12,22 | 64:18 | 81:7 83:12 87:3 | 9:1 11:7,8 15:6 | 133:20,24 |
| 109:10 135:14 | **Plaintiffs** 1:7 2:10 | **potential** 103:5,24 | 17:2 20:23 32:7 | **protection** 99:11 |
| **person's** 42:9 54:8 | 2:20 3:3 | 104:3,4 | 34:15,22 40:9 | **providing** 10:14 |
| **persona** 55:19 | **pleadings** 8:22,24 | **potentially** 57:20 | 47:19,20,25 59:10 | **provocation** 62:12 |
| **PERSONAL** 1:1 | 9:2 16:6,7 | 75:2 86:3 88:21 | 68:21,23 69:1,11 | **proximity** 62:6 |
| 2:5 | **please** 6:8,18 | **pound** 101:25 | 69:12 77:16 81:5 | 82:11 90:12 92:18 |
| **personnel** 97:1 | **point** 13:13 14:7 | **pounds** 88:2 101:12 | 83:12 89:4,9,10 | 113:12 |
| **persons** 96:15 | 29:24 55:6 58:13 | 102:7 130:1 | 89:22 90:24 91:6 | **psychosis** 32:6,19 |

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-14   Filed: 06/01/16   Page: 152 of 158 PageID #: 3039
Tina Moore v. Brian Kaminski, et al.
Michael Graham, M.D.                                                    March 8, 2016

Page 151

38:1,15,19 39:13
107:21 114:7
120:11 123:3
125:9 127:8 128:8
**psychotic** 38:3
**public** 103:2
137:13
**published** 24:10,12
49:19
**pull** 30:2 70:2
72:11,12,14,25
73:5,10,11 74:11
74:22 75:3 121:1
**pulled** 61:15 65:23
69:25 70:1,6 77:5
**pulse** 25:1 42:11,13
43:1,10,12 50:20
51:7 65:3 73:20
76:14 77:25 78:3
91:10 108:8
109:13,14
**pulses** 51:3 65:3,6
76:15,18,23 77:18
77:23 78:7
**pump** 43:3
**pumped** 43:19
**pumping** 106:20,23
107:4,6,12
**pumps** 43:13
**punched** 117:21,22
**puncture** 92:14
**pursuant** 133:4
**put** 7:17 39:11 43:6
62:17 64:11 84:7
94:7 96:8 104:18
109:5 126:23

**Q**
**qualified** 26:6,8,20
26:24 133:2
**quality** 53:14
**quarter** 30:5
**question** 37:18
41:25 55:4 59:5

107:18 112:13
118:1
**questioning** 113:8
**questions** 5:2 120:9
132:4,6 133:20,23
**quite** 20:18 21:5
**quivering** 43:18
44:7
**quivers** 42:8
**quote** 112:8
**quotes** 112:11

**R**
**rapid** 57:18 70:20
120:1
**rare** 108:1 129:14
129:16,17,19
**rarely** 25:18
**raspy** 112:10,17
113:6,10
**rate** 10:25 16:10
65:3 76:15 77:25
84:16,21,23
130:15
**reacted** 62:19
**reaction** 72:13
80:24
**read** 8:5,8 23:16
24:14 25:25 30:6
30:10 44:5 52:3
54:8 56:1 59:8
60:8 86:14,15,18
89:7,10,13,22
90:3 99:3,4
100:11,14 104:11
110:12 112:2,11
121:8 130:5
**reading** 60:17
110:19
**readings** 102:4
**real** 37:3 45:6
**realistic** 63:24
**realistically** 67:14
68:21

**reality** 121:4 126:2
**realize** 103:1
104:25
**really** 9:15 30:9
37:20 39:7 44:15
48:24 50:1 53:8
65:9 81:18 83:9
84:4 87:8 89:20
95:21 97:21
103:20 108:23
109:22 113:20
122:2 126:4,7
**reason** 29:2 53:15
54:13,17,20 87:15
**reasonable** 79:13
80:2
**reasonably** 105:19
128:23
**recall** 8:11 16:25
17:3 23:22 60:5
**received** 61:7 77:19
116:20
**receiving** 44:23
54:10 101:6
109:25
**receptors** 123:11
**Recess** 76:6 120:7
**recognize** 97:17
**recognized** 35:12
35:14 90:17 105:8
**recommend** 12:16
**record** 6:1,8 65:14
68:15 76:5,7
85:23 86:5,6
110:17 120:6,8
128:4 132:8
**recorded** 66:15
**records** 7:23 14:2
16:4 29:13,14
30:1 60:18 128:6
**recounting** 62:5
**referenced** 88:17
**referencing** 95:14
**referring** 38:2

79:21
**reflects** 51:6
**regard** 41:2 120:10
**regarding** 49:22
100:16 104:11
**related** 7:15,20
23:17 26:4,9,20
39:18 41:11 42:20
46:24,25 47:3
59:4 84:4,21
97:19 107:6 124:3
125:9 134:4
**relates** 22:1
**relationship** 12:12
77:23
**relative** 84:10
**relaxed** 57:10
**release** 70:5
**released** 69:23 70:8
**relevant** 53:22 55:3
**reliably** 120:21
**remarks** 133:21
**remember** 20:4
49:25 52:14 62:20
63:2 88:1 115:12
130:25
**Renee** 1:3 2:7 3:3
6:14 29:20
**repeat** 56:3
**repeated** 79:12
118:3
**reply** 6:24
**report** 8:20 14:8
16:11 29:13 32:6
38:2 58:14,15,17
59:8 62:21 71:16
71:20 88:17 91:20
91:22 92:12
100:20,25 107:22
109:23 110:21,22
111:18 112:8
**reported** 38:10
109:24 133:16
**reporter** 6:18 61:1

110:16 111:14
132:12
**reporting** 4:11 61:7
137:5
**reports** 29:22
**represent** 114:3
**REPRESENTAT...**
1:2 2:6
**representatives**
30:21
**representing** 6:9,11
6:13,15 7:7
**requires** 98:21
**resistance** 80:3,19
**respects** 133:22
**responded** 61:9
**response** 24:18
58:19,20
**responsible** 19:12
37:5
**restores** 48:9
**restrained** 39:21
**restraint** 97:19
**result** 25:5 29:3
37:22 40:16 82:11
99:13 129:10
**results** 74:9
**resuscitating**
108:24
**resuscitation** 101:3
101:8
**revenue** 16:22
**review** 8:15 9:2,6
13:2 14:18 28:4
68:5 113:21
**reviewed** 7:16 8:6
8:22,24 26:8,19
28:19,21 29:8,10
31:1 122:21
**reviewing** 10:21
16:3,6,7
**rhythm** 24:25
39:25 40:15 43:11
43:17,21,22,23,23

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 152

43:25 45:22 46:6
46:9,13 47:18
48:6,9,12,20,25
49:3 84:16,22,24
84:25 85:8,13,20
86:7 90:23 91:10
91:19 106:19,25
107:1,3,7,8,9,12
107:13 108:9,18
108:23,23 109:1
115:1
**rhythmic** 42:7,19
**rhythms** 92:6
108:25
**Rice** 29:21
**Rick** 30:16,17
**right** 12:11 14:12
15:18 19:21 25:25
30:3 32:5 36:2
38:15 41:16 54:19
56:12 64:15 65:2
69:3 70:5,7 77:25
81:25 83:17 88:22
92:16 99:10
101:22,23 102:16
111:9 115:15,22
119:1,6 131:15
**rigorous** 37:3
**risk** 44:18 87:3,9
87:13 96:11,15,17
100:2,6 117:9,13
117:14 118:12
**risking** 117:16
**risks** 106:4 130:15
**risky** 117:22
**Road** 3:15 61:9
**Rodgers** 1:3 2:7 3:4
6:14 29:20
**role** 19:16
**Ron** 29:22
**round** 67:8,25
**rounded** 66:15 67:5
**rounding** 67:11
68:23

**routine** 124:8
127:15,22
**rule** 29:25 124:12
125:1
**running** 37:13 61:9
111:6,19

---

### S

**S** 2:21
**Sabharwal** 31:19
31:21,22 38:6,7,8
38:10 92:13
101:14 114:17
**safe** 106:9
**safety** 79:8 95:19
95:20 98:16 99:11
99:12 106:1,3
**salary** 17:24 18:3,6
18:10
**salt** 123:23
**salts** 124:4,25
**samples** 127:7
**sand** 34:18
**save** 96:10
**saw** 62:14 64:13
112:19 122:22
128:23
**saying** 26:10 46:2
63:3 73:14,15
98:10 115:15
124:16 126:2,3
130:20,25
**says** 6:24 28:14
50:25 52:20 60:16
63:4,15 65:8 66:5
66:7,7,24,25
68:22 71:4 72:18
76:15 81:7,12,22
83:15 84:13 86:22
86:24 87:14,17,18
96:25 98:4 110:20
**scenario** 101:18
**scene** 111:3 113:3
**scheduling** 16:8

**Schilling** 29:15
**School** 2:21 24:1
**science** 56:12 85:5
94:13
**scientific** 50:17
56:5 81:25 98:18
**screen** 37:22
123:22
**screening** 124:8
**screens** 124:9
**seal** 137:10
**second** 58:18 60:10
63:14,18,18 65:4
65:6 66:8,16,22
66:25 67:1,4,5,6
67:15,16,17,18,19
67:24,25 68:1
69:16,21 70:12,19
71:23,24 72:1,2,3
72:6,6,8,9,18 73:2
73:3,3,4,6,8,9
74:12,12,14 75:24
76:16,19,23 78:7
79:9 80:23,24
**secondary** 20:14
38:15,18 39:13
**seconds** 61:18 66:8
66:20,21 67:9
68:21,22,25 69:7
69:9,9,12,12,13
69:25 70:6,9 72:4
73:13 76:25 77:16
77:17,19 110:1
118:14 120:2,5
**section** 60:7 79:11
**security** 20:14
**see** 7:25 14:8 30:1
48:22 49:17 51:24
52:8 54:18 55:9
55:10 60:4,6,15
63:23 64:16 78:25
80:5,21 84:17
87:10 93:6 94:3
97:12 99:15

107:24 108:18
110:9 116:6 122:6
122:8
**seeing** 47:13
**seen** 20:25 32:18
44:6 53:12,13
62:14 64:5,6
78:12 89:23,24
91:23 115:21,23
122:16 124:2
125:19
**seizure** 74:8
**seminars** 20:16
**send** 28:8
**sending** 8:6 13:6
**sensitive** 81:4,8,22
**sent** 9:3,4 16:8
**sentence** 58:18
87:17 112:8
**sequence** 65:14
70:8 75:1 106:20
106:25
**sequential** 69:17
**serious** 82:12 87:4
87:10 98:2 99:13
**set** 82:6 133:19
137:8
**setting** 32:18
**seven** 30:5 38:25
39:5
**Shafaie** 4:2 6:15,15
20:21 33:16 34:2
34:6,12,21 35:4
36:3,23 37:6,16
37:24 44:22 55:8
56:11 64:7 74:24
75:15,20 81:1
85:14,17 87:11
93:22 97:24 99:7
99:9,23 102:22
104:20 105:3,16
105:21 106:7
113:14,18 115:14
115:20 116:5

**117:6** 118:2,23
124:6 125:3 127:1
127:9 128:12
132:2
**shafaie@pspclaw...**
4:7
**shaking** 73:19
**Shannon** 29:21
**shared** 125:24
**shock** 48:8 54:10
108:4
**shoot** 85:12 106:9
**shorter** 41:1
**shorthand** 133:17
**shortly** 39:22
**shot** 20:14 88:19,21
89:11 97:20
**show** 94:13 118:5
119:3 120:16
127:7,18 129:10
**showed** 101:4
116:18 127:19
**showing** 121:3
128:6
**shown** 25:18,19
27:8 86:1,9 89:18
90:15 94:11 96:19
97:21 133:15
**shows** 39:20 68:5
114:14 128:4
**Shurn** 29:15
**sic** 62:16
**side** 9:16
**signature** 48:20
133:25
**signed** 114:18
**significance** 101:16
**significant** 101:9
101:15,19 118:6
**signs** 39:20 128:17
**silent** 131:14
**simultaneous** 79:13
80:17
**single** 117:14

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                         March 8, 2016

Page 153

**sinoatrial** 42:21
**sinus** 48:6,12
**sir** 112:5 132:6
**sit** 20:7 54:19
**sits** 42:8
**situation** 33:15
  64:3 78:2 87:3,9
  87:19 102:24
  107:25 117:8
**situations** 10:5
  34:11 105:1,1
**six** 51:11,17 66:25
  68:22,24 69:9
  95:23
**size** 86:1
**skin** 53:21 92:17,20
  92:24
**skinny** 88:2,7 89:5
**skip** 86:23
**skipping** 106:16
**slash** 33:7
**slides** 14:9,19 21:23
  53:13 101:17,20
  127:6
**slight** 88:16,19
**slightly** 93:11 102:5
**small** 34:23 86:24
  104:3 129:11
**Smith** 30:15,16,17
**SNLJ** 2:12,13
**Snodgrass** 4:3
  27:20,21 113:25
  136:9
**solves** 71:17
**somebody** 20:14
  28:13 39:15,20
  45:7 46:18 63:10
  63:10 77:5 87:7
  88:15 90:2 91:18
  102:6 103:16
  114:15 117:15
  121:3 122:9
  123:15
**somebody's** 80:24

82:16 87:22
  102:24 131:24
**somewhat** 45:19
**soon** 111:21 119:10
  119:11
**sophistication**
  47:24
**sorry** 28:7 52:9,12
  111:25
**sort** 59:4
**sound** 112:10,18,21
  133:11
**source** 16:12
**South** 4:4 133:8
  136:10
**sparked** 68:13
**spasming** 43:18
**speak** 13:5 30:23
**spec** 76:22 77:3
**specialist** 47:17
**specialized** 123:9
**specialty** 22:25
  25:11 41:24
**specifically** 124:10
  125:22
**specifications** 65:2
**specs** 65:5 76:19
**spectacular** 122:8
**speculating** 116:11
**speculation** 116:10
**spike** 25:20
**spoke** 31:18
**spoken** 30:20 31:3
  31:6,9,10,22
**spot** 88:22
**sprains** 83:14
**St** 2:20,21 3:16,24
  4:5,13 13:21,24
  14:2,11 17:16,17
  17:17,25 18:4,7,8
  18:10 21:4 31:19
  53:10 59:23 60:17
  71:21 133:8,9
  135:19 136:5,11

137:7
**stand** 71:7
**standing** 62:15
  119:17
**standpoint** 48:5
  81:25
**stands** 52:1 56:8
**start** 10:14 69:4
  73:5 108:24
**started** 7:11 24:21
  61:19,22 70:7
  71:4 74:13 113:12
  119:18
**starting** 11:3
  129:13
**starts** 69:8 70:12,19
  72:7,14
**stasis** 45:2
**state** 56:14,15,20
  59:1 83:1 91:20
  97:7,9 98:1 99:16
  99:19 111:18
  133:6
**stated** 7:6
**statement** 33:10
  36:12,13 44:17
  55:7 57:22 58:14
  60:15 66:5 70:21
  71:2 80:10,13
  85:18 86:12,16
  96:21 98:8 110:6
  112:16 113:17
  120:3 131:19,20
  135:9 137:9
**statements** 29:14
  55:21 56:1 60:2,4
  62:7 96:11
**states** 24:8 26:15
  26:17 53:1 79:13
  97:7 99:4 110:22
  133:5
**stating** 100:24
**statistics** 88:8
**stay** 9:15 63:14,15

63:16 75:8,8
**stayed** 61:24
**steady** 11:7
**step** 33:23
**sternum** 95:7
**Steve** 4:10
**stick** 82:15 94:9
**stimulants** 32:18
**stimulate** 78:1,5
**stimulating** 81:20
**stimulation** 27:6
**stimulus** 24:19
**stood** 61:19
**stop** 69:18 112:10
  112:18
**stopped** 69:20
  111:21 113:1
  119:10
**stories** 37:23
**story** 122:5
**straightforward**
  25:17
**strains** 83:23
**street** 4:4,12 61:9
  136:10 137:6
**streets** 102:13
**strength** 103:6
**stress** 58:23
**stretch** 118:19,21
**stretched** 83:24
**strict** 32:22 78:8
**strike** 96:12
**striking** 53:9
**stroke** 44:19
**strong** 82:25
**stronger** 40:6
  115:19 116:4
**studied** 27:13 118:5
**studies** 49:11,13
  54:8,14,18 55:9
  56:19,22,25 57:8
  58:1,10 72:10
  95:14 123:8
  124:17 127:11

**study** 21:19 39:9,9
  49:17 57:2,24
  58:3,4 72:16
  100:21 125:5
**stuff** 9:8 28:15 30:9
  66:2 79:1 89:22
**subject** 25:12 97:18
  98:8 132:1
**subject's** 80:3,19
**subjects** 117:3
**subspecialty** 23:1
**substance** 7:21
  125:9
**substances** 125:22
**substantial** 44:18
**succession** 57:18
  70:20 120:1
**sudden** 46:25 97:18
  98:9 119:6,7
**suddenly** 119:3,12
  119:13,14
**sue** 12:2
**sued** 10:10 19:3,11
  20:2,9
**suffering** 120:11
**sufficient** 46:5
**suggest** 113:9,11
  125:16
**suggesting** 26:14
  51:17 58:16,25
  75:11 115:25
  124:22
**suggestion** 82:20
**suing** 19:23
**suit** 134:3
**Suite** 3:7,15,23 4:4
  4:12 135:18 136:4
  136:10 137:6
**supply** 40:18 41:13
**support** 85:5 94:17
  113:16 114:6
  124:17 125:12
  127:12
**supports** 39:12

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                    March 8, 2016

Page 154

131:22
**suppose** 14:5 22:10
  62:4
**sure** 7:13 11:16,25
  15:17 25:25 30:3
  36:9 41:17 46:17
  51:1 53:8 55:15
  63:22 74:18 76:4
  82:16 83:10,14
  84:25 96:3 104:21
  128:18 129:1
  130:16,21
**surgeries** 48:1
**surprised** 91:8,18
**susceptibilities**
  103:2
**susceptibility** 97:5
  98:5
**susceptible** 97:3
  103:2
**suspect** 71:19
**suspicious** 101:23
  129:3,6,8
**sustained** 26:22
  119:25
**sustaining** 58:20
**swear** 6:18
**sweating** 121:23,25
**swine** 95:16
**swinging** 61:14
**sworn** 6:21 133:13
**synchronized** 65:24
**syndrome** 32:12,25
  121:16,17
**system** 23:7,9

**T**

**T** 3:21
**table** 88:6
**take** 7:8,11 13:5
  33:23 43:5 57:9
  57:13 64:21 68:3
  76:4 78:7 118:20
  118:25 123:23

**taken** 2:19 6:4 13:3
  76:6 120:7
**takes** 40:8 41:22
**talk** 9:8,14 14:22
  20:24 21:24 32:7
  32:8 42:2 57:7
  62:1 76:11 78:18
  82:23 97:25 98:25
  120:12
**talked** 24:22 28:1
  30:8 50:16 60:16
  61:3 71:25 106:16
  130:2
**talking** 45:11 53:19
  55:10,22,23 65:10
  82:4 91:16 124:23
  124:25 130:22
**talks** 79:10 81:4
  86:22
**tall** 88:1
**tape** 78:13
**targeting** 81:8,19
**tase** 25:23 57:11,16
  63:12,14,17 66:9
  66:25,25 67:1,24
  67:25 68:20 69:4
  69:5,6,8,15,16
  70:11,11,18 71:24
  72:2,3 73:3,4,8
  74:12 75:7,22,23
  75:24 88:14
  102:20 113:13
  117:10,15 131:24
**tased** 25:22 56:16
  56:21 57:12,12
  61:16 63:13 71:3
  75:8,9,10 96:16
  100:2,4,6 108:16
  110:7,8 111:7,21
  115:10 117:4
**TASER** 11:13,15
  11:19,23,24 12:1
  12:7,16,19 14:23
  23:23 25:18 26:10

26:20,22,22,25
  27:2 29:15,18
  30:14,19,20 39:24
  49:13 50:9,10,12
  50:18 52:7,20
  53:5 54:11,16,25
  55:12 56:10,21
  58:20 61:16,17,20
  61:23 64:6,10,17
  64:19 66:13 75:12
  76:12,15 78:13,19
  78:20,23 79:6,18
  79:19,21 80:8
  81:21,22 82:9,13
  83:17 84:6,19
  85:8,11,19 86:6
  87:5,7 90:22 96:6
  96:16 97:11,20
  98:15,15,17,19,21
  98:21,24 99:5
  100:12,16 108:7
  109:25 115:5,25
  116:16,20 117:2
  118:3,15 119:25
  128:22,24
**TASER's** 85:2
**TASER-involved**
  26:2
**tasered** 55:17,20,22
**TASERs** 13:18
  23:18 25:5 26:4
  49:9,12,22 52:5
  104:11
**tases** 62:24 66:23
  66:24 67:4 71:6
  75:25
**tasing** 12:3 59:6
  78:14 100:11
  105:5 113:1
  115:11 116:17
  117:2
**TAXED** 136:1,7
**tearing** 117:16
**tears** 83:3

**technology** 65:21
**teens** 104:5
**tell** 11:1 21:17
  24:17 27:25 28:20
  29:10 42:3 49:15
  59:20 65:19,21
  66:1,19 67:22
  76:25 101:20
  113:15,20 117:23
  123:11,14
**telling** 32:2 74:22
  103:23
**tells** 42:24
**temperature**
  121:11 128:10,14
**temporally** 26:3
  97:19
**ten** 11:8,21 12:10
  66:16
**tendency** 130:8
**tendons** 83:4
**term** 40:9 44:6
**terms** 43:16 108:10
**test** 56:5 58:12
  95:18 125:1
  127:10
**tested** 55:25 87:18
  89:19 101:4
  123:24,25 124:1
  125:7
**testified** 9:24 10:5
  10:8 20:1,8,15
  23:19 35:13,15
  54:14 63:8 68:14
  73:22 80:7,12
  85:7 95:13 100:9
  133:15
**testify** 6:22 133:13
**testifying** 11:9 19:3
  19:16,22 20:18
  37:12
**testimony** 10:15
  16:14,14,18 19:1
  34:5 35:8 91:4

133:16,19
**tests** 47:14 59:5
**Texas** 78:14
**Thank** 6:17 132:6
**theoretic** 87:16
**theoretically** 14:15
  27:9 67:13 74:15
  76:23 85:20 86:2
  86:8,10 89:18
**theorize** 58:9 94:16
**theorized** 94:14
**Theorizing** 58:11
**theory** 94:14
  124:18 125:24
  126:1,24
**therapy** 45:20
**thereabouts** 120:4
**thereto** 133:22
**thin** 89:3,3
**thing** 32:10 39:16
  62:23 99:16,19,21
  113:19 119:24
**things** 22:11 45:5
  45:13,14 46:8
  48:23 58:8 62:10
  83:14 84:9 85:4
  89:8 91:24 98:7
  106:8,13 113:21
  120:22 123:24
  124:24 127:5
  131:14
**think** 7:20 8:14 9:7
  9:17 12:11 13:10
  15:23 17:14 19:24
  19:25 20:13,22
  23:21,22,24 24:14
  24:21 25:17 26:4
  26:5 27:3,7 28:10
  28:10 31:8 32:10
  32:21 42:1 51:5
  52:12 53:10,13
  63:24 64:12,13
  65:5 68:10 69:2
  72:22 76:18,23

Case: 4:14-cv-01443-SNLJ   Doc. #: 76-14   Filed: 06/01/16   Page: 156 of 158 PageID #: 3043
Tina Moore v. Brian Kaminski, et al.
Michael Graham, M.D.                                                    March 8, 2016

Page 155

78:10,12,13 80:23
81:14,15 82:1
84:6 86:2 88:8,18
89:21 90:16 99:3
100:9,14 101:2
102:8,23 103:22
105:4,18,23
108:11,13,17,22
110:19,21 112:15
113:3 114:9 117:7
118:24 119:8
120:5,16,21 122:4
126:17 128:24
129:6,18,18
130:11,21
**thinks** 105:17,22
**thinner** 88:20
**third** 61:22 63:18
72:7,18 73:2,4,4,8
74:13
**thirty** 10:7
**thought** 26:6,12,20
53:20,22 55:3
58:15 85:6 121:15
125:21 130:5,18
**thoughts** 89:9
**thousand** 9:22
18:16
**three** 18:15 65:9
80:18 91:6
**thresholds** 41:14
**throat** 81:9
**throw** 108:8
**till** 69:9
**time** 6:7 8:15 11:5
13:17 16:5,15,15
16:25 20:1 28:1,4
28:6,14,15 39:2
46:18 61:22,24
65:16 68:24 69:5
69:14 70:8,10,11
70:18 72:5,12,13
72:13 73:1,16
74:12 75:1,13

77:2 78:2 80:24
96:10 112:19
115:9 116:4
125:14
**timeframe** 119:15
**times** 9:24 27:23
51:11 57:18 77:20
97:20 100:7
108:16,21 117:15
117:22
**timing** 64:14 113:1
**Tina** 1:1 2:5 3:12
3:20 6:5,9,11 7:7
29:20 135:5
**tip** 89:6
**tissue** 21:23 22:2
22:16 96:3
**tissues** 22:5,20
114:10 127:14,21
**tjohnson@batyh...**
3:10
**to-wit** 6:25
**toc** 34:10
**today** 6:3 7:8 11:6
16:16 20:7 50:2
**Today's** 6:2
**Todd** 3:5 6:13
**told** 8:18 33:20
62:6,16 75:5
**tool** 104:25
**tools** 105:9
**top** 20:6 99:10
110:19
**total** 18:20 136:6
136:12
**totally** 45:13,14
**touch** 51:15,25
121:4
**touching** 40:12
51:12
**tox** 123:22 124:9
125:20
**toxicology** 100:20
100:25 123:25

124:8 125:5,21
**track** 94:11
**trained** 100:15
**trainer** 80:9 100:18
**training** 49:8
**transcribed** 133:17
**transcript** 5:13
133:16,23 135:15
136:1
**transcripts** 137:1
**transcutaneous**
91:13,15,18
**transplant** 47:10
**transthoracic**
48:15
**treat** 47:7,15 48:1
**treated** 44:19
**treating** 47:14
**treatment** 101:6
**treats** 23:2 47:17
**trial** 7:10 133:6
**tried** 109:2,5
**trigger** 65:23 69:24
70:1,2,8 72:11,12
72:14,25 73:5,10
74:12,23 75:3
77:4
**trip** 13:4
**trips** 13:3
**true** 33:18,19 34:22
58:23,24 71:14
91:3 107:14
121:13,14,15
130:17 132:3
133:22
**truth** 6:22,22,23
133:13,13,14
**try** 9:15 39:9 47:11
57:24 80:16
102:23
**trying** 56:7 78:5
124:21
**turned** 112:22
**twenties** 104:5

**twenty** 34:20 35:18
35:19,23,25
**twice** 63:5
**two** 32:9 64:22 67:8
68:4 71:5 76:9
80:16 90:8,10
101:15 112:6
132:9
**two-thirds** 73:6,9
92:10
**type** 40:13 56:8
65:12 79:19
107:10
**types** 55:2 86:23
124:23
**typewriting** 133:18
**typical** 39:17
120:20 122:13,14
**typically** 19:16
39:21 84:9 94:3

_____

**U**

**Uh-huh** 38:9
**unclear** 110:4
**uncommon** 129:15
129:16,18
**uncontrolled** 105:7
**uncoordinated**
44:2,3,5 45:25
**underlined** 81:6
**underlying** 103:25
131:25
**understand** 13:20
17:13,14 21:1
23:9 25:3 42:10
50:9 52:17 54:15
55:13,16 56:9
65:12 66:17,19
87:6
**understanding**
12:14 22:23 36:15
42:9 64:23 68:2
98:14,20,23 99:2
116:3

**understands** 63:9
109:10
**underweight** 88:9
**undetermined**
133:5
**unequivocally**
25:19 27:8
**United** 24:8 133:5
**university** 2:20
17:17,19,22,25
18:2,5,11 21:4
133:8
**unresponsive** 110:8
111:8 119:12,14
**unusual** 32:25
108:2
**upper** 44:24
**urban** 34:14
**usage** 85:25
**use** 32:22 38:4 39:8
41:3,7 49:8 79:2
79:20,25 81:2
86:22 87:5,7 88:6
95:21 98:3,21,24
105:14,18
**user** 79:25
**users** 19:6,7
**uses** 105:23
**usually** 19:11 28:11
42:21 46:17 48:8
48:14,18,22 103:6
103:9 107:24

_____

**V**

**v-fib** 40:10,24,25
41:4,8,11,19 42:2
42:3 43:15 44:12
44:13 45:11,16,23
45:25 46:5,7 48:7
48:12,17,19 49:2
91:7 92:7 106:17
106:18,22,24
107:2,3,5,14,15
107:21 108:4,14

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                      March 8, 2016

Page 156

108:16,17,20
109:3,4,14,19
114:22,24 115:3
128:22 129:10,10
**vacation** 13:7
**vague** 40:17
**vaguely** 8:14
**value** 12:24
**valves** 43:13 96:1,2
96:3
**Van** 51:24
**variance** 76:19
**variety** 12:15 27:2
79:23
**various** 36:12
49:16
**vast** 104:4
**ventricle** 102:3,4,8
**ventricular** 40:4,16
40:19,21 41:1
42:22 45:9 129:22
129:23
**verbal** 54:9,15
55:14 56:1,9 75:6
**versus** 6:5 57:13
**vetted** 63:23
**VIDEOGRAPH...**
4:9 6:1,17 76:5,7
120:6,8 132:7
**view** 29:4
**violence** 32:14
121:7
**vision** 82:12
**volitional** 83:20,21
**volt** 52:21
**voltage** 50:21 51:3
51:22 52:23,24
64:25 82:5
**volts** 51:2,8,15,18
51:24 52:1,21
65:1,15,19
**voluminous** 7:17
**voluntary** 83:19
**vs** 1:10 2:12 135:5

**W**

**waived** 133:25
**walk** 115:24
**walking** 102:13
104:4
**wall** 90:6,10 92:21
95:1,2 129:2
**want** 9:2 20:24
29:7 36:21 37:14
50:8 51:13,15
55:18 60:8 63:21
63:22 64:4 72:20
76:11 77:10 78:18
78:24,25 80:9
81:11,18 82:6
84:11 87:20 88:10
94:16 99:5 105:11
110:10 115:24
116:9 118:7
120:12
**wanted** 62:1 79:10
85:1 86:21
100:10 110:5
112:24
**wanting** 48:16 62:7
**warm** 121:16
**warmup** 68:12
**warning** 80:5 81:11
81:13,22 82:3
84:2,7,19 85:2,3
85:11 87:5,6
97:10,23 115:9,10
115:11
**warnings** 75:6,7
78:19,21,22,23
79:5,5 81:24 84:8
84:9 85:3,4,16
88:12 96:5 97:9
97:14,25 98:11,12
98:13,22 99:6,11
100:16 115:16,19
116:1,7,13,14,16
116:16 117:7
**warns** 115:5 117:2

**warranted** 105:18
**warrants** 116:17
117:8
**wasn't** 10:25 79:2
112:23 121:22
125:7,16,18
**watching** 73:15
**way** 40:23 41:1
51:14 53:18 58:1
59:1 77:6 78:4,6,8
99:18
**ways** 43:21
**we'll** 40:25 72:22
86:23 99:25
103:22 113:22
116:8 119:23
**we're** 21:13 22:6
36:4,6 45:11 50:1
53:19 60:23 71:23
71:25 75:23 82:3
91:16 112:19
131:19
**we've** 7:7 33:11
62:14 81:25 88:10
88:11 93:15,18,19
93:25 106:16
119:19 123:21
124:2 125:19
128:6,10
**weapon** 65:13
104:25
**weapons** 11:24
**week** 17:2
**weighs** 129:25
**weight** 87:22 88:5
101:24 102:11
**well-known** 24:5
**went** 61:21 69:12
92:24 93:1 108:20
109:3,4 111:8
115:12 119:2
**weren't** 55:25,25
56:5 75:18 122:11
124:1

**WHEREOF** 137:8
**White** 29:19 109:24
110:1 112:23
113:4,9 119:16,17
**widely** 36:20,24
**widespread** 24:12
**William** 3:21 29:19
**window** 74:16
**wire** 40:13
**witness** 6:18 93:9
93:13 133:11,20
133:24 137:8
**wondering** 14:13
**word** 21:22
**words** 17:12 84:12
**work** 9:25 10:4
14:21 17:15,18
18:2 19:8 22:7,11
36:1,5 39:5,7
68:13 72:13 78:3
98:17
**worked** 27:21,24
98:15,15
**working** 20:14
42:24 45:2 107:19
**works** 40:24 71:21
123:12
**worry** 103:24
**wouldn't** 34:1
35:16,21 41:20
43:8 54:17 63:22
86:12 129:2 131:9
**wound** 94:11
**wrestling** 103:10
**write** 16:11 28:15
**writings** 130:6
131:20
**written** 46:23 47:2
81:25 86:19
130:24
**wrong** 64:1 72:21
72:22 110:2
**wrote** 50:3

**X**

**X26** 50:10,18 54:11
55:12 56:10 76:15
78:13 79:22,24
108:7,13

**Y**

**yeah** 9:20 11:12
13:10,14 17:4,10
18:19,23 23:11,18
30:17 31:22 33:4
33:5,18 39:4
43:25 44:13,23,23
45:17 46:20,22
47:25 48:18 50:7
50:14,24 52:17
53:2 57:5 59:10
65:1 70:25 71:11
71:13 77:22,25
79:20 82:15 83:13
83:24 84:3,23
86:19 92:4 93:17
94:2,5 96:3,4,24
97:16 99:24
102:23 103:12,15
105:22,23 106:13
107:23,24 117:8
118:17,17 119:7
119:11,13 121:21
122:4,19,20
127:22 129:6,18
129:25 131:3,5
**year** 10:19,21 15:3
15:15 16:22 17:5
18:16 28:7,9 35:9
**years** 10:6,14 11:4
11:8,22 12:2,10
15:5,6 19:19
20:22 21:5 33:11
33:22 34:20,22
35:16,18,19,23
37:12 38:25 39:5
55:3 80:9 100:13
**yelling** 61:12

Tina Moore v. Brian Kaminski, et al.

Michael Graham, M.D.                                                    March 8, 2016

Page 157

| | | | |
|---|---|---|---|
| **young** 103:8,12,13 103:16 104:1,14 104:19 **youth** 104:1 | **18** 88:4 **18th** 28:7 **19** 65:6 76:17,18,23 77:20 78:7 79:2,4 94:22 95:9 99:3 100:17 **1980s** 35:11 **1989** 21:8 **1990s** 35:2 | **30's** 103:14 **300,000** 17:4,5 **30s** 104:17 **314** 3:17 4:6,14 **317** 110:23,24 111:3 **32** 94:22,24,25 **35** 33:11,22 **36** 64:19 65:8 76:13 **380** 77:21,22 | **6** 69:11 92:9 **6:46** 61:6 **6:53:17** 68:19 69:8 **60** 5:5 17:22 18:12 18:18 **600** 51:6 **63101** 4:13 135:19 136:5 137:7 **63102** 3:24 4:5 136:11 **63104** 2:22 133:9 **63117** 3:16 **64112-3012** 3:8 |

**Z**

**Zipes** 23:14,25 25:15 26:5 27:15 86:11,13
**Zipes'** 24:15 25:3

**0**

**084.004741** 2:25 134:11

**1**

**1** 5:5 60:23,24 65:8 136:7
**1,200** 52:3
**1,400** 64:20 65:1
**1,400-volts** 52:4
**10** 92:21
**100** 4:4 9:21 52:10 91:17,19 136:10
**105** 121:12
**107** 121:12
**110** 5:6 51:8 52:11
**111** 5:7
**12** 112:6,7
**13** 94:5,24 95:10 102:9
**13-millimeter** 93:6 93:13 95:12
**130** 88:2 101:12 102:7
**132** 5:8
**134** 101:25 130:1
**13th** 134:7
**14** 52:12
**1402** 2:21 133:8
**15** 15:6 55:2 92:21 112:7
**16-1/2** 65:3
**16.5** 76:15
**17** 92:6

**2**

**2** 5:6 110:10,14
**2,520** 65:1
**2,520-volts** 64:21
**2.1-milliamps** 52:8
**2:08** 2:23 6:1
**20** 10:6 15:6 35:16 65:3 76:15 77:16 77:17,19,20 94:6
**20-year** 103:20
**2001** 26:1
**2009** 38:24
**2016** 1:23 2:22 6:2 38:2 133:10 134:7
**202** 3:15
**21** 112:4
**210** 3:7
**211** 3:23 135:18 136:4
**220-volt** 40:12
**23** 91:25 95:16 112:14
**241-6750** 4:14
**26** 29:25
**28** 38:2

**3**

**3** 5:7 111:11,12,16 112:20
**3/8/2016** 135:13
**3:24** 76:5
**3:34** 76:7
**30** 10:6 37:12 55:3 120:22

**4**

**4** 5:8 66:21 92:10 132:10
**4-** 51:6
**4:14-CV1443** 2:12
**4:14-CV1447** 2:13
**4:22** 120:6
**4:31** 120:8
**4:44** 2:23 132:8
**40** 17:23 18:23 83:12,22 121:19 122:23
**40's** 103:14
**400** 4:4 51:5 102:6 129:25 136:10
**400-gram** 101:12
**4050** 3:23 135:18 136:4
**421-5545** 4:6
**45** 83:22
**4600** 3:7

**5**

**5** 69:3,12,13 90:25 91:21
**5.1** 69:1
**50,000-volt** 52:21
**50,000-volts** 50:19 50:21,23 53:3
**500** 15:25 16:3,16
**515** 4:12 137:6
**55** 93:8,11

**6**

**7**

**7** 5:2 92:20 94:1
**7-millimeter** 92:14
**70-year** 103:10
**700** 4:12 137:6
**72-inches** 87:25
**75-year** 103:10
**779** 2:25 134:11

**8**

**8** 1:23 6:2
**80s** 10:24 11:1 35:12
**8151** 3:15
**816-531-7200** 3:9
**85** 52:10
**863-4114** 3:17
**88** 112:4
**89** 112:13
**8th** 2:22 133:10

**9**

**9** 93:2,5
**90** 112:20
**90s** 10:25
**911** 61:7
**947** 68:12
**948** 68:18