UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TINA MOORE, individually and as | ) | |
| Personal Representative of the ESTATE OF | ) | |
| JASON MOORE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 4:14-cv-1443 SNLJ |
| | ) | No. 4:14-cv-1447 SNLJ |
| vs. | ) | CONSOLIDATED |
| | ) | |
| CITY OF FERGUSON, MISSOURI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM and ORDER

Plaintiffs' decedent, Jason Moore, died during an altercation with police in Ferguson, Missouri.  Plaintiffs are decedent's relatives; they have filed this lawsuit against the City of Ferguson, Officer Brian Kaminski in his official and individual capacities, and Thomas Jackson in his official capacity as Chief of Police for the Ferguson Police Department.[1]  Defendants have filed a motion for summary judgment (#62).  The matter has been fully briefed and is now ripe for disposition.

## I.    Background

The following facts are undisputed unless otherwise indicated.[2]  Jason Moore was a 31-year-old man weighing approximately 135 pounds when he encountered police in

---

[1] Numerous other defendants have been dismissed from the case.

[2] Plaintiffs dispute many of defendants' factual statements, suggesting that because defendant Kaminski is the only living witness to the event described in the complaint, the Court should discredit his testimony and make "reasonable inferences" in favor of plaintiffs.  In the absence of citations to evidence refuting the evidence submitted with defendant's statement of facts, however, the Court must consider those facts admitted.

the early morning of September 17, 2011.  Mr. Moore was near his Ferguson, Missouri home when he took his clothes off and ran naked down the street yelling "God is good," "glory to God," and "I am Jesus."  Several 911 calls were made by individuals nearby, and Ferguson Police Department officers were dispatched.

Defendant Officer Kaminski was first on the scene.   As Kaminski arrived in the area, he was flagged by a woman in a vehicle who advised Kaminski that the naked individual was nearby at the intersection of Airport Road and Henquin.  Officer Kaminski proceeded to that area and saw Mr. Moore, naked, walking from behind a building and standing near the curb of Airport Road.  There was light traffic on the roadway, and it was just becoming daylight.

Officer Kaminski walked toward Mr. Moore and ordered him to come to Kaminski, away from the street.  Then he ordered Mr. Moore to stop and get on the ground.  Instead, Mr. Moore began running at Kaminski, swinging his fists aggressively in a pinwheel motion.[3]   Kaminski stepped backwards, but Mr. Moore continued to advance aggressively, so the officer unholstered his Taser and gave a third command to stop or else Moore would be Tased.   Mr. Moore continued to aggressively move toward Officer Kaminski, so Kaminski deployed the Taser.  The Taser shot two metal darts or probes at Mr. Moore and, although Kaminski could not see exactly where the darts

_____

[3] Plaintiffs dispute that Moore swung his fists "in a pinwheel motion" and cite to a Use of Force Memorandum that they state does not mention the "pinwheel motion."  Kaminski denies authoring the Use of Force ("UOF") Memorandum (rather, another officer drafted it with information provided by Kaminski).  Moreover, the UOF Memorandum does state that Moore "started running towards me swinging my fist in an aggressive manner."  (#80 at Ferg1882.)  The UOF Memorandum is therefore not inconsistent with other written descriptions of Moore's behavior prior to being Tased.

landed, they attached at Moore's right chest and his leg.  Kaminski had been aiming at the right side of Mr. Moore's body, near his hip.  The Taser darts delivered a 50,000-volt shock that lasting five seconds.   Mr. Moore fell forward onto the ground.  Kaminski commanded Mr. Moore to stay on the ground, but Moore attempted to rise up.  Kaminski applied another Taser cycle.

Non-party Officer White arrived just after Kaminski applied the second Taser cycle.  He heard Kaminski giving orders to Moore to stay down, and he saw Moore trying to get back up.  Although plaintiffs dispute just how far up Mr. Moore managed to move before being Tased again, plaintiffs appear to agree Moore raised himself up at least 6 inches.  Moore was also yelling something indecipherable.  Kaminski recalls Tasing Mr. Moore a third time, at which time White was able to handcuff Mr. Moore.

The Taser device data is somewhat helpful.  The Taser's data shows that the trigger was activated four times during the relevant period.  The activation times and the duration of the Tases are as follows:

| | |
|---|---|
| 6:53:17 | 6 second duration |
| 6:53:22 | 5 second duration |
| 6:53:28 | 5 second duration |
| 6:53:34 | 5 second duration |

The Taser's data download, however, advises that activation times are recorded at the time that the firing cycle ended, and that the activation durations recorded in the activation log are rounded up to the next second after 0.010 seconds.  Thus, the activation log shows that the second cycle might have started up to 0.89 seconds after the first Taser

cycle, and up to 1.99 seconds passed between each of the second and third and third and fourth Taser cycles.

After Mr. Moore was handcuffed, Emergency Medical Services ("EMS") was called to respond to the location.  Officer White attempted to speak to Mr. Moore but noticed Moore was unresponsive and not breathing.  Officer White rolled Mr. Moore onto his back and removed the handcuffs to begin chest compressions.  At that point, Officer White was able to see that the Taser probes had attached at Mr. Moore's chest and leg.  EMS was advised that Mr. Moore had stopped breathing and to expedite their arrival.  The officers continued administering chest compressions until EMS arrived.  Mr. Moore was transported to a hospital, where he was pronounced dead.  Although the Assistance Medical Examiner, Kamal Sabharwal, M.D., ruled the manner of death as "natural" and the immediate cause of death as being "Agitated Delirium secondary to Psychosis," plaintiffs dispute that characterization.  Plaintiffs' expert Philip Cuculich, M.D., testified that the third and fourth applications of the Taser more likely than not caused or contributed to  Mr. Moore's death.  The Ferguson Police Department's subsequent investigation made no determination as to whether or not Officer Kaminski's use of force violated the FPD's written policies and procedures and no one was disciplined.

Mr. Moore's family members filed lawsuits that were consolidated into this matter.  The plaintiffs filed a consolidated complaint asserting three counts.  After dismissing some parties, the following counts remain:

> Count I:  Violation of Mr. Moore's Fourth and Fourteenth Amendment rights by using excessive force under 42 U.S.C. § 1983 against Officer Kaminski

Count II:  Municipal liability for the violation of Mr. Moore's Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983 against the City of Ferguson and Chief Thomas Jackson

Count III:  Wrongful death against Officer Kaminski

Defendants have moved for summary judgment as to all three counts.

## II.   Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962).  The burden is on the moving party.  *City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).  After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts.  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts.  *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983).  The court is required to resolve all conflicts of evidence in favor of the nonmoving party.  *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976).

III.    **Discussion**

A.      **Count I --- Excessive Force against Officer Kaminski**

Plaintiffs maintain that defendant Kaminski used excessive force in attempting to "seize" Mr. Moore, thereby violating his Fourth Amendment rights.  To establish a violation of Fourth Amendment rights under 42 U.S.C. § 1983, plaintiff must show that a seizure occurred and that it was unreasonable.  *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989).  The Fourth Amendment to the  United States Constitution prohibits the use of excessive force during the seizure of a free citizen.  *Graham v. Connor*, 490 U.S. 386, 388 (1989); *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998).  The test for determining whether excessive force was used is whether the amount of force used was reasonable under the circumstances.  *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009).  The Court evaluates the reasonableness of an officer's use of force from the perspective of a reasonable officer on the scene, rather than with the benefit of hindsight. *Id.*  "This calculus allows for the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation."  *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  "A threat to an officer's safety can justify the use of force in cases involving relatively minor crimes."  *Id.*

Here, Mr. Moore posed an immediate threat to Officer Kaminski as he rushed toward him with his closed fists pinwheeling.  Mr. Moore ignored commands to get on the ground.  Despite plaintiffs' argument that Kaminski outweighed Moore and that Moore had no weapons, Mr. Moore's behavior --- running around naked yelling "Glory to God" and "I am Jesus" in the street --- suggested psychological disturbance whether organically caused or drug-induced.  It appears that the first Taser cycle was reasonable

6

under the circumstances.  Officer Kaminski did not see where the Taser probes attached to Mr. Moore, but he did see Mr. Moore attempt to get up after falling to the ground.  Just how far up Mr. Moore progressed is disputed.  Some evidence says he was sitting on his knees, but the plaintiffs maintain he was on his back, raised up only about six inches. Kaminski fired the Taser again, at which time Officer White arrived.  Officer White observed Officer Kaminski yelling loudly for Mr. Moore to stay on the ground, and he heard Mr. Moore yelling as well.  Officer White corroborates that Mr. Moore again attempted to sit up.  Kaminski fired the Taser again, and at that time White was able to place Mr. Moore in handcuffs.  Shortly thereafter, White realized Mr. Moore was not breathing and began chest compressions.

Officer Kaminski's version of the events --- which is in part corroborated by Officer White's testimony --- makes the use of force sound reasonable, but the data from the Taser itself tells a somewhat different story and must be considered.  The Taser data shows that Kaminski fired the Taser four times, not the three times that Kaminski remembers.  Kaminski testified he has no reason to dispute the Taser data.  Further, the Taser data shows that approximately 0.89 second --- less than one second --- passed between the end of the first Taser cycle and the start of the second.  Then, less than two seconds passed between the second and third and third and fourth cycles.

A question of fact exists regarding whether the Tasings were reasonable under the circumstances.  One to two seconds may be a long time in the context of neutralizing a threat to an officer, and the Court understands that "split-second decisions" would apply here, in a circumstance that was indeed "tense, uncertain, and rapidly evolving."  *Brown*, 574 F.3d at 496.  But it is a question for a jury whether or not one to two seconds constitutes a reasonable amount of time to allow someone to recover from the electrical

shock of a 50,000 volt, five-second-long Tasing cycle, give a command to stay on the ground, and observe whether or not the individual complies or resists commands.  Many factors are at play here: the reliability and meaning of the Taser data, how upright Mr. Moore was able to get himself in between Tasings, and the general threat Mr. Moore could have posed to Officer Kaminski as an unarmed person who never became completely vertical before being serially Tased, just to name a few.  Resolving disputes in favor of the plaintiffs here requires that the Court deny summary judgment to defendant Officer Kaminski.

As for defendant Kaminski's qualified immunity defense, the Court denies summary judgment on that ground as well.  "Qualified immunity is a defense available to government officials if they have not violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Amrine v. Brooks*, 522 F.3d 823, 831 (8th Cir. 2008) (quoting *Young v. Selk*, 508 F.3d 868, 871 (8th Cir. 2007)).  It "allows officers to make reasonable errors so that they do not always err on the side of caution" for fear of being sued. *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996) (internal quotation omitted); *see Davis v. Scherer*, 468 U.S. 183, 196 (1984). "This defense provides 'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law." *Amrine*, 522 F.3d at 831 (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).

Qualified immunity determinations are based on a two-part inquiry. First, the court determines whether the alleged facts, viewed in the light most favorable to the injured party, demonstrate that the official's conduct violated a constitutional right. *Amrine*, 522 F.3d at 831. Second, if the answer to that inquiry is yes, the court asks whether the constitutional right was clearly established at the time so that a reasonable officer would

8

have understood that his conduct violated that right. *Amrine*, 522 F.3d at 831.  The law was established that "non-violent, non-fleeing subjects have a clearly established right to be free from the use of tasers." *De Boise v. Taser Intern., Inc.*, 760 F.3d 892, 987 (8th Cir. 2014) (citing *Brown*, 574 F.3d at 499-500, a 2009 case).  *De Boise* explored whether officers who Tased an arrestee under similar circumstances to those here were entitled to qualified immunity in an excessive force case where the arrestee continued to struggle and ignore commands.  The *De Boise* court determined that because the arrestee there continued to resist, and the state of the law at the time would not have placed an officer on notice that he must limit the use of his Taser in certain circumstances even in the face of a resisting arrestee, that the officer was entitled to qualified immunity.  *Id.*  The result is not the same here.  If Mr. Moore was not violent, resisting, or fleeing in between Tasings, then he had a "clearly established right to be free from the use of tasers."  *Id.* Whether Mr. Moore was resisting at all in the intervals between Tasings is an issue for the jury to determine.  *See, e.g.*, *Van Raden v. Larsen*, No. 13-2283 (DWF/LIB), 2015 WL 853592, at *7 (D. Minn. Feb. 26, 2015) (addressing qualified immunity and the reasonable use of a taser).

### B.     Count II --- Municipal Liability

Plaintiffs' claims in Count II include

- that Mr. Moore's constitutional rights were violated as a result of policies and customs of the City of Ferguson; and

- that defendants City of Ferguson and Chief Thomas Jackson failed to train defendant officer Kaminski and failed to supervise and investigate in a manner which deprived Mr. Moore of his Fourth Amendment Constitutional rights.

9

A "municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). A "policy" is a "deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Id.* A "custom" is an unofficial practice characterized by a "continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees." *Id.* Plaintiffs allege that circumstances here suggest a custom of excessive force being used by Ferguson police.

In order to prove a municipal custom exists, the plaintiff must demonstrate:

(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3) The plaintiff['s] injury by acts pursuant to the governmental entity's custom, *i.e.*, [proof] that the custom was the moving force behind the constitutional violation.

*Mettler*, 165 F.3d at 1204 (internal citations omitted). Defendants argue that plaintiffs have no evidence to support any of the three factors.

Plaintiff allege that there is an unofficial custom by Ferguson Police Department[4] ("FPD") officers to use excessive force.

Most of plaintiffs' evidence in support of their claim regarding FPD's unofficial custom is derived from a report published by the United States Department of Justice ("DOJ") on March 4, 2015 (the "Report"). The Report contains the results of an

---

[4] Because the FPD is a part of the City of Ferguson, the FPD is not a separate defendant in this matter.

investigation initiated under the pattern-or-practice provision of the Violent Crime
Control and Enforcement Act of 1994, 42 U.S.C. § 14141, the Omnibus Crime Control
and Safe Streets Act of 1968, 42 U.S.C. § 3789d ("Safe Streets Act"), and Title VI of the
Civil Rights Act of 1962, 42 U.S.C. § 200d ("Title VI").   Plaintiffs contend that the DOJ
Report's findings are admissible evidence, despite defendants' hearsay objection, because
the factual findings of a legally authorized investigation are admissible pursuant to
Federal Rule of Evidence 803(8).  Defendants suggest that the Report's summaries are
unreliable and that they do not provide the detailed evidence required to meet the
plaintiffs' burden regarding the existence of municipal custom.  The Report is
undoubtedly within the hearsay exception set out by Federal Rule of Evidence
803(8)(A)(iii).  Defendants are free to challenge the reliability and accuracy of the
Report's summaries.  But for the purposes of summary judgment, and as explained
below, the evidence relied upon by the plaintiffs is properly before this Court.

### 1.    Evidence of Pattern of Unconstitutional Misconduct

Plaintiffs' main evidence in support of the existence of a "continuing, widespread,
persistent pattern of unconstitutional conduct" by FPD officers is contained in the DOJ
Report.  The Report concluded that the FPD engages in a pattern of excessive force in
violation of the Fourth Amendment  and that, specifically, the FPD's use of "electronic
control weapons" ("ECWs") such as Tasers is "unreasonable."  Furthermore, the Report
observed that the "[o]verwhelming majority of force --- almost 90% --- is used against
African Americans" and that the FPD demonstrated a "pattern of insufficient sensitivity
to, and training about, the limitations of those with mental health conditions or
intellectual disabilities."

11

Plaintiffs cite to at least five incidents of excessive force that occurred before Jason Moore was Tased.  Those incidents occurred between August 2010 and August 2011 and involved ECWs or Tasers.  At least four of the five involved African-American men.  Although defendants dispute the details of these incidents, five instances of excessive force --- involving Tasers --- predating the events of this matter over the course of just one year constitutes more than isolated incidents.  *See Ware v. Jackson County, Mo.*, 150 F.3d 873, 881-82 (8th Cir. 1998).

Moreover, although the Report noted that the FPD had a procedure for documenting and reviewing use of force by officers, the DOJ determined that the "requirements are not adhered to in practice."  The DOJ further stated that it "learned of many uses of force that were never officially reported or investigated from reviewing emails between FPD supervisors."[5]

Similarly, the DOJ Report observed that Ferguson supervisory personnel have a custom of failing to "review critical evidence even when it is readily available."  In keeping with the FPD's failure to adhere to its own policies related to use of force review, plaintiff further points out that the FPD's investigation of this matter was limited --- in fact, no one at the FPD initiated the "data download" for the Taser used on Mr. Moore until four years after the incident, after this lawsuit was well underway.  This evidence is perhaps more germane to the second factor, however, to which the Court turns next.

---

[5] The plaintiff requested the "emails between FPD supervisors" that had been provided to the DOJ, but the emails had not been produced as of the date of plaintiffs' response memorandum.

2.      **Evidence of deliberate indifference to or tacit authorization of such conduct by Ferguson's policymaking officials after notice to the officials of that misconduct**

Having set forth evidence of a pattern of the use of excessive force by Ferguson officers, plaintiffs must next set forth evidence supporting that the City of Ferguson and Chief Jackson were deliberately indifferent to or tacitly authorized police officers' use of excessive force.  Again, the DOJ Report supports plaintiffs' claims.  The Report concludes that Ferguson police officers do not minimize their use of force but rather "respond with impatience, frustration, and disproportionate force" and that "FPD's weak oversight of officer use of force…facilitates this abuse."  Although official FPD policy "prohibits use of force unless reasonable alternatives have been exhausted or would clearly be ineffective," the DOJ found that "FPD officers routinely engage in the unreasonable use of ECWs, and supervisors routinely approve their conduct."  Specifically, "[s]upervisors seem to believe that any level of resistance justifies any level of force" and those supervisors "almost never actually investigate force incidents."  In fact, "though contrary to policy, supervisors almost never interview non-police witnesses, such as the arrestee or any independent witnesses" and, critically, "[t]hey do not review critical evidence even when it is available."

As Chief of Police at the time of the incident in question here, defendant Chief Jackson was the individual designated by the Mayor and City Council to "have general supervision and control of the police department, including the enforcement of discipline among the members thereof and the instruction of the members in their duties."  City of Ferguson Code of Ordinances, § 33-18.  Chief Jackson testified that he had never disciplined an officer for using excessive force.  Although the fact that Chief Jackson had never disciplined an officer for using excessive force is not at all dispositive, it is some

evidence that supports plaintiffs' claims, particularly in light of the DOJ Report's findings.

Plaintiffs have adequately shown that evidence exists to support their contention that the defendant Chief Jackson and City of Ferguson have been deliberately indifferent to or tacitly authorized the FPD's custom of using excessive force.  The DOJ found that the custom and practice of use of excessive force was the direct result of the failure to properly supervise and discipline officers by investigating and enforcing the FPD's own use of force policies.

### 3.     The custom of excessive force was the moving force behind Jason Moore's death

Finally, plaintiffs must prove that Ferguson's deliberate indifference to or tacit authorization of officers' use of excessive force was the "moving force" behind Jason Moore's death.  The Eighth Circuit has held that, "where it becomes clear that an employee or group of employees needs close and continuing supervision and the municipality fails to provide such supervision, the inevitable result is a continuation of the misconduct."   *Ware*, 150 F.3d at 885 (internal quotation to *Harris v. City of Pagedale*, 821 F.3d 499, 508 (8th Cir. 1987) omitted).  Plaintiffs' evidence supports exactly that:  as stated in the Report, there is evidence that Ferguson did not enforce its own policies regarding the appropriate use of ECWs during interactions with the public. There is also evidence from which a jury may find that Jason Moore was excessively Tased.  The evidence is therefore sufficient to show that Ferguson's failure to address the persistent use of excessive force by police officers was the "moving force" behind the violation of Moore's constitutional rights.

14

### 4.      Failure to Train Claim

As for plaintiffs' claim that defendants failed to properly train FPD officers, defendants argue they cannot be liable because training is the responsibility of the State of Missouri, not the City.  *See Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014).  Indeed, state law requires that all officers be trained not by municipalities, but by the Missouri Department of Public Safety.  *Id.*  Although the DOJ found that the FPD officers were insufficiently trained on tactics that would minimize force when dealing with individuals in mental health crisis, that training is the responsibility of the state.  *See id.*  In any event, Kaminski did receive training from the Taser manufacturer and in fact is a Taser instructor himself; further, he testified that he was trained to know that an unarmed citizen should never be Tased unless he poses a serious threat of injury or death to themselves or others.  Plaintiffs' complaints regarding training are thus primarily that Kaminski received the training but did not apply the training.  The claim that Ferguson officers received insufficient training is therefore untenable, and summary judgment will be granted as to failure to train.

Defendants' motion for summary judgment on Count II is therefore granted with respect to the failure to train claim but denied with respect to the rest of Count II.

### C.      Count III --- Wrongful Death against Defendant Kaminski

Defendant Kaminski contends that the wrongful death count against him should be disposed of because, he says, official immunity applies.  This Court addressed defendant's official immunity argument with respect to Count III as part of its memorandum addressing defendants' Motion to Dismiss.  The Court denied the motion to dismiss as to Count III because Missouri law is clear that official immunity does not

15

apply to discretionary acts that were performed "in bad faith or with malice." *Teasley v. Forler*, 548 F. Supp. 2d 694, 710 (E.D. Mo. 2008).

It remains true that defendant Kaminski's actions are classified as discretionary as opposed to "ministerial acts," which are of a clerical nature. *Id*. However, defendant argues that no evidence supports that Kaminski acted with malice or bad faith because he did not use force until Mr. Moore charged him aggressively and then failed to comply with orders to stay on the ground. "[M]alice is defined to include 'reckless indifference to the rights of others.'" *Estate of Snyder v. Julian*, 789 F.3d 883, 887 (8th Cir. 2015) (quoting *State ex. rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 446–47 (Mo. banc 1986)).  In *Snyder*, a parole officer argued that he had official immunity for the discretionary act of shooting a parolee in the back while attempting to apprehend him. *Id*.  The parolee died from his injuries.  The defendant parole officer testified that he believed the decedent was going to attack him and that he fired the gun as the parolee was turning.  The Eighth Circuit affirmed that the evidence was sufficient to support a finding that the officer acted with reckless indifference  to the decedent's rights --- the decedent was unarmed, was running away, and posed no threat to the officer when the officer fired.  *Id.*

Here, though it is a close call, the evidence could support a finding that because Mr. Moore was unarmed and on the ground and so little time passed between Tasings, defendant Kaminski acted with reckless indifference to Mr. Moore's rights.  Official immunity is therefore denied to defendant Kaminski.

16

Case: 4:14-cv-01443-SNLJ   Doc. #:  93   Filed: 10/04/16   Page: 17 of 17 PageID #: 3628

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment

(#62) is DENIED in part and GRANTED in part.

**IT IS FURTHER ORDERED** that summary judgment is GRANTED to

defendants on plaintiffs' failure to train claim.

Dated this  4th  day of October, 2016.

_____

STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE